CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

STEVEN A. MYERS (NY Bar # 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Rm. 7334
Washington, DC 20530
Tel: (202) 305-8648
Fax: (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURVJUSTICE, INC., EQUAL RIGHTS ADVOCATES, and VICTIM RIGHTS LAW CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, in her official capacity as Secretary of Education, CANDICE JACKSON, in her official capacity as Acting Assistant Secretary for Civil Rights, and U.S. DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 18-cv-0535-JSC <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS** <br><br> Magistrate Judge: Jacqueline Scott Corley <br> Hearing: June 28, 2018, 9:00 a.m. <br><br> Phillip Burton Federal Building & United States Courthouse, Courtroom F, 15th Floor, <br> 450 Golden Gate Ave., San Francisco, CA 94102 |

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

I.     Introduction and Statement of Issues ..............................................................................1

II.    Background ......................................................................................................................2

       A.     Statutory and Regulatory Background ...................................................................2

       B.     Plaintiffs .................................................................................................................4

III.   Legal Standard ................................................................................................................4

IV.    Argument .........................................................................................................................4

       A.     Plaintiffs Lack Standing .........................................................................................4

       B.     The Court Should Dismiss Plaintiffs' APA Claims ..............................................16

       C.     The Court Should Dismiss Count Two Because the Complaint Contains No
              Plausible Allegation That Defendant Engaged in Ultra Vires Action. ...............20

       D.     The Court Should Dismiss Count Three Because Plaintiffs Do Not Plausibly
              Plead That Defendants' Purpose Was to Discriminate Against Women. ............21

V.     Conclusion ....................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Airline Serv. Providers Ass'n v. L.A. World Airports*,
    873 F.3d 1074 (9th Cir. 2017) ................................................................ 16

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
    632 F. App'x 905 (9th Cir. 2015) ............................................................ 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).............................................................. 21, 22, 23, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................... 4, 22

*Ass'n of Flight Attendants-CWA v. Huerta*,
    785 F.3d 710 (D.C. Cir. 2015) .......................................................... 17, 18

*Avenue 6E Invs., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) ........................................................... 23, 24

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1988) ................................................................. 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................... 4

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................... 16

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)......................................................................... 23

*Brust v. Regents of Univ. of Cal.*,
    2009 WL 8634478 (E.D. Cal. Oct. 20, 2009) ................................................. 15

*Cal. Dep't of Water Res. v. FERC*,
    341 F.3d 906 (9th Cir. 2003) ................................................................ 17

*Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*,
    No. 15-912, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015)...................................... 20

*City of San Diego v. Whitman*,
    242 F.3d 1097 (9th Cir. 2001) ............................................................... 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)................................................................... *passim*

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987) ........................................................................ 19

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
    657 F.3d 936 (9th Cir. 2011) ................................................................... 10, 12

*Ctr. for Envt'l Health v. Vilsack,*
    No. 15-1690, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ........................ 20

*Diamond v. Corizon Health, Inc.*, No.16-cv-03534-JSC,
    2016 WL 7034036 (N.D. Cal Dec. 2, 2016) ................................................ 16

*Doe v. Brandeis Univ.,*
    177 F. Supp. 3d 561 (D. Mass. 2016) ............................................................. 8

*Doe v. Obama,*
    670 F. Supp. 2d 435 (D. Md. 2009) ............................................................. 15

*Fair Emp't Council of Washington, Inc. v. BMC Mktg. Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994) ..................................................................... 12

*Fair Hous. of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002) .......................................................................... 6

*Fair Hous. of Marin v. Combs,*
    No. C 97–1247 MJJ, 2000 WL 365029 (N.D. Cal. Mar. 29, 2000) ............ 12

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,*
    543 F.3d 586 (9th Cir. 2008) ....................................................................... 17

*Fla. Dep't of State v. Treasure Salvors, Inc.,*
    458 U.S. 670 (1982) ..................................................................................... 20

*Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA,*
    313 F.3d 852 (4th Cir. 2002) ....................................................................... 17

*Goldstein v. Costco Wholesale Corp.,*
    278 F. Supp. 2d 766 (E.D. Va. 2003) .......................................................... 15

*Goss v. Lopez,*
    419 U.S. 565 (1975) ....................................................................................... 8

*Griffith v. FLRA,*
    842 F.2d 487 (D.C. Cir. 1988) ................................................................ 20, 21

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ....................................................................................... 5

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.,*
    408 F.3d 638 (9th Cir. 2005) ....................................................................... 17

*Indus. Safety Equip. Ass'n, Inc. v. EPA*,
  837 F.2d 1115 (D.C. Cir. 1988) ........................................................... 17

*Jimenez v. Tsai*,
  No. 5:16-cv-04434-EJD, 2017 WL 2423186 (N.D. Cal. June 5, 2017) ........................... 12

*Kokkonen v. Guardian Life Ins.*,
  511 U.S. 375 (1994) ...................................................................... 4

*Laird v. Tatum*,
  408 U.S. 1 (1972) ........................................................................ 6

*La Asociacion de Trabadjadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010) .................................................... *passim*

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ............................................................ 24

*Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*,
  145 F.3d 1017 (9th Cir. 1998) ........................................................... 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 5

*Mada-Luna v. Fitzpatrick*,
  813 F.2d 1006 (9th Cir. 1987) ........................................................... 19

*Nat'l Taxpayers Union, Inc.v, U.S.*,
  68 F.3d 1428 (D.C. Cir. 1995) ........................................................... 13

*Nat'l Wrestling Coaches Ass'n v. ED*,
  383 F.3d 1047 (D.C. Cir. 2004) .......................................................... 19

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................... 19

*Navarro v. Block*,
  72 F.3d 712 (9th Cir. 1995) ............................................................. 24

*Nyunt v. Chairman, Broad. Bd. Of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ........................................................... 20

*Pac. Maritime Ass'n v. Nat'l Labor Relations Bd.*,
  827 F.3d 1203 (9th Cir. 2016) ........................................................... 20

*Parsons v. DOJ*,
  878 F.3d 162 (6th Cir. 2017) ............................................................ 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ...................................................................... 20

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ............................................................................................ 11

*Pers. Admin'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ........................................................................................ *passim*

*Powers v. Ohio*,
  499 U.S. 400 (1991) ................................................................................................ 16

*Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ............................................................................. 18

*Raines v. Byrd*,
  521 U.S. 811 (1997) .................................................................................................. 4

*San Diego Cty. Gun Rights Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) ................................................................................... 6

*Schlesinger v. Reservists Committee to Stop the War*,
  418 U.S. 208 (1974) ............................................................................................... 14

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................................ *passim*

*Sierra Club v. U.S. Nuclear Regulatory Comm'n*,
  825 F.2d 1356 (9th Cir. 1987) ............................................................................... 18

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ................................................................................................... 5

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................. 5

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ........................................................................................... 16

*United States v. City & Cty. of San Francisco*,
  748 F.Supp. 1416 (N.D. Cal. 1990) ....................................................................... 15

*Valley Forge Christian Coll. v. Ams. United for Separation of Church &
  State*,
  454 U.S. 464 (1982) ................................................................................................. 5

*W. Oil & Gas v. EPA*,
  633 F.2d 803 (9th Cir. 1980) ................................................................................. 18

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................................... 22

*Younger v. Harris*,
   401 U.S. 37 (1971) ................................................................................................ 6

**STATUTES**

5 U.S.C. § 553 ..................................................................................................... 19

5 U.S.C. § 704 ........................................................................................... 1, 16, 18

20 U.S.C. § 1681 .................................................................................................. 2

20 U.S.C. § 1682 .................................................................................................. 2

110 Ill. Comp. Stat. 155/25(b)(5) (West 2014) ................................................ 10

Cal. Educ. Code § 67386(a)(3) (West 2012) .................................................... 10

**RULES**

Fed. R. Civ. P. 12 ........................................................................................... 4, 16

**REGULATIONS**

34 C.F.R. § 106.8(b) ....................................................................................... 2, 13

66 Fed. Reg. 5512-01 (Jan. 19, 2001) ................................................................ 2

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE THAT on June 28, 2018, at 9:00 a.m., before the Honorable Jacqueline Scott Corley, Courtroom F, 15th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants U.S. Department of Education (ED), Secretary of Education Betsy DeVos, and Acting Assistant Secretary for Civil Rights Candice Jackson (in their official capacities) will and hereby do move the Court for an order dismissing the Complaint filed by Plaintiffs SurvJustice, Inc. (SurvJustice), Equal Rights Advocates (ERA), and the Victim Rights Law Center (VRLC).

