CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

STEVEN A. MYERS (NY Bar # 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Rm. 7334
Washington, DC 20530
Tel: (202) 305-8648
Fax: (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SURVJUSTICE, INC.,<br>EQUAL RIGHTS ADVOCATES, and<br>VICTIM RIGHTS LAW CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS,<br>in her official capacity as Secretary of Education,<br>KENNETH L. MARCUS,<br>in his official capacity as Assistant Secretary for Civil Rights,[1] and<br>U.S. DEPARTMENT OF EDUCATION,<br><br>Defendants. | Case No. 18-cv-0535-JSC<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>Magistrate Judge: Jacqueline Scott Corley<br>Hearing: July 19, 2018, at 2:00 p.m.<br><br>Phillip Burton Federal Building & United States Courthouse, Courtroom F, 15th Floor,<br>450 Golden Gate Ave., San Francisco, CA 94102 |

---

[1] Kenneth L. Marcus, who assumed office as Assistant Secretary for Civil Rights on June 25, 2018, "is automatically substituted as a party" pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Reply ISO Motion to Dismiss

# TABLE OF CONTENTS

I.      Plaintiffs Lack Standing....................................................................................1

        A.      Plaintiffs Have Not Plausibly Alleged that Defendants Frustrated Plaintiffs'
                Missions. ...................................................................................................1

        B.      Plaintiffs Have Not Plausibly Alleged that They Were Forced to Divert
                Resources. ................................................................................................4

        C.      Plaintiffs Lack Standing to Bring Their Fifth Amendment Claim. ...................5

II.     The Court Should Dismiss Plaintiffs' APA Claims.............................................6

        A.      The 2017 Guidance Is Not Final Agency Action...................................6

        B.      The Court Should Dismiss Plaintiffs' APA Claims Because They Have
                Another Adequate Remedy in a Court.......................................................9

III.    The Court Should Dismiss Count Two Because the Amended Complaint Contains No
        Plausible Allegation That Defendants Engaged in Ultra Vires Action.......................10

IV.     The Court Should Dismiss Count Three Because Plaintiffs Do Not Plausibly Plead
        That Defendants' Purpose Was to Discriminate Against Women..............................12

V.      Conclusion .................................................................................................15

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*Animal Legal Defense Fund v. USDA*,
   223 F. Supp. 3d 1008 (C.D. Cal. 2016) ............................................................ 4

*Ass'n of Flight Attendants-CWA v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) .......................................................................... 6

*Avenue 6E Invs., LLC v. City of Yuma*
   818 F.3d 493 (9th Cir. 2016) ..................................................................... 12, 13

*Back v. Hastings on Hudson Union Free. Sch. Dist.*,
   365 F.3d 107 (2d Cir. 2004) ........................................................................... 14

*Balisteri v. Pacifica Police Dept*,
   901 F.2d 696 (9th Cir. 1988) .......................................................................... 14

*Bates & Guild Co. v. Payne*,
   194 U.S. 106 (1904) ....................................................................................... 11

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ........................................................................... 13, 14, 15

*Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*,
   No. 15-912, 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) .............................. 11

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ....................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................. *passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ............................................................................ 4

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ................................................................. 6, 7, 9

*DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*,
   76 F.3d 1212 (D.C. Cir. 1996) ......................................................................... 8

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health &*
   *Human Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005) ..................................................................... 10

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
  543 F.3d 586 (9th Cir. 2008) ................................................................................ 9

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ........................................................................................... 11

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ........................................................................... 10

*Garfias-Rodriguez v. Holder*,
  702 F.3d 504 (9th Cir. 2012) ............................................................................. 11

*Gladstone, Realtors v. Vill. Of Bellwood*,
  441 U.S. 91 (1979) ............................................................................................... 5

*Griffith v. FLRA*,
  842 F.2d 487 (D.C. Cir. 1988) ........................................................................... 11

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2016) ....................................................................... 10, 11

*Hong Kong Supermarket v. Kizer*,
  830 F.2d 1078 (9th Cir. 1987) ............................................................................. 5

*Innovative Health Sys., Inc. v. City of White Plains*,
  117 F.3d 37 (2d Cir. 1997) ................................................................................. 15

*Jackson v. City and County of San Francisco*,
  829 F. Supp. 2d 867 (N.D. Cal. 2011) ........................................................ 1, 2, 3

*Kansas ex rel. Schmidt v. Zinke*,
  861 F.3d 1024 (10th Cir. 2017) ........................................................................... 7

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ............................................................................................. 6

*Laird v. Tatum*,
  408 U.S. 1 (1972) ................................................................................................. 2

*Latta v. Otter*,
  771 F.3d 456 (9th Cir. 2014) ............................................................................. 14

*Lexmark Int'l, Inc. v. Static Control Components*,
  134 S. Ct. 1377 (2014) ........................................................................................ 6

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ...................................................................................... 12

*McCollum v. Cal. Dept. of Corr.*,
  647 F.3d 870 (9th Cir. 2011) ............................................................................... 6

*McMichael v. Napa Cty.*,
   709 F.2d 1268 (9th Cir. 1983) ........................................................................ 5

*MedImmune, Inc. v. Genetech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................ 2

*Mohamed v. Uber Technologies, Inc.*,
   848 F.3d 1201 (9th Cir. 2016) ........................................................................ 3

*Moss v. U.S. Secret Serv.*,
   572 F.3d 962 (9th Cir. 2009) .......................................................................... 3

*Motley v. Smith*,
   No. 15-905, 2016 WL 3407658 (E.D. Cal. June 20, 2016) ...................... 14, 15

