Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 621-0672
Fax: (415) 621-6744
Email: jreisch@equalrights.org

Javier M. Guzman*
Robin F. Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org, kjones@democracyforward.org

Leecia Welch (CA Bar No. 208741)
Alice Y. Abrokwa*
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, and
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, aabrokwa@youthlaw.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, schandy@nwlc.org

*admitted pro hac vice

Counsel for Plaintiffs

Plaintiffs' Supplemental Brief re Motion to Dismiss; Case No.: 3:18-cv-00535-JSC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SURVJUSTICE, INC., *et al.*, ) | |
| ) | Case Number: 3:18-cv-00535-JSC |
| Plaintiffs, ) | |
| ) | PLAINTIFFS' SUPPLEMENTAL |
| v. ) | MEMORANDUM IN SUPPORT OF |
| ) | THEIR OPPOSITION TO DEFENDANTS' |
| ELISABETH D. DEVOS, in her official ) | MOTION TO DISMISS |
| capacity as Secretary of Education, *et al.*, ) | |
| ) | DEMAND FOR JURY TRIAL |
| Defendants. ) | |
| ) | |

Plaintiffs submit this supplemental memorandum to provide additional information and argument concerning why Defendants' 2017 Title IX Policy is final agency action and therefore reviewable under the Administrative Procedure Act. As directed by the Court at the July 19, 2018 hearing on Defendants' pending motion to dismiss, this memorandum addresses the second prong of the test set forth in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997): whether the challenged action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.*[1] Specifically, this memorandum responds directly to questions raised by the Court at the hearing, including the ways in which the 2017 Title IX Policy will affect legal actions enforcing Title IX as a matter of law, including protecting schools from damages liability in litigation by students, providing a presumptively controlling interpretation of Title IX regulations due to deference it may receive, limiting the discretion of the Department of Education's (ED's) Office for Civil Rights (OCR) in finding and resolving violations in Title IX investigations, and binding schools who promised to comply with the Policy.

---

[1] Plaintiffs incorporate by reference the additional arguments and authorities presented in their Opposition to Defendants' Motion to Dismiss, Dkt. No. 45, including the requirement that finality "must be interpreted in a pragmatic and flexible manner," focusing on the "practical" as well as "legal effects of the agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) ("[C]ourts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled.").

Plaintiffs' Supplemental Brief re Motion to Dismiss; Case No.: 3:18-cv-00535-JSC    Page: 1

### A. A School May Rely on the 2017 Title IX Policy to Establish that it Did Not Violate a Student's Rights Under Title IX with Deliberate Indifference.

Finality can be demonstrated by showing that the agency's action will have legal consequences for litigation between private parties. *Cf. W. Coast Truck Lines, Inc. v. Am. Indus., Inc.*, 893 F.2d 229, 234 (9th Cir. 1990) (agency declaration on reasonableness of shipping rates deemed final, even though agency could not enforce the declaration itself and impact was felt only in third-party litigation). The new Policy (and guidance it rescinded) state what ED has decided Title IX and its regulations require a school to do in response to student-on-student sexual harassment, including violence, and what ED has decided is *not* required of a school.

Following such guidance can immunize schools from damages claims as a matter of law. One of the necessary elements to establish damages from a school under Title IX based on its response to sexual harassment of a student is that the school acts with "deliberate indifference," which occurs "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736, 739 (9th Cir. 2000). It is difficult to imagine a situation where a recipient *complying* with ED's guidance could be found to be acting in a "clearly unreasonable" manner. While Plaintiffs are not aware of a case directly on point, *T.B. ex rel Brenneise v. San Diego Unified School Dist.*, 806 F.3d 451 (9th Cir. 2015) effectively resolves the matter. In that case, a student with a disability sought damages against a school district under Section 504 of the Rehabilitation Act, which also requires a showing of deliberate indifference. *Id*. at 469. The Ninth Circuit agreed that, in that instance, a violation of a state law standard constituted a federal violation, but held that the school district was not deliberately indifferent to the "right to be assisted by a person qualified under California law" because "California's requirements are not spelled out with precision," and the administrative adjudication on which plaintiffs attempted to rely did not "shed light on how much training … [was] required to be able to provide nursing services under California law," *id.* at 470-471. The court concluded that "at most" the school district "was wrong about the state's … requirements, not that it was deliberately indifferent." *Id*. at 470.[2]

