1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SURVJUSTICE INC., et al.,

    Plaintiffs,

  v.

ELISABETH D. DEVOS, et al.,

    Defendants.

Case No. 18-cv-00535-JSC

**ORDER RE: DEFENDANTS' MOTION TO DISMISS**

Re: Dkt. No. 40

    Plaintiffs SurvJustice, Inc., Equal Rights Advocates, and Victim Rights Law Center (collectively, "Plaintiffs") bring this action for injunctive relief against Defendants U.S. Department of Education ("the Department"), Secretary Elisabeth D. DeVos, and Acting Assistant Secretary for Civil Rights Kenneth L. Marcus (collectively, "Defendants").[1]  Plaintiffs seek to vacate the Department's new policy regarding enforcement of Title IX of the Education Amendments of 1972, as detailed in Department guidance issued on September 22, 2017.  (Dkt. No. 23 at ¶ 1.)[2]  Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state claims upon which relief can be granted.  (Dkt. No. 40.)  After carefully considering the arguments and briefing submitted, and having had the benefit of oral argument on July 19, 2018, the Court grants Defendants' motion to dismiss.  The allegations are insufficient to show standing to bring an equal protection claim, the 2017 Guidance

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 18 & 36.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

1  does not constitute final agency action for purposes of the APA claim, and the allegations do not

2  plausibly suggest that Defendants acted outside their authority for the *ultra vires* claim.

3  **BACKGROUND**

4  **I.**    **Factual Background**

5        **A.**    **Title IX Generally**

6        Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, prohibits any

7  educational program or activity that receives federal funding from discriminating on the basis of

8  sex.  20 U.S.C. § 1681(a).  Sexual harassment, including sexual violence, is a form of sex

9  discrimination that educational institutions must address and remedy under Title IX.  (Dkt No. 23

10  at ¶ 45) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista*

11  *Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Franklin v. Gwinnett Cty. Pub. Schools,* 503 U.S. 60, 75

12  (1992)).  The Department, acting through its Office of Civil Rights is "the administrative agency

13  charged with administering Title IX."  *Neal v. Bd. of Trs. of California State Univ.*, 198 F.3d 763,

14  770 (9th Cir. 1999) (internal quotation marks and citation omitted).  This responsibility includes

15  "establishing rules, regulations, and procedures that implement Title IX and define the ways in

16  which educational institutions comply with Title IX's requirements."  (Dkt No. 23 at ¶ 46.)  The

17  Office of Civil Rights requires recipients of federal funding to "adopt and publish grievance

18  procedures providing for prompt and equitable resolution of student and employee complaints

19  alleging any action" prohibited under Title IX.  34 C.F.R. § 106.8(b).

20        **B.**    **The 1997 Guidance**

21        In 1997, the Department published its first guidance ("1997 Guidance") "addressing

22  educational institutions' obligations to address sexual harassment" following "a public notice and

23  comment period" that included "'extensive consultation with interested parties.'"  (Dkt. No. 23 at

24  ¶ 52) (quoting Sexual Harassment Guidance, 62 Fed. Reg. 12,034, 12035 (Mar. 13, 1997)).  The

25  1997 Guidance established "principles for how educational institutions should address sexual

26  harassment" and "provided information regarding the standards used by the Department's Office

27  of Civil Rights to investigate student complaints regarding educational institutions' responses to

28  sexual harassment."  (*Id.* at ¶¶  52-53.)  The 1997 Guidance provided that "'informal mechanisms'

2

for resolving complaints," such as mediation, "may be used by mutual consent of the parties but that it was inappropriate for a complaining  student to be required to work out the problem directly with the individual accused of harassment."  (*Id.* at ¶ 54.)  Furthermore, in cases involving sexual assault, "mediation would be inappropriate even on a voluntary basis." (*Id.*)  Schools investigating complaints were permitted to "take appropriate interim and remedial measures . . . designed to minimize, as much as possible, the burden on the student who was harassed."  (*Id.* at ¶ 55.)  The 1997 Guidance also explained that police investigations into the alleged criminal conduct of an accused perpetrator could not substitute for a school utilizing its own sexual harassment processes.  (*Id.* at ¶ 58.)

## C.    The 2001 Guidance

The Department issued revised guidance in 2001 that largely reaffirmed the requirements and guidelines established under the 1997 Guidance.  (*Id.* at ¶¶ 59-60) (citing Notice of Revised Sexual Harassment Guidance, 66 Fed. Reg. 5512 (Jan. 19, 2001) ("Notice")).  The revised guidance, like the 1997 Guidance, "followed a public notice and comment period."  (*Id.* at ¶ 60.) As stated in the Notice:

> The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 agency law.  In most other respects the revised guidance is identical to the 1997 guidance.

