Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 621-0672
Fax: (415) 621-6744
Email: jreisch@equalrights.org

Javier M. Guzman*
Robin F. Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org, kjones@democracyforward.org

Leecia Welch (CA Bar No. 208741)
Alice Y. Abrokwa*
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, and
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, aabrokwa@youthlaw.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, schandy@nwlc.org

*admitted pro hac vice

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SURVJUSTICE, INC., et al., | ) Case Number: 3:18-cv-00535-JSC |
| Plaintiffs, | ) |
| | ) PLAINTIFFS' OPPOSITION TO |
| v. | ) DEFENDANTS' MOTION TO DISMISS |
| | ) THE SECOND AMENDED COMPLAINT |
| ELISABETH D. DEVOS, in her official | ) |
| capacity as Secretary of Education, et al, | ) HEARING NOTICED: February 14, 2019, |
| | ) at 9:00 a.m. |
| Defendants. | ) |
| | ) DEMAND FOR JURY TRIAL |
| | ) |

# TABLE OF CONTENTS

Introduction and Statement of Issues ............................................................................. 1

Background Facts .............................................................................................................. 2

Procedural History .......................................................................................................... 3

Standard of Review ......................................................................................................... 4

Argument ......................................................................................................................... 4

    I. Plaintiffs Have Prudential Standing To Bring An Equal Protection Claim ......................... 4

        A. Plaintiffs Have Alleged A Close Relationship With Their Clients
           And Other Women And Girl Survivors With Whom They Work ......................... 5

        B. Plaintiffs Have Alleged The Requisite Hinderance ................................................. 7

        C. ED's Causation And Redressability Argument Is Incorrect ................................... 9

    II. Plaintiffs Have Stated An Equal Protection Claim ............................................................ 12

        A. Plaintiffs Plausibly Allege That A Sex-Stereotype Motivated ED
           To Reduce Protections For Sexual Violence Survivors ...................................... 13

           1. The Policy's Disparate Impact Raises An Inference Of
               Discrimination ................................................................................... 14

           2. Legislative History And Preceding Events Reveal That ED's
               Sex-Stereotyped View Drove The Change In Policy ......................... 15

           3. ED's Stated Substantive Conclusions Reveal Its
               Discriminatory Purpose ..................................................................... 19

        B. Plaintiffs Plausibly Allege That ED Reduced Title IX Protections
           For Survivors Because Of A Sex-Stereotype, Stating An Equal
           Protection Claim ................................................................................................ 21

        C. The Existence of Non-Discriminatory Policy Disagreements
           Regarding Title IX Does Not Render Plaintiffs' Discrimination
           Claim Implausible .............................................................................................. 24

    III. Plaintiffs Have Stated An Ultra Vires Claim ................................................................ 25

Conclusion ...................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                   **Page(s)**

*Aid for Women v. Foulston,*
    441 F.3d 1101 (10th Cir. 2006) ................................................................7, 8

*Arce v. Douglas,*
    793 F.3d 968 (9th Cir. 2015) ...................................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................2, 12, 13, 18

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.,*
    818 F.3d 493 (9th Cir. 2016) ....................................12, 14, 16, 19, 22

*Balisteri v. Pacifica Police Dep't,*
    901 F.2d 696 (9th Cir. 1988) ...................................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................4, 18

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993)...................................................................................25

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989)...............................................................................5, 9

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017).............................................................................13

*Doe No. 1 v. Reed,*
    697 F.3d 1235 (9th Cir. 2012) ...................................................................8

*Doe v. Hamburg,*
    No. C-12-3412 EMC, 2013 WL 3783749 (N.D. Cal. July 16, 2013)........................4

*Dominguez-Curry v. Nev. Transp. Dep't,*
    424 F.3d 1027 (9th Cir. 2005) ...........................................................17, 18

*Elizabeth Retail Properties LLC v. KeyBank Nat'l. Ass'n,*
    83 F. Supp. 3d 972 (D. Or. 2015) ..............................................................4

*Exodus Refugee Immigration, Inc. v. Pence,*
    165 F. Supp. 3d 718 (S.D. Ind.)...........................................................6, 9

*Gentges v. Trend Micro Inc.,*
    No. C 11–5574 SBA, 2012 WL 2792442 (N.D. Cal. July 9, 2012). .........................4

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ............................................................................................7

*Hadley v. Kellogg Sales Co.,*
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................20

*Harold H. Huggins Realty, Inc. v. FNC, Inc.,*
    634 F.3d 787 (5th Cir. 2011) ..............................................................................4

*Hawaii v. Trump,*
    138 S. Ct. 2392 (2018) ......................................................................................15

*Holistic Candlers & Consumers v. FDA,*
    664 F.3d 940 (D.C. Cir. 2012) ..........................................................................11

*In re Idaho Conservation League,*
    811 F.3d 502 (D.C. Cir. 2016) ..........................................................................11

*Innovative Health Sys., Inc. v. City of White Plains,*
    117 F.3d 37 (2nd Cir. 1997) ..............................................................................21

*Jane L. v. Bangerter,*
    61 F.3d 1505 (10th Cir. 1995) ..........................................................................25

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ................................................................................5, 6, 9, 10

*Latta v. Otter,*
    771 F.3d 456 (9th Cir. 2014) ............................................................................22

*Legal Aid Soc'y. of Haw. v. Legal Servs. Corp.,*
    145 F.3d 1017 (9th Cir. 1998) ..........................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ............................................................................................4

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..........................................................................................10

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n,*
    138 S. Ct. 1719 (2018) ......................................................................................16

*McCollum v. Cal. Dep't of Corr. & Rehab.,*
    647 F.3d 870 (9th Cir. 2011) ..........................................................................5, 9

*Meaux v. Nw. Airlines, Inc.,*
    718 F. Supp. 2d 1081 (N.D. Cal. 2010) ............................................................18

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008) ............................................................................4

*Mills v. United States*,
 742 F.3d 400 (9th Cir. 2014) ............................................................5

*Novak v. United States*,
 795 F.3d 1012 (9th Cir. 2015) .....................................................10, 11

*NRDC v. EPA*,
 643 F.3d 311 (D.C. Cir. 2011) .........................................................11

*Obergefell v. Wymyslo*,
 980 F. Supp. 2d 907 (S.D. Ohio 2013) ................................................6

*OSU Student All. v. Ray*,
 699 F.3d 1053 (9th Cir. 2012) .........................................................25

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
 280 F.3d 278 (3d Cir. 2002).........................................................8, 9

*Pac. Shores Props., LLC v. City of Newport Beach*,
 730 F.3d 1142 (9th Cir. 2013) .....................................................12, 15

*Pers. Adm'r of Mass. v. Feeney*,
 442 U.S. 256 (1979)........................................................21, 22, 23, 24

*Planned Parenthood of Idaho, Inc. v. Wasden*,
 376 F.3d 908 (9th Cir. 2004) ...........................................................7

*Pony v. City of L.A.*,
 433 F.3d 1138 (9th Cir. 2006) ........................................................6, 7

*Powers v. Ohio*,
 499 U.S. 400 (1991)......................................................................8, 9

*Puente Ariz. v. Arpaio*,
 76 F. Supp. 3d 833 (D. Ariz. 2015) ..................................................23

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
 908 F.3d 476 (9th Cir. 2018) ..........................................................15

*Regents of Univ. of Cali. v. U.S. Dep't of Homeland Sec.*,
 298 F. Supp. 3d 1304 (N.D. Cal.) ....................................................16

*Rothner v. City of Chi.*,
 929 F.2d 297 (7th Cir. 1991) ............................................................9

*Singleton v. Wulff*,
 428 U.S. 106 (1976)...................................................................7, 8, 9

*Starr v. Baca*,
 652 F.3d 1202 (9th Cir. 2011) .....................................................13, 24

*The Cetacean Cmty. v. Bush*,
   386 F.3d 1169 (9th Cir. 2004) .......................................................................4

*U.S. v. $100,348.00 in U.S. Currency*,
   354 F.3d 1110 (9th Cir. 2004) .......................................................................6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ......................................................................................4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)........................................................................12, 16, 19

*Voigt v. Savell*,
   70 F.3d 1552 (9th Cir. 1995) ........................................................................6

*VR Acquisitions, LLC v. Wasatch Cty.*,
   853 F.3d 1142 (10th Cir. 2017) ....................................................................4

*Wilson v. City of Aliceville*,
   779 F.2d 631 (11th Cir. 1986) ....................................................................17

**Rules**

F.R.C.P.

   25(d)...............................................................................................................1

   12(b)..........................................................................................................4, 24

**Other Authorities**

Elizabeth Bartholet, et al., *Fairness for All Students Under Title IX* (Aug. 21, 2017),
   https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=y...........................................21

Erica L. Green & Sheryl Gay Stolberg, *Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times, July 13, 2017...............................................17, 23

Heather M. Karjane, et al., Educ. Development Ctr., Inc., Campus Sexual Assault: How America's Institutions of Higher Education Respond 122 (Oct. 2002),
   https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf........................20

Majority Staff of S. Subcomm. on Fin. and Contracting Oversight, 113th Cong., Sexual Violence on Campus (July 9, 2014),.........................................20

Press Release, ED, Sec'y DeVos Prepared Remarks on Title IX Enforcement
(Sept. 7, 2017) ("DeVos Speech"),
https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-
enforcement.................................................................................................14, 16, 21, 23, 24

Sarah Brown, *Ed. Dept. Official Apologizes for '90%' Remark on Campus Rape.
What's the Research?*, The Chron. of Higher Educ., July 12, 2017,
https://www.chronicle.com/article/Ed-Dept-Official-Apologizes/240634.............................17

U.S. Dep't of Educ., Ltr. from Ass't Sec'y Russlynn Ali (Apr. 4, 2011),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf
("2011 DCL") ...........................................................................................................2, 3, 20, 21

U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence
(Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-
title-ix.pdf ("2014 Q&A"). ..................................................................................................2, 3

1

## <u>INTRODUCTION AND STATEMENT OF ISSUES</u>

2

Nearly half of students in the United States are sexually harassed before they complete

3

high school, with girls significantly more likely to be harassed than boys. Indeed, twenty percent

4

of women are sexually assaulted while in college.[1] Second Am. Comp., Dkt. No. 86 (SAC) ¶¶

5

39-40. These experiences cause physical, psychological and academic harm, with "delayed and

6

long lasting" consequences. *Id*. ¶ 41. Sexual harassment, including assault and other forms of

7

sex-based violence can impede students' equal access to educational opportunities, which is

8

required by Title IX of the Education Amendments of 1972 (Title IX).

9

In September 2017, Defendants, the Department of Education, Secretary DeVos, and then

10

Acting Assistant Secretary Jackson[2] (collectively ED) implemented a new Title IX Policy that

11

reduces substantive and procedural protections for survivors of sexual violence. This Policy is

12

discriminatory and unconstitutional because it was motivated by baseless sex stereotypes that

13

women and girls tend to lie about experiences of sexual violence or misunderstand or

14

mischaracterize incidents as harassment when they are "harmless" romantic advances.

15

Plaintiffs sued to vacate the Policy. The matter is now before the Court on ED's Motion

16

to Dismiss Plaintiffs' Second Amended Complaint, Dkt. No. 95 (Mot.) which argues that

17

Plaintiffs have not alleged prudential standing and have not stated an equal protection claim.

18

ED's arguments are unavailing.

19

ED's prudential standing argument acknowledges that at a minimum Plaintiffs have a

20

sufficiently close relationship to advance their clients' discrimination claims, and mainly argues

21

that those clients are not hindered from pursuing their own lawsuits because other survivors have

22

done so and because they can use pseudonyms. But the availability of pseudonyms has been

23

rejected in this context, and the fact that some individuals are willing to sue says nothing about

24

25

[1] Sexual harassment includes, *inter alia*, unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal, nonverbal, or physical conduct of a sexual nature targeting someone because of their sex, including sexual assault or other sexual violence. SAC ¶ 38.

26

27

[2] Jackson, who was named in her official capacity, has been replaced as a Defendant by current Assistant Secretary for Civil Rights Kenneth L. Marcus pursuant to F.R.C.P. 25(d). Because the equal protection claim addresses Jackson's state of mind, however, the brief still references her.

28

Plaintiffs' Opposition to Motion to Dismiss; Case No.: 3:18-cv-00535-JSC          Page: 1

Plaintiffs' clients' own obstacles. Plaintiffs have alleged in detail the obstacles to litigation faced by the survivors with whom they work, which meets their pleading burden.

ED's challenge to the sufficiency of the Plaintiffs' discrimination allegations fares no better. In large part, and improperly, ED takes issue with the truth of those allegations, arguing that other "obvious" reasons motivated the policy change. It also invokes *Iqbal* incorrectly to suggest a heightened pleading standard for discrimination cases. Plaintiffs have alleged in detail that DeVos and Jackson, through their statements and actions, revealed their baseless stereotypes about female survivors and adopted the Policy knowing and intending that it would disproportionately affect female students by curbing what they believe are meritless Title IX complaints. Accordingly, Plaintiffs have plausibly alleged that ED acted discriminatorily—all that is required under the rules of pleading. Accordingly, ED's motion should be denied.

## BACKGROUND FACTS

Sexual harassment, which ranges from harmful verbal comments to sexual assault and rape, is a pervasive problem that disproportionately harms women and girls in schools across the country. *See* SAC ¶¶ 38-43. As a result, ED has spent the past twenty years crafting policies to apply the protections of Title IX to of sexual harassment survivors. *Id*. ¶¶ 46-81. Consistent with Title IX's prohibition on sex discrimination, these policies require federally-funded educational institutions (hereafter, schools) to prevent and redress sex-based harassment. For example, ED issued a Dear Colleague Letter in 2011 and a set of Questions and Answers in 2014 regarding Title IX's application to sexual violence.[3] These documents reminded schools of their obligations to address peer sexual harassment, identified steps to respond to such harassment, *id*. ¶ 71-77, offered mechanisms for preventing harassment and remedies for survivors. *Id*. ¶¶ 78-80.

In 2017 ED reversed course and issued a new Dear Colleague Letter and a new set of

---

[3] U.S. Dep't of Educ., Ltr. from Ass't Sec'y Russlynn Ali (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ("2011 DCL"); U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ("2014 Q&A").

Questions and Answers (together, 2017 Title IX Policy or Policy). *Id*. ¶ 114.[4] The 2017 Title IX Policy not only rescinded the 2011 DCL and 2014 Q&A, it provides guidance meant to reduce protections for survivors, who are predominantly female. *Id*. ¶ 116. As a result, schools have modified their own sexual harassment policies to be consistent with the Policy, and ED has modified its enforcement actions. *Id*. ¶¶ 124-26.

Secretary DeVos and then Acting Assistant Secretary for Civil Rights Jackson were the ED decisionmakers primarily responsible for this policy change. *See id*. ¶ 82; 2017 DCL at 2. While ED was revising the Policy, Jackson and DeVos made statements and took other actions revealing their sex-stereotyped belief that women and girls tend to lie about or mischaracterize experiences of sexual harassment, including assault. SAC ¶¶ 83-113. This belief motivated DeVos and Jackson to reduce Title IX protections for survivors. *Id*.

## **PROCEDURAL HISTORY**

Plaintiffs filed this lawsuit on January 25, 2018 and filed an amended complaint on February 21, 2018. Dkt. No. 23. ED filed a motion to dismiss on May 2, 2018. Dkt. No. 40.

After briefing and oral argument, the Court issued a decision in which it concluded that Plaintiffs had alleged organizational standing. *See* Order re: Defs.' Mot. to Dismiss, Dkt. No. 81 (Order) at 14. The Court determined that the allegations did not establish prudential standing as to the equal protection claim and dismissed that claim with leave to amend. *Id*. at 15. The Court dismissed the Administrative Procedure Act ("APA") claim with prejudice because it determined that there had been no final agency action and dismissed the *ultra vires* claim without prejudice.

Plaintiffs filed their Second Amended Complaint on October 31, 2018, adding factual allegations regarding both their prudential standing and regarding ED's discriminatory intent in issuing the 2017 Title IX Policy. Dkt. No. 86. Defendants have now moved to dismiss.

---

[4] U.S. Dep't of Educ., Ltr. from Ass't Sec'y Candice Jackson (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ("2017 DCL"); U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf ("2017 Q&A").

**STANDARD OF REVIEW**

Challenges to constitutional standing, in which subject matter jurisdiction is raised, are adjudicated pursuant to Rule 12(b)(1). *The Cetacean Cmty. v. Bush,* 386 F.3d 1169 (9th Cir. 2004). But challenges to prudential standing, which is not a jurisdictional requirement, are more appropriately resolved under the standards set forth in Rule 12(b)(6). *See VR Acquisitions, LLC v. Wasatch Cty.*, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017); *Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 795 n.2 (5th Cir. 2011); *Elizabeth Retail Properties LLC v. KeyBank Nat'l. Ass'n*, 83 F. Supp. 3d 972, 985–86 (D. Or. 2015); *Doe v. Hamburg*, No. C-12-3412 EMC, 2013 WL 3783749, at *5 (N.D. Cal. July 16, 2013); *Gentges v. Trend Micro Inc*., No. C 11–5574 SBA, 2012 WL 2792442, at *4 n.3 (N.D. Cal. July 9, 2012).

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**ARGUMENT**

**I.  Plaintiffs Have Prudential Standing To Bring An Equal Protection Claim.**

In granting Plaintiffs leave to amend their complaint to plead third party standing, the Court made clear that, given their starting point, the road to be traveled was likely neither long nor arduous. *See* Hr'g Tr. at 22 ("I'm not questioning that you could probably allege [prudential standing]."). Plaintiffs have done so. SAC ¶¶ 143-148.

Prudential limits on standing (also called third party or *jus tertii* standing) is "not compelled by the language of the Constitution." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 474–75 (1982); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014) (prudential standing restrictions are "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.") (citation omitted). Thus, while prudential considerations may cause a court to decline to "hear cases

asserting rights properly belonging to third parties" this prohibition is not absolute, and long-established precedent has recognized third party standing in the civil and privacy rights context. *McCollum v. Cal. Dep't of Corr. & Rehab.,* 647 F.3d 870, 878 (9th Cir. 2011). To that end, courts have adopted "flexible rules," finding prudential standing when, "(1) 'the party asserting the right has a "close" relationship with the person who possesses the right' and (2) 'there is a "hindrance" to the possessor's ability to protect his own interests.'" *Mills v. United States*, 742 F.3d 400, 406–07 (9th Cir. 2014) (quoting *Kowalski v. Tesmer,* 543 U.S. 125, 130 (2004)).

Here, Plaintiffs' allegations show that they appropriately may pursue their sex-discrimination claim on behalf of women and girl survivors of campus sexual violence with whom they have an attorney-client or other advisory or advocacy relationship. The interest between plaintiffs and these survivors is closely aligned and the survivors face significant hindrances to pursuing federal constitutional litigation on their own behalf.

## A.   Plaintiffs Have Alleged The Requisite Close Relationship With Their Clients And Others Women And Girl Survivors With Whom They Work.

First, ED's argument that Plaintiffs have not identified the third parties whose rights they seek to advance is unavailing. The SAC contains a section dedicated to the prudential standing allegations. SAC ¶¶ 131-142. Regardless of minor variations in word choice, this section clearly identifies female survivors of sexual violence who are protected by Title IX (primarily students) and to whom Plaintiffs provide legal representation or with whom Plaintiffs otherwise have an advisory or representative relationship as the relevant third party. SAC ¶¶ 131-135.

Second, ED's quarrel with Plaintiffs' ability to sue on behalf of female survivors broadly is largely academic because they acknowledge that Plaintiffs, at a minimum, may invoke third party standing on behalf of their "current clients." Mot. at 9, 11. Justly so. Plaintiffs plainly have a sufficiently close relationship with their clients to advance litigation asserting the right not to be discriminated against on the basis of sex. SAC ¶¶ 131. Existing attorney-client relationships are sufficiently close to establish prudential standing. *See Tesmer*, 543 U.S. at 131; *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). The same is true for Plaintiffs' other advisory or advocacy relationships with survivors, like SurvJustice's role as an

"advisor of choice" for college students and ERA's Advice & Counseling program. SAC ¶¶ 11, 26. Those relationships bear the same hallmarks of confidential advice and trust inherent in any attorney-client relationship, sufficient to establish the close relationship element of prudential standing. *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (refugee resettlement agency had sufficiently close relationship with Syrian refugees who it sought to resettle); *Obergefell v. Wymyslo*, 980 F. Supp. 2d 907, 914 (S.D. Ohio 2013) (funeral director who created and registered death certificates had prudential standing on behalf of gay clients due to his relationship to the gay community generally and their reliance on him); *see also Pony*, 433 F.3d at 1147 ("third party standing recognizes a wide range of relationships in which the third parties' interests are sufficiently aligned with the interests of the rights-holder that standing is appropriate.").

While ED seeks to rely on *Tesmer's* holding that the plaintiff attorneys did not have a sufficiently close relationship with their hypothetical future clients, 543 U.S. at 130-32, there is no such parallel here. Plaintiffs' attorney relationships with their current clients are, of course, distinct from *Tesmer*, as are Plaintiffs' advisory relationships with women and girls whom they serve but who decide not to pursue legal relief. *See*, *e.g.*, SAC ¶¶ 16, 25, 31. Among other indicia, Plaintiffs retain ethical obligations to past clients, and an initial consultation may create a privilege, even if an attorney-client relationship is never formalized. Further, ED's argument that Plaintiffs seek prudential standing on behalf of hypothetical future clients, Mot. at 11, is nonsensical. The allegations at issue simply illustrate the time pressure facing student survivors, many of whom are already working with Plaintiffs. SAC ¶ 142.

The close nature of the relationships is even clearer given Plaintiffs' core missions of supporting and advocating for these women and girls. SAC ¶¶ 10, 23, 28. In this way too they are distinct from the private sector attorneys in *Tesmer*. There can be no question that Plaintiffs are motivated to advocate zealously on the behalf of survivors, compelling a finding that Plaintiffs have adequately pled prudential standing. *See Voigt v. Savell,* 70 F.3d 1552, 1564–65 (9th Cir. 1995) (the close relationship requirement may be satisfied where the litigant "is fully, or very nearly, as effective a proponent of the right as the [third party]."); *U.S. v. $100,348.00 in*

*U.S. Currency,* 354 F.3d 1110, 1127 (9th Cir. 2004) (stating that "[a] third party may litigate another person's rights only if 'the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal'"). Just as in *Eisenstadt*, "the relationship between [the litigant] and the those whose rights [Plaintiffs] assert [is] not simply the fortuitous connection between a vendor and potential vendees, but the relationship between one who acted to protect the rights of a minority and the minority itself." 405 U.S. at 445.[5]

## B. Plaintiffs Have Alleged The Requisite Hindrance.

Plaintiffs have also alleged a sufficient hindrance to survivors advancing litigation on their own behalf. An obstacle need not be "insurmountable" to meet this standard. *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality opinion). These hindrances include: the desire to maintain privacy regarding an experience of sexual violence, which still carries stigma, *id.* ¶ 137, concern about physical safety and retaliation following a public report of sexual violence, as well as the impact that making sexual assault or harassment public could have on a student's career prospects, *id.* ¶ 138, 140-41, the possibility of retraumatization during federal litigation, *id.* ¶ 139, and the low likelihood that a student will obtain relief prior to graduation. *Id.* ¶ 142.

Such privacy and mootness concerns are obstacles traditionally found to support prudential standing in the abortion context. *See Singleton*, 428 U.S. at 117 (recognizing lawsuit's invasion of patient's privacy and "imminent mootness" of pregnancy sufficiently impeded patient from suing herself); *Planned Parenthood of Idaho, Inc.*, 376 F.3d at 917–18. Concerns about personal privacy and the consequences of disclosing private information also support a finding of hindrance outside the abortion context. *See Griswold v. Connecticut,* 381 U.S. 479, 481 (1965) (access to contraception); *Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir.

---

[5] ED's argument that prudential standing should be denied because there is disagreement within the survivor community about whether and how to challenge the Policy is not persuasive. Unlike cases where the *only* relevant right holder opposed a legal challenge on their behalf, *see*, *e.g.*, *Pony v. City of L.A.*, 433 F.3d 1138, 1147 (9th Cir. 2006), there is no such showing here. Nor have courts required abortion-providers seeking prudential standing to show uniformity of opinion about a particular abortion-limitation or a litigation theory among their patients, who are, no doubt, a similarly diverse group of women as are sexual violence survivors. *See*, *e.g.*, *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 917–18 (9th Cir. 2004).

2006) (adolescents seeking health care related to sexuality or mental health care counseling); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (mental health services). These concerns are compounded for minors, a significant part of the impacted group, despite ED's inaccurate references to "college women". Mot. at 9, 11; *see Aid for Women*, 441 F.3d at 1114 ("minors may be hindered by the fear of reprisal from parents should information about their sexual activity be disclosed").

ED dismisses these concerns by asserting that survivors could proceed under a pseudonym, and that, in any event, not all survivors have been or will be deterred from suing on their own behalf. Mot. at 11-13. Both contentions are meritless. First, the Supreme Court has expressly rejected the pseudonym argument. *Singleton*, 428 U.S. at 117–18 (prudential standing warranted even though abortion seekers frequently had challenged abortion restrictions anonymously). Furthermore, by asserting that it knows how to resolve these hindrances as a factual matter, ED fails to credit Plaintiffs' well-pleaded allegations (which are observations of the obstacles faced by their clients and other survivors). And even if proceeding under a pseudonym might provide protection against widespread publicity, it does not mitigate a survivor's fear that her attacker or school will learn of the lawsuit, as they are presumably involved parties. The use of a pseudonym therefore provides no relief for those survivors who fear physical harm, retaliation by their school, harm to their professional careers as the result of retaliation by a professor, retraumatization, or imminent mootness. SAC ¶¶ 136-141.

As to the second point, an obstacle need not be "insurmountable." *Singleton,* 428 U.S. at 114–15; *see Doe No. 1 v. Reed*, 697 F.3d 1235, 1245 n. 3 (9th Cir. 2012) (concurrence). Instead, it is sufficient that there is merely "*some* hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (emphasis added). Plaintiffs have alleged that, based on their experiences, survivors will indeed be reluctant or decline to pursue their legal rights in court, and that allegation suffices to establish the requisite hindrance.

Thus, here too ED's invocation of *Tesmer*, this time to suggest that past litigation by an individual negates any barrier for someone else to sue today, misses the mark. The Supreme Court in *Tesmer* found that lack of counsel did not sufficiently hinder indigent criminal

1   defendants from challenging a state statute because it was not impossible for them to bring such

2   a challenge *pro se*. Contrary to ED's characterization, Mot. at 12, *Tesmer* does not hold that *any*

3   example of an individual overcoming an asserted hindrance to litigation should bar the finding of

4   prudential standing, nor could it without upending long-settled doctrine to the contrary. *See*

5   *Singleton*, 428 U.S. at 117-18.[6] Further, the decision in *Tesmer* was also motivated by the

6   Court's view that the asserted hindrance simply was not credible, an irrelevant consideration at

7   the pleading stage. 543 U.S. at 133. Finally, *Tesmer* is also consistent with the line of cases

8   which balances the analysis of the closeness of the relationship with the scale of the obstacles

9   facing a third party—if the Court found no relationship, it was unlikely to find a sufficient

10  hindrance. *See Pa. Psychiatric Soc'y.*, 280 F.3d at 289 ("It remains for courts to balance these

11  factors to determine if third-party standing is warranted."); *Exodus Refugee Immigration, Inc.*,

12  165 F. Supp. 3d at 732–33 ("even if the foregoing hindrances to bringing this litigation were

13  relatively minor, 'when the interests of the litigant and the third party are closely related,' as they

14  undoubtedly are here, 'courts have viewed quite charitably assertions of third-party standing.'")

15  (quoting *Rothner v. City of Chi.*, 929 F.2d 297, 301 (7th Cir. 1991)). *Tesmer* does not change the

16  determination that Plaintiffs meet the standards for prudential standing here.

17  **C.      ED's Causation And Redressability Argument Is Incorrect.**

18          Finally, ED argues that Plaintiffs lack standing because the 2017 Title IX Policy has not

19  injured female survivors and any injuries are not redressable. Mot. at 14-16. It is unclear whether

20  ED contends that causation and redressability are elements of prudential standing or if it seeks to

21  relitigate the Court's earlier Article III standing decision. However framed, the argument fails.

22          For prudential standing, both the Supreme Court and this Circuit are clear that a plaintiff

23  need only show a close relationship to the third party and some hindrance to the third party's

24  ability to protect his or her own interests. *See, e.g., Tesmer*, 543 U.S. at 129-30; *McCollum*, 647

---

[6] *See also Powers*, 499 U.S. at 415 (while it is *possible* for jurors excluded on racial grounds to bring suit, the juror faced "considerable practical barriers" to doing so, making third party standing appropriate); *Caplin & Drysdale, Chartered*, 491 U.S. at 623 n.3 (finding prudential standing even though third party "suffers none of the obstacles discussed in [*Singleton*]").

1    F.3d at 879; *Legal Aid Soc'y. of Haw. v. Legal Servs. Corp.*, 145 F.3d 1017, 1031 (9th Cir.

2    1998). Of course, the plaintiff asserting prudential standing must itself be able to establish

3    constitutional standing, including the requisite showings of causation and redressability. *See*

4    *Tesmer*, 543 U.S. at 128-29 & n.2. But, as this Court previously found, Plaintiffs have done so

5    here by alleging that the 2017 Policy has impeded their mission and forced them to divert

6    resources. Order at 14.[7] That, taken with the factors discussed above, is all that is needed.

7        Even if ED were correct that prudential standing requires a showing of causation and

8    redressability as to the third party, Plaintiffs have done so. When causation and redressability

9    "hinge on the response of the regulated (or regulable) third party to the government action or

10   inaction" the plaintiff must "adduce facts showing that those [third party] choices have been or

11   will be made in such manner as to produce causation and permit redressability of injury." *Lujan*

12   *v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). The plaintiff must therefore "offer facts showing

13   that the government's unlawful conduct is at least a substantial factor motivating the third

14   parties' actions." *Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015) (citation omitted).

15       Contrary to ED's suggestion that it is "entirely speculative" that schools would not

16   change their conduct if the new Policy were vacated, Mot. at 15, Plaintiffs have alleged that

17   "[f]ollowing the issuance of the 2017 Title IX Policy, schools have modified and/or stated their

18   intention to modify their practices," and cited multiple examples from across the country. SAC

19

20   [7] In deciding ED's first Motion to Dismiss, this Court found that Plaintiffs had established
     organizational standing. *See* Order at 14. This Court made such a finding in a section of the
21   Opinion entitled "APA and *Ultra Vires* Action Claims." *Id.* at 10. However, nothing in the
     decision suggests that the finding that Plaintiffs had been forced to divert resources because the
22   Policy impeded their organizational missions was limited to the APA and *ultra vires* claims.
     Indeed, ERA specifically alleges that its mission is to "protect[] and expand[] economic
23   educational access and opportunities for women and girls," SAC ¶ 23—a mission that is
     certainly impeded by an unconstitutional policy that discriminates against women and girls.
24   Additionally, all Plaintiff organizations work on behalf of victims of sexual violence and sexual
     harassment—acts which "disproportionately impact[] women and girls." SAC ¶¶ 39-40.
25   Accordingly, the new Policy disproportionately affects Plaintiffs' clients. In sum, ED's unlawful
     action—the issuance of a discriminatory policy in violation of the equal protection clause—
26   caused Plaintiffs' injury—the required expenditure of resources. That injury can and will be
     redressed by an order of this Court vacating the 2017 Title IX Policy.
27

28

¶ 124. These allegations show that the regulated parties—here, schools—have made or will make changes to their Title IX policies and practices, and that the challenged Policy is at least a "substantial factor" motivating such changes. *See Novak*, 795 F.3d at 1019; *see also NRDC v. EPA*, 643 F.3d 311, 318 (D.C. Cir. 2011) (finding standing where plaintiffs adduced facts to show that certain regulated parties had changed course in response to the challenged guidance).

In addition, Plaintiffs have identified changes at schools which could result in delaying the resolution of Title IX reports, SAC ¶ 125 & n.55, and examples of ED reversing course on enforcement actions it previously initiated. *Id.* ¶¶ 124, 126. These allegations, too, show causation. *See NRDC*, 643 F.3d at 318 (finding standing because the challenged guidance (1) "had a present, concrete effect because it eliminated" the prior policy's "powerful incentive" for regulated parties to behave a certain way, and (2) replaced a "brightline" rule with "a flexible standard," likely resulting "in lengthier rulemaking processes"). Thus, because an order vacating the 2017 Title IX Policy would likely result in schools returning to policies and practices in place under the former policy, Plaintiffs have redressable injuries. *See In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016) ("Article III does not demand a demonstration that victory in court will without doubt cure the identified injury … Our cases require more than speculation but less than certainty.") (citation omitted).

At bottom, ED's argument as to causation and redressability is nothing more than an attempt to graft a finality requirement onto the prudential standing inquiry. *See* Mot. at 14 (quoting this Court's decision dismissing Plaintiffs' APA claim because the 2017 Policy was not "final agency action"). Even in the context of an APA challenge, where finality is a required showing, courts have found such an attempt improper. *See, e.g.*, *Holistic Candlers & Consumers v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (rejecting an argument that plaintiff lacked standing because the challenged agency letters did not amount to final agency action, observing instead that a court "must assume that the plaintiff states a valid legal claim and must accept the factual allegations in the complaint as true"). That conclusion is even more appropriate for Plaintiffs' equal protection claim, which does not require finality. The Court should reject ED's attempt to shoehorn the final agency action requirement into the standing inquiry for a constitutional claim.

1

**II.   Plaintiffs Have Stated An Equal Protection Claim.**

2

    Plaintiffs plausibly allege that ED decisionmakers,—DeVos and Jackson—believe that

3

women and girls tend to make false accusations about sexual assault and harassment or

4

mischaracterize so-called, "harmless romantic advances;" and, motivated by this belief, changed

5

Title IX policy to make it more difficult for survivors, most of whom are female, to pursue relief.

6

Plaintiffs therefore state a claim that the new Policy discriminates on the basis of sex.

7

    When a challenged government action is facially neutral, as here, a plaintiff may allege

8

an equal protection violation by alleging that invidious discriminatory purpose was a motivating

9

factor. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

10

*Arlington Heights* governs the Court's analysis as to whether Plaintiffs have stated an intentional

11

discrimination claim. *See Ave. 6E Invs, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir.

12

2016) (citing *Arlington Heights*, 429 U.S. at 266). Under this framework:

13

> [A] plaintiff must simply produce direct or circumstantial evidence demonstrating
> that a discriminatory reason *more likely than not* motivated the defendant and that

14

> the defendant's actions adversely affected the plaintiff in some way. *A plaintiff*

15

> *does not have to prove that the discriminatory purpose was the sole purpose of*
> *the challenged action, but only that it was a motivating factor.* The court analyzes

16

> whether a discriminatory purpose motivated the defendant by examining the
> events leading up to the challenged decision and the legislative history behind it,

17

> the defendant's departure from normal procedures or substantive conclusions, and
> the historical background of the decision and whether it creates a disparate

18

> impact. These elements are non-exhaustive, and a plaintiff need not establish any
> particular element in order to prevail.

19

20

*Ave. 6E*, 818 F.3d at 504 (emphasis added). As discussed below, Plaintiffs' factual allegations

21

make it more than plausible that the sex-stereotype regarding women and girls bringing "false"

22

accusations was a motivating factor in the Policy's reduction of protections for survivors. *Pac.*

23

*Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013) ("any

24

indication of discriminatory motive may suffice to raise a question that can only be resolved by a

25

factfinder") (citation omitted). That others have criticized aspects of the withdrawn Title IX

26

policy from apparently non-discriminatory perspectives does not change this conclusion.

27

Ultimately, it is ED's intent that matters, not that of other entities.

28

    Rather than engage with *Arlington Heights*, ED relies heavily on *Ashcroft v. Iqbal*, 556

U.S. 662 (2009). ED's argument fails in two respects. First, much of what it deems Plaintiffs' failure to satisfy *Iqbal's* pleading standard is really a challenge to the truth of Plaintiffs' allegations, which is improper at this stage. *See* Mot. at 16-21 (disputing Plaintiffs' allegations of motivation and asserting alternate "obvious" motivations, and disputing Plaintiffs' allegations concerning officials' state of mind based on their acknowledged public statements).

Second, *Iqbal's* articulation of the standard for pleading a discrimination claim did not modify *Arlington Heights* and is entirely consistent with finding that Plaintiffs have stated a claim here. *See Cooper v. Harris*, 137 S. Ct. 1455, 1479–80 (2017) (post-*Iqbal* decision identifying *Arlington Heights* factors as subjects of proper inquiry in determining whether discriminatory intent existed). *Iqbal* states that an intentional discrimination claim must identify facts revealing the decisionmaker's state of mind and may not rely on conclusory statements as to intent. *Iqbal*, 556 U.S. at 683. There, the plaintiff's claim failed because his non-conclusory factual allegations as to the defendants' intent did not identify any discriminatory motivation. *Id*. at 682-683. Contrary to ED's intimation, Mot. at 16-17, *Iqbal* did not hold that intentional discrimination claims must clear an especially high pleading burden, *Iqbal*, 556 U.S. at 678-79, or that the existence of a non-discriminatory explanation for the challenged action requires dismissal, *id*. at 682. Rather, the Court emphasized that all non-conclusory factual allegations must be credited. *Id*. at 681. And it remains true that dismissal is *only* required when a plaintiff's theory of discrimination is "implausible", not when there are alternate plausible motivations. *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011).

As discussed below, Plaintiffs' factual allegations easily make their theory plausible.

**A.** **Plaintiffs Plausibly Allege That A Sex-Stereotype Motivated ED To Reduce Protections For Sexual Violence Survivors.**

The baseless stereotype that women and girls tend to lie about or mischaracterize their experiences of sexual harassment, including assault, pervades our society. SAC ¶ 83. When such stereotyped views motivate government decisionmakers, facially neutral actions are unconstitutional. As set forth below, Plaintiffs' allegations regarding the Title IX Policy— including its disproportionate impact on women and girls, DeVos's and Jackson's statements

revealing their motivation, the influence of others advocating the same sex-stereotype, and the substantive inaccuracies in ED's description of the Policy—meet the standard articulated by *Arlington Heights* and cases that follow to plead an intentional discrimination claim.

### 1.     The Policy's Disparate Impact Raises An Inference Of Discrimination.

The 2017 Title IX Policy disproportionately impacts women and girls.[8] Girls are more likely than boys to be sexually harassed "by a significant margin." SAC ¶ 40. And a much higher proportion of women experience sexual assault in college than men. *Id*. ¶ 39. Changing guidance on Title IX obligations regarding sexual violence therefore impacts more women than men.

As ED admits, "any policy change in this area will necessarily affect men and women differently." Mot. at 18 n.5. The disproportionate impact on women is compounded by the stated goal of the Policy—to remove protections for (predominantly female) survivors and to add protections for accused students. The Policy is explicit that, in ED's view, as a result of the rescinded guidance "many schools have established procedures for resolving allegations that … are overwhelmingly stacked against the accused.'" 2017 DCL at 1. Similarly, DeVos's speech introducing the new Policy acknowledges that many viewed the rescinded policy as more protective of survivors.[9] She presents the new Policy as responding to an "overreach" on behalf of survivors in which "the heavy hand of Washington tipp[ed] the balance of [the] scale." DeVos Speech. Indeed, the new Policy does meaningfully reduce Title IX's protections for survivors.

---

[8] ED argues that disparate impact alone does not state an equal protection challenge to a facially neutral policy, a proposition with which Plaintiffs agree, and which is why Plaintiffs have presented substantial allegations regarding ED's intent. But it cannot be disputed that disparate impact supports an inference of intentional discrimination. *Ave. 6E*, 818 F.3d at 508.

[9] Press Release, ED, Sec'y DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017) ("DeVos Speech"), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement (e.g. "Some suggest that this current system, while imperfect, at least protects survivors and thus must remain untouched. But the reality is it doesn't even do that. Survivors aren't well-served when they are re-traumatized with appeal after appeal because the failed system failed the accused."). The text of this speech is an ED public record and was cited in the Second Amended Complaint, making all statements therein subject to judicial notice.

SAC ¶ 116.[10] (As discussed above, *supra* at 10-11, the determination that the Policy is not "final" for APA purposes does not mean that it has no impact on survivors). Although ED may assert that it had good reasons for these changes (an argument with which Plaintiffs disagree), ED cannot dispute that the new Policy disproportionately burdens women.[11]

Stuck with this clear disparate impact, ED posits that because any policy change regarding sexual violence will likely affect men and women differently, disparate impact should be ignored as a factor in the Court's equal protection analysis. Mot. at 18 n.5 (citing *Hawaii v. Trump*, 138 S. Ct. 2392, 2421 (2018)). But no case law suggests that an agency sails in a safe harbor when acting in a policy area that necessarily affects one group more than another. On the contrary, as the Ninth Circuit reiterated in a decision post-dating *Hawaii v. Trump*, disparate impact remains a significant factor in any analysis of discriminatory purpose. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518–19 (9th Cir. 2018). Further, the Court made this statement in the context of immigration policy, where most policy changes are similarly likely to produce disparate impacts on various ethnic groups. *Id.* Thus, consistent with *Arlington Heights*, the Court should consider the Policy's disproportionate harm to female students in finding that Plaintiffs pleaded a plausible discrimination claim.

### 2. Legislative History And Preceding Events Reveal That ED's Sex-Stereotyped View Drove The Change In Policy.

The actions and statements of ED decisionmakers leading up to the new Policy also reveal the discriminatory motivation. "Circumstantial evidence of intent, including statements by

---

[10] Consistent with this argument, in its determination that Plaintiffs adequately pleaded organizational standing, the Court credited Plaintiffs' allegations that they had observed survivors being chilled from pursuing Title IX claims as a result of survivors' perceptions that the Policy limited their chances of success and that ERA had found it more difficult to obtain beneficial outcomes on behalf of its clients. Order at 11-12.

[11] That the new Policy also burdens some men, as ED notes, Mot. at 18 n.5, does not change this conclusion or prevent a determination that the Policy is discriminatory. *See Pac. Shores Props,* 730 F.3d at 1159–60 ("A willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination.").

a decisionmaker, may be considered in evaluating whether government action was motivated by a discriminatory purpose." *Regents of Univ. of Cali. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1314 (N.D. Cal.), *aff'd sub nom.*, 908 F.3d 476 (9th Cir. 2018) (citing *Arlington Heights*, 429 U.S. at 266–68). Accordingly, Plaintiffs identified statements and other expressions of intent from ED decisionmakers, close in time to the issuance of the new Policy, revealing sex-stereotyped views of survivors and a corresponding intent to make it harder for survivors to succeed in Title IX claims. *See* SAC ¶¶ 84-98; *see also Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719 (2018) (contemporaneous statements can indicate bias).

First, DeVos and Jackson revealed their own stereotyped views that women and girls tend to lie about or mischaracterize experiences of sexual violence in their discussion of the new Title IX Policy. DeVos revealed the influence of these stereotypes in her statement announcing the new Policy by equating the magnitude of the (very low) rate of false accusations with the (very high) rate of sexual violence. *See* DeVos Speech (presenting the two issues in parallel and stating *inter alia*, that prior Title IX policy permitted "any perceived offense [to] become a full-blown Title IX investigation"). Similarly, her reference to "perceived offense[s]" is entirely consistent with society's historic tendency to discredit women's experiences of sexual harassment as "misunderstanding" or being "oversensitive" to "harmless" flirtation. *Ave. 6E*, 818 F.3d at 505-06 ("use of 'code words' may demonstrate discriminatory intent"); *see also Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (Because "officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority, we look to whether they have camouflaged their intent.") (citations omitted).

Jackson, who signed the Title IX Policy, made numerous statements blatantly revealing her own sex-stereotyped view. For example, while ED was actively revising the Policy under her direction, Jackson told the *New York Times* that 90 percent of Title IX investigations result from a woman's later regret of consensual sexual activity. SAC ¶ 97. This statement reveals the baseless belief that women and girls routinely make false reports of sexual misconduct. Jackson

was "previewing her plans" at ED for a revamped Title IX sexual harassment policy,[12] making it the type of "contemporaneous statement" of a decisionmaker contemplated by *Arlington Heights*. Jackson's attempt to disavow the statement was not "almost immediate" as ED asserts, Mot. at 21, but came in a later issued statement, and after widespread criticism on social media.[13] Contrary to ED's assertion, this statement, alone would be enough to make discriminatory intent plausible. *Cf. Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005) ("[I]n this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer").

This is not the only indication of Jackson's biased viewpoint. Jackson also instructed OCR staff, via her assistant, to read a book or excerpted portions of it that she described as "helpful … in reference to the issues we are discussing." SAC ¶ 95.[14] Among the excerpts emailed to staff were the following:

> The existing Title IX guidance from the Department was motivated by "an ill-conceived effort to protect women students from a rapidly growing catalogue of sexual bogeymen."

> "[W]e seem to be breeding a generation of students, mostly female students, deploying Title IX to remedy sexual ambivalences or awkward sexual experiences, and to adjudicate relationship disputes post-breakup—and campus administrators are allowing it."

---

[12] Erica L. Green & Sheryl Gay Stolberg, *Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times, July 13, 2017, https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.

[13] *Id*. (reporting that Jackson's clarification came in a later-issued statement); *see also* Sarah Brown, *Ed. Dept. Official Apologizes for '90%' Remark on Campus Rape. What's the Research?*, The Chron. of Higher Educ., July 12, 2017, https://www.chronicle.com/article/Ed-Dept-Official-Apologizes/240634 (reporting that Jackson's statement was issued after social media criticism). While the Chronicle of Higher Education article is not cited in the SAC, it responds to ED's introduction of facts also not alleged, Jackson's reported disavowal. Regardless, the parties' different interpretations of a statement that ED does not dispute Jackson made indicates that there are disputed issues of fact. *Cf. Wilson v. City of Aliceville*, 779 F.2d 631, 636 (11th Cir. 1986) ("After a witness disavows a statement, the trier of fact must determine which is more credible, the former or the present version of the witness' statement.").

[14] Contrary to ED's inaccurate characterization, Plaintiffs allege that Jackson relied on this book to inform ED's policy decisions; she did not just "read" it. Mot. at 20.

> "[A]ny number of other cases I learned about: astounding levels of bias against accused men, inventive deployments of the preponderance standard, and female complainants with ambiguous motives. I don't wish to betray my gender, but the premise that accusers don't lie turns out to be mythical. By sentimentalizing women in such preposterous ways, aren't Title IX officials setting schools up as cash cows for some of our more creatively inclined women students?"

SAC ¶ 95. This book explicitly promotes the view that female students tend to lie or misrepresent their experiences of sexual violence. Jackson praised the book and instructed OCR staff to consider it while revising Title IX policy. *Id*. This is precisely the kind of nonconclusory factual allegation that "nudge[s]" Plaintiffs "claim of purposeful discrimination across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S., at 570).

Finally, Jackson's approach to the Title IX policy revision is consistent with her stated view that the many women who claim President Trump sexually harassed them are liars. SAC ¶ 86. Jackson can claim no special insight into those incidents, making her statements particularly revelatory of her innate assumptions that female accusers tend to be "fake victims." *Id*.; *see also Dominguez-Curry*, 424 F.3d at 1038 ("Where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision."); *Meaux v. Nw. Airlines, Inc.*, 718 F. Supp. 2d 1081, 1089–90 (N.D. Cal. 2010), *aff'd*, 490 F. App'x 58 (9th Cir. 2012) ("Comments that overtly exhibit hostility to a protected class, even if they are general comments about the class, or are directed to other people, are probative of discriminatory intent.").

Second, and strengthening the inferences raised by their own statements, as part of the Title IX policy revision by ED, DeVos and Jackson both gave special attention to those stakeholders who assert the same sex-stereotyped view. DeVos met with a Georgia State Representative who has questioned women's credibility on the experience of sexual assault and with the National Coalition for Men, an organization that published photos of women who have made complaints of rape, calling them "false victims." SAC ¶ 89. Similarly, Jackson sought out the views of Professor Gordon Finley, a member of the National Coalition for Men, who has suggested (incorrectly) that rates of false accusations of rape and other sexual abuse range upwards of forty percent. SAC ¶ 91. She met outside of work hours to discuss Title IX policy

1     with the Deputy Executive Director of Stop Abusive and Violent Environments ("SAVE"), a

2     group that advances inaccurately inflated rates of false accusations regarding sexual assault. *Id*. ¶

3     90. Jackson was also in regular contact with the co-President of Families Advocating for Campus

4     Equality ("FACE") a group of mothers of boys and men who have been accused of sexual

5     harassment and assault that "advocate[es] for the rights of falsely accused students." *Id*. ¶ 92.

6     Jackson even coordinated with FACE on a letter campaign regarding ED's Title IX policy and

7     requested that FACE publish op-eds supportive of the new Policy. *Id*. ¶¶ 92-93. In contrast, the

8     Department met with organizations that advocate for Title IX protections for survivors, like

9     Plaintiffs, late in the policymaking process and only after repeated, collective requests. *Id*. ¶ 94.

10         The special solicitude that DeVos and Jackson afforded to groups like FACE, SAVE, and

11     the National Coalition for Men reveals ED's discriminatory purpose, especially in comparison to

12     the relative lack of access provided to survivor advocates. Plaintiffs are not arguing, as ED

13     asserts, that any meeting with a group that has been critical of Title IX policy would raise a

14     reasonable inference that ED's policy was motivated by discriminatory stereotypes. Mot. at 20.

15     And while ED has identified other criticisms of the rescinded Title IX policies in an effort to

16     posit an "obvious alternative explanation," *see* Mot. at 17, by and large those criticisms do not

17     appear to derive from the assumption that women and girls tend to lie about sexual assault.

18     Plaintiffs' claim is not based on a good-faith policy disagreement, but on the fact that ED's

19     reversal in policy was motivated, at least in part, by discriminatory stereotypes about women and

20     girls. Jackson's and DeVos's special attention to those who criticized earlier Title IX policy *from*

21     *the perspective that it enabled women and girls to make false accusations,* compared to their

22     attention to survivor advocates and other Title IX stakeholders, makes such discriminatory intent

23     plausible. *Ave 6E*, 818 F.3d at 504 (plaintiff may establish discriminatory intent based on animus

24     of "those to whom the decision-makers were knowingly responsive").

25         **3.      ED's Stated Substantive Conclusions Reveal Its Discriminatory Purpose.**

26         The substantive conclusions that ED presented to support the new Title IX Policy further

27     reveal ED's discriminatory motivation. *Arlington Heights*, 429 U.S. at 266-68 (departure from

28     substantive conclusions as one factor). While policy disagreements do not give rise to an

inference of discrimination, ED's mischaracterization of the effects of the rescinded Policy and its incorrect statements supporting the new Policy do support such an inference.

ED justifies its new Policy with sweeping and unsupported statements regarding the Title IX regime before the rescinded guidance, as well as the effects of the prior guidance. *See* SAC ¶ 120. For example, it asserts that "[m]any schools [before the rescinded guidance was in place] had traditionally employed a higher clear-and-convincing-evidence standard." 2017 DCL at 2. ED does not substantiate this assertion, nor does it appear that it could. For example, a Congressionally-mandated report submitted to the U.S. Department of Justice in 2002 revealed that more than 80 percent of schools did not mention the burden of proof used in a hearing, and that for those that did, 81 percent used the "preponderance of the evidence standard."[15] There is no information reported from that survey as to how many schools used the "clear and convincing standard." *Id.* ED also makes unqualified assertions that the rescinded policy "led to the deprivation of rights for many students" and that it caused procedures at "many schools" to be "overwhelmingly stacked against the accused." SAC ¶ 120, 2017 DCL at 2. While there are anecdotes of accused students being treated unfairly by their schools, post-2011 DCL studies reveal no systemic problem, and indeed have found that accused students are still more likely to receive various procedural rights than survivors.[16] The 2017 DCL even overstates and

---

[15] Heather M. Karjane, et al., Educ. Development Ctr., Inc., Campus Sexual Assault: How America's Institutions of Higher Education Respond 122 (Oct. 2002), https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf. The Court may take judicial notice of this government document. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1088 (N.D. Cal. 2017).

[16] *See*, *e.g*, Majority Staff of S. Subcomm. on Fin. and Contracting Oversight, 113th Cong., *Sexual Violence on Campus* (July 9, 2014), at 11-12, https://www.hsgac.senate.gov/download/sexual-violence-on-campus-survey-report2 ("There has been concern voiced among some groups that if universities adopted more victim-centered approaches in their handling of sexual assault cases, they would violate the due process rights of alleged perpetrators. Some have even said the system is already too survivor-focused. Contrary to these concerns, it appears that some institutions actually afford certain due process elements more frequently to alleged perpetrators than they do to survivors."). Again, the Court may take judicial notice of this government document.

mischaracterizes the letter from Harvard Law professors on which it relies.[17] Similarly, in her speech introducing the new Policy, DeVos inaccurately presents the problem of false accusations as being of a similar magnitude as the rate of sexual violence. *See* DeVos Speech.

In short, ED's inaccurate assertions both in the 2017 DCL and Secretary DeVos's speech do not simply evince a policy disagreement. To the contrary, ED presents the "solution" to a complicated issue as uniformly requiring the need for more rights for the accused at the expense of the rights of the survivors (mostly female). This failure to acknowledge any nuance, in combination with the other *Arlington Heights* factors, bolsters the inference that ED's proffered explanation for its new Policy is not credible. *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2nd Cir. 1997) ("The lack of a credible justification for the zoning decision raises an additional inference that the decision was based on impermissible factors.").

**B.    Plaintiffs Plausibly Allege That ED Reduced Title IX Protections For Survivors Because Of A Sex-Stereotype, Stating An Equal Protection Claim.**

ED attempts, unsuccessfully, to defeat Plaintiffs' well-pleaded allegations by arguing that even if its actions were motivated by sex-stereotypes, at most its motivation was "unintentional." Mot. at 23. ED accurately states that if the government undertakes a facially neutral action with disparate effects, its mere awareness of those effects does not state a discrimination claim. Instead, the government must take the action at least in part because of that impact. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). But, this statement of the law does not support dismissal for two reasons. First, ED overreads the holding of *Feeney* in asserting that Plaintiffs must allege an affirmative desire to "harm" women. Mot. at 22-23. A facially neutral policy enacted to perpetuate decisionmakers' sex-stereotypes, regardless of any intent to harm or

---

[17] The cited letter asserts only that procedures were "overwhelmingly stacked against the accused" at Harvard University, not at "many schools." Further, ED fails to note that the authors of the letter, while critical of Harvard University's sexual harassment policy, state that the "most severe problems" they complain of were caused by overcompliance with the 2011 DCL, and that the 2011 DCL itself "did not require schools to treat accused students unfairly in the investigation and adjudication process." Elizabeth Bartholet, et al., *Fairness for All Students Under Title IX* (Aug. 21, 2017),
https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=y.

1   punish, is also discriminatory. Second, and separately, Plaintiffs' allegations meet the

2   requirements of *Feeney* because ED changed its Policy to reduce survivor protections and

3   discourage what it viewed as false or frivolous complaints, harming women and girls.

4        On the first point, ED's attempt to draw a distinction between enacting government

5   policy for the purpose of perpetuating discriminatory stereotypes rather than for the explicit

6   purpose to harm a protected class is unpersuasive. *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014),

7   which ED seeks to distinguish, is instructive. There, the Ninth Circuit determined that the

8   challenged state prohibitions on same-sex marriage were facially discriminatory (unlike the

9   facially neutral Title IX Policy). The court then explained that the prohibitions "constitute gender

10  discrimination both facially *and* when recognized, in their historical context, both as resting on

11  sex stereotyping and as a vestige of the sex-based legal rules once imbedded in the institution of

12  marriage." *Id*. at 490 (emphasis added). The perpetuation of sex stereotypes via state policy

13  therefore is sex discrimination, regardless of whether it also includes facial discrimination. *Id*.

14  Similarly, in *Avenue 6E*, which ED admits is controlling, the Ninth Circuit found a

15  discrimination claim where housing development policy was enacted to appease constituents'

16  negative racial stereotypes. Once it determined that racially discriminatory stereotypes motivated

17  the policy decision, the court did not find it necessary to identify any additional animus against

18  the Hispanic residents who were disproportionately impacted. *Ave. 6E*, 818 F.3d at 503-09.

19  *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988), which ED also relies on,

20  did not require allegations that a police officer believed that women deserved violence, as ED

21  asserts, but rather stated that a plaintiff could plead an equal protection claim based on intent to

22  treat domestic abuse cases less seriously than other assaults coupled with sex-based animus.

23  Likewise, here ED held discriminatory views about women and girls based on sex-stereotypes

24  and enacted policy as result of those stereotypes—to reduce the "problem of false accusations"—

25  to the disproportionate detriment of female survivors.

26       One the second point, regardless of how one characterizes the type of animus required by

27  *Feeney* and *Avenue 6E*, Plaintiffs have pleaded facts supporting its inference here. ED changed

28  its Title IX policy at least in part to "fix" the perceived "problem" that false accusations by

Plaintiffs' Opposition to Motion to Dismiss; Case No.: 3:18-cv-00535-JSC    Page: 22

women and girls were prevalent, which is not an entirely neutral purpose (in contrast to the purpose to benefit veterans in *Feeney*).[18] Plaintiffs' allegations show that DeVos and Jackson held the relevant sex stereotype (and were influenced by others that held it, *see* SAC ¶¶ 90-93) while in their official capacities at ED and during the revision of the Title IX Policy—making it plausible that they intended that the Policy "correct" the perceived "problem" of false accusations from women. SAC ¶¶ 89-93. For example, DeVos's speech introducing the Policy presented the problem of false accusations as rampant. *Id*. ¶ 99.[19] Also, Jackson's 90 percent statement to the *New York Times* was in response to a question about her approach to ED's Title IX Policy. *Id*. ¶ 97.[20] And, Jackson instructed her staff to read a book advocating the same sex stereotype because it was "helpful" to their ongoing revision of Title IX Policy. *Id*. ¶ 95. Such allegations support the inference that ED intended the resulting disparate impact. *See Puente Ariz. v. Arpaio*, 76 F. Supp. 3d 833, 862–63 (D. Ariz. 2015), *rev'd in part on other grounds*, 821 F.3d 1098 (9th Cir. 2016) (describing of allegations that defeat a proffered neutral purpose).

ED exerted this animus against women and girls by reducing Title IX protections for survivors, who are predominantly female—exactly the type of intent required by *Feeney*. *See* SAC ¶ 116 (detailing reduced protections). ED is explicit that the new Policy is meant to shift the balance of protections in favor of accused students. *See* 2017 DCL (explaining that it was removing prior "minimal standard of proof" removing requirement that complainants be allowed to appeal "not-guilty" findings in any appeals process, removing discouragement of cross-

---

[18] *Feeney* is different from this case in multiple respects, not least of which that it was decided based upon a record, not the allegations in a complaint.

[19] DeVos stated that she convened a conversation "with and for all students" regarding Title IX Policy, but identifies those students only as survivors and "*falsely* accused students", not credibly accused students, making her fixation on false accusations even more plain. DeVos Speech (emphasis added).

[20] As the article notes, the interview was "previewing [Jackson's] plans" for Title IX policy. The article continues: "Investigative processes have not been "fairly balanced between the accusing victim and the accused student," Ms. Jackson argued, and students have been branded rapists "when the facts just don't back that up." In most investigations, she said, there's "not even an accusation that these accused students overrode the will of a young woman." Green & Stolberg, *supra* note 12.

examination, and removing requirement of speedy resolution of complaints). DeVos's description of the new Policy also makes clear that she intended to eliminate protections for survivors at least in part because she believes that there have been too many Title IX investigations based on what she perceives as false or frivolous reports. *See* DeVos Speech (stating, *inter alia*, that prior Title IX policy "clearly pushed schools to overreach" on behalf of survivors and against accused students, and it permitted "any perceived offense [to] become a full-blown Title IX investigation"). The allegations thus make it plausible that not only was ED aware that the new Policy would disproportionately impact women and girls, as survivors of sexual violence, but that it adopted the new Policy "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" those women and girl survivors. *Feeney*, 442 U.S. at 279.

**C.     The Existence of Non-Discriminatory Policy Disagreements Regarding Title IX Does Not Render Plaintiffs' Discrimination Claim Implausible.**

To support their motion to dismiss, ED relies heavily on the fact that there are examples of criticism of the prior Title IX policy from across the political spectrum. Mot. at 16-18. But the fact that others in the legal and policy community critiqued prior ED Title IX policies from other, non-discriminatory, perspectives, does not absolve ED from its own discriminatory motivation. First, sex stereotypes are not confined to any one political viewpoint. Further, that there were critiques of the prior policy on a variety of grounds does not make it implausible that ED's intent in enacting *this* Policy was discriminatory.

At the pleading stage, where there are multiple plausible motivations for a government policy, if just *one* is discriminatory the plaintiffs have stated an equal protection claim. *Starr*, 652 F.3d at 1216–17. As the Ninth Circuit explained:

> If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible. The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable.

*Id.* Thus, although Plaintiffs contend that their allegations raise the inference that sex stereotyping motivated the new Policy, all they need show at this stage is that sex stereotyping

was one of multiple possible motivations. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1077–78 (9th Cir. 2012) ("[W]here the claim is plausible—meaning something more than a sheer possibility, but less than a probability—the plaintiff's failure to prove the case on the pleadings does not warrant dismissal.") (citation omitted).

By contrast, in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), cited by ED, the Supreme Court relied on the district court's finding that "the record in this case does not indicate that [the challenged anti-abortion demonstrations] are motivated by a purpose (malevolent *or* benign) directed specifically at women as a class" but instead by a commitment to stopping the practice of abortion. *Id*. at 270 (emphasis in original). Based on that factual conclusion and its observation that "there are common and respectable reasons for opposing [abortion], other than hatred of, or condescension toward … women as a class," the Court held that there was no invidiously discriminatory animus against women motivating the challenged demonstrations. *Id*. at 270-274. The Court left open the possibility that opposition to abortion could be motivated by anti-woman animus in certain circumstances, but the particular record in *Bray* simply did not establish those circumstances in that case. *Cf. Jane L. v. Bangerter*, 61 F.3d 1505, 1517 n. 11 (10th Cir. 1995) (*Bray* "do[es] not preclude the future development of an abortion jurisprudence rooted in the Equal Protection Clause"). Thus, the fact that some people may have different and non-discriminatory views about a policy that disproportionately impacts women (or another protected class) is irrelevant. The inquiry is whether the particular Policy at issue was motivated by the decisionmakers' discriminatory intent. Put another way, Justice Ginsberg's expressed concern about due process in an interview, Mot. at 17-18, does not absolve ED of its discriminatory motivations.

### III.   **Plaintiffs Have Stated An Ultra Vires Claim.**

Plaintiffs included the *ultra vires* claim in their SAC to preserve it for appeal, if necessary. They respectfully refer back to the prior briefing in support of this claim. Dkt. No. 45 at 24-25.

### **CONCLUSION**

Plaintiffs respectfully request that the Court deny the Motion to Dismiss in its entirety.

Respectfully submitted,                    Date: January 11, 2019


/s/ Robin F. Thurston
Alice Y. Abrokwa*
Leecia Welch (CA Bar No. 208741)
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, and
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, aabrokwa@youthlaw.org

Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 621-0672
Fax: (415) 621-6744
Email: jreisch@equalrights.org

Javier M. Guzman*
Robin F. Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org, kjones@democracyforward.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, schandy@nwlc.org

*admitted pro hac vice
Counsel for Plaintiffs