1  JOSEPH H. HUNT
   Assistant Attorney General
2
   DAVID L. ANDERSON
3  United States Attorney

4  CARLOTTA P. WELLS
   Assistant Branch Director
5  Civil Division

6  STEVEN A. MYERS (NY Bar # 4823043)
   Trial Attorney
7  United States Department of Justice
   Civil Division, Federal Programs Branch
8  P.O. Box No. 883, Ben Franklin Station
   Washington, DC 20044
9  Tel: (202) 305-8648
   Fax: (202) 616-8470
10 E-mail: steven.a.myers@usdoj.gov

11 *Attorneys for Defendants*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SURVJUSTICE, INC., EQUAL RIGHTS ADVOCATES, and VICTIM RIGHTS LAW CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*, KENNETH L. MARCUS, *in his official capacity as Assistant Secretary for Civil Rights*, and U.S. DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 18-cv-0535-JSC <br><br> **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> Hon. Jacqueline Scott Corley <br> Hearing: March 7, 2019, 9:00 a.m. <br><br> Phillip Burton Federal Building & United States Courthouse, Courtroom F, 15th Fl., 450 Golden Gate Ave., San Francisco, CA 94102 |

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.

# TABLE OF CONTENTS

I. Argument ..................................................................................................................................1

    A. **Plaintiffs Lack Prudential and Article III Standing to Bring Their Fifth Amendment Claim.** ............................................................................................................1

        1. Plaintiffs Lack Prudential Standing. ........................................................................1

        2. Plaintiffs Lack Article III Standing.........................................................................4

    B. **Plaintiffs Do Not Plausibly Allege That Defendants Issued the 2017 Guidance with Intent to Discriminate Against Women.** ....................................................6

        1. Alleged Disparate Impact Is Not Probative of Discriminatory Intent. ....................7

        2. The Statements in the Second Amended Complaint Do Not Show That Defendants Issued the 2017 Guidance Because of a Sex Stereotype. .....................8

        3. Plaintiffs' Substantive Disagreement With the 2017 Guidance Is Not Probative of Discriminatory Intent. ......................................................................10

        4. There Is an "Obvious Alternative Explanation" for the 2017 Guidance. .............11

        5. In the Alternative, Unintentional Reliance Upon Sex Stereotypes Is Not Intentional Discrimination. ...........................................................................12

II. Conclusion................................................................................................................................14

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.

i

# TABLE OF AUTHORITIES

**Cases**

*Aid for Women v. Foulston*,
    441 F.3d 1101 (10th Cir. 2006) .................................................................................................. 3

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................................ 11

*Avenue 6E Investments., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) .................................................................................................. 13

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1988) .................................................................................................. 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................ 11

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ................................................................................................................ 12

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989) .................................................................................................................. 2

*DOL v. Triplett*,
    494 U.S. 715 (1990) .................................................................................................................. 2

*Dominguez-Curry v. New Transp. Dep't*,
    424 F.3d 1027 (9th Cir. 2005) .................................................................................................. 9

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) .................................................................................................. 12

*Exodus Refugee Immigration, Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016) ...................................................................................... 2

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ................................................................................................ 12

*Jane L. v. Bangerter*,
    61 F.3d 1505 (10th Cir. 1995) .................................................................................................. 8

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ............................................................................................................ 2, 3

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) .................................................................................................. 13

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) .................................................................................................... 6

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) .................................................................................................. 5

*Natural Resources Defense Council v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011) .................................................................................................. 4

*Nat'l Wrestling Coaches Ass'n v. ED*,
  366 F.3d 930 (D.C. Cir. 2004) .................................................................................................. 6

*Novak v. United States*,
  795 F.3d 1012 (9th Cir. 2015) ............................................................................................... 4, 6

*Penn. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002) ..................................................................................................... 3

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ........................................................................................................... 12, 13

*Planned Parenthood of Idaho, Inc. v. Wasden*,
  376 F.3d 908 (9th Cir. 2004) .................................................................................................... 2

*Powers v. Ohio*,
  499 U.S. 400 (1991) .................................................................................................................. 3

*Regents of the Univ. of Cal. v. DHS*,
  908 F.3d 476 (9th Cir. 2018) .................................................................................................... 7

*Singleton v. Wulff*,
  428 U.S. 106 (1976) .................................................................................................................. 3

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ................................................................................................ 11

*SurvJustice, Inc. v. DeVos*,
  No. 18-cv-00535-JSC, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018) ............................... 4, 5, 6

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .............................................................................................................. 7

*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................................................. 2

*Washington v. Davis*,
  426 U.S. 229 (1976) .................................................................................................................. 7

**<u>Statutes</u>**

5 U.S.C. § 706 ................................................................................................................................ 11

**<u>Other Authorities</u>**

*Actuarial Life Table*, Social Security Administration,
  https://www.ssa.gov/oact/STATS/table4c6.html (last visited Feb. 7, 2019) ........................... 8

*Inmate Gender*, Federal Bureau of Prisons (Nov. 24, 2018),
  https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp ......................................... 8

Jennifer Senior, *'Unwanted Advances' Tackles Sexual Politics in Academia*, N.Y. Times, Apr. 5, 2017, https://www.nytimes.com/2017/04/05/books/review-laura-kipnis-unwanted-advances.html.................9

John Stuart Mill, On Liberty (Edward Alexander ed., Broadview Literary Texts 1999) (1859)................9

Diary of John Adams (Mar. 5, 1773), *in* National Archives, https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002.....................................10

*The Best Fiction and Nonfiction of 2017*, Wall St. J., Dec. 7, 2017, https://www.wsj.com/articles/the-best-fiction-and-nonfiction-of-2017-1512660946............................9

*2019 Is off to Quite a Start!*, SurvJustice (Feb. 6, 2019), https://survjustice.org/news/2019-is-off-to-quite-a-start.........................................................................5

**SurvJustice, Inc. v. DeVos**, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.

iv

## I. Argument

Defendants' motion to dismiss demonstrated that the Second Amended Complaint should be dismissed for three reasons: Plaintiffs lack prudential standing to advance the equal protection rights of women who are strangers to this litigation, the purely advisory guidance at issue in this case does not cause Plaintiffs any injury that is redressable by an order of this Court, and Plaintiffs have failed to meet their burden of pleading facts rendering it plausible that the challenged guidance was issued with discriminatory intent. *See generally* Defs.' Mot. Dismiss 2d Am. Compl., ECF No. 95 [hereinafter Defs.' Mot.]. Nothing in Plaintiffs' opposition memorandum, *see* Pls.' Opp'n Defs.' Mot. Dismiss 2d Am. Compl., ECF No. 96 [hereinafter Pls.' Opp'n], adequately rebuts any of these arguments. Accordingly, the Court should grant Defendants' motion to dismiss and terminate this case.

### A. Plaintiffs Lack Prudential and Article III Standing to Bring Their Fifth Amendment Claim.

At the outset, the Court should dismiss this case for lack of both prudential standing and Article III standing. With respect to prudential standing, Plaintiffs now make clear in their opposition memorandum that they seek to litigate only on behalf of women with whom they have an attorney-client or other advisory relationship. Crucially, however, Plaintiffs fail to identify a sufficient hindrance to these women bringing their own claims. With respect to Article III standing, it follows from the Court's determination that the 2017 Guidance causes no legal consequences that any alleged injury to Plaintiffs' clients is caused by the voluntary choices of their schools and is not redressable by an order from this Court.

#### 1. Plaintiffs Lack Prudential Standing.

After three complaints and two rounds of briefing, Plaintiffs have finally narrowed the class of people whose rights they invoke from "survivors of sexual harassment and assault" writ large, *see, e.g.*, 2d Am. Compl. ¶ 132, ECF No. 86, to "female survivors of sexual violence who are protected by Title IX (primarily students) *and to whom Plaintiffs provide legal representation or with whom Plaintiffs otherwise have an advisory or representative relationship*," Pls.' Opp'n at 5 (emphasis added). In other words, Plaintiffs now make clear that they do not invoke third party standing on behalf of anyone other than their clients. Yet while Defendants are not disputing that Plaintiffs have pleaded a sufficiently close relationship

with their current clients to satisfy third party standing doctrine, Plaintiffs have failed to establish a sufficient hindrance to these clients bringing their own claims. Plaintiffs' suggestion that Defendants have in fact conceded this argument, Pls.' Opp'n at 5, is incorrect. To the contrary, Defendants have shown that no such hindrances exist. *See* Defs.' Mot. at 11–13.

As an initial matter, Plaintiffs overgeneralize third party standing cases and thereby understate their burden to demonstrate a hindrance to their clients. Where a lawsuit does not involve direct regulation of the litigant, or certain other narrow exceptions like First Amendment challenges, the Supreme Court has "not looked favorably upon third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). In suggesting that the hindrance inquiry is not demanding, Plaintiffs rely exclusively on cases involving challenges to laws that *directly* regulated the litigant while *indirectly* burdening a third party's rights. *See, e.g.*, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 619–21, 623 n.3 (1989) (enforcement of a forfeiture statute against the attorney-petitioner would burden client's Sixth Amendment right to counsel); *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 733 (S.D. Ind. 2016) (enforcement of directive to not pay federal grant funds to refugee resettlement agency-plaintiff would violate refugee clients' constitutional rights). However, Plaintiffs' alleged injury does not fall into this category, since the challenged guidance does not regulate them (or anyone else, for that matter). *See Tesmer*, 543 U.S. at 131 (distinguishing *DOL v. Triplett*, 494 U.S. 715 (1990), because it "falls within the class of cases where we have 'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights" (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975))). Accordingly, Plaintiffs must satisfy a more demanding standard.

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004), *cited in* Pls.' Opp'n at 7, illustrates how the prudential standing doctrine treats litigants who are directly subject to the challenged restriction differently from litigants who are not for purposes of third party standing. Although the court in that case permitted the doctor-plaintiff to invoke the constitutional rights of his patients in challenging an Idaho statute that restricted *doctors'* ability to perform abortions, it cast doubt on whether Planned Parenthood, an organization that did not provide abortion services in Idaho, could challenge the statute. *Id.* at 918. This is precisely the distinction that the Court should draw in this case, where the 2017

Guidance makes no attempt to regulate organizations such as Plaintiffs.

Because this is not the sort of case where courts have been "forgiving" of third party standing criteria, the "low hindrance" rule that Plaintiffs advocate is inapplicable here. Plaintiffs claim that "an obstacle need not be 'insurmountable'" and that "it is sufficient that there is merely '*some* hindrance to the third party's ability to protect his or her own interests.'" Pls.' Opp'n at 7, 8 (quoting *Singleton v. Wulff*, 428 U.S. 106, 117 (1976); *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). But in cases that do not involve threatened enforcement against the litigant, courts have not applied this forgiving standard. Rather, in such cases, as discussed below, so long as it is possible for the third party to assert his or her rights and there is evidence that third parties have in fact asserted such rights, there is no hindrance sufficient to permit third party standing. *See Tesmer*, 543 U.S. at 132 (holding that there was no hindrance because indigent defendants could challenge the statute *pro se* and because at least two defendants had done so). Because there is ample evidence that students affected by the 2017 Guidance are able to challenge it and, indeed, have done so, *see* Defs.' Mot. at 12–13, the alleged hindrances to Plaintiffs' clients are not sufficient for Plaintiffs to invoke third party standing.

In fact, the very hindrances allegedly faced by Plaintiffs' clients have not overcome the general bar against third party standing in similar cases. While courts have permitted doctors to challenge laws that restrict *doctors'* abilities to perform abortions based upon "the patients' fear of stigmatization," *Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir. 2006) (quoting *Penn. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002)), these bases have been rejected when the challenged restriction did not target the litigant. In such cases, a third party's practical hindrances, such as an inability "to coherently advance the substance of their constitutional claim," are insufficient to establish third party standing when there is evidence that some third parties have in fact advanced such claims. *See Tesmer*, 543 U.S. at 132. So here, although a pseudonym may not alleviate all students' privacy concerns, because some students have challenged the 2017 Guidance undeterred, such privacy concerns are not a sufficient hindrance to establish third party standing.

Finally, Plaintiffs incorrectly argue that applying a higher hindrance bar impermissibly raises the pleading standard. Just as the *Tesmer* court referred to public dockets to identify defendants who had overcome the alleged hindrances to assert their right to appellate counsel, 543 U.S. at 132, so too have

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.
3

Defendants referred to public dockets—indeed, this docket—to point out that students have challenged the 2017 Guidance without need for Plaintiffs.

### 2. Plaintiffs Lack Article III Standing.

In addition to lacking prudential standing to bring their Fifth Amendment claim, Plaintiffs also lack Article III standing because they have not plausibly alleged that any purported Fifth Amendment violation is caused by Defendants or that this Court could redress any such injury.[1]

First, Plaintiffs have not plausibly alleged that the 2017 Guidance caused any Fifth Amendment injury to them.[2] Plaintiffs allege that a handful of schools have adjusted their Title IX policies following the issuance of the 2017 Guidance, but this Court has unambiguously held that any such choices were voluntary. *See SurvJustice, Inc.*, 2018 WL 4770741, at *10 (explaining that a school "need not change its policies in response to the 2017 Guidance" and that "voluntarily changing a policy in response to an agency's nonbinding enforcement guidance is not the same as being required to do so by the guidance itself."). Since Plaintiffs allege injuries flowing only from the voluntary choices of third parties not before the Court, Defendants clearly did not cause any injury that Plaintiffs have allegedly suffered. Defendants are not responsible for the voluntary choices of third parties. *See Novak v. United States*, 795 F.3d 1012,

---

[1] Plaintiffs claim that Defendants were unclear whether they raised causation and redressability issues as a prudential or Article III matter. However, Defendants clearly challenged Plaintiffs' Article III standing in their section on causation and redressability. *See* Defs.' Mot. at 14 (challenging Plaintiffs' "Article III standing").

Plaintiffs also argue that the Court has already determined that they have Article III standing. Pls.' Opp'n at 10 n.7. The Court previously held only that "Plaintiffs have adequately alleged standing at the pleading stage *with respect to their APA and* ultra vires *causes of action*," *SurvJustice, Inc. v. DeVos*, No. 18-cv-00535-JSC, 2018 WL 4770741, at *8 (N.D. Cal. Oct. 1, 2018) (emphasis added), not with respect to their Fifth Amendment claim. The Court did not reach the question of whether Plaintiffs had Article III standing with respect to that claim because it held that Plaintiffs lacked prudential standing. *See id.*

[2] Defendants do not contend, as Plaintiffs suggest, that the Court's final agency action holding *requires* it to hold that Plaintiffs lack standing. However, the Court's holding that the 2017 Guidance has no legal effect casts serious doubt on the plausibility of Plaintiffs' allegations that the 2017 Guidance caused schools to alter their procedures and that vacatur would redress Plaintiffs' Fifth Amendment injury. *Natural Resources Defense Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011), which Plaintiffs rely on to support causation, in fact illustrates the relationship between standing and finality. There, the D.C. Circuit held that the plaintiffs had standing for the same reason that the challenged "guidance" was in fact a legislative rule: its implementation produced legal consequences that injured the plaintiffs. *Id.* at 319 (observing that the issue of standing and finality "turn on the same question: whether the Guidance announces a binding change in the law"). Applying that rationale here, Plaintiffs lack standing for the same reason that the 2017 Guidance is not final: its implementation produces no legal consequences for anyone, including Plaintiffs.

1019 (9th Cir. 2015) (holding that the plaintiffs lacked standing because a third party "may well have engaged in their injury-inflicting actions even in the absence of the government's challenged conduct" (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014))).

The weakness in Plaintiffs' causation theory is compounded by their concession, discussed above, that they are asserting third party standing only on behalf of their clients, rather than female students writ large. Notwithstanding that concession, Plaintiffs have not alleged that they have even one client who attended or attends a school that has changed its procedures because of the 2017 Guidance. *See* 2d Am. Compl. ¶¶ 124–126. In light of the Court's holding that the 2017 Guidance has no legal effect, Plaintiffs cannot establish causation merely by presenting sparse allegations that a handful of schools with no connection to Plaintiffs or their clients made minor changes to their policies.

Plaintiffs' causation theory is further weakened by certain admissions that they have made since the Court ruled on Defendants' motion to dismiss. In concluding that SurvJustice had standing to bring its Administrative Procedure Act ("APA") claims, the Court reasoned that "Plaintiffs allege an observed decrease in student-filed complaints following issuance of the 2017 Guidance." *SurvJustice*, 2018 WL 4770741, at *6 (emphasis omitted). Yet, in a blog entry dated February 6, 2019, SurvJustice indicated that "this month has been one of our busiest ever as we have seen a spike in requests for assistance," and explained that it will need to start charging $50 per case review "to ensure sustainability." *See 2019 Is off to Quite a Start!*, SurvJustice (Feb. 6, 2019), https://survjustice.org/news/2019-is-off-to-quite-a-start. This admission runs directly contrary to the allegations upon which Plaintiffs relied in support of their claim to standing.

For related reasons, this Court cannot redress Plaintiffs' alleged Fifth Amendment injury. Even if Plaintiffs had plausibly alleged that the 2017 Guidance caused schools to change their Title IX procedures, it would not follow that an order vacating the 2017 Guidance would cause schools to change those procedures once more. To see why, it is worth emphasizing the D.C. Circuit's reasoning in *National Wrestling Coaches Association*, a case on all fours with this one and which Plaintiffs fail to address.

In *National Wrestling Coaches*, organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni alleged that schools had cut men's wrestling programs because of certain Department of Education ("ED") guidance construing regulations mandating equal athletic

opportunity. *Nat'l Wrestling Coaches Ass'n v. ED*, 366 F.3d 930, 939–40 (D.C. Cir.), *reh'g en banc denied*, 383 F.3d 1047 (D.C. Cir. 2004). Without addressing whether the guidance caused the organizations' alleged APA and Fifth Amendment injuries, the court held that it could not redress these injuries:

> At oral argument, counsel for appellants candidly said that, if his clients prevail, appellants think they may have 'better odds' of retaining their desired wrestling programs. Counsel's candor was admirable, but a quest for ill-defined "better odds" is not close to what is required to satisfy the redressability prong of Article III.

*Id.* at 939. In denying a petition for rehearing, the D.C. Circuit, sitting en banc, upheld the panel's reasoning. *Nat'l Wrestling Coaches Ass'n*, 383 F.3d at 1047 (concurring with the panel's opinion that the advocacy groups "have offered nothing but unadorned speculation to support their claim that a favorable decision from this court would redress their alleged injuries").

Plaintiffs fatally echo the arguments advanced by the *National Wrestling Coaches Association* organizational plaintiffs, claiming that "an order vacating the 2017 [Guidance] would *likely* result in schools returning to policies and practices in place under the former policy." Pls.' Opp'n at 11 (emphasis added). Yet, as the *National Wrestling Coaches Association* court held, better odds are not the sort of certainty that Article III requires for an injury to be redressable. Indeed, Plaintiffs could not plausibly allege any greater certainty than what they have; even if the 2017 Guidance were vacated, recipients would still have an independent obligation to "comply with Title IX and its implementing regulations." *See SurvJustice, Inc.*, 2018 WL 4770741, at *10. Guesswork as to how schools would react to vacatur cannot support the redressability prong of Article III standing. *See Levine v. Vilsack*, 587 F.3d 986, 994–95 (9th Cir. 2009) (rejecting similar redressability guesswork); *Novak*, 795 F.3d at 1019–20 (same). Therefore, Plaintiffs have failed to plausibly allege that this Court could redress any alleged Fifth Amendment injury. As such, they lack Article III standing with respect to their Fifth Amendment claim.

**B.   Plaintiffs Do Not Plausibly Allege That Defendants Issued the 2017 Guidance with Intent to Discriminate Against Women.**

With respect to the merits of Plaintiffs' Fifth Amendment claim alleging a violation of the equal protection guarantee, the opposition memorandum is principally notable for what it does not dispute. It does not dispute that it is Plaintiffs' burden to plausibly allege that "invidious discriminatory purpose"

motivated the challenged guidance. Pls.' Opp'n at 12. It does not dispute that "policy disagreements do not give rise to an inference of discrimination." *Id.* at 19–20. It does not dispute that "if the government undertakes a facially neutral action with disparate effects, its mere awareness of those effects does not state a discrimination claim." *Id.* at 21. And it does not dispute that "others in the legal and policy community" criticized the previous Title IX guidance for a variety of legitimate, nondiscriminatory reasons. *Id.* at 24. Notwithstanding those concessions—and notwithstanding this Court's recognition that "when we throw around . . . intentional discrimination against women, that's a serious allegation," July 19, 2018 Hr'g Tr. at 75—Plaintiffs steadfastly try to cast their utterly ordinary disagreement with ED's policy judgment through a constitutional lens. The Court should reject that effort.

### 1. Alleged Disparate Impact Is Not Probative of Discriminatory Intent.

At the outset, the Court should reject Plaintiffs' invitation to find discriminatory intent from Plaintiffs' allegation that the 2017 Guidance principally affects women. Contrary to Plaintiffs' straw-man characterization, Defendants do not suggest that "disparate impact should be ignored as a factor in the Court's equal protection analysis." Pls.' Opp'n at 15. Rather, Defendants' argument is that because any change in how sexual assault cases are adjudicated will necessarily affect men and women differently (as complainant and respondent status is not equally distributed with respect to sex), disparate impact should be given relatively little weight in the context of this case.

That argument is both logical and supported by abundant case law. As Plaintiffs acknowledge, "disparate impact alone does not state an equal protection challenge to a facially neutral policy." Pls.' Opp'n at 14 n.8; *see also, e.g.*, *Washington v. Davis*, 426 U.S. 229, 242 (1976); *Trump v. Hawaii*, 138 S. Ct. 2392, 2421 (2018). While the Ninth Circuit has recently observed that disparate impact can be a relevant consideration in appropriate cases, *see Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476 (9th Cir. 2018), *petition for cert. filed*, (U.S. Nov. 5, 2018) (No. 18-0587), that case does not hold that disparate impact, standing alone, makes out a case of intentional discrimination. To the contrary, the court rested its decision on the plaintiffs' allegations that the government had, "*motivated by animus*, ended a program that overwhelmingly benefits a certain ethnic group." *Id.* at 519 (emphasis added).

If discriminatory intent could be inferred from the mere fact that complainants are disproportionately female, any future guidance in this area would be subject to a constitutional challenge.

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.
7

If ED one day recommended changes bolstering the rights of complainants, it could face an equal protection challenge from male students. The government might face an equal protection challenge if it adjusted programs affecting the elderly, since men and women have statistically different life expectancies. *See Actuarial Life Table*, Social Security Administration, https://www.ssa.gov/oact/STATS/table4c6.html (last visited Feb. 7, 2019). Or an adjustment to federal criminal laws could be challenged on equal protection grounds, since men are overrepresented in the federal criminal system. *See Inmate Gender*, Federal Bureau of Prisons (Nov. 24, 2018), https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp. The law's refusal to permit equal protection challenges to facially neutral practices absent intent to discriminate is what keeps all of these ordinary policy questions from becoming constitutional cases.[3]

### 2. The Statements in the Second Amended Complaint Do Not Show That Defendants Issued the 2017 Guidance Because of a Sex Stereotype.

After addressing disparate impact in the context of their equal protection claim, Plaintiffs turn to what had once been their primary theory—that statements made by various executive branch officials suggest that the 2017 Guidance was issued with discriminatory intent. *See* Pls.' Opp'n at 15–19. Plaintiffs' arguments are unavailing.

First, Plaintiffs point to a speech in which Secretary DeVos criticized the prior Title IX guidance. *See* Pls.' Opp'n at 16. The Court has already expressed its reluctance to infer discriminatory intent from generic criticism of a legal regime. *See, e.g.*, July 19, 2018 Hr'g Tr. at 72:10–14 ("I don't know that I can draw that inference . . . that because you . . . think the other policy went too far, that that means you have animus or discriminatory intent against women."); *id.* at 73:13–14 ("You can disagree with it, but I don't know that your disagreement with it makes it support a plausible inference [of discrimination]."). Plaintiffs ignore this analysis and refuse to seriously entertain the possibility that someone might disagree with them

---

[3] Notwithstanding the Tenth Circuit's observation that it is possible to imagine challenges to abortion restrictions under the Equal Protection Clause (presumably by alleging that such restrictions disproportionately affect women and are rooted in stereotypes about women), *see Jane L. v. Bangerter*, 61 F.3d 1505, 1517 n.11 (10th Cir. 1995), *cited in* Pls' Opp. at 25, it is telling that no such successful challenges have been brought in the twenty-five years since the Tenth Circuit made that observation. The Supreme Court's abortion jurisprudence is rooted in principles of substantive due process, not equal protection.

*SurvJustice, Inc. v. DeVos*, No. 18-cv-0535-JSC, Defs.' Reply ISO Mot. Dismiss 2d Am. Compl.

about an important public policy issue in good faith and for reasons other than sexism.

Second, Plaintiffs point to Ms. Jackson's statement to the *New York Times* in July 2017 suggesting that certain Title IX cases should not have been brought. *See* Pls.' Opp'n at 16 (citing 2d Am. Compl. ¶ 97). Plaintiffs again fail to acknowledge the Court's expressed skepticism that this single remark is probative of discriminatory intent. *See* July 19, 2018 Hr'g Tr. at 64:22–25 ("[I]t's hard to see from these that . . . it's the view that women lie. I understand she said that that one time."). And that skepticism makes sense: one isolated use of the feminine pronoun to refer to a hypothetical complainant is not the stuff of which discrimination claims are made, particularly since the statement contains no suggestion that women's reports of sexual assault are uniquely unreliable. *Dominguez-Curry v. New Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005), which deals with the summary judgment standard in employment cases, is entirely inapposite; among other things, it requires a comment that is actually "discriminatory," *id.* at 1039. Indeed, the statement at issue in *Dominguez-Curry*—the employer's own declaration that he was "going to hire a guy," *id.* at 1038—was plainly evidence of intent to treat women worse than men, and is thus wholly different in both kind and degree from Ms. Jackson's statement.

Plaintiffs also ask the Court to infer that Ms. Jackson is biased against women because she told her staff that she found a particular book "helpful." *See* Pls.' Opp'n at 17 (citing 2d Am. Compl. ¶ 95). The book in question is *Unwanted Advances: Sexual Paranoia Comes to Campus*, by Laura Kipnis, a professor at Northwestern University. It was favorably reviewed in the *New York Times*, *see* Jennifer Senior, *'Unwanted Advances' Tackles Sexual Politics in Academia*, N.Y. Times, Apr. 5, 2017, https://www.nytimes.com/2017/04/05/books/review-laura-kipnis-unwanted-advances.html ("above all else . . . necessary"), and the *Wall Street Journal* listed it among the twenty best books of 2017, *see The Best Fiction and Nonfiction of 2017*, Wall St. J., Dec. 7, 2017, https://www.wsj.com/articles/the-best-fiction-and-nonfiction-of-2017-1512660946. It is hardly suggestive of discriminatory intent for Ms. Jackson to ask that her staff consider a well-reviewed book by a professor at one of the nation's leading universities addressing the very topic that was before them, nor is it Plaintiffs' prerogative to unilaterally declare that certain ideas are so outside the bounds of acceptable discourse that it is evidence of sexism to even consider them. *Cf., e.g.*, John Stuart Mill, On Liberty 97 (Edward Alexander ed., Broadview Literary Texts 1999) (1859) (classic description of marketplace of ideas).

For the same reasons, the Court should reject Plaintiffs' argument that Secretary DeVos and Ms. Jackson were motivated by sexism because they met with certain stakeholders who advocate for the rights of students accused of sexual assault. At the outset, as Defendants have noted, Secretary DeVos and Ms. Jackson met with groups on all sides of this issue, including SurvJustice. *See* Defs.' Mot. at 20. More fundamentally, just as it is unreasonable for Plaintiffs to suggest that Secretary DeVos and Ms. Jackson are biased against women because they disagree with Plaintiffs about how best to balance due process with other relevant concerns, so is it unreasonable for Plaintiffs to suggest that outside groups advocating due process protections for accused students are so biased. To the contrary, in a country with a flourishing civil society, it is to be expected that there will be groups advocating every imaginable perspective on these issues—including some that advocate for complainants and others that advocate for respondents. Just as it is implausible to say that advocates for criminal defendants are biased against crime victims—John Adams famously described his representation of British soldiers accused of participating in the Boston Massacre as "one of the best Pieces of Service I ever rendered my Country," Diary of John Adams (Mar. 5, 1773), *in* National Archives, https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002—so it is implausible to say that advocates for students accused of sexual assault are biased against survivors, let alone against women. They simply have a different role to play.

Finally, Plaintiffs point to a social media post by Ms. Jackson casting doubt on allegations made against then-candidate Trump during the 2016 presidential election, months before Ms. Jackson started work at ED. *See* Pls.' Opp'n at 18 (citing 2d Am. Compl. ¶ 86). This post was focused on specific allegations against a specific individual, and it was utterly disconnected from the 2017 Guidance. Contrary to Plaintiffs' bald conjecture that Ms. Jackson's post was based upon "innate assumptions" about women, *id.*, the post indicates on its face that it was based on "evidence" that Ms. Jackson believed to be pertinent to the allegations at issue. *See* 2d Am. Compl. ¶ 86. The post concerns specific allegations and does not reveal a view of women as a class.

### 3. Plaintiffs' Substantive Disagreement With the 2017 Guidance Is Not Probative of Discriminatory Intent.

Plaintiffs also argue that the "substantive conclusions that ED presented to support the [2017 Guidance] reveal ED's discriminatory motivation." Pls.' Opp'n at 19. Boiled down, Plaintiffs' argument

appears to be that because ED is allegedly wrong about certain facts (like how many schools previously used certain evidentiary standards, or just how severely the previous guidance was criticized by members of the Harvard Law School faculty), that must mean that the guidance was actually issued with discriminatory intent.

The Court should reject this argument out of hand. Plaintiffs are entitled to disagree with Defendants' policy judgment, and they are entitled to believe that Defendants are wrong about certain facts. Were the 2017 Guidance final agency action reviewable under the APA, those arguments might be relevant. *See* 5 U.S.C. § 706(2)(A), (E) (final agency action may be challenged as "arbitrary, capricious, an abuse of discretion," or "unsupported by substantial evidence"). The Court has dismissed Plaintiffs' APA claims, however, and so the only question is whether the 2017 Guidance was the product of *intentional* discrimination. Plaintiffs' belief that Defendants got certain facts wrong is not probative of such intent.

### 4. There Is an "Obvious Alternative Explanation" for the 2017 Guidance.

Against the extraordinarily weak theory of discriminatory intent that Plaintiffs have advanced, the Court must consider whether there is an "obvious alternative explanation" for the challenged conduct, such that "discrimination is not a plausible conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). As Defendants have demonstrated, there is: the rescinded 2011 and 2014 guidance (and policies following it) received deafening criticism from all corners, including from members of University of Pennsylvania Law School faculty, members of the Harvard Law School faculty, task forces of the American Bar Association and the American College of Trial Lawyers, the Governor of California, various writers and editorial boards, and even Justice Ruth Bader Ginsburg. *See* Defs.' Mot. at 17–18. Against that backdrop, it is hardly surprising that a new administration might look at the guidance with a critical eye.

Plaintiffs dispute none of this, acknowledging "criticism of the prior Title IX policy from across the political spectrum." Pls.' Opp'n at 24. They instead ask the Court to ignore it. In support of that request, they rely on *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), in which the Ninth Circuit explained that "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id.*

at 1216. *Starr* holds that a court may not dismiss an action if there are two plausible explanations for the conduct at issue. It does not—indeed could not—set aside *Iqbal*'s instruction that a court must consider an obvious alternative explanation for the challenged conduct when determining whether the plaintiff's allegations are plausible in the first place. *See also, e.g.*, *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("When considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior"); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (similar). The Court should recognize the obvious alternative explanation for the 2017 Guidance in evaluating whether Plaintiffs have made out a plausible case of intentional discrimination.

### 5. In the Alternative, Unintentional Reliance Upon Sex Stereotypes Is Not Intentional Discrimination.

Finally, even if the Court found plausible Plaintiffs' allegations that sex stereotypes played a role in the formation of the 2017 Guidance, it still would not follow that the guidance was issued with discriminatory intent, which is their pleading burden. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (discriminatory intent requires that decision maker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). To the contrary, Plaintiffs' argument boils down to the contention that ED held certain incorrect views and thereby arrived at a suboptimal policy by accident. *See* July 19, 2018 Hr'g Tr. at 77:6–8 (the Court accurately summarizing Defendants' argument: "[T]hey may hold that view, which is wrong . . . but that doesn't equate to intentional discrimination.").

As set out in Defendants' motion to dismiss, there are two categories of cases in which sex stereotypes have been found relevant to equal protection violations. First, if a government action facially discriminates on the basis of sex (i.e., treats men and women differently), and the government relies exclusively on sex stereotypes to justify that disparate treatment, the government will lose that case. *See* Defs.' Mot. at 21–22. Second, where a decision maker's stereotyped views about a group give rise to discriminatory animus against that group, then facially neutral action may be challenged because it is the product of discriminatory animus. *See id.* at 22.

This case fits into neither of those categories, which is why Plaintiffs attempt to conjure a third category, in which a facially neutral action that is not motivated by animus and that is not intended to cause adverse effects upon anyone is nonetheless unconstitutional because it was informed in part by incorrect assumptions about discrete groups of people. No such category exists.

Plaintiffs suggest that the Ninth Circuit's decision in *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), is "instructive," Pls.' Opp'n at 22, but they fail to mention that the portion of the opinion upon which they rely is a concurring opinion, not the panel majority. *See id.* at 490 (Berzon, J., concurring).[4] As for *Avenue 6E Investments., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016), Plaintiffs suggest that the case "did not find it necessary" to find animus against Hispanic residents, *see* Pls.' Opp'n at 22, but the case plainly turned on the fact that the complaint plausibly alleged exactly such animus. *See, e.g.*, *Ave. 6E*, 818 F.3d at 498 ("Developers allege that the City [acted] in response to animus by neighbors of the proposed development who wished to prevent the development of a heavily Hispanic neighborhood adjacent to their subdivisions, in which 75% of the population was White."). *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1988), is even further afield, since in that case the allegation was that a police officer believed that a woman deserved to be the victim of violence specifically because of her stereotypically female behavior (i.e., the allegation was that she was singled out for worse treatment because she acted in a stereotypically female way). *See id.* at 701 (officer allegedly "did not blame plaintiff's husband for hitting her because of the way she was 'carrying on'").

To be sure, ED did intentionally encourage schools to increase certain protections for respondents, and it also was aware that respondents are predominantly male. *See* Pls.' Opp'n at 23 (arguing that ED "exerted this animus against women and girls by reducing Title IX protections for survivors, who are predominantly female"). A functionally identical argument was made in *Feeney*, where Massachusetts indisputably intended to provide certain benefits for veterans while understanding that veterans were predominantly male. As Plaintiffs acknowledge, however, that argument was rejected in *Feeney*, *id.* at 21 ("ED accurately states that if the government undertakes a facially neutral action with disparate effects,

---

[4] In any case, while Judge Berzon discussed at some length the "historical context" of prohibitions on same sex marriage, *see id.* at 485–90, even her sex-stereotype analysis fundamentally turned on the fact "the same-sex marriage prohibitions restrict individuals' choices on the basis of sex" (i.e., that such prohibitions were facially discriminatory), *id.* at 487.

its mere awareness of those effects does not state a discrimination claim."), for the law does not conflate awareness of consequences with discriminatory intent, *Feeney*, 442 U.S. at 278–79 ("The decision to grant a preference to veterans was of course 'intentional.' . . . 'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences.").

## II. Conclusion

For the foregoing reasons, the Second Amended Complaint should be dismissed.

Dated: February 8, 2019

Respectfully Submitted,

JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

CARLOTTA P. WELLS
Assistant Branch Director
Civil Division

/s/ *Steven A. Myers*
STEVEN A. MYERS
(NY Bar # 4823043)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-8648
Fax: (202) 616-8470
E-mail: steven.a.myers@usdoj.gov

*Attorneys for Defendants*