Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 621-0672
Fax: (415) 621-6744
Email: jreisch@equalrights.org

Javier M. Guzman*
Robin Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org,
kjones@democracyforward.org

Leecia Welch (CA Bar No. 208741)
Seth Galanter*
Alice Y. Abrokwa*
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, *and*
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, sgalanter@youthlaw.com, aabrokwa@youthlaw.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, schandy@nwlc.org

*pro hac vice*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
SAN FRANCISCO DIVISION

| | |
|---|---|
| SURVJUSTICE, INC.,<br>1015 15th Street NW, Suite 632<br>Washington, DC 20005,<br><br>EQUAL RIGHTS ADVOCATES<br>1170 Market Street, Suite 700<br>San Francisco, CA 94102,<br><br>VICTIM RIGHTS LAW CENTER<br>520 SW Yamhill Street<br>Portland, OR 97204,<br><br>　　　Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, in her official<br>capacity as Secretary of Education,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>KENNETH L. MARCUS, in his official<br>capacity as Assistant Secretary for Civil<br>Rights,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>U.S. DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>　　　Defendants. | Case Number: <u>3:18-cv-00535-JSC</u><br><br>~~SECOND~~<u>THIRD</u> AMENDED<br>COMPLAINT FOR INJUNCTIVE RELIEF<br><br>~~DEMAND FOR JURY TRIAL~~ |

1.　　Plaintiffs SurvJustice, Inc., Equal Rights Advocates, and Victim Rights Law Center bring

this action against Defendants U.S. Department of Education ("the Department" or "the

agency"), Secretary Elisabeth DeVos, and Assistant Secretary for Civil Rights Kenneth L.

Marcus seeking vacatur of the Department's new policy, as expressed in a Dear Colleague Letter

and Question and Answers guidance issued on September 22, 2017 (hereinafter jointly referred to as the "2017 Title IX Policy" or "Policy"), concerning Title IX of the Education Amendments of 1972 ("Title IX").

2.      Over 45 years ago, Congress enacted Title IX to prohibit discrimination on the basis of sex in educational programs and activities receiving federal financial assistance (hereinafter "recipients" or "educational institutions"). This landmark civil rights law has helped fight sex discrimination and promote equal educational access and opportunities for girls and women from the classroom to the playing field.

3.      Twenty years ago, acting on the basis of Supreme Court decisions and the recognition that Title IX's promise of equality is hollow if a student can be subjected to sexual harassment with impunity, the Department issued its first guidance to educational institutions (both K-12 schools and institutions of higher education) on the standards that govern their response to sexual harassment, a form of sex discrimination. Since then, through several successive guidance materials issued under Administrations led by both political parties, the Department has reaffirmed that Title IX's prohibition on sex discrimination requires recipients to prevent and redress sex and gender-based harassment. These policies recognize that students who experience sexual harassment, including in its most extreme form, sexual violence, suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities, on the basis of their sex.

4.      The reaffirmation of Title IX's protections continued until September 2017, when the Department formally rescinded sexual violence guidance documents issued in 2011 and 2014 and issued new conflicting policy documents to educational institutions.[1]

5.      The 2017 Title IX Policy imposes significant changes on educational institutions and on students to the detriment of survivors of sexual violence. For example, whereas previous Department Title IX guidance advised educational institutions to make available interim measures, such as a revised class schedule or new housing assignment, in order to *protect the safety* of students who complain of sexual harassment and preserve their access to an education, the 2017 Title IX Policy prohibits schools from making available interim measures to a complainant unless they are offered "on equal terms" to respondent(s) who are being investigated for sexual misconduct. The 2017 Title IX Policy also removes protections for sexual harassment victims, such as by allowing schools to resolve complaints through mediation between the parties, even in cases of alleged sexual assault, where the pressure to agree to mediation can be coercive.

6.      The The 2017 Title IX Policy is substantively unlawful. It conflicts with existing Title IX requirements and fails to provide a reasoned justification for its reversal in position. It is also based on a legally and factually mistaken view that earlier guidance limited due process protections for students. And in issuing the 2017 Title IX Policy, the Department failed to take into account reliance interests that students, and organizations like Plaintiffs that work with students, have in the protections set out in prior guidance documents. Instead, the 2017 Title IX

---

[1] *See* U.S. Dep't of Educ., Ltr. from Ass't Sec'y Candice Jackson (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ("2017 Dear Colleague Letter"); U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf ("2017 Q&A").

Policy, which disproportionately burdens women and girls, was motivated by the baseless and discriminatory but longstanding stereotype that women and girls tend to lie about or exaggerate experiences of sexual assault and harassment. ~~As such, it discriminates on the basis of sex in violation of the equal protection guarantee of the Fifth Amendment of the United States Constitution.~~

~~6.~~7.     Plaintiffs therefore respectfully request that the 2017 Title IX Policy be vacated.

### Jurisdiction and Venue

~~7.~~8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

~~8.~~9.     Venue is proper under 28 U.S.C. § 1391(e) because Equal Rights Advocates, a plaintiff, resides in San Francisco, California.

### Intradistrict Assignment

~~9.~~10.    Filing is proper in this Judicial District because Equal Rights Advocates, a plaintiff, is located in San Francisco, California.

### Parties

~~10.~~11.  **Plaintiff SurvJustice, Inc.,** ("SurvJustice") is a national not-for-profit organization based in Washington, D.C., founded in 2014. SurvJustice's mission is to increase the prospect of justice for survivors of sexual violence. It pursues this goal through legal assistance, policy advocacy, and institutional training. Through its efforts, SurvJustice aims to decrease the prevalence of sexual violence throughout the country.

~~11.~~12.  SurvJustice provides legal assistance to survivors of sexual violence in campus proceedings, as well as civil and criminal legal systems. The majority of requests for legal assistance that SurvJustice receives are from students at institutions of higher education. SurvJustice staff help sexual violence survivors navigate the campus grievance process,

including by reporting the violence; assisting survivors throughout any investigation; advising survivors in campus hearings; helping survivors with any appeals; and helping survivors access accommodations and services from their educational institutions. They frequently serve as "advisors of choice" for college students in institutional disciplinary actions for cases of alleged domestic violence, dating violence, sexual assault, or stalking, as provided for by the Clery Act as amended by the 2013 Violence Against Women Reauthorization Act, 20 U.S.C. § 1092(f)(8)(B)(iv)(II) ("Clery Act"). SurvJustice staff also represent survivors in civil litigation or refer survivors to other qualified lawyers for such representation. SurvJustice also assists survivors in reporting crimes to law enforcement, in advocating for prosecution, and by serving as media representatives for victims and their families in high-profile criminal cases.

12.13.  SurvJustice also trains educational institutions to prevent and address sexual violence through compliance with federal law, enforcement of victims' rights, and adoption of best practices that include development of a culture that supports survivors and encourages "sexual respect" (*i.e.*, respect in sexual interactions and relationships). As part of this work, SurvJustice has provided the annual training required by the Clery Act to various campus officials across the country who investigate and adjudicate complaints of sexual assault, dating violence, domestic violence, and stalking.

13.14.  SurvJustice also engages in policy advocacy by providing technical assistance and advice to legislators and policymakers on various state and federal legislation and policy efforts regarding sexual violence, and by working with changemakers within their communities on local policy efforts, especially on college and university campuses.

14.15.  SurvJustice brings this action on its own behalf because the challenged 2017 Title IX Policy (i) requires resource-intensive efforts that impede its daily operations; (ii) limits the

efficacy of available avenues of redress for the students it serves; (iii) increases the costs it bears in its work on behalf of sexual violence survivors—for example, by causing it to waive intake fees and reduce or waive speaking fees; and (iv) otherwise directly conflicts with, impairs, and frustrates SurvJustice's organizational mission and priorities.

15.16.  As an organization that provides direct assistance and referral services to survivors of sexual violence, SurvJustice's core mission and daily operations have been and will continue to be impeded by the chilling effect that the 2017 Title IX Policy has had and continues to have on the reporting of sexual violence.

16.17.  Following and as a result of the 2017 Title IX Policy change, SurvJustice experienced a decrease in the number of sexual violence survivors seeking its services. This trend is borne out by SurvJustice's interactions with particular college and university students who have questioned whether they should continue with their plans to report sexual violence given the uncertainty regarding their legal protections and an anticipated lowered likelihood of success created by the policy change.

17.18.  Following the 2017 Title IX Policy change and as a result of the change, SurvJustice has provided an increased number of student rights trainings at college and university campuses. These additional trainings are necessary to respond to confusion created by the 2017 Title IX Policy among students about their legal rights. SurvJustice has also significantly reduced its price for doing these trainings or agreed to provide them *pro bono* in response to increased need resulting from the widespread uncertainty among students regarding their legal protections following the 2017 Title IX Policy change.

18.19.  SurvJustice has also had to devote significant staff time to reviewing and understanding the 2017 Title IX Policy in order to advise clients in ongoing campus investigations and advocate

on their behalf. This shift in use of time due to the change in policy decreased the amount of time that SurvJustice has available to provide legal services, including work on ongoing civil litigation.

19.20.  The 2017 Title IX Policy makes it more difficult for SurvJustice to accomplish its mission of obtaining justice for survivors of sexual violence, both because it makes beneficial outcomes less likely for survivors and because even where those outcomes are still available, success will take more staff time and effort.

20.21.  For example, SurvJustice often advocates for schools to provide accommodations to its clients, including during the pendency of an investigation, so that they can continue to learn safely. SurvJustice often requests unilateral no-contact orders on its clients' behalf but has opposed mutual no-contact orders because they tend to be retaliatory.[2] Yet the agency's Title IX policyPolicy change requires no-contact orders to be mutual, by prohibiting a school from making interim measures available to only one party. SurvJustice has observed schools issuing mutual no contact orders on a regular basis. The 2017 Title IX Policy therefore impedes SurvJustice's mission by making it more difficult for SurvJustice to obtain interim measures that are appropriate for survivors of sexual harassment and to ensure ongoing access to education for its clients in accordance with its mission.

21.22.  In addition, since the 2017 Title IX Policy no longer identifies any benchmarks to determine whether educational institutions are meeting their obligation to resolve reports of sexual violence in a timely fashion, SurvJustice has observed a trend in educational institutions

---

[2] SurvJustice argues that mutual no-contact orders are forms of retaliation when there is no basis to place the order against victim-complainants other than the fact that they made a Title IX complaint. In such instances, schools limit victims' access to educational opportunities and benefits as a direct result of the victims' assertion of their federal rights and utilization of the Title IX grievance process.

not responding at all, or not responding as promptly, to its clients' complaints. This trend has required SurvJustice to spend additional staff time and resources that it has not had to spend in the past attempting to get school officials to respond to a survivor's complaint of sexual violence.

22.23.  The Department's 2017 Title IX Policy also makes it more difficult for SurvJustice to obtain beneficial results for its clients due to, among other particulars, its endorsement of one-sided appeal rights and a heightened standard of evidence that disfavors survivors and makes findings of responsibility for sexual misconduct more onerous.

23.24.  **Plaintiff Equal Rights Advocates** ("ERA") is a national non-profit civil rights organization based in San Francisco, California. Founded in 1974, ERA is dedicated to protecting and expanding economic educational access and opportunities for women and girls.

24.25.  ERA furthers its mission through engaging in public education efforts, as well as policy reform and legislative advocacy; providing free legal information and counseling; and litigating cases involving issues of gender discrimination in employment and education at all stages, from the administrative agency process through and including the United States Supreme Court. ERA has a long history of pursuing gender justice and equal opportunity for women and girls in education and has litigated a number of important precedent-setting cases under Title IX, including *Doe v. Petaluma City School District*, 54 F.3d 1447 (9th Cir. 1995), which held for the first time that a school can be sued for sex discrimination under that law when it fails to address one student's serious harassment of another. ERA has participated as *amicus curiae* in scores of state and federal cases involving the interpretation and application of procedural rules and civil rights laws that have an impact on access to justice and economic opportunity for women and girls. Through its Advice and Counseling program, ERA also provides free information and assists individuals on matters relating to sex and gender discrimination at work and in school. As

part of its mission, ERA counsels and represents women who have been victims of sexual

harassment and/or sexual assault in matters pursuant to Title IX.

25.26.  ERA brings this action on its own behalf because the challenged 2017 Title IX Policy

(i) requires resource-intensive efforts that divert resources from its daily operations; (ii) limits

the efficacy of available avenues of redress to ERA's clients and others it serves, (iii) increases

the costs ERA bears in its work on behalf of student survivors of sexual violence; and (iv)

otherwise directly conflicts with, impairs, and frustrates ERA's organizational mission and

programmatic priorities.

26.27.  ERA has had to expend resources over and above what it would otherwise have expended

in order to counteract the effects of the 2017 Title IX Policy change. For example, to counteract

the effects of the Title IX policyPolicy change, ERA has had to divert staff time and resources

away from core programmatic activities, such as litigating employment-related civil rights

enforcement cases and cases involving Title IX enforcement that do not relate to sexual violence

in schools, in order to step up its efforts to assist victims of sexual harassment and assault in

educational settings obtain redress. In particular, ERA has launched a national initiative to End

Sexual Violence in Education ("ESVE") to narrow a justice gap for survivors of sexual violence

that ERA has observed is expanding rapidly given the unlawful actions Defendants have taken.

Through the ESVE Initiative, which was launched as a result of the Department's 2017 Title IX

Policy change, ERA is expanding its Advice & Counseling program, re-designing its intake

process, and developing new resources to better reach and serve individuals facing sexual

harassment and violence in schools. Additionally, as part of ESVE and in order to counteract the

negative impact of policy changes and rollbacks at the federal level on ERA's clients and the

communities it serves, ERA is expending resources and diverting resources away from core

programmatic activities in order to establish a network of attorneys to provide pro bono

counseling and other assistance to victims of sexual harassment and assault in schools. In order

to recruit, train, and support these pro bono attorneys and to meet the increased demand for legal

assistance in this area, ERA created a new position and hired its first-ever Pro Bono Coordinator.

It also is planning to build a new website where advocates for survivors can find and share

resources with each other.

27.28.  Moreover, as an organization that has a longstanding history of providing direct

assistance and referral services to survivors of sexual violence, ERA is hampered in its ability to

assist the victims of sexual harassment and assault that it represents and counsels in obtaining

equitable outcomes and redress for the harms they have suffered. In particular, and as discussed

more fully below, the 2017 Title IX Policy permits schools to offer asymmetric appellate rights

that disadvantage victims of sexual harassment, including sexual assault; tells schools to make

interim safety measures, such as no-contact orders, available on "equal terms" to complainants

and respondents during the pendency of an investigation without any allegation that the

complainant committed any misconduct or may have done something that undermines the

respondent's sense of safety; permits schools to evade responsibility for protecting students and

the school community as a whole by resolving claims of sexual assault privately through

mediation; and rolls back other critical protections for survivors that inhibit ERA's ability to

obtain redress and achieve results for its clients.

28.29.  **Plaintiff Victim Rights Law Center** ("VRLC") is a non-profit organization with

locations in Oregon and Massachusetts dedicated solely to serving the legal needs of rape and

sexual assault victims. VRLC's mission is to provide legal representation to victims of rape and

sexual assault to help rebuild their lives and to promote a national movement committed to

seeking justice for every rape and sexual assault victim.

29.30.  VRLC provides legal free, comprehensive services to help restore victims' lives after

experiencing sexual violence, ensuring that survivors may stay in school; protecting their

privileged and confidential mental health, medical, and education records; preserving their

employment; maintaining safe housing; securing their immigration status; and swiftly accessing

victim compensation and other benefits. As part of its work, VRLC provides legal services

and/or facilitates the provision of legal services to individuals who have experienced sexual

violence and/or assault on elementary, secondary, and higher education campuses. With almost

50 percent of VRLC's clients under the age of 24, a substantial portion of its practice is

providing education-related legal consultation and representation. VRLC attorneys represent

campus victims to communicate effectively with campus administrators, acquire interim

measures and accommodations to secure their education, prepare and attend disciplinary

hearings, file appeals, and, if necessary, file complaints with the Department of Education,

Office of Civil Rights ("OCR").

30.31.  VRLC brings this action on its own behalf because, as detailed below, the challenged

Title IX policyPolicy concretely frustrates its mission and purpose through (among other things)

(i) requiring resource-intensive efforts that impede its daily operations, (ii) impairing its mission

of providing legal assistance to survivors of sexual assault and/or violence, (iii) limiting the

efficacy of available avenues of redress for the population it seeks to serve, (iv) requiring that

resources be diverted in order to combat the harmful effects of the Title IX policyPolicy, and (v)

otherwise directly conflicts with, impairs, and frustrates VRLC's organizational mission and

priorities.

31.32.  The new 2017 Title IX Policy has been devastating to VRLC's mission and its operational activities. For example, as result of the 2017 Title IX Policy, sexual violence and assault victims have expressed an unwillingness to report harassment and assault to campus authorities, denying VRLC the ability to achieve its mission. VRLC saw an immediate chilling effect after the Department issued its 2017 Dear Colleague letterLetter and new Title IX policyPolicy. VRLC has seen a decline in the number of sexual violence and assault survivors willing to pursue justice through campus processes. The 2017 Title IX Policy makes it less likely for VRLC clients to engage in the campus process due to, among other particulars, its endorsement of one-sided appeal rights and a heightened standard of evidence that disfavors survivors and makes findings of responsibility for sexual assault and violence more onerous. Moreover, as a result of the new Title IX policyPolicy, there has been a decline in the number of survivors willing to file complaints with the Department of Education and/or otherwise communicating with the Department of Education where there is already an investigation pending. Such declines in reporting and hesitance to participate in the grievance process either through educational institutions or at the Department of Education directly threaten and frustrate VRLC's mission and purpose.

32.33.  In addition to chilling and discouraging sexual violence and assault victims from availing themselves of campus processes, the new Title IX policyPolicy has made it more difficult for VRLC to provide appropriate legal advice that helps its clients weigh their options with the best information, leading to further reductions in reports of sexual violence and assault.

33.34.  In cases where a survivor or victim may proceed with a claim (which is rare under the new Title IX policyPolicy), VRLC's mission remains frustrated given the nature of the Title IX policyPolicy. In particular, the 2017 Title IX Policy makes it more difficult for VRLC to

accomplish its mission of obtaining justice for survivors of sexual violence, both because it makes beneficial outcomes less likely for survivors and because even where those outcomes are still available, success will take more staff time and effort. In addition, since the 2017 Title IX Policy no longer requires colleges and universities to resolve reports of sexual violence in a timely fashion, VRLC has observed a trend in educational institutions not responding or not responding as promptly to its clients' complaints. This trend has required VRLC to spend additional staff time and resources that it has not had to spend in the past attempting to get school officials to respond.

34.35.  VRLC has also had to devote staff time to reviewing and understanding the 2017 Title IX Policy in order to advise clients in ongoing campus investigations and advocate on their behalf. This use of time has decreased the amount of time that it has available to provide legal services, including work on ongoing civil litigation.

35.36.  **Defendant U.S. Department of Education** ("the Department" or "the agency") is a federal agency headquartered in Washington, D.C. As discussed more fully below, the Department implements Title IX through issuing regulations and guidance documents and is also tasked with administrative enforcement of Title IX, 20 U.S.C. § 1682. As a federal agency, the Department is subject to the requirements of the Administrative Procedure Act and the United States Constitution.

36.37.  **Defendant Elisabeth D. DeVos** is the United States Secretary of Education. She is sued in her official capacity.

37.38.  **Defendant Kenneth L. Marcus** is the Assistant Secretary for Civil Rights. He is sued in his official capacity.

## **Background**

38.39.  Sexual harassment—which is conduct including, but not limited to, unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal, nonverbal, or physical conduct of a sexual nature that targets someone because of their sex, including sexual assault or other sexual violence (hereinafter "sexual harassment" or "sexual harassment, including sexual violence")—is widespread in schools across the country, particularly in institutions of higher education.

39.40.  Sexual harassment disproportionately impacts women and girls. One in five women and one in fourteen men experience sexual assault while in college.[3] As the last Administration's Task Force to Protect Students from Sexual Assault concluded: "For female bisexual and transgender students, victimization rates are even higher: More than 1 in 4 transgender students and more than 1 in 3 of bisexual students experience sexual assault while in college."[4]

---

[3] The White House, The Second Report of the White House Task Force to Protect Students from Sexual Assault, 9 (Jan. 5, 2017), https://obamawhitehouse.archives.gov/sites/obamawhitehouse. archives.gov/files/images/Documents/1.4.17.VAW%20Event.TF%20Report.PDF. Similarly, a 2007 report found that one in five women were victims of sexual assault while in college and that approximately 6.1 percent of men were victims of sexual assault during college. Krebs, *et al*., The Campus Sexual Assault (CSA) Study Final Report 5-5 (Oct. 2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.  A report published by the American Association of University Women similarly concluded that: "Girls were more likely than boys to be sexually harassed, by a significant margin (56 percent versus 40 percent) [during the 2010-2011 school year]. Girls were more likely than boys to be sexually harassed both in person (52 percent versus 35 percent) and via text, e-mail, Facebook, or other electronic means (36 percent versus 24 percent). This finding confirms previous research showing that girls are sexually harassed more frequently than boys and that girls' experiences tend to be more physical and intrusive than boys' experiences."  Catherine Hill and Holly Kearl, Crossing The Line, Sexual Harassment at School, American Association of University Women, 2 (2011), https://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

[4] The White House, *supra* note 3 at 9.

40.41.  While sexual harassment on college campuses is more widely known, students of all ages face sexual harassment, including sexual assault. A nationally representative survey of students in grades 7-12 in 2011 concluded that nearly half of the students surveyed experienced some form of sexual harassment that school year, and the majority said that the experience had a negative effect on them.[5] Of these students, "[g]irls were more likely than boys to be sexually harassed, by a significant margin."[6] Children who experience sexual violence are nearly 14 times more likely to experience rape or attempted rape in their first year of college, according to the National Center for Victims of Crime.[7]

41.42.  Experiences of sexual violence harm students physically, psychologically, and academically. Research shows that the effects of sexual assault in high school has consequences that are "delayed and long lasting."[8] Sexually victimized students are more likely to drop classes,

---

[5] Hill and Kearl, *supra* note 3 at 2.

[6] *Id.*

[7] Mark Keierleber, *The Younger Victims of Sexual Violence in School*, The Atlantic, Aug. 10, 2017, https://www.theatlantic.com/education/archive/2017/08/the-younger-victims-of-sexual-violence-in-school/536418/.

[8] Dana Bolger, *Gender Violence Costs: School's Financial Obligations Under Title IX*, 125, Yale L. J. 2106, 2118 (May 2016), https://www.yalelawjournal.org/feature/gender-violence-costs-schools-financial-obligations-under-title-ix#_ftnref72 ("Violence—and institutional indifference in its wake—changes the courses of survivors' lives, with educational and employment consequences following them far into the future.").

change residences, and have lower GPAs, creating long-term consequences for professional

success and earning potential.[9]

42.43.  Incidents of sexual harassment, including sexual violence, are often underreported,

especially on college campuses. For example, the Campus Climate Survey Validation Study

found that only 7 percent of students who indicated that they had been raped reported the rape to

school authorities.[10]

43.44.  If unreported or inappropriately addressed, sexual harassment can continue unchecked

and create ongoing hostile environments for those who are the targets of such attacks.

### Title IX of the Education Amendments of 1972

44.45.  Signed into law by President Nixon, Title IX of the Education Amendments of 1972, 20

U.S.C. § 1681, prohibits discrimination on the basis of sex in any federally funded education

program or activity. When a recipient institution fails to comply with Title IX or to take action to

remedy its non-compliance, it can be subject to a range of enforcement actions, including the

loss of federal financial assistance. 20 U.S.C. § 1682.

---

[9] Victoria L. Banyard *et al.*, Academic Correlates of Unwanted Sexual Contact, Intercourse, Stalking, and Intimate Partner Violence: An Understudied but Important Consequence for College Students, J. of Interpersonal Violence (June 21, 2017), http://journals.sagepub.com/doi/10.1177/0886260517715022; National Women's Law Center, Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence, 8 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf (finding that 43 percent of girls who are survivors of sexual violence missed 15 days or more of school, compared to 25 percent of girls overall).

[10] The White House, *supra* note 3 at 10.

~~45.~~46.  The Supreme Court has squarely held that sexual harassment, which includes sexual violence, is a form of sex discrimination that Title IX requires schools to address and remediate.[11]

**The Department of Education's Implementation and Enforcement of Title IX**

~~46.~~47.  The U.S. Department of Education is the lead agency charged with enforcing Title IX. It may do so by establishing rules, regulations, and procedures that implement Title IX and define the ways in which educational institutions comply with Title IX's requirements. *See* 20 U.S.C. § 1682.

~~47.~~48.  In 1975, the Department's predecessor promulgated regulations to effectuate Title IX. *See* 40 Fed. Reg. 24,128 (June 4, 1975). As amended, those regulations remain in effect today and apply to educational institutions that receive federal financial assistance. *See* 34 C.F.R. pt. 106. Among other things, the regulations incorporate Title IX's nondiscrimination mandate, *see id.* § 106.31(a), and identify specific actions that constitute discrimination, *see id.* § 106.31(b~~), and require assurances from recipients of federal financial assistance that their programs and activities comply with regulatory requirements, see id.~~ § 106.4(a).

~~48.~~49.  Recipients found to have discriminated on the basis of sex must "take such remedial action as the Assistant Secretary [for Civil Rights] deems necessary to overcome the effects of such discrimination." *Id.* § 106.3(a).

~~49.~~50.  The regulations require that recipients "adopt and publish grievance procedures providing for prompt and equitable resolution" of student and employee complaints of sexual discrimination, including sexual assault and other forms of sexual harassment. *Id.* § 106.8(b).

---

[11] *See, e.g., Franklin v. Gwinnett Cnty Public Schools*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

Such grievance procedures are designed to facilitate the reporting and resolution of complaints of such sex discrimination so as to prevent and remedy hostile environments on campus.

~~50.~~51.  These same regulations require that educational institutions "designate at least one employee"—commonly known as a Title IX coordinator—"to coordinate its efforts to comply with and carry out its responsibilities" under Title IX, including any investigation of any complaint of sexual discrimination, including sexual violence and other forms of sexual harassment. *Id.* § 106.8(a).

52.     The regulations further require that applicants for and recipients of federal financial assistance sign assurances, *see id.* § 106.4(a), in which they commit to complying with all rules, regulations, guidelines, policies, and standards related to Title IX issued by the Department. There are at least two assurances that recipients of Department financial assistance may sign to meet that requirement.

53.     The Department's Assurance provides, in pertinent part:

> The applicant provides this assurance for the purpose of obtaining Federal grants, loans, contracts (except contracts of insurance of guaranty), property, discounts, funds made available through the U.S. Department of Education, or other Federal financial assistance from the Department. This assurance applies to all Federal financial assistance from or funds made available through the Department, including any that the applicant may seek in the future.[12]

Applicants agree that they "must comply" with Title IX, as well as "[a]ll regulations, guidelines, and standards issued by the Department" under Title IX "in order to continue receiving Federal financial assistance from the Department."[13] The Assurance specifies that it "is binding on the

---

[12] U.S. Dep't of Educ., Off. for C.R., *Assurances of Compliance*, https://www2.ed.gov/about/offices/list/ocr/letters/boy-scouts-assurance-form.pdf.
[13] *Id.*

applicant" and that, if the applicant fails to comply, "financial assistance can be terminated and the applicant can be declared ineligible to receive further assistance."[14]

54.      The Department's Revised Assurances Template for a consolidated State plan incorporates the Office of Management and Budget's (OMB's) Standard Form 424B, Assurances for Non-Construction Programs.[15]  Recipients that sign this assurance form agree to comply with Title IX, as well as with "all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."[16]  An applicant "certifies and assures compliance with" that form "in order to receive Federal allocations" of funding.[17] The Revised Assurances Template that is posted on the Department's website was in effect at the time the challenged Title IX Policy was issued on September 22, 2017.[18]  Further, although that version of the Revised Assurances Template lists an expiration date under the Paperwork Reduction Act of September 30, 2017, the Department sought[19] and received[20] an "extension without change"

---

[14] *Id.*
[15] U.S. Dep't of Educ., *Revised Assurances Template* 2 (May 2017), https://www2.ed.gov/admins/lead/account/stateplan17/revisededated18100576.pdf ("An authorized representative of the SEA must sign the enclosed assurances and the standard forms attached in Appendix A …); *id.* at 5 ("The SEA certifies and assures compliance with the following enclosed forms: 1) Assurances for Non-Construction Programs (SF 424B Form).").
[16] *Id.* at 6-7 ¶¶ 6, 18.
[17] *Id.* at 5, 2 (last checkbox).
[18] *Id.* at 1.
[19] 82 Fed. Reg. 34,291 (July 24, 2017) ("proposing an extension of an existing information collection"), https://www.govinfo.gov/content/pkg/FR-2017-07-24/pdf/2017-15449.pdf; Regulations.gov, https://www.regulations.gov/document?D=ED-2017-ICCD-0021-0522 (listing forms, including Standard Form 424B, that were part of proposed extension).
[20] *See* OMB, Information Collection Request – Office of Information and Regulatory Affairs, Conclusion, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201707-1810-001# ("Conclusion Action" was "[a]pproved without change" with a new expiration date of "09/30/2020"); *see also* OMB, Documents for Information Collection (including Standard Form 424B as one of the documents included in the OMB approval), https://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=201707-1810-001&icID=21256.

of the Revised Assurances Template until September 30, 2020. A recipient's promise to comply with the Assurance attached to the Revised Assurances Template is therefore still in effect.

51.55.  In addition to promulgating Title IX's implementing regulations, the Department has issued a series of guidance documents that explain the obligations recipient schools and universities are required to take under Title IX.  In the recent past, the Department has used the synonyms "guidance" and "guidelines" interchangeably in describing its Title IX policies.[21]  The guidance document challenged here, the 2017 Title IX Policy, consists of "guidelines" and "policies" that schools must comply with under the terms of the signed assurances.  Furthermore, as the Department declared when it announced the 2017 Title IX Policy, the new guidance "explains the Department's current expectations of schools."[22]

**The 1997 Sexual Harassment Guidance**

52.56.  The first of suchthe Department's guidance documents addressing educational institutions' obligations to address sexual harassment, titled *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, was published in 1997 after a public notice and comment period and "extensive consultation with interested parties, [including] students, teachers, school administrators, and researchers." *See* 61 Fed. Reg. 42,728 (Aug. 16, 1996),); 61 Fed. Reg. 52,172 (Oct. 4, 1996), and); 62 Fed. Reg. 12,034, 12,035 (Mar. 13, 1997) ("1997 Guidance"). The 1997 Guidance provided information regarding the standards used by the Department's Office for Civil Rights ("OCR") to investigate student

---

[21] *See* Press Release, U.S. Dep't of Educ., Guidance Issued on Responsibilities of Schools to Address Sexual Violence, Other Forms of Sex Discrimination (Apr. 29, 2014), https://www.ed.gov/news/press-releases/guidance-issued-responsibilities-schools-address-sexual-violence-other-forms-sex-discrimination.

[22] Press Release, U.S. Dep't of Educ., Department of Education Issues New Interim Guidance on Campus Sexual Misconduct (Sept. 22, 2017), https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

complaints regarding educational institutions' responses to sexual harassment perpetuated by school employees, other students (peers), or third parties.

~~53.~~57.   The 1997 Guidance set forth principles for how educational institutions should address sexual harassment in the educational setting. It noted that schools "are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination." ~~*Id.*~~62 Fed. Reg. at 12,040.

~~54.~~58.   With respect to "informal mechanisms" for resolving complaints, the 1997 Guidance explained that they may be used by mutual consent of the parties but that it was inappropriate for a complaining student to be required to work out the problem directly with the individual accused of harassment and that mediation would be inappropriate even on a voluntary basis in cases that involve sexual assault. *Id.* at 12,045.

~~55.~~59.   The 1997 Guidance further explained that, during an investigation of a complaint, a school may take appropriate interim and remedial measures, such as placing the involved students in separate classes or in different housing arrangements. The touchstone for these measures was that they "be designed to minimize, as much as possible, the burden on the student who was harassed." *Id.* at 12,043.

~~56.~~60.   The 1997 Guidance also made clear that, beyond temporary interim accommodations, a school "may be required to provide . . . services to the student who was harassed if necessary to address the effects of the harassment on that student." Such service might include tutoring and mental health counseling. *Id.*

~~57.~~61.  The 1997 Guidance set forth factors that OCR would consider in evaluating whether a school's grievance procedures were "prompt and equitable," noting that "many schools … provide an opportunity to appeal the findings or remedy or both." *Id.* at 12,044.

~~58.~~62.  The 1997 Guidance explained that other legal or adjudicatory processes could not substitute for a school's own processes. For example, where possible criminal conduct was involved, a police investigation "may be useful in terms of fact-gathering," but, "because legal standards for criminal conduct are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly." *Id.* at 12,045.

### The 2001 Revised Sexual Harassment Guidance

~~59.~~63.  Following the Supreme Court's 1998 decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and its 1999 decision in *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)*,* the Department issued revisions to the 1997 Guidance in 2001, entitled *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties. See* 66 Fed. Reg. 5512 (Jan. 19, 2001).

~~60.~~64.  The 2001 Guidance, which also followed a public notice and comment period, *see* 62 Fed. Reg. 66,092 (Nov. 2, 2000), reaffirms many of the principles set forth in the 1997 Guidance. It "explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance [with Title IX and its implementing regulations]." 2001 Guidance at 4.

~~61.~~65.  The 2001 Guidance reaffirms the requirement that educational institutions publish grievance procedures "providing for prompt and equitable resolution of sex discrimination

complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination." *Id.* at 14.

62.66.  The 2001 Guidance further provides that "[o]nce a school has notice of possible sexual harassment of students—whether carried out by employees, other students, or third parties—it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." *Id.* at 15.

63.67.  The 2001 Guidance specifies a number of factors that would be considered in determining whether an educational institution's grievance procedures were "prompt and equitable," as required by Title IX and the Department's implementing regulations, including, as in the 1997 Guidance, the acknowledgment that many schools "provid[ed] an opportunity to appeal the findings or remedy or both." *Id*. at 20.

64.68.  The 2001 Guidance also reaffirms that although informal resolution of complaints might be appropriate in some cases, OCR had "frequently advised schools" that "mediation" or other informal resolution would not be appropriate in the context of some forms of sexual harassment, such as sexual assault, even on a voluntary basis. *Id*. at 21.

65.69.  The 2001 Guidance also reiterates the importance of interim measures discussed in the 1997 Guidance, stressing that such measures "should be designed to minimize, as much as possible, the burden on the student who was harassed." *Id.* at 16.

66.70.  Like the 1997 Guidance, the 2001 Guidance made clear that, after an investigation has concluded, a school "may be required to provide. . . services to the student who was harassed if necessary to address the effects of the harassment on that student." *Id*. at 16-17.

67.71.  The 2001 Guidance cautions schools, as did the 1997 Guidance, about relying on police or insurance company investigations as a substitute for their own processes, again emphasizing the different purposes and legal standards applicable in those third-party investigations. *Id.* at 21.

68.72.  Finally, the 2001 Guidance notes that both employees and students of public schools and universities are entitled to certain Constitutional due process protections, and that the rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. The guidance instructed, however, that recipients should ensure that "steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." *Id.* at 22.

**The 2011 Dear Colleague Letter and 2014 Q&A Document**

69.73.  Even with the Department's enforcement and guidance activities, sexual harassment, including sexual violence, has remained a pervasive problem on campuses and in schools across the country.

70.74.  In the wake of these ongoing challenges, educational institutions solicited assistance from the Department of Education in further understanding their obligations under Title IX in regard to sexual harassment, particularly sexual violence. Thereafter, in 2011, the Department issued a "Dear Colleague Letter on Sexual Violence" and, in 2014, a set of Questions and Answers to respond to additional concerns raised by schools and students.[23]

71.75.  Citing the "deeply troubling" statistics concerning sexual violence on campuses, the 2011 Dear Colleague Letter provided clarity on how schools should address peer-on-peer sexual

---

[23] *See* U.S. Dep't of Educ., Ltr. from Ass't Sec'y Russlynn Ali (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ("2011 Dear Colleague Letter"); U.S. Dep't of Educ., Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ("2014 Q&A").

harassment, including sexual violence, as well as steps that schools could take to respond in accordance with the Department's regulations and 2001 Guidance.

72.76.  The 2011 Dear Colleague Letter reiterated, consistent with the 2001 Guidance, the importance of schools offering services to survivors, such as tutoring and mental health care, to ensure that they can continue to learn in the wake of sexual harassment, including sexual violence. 2011 Dear Colleague Letter at 15-17. It noted, again consistent with the 2001 Guidance, that necessary accommodations may include interim remedies to protect the complainant during the investigation. *Id.* at 15.

73.77.  As in the 2001 Guidance, the 2011 Dear Colleague Letter discussed what constitutes a prompt and equitable adjudication. The 2011 Dear Colleague Letter also made clear that Title IX requires schools to provide complainants and respondents equal rights and opportunities throughout an investigation and any appellate process. *Id*. at 12.

74.78.  The 2011 Dear Colleague Letter also discouraged schools from allowing a complainant and alleged perpetrator to directly cross-examine each other. As the guidance explained, "[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment." *Id*. at 12.

75.79.  The 2011 Dear Colleague Letter reiterated the ongoing policy expressed in the 2001 Guidance that mediation is an inappropriate way to resolve sexual violence complaints. *Id*. at 8.

76.80.  The 2011 Dear Colleague Letter also discussed, in response to questions that school administrators had posed, the burden of proof that recipient schools should use in investigating complaints of sexual assault. The 2011 Dear Colleague Letter explained that, in investigating Title IX complaints, OCR reviews a school's grievance procedures to determine whether a school uses preponderance of the evidence as the complainant's burden of proof. It explained

that this burden appropriately reflected the burden used in litigation under Title VII of the Civil Rights Act of 1964, to which courts have looked in construing Title IX, as well as the burden used by OCR in investigating Title IX complaints against recipients of federal funding. *Id*. at 11.

77.81.  Also consistent with the 2001 Guidance, the 2011 Dear Colleague Letter reiterated that public and state-supported schools must provide due process protections to an alleged perpetrator. *Id*. at 12.

78.82.  In 2014, the Department issued further clarifications consistent with its previously issued guidance in response to questions that it received from schools and colleges in the form of a Questions and Answers document ("2014 Q&A"). The 2014 Q&A provided examples of proactive efforts schools could take to prevent sexual violence and remedies schools could use to end such conduct, prevent its recurrence, and address its effects.

79.83.  Among other things, the 2014 Q&A further discussed Title IX's mandate that schools take steps to ensure equal access to educational programs and activities, including by protecting a complainant with interim measures pending resolution of a complaint. Such measures should allow the complainant to avoid contact with the alleged perpetrator and "to change academic and extracurricular activities or his or her living, transportation, dining, and working situations as appropriate." 2014 Q&A at 32. This requirement is consistent with the 2001 Guidance's emphasis on Title IX's mandate to take immediate steps once a complaint is filed to eliminate any hostile environment and prevent harassment from occurring again. *Id.* at 32-33; *see also* 2001 Guidance at 12.

80.84.  The 2014 Q&A also emphasized that schools should provide the same rights and opportunities to complainants and respondents. 2014 Q&A at 26.

81.85.  The 2011 Dear Colleague Letter and the 2014 Q&A did not reflect any policy change, but rather reminded schools of longstanding statutory and regulatory obligations to address sexual harassment, including sexual violence, while providing more details and examples of how to do so. Both documents were the product of the Department's consideration of the standards that OCR had relied on in dozens of investigations and reflected the input of students, faculty, administrators, staff, attorneys, Sexual Assault Response Teams ("SARTs"), counselors, student advocates, medical personnel, parents, law enforcement, prosecutors, and campus police.

### The Trump Administration's Change in Title IX Policy

82.86.  Following his inauguration, President Trump appointed Secretary DeVos to lead the Department of Education. In April 2017, Secretary DeVos selected Candice Jackson to serve as Deputy Assistant Secretary and to lead OCR as Acting Assistant Secretary for Civil Rights.

83.87.  Secretary DeVos and Ms. Jackson have repeatedly criticized the protections that Title IX affords to women and other survivors of sexual harassment, including sexual violence. Much of that criticism has been based on discriminatory stereotypes and unfounded generalizations about female students in general and female victims of sexual violence in particular. There is a longstanding and inaccurate stereotype that women and girls tend to lie about or misunderstand sexual assault and harassment. For example, a recent study published in the Psychology of Violence determined that police routinely rely on rape myths, such as that the victim was lying or that the victim had given consent, in judging whether a case should be referred to a prosecutor.[24]  Secretary DeVos'DeVos and Ms. Jackson's statements and actions reveal that their

---

[24] *See* Romeo Vitelli, *Rape Myths and the Search for True Justice*, Psychology Today, Oct. 26, 2017, https://www.psychologytoday.com/us/blog/media-spotlight/201710/rape-myths-and-the-search-true-justice (citing and linking to Psychology of Violence study, Jessica Shaw, *et al.*, Beyond Surveys and Scales: How Rape Myths Manifest in Sexual Assault Police Records, 7(4)

decision-making regarding the 2017 Title IX Policy was motivated at least in part by these stereotypes.

~~84.~~88.   For example, Ms. Jackson has repeatedly criticized core civil rights achievements, such as legal protections against sexual harassment. In a book she published in 2005, Ms. Jackson stated that laws to combat sexual harassment gloss over "the reality that unwanted sexual advances are difficult to define."[25]

~~85.~~89.   Ms. Jackson regularly questions the veracity of sexual harassment and assault claims made by women, stating, for example:

> [I]t wasn't enough that women are not legally forbidden anymore from getting an education and entering the workforce. Feminists and other leftists thought the problem of workplace sexual harassment needed a legal remedy. Since sexual harassment is such a nebulous experience, defined so subjectively and turning on the perceptions of the people involved, laws banning it are difficult to articulate. But they have tried anyway, with the side result that many men self-censor themselves to avoid being accused of sexual harassment, and institutions remove valid expressions of art and learning to avoid "even the appearance of sexual harassment."[26]

~~86.~~90.   In October 2016, a few months before joining the Department, Ms. Jackson stated in a social media post that women who claimed that Donald Trump sexually harassed them were lying "for political gain," and "evidence is piling up that shows these recent accusers against

---

Psychology of Violence 602 (Oct. 2017)); ~~."");~~ *Critical Issues on Violence Against Women: International Perspectives and Promising Strategies* 96 (Holly Johnson, *et al.*, eds., Routledge 2015), *available at* https://books.google.com/books?id=pD62BQAAQBAJ&pg=PA96#v=onepage&q&f=false ("Allegations that women lie about sexual assault are not new. … Despite social advancements in the past several decades regarding rape awareness, negative attitudes and belief in 'rape myths' are still pervasive.").

[25] Candice Jackson, Their Lives: The Women Targeted by the Clinton Machine (2005), at 138.

[26] *Id.*

Trump are, frankly, fake victims.[27] Ms. Jackson's post came just days after a tape surfaced of then-candidate Trump expressly bragging about sexually assaulting women.

~~87.~~91.  Similarly, and for example, in the past, Secretary DeVos has provided substantial financial contributions—a form of speech—to FIRE, an organization that advocates for schools to abdicate their responsibility to address sexual violence and instead defer entirely to law enforcement.[28] FIRE asserts that the 2011 Dear Colleague Letter "eviscerated due process rights of students and faculty accused of sexual misconduct on campus."[29] FIRE has previously litigated against the Department to weaken Title IX's protections, including by arguing that the preponderance of the evidence standard, which is used in nearly all civil matters, is unfair to the alleged perpetrator in a Title IX grievance proceeding.

---

[27] Tyler Kingkade, *The Lawyer Who Helped Bill Clinton's Rape Accusers May Have Scored A Top Civil Rights Job Under Trump,* BuzzFeed News, Apr. 3, 2017, https://www.buzzfeednews.com/article/tylerkingkade/the-lawyer-who-helped-clinton-rape-accusers-may-have-scored#.ej6ZKYBG8X; *see also* Annie Waldman, *DeVos Pick to Head Civil Rights Office Once Said She Faced Discrimination for Being White*, Pro Publica~~(,~~ ~~,~~ Apr. 14, 2017~~),~~, https://www.propublica.org/article/devos-candice-jackson-civil-rights-office-education-department.

[28] Benjamin Wermund, *DeVos' Donations Spark Questions About Her Stance On Sexual Assault*, Politico, Jan. 9, 2017, https://www.politico.com/story/2017/01/betsy-devos-education-sexual-assault-233376; Alex Morey, *Baylor Rape Controversy More Evidence Colleges Unequipped to Decide Sexual Assault Cases*, Found. for Individual Rights in Educ. ~~(("FIRE),")~~ (Sept. 14, 2015~~;~~), https://www.thefire.org/baylor-rape-controversy-more-evidence-colleges-unequipped-to-decide-sexual-assault-cases/~~.~~; Robert Shibley, *Time to Call the Cops: Title IX Has Failed Campus Sexual Assault*, TIME, Dec. 1, 2014, http://time.com/3612667/campus-sexual-assault-uva-rape-titleix/ (FIRE's senior vice president arguing that campus responses "encourage[ ] silence or the avoidance of law enforcement" in the wake of the Rolling Stone account of alleged rape at a fraternity house at the University of Virginia).

[29] *Dear Colleague: It's Over! Education Department Rescinds Controversial 2011 Letter*, FIRE, Sept. 22, 2017, https://www.thefire.org/dear-colleague-its-over-education-department-rescinds-controversial-2011-letter/.

88.92.  Since they have assumed their current roles at the Department, Secretary DeVos's and Ms. Jackson's official actions and statements preceding the 2017 Title IX Policy reveal their discriminatory motivation.

89.93.  For example, Secretary DeVos actively solicited the views of those individuals and groups that oppose robust Title IX protections and have questioned the veracity of survivors' experiences. Shortly after assuming her role as Secretary, Secretary DeVos met with State Representative Earl Ehrhart from Georgia—a notorious opponent of Title IX—to discuss, among other topics, Title IX enforcement.[30] Representative Ehrhart has pushed a state bill that would require colleges to refer all sexual assault reports to the police, even against a victim's expressed wishes, a dangerous policy that would discourage reporting by victims. He has also questioned women's credibility on the experience of sexual assault, accusing one woman of "utilizing a victim's status" for ulterior motives.[31] Similarly, during the summer of 2017, Secretary DeVos met with the National Coalition for Men, an organization that has published photos of women who have made complaints of rape, calling them "false victims."[32] This Coalition has referred to rape survivors as "anti-male." [33]

---

[30] Kathryn Joyce, *The Takedown of Title IX,* N.Y. Times, Dec. 5, 2017, https://www.nytimes.com/2017/12/05/magazine/the-takedown-of-title-ix.html?_r=0 ("Ehrhart came away from his meeting gratified that DeVos seemed to agree with him on the limited role that federal authorities should play. 'She's placing this back where it belongs,' he told me, 'in the purview of the states.'")

[31] Letter from Nat'l Women's Law Ctr, *et al*. to Elisbeth DeVos, Sec'y of Educ., Apr. 17, 2017, https://nwlc.org/wp-content/uploads/2017/04/April-17-2017-Letter-to-Secretary-DeVos.pdf.

[32] Jessica Valenti, *Why is Betsy DeVos Enabling Rape Deniers?*, The Guardian, July 14, 2017, https://www.theguardian.com/commentisfree/2017/jul/14/betsy-devos-accused-rapists-meetings-sexual-assault.

[33] Tyler Kingkade, *These Democratic Senators Are Blasting Betsy DeVos For Her Approach To Campus Rape*, Buzzfeed, July 12, 2017, https://www.buzzfeed.com/tylerkingkade/these-democratic-senators-are-blasting-betsy-devos-for-her?utm_term=.sd2GyLb3M#.lvOz57wgB.

~~90.~~94.   Similarly, Candice Jackson proactively sought out the views and input of those individuals who question the veracity of women and girl's reports of sexual harassment and assault, as the Defendants developed the new Policy. According to documents released by the Department in response to a Freedom of Information Act request, she had a dinner meeting with Chris Perry, Deputy Executive Director of Stop Abusive and Violent Environments ("SAVE"), and others in advance of the release of the 2017 Title IX Policy to discuss the Dear Colleague Letter. SAVE's mission includes stopping "false accusations" of sexual assault, and its website repeats a discredited and aberrational study that concluded that 41% of rape claims are false.[34]

~~91.~~95.   FOIA records also show that in May 2017, Ms. Jackson telephoned Gordon E. Finley regarding his writing on issues related to sexual assault. Mr. Finley is a member of the National Coalition for Men and a professor at Florida International University who opines frequently on sexual harassment and assault, including essays such as "Sex: The New War on Men,"[35] and "A false accusation can spell the end of a college male's future," which relies on studies that assert (incorrectly) that rates of false allegations regarding rape and other sexual abuse range from 41 to 62 percent. [36] In an email response, after thanking Ms. Jackson for her "kind call" and saying

---

[34] SAVE, *Falsely Accused of Sexual Assault,* http://www.saveservices.org/dv/falsely-accused/sex-assault/; *see* SAVE, *Ten Myths of Campus Sexual Assault*, http://www.saveservices.org/sexual-assault/ten-myths/.

[35] Gordon E. Finley, *Sex: The New War on Men,* Nat'l Coal. for Men, May 12, 2014, https://ncfm.org/2014/05/action/ncfm-advisor-gordon-finley-ph-d-sex-the-new-war-on-men/ ("Sexual allegations made by females are not taken as allegations but rather as 'settled fact.' These claims do not even consider the possibility that women might lie about any manner of things sexual …" and "The former definition of forcible rape has morphed into anything sexual without "consent" and with the determination of "consent" left entirely up to the woman, even to be determined the morning after.").

[36] *See NCFM Adviser Gordon Finley Letter, "A False Accusation Can Spell the End of College Male's Future," Published in the Boston Globe,* Nat'l Coal. for Men, Oct. 18, 2014, https://ncfm.org/2014/10/news/discrimination-news/discrimination-against-men-news/ncfm-

"[i]t's always nice to know that someone actually reads what you write," Mr. Finley directed Ms. Jackson to additional of his writings, including the two previously identified.

~~92.~~96.  Ms. Jackson was also in regular email contact with Cynthia Garrett, co-President of Families Advocating for Campus Equality ("FACE"), and others at FACE, regarding the Department's Title IX ~~policy~~Policy. FACE, which is comprised primarily of mothers of boys and men who have been accused of sexual harassment and assault, "advocate[es] for the rights of falsely accused students."[37]  One of these FACE members told the New York Times of her son's expulsion for having sex with a student who was too intoxicated to give consent, "[i]n my generation, what these girls are going through was never considered assault ~~. . .~~.  It was considered, 'I was stupid and I got embarrassed.'"[38]

~~93.~~97.  Ms. Jackson coordinated with Ms. Garrett regarding a letter campaign from FACE members to the Department regarding the Department's Title IX sexual violence policy. By and large, these letters presented stories of supposedly false accusations of sexual assault or harassment by women or girls against boys and men. Ms. Jackson also requested that FACE publish numerous op-eds regarding the Department's Title IX ~~policy~~Policy in advance of Secretary DeVos's September 2017 speech on the Department's Title IX ~~policy~~Policy.

~~94.~~98.  In contrast to the Department's solicitation of persons and organizations with views that female sexual assault survivors are prone to exaggerate or fabricate accusations, the Department

---

adviser-gordon-finley-letter-a-false-accusation-can-spell-the-end-of-college-males-future-published-in-the-boston-globe/.

[37] FACE, *Title IX's Other Victims*, https://www.facecampusequality.org/ourstories/.

[38] Anemona Hortocollis & Christina Capecchi, *'Willing to Do Everything,' Mothers Defend Sons Accused of Sexual Assault,* N.Y. Times, Oct. 22, 2017, https://www.nytimes.com/2017/10/22/us/campus-sex-assault-mothers.html.

met with organizations that advocate for Title IX's protections for survivors only after repeated, collective requests from those organizations. Plaintiffs, along with other organizations that advocate for Title IX's protections for sexual assault survivors, sent Secretary DeVos a letter in April 2017 urging her to consider the views of sexual assault survivors and groups dedicated to survivors' rights, as opposed to the biased and extreme views held by Mr. Ehrhart and others.[39] While Department decisionmakers did eventually meet with SurvJustice and others representing the views of sexual violence survivors, one survivors' rights group, Know Your IX, was disinvited after its co-founders published an op-ed critical of the Office for Civil Rights.

95.99.  The views of individuals arguing that women tend to lie about sexual harassment and assault, especially in educational settings, influenced and infected the Department's decision-making. For example, FOIA records show that on July 18, 2017, Candice Jackson discussed a book titled "Unwanted Advances: If this is feminism, it's feminism hijacked by melodrama" with OCR staff and remarked on "how helpful it has been in reference to the issues we are discussing." In an email to Department colleagues attaching a summary of the book and referencing Ms. Jackson's favorable view of it, OCR's Confidential Assistant instructed the group, "[i]t is imperative that we all read either the summary or the book . . . . . before tomorrow's meeting." The attached book summary included the following statements:

> The existing Title IX guidance from the Department was motivated by "an ill-conceived effort to protect women students from a rapidly growing catalogue of sexual bogeymen."

> "Sexual paranoia has converted the Title IX bureaucracy into an insatiable behemoth, bloated by its own federal power grab, though protests are few because—what are you, in favor of rape culture or something?"

---

[39] Letter from Nat'l Women's Law Ctr, *et al.*, *supra* note 20.

"It turns out that rampant accusation is the new norm on today's campus; the place is a secret cornucopia of accusation, especially when it comes to sex."

"[W]e seem to be breeding a generation of students, mostly female students, deploying Title IX to remedy sexual ambivalences or awkward sexual experiences, and to adjudicate relationship disputes post-breakup—and campus administrators are allowing it."

"[A]ny number of other cases I learned about: astounding levels of bias against accused men, inventive deployments of the preponderance standard, and female complainants with ambiguous motives. I don't wish to betray my gender, but the premise that accusers don't lie turns out to be mythical. By sentimentalizing women in such preposterous ways, aren't Title IX officials setting schools up as cash cows for some of our more creatively inclined women students?"

96.100.      Although Title IX affords protections to all victims of discriminatory conduct on the basis of sex, Secretary DeVos and Ms. Jackson have criticized the protections that civil rights laws, such as Title IX, afford to women, continuing to base their statements on stereotypes about college women and women who are survivors of sexual harassment, including sexual assault, as fabricators and exaggerators.

97.101.      In a July 2017 article in the *New York Times*, in which Ms. Jackson was quoted, she publicly propounded discriminatory stereotypes of women who survive sexual assault. Regarding investigations conducted by schools and universities to identify and remedy unlawful sexual violence and other forms of harassment, she echoed many of the views expressed by groups and individuals from whom she sought input:

> [In most investigations there's] not even an accusation that these accused students overrode the will of a young woman. Rather, the accusations—90 percent of them—fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because *she* just decided that our last sleeping together was not quite right.'[40]

---

[40] Erica L. Green & Sheryl Gay Stolberg, *Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times, July 13, 2017 (emphasis added), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.

98.102.        In September 2017, Secretary DeVos gave a speech on campus sexual

harassment, including sexual violence, at George Mason University. In her remarks, she cited a

number of examples where students, particularly male students accused of sexual violence, were

allegedly treated unfairly by their schools. She used these examples to justify rescinding the

2011 Dear Colleague Letter and 2014 Q&A.[41] Yet these anecdotes involve problems that arose

because schools did not follow the then-existing guidance, and therefore do not support

rescission of that guidance.  Moreover, many of the anecdotes used by Secretary DeVos in her

speech were misleading and/or untrue, in that they recounted supposed facts that the parties to

the incident disputed.

99.103.        Secretary DeVos's September 2017 speech presented as equally problematic the

harm faced by sexual violence survivors and the harm faced by individuals who have been

falsely accused, despite a lack of evidence that the latter is a widespread problem extending

beyond a few occurrences, unlike the former.[42] Rather than recognizing that false accusations are

rare, Secretary DeVos presented the problem of false accusations as rampant. On the contrary,

research shows that the prevalence of false allegations of sexual assault is very low—false

accusations regarding criminal sexual assault, for example, are estimated at 2-10 percent.[43]

100.104.        Secretary DeVos also asserted that the loss of due process protections for alleged

perpetrators is a widespread problem on school campuses, mentioning "due process" ten times

---

[41] *See* Elisabeth DeVos, Sec'y of the U.S. Dep't of Educ., Remarks on Title IX Enforcement at George Mason University (Sept. 7, 2017), https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement ("DeVos Remarks").

[42] *See* DeVos Remarks.

[43] David Lisak, *et al*., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, 16(12) Violence Against Women 1318, 1330 (2010), https://icdv.idaho.gov/conference/handouts/False-Allegations.pdf.

during the speech. She also claimed that "the system established by the prior administration" was responsible for creating "victims of a lack of due process".[44]

101.105.        Secretary DeVos also expressed doubt about the seriousness of sexual harassment claims, saying, "[I]f everything is harassment, then nothing is."[45] This statement, among other things, minimizes the full range of sexual harassment and its impact on women and girls, including deprivation of their access to education.

102.106.        Secretary DeVos's and Ms. Jackson's statements are consistent with and reveal their discriminatory belief, based on gender stereotypes, that many girls and women who report sexual harassment misunderstood a harmless romantic advance and that those who report sexual violence often are either lying or have regret about a consensual sexual encounter.

103.107.        Other politically appointed Department of Education officials have similar doubts about the veracity of sexual harassment and violence claims. For example, Adam Kissel, previously Deputy Assistant Secretary for Higher Education Programs, has criticized affirmative consent policies adopted on college campuses through his Twitter accountaccounting, stating in February 2017, "The that "[t]he new OCR [Office of Civil Rights, Department of Education] will start to fix this."  Mr. Kissel has also criticized the "preponderance of evidence" standard because it will lead, in his view, to "more guilty verdicts," apparently referring to campus findings of responsibility. He has also criticized antidiscrimination policies preventing sexual harassment.

104.108.        This discriminatory mindset not only has motivated decisionmakers at the Department; it flows from the top of the Executive Branch. President Trump's actions and

---

[44] DeVos Remarks.

[45] DeVos Remarks.

statements reveal his discriminatory and stereotyped views of women, and particularly women's

veracity regarding claims of sexual harassment, including violence. For example, during his

campaign for President, Donald Trump called women who have made accusations of sexual

harassment and assault against him "phony accusers" who have made such reports to get "some

free fame." He has called sexual harassment reports against him by women "a total setup" and

the women who made those reports, "horrible."[46]

105.109.      Mr. Trump has bragged about sexually assaulting women on audiotape, but

continues to deny the experiences of women and girls who have experienced sexual assault. He

asserted that "every woman lied when they came forward"…" regarding alleged sexual

harassment by him, and that all of the women "liars will be sued after the election is over." [47]

106.110.      This discriminatory and stereotyped view of women and girls has become de facto

White House policy, as the White House has asserted in an official statement that at least 16

women who had accused the President of sexual harassment were lying.[48]

107.111.      The Administration's disbelief of women and girls and disregard for gender-based

violence is also evident from the employment of multiple White House staff members who have

been accused of abusing their female partners.  It has been widely reported that now-former

White House staff secretary Rob Porter was elevated within the White House despite law

---

[46] Ryan T. Beckwith, *Read Donald Trump's Speech Attacking His Accusers*, TIME, Oct. 14, 2016, http://time.com/4532181/donald-trump-north-carolina-accusers-speech-transcript/.

[47] Ben Jacobs, *Trump Uses Gettysburg Address to Threaten to Sue Sex Assault Accusers,* The Guardian, Oct. 22, 2016, https://www.theguardian.com/us-news/2016/oct/22/donald-trump-gettysburg-contract-with-america-sue-accusers-hillary-clinton.

[48] John Wagner, *All of the Women Who Have Accused Trump of Sexual Harassment Are Lying, the White House Says*, Wash. Post, Oct. 27, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/10/27/all-of-the-women-who-have-accused-trump-of-sexual-harassment-are-lying-the-white-house-says/?utm_term=.79b67a7a3a2b.

enforcement investigations concerning multiple reports of his abuse of women.[49] After the reports of Mr. Porter's abuse were made public, President Trump has defended Mr. Porter, and White House Chief of Staff John Kelly stated that Mr. Porter is a man of "integrity." Mr. Porter's resignation was followed by the resignation of another senior White House official, David Sorensen, who also has been accused of gender-based violence.

~~108.~~112.    Following these resignations, President Trump issued a statement in the form of a tweet: "Peoples [sic] lives are being shattered and destroyed by a mere allegation," he wrote. "There is no recovery for someone falsely accused—life and career are gone. Is there no such thing any longer as Due Process?"[50]

~~109.~~113.    More recently, President Trump mocked Christine Blasey Ford, who accused now-Justice Brett Kavanaugh of sexual assault. In a speech in Mississippi, Trump questioned Dr. Ford's recollection of the incident, which she reports occurred several decades ago. Later, the President confirmed that he doubted Dr. Ford's report of sexual assault, saying "I was just saying she didn't seem to know anything."[51]

---

[49] Mr. Porter's reported abuse of women is well documented; in 2010, a court issued a protective order against him, finding "reasonable grounds" to believe that Mr. Porter committed domestic abuse towards his wife at the time, Jennifer Willoughby, and "probable danger" of the abuse occurring. Reports and evidence concerning Mr. Porter's abuse of women are among the things that prevented Mr. Porter from obtaining a permanent security clearance.

[50] Donald Trump (@realDonaldTrump), Twitter (Feb. 10, 2018), https://twitter.com/ realDonaldTrump/status/962348831789797381.

[51] Alex Johnson, *Trump Defends Mockery of Christine Blasey Ford, Says It Got Kavanaugh Confirmed*, NBC News, Oct. 15, 2018, https://www.nbcnews.com/politics/donald-trump/trump-defends-mockery-christine-blasey-ford-says-it-got-kavanaugh-n919986.

110.114.    President Trump also claimed that two women who confronted Senator Jeff Flake in an elevator with stories of their own sexual assaults during now-Justice Kavanaugh's confirmation hearings were "paid professionals."[52]

111.115.    On October 2, 2018, President Trump again addressed Dr. Ford's allegations that now-Justice Kavanaugh sexually assaulted her, calling it "a very scary time for young men in America."  He added that "[w]omen are doing great."[53]

112.116.    The Trump Administration's animus towards women gives license to and encourages Executive branch decisionmakers who share the same discriminatory views to perpetuate those views in their work.

113.117.    The Department's revised Title IX policyPolicy, described in detail in the paragraphs that follow, was motivated by discriminatory and unfounded stereotypes about the women and girls who come forward to report sexual assault and harassment. Consistent with this view, the new policy removes protections for survivors, the majority of whom are female, and does so in order to make it more difficult for these women and girls to obtain relief via a school's Title IX process and to discourage them from making Title IX reports to their schools in the first place.

---

[52] Donald Trump (@realDonaldTrump), Twitter (Oct. 5, 2018), https://twitter.com/realDonaldTrump/status/1048196883464818688.

[53] Luke Barnes, *Trump Says It's A 'Very Scary Time for Young Men',* ThinkProgress, Oct. 2, 2018, https://thinkprogress.org/trump-kavanaugh-very-scary-time-for-young-men-in-america-e8ed567bc365/.

**2017 Title IX Policy**

~~114.~~118.        On September 22, 2017, the Department issued a new Dear Colleague Letter

("2017 Dear Colleague Letter"), rescinding the 2011 Dear Colleague Letter and 2014 Q&A.[54]

The 2017 Dear Colleague Letter also provides new information about how the Department will

assess an educational institution's compliance with Title IX through a set of Questions and

Answers.[55] Together, these documents set forth the Department's revised Title IX ~~policy~~Policy

("2017 Title IX Policy"). This Policy is made binding on recipients of federal funding through

the assurances.

~~115.~~119.        The 2017 Title IX Policy departs dramatically from the 2011 and 2014 guidance

documents. The 2017 Title IX Policy does not simply rescind the 2011 Dear Colleague Letter

and 2014 Q&A. Instead, it affirmatively contradicts Department policies that the 2017 Title IX

Policy supposedly kept in effect, including the 2001 Guidance.

~~116.~~120.        The 2017 Title IX Policy, among other changes from existing law, imposes the

following requirements on schools that weaken protections for sexual harassment survivors:

- prohibits educational institutions from issuing interim measures that benefit

complainants by minimizing the burden on these students, such as modifications to their work

and class schedules or to housing assignments, thereby increasing the risk that survivors of

sexual harassment are isolated from their support networks in the aftermath of their experience,

*see* 2017 Q&A at 3;

- requires educational institutions issuing interim measures to provide such

measures to both parties or not at all, thereby burdening survivors and increasing the risk that

---

[54] *See* 2017 Dear Colleague Letter.

[55] *See* 2017 Q&A.

survivors of sexual harassment are isolated from their support networks in the aftermath of their experience and impeded in their ongoing access to educational benefits and opportunities, *see id.*;

- requires educational institutions to consider the impact of disciplinary sanctions on a *perpetrator's* access to education, even after finding the individual responsible for sexual harassment or violence and without regard to the survivor's access to education, *id.* at 6;

- eliminates the requirement that educational institutions consider the effect of off-campus conduct that does not involve a program or activity of the institution in determining whether there is a hostile environment, *id.* at 1, n. 3.

- eliminates the requirement that educational institutions provide appellate rights to both parties, if they are provided at all, and instead permits institutions to provide appellate rights only to the alleged perpetrator, *id.* at 6-7;

- permits educational institutions *not* to provide interim measures to protect victims of sexual harassment, including sexual violence from further harassment or violence during the investigation into their complaint, *see* at 2-3;

- does not require educational institutions to timely resolve reports of sexual harassment, including sexual violence, *id.* at 3;

- permits educational institutions to resolve claims of sexual assault through mediation if both parties consent, notwithstanding, among other concerns, the likelihood that even mediation which is agreed to may retraumatize the victim, *see id.* at 4;[56]

---

[56] *See also* Anne Lawton, *The Emperor's New Clothes: How the Academy Deals with Sexual Harassment*, 11 Yale J.L. & Feminism 75, 130 (1999) ("[E]ven voluntary mediation can be coercive."); Grace Watkins, *Sexual Assault Survivor to Betsy DeVos: Mediation is Not a Viable Resolution*, TIME ~~(~~ Oct. 2, 2017~~),~~, http://time.com/4957837/campussexual-assault-mediation/.

- permits educational institutions to use the "clear and convincing evidence" burden of proof in adjudicating claims of sexual harassment, including sexual violence, rather than the equitable standard of "preponderance of evidence," *id.* at 5;

- eliminates the caution against educational institutions relying on criminal investigations as a substitute for their own independent investigations and determinations regarding complaints of sexual harassment, including sexual violence, *cf.* 2014 Q&A at 27;

- eliminates the prohibition on permitting an alleged perpetrator to question a complainant's sexual history with individuals other than the alleged perpetrator, *cf. id.* at 31;

- eliminates the prohibition on educational institutions treating a current or previous consensual dating or sexual relationship between parties as implying consent or precluding a filing of sexual violence, *cf. id.* at 31;

- fails to provide instructions on how to respond when a complainant requests confidentiality or requests that no investigation or disciplinary action be pursued, *cf. id.* at 18-22; and

- eliminates the strong discouragement to educational institutions from permitting alleged perpetrators to directly cross-examine complainants to avoid the perpetuation of a hostile environment, *cf. id.*

117.121.    The 2017 Title IX Policy definitively changes expectations and mandates for recipient institutions, including the expectationsthose outlined in the longstanding 2001 Guidance, which was the product of notice and comment procedures (unlike the 2017 Title IX Policy) and remains in effect. For example, the 2001 Guidance stated that in "alleged sexual violence, mediation will not be appropriate even on a voluntary basis," 2001 Guidance at 21,

while the 2017 Title IX Policy permits explicitly permits mediation in all cases where the parties

consent. 2017 Q&A at 4.

118.122.          The 2017 Title IX Policy also sets forth expectations and mandates on educational

institutions that are inconsistent with the statutory text of Title IX and its implementing

regulations, including, but not limited to, the following: providing for one-sided appellate rights

favoring the accused; permitting schools to adopt a higher burden of proof—clear and

convincing evidence—for adjudicating complaints of sexual harassment, including sexual

violence; considering the impact that particular sanctions would have on a perpetrator's access to

education after being found responsible for sexual harassment, including sexual violence, under

Title IX; and departing from prior policy requiring interim measures be issued to promptly

remedy the hostile environment for the complainant of sexual harassment.

119.123.          Ironically, Defendants issued the 2017 Title IX Policy and rescinded the 2011 and

2014 guidance documents without any opportunity for public notice and comment on the new

policy despite stating that the "era of rule by letter is over."[57] The Department stated that it

would "craft a new Title IX regulation" after a period of notice and comment.[58] Yet, more than a

year later, the Department has not done so. (An apparently leaked draft of a proposed regulation

was reported on last month, but the Department has not made the proposed regulation public). In

promulgating the 2017 Title IX Policy, Defendants failed to provide reasoned justifications for

the abrupt reversal in policy—and frequently failed to acknowledge the reversal in policy.

---

[57] Press Release, U.S. Dep't of Educ., Dep't of Educ. Issues New Interim Guidance on Campus
Sexual Misconduct, (Sept. 22, 2017), https://www.ed.gov/news/press-releases/department-
education-issues-new-interim-guidance-campus-sexual-misconduct.

[58] Id.

120.124.      In promulgating the 2017 Title IX Policy, Defendants relied on multiple errors of fact and law, underscoring that the Department's policy reversal is based not on reasoned justifications, but on discriminatory views of women and girls who allege sexual harassment. Among these errors, the 2017 Dear Colleague letter makes several claims about the effects of the rescinded guidance, stating, for example, that it had "led to the deprivation of rights for many students—both the accused students denied fair process and victims denied an adequate resolution of their complaints." 2017 Dear Colleague Letter at 1-2. On the contrary, the prior policy did not require schools to limit due process or basic fairness protections for alleged perpetrators. While there are anecdotes of schools making errors in providing these procedural protections, such errors were neither required by, nor the result of, the 2011 and 2014 guidance documents.

121.125.      The 2011 and 2014 guidance documents clarified the requirements that Title IX imposes on educational institutions to respond to complaints of sexual harassment and the protections it requires for complainants. As such, they empowered students to make complaints of sexual harassment, including sexual violence through campus complaint processes. The 2017 Title IX Policy does not acknowledge or otherwise account for the reliance interests that students, or organizations that work with students, have in these protections. A student who filed a complaint regarding sexual violence before the issuance of the 2017 Title IX Policy would have been assured that her educational institution should resolve the investigation within about sixty days, and among other protections, she would not be cross-examined by the person who allegedly assaulted her. For those students whose complaints were pending in the fall of 2017, no such assurances remain.

122.126.       The 2017 Title IX Policy's retrenchment on Title IX protections for victims of sexual harassment, including sexual violence, in educational institutions was motivated by stereotypical assumptions and overbroad generalizations about girls and women. Limiting Title IX's protections disproportionately impacts female students, a fact which motivated decisionmakers.  Specifically, decisionmakers at the Department hold the discriminatory views, as evidenced by Secretary DeVos's and Ms. Jackson's statements and coordination with others who hold the same views, that (1) many girls and women who report sexual harassment, including sexual violence, have misunderstood a harmless romantic advance and (2) most girls and women who report sexual violence either are lying or have regret about a consensual sexual encounters. By reducing protections for survivors, in the Department's view, they would reduce and discourage women and girls from making such reports of their sexual assaults, reports that Department decisionmakers tend not to believe.

**The Devastating Effects of the Department's 2017 Title IX Policy**

123.127.       The 2017 Title IX Policy curtails important protections against sexual harassment. This rollback has had devastating effects on students' equal access to educational opportunity, which is all too often thwarted on the basis of their sex.

124.128.       Following the issuance of the 2017 Title IX Policy, schools have modified and/or stated their intention to modify their practices. For example, in the weeks following the issuance of the 2017 Title IX Policy, the South Dakota Board of Regents proposed "emergency revisions" to its Title IX policyPolicy that "were required to comply with the Interim Guidance [i.e., 2017 Title IX Policy] issued on September 22, 2017."[59] The Board identified "revisions … to comply

---

[59]  South Dakota Board of Regents, *Minutes of the Meeting*, Oct. 3-5, 2017, at 20, https://www.sdbor.edu/the-board/minutes/Documents/BOR_Minutes_102017.pdf

with the requirements contained in the Interim Guidance."[60] It ultimately made a host of changes to its policy to "align with" and "follow[]" the Interim Guidance.[61] The changes made by South Dakota Board of Regents include, among others, modifications to its policy on interim measures, sanctions, and mediation to "explicitly incorporate language contained in the interim guidance."[62] As another example, following issuance of the 2017 Title IX Policy and after the Department closed an investigation into the handling of campus sexual violence at the University of Houston, the university's spokesman stated that, in light of the current guidance, the university may make some changes to how it adjudicates sexual misconduct violations to "better align with the [Department of Education's] expectations to how we ensure due process."[63] In addition, the University of Michigan has changed its Title IX policyPolicy to adopt the option of mediation between an accused student and a survivor in cases of sexual assault. This new

---

[60]  South Dakota Board of Regents, *Title IX Interim Guidance*, Oct. 3-5, 2017, at 1, https://www.sdbor.edu/the-board/agendaitems/2014AgendaItems/2017%20Agenda%20Items/October0317/5_O_BOR1017.pdf.

[61]  South Dakota Board of Regents, *Minutes of the Meeting*, Dec. 5-7, 2017, at 30, https://www.sdbor.edu/the-board/minutes/Documents/BOR_Minutes_1217_DRAFT.pdf

[62]  South Dakota Board of Regents, *Title IX Interim Guidance, Revisions to Board Policies*, Dec. 5-7, 2017, at 1, https://www.sdbor.edu/the-board/agendaitems/2014AgendaItems/2017%20Agenda%20Items/December17/7_E_BOR1217_REVISED.pdf; *see also* Danielle Ferguson, *South Dakota Board of Regents Passes Interim Title IX Sexual Assault Guidelines*, Argus Leader, Dec. 7, 2017, http://www.argusleader.com/story/news/2017/12/07/regents-pass-interim-title-ix-sexual-assault-guidelines/926445001/ (South Dakota State University vice president of student affairs stating that some of the changes were "substantive" but claiming that "most aren't").

[63]  Lindsay Ellis, *Feds Close Title IX Investigation Into University of Houston,* Chron, Oct. 4, 2017, http://www.chron.com/local/education/campus-chronicles/article/Feds-close-Title-IX-investigation-into-University-12253555.php.

University of Michigan policy resulted from the Title IX ~~policy~~Policy change.[64] The University of Kentucky has also adopted new policies regarding disciplinary procedures relating to sexual assault, among which it now only permits appeals by students found responsible for sexual assault, not for the survivor.[65]

~~125.~~129.          Following the issuance of the 2017 Title IX Policy, universities have also changed their policies in such a way that could delay resolution of reports of sexual misconduct, including sexual assault.[66]

~~126.~~130.          Following the issuance of the 2017 Title IX Policy, the Department has begun to modify and limit its ongoing investigations and analysis of University responses to reports of sexual misconduct, including sexual violence, to conform to the new Title IX ~~policy.~~Policy.  For example, in June 2018 OCR issued a Letter of Findings against the University of North Carolina

---

[64]Jeremy Bauer-Wolf, *Mediating Sexual Assault,* Inside Higher Ed, Feb. 20, 2018, https://www.insidehighered.com/news/2018/02/20/university-michigan-will-now-allow-mediation-some-sexual-assault-cases; Rick Fitzgerald, *U-M Revises Student Sexual and Gender-Based Misconduct Policy*, The Univ. Record, Feb. 1, 2018, https://record.umich.edu/articles/u-m-revises-student-sexual-gender-based-misconduct-policy  (University of Michigan Public Affairs Office explains that "[t]he change [regarding mediation] also reflects the most recent guidance from the U.S. Department of Education's Office for Civil Rights.").

[65] Jacob Eads, *UK Administration Overhauls Disciplinary Policies Regarding Sexual Assault Claims,* Kentucky Kernel, June 20, 2018, http://www.kykernel.com/news/uk-administration-overhauls-disciplinary-policies-regarding-sexual-assault-claims/article_d9808d74-74c2-11e8-8509-67e774e9238c.html.

[66] Press Release, Grand Valley State Univ., Update on the Impact of Interim Q&A Related to Title IX (Oct. 2, 2017), https://www.gvsu.edu/inclusion/module-news-view.htm?storyId=B4C32E26-0CC1-44BC-CCF964C4D07C10C3&siteModuleId=6D5DCE61-CC95-4B12-A9C94F3632A6F3DD (Grand Valley State University announcing it will remove its 60-day time frame for investigations.); Kara Coleman, *Auburn University Re-Evaluating Title IX Policies and Procedures,* Feb. 9, 2018, www.oanow.com/news/auburnuniversity/auburn-university-re-evaluating-title-ix-policies-and-procedures/article_16b90e14-ecf7-507c-a390-85c0ad88e538.html (Auburn University removed its 60-day time frame sometime "before Christmas" and now allows for "reasonable time," which can be "three or four months.").

("UNC") stating that UNC's sexual harassment policy was not equitable because it did not allow for both parties to appeal.[67] Questioned about how this finding was consistent with the new Policy, "Department spokeswoman Liz Hill said that OCR is in the process of correcting its correspondence with the university to let it know [UNC's] policy is consistent with the department's temporary rules."[68] ~~But for the new Policy, UNC would have remained subject to a finding of noncompliance for the unequal appeal rights it permits, and would have been required to change its practices through a binding Resolution Agreement. Now, due solely to the new Policy, UNC need not enter into a legally-enforceable agreement with OCR or be subject to a proceeding seeking to withdrawal of federal funds.~~ The Department subsequently modified its Letter of Findings with the university in order to align this enforcement action with its guidance in the 2017 Title IX Policy permitting unequal appeal rights when provided to the responding party.[69]

~~127.~~131.    Following the issuance of the 2017 Title IX Policy, numerous individuals who have been the subject of sexual violence or harassment have expressed to the Plaintiffs a

---

[67] Compl. Ltr. and Resolution Agreement, UNC & OCR (June 2018), https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF-1.pdf. ED seems to no longer be publishing resolution agreements as a matter of course. None appear on its website post-dating the 2017 Title IX Policy, making it difficult to find additional examples.

[68] Jeremy Bauer-Wolf, *The "Confusing" Case of UNC's Title IX Violations*, Inside Higher Ed, ~~(~~June 27, 2018~~),~~, https://www.insidehighered.com/news/2018/06/27/unc-found-have-violated-title-ix-multiyear-investigation.

[69] *Compare* U.S. Dep't of Educ., OCR Complaint No. 11-13-2051 Letter of Findings, at 10 (June 25, 2018), https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF-1.pdf (determining that the university's policy providing an appeal only to one party "is not equitable"), *with* U.S. Dep't of Educ., OCR Complaint No. 11-13-2051 Amended Letter of Findings, at 1 n.1 (June 28, 2018), https://www.unc.edu/wp-content/uploads/2018/07/FINAL-AMENDED-R-LOF-UNC-Chapel-Hill-11132051-PDF_Redacted.pdf (amending prior Letter of Findings to "clarif[y]" that educational institutions "may choose to allow an appeal . . . solely by the respondent or responding party . . . ").

hesitance or unwillingness to report their incidents to their school authorities, citing the

Department's 2017 Title IX Policy as the reason for their hesitation or unwillingness.

~~128.~~132.       These devastating consequences have overwhelmingly and disproportionately

harmed women and girls, among other populations that are disproportionately likely to be

targeted for sexual harassment and violence.

~~129.~~133.       As outlined more fully in paragraphs 10-34, the consequences of the

Department's 2017 Title IX Policy have harmed and continue to harm Plaintiffs. Indeed,

Plaintiffs are organizations that assist and counsel survivors of sexual harassment, including

sexual violence. As a result of the chilling effect that the Department's change in policy has had

and continues to have on reporting sexual assault and other forms of sexual harassment,

Plaintiffs are unable to meet their missions of serving survivors of sexual violence and other

forms of sexual harassment. Further, Plaintiffs have had to expend resources over and above

normal levels to combat underreporting that has resulted from the Department's change in

policy, causing a diversion of resources away from their other core programmatic activities.

~~130.~~134.       The effects of the 2017 Title IX Policy have also required Plaintiffs to expend

resources over and above their normal levels to combat confusion among survivors and

educational institutions and to educate both on the requirements of Title IX's antidiscrimination

provisions. These resource expenditures have taken away from Plaintiffs' other core

programmatic activities, causing a diversion of resources.

~~Plaintiff Organizations' Relationship to Female Survivors of Sexual Violence and Barriers~~
~~Those Women and Girls Face to Pursuing Federal Litigation to Challenge the~~
~~Discriminatory 2017 Policy~~

~~131.     Plaintiff organizations have a close relationship with the women and girls they serve.~~

~~Each organization has attorney-client relationships with women and girl students who they~~

represent in Title IX proceedings before schools.

As set forth above in paragraphs 10-34, Plaintiffs' missions are aligned with advancing

the interests of survivors of sexual harassment and assault, most of whom are women and girls,

and protecting their clients, survivors of sexual harassment and assault, from discriminatory

treatment in their schools' Title IX processes. In addition to the legal services they provide to

their clients, Plaintiffs' other work reveals the alignment of their interests with those of

survivors.

132.    For example, SurvJustice provides training to schools to prevent and address sexual and

gender-based violence to ensure compliance with federal law, enforcement of victim rights, and

development of a culture that supports survivors and encourages sexual respect. SurvJustice also

engages in policy advocacy to promote robust protections for survivors and to dispel rape myths

about women and girls like those advocated by Ms. Jackson in her statement to the New York

Times.

132.    VRLC provides trainings to lawyers, advocates, and educators regarding sexual violence

on college campuses, including providing up to date research on who victims are, who

perpetrators are, how sexual violence is committed on campus, and on campus best practices to

prevent and respond to sexual violence.

132.    ERA's mission is to fight for women's equality and combat gender discrimination in

education and employment, and it pursues this mission on behalf of students who have been

sexually harassed and assaulted. In addition to providing direct legal assistance, including free

advice and counseling, to such individuals, ERA represents them in litigation against schools,

school districts, and universities. ERA also files amicus briefs in cases involving the

interpretation and enforcement of anti-discrimination and other civil rights laws; provides

technical assistance and serves as a consultant to other attorneys representing women and girls in

Title IX cases and related civil litigation; connects victims of sexual harassment, including

sexual violence, to pro bono or other private attorneys; publishes and amplifies communications

in which women and girls use their voices to advocate on issues related to gender justice;

partners with student activists and leaders to conduct outreach and education to promote gender

equity and awareness of Title IX-related rights in schools; and advocates for policies that

promote gender equity in education at the local, state, and federal level, including policies that

protect full and equal access to education for victims of sexual assault and harassment.

133.    Individual women and girls affected by the discriminatory 2017 Title IX Policy face

barriers to bringing litigation on their own behalf to challenge the Policy as discriminatory.

The desire to maintain confidentiality is a significant barrier to students bringing a federal

lawsuit to challenge the discriminatory Policy. Women and girls considering reporting sexual

assault and harassment do so at the risk of having their sexual assault or harassment made public,

an experience which many prefer to keep private and which still carries significant social stigma.

Each organization has observed its clients wrestling with whether to report an experience of

sexual assault or harassment against the risk of loss of confidentiality; many women and girls

ultimately decide not to make such reports in favor of not losing their privacy. Pursuing federal

litigation creates just as much, if not more, risk of publicity.

134.    The loss of confidentiality also carries practical concerns for students. For example,

VRLC clients have expressed concerns about the impact on their future career prospects if they

bring complaints forward at their institution, much less in a federal court. This concern is

especially true for those graduate students and PhD candidates who have been harassed or

assaulted by individuals who are powerful within their field. Coupled with the safety concerns,

the implication of having a future employer know they have been sexually assaulted, resulting

from lost confidentiality following reporting, plus the potential for retaliation or stalking, victims

are often placed in an untenable position of choosing between fighting for their rights in the

present and navigating career implications for their future.

135.    The possibility of retraumatization is also a barrier to many students in bringing a federal

case to challenge the discriminatory Policy. SurvJustice and ERA have observed their clients

being retraumatized by schools' hostile, retaliatory, and dilatory responses to their reports of

sexual violence, which have grown more common in the wake of the 2017 Title IX policy. In

particular, ERA has observed institutional responses, which include but are not limited to long

delays in initiating and/or completing investigations, victim-blaming investigation tactics,

reversals of the role of victim and offender through, *e.g.*, automatically issuing and enforcing

mutual no-contact orders *against* students who report sexual assault and encouraging or

facilitating facially retaliatory counter-complaints by respondents against victims, compound the

trauma caused by being sexually assaulted. Plaintiffs' clients would face the prospect of further

re-traumatization by participation in a federal lawsuit.

Participation in a federal lawsuit raises safety concerns for women and girl survivors of

sexual assault and harassment. Each organization has clients who have experienced retaliation

after reporting sexual assault or harassment, either by their assailant or by third-parties (such as

peers, coaches, or professors), and clients who have experienced post-reporting stalking or other

harassment by the assailant. All three Plaintiffs have observed that no-contact orders are

frequently insufficient to protect survivors' safety and/or are ignored at an institutional level.

ERA also has observed an increase in the frequency of institutions making no-contact orders

*mutual*, thereby automatically subjecting students who report sexual assault to restrictions on

their movement and access to educational programs, privileges, and activities and making

complainants subject to discipline for otherwise permissible conduct. Inadequate responses by

schools to students' reports of sexual harassment and assault have led SurvJustice's clients to

believe that their experiences were not taken seriously and that their safety is not important.

Individual participation in a federal lawsuit with its attendant spotlight—on the assailant and the

school—would exacerbate these safety risks by creating additional motivation to retaliate.

Fear of retaliation is also a barrier against pursuing federal litigation to challenge the

discriminatory Policy. Many of the Plaintiff organizations' clients remain students at the schools

where they were assaulted. These students have been subject to retaliation, not only from the

harasser, but from the school itself. For example, VRLC has observed students encountering

barriers to accessing appropriate classes for an on-time graduation and additional procedural

requirements for graduation, such as meeting with a new "advisor." SurvJustice's clients have

also expressed fear of being retaliated against for going public with their experience of sexual

assault and harassment. Becoming a named plaintiff in a federal lawsuit would likely exacerbate

those retaliatory responses if the portrayal of the school's Title IX process in the lawsuit was

critical.

137.    In addition, Plaintiffs have observed practical and procedural barriers to individual

students being able to bring a constitutional claim or effectively vindicate their constitutional

rights through a lawsuit challenging the 2017 Title IX Policy. The student's claim as to the

Department's Policy likely would not be ripe until after she had been sexually assaulted and

proceeded through the campus Title IX process to completion. Even if she had not graduated by

the time the campus Title IX process concluded, it is extremely likely that she would have

graduated (or been pushed out of school) by the time she could obtain relief in a federal lawsuit,

1  making any requests for relief practically—if not legally—moot.

2                            ~~Claims~~Claim for Relief

3

4                                  **Count One**
   **(Violation of the ~~Equal Protection Guarantee of the Fifth Amendment~~Administrative**

5                         **Procedure Act, 5 U.S.C. § 706)**

6  ~~138.~~135.        Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth

7  herein.

8  ~~139.    The Due Process Clause of the Fifth Amendment to the United States Constitution~~

9  ~~forbids the federal government from denying equal protection of the laws, including by~~

10 ~~discriminating on the basis of sex.~~

11 ~~140.    In issuing the 2017 Title IX Policy, Defendants were motivated, at least in part, by their~~

12 ~~discriminatory—and baseless—gender stereotype that many women and girls lack credibility~~

13 ~~with regard to sexual harassment and assault. Such stereotype includes the perception that~~

14 ~~women and girls who report sexual harassment misunderstood a harmless romantic advance and~~

15 ~~that those who report sexual violence are often either lying or have regret about a consensual~~

16 ~~sexual encounter.~~

17 ~~141.    The statements and actions of Secretary DeVos and Ms. Jackson, as well as the~~

18 ~~circumstances under which the 2017 Title IX Policy change was issued, further demonstrate that~~

19

20 ~~Defendants issued the 2017 Title IX Policy knowing it would have a disparate impact on women,~~

21 ~~who constitute the overwhelming majority of sexual harassment and assault survivors, by~~

22 ~~reducing federal protections for victims of sexual harassment and assault. They took this action~~

23 ~~not despite this impact on women, but because of it.~~

24 ~~142.    Defendants, in issuing the 2017 Title IX Policy based on gender stereotyped~~

25 ~~assumptions—as evidenced by decisionmakers' statements and reliance on and solicitation of~~

26

27

28

input from groups espousing those very assumptions, departing from normal agency processes, acting with the knowledge that the policy would disproportionately impact female students, and motivated by that disproportionate impact—discriminated on the basis of sex in violation of the Due Process Clause of the Fifth Amendment.

136.    The Administrative Procedure Act ("APA") empowers this Court to set aside agency action that is arbitrary, capricious, or contrary to law. It also requires an agency to provide a sufficient explanation for its actions and empowers this Court to set aside actions that were undertaken without observance of procedure required by law.

137.    The 2017 Title IX Policy is the Department's current policy for interpreting and enforcing Title IX; it contains expectations and mandates for recipients that represent a shift away from prior policy. Although labeled as interim, the 2017 Title IX Policy is final agency action for the purposes of the APA because it represents a conclusive shift in Department policy that governs the enforcement and interpretation of Title IX and because it has no definite termination date. Schools that receive Department funding are expected and obliged to comply with the Policy in part based on the assurances of compliance they sign in order to receive such funding.

138.    By issuing the 2017 Title IX Policy, the Defendants have adopted a policy that is arbitrary, capricious, and contrary to law.

139.    Among other particulars, the 2017 Title IX policy arbitrarily and without reasoned explanation eliminates protections designed to prevent a discriminatory educational environment. It does so, for example, by permitting the use of mediation to resolve claims of sexual assault, which is not only arbitrary and unexplained, but also directly contradicts the Department's 2001 Guidance. It also fails to consider the reliance interests that students have in the continuation of those protections.

140.    In addition, the 2017 Title IX policy fails to articulate an adequate reason for, or in some cases even acknowledge, its departure from prior guidance documents and other Department interpretations of Title IX and its implementing regulations, including the 2014 Q&A, 2011 Dear Colleague Letter, and 2001 Guidance.

141.    Defendants' proffered explanation for issuing the Policy is based upon mistakes of fact and law.

142.    Defendants also acted in an arbitrary and capricious manner by implementing their 2017 Title IX policy without following the procedures required by law.

143.    As a result of Defendants' unlawful actions, Plaintiffs have been harmed and their missions frustrated, as outlined more fully in paragraphs ~~10-34~~11-35 above.

**~~Count Two~~**
**~~(*Ultra Vires* Action)~~[70]**

~~Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.~~

~~144.    This Court has the power to set aside actions by the Executive Branch that are *ultra vires* (*i.e.*, without legal authority).~~

---

~~[70] Plaintiffs are not alleging additional facts in support of their *ultra vires* claim, but maintain it for the purpose of appeal, if necessary.~~

145.   In adopting the 2017 Title IX policy and permitting recipients of federal funding to adopt policies that disadvantage victims of sexual harassment, including sexual violence, and benefit the alleged perpetrators, such as by permitting educational institutions to provide one-sided appellate rights, and in considering factors unrelated to Title IX's mandate in doing so, Defendants have acted in excess of their legal authority.

WHEREFORE, Plaintiffs pray that this Court:_____

1. Declare the Dear Colleague Letter and the Q&A issued in September 2017 unlawful;

2. Issue an injunction ordering Defendants to vacate the Dear Colleague Letter and the Q&A issued in September 2017;

3. Award Plaintiffs costs, attorneys' fees, and other disbursements for this action; and

4. Grant any other relief this Court deems appropriate.

DEMAND FOR JURY TRIAL.

Respectfully submitted,                                      Date: October 31April 18, 2018

/s/ Robin F. Thurston
Alice Y. Abrokwa*
Leecia Welch (CA Bar No. 208741)
Alice Y. Abrokwa*
Seth Galanter*
**National Center for Youth Law**
405 14th Street, 15th Floor
Oakland, CA 94612, *and*
1313 L Street, NW, Suite 130
Washington, DC 20005
Ph: (510) 835-8098
Fax: (510) 835-8099
Emails: lwelch@youthlaw.org, sgalanter@youthlaw.com, aabrokwa@youthlaw.org

Jennifer A. Reisch (CA Bar No. 223671)
**Equal Rights Advocates**
1170 Market Street, Suite 700
San Francisco, CA 94102

SecondThird Amended Complaint for Injunctive Relief; Case No.: 3:18-cv-00535-JSC
_____Page: 58

Ph: (415) 896-0672
Fax: (415) 231-0011
Email: jreish@equalrightsadvocates.org

Javier M. Guzman*
Robin Thurston*
Karianne Jones*
**Democracy Forward Foundation**
1333 H St. NW
Washington, DC 20005
Ph: (202) 448-9090
Fax: (202) 701-1775
Emails: jguzman@democracyforward.org, rthurston@democracyforward.org,
kjones@democracyforward.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
**National Women's Law Center**
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org, nchaudhry@nwlc.org, ~~etang@nwlc.org,~~ schandy@nwlc.org,

*Admitted pro hac vice*

*Counsel for Plaintiffs*