

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

**U.S. Department of Education**
*Office for Civil Rights*

### Notice of Language Assistance

**Notice of Language Assistance:**  If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN
(1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 **1-800-USA-LEARN (1-800-872-5327)** 또는 청각 장애인용 전화번호 **1-800-877-8339** 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

AR_00000001



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

September 22, 2017

Dear Colleague:

The purpose of this letter is to inform you that the Department of Education is withdrawing the statements of policy and guidance reflected in the following documents:

- Dear Colleague Letter on Sexual Violence, issued by the Office for Civil Rights at the U.S. Department of Education, dated April 4, 2011.

- Questions and Answers on Title IX and Sexual Violence, issued by the Office for Civil Rights at the U.S. Department of Education, dated April 29, 2014.

These guidance documents interpreted Title IX to impose new mandates related to the procedures by which educational institutions investigate, adjudicate, and resolve allegations of student-on-student sexual misconduct.  The 2011 Dear Colleague Letter required schools to adopt a minimal standard of proof—the preponderance-of-the-evidence standard—in administering student discipline, even though many schools had traditionally employed a higher clear-and-convincing-evidence standard.  The Letter insisted that schools with an appeals process allow complainants to appeal not-guilty findings, even though many schools had previously followed procedures reserving appeal for accused students.  The Letter discouraged cross-examination by the parties, suggesting that to recognize a right to such cross-examination might violate Title IX.  The Letter forbade schools from relying on investigations of criminal conduct by law-enforcement authorities to resolve Title IX complaints, forcing schools to establish policing and judicial systems while at the same time directing schools to resolve complaints on an expedited basis.  The Letter provided that any due-process protections afforded to accused students should not "unnecessarily delay" resolving the charges against them.

Legal commentators have criticized the 2011 Letter and the 2014 Questions and Answers for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[1]  As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[2]

The 2011 and 2014 guidance documents may have been well-intentioned, but those documents have

---

[1] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J. ONLINE (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[2] *Rethink Harvard's Sexual Harassment Policy*, BOSTON GLOBE (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty); *see also* ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS, RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT (2017); AMERICAN COLLEGE OF TRIAL LAWYERS, TASK FORCE ON THE RESPONSE OF UNIVERSITIES AND COLLEGES TO ALLEGATIONS OF SEXUAL VIOLENCE, WHITE PAPER ON CAMPUS SEXUAL ASSAULT INVESTIGATIONS (2017).

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.

AR_00000002

led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints. The guidance has not succeeded in providing clarity for educational institutions or in leading institutions to guarantee educational opportunities on the equal basis that Title IX requires. Instead, schools face a confusing and counterproductive set of regulatory mandates, and the objective of regulatory compliance has displaced Title IX's goal of educational equity.

The Department imposed these regulatory burdens without affording notice and the opportunity for public comment. Under these circumstances, the Department has decided to withdraw the above-referenced guidance documents in order to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits. The Department intends to implement such a policy through a rulemaking process that responds to public comment. The Department will not rely on the withdrawn documents in its enforcement of Title IX.

The Department refers you to the *Q&A on Campus Sexual Misconduct*, issued contemporaneously with this letter, and will continue to rely on its *Revised Sexual Harassment Guidance*, which was informed by a notice-and-comment process and issued in 2001,[3] as well as the reaffirmation of that *Guidance* in the Dear Colleague Letter on Sexual Harassment issued January 25, 2006.[4] As always, the Department's enforcement efforts proceed from Title IX itself[5] and its implementing regulations.[6]

In the forty-five years since the passage of Title IX, we have seen remarkable progress toward an educational environment free of sex discrimination. That progress resulted in large part from the vigorous enforcement of Title IX by the Office for Civil Rights at the Department of Education. The Department remains committed to enforcing these critical protections and intends to do so consistent with its mission under Title IX to protect fair and equitable access to education.

The Department has determined that this letter is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This letter does not add requirements to applicable law.[7]

Sincerely,

/s/

Candice Jackson
Acting Assistant Secretary for Civil Rights
U.S. Department of Education

---

[3] The *Revised Sexual Harassment Guidance* is available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.
[4] The 2006 Dear Colleague Letter is available at https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
[5] 20 U.S.C. §§ 1681-88.
[6] 34 C.F.R. § 106.1 *et seq.*; *see also* 34 C.F.R. § 668.46(k) (implementing requirements of the Violence Against Women Act).
[7] If you have questions or are interested in commenting on this letter, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

2



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**September 2017**

**<u>Q&A on Campus Sexual Misconduct</u>**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

<u>Question 1</u>:

What is the nature of a school's responsibility to address sexual misconduct?

<u>Answer</u>:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[2] 2001 Guidance at (VII).

[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

AR_00000004

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

2

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

3

AR_00000006

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

## INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

4

**DECISION-MAKING AS TO RESPONSIBILITY**

<u>Question 8</u>:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

<u>Answer</u>:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).
[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).
[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.
[22] 34 C.F.R. § 668.46(k)(2)(iii).
[23] 34 C.F.R. § 668.46(k)(2)(iv).

5

## DECISION-MAKING AS TO DISCIPLINARY SANCTIONS

Question 9:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

Answer:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

## NOTICE OF OUTCOME AND APPEALS

Question 10:

What information should be provided to the parties to notify them of the outcome?

Answer:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. See 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. See 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

6

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

## EXISTING RESOLUTION AGREEMENTS

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

*Note:* The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").

7

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Sossamon v. Texas, U.S., April 20, 2011

112 S.Ct. 1028
Supreme Court of the United States

Christine FRANKLIN, Petitioner,

v.

GWINNETT COUNTY PUBLIC
SCHOOLS and William Prescott.

No. 90–918.
|
Argued Dec. 11, 1991.
|
Decided Feb. 26, 1992.

**Synopsis**

High school student brought Title IX action, seeking damages for alleged intentional gender-based discrimination in connection with alleged sexual harassment and abuse by coach-teacher. The United States District Court for the Northern District of Georgia, Orinda D. Evans, J., dismissed. Student appealed. The Court of Appeals for the Eleventh Circuit, Henley, Senior Circuit Judge, sitting by designation, 911 F.2d 617, affirmed. Certiorari was granted. The Supreme Court, Justice White, held that damages remedy was available for action brought to enforce Title IX.

Reversed and remanded.

Justice Scalia filed opinion concurring in judgment in which Chief Justice Rehnquist and Justice Thomas joined.

West Headnotes (9)

[1]     **Civil Rights**
          Education
        Title IX is enforceable through implied right of action. Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C.A. §§ 1681–1688.

        253 Cases that cite this headnote

[2]     **Action**
          Statutory rights of action
        **Action**
          Statutory Remedies
        Question of what remedies are available under statute that provides private right of action is analytically distinct from issue of whether such right exists in the first place; thus, although court examines text and history of statute to determine whether Congress intended to create right of action, it presumes availability of all appropriate remedies unless Congress has expressly indicated otherwise.

        119 Cases that cite this headnote

[3]     **Action**
          Statutory Remedies
        Where legal rights have been invaded and federal statute provides for general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

        50 Cases that cite this headnote

[4]     **Action**
          Statutory Remedies
        Absent clear direction to the contrary by Congress, federal courts have power to award any appropriate relief in cognizable cause of action brought pursuant to federal statute.

        127 Cases that cite this headnote

[5]     **Civil Rights**
          Grounds and subjects;compensatory damages
        Damages remedy is available for action brought to enforce Title IX prohibiting exclusion from participation in, denial of benefits of, or discrimination under any education program or activity receiving Federal financial assistance, absent indication in text or history of statute that Congress intended to limit available remedies. Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C.A. §§ 1681–1688.

AR_00000011

Case 3:18-cv-00535-JSC   Document 134-2   Filed 06/03/19   Page 12 of 133

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

**539 Cases that cite this headnote**

**[6]    Constitutional Law**
   ⮡ Civil Remedies and Procedure

Unlike finding of cause of action, which authorizes court to hear case or controversy, discretion to award appropriate relief involves no such increase in judicial power, and thus exercise of such discretion does not violate separation of powers principles; federal courts cannot reach out to award remedies when Constitution or laws of United States do not support cause of action.

**26 Cases that cite this headnote**

**[7]    Action**
   ⮡ Statutory Remedies

**Action**
   ⮡ Cumulative or exclusive remedies

Presumption that remedies are limited under statutes enacted under Spending Clause of United States Constitution does not apply to intentional violations. U.S.C.A. Const. Art. 1, § 8, cl. 1.

**8 Cases that cite this headnote**

**[8]    Civil Rights**
   ⮡ Judgment and relief in general

Remedies permissible under Title IX are not limited to back pay and prospective relief; both those remedies are equitable in nature, and court must determine adequacy of remedy in law before resorting to equitable relief. Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C.A. §§ 1681–1688.

**42 Cases that cite this headnote**

**[9]    Civil Rights**
   ⮡ Grounds and subjects;compensatory damages

High school student who was allegedly subjected to sexual harassment and abuse could seek monetary damages under Title IX for alleged intentional gender-based discrimination; equitable remedy of prospective relief was clearly inadequate insofar as subject teacher no longer taught at that school and student no longer attended school in that system. Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C.A. §§ 1681–1688.

**382 Cases that cite this headnote**

 

**\*\*1029** *Syllabus* [*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner Franklin, a student in a high school operated by respondent school district, filed an action for damages in Federal District Court under Title IX of the Education Amendments of 1972, alleging, *inter alia,* that she had been subjected to continual sexual harassment and abuse by a teacher, Andrew Hill. After the complaint was filed, Hill resigned on the condition that all matters pending against him be dropped, and the school thereupon closed its investigation. The District Court subsequently dismissed the complaint on the ground that Title IX does not authorize an award of damages, and the Court of Appeals affirmed.

*Held:* A damages remedy is available for an action brought to enforce Title IX. Pp. 1032–1038.

(a) Title IX is enforceable through an implied right of action. *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560. P. 1032.

(b) The longstanding general rule is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute. See, *e.g., Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939; *Davis v. Passman,* 442 U.S. 228, 246–247, 99 S.Ct. 2264, 2278, 60 L.Ed.2d 846. Pp. 1032–1033.

AR_00000012

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

(c) This Court's adherence to the general rule has not eroded since *Bell.* See, *e.g., J.I. Case Co. v. Borak,* 377 U.S. 426, 433–435, 84 S.Ct. 1555, 1560–1561, 12 L.Ed.2d 423. In declaring that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a [constitutionally protected] right," *Davis,* 442 U.S., at 241, 99 S.Ct., at 2275, was not limiting the traditional presumption in favor of all appropriate relief to actions claiming constitutional violations. Rather it was merely attempting to decide whether a litigant had a "cause of action," a question that is analytically distinct from, and prior to, the one at issue: what relief, if any a litigant is entitled to receive, see *id.,* at 239, 99 S.Ct., at 2274. Nor did **1030 *Guardians Assn. v. Civil Service Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866, and *Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568, erode the traditional presumption. In fact, those cases support it, since a clear majority in *Guardians* expressed the view that damages were available in an action seeking remedies for an intentional violation of a statute *61 closely analogous to Title IX, while a unanimous Court in *Darrone* held that another such statute authorized the award of backpay. Pp. 1034–1035.

(d) Congress did not intend to limit the remedies available in a Title IX suit. Because the *Cannon* Court inferred a cause of action upon concluding that Title IX supported no express right of action, the silence of the pre-*Cannon* statutory text and legislative history on the issue of available remedies is neither surprising nor enlightening. Rather, the appropriate inquiry for the pre-*Cannon* period is the state of the law when Congress passed Title IX. Since, at that time, the traditional presumption in favor of all available remedies was firmly established, and this Court had recently found implied rights of action in six cases and approved a damages remedy in three of them, the lack of any legislative intent to abandon the traditional presumption is amply demonstrated. For the post-*Cannon* period, when Congress was legislating with full cognizance of that decision, analysis of the text and history of the two statutes enacted to amend Title IX—the Civil Rights Remedies Equalization Amendment of 1986 and the Civil Rights Restoration Act of 1987—establishes that Congress validated *Cannon*'s holding and made no effort to alter the traditional presumption. Pp. 1035–1037.

(e) The argument that a damages award would unduly expand the federal courts' power into a sphere properly reserved to the Executive and Legislative Branches in violation of separation of powers principles misconceives the difference between a cause of action and a remedy. Unlike the finding of a cause of action, which authorizes a court to hear a case or controversy, the discretion to award appropriate relief involves no such increase in judicial power and, in fact, historically has been thought necessary to provide an important safeguard against legislative and executive abuses and to insure an independent Judiciary. Moreover, selective adjudication of the sort advocated here would harm separation of powers by giving judges the power to render inutile causes of action authorized by Congress through a decision that *no* remedy is available. P. 1037.

(f) Also rejected is the contention that the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power. The Court's observation in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28–29, 101 S.Ct. 1531, 1545–46, 67 L.Ed.2d 694, that remedies are limited under Spending Clause statutes when the alleged violation is *unintentional* is based on the theory that an entity receiving federal funds lacks notice that it will be liable for damages for such a violation, see *id.,* at 17, 101 S.Ct., at 1539. This notice problem does not arise in a case such as the present, where intentional discrimination is alleged and is proscribed by the statute in question. Moreover, the notion that Spending Clause statutes do not authorize monetary awards *62 for intentional violations is belied by the unanimous holding in *Darrone, supra,* 465 U.S., at 628, 104 S.Ct., at 1251. Pp. 1037–1038.

(g) The assertion that Title IX remedies should nevertheless be limited to backpay and prospective relief diverges from this Court's traditional approach to deciding what remedies are available for violation of a federal right. Both suggested remedies are equitable in nature, and it is axiomatic that a court should determine the adequacy of damages at law before resorting to equitable relief. Moreover, both suggested remedies are clearly inadequate in that they would **1031 provide Franklin no relief: backpay because she was a student when the alleged discrimination occurred, and prospective relief because she no longer attends school in respondent system and Hill no longer teaches there. P. 1038.

AR_00000013

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

911 F.2d 617 (CA11 1985), reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which REHNQUIST, C.J., and THOMAS, J., joined, *post,* p. 1038.

**Attorneys and Law Firms**

Joel I. Klein, Washington, D.C., for petitioner.

Albert M. Pearson, III, Athens, Ga., for respondents.

Stephen L. Nightingale, Washington, D.C., for respondents as amicus curiae.

**Opinion**

Justice WHITE delivered the opinion of the Court.

This case presents the question whether the implied right of action under Title IX of the Education Amendments of **\*63** 1972, 20 U.S.C. §§ 1681–1688 (Title IX),[1] which this Court recognized in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), supports a claim for monetary damages.

[1]    This statute provides in pertinent part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

I

Petitioner Christine Franklin was a student at North Gwinnett High School in Gwinnett County, Georgia, between September 1985 and August 1989. Respondent Gwinnett County School District operates the high school and receives federal funds. According to the complaint filed on December 29, 1988, in the United States District Court for the Northern District of Georgia, Franklin was subjected to continual sexual harassment beginning in the autumn of her tenth grade year (1986) from Andrew Hill, a sports coach and teacher employed by the district. Among other allegations, Franklin avers that Hill engaged her in sexually oriented conversations in which he asked about her sexual experiences with her boyfriend and whether she would consider having sexual intercourse with an older man, Complaint ¶ 10; First Amended Complaint, Exh. A, p. 3;[2] that Hill forcibly kissed her on the mouth in the school parking lot, Complaint ¶ 17; that he telephoned her at her home and asked if she would meet him socially, Complaint ¶ 21; First Amended Complaint, Exh. A, pp. 4–5; and that, on three occasions in her junior year, Hill interrupted a class, requested that the teacher excuse Franklin, and took her to a private office where he subjected her to coercive intercourse, Complaint ¶¶ 25, 27, 32. The complaint further alleges that though **\*64** they became aware of and investigated Hill's sexual harassment of Franklin and other female students, teachers and administrators took no action to halt it and discouraged Franklin from pressing charges against Hill. Complaint ¶¶ 23, 24, 35. On April 14, 1988, Hill resigned on the condition that all matters pending against him be dropped. Complaint ¶¶ 36, 37. The school thereupon closed its investigation. Complaint ¶ 37.

[2]    This exhibit is the report of the United States Department of Education's Office for Civil Rights based on that office's investigation of this case. Franklin incorporated this exhibit into her amended complaint.

In this action,[3] the District Court dismissed the complaint on the ground that **\*\*1032** Title IX does not authorize an award of damages. The Court of Appeals affirmed. 911 F.2d 617 (CA11 1990). The court noted that analysis of Title IX and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Title VI), has developed along similar lines. Citing as binding precedent *Drayden v. Needville Independent School Dist.,* 642 F.2d 129 (CA5 1981), a decision rendered prior to the division of the Fifth Circuit, the court concluded that Title VI did not support a claim for monetary damages. The court then analyzed this Court's decision in *Guardians Assn. v. Civil Service Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), to determine whether it implicitly overruled *Drayden.* The court stated that the absence of a majority opinion left unresolved the question whether a court could award such relief upon a showing of intentional discrimination. As a second basis for its holding that monetary damages were unavailable, the court reasoned that Title IX was enacted under Congress' Spending Clause powers and that **\*65** "[u]nder such statutes, relief may frequently be limited to that which is

AR_00000014

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

equitable in nature, with the recipient of federal funds thus retaining the option of terminating such receipt in order to rid itself of an injunction." 911 F.2d, at 621. [4] The court closed by observing it would "proceed with extreme care" to afford compensatory relief absent express provision by Congress or clear direction from this Court. *Id.,* at 622. Accordingly, it held that an action for monetary damages could not be sustained for an alleged intentional violation of Title IX, and affirmed the District Court's ruling to that effect. *Ibid.* [5]

3    Prior to bringing this lawsuit, Franklin filed a complaint with the Office for Civil Rights of the United States Department of Education (OCR) in August 1988. After investigating these charges for several months, OCR concluded that the school district had violated Franklin's rights by subjecting her to physical and verbal sexual harassment and by interfering with her right to complain about conduct proscribed by Title IX. OCR determined, however, that because of the resignations of Hill and respondent William Prescott and the implementation of a school grievance procedure, the district had come into compliance with Title IX. It then terminated its investigation. First Amended Complaint, Exh. A, pp. 7–9.

4    The court also rejected an argument by Franklin that the terms of outright prohibition of Title VII, 42 U.S.C. §§ 2000e to 2000e–17, apply by analogy to Title IX's antidiscrimination provision, and that the remedies available under the two statutes should also be the same. 911 F.2d, at 622. Because Franklin does not pursue this contention here, we need not address whether it has merit.

5    Judge Johnson concurred specially, writing that the result was controlled by *Drayden v. Needville Independent School Dist.,* 642 F.2d 129 (CA5 1981), and that there was no need to address whether Titles VI and IX are grounded solely in the Spending Clause and whether Title VII analysis should apply to an action under Titles VI or IX. See 911 F.2d, at 622–623.

Because this opinion conflicts with a decision of the Court of Appeals for the Third Circuit, see *Pfeiffer v. Marion Center Area School Dist.,* 917 F.2d 779, 787–789 (1990), we granted certiorari, 501 U.S. 1204, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991). We reverse.

II

[1] [2]   In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court held that Title IX is enforceable through an implied right of action. We have no occasion here to reconsider that decision. Rather, in this case we must decide what remedies are available in a suit brought pursuant to this implied right. As we have often stated, the question of what remedies are available under a statute that provides a private right of action is "analytically distinct" from the issue *66 of whether such a right exists in the first place. *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Thus, although we examine the text and history of a statute to determine whether Congress intended to create a right of action, *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. *Davis, supra,* 442 U.S., at 246–247, 99 S.Ct., at 2277–2278. This principle has deep roots in our jurisprudence.

**1033 A

[3]   "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). The Court explained this longstanding rule as jurisdictional and upheld the exercise of the federal courts' power to award appropriate relief so long as a cause of action existed under the Constitution or laws of the United States. *Ibid.*

The *Bell* Court's reliance on this rule was hardly revolutionary. From the earliest days of the Republic, the Court has recognized the power of the Judiciary to award appropriate remedies to redress injuries actionable in federal court, although it did not always distinguish clearly between a right to bring suit and a remedy available under such a right. In *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), for example, Chief Justice Marshall observed that our Government "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high

AR_00000015

appellation, if the laws furnish no remedy for the violation of a vested legal right." This principle originated in the English common law, and Blackstone described it as "a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded." 3 W. Blackstone, Commentaries 23 (1783). See also *Ashby v. White,* 1 Salk. 19, 21, *67 87 Eng.Rep. 808, 816 (Q.B.1702) ("If a statute gives a right, the common law will give a remedy to maintain that right ...").

In *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), the Court applied these principles to an Act of Congress that accorded a right of action in mail carriers to sue for adjustment and settlement of certain claims for extra services but which did not specify the precise remedy available to the carriers. After surveying possible remedies, which included an action against the Postmaster General for monetary damages, the Court held that the carriers were entitled to a writ of mandamus compelling payment under the terms of the statute. "It cannot be denied but that congress had the power to command that act to be done," the Court stated; "and the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist. And if the remedy cannot be applied by the circuit court of this district, it exists nowhere." *Id.,* at 624. *Dooley v. United States,* 182 U.S. 222, 229, 21 S.Ct. 762, 764, 45 L.Ed. 1074 (1901), also restated "the principle that a liability created by statute without a remedy may be enforced by a common-law action."

The Court relied upon this traditional presumption again after passage of the Federal Safety Appliance Act of 1893, ch. 196, 27 Stat. 531. In *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), the Court first had to determine whether the Act supported an implied right of action. After answering that question in the affirmative, the Court then upheld a claim for monetary damages: "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law...." *Id.,* at 39, 36 S.Ct., at 484. The foundation upon which the *Bell v. Hood* Court articulated this traditional

presumption, therefore, *68 was well settled. See also *Texas & New Orleans R. Co. v. Railway Clerks,* 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930).

**1034 B

Respondents and the United States as *amicus curiae,* however, maintain that whatever the traditional presumption may have been when the Court decided *Bell v. Hood,* it has disappeared in succeeding decades. We do not agree. In *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Court adhered to the general rule that all appropriate relief is available in an action brought to vindicate a federal right when Congress has given no indication of its purpose with respect to remedies. Relying on *Bell v. Hood,* the *Borak* Court specifically rejected an argument that a court's remedial power to redress violations of the Securities Exchange Act of 1934 was limited to a declaratory judgment. 377 U.S., at 433–434, 84 S.Ct., at 1560. The Court concluded that the federal courts "have the power to grant all necessary remedial relief" for violations of the Act. *Id.,* at 435, 84 S.Ct., at 1561. As Justice Clark's opinion for the Court observed, this holding closely followed the reasoning of a similar case brought under the Securities Act of 1933, in which the Court had stated:

" 'The power *to enforce* implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case.' " *Id.,* at 433–434, 84 S.Ct., at 1560 (quoting *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 288, 61 S.Ct. 229, 233, 85 L.Ed. 189 (1940)).

That a statute does not authorize the remedy at issue "in so many words is no more significant than the fact that it does not in terms authorize execution to issue on a judgment." *Id.,* at 288, 61 S.Ct., at 233. Subsequent cases have been true to this position. *69 See, e.g., Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969), stating that the "existence of a statutory right implies the existence of all necessary and appropriate remedies"; *Carey v. Piphus,* 435 U.S. 247, 255, 98 S.Ct. 1042, 1048, 55 L.Ed.2d 252 (1978), upholding damages remedy under Rev.Stat. § 1979, 42 U.S.C. § 1983,

AR_00000016

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

even though the enacting Congress had not specifically provided such relief.

The United States contends that the traditional presumption in favor of all appropriate relief was abandoned by the Court in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and that the *Bell v. Hood* rule was limited to actions claiming constitutional violations. The United States quotes language in *Davis* to the effect that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Davis,* 442 U.S., at 241, 99 S.Ct., at 2275. The Government's position, however, mirrors the very misunderstanding over the difference between a cause of action and the relief afforded under it that sparked the confusion we attempted to clarify in *Davis.* Whether Congress may limit the class of persons who have a right of action under Title IX is irrelevant to the issue in this lawsuit. To reiterate, "the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Id.,* at 239, 99 S.Ct., at 2274. *Davis,* therefore, did nothing to interrupt the long line of cases in which the Court has held that if a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief. See *id.,* at 247, n. 26, 99 S.Ct., at 2278, n. 26 (contrasting *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)). [6]

6    Cases cited by respondents and the United States since *Davis* are inapposite, either because they involved holdings that plaintiffs had no right of action, see, *e.g., Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *Karahalios v. Federal Employees,* 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); or because the Court rejected a claim for damages under a statute

that expressly enumerated the remedies available to plaintiffs, *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

**\*\*1035** **[4]** **\*70** Contrary to arguments by respondents and the United States that *Guardians Assn. v. Civil Service Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), and *Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), eroded this traditional presumption, those cases in fact support it. Though the multiple opinions in *Guardians* suggest the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action. See *Guardians,* 463 U.S., at 595, 103 S.Ct., at 3229 (WHITE, J., joined by REHNQUIST, J.); *id.,* at 607–611, 103 S.Ct., at 3235–3237 (Powell, J., concurring in judgment, joined by Burger, C.J.); *id.,* at 612, and n. 1, 103 S.Ct., at 3237, and n. 1 (O'CONNOR, J., concurring in judgment); *id.,* at 624–628, 103 S.Ct., at 3244–3246 (Marshall, J., dissenting); *id.,* at 636, 103 S.Ct., at 3250 (STEVENS, J., dissenting, joined by Brennan and BLACKMUN, JJ.). The correctness of this inference was made clear the following Term when the Court unanimously held that the 1978 amendment to § 504 of the Rehabilitation Act of 1973—which had expressly incorporated the "remedies, procedures, and rights set forth in title VI" (29 U.S.C. § 794a(a)(2))—authorizes an award of backpay. In *Darrone,* the Court observed that a majority in *Guardians* had "agreed that retroactive relief is available to private plaintiffs for all discrimination ... that is actionable under Title VI." 465 U.S., at 630, n. 9, 104 S.Ct., at 1252 n. 9. The general rule, therefore, is that absent clear direction to the contrary by **\*71** Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

III

**[5]** We now address whether Congress intended to limit application of this general principle in the enforcement of Title IX. See *Bush v. Lucas,* 462 U.S. 367, 378, 103 S.Ct. 2404, 2411–2412, 76 L.Ed.2d 648 (1983); *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 200, 88 S.Ct. 379, 385, 19 L.Ed.2d 407 (1967). Because the

AR_00000017

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)
112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

cause of action by the Court in *Cannon,* the usual recourse to statutory text and legislative history in the period prior to that decision necessarily will not enlighten our analysis. Respondents and the United States fundamentally misunderstand the nature of the inquiry, therefore, by needlessly dedicating large portions of their briefs to discussions of how the text and legislative intent behind Title IX are "silent" on the issue of available remedies. Since the Court in *Cannon* concluded that this statute supported no express right of action, it is hardly surprising that Congress also said nothing about the applicable remedies for an implied right of action.

During the period prior to the decision in *Cannon,* the inquiry in any event is *not* " 'basically a matter of statutory construction,' " as the United States asserts. Brief for United States as *Amicus Curiae* 8 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979)). Rather, in determining **\*\*1036** Congress' intent to limit application of the traditional presumption in favor of all appropriate relief, we evaluate the state of the law when the Legislature passed Title IX. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 378, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982). In the years before and after Congress enacted this statute, the Court "follow[ed] a common-law tradition [and] regarded the denial of a remedy as the exception rather than the rule." *Id.,* at 375, 102 S.Ct., at 1837 (footnote omitted). As we outlined in Part II, this has been the prevailing presumption in our federal **\*72** courts since at least the early 19th century. In *Cannon,* the majority upheld an implied right of action in part because in the decade immediately preceding enactment of Title IX in 1972, this Court had found implied rights of action in six cases.[7] In three of those cases, the Court had approved a damages remedy. See, *e.g., J.I. Case Co.,* 377 U.S., at 433, 84 S.Ct., at 1560; *Wyandotte Transportation Co., supra,* 389 U.S., at 207, 88 S.Ct., at 389; *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Wholly apart from the wisdom of the *Cannon* holding, therefore, the same contextual approach used to justify an implied right of action more than amply demonstrates the lack of any legislative intent to abandon the traditional presumption in favor of all available remedies.

[7]    *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d

407 (1967); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); and *Superintendent of Ins. of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

In the years *after* the announcement of *Cannon,* on the other hand, a more traditional method of statutory analysis is possible, because Congress was legislating with full cognizance of that decision. Our reading of the two amendments to Title IX enacted after *Cannon* leads us to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX. In the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d–7, Congress abrogated the States' Eleventh Amendment immunity under Title IX, Title VI, § 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. This statute cannot be read except as a validation of *Cannon* 's holding. A subsection of the 1986 law provides that in a suit against a State, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a **\*73** State." 42 U.S.C. § 2000d–7(a)(2). While it is true that this saving clause says nothing about the nature of those other available remedies, cf. *Milwaukee v. Illinois,* 451 U.S. 304, 329, n. 22, 101 S.Ct. 1784, 1798–1799, n. 22, 68 L.Ed.2d 114 (1981), absent any contrary indication in the text or history of the statute, we presume Congress enacted this statute with the prevailing traditional rule in mind.

In addition to the Rehabilitation Act Amendments of 1986, Congress also enacted the Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 28. Without in any way altering the existing rights of action and the corresponding remedies permissible under Title IX, Title VI, § 504 of the Rehabilitation Act, and the Age Discrimination Act, Congress broadened the coverage of these antidiscrimination provisions in this legislation. In seeking to correct what it considered to be an unacceptable decision on our part in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), Congress made no effort to restrict the right of action recognized in *Cannon* and ratified in the 1986 Act or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right. We cannot say, therefore,

AR_00000018

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

that Congress has limited **\*\*1037** the remedies available to a complainant in a suit brought under Title IX.


# IV

Respondents and the United States nevertheless suggest three reasons why we should not apply the traditional presumption in favor of appropriate relief in this case.


# A

[6]   First, respondents argue that an award of damages violates separation of powers principles because it unduly expands the federal courts' power into a sphere properly reserved to the Executive and Legislative Branches. Brief for Respondents 22–25. In making this argument, respondents misconceive the difference between a cause of action and a remedy. Unlike the finding of a cause of action, which authorizes a court to hear a case or controversy, the discretion **\*74** to award appropriate relief involves no such increase in judicial power. See generally Note, Federal Jurisdiction in Suits for Damages Under Statutes Not Affording Such Remedy, 48 Colum.L.Rev. 1090, 1094–1095 (1948). Federal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action. Indeed, properly understood, respondents' position invites us to *abdicate* our historic judicial authority to award appropriate relief in cases brought in our court system. It is well to recall that such authority historically has been thought necessary to provide an important safeguard against abuses of legislative and executive power, see *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), as well as to ensure an independent Judiciary. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in *Bell v. Hood,* 117 U.Pa.L.Rev. 1, 16–17 (1968). Moreover, selective abdication of the sort advocated here would harm separation of powers principles in another way, by giving judges the power to render inutile causes of action authorized by Congress through a decision that *no* remedy is available.


# B

[7]   Next, consistent with the Court of Appeals' reasoning, respondents and the United States contend that the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to Congress' Spending Clause power. In *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28–29, 101 S.Ct. 1531, 1545–1546, 67 L.Ed.2d 694 (1981), the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was *unintentional.* Respondents and the United States maintain that this presumption should apply equally to *intentional* violations. We disagree. The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. See *id.,* at 17, 101 S.Ct., at 1540. This notice problem does **\*75** not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe. Moreover, the notion that Spending Clause statutes do not authorize monetary awards for intentional violations is belied by our unanimous holding in *Darrone.* See 465 U.S., at 628, 104 S.Ct., at 1251. Respondents and the United States characterize the backpay remedy in *Darrone* as equitable relief, but this description is irrelevant to their underlying objection: that application of the traditional rule in this case will require state entities to pay **\*\*1038** monetary awards out of their treasuries for intentional violations of federal statutes.[8]

---

[8]     Franklin argues that, in any event, Title IX should not be viewed solely as having been enacted under Congress' Spending Clause powers and that it also rests on powers derived from § 5 of the Fourteenth Amendment. See Brief for Petitioner 19, n. 10. Because we conclude that a money damages remedy is available under Title IX for an intentional violation irrespective of the constitutional source of Congress' power to enact the statute, we need not decide which power Congress utilized in enacting Title IX.

AR_00000019

Case 3:18-cv-00535-JSC   Document 134-2   Filed 06/03/19   Page 20 of 133

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)
112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

C

**[8]**   **[9]**   Finally, the United States asserts that the remedies permissible under Title IX should nevertheless be limited to backpay and prospective relief. In addition to diverging from our traditional approach to deciding what remedies are available for violation of a federal right, this position conflicts with sound logic. First, both remedies are equitable in nature, and it is axiomatic that a court should determine **\*76** the adequacy of a remedy in law before resorting to equitable relief. Under the ordinary convention, the proper inquiry would be whether monetary damages provided an adequate remedy, and if not, whether equitable relief would be appropriate. *Whitehead v. Shattuck,* 138 U.S. 146, 150, 11 S.Ct. 276, 276, 34 L.Ed. 873 (1891). See generally C. McCormick, Damages 1 (1935). Moreover, in this case the equitable remedies suggested by respondent and the Federal Government are clearly inadequate. Backpay does nothing for petitioner, because she was a student when the alleged discrimination occurred. Similarly, because Hill—the person she claims subjected her to sexual harassment—no longer teaches at the school and she herself no longer attends a school in the Gwinnett system, prospective relief accords her no remedy at all. The Government's answer that administrative action helps other similarly situated students in effect acknowledges that its approach would leave petitioner remediless.

V

In sum, we conclude that a damages remedy is available for an action brought to enforce Title IX. The judgment of the Court of Appeals, therefore, is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

Justice SCALIA, with whom THE CHIEF JUSTICE and Justice THOMAS join, concurring in the judgment.
The substantive right at issue here is one that Congress did not expressly create, but that this Court found to be "implied." See *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Quite obviously, the search for what was Congress' *remedial*

intent as to a right whose very existence Congress did not expressly acknowledge is unlikely to succeed, see *ante,* at 1035–1036; it is "hardly surprising," as the Court says, *ibid.,* that the usual sources yield no explicit answer.

**\*77**   The Court finds an implicit answer, however, in the legislators' presumptive awareness of our practice of using "any available remedy" to redress violations of legal rights. *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946); see *ante,* at 1036–1037. This strikes me as question begging. We can plausibly assume acquiescence in our *Bell v. Hood* presumption when the Legislature says nothing about remedy in expressly creating a private right of action; perhaps even when it says nothing about remedy in creating a private right of action by clear textual implication; but not, I think, when it says nothing about remedy in a statute in which the courts divine a private right of action on the basis of "contextual" evidence such as that in *Cannon,* which charged Congress with knowledge of a court of appeals' creation of a cause of action under a similarly worded statute. See *Cannon, supra,* 441 U.S., at 696–698, 99 S.Ct., at 1957–58. Whatever one thinks of the validity of the last **\*\*1039** approach, it surely rests on attributed rather than actual congressional knowledge. It does not demonstrate an explicit legislative decision to create a cause of action, and so could not be expected to be accompanied by a legislative decision to alter the application of *Bell v. Hood.* Given the nature of *Cannon* and some of our earlier "implied right of action" cases, what the Court's analytical construct comes down to is this: Unless Congress expressly legislates a more limited remedial policy with respect to rights of action it does not know it is creating, it intends the full gamut of remedies to be applied.

In my view, when rights of action are judicially "implied," categorical limitations upon their remedial scope may be judicially implied as well. Cf. *Cort v. Ash,* 422 U.S. 66, 84–85, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1975). Although we have abandoned the expansive rights-creating approach exemplified by *Cannon,* see *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 23–24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979)—and perhaps ought to abandon the notion of implied causes of action entirely, see *Thompson v. Thompson,* 484 U.S. 174, 191, 108 S.Ct. 513, 522, 98 L.Ed.2d 512 (1988) (SCALIA, J., concurring **\*78** in judgment)—causes of action that came

AR_00000020

Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)

112 S.Ct. 1028, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293...

into existence under the *ancien regime* should be limited by the same logic that gave them birth. To require, with respect to a right that is not consciously and intentionally created, that any limitation of remedies must be express, is to provide, in effect, that the most questionable of private rights will also be the most expansively remediable. As the United States puts it, "[w]hatever the merits of 'implying' rights of action may be, there is no justification for treating [congressional] silence as the equivalent of the broadest imaginable grant of remedial authority." Brief for United States as *Amicus Curiae* 12–13.

I nonetheless agree with the Court's disposition of this case. Because of legislation enacted subsequent to *Cannon,* it is too late in the day to address whether a judicially implied exclusion of damages under Title IX would be appropriate. The Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7(a)(2), must be read, in my view, not only "as a validation of *Cannon*'s holding," *ante,* at 1036, but also as an implicit acknowledgment that damages are available. See 42 U.S.C. § 2000d–7(a)(1) (withdrawing the States' Eleventh Amendment immunity); § 2000d–7(a)(2) (providing that, in suits against States, "remedies (including remedies both at law and in equity) are available for [violations of Title IX] to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State"). I therefore concur in the judgment.

## All Citations

503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208, 59 Fair Empl.Prac.Cas. (BNA) 213, 58 Empl. Prac. Dec. P 41,293, 60 USLW 4167, 72 Ed. Law Rep. 32

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

AR_00000021



# HARVARD
## Office of the Provost

# 2015-2016

# Title IX Office Annual Report



Harvard University Title IX Office

44R Brattle Street, 2nd Floor

Cambridge, MA 02138

AR_00000022

*The Title IX Office, including the Office for Sexual and Gender-Based Dispute Resolution (ODR), operates under the Office of the Provost. The Title IX Officer is responsible for, and is committed to, ensuring equal access to University programs and activities and promoting diversity and inclusion based on sex, including sexual orientation and gender identity.*

**Letter from Mia Karvonides, Title IX Officer and Director of ODR**



This is an extraordinary moment in education. More than ever, the voices of students, faculty, and staff at Harvard University are inspiring groundbreaking initiatives to promote gender equity and inclusion, and combat sexual harassment – including sexual assault, and gender-based harassment – with promising outcomes.

Since the Title IX Office opened its doors in March 2013, we have served as a central resource for community members by providing pathways for individuals who may have experienced sexual or gender-based harassment to receive individualized supports. We also address these issues on a systemic level through our network of 52[1] Title IX Coordinators, and through comprehensive prevention and education programming, including trainings across the University.

When a formal complaint is filed and ODR finds there is a hostile environment for one or multiple members of our community, the ODR Investigative Team together with the involved School or unit create tailored recommended measures to identify concrete action steps to remedy the underlying problem and prevent its recurrence. This holistic approach works to improve outcomes both for individuals and the broader community.

In designating Title IX services in a central office with capacity to support local Title IX Coordinators, Harvard has demonstrated an ongoing commitment to its community members and has continued to improve the University's culture around these issues. In April 2014, Harvard President Drew Faust convened a University-wide Task Force on the Prevention of Sexual Assault which included members from across the University's 13 Schools. The resulting Final Report (the "Task Force Report"), released in March 2016, outlined detailed findings and recommendations to improve the University's response to, and prevention of, sexual assault. Along with partner offices, Schools, and the Office of Sexual Assault Prevention & Response (OSAPR), the Title IX Office has taken immediate steps to implement the recommendations and continues to collaborate with stakeholders across every School and unit.

Another source of community feedback that will continue to influence our work is the Harvard University Campus Climate Survey on Sexual Assault and Sexual Misconduct, organized by the Association of American Universities (AAU), surveying students in the spring of 2015. The resulting report ("Harvard AAU Report") was released in September 2015.

As I read through the survey results, I was deeply concerned by the number of participants who identified having experienced sexual assault and sexual harassment during their career at Harvard. What also troubled me were the number of students who reported having low knowledge of and trust in the

---

[1] This represents the total number of Title IX Coordinators as of June 30, 2016 and since established in August of 2013, the number has fluctuated between 50 and 55.

1

University resources dedicated to addressing these issues. During the 2015-2016 school year (and on an ongoing basis), one of my main priorities was to continue to build our community's awareness of their options and improve their trust in the Title IX Office, ODR, and Title IX Coordinators. Sexual and gender-based harassment are underreported, nationally and at Harvard. My goal is that every Harvard community member in need connects with a person with the expertise and position to help. Meaningful progress is for these individuals to feel safe to come forward and to be supported when they do so.

While the Task Force Report and AAU survey inform our work, the scope of our programming is much broader than the student voices captured in those efforts. For example, we focus on providing services to other community members in addition to students, including staff and faculty. As our office has grown over the last two years, Title IX Coordinators are becoming better known in each School and unit. We often see and encourage the full spectrum of our community members – students, faculty, and staff – to work with Title IX Coordinators while also accessing other services, such as OSAPR, Harvard Chaplains, health services, the Employee Assistance Program (EAP), and/or Harvard University Police Department (HUPD).

Under the leadership of Donald H. Pfister, former interim Dean of Harvard College and current Asa Gray Professor of Systematic Botany and Curator of the Farlow Library and Herbarium, the University convened the Title IX Policy Review Advisory Committee in February 2016. This committee of faculty and students from across Harvard is in the process of reviewing the University-wide Sexual and Gender-Based Harassment Policy ("Policy") and procedures as implemented by our Office. As requested by the Committee, we continue to provide consultation, ODR program documentation, data, and other information to inform their review, while protecting the privacy of those who have engaged our services. We welcome this close assessment by the Committee and look forward to the insights and ideas that will be generated by this important work.

I am incredibly grateful for this opportunity to share our Office's first Annual Report, which focuses on our activities during 2015-2016 and provides background information on the type of programs we offer. The highlights below reflect the action steps we've taken toward our goals and are consistent with the Task Force recommendations and lessons learned from the Harvard AAU Report.

*2015-2016 Highlights*

- Compared to 2014-2015 (ODR's first year), there was an almost 60 percent increase in the number of complaints filed.
- Our Office was involved in delivering 96 audience-tailored trainings and presentations, which included community members from across Harvard.
- We continued to support and build expertise within the network of 52 Title IX Coordinators across all Schools and units.
- Last year, our Office experienced significant growth by instituting a "pipeline program" to recruit and promote diverse staff with specialized professional backgrounds, thus increasing our efficiency, reach, and timeliness, while continuing to maintain the high quality of our service to the University community.
- Title IX Office and ODR staff members also continued to hone and advance our skills base, receiving more than 200 hours of professional development training in subjects including sexual assault forensics, the neurobiology of trauma, and mental health issues in the workplace.

2

I hope you find this report helpful and thank you for the opportunity to partner with you in this important work.

P.S. Jumping to the present, we are excited to unveil our new mobile-optimized Title IX Resource Guide, which can be accessed via http://resourceguide.titleix.harvard.edu/.

November 29, 2016

# Table of Contents

I.    Overview of Services: Title IX Office, Title IX Coordinators, and ODR ................................ 3

II.   Meet the Team ................................................................................................................ 6

III.  Community Response Initiatives ................................................................................... 10

IV.   Community Engagement Programming .......................................................................... 11

V.    ODR – Equitable, Prompt, Sensitive, and Thorough Dispute Resolution ........................... 13

VI.   Conclusion .................................................................................................................... 17

      Appendix A: Abridged List of Harvard Resources ......................................................... 17

## I.    Overview of Services: Title IX Office, Title IX Coordinators, and ODR

The Title IX Office, 52 Title IX Coordinators, and ODR play a central role in addressing concerns regarding sex discrimination in a fair manner, with the ultimate goal of ensuring that all community members have full, equal access to University programs and activities regardless of sex, sexual orientation, and/or gender identity. University programs and activities include, for example: access to the Harvard facilities, academic courses and events, employment opportunities, and off-campus activities sponsored at the local School or unit level.

There is no place at Harvard for **sex discrimination** – this includes sexual harassment and sexual violence, as well as gender-based harassment, which encompasses harassment based on sex-stereotyping, sexual orientation, and/or gender identity.

The Title IX Office and ODR are located at:
44R Brattle Street, 2nd Floor
Cambridge, MA 02138

Title IX Office
Phone: (617) 496-0200
Fax: (617) 496-5641
Email: titleix@harvard.edu
Website: http://titleix.harvard.edu/

ODR
Phone: (617) 495-3786
Fax: (617) 496-5641
Email: odr@harvard.edu
Website: http://odr.harvard.edu/

3

A. Title IX Structure at Harvard



B. Options for Supportive Services

The Title IX Office provides a multi-pronged approach to addressing issues of sexual or gender-based harassment impacting the Harvard community. Individuals making disclosures, and those alleged to have committed sexual and/or gender-based harassment, have access to a range of options and resources to choose from – including both informal and formal avenues for seeking assistance and resolving disputes. The options, explained below, are designed to appropriately address the particular behavior at issue, while maintaining fairness and providing due process.

Individuals seeking more information may meet with a member of the Title IX Office, ODR, and/or their Title IX Coordinator to learn about the options and resources available, and ask questions.

i.  *Disclosure with Interim Measures*

Disclosures with interim measures represent the majority of Title IX Office and Coordinator activity. Most individuals who disclosed an incident of potential sexual or gender-based harassment in 2015-2016 chose to engage their Title IX Coordinator for these informal supports and did not file a formal complaint with ODR. Interim measures are individualized supports to help students, faculty, and staff who may have experienced incidents of sexual or gender-based harassment continue to fully participate in University programs and activities. Title IX Coordinators work with these individuals to develop robust supports designed to address particular concerns and prevent those issues from recurring. Coordinators also monitor interim measures and work with the individual to make any changes, as appropriate.

AR_00000026

An individual may request interim measures at any time and, where appropriate, without engaging in other University options – such as informal resolution or filing a complaint with ODR. If informal resolution or an ODR complaint are utilized, interim measures may be put in place throughout those processes. Where an individual files a complaint with ODR, following the ODR investigation, additional measures may be put in place, and interim measures may become permanent.

Consistent with School or unit policy, interim measures might include, among others:

- Extensions of time or other course-related adjustments
- Alterations to course schedules or work schedules
- Working with HUPD to arrange for a campus escort
- Restrictions on contact between parties
- Changes in work locations
- Changes in housing
- Leaves of absence
- Increased monitoring of certain areas of the campus

## ii. *Informal Resolution*

Informal resolution is a voluntary process through which the party initiating the request identifies specific allegations and, with the assistance of their Title IX Coordinator or ODR, addresses those allegations through a written agreement that is mutually acceptable to both parties and the School or unit Title IX Coordinator. At any point prior to such resolution, the party who initiated the request may withdraw the request for informal resolution and initiate a formal complaint under the applicable procedures. Ordinarily, the informal resolution process will be concluded within two to three weeks of the date of the request. Once the parties have reached an express agreement through informal resolution, ODR will not investigate a complaint based on the same scope of allegations. Some allegations may not be appropriate for informal resolution, for example: allegations that may indicate sexual assault or sexual violence.

## iii. *ODR Investigation*

An individual may file a complaint with ODR, either on their own behalf or on behalf of another individual, alleging a violation of the Policy (or the policy in effect at the time of the conduct, if different). Pursuant to the Policy, ODR has been charged with implementing the University's procedures for students,[2] staff,[3] and, in almost all schools, faculty. ODR, in a neutral role and overseen by the University Title IX Officer, works in partnership with the Schools and units to carry out these responsibilities.

Once a complaint is received by ODR, the Title IX Officer will assign the case to an Investigator. Typically, the Investigator is assisted by one Title IX Associate or Title IX Fellow on each case, with oversight by the Lead Investigator and the Title IX Officer. The School or unit with which the

---

[2] With the exception of Harvard Law School (HLS) students, for whom a separate set of procedures applies.

[3] ODR began investigating staff cases on March 6, 2015 when the University-wide staff procedures took effect.

5

Respondent (the person who is alleged in the Complaint to have engaged in conduct prohibited by the Policy) is affiliated may designate an additional individual (a "designee") to work jointly with the Investigator (collectively, the "Investigative Team"). Investigators and designees have the appropriate training to ensure they possess the specialized skills and understanding to conduct prompt, fair, and effective investigations.

<u>Findings and Determination</u>

Acting as a neutral, in each case ODR makes findings of fact, applying a preponderance of the evidence standard ("more likely than not"), and determines based on those findings of fact whether a Policy violation has occurred. At the conclusion of the investigation, ODR issues a final report that is provided to both parties, the School or unit Title IX Coordinator, and the appropriate officer for disciplinary matters in the School or unit.

The applicable procedures set out reasonably prompt timeframes for investigations, taking into account the complexity of any case and the severity and extent of the alleged conduct.

<u>Appeal</u>

Both parties may appeal the decision based on specific procedural grounds (outlined in the applicable procedures) and must submit their appeal within one week of the date of the final report.

<u>Sanctioning</u>

When ODR finds a Policy violation has occurred, the imposition of disciplinary sanctions will be considered separately by the appropriate officials at the Respondent's School or unit. ODR does not determine sanctioning.

## II.   Meet the Team

*Title IX Office*

***Mia Karvonides***
**Title IX Officer and Director of ODR**



Mia began as Harvard University's inaugural Title IX Officer in March 2013 and assumed additional responsibilities as the Director of ODR in September 2014. In these roles and as a member of the Office's leadership team, she oversees and coordinates the University's initiatives to prevent and address sexual and gender-based harassment. Mia is responsible for ensuring compliance across the University with Title IX, related provisions of the Violence Against Women Act, and other related federal and state laws pertaining to sex discrimination. Having represented schools in private practice and held appointments at both the state and federal level, Mia came to Harvard with 12 years of experience in education law and civil rights, including investigating cases of alleged sex, race, national origin, and disability discrimination. Prior to entering law, Mia worked as a Bowdoin College administrator for 5 years. She is a licensed attorney and holds a

AR_00000028

B.A. from Wheaton College and a J.D. from Vermont Law School. For 3 years, Mia served on the board of a Boston-based non-profit serving pregnant and parenting teens.

*Nicole Merhill*
**Deputy Title IX Officer**



As a member of the Office's leadership team, Nicole leads education programming and prevention efforts in the Title IX Office and continues to support and build expertise within the group of 52 Title IX Coordinators across the University. She has more than 15 years of civil rights experience in various protected class statuses, including sex, race, color, national origin, disability, and age. She holds a bachelor's degree in Elementary Education and English from Purdue University and a J.D. from University of New Hampshire School of Law.

*Alexandria ("Alex") Masud*
**Title IX Department Administrator**



As a member of the Office's leadership team, Alex oversees the operational and financial status of the office by evaluating all ongoing projects for adherence to long-term strategic and multi-year financial plans. She has a B.A. in Philosophy of Law with a concentration in French Literature from Albion College. Prior to Harvard, she spent over a decade working in the business management and institutional asset management fields.

*Sara Rattigan*
**Title IX Administrator**



Sara coordinates monthly programming for the 52 Title IX Coordinators and recurring trainings for the other University stakeholders who engage with the Title IX Office and ODR. She works closely with Nicole to develop new strategic prevention and education initiatives. Sara has more than six years of experience in the field of public health, including community interventions (to promote injury prevention), data collection, and engaging with community and government stakeholders. She holds a B.A. from Fordham University with a major in Theatre Arts and a minor in Communications & Media Studies and an M.S. in Health Communication from Tufts University School of Medicine.

AR_00000029

*Erika Christensen*
**Title IX Program Coordinator**



Erika is the friendly face welcoming visitors to the Office and supports our projects by conducting research, event planning and coordination, and developing web content. She has a B.A. in the Studies of Women, Gender, & Sexuality from Harvard College. Prior to joining our Office, she worked to support at-risk communities by developing suicide mitigation strategies. She also worked as a national campaign recruiter during the 2016 presidential primaries.

*ODR*

*William ("Bill") McCants*
**Lead Investigator and Deputy Title IX Officer**



As a member of the Office's leadership team, Bill supervises the ODR staff, ensures timely and high-quality complaint resolution processes, and develops and delivers extensive University-wide training. He came to the Office in August 2014 with over 12 years of experience in civil rights investigations on the federal and state levels, in various protected class statuses, including sex, race, color, national origin, disability, and age. A graduate of HLS and a licensed attorney, Bill has master's degrees in psychology (FAS/DCE) and criminal justice (Northeastern University). He holds a bachelor's degree from UCLA in History with a minor in Economics. A secondary schoolteacher for eight years, Bill taught U.S. and European History and Psychology, the latter two subjects at the advanced placement (AP) level. He has also served as a co-Head of House in MIT undergraduate and graduate housing for over 14 years.

*Ilissa Povich*
**Title IX Investigator**



Ilissa has conducted investigations and facilitated trainings with ODR since its inception in the fall of 2014. A graduate of HLS and a licensed attorney, Ilissa previously worked at a major Boston law firm and as General Counsel of a Boston area company. She holds a bachelor's degree from Duke University in Public Policy Studies and Economics. Ilissa has taught legal writing to new lawyers and summer associates. She is also an active volunteer in her local community and has served in leadership roles in education.

8

*Brigid Harrington*
**Title IX Investigator**



Brigid has been a licensed attorney for 11 years and is in her second year conducting ODR investigations and facilitating trainings as an Investigator. She previously conducted criminal investigations as an Assistant District Attorney in New York, where she was assigned to the Special Investigations Bureau of the Special Narcotics Prosecutor, and has worked as a civil litigator in Boston. Brigid has a B.A. from the University of Pennsylvania and a J.D. from Boston College.

*Betsy Noel*
**Title IX Investigator**



Betsy joined ODR in August of 2014 as a Fellow and now conducts investigations and facilitates trainings as an Investigator. She is a licensed attorney and registered nurse with a background in health, health policy, nonprofits, and higher education. She obtained a B.A. from Yale in 2006, a nursing degree from Johns Hopkins University School of Nursing in 2008, and her J.D. from Columbia in 2014. Betsy continues to serve as a resident tutor at the College and has been in that role for 5 years.

*Julia Sáenz*
**Title IX Associate**
**(Currently serving in interim role as Assistant Deputy Title IX Officer)**



Julia is an alumna of the University's Administrative Fellowship Program (AFP). As Title IX Associate, she assists the ODR investigators in conducting investigations, conducting legal research, and facilitating trainings. In her current interim role as Assistant Deputy Title IX Officer, Julia has separated from the work of ODR in order to support the 52 Title IX Coordinators in responding to disclosures. Julia is a licensed attorney with a bachelor's degree in social work from New York University and a J.D. from Boston University School of Law. Prior to coming to Harvard, she worked in the civil rights, clinical social work, and public policy fields providing services to LGBTQ and immigrant clients. She also serves as a volunteer tutor for elementary and middle school students and is fluent in Spanish.

*Annie Chan*
**Title IX Fellow**



Annie is a participant in AFP and as Title IX Fellow, assists the ODR investigators in conducting investigations, conducting legal research, and facilitating trainings. She is a licensed attorney with a bachelor's degree in Politics from New York University and a J.D. from Emory University School of Law. Before coming to Harvard, she practiced law with a non-profit organization. Annie also works with middle school, high school, and college students as a tutor in test preparation and academics. She is fluent in Mandarin Chinese.

9

## III.     Community Response Initiatives

A. *Title IX Coordinators: Sensitive, Discrete Expertise and Positioned to Help*

Harvard has designated 52 Title IX Coordinators with affiliations across every School and unit of the University to assure that every student, faculty, and staff member has access to support at the local level. Title IX Coordinators serve in a neutral role and help address issues of equity and inclusion pertaining to sex (including sexual harassment), sexual orientation, and gender identity. In 2015-2016, the Title IX Office provided ongoing individualized coaching to Coordinators, who responded to hundreds of disclosures, and assisted in: providing robust supports designed to address particular concerns and prevent them from recurring; monitoring for evolving patterns; and helping constituents to access University and community resources.

The Title IX Office's support for Coordinators also includes monthly 90-minute continuing education trainings on subjects relevant to Title IX and sexual and gender-based discrimination. In 2015-2016, trainings covered topics such as sexual harassment and cross-cultural communications, academic freedom, and responding to disclosures. Guest speakers also presented on Task Force-recommended topics such as bystander intervention and LGBTQ cultural competency.

As emphasized earlier, when Title IX Coordinators receive a disclosure of possible sexual or gender-based harassment, they provide multiple options to each individual who may have been affected. In 2015-2016, the vast majority of people who worked with Title IX Coordinators chose to use interim measures, which can be modified as the person's needs change over time. Harvard's Title IX system promotes the self-determination of these individuals and recognizes that though they may not initially be ready to file a complaint with ODR, they may do so down the road, or they made decide to continue to receive supports without engaging their other options. In the interim, and regardless of whether they decide to proceed with a formal complaint, they receive individualized supports from the time of the initial disclosure to the Coordinator.

The Task Force Report noted that our Title IX Coordinators, "who were appointed and trained in the summer of 2013, have already seen a significant increase in the number of students requesting support."[4] In 2015-2016, the Title IX Office saw a steady increase in the number of students, faculty, staff, and other community members accessing services. It is anticipated that this trend will continue as the office builds further confidence in, and awareness of, those resources.

Our goal is that each individual impacted by sexual or gender-based harassment will connect with a Title IX Coordinator – either directly or through a friend, colleague, mentor – to receive timely information and the supports they need to fully participate in their day-to-day routine at Harvard. This not only helps improve outcomes on the individual level, it also enables Title IX Coordinators to track and address patterns, and create comprehensive solutions for their entire School or unit community and the University at large.

Below is one example of this growing trend, capturing the marked increase over a three-year period in Harvard College undergraduate students connecting with their Title IX Coordinators for support.

---

[4] Task Force Report at 9.

AR_00000032

**Snapshot: Increased Disclosures to the Title IX Coordinators at Harvard College**

In 2015-2016, 121 students connected with the two Title IX Coordinators for students at Harvard College to disclose incidents of potential sexual or gender-based harassment and receive supports – a significant increase from the two prior years.* This is just one example from two of the 52 Title IX Coordinators across the University.

**Example: Disclosures to Title IX Coordinators for One School (Harvard College)**



*The increase in the number of disclosures over this time period may be attributed, in part, to a greater awareness of University resources.*

## IV.   Community Engagement Programming

A.   *Education & Training*

Through education and training initiatives, the Title IX Office provided the University community with information, tools, and resources to promote healthy and inclusive interactions between students, faculty, staff, and other community members. We also delivered targeted programming to the many University resources who provide supportive services and link individuals to other professionals and peers, including Title IX Coordinators, OSAPR, and EAP.

University training participants included, for example:

- OSAPR
- Harvard Chaplains
- Bureau of Study Council
- Office of BGLTQ Student Life
- Sexual Assault and Sexual Harassment ("SASH") and other Tutors
- Student peer counselors

11

- Managers at Schools and units across the University
- Harvard University Health Services Counseling and Mental Health staff



### i. *Collaborative Resource Development*

**FAQs & Community Engagement:**
- In October 2015, the Title IX Office released its first round of FAQs, which focused on questions about the Policy and procedures for the broader Harvard community. Outreach included prerelease notices to student leaders and *The Harvard Crimson*;
- We then engaged with student groups (Undergraduate and Graduate Councils, Our Harvard Can Do Better, Harvard Students Demand Respect, and SASH Advisors) over a four-month period to identify and develop student-centered questions. We continued to work with student groups to develop a set of FAQs released in April 2016.

**Prevention & Awareness Resources:**
- Created and distributed printed materials, including 15,300 copies of the Sexual Violence Brochure (which incorporated significant student input) to students, faculty, and staff, including an Undergraduate Council-initiated door drop in the Yard; and
- Assisted in the development of the College's "Sharing Information with the Title IX Coordinator" poster that was subsequently shared across all Schools; and reviewed and assisted with the creation of the Global Support Services-designed Sexual Harassment/Sexual Violence brochure for student travelers.

### B. *Enhanced Supports for LGBTQ Students, Faculty, and Staff*

- **Community Training:** In response to the May 2016 OCR *Dear Colleague Letter on Transgender Students*, we provided specialized training to the faculty/staff Title IX Coordinators on issues related to gender identity and expression in the employment context, with a focus on cultural competency. We also provided training to the full group of 52 Title IX Coordinators in recent developments and best practices for serving the LGBTQ communities in an informed, sensitive way.

12

- **Culturally Competent Resources:** We revised content on the Title IX Office website to promote inclusivity of resources for the LGBTQ communities, consistent with the Task Force recommendation to enhance resources for this population. Along with OSAPR, all Title IX/ODR staff attended half-day training on LGBTQ awareness offered by the *Fenway Health Violence Recovery Program* and *GLBTQ Domestic Violence Project*.

## V.   ODR – Equitable, Prompt, Sensitive, and Thorough Dispute Resolution

As with our first year, each case ODR investigated was unique and highly complex. A summary of ODR complaint processing in 2015-2016,[5] with comparisons to 2014-2015, is provided below:

- ODR received 26 new complaints in 2015-2016, compared to 15 complaints in 2014-2015.
- Complaints in 2015-2016 involved parties from 11 Schools and units.
- Approximately half of the complaints were resolved before progressing to a full investigation (i.e., administrative closure, voluntary shift to informal resolution).
- One complaint was resolved through informal resolution in less than two months.

*Timing*: The ODR staff cut almost a month off the average length of investigations in comparison with 2014-2015. Average length of investigation for student cases: 5.4 months (2014-2015), 4.7 months (2015-2016).[6] The decrease in investigation time can be attributed in part to the fact that ODR became fully staffed in 2015-2016. ODR ensures that its investigators are as thorough as possible, and we continue to work to make the process move more quickly while maintaining the same quality, fairness, and sensitivity.

Many factors affect the length of the investigation in a particular case, for example:
- The type and total number of allegations per complaint;
- The nature and volume of the documentation submitted as evidence;
- The number of witnesses interviewed;
- Scheduling challenges, such as: academic obligations (e.g., exams, final projects); University holidays; and parties' and/or witnesses' travel abroad;
- Extensions in time granted to parties to designate their respective personal advisors, which may include attorneys

One of the strengths of our Policy, in contrast to those of many peer institutions, is that we have one standard that applies to a range of behaviors. As a result, more frequently than not, we see in one complaint allegations that include a constellation of conduct such as sexual assault, stalking (including through electronic means), and a pattern of comments targeting an individual based on sex-stereotyping, sexual orientation, and/or gender identity. The Policy takes into account that an individual may have experienced multiple types of prohibited behavior, during one or more incidents. This standard allows us

---

[5] This report reflects ODR case data through June 30, 2016. Case data is presented without identifying information so as to protect the privacy of the individuals involved. The sexual and gender-based harassment data in this report will not correspond to Harvard's annual report required under the federal Clery Act because this annual report uses definitions of prohibited conduct that are more expansive than the Clery reportable offenses and also includes cases from a wider geographic jurisdiction than in the Clery report.

[6] The average length of investigation was not calculated for staff cases because the population was too small.

AR_00000035

to be responsive to the broader array of conduct that may be negatively affecting someone's life at Harvard. Accordingly, a single case against one respondent may contain multiple allegations.

In addition, another advantage of our Policy is that we don't stop at determining whether the conduct occurred. We also assess whether a hostile environment has been created by evaluating the impact of the conduct on the person who came forward and, potentially, on other individuals.

> **Data on the number of Policy violations can be viewed through two different lenses: by case or by allegation. Of the total cases that went to full investigation (all involving students and staff), approximately two-thirds were found to involve violations of the Policy, although only approximately one-third of the total number of allegations brought in those cases were found to be Policy violations. (Figures 1 and 2)**

**Figure 1. Full Investigations, Known Student Respondent:
Outcome by Case and Allegation,[7] 2014-2016**



---

[7] Many complaints contain more than one allegation. Policy violation determinations must be made separately for each allegation. If one or more allegations in a complaint result in the finding of a Policy violation, this is counted as a single "Policy Violation, by Case."

14

**Figure 2. Full Investigations, Known Staff Respondent:[8]
Outcome by Case and Allegation, 2014-2016**



Case Demographics 2015-2016:

- Just fewer than half of the complaints were filed by or on behalf of students (divided almost equally between undergraduate and graduate/professional School students); the second largest number were filed by or on behalf of staff, followed by third parties and faculty. (Figure 3)
- In all but three of the cases that went to full investigation, the principals, prior to the incident, either had interacted in a work context, in the course of a program or activity, or were engaged in a dating/romantic relationship or a friendship prior to the incident. This is consistent with national data.[9]

---

[8] This category includes all non-faculty positions.

[9] *See*, *e.g.*, Cantor, David ET AL., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, xvii (Sept. 21, 2015), https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/AAU_Campus_Climate_Survey_12_14_15.pdf (the majority of undergraduate and graduate/professional students surveyed indicated the sexual harassment "offender" was known to them prior to the incident) and U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *National Crime Victimization Survey*, 2010-2014 (2015), *available at* https://www.bjs.gov/index.cfm?ty=dcdetail&iid=245#Methodology.

AR_00000037

**Figure 3. University Status of Complainant, All Case Types, 2014-2016 (n=41)[10][11]**

|  | 2014-2015 | 2015-2016 |
|---|---|---|
| **Student** | 13 | 12 |
| **Staff** | 0 | 10 |
| **Faculty** | 0 | 1 |
| **Third Party** | 2 | 3 |

**Figure 4. University Status of Respondent, All Case Types, 2014-2016 (n=41)**

|  | 2014-2015 | 2015-2016 |
|---|---|---|
| **Student** | 13 | 10 |
| **Staff** | 0 | 10 |
| **Faculty** | 2 | 4 |
| **Third Party** | 0 | 1 |
| **Unknown** | 0 | 1 |

---

[10] "Complainant" includes Reporter filing on behalf of a party. Of the 11 student Complainants for 2014-2015, 7 were undergraduate and 4 were graduate or professional. Two of these 11 complaints were filed by Reporters on behalf of students. Of the 9 student Complainants for 2015-2016, 5 were undergraduate and 4 were graduate or professional. Three of these 9 complaints were filed by Reporters on behalf of students.

[11] A party is categorized based on their University status at the time of the alleged conduct. Thus, for example, a former student who is alleging harassment that occurred while they were a student is not counted, for the purposes of this data, as a "third party." (The same is true for staff. There have been no complaints thus far brought by or against former faculty members.)

16

AR_00000038

**Figure 5. Gender of the Principals,[12] All ODR Cases, 2014-2016
(Complainant v. Respondent),[13] [14] (n=88)**



## VI.    Conclusion

The 2015-2016 period featured significant growth in the Title IX Office's staff and programming, and in the number of community members who sought support from our Office, including ODR, and from the University's 52 Title IX Coordinators. Our goal is for each person seeking information and resources to receive a sensitive, knowledgeable, and timely response. The Title IX Office will continue to work to earn the trust of our community while increasing awareness of these issues and partnering effectively with other stakeholders.

---

[12] For the purposes of this chart, "principals" include the individuals on whose behalf a complaint was filed.

[13] The terminology used for these categories are the self-disclosed gender identifications of the principals in ODR cases to date (i.e., through June 30, 2016).

[14] "Female and Male v. Male" refers to a complaint filed on behalf of multiple female staff members and multiple male staff members.

AR_00000039

## APPENDIX A: ABRIDGED LIST OF HARVARD RESOURCES

For a comprehensive list of resources, visit our Title IX Resource Guide at
http://resourceguide.titleix.harvard.edu/.

- Title IX Office
- Title IX Coordinators
- Office for Sexual and Gender-Based Dispute Resolution (ODR)
- Office for Sexual Assault Prevention and Response (OSAPR)
- Harvard University Police Department (HUPD)
- Harvard University Health Services (HUHS)
- Harvard University Counseling and Mental Health (CAMHS)
- Harvard University Health Services Behavioral Health
- Harvard Chaplains
- Bureau of Study Counsel
- University Ombudsman Office
- Ombuds Office – Longwood
- Employee Assistance Program (EAP)

18

AR_00000040



# NOT ALONE

The First Report of the White House Task Force to
Protect Students From Sexual Assault

April 2014



AR_00000041



**President Barack Obama signs the Presidential Memorandum establishing the White House Task Force to Protect Students From Sexual Assault on January 22, 2014. (Official White House Photo by Lawrence Jackson)**

*Sexual violence is more than just a crime against individuals. It threatens our families, it threatens our communities; ultimately, it threatens the entire country. It tears apart the fabric of our communities. And that's why we're here today -- because we have the power to do something about it as a government, as a nation. We have the capacity to stop sexual assault, support those who have survived it, and bring perpetrators to justice.*

**President Barack Obama, January 22, 2014**

*Freedom from sexual assault is a basic human right… a nation's decency is in large part measured by how it responds to violence against women… our daughters, our sisters, our wives, our mothers, our grandmothers have every single right to expect to be free from violence and sexual abuse.*

**Vice President Joe Biden, January 22, 2014**

AR_00000042

*This report was prepared by the White House Task Force to Protect Students From Sexual Assault.*

*The Task Force is Co-Chaired by the Office of the Vice President and the White House Council on Women and Girls.*

AR_00000043

# Table of Contents

Executive Summary.........................................................................2

Introduction....................................................................................6

Our First Task: Listening ................................................................6

I.   How Best to Identify the Problem: Campus Climate Surveys ..........7

II.  Preventing Sexual Assault on Campus............................................9

III. Responding Effectively When a Student is Sexually Assaulted......11

IV. Improving the Federal Government's Enforcement Efforts, and
     Making Them More Transparent ................................................16

Next Steps ..................................................................................20

AR_00000044

# Executive Summary

## Why We Need to Act

One in five women is sexually assaulted in college.  Most often, it's by someone she knows – and also most often, she does not report what happened.  Many survivors are left feeling isolated, ashamed or to blame.  Although it happens less often, men, too, are victims of these crimes.

The President created the Task Force to Protect Students From Sexual Assault to turn this tide.  As the name of our new website – NotAlone.gov – indicates, we are here to tell sexual assault survivors that they are not alone.  And we're also here to help schools live up to their obligation to protect students from sexual violence.

Over the last three months, we have had a national conversation with thousands of people who care about this issue.  Today, we offer our first set of action steps and recommendations.

## 1.  Identifying the Problem: Campus Climate Surveys

The first step in solving a problem is to name it and know the extent of it – and a campus climate survey is the best way to do that.  We are providing schools with a toolkit to conduct a survey – and we urge schools to show they're serious about the problem by conducting the survey next year.  The Justice Department, too, will partner with Rutgers University's Center on Violence Against Women and Children to pilot, evaluate and further refine the survey – and at the end of this trial period, we will explore legislative or administrative options to require schools to conduct a survey in 2016.

## 2.  Preventing Sexual Assault – and Engaging Men

Prevention programs can change attitudes, behavior – and the culture.  In addition to identifying a number of promising prevention strategies that schools can undertake now, we are also researching new ideas and solutions.  But one thing we know for sure: we need to engage men as allies in this cause.  Most men are not perpetrators – and when we empower men to step in when someone's in trouble, they become an important part of the solution.

As the President and Vice President's new Public Service Announcement puts it: if she doesn't consent – or can't consent – it's a crime.  And if you see it happening, help her, don't blame her, speak up.  We are also providing schools with links and information about how they can implement their own bystander intervention programs on campus.

## 3.  Effectively Responding When a Student Is Sexually Assaulted

When one of its students is sexually assaulted, a school needs to have all the pieces of a plan in place.  And that should include:

### Someone a survivor can talk to in confidence

While many victims of sexual assault are ready to file a formal (or even public) complaint against an alleged offender right away – many others want time and privacy to sort through their next steps.  For some, having a confidential place to go can mean the difference between getting help and staying silent.

AR_00000045

Today, we are providing schools with a model reporting and confidentiality protocol – which, at its heart, aims to give survivors more control over the process.  Victims who want their school to fully investigate an incident must be taken seriously – and know where to report.  But for those who aren't quite ready, they need to have – and know about – places to go for confidential advice and support.

That means a school should make it clear, up front, who on campus can maintain a victim's confidence and who can't – so a victim can make an informed decision about where best to turn. A school's policy should also explain when it may need to override a confidentiality request (and pursue an alleged perpetrator) in order to help provide a safe campus for everyone.  Our sample policy provides recommendations for how a school can strike that often difficult balance, while also being ever mindful of a survivor's well-being.

New guidance from the Department of Education also makes clear that on-campus counselors and advocates – like those who work or volunteer in sexual assault centers, victim advocacy offices, women's and health centers, as well as licensed and pastoral counselors – can talk to a survivor in confidence.  In recent years, some schools have indicated that some of these counselors and advocates cannot maintain confidentiality.  This new guidance clarifies that they can.

## A comprehensive sexual misconduct policy

We are also providing a checklist for schools to use in drafting (or reevaluating) their own sexual misconduct policies.  Although every school will need to tailor a policy to its own needs and circumstances, all schools should be sure to bring the key stakeholders – including students – to the table.  Among other things, this checklist includes ideas a school could consider in deciding what is – or is not – consent to sexual activity.  As we heard from many students, this can often be the essence of the matter – and a school community should work together to come up with a careful and considered understanding.

## Trauma-informed training for school officials

Sexual assault is a unique crime: unlike other crimes, victims often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress.  Starting this year, the Justice Department, through both its Center for Campus Public Safety and its Office on Violence Against Women, will develop trauma-informed training programs for school officials and campus and local law enforcement. The Department of Education's National Center on Safe and Supportive Learning Environments will do the same for campus health centers.  This kind of training has multiple benefits: when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable.

## Better school disciplinary systems

Many sexual assault survivors are wary of their school's adjudication process – which can sometimes subject them to harsh and hurtful questioning (like about their prior sexual history) by students or staff unschooled in the dynamics of these crimes.  Some schools are experimenting with new models – like having a single, trained investigator do the lion's share of the fact-finding – with very positive results.  We need to learn more about these promising new ideas. And so starting this year, the Justice Department will begin assessing different models for

AR_00000046

investigating and adjudicating campus sexual assault cases with an eye toward identifying best practices.

The Department of Education's new guidance also urges some important improvements to many schools' current disciplinary processes: questions about the survivor's sexual history with anyone other than the alleged perpetrator should not be permitted; adjudicators should know that the mere fact of a previous consensual sexual relationship does not itself imply consent or preclude a finding of sexual violence; and the parties should not be allowed to personally cross-examine each other.

### Partnerships with the community

Because students can be sexually assaulted at all hours of the day or night, emergency services should be available 24 hours a day, too. Other types of support can also be crucial – like longer-term therapies and advocates who can accompany survivors to medical and legal appointments. Many schools cannot themselves provide all these services, but in partnership with a local rape crisis center, they can. So, too, when both the college and the local police are simultaneously investigating a case (a criminal investigation does not relieve a school of its duty to itself investigate and respond), coordination can be crucial. So we are providing schools with a sample agreement they can use to partner with their local rape crisis center – and by June, we will provide a similar sample for forging a partnership with local law enforcement.

## 4.   Increasing Transparency and Improving Enforcement

### More transparency and information

The government is committed to making our enforcement efforts more transparent – and getting students and schools more resources to help bring an end to this violence. As part of this effort, we will post enforcement data on our new website – NotAlone.gov – and give students a roadmap for filing a complaint if they think their school has not lived up to its obligations.

Among many other things on the website, sexual assault survivors can also locate an array of services by typing in their zip codes, learn about their legal rights, see which colleges have had enforcement actions taken against them, get "plain English" definitions of some complicated legal terms and concepts; and find their states' privacy laws. Schools and advocates can access federal guidance, learn about relevant legislation, and review the best available evidence and research. We invite everyone to take a look.

### Improved Enforcement

Today, the Department of Education's Office for Civil Rights (OCR) is releasing a 52-point guidance document that answers many frequently asked questions about a student's rights, and a school's obligations, under Title IX. Among many other topics, the new guidance clarifies that Title IX protects all students, regardless of their sexual orientation or gender identity, immigration status, or whether they have a disability. It also makes clear that students who report sexual violence have a right to expect their school to take steps to protect and support them, including while a school investigation is pending. The guidance also clarifies that recent amendments to the Clery Act do not alter a school's responsibility under Title IX to respond to and prevent sexual violence.

AR_00000047

OCR is also strengthening its enforcement procedures in a number of ways – by, for example, instituting time limits on negotiating voluntary resolution agreements and making clear that schools should provide survivors with interim relief (like changing housing or class schedules) pending the outcome of an OCR investigation.  And OCR will be more visible on campus during its investigations, so students can help give OCR a fuller picture about what's happening and how a school is responding.

The Departments of Education and Justice, which both enforce Title IX, have entered into an agreement to better coordinate their efforts – as have the two offices within the Department of Education charged with enforcing Title IX and the Clery Act.

## Next Steps

This report is the first step in the Task Force's work.  We will continue to work toward solutions, clarity, and better coordination.  We will also review the various laws and regulations that address sexual violence for possible regulatory or statutory improvements, and seek new resources to enhance enforcement.  Also, campus law enforcement officials have special expertise to offer – and they should be tapped to play a more central role.  We will also consider how our recommendations apply to public elementary and secondary schools – and what more we can do to help there.

* * *

The Task Force thanks everyone who has offered their wisdom, stories, expertise, and experiences over the past 90 days.  Although the problem is daunting and much of what we heard was heartbreaking, we are more committed than ever to helping bring an end to this violence.

AR_00000048

# Introduction

For too many of our nation's young people, college doesn't turn out the way it's supposed to.

One in five women is sexually assaulted while in college.[1]  Most often, it happens her freshman or sophomore year.[2]  In the great majority of cases (75-80%), she knows her attacker, whether as an acquaintance, classmate, friend or (ex)boyfriend.[3]  Many are survivors of what's called "incapacitated assault": they are sexually abused while drugged, drunk, passed out, or otherwise incapacitated.[4]  And although fewer and harder to gauge, college men, too, are victimized.[5]

The Administration is committed to turning this tide.  The White House Task Force to Protect Students From Sexual Assault was established on January 22, 2014, with a mandate to strengthen federal enforcement efforts and provide schools with additional tools to help combat sexual assault on their campuses.  Today, we are taking a series of initial steps to:

1. **Identify the scope of the problem on college campuses;**
2. **Help prevent campus sexual assault;**
3. **Help schools respond effectively when a student is assaulted; and**
4. **Improve, and make more transparent, the federal government's enforcement efforts.**

As the Task Force recognized at the outset, campus sexual assault is a complicated, multi-dimensional problem with no easy or quick solutions.  These initial recommendations do not purport to find or even identify all of them.  Our work is not over.[6]

---

[1]    Krebs, C.P., Lindquist, C.H., Warner, T.D., Fisher, B.S., & Martin, S.L. (2007). *The Campus Sexual Assault (CSA) Study*. Washington, DC: National Institute of Justice, U.S. Department of Justice.; Krebs, C.P., Lindquist, C.H., Warner, T.D., Fisher, B.S., & Martin, S.L. (2009). College Women's Experiences with Physically Forced, Alcohol- or Other Drug-Enabled, and Drug-Facilitated Sexual Assault Before and Since Entering College. *Journal of American College Health*, 57(6), 639-647.

[2]    Krebs et al., *The Campus Sexual Assault (CSA) Study*.

[3]    *Ibid.*

[4]    *Ibid.; see also* Kilpatrick, D.G., Resnick, H.S., Ruggiero, K.J., Conoscenti, L.M., & McCauley, J. (2007). *Drug Facilitated, Incapacitated, and Forcible Rape: A National Study*. Charleston, SC: Medical University of South Carolina, National Crime Victims Research & Treatment Center.

[5]    The *CSA Study* found that 6.1% of college males were victims of ether attempted or completed sexual assault. Although many advocates prefer to use the term "survivor" to describe an individual who has been sexually assaulted, the term "victim" is also widely used.  This document uses the terms interchangeably and always with respect for those who have been subjected to these crimes.

[6]    This first Task Force report focuses on sexual assault at postsecondary institutions – such as colleges, universities, community colleges, graduate and professional schools, and trade schools – that receive federal financial assistance. Thus, our use of the term "schools" refers to these postsecondary institutions.

AR_00000049

# Our First Task: Listening

Many people are committed to solving this problem. To hear as many of their views as possible, the Task Force held 27 listening sessions (12 webinars and 15 in-person meetings) with stakeholders from across the country: we heard from survivors; student activists; faculty, staff and administrators from schools of all types; parents; alumni; national survivors' rights and education associations; local and campus-based service providers and advocates; law enforcement; civil rights activists; school general counsels; men's and women's groups; Greek organizations; athletes; and researchers and academics in the field. Thousands of people joined the conversation.

Not surprisingly, no one idea carried the day. But certain common themes did emerge. Many schools are making important strides and are searching in earnest for solutions. A new generation of student activists is effectively pressing for change, asking hard questions, and coming up with innovative ways to make our campuses safer.

Even so, many problems loom large. Prevention and education programs vary widely, with many doing neither well. And in all too many instances, survivors of sexual violence are not at the heart of an institution's response: they often do not have a safe, confidential place to turn after an assault, they haven't been told how the system works, and they often believe it is working against them. We heard from many who reached out for help or action, but were told they should just put the matter behind them.

Schools, for their part, are looking for guidance on their legal obligations and best practices to keep students safe. Many participants called on the federal government to improve and better coordinate our enforcement efforts, and to be more transparent. And there was another constant refrain: get men involved. Most men are not perpetrators – and when we empower men to speak up and intervene when someone's in trouble, they become an important part of the solution.

## I.   How Best to Identify the Problem: Campus Climate Surveys

When then-Senator Joe Biden wrote the Violence Against Women Act 20 years ago, he recognized a basic truth: no problem can be solved unless we name it and know the extent of it. That is especially true when it comes to campus sexual assault, which is chronically underreported: only 2% of incapacitated sexual assault survivors, and 13% of forcible rape survivors, report the crime to campus or local law enforcement.[7]

The reasons for non-reporting (whether to a school or to law enforcement) vary. Many survivors of acquaintance rape don't call what happened to them rape and often blame themselves. One report found that 40% of college survivors feared reprisal by the perpetrator.[8] Survivors also cite

---

[7]   Krebs et al., *The Campus Sexual Assault (CSA) Study*.
[8]   Sampson, Rana (2002). *Acquaintance Rape of College Students*; Washington, DC: Office of Community Oriented Policing Services, U.S. Department of Justice.

AR_00000050

fear of treatment by authorities, not knowing how to report, lack of independent proof, and not wanting families or other students to find out what happened.[9]  Still others don't report because they don't want to participate in a formal college adjudication process.[10]

For colleges and universities, breaking the cycle of violence poses a unique challenge.  When a school tries to tackle the problem – by acknowledging it, drawing attention to it, and encouraging survivors to report – it can start to look like a dangerous place.  On the flip side, when a school ignores the problem or discourages reporting (either actively or by treating survivors without care), it can look safer.  Add to this the competition for top students or a coveted spot on a college rankings list – and a school might think it can outshine its neighbor by keeping its problem in the shadows.

We have to change that dynamic.

Schools have to get credit for being honest – and for finding out what's really happening on campus.  Reports to authorities, as we know, don't provide a fair measure of the problem.  But a campus climate survey can.  When done right, these surveys can gauge the prevalence of sexual assault on campus, test students' attitudes and awareness about the issue, and provide schools with an invaluable tool for crafting solutions.  And so:

- **We are providing schools with a new toolkit for developing and conducting a climate survey**. This guide explains the methods for conducting an effective survey – and contains a set of evidence-based sample questions to get at the answers.

- **We call on colleges and universities to voluntarily conduct the survey next year.** Again, a school that is willing to get an accurate assessment of sexual assault on its campus is one that's taking the problem – and the solution – seriously.  Researchers recommend that schools conduct the survey in the winter or spring semesters, rather than when students first arrive on campus in the fall.

  Rutgers University, with its leading research institute on violence against women,[11] will pilot and evaluate the survey.  Also, the Justice Department's Office on Violence Against Women will work with its campus grantees to conduct the survey and evaluate it.  And the Bureau of Justice Statistics will further refine the survey methodology.
  What we learn from these pilots, evaluations, and schools' experiences will chart the path forward for everyone – and will culminate in a survey for all to use.

- **We will explore legislative or administrative options to require colleges and universities to conduct an evidence-based survey in 2016.**  A mandate for schools to periodically conduct a climate survey will change the national dynamic: with a better picture of what's really happening on campus, schools will be able to more effectively tackle the problem and measure the success of their efforts.

---

[9]     Krebs et al., *The Campus Sexual Assault (CSA) Study*.
[10]    *Ibid.*
[11]    The Center on Violence Against Women & Children at the School of Social Work.

AR_00000051

# II. Preventing Sexual Assault on Campus

Participants in our listening sessions roundly urged the Task Force to make prevention a top priority. Some even suggested that if prevention and education efforts don't start earlier, it's too late by the time students get to college. While we certainly agree that this work should begin early, the college years, too, are formative. During this transition to adulthood, attitudes and behaviors are created or reinforced by peer groups. And students look to coaches, professors, administrators, and other campus leaders to set the tone. If we get this right, today's students will leave college knowing that sexual assault is simply unacceptable. And that, in itself, can create a sea change.

Federal law now requires schools to provide sexual assault prevention and awareness programs.[12] To help colleges and universities in this endeavor, we are providing schools with new guidance and tools.

- **Best practices for better prevention.** The Centers for Disease Control and Prevention (CDC) conducted a systematic review of primary prevention strategies for reducing sexual violence, and is releasing an advance summary of its findings. CDC's review summarizes some of the best available research in the area, and highlights evidence-based prevention strategies that work, some that are promising, and – importantly – those that don't work. The report points to steps colleges can take now to prevent sexual assault on their campuses.

  Among other things, CDC's review shows that effective programs are those that are sustained (not brief, one-shot educational programs), comprehensive, and address the root individual, relational and societal causes of sexual assault. It also includes a listing of prevention programs being used by colleges and universities across the country, so schools can better compare notes about effective and encouraging approaches.[13]

- **Getting everyone to step in: bystander intervention.** Among the most promising prevention strategies – and one we heard a lot about in our listening sessions – is bystander intervention. Social norms research reveals that men often misperceive what other men think about this issue: they overestimate their peers' acceptance of sexual assault and underestimate other men's willingness to intervene when a woman is in trouble.[14] And when men think their peers don't object to abusive behavior, they are

---

[12]   *See* 20 U.S.C. § 1092(f) (The Jeanne Clery Disclosure of Campus Security and Campus Crimes Statistics Act, commonly known as the Clery Act). The Department of Education is currently engaged in negotiated rule-making to implement the VAWA 2013 amendments to the Clery Act that require schools to provide education and awareness programs and to improve their campus security policies. Rule-making is scheduled to be completed in 2015, but schools are expected to make a good faith effort now to meet the new requirements.

[13]   For a concise and complementary factsheet on prevention strategies, *see* http://notalone.gov/assets/prevention-overview.pdf.

[14]   Berkowitz, A.D. (2010) "Fostering Healthy Norms to Prevent Violence and Abuse: The Social Norms Approach." Accessed from: http://www.alanberkowitz.com/articles/Preventing%20Sexual%20Violence%20Chapter%20-%20Revision.pdf

AR_00000052

much less likely to step in and help.  Programs like *Bringing in the Bystander*[15] work to change those perspectives – and teach men (and women) to speak out against rape myths (*e.g.*, women who drink at parties are "asking for it") and to intervene if someone is at risk of being assaulted.

- **To help enlist men as allies, we are releasing a Public Service Announcement featuring President Obama, Vice President Biden, and celebrity actors.**  The message of the PSA is simple: if she doesn't consent – or can't consent – it's a crime.  And if you see it happening, help her, don't blame her, speak up.  We particularly urge men's groups, Greek organizations, coaches, alumni associations, school officials and other leaders to use the PSA to start campus conversations about sexual assault.

- **To help keep these conversations going, we are providing a basic factsheet on bystander intervention.**  In addition to the CDC summary, this document identifies the messages and skills that effective programs impart, describes the various ways to get the word out (in-person workshops, social marketing campaigns, online training, interactive theater) and provides links to some of the more promising programs out there.

- **Developing new prevention strategies.**  More research is needed to develop and evaluate evidence-based programming to prevent sexual violence on campus.  And so:

  - In Fall 2014, the CDC, in collaboration with the Justice Department's Office on Violence Against Women and the Department of Education, will convene a panel of experts to identify emerging, promising practices to prevent sexual assault on campus.  CDC will then convene pilot teams to put the consensus recommendations into practice.

  - The Justice Department's Office on Violence Against Women (OVW) is developing a multi-year initiative on campus sexual assault which, among other things, will test and evaluate prevention programs used by its campus grantees.  Grantees will work with OVW and technical assistance experts to meet core standards and evaluate the results. The next group of campus grantees will be selected by October 2014.

  - In 2015, the CDC will solicit proposals to identify, and fill, gaps in the research on sexual violence prevention.

---

[15]   Banyard, V. L., Moynihan, M. M., & Plante, E. G. (2007). Sexual violence prevention through bystander education: An experimental evaluation. *Journal of Community Psychology*, 35, 463-481

AR_00000053

# III.  Responding Effectively When a Student is Sexually Assaulted

Sexual assault is a crime – and while some survivors turn to the criminal justice system, others look to their schools for help or recourse.  Under federal law, when a school knows or reasonably should know that one of its students has been sexually assaulted, it is obligated to act.  These two systems serve different (though often overlapping) goals.  The principal aim of the criminal system is to adjudicate a defendant's guilt and serve justice.  A school's responsibility is broader: it is charged with providing a safe learning environment for all its students – and to give survivors the help they need to reclaim their educations.  And that can mean a number of things – from giving a victim a confidential place to turn for advice and support, to effectively investigating and finding out what happened, to sanctioning the perpetrator, to doing everything we can to help a survivor recover.  The Task Force is taking the following steps:

## Giving Survivors More Control: Reporting and Confidentially Disclosing What Happened

Sexual assault survivors respond in different ways.  Some are ready to make a formal complaint right away, and want their school to move swiftly to hold the perpetrator accountable.

Others, however, aren't so sure.  Sexual assault can leave victims feeling powerless – and they need support from the beginning to regain a sense of control.  Some, at least at first, don't want their assailant (or the assailant's friends, classmates, teammates or club members) to know they've reported what happened.  But they do want someone on campus to talk to – and many want to talk in confidence, so they can sort through their options at their own pace.  If victims don't have a confidential place to go, or think a school will launch a full-scale investigation against their wishes, many will stay silent.

In recent years, some schools have directed nearly all their employees (including those who typically offer confidential services, like rape crisis and women's centers) to report all the details of an incident to school officials – which can mean that a survivor quickly loses control over what happens next.  That practice, however well-intentioned, leaves survivors with fewer places to turn.

This is, by far, the problem we heard most about in our listening sessions. To help solve it:

- **Schools should identify trained, confidential victim advocates who can provide emergency and ongoing support.**  This is a key "best practice."  The person a victim talks to first is often the most important.  This person should understand the dynamics of sexual assault and the unique toll it can take on self-blaming or traumatized victims.  The advocate should also be able to help get a victim needed resources and accommodations, explain how the school's grievance and disciplinary system works, and help navigate the process.  As many advocates have learned over the years, after survivors receive initial, confidential support, they often decide to proceed with a formal complaint or cooperate in an investigation.

AR_00000054

- **We are also providing schools with <u>a sample reporting and confidentiality protocol</u>.** A school, of course, must make any policy its own – but a few guiding principles should universally apply.  As noted, some sexual assault survivors are ready to press forward with a formal (or even public) complaint, while others need time and privacy to heal. There is no one-size-fits-all model of victim care.  Instead, there must be options.

    That means, at a minimum, that schools should make it clear, up front, who on campus will (or will not) share what information with whom.  And a school's policy should also explain when it may need to override a request for confidentiality (and pursue an alleged perpetrator) in order to provide a safe campus for everyone.  The watchword here is clarity: both confidential resources and formal reporting options should be well and widely publicized – so a victim can make an informed decision about where best to turn.

    And in all cases, the school must respond.  When a student wants the school to take action against an offender – or to change dorms or working arrangements – the school must take the allegation seriously, and not dissuade a report or otherwise keep the survivor's story under wraps.  Where a survivor does not seek a full investigation, but just wants help to move on, the school needs to respond there, too.  And because a school has a continuing obligation to address sexual violence campus-wide, it should always think about broader remedial action – like increasing education and prevention efforts (including to targeted groups), boosting security and surveillance at places where students have been sexually assaulted, and/or revisiting its policies and practices.

## Developing a Comprehensive Sexual Misconduct Policy

Every college and university should have an easily accessible, user-friendly sexual misconduct policy.  As the Task Force recognizes, there is no one approach that suits every school – but as we also learned, many schools don't have adequate policies.  To help:

- **We are providing schools with <u>a checklist for a sexual misconduct policy</u>.**  This checklist provides both a suggested process for developing a policy, as well as the key elements a school should consider in drafting one.  Importantly, schools should bring all the key stakeholders to the table – including students, survivors, campus security, law enforcement, resident advisors, student groups (including LGBTQ groups), on-campus advocates, and local victim service providers.  Effective policies will vary in scope and detail, but an inclusive process is common to all.

    We have not endeavored with this checklist to provide schools with all the answers: again, depending on its size, mission, student body, location, administrative structure and experience, a school community needs to tailor the checklist and make the policy its own.

- **By September 2014, the Task Force will provide samples of promising policy language on several other key issues.**  While all schools are different, we have identified several challenging areas (in addition to confidentiality) where sample language could be helpful. These include definitions of various forms of sexual misconduct; the role of the

AR_00000055

Title IX coordinator (recognizing that there may be various appropriate models for different schools); and the proper immediate, interim and long-term measures a school should take on behalf of survivors, whether or not they seek a full investigation.

## Training for School Officials

Sexual assault can be hard to understand.  Some common victim responses (like not physically resisting or yelling for help) may seem counter-intuitive to those unfamiliar with sexual victimization.  New research has also found that the trauma associated with rape or sexual assault can interfere with parts of the brain that control memory – and, as a result, a victim may have impaired verbal skills, short term memory loss, memory fragmentation, and delayed recall.[16] This can make understanding what happened challenging.

Personal biases also come into play.  Insensitive or judgmental comments – or questions that focus on a victim's behavior (*e.g.*, what she was wearing, her prior sexual history) rather than on the alleged perpetrator's – can compound a victim's distress.

Specialized training, thus, is crucial.  School officials and investigators need to understand how sexual assault occurs, how it's perpetrated, and how victims might naturally respond both during and after an assault.  To help:

- **By September 2014, the Justice Department's Center for Campus Public Safety will develop a training program for campus officials involved in investigating and adjudicating sexual assault cases.**  The Clery Act requires these officials to receive annual training on sexual assault (and also on domestic violence, dating violence and stalking).  The Center will develop a trauma-informed training program consistent with the new requirements.

- **By June 2014, the Justice Department's Office on Violence Against Women will launch a comprehensive online technical assistance project for campus officials.**  Key topics will include victim services, coordinated community responses, alcohol and drug-facilitated sexual assaults, and Clery Act compliance.  Webinars and materials will include the latest research, promising practices, training opportunities, policy updates, prevention programming, and recent publications.  The project will feature strategies and training materials for campus and local law enforcement.

- **By December 2014, the Department of Education, through the National Center on Safe and Supportive Learning Environments, will develop trauma-informed training materials for campus health center staff.**  Often, campus health centers are the first responders for victims of sexual assault.  Services will vary according to the

---

[16]     Bremner, J.D., Elzinga, B., Schmahl, C., & Vermetten, E. (2008). Structural and functional plasticity of the human brain in posttraumatic stress disorder. *Progress in Brain Research. 167*(1), 171-186; Nixon, R. D., Nishith, P., & Resick, P. A. (2004). The Accumulative Effect of Trauma Exposure on Short-Term and Delayed Verbal Memory in a Treatment-Seeking Sample of Female Rape Victims. *Journal of Traumatic Stress, 17*(1), 31-35.

AR_00000056

school's resources, but all staff should be trained on trauma-informed care – and these materials will help.

## New Investigative and Adjudicative Protocols: Better Holding Offenders Accountable

Separate and apart from training, we also need to know more about what investigative and adjudicative *systems* work best on campus: that is, who should gather the evidence; who should make the determination whether a sexual assault occurred; who should decide the sanction; and what an appeals process, if the school has one, should look like.

Schools are experimenting with new ideas.  Some are adopting different variations on the "single investigator" model, where a trained investigator or investigators interview the complainant and alleged perpetrator, gather any physical evidence, interview available witnesses – and then either render a finding, present a recommendation, or even work out an acceptance-of-responsibility agreement with the offender.  These models stand in contrast to the more traditional system, where a college hearing or judicial board hears a case (sometimes tracking the adversarial, evidence-gathering criminal justice model), makes a finding, and decides the sanction.

Preliminary reports from the field suggest that these innovative models, in which college judicial boards play a much more limited role, encourage reporting and bolster trust in the process, while at the same time safeguarding an alleged perpetrator's right to notice and to be heard.  To evaluate these ideas:

- **By October 2014, the Justice Department's Office on Violence Against Women and National Institute of Justice will begin assessing models for investigating and adjudicating campus sexual assault cases, and identify promising practices.**  OVW will also further test and evaluate these models through its campus grantees – which will be selected by October 2014.

- **On April 29, 2014, the Justice Department's SMART Office will release a solicitation for a pilot sex offender treatment program targeting college perpetrators.**  Research suggests that treatment can be effective in reducing recidivism among offenders, yet no programs currently exist for the college population.  Regardless of campus-imposed sanctions, we need to help reduce the risk that young perpetrators will offend again.  This first-of-its kind pilot project holds out new hope for reducing sexual violence on campuses.

## Providing Comprehensive Support: Partnering with the Community

**Rape Crisis Centers.**  Sexual assault survivors often need a variety of services, both immediate and long-term, to help them regain a sense of control and safety.  While some schools may be able to provide comprehensive trauma-informed services on campus, others may need to partner with community-based organizations.

AR_00000057

Regardless of where they are provided, certain key elements should be part of a comprehensive victim-services plan. Because students can be assaulted at all hours of the day or night, crisis intervention services should be available 24 hours a day, too. Survivors also need advocates who can accompany them to medical and legal appointments. And because, for some survivors, the road to recovery is neither short nor easy, longer-term clinical therapies can be crucial.

Rape crisis centers can help schools better serve their students. These centers often provide crisis intervention, 24-hour services, longer-term therapy, support groups, accompaniment to appointments, and community education. Rape crisis centers can also help schools train students and employees and assist in developing prevention programs. And so:

- **To help schools build these partnerships, we are providing a sample Memorandum of Understanding (MOU) with a local rape crisis center.** Schools can adapt this MOU depending on their specific needs and the capacity of a local center.

- **To help schools develop or strengthen on-campus programs, we are also providing a summary of promising practices in victim services.** This guide reviews the existing research on sexual assault services and outlines the elements of an effective victim services program.

- **To assist Tribal Colleges and Universities (TCUs) with victim services, the Justice Department's Office on Violence Against Women will continue to prioritize TCUs in its campus grant program solicitations.** OVW is working to raise awareness of funding opportunities by engaging with leading tribal organizations and partnering with the White House Initiative on American Indian and Alaska Native Education. OVW will also work with tribal domestic violence and sexual assault coalitions to provide TCUs with technical assistance on victim services.

**Local Law Enforcement.** At first blush, many may ask why all cases of sexual assault are not referred to the local prosecutor for criminal prosecution. Some, of course, are – but for many survivors, the criminal process simply does not provide the services and assistance they need to get on with their lives or to get their educations back on track. There are times, however, when the local police and a school may be simultaneously pursuing a case. A criminal investigation does not relieve a school of its independent obligation to conduct its own investigation – nor may a school wait for a criminal case to conclude to proceed. Cooperation in these situations, thus, is critical. So:

- **By June 2014, we will provide schools with a sample Memorandum of Understanding (MOU) with local law enforcement.** An MOU can help open lines of communication and increase coordination among campus security, local law enforcement and other community groups that provide victim services. An MOU can also improve security on and around campus, make investigations and prosecutions more efficient, and increase officers' understanding of the unique needs of sexual assault victims.

AR_00000058

## Developing a Research Collaborative: Enlisting School Researchers to Find New Solutions

Many schools have research institutes that can measurably improve our thinking about sexual assault.  Schools are uniquely suited to identify gaps in the research and develop methods to address them.  To lead by example, three universities have committed to developing research projects that will better inform their response to the problem and contribute to the national body of work on campus sexual assault:

- The Johns Hopkins University School of Nursing will study sexual assault among student intimate partners, including LGBTQ relationships.

- The University of Texas at Austin School of Social Work will develop and evaluate training for campus law enforcement and examine the effectiveness of Sexual Assault Response Teams.

- The University of New Hampshire Prevention Innovations Center will design and evaluate a training program for incoming students on sexual assault policies and expectations for student conduct.

We invite others to join this collaborative – and to add their own research brains and resources toward finding solutions.

# IV.  Improving the Federal Government's Enforcement Efforts, and Making Them More Transparent

The federal government plays an important role in combatting sexual violence.  And as we outlined in our recent report, "Rape and Sexual Assault: A Renewed Call to Action," this Administration has taken aggressive action on many fronts.

We need to build on these efforts.  To better address sexual assault at our nation's schools, we need to both strengthen our enforcement efforts and increase coordination among responsible federal agencies.  Also, and importantly, we need to improve our communication with students, parents, school administrators, faculty, and the public, by making our efforts more transparent.

## Some Background on the Laws

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, requires schools that receive federal financial assistance to take necessary steps to prevent sexual assault on their campuses, and to respond promptly and effectively when an assault is reported.  Title IV of the 1964 Civil Rights Act, 42 U.S.C. § 2000c *et seq.*, also requires public schools to respond to sexual assaults committed against their students.  The Clery Act requires colleges and

AR_00000059

universities that participate in federal financial aid programs to report annual statistics on crime, including sexual assault and rape, on or near their campuses, and to develop and disseminate prevention policies.[17]

The Department of Education's Office for Civil Rights (OCR) is charged with administrative enforcement of Title IX in schools receiving financial assistance from the Department. OCR may initiate an investigation either proactively or in response to a formal complaint. If OCR finds a Title IX violation, the school risks losing federal funds. In these cases, OCR must first seek to voluntarily resolve the non-compliance before terminating funds. Through this voluntary resolution process, OCR has entered into agreements that require schools to take a number of comprehensive steps to remedy the problem on their campuses.

The Department of Education's Federal Student Aid (FSA) office is responsible for enforcing the Clery Act, and conducts on-site reviews to ensure compliance. If a school is found to have violated Clery, FSA directs it to take steps to comply and can impose fines for violations.

The Justice Department (DOJ) is responsible for coordinating enforcement of Title IX across all federal agencies. DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can initiate litigation, including upon referral from other federal agencies, or seek to terminate DOJ funds. DOJ is also responsible for enforcing Title IV. DOJ can use its authority under Title IV, Title IX, and other federal civil rights statutes to bring all facets of a school, including its campus police, and local police departments into compliance with the law. DOJ can also intervene, file amicus briefs, and/or file statements of interest in court cases involving these statutes.

## Improving Transparency and Information-sharing

The Administration is committed to making our enforcement efforts more transparent, and getting schools and students more resources. And so:

- **The Task Force is launching a dedicated website – NotAlone.gov – to make enforcement data public and to make other resources accessible to students and schools.** Although many tools and resources exist, students and schools often haven't been able to access them – either because the materials haven't been widely available or because they are too hard to find. Today, we are changing that.

  Our new website will give students a clear explanation of their rights under Title IX and Title IV, along with a simple description of how to file a complaint with OCR and DOJ and what they should expect throughout the process. It will help students wade through often complicated legal definitions and concepts, and point them toward people who can give them confidential advice – and those who can't.

---

[17]    Other laws also authorize the Justice Department to investigate campus sexual assaults and help campus police as well as local, tribal and state law enforcement adopt comprehensive policies and practices to address the problem. These include the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141; and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

AR_00000060

The website will also put in one central place OCR resolution letters and agreements (except those that raise individual privacy concerns), and all DOJ federal court filings, including complaints, motions, and briefs, consent decrees, and out-of-court agreements (which are also available on DOJ's website). These documents will be posted as a matter of course, so students, school officials, and other stakeholders can easily access the most current agreements.

The website will also contain the relevant guidance on a school's federal obligations, best available evidence and research on prevention programs, and sample policies and model agreements.

Finally, the website will have trustworthy resources from outside the government – like hotline numbers and mental health services locatable by simply typing in a zip code. It will also have a list of resources broken down by issue – like advocacy/survivor services, student groups, or LGBTQ resources – so someone can find more issue-specific information.

- **The Task Force will continue to work with developers and advocates to find ways that tech innovations can help end the violence.** On April 11, more than 60 innovators, technologists, students, policy experts, and survivors of sexual assault gathered at the White House for a "Data Jam" to brainstorm new ways to use technology to shed light on campus sexual assault and better support survivors.

- **Federal agencies are making datasets relevant to sexual assault readily available.** In keeping with the Administration's open data pledge, federal agencies, including the Departments of Education, Justice, Interior, and Health & Human Services have made public more than 100 datasets related to sexual assault and higher education. These datasets include survey results related to sexual violence, program evaluations, and guidance documents. This data is posted on data.gov.

- **The Department of Education is taking additional steps to make its activities more transparent.** As noted, OCR is posting nearly all recent resolution letters and agreements with schools on its website. OCR will also make public the schools that are under OCR investigation, including those that involve Title IX sexual violence allegations. This information will be made available by contacting the Department of Education.

- **The Department of Education will collect and disseminate a list of Title IX coordinators by next year.** Every school must designate at least one employee to coordinate its efforts to carry out its Title IX responsibilities. Although schools must notify students of the name and contact information of the Title IX coordinator, there is no central, national repository of coordinator contact information. The Department of Education's Office of Postsecondary Education and OCR will collect and disseminate the list of higher education Title IX coordinators annually so anyone can easily locate a coordinator. This information will also encourage coordinators to talk to each other and share positive practices to Title IX compliance.

AR_00000061

## Improving Our Enforcement Efforts

The Administration is also committed to improving, and better coordinating, our enforcement efforts.  And so:

- **The Department of Education is providing more clarity on schools' obligations under Title IX.**  In April 2011, OCR issued groundbreaking guidance to schools on their obligations to prevent and respond to sexual violence under Title IX.  Since then, schools and students have asked for further guidance and clarity – and, today, OCR is issuing its answers to these frequently asked questions.

  Among many other topics, this new guidance clarifies that:

  - Title IX protects all students, regardless of their sexual orientation or gender identity, immigration status, or whether they have a disability;
  - non-professional on-campus counselors and advocates – like those who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers and health centers – can generally talk to a survivor in confidence;
  - questioning or evidence about the survivor's sexual history with anyone other than the alleged perpetrator should not be permitted during a judicial hearing;
  - adjudicators should know that the mere fact of a previous consensual dating or sexual relationship does not itself imply consent or preclude a finding of sexual violence; and
  - the parties should not be allowed to personally cross-examine each other.

  The Q&A also discusses (again, among many other topics) college employees' reporting obligations; the role of the Title IX coordinator; how a school should conduct investigations; and Title IX training, education and prevention.

- **The Department of Education is strengthening its enforcement procedures.**  OCR has made changes to its enforcement procedures.[18]

  Among other things, OCR is instituting time limits for negotiating voluntary resolution agreements.  By law, OCR is required to pursue a voluntary resolution with a school before initiating an enforcement action.  Although this process is usually much faster than litigation, it can also take time and, as a result, be frustrating for survivors who typically remain on campus or enrolled in school for a limited time.  To help guard against the risk that a school may extend negotiations to delay enforcement, OCR is placing a 90-day limit on voluntary resolution agreement negotiations where it has found a school in violation of Title IX.

  OCR's procedures also now make explicit that schools should provide survivors with interim relief – such as changing housing or class schedules, issuing no-contact orders, or providing counseling – pending the outcome of an OCR investigation.  OCR will also be

---

[18]   *See* http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

AR_00000062

more visible on campus and reach out to more students and school officials during its investigations, in order to get a fuller picture as to whether or not there is a problem on campus.

- **The Department of Education is also clarifying how key federal laws intersect.** In addition to Title IX and the Clery Act, the Family Educational Rights and Privacy Act (FERPA),[19] which protects the privacy of student education records, can also come into play in campus sexual violence investigations. In response to requests for guidance, the Department of Education has created a chart outlining a school's reporting obligations under Title IX and the Clery Act, and how each intersects with FERPA. The chart shows that although the requirements of Title IX and the Clery Act may differ in some ways, they don't conflict.

- **The Departments of Education and Justice have entered into an agreement clarifying each agency's role vis-à-vis Title IX.** OCR and the Justice Department's Civil Rights Division (CRT) both enforce Title IX. To increase coordination and strengthen enforcement, the agencies have entered into a formal memorandum of understanding.[20]

- **The Department of Education offices responsible for Title IX and Clery Act enforcement have also entered into an agreement clarifying their respective roles.** As noted, the Federal Student Aid (FSA) office is responsible for Clery Act compliance, whereas OCR enforces Title IX. Sometimes, their efforts overlap. To clarify their roles and increase efficiency, FSA and OCR have formalized an agreement to ensure more efficient and effective handling of complaints and to facilitate information sharing.

# Next Steps

The action steps and recommendations highlighted in this report are the initial phase of an ongoing plan. The Task Force is mindful, for instance, of the continuing challenges schools face in meeting Title IX and Clery Act requirements. We will continue to work toward solutions, clarity, and better coordination. We will also review the various laws and regulations that address sexual violence for possible regulatory or statutory improvements, and seek new resources to enhance enforcement. Also, campus law enforcement officials have special expertise – and they should be tapped to play a more central role. We will also consider how our recommendations apply to public elementary and secondary schools – and what more we can do to help there.

Our work continues.

---

[19]   20 U.S.C. § 1232g; 34 C.F.R. Part 99.
[20]   *See* http://www.justice.gov/crt/about/cor/ED_DOJ_MOU_TitleIX-04-29-2014.pdf.

AR_00000063

United States Senate

COMMITTEE ON
HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

WASHINGTON, DC 20510-6250

May 5, 2017

President Donald J. Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. President:

As Chairman of the Senate Homeland Security and Governmental Affairs Subcommittee on Regulatory Affairs and Federal Management, I conduct oversight of the federal regulatory process to ensure regulations and sub-regulatory guidance are promulgated in a lawful manner. As part of this oversight, I have repeatedly raised concerns about the Department of Education's (the Department) use of certain Dear Colleague letters that advance substantive policy but may have been issued without any legal basis. I was pleased to see your recent Executive Order, 13791, directing the Secretary of Education to review all regulations and guidance documents relating to the Department of Education Organization Act, the General Education Provisions Act, and the Elementary and Secondary Education Act of 1965 as amended by the Every Student Succeeds Act.[1] I write to you today to seek clarification as to whether this Executive Order extends this regulatory review to the Office for Civil Rights as that office, in the previous Administration, issued several problematic guidance documents.

During the 114th Congress, I conducted extensive oversight of the Department's use of Dear Colleague letters to advance substantive policy changes without proper underlying legal authority. On January 7, 2016, I wrote to Secretary King regarding the Department's Office for Civil Rights Dear Colleague letters on harassment and bullying (issued October 23, 2010)[2] and sexual violence (issued April 4, 2011).[3] On March 4, 2016, I wrote again, reaffirming my concerns after the Department's response to my initial letter was insufficient. Then on July 11, 2016, I sent a letter to Kathleen Tighe, Inspector General for the Department of Education, raising similar concerns over a Dear Colleague letter regarding transgender students (issued May 13, 2016),[4] which was subsequently withdrawn on February 22, 2017.[5] As guidance, these letters purport to merely interpret statements of existing law; however, while they broadly cite to

---

[1] Exec. Order No. 13791 (Apr. 26, 2017).
[2] U.S. Dept. of Edu., Office for Civil Rights, Dear Colleague (Oct. 26, 2010).
[3] U.S. Dept. of Edu., Office for Civil Rights, Dear Colleague (Apr. 4, 2011).
[4] U.S. Dept. of Edu., Office for Civil Rights, Dear Colleague (May 13, 2016).
[5] U.S. Dept. of Justice, Civil Rights Div. and U.S. Dept. of Edu. Office for Civil Rights, Dear Colleague (Feb. 22, 2017).

President Donald J. Trump
May 5, 2017
Page 2

Title IX of the Education Amendments of 1972, the letters fail to point to precise governing
statutory or regulatory language that support their substantive policy changes.

In my view, the Department's decision to advance these substantive policies through the issuance
of Dear Colleague letters was an attempt to regulate without statutory authorization. Because the
Department issued these Dear Colleague letters without any underlying legal authority, they
should be considered void and immediately rescinded – in the same way the May 13, 2016 Dear
Colleague letter was rescinded.

I strongly believe that under the previous Administration, the Department's Office for Civil
Rights has abused its authority and issued Dear Colleague letters without proper statutory
authority. Accordingly, I write to ask that you clarify whether this Executive Order extends to
the Office for Civil Rights, and if it does not, I strongly urge you to direct Secretary DeVos to
review all regulations and guidance documents issued by that office to ensure they comply with
federal law.

I also urge you to require all future guidance documents issued by the Department to state their
statutory authority and which existing regulations they seek to clarify.

Sincerely,

James Lankford
Chairman
Subcommittee on Regulatory Affairs
and Federal Management, U.S. Senate
Committee on Homeland Security and
Governmental Affairs

cc:     The Honorable Betsy DeVos
        Secretary of Education

cc:     The Honorable Heidi Heitkamp
        Ranking Minority Member
        Subcommittee on Regulatory Affairs and Federal Management

JAMES LANKFORD
OKLAHOMA

COMMITTEES:
APPROPRIATIONS
INDIAN AFFAIRS
INTELLIGENCE
HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS
CHAIRMAN
SUBCOMMITTEE ON REGULATORY
AFFAIRS AND FEDERAL MANAGEMENT

**United States Senate**

WASHINGTON, DC OFFICE:
316 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5754

OKLAHOMA CITY OFFICE:
1015 NORTH BROADWAY AVENUE, SUITE 310
OKLAHOMA CITY, OK 73102
(405) 231-4941

TULSA OFFICE:
THE REMINGTON TOWER
5810 EAST SKELLY DRIVE, SUITE 1000
TULSA, OK 74135
(918) 581-7651

June 7, 2017

The Honorable Elizabeth DeVos
Secretary
U.S. Department of Education
400 Maryland Ave., S.W.
Washington, DC 20202

Dear Secretary DeVos:

Religious freedom – the right to practice any faith or to choose no faith at all – is a fundamental human right of all people. Our Founders believed religious liberty was vital to a free nation. I want to encourage you, as the Secretary of Education, to ensure religious liberty is prioritized in the actions of your department. In response to restrictive and biased actions taken by the previous administration, I believe there are several corrective measures you can put in place to honor and protect this essential freedom for all Americans.

Your department sets the tone for how religious freedom is incorporated into our nation's education policy. Unfortunately, under the previous administration, the Office of Civil Rights at the Department of Education posted a list of all colleges and universities that have requested and/or been granted a religious exemption under Title IX of the Education Amendments of 1972.

The posting has been used to "shame" institutions of higher learning that are structured according to a faith mission, and provide an inference that these schools are somehow guilty of discrimination. Following the posting of this list, eighty-eight organizations petitioned the NCAA to "divest from all religious-based campuses" that requested a religious exemption under Title IX. Further, the California state legislature considered legislation to deny state educational grants (Cal Grants) to students who attend a religious college that notifies the Department that it is invoking its Title IX religious exemption.

While the Office's website has been slightly modified, the list of schools remains. I was pleased to hear you say during the June 6th Appropriations Committee hearing that it "doesn't sound like it's a necessary thing." As such, I encourage you to take this list down. There is no need for a separate website listing these schools. Instead, the letters could be kept readily-available in the FOIA room. If the list of letters must remain on a separate website, the additional search features listed in conjunction with the list of letters can be removed. It is unnecessary to publicize the schools that have been granted a Title IX exemption as though to categorize them as discriminatory.

Additionally, as we discussed during the hearing, many faith-based organizations on college campuses, such as InterVarity, Campus Crusade for Christ, Christian Legal Society and Chi Alpha face unfair treatment. Colleges and universities across the country are forcing faith-based groups to not only accept any student regardless of whether they align with the organization's purpose, but also to hold leadership positions. When campus organizations refuse to appoint a group leader who is adamantly opposed to the organizations' goals or belief system, it is in some cases denied access to otherwise available university property, services or funds.

AR_00000066

This prevents faith-based groups from maintaining the same privileges as other groups, including meeting spaces, funding requests, and other campus resources open to every other campus organization. In some cases, religious organizations were being charged additional "security fees" to host events the University deemed "controversial."

Colleges and universities were once revered as marketplaces of ideas and areas to have respectful, yet contrasting dialogue. I am disheartened that campus culture, which is outwardly committed to tolerance, acceptance and diversity, has become intolerant to different beliefs or points of view. Universities have no business forcing faith-based organizations or organizations of conscience to betray the very values on which they were founded.

In the days ahead, I urge you to use your influence at institutes of higher education to ensure that faith-based organizations are able to be present on campus and maintain their faith missions. All Americans have the right to practice their faith or choose no faith at all. That right should not be limited on a college campus.

It is my hope that during your time as Secretary of Education, you will take concrete steps, such as those I laid out above, to protect religious freedom. I am willing and ready to work with you and every office within the Department of Education to protect and preserve this fundamental and foundational right. I look forward to hearing from you.

In God We Trust,

JAMES LANKFORD
United States Senator



**FIRE**
Foundation for Individual
Rights in Education

OS-EXEC. SEC

2017 JUN 2  AM 9 08

May 24, 2017

Ms. Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

_Sent via email and U.S. Mail_

Dear Secretary DeVos:

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit
organization dedicated to defending liberty, freedom of speech, due process, academic
freedom, legal equality, and freedom of conscience on America's college campuses. We write
to you today to congratulate you on your appointment and to request an opportunity to meet
with you at your convenience.

As we explained in previous correspondence with former Department of Education Assistant
Secretaries for Civil Rights Russlynn H. Ali and Catherine Lhamon (attached), FIRE is deeply
concerned about recent actions taken by the Department of Education's Office for Civil Rights
(OCR) and their consequences for student and faculty rights to due process and freedom of
speech. Over the past few years, OCR's actions have prompted colleges and universities across
the country to adopt unconstitutional speech codes and eliminate critical due process
protections.

You may already know that FIRE is currently sponsoring litigation by two plaintiffs (one
university and one individual student) that challenges OCR's imposition, through an April 4,
2011, "Dear Colleague" letter, of a requirement that colleges and universities receiving federal
funds use the low "preponderance of the evidence" standard in sexual misconduct cases. _Doe
v. Lhamon_, No. 1:16-cv-01158 (RC) (D.D.C. Aug. 15, 2016).

FIRE is also sponsoring litigation by former Louisiana State University (LSU) Professor
Theresa Buchanan, who was fired from her tenured position over her alleged violation of an
unconstitutional speech code. LSU's code mirrors the language recommended as "a blueprint
for colleges and universities throughout the country" by OCR and the Department of Justice's

AR_00000068

Civil Rights Division, Educational Opportunities Section. Buchanan's firing was such a severe attack on academic freedom that LSU was censured for it by the American Association of University Professors. *Buchanan v. Alexander, et al.*, No. 3:16-cv-00041-SDD-EWD (M.D. La. Jan. 20, 2016).

FIRE and many other individuals and organizations have repeatedly raised concerns about the Department's policies over the past few years. Disappointingly, however, the Department has been unwilling to seriously engage with organizations focused on our nation's constitutional commitments to free speech, due process, and academic freedom. It remains FIRE's firm belief that the Department's laudable and necessary work to address the effects of discrimination in federally funded education programs, as well as its mission to promote student achievement and preparation for global competitiveness, can and must be accomplished within the bounds of the law and the Constitution. These goals need not be in tension, and we stand ready to help reconcile them in a way that benefits all students and faculty members.

We at FIRE would like to take this opportunity to once again reach out to the Department of Education in the hope of building a productive relationship between the Department and civil liberties organizations. To that end, we look forward to your response.

Sincerely,


Robert Shibley
Executive Director

Cc: Candice Jackson, Acting Assistant Secretary for Civil Rights, Department of Education

Encl.

| | |
|---|---|
| **To:** | Manalo, Alvin[Alvin.Manalo@ed.gov] |
| **Subject:** | RE: Input Needed- Meeting Request from FIRE (Foundation for Individual Rights in Education) |
| **Sent:** | Thur 6/8/2017 5:08:52 PM |
| **From:** | Jackson, Candice |

Alvin, for Dougie, here's my recommendation about this meeting:

# DPP

Sincerely,

Candice

Candice Jackson

Acting Assistant Secretary for Civil Rights

Dep. Ass. Sec. for Strategic Operations & Outreach

Office for Civil Rights

U.S. Department of Education

400 Maryland Ave. SW

Washington, DC 20202

From: Manalo, Alvin
Sent: Monday, June 05, 2017 12:47 PM
To: Jackson, Candice
Subject: Input Needed- Meeting Request from FIRE (Foundation for Individual Rights in Education)

Hi Candice,

Please see the attached. The Foundation for Individual Rights in Education (FIRE) is requesting a meeting with the Secretary at her convenience. They want to address their concerns with OCR's actions (it seems from the previous Administration) that prompted colleges and universities "to adopt unconstitutional speech codes and eliminate critical due process protections."

I see that you were copied on this letter. Do you recommend that the Secretary find time to meet with (b)(5) If so, Dougie asked that the following questions be answered:

1.    Why would you like the Secretary to participate in this meeting/event?

2.    What specific issues would you like the Secretary to discuss/speak on during the meeting/event?

3.    What specific issues would the group like to discuss/hear about during the meeting/event?

4.    What would the takeaway be for the Department of Education/Secretary and how does it advance the agenda of the Department?

If not, let me know if you advise that a surrogate meet with this group (who?) or if we should simply decline.

**Cunningham, Phavy**

| | |
|---|---|
| **Subject:** | FW: Families Advocating for Campus Equality FACE |

From: Mayes, Edgar On Behalf Of DeVos, Betsy
Sent: Friday, March 31, 2017 8:14 AM
To:  **PII**
Subject: RE: Families Advocating for Campus Equality FACE

Dear **PII**

Thank you for your e-mail to Secretary of Education Betsy DeVos.  Your e-mail has been forwarded to the Secretary's scheduling staff for review.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202


-----Original Message-----
From: Judith KELLEY **PII**
Sent: Thursday, March 30, 2017 4:47 PM
To: DeVos, Betsy
Subject: Families Advocating for Campus Equality FACE

Dear Secretary DeVos:

I am a board member of Families Advocating for Campus Equality (FACE).  I am writing to you in hopes you will meet with FACE representatives in April to discuss OCR's mandates regarding Title IX investigations of campus sexual misconduct cases.  Many wrongfully accused students are being suspended, expelled, having their futures ruined and reputations smeared in campus Star Chamber tribunals.  FACE is a relatively new organization, small and unfortunately growing quickly.  We are averaging close to a call a day since the beginning of the year from students and their families devastated by policies put in place by Obama's OCR but fortunate to have found our organization and the support and education we can provide.  The number of campus sexual misconduct reports has increased exponentially since 2011.  For every report made, there is an accused student on the other end receiving no help or support on campus while facing the most devastating accusation of his or her young life.

FACE supports legislation that will make the process fair for all students and the repeal of the 2011 Dear Colleague Letter.  I hope that you will hear our voices and listen to our stories.

Sincerely,

**PII**

1

**Cunningham, Phavy**

Subject:                    FW: FACE Meetings

-----Original Message-----
From: Mayes, Edgar On Behalf Of DeVos, Betsy
Sent: Friday, April 07, 2017 3:33 PM
To: [ PII ]
Subject: RE: FACE Meetings

Dear [ PII ]

Thank you for your e-mail to Secretary of Education Betsy DeVos. Your letter in support of Families Advocating for Campus Equity's meeting request has been forwarded to the Secretary's scheduling staff for review.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

-----Original Message-----
From: [ PII ]
Sent: Friday, April 07, 2017 2:28 PM
To: DeVos, Betsy
Subject: FACE Meetings

Dear Ms.DeVos: I am emailing you in support of my very dear friend, [ PII ] who will be joining the FACE Capitol Hill meetings end of this month. I urge you to please take the time, which I know must be a very busy time for you, to attend their meetings and listen to what they have to say. Their stories and experiences are remarkable and heartbreaking.

Thank you for taking the time to read my email/request. Here's hoping you will be able to attend.

Sincerely, [ PII ]

Sent from my iPad

1

**Cunningham, Phavy**

**Subject:**          FW: PLEASE meet with the FACE group regarding Title IX and Campus Sexual Assault

---

**From:** Mayes, Edgar **On Behalf Of** DeVos, Betsy
**Sent:** Thursday, April 06, 2017 4:38 PM
**To:** [ PII ]
**Subject:** RE: PLEASE meet with the FACE group regarding Title IX and Campus Sexual Assault

Dear [ PII ]

Thank you for your e-mail to Secretary of Education Betsy DeVos.  Your letter in support of Families Advocating for Campus Equity's meeting request has been forwarded to the Secretary's scheduling staff for review.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

---

**From:** [ PII ]
**Sent:** Thursday, April 06, 2017 3:32 PM
**To:** DeVos, Betsy
**Subject:** PLEASE meet with the FACE group regarding Title IX and Campus Sexual Assault

Ms. DeVos,

I understand some key people from a family advocacy group called FACE have requested to meet with you when they're in Washington DC 4/24 and 25.  I URGE you to meet with them.  A personal tie I have to the power that Title IX was given in 2011, is my nephew. He was falsely accused of rape from a member of the young lady's family, **not even by the young lady**. Her brother, who never witnessed the act, said it was rape, and the Title IX coordinator proceeded conduct a one-sided investigation and eventually suspend my nephew, stripping him of his basketball scholarship and his 4th year of college.  Even the local police, who interviewed over 20 students who had attended the party where this consensual act happened, closed the case because of lack of evidence and agreed that it was indeed consensual.

After spending well over $100,000, my sister's family continues to battle while my nephew suffers from severe depression and feels like he will have to live in the shadows for the rest of his life. THIS IS NOT RIGHT!  Please meet with these FACE members.  I understand they'll also be bringing 2 or 3 of the young men that have seen first hand what happens and can speak to their horrific experiences.

Thank you for your consideration.

1

**PII**

AR_00000075

**Washington, Wendell**

| | |
|---|---|
| From: | Washington, Wendell |
| Sent: | Thursday, April 06, 2017 12:42 PM |
| To: | Washington, Wendell |
| Subject: | Kindly find time to meet with FACE (re. OCR CSTT Control #16-004721) |

**From:** Mayes, Edgar **On Behalf Of** DeVos, Betsy
**Sent:** Thursday, April 06, 2017 8:40 AM
**To:** PII
**Subject:** RE: Kindly find time to meet with FACE (re. OCR CSTT Control #16-004721)

Dear PII

Thank you for your e-mail to Secretary of Education Betsy DeVos. Your letter in support of Familres Advocating for Campus Equity's meeting request has been forwarded to the Secretary's scheduling staff for review.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

**From:** PII
**Sent:** Wednesday, April 05, 2017 8:10 PM
**To:** DeVos, Betsy
**Subject:** Kindly find time to meet with FACE (re. OCR CSTT Control #16-004721)

Good Day Ms. Devos,

As a proud mother of seven children, four sons and three daughters, a special education public school social worker and a University of Michigan Alumnus - I urge you to meet with the fine and knowledgable people of FACE - Families Advocating for Campus Equity. As a group, and individually, we recognize the importance of addressing and reducing sexual assault on our college campuses. However, we equally understand that Title IX was designed to impact positive change in the area of gender discrimination. It was **not** designed to be the punitive response to sexual assault cases. Discriminatory accusations *should* result in investigation, institutional and/or civil action, while sexual assault accusations *should* result in criminal investigation and actions - there is a monumental difference and divide between discrimination and assault. FACE is advocating for campus equity for ALL - we have no hidden agenda - we seek equity in its purest form - FOR ALL.

i

Tragically, we are letting our youth down with the improper implementation of a warped Title IX amendment and new-found application.

In my mind, this profound difference between discrimination and assault lends itself to the obvious question - why use a 1970s anti-discriminatory amendment to combat sexual assault? The Dear Colleague letters of 2011 and 2014 employ an archaic and overreaching civil reform tactic, via Title IX, to *attempt* to manage sexual assault - a serious criminal offense and mental health issue on the campuses of our youth. It clearly is **not** effective - simply take a count of legal filings by all related parties - both accusers and accused are offended and unsatisfied by this bastardized application of this *quasi-amended* amendment. (The loop-hole with which was used to further the Title IX agenda in itself **is** worthy of investigation and reform.) Sadly, in addition to the nightmare the falsely accused experience, hundreds of other college students, male and female, are called to testify on their campuses and then for years to come in further civil litigation - ALL lives are tragically altered for their unforeseen future.

Noteworthy, there is something horrifically wrong with the tying of federal funding to the backs of the accused. In my son's case, and many others, terrorists and mass murders have more civil liberties than is afforded my child and he is a law abiding, American citizen. Additionally, gender bias has actually reversed itself in cases employed to use Title IX. If my son engaged in the same behaviors of his accuser - he uniquivically would have been incarcerated. Tragically, the new Dear Colleague-Title IX protocol has cultivated a harmful platform and vehicle to ensure that gender bias will flourish on college campuses - especially when used to address modern-day, co-ed sexual behavior. These cases require true professional intervention, which *should* include mental health professionals, sociologists, psychologists and law enforcement personal collaborating to develop effective anti-assault protocol and interventions on campuses statewide. FACE demands safety for ALL college students - for ALL our children.

My sincere appreciation for your time, efforts and dedication to education and our country.



AR_00000077

**Cunningham, Phavy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Wednesday, April 05, 2017 3:30 PM |
| **To:** | Kegler, Tarkishia |
| **Subject:** | FW: Title IX and FACE |

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Wednesday, April 05, 2017 3:29 PM
**To:** PII
**Subject:** RE: Title IX and FACE

Dear Friend:

Thank you for your e-mail to Secretary of Education Betsy DeVos. Your appointment request has been forwarded to the Secretary's scheduling staff for review. The staff there will evaluate your request and be in touch if there are any questions.

If you have any questions regarding the status of your request, the scheduling staff can be reached at 202-401-3043.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

**From:** PII
**Sent:** Wednesday, April 05, 2017 3:26 PM
**To:** DeVos, Betsy
**Subject:** Title IX and FACE

Dear Ms. Devos,

I am writing to you as a member of FACE. I know that there are a few of our members who would like to meet with you when the group meets in Washington, D.C. at the end of April. I would ask that you take the time to meet them and listen to the stories of our sons who have been wrongly accused and "convicted." My son was suspended from a small, private college in Southern California. The accuser originally claimed he raped her, and then she changed her story to say it was not sex. According to my son, the "fooling around" was consensual. As parents, we read the evidence that was put in the case, and there is no way anyone should have come to the conclusion that it was not consensual. In fact, in their ruling, they said that her version of the story was "above reproach." This, after she'd already lied and changed her story from rape to not rape.

1

This type of injustice needs to stop. Our sons need to be heard clearly and treated fairly before their lives are ruined by girls who are jealous of new girlfriends or are mentally unstable. If we had the means to do so, we'd sue the accuser and the school, but as it is, we cannot take on that kind of financial stress, unfortunately. So, our son is living at home this semester and working while his friends are at school, where they belong. I pray that this does not affect his acceptance into graduate schools in the future. I have to write emails under a pseudonym to protect my identity so that if our story comes out, the accuser does not decide to sue us personally. This is a vicious circle that needs to be broken. Please, have the true rapists and those who have sexually assaulted others be punished to the full extent, but the witch hunt for men on campus needs to end today.

I am shocked at the number of families who are dealing with this issue. When I googled this issue to try and find some online information about dealing with such trouble, I found FACE. The stories of the mental anguish that these young men are facing is astounding. Please meet with our group and hear their stories.

Thank you for your time.

2

AR_00000079

## Cunningham, Phavy

| | |
|---|---|
| **From:** | Mayes, Edgar |
| **Sent:** | Friday, March 31, 2017 8:41 AM |
| **To:** | Kegler, Tarkishia |
| **Subject:** | FW: Request for a Meeting Regarding Abuses of Title IX |

Please assign to Scheduling. [ PII ] is writing in support of a request for a meeting with the advocacy group, "FACE."

Thanks,
Edgar

---

**From:** Mayes, Edgar **On Behalf Of** DeVos, Betsy
**Sent:** Friday, March 31, 2017 8:19 AM
**To:** [ PII ]
**Subject:** RE: Request for a Meeting Regarding Abuses of Title IX

Dear [ PII ]

Thank you for your e-mail to Secretary of Education Betsy DeVos.  Your e-mail has been forwarded to the Secretary's scheduling staff for review.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

---

**From:** [ PII ]
**Sent:** Thursday, March 30, 2017 8:03 PM
**To:** DeVos, Betsy
**Subject:** Request for a Meeting Regarding Abuses of Title IX

Ms. DeVos,

I am writing to request that you meet with representatives from Families Advocating for Campus Equality (FACE).  Your appointment as Secretary of Education was heralded by many in the "silent majority" as  signaling a return to reason in our educational system.  You are seen a voice of reason in the very unreasonable world of American Education as it stands at present.

As an Attorney practicing in NY, I have seen much, and become almost accustomed to, complete craziness in the educational system.  What goes in the realm of Title IX enforcement, however, is truly frightening.  The absolute and complete lack of Due Process is accepted by "intelligent" people in academia.  The Constitution guarantees accused the

1

right to Due Process of Law...that is a cherished hallmark of our system of justice. That right is completely denied to respondents in Title IX proceedings.

Fingers are pointed, accusations are made, rights are violated, and then quickly LIVES ARE RUINED.

I do not seek this meeting for myself, I ask only that members of FACE be permitted some of your very valuable time to make their case. They are speaking for countless others who have no voice in these matters, or fear to identify themselves because of the horrible and life altering stigma that has been thrust upon them by Title IX.

As an attorney, I can attest to the errors of Title IX enforcement. As a Registered Nurse, I can attest to the tremendous strain, grief depression and psychological harm that these false accusations and "kangaroo courts" have inflicted on the accused and their families.

I am grateful for your consideration of this matter.

Very respectfully,

PII

AR_00000081

**Cunningham, Phavy**

| | |
|---|---|
| **From:** | Mayes, Edgar |
| **Sent:** | Friday, March 31, 2017 8:35 AM |
| **To:** | Kegler, Tarkishia |
| **Subject:** | FW: Reform of Title IX Campus Sexual Assault Hearings |

Please assign to Scheduling.

Thanks,
Edgar

---

**From:** Mayes, Edgar **On Behalf Of** DeVos, Betsy
**Sent:** Thursday, March 30, 2017 4:40 PM
**To:** [ PII ]
**Subject:** RE: Reform of Title IX Campus Sexual Assault Hearings

Dear [ **PII** ]

Thank you for your e-mail to Secretary of Education Betsy DeVos. Your request for an appointment has been forwarded to the Secretary's scheduling staff for review. The staff there will evaluate your request and be in touch if there are any questions.

If you have any questions regarding the status of your request, the scheduling staff can be reached at 202-401-3043.

Sincerely,
Edgar Mayes

Director, Correspondence and
Communication Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

---

**From:** [ PII ]
**Sent:** Thursday, March 30, 2017 4:15 PM
**To:** DeVos, Betsy
**Subject:** Reform of Title IX Campus Sexual Assault Hearings

Dear Madame Secretary,

1

I have written to you before about my situation, being the mother of a boy who was wrongfully accused of sexual assault as a third year law student at a VERY GOOD law school.

He has had a biased investigator, caught in two written lies, and he is in a biased system that is disrespectful of his rights while championing the girl's, and she is not being honest on multiple counts.

I do not know how this will resolve, if at all, for many years as we intend to seek him complete vindication against the school and the girl, as well as anyone of her friends to who she defamed him.

I would like for you to meet with our group, FACE, when we are in D.C., Monday or Tuesday 4/24 & 25.

The effect on my son, my family and my law practice has been tremendous. We have incurred legal costs in excess of $60,000 prior to the administrative proceeding simply to get as much information and fairness as we can possible wrought out of the bias system.

Thanks

PII

2

**Mayes, Edgar**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Thursday, March 30, 2017 3:10 PM |
| **To:** | DeVos, Betsy |
| **Subject:** | Dear Colleague Letter |

Dear Ms DeVos

I am a member of a group called Families Advocating for Campus Equality "FACE"

The lack of due process on College Campuses is destroying the lives of young men and their families and wasting our tax dollars.

We would like to meet with you in Washington on 4/24 or 4/25. To discuss this topic.

Upon confirmation of the opportunity to meet with you we will confirm the names of the attendees. There will be a small number.

We are enthusiastic about the opportunity to support you and your team to be the change we need to see to improve our educational system.

Thank you in advance. Look forward to meeting you.

**PII**

Sent from my iPhone

1

**Mayes, Edgar**

| | |
|---|---|
| **From:** | PII |
| **Sent:** | Thursday, March 30, 2017 3:11 PM |
| **To:** | DeVos, Betsy |
| **Subject:** | Title IX and the Dear Colleague Letter |

Thank you so much!

Have a great day!

PII

Sent from my iPhone

> On Mar 30, 2017, at 12:07 PM, DeVos, Betsy <Betsy.DeVos@ed.gov> wrote:
>
> Dear PII
>
> Thank you for your telephone call and for your e-mail to Secretary DeVos.  Your request for an appointment has been forwarded to the Secretary's scheduling staff for review.  The staff there will evaluate your request and be in touch if there are any questions.
>
> If you have any questions regarding the status of your request, the scheduling staff can be reached at 202-401-3043.
>
> Sincerely,
> Edgar Mayes
>
> Director, Correspondence and
> Communication Control Unit
> Office of the Secretary
> U.S. Department of Education
> Washington, DC 20202
>
>
>
>
> -----Original Message-----
> From: PII
> Sent: Thursday, March 30, 2017 2:26 PM
> To: DeVos, Betsy
> Subject: Re: Title IX and the Dear Colleague Letter
>
> There is a group called Families Advocating For Campus Equality. We would like to meet with her possibly 4/24 or 4/25.
>

1

> We are very concerned about the lack of due process.
>
> Thank you so much for your ongoing dialogue.
>
> PII
>
>
>
> Sent from my iPhone
>
>> On Mar 23, 2017, at 5:32 AM, DeVos, Betsy <Betsy.DeVos@ed.gov> wrote:
>>
>> PII
>>
>> Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
>> Your communication has been forwarded to the appropriate staff member for review and further handling.
>>
>> Thank you again for contacting us.
>>
>> Sincerely,
>> Edgar Mayes
>>
>> Director of Correspondence and
>> Communications Control Unit
>> Office of the Secretary
>> U.S. Department of Education
>> Washington, DC 20202
>>
>>
>> -----Original Message-----
>> From: PII
>> Sent: Wednesday, March 22, 2017 4:09 PM
>> To: DeVos, Betsy
>> Subject: Title IX and the Dear Colleague Letter
>>
>>
>>
>>> Congratulations on your appointment!  We are encouraged to have the educational system looked at with fresh eyes.
>>>
>>> I am writing to bring to your attention the Title IX with the Dear
>>> Colleague letter (authored by then President Bill Clinton) Does not allow due process on Campus.
>>>
>>> The system is broken for the accuser and the accused. If accused you are guilty until proven innocent. You have no right to due process.
>>>
>>> Any alleged felonies should be handled by the police. They are the professionals.
>>>
>>> How can you conduct a legal investigation and a Title IX hearing concurrently.
>>>
>>> Our Kids are everything. You are a mom you know they are your purpose.

2

>>>
>>> Please repeal the Title IX Dear Colleague letter and any felony act should bring in the police to investigate not a Title IX Coordinator.
>>>
>>> Innocent young lives are being kicked out of College over executive orders written by then President Bill Clinton. If would be hysterical if it wasn't so devastating.
>>>
>>> I would welcome an opportunity to discuss this with you or an appointed person on your behalf.
>>
>>
>>>
>>>
>>>
>> **PII**
>>
>>>
>>>
>>> Sent from my iPhone
>>
>

3

| From: | National Coalition For Men Carolinas |
| Sent: | 15 Jun 2017 20:17:10 +0000 |
| To: | Ferg-Cadima, James |
| Cc: | Jackson, Candice |
| Subject: | Copy of NCFMC Students at Risk presentation |
| Attachments: | Students at Risk - State of Campus Environments preso 8.1.16.pdf |

James,

Thank you again for our meeting earlier this week. You had a lot of quality questions regarding our Title IX discussion so with that in mind, I'm sharing a copy of the materials I presented last August at our *NCFM Carolinas: Forum on Campus Sexual Assault, Due Process and Consent.*

You may observe that a portion of the material provided is somewhat elemental but that was by design as the intent of the presentation was to provide the audience (comprised mostly of parents and college students) a snapshot of what was happening on college campuses. I believe the materials provided are as relevant today as they were a year ago and that they provide a clear answer as to how we've arrived to the point that we are at today regarding the mishandling of Title IX related sexual misconduct cases by university administrators.

I hope you will find the attached presentation of value and would be interested in hearing your thoughts. Please do not hesitate in contacting me if I can be of any service.

Best regards,

Greg

Gregory J. Josefchuk
National Coalition For Men Carolinas (NCFMC)
1270 Lake Front Drive
Catawba, NC 28609
Office: (828) 478-2281
Mobile: [ PII ]
http://www.ncfmcarolinas.com/

# Snowflake Warning



https://www.youtube.com/watch?v=Xykv9NzPjoA

AR_00000089



# National Coalition For Men Carolinas (NCFMC)

# *Forum on Campus Sexual Assault, Consent and Due Process*

Central Piedmont Community College – Charlotte, NC
August 1, 2016

AR_00000090

# Who we are



National Coalition For Men (NCFM)

- a 501(c)(3) non-profit
- founded in 1977
- oldest men's *human rights* organization
- dedicated to ensuring fair and equal treatment for all mankind
- built on education and advocacy
- chapters around the USA & globally

AR_00000091

# Housekeeping

- Turn cell phones off or to silent mode
- Be respectful at all times
- No recording or broadcasting of this event
- No taking photographs
- Safety first – emergency exit
- Bathrooms, restaurants nearby
- Questions for panelists – time permitting

AR_00000092

# Agenda

9:00am          Welcome / Opening Remarks

9:10am          At Risk Students: The State of Today's College Campus Environment, *Gregory Josefchuk, President – NCFM Carolinas*

9:45am          How Should Colleges Handle Sexual Assault?, *Wendy McElroy*

10:10am        VIDEO – Rape Culture Panic is Not the Answer, *Factual Feminist (aka Christina Hoff Somers)*

10:15am        Sexual Paranoia: The Ideology of 'Rape Culture' Hysteria, *Robert Stacy McCain*

10:45am        VIDEO – Sexual Assault Myths; Part 1, *Factual Feminist (CHS)*

10:50am        Title IX: Guilty Until Proven Innocent, *Kerry Sutton, Esq. and Steve Lindsay, Esq. defense attorneys and Title IX Defenders*

11:30am        Lunch Break

12:30pm       Affirmative Consent: Redefining Sex as Rape, *Ashe Schow, journalist for the Washington Examiner*

1:15pm         VIDEO – Sexual Assault Myths; Part 2, *Factual Feminist (CHS)*

1:20pm         Defending Campus Sexual Assault Cases, *Eric Rosenberg, Esq. defense attorney; John W. Gresham, Esq., civil litigation attorney*

2:00pm         Falsely Accused – A Student's Perspective, *Brandon; Will*

2:30pm         Panel Discussion: Campus Sexual Assault, Due Process & Consent

3:20pm         Closing Remarks

3:30pm         Adjourn



# Students at Risk: The State of College Campus Environments

## Gregory J. Josefchuk

## President

## National Coalition For Men Carolinas

AR_00000094



Dedicated to Coop and to falsely accused students everywhere

# Close your eyes…



# Your first month













# The social scene




# A week later…



- Email from Dean of Students
- Need to meet with Title IX coordinator
- Interim suspension
- Meet with university investigator
- Hearing



# Welcome to...



The Kangaroo Court

- Accused students are advised they have no right to remain silent.
- The faculty panel that pronounces final judgment hears only from the investigator, not the accused student.
- The accused student can have a lawyer, but the lawyer can't actively participate in the disciplinary process.
- The accused student or his representative can't cross-examine the accuser, even indirectly.
- The accused student or his representative has no right to the evidence gathered by the single investigator—on grounds that this constitutes "work product."
- The accused student often faces interim punishments, which occur before the adjudication process has been completed.
- *Every* demand for an interim punishment filed by an accuser listed either that she "disliked" the accused student, or was uncomfortable with the accused student remaining on campus. But "if one student may be temporarily suspended merely because another student dislikes him or expresses discomfort," the policy "becomes a tool for students to easily injure one another."

***This point doesn't get stressed enough. As troubling as OCR's demands are, most universities (including all the Ivy League members) have enacted policies that go even further in denying due process to accused students.***

# To summarize

Based on an *allegation* of sexual misconduct, a student can be:

- Suspended w/o a hearing
- Removed from campus
- Threatened with trespassing charges
- The target of a criminal investigation
- The target of a university investigation
- Denied the right to obtain or make a copy of the school investigator's report
- Denied the right to have an attorney participate in his/her hearing
- Denied the right to present exculpatory evidence
- Denied the right to have witnesses appear
- Denied the right to question and/or cross-examine his/her accuser
- Treated as guilty (referred to as "perpetrator") and required to prove his/her innocence
- Summarily expelled
- Denied diploma
- Branded a rapist for life

# "It's just a college hearing…"













# Are college men "at risk"?











AR_00000103

# Drunk sex = RAPE





…two students were drinking and had sex, after which the university concluded that the male student had committed sexual assault because the accuser could not give consent. Why? **Dean Sue Wasiolek explained: Even when both students consumed alcohol, "assuming it is a male and female, it is the responsibility in the case of the male to gain consent before proceeding with sex."** (*Source: IF SHE HAD DRINKS, YOU MAY BE A RAPIST, KC JOHNSON, MINDING THE CAMPUS 6/18/14*)



AR_00000104

# Policies based on hysteria?



THE UNIVERSITY
*of* NORTH CAROLINA
*at* CHAPEL HILL

## A student can be charged with harassment, sexual misconduct or discrimination if he/she*:

- Upsets another student by a verbal comment or one by email, text message or on social media
- Even if the comment was unintentional and not intended to harm
- Or wasn't even directed at a specific target & even if it only happened once
- If you disclose an individual's sexual orientation, gender identity or gender expression
- If you walk in on a roommate while he/she is having sex or observe another individual's nudity

**Affirmative Consent requirement**



If you CANNOT PROVE that you received a clear YES FOR EACH form of sexual activity you engaged in, you can be charged with SEXUAL ASSAULT for: ☐Kissing ☐Hugging ☐Touching ☐Any form of physical contact    Consent is NOT *to be inferred from an existing or previous sexual relationship.*

*\*Source:  The University of North Carolina at Chapel Hill Policy on Prohibited Discrimination, Harassment, and Related Misconduct*

AR_00000105

# How did we get to this point?

The perfect storm…

Started with VAWA (funding mechanism)  +

Ed. Department's 2011 *Dear Colleague* Letter (political power)  +

University of North Carolina – Chapel Hill (activism)
   3 complaints filed with OCR in early 2013  = over 300+ cases


*Birth of the sexual grievance industry*

# Universities are threatened

## Per the 2011 DCL mandate:

- colleges and universities must employ a "preponderance of the evidence" standard—a 50.01%, "more likely than not" evidentiary burden—when adjudicating student complaints concerning sexual harassment or sexual violence.
- require that if a university judicial process allows the accused student to appeal a verdict, it must allow the accusing student the right to appeal as well, resulting in a type of "double jeopardy" for the accused.
- **Institutions that do not comply with OCR's new regulations face federal investigation and the loss of federal funding.**

# Title IX Investigations



The federal government has conducted 307 investigations of colleges for possibly mishandling reports of sexual violence. **So far, 50 cases have been resolved and 257 remain open.**

AR_00000108

# Why are campuses hostile to men?

North Carolina is scheduled to receive an estimated $4.58 billion from the federal government in 2016 for education funding, which could be at risk with Title IX violations.

# UNC-Chapel Hill research funding

UNC-Chapel Hill research funding for fiscal year 2015 totaled $796,171,469. **Federal government funding accounted for 71.80 percent ($571.7 million) of the 2015 total.** The remainder came from sources such as educational and research institutions (8.03 percent), business and industry (5.02 percent), foundations (6.66 percent), North Carolina state government (3.09 percent), and nonprofits (3.10 percent). Of the federal funding, 68 percent was from the National Institutes of Health. *(Source: Office of Research Information Systems. Updated: 5/2016.)*



AR_00000110

# Rape culture?

Rape (including those that occur on campus) has been on a decline since the 1990's as reported by the FBI Uniform Crime Reports and indicated in the graph below.



US Forcible Rape Rate (per 100,000 people), 1972 to 2013 (est.)

# Rape culture?



## Perpetrators of Campus Sexual Assault: What We Know

In the last few years, there has been an unfortunate trend towards blaming "rape culture" for the extensive problem of sexual violence on campuses. While it is helpful to point out the systemic barriers to addressing the problem, it is important to not lose sight of a simple fact: Rape is caused not by cultural factors but by the conscious decisions, of a small percentage of the community, to commit a violent crime.

While that may seem an obvious point, it has tended to get lost in recent debates. This has led to an inclination to focus on particular segments of the student population (e.g., athletes), particular aspects of campus culture (e.g., the Greek system), or traits that are common in many millions of law-abiding Americans (e.g., "masculinity"), rather than on the subpopulation at fault: those who choose to commit rape. This trend has the paradoxical effect of making it harder to stop sexual violence, since it removes the focus from the individual at fault, and seemingly mitigates personal responsibility for his or her own actions.

AR_00000112

# Rape culture on campus?

**1 out of 5? More like 1 out of 1,500.**

Here's a snapshot of reported sexual assault data sourced from Clery reports:

| University | Year | Sex Offenses | Enrollment | SO/Student |
|---|---|---|---|---|
| UNC-Chapel Hill | 2012 | 21 | 29278 | 1394 |
| | 2011 | 12 | 29137 | 2428 |
| | 2010 | 19 | 29390 | 1547 |
| | | AVG: | 1 Per | 1689 |
| Wake Forest | 2012 | 4 | 7351 | 1838 |
| | 2011 | 5 | 7162 | 1432 |
| | 2010 | 7 | 7079 | 1011 |
| | | AVG: | 1 Per | 1350 |
| Duke University | 2012 | 11 | 15386 | 1399 |
| | 2011 | 8 | 15427 | 1928 |
| | 2010 | 12 | 14982 | 1249 |
| | | AVG: | 1 Per | 1477 |

AR_00000113



| Name / Title | Hired |
|---|---|
| Becci Menghini, Senior Associate Vice Chancellor | 2015 |
| Katie Nolan, Interim Title IX Compliance Coordinator | 2014 |
| Adrienne Allison, Title IX Associate Coordinator | 2016 |
| Camille Brooks, Senior EO Compliance Consultant | 2010 |
| Hilary Delbridge, Communications | 2014 |
| Laura DePersia, EO Investigator | |
| Kenley Eaglestone, EO Investigator | 2015 |
| Rebecca Gibson, Report and Response Coordinator | 2015 |
| Elizabeth Hall, EOC/Title IX Investigator | 2016 |
| Jourdan Davis, Administrative Assistant | |
| Rudy Jones, Associate Director | 2009 |
| Ericka Lewis, EO Investigator | 2014 |
| Jeanna McCullers, Hearing Coordinator | 2014 |
| Ew Quimbaya-Winship, Report and Response Coordinator | 2013 |
| Sarah Riney, EOC/Title IX Investigator | 2016 |
| Jenn Scott, Title IX Program Coordinator | 2014 |
| Jayne Grandes, University Compliance Director | 2013 |





Only 2 out of 17 department employee's are men… it appears that only women are "qualified" as EO and/or Title IX investigator's. The hiring practice for this department alone violates federal discrimination laws.

# More penalties (and funding)

The HALT Act, Hold Accountable and Lend Transparency on Campus Sexual Violence Act bill was introduced into the House by Representatives Jackie Speier and Patrick Meehan in 2014.

According to Congresswoman Speier's website, the HALT Act will significantly expand the federal government's ability to hold colleges and universities accountable if they fail to protect their students' civil rights by:

**(1) requiring the Department of Education to issue penalties for noncompliance with civil rights requirements under its authority, including Title IX;**
**(2) increasing penalties for violating the Clery Act from $35,000 to $100,000;**
(3) creating a private right of action for students harmed by institutions that fail to meet campus safety requirements;
(4) instituting biennial climate surveys;
(5) requiring greater transparency and public disclosure of a list of institutions under investigation, the sanctions (if any) or findings issued pursuant to such investigations, and copies of all program reviews and resolution agreements entered into between higher education institutions and the Education and Justice Departments under Title IX and the Clery Act;
**(6) increasing funding for Title IX and Clery investigators by $5 million;**
(7) expanding institutional requirements to notify and publicly post students' legal rights and institutions' obligations under Title IX; and
(8) creating an interagency task force to increase coordination between agencies and enhance investigations.

# MARGOLIS HEALY ᔆᴹ
## SOLUTIONS FOR SAFE CAMPUSES ᔆᴹ

- Campus safety firm
- Coordinates the National Center for Campus Public Safety
- Has received $5,854,732 in taxpayer funds through YE 2015
- Grant runs through 2017 = approx. $8M
- Provides training of Title IX investigators

AR_00000116

# MARGOLIS HEALY <sup>SM</sup>

## SOLUTIONS FOR SAFE CAMPUSES <sup>SM</sup>

- instructed Middlebury officials that they must "start by believing" the *accuser*
- held that the *investigator's report* "should not include . . . consensual language"
- **or** note that the "victim has inconsistencies with her story."
- "After the Middlebury piece appeared at *Minding the Campus*, Margolis Healy removed its training slides from the web. It would seem that—for around $8 million in taxpayers' funds—the public has a right to know how, specifically, this firm trains colleges to reach the "truth" in sexual assault claims." KC Johnson

# State of campus due process

## Stanford University

Displaying a shocking disregard for fair procedures on campus, Stanford University is training student jurors in sexual misconduct cases to believe that **"act[ing] persuasive and logical" is a sign of guilt.** Stanford also instructs campus tribunals that **taking a neutral stand between the parties is the equivalent of siding with the accused.** (Source: *Stanford Trains Student Jurors That 'Acting Persuasive and Logical' is Sign of Guilt; Story of Student Judicial Nightmare in Today's 'New York Post'* FIRE July 20, 2011)

## Dartmouth College

**"Why could we not expel a student based on an allegation?"** That astonishing question was posed at a conference on how colleges respond to sexual assault issues by Amanda Childress, Sexual Assault Awareness Program coordinator at Dartmouth. According to *Inside Higher Ed*, Childress continued: "It seems to me that we value fair and equitable processes more than we value the safety of our students." (Source: ' WHY HAVE A HEARING? JUST EXPEL HIM', KC JOHNSON, MINDING THE CAMPUS FEB. 13, 2014)

AR_00000118

# Memo from Title IX Director…



# Culture of presumed guilt

"A <u>Washington Post and Kaiser Family Foundation survey</u> shows that almost half of all college women-- full 44 percent--wrongly think that when a woman gives a guy a "nod in agreement," that isn't enough for consent. (Question 35(c)) That same survey shows that an overwhelming majority of college women automatically think that the man is more to blame whenever they hear an accusation of sexual assault. (Question 21) In addition, **an overwhelming majority of women think it's better that innocent young men be punished for offenses they didn't commit than to allow a guilty man to go free.** (Question 32)"



Community of the Wrongly Accused

# Amherst College Case

- Male student (John Doe) in blacked-out state
- Female student performed oral sex on him (by her own admission)
- "Exculpatory" text messages that suggest she was the aggressor and tried to seduce *another* guy right after fellating Doe
- Amherst found the male student responsible for sexual misconduct, expelled him and would not re-open case after her text messages were discovered.
- https://www.youtube.com/watch?v=gfc3XIZ4Fo8

# Columbia University Case

- Columbia investigated, held a hearing and cleared Nungesser of responsibility.

- Nungesser was called a rapist on a list anonymously scrawled in campus bathrooms.

- Columbia's undergraduate newspaper published his name when Sulkowicz went to the police. (No charges were brought.)

- Nungesser's friends fell away. He found himself shunned on campus.

- Suing Columbia for gender discrimination , arguing that the university supported a campaign to bully and harass him

*Source: Have We Learned Anything From the Columbia Rape Case?, Emily Bazelon, NY Times May 29, 2015*





https://www.youtube.com/watch?v=cO6QXmnXaSU

AR_00000122

# UVa / *Rolling Stone*





- ➤ Allegation of gang rape
- ➤ National coverage & outrage
- ➤ Protests, vandalism, threats
- ➤ Suspends fraternal organizations

https://www.youtube.com/watch?v=H
EBew2MJA30



AR_00000123

# UVa / *Rolling Stone*



<u>What Have We Learned from the UVA Rape Story? Bad Campus Policies Are Here to Stay</u> - We *will* get fooled again.

reason.com

"This cycle—outrageous rape story, heaps of praise and righteous indignation, thorough debunking—has continued in the wake of UVA, and existed long before it (remember Duke lacrosse?). Getting duped by fabulists is a recurring motif of the campus violence beat."

AR_00000124

# Over 110 Lawsuits Filed



Victims Of Education Dep... ✕

← → C  🔒 www.ncfmcarolinas.com/#!Victims-Of-Education-Departments-Unfair-Sexual-Assault-Rules-Counterattack-With-Lawsuits/c15kh/579260f70cf2a8522f94cb91  ☆ ≡

⋮⋮ Apps  📄 AdvanTE3C Solutions  💼 Welcome! | LinkedIn

## Victims Of Education Department's Unfair Sexual Assault Rules Counterattack With Lawsuits

July 22, 2016  | George Leef



Administrative law in America is an open invitation to bureaucrats to see how much they can get away with by "interpreting" statutes to expand their power and impose their own will. The Department of Education provides many examples.

One of the most appalling is the way officials in the Department's Office for Civil Rights (OCR) have treated the vague language in Title IX of the 1972 Education Act Amendments as if it gave them plenary authority to control anything on a college campus having to do with alleged sexual misbehavior.

The wording says: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance."

The members of Congress who passed the bill and President Nixon who signed it thought they were acting to keep schools and colleges from discriminating against women—not admitting them or treating them differently from male students. If someone had asked any of them if this meant that federal bureaucrats could dictate to colleges how they must handle cases where individual students were accused of sexual misbehavior, the answer would surely have been "Of course not."

### Featured Posts



**Rape Culture Hysteria on Campus**
March 20, 2014

### Recent Posts

Victims Of Education Department's Unfair Sexual Assault Rules Counterattack With Lawsuits
July 22, 2016

Readers respond: Who should adjudicate cases of sexual assault on college campuses?
July 18, 2016

False accusations should receive harsh punishments
July 18, 2016

Teen spends year in prison for false rape accusation
July 18, 2016

Student accused of sexual assault says he was denied a hearing before being suspended
July 12, 2016

'Listen and believe' actually hurts rape

AR_00000125

# The tide *is* shifting

- ***NC House Bill 74 (8/23/13)*** -  Governor Pat McCrory signed **HB74 granting public university students** in the state facing non-academic disciplinary charges **the right to an attorne**y. The law, was the first of its kind nationwide.

- ***Tanyi vs. Appalachian State University*** – ASU **paid $100,000** to former Mountaineer football player Lanston Tanyi **to settle a lawsuit** in which Tanyi claimed that he was falsely accused of sexual misconduct after the U.S. District Court allowed several due process claims to proceed.

- ***Doe vs. Regents of UC San Diego*** – A California trial court judge **ruled that the University of California at San Diego must reverse the suspension of a male student** who allegedly assaulted a female student. The student accused the university of violating his due process rights by presuming his guilt ahead of a hearing, not allowing the accused student access to witnesses and evidence, and informing a hearing panel of his guilt instead of letting the panel reach its own conclusion. The Superior Court judge in the case agreed.

- ***Mock vs. University of Tennessee at Chattanooga*** - Judge Carol McCoy **overturned the expulsion** of Corey Mock after determining that UTC's administration had improperly required Mock to prove that he was innocent of sexually assaulting another student. The decision is a significant blow to the concept of affirmative consent. According to Judge McCoy, UTC's consent standard **wrongfully shifted the burden of proof and violated Mock's due process rights**.

# A good week for student lawsuits

- **The 2nd U.S. Circuit Court of Appeals overruled** the decision by Judge Jesse Furman of the U.S. District Court in Manhattan, an appointee of President Obama, against an anonymous male student who said Columbia University violated Title IX in its sexual-assault proceeding against him.  This ruling by our nation's second highest and most influential court says that males accused of rape by women can now sue their universities under the same federal law - Title IX - that women have been using effectively in suing universities.

- **The University of Southern California has been ordered to stop the expulsion** of a student pending court review of the university's Title IX sexual misconduct disciplinary process. The stay order, issued July 28, 2016 by Los Angeles Superior Court Judge Robert H. O'Brien, allows the student to continue to attend his classes at USC while the court considers his appeal. USC initiated the Title IX investigation against John Doe, as he is identified in court records, after John Doe had asked USC to stop harassment, threats, and stalking by another USC student, identified as Jane Roe.

- Last Monday, The Atlanta Journal-Constitution reported that **the University System of Georgia had recently settled two separate lawsuits** brought by male Georgia Institute of Technology (Georgia Tech) students who alleged they were denied fundamental fairness in campus sexual misconduct proceedings. Both suits concerned Georgia Tech's use of a "single investigator" model to resolve complaints of sexual assault. Under the single investigator model—which is growing increasingly popular on campuses nationwide—one person (or small group of people) takes on multiple roles in the investigative and adjudicative processes, acting as detective, judge, and jury. According to the *Journal-Constitution*, one of those lawsuits ended with a settlement in which system **officials agreed to pay a male student $125,000 to settle his case**.

# But there's still work to be done

| Due Process Right | K-12 | College |
|---|---|---|
| No long-term suspension until a formal hearing is provided to the student | yes | no |
| Right to have an attorney represent the student in the hearing process | yes | tbd |
| The right to be provided copies of the school investigator's report | yes | no |
| The right to question witnesses appearing at the hearing | yes | tbd |
| The right to present evidence on his or her own behalf | yes | tbd |
| The right to have a record made of the hearing | yes | tbd |
| The right to make an audio recording of the hearing | yes | no |
| The right to appeal and notice of the procedures of an appeal | yes | tbd |

# One last thought (from who else?)…



http://bcove.me/2wa116e0

# "this can happen to virtually any male on any campus at anytime"

AR_00000129

# Thank You

Additional information can be found at:

www.ncfmcarolinas.com



**Don't be THAT girl**

**Embarrassed by a hookup? Angry at a boyfriend?**

**Willing to lie to destroy a life?**

**National Coalition For Men Carolinas**   www.NCFMCarolinas.com

| From: | Shelley Dempsey |
|---|---|
| Sent: | 25 Jun 2017 21:21:51 -0400 |
| To: | Jackson, Candice |
| Cc: | Alison Scott |
| Subject: | Fwd: Support for access to legal support |

Hello Candice

I am fwd an email from [PII] who had asked me to fwd her her experience [PII] was accused. Thank you for your willingness to listen to these stories.

Shelley S Dempsey, Esq.
Face VP
Outreach Ctte Chair

Sent from my iPad

Begin forwarded message:

**From:** Allyson [PII]
**Date:** June 25, 2017 at 8:56:11 PM EDT
**To:** Shelley Dempsey [PII]
**Subject: Support for access to legal support**

Hey [PII] don't feel well versed in all of these issues, but see if this email will be ok :)

Dear Candice, I thank you for your work in this area.  I am a [PII] [PII] non of whom went through any untoward sexual encounters in their college years. My [PII] however, went through a horrendous experience with an accusation of sexual assault, actually "false imprisonment" that could have ruined his life if not for the legal resources his family was able to access and afford.  While he has been able to be very successful in his life, the situation continues to be ever present in his professional and personal life.  The situation with regrettable sexual encounters on campuses is out of control, and likely alcohol infused, which is another topic all together. Kids need to assume responsibility for the choices they make, but when the issue of choice becomes blurred or distorted unequally, and allegations ensue, they need to be allowed protection under the law.   I believe it is important that the kids involved in these situations have access to legal assistance so that the allegations can be assessed through a fair and unbiased process.
Thank you again for your efforts,

*Allyson*

| | |
|---|---|
| **From:** | FACE (Families Advocating for Campus Equality) |
| **Sent:** | 12 Mar 2018 12:00:16 -0400 |
| **To:** | Jackson, Candice |
| **Subject:** | Help Support Our FACE Families! |



## THE FACE MEET & GREET SCHOLARSHIP FUND

Dear Friend of FACE,

A false accusation is a terrifying event. Friends turn away. Accusers taunt. Now, when support is most needed, the accused is most isolated.

Since its inception, our Meet & Greet has been a rare opportunity for our members and their families to connect with supporters and move forward. However, with tuition compounded by legal bills, it is often difficult for our members and families to attend the event. That's why we established **Meet & Greet Scholarship Fund**.

☐**The Fund** finances the travel and lodging expenses of students and families who would not otherwise be able to attend. Your generosity will help lift someone out of fear, isolation, and depression.