Defendants' motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the Court's files and records in this action; Plaintiff's Amended Complaint; any matter that may be judicially noticed; and any other matter that the Court may consider at any oral argument that may be presented in support of this motion. Pursuant to the Court's Order of March 29, 2018, *see* ECF No. 37, Plaintiffs' opposition or other response to this motion must be filed with the Court and served on counsel for Defendants on June 1, 2018.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    Introduction and Statement of Issues**

In this action, three advocacy groups challenge certain guidance documents describing how ED will exercise its enforcement authority under Title IX of the Education Amendments of 1972 (Title IX) with respect to alleged sexual misconduct at educational institutions receiving Federal funding. Because Plaintiffs have no more than "a mere 'interest in'" the guidance documents and ED's Title IX policies, *see Sierra Club v. Morton*, 405 U.S. 727, 739 (1972), this case should be dismissed for lack of standing.

In the alternative, the case should be dismissed for failure to state a claim on which relief may be granted. The challenged documents are not final agency action, precluding any challenge under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 704. The challenged documents are plainly not ultra vires, barring any claim for nonstatutory review. And because Plaintiffs have failed to adequately plead that Defendants intended to discriminate on the basis of sex, their equal protection challenge fails.

## II.   Background

### A.   Statutory and Regulatory Background

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). ED is authorized to "issue[] rules, regulations, and orders of general applicability," and, among other actions, to initiate proceedings to terminate Federal financial assistance if voluntary compliance with such rules cannot be secured. 20 U.S.C. § 1682. ED requires each recipient to "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part." 34 C.F.R. § 106.8(b).

ED's Office for Civil Rights (OCR) has issued a number of guidance documents regarding enforcement of this regulation. In 2001, OCR issued *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512-01 (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance], which "provide[s] the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."

In 2011 and 2014, OCR issued a Dear Colleague Letter (DCL), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter 2011 DCL] and a document titled *Questions and Answers on Title IX and Sexual Violence*, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Q&A], both of which supplemented the 2001 Guidance and addressed sexual violence as a form of sexual harassment covered under Title IX. The documents indicated that they did "not add requirements to applicable law, but provide[d] information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations." 2011 DCL at 1 n.1; 2014 Q&A at i n.1. Among other things, these documents advised schools as follows:

1.   Schools may employ voluntary informal mechanisms to resolve sexual harassment complaints. *See* 2011 DCL at 8.

---

*SurvJustice, Inc. v. DeVos*, **No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss**

2. OCR interpreted § 106.8(b) to require that schools use a preponderance of the evidence standard in their procedures for resolving Title IX complaints. 2011 DCL at 10–11 & n.26; 2014 Q&A §§ C-5, C-6, F-1, J-3.

3. Typical investigations take approximately sixty days to complete, but this time frame "will vary depending on the complexity of the investigation and the severity and extent of the harassment." 2011 DCL at 12–13; *see also* 2014 Q&A § F-8.

4. OCR interpreted Title IX as requiring interim measures in certain circumstances. 2011 DCL at 15–16; 2014 Q&A § G-1.

5. If a school provides an appeals process, it must make it available to both parties. 2011 DCL at 12; 2014 Q&A § I-1.

On September 22, 2017, OCR withdrew "the statements of policy and guidance reflected in" the 2011 DCL and the 2014 Q&A. 2017 DCL at 1, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. OCR explained that the 2011 DCL and 2014 Q&A "interpreted Title IX to impose new mandates" and that the documents "imposed these regulatory burdens without affording notice and the opportunity for public comment." *Id.* at 1–2. OCR announced that it would engage in future rulemaking "to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits." *Id.* at 2. In the interim, OCR advised schools that the 2001 Guidance and the accompanying *Q&A on Campus Sexual Misconduct*, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A] would "provide information about how OCR will assess a school's compliance with Title IX." 2017 Q&A at 1. The 2017 DCL and 2017 Q&A (collectively, "2017 guidance") do "not add requirements to applicable law," 2017 DCL at 2, but rather "provide information about how OCR will assess a school's compliance with Title IX," 2017 *Q&A* at 1. The 2017 Q&A advises as follows:

1. Schools may employ voluntary informal mechanisms to resolve complaints of sexual misconduct if all parties agree. *Id.* at 4.

2. OCR interprets § 106.8(b) to permit schools to use either a preponderance of the evidence standard or a clear and convincing evidence standard for resolving Title IX complaints. *Id.* at 5.

3. OCR evaluates whether an investigation is "prompt" based on "a school's good faith effort to

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1  conduct a fair, impartial investigation in a timely manner designed to provide all parties with a

2  resolution." *Id.* at 3.

3  4.  OCR interprets Title IX as making interim measures appropriate in certain circumstances. *Id.* at 2–3.

4  5.  If a school provides an appeals process, it may make it available either to the responding party or to

5  both parties. *Id.* at 7.

6  **B.   Plaintiffs**

7  Plaintiffs are three nonprofit organizations. SurvJustice states that its mission is "to increase the

8  prospect of justice for survivors of sexual violence," which it pursues "through legal assistance, policy

9  advocacy, and institutional training." Am. Compl. ¶ 10. ERA states that its mission includes "protecting

10  and expanding economic educational access and opportunities for women and girls." *Id.* ¶ 23. It claims

11  that it provides legal services, engages in "public education efforts," and engages in "policy reform and

12  legislative advocacy." *Id.* ¶ 24. And last, VRLC states that its mission is "to provide legal representation

13  to victims of rape and sexual assault to help rebuild their lives; and to promote a national movement

14  committed to seeking justice for every rape and sexual assault victim." *Id.* ¶ 28. It further states that it

15  provides free legal services, including to students who have experienced sexual violence. *Id.* ¶ 29. Each

16  organization brings this action on its own behalf. *Id.* ¶¶ 14, 25, 30.

17  **III.   Legal Standard**

18  Defendants move to dismiss for lack of standing pursuant to Rule 12(b)(1) of the Federal Rules

19  of Civil Procedure. "Federal courts are courts of limited jurisdiction," so "[i]t is to be presumed that a

20  cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).

21  Defendants further move to dismiss pursuant to Rule 12(b)(6). To defeat such a motion, "a complaint

22  must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

23  face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

24  570 (2007)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation."

25  *Id.*

26  **IV.   Argument**

27  **A.   Plaintiffs Lack Standing.**

28  The "'irreducible constitutional minimum' of standing" provides that "[t]he plaintiff must have

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The standing inquiry is "especially rigorous" where "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)), and where the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," *Defs. of Wildlife*, 504 U.S. at 562.

### 1. Plaintiffs Have Demonstrated Interest in a Problem, Not Injury in Fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Defs. of Wildlife*, 504 U.S. at 560). Adherence to these requirements "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982).

Plaintiffs have shown at most "a mere 'interest in'" the guidance documents and ED's Title IX policies. *See Sierra Club*, 405 U.S. at 739. However sincere their interest, Plaintiffs have not distinguished themselves from other interest groups whose standing the Supreme Court repeatedly has rejected. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 39–40 (1976) (holding that certain organizations, "which described themselves as dedicated to promoting access of the poor to health services, could not establish their standing simply on the basis of that goal"); *Sierra Club*, 405 U.S. at 739 (holding that "a large and long-established organization, with a historic commitment" to protecting the environment, could not establish standing on that basis alone).

### 2. *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) Does Not Provide Plaintiffs with Standing.

Invoking *Havens Realty Corp.* Plaintiffs claim that Defendants have frustrated their missions, and that they necessarily diverted organizational resources to avoid injury. *See* Am. Compl. ¶¶ 14, 25,

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

5

30. "An organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Crucially, however, an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* Plaintiffs fail to make that showing.

### i.   Defendants Have Not Frustrated Plaintiffs' Missions.

Plaintiffs allege similar organizational missions in their Amended Complaint: "SurvJustice's mission is to increase the prospect of justice for survivors of sexual violence"; "ERA is dedicated to protecting and expanding economic educational access and opportunities for women and girls"; and "VRLC's mission is to provide legal representation to victims of rape and sexual assault to help rebuild their lives; and to promote a national movement committed to seeking justice for every rape and sexual assault victim." Am. Compl. ¶¶ 10, 23, 28. Plaintiffs have advanced essentially two theories regarding how these missions have been frustrated: that the guidance documents have (a) had a chilling effect on SurvJustice and VRLC's clients and (b) made it more difficult for Plaintiffs to achieve beneficial outcomes for their clients. Neither is a cognizable frustration of mission for purposes of standing.

### a.   Any Subjective Chilling Effect on SurvJustice and VRLC's Clients Is Not an Article III Injury in Fact.

SurvJustice and VRLC claim that the guidance documents have produced a "chilling effect" on their clients. *See id.* ¶¶ 15–16, 31. The law is clear, however, that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1129 (9th Cir. 1996) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). In *San Diego*, for example, two organizational plaintiffs asserted standing because their members were less likely to purchase outlawed firearms after the passage of the Crime Control Act. *Id.* The Ninth Circuit disagreed, explaining that "the 'existence of a "chilling effect" . . . has never been considered a sufficient basis, in and of itself, for prohibiting . . . [government] action.'" *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971)). Likewise, Plaintiffs' self-serving

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

6

allegations of a chilling effect on their clients are not sufficient to confer standing. Were it otherwise, any organization with an interest in government action could manufacture standing by alleging that agency guidance curbed its clients' behavior. *See Amnesty Int'l USA*, 568 U.S. at 416 (holding that organizations "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). Put simply, Plaintiffs ask the Court to speculate that following the issuance of the 2017 guidance, (1) a college student might be less likely to report a claim of sexual assault, (2) the college student might be less likely to do so because of ED guidance, and (3) this student might otherwise have been a client of one of the Plaintiff organizations. There is no basis for such speculation. *See id.* at 414 ("speculative chain of possibilities" insufficient).

The speculative nature of Plaintiffs' claims is especially apparent in light of their inaccurate description of what the 2017 guidance actually does. First, Plaintiffs allege that the 2017 Q&A "prohibits educational institutions from issuing interim measures that minimize the burden on complainants to modify their work and class schedules or housing assignments." *Id.* ¶ 107 (citing 2017 Q&A at 3); *see also id.* ¶ 20. In reality, the 2017 Q&A contains no such prohibition; it unequivocally states, "It may be appropriate for a school to take interim measures during the investigation of a complaint." 2017 Q&A at 3; *see also* 2001 Guidance § VII.A. The Q&A further explains that "a school may not rely on fixed rules or operating assumptions that favor one party over another," that it may not "make such measures available only to one party," and that any interim measures "should be individualized and appropriate based on the information gathered by the Title IX Coordinator." *Id.* Nothing in this answer discourages a school from minimizing the burden on complainants to modify their work and class schedules or housing assignments.

Second, Plaintiffs allege that the 2017 Q&A "requires educational institutions issuing interim measures to provide such measures to both parties thereby placing the burden on the complainant of sexual harassment to modify their access to education." Am. Compl. ¶ 107 (citing 2017 Q&A at 3). Again, however, nothing in the 2017 Q&A places the burden on the complainant to modify their access to education. The Q&A advises schools to individualize interim measures based on the circumstances of the case—nothing more, nothing less.

Third, Plaintiffs allege that the 2017 Q&A "requires educational institutions to consider the

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

7

1   impact on a perpetrator's access to education, even after finding the individual responsible for sexual

2   harassment or violence, in reaching a decision on sanctions." *Id.* (citing 2017 Q&A at 6). The 2017

3   Q&A states, "Disciplinary sanction decisions must be made for the purpose of deciding how best to

4   enforce the school's code of student conduct while considering the impact of separating a student from

5   her or his education. Any disciplinary decision must be made as a proportionate response to the

6   violation." 2017 Q&A at 6. This statement is entirely consistent with previous guidance, which advises

7   schools to "take *reasonable*, timely, age-appropriate, and effective corrective action, including steps

8   *tailored to the specific situation*." 2001 Guidance § VII.A (emphasis added). Thus, there is nothing new

9   about the 2017 Q&A that should discourage students from reporting sexual misconduct.

10      In any event, it is utterly speculative to assert that a student would not report sexual misconduct

11   because a Q&A from ED acknowledges that punishments should be proportionate to violations. It has

12   long been well established that principles of due process attach to both complainants and respondents in

13   campus disciplinary cases. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975); *see also Doe v. Brandeis Univ.*,

14   177 F. Supp. 3d 561, 602 (D. Mass. 2016); 2001 Guidance § X. Thus, both before and after the 2017

15   guidance, students who report sexual misconduct reasonably should expect their school to consider both

16   students' rights before taking disciplinary action against the respondent, including removal from

17   campus.

### b.  Plaintiffs Have Not Plausibly Alleged That the 2017 Guidance Makes Beneficial Outcomes Less Likely for Their Clients.

20      Plaintiffs also allege that the 2017 guidance frustrates their missions because "it makes beneficial

21   outcomes less likely for survivors and because even where those outcomes are still available, success

22   will take more staff time and effort." Am. Compl. ¶¶ 19, 27, 33. This allegation fails to support a

23   frustration of mission. First, Plaintiffs have not plausibly alleged that the 2017 guidance makes

24   beneficial outcomes less likely for their clients. As discussed *supra*, Plaintiffs exaggerate the terms of

25   the 2017 guidance.

26      Furthermore, these documents are merely *guidance*; they "provide information about how OCR

27   will assess a school's compliance with Title IX," 2017 Q&A at 1, but do "not add requirements to

28   applicable law," 2017 DCL at 2. Plaintiffs have not plausibly alleged that schools have actually

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

8

1   implemented any of the challenged aspects of the guidance documents, a glaring omission if they want

2   to show that the guidance documents have actually made beneficial outcomes less likely. At most, they

3   have alleged that a handful of schools have acknowledged the guidance documents. Yet, as with their

4   exaggerations regarding the terms of the guidance documents, Plaintiffs exaggerate schools' reaction to

5   the documents.[1]

6   _____

7       [1] Plaintiffs point to the South Dakota Board of Regents, which acknowledged the guidance documents and made some minor changes to its Title IX policies. Crucially, however, none of the Board of Regents' changes contribute to Plaintiffs' alleged injuries. In fact, nearly all of the changes *bolster* procedural safeguards for complainants. For instance, whereas the previous policies permitted an institution to "reserve the right to extend any deadline," such an extension now requires "good cause with written notice to the parties of the delay and the reason for the delay." Student Code of Conduct 2 (Dec. 5–7, 2017), https://www.sdbor.edu/the-board/agendaitems/2014AgendaItems/2017%20Agenda%20Items/December17/7_E_BOR1217_REVISED.pdf. Both before and after the changes, the student code of conduct provided that "Interim measures are intended to protect the interests of both the Complainant and the Respondent prior to a hearing" and that "Interim Measures may include, but are not limited to, no-contact directives, residence modifications, academic modifications and support, Institutional work schedule modifications, interim residence suspension, or interim suspension." *Id.*

13       Plaintiffs also address changes or potential changes to school policies at the University of Houston (UH), the University of Michigan, Grand Valley State University (GVSU), and Auburn University. None of the changes at these schools plausibly make it less likely for Plaintiffs to achieve beneficial results for their clients. The article that Plaintiffs cite regarding UH, Am. Compl. ¶ 116 n.42, quotes a university spokesman, who stated that UH "may make some changes to how it adjudicates sexual misconduct violations to 'better align with [ED's] expectations to how we ensure due process.'" Lindsay Ellis, *Feds Close Title IX Investigation into University of Houston*, Hous. Chron. (Oct. 4, 2017), https://www.chron.com/local/education/campus-chronicles/article/Feds-close-Title-IX-investigation-into-University-12253555.php. Of course, that something "may" happen is not enough to establish standing.

18       Even more absurd are Plaintiffs' claims about Michigan. Plaintiffs take issue with one policy, which permits mediation when both parties agree to it and it is approved by the Title IX coordinator. Plaintiffs do not even attempt to explain how they are injured by a policy that permits their clients—at their absolute discretion—to agree to voluntary mediation if they wish to do so. While Plaintiffs might prefer that their clients be forced into adversarial proceedings, that is a choice to be made by their clients. *Cf.* Model Rule of Prof'l Conduct r. 1.2(a) (Am. Bar Ass'n 2016) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation and . . . shall abide by a client's decision whether to settle a matter.").

22       Last, Plaintiffs implausibly allege that they have been injured by GVSU and Auburn's decision not to require a sixty-day timeframe for investigations. *See* Am. Compl. ¶ 117 & n.44. As discussed *supra*, ED has never required schools to complete investigations within sixty days. In addition, Plaintiffs have not plausibly alleged an injury stemming from a school conducting an investigation for more than sixty days to "allow for both continued timeliness of investigations but also the thoroughness that is required for investigations," *Update on the Impact of Interim Q&A Related to Title IX*, Grand Valley State University, https://www.gvsu.edu/inclusion/module-news-view.htm?siteModuleId=6D5DCE61-CC95-4B12-A9C94F3632A6F3DD&storyId=B4C32E26-0CC1-44BC-CCF964C4D07C10C3. Common sense dictates that a more thorough investigation would benefit, rather than harm, Plaintiffs' clients.

27       Plaintiffs do not allege that any school has adopted other challenged aspects of the 2017 guidance. For example, SurvJustice and VRLC argue that the guidance documents' "endorsement of one-sided appeal rights" makes beneficial outcomes less likely. Am. Compl. ¶¶ 21, 31. Yet, they point to no school that permits only the respondent to appeal. Moreover, they have not alleged how such advice

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, **Defendants' Notice of Motion & Motion to Dismiss**

9

Even if Plaintiffs showed that a handful of schools changed their policies because of the 2017 guidance, they have not plausibly alleged that such changes perceptibly impaired their missions. Plaintiffs have not alleged a connection with any of these schools; there is no allegation that they represent a single student who attends one of these schools.[2] It is implausible enough, for instance, that a school's decision to permit complainants to pursue mediation (at their election) would injure that complainant. It exceeds implausibility that this decision would injure Plaintiffs. They must allege more than the "speculative threat" of mediation; they must allege concrete facts that would support standing. *See Amnesty Int'l USA*, 568 U.S. at 416. Plaintiffs' failure to allege that these schools' policies injure them renders the amended complaint nothing more than an attempt to "vindicate [Plaintiffs'] own value preferences through the judicial process." *Sierra Club*, 405 U.S. at 740.

### ii. Plaintiffs Were Not Forced to Divert Resources, and Any Additional Expenditures Were Not Necessary to Avoid Organizational Injury.

As referenced above, to establish standing, an organization must plausibly allege that "it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088; *see also Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x 905, 908–09 (9th Cir. 2015) (Chhabria, J., concurring). An organization "cannot manufacture standing by choosing to make expenditures on hypothetical future harm that is not certainly impending." *Amnesty Int'l USA*, 568 U.S. at 402. Only if an organization shows that it was "forced" to divert resources to avoid an injury that would inhibit its ability to function has it met this second organizational standing prong. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc).

### a. Providing More Student Trainings at a Reduced Price Was Not Necessary to Avoid Organizational Injury.

SurvJustice alleges that it "has provided an increased number of student trainings" at a reduced

---

would perceptibly impair their organizational missions.

[2] In fact, it is entirely likely that schools may never change their procedures to perceptibly impair Plaintiffs' missions. California, where ERA is located, independently requires schools that receive state funds for student financial assistance to apply a preponderance of the evidence standard, among other things. *See* Cal. Educ. Code § 67386(a)(3) (West 2012); *see also* 110 Ill. Comp. Stat. 155/25(b)(5) (West 2014) (same for Illinois).

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss
10

price "to respond to confusion created by the 2017 Title IX policy." Am. Compl. ¶ 17. Providing trainings, however, is central to SurvJustice's mission. *See id.* ¶ 10 (alleging that SurvJustice pursues its mission through "institutional training"). It is not a *diversion* of resources to provide student trainings when this is what the organization is set up to do. Furthermore, it is implausible that conducting student trainings was a necessary expense to avoid an injury that would inhibit SurvJustice's ability to function. Aside from the conclusory observation that such trainings were "necessary," *id.*, SurvJustice has not alleged facts that would support the legal conclusion that "it would have suffered some other injury if it had not diverted resources to counteracting the problem," *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 (holding that an organization that failed to "assert any factual allegations regarding organizational standing in its complaint" failed to establish standing). And any suggestion that an organization need only label an expenditure as "necessary" to confer standing would contradict the Supreme Court's admonition that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *See Amnesty Int'l USA*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* Just so here: if the Constitution merely required that SurvJustice deem its trainings "necessary," an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by labeling an expenditure "necessary" because of "confusion created by" the law, *see* Am. Compl. ¶ 17.

Relatedly, SurvJustice has not plausibly alleged that any "confusion" about students' legal rights was (1) an injury to the organization that was (2) caused by the 2017 guidance. Allegations that the 2017 guidance confused students is a mere repackaged argument that the guidance documents chilled students' inclination to report sexual harassment. However, as discussed *supra*, such a chilling effect is not a cognizable injury in fact. In addition, Plaintiffs have not plausibly alleged that the 2017 guidance has confused anyone. They point to no language in the documents that is confusing or vague. On the contrary, the very purpose of guidance documents such as these is to provide clarity for educational institutions. *See* 2017 DCL at 2; *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). If anything, the absence of these guidance documents would create more confusion regarding how ED

interprets Title IX.

### b. Studying the 2017 Guidance Was Neither a Diversion of Resources Nor Necessary to Avoid Organizational Injury.

Next, SurvJustice and VRLC allege that they have "had to devote significant staff time to reviewing and understanding the 2017 Title IX policy in order to advise clients in ongoing campus investigations and advocate on their behalf," which "has decreased the amount of time . . . available to provide legal services." Am. Compl. ¶¶ 18, 34. Yet, studying regulations that pertain to clients' cases is not a *diversion* of resources. SurvJustice's and VRLC's very missions are to provide "legal assistance" and "legal representation" to sexual violence claimants. *Id.* ¶¶ 10, 28. Indeed, Plaintiffs would have to study the guidance documents to provide competent representation to their clients. *See* Model Rules of Prof'l Conduct r. 1.1. Reviewing and understanding guidance that relates to such legal assistance or representation is thus an extension of the organizations' "regular—or 'core'—programs." *See Jimenez v. Tsai*, No. 5:16-cv-04434-EJD, 2017 WL 2423186, at *11 (N.D. Cal. June 5, 2017) (quoting *Fair Hous. of Marin v. Combs*, No. C 97–1247 MJJ, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000), *aff'd*, 285 F.3d 899 (9th Cir. 2002)).

More than that, such expenses are plainly litigation costs that do not qualify as a diversion of resources. SurvJustice and VRLC acknowledge that their staff studied the guidance documents "in order to advise clients in ongoing campus investigations and *advocate on their behalf.*" *See* Am. Compl. ¶¶ 18, 34 (emphasis added). This lawsuit is plainly an example of such advocacy. Because Plaintiffs' study of the 2017 guidance is not "independent of the lawsuit," Plaintiffs cannot claim that they diverted resources sufficient to confer standing. *See Comite de Jornaleros*, 657 F.3d at 943; *see also Fair Emp't Council of Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (observing that otherwise, "an organization devoted exclusively to advancing more rigorous enforcement of selected laws could secure standing simply by showing that one alleged illegality had 'deflected' it from pursuit of another").

Finally, SurvJustice and VRLC have not sufficiently alleged that they "would have suffered some other injury if [they] had not" studied the 2017 guidance. Instead, they circularly assert that they "had" to do so. Yet, as with SurvJustice's assertion that it was "necessary" to conduct additional

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1    trainings, an organization may not establish standing "based solely on its own decision regarding

2    resources allocation." *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 n.4 (citing *BMC*

3    *Mktg. Corp.*, 28 F.3d at 1277). Without any factual allegations to explain why studying these documents

4    was necessary to avoid an injury to the organization, SurvJustice and VRLC have not plausibly alleged

5    that their study of the 2017 guidance was a diversion of resources that confers standing to bring this suit.

6
                    **c.  Asking School Officials to Respond to Complaints Was Neither a
Diversion of Resources Nor Necessary to Avoid Injury.**

7

8        SurvJustice and VRLC also claim to have "observed a trend in educational institutions not

9    responding at all, or not responding as promptly, to [their] clients' complaints." *See* Am. Compl. ¶¶ 21,

10    33. As a result, they assert, they have had "to spend additional staff time and resources that [they have]

11    not had to spend in the past attempting to get school officials to respond to a survivor's complaint of

12    sexual violence." *See id.* These assertions do not support standing for several reasons.

13        At the outset, SurvJustice and VRLC do not allege that schools are actually responding more

14    slowly; they merely allege that they have *observed* as much. But even if SurvJustice and VRLC had

15    shown that the 2017 guidance caused schools to take longer to adjudicate sexual assault allegations, that

16    would not mean that they were forced to divert resources to avoid an injury to their mission. Once again,

17    their missions are "to increase the prospect of justice for survivors of sexual violence," Am. Compl.

18    ¶ 10, and "to provide legal representation to victims of rape and sexual assault," *id.* ¶ 28. Asking schools

19    to respond to their clients' complaints promptly does not distract Plaintiffs from these missions; it is

20    entirely consistent with them. SurvJustice and VRLC have not put forth any factual allegations that the

21    2017 guidance have subjected them "to operational costs beyond those normally expended to" inquire

22    about the status of their clients' complaints. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d

23    1428, 1434 (D.C. Cir. 1995).

24        In any event, nothing in the language of the 2017 guidance would plausibly cause schools to

25    respond to complaints more slowly. ED's regulations require a "prompt and equitable" resolution to a

26    complaint. 34 C.F.R. § 106.8(b). And ED "continue[s] to rely on" its longstanding advice that schools

27    "promptly investigate" complaints and "take appropriate steps to resolve the situation," 2001 Guidance

28    § VII.A. *See* 2017 DCL at 2; *see also* 2017 Q&A at 3 (answering "[w]hat time frame constitutes a

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1   'prompt' investigation"). ED also advises schools that "[t]he specific steps in an investigation will vary

2   depending upon the nature of the allegations, the source of the complaint, the age of the student or

3   students involved, the size and administrative structure of the school, and other factors" but that "in all

4   cases the inquiry must be prompt, thorough, and impartial." 2001 Guidance § VII.A; *see id.* § IX. The

5   2011 DCL and 2014 Q&A did not contradict this advice, acknowledging that time frames vary

6   "depending on the complexity of the investigation and the severity and extent of the harassment," 2011

7   DCL at 12; 2014 Q&A § F-8, and underscoring that "OCR does not require a school to complete

8   investigations within 60 days." 2014 Q&A § F-8.

9       At bottom, SurvJustice and VRLC have alleged no facts that would make the 2017 guidance

10   more likely than any other factor to have caused their alleged observation of slower school responses.

11   Plaintiffs' "highly attenuated chain of possibilities[] does not satisfy the requirement that threatened

12   injury must be certainly impending." *Amnesty Int'l USA*, 568 U.S. at 410.

### d.   ERA's Projects Are Neither a Diversion of Resources Nor Necessary to Avoid Organizational Injury.

15       Finally, ERA alleges that it has begun or expanded a number of projects in response to the

16   guidance, including "a national initiative to End Sexual Violence in Education," an "Advice &

17   Counseling program," and "build[ing] a new website where advocates for survivors can find and share

18   resources with each other." *See* Am. Compl. ¶ 26. It claims that the resources to support these projects

19   are "over and above what it would otherwise have expended in order to counteract the effects of the

20   2017 Title IX policy change." *Id.* First, to the extent that ERA diverted resources for these projects from

21   "litigating employment-related civil rights enforcement cases and cases involving Title IX

22   enforcement," such an expenditure is not a "diversion of resources" under standing doctrine. Once

23   again, if this is all that the standing doctrine required, "an organization devoted exclusively to advancing

24   more rigorous enforcement of selected laws could secure standing simply by showing that one alleged

25   illegality had 'deflected' it from pursuit of another, contrary to such decisions as *Schlesinger v.*

26   *Reservists Committee to Stop the War*, 418 U.S. 208 (1974)." *BMC Mktg. Corp.*, 28 F.3d at 1277. Even

27   if ERA was not previously litigating or advocating on behalf of "victims of sexual harassment and

28   assault in educational settings," *see* Am. Compl. ¶ 26, simply choosing to do so now does not answer the

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

14

1   key organizational standing question of whether there was an "injury that the defendants' actions

2   themselves had inflicted upon the organization's programs." *BMC Mktg. Corp.*, 28 F.3d at 1277.

3       Relatedly, ERA has not shown that any of these projects were necessary to avoid injury to its

4   mission. Rather, it simply asserts that it "had" to divert resources to engage in these projects. *See* Am.

5   Compl. ¶ 26. It does not explain how the failure to build a website, for instance, would result in an

6   organizational injury caused by Defendants. An organization that does not plausibly allege how "it

7   would have suffered some other injury if it had not diverted resources to counteracting the problem" has

8   not established standing. *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088.

9       Even if the guidance in fact were discriminatory (which it is not), that fact would simply provide

10  ERA with the opportunity to *fulfill* its organizational purpose of litigating "issues of gender

11  discrimination in employment and education." Am. Compl. ¶ 24. Such fulfillment of its mission is not

12  an injury. *See Doe v. Obama*, 670 F. Supp. 2d 435, 441 (D. Md. 2009) (ruling that an organization could

13  not demonstrate injury in fact where it "is fulfilling its [organizational] purpose of pursuing

14  constitutional challenges by the very act of filing this lawsuit"); *Goldstein v. Costco Wholesale Corp.*,

15  278 F. Supp. 2d 766, 770-72 (E.D. Va. 2003) ("When an organization's primary source of revenue is

16  litigation directed against alleged discrimination, it cannot be said that the organization's participation in

17  such litigation impairs its ability to do its work."); *United States v. City & Cty. of San Francisco*, 748 F.

18  Supp. 1416, 1441 (N.D. Cal. 1990) (awarding ERA large amount of fees); *Brust v. Regents of Univ. of*

19  *Cal.*, No. 2:07–CV–01488–FCD–EFB, 2009 WL 8634478 (E.D. Cal. Oct. 20, 2009) (same in Title IX

20  case).

21          **3.      Plaintiffs Lack Standing to Bring Their Fifth Amendment Claim**

22      Plaintiffs' third count alleges that Defendants "discriminated on the basis of sex in violation of

23  the Due Process Clause of the Fifth Amendment." Am. Compl. ¶ 137. In addition to the reasons set out

24  above, Plaintiffs lack standing to bring such a claim for additional reasons. To make out a Fifth

25  Amendment equal protection injury on the basis of sex, Plaintiffs must plausibly allege that Defendants

26  acted with "purposeful discrimination" against them on the basis of their sex. *See Pers. Admin'r of*

27  *Mass. v. Feeney*, 442 U.S. 256, 274 (1979). But Plaintiffs, which are all organizations, do not allege that

28  Defendants discriminated against *them* on the basis of sex. Rather, they allege that Defendants

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

15

discriminated against women. *See* Am. Compl. ¶ 137–39.

To sue under the Fifth Amendment, Plaintiffs must therefore articulate a theory permitting them to advance the Fifth Amendment rights of women who are strangers to this litigation. Plaintiffs notably do not invoke associational standing, a doctrine that permits membership organizations to litigate on behalf of their members in certain circumstances. *See Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017). Indeed, Plaintiffs do not allege that they have any members.

To be sure, on "certain, limited" occasions, litigants may "bring actions on behalf of third parties." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). But here, Plaintiffs do not even allege that they bring this Fifth Amendment claim on behalf of third parties. *See* Am. Compl. ¶ 140 (alleging that "*Plaintiffs* have been harmed and their missions frustrated" because of Defendants' Fifth Amendment violation (emphasis added)). And to the extent that Plaintiffs mean to bring claims on behalf of women, they have not alleged that they have a "close relation to the third party" or that there is "some hindrance to the third party's ability to protect his or her own interests." *See Powers*, 499 U.S. at 411. Without pleading facts that support third party standing, Plaintiffs cannot show that they have it here. *See Legal Aid Soc'y of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1031 (9th Cir. 1998) (White, J.); *Diamond v. Corizon Health, Inc.*, No.16-cv-03534-JSC, 2016 WL 7034036, at *5 (N.D. Cal Dec. 2, 2016).

**B.**     **The Court Should Dismiss Plaintiffs' APA Claims**

**1.**     **The 2017 Guidance Is Not Final Agency Action**

Plaintiffs' APA claim also should be dismissed pursuant to Rule 12(b)(6) because the challenged documents are not final agency action. *See* 5 U.S.C. § 704 (APA applies to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court"). Two conditions comprise a "final agency action": "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Plaintiffs have met neither of these conditions.

1

2

> **i.     The 2017 Guidance Does Not Determine Any Rights or Obligations and Do Not Produce Any Legal Consequences.**

3

Plaintiffs have not plausibly alleged that the 2017 guidance "directly affects" their rights and liabilities. *See id.* The 2017 guidance plainly makes no attempt to determine the rights or obligations of organizations who represent complainants in sexual misconduct cases. Rather, the documents "provide information about how OCR will assess a *school's* compliance with Title IX." 2017 Q&A at 1 (emphasis added). Indeed, "harms caused by agency decisions are not legal consequences if they 'stem from independent actions taken by third parties.'" *Parsons v. DOJ*, 878 F.3d 162, 168 (6th Cir. 2017) (quoting *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002)); *see also Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115 (D.C. Cir. 1988) (holding that injury caused by "the reactions and choices of industry customers and workers" does not constitute final agency action).

13

In any case, the 2017 guidance would not be properly treated as final agency action even if schools themselves had brought suit. The Ninth Circuit has "determined that certain factors provide an indicia of finality, such as '. . . whether the [action] has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance [with the terms] is expected.'" *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003)). Thus, "a bare statement of the agency's opinion" does not produce legal consequences. *See Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593–94 (9th Cir. 2008). In this regard, interpretive rules and guidance documents generally do not produce legal consequences. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 714 (D.C. Cir. 2015) ("The Notice merely provides guidance to aviation safety inspectors who enforce FAA regulations. Moreover, Notice N8900.240 creates no rights or obligations, and generates no legal consequences. No airline need alter any policy in response to it. The Notice does not eliminate the discretion of safety inspectors or require that any particular carry-on baggage program be approved or denied.").

27

As explained *infra*, the 2017 guidance is just that: guidance. ED expressly stated that the DCL "does not add requirements to applicable law." 2017 DCL at 2. Indeed, the documents' express purpose

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1   is to "provide information about how OCR will assess a school's compliance with Title IX." 2017 Q&A

2   at 1. As in *Association of Flight Attendants-CWA*, "no [recipient] need alter any policy in response to

3   [them]." 785 F.3d at 714. And the guidance does not eliminate OCR's discretion in enforcing Title IX;

4   investigations into a school's compliance with Title IX will rise and fall with the statute and its

5   governing regulations, not the 2017 guidance. *See id.*

6           ii.   **The 2017 Guidance Does Not Mark the Consummation of ED's Decision**
                  **Making Process.**

7

8           Furthermore, the guidance documents do not reflect ED's final decision on how it will enforce

9   Title IX or its implementing regulations. "An order is final when the administrative agency has given its

10  'last word on the matter.'" *Sierra Club v. U.S. Nuclear Regulatory Comm'n*, 825 F.2d 1356, 1362 (9th

11  Cir. 1987) (quoting *W. Oil & Gas v. EPA*, 633 F.2d 803, 807 (9th Cir. 1980)). The Ninth Circuit "will

12  not entertain a petition where pending administrative proceedings or further agency action might render

13  the case moot and judicial review completely unnecessary." *Id.* Here, ED has been unequivocal that it

14  "intends to implement . . . a policy [regarding student sexual misconduct] through a rulemaking process

15  that responds to public comment." 2017 DCL at 2; 2017 Q&A at 1. And ED's Unified Agenda of

16  Federal Regulatory and Deregulatory Action stated that "[t]he Secretary plans to issue a notice of

17  proposed rulemaking to clarify schools' obligations in redressing sex discrimination, including

18  complaints of sexual misconduct, and the procedures by which they must do so." ED, No. 1870-AA14,

19  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial

20  Assistance (Fall 2017), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=

21  1870-AA14. This is not a case where an agency action "was 'unambiguous and devoid of any

22  suggestion that it might be subject to subsequent revision.'" *City of San Diego v. Whitman*, 242 F.3d

23  1097, 1102 (9th Cir. 2001) (quoting *Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir.

24  1990)). Thus, it does not mark the consummation of ED's decision making.

25          2.    **The Court Should Dismiss Plaintiffs' APA Claims Because They Have**
                  **Another Adequate Remedy in a Court.**

26

27          The Court should also dismiss Plaintiffs' APA claims because they have "[an]other adequate

28  remedy in a court." 5 U.S.C. § 704. If Plaintiffs are in fact injured by universities changing their policies

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1  in reliance upon the 2017 guidance (a proposition Defendants dispute), Plaintiffs would retain the ability

2  to sue the universities directly under Title IX, assuming that the requirements for standing are otherwise

3  met. Indeed, if Plaintiffs believe that universities are acting inconsistently with Title IX because of how

4  ED is interpreting the statute, that is the course they are required to follow. *See, e.g.*, *See Nat'l Wrestling*

5  *Coaches Ass'n v. ED*, 383 F.3d 1047, 1047–48 (D.C. Cir. 2004) (en banc).

### 3. The Court Should Dismiss Plaintiffs' Notice and Comment Claim Because the 2017 Guidance Is Not a Legislative Rule.

8      Plaintiffs further claim that by issuing the 2017 guidance, Defendants failed to "follow[] the

9  procedures required by law." Am. Compl. ¶ 130; *see also, e.g.*, *id.* ¶ 110. To the extent that Plaintiffs are

10  alleging that the 2017 guidance did not comply with the notice and comment requirements of 5 U.S.C.

11  § 553, that claim fails because the 2017 guidance is a "general statement of policy" that is exempt from

12  the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(b).

13      As the Ninth Circuit has explained, statements of policy "inform[] the public concerning the

14  agency's future plans and priorities for exercising its discretionary power [and] they serve to 'educate'

15  and provide direction to the agency's personnel in the field, who are required to implement its policies

16  and exercise its discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013

17  (9th Cir. 1987). "A statement of policy explains how the agency will enforce a statute or regulation—in

18  other words, how it will exercise its broad enforcement discretion or permitting discretion under some

19  extant statute or rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). It serves to

20  "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion

21  by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).

22  An agency pronouncement requires notice and comment only when it "'narrowly limits administrative

23  discretion' or establishes a '*binding norm*' that 'so fills out the statutory scheme that upon application

24  one need only determine whether a given case is within the rule's criterion.'" *Mada-Luna*, 813 F.2d at

25  1014 (first quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983); then

26  quoting *Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir. 1983)).

27      Here, the 2017 guidance documents reveal on their face that they are not legislative rules;

28  indeed, they specifically indicate that the Department intends to engage in such rulemaking in the future.

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

While a legislative rule has the force of law, *see, e.g.*, *Ctr. for Env't Health v. Vilsack*, No. 15-1690, 2016 WL 3383954, at *4 (N.D. Cal. June 20, 2016), the 2017 DCL explicitly indicates that it "does not add requirements to applicable law." 2017 DCL at 3. "As always," the DCL indicates, "the Department's enforcement efforts proceed from Title IX itself and its implementing regulations." *Id.* The sole purpose of the 2017 Q&A is to "provide information about how OCR will assess a school's compliance with Title IX" itself. These statements demonstrate that the 2017 guidance are guidance documents, not legislative rules.

> **C.    The Court Should Dismiss Count Two Because the Complaint Contains No Plausible Allegation That Defendant Engaged in Ultra Vires Action.**

In Count Two, Plaintiffs contend that the Court should set aside the 2017 guidance because Defendants "acted in excess of their legal authority." Am. Compl. ¶ 134. Plaintiffs appear to invoke the doctrine of non-statutory review, "essentially a Hail Mary pass" that "in court as in football . . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

At the outset, the doctrine of non-statutory review applies extremely narrowly; one court has observed that it "has been unable to locate a single Ninth Circuit case that ever seriously considered applying nonstatutory review outside the context of labor relations law." *Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521, at *11 (E.D. Cal. Oct. 20, 2015). Thus, it is questionable that the doctrine is available even theoretically in this case.

Even if it is potentially available, non-statutory review "requires a plaintiff to make a two-part showing. First, the challenged [agency] action must be ultra vires, *i.e.*, it must contravene 'clear and mandatory' statutory language. And second, absent district court jurisdiction, the party seeking review must be wholly deprived of a meaningful and adequate means of vindicating its statutory rights." *Pac. Maritime Ass'n v. Nat'l Labor Relations Bd.*, 827 F.3d 1203, 1208 (9th Cir. 2016) (citations, internal quotation marks, and alterations omitted)). In other words, it applies, if at all, only when a government official "acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (quoting *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982)). The "agency error [must] be 'so extreme that one may view it as jurisdictional or nearly so.'" *Nyunt*, 589 F.3d at 449 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

20

Plaintiffs make the conclusory allegation that Defendants have "acted in excess of their legal authority," Am. Compl. ¶ 134, but they plead nothing to make that allegation plausible. To the contrary, Plaintiffs acknowledge that "[t]he U.S. Department of Education is the lead agency charged with enforcing Title IX," and that it "may do so by establishing rules, regulations, and procedures that implement Title IX and define the ways in which educational institutions comply with Title IX's requirements." *Id.* ¶ 46. There can be no serious contention that issuing guidance describing how ED will exercise its enforcement authority falls outside of ED's jurisdiction.

Plaintiffs also make the conclusory allegation that the 2017 guidance is "inconsistent with the statutory text of Title IX and its implementing regulations." *Id.* ¶ 109. As discussed above, that is wrong; the guidance is wholly consistent with Title IX and its implementing regulations. But even if Plaintiffs had a colorable argument that the challenged guidance misapplies existing law, at most that would amount to a disagreement with how Defendants exercise authority under the statute. Such disagreements are inadequate to support a claim of ultra vires agency action. *See Griffith*, 842 F.2d at 492 ("Garden-variety errors or law or fact are not enough.").

### D. The Court Should Dismiss Count Three Because Plaintiffs Do Not Plausibly Plead That Defendants' Purpose Was to Discriminate Against Women.

Plaintiffs do not suggest that 2017 guidance facially discriminates against women. Instead, Plaintiffs contend that it has a "disparate impact on women, who constitute the overwhelming majority of sexual harassment and assault survivors." Am. Compl. ¶ 141. Under binding precedent, such a facially neutral policy "is unconstitutional . . . *only* if [a disparate] impact can be traced to a discriminatory *purpose*," *Feeney*, 442 U.S. at 272, 274 (emphasis added). Because Plaintiffs have not plausibly alleged that Defendants issued the 2017 guidance with the purpose of causing an adverse impact upon women, the Court should dismiss plaintiffs' equal protection claim.

The Supreme Court has identified certain factors that are relevant in evaluating whether a decision maker acted with discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). The ultimate question, however, is whether "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon a particular group." *Feeney*, 442 U.S. at 279. In other words, "to state a claim, . . .

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1  respondent must plead sufficient *factual matter* to show that petitioners adopted and implemented the

2  . . . policies at issue not for a neutral . . . reason *but for the purpose of discriminating . . . .*" *Iqbal*, 556

3  U.S. at 677 (citing *Feeney*, 442 U.S. at 279) (emphasis added).

4      In an attempt to satisfy this burden, Plaintiffs rely almost exclusively on a handful of statements

5  that concern sexual harassment and assault generally.[3] Such statements, however, do not demonstrate

6  animus against women; they consist of commentary on the sufficiency of the existing legal framework.

7  *See, e.g.*, Am. Compl. ¶¶ 84, 85, 98. While certain individuals have expressed their view that the law

8  would benefit from refinement, these statements do not suggest intent to discriminate against women.

9  Moreover, some of these statements were not even made by individuals involved in developing the 2017

10  guidance, *contra Vill. of Arlington Heights*, 429 U.S. at 267 (examining the "decisionmaker's

11  purposes"). *See, e.g.*, Am. Compl. ¶¶ 98-103. Plaintiffs cannot make out an equal protection claim by

12  relying on irrelevant statements entirely extrinsic to the administrative process. To allow reliance on

13  such materials would open the door to unlimited second-guessing of officials' motives, ignoring the

14  reality of changes in belief and purpose over time while chilling political speech directed at the public.

15      In addition, some of the material to which Plaintiffs point consists of expressions of doubt about

16  specific allegations of sexual misconduct. *See, e.g.*, *id.* ¶ 86, 99–100. While these statements suggest that

17  the speakers doubted certain specific allegations against certain specific individuals, they do not suggest

18  that the speakers hold stereotyped views about women as a general matter. Plaintiffs also allege that

19  Secretary DeVos met with people on both sides of the Title IX issue, *id.* ¶¶ 88–90, but this allegation

20  undermines their claim of discriminatory intent.

21      Finally, Plaintiffs cite to a news article in support of the allegation that Defendant Jackson

22  "propounded discriminatory stereotypes of women who survive sexual assault." *Id.* ¶ 92. Plaintiffs do

23

24  _____

[3] Plaintiffs also allege that the 2017 guidance disproportionately affects women. Notably, however, the

25  guidance will apply to a large number of men as well. *See, e.g.*, Centers for Disease Control, NISVS Infographic, http://www.cdc.gov/violenceprevention/nisvs/infographic.html (federal survey shows 1 in 3 women and 1 in 6 men victims of "contact sexual violence" in their lifetime); *Feeney*, 442 U.S. at 281

26  (discounting disproportionate impact because "the number of males disadvantaged by Massachusetts'

27  veterans' preference"). Absent an additional showing of discriminatory purpose, disproportionate impact alone does not support an equal protection claim. *See Washington v. Davis*, 426 U.S. 229, 242 (1976). And given the undisputed reality that complainant and respondent status is not equally distributed with

28  respect to sex, any policy change in this area will necessarily affect men and women differently, further undercutting the notion that disparate impact is probative of discriminatory intent in this context.

not plausibly allege that the views expressed in this statement influenced ED's decision to issue the 2017 guidance. *See Vill. of Arlington Heights*, 429 U.S. at 268 (considering "contemporary statements by members of the decisionmaking body" such as "minutes of its meetings, or reports"); *cf. Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) (citing cases holding "isolated comment" "unrelated to the decisional process" did not establish employment discrimination). In any case, Ms. Jackson's statement—later clarified[4]—does not plausibly reflect sex-based discrimination, even on its own terms. Rather, it reflects a view that most OCR investigations do not involve sexual assault, as opposed to other forms of sexual misconduct. To the extent that Plaintiffs allege that this statement reflects a "gender stereotype that many women and girls lack credibility with regard to sexual harassment," Am. Compl. ¶ 137, the text of the statement does not bear such an interpretation, as it does not contain any sex-based view on whether either party lacks credibility.

In any event, even if any statements could be read to suggest that individuals involved in developing the 2017 guidance believe that many women's accounts of alleged sexual harassment are not credible—which they cannot—the statements certainly cannot be read to suggest that Defendants intended to discriminate against women on the basis of those views. To be sure, where a decision maker holding stereotyped views takes action that is *intended to discriminate* against a protected class because of those views, that is a potential equal protection claim. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) (animus requirement "demand[s] . . . at least a purpose that focuses upon women by reason of their sex—for example . . . , the purpose of 'saving' women because they are women from a combative, aggressive profession such as the practice of law."). Thus, for example, where residents hold negative stereotypes about Hispanic people (that they "had large households" and would "allow unattended children to roam the streets"), and take an action whose transparent purpose is to exclude Hispanic residents from their city, there is a plausible allegation of discriminatory intent. *See Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 501 (9th Cir. 2016) ("use of 'code words' may

---

[4] The very next paragraph of the news article that Plaintiffs rely on states that Ms. Jackson later clarified that her "conclusion was based on feedback from cases involving accused students, and even if complaints don't allege violence, 'all sexual harassment and sexual assault must be taken seriously.'" *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times, July 12, 2017, https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-ix-education-trump-candice-jackson.html. Because this article is incorporated by reference in the Amended Complaint, the Court may consider it. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

23

1  demonstrate discriminatory intent"). Or, where a plaintiff alleged that a police officer who failed to

2  adequately respond to a domestic violence complaint indicated that the victim deserved violence

3  because of his stereotyped views about women (he "did not blame plaintiff's husband for hitting her

4  because of the way she was 'carrying on'"), the plaintiff plausibly alleged discriminatory intent. *See*

5  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988)). In each such case, the court

6  could conclude that the "adverse effect reflects invidious gender- [or race-] based discrimination,"

7  *Feeney*, 442 U.S. at 274.

8       That is simply not this case. Plaintiffs' amended complaint does not contain a single plausible

9  allegation that because the decision makers held stereotypes about women, it became Defendants' intent

10 or purpose to cause "adverse effects upon" them as a result. *Feeney*, 442 U.S. at 274; *see also, e.g.*, *Lee*

11 *v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (equal protection violation requires "invidious

12 or discriminatory purpose"); *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) ("[A] long line of

13 Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory *intent*

14 or *motive*.").

15      In reality, the "sequence of events leading up to the decision," *Vill. of Arlington Heights,* 429

16 U.S. at 269, shows the opposite: for years before the rescission, the 2011 DCL was the subject of

17 considerable debate. *See, e.g.*, 161 Cong. Rec. S535 (daily ed. Jan. 27, 2015) (statement of Sen.

18 Grassley) (criticizing the 2011 DCL and quoting similar objections from Senator Alexander, chairman

19 of the Education Committee and former Education Secretary); 162 Cong. Rec. S1448–49 (daily ed. Mar.

20 14, 2016) (statement of Sen. Lankford) (criticizing the 2011 DCL and quoting criticisms by "legal

21 scholars at Harvard Law and Penn Law").[5]

22      Ultimately, on a topic as important as how to achieve justice for sexual misconduct complainants

23 while ensuring due process for respondents, it is to be expected that people acting in good faith will hold

24

25 [5] California Governor Edmund G. Brown Jr. endorsed the same position by vetoing a bill that would
   have imposed the policies of the 2011 DCL as a matter of law. *See* Governor's Veto Message, SB-169
26 2017-2018 Status Page, California Legislative Information, https://leginfo.legislature.ca.gov/faces/
   billStatusClient.xhtml?bill_id=201720180SB169 (noting that "thoughtful legal minds have increasingly
27 questioned whether federal and state actions to prevent and redress sexual harassment and assault—
   well-intentioned as they are—have also unintentionally resulted in some colleges' failure to uphold due
28 process for accused students," and that "[d]epriving any student of higher education opportunities should
   not be done lightly").

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

divergent views. But while Plaintiffs are entitled to their own views of the best policy, it does not follow that decisions with which Plaintiffs disagree are the product of sexism. *Cf., e.g.*, *Bray*, 506 U.S. at 270 ("Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class . . . .").

## V.  Conclusion

For the foregoing reasons, the Amended Complaint should be dismissed.

Dated: May 2, 2018                              Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

/s/ *Steven A. Myers*
STEVEN A. MYERS
(NY Bar # 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Rm. 7334
Washington, DC 20530
Tel: (202) 305-8648
Fax: (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

*Attorneys for Defendants*

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Notice of Motion & Motion to Dismiss

1

**[PROPOSED] ORDER**

2          Having considered Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and (6) of the

3    Federal Rules of Civil Procedure, and any opposition, reply, and oral argument presented, the Court

4    holds that it lacks subject matter jurisdiction over the Amended Complaint and/or that Plaintiffs have

5    failed to state a claim upon which relief may be granted. Therefore, IT IS HEREBY ORDERED that this

6    action is dismissed.

7          IT IS SO ORDERED.

8

9    Dated: _____

10                                                              _____
                                                                JACQUELINE SCOTT CORLEY
                                                                UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28