*Nat'l Wrestling Coaches Ass'n v. ED*,
   383 F.3d 1047 (D.C. Cir. 2004) ..................................................................... 10

*Pac. Maritime Ass'n v. Nat'l Labor Relations Bd.*,
   827 F.3d 1203 (9th Cir. 2016) ................................................................... 10, 11

*Parsons v. DOJ*,
   878 F.3d 162 (6th Cir. 2017) ........................................................................... 7

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ........................................................................................ 11

*Pers. Admin'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ...................................................................................... 12

*Powers v. Ohio*,
   499 U.S. 400 (1991) ........................................................................................ 6

*Ray Charles Found. v. Robinson*,
   795 F. 3d 1109 (9th Cir. 2015) ........................................................................ 6

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 ................................................................................................... 9

*Rhea Lana, Inc. v. Dep't of Labor*,
   824 F.3d 1023 (D.C. Cir. 2016) ..................................................................... 8, 9

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ........................................................................................ 8

*San Diego Cty. Gun Rights Comm. v. Reno*,
   98 F.3d 1121 (9th Cir. 1996) ........................................................................ 1, 2

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) ............................................................................................ 5

*Sierra Club v. Morton*,
  405 U.S. 727 (1972).............................................................................................. 4, 5

*Sierra Club v. USPS*,
  549 F.2d 1199 (9th Cir. 1976) ................................................................................. 11

*Smith v. City of Elyria*,
  857 F. Supp. 1203 (N.D. Ohio 1994)........................................................................ 15

*Thurman v. City of Torrington*,
  595 F. Supp. 1521 (D. Conn. 1984).......................................................................... 15

*Trump v. Hawaii*,
  No. 17-965, 2018 WL 3116337 (S. Ct. June 26, 2018) ...................................... 10, 11, 15

*U.S. Army Corp. of Engineers v. Hawkes*,
  136 S. Ct. 1807 (2016)............................................................................................... 7

*Viceroy Gold Corp. v. Aubry*,
  75 F.3d 482 (9th Cir. 1996) ....................................................................................... 5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................................................. 12

*Warth v. Seldin*,
  422 U.S. 490 (1975)................................................................................................... 6

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)................................................................................................... 1

*Women's Equity Action League v. Cavazos*,
  906 F.2d 742 (D.C. Cir. 1990) ................................................................................. 10

*Younger v. Harris*,
  401 U.S. 37 (1971)..................................................................................................... 1

**STATUTES**

5 U.S.C. § 704 ...................................................................................................... 6, 11

**REGULATIONS**

*Guidelines for Eliminating Discrimination and Denial of Services on the
  Basis of Race, Color, National Origin, Sex, and Handicap*,
34 C.F.R. pt. 100 ...................................................................................................... 8

34 C.F.R. § 104.23(c)................................................................................................ 8

*Guidelines on current title IX requirements related to single-sex classes
  and schools*,

67 Fed. Reg. 31102 ........................................................................................................................ 8

**MISCELLANEOUS**

Erwin Chemerinsky, Constitutional Law: Principles and Policies ...................................................... 13–14

William J. Rich, 1 Modern Constitutional Law § 13:5 ............................................................................ 13

Plaintiffs' opposition to Defendants' motion to dismiss does not rebut Defendants' demonstration that Plaintiffs' claims must be dismissed. In the first place, Article III and prudential considerations present insurmountable threshold obstacles to addressing the merits of Plaintiffs' claims. Even if the Court reaches the merits, Plaintiffs have failed to state a claim upon which relief may be granted: they have not challenged a final agency action, the challenged documents are not ultra vires, and they have not plausibly alleged that Defendants intended to discriminate on the basis of sex.

## I.      Plaintiffs Lack Standing.

### A.      Plaintiffs Have Not Plausibly Alleged that Defendants Frustrated Plaintiffs' Missions.

Plaintiffs' opposition argues that Defendants bring a disguised factual challenge to Plaintiffs' standing, "quibble" with details about the 2017 guidance's effects, and set the pleading bar too high. Yet Plaintiffs' true quarrel is with the Supreme Court's repeated admonition that an injury in fact must be "certainly impending" and "that '[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). At bottom, because Plaintiffs do no more than speculate that the 2017 guidance might one day possibly frustrate their mission or force them to divert resources, the case should be dismissed.

#### 1.      SurvJustice and VRLC's Alleged Observation of a Subjective Chilling Effect on Students Is Not an Injury in Fact.

Plaintiffs argue that Defendants' motion presents a disguised factual challenge. In fact, Defendants accept the truth of Plaintiffs' allegations for the purposes of this motion. Yet even accepting Plaintiffs' factual allegations, "the 'existence of a "chilling effect" . . . has never been considered a sufficient basis, in and of itself, for prohibiting . . . [government] action,'" *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1129 (9th Cir. 1996) (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971)). Therefore, SurvJustice and VRLC's alleged observation that some students have been less inclined to report sexual violence does not plausibly establish that they have standing to challenge the 2017 guidance.

Plaintiffs' reliance on *Jackson v. City and County of San Francisco*, 829 F. Supp. 2d 867 (N.D. Cal. 2011), *cited in* Pls' Opp'n at 8, ECF No. 45, is misplaced. That decision mistakenly questioned the precedential value of *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996). Contrary to *Jackson*'s suggestion that "[t]he continued vitality of *Gun Rights Committee* is . . .

questionable in light of *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118 (2007)," 829 F. Supp. 2d at 871, there is no conflict between the two cases. The Ninth Circuit observed in *Gun Rights Committee* that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." 98 F.3d at 1129 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Consistent with this observation, the Supreme Court held in *MedImmune* that the petitioner had standing when it "allege[d] (without contradiction) a threat by respondents to enjoin sales if royalties are not forthcoming." 549 U.S. at 128. "Although imminence is concededly a somewhat elastic concept," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), the analysis of the Ninth Circuit in *Gun Rights Committee* is the same as that of the Supreme Court regarding the justiciability of a concrete future harm.

Lest there be any doubt that *Gun Rights Committee* is good law, the Supreme Court's decision in *Amnesty International USA* puts any such doubt to rest. At issue there was a statute permitting the government to monitor communications of non-U.S. persons located abroad. 568 U.S. at 404. The respondents alleged that "some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under § 1881a." *Id.* at 406. Because they feared surveillance pursuant to § 1881a, the respondents "'ceased engaging' in certain telephone and e-mail conversations" and "undert[ook] 'costly and burdensome measures' to protect the confidentiality of sensitive communications." *Id.* at 406–07. Despite this fear of surveillance, however well founded; despite the preventative measures that the respondents undertook; and despite the dissent's objection that *MedImmune* counseled a different result, *see id.* at 434 (Breyer, J. dissenting), the Court held that the respondents lacked standing. The Court reasoned that the

> respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

*Id.* at 410.

As discussed in Defendants' opening brief, Plaintiffs present a highly attenuated chain of

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Reply ISO Motion to Dismiss

1   possibilities indistinguishable from the one rejected in *Amnesty International USA*. *See* Defs.' Mot. at 7–

2   8, ECF No. 40. In response, Plaintiffs principally argue that Defendants "mount a factual challenge to

3   subject matter jurisdiction." Pls.' Opp'n at 9. But Defendants do no such thing. To be sure, Defendants

4   take issue with Plaintiffs' mischaracterization of the 2017 guidance. But the Court should only accept as

5   true "the non-conclusory 'factual content'" in the amended complaint. *See Moss v. U.S. Secret Serv.*, 572

6   F.3d 962, 969 (9th Cir. 2009). Interpretation of the 2017 guidance is a legal analysis, not a factual one.

7   Plaintiffs' characterization (indeed, exaggeration) of the guidance is therefore not entitled to a

8   presumption of truth. And finally, even if *Jackson* were in some tension with *Gun Rights Committee*, the

9   Ninth Circuit decision controls until such time as the Ninth Circuit holds otherwise. *See Mohamed v. Uber*

10  *Technologies, Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016).

11       Plaintiffs also claim that a statement in Secretary DeVos' speech indicates an intent to dissuade

12  individuals from reporting sexual misconduct. *See* Pls.' Opp'n at 8–9. In the first place, the full speech

13  actually indicates an intent to support students who report sexual misconduct, not dissuade them from

14  reporting. Most crucially, Plaintiffs point to no cases that support their theory that an administrative

15  purpose, rather than the administrative action itself, can provide an injury in fact.

### 2.   Plaintiffs Have Not Plausibly Alleged that They Have Suffered a Reduced Likelihood of Beneficial Outcomes.

16

17

18       Plaintiffs also mischaracterize Defendants' argument that Plaintiffs have not plausibly alleged a

19  reduced likelihood of beneficial outcomes: Defendants do not dispute the truth of Plaintiffs' factual

20  allegations, but simply contend that Plaintiffs must meet the standard set forth in *Amnesty International*

21  *USA*. In that case, the Court rejected the low bar to standing that Plaintiffs advocate here. The Second

22  Circuit's standard of "objectively reasonable likelihood" that an injury will take place, the Supreme Court

23  held, "is inconsistent with our requirement that 'threatened injury must be certainly impending to

24  constitute injury in fact.'" 568 U.S. at 410. Following *Amnesty International USA*, "likelihood" is not

25  enough. Plaintiffs must show that the injury is "certainly impending." Because Plaintiffs have not pointed

26  to a single school that has adopted the allegedly injurious procedures, let alone a school that one of their

27

28

1    clients attend, they have not met the *Amnesty International USA* standard.[2] *See* Defs.' Mot. at 9–10 & n.1.

2           Furthermore, the notion that an organization may establish standing merely by alleging that it is

3    more difficult for it to achieve beneficial results for its clients flatly contradicts the Supreme Court's

4    admonition that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter

5    how qualified the organization is in evaluating the problem," cannot establish standing. *Sierra Club v.*

6    *Morton*, 405 U.S. 727, 739 (1972). Otherwise, Sierra Club would have established standing in that

7    eponymous case, since it failed to achieve a beneficial result in preserving the Mineral King Valley. *See*

8    *id.* at 729–30. Of course, the Supreme Court rejected that argument, reasoning that "if any group with a

9    bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual

10   citizen with the same bona fide special interest would not also be entitled to do so." *Id.* at 739–40.

11          **B.      Plaintiffs Have Not Plausibly Alleged that They Were Forced to Divert Resources.**

12          Finally, Plaintiffs argue that Defendants misstate organizational standing law with respect to the

13   diversion of resources prong of *Havens Realty*. But Defendants hew to the Ninth Circuit's clear precedent

14   that an organization must show that the "challenged statute or policy . . . *requires* the organization 'to

15   expend resources in representing clients they otherwise would spend in other ways.'" *Comite de*

16   *Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)

17   (emphasis added). This high bar exists for a reason: as discussed in the previous section, were it otherwise,

18   any interest group could get into federal court merely by alleging that it has an interest in a policy and that

19   it expended resources advocating for that interest. *Sierra Club*, *Amnesty International USA*, and a host of

20   other Supreme Court decisions require much more. These decisions distinguish organizations that have

21   expended resources to counteract a concrete injury, *see Animal Legal Defense Fund v. USDA*, 223 F.

22   Supp. 3d 1008, 1013–14 (C.D. Cal. 2016) (observing that organizations were forced to expend resources

23   because their rulemaking petition the Food Safety and Inspection Services was denied), from

24   organizations that have expended resources to counteract an anticipated, remote injury, *see Amnesty Int'l*

25

26   _____

27   [2] Plaintiffs argue that George Washington University (GW) has changed its policy to provide for voluntary alternative dispute resolution. Pls.' Opp'n at 6, n.8. Setting aside that this allegation appears for the first time in the motion to dismiss briefing and that the change took place after this suit commenced, Plaintiffs

28   still have not plausibly alleged that this change, which gives their clients an additional option at their sole discretion, frustrates their mission.

1  *USA*, 568 U.S. at 410–15 (observing that the organizations undertook "costly and burdensome measures"

2  to counteract the statute's effects based purely on speculation of future harm not fairly traceable to the

3  government's actions).

4        The organizational plaintiffs in this case are solidly in the *Sierra Club* and *Amnesty International*

5  *USA* camp. At this juncture, Defendants do not contest the truth of Plaintiffs' allegations that they spent

6  resources providing student trainings, studying the 2017 guidance, asking schools to respond to sexual

7  misconduct complaints, and beginning initiatives to combat sexual misconduct. But other than circularly

8  alleging that Plaintiffs "need" to take these measures, Plaintiffs have not plausibly alleged how such

9  expenditures were necessary to avoid organizational injury. They may not "secure a lower standard for

10  Article III standing simply by making an expenditure based on a nonparanoid fear." *Amnesty Int'l USA*

11  568 U.S. at 416. They therefore have not met the second *Havens Realty* prong.

      **C.**    **Plaintiffs Lack Standing to Bring Their Fifth Amendment Claim.**

13        Even if they had standing with respect to their APA claims, the Plaintiff organizations lack

14  standing to bring their Fifth Amendment claims because they do not allege that *they* have been

15  discriminated against on the basis of sex. *See* Defs.' Mot. at 15–16. Equal protection rights are "personal

16  rights" that are "guaranteed to the individual." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948). But "[p]rudential

17  limitations on standing 'require that parties assert their own rights rather than rely on the rights or interests

18  of third parties.'" *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (quoting *Hong Kong*

19  *Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987)).

20        *Havens Realty* carved out a narrow exception to this rule, explaining that "'Congress intended

21  standing under [the Fair Housing Act] to extend to the full limits of Art. III' and that courts accordingly

22  lack the authority to create prudential barriers to standing in suits brought under that section.'" 455 U.S.

23  at 372 (quoting *Gladstone, Realtors v. Vill. Of Bellwood*, 441 U.S. 91 (1979)). But *Havens Realty*

24  manifestly did not hold that prudential considerations cease to apply in every context. To the contrary,

25  Ninth Circuit precedent post-dating *Havens* makes clear that ordinary prudential standing principles apply

26  to equal protection claims. *See, e.g.*, *McMichael v. Napa Cty.*, 709 F.2d 1268, 1272 (9th Cir. 1983) ("To

27  determine whether McMichael has prudential standing, we must decide whether his interests are within

28  the zone of interests to be protected by the equal protection clause in this case."). And as a matter of

prudential standing, "*even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement*, [the Supreme] Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added); *see also McCollum v. Cal. Dept. of Corr.*, 647 F.3d 870, 878-79 (9th Cir. 2011) (chaplain could not sue over prison policies "impeding his access . . . to his prison congregation," because the policies violated prisoners' free-exercise rights, not his); *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (lawyers could not vindicate constitutional rights of their clients).[3]

Those principles of black-letter law are dispositive of Plaintiffs' equal protection claim. The cases that Plaintiffs have identified suggesting otherwise are not binding precedent and deal with this issue extremely obliquely. Even if the Court accepts Plaintiffs' argument that Defendants' alleged violation of certain female students' rights causes an Article III injury to Plaintiffs under *Havens Realty*, the equal protection rights belong to those students. Under established prudential standing precedent, Plaintiffs cannot assert equal protection rights that do not belong to them. Indeed, the recently filed proposed amicus brief, which challenges Plaintiffs' ability "to speak for women as a class," *see* Mot. Leave to File Br. as Amicus Curiae at 6–7, ECF No. 46, underlines that Plaintiffs do not have a sufficiently "close relation" to women to assert their rights. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991).

## II.   The Court Should Dismiss Plaintiffs' APA Claims.

### A.   The 2017 Guidance Is Not Final Agency Action.

The Court should dismiss Plaintiffs' APA claims because Plaintiffs are not challenging final agency action under 5 U.S.C. § 704. Indeed, it is telling that Plaintiffs now walk back the contention that the 2017 guidance is a legislative rule that should have been promulgated pursuant to notice and comment, *see* Pls.' Opp'n at 15, since interpretive rules and guidance documents generally do not produce legal consequences and are therefore not final agency action. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 714 (D.C. Cir. 2015) (document not final agency action because it "merely provides guidance to aviation safety inspectors"); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452

---

[3] Third-party standing considerations are appropriately analyzed as part of a prudential standing analysis, even following *Lexmark International, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). *See Ray Charles Found. v. Robinson*, 795 F. 3d 1109, 1118 n.9 (9th Cir. 2015).

1    F.3d 798, 808 (D.C. Cir. 2006) ("There is no doubt that the guidelines reflect NHTSA's views on the

2    legality of regional recalls. But this does not change the character of the guidelines from a policy statement

3    to a binding rule.").

4         Plaintiffs invoke *U.S. Army Corps of Engineers v. Hawkes*, 136 S. Ct. 1807 (2016), for the

5    proposition that naked agency statements of the law can amount to final agency action. Yet that case

6    cannot bear the weight that Plaintiffs place upon it. *Hawkes* held that a jurisdictional determination (JD)

7    under the Clean Water Act constitutes final agency action, since a determination that a parcel of land is

8    not subject to the CWA "binds the two agencies authorized to bring civil enforcement proceedings under

9    the Clean Water Act." 136 S. Ct. at 1814. "In other words, a negative JD both narrows the field of potential

10    plaintiffs and limits the potential liability a landowner faces for discharging pollutants without a permit."

11    *Id.* As the Tenth Circuit has explained, "the Court's holding in *Hawkes* turned on the [jurisdictional

12    determination]'s ability to bind the agency for five years." *Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024,

13    1033 (10th Cir. 2017); *see also Parsons v. DOJ*, 878 F.3d 162, 170 (6th Cir. 2017) (distinguishing feature

14    of *Hawkes* is that "jurisdictional determination resulted in legal consequences because a negative

15    determination imposed a legal obligation on two government agencies, preventing those agencies from

16    pursuing enforcement proceedings that they were otherwise authorized to bring").

17         Attempting to squeeze this case into the *Hawkes* mold, Plaintiffs say that "schools that continue to

18    comply with the 2011 DCL and 2014 Q&A are no longer assured of avoiding Title IX enforcement by

19    ED." Pls.' Opp'n at 16. Yet even as to schools that follow ED's guidance, there is no legally binding

20    immunity from enforcement. In *Hawkes*, in contrast, a negative JD created immunity from enforcement

21    as a matter of law: "Under a longstanding memorandum of agreement between the Corps and EPA, [the

22    negative JD] will also be 'binding on the Government and represent the Government's position in any

23    subsequent Federal action or litigation concerning that final determination.'" 136 S. Ct. at 1814. That

24    formal legal consequence distinguishes *Hawkes* from this case. The 2017 guidance describes how ED

25    understands the law, but nothing about it creates legally binding safe harbors.

26         Plaintiffs nonetheless contend that ED requires schools to sign an Assurance of Compliance

27    indicating that they will comply with all ED guidelines. *See* Pls.' Opp'n at 16–17. In actuality, the

28    *guidance* of the type at issue in this case is distinct from the "regulations, guidelines, and standards"

referred to in the Assurance. The terms "guidelines" and "standards" addressed in the form refer to certain notices or appendices ED published in the Federal Register or Code of Federal Regulations or to specific standards referenced in the regulations. *See, e.g.*, *Guidelines for Eliminating Discrimination and Denial of Services on the Basis of Race, Color, National Origin, Sex, and Handicap,* 34 C.F.R. pt. 100, app. B; *Guidelines on current title IX requirements related to single-sex classes and schools*, 67 Fed. Reg. 31102–03, 31098–99 (2002) (issued pursuant to Section 5131(c) of the Elementary and Secondary Education Act of 1965, which required that the Secretary "issue guidelines for local educational agencies" seeking funding for "programs to provide same-gender schools and classrooms"); and 34 C.F.R. § 104.23(c) (incorporating sections 3 through 8 of the Uniform Federal Accessibility Standards).[4]

By way of contrast to *guidelines*, ED expressly made clear in the challenged *guidance* that it is merely "guidance," and that it "does not add requirements to applicable law." 2017 Q&A at 7. ED does not, therefore, as Plaintiffs contend, require schools to agree to comply "with this (and other) policy guidance." And while Plaintiffs suggest that, pursuant to ED's Case Processing Manual, ED could unilaterally modify resolution agreements following the issuance of the guidance, the 2017 Q&A is explicit that "[e]xisting resolution agreements remain binding." *Id.* In any case, even assuming that the future modification of a resolution agreement might constitute final agency action, the mere issuance of a document that hypothetically permits such modification in the future is plainly not. *See, e.g.*, *DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (no final agency action where order "'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action'" (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939))).

Plaintiffs also point to certain "mandatory language" in the guidance. But while it is true that the 2017 Q&A occasionally uses words like "must," the document uses such language to state ED's view of what Title IX requires—not to issue new requirements. *Cf. Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d

---

[4] To be sure, ED expects recipients to comply with the "regulations" implementing the statutes under OCR's jurisdiction, certain "guidelines" that have been subjected to notice-and-comment rulemaking or otherwise required by statute, and technical "standards" incorporated into ED's regulations. None of these items is policy *guidance*.

1023, 1028 (D.C. Cir. 2016) (agency letter "created no new legal obligations beyond those the FLSA already imposed."); *see* 2017 Q&A at 1 (Q&A will "provide information about how OCR will assess a school's compliance with Title IX"); 2017 DCL at 2 (DCL "does not add requirements to applicable law").[5] It would make little sense to conclude that a document providing a "bare statement of the agency's opinion," *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593–94 (9th Cir. 2008), provides legal consequences simply because the agency's opinion is that the separate statute that it is analyzing requires or prohibits certain action.

Finally, Plaintiffs contend that schools are treating the 2017 guidance as final agency action "as a practical matter." Pls.' Opp'n at 18. As Defendants have explained, Plaintiffs have set forth plausible allegations that schools are actually doing so. In any case, however, ample law provides that incidental responses to an agency statement do not govern whether the action is or is not final agency action as a matter of law. *See, e.g.*, *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("practical consequences" do not amount to "legally binding effect"); *Ctr. For Auto Safety*, 452 F.3d at 811.[6]

## B. The Court Should Dismiss Plaintiffs' APA Claims Because They Have Another Adequate Remedy in a Court.

The Court should also dismiss Plaintiffs' APA claims because they have another adequate remedy in a court. Plaintiffs' fear of injury is that pursuant to the 2017 guidance, ED will insufficiently or inappropriately enforce Title IX, and that schools will therefore act in a way that is discriminatory on the basis of sex. *See* Am. Compl. ¶¶ 115–122. Should those fears come to pass, the appropriate remedy is for

---

[5] Plaintiffs observe that the rescinded 2011 and 2014 guidance contained similar disclaimers, yet ED has described them as imposing "regulatory burdens." *See* Pls.' Opp'n at 18. ED's position, however, is that the 2011 and 2014 guidance "*interpreted Title IX* to impose new mandates." 2017 DCL at 1 (emphasis added). Nothing in the 2017 guidance opined on the legal question of whether the 2011 or 2014 guidance constituted final agency action within the meaning of the APA.

[6] In addition, Defendants observed that ED is committed to issuing an actual legislative rule on the subject of the 2017 guidance, such that the guidance does not represent the consummation of ED's decisionmaking. *See* Defs.' Mot. at 18. While Plaintiffs complain that "more than eight months have passed since the Policy issued without a notice of proposed rulemaking from ED," *see* Pls.' Opp'n at 15, ED's Unified Agenda of Federal Regulatory and Deregulatory Action indicates that ED anticipates issuing such a notice mere months from now. *See* ED, No. 1870-AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Spring 2018), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804&RIN=1870-AA14 (indicating that a proposed rule is expected in September 2018).

1   the aggrieved parties to bring a lawsuit against the relevant school.[7]

2          As the D.C. Circuit has explained, "'a private cause of action against a third party otherwise subject

3   to agency regulation'" may constitute an adequate alternative remedy. *Garcia v. Vilsack*, 563 F.3d 519,

4   523 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health &*

5   *Human Servs.*, 396 F.3d 1265, 1271 (D.C. Cir. 2005)). Such suits provide an adequate alternative remedy

6   even if "individual actions against discriminators cannot redress the systemic lags and lapses by federal

7   monitors about which they complain." *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751

8   (D.C. Cir. 1990). "Suits directly against the discriminating entities may be more arduous, and less effective

9   in providing systemic relief, than continuing judicial oversight of federal government enforcement." *Id.*

10  "But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy." *Id.*

11         Just as in *National Wrestling Coaches Association v. ED*, 383 F.3d 1047 (D.C. Cir. 2004) (en

12  banc), the Plaintiffs here are concerned that schools will take action that is inconsistent with Title IX

13  because of guidance materials promulgated by ED. As *National Wrestling Coaches Association* and the

14  precedent discussed above teach, should Plaintiffs' fears come to pass, the appropriate response to such

15  action is lawsuits against the schools that Plaintiffs believe are violating the law.

16  **III.    The Court Should Dismiss Count Two Because the Amended Complaint Contains No**
         **Plausible Allegation That Defendants Engaged in Ultra Vires Action.**

17

18         The Court should also dismiss Plaintiffs' ultra vires claim, as Plaintiffs have not plausibly alleged

19  that Defendants' action "contravene[s] clear and mandatory statutory language." Defs.' Mot. at 20

20  (quoting *Pac. Maritime Ass'n v. Nat'l Labor Relations Bd.*, 827 F.3d 1203, 1208 (9th Cir. 2016)).[8]

21

---

22  [7] Plaintiffs complain that Defendants "argue[] that Plaintiffs lack standing as organizations." Pls.' Opp'n
23  at 19. Yet Plaintiffs either have standing to bring this suit, in which case they presumably would also have
    standing to bring a suit against schools, or Plaintiffs lack standing to bring either suit.

24  [8] Defendants further observed that courts in the Ninth Circuit had questioned whether the doctrine of non-
    statutory review was even theoretically available outside the content of federal labor law. *See* Defs.' Mot.
25  at 20 (citing *Cal. Sportfishing Prot. All. v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521,
    at *11 (E.D. Cal. Oct. 20, 2015)). In response, Plaintiffs point to the Ninth Circuit's decision in *Hawaii v.*
26  *Trump*, 878 F.3d 662, 682–83 (9th Cir. 2016), which suggested that a presidential order outside the context
    of labor law could be subject to *ultra vires* review. The Supreme Court has now reversed that decision.
27  *See Trump v. Hawaii*, No. 17-965, 2018 WL 3116337 (S. Ct. June 26, 2018). Moreover, the Ninth Circuit's
    statement was limited to the President's actions, *see Hawaii*, 878 F.3d at 683, which might be explained
28  in part by the fact that the President's actions are not reviewable under the APA. *See Franklin v.*
    *Massachusetts*, 505 U.S. 788 (1992).

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defendants' Reply ISO Motion to Dismiss

Plaintiffs contend that they are entitled to ultra vires review whenever an agency action is "clearly wrong." *See* Pls.' Opp'n at 24 (quoting *Bates & Guild Co. v. Payne*, 194 U.S. 106, 109-110 (1904)). Going further, they contend that agency action is "clearly wrong" whenever it is "arbitrary and capricious" within the meaning of the APA. *Id.* (citing *Sierra Club v. USPS*, 549 F.2d 1199, 1201 (9th Cir. 1976)). The upshot of Plaintiffs' theory is that 5 U.S.C. § 704's limitation on the reviewability of final agency action is a nullity, and the APA standard of review is available for *all* agency actions, final or not.

Plaintiffs' cases do not support that extraordinary result. *Sierra Club v. USPS* did not involve ultra vires review, and *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 525 (9th Cir. 2012) (en banc), *quoted in* Pls.' Opp'n at 24, both rejected a finding of ultra vires action and simply noted that the *Chevron* framework (which counsels deference to executive branch decisions) is generally applicable in this context. The Ninth Circuit did not suggest that an agency acts ultra vires whenever an agency exercises its authority in a way that a plaintiff believes is arbitrary or capricious. As for *City of Arlington v. FCC*, 569 U.S. 290 (2013), it recognizes only that an agency's action may be ultra vires when it is contrary to the "authoritative[] prescri[ption]" of Congress, *id.* at 297, which is entirely consistent with Defendants' reading of the law.

Ultimately, no case supports Plaintiffs' remarkably expansive understanding of ultra vires review. Instead, the Ninth Circuit has been clear that to be ultra vires, an agency action "must contravene 'clear and mandatory' statutory language." *Pac. Maritime Ass'n*, 827 F.3d at 1208; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984).[9] Plaintiffs disagree with *how* Defendants are exercising the authority to issue guidance documents that they plainly possess, but that does not amount to an ultra vires claim. *See Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) ("Garden-variety errors of law or fact are not enough."). Because Plaintiffs cannot identify mandatory statutory language that Defendants are violating, the Court should dismiss Plaintiffs' ultra vires claim.

---

[9] This case also makes clear that for ultra vires review to be available, the party seeking review must be wholly deprived of a meaningful and adequate means of vindicating its statutory rights." *Pac. Maritime Ass'n*, 827 F.3d at 1208. Plaintiffs suggest that Defendants do not challenge this element, but Defendants have explained (and reiterate here) that Plaintiffs do in fact have an adequate alternative remedy. *See* Defs.' Mot. at 18–19; *supra* Part II.B.

**IV.    The Court Should Dismiss Count Three Because Plaintiffs Do Not Plausibly Plead That Defendants' Purpose Was to Discriminate Against Women.**

Finally, the Court should dismiss Plaintiffs' equal protection claim. Plaintiffs do not dispute that the 2017 guidance is facially neutral, such that they can only state a claim if they plead facts rendering it plausible that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part *because of, not merely in spite of, its adverse effects upon* [women]." *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). In an attempt to satisfy that pleading burden, Plaintiffs abandon any allegation of intentional discrimination and instead allege that Defendants' efforts to improve the sexual misconduct response regime were influenced by the "gender stereotype that women and girls lack credibility when reporting sexual harassment." Pls.' Opp'n at 21.

Plaintiffs fall far short of satisfying their pleading burden. At the outset, even if it were possible to plead intentional discrimination by alleging that stereotyped views unintentionally influenced guidance with a nondiscriminatory purpose, none of the statements to which Plaintiffs point reflects stereotyped views about women. Although Plaintiffs latch onto former Acting Assistant Secretary Jackson's July 2017 comments to *The New York Times*, Defendants have previously demonstrated that this statement (1) at most, merely reflects a view that most OCR investigations do not involve sexual assault; and (2) does not contain any sex-based assessment of credibility (i.e., it does not state that women are uniquely unreliable). *See* Defs.' Mot. at 23. Ms. Jackson has expressed the view that there have been too many complaints of sexual assault for conduct that does not meet the definition of such conduct, but her statement cannot be plausibly read to mean that *women* are especially likely to lie about or misremember sexual encounters. Furthermore, Plaintiffs mischaracterize *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), as supporting the use of *any* contemporaneous statements by adjudicators as evidence of animus. In fact, the Supreme Court considered only statements "at the [decision maker's] formal public hearings." *Id.* at 1729–30; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (considering only "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."); *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 499–500 (9th Cir. 2016 (considering only letters and statements at a public hearing).

Plaintiffs also rely on what they describe as "DeVos' preferential access for those who assert that

women lie about their experiences of sexual harassment," as well as "the statements of the President of the United States who directs Administration policy goals and to whom DeVos reports." Pls.' Opp'n at 23. Although the Ninth Circuit has held that government officials who do not hold discriminatory views may nevertheless violate equal protection where they act on the basis of "community animus," *Avenue 6E Invs., LLC*, 818 F.3d at 504, that case presupposes that the community animus influenced the challenged decision. The Amended Complaint, however, contains no allegation that the President had any personal involvement in promulgating the 2017 guidance—even assuming (wrongly) that his denials of specific allegations of sexual assault are tantamount to doubt of women generally, *see* Pls.' Opp'n at 23 n.20. And notwithstanding Plaintiffs' complaint about "preferential access" for certain interest groups, the Amended Complaint makes clear that Defendants met with groups on both sides of these issues. *See* Am. Compl. ¶¶ 89–90.

Plaintiffs have thus not plausibly alleged that stereotyped views influenced the 2017 guidance. But even if Plaintiffs had plausibly made such an allegation, they cannot make out an equal protection challenge to a facially neutral policy (which requires intent to discriminate) merely by alleging that stereotyped views unintentionally contributed to its development. To the contrary, while stereotypes surely may supply a discriminatory intent in some circumstances, the Supreme Court has made clear that equal protection's animus requirement "demand[s] . . . at least a purpose that focuses upon women *by reason of their sex*—for example . . . , the purpose of 'saving' women *because they are women* from a combative, aggressive profession such as the practice of law." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). In other words, while stereotypes can be relevant if they demonstrate an intent to discriminate on the basis of sex, there still needs to be an intent to discriminate on the basis of sex.

The cases on which Plaintiffs rely are consistent with Defendants' reading of the law. To be sure, when a government action classifies on the basis of sex (i.e., is facially discriminatory), it is subject to intermediate scrutiny, and sex stereotypes will be an inadequate justification for the discrimination. *See, e.g.*, William J. Rich, 1 Modern Constitutional Law § 13:5 ("The Supreme Court Justices repeatedly concluded that administrative convenience served by use of such stereotypes will not meet a state's need for an 'important government interest.'"); Erwin Chemerinsky, Constitutional Law: Principles and Policies 794-798 (similar). Judge Berzon's concurring opinion in *Latta v. Otter* simply restates that

proposition. *See Latta v. Otter*, 771 F.3d 456, 480 (9th Cir. 2014) (Berzon, J., concurring) (opining that "same-sex marriage prohibitions facially classify on the basis of sex" and that "plaintiffs challenging policies that facially discriminate on the basis of sex need not separately show 'intent' or 'purpose' to discriminate"), *cited in* Pls.' Opp'n at 22. But that principle is irrelevant here, because it is undisputed that the challenged guidance is facially neutral.

By contrast, *Back v. Hastings on Hudson Union Free. Sch. Dist.*, 365 F.3d 107 (2d Cir. 2004), *cited in* Pls.' Opp'n at 22, is an example of a case where there was actual intent to discriminate on the basis of sex, insofar as the court found that the defendants held stereotyped views about women that they believed rendered discrimination appropriate: "[I]t takes no special training to discern stereotyping in the view that a woman cannot 'be a good mother' and have a job that requires long hours." *Id.* at 120. That case thus fits comfortably in the *Bray* framework, which recognizes that when a decision maker holds stereotyped views about women that he or she believes renders women worthy of discrimination, and then takes action that discriminates against women, there is a potential equal protection clause violation. *See Bray*, 506 U.S. at 270, 272. *This* case, however, does not fall into that framework: Plaintiffs' amended complaint does not contain any plausible allegations establishing a nexus between the decision makers' alleged stereotypes about women and Defendants' intent or purpose to cause "adverse effects upon" them as a result. Rather, at the very most, the amended complaint attempts to allege that Defendants held certain stereotypes about women, and that those stereotypes unintentionally influenced Defendants' attempts to improve the fairness and accuracy of campus sexual misconduct investigations.

Nor are Plaintiffs' cases involving police departments that fail to adequately respond to domestic violence applicable here. For instance, *Balisteri v. Pacifica Police Department*, 901 F.2d 696, 701 (9th Cir. 1988) is distinguishable because in that case there was a credible allegation that the police officer held stereotyped views that he believed rendered a woman worthy of discriminatory treatment. *See id.* (officer "did not blame plaintiff's husband for hitting her[] because of the way she was 'carrying on'"). Similarly, in *Motley v. Smith*, No. 15-905, 2016 WL 3407658 (E.D. Cal. June 20, 2016), the court permitted an equal protection claim to go forward only against a defendant who had made comments that "speak to a belief that women, through their personal choices, somehow become *more deserving of*

*becoming victims of domestic abuse.*" *Id.* at *8 (emphasis added).[10] Again, that is not this case: even if the Court assumes that Defendants believe women hold certain stereotypical characteristics, an assumption that Defendants vehemently contest, there is no allegation that Defendants believed women were "deserving" of sexual assault or other discriminatory treatment.

Plaintiffs make two other arguments. First, they again contend that the 2017 Guidance has a disparate impact on women and girls. *See* Pls.' Opp'n at 23–24. But Defendants have previously explained that because complainant and respondent status is not equally distributed with respect to sex, literally any policy change in this area will necessarily affect men and women differently. Because it is not possible to craft guidance that has no disparate impact on either sex, there is no basis for concluding that this factor points in the direction of discriminatory intent.[11] Second, Plaintiffs contend that "the substantive conclusions ED presented as justification for the new guidance "were factually and legally baseless, raising the inference of discriminatory intent," *id.* at 23, but that attempt to constitutionalize an ordinary policy disagreement should be rejected out of hand. *See Bray*, 506 U.S. at 270. Plaintiffs are entitled to disagree with ED's guidance, but they cannot seriously claim that there is not even a "credible justification" for it. *See id.* (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997).

## V.    Conclusion

For the foregoing reasons, the Amended Complaint should be dismissed.

Respectfully Submitted,

---

[10] *Smith v. City of Elyria*, 857 F. Supp. 1203 (N.D. Ohio 1994), and *Thurman v. City of Torrington*, 595 F. Supp. 1521 (D. Conn. 1984), are equally distinguishable. In *Smith*, the court found "facts [that] demonstrate discriminatory intent because they reveal a sexually discriminatory assumption that Alfred Guerrant had a right to exercise dominion and control over his ex-wife and her home." 857 F. Supp. at 1212. *Thurman* is even further afield; it did not involve facially neutral action, but rather the alleged "practice of affording inadequate protection, or no protection at all, to women." 595 F. Supp. at 1527; *see also id.* ("In its memorandum and at oral argument the City has failed to put forward any justification for its disparate treatment of women.").

[11] The Supreme Court recently reiterated the limited value of disparate impact in determining discriminatory intent. *See Hawaii*, 2018 WL 3116337, at *22 ("Plaintiffs and the dissent nonetheless emphasize that five of the seven nations currently included in the Proclamation have Muslim-majority populations. Yet that fact alone does not support an inference of religious hostility, given that the policy covers just 8% of the world's Muslim population and is limited to countries that were previously designated by Congress or prior administrations as posing national security risks.").

Dated: June 27, 2018

CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

/s/ Steven A. Myers
STEVEN A. MYERS
(NY Bar # 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Rm. 7334
Washington, DC 20530
Tel: (202) 305-8648
Fax: (202) 616-8460
E-mail: steven.a.myers@usdoj.gov

*Attorneys for Defendants*