---

[2] Conversely, the court also held there was a triable issue of fact regarding the district's

If uncertainty about the law is sufficient to bar a finding of deliberate indifference, then it would certainly follow that affirmative statements from the responsible administrative agency that certain conduct *was* lawful would likewise bar such a finding as a matter of law. *Cf. FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254, (2012) (setting aside agency sanctions under Due Process Clause when regulated entities "did not have fair notice of what was forbidden" under the agency "Guidelines in force when the [events] occurred"); *U.S. v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) (defendant could avoid criminal liability if it showed that "it was affirmatively misled by the responsible administrative agency into believing that the law did not apply in this situation"). Indeed, district courts have relied upon compliance with the rescinded 2011 DCL to find that a school's disciplinary processes were not so flawed that they led to an erroneous outcome nor were they based on discriminatory bias against men. *See Yu v. Vassar*, 97 F. Supp. 3d 448, 465, 471 (S.D.N.Y. 2015); *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *10 (D. Mass. Aug. 26, 2013).

Federal courts have taken a similar approach with other statutes that require a showing of "reckless disregard" or "willfulness." The Ninth Circuit recently held in a case involving the Fair Credit Reporting Act that reliance on agency guidance could prevent a finding of "reckless disregard." *Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 760-61 (9th Cir. 2018). In that case, the agency had issued a memorandum stating "that it had investigated" a problem and "discovered that the underlying problem was not due to inaccurate reporting by furnishers or [consumer reporting agencies]," of which the defendant was one. The court of appeals held "[t]his agency guidance suggests [defendant's] conduct, even if it were a violation of the [statute], was not objectively unreasonable and therefore not reckless." *Id*. Similarly, in a case under the Fair Labor Standards Act (FLSA) against the federal government, the Federal Circuit held that, even though the government had violated the law, its action was not willful. The court adopted a "*per se* rule" that "any mistake in responding to the demands of the FLSA is not willful" when the federal agency "accepted and followed the advice of the Secretary of Labor."

---

deliberate indifference in the following year, after an administrative law judge "had suggested strongly" that the care provided would not be sufficient to "fulfill its legal duties." *Id.* at 471.

Plaintiffs' Supplemental Brief re Motion to Dismiss; Case No.: 3:18-cv-00535-JSC          Page: 3

*Cook v. U.S.*, 855 F.2d 848, 850 (Fed. Cir. 1988); *Zachary v. Rescare Okla., Inc.,* 471 F. Supp. 2d 1183, 1190 (N.D. Okla. 2006) ("Defendants cannot be found to be in reckless disregard" when "they were, at all relevant times, in possession of a letter from the DOL stating that their conduct at Oklahoma operations did not violate the FLSA"). As in those cases, a school's compliance with the 2017 Title IX Policy will provide safe harbor from deliberate indifference claims, creating a legal consequence under *U.S. Army Corps of Engs. v. Hawkes Co, Inc*., 136 S. Ct. 1807 (2016).

### B. The 2017 Title IX Policy Will Presumptively Receive "Controlling" Weight in Litigation About the Meaning of Title IX Regulations. [3]

The 2017 Title IX Policy provides ED's current definitive interpretation of arguably ambiguous Title IX regulations (such as the regulatory requirement that grievance procedures be "prompt and equitable"), meaning that both the government and private litigants may seek to have the Policy accorded deference in litigation under *Auer v. Robbins*, 519 U.S. 452 (1997) (sometimes referred to as *Seminole Rock* or *Martin* deference).[4] Under *Auer*, when an agency is interpreting its own ambiguous regulation, that interpretation is "controlling" unless it is "plainly erroneous or inconsistent with the regulation." *Id.* at 461 (quoting in part from *Seminole Rock*).

Because deference of this kind frequently dictates the court's interpretation of an agency's ambiguous regulation (absent a doctrinal exception such as inconsistency with the

---

[3] Plaintiffs reserve the right to argue on the merits that the Policy is not entitled to deference because it conflicts with Title IX and its regulations, was adopted without proper APA processes (such as a reasoned explanation and consideration of alternatives), or is exempt from *Auer*, *see Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1266-67 (9th Cir. 2015). The Court need not resolve the question of which level of deference the Policy may receive at this stage to determine that its presumptive claim to deference creates legal consequences. *See Sackett v. EPA*, 566 U.S. 120, 126 n.2 (2012) (holding that "legal consequences" existed for purposes of finality even while stating: "[w]e do not decide today that the Government's position is correct, but assume the consequences of the order to be what the Government asserts.").

[4] *Lezama-Garcia v. Holder*, 666 F.3d 518, 525 (9th Cir. 2011) (equating deference under *Auer* and *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144 (1991)) *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (equating deference under *Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410 (1945), and *Martin*). While some members of the Supreme Court have questioned the underpinnings of *Auer* deference, it is still governing law. *See Campos-Hernandez v. Sessions*, 889 F.3d 564, 569 (9th Cir. 2018) (applying *Auer*).

Plaintiffs' Supplemental Brief re Motion to Dismiss; Case No.: 3:18-cv-00535-JSC        Page: 4

underlying statute), courts have recognized that such deference is a legal consequence for purposes of the APA. The D.C. Circuit held that because the "authoritative interpretation of an executive official has the legal consequence ... of commanding deference from a court that itself might have reached a different view if it had been free to consider the issue as on a blank slate," the agency's interpretation has the "significant legal ... effect" required for finality. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) ("letter from the head of the EPA's Pesticide Division, speaking for the agency charged with administering FIFRA" was final).

Similarly, the Sixth Circuit has held that *Auer/Martin/Seminole Rock* deference supports "finding the requisite 'legal consequences'" because "the 'controlling weight' that federal courts generally give an agency's interpretation of its own ambiguous regulation … would seem to have the requisite legal consequences for APA finality purposes." *Air Brake Sys. Inc. v. Mineta*, 357 F.3d 632, 643-44 (6th Cir. 2004).[5] The court cited approvingly a law review article that concluded that "*Seminole Rock* has a significant impact on the public's legal rights and obligations." *Id.* at 644 (quoting John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules,* 96 Colum. L. Rev. 612, 615 (1996)).

Consistent with past practice, the government is likely to seek "controlling" *Auer* deference for the Policy. For example, the government argued that OCR guidance (including a Q&A document and an opinion letter) regarding the rights of transgender students was entitled to *Auer* deference. *See* U.S. Amicus Brief, *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.* (4th Cir.), 2015 WL 6585237 at 23-24;[6] *see also, e.g.*, U.S. Amicus Brief, *Nat'l Ass'n of the Deaf v. Harvard Univ.* (D. Mass), 2015 WL 10733355 (urging *Auer* deference to OCR letters

---

[5] The court held that the documents at issue were not entitled to *Auer* deference because DOJ "emphatically denie[d] that the opinion letters … are authoritative views entitled to any deference." 357 F.3d at 644. There has been no such assertion here, nor could one be colorable given the past litigation views of the United States, discussed below; and in any event private litigants could still claim deference for the new Policy, an issue not before the Sixth Circuit.

[6] The government made the argument for *Auer* deference in the amicus brief, although in separate litigation it argued that the guidance documents setting forth the rights of transgender students with regard to restroom access were not final. *See Texas v. U.S.*, 201 F. Supp. 3d 810, 824 (N.D. Tex. 2016) (determining that such guidance was final agency action).

Plaintiffs' Supplemental Brief re Motion to Dismiss; Case No.: 3:18-cv-00535-JSC           Page: 5

interpreting regulations under Rehabilitation Act); DOJ, *Title VI Legal Manual* § III.2 n.3 (agency's regulatory interpretations "controlling"), https://www.justice.gov/crt/fcs/T6manual.

Courts have been generally receptive to those claims. The Fourth Circuit agreed with the government that the relevant OCR guidance was entitled to "controlling weight" on a particular issue. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 721 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017). Likewise, a federal district court held that the now-rescinded 2011 DCL was entitled to "appreciable deference." *Doe v. Univ. of Massachusetts-Amherst*, No. 14-30143-MGM, 2015 WL 4306521, at *7 & n.3 (D. Mass. July 14, 2015) (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (citing *Martin*)).

The Ninth Circuit's decision in *Neal v. Board of Trustees of Cal. State Univs.*, 198 F.3d 763 (9th Cir. 1999), is in accord. It held that a 1996 letter from OCR's then-Assistant Secretary (Norma Cantu) regarding a Title IX athletics regulation "merit[s] deference under *Martin*," which it described as requiring a court to "defer substantially to an agency's interpretation of its own regulations." *Id*. at 771, 770;[7] *see Mansourian v. Regents of Univ. of Cal.,* 602 F.3d 957, 965 n.9 (9th Cir. 2010) (following *Neal*). And other courts have given *Auer* deference to various documents issued by ED interpreting its regulations under Title IX,[8] and regulations prohibiting disability discrimination.[9] *Cf. Taylor v. Vermont Dep't of Educ.,* 313 F.3d 768, 780 (2d Cir. 2002) (Sotomayor, J.) (*Auer* deference for ED policy letter interpreting IDEA regulation).

Even if the government were to disclaim such deference in this litigation (contrary to its views regarding analogous OCR guidances), such a disclaimer would not be effective. Assuming

---

[7] *Neal* deferred to a number of other OCR documents. Because the others went through a notice-and-comment process, or at least solicited public comment before being issued, Plaintiffs have focused on the Ninth Circuit's treatment of the "Cantu letter" for clarity.

[8] *See, e.g.*, *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) (*Auer* deference to OCR 2008 DCL); *Portz v. St. Cloud State Univ.*, No. CV 16-1115, 2018 WL 3579109, at *3 (D. Minn. July 25, 2018) (*Auer* deference to OCR's internal Title IX Athletics Investigator's Manual).

[9] *See, e.g.*, *D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 259 (4th Cir. 2013) (*Auer* deference to OCR "opinion letter"); *Nat'l As''n of the Deaf v. Harvard Univ.*, No. 3:15-CV-30023-MGM, 2016 WL 3561622, at *8 (D. Mass. Feb. 9, 2016) (*Auer* deference to OCR DCL), *report and recommendation adopted*, 2016 WL 6540446 (D. Mass. Nov. 3, 2016).

this court accepted the disclaimer in this case, no other court would be bound by it (even if the court became aware of it). Nothing would prevent schools and students in private civil litigation to ask a court to defer to the 2017 Title IX Policy, or even prevent a court doing so *sua sponte*. *Cf.* U.S. Reply Br., *Ammex, Inc. v. U.S.* at 18 (Fed. Cir.), 2005 WL 1178132.

### C.  The Policy Binds OCR Employees, Creating Legal Consequences.

The 2017 Title IX Policy, like its withdrawn predecessors the 2011 DCL and 2014 Q&A, binds the hundreds of employees of ED's OCR located in 12 regional offices as they make findings in response to complaints about whether or not a school has violated Title IX or its regulations. *Cf. Appalachian Power v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("if an agency acts as if a document issued at headquarters is controlling in the field" it may be final).

An OCR finding of a violation has legal consequences itself because it is a necessary precondition to withholding a school's federal funds. The regulations require OCR to try to resolve any violation through informal means, *i.e.*, a resolution agreement between the school and OCR; only if that is unsuccessful may OCR initiate formal administrative proceedings to withhold funds. 34 C.F.R. § 106.71 (incorporating §§ 100.7(d)(1), 100.8(a) & (c)). During this investigation and resolution process, OCR treats its guidance as binding as it does its regulations. OCR's Case Processing Manual (CPM) states that when OCR issues a letter of non-compliance, the letter "must include, as appropriate, … [c]onclusions for each allegation that reference the relevant facts, the applicable regulation(s) and *OCR policy*, and the appropriate legal standards." ED CPM § 303(e) (Mar. 5, 2018) (emphasis added), https://www.ed.gov/ocr/docs/ocrcpm.pdf. Internal guidance from OCR in June 2017 instructing staff to follow "the statutes and regulations" [and] published guidance" in investigating alleged violations verifies this reading.[10]

---

[10] Ltr. from Ass't Sec'y Candice Jackson to Regional Dirs., *OCR Instructions to the Field re Scope of Complaints* (June 6, 2017), *available at* http://blogs.edweek.org/edweek/rulesforengagement/OCR-Instructions-to-the-Field-Re-Transgender.pdf. This document is a government record which to our knowledge ED has not disputed and is appropriately subject to judicial notice. It was reported on by ProPublica, *see* Jessica Huseman & Annie Waldman, *Trump Administration Quietly Rolls Back Civil Rights Efforts Across Federal Government*, ProPublica (June 15, 2017) https://www.propublica.org/article/trump-administration-rolls-back-civil-rights-efforts-federal-government, and has been acknowledged by members of the United

OCR relied on its former policy documents to find that schools had violated Title IX and its regulations, and is now relying on the 2017 Title IX Policy to find that schools have not violated Title IX and its regulations. For example, OCR investigated Harvard Law School's treatment of sexual violence complaints and determined in a formal letter that the school "failed to comply with the requirements for the prompt and equitable response to complaints of sexual harassment and sexual assault."[11] OCR found, *inter alia*, that the school had not ensured that certain individuals "received training adequate to meet the requirements of OCR policy and guidance;" that a school policy "did not address complaints against third parties, as required by Title IX and OCR policy and guidance;" and that the school policy "did not require written notification of the outcome of the complaint … as required by Title IX and OCR policy and guidance." Letter of Findings at 3, 10, 11.

OCR also determined that the school had violated Title IX because, "contrary to the guidance detailed in OCR's 2011 Dear Colleague Letter," the school's sexual harassment policy "did not expressly state that mediation must not be used to resolve complaints of sexual assaults and violence." *Id*. at 11. Further, OCR noted that the school unlawfully provided additional post-hearing rights only for respondents in some circumstances without affording the same right to complainants, expressly relying on the 2011 DCL for the principle that "if a school provides for appeal of the findings or remedy, it must do so for both parties." *Id*. at 10-11. In response, the school agreed to revise its procedures "to ensure compliance with the Title IX regulation and OCR policy." *Id.* at 17. Each issue was specifically addressed in the Resolution Agreement.

The Harvard Law School enforcement action is not unique. Following the 2011 DCL, OCR issued numerous Letters of Findings with accompanying Resolution Agreements based on

---

States Senate, *see* Ltr. from U.S. Sen. Patty Murray, et al., to Sec'y of ED Betsy DeVos (June 27, 2017), https://assets.documentcloud.org/documents/3878460/Betsy-DeVos-ED-Office-of-Civil-Rights-OCR.pdf.

[11] Ltr. from Joel J. Berner, OCR, to Martha Minow, Dean, Harvard Law School (Dec. 30, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01112002-a.pdf (Letter of Findings) at 2; *Resolution Agreement*, OCR (Dec. 23, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01112002-b.pdf (Agreement).

the DCL's interpretations of Title IX and its implementing regulations—including to Notre Dame, Michigan University ("MSU"), State University of New York ("SUNY"), and Princeton—around a host of issues that are addressed differently in the new Policy, including burden of proof, one-sided appeals, mediation of sexual assault complaint, interim measures, and delay in investigations.[12] These Letters rely on the rescinded guidance as binding interpretation of Title IX. *See*, *e.g.* Princeton Letter at 3 n.2 ("The applicable legal standards described herein are more fully discussed in [the 2011 DCL]; for further clarification on this topic, see [the 2014 Q&A]."). None of these findings would be permitted under the new Policy and, under CPM § 503(a), these Resolution Agreements may now be modified at OCR's discretion because of the Policy.

The new Policy binds OCR employees just as the earlier guidance did. For example, in June 2018 OCR issued a Letter of Findings against the University of North Carolina. This stated, that UNC's sexual harassment policy was not equitable because it did not allow for both parties to appeal.[13] Questioned about how this finding was consistent with the new Policy, "Department spokeswoman Liz Hill said that OCR is in the process of correcting its correspondence with the

---

[12] Resolution Agreement, Univ. of Notre Dame & OCR, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/05072011-b.pdf ("In accord with the recommendations in the [2011 DCL], the University will conclude its Title IX investigations within sixty (60) calendar days of receipt of a complaint, except in extraordinary circumstances."); Resolution Agreement, MSU & OCR (Aug. 28, 2015), https://www.ed.gov/documents/press-releases/michigan-state-agreement.pdf (violation because interim measures did not reduce burden on complainant and one-sided appeal rights); Ltr. from Timothy Blanchard, OCR, to Nancy Zimpher, Chancellor, SUNY (Oct. 31, 2013), http://www.ed.gov/documents/press-releases/suny-new-york-letter.doc at 18 ("[T]he SUNY System procedures do not: … (4) state that mediation of sexual assault complaints is prohibited, as recommended by OCR's Dear Colleague Letter on Sexual Violence[.]"); Ltr. from Timothy Blanchard, OCR, to Christopher L. Eisgruber, President, Princeton Univ. (Nov. 5, 2014), https://www.ed.gov/documents/press-releases/princeton-letter.pdf (one-sided appeal rights and failure to use preponderance standard).

[13] Compl. Ltr. and Resolution Agreement, UNC & OCR (June 2018), https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF-1.pdf. ED seems to no longer be publishing resolution agreements as a matter of course. None appear on its website post-dating the 2017 Title IX Policy, making it difficult to find additional examples.

university to let it know [UNC's] policy is consistent with the department's temporary rules."[14] But for the new Policy, UNC would have remained subject to a finding of noncompliance for the unequal appeal rights it permits, and would have been required to change its practices through a binding Resolution Agreement. Now, due solely to the new Policy, UNC need not enter into a legally-enforceable agreement with OCR or be subject to a proceeding seeking to withdrawal of federal funds. This change in UNC's legal obligations confirms the Policy is final agency action. *See*, *e.g.*, *Hawkes*, 136 S. Ct. at 1815 (deprivation of safe harbor indicates finality).

### D. The 2017 Title IX Policy Binds Schools Because They Must Promise They Will Comply With ED Policy in Their Assurances of Compliance.

As Plaintiffs argued in their original Opposition (at 16-17), the legal obligations of schools were changed by the 2017 Title IX Policy because schools were required to sign an OCR assurance to comply with *all* "guidelines[] and standards issued by the Department;" and a separate OMB assurance to comply with "all applicable requirements of all other … policies governing this program." Defendants argue in their Reply (at 14-15) that the 2017 Title IX Policy is a "guidance" not a "guideline." In the recent past, ED has used these terms interchangeably. *See* ED, Press Release, *Guidance Issued on Responsibilities of Schools to Address Sexual Violence, Other Forms of Sex Discrimination* (Apr. 29, 2014) (describing the 2014 Q&A document as "guidelines … [that] provide greater clarity about the requirements of Title IX"), https://www.ed.gov/news/press-releases/guidance-issued-responsibilities-schools-address-sexual-violence-other-forms-sex-discrimination. In any event, defendants offer no reason why the 2017 Title IX Policy doesn't fall squarely within the "other … policies" that the OMB assurance addresses. By requiring recipients to promise to comply with ED's policies, legal consequences attach when ED changes its policies.  *See* Opposition at 17.

### CONCLUSION

Plaintiffs respectfully request the Court deny the Motion to Dismiss in its entirety.

---

[14] Jeremy Bauer-Wolf, *The "Confusing" Case of UNC's Title IX Violations*, Inside Higher Ed, (June 27, 2018), https://www.insidehighered.com/news/2018/06/27/unc-found-have-violated-title-ix-multiyear-investigation.

Respectfully submitted,                                        Date: August 2, 2018

/s/ Robin F. Thurston
Alice Y. Abrokwa*
Leecia Welch (CA Bar No. 208741)
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, and
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, aabrokwa@youthlaw.org

Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 621-0672
Fax: (415) 621-6744
Email: jreisch@equalrights.org

Javier M. Guzman*
Robin F. Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org, kjones@democracyforward.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, etang@nwlc.org, schandy@nwlc.org

*admitted pro hac vice
Counsel for Plaintiffs