Notice, 66 Fed. Reg. 5512.  The revised guidance also noted that "[p]rocedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions."  U.S. Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties 22 (Jan. 2001) ("2001 Guidance").[3]  The 2001 Guidance cautioned, however, that "schools

---

[3] https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf

should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  *Id.*

### D.      The 2011 Letter and the 2014 Q&A

In 2011, the Department issued a "Dear Colleague Letter on Sexual Violence," followed by a set of questions and answers in 2014 in response to "additional concerns raised by schools and students."  (*Id.* at ¶ 70) (citing U.S. Dep't of Educ., Ltr. From Ass't Sec'y Russlynn Ali (Apr. 4, 2011) ("2011 Letter")[4]; U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014) ("2014 Q&A")).[5]  The 2011 Letter and 2014 Q&A were not subject to public notice and comment.  (*Id.* at ¶ 81.)  In addition to reaffirming the 2001 Guidance, the 2011 Letter discouraged schools from allowing the complainant and the alleged perpetrator from cross-examining each other in adjudicative proceedings.  (*Id.* at ¶ 74.)  The 2011 letter also clarified that "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)."  2011 Letter at 11.  The letter explained:

> The "clear and convincing" standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.  Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

*Id.*  The 2014 Q&A opined, among other things, that Title IX required schools to take "interim measures before the final outcome of an investigation."  2014 Q&A at 32.  Such measures included "allow[ing] the complainant to avoid contact with the alleged perpetrator and . . . 'chang[ing] academic and extracurricular acitivities . . . as appropriate.'"  (Dkt. No. 23 at ¶ 79) (quoting the 2014 Q&A).  The 2014 Q&A also directed that "the appeals process must be equal for both parties," thus, "[i]f a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties."  2014 Q&A at 37-38.  The 2014 Q&A reiterated "that

---

[4] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf
[5] https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

United States District Court
Northern District of California

schools should provide the same rights and opportunities to complainants and respondents."  (*Id.* at ¶ 80.)

### E.      The 2017 Guidance

On September 22, 2017, the Department issued a "Dear Colleague Letter" rescinding the 2011 Letter and the 2014 Q&A (together, "Rescinded Guidance").  (*Id.* at ¶ 105) (citing U.S. Dep't of Educ., Ltr. From Ass'y Sec'y Candice Jackson (Sept. 22, 2017) ("2017 Letter")).[6]  That same day, the Department issued questions and answers on "Campus Sexual Misconduct."  (*Id.*) (citing U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct (Sept. 22, 2017) ("2017 Q&A")).[7]  The stated purpose of the 2017 documents (collectively, "2017 Guidance") was to withdraw the "new mandates" imposed by the 2011 letter and 2014 Q&A "related to the procedures by which educational institutions investigate, adjudicate, and resolve allegations of student-on-student sexual misconduct."  2017 Letter at 1.  The 2017 Letter singles-out as flawed the following procedures set forth in the 2011 Letter: (i) requiring "schools to adopt a minimal standard of proof—the preponderance-of-the-evidence standard—in administering student discipline, even though many schools had traditionally employed a higher clear-and-convincing-evidence standard"; (ii) "insist[ing] that schools with an appeals process allow complainants to appeal not-guilty findings, even though many schools had previously followed procedures reserving appeal for accused students"; (iii) "discourag[ing] cross-examination by the parties, suggesting that to recognize a right to such cross-examination might violate Title IX"; (iv) "forb[idding] schools from relying on investigations of criminal conduct by law-enforcement authorities to resolve Title IX complaints, forcing schools to establish policing and judicial systems while at the same time directing schools to resolve complaints on an expedited basis;" and (v) "provid[ing] that any due-process protections afforded to accused students should not 'unnecessarily delay' resolving the charges against them."  *Id.*

The 2017 Letter notes that "[t]he Department imposed these regulatory burdens without affording notice and the opportunity for public comment."  *Id.* at 2.  The 2017 Letter continues:

---

[6] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf).
[7] https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

United States District Court
Northern District of California

1

2

3

4

> Under these circumstances, the Department has decided to withdraw the above-referenced guidance documents in order to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits.  The Department intends to implement such a policy through a rulemaking process that responds to public comment.  The Department will not rely on the withdrawn documents in its enforcement of Title IX.

5

*Id*.  In the interim, the 2017 Letter directs readers to the 2017 Q&A, and states that the Department

6

"will continue to rely on [the 2001 Guidance], which was informed by a notice-and-comment

7

process," and a 2006 Dear Colleague Letter[8] on Sexual Harassment that reaffirmed the 2001

8

Guidance.  *Id*.

9

### i.   Substantive changes under the new policy

10

The 2017 Q&A rescinds the 2014 Q&A's mandate that schools must take interim measures

11

during the investigation of a complaint, and instead returns to the 2001 Guidance, which provided

12

that "[i]t may be appropriate for a school to take interim measures during the investigation of a

13

complaint."  *See* 2001 Guidance at 16; *see also* 2017 Q&A at 3.  The 2017 Guidance also returns

14

to the pre-2011 policy of giving schools discretion over the standard it employs in evaluating

15

evidence, permitting schools to use either the "preponderance" or a "clear and convincing"

16

standard.[9]  2017 Q&A at 5.  The 2017 Guidance allows for voluntary "informal resolution" where

17

the parties have "receiv[ed] a full disclosure of the allegations and their options for formal

18

resolution and if a school determines that the particular Title IX complaint is appropriate for such

19

a process."  2017 Q&A at 4.  As for the appeals process, the 2017 Guidance allows schools to

20

"choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case

21

any appeal procedures must be equally available to both parties."  *Id*. at 7.

22

The 2017 Q&A reiterates the Department's intent to "engage in rulemaking on the topic of

23

schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-

24

peer sexual harassment and sexual violence."  2017 Q&A at 1.

25

26

27

28

[8] The 2006 Letter provides no substantive guidance, and merely directs readers to the 2001 Guidance.  *See* U.S. Dep't of Educ., Ltr. From Ass't Sec'y Stephanie Monroe (Jan. 25, 2006) https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html
[9] The 2017 Q&A clarifies, however, that "the standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases."  2017 Q&A at 5 n.19.

## II.   Complaint Allegations

Plaintiffs are three non-profit advocacy organizations; each brings this action on its own behalf.  The gravamen of Plaintiffs' collective allegations is that the 2017 Guidance: (i) requires a diversion of resources that impedes Plaintiffs' daily operations; (ii) "limits the efficacy" of the avenues of redress available to Plaintiffs' clients; (iii) increases the costs borne by Plaintiffs in providing their services; and (iv) "directly conflicts with, impairs, and frustrates [Plaintiffs'] organizational mission and priorities."  (Dkt. No. 23 at ¶¶ 14, 25, 30.)

### A.   SurvJustice, Inc.

Plaintiff SurvJustice, Inc.'s "mission is to increase the prospect of justice for survivors of sexual violence."  (*Id*. at ¶ 10.)  SurvJustice "pursues this goal through legal assistance [to complainants], policy advocacy, and institutional training."  (*Id*.)  "The majority of requests for legal assistance that SurvJustice receives are from students at institutions of higher education."  (*Id*. at ¶ 11.)  However, "SurvJustice also engages in policy advocacy by providing technical assistance and advice to legislators and policymakers on various state and federal legislation and policy efforts regarding sexual violence, and working with changemakers within their communities on local policy efforts, especially on college and university campuses."  (*Id*. at ¶ 13.)

### B.   Equal Rights Advocates

Plaintiff Equal Rights Advocates' mission is to "protect[ ] and expand[ ] economic educational access and opportunities for women and girls."  (*Id*. at ¶ 23.)  In furthering its mission, Equal Rights Advocates "engag[es] in public education efforts, as well as policy reform and legislative advocacy; provid[es] free legal information and counseling; and litigat[es] cases involving issues of gender discrimination in employment and education at all stages."  (*Id*. at ¶ 24.)  Equal Rights Advocates also "counsels and represents women who have been victims of sexual harassment and/or sexual assault in matters pursuant to Title IX."  (*Id*.)

### C.   Victim Rights Law Center

Plaintiff Victim Rights Law Center's "mission is to provide legal representation to victims of rape and sexual assault to help rebuild their lives and to promote a national movement committed to seeking justice for every rape and sexual victim."  (*Id*. at ¶ 28.)  In furthering its

United States District Court
Northern District of California

mission, Victim Rights Law Center provides free legal services to victims, a "substantial portion" of whom are students.  (*Id.* at ¶ 29.)  The Law Center's "attorneys represent campus victims to communicate effectively with campus administrators, acquire interim measures and accommodations to secure their education, prepare and attend disciplinary hearings, file appeals, and if necessary, file complaints with the [the Department's] Office of Civil Rights."  (*Id.*)

### III.    Procedural History

In January 2018, Plaintiffs filed their initial complaint for injunctive relief against Defendants Elisabeth D. DeVos and Candice Jackson in their official capacities,[10] and the Department.  (Dkt. No. 1.)  Plaintiffs filed an amended complaint the following month, seeking injunctive relief and alleging causes of action for: (i) violation of the Administrative Procedure Act, 5 U.S.C. § 706; (ii) *ultra vires* action; and (iii) violation of the equal protection guarantee under the Fifth Amendment.  (Dkt. No. 23.)

Defendants now move to dismiss these causes of action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. No. 40.)  In addition, six advocacy organizations— Women's and Children's Advocacy Project, Equal Means Equal, National Coalition against Violent Athletes, Allies Reaching for Equality, Women Matter, and We Are Woman—submitted an amicus curiae brief.  (Dkt. No. 47.)

### LEGAL STANDARD

### A.    Rule 12(b)(1)

Pursuant to Rule 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit.  *See* Fed. R. Civ. P. 12(b)(1).  "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject matter jurisdiction exists."  *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks and citation omitted).  "A party invoking federal jurisdiction has the burden of establishing that it has satisfied the 'case-or-

---

[10] On June 25, 2018, Kenneth L. Marcus succeeded Candice Jackson as Assistant Secretary for Civil Rights; he is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

United States District Court
Northern District of California

controversy' requirement of Article III of the Constitution [and] standing is a 'core component' of that requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy that requirement and establish standing, a plaintiff must show: "(1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010). In ruling on a motion to dismiss under Rule 12(b)(1), the court must "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party." *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009) (internal quotation marks and citation omitted).

### B.      Rule 12(b)(6)

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not bound, however, "to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

"[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.,* 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted); *see also Neitzke v. Williams,* 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law"). The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 663-64.

**DISCUSSION**

Plaintiff brings three causes of action: (i) violation of the Administrative Procedure Act ("APA"), 5 U.S.C. section 706; (ii) *ultra vires* action; and (iii) violation of the equal protection guarantee under the Fifth Amendment.  Defendants' motion to dismiss is two-fold.  First, Defendants contend that Plaintiffs lack standing because: (i) they have not alleged a cognizable injury; and (ii) they have failed to plead facts that support third party standing for their Fifth Amendment claim.  Alternatively, Defendants argue that Plaintiffs fail to state a claim upon which relief can be granted because: (i) the 2017 Guidance does not constitute final agency action and Plaintiffs have another adequate remedy for purposes of the APA claim; (ii) Plaintiffs fail to plausibly allege that Defendants engaged in *ultra vires* action; and (iii) Plaintiffs fail to plausibly allege that Defendants' acted with discriminatory purpose.  The Court addresses each contention in turn.

**I.     Standing**

To establish constitutional standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Here, Defendants challenge only the first prong of the standing inquiry—whether Plaintiffs have adequately alleged a legally cognizable injury.[11]

**A.     APA and *Ultra Vires* Action Claims**

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).  "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission [by defendant's actions]; and (2) diversion of its resources to combat [that frustration]."  *Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). However, "[a]n organization cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."

---

[11] Defendants also challenge Plaintiffs' Fifth Amendment claim on the grounds that Plaintiffs lack prudential standing.  The Court addresses that argument below.

United States District Court
Northern District of California

1    *Fair Hous. Council of San Fernando Valley*, 666 F.3d 1216, 1219 (9th Cir. 2012) (internal

2    quotation marks and citation omitted).

3                    **i.    Frustration of Organizational Mission**

4            Where a defendant's conduct has "perceptibly impaired" an organizational plaintiff's

5    "ability to provide [services to its clients], there can be no question that the organization has

6    suffered injury in fact." *Havens*, 455 U.S. at 379.  Here, Plaintiffs SurvJustice and Victim Rights

7    Law Center allege that the 2017 Guidance has frustrated their individual missions, in part, because

8    the Guidance discourages survivors of sexual harassment and sexual violence from filing

9    complaints.  (Dkt. No. 23 at ¶ 119.)  Because Plaintiffs are organizations that advocate for

10   survivors of sexual harassment, this "chilling effect" on the filing of complaints makes it

11   increasingly difficult for them to fulfill their organizational missions.  (*Id.* at ¶ 121.)  Defendants

12   counter that Plaintiffs' speculative allegations of a subjective "chilling effect" are insufficient to

13   show frustration of organizational mission for purposes of standing.[12]  (Dkt. No. 40 at 13) (citing

14   *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1129 (9th Cir. 1996) (noting that

15   "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present

16   objective harm or a threat of specific future harm.") (internal quotation marks and citation

17   omitted).

18           Here, however, Plaintiffs do not allege a "subjective chill"; instead, Plaintiffs allege an

19   *observed* decrease in student-filed complaints following issuance of the 2017 Guidance.

20   Furthermore, Plaintiffs allege that their clients have directly attributed their hesitancy in filing

21   complaints to the 2017 Guidance.  Specifically, SurvJustice alleges:

22                   Following and as a result of the 2017 Title IX policy change,
23                   SurvJustice experienced a decrease in the number of sexual violence

---

24   [12] Defendants "do not dispute the truth of Plaintiffs' factual allegations," but instead, "take issue
     with Plaintiffs' mischaracterization of the 2017 guidance."  (Dkt. No. 48 at 3.)  Defendants note
25   that the "Court should only accept as true the 'the non-conclusory "factual content"' in the
     amended complaint."  (*Id.*) (quoting *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009)).
26   Defendants further contend that "[i]nterpretation of the 2017 guidance is a legal analysis, not a
     factual one."  (*Id.*)  The Court agrees with Defendants that it need not accept as true Plaintiffs'
27   characterization of the content of the 2017 Guidance; however, at the pleading stage the Court
     must accept as true Plaintiffs' factual allegations regarding Plaintiffs' observed effects of the 2017
28   Guidance.

1

2

3

> survivors seeking its services.   This trend is borne out by SurvJustice's interactions with particular college and university students who have questioned whether they should continue with their plans to report sexual violence given the uncertainty regarding their legal protections and an anticipated lowered likelihood of success created by the policy change.

4

(Dkt. No. 23 at ¶ 16.)   Victim Rights Law Center alleges:

5

6

7

8

> [A]s a result of the 2017 Title IX policy, sexual violence and assault victims have expressed an unwillingness to report harassment and assault to campus authorities, denying VRLC the ability to achieve its mission.   VRLC saw an immediate chilling effect after the Department issued its 2017 . . . Title IX policy.   VRLC has seen a decline in the number of sexual violence and assault survivors willing to pursue justice through campus processes.

9

(*Id*. at ¶ 31.)   Victim Rights Law Center further states that "[s]uch declines in reporting and

10

hesitance to participate in the grievance process either through educational institutions or at the

11

Department . . . directly threaten and frustrate VRLC's mission and purpose." (*Id*.)   Based on

12

these allegations, SurvJustice and Victim Rights Law Center have plausibly alleged a frustration

13

of their missions as a result of the 2017 Guidance.

14

Plaintiff Equal Rights Advocates has similarly pleaded a frustration of its mission due to

15

the 2017 Guidance.   As part of its stated mission, Equal Rights Advocates "counsels and

16

represents women who have been victims of sexual harassment and/or sexual assault in matters

17

pursuant to Title IX." (*Id*. at ¶ 24.)   Equal Rights Advocates alleges that the changes to the

18

Department's Title IX enforcement policy have made it more difficult to obtain beneficial

19

outcomes for its clients.   Specifically, Equal Rights Advocates alleges that the policy change

20

permitting schools to offer appellate rights to only the accused "inhibit[s] ERA's ability to obtain

21

redress and achieve results for its clients." (*Id*. at ¶ 27.)   Equal Rights Advocates' allegations,

22

coupled with its alleged diversion of resources (discussed below), is sufficient to establish

23

frustration of its mission.   *See El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Rev*.,

24

959 F.2d 742, 748 (9th Cir. 1982) (organizations "established to assist Central American refugee

25

clients" suffered injury in fact where "their efforts to obtain asylum and withholding of

26

deportation in immigration court proceedings" were frustrated by defendant's policy and required

27

a diversion of resources).

28

//

United States District Court
Northern District of California

### ii. Diversion of Resources

"[A] diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (quoting *Havens*, 455 U.S. at 379). Here, Plaintiffs have sufficiently pleaded a diversion-of-resources injury to survive a motion to dismiss.

SurvJustice alleges that the 2017 Guidance has required it to divert resources by: (i) increasing the number of its "student rights trainings at college and university campuses"; (ii) "devot[ing] significant staff time to reviewing and understanding the 2017 Title IX policy in order to advise clients in ongoing campus investigations and advocate on their behalf"; and (iii) spend[ing] additional staff time and resources that it has not had to spend in the past attempting to get school officials to respond to a survivor's complaint of sexual violence." (Dkt. No. 23 at ¶¶ 16-18, 21.) Similarly, Equal Rights Advocates alleges that it has "divert[ed] staff time and resources away from core programmatic activities . . . in order to step up its efforts to assist victims of sexual harassment and assault in educational settings obtain redress," due to the 2017 Guidance. (*Id.* at ¶ 26.) Equal Rights Advocates' diversion of resources includes "launch[ing] a national initiative to End Sexual Violence in Education" that expands Equal Rights Advocates' counseling program, re-designs its intake process, and "establish[es] a network of attorneys to provide pro bono counseling and other assistance to victims of sexual harassment and assault in schools." (*Id.*) The 2017 Guidance has required Victim Rights Law Center "to spend additional staff time and resources that it has not had to spend in the past attempting to get school officials to respond [to its clients' complaints]." (*Id.* at ¶ 33.) Furthermore, Victim Rights Law Center has devoted "staff time to reviewing and understanding the 2017 Title IX policy in order to advise clients in ongoing campus investigations," thereby reducing "the amount of time that it has available to provide legal services, including work on ongoing civil litigation." (*Id.* at ¶ 34.)

Defendants argue that Plaintiffs have failed to show that their alleged diversion of resources was necessary to avoid "some other injury." (Dkt. No. 40 at 10) (citing *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (noting that a plaintiff must "show that it would have suffered some other injury if it had not

13

diverted resources to counteracting the problem."). Avoidance of "some other injury" is sufficiently alleged, however, where an organization contends that the challenged policy required it to divert resources it "otherwise would spend in other ways" to further its mission. *El Rescate,* 959 F.2d at 748 ("The allegation that [defendant's] policy frustrates [plaintiff-organizations'] goals and requires the organizations to expend resources in representing clients they otherwise would spend in other ways is enough to establish standing.") (citing *Havens*, 455 U.S. at 379); *see also Smith*, 358 F.3d at 1105 (allegations of diversion of resources sufficient to survive motion to dismiss where plaintiff-organization "specifically stated in its complaint that 'in order to monitor the violations and educate the public regarding the discrimination at issue, [plaintiff] has had (and, until the discrimination is corrected, will continue) to divert its scarce resources from other efforts to [further its mission]").

Plaintiffs have sufficiently alleged that the 2017 Guidance has required them to divert resources that otherwise "would have been spent on some other activity that advances their goals." *See Nat'l Council of La Raza*, 800 F.3d at 1040 (finding organizational standing where plaintiffs were not "simply going about their 'business as usual,' unaffected by [defendant's] conduct."). Because there is no dispute that Plaintiffs have met the other two prongs of the standing inquiry— causation and redressability—Plaintiffs have adequately alleged standing at the pleading stage with respect to their APA and *ultra vires* causes of action. *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotation marks and citation omitted).

Accordingly, the Court denies Defendants' motion to dismiss the first and second causes of action for lack of standing.

### B.   Fifth Amendment Claim

Defendants challenge Plaintiffs' prudential standing with regard to the third cause of action under the Due Process Clause of the Fifth Amendment, arguing that Plaintiffs "do not allege that Defendants discriminated against *them* on the basis of sex," but "[r]ather, they allege that Defendants discriminated against women." (Dkt. No. 40 at 23.) Thus, Defendants insist the claim

United States District Court
Northern District of California

must be dismissed because Plaintiffs are resting their claim for relief on the legal rights of third parties but have failed to plead facts supporting third party[13] or associational[14] standing.  The Court agrees.

Plaintiffs' allegations do not discuss gender discrimination against Plaintiffs in their capacity as organizations, but more generally allege that the 2017 Guidance discriminates against women in violation of the equal protection guarantee under the Due Process Clause of the Fifth Amendment.  (Dkt. No. 23 at ¶¶ 135-40.)  Plaintiffs do not, however, invoke associational or third party standing to litigate this claim on behalf of their female members or clients.  Instead, Plaintiffs reiterate the same allegations set forth in support of their own organizational standing.[15] (*See id*. at ¶ 140) ("As a result of Defendants' unlawful actions, Plaintiffs have been harmed and their missions frustrated, as outlined more fully in paragraphs 10-34 above.")  Those allegations are insufficient for their equal protection claim, however, because Plaintiffs are not seeking to vindicate their *own* rights as an organization, but the constitutional rights of women in general.[16] *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, [the Supreme] Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests third parties.").

---

[13] A plaintiff asserting third party standing "must show his own injury, a close relationship between himself and the parties whose rights he asserts, and the inability of the parties to assert their own rights."  *McCollum v. Cal. Dep't. of Corr.*, 647 F.3d 870, 879 (9th Cir. 2011).

[14] "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (internal quotation marks and citation omitted).

[15] At oral argument on July 19, 2018, Plaintiffs suggested that the complaint's allegations were sufficient to *infer* third-party standing based on the Plaintiff-organizations' close relationship with women.  The Court is not persuaded.

[16] The Court need not consider whether the "zone of interests" test set forth in *Lexmark Int'l v. Static Control Components, Inc.*, 124 S. Ct. 1377 (2014) is applicable to the prudential standing issue raised here.  In *Lexmark*, the Supreme Court did not address the issue of third-party standing. *See* 124 S. Ct. at 1387 n.3; *see also Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118 n.9 (9th Cir. 2015) ("conclud[ing], in unison with all other courts to have spoken on the issue [after *Lexmark*], that the third-party standing doctrine continues to remain in the realm of prudential standing.").

United States District Court
Northern District of California

1    Accordingly, the Court grants without prejudice Defendants' motion to dismiss the third

2    cause of action for lack of standing.

3    **II.    Failure to State a Claim**

4        **A.    APA Claim**

5    Under the APA, a plaintiff may seek judicial review of "final agency action for which there

6    is no other adequate remedy in a court." 5 U.S.C. § 704. Determining whether an agency action is

7    "final" is a two-step process. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The action must

8    first "mark the consummation of the agency's decisionmaking process." *Id*. (internal quotation

9    marks and citation omitted). Next, "the action must be one by which rights or obligations have

10   been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation

11   marks and citation omitted). Defendants argue that the 2017 Title IX policy does not constitute

12   final agency action, but is instead merely "guidance" and is therefore non-reviewable under the

13   APA.

14   In determining whether the challenged agency action is "final" under the first prong of the

15   *Bennett* test, the Court must "look to see whether the agency has rendered its last word on the

16   matter." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006)

17   (internal quotation marks and citation omitted). In doing so, the Court must consider "the effect of

18   the action and not its label." *Id*. at 985 (internal quotation marks and citation omitted). Thus,

19   "finality is to be interpreted in a pragmatic way." *Oregon v. Ashcroft*, 368 F.3d 1118, 1147 (9th

20   Cir. 2004) (internal quotation marks and citation omitted).

21   The 2017 Letter notes that it "does not add requirements to applicable law," and that it

22   "intends to implement [a revised Title IX policy] through a rulemaking process that responds to

23   public comment." 2017 Letter at 2. Likewise, the 2017 Q&A states, in pertinent part:

24       The Department of Education intends to engage in rulemaking on
         the topic of schools' Title IX responsibilities concerning complaints
25       of sexual misconduct, including peer-on-peer sexual harassment and
         sexual violence. The Department will solicit input from stakeholders
26       and the public during that rulemaking process. In the interim, these
         questions and answers—along with the [2001 Guidance] previously
27       issued by [OCR]—provide information about how OCR will assess
         a school's compliance with Title IX.

28

United States District Court
Northern District of California

16

2017 Q&A at 1.  Nonetheless, the Department's stated intention to engage in future rulemaking through notice and comment is not dispositive as to whether the 2017 Guidance reflects the consummation of the Department's decision-making process regarding OCR's *current* Title IX enforcement policy.  *See Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014) ("[A]n agency's characterization of its action . . . is not necessarily dispositive, and courts consider whether the practical effects of an agency's decision make it a final agency action").  In other words, because the 2017 Guidance consummates the Department's decision to rescind the previous guidance and thereby effect several substantive changes, it reflects a definitive statement regarding the Department's current Title IX enforcement policy.  Whether the Department intends to engage in future rulemaking does not affect the finality of that particular decision.  *See Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008) (rejecting defendant's argument against finality that "conflate[d] one . . . decision with a future yet distinct administrative process.").

The Court next considers whether the action is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett,* 520 U.S. at 178 (internal quotation marks and citation omitted).  Similarly, the Court need not blindly accept that the 2017 Guidance "does not add requirements to applicable law" merely because the documents say so. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (rejecting as "boilerplate" a disclaimer contained in EPA guidance documents stating that the "policies set forth in this paper are intended solely as guidance, do not represent Agency action, and cannot be relied upon to create rights enforceable by any party.").  Instead, relevant considerations in this regard include: (i) whether the agency action has a "direct and immediate effect on the complaining parties," (ii) "whether it has the status of law," and (d) "whether it requires immediate compliance."  *Ashcroft*, 368 F.3d at 1146-47 (internal quotation marks and citation omitted).  Although it is a close call, drawing all inferences in Plaintiffs' favor, the 2017 Guidance does not satisfy the second *Bennett* prong.

Plaintiffs contend that if schools do not comply with the Department's guidance, they risk an enforcement action by OCR and loss of federal funding.  Plaintiffs also allege that some

17

schools have responded accordingly, citing the 2017 Guidance as the impetus for revising their Title IX policies.  (Dkt. No. 23 at ¶¶ 116-117.)  Defendants argue that the 2017 Guidance constitutes a "'bare statement of the agency's opinion' and does not produce legal consequences." (Dkt. No. 40 at 24) (quoting *Fairbanks*, 543 F.3d at 593-94).  The Court agrees.

The 2017 Letter states that "the Department's enforcement efforts proceed from Title IX itself and its implementing regulations."  2017 Letter at 2.  And although the Court need not accept that assertion on its face, *see Appalachian Power Co.*, 208 F.3d at 1022-23, the direct effect of the 2017 Guidance does not suggest otherwise.  The 2017 Q&A states that the guidance "provide[s] information about how [the Department's Office of Civil Rights] will assess a school's compliance with Title IX" for enforcement purposes, however, it does not suggest that schools are immediately required to comply with the Department's guidance or else face legal consequences. 2017 Q&A at 1.  Rather, the plain language of the 2017 Guidance suggests just the opposite— legal consequences continue to flow only from a school's noncompliance with Title IX and its implementing regulations, and the guidance merely provides "information" for schools regarding how the Department's Office of Civil Rights will assess compliance with *those* existing laws. Therefore, if a school is in compliance with Title IX and its regulations, it need not change its policies in response to the 2017 Guidance.  Plaintiffs plausibly allege that some schools have done just that; however, voluntarily changing a policy in response to an agency's nonbinding enforcement guidance is not the same as being required to do so by the guidance itself.

Nor does the 2017 Guidance suggest that it creates new obligations for schools.  The language is instead discretionary, and largely *relieves* schools of previous obligations under the Rescinded Guidance.  Plaintiffs' reference to "mandatory language" in the 2017 Guidance as evidence of its legal effect is unavailing.  Simply put, if a school disagreed with the 2017 Guidance and chose not to follow it, it would suffer no legal consequences as long as it continued to comply with Title IX and its implementing regulations.

At the hearing on July 19, 2018, Plaintiffs raised a new argument that the 2017 Guidance creates legal consequences—and thus satisfies the second prong of *Bennett*—because it provides

safe harbor from deliberate indifference claims.  The Court requested supplemental briefing from the parties on that specific issue.[17]  (*See* Dkt. No. 67 at 42-43; 84-85.)

The gravamen of Plaintiffs' supplemental argument is that a school could rely on its compliance with the 2017 Guidance to defend against a private right of action in which the plaintiff claimed that the school was deliberately indifferent to discrimination.  (*See* Dkt. No. 68 at 5) (citing *U.S. Army Corps of Engs. v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016)).  Thus, in Plaintiffs' view, a school's compliance with the 2017 Guidance provides the type of "safe harbor" recognized by the Supreme Court in *Hawkes* as giving rise to legal consequences sufficient to satisfy the second prong of *Bennett*.  The Court disagrees.

The challenged agency action in *Hawkes* stemmed from a U.S. Army Corps of Engineers' jurisdictional determination designating a particular waterway as within the scope of the Clean Water Act.  136 S. Ct. at 1813.  As relevant here, the Supreme Court concluded that the jurisdictional determination met *Bennett*'s second prong, and in doing so discussed "the effect of an approved [jurisdictional determination] stating that a party's property does not contain jurisdictional waters—a 'negative' [jurisdictional determination] in Corps parlance."  *Id*. at 1814.  The *Hawkes* Court noted that "such a [jurisdictional determination] will generally bind the Corps for five years."  *Id*.  Because an approved jurisdictional determination was thus "binding on the Government and [would] represent the Government's position in any subsequent Federal action or litigation concerning that [jurisdictional] determination," the negative jurisdictional determination created a safe harbor from civil enforcement proceedings brought by the Government under the Clean Water Act against a property owner whose property fell within the scope of the jurisdictional determination.  *Id*.  The *Hawkes* Court deemed such safe harbor from liability "a legal consequence[ ] satisfying the second *Bennett* prong."  *Id*. (internal quotation marks and citation omitted).

---

[17] Plaintiffs' supplemental papers set forth additional arguments beyond the scope of the discrete issue on which the Court requested briefing.  (*See generally* Dkt. No. 68 at 5-11.)  Defendants argue that Plaintiffs' additional arguments "constitute[ ] unauthorized supplementary material" in violation of Civil Local Rule 7-3(d).  (Dkt. No. 70 at 6.)  The Court agrees, and will only consider Plaintiffs' supplemental argument related to the issue of safe harbor from deliberate indifference claims.

United States District Court
Northern District of California

1    *Hawkes* does not help Plaintiffs.  First, and as previously discussed, the 2017 Guidance is

2    not binding.  Further, it does not create the kind of complete immunity from suit discussed in

3    *Hawkes*.  The situation contemplated in *Hawkes*—where a defendant-property owner could rely

4    entirely on a negative jurisdictional determination as providing safe harbor—does not exist here.

5    A school defending a deliberate indifference claim under Title IX could not simply point to its

6    compliance with the 2017 Guidance and escape liability.  As Defendants note, courts in this

7    district have clearly held that while compliance or noncompliance with Department guidance is a

8    consideration in deliberate indifference claims, it is not legally dispositive.  (*See* Dkt. No. 70 at 7)

9    (citing *Moore v. Regents of the Univ. of Cal.*, No. 15-cv-05779-RS, 2016 WL 4917103, at *3

10   (N.D. Cal. Sept. 15, 2016) ("Adherence to the [Dear Colleague Letter] might be good policy, but

11   failure to adhere, standing alone, does not constitute deliberate indifference."); *Karasek v. Regents

12   of the Univ. of Cal.*, No. 15-cv-03717-WHO, 2015 WL 8527338, at *14 (N.D. Cal. Dec. 11, 2015)

13   ("Plaintiffs do not cite, and I have not found, any case in which a plaintiff has successfully relied

14   on the [Dear Colleague Letter] to establish deliberate indifference under Title IX.").  The Court

15   finds this authority persuasive and on point as to whether Department guidance provides the same

16   safe harbor from liability as the type of binding agency action at issue in *Hawkes*.  It does not.

17        Accordingly, the 2017 Guidance does not constitute "final agency action" for purposes of

18   review under the APA because it fails to satisfy the second *Bennett* prong.  The Court need not

19   address the existence of other adequate remedies or Plaintiffs' cause of action for arbitrary and

20   capricious action under 5 U.S.C. section 706.

21        **B.**    ***Ultra Vires* Action**

22        Non-statutory review of agency action is available when the action is *ultra vires*; that is,

23   when an agency has violated an unambiguous and mandatory legal requirement.  *Leedom v. Kyne*,

24   358 U.S. 184, 188-89 (1958).  Plaintiffs allege that the Defendants "acted in excess of their legal

25   authority" in adopting the 2017 Guidance.  (Dkt. No. 23 at ¶ 134.)  Defendants argue that

26   Plaintiffs fail to plead any allegations describing how Defendants—who are charged with

27   enforcing Title IX—acted outside their authority by "issuing guidance describing how [the

28

Department] will exercise [that] enforcement authority." (Dkt. No. 40 at 28.)  The Court agrees. Plaintiffs provide wholly conclusory allegations in support of this claim.

In the absence of plausible allegations that Defendants acted outside their legal authority in issuing the 2017 Guidance, the Court grants Defendants motion to dismiss the claim for *ultra vires* action.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss.  The allegations are insufficient to show standing to bring an equal protection claim, the 2017 Guidance does not constitute final agency action for purposes of an APA claim, and the allegations do not plausibly suggest that Defendants acted outside their authority for the *ultra vires* action claim. Plaintiffs' equal protection and *ultra vires* action claims are dismissed without prejudice and with leave to amend.  The dismissal of Plaintiffs' APA claim is with prejudice given that amendment would be futile because the 2017 Guidance does not satisfy the second *Bennett* prong as a matter of law.  Plaintiffs' amended complaint, if any, shall be filed within 30 days of the date of this Order.

**IT IS SO ORDERED.**

Dated:  October 1, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge