# SUPPORT A FACE MEMBER'S TRAVEL
## Donate Today!

A gift from you will help buy a plane ticket, pay for a hotel room, or help with meals. Support the FACE Meet and Greet Scholarship by clicking the link below:



**Yes, I'd love to Donate**

# OR, YOU CAN SEND A CHECK TO:



FAMILIES ADVOCATING FOR CAMPUS EQUALITY
3905 STATE STREET #7-408
SANTA BARBARA, CA 93105

## Donate Today!

Early gifts help with planning and reservations. Your voice makes a difference in the lives of our members. We thank you for your consideration and support. Please make your gift today!



(b)(6)

Cynthia Garrett, Esq.

Alison Scott

**Co-Presidents of Families Advocating for Campus Equality**





Families Advocating for Campus Equality

FACE (Families Advocating for Campus Equality) | 3905 State Street #7- 408, Santa Barbara, CA 93105

Unsubscribe candice.jackson@ed.gov

Update Profile | About our service provider

Sent by contact@facecampusequality.org

AR_00000136

| | |
|---|---|
| **From:** | National Coalition For Men Carolinas |
| **Sent:** | 5 Sep 2017 20:34:37 +0000 |
| **To:** | Jackson, Candice |
| **Subject:** | NCFM Carolinas - draft concerning Title IX related regulations |
| **Attachments:** | NCFM Carolinas - Recommended Rules for OCR Consideration |

Regarding Handling of Title IX Sexual Misconduct Cases.docx

Candice,

Attached to this email is a draft of a report issued by our organization that highlights recommendations for the issuance of new Title IX related policies/regulations that would restore impartiality and balance the scales of jurisprudence for college students involved with a sexual misconduct disciplinary case.

We offer our thoughts as an organization that knows from first-hand experience how well-intentioned administrators have fumbled investigations that caused a rush to judgment, a presumption of guilt and ultimately a miscarriage of justice for both the accused and complainant students.

This report seeks to address and correct fundamental flaws by establishing fundamental elements of due   process.

Please contact me at your earliest convenience should you have any questions, comments or suggestions on how to improve this draft.

Thank you.

Best regards,

Greg

Gregory J. Josefchuk
President
National Coalition For Men Carolinas (NCFMC)
Tel: (828) 478-2281
http://www.ncfmcarolinas.com/

THE NEED FOR NEW TITLE IX RELATED REGULATIONS - 34 C.F.R. Part 106

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.

These recommendations are submitted to the U.S. Department of Education by the Carolinas chapter of the National Coalition For Men (NCFM) a non-partisan men's human rights organization that advocates on behalf of men, women and children who find themselves discriminated against or treated in a harmful way. Our organization calls for the U.S. Department of Education Office for Civil Rights (OCR) to withdraw guidance previously issued under the Obama administration by OCR to universities in the handling of disciplinary cases related to Title IX of the Educational Amendments of 1972. In this regard, we endorse and support the issuance of new Title IX related regulations following the rulemaking process as established by Congress.

While higher education faces many challenges today, the issue of how to handle sexual misconduct on college campuses is firmly planted in the national spotlight. No one denies that sexual assault on college campuses is a serious matter that warrants attention yet the prescribed cure by the Department of Education under the previous administration was worse than the disease inasmuch as it has done violence to the concept of the presumption of innocence and eviscerates due process for any student facing a Title IX university disciplinary hearing.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000138

As previously stated, Title IX prohibits discrimination on the basis of sex in education programs or publicly funded institutions. Over the years, this has come to encompass investigating cases of alleged sexual harassment and sexual assault. In 2011, the Office for Civil Rights, under the Obama administration's Education Department, informed colleges that they should deploy a 'preponderance of the evidence' standard in campus sexual-assault hearings which requires a 50 percent plus a feather outcome, to determine guilt. Title IX related sexual assault cases should require the burden of proof minimally to be that of a "clear and convincing evidence" standard used when adjudicating allegations with life-altering outcomes.

It seems inconceivable that our nation has forgotten the painful lessons learned at the expense of so many college men falsely accused of rape. Perhaps the following examples can serve as a brief yet vital reminder of Title IX related injustices faced by college students today:

• Duke Lacrosse case – gang rape hoax; the three accused college men ultimately were declared innocent by the Attorney General of North Carolina but not until after their young lives and family names were irreparably destroyed.

• UVa case – the recent infamous Rolling Stone gang rape hoax story that resulted in vandalism and threats of violence made against innocent fraternity members. As has been recognized, the story was a fabrication that perpetuates a harmful myth that depicts fraternity men as rapists in waiting who ply woman with alcohol in order to use sexual violence against them.

• Amherst College case – male student walked his girlfriend's roommate back to her dorm after a party and while he was passed out the roommate accuser performed a sex act on

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

him that she admitted to. Twenty-one months later she accused him of sexual assault. Amherst said his account of being blacked out was credible but still ruled against him and expelled him.

• Columbia University case - male student was terrorized by a jilted female student who determined to ruin his life. Even though Columbia exonerated him of any wrongdoing, his accuser made his life a living hell by publicly naming him as a rapist and then made him a target of public ridicule and humiliation by the accuser carrying a mattress around campus as her "art project". The accused student and his family had to endure the humiliation and shame of seeing his accuser up on stage carrying her mattress during their graduation ceremony. The male student was subjected to discrimination under Columbia's toxic campus environment, yet neither Columbia nor OCR stepped in to protect this male student's Title IX rights.

• CSU-Pueblo case – pre-med male student who had consensual sex with a casual friend who had invited him up to her room, undressed and got in bed with him. The next morning, a friend of the woman's noticed a hickey on the woman's neck. When she learned the woman had sex with a prominent football player, she surmised her friend had been raped and reported that to university authorities. CSU-Pueblo suspended him even though the female student told the university that the sex was consensual and that he did nothing wrong.

These cases represent just a small sampling of the approximately 180 lawsuits filed against universities in which male student plaintiffs allege being denied due process, subjected to what can only be described as a kangaroo court process and summarily expelled as a direct result of flawed directives issued and enforced by the Office of Civil Rights (OCR) within the Department of Education.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

Universities are not the proper institution to prosecute a rape case. In this regard, we would echo testimony provided to Congress by Molly Corbett Broad, President of the American Council on Education, who stated:

"Conducting education and providing information is an area where college officials have vast experience. We must redouble our education efforts on sexual assault, and as I noted earlier, institutions are moving aggressively to do this. But performing investigations and adjudicating cases is a far more difficult challenge. We lack the authority to subpoena witnesses, control evidence and impose legal standards. Our disciplinary and grievance procedures were designed to provide appropriate resolution of institutional standards for student conduct, especially with respect to academic matters. They were never meant for misdemeanors, let alone felonies. While we take our obligations to the victims/survivors of sexual assault very seriously and are fully aware of our responsibilities with respect to sexual assaults, our on-campus disciplinary processes are not proxies for the criminal justice system, nor should they be."  (ACT letter to Senate HELP committee issued June 25, 2014 https://docs.wixstatic.com/ugd/81633a_e6349f914edd434792c9f9848b6ea5a8.pdf)

That universities are ill-equipped and doing a rather poor job in handling Title IX related disciplinary cases is perhaps best illustrated by Proskauer's Higher Education Group which recently released a report on lawsuits brought by students accused of sexual misconduct. The Proskauer report reviewed 130 federal and state court complaints filed by students across the country between January 2011 and December 2016 who claimed violation of their rights during a Title IX investigation and/or adjudication. An analysis of "mistakes" cited in the 130 cases found:

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

- Violations of disciplinary procedures = 3.8%

- Insufficient/improper interim measures = 4.6%

- School made inappropriate public comments re: accused/incident = 6.9%

- Insufficient notice to accused of hearing/charges = 10%

- Insufficient/improper training of school personnel = 11.5%

- Improper use or exclusion of witness testimony at hearing or in investigation = 12.3%

- Evidence of gender bias in investigation and/or hearing = 15.4%

- Improper/insufficient policies, or failure to conform to recorded policies = 17.7%

- Other failures in hearing (evidentiary issues, failure to follow hearing protocol, impartiality of hearing board members) = 46.2%

- Failures in the investigation = 46.9%

  (http://docs.wixstatic.com/ugd/81633a_1d04d45c9a3c433eb6d5f487bb516b0d.pdf)

Clearly defined regulations around the proper way to handle Title IX related sexual misconduct cases that embrace a presumption of innocence, impartial investigations and a balanced and fair approach to gathering reliable information with the objective of reaching equitable outcomes is greatly needed.

The Education Department must not impugn or deny a student's fundamental right to due process. Furthermore, sexual assault should not be swept under the rug by universities, and neither should due process rights of students be tossed out the door. Protecting the rights of sexual assault victims and accused students are not mutually exclusive and should not be treated as a zero-sum game.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

OCR guidance that predisposes college men as rapists is where we stand today which is an aberration to civil liberties. That the only evidence needed to warrant a college student's permanent removal from campus, forever ending one's educational attainment while branding them a rapist for life, is an unsubstantiated accusation is beyond unconscionable.

Flawed policies like the 2011 Dear Colleague Letter directive have promulgated rules that waste millions of taxpayer dollars and foster false beliefs that university campuses are default sanctuaries for sexually violent male students. We need to reverse discriminatory beliefs like these in higher education by developing policies that are fair and equitable.

The Department needs to develop regulations which: 1. protect students from being subjected to biased or discriminatory treatment whenever a Title IX related sexual misconduct or harassment case is pursued and, 2. withdraws and replaces flawed Department guidance documents issued by the Office for Civil Rights (OCR) in April 4, 2011 commonly referred to as the 2011 Dear Colleague Letter (DCL) and also in April 29, 2014 referred to as Questions and Answers on Title IX and Sexual Violence .

Most postsecondary institutions provide a high-quality education that equips students with new knowledge and skills and prepares them for their careers in an educational environment that is free from discrimination which is consistent with the directives of Title IX. However, when postsecondary institutions fail to provide fair and equal treatment to their students and make life-altering disciplinary decisions by demonstrating outcomes that clearly and consistently favor one gender over another by the denial of due process, they violate both the mandate of Title IX which promises all students an educational environment free from discrimination regardless of gender and federal regulations as contained in 34 C.F.R. Part 106

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

which prohibits discrimination on the basis of sex in education institutions receiving federal financial assistance.

OCR needs to issue Title IX regulations that give students access to consistent, clear, and transparent processes that provide fair and equal treatment to both the accuser (the reporting party) and the accused (the responding party); that ensure impartiality in the investigation and adjudication of Title IX related misconduct cases; that provide due process for students; and that warn students, using plain language issued by the Department, about schools which have seen lawsuits filed against them by students alleging denial of due process or the mishandling of their case related to a Title IX disciplinary hearing--so that students can make more informed enrollment decisions.

We endorse regulations that bring clarity to the unique concerns that arise in sexual harassment cases. Specifically, OCR need's to return to foundational requirements contained in their Revised Sexual Harassment Guidance issued on January 19, 2001, namely :

- Guidance about key Title IX requirements and how they relate to sexual harassment and sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish equitable grievance procedures.

- Guidance on proactive efforts schools can take to prevent sexual violence on campus.

- Examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual harassment and sexual violence.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

New regulations are needed to establish a standard that offer the following due process rights to students enrolled at schools:

- The right to written notice of the accuser's complaint with full details of the accusation and with adequate time provided to the accused student in order to prepare a defense;

- The right to students to be represented by counsel, at their own personal expense, and that the student' counsel is granted full participation throughout the proceedings (meaning throughout the investigation and adjudication process);

- The right to examine and have copies provided to the student parties of all evidence obtained by the university, including the university investigator's notes and reports, with special attention provided by the university to gather and provide to both parties all exculpatory evidence;

- The right of the accused student to know the identity of the accuser;

- The right to cross-examine all witnesses, including the accused and the accuser, and the right to call expert witnesses when questions arise, such as whether alcohol or drugs substantially impaired the ability of parties to give consent;

- The right to object to members of the tribunal because of prejudicial bias or conflicts of interest;

- The right for the accused student to remain silent and not provide a statement to college investigators or the campus tribunal, which when exercising this right shall not be construed as an admission of wrongdoing;

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

- The right for the accused to file a counter-claim if evidence indicates violations of the school's student code of conduct or related policies by the reporting student. The exercise of this right cannot be a basis for a claim of retaliation by the school against the accused student;

- The right to have the university produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review in sexual misconduct hearings and;

- The accused student solely shall be provided appellate rights and an appellate review shall be provided in a timely manner so as not to impede a student's educational progress.

It is imperative that new regulations are created that use at minimum the clear and convincing evidentiary standard for all Title IX sexual misconduct related hearings. Victims' rights advocates correctly argue that a lower burden of proof makes it easier to ensure that the guilty are punished. But there is also a mathematically inevitable corollary: a lower burden of proof increases the probability of concluding that the innocent are guilty. A celebrated study conducted by John Villasenor, Professor of Electrical Engineering, Public Policy and Management at UCLA and Visiting Professor of Law, UCLA Luskin School of Public Affairs presented a framework for calculating the risk that an innocent defendant, when subjected to a judicial proceeding using the preponderance of the evidence standard, will be found guilty. "This is a particularly critical issue in light of the significant growth on U.S. college and university campuses of Title IX proceedings which, due to a 2011 mandate from the U.S. Department of Education, must be conducted using preponderance of the evidence standard. Even under the

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

most conservative mathematical assumptions possible under the framework and examples

presented herein, this article has demonstrated that an innocent defendant faces a five times

higher risk of being wrongly found guilty when a preponderance of the evidence standard is

used as opposed to under a beyond a reasonable doubt standard. Under many circumstances,

including the more realistic (relative to the 'conservative' model) probability models explored

here, the relative risk would be even higher, often by a very large margin." (*A probabilistic*

*framework for modelling false Title IX 'convictions' under the preponderance of the evidence*

*standard*; Law, Probability and Risk, Volume 15, Issue 4, 1 December 2016, Pages 223–237)

Additionally, schools should train and appoint 3-person campus tribunals, who will at all

times apply fairness and impartiality to their hearing process and subsequent deliberations.

Given the range of disciplinary sanctions up to and including expulsion, Title IX campus tribunals

should require a unanimous decision before a student can be suspended or expelled.  Faculty of

the University of Pennsylvania School of Law have said that in regard to that university's three-

member tribunal, implementing "scrupulously fair proceedings" requires "a unanimous

decision before a student can be expelled from the University and be stigmatized as a sexual

offender. To require anything less than unanimity for the imposition of serious sanctions is

unacceptable." (Open Letter from Members of The Penn Law School Faculty Regarding Sexual

Assault Complaints: *Protecting Complainants and the Accused Students at Universities - Feb. 18,*

*2015 at*  http://media.philly.com/documents/OpenLetter.pdf )

Definitions of sexual wrongdoing on college campuses are now seriously overbroad.

They go way beyond accepted legal definitions of rape, sexual assault, and sexual harassment.

The definitions often include mere speech about sexual matters which allow students who find

*This document contains privileged and confidential information and shall not be reproduced or distributed*
*without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000147

class discussion of sexuality offensive to accuse instructors of sexual harassment. They are so broad as to put students engaged in behavior that is overwhelmingly common in the context of romantic relationships to be accused of sexual misconduct. Overbroad definitions of sexual wrongdoing are unfair to all parties, and squander the legitimacy of the system. (Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX*, Aug. 21, 2017).

We would hope that OCR would take this opportunity to adopt a clear and consistent definition of sexual harassment that stays within the bounds of Title IX and Title VII law as opposed to straying significantly beyond. Furthermore, rules governing sexual conduct between students both of whom are impaired or incapacitated need to be promulgated, rules which are even-handed as opposed to starkly one-sided between complainants (accusers) and respondents (accused), and that adequately address the complex issues in situations involving use and potentially abuse of alcohol and drugs by college students.

While some terms such as "victims" or "survivors" may be appropriate at certain stages, such as post-conviction, those terms are inappropriate at other stages, such as during an investigation. These terms are appropriate when delivering medical treatment to a victim or remedial services to survivors of rape or sexual assault in a post-conviction context. They are not appropriate, however, in regulations dealing with campus disciplinary processes or during the investigatory phase of an anticipated administrative proceeding, where the truth is not yet known and the use of such terms could skew the investigation and the proceedings. In these contexts, the terms "complaining witness" or "accuser" are more appropriate. (The Heritage

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

Foundation LEGAL MEMORANDUM No. 211 | July 25, 2017 *Campus Sexual Assault: Understanding the Problem and How to Fix It* by Hans von Spakovsky).

New regulations need to provide definition and standardization to ambiguous sexual misconduct related terms. We suggest that proposed regulations provide the following definitions and examples:

- **Sex discrimination** refers to treating a person differently because of that person's sex. As a general rule, sex discrimination occurs when a school has a policy or practice that treats men different from women. This could be an affirmative policy—men's sports teams receive special perks that women's teams do not—or it could be the absence of a policy. In the Title IX context, "deliberate indifference" to sexual harassment by an institution is an example of the latter.

- **Sexual harassment**, is one type of sex discrimination. "Harassment," even when not sexual, is always difficult to define. In general, sexual harassment is a pattern of intimidation or bullying relating to one's sex or the sexual act. The Supreme Court of the United States has given some guidance: In the context of Title IX, actionable sexual harassment by an institution occurs when an institution (1) has actual knowledge of sexual harassment; (2) is deliberately indifferent to that sexual harassment; and (3) the sexual harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an education opportunity or benefit." Sexual harassment must refer only to behavior that could reasonably be expected to actually interfere with a student's equal access

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

to federally subsidized educational programming and meets the legal standard promulgated by the Supreme Court.

- **Sexual violence** refers to a violation of a state criminal statute and involves non-consensual sexual contact with violence by one person against another. Some of this conduct might constitute a misdemeanor; other conduct such as rape and aggravated sexual assault are felonies. This conduct is squarely within the criminal realm. All reasonable people know that sexual violence is illegal; that it harms victims physically and psychologically; and that it threatens the peace and safety of college communities. Colleges have a duty to foster an atmosphere of mutual respect that will help prevent these types of crimes. But they also have a legal duty to publicly disclose these crimes that are reported to their campus police or security department under the Clery Act.

- **Rape** is the most serious type of criminal sexual assault. Rape is defined by the FBI as "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without consent of the victim." Each state has its own definition of rape, which may vary slightly from the FBI's definition. Schools should report rape to law enforcement. (The Heritage Foundation LEGAL MEMORANDUM No. 211 | July 25, 2017 *Campus Sexual Assault: Understanding the Problem and How to Fix It* by Hans von Spakovsky).

It's worth noting that there remains in the public domain debate surrounding the question of consent. New regulations should include a definition of consent. In that regard, we

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

would suggest using the definition of consent as defined by Congress which in the context of rape and sexual assault is stated as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from use of force, threat of force, or placing another person in fear does not constitute consent." (*Manual for Courts-Martial*, Article 120(g)(8)(A) (2012 edition).

We suggest new regulations also require schools to:

- Prohibit the use of lawsuit waivers for Title IX disciplinary matters;

- Require schools to disclose to and notify the Secretary of judicial filings and dispositions related to any legal proceeding filed by a student against their school related to the handling of their Title IX disciplinary case.

There are typically three aspects involved in the disposition of a Title IX sexual misconduct complaint and they are:

1. Notification of a complaint

2. Investigation of a complaint

3. Adjudication of a complaint

Each of these stages have essential elements which school's need to incorporate into their policies so as to ensure consistent, clear, and transparent processes that provide fair and equal treatment to both the accuser and the accused. We have outlined these stages and their respective due process elements in the following table. Lastly, we have provided a suggested outline that OCR should utilize when issuing new regulations and/or Title IX related guidance.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

| Item | Notification | Investigation | Adjudication |
|---|---|---|---|
| 0 | Universities shall provide formal, detailed notification to students facing a Title IX investigation relating to sexual misconduct or harrassment and shall include the following elements in the notification document: | Universities shall provide to employees tasked with conducting Title IX related investigations specialized training that requires the mastery of the following investigative work elements: | Universities shall conduct Title IX related hearings in a manner that is fair and impartial and shall provide the following elements of due process throughout the adjudication process: |
| 1 | The identity of the complainant (accuser); | Conducting work in a sensitive, fair and impartial manner throughout the investigation; | The accused party shall have the right to face his/her accuser unless he/she has explicitly waived this right; |
| 2 | A description of the violation being alleged and the date, time and location of where the alleged violation took place; | Conducting work that meets applicable confidentiality requirements; | The parties must have an equal opportunity to present relevant witnesses and other evidence; |
| 3 | A description of the investigative process; | Gathering (and preserving) inculpatory and exculpatory evidence; | The parties shall have the right to question and cross-examination each other and witnesses; |
| 4 | Reference to all procedures, policies and student rights applicable during the investigative process; | Identifying and locating potential witnesses to arrange interviews; | The parties shall have the right to be represented by an attorney who shall be allowed to fully participate in the questioning and cross-examination of the parties and witnesses |
| 5 | Assurance that the investigator has been trained in handling investigations in a sensitive and impartial manner and will afford a presumption of innocence to the accused throughout the investigation; | Conducting witness interviews in a sensitive, transparent, non-threatening, and non-adversarial manner; | The parties shall be provided two weeks advance notice of the hearing and which shall contain the time, date and location of the hearing and shall further reference all procedures, policies and student rights applicable during the hearing process; |
| 6 | A recommendation for the accused student to seek legal counsel with notice provided that information and evidence provided to the university in the course of the investigation may be deemed admissible in a court of law; | Taking and preserving legible, detailed witness interview notes; | The parties shall be provided with a copy of the investigation's report to include copies of all gathered evidence and witness interview notes which shall be provided to the parties at least two weeks prior to the time of the scheduled hearing; |
| 7 | Assurance that the university will provide an adequate, reliable, fair and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence. | Summarizing and communicating the veracity of the evidence gathered during the investigation in a manner that is free from pre-judgment determination. In other words, the investigator's formal report should allow for the evidence to speak for itself. | The parties shall be provided with the name or names of the person or persons who have been chosen to act in the capacity of the hearing authority at least two weeks prior to the time of the scheduled hearing and if either party raises a verifiable concern of a conflict of interest, the university shall remove and replace the person or persons from the hearing authority role; |
| 8 | The right for a student to remain silent and an assurance that adverse inferences or comments cannot be made by the investigator as a result of the student's silence. | | Inculpatory and exculpatory evidence shall be admitted as evidence into the hearing; |
| 9 | Three day written notice provided prior to any initial meeting and/or contact with an investigator with the right to have the student's attorney present during any and all meetings between the student and the investigator. | | The standard used for Title IX sexual misconduct or harrassment cases shall be the clear and convincing evidentiary standard; |
| 10 | A copy provided to the parties of the notification. | | The accused party shall have the right to appeal where the university sanction disrupts the accused student's educational progress; |

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

REVISED GUIDANCE ON TITLE IX AND SEXUAL VIOLENCE

Suggested Outline of Contents

I.     Introduction

II.    Title IX Requirements Related to Sexual Harassment and Sexual Violence

       A.  Definitions
       B.  Schools' Obligations to Respond
       C.  Procedural Requirements
              1.  Notice of nondiscrimination
              2.  Designation of Title IX coordinator
              3.  Publish grievance procedures

III.   Prompt and Equitable Grievance Procedures

IX.    Role of Title IX Coordinators

       A.  Overseeing complaints
       B.  Confidentiality
       C.  Notification
       D.  Assigning an investigator
              1.  Fairness and impartiality
              2.  Conflicts of interest
              3.  Fact-finding experience
              4.  Inclusion of exculpatory evidence
              5.  Suspension of investigation due to criminal investigation
       E.  Providing copies of collected evidence to student parties

X.     Due Process Rights

       A.  Notification of disciplinary charges
       B.  Notification of disciplinary hearing
       C.  Right to counsel participation
       D.  Right to Title IX investigator report
       E.  Right to inclusion of exculpatory evidence
       F.  Right to question accuser, accused and witnesses
       G.  Right to remain silent
       H.  Right to remove hearing panelist due to conflict of interest
       I.   Right to file a non-retaliatory counterclaim
       J.  Right to a meaningful record
       K.  Appellate rights

XI.    Campus disciplinary tribunal

       A.  Make up of panel
       B.  Independence from Title IX office (conflict of interest)
       C.  Training requirements
       D.  Fairness and impartiality
       E.  Adjudication
       F.  Clear and convincing evidentiary standard
       G.  Unanimity for imposition of sanctions

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

| | |
|---|---|
| **From:** | NCFMC |
| **Sent:** | 23 Jun 2017 20:19:28 -0400 |
| **To:** | Ferg-Cadima, James |
| **Cc:** | Henderson, Chelsea;Jackson, Candice |
| **Subject:** | NCFMC recommendations 6.20.17 v1.pdf |
| **Attachments:** | OCR related DCL remedy recommendations 6.20.17 v1.pdf |

James,

Thank you, Candice and the rest of the OCR team for the rich discussion around due process rights for accused students this morning during our meeting. It is great relief to know that OCR is hearing the voices of those who have been victims of a biased, inequitable and unfair system stacked against students accused of Title IX violations.

We believe that having well-defined processes, policies and protocols in place to help guide universities is a necessary approach to ensuring that adequate due process is applied uniformly across institutions of higher learning. In other words, we should not leave the determination of what constitutes due process in the hands of university administrators to decide as we have seen firsthand the damage done by this kind of ambiguity.

To that end, we have developed a series of recommendation that are quite prescriptive in the application of the notification, investigation and adjudication stages of a Title IX related case. We shared this document with Candice previous to our meeting and want to ensure that you and the rest of the team likewise have access to this supplement.

Thank you again for your dedication and diligence. As always, please do not hesitate in contacting me if I can be of any immediate service.

Best regards,

Greg

Gregory J. Josefchuk
National Coalition For Men Carolinas (NCFMC)
1270 Lake Front Drive
Catawba, NC 28609
Office: (828) 478-2281
Mobile: PII
http://www.ncfmcarolinas.com/

Sent from my iPad

**National Coalition For Men Carolinas (NCFMC)**
**Remedies to Improve Due Process for Title IX Cases Related to Sexual Misconduct or Harassment**

| | Notification Stage (NS) | Investigation Stage (IS) | Adjudication Stage (AS) |
|---|---|---|---|
| | Universities shall provide formal, detailed notification to students facing a Title IX investigation relating to sexual misconduct or harassment and shall include the following elements in the notification document: | Universities shall provide to employees tasked with conducting Title IX related investigations specialized training that requires the mastery of the following investigative work elements: | Universities shall conduct Title IX related hearings in a manner that is fair and impartial and shall provide the following elements of due process throughout the adjudication process: |
| 1 | The identity of the complainant (accuser); | Conducting work in a sensitive, fair and impartial manner throughout the investigation; | The accused party shall have the right to face his/her accuser unless he/she has explicitly waived this right; |
| 2 | A description of the violation being alleged and the date, time and location of where the alleged violation took place; | Conducting work that meets applicable confidentiality requirements; | The parties must have an equal opportunity to present relevant witnesses and other evidence; |
| 3 | A description of the investigative process; | Gathering (and preserving) inculpatory and exculpatory evidence; | The parties shall have the right to question and cross-examination each other and witnesses; |
| 4 | Reference to all procedures, policies and student rights applicable during the investigative process; | Identifying and locating potential witnesses to arrange interviews; | The parties shall have the right to be represented by an attorney who shall be allowed to fully participate in the questioning and cross-examination of the parties and witnesses |
| 5 | Assurance that the investigator has been trained in handling investigations in a sensitive and impartial manner and will afford a presumption of innocence to the accused throughout the investigation; | Conducting witness interviews in a sensitive, transparent, non-threatening, and non-adversarial manner; | The parties shall be provided two weeks advance notice of the hearing and which shall contain the time, date and location of the hearing and shall further reference all procedures, policies and student rights applicable during the hearing process; |
| 6 | A recommendation for the accused student to seek legal counsel with notice provided that information and evidence provided to the university in the course of the investigation may be deemed admissible in a court of law; | Taking and preserving legible, detailed witness interview notes; | The parties shall be provided with a copy of the investigation's report to include copies of all gathered evidence and witness interview notes which shall be provided to the parties at least two weeks prior to the time of the scheduled hearing; |

6/22/2017

AR_00000155

**National Coalition For Men Carolinas (NCFMC)**
**Remedies to Improve Due Process for Title IX Cases Related to Sexual Misconduct or Harassment**

| | Notification Stage (NS) | Investigation Stage (IS) | Adjudication Stage (AS) |
|---|---|---|---|
| | Universities shall provide formal, detailed notification to students facing a Title IX investigation relating to sexual misconduct or harassment and shall include the following elements in the notification document: | Universities shall provide to employees tasked with conducting Title IX related investigations specialized training that requires the mastery of the following investigative work elements: | Universities shall conduct Title IX related hearings in a manner that is fair and impartial and shall provide the following elements of due process throughout the adjudication process: |
| 7 | Assurance that the university will provide an adequate, reliable, fair and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence. | Summarizing and communicating the veracity of the evidence gathered during the investigation in a manner that is free from pre-judgment determination. In other words, the investigator's formal report should allow for the evidence to speak for itself. | The parties shall be provided with the name or names of the person or persons who have been chosen to act in the capacity of the hearing authority at least two weeks prior to the time of the scheduled hearing and if either party raises a verifiable concern of a conflict of interest, the university shall remove and replace the person or persons from the hearing authority role; |
| 8 | The right for a student to remain silent and an assurance that adverse inferences or comments cannot be made by the investigator as a result of the student's silence. | The accused student shall have the right to be represented by an attorney who shall be allowed to participate to the same extent as the accused. | Inculpatory and exculpatory evidence shall be admitted as evidence into the hearing; |
| 9 | Three day written notice provided prior to any initial meeting and/or contact with an investigator with the right to have the student's attorney present during any and all meetings between the student and the investigator. | Investigation interviews shall be recorded and the audio files shall be made available to the parties and deemed admissible at any hearing | The standard of proof used for Title IX sexual misconduct or harrassment cases shall be the clear and convincing evidentiary standard; |
| 10 | A copy provided to the parties of the Title IX related complaint notification. | | The accused party shall be provided with the investigation and/or hearing findings which shall be sufficiently detailed to permit meaningful appellate review. |

6/22/2017

AR_00000156

**Ashley, Carol**

| | |
|---|---|
| **From:** | Ashley, Carol |
| **Sent:** | Monday, July 31, 2017 7:13 PM |
| **To:** | Henderson, Chelsea; Faiella, Matt; Reyes, Alejandro; Patel, Shiwali; Wheeler, Joseph; Gettler, Rachel; Battle, Sandra; Yao, Alice; Sherman, Brandon; Wills, Randolph; Chang, Lisa |
| **Cc:** | Jackson, Candice |
| **Subject:** | RE: Draft Intro/Preamble |
| **Attachments:** | Clarification re Title IX and Sexual Violence.Clean.07-31-17.docx; Clarification re Title IX and Sexual Violence.Tracked.07-31-17.docx |

Hi All,

> # DPP

Thanks for all your work on the draft!

Carol

---

**From:** Henderson, Chelsea
**Sent:** Friday, July 28, 2017 2:42 PM
**To:** Faiella, Matt; Reyes, Alejandro; Patel, Shiwali; Wheeler, Joseph; Gettler, Rachel; Battle, Sandra; Yao, Alice; Sherman, Brandon; Wills, Randolph; Ashley, Carol; Chang, Lisa
**Cc:** Jackson, Candice
**Subject:** RE: Draft Intro/Preamble

Attached.

---

**From:** Henderson, Chelsea
**Sent:** Friday, July 28, 2017 2:41 PM
**To:** Faiella, Matt; Reyes, Alejandro; Patel, Shiwali; Wheeler, Joseph; Gettler, Rachel; Battle, Sandra; Yao, Alice; Sherman, Brandon; Wills, Randolph; Ashley, Carol; Chang, Lisa
**Cc:** Jackson, Candice
**Subject:** Draft Intro/Preamble

Hi everyone,

I just wanted to make sure this draft was circulated to all (b)(5) who participated in our T9 Team + HQ Enforcement meetings. (b)(5) Thanks to (b)(5) Title IX team for putting it together.

Have a great weekend,
Chelsea


Chelsea C. Henderson
Office for Civil Rights
US Department of Education
O: 2024535799

# DPP

AR_00000158

# DPP

# DPP

AR_00000160

# DPP

AR_00000161

# DPP

AR_00000162

# DPP

AR_00000163

# DPP

AR_00000164

# DPP

AR_00000165

**Kathleen C. Santora**

| | |
|---|---|
| **From:** | Kathleen C. Santora |
| **Sent:** | Tuesday, August 01, 2017 10:02 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Regional Center Study |
| **Attachments:** | Regional Center Pilot Program Final Report.pdf |

Candice, the Virginia report has been made public -- it is attached.

Kathleen

August 2017



# Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and Gender-Based Violence



STATE COUNCIL OF HIGHER
EDUCATION FOR VIRGINIA

AR_00000167

## Contents

Overview ............................................................................................... 1

    Methodology ...................................................................... 3

    Conclusion ........................................................................ 4

Legislative and Historical Background ................................................ 4

Key Components and Functions ......................................................... 7

A Multidisciplinary Approach ........................................................... 11

Start-up and Operational Costs ........................................................ 12

Governance and Model for Long-term Shared Financial Support ................... 15

Legislative Requirements ................................................................. 16

Potential Locations .......................................................................... 16

Conclusion ...................................................................................... 16

Appendix A: Acts of Assembly ......................................................... 17

Appendix B: Sample Memorandum of Understanding ...................... 18

Appendix C: Letter from Ellen W. Plummer, Associate Vice Provost for Academic Administration at Virginia Tech on behalf of the Sexual Assault Advisory Committee ......................................................................... 18

Appendix D: Letter from David M. McCoy, President of the Virginia Association of Campus Law Enforcement Administrators ................................... 18

Works Cited .................................................................................... 19

AR_00000168

## Overview

Item 146, Paragraph k, Chapter 780, 2016 Acts of Assembly appropriated $100,000 from the general fund to the State Council of Higher Education for Virginia (SCHEV) to study and design a pilot program for a regional center for the investigation of incidents of sexual and gender-based violence at the Commonwealth's institutions of higher education. SCHEV is to "communicate the pilot design to the Secretaries of Education and Public Safety and Homeland Security and to the Chairs of the House Appropriations and Education and Senate Finance and Education and Health Committees by August 1, 2017."

Specifically, this legislative charge requires that the pilot program include:

> a partnership between higher education, law enforcement, and state government where criminal incidents of sexual and gender-based violence could be reported directly to the center for independent and neutral investigation. The center would be staffed with trauma-informed investigators who would coordinate with both colleges and universities and law enforcement to carry out the investigative responsibilities outlined by Title IX and the Violence Against Women Act. The program design shall include start-up and operational costs, staffing needs, sample memorandum of understanding between higher education institutions, law enforcement and Commonwealth's attorneys' offices, any legislative requirements, and a model for long-term shared financial support. The center's scope would apply only to allegations of criminal behavior.

All institutions of higher education that receive federal funds are obligated to "provide a safe and nondiscriminatory living, learning, and work environment," as well as to "prevent sexual and gender-based harassment, interpersonal violence, and to take immediate responsive action when such conduct occurs in connection with the educational institution's programs or activities."[1] Every institution also has the responsibility to enforce its own code of student, faculty and employee conduct, which may include many violations of the criminal code including sexual assault.

---

[1] (Gomez & Smith, 2016)

AR_00000169

While fulfilling these obligations, institutions of higher education are required to investigate and adjudicate sexual and gender-based crimes in accordance with the law, while also supporting victim-complainants, respondents and witnesses, in a timely and fair manner. For many institutions, the financial and staffing burden of Title IX investigations is enormous, but they must comply with federal laws and regulations regardless of resources. Additionally, there can be a "perception of institutional bias, meaning that if and when they do err, they are presumed to have done so to protect the institution."[2] This perception can lead to underreporting of sexual violence and additional trauma for victim-complainants. Also, it can expose the Commonwealth and its institutions to a liability and potential lawsuit in every single case it investigates.[3] Proponents of the consortial regional center model believe it could address issues that arise naturally as institutions of higher education grapple with how to provide competent, fair, and cost-efficient investigations. A consortial approach could be particularly effective for under-resourced institutions of higher education, as they can leverage common resources to reduce costs. However, if the regional center includes large, well-resourced institutions, the large caseloads from these schools could overwhelm the center and perhaps prevent timely investigations.

The pilot program explored here aims to improve communication between law enforcement and educational institutions in order to ensure a fair and timely investigation of sexual and gender-based violence. Among its goals would be the reduction of victim re-traumatization and the improvement of due process for both complainants and respondents by providing a multidisciplinary approach to Title IX investigations.

A pilot center would employ neutral, trauma-informed investigators who would operate with increased cooperation with local law enforcement and institutional advocates to navigate each school's adjudication process. Additionally, the regional center would aim to reduce the cost to the Commonwealth's colleges and universities for investigating these incidents by pooling resources. The Commonwealth's four-year institutions average 40 investigations of criminal incidents of sexual and gender-based violence by a known and affiliated person (such as a student, employee, or faculty

---

[2] (Gomez & Smith, 2016)
[3] (Gomez & Smith, 2016)

member) per institution, per year.[4] This does not include the total number of
investigations for the Commonwealth's community colleges, which have fewer cases
per year but would add to the total investigated by a regional center. The cost of each
investigation can be upwards of $30,000, resulting in a potential $16.8 million
expenditure every academic year to investigate and adjudicate these cases, not
including the potential for litigation expenses.[5]

Per the legislative requirements, the regional center is to be based on the model of the
Children's Advocacy Center, which implements a multidisciplinary approach to
investigating allegations of child abuse.[6] The Children's Advocacy Center model is a
"child-focused, facility-based program in which representatives from core disciplines —
law enforcement, child protection, prosecution, mental health, medical, and victim
advocacy — collaborate to investigate child abuse reports, conduct forensic interviews,
determine and provide evidence-based interventions, and assess cases for
prosecution."[7] The Children's Advocacy Center model works well for minor children
who have limited choice due to their status as minors, and whose cases are adjudicated
within the criminal codes that protect them. This model does not translate to an
institutional setting where the complainants are typically adults operating in a
framework governed by an administrative code of conduct, and is led by victim-choice.

## Methodology

In researching and developing the pilot program, SCHEV staff engaged subject-matter
experts, law enforcement, victims' advocates, various representatives from Virginia's
public and private colleges and universities, as well as commonwealth's attorneys and
the Office of the Attorney General for Virginia (OAG). SCHEV's Sexual Violence
Advisory Committee (SVAC) was engaged on three occasions to provide input on the
regional-center pilot study. The SVAC is composed of experts and practitioners who
advise on programs, policies, training and education opportunities to prevent and

---

[4] Self-reported by some of the Commonwealth of Virginia's two- and four-year institutions of higher
education for the purposes of this report, however, not all institutions are represented in this figure due
to non-response.
[5] Self-reported by some of the Commonwealth of Virginia's two- and four-year institutions of higher
education for the purposes of this report, however, not all institutions are represented in this figure due
to non-response.
[6] (2016 Virginia Acts of Assembly, 2016)
[7] (National Children's Alliance, 2017)

AR_00000171

respond to sexual violence within the Commonwealth's institutions of higher education.[8] Additionally, Virginia's public college and university presidents, and public and private college and university provosts were invited to provide feedback on the regional center. SCHEV staff attended a conference and trainings through the Virginia Department of Criminal Justice on the subject of campus sexual violence and met with representatives from the Greater Richmond Child Advocacy Center (on whose model the regional center was to be based). Subject-matter experts on the institutional response to sexual and gender-based harassment and violence were invited to present to one of the SVAC meetings, and their expertise was utilized on several occasions while devising the regional center. Finally, SCHEV staff met with representatives from campus law enforcement, several commonwealths' attorneys and their assistants, as well as liaisons from the OAG to provide feedback on the legal and functional role of a regional center.

## Conclusion

The following sections lay out a design for the regional center for the investigation of sexual and gender-based violence, and its positives and negatives. However, in studying and devising this concept, in consultation with Virginia's institutions of higher education, law enforcement, victims' advocates and the Office of the Attorney General, it is a conclusion of this report that the regional-center model entails too many difficulties and unresolved problems to make it feasible.

## Legislative and Historical Background

Several federal laws make up the regulatory framework surrounding investigations of sexual and gender-based violence at institutions of higher education. Title IX of the Education Amendments of 1972 (Title IX) prohibits discrimination on the basis of sex in educational institutions that receive federal funds either directly or indirectly.[9] It applies to students, employees, and third parties, and its protections apply to conduct that occurs either on- or off-campus involving someone associated with an institution of higher education.[10] Sexual violence is defined by Title IX as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent

---

[8] (State Council of Higher Education for Virginia, 2016)
[9] (Title IX and Sex Discrimination, 2015)
[10] (Ali, 2011)

AR_00000172

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

(e.g., due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion."[11]

In 2011, the U.S. Department of Education's Office for Civil Rights (OCR) released a "Dear Colleague" letter (DCL), which clarifies the Title IX requirements and outlines specific guidance to institutions of higher education that receive federal funding with regard to student-on-student sexual harassment and sexual violence."[12] Specifically, it provides:

> guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police) and address sexual violence; provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures; discusses proactive efforts schools can take to prevent sexual violence; discusses the interplay between Title IX, the Family Educational Rights and Privacy Act (FERPA), and the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act) as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator; and provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.[13]

In 2014, the Office for Civil Rights released a "significant guidance document" titled "Questions and Answers on Title IX and Sexual Violence," which further clarifies its interpretation of policy on a school's obligations for ensuring all students' Title IX rights in regards to sexual violence.[14] It outlines a school's obligation to respond to sexual violence, procedural requirements, investigations and hearings, interim measures, remedies and notice of outcome, and appeals, among other relevant topics.

---

[11] (Lhamon, 2014)
[12] (Ali, 2011)
[13] (Lhamon, 2014)
[14] (Lhamon, 2014)

AR_00000173

In addition to the Title IX requirements, two other major federal laws affect institutional responses to sexual violence. The Jeanne Clery Act of 1990 requires institutions of higher education to report crimes, issue timely warnings, provide education and prevention programs, and create policies and procedures for many other crimes in addition to sexual violence.[15] Currently, the fine for failing to provide a timely warning under the Clery Act is $35,000 per violation. The Violence Against Women Reauthorization Act of 2013 amends the Clery Act to expand sexual-assault reporting requirements to include dating violence, domestic violence and stalking, and expands its application to all students and employees.[16]

In 2014 Governor McAuliffe announced a Task Force on "Combating Campus Sexual Violence," which was chaired by Attorney General Mark Herring.[17] The Task Force recommendations fall under five themes:

I. Engaging Our Campuses and Communities in Comprehensive Prevention;
II. Minimizing Barriers to Reporting;
III. Cultivating a Coordinated and Trauma-Informed Response;
IV. Sustaining and Improving Campus Policies and Ensuring Compliance; and
V. Institutionalizing the Work of the Task Force and Fostering Ongoing Collaborations.[18]

Under the recommendation of the Governor's Task Force, SCHEV regularly convenes the SVAC and engages its members' expertise on pertinent topics regarding campus sexual violence.

Since 2008, there have been 11 active and resolved Title IX investigations by the OCR at Virginia public institutions of higher education.[19] Currently, the College of William and Mary, George Mason University, James Madison University, the University of Mary Washington, the University of Virginia and Virginia Commonwealth University are all under active investigation by OCR. The University of Virginia, Virginia Commonwealth University and Virginia Military Institute all have come to resolution with OCR in some or all cases. Three private Virginia institutions of higher education are also currently

---

[15] (The Clery Center, 2017)
[16] (Violence Against Women Reauthorization Act of 2013, 2013)
[17] (Governor's Task Force On Combating Campus Sexual Violence, 2015)
[18] (Governor's Task Force On Combating Campus Sexual Violence, 2015)
[19] (The Chronicle's Title IX investigation tracker, 2017)

AR_00000174

under investigation by OCR, including Liberty University, the University of Richmond and Washington and Lee University.[20]

In November 2014, *Rolling Stone* magazine published an article describing a purported gang rape at the University of Virginia and the alleged victim's inability to receive justice at the university level.[21] The account and article, which was found to be false and then was subsequently retracted by the magazine, brought Virginia institutions of higher education and Title IX investigations to national attention.[22] Following the now-retracted article and the subsequent media scrutiny, the University of Virginia initiated a discussion with the Virginia Department of Education relating to a proposed regional center for the investigation and adjudication of incidents of sexual and gender-based violence. The idea never progressed to the point of a formal proposal; however, the 2016 Virginia State Budget included a line item appropriating $100,000 for the purposes of its study and outlining its requirements.[23]

## Key Components and Functions

In order to accomplish the goals set forth in the legislative charge,[24] a regional center for the investigation of sexual and gender-based violence would investigate and adjudicate criminal conduct that occurs at any of Virginia's institutions of higher education. Investigations of incidents that do not meet the criminal threshold would occur at the institutional level. However, colleges and universities would still be required to investigate and adjudicate noncriminal violations of conduct, so the establishment of a regional center would not eliminate staffing needs for Title IX functions. Duplication of Title IX staff, including investigators, would negate any cost savings that could be associated with a consortial approach, as shown in the figures below.

The regional center would be an objective, investigative body, staffed with forensically trained trauma-informed professionals. The employment of independent professional forensic interviewers and investigators could inoculate against the perception of

---

[20] (The Chronicle's Title IX investigation tracker, 2017)
[21] (Erdely, 2014)
[22] (Sisario, Spencer, & Ember, 2016)
[23] (Summary of Budget Actions for the 2014-16 Biennium, 2016)
[24] (2016 Virginia Acts of Assembly, 2016)

AR_00000175

institutional bias and provide consistent and reliable results.[25] The center staff would also be free from conflict of interest in a "word-against-word" model, which is often the case in incidents of sexual violence at institutions of higher education.[26] However, the state potentially could open itself up to more litigation and higher costs under this model because the regional center would carry out some of the required Title IX functions; it would therefore be subject to investigation by OCR along with the institution itself. If a respondent files a lawsuit in a case that was investigated and adjudicated by the regional center, s/he would likely file against both the institution and the regional center. In this model the Commonwealth would bear the cost of this litigation, even if the center and affiliated institutions of higher education all are granted immunity by the General Assembly, due to the fact that most of the litigation involving institutions of higher education in the Commonwealth is based on allegations of violating federal law and the U.S. constitutional due process, and the General Assembly cannot grant immunity from those claims.

A regional center also would provide a centralized way for incidents to be reported. It would be equipped with a hotline and an easily navigable website that allows for reporting, similar to what most institutions already have in place. Institutional websites also would have the option for those reporting criminal incidents of a sexual and gender-based nature to connect directly to the regional center's reporting form. This capability for centralized reporting could provide a quick investigative response, which is required under Title IX.[27] However, having a regional center provide intake for cases before the police could result in lost time and degradation of evidence, thus reducing the effectiveness of both the criminal and Title IX investigations. Additionally, records-maintenance practices that are consistent with good investigative practice could well violate FERPA requirements.

Investigative functions would include conducting independent fact-finding separate from the institution of higher education. According to OCR,

> the term 'investigation' refers to the process a school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing

---

[25] (Gomez & Smith, 2016)
[26] (Gomez & Smith, 2016)
[27] (Ali, 2011)

and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.[28]

However, one major issue regarding these investigations is that each institution of higher education in Virginia has its own policies and procedures regarding Title IX investigations, in addition to individual university cultures, which the regional center must take into account. This may require standardization across all institutions with regards to sexual assault investigations.

The regional center would provide at least one mobile unit that is equipped with a video recording system specifically designed for forensic interviews. This aims to prevent victim re-traumatization by conducting only one interview with the complainant, which can be shared with law enforcement, if necessary.[29] OCR requires a "timely" investigation, which typically occurs in a 60-calendar-day timeframe.[30] A mobile unit could be dispatched immediately to anywhere in the Commonwealth to ensure that the federal time requirement is met. However, transferring the investigative function to the regional center does not relieve the institutions of higher education from the responsibility of compliance with Title IX and OCR for those cases. The institutions still need to provide accommodations to students affected by misconduct, impose interim safety measures, provide counseling, etc. Compliance with these requirements means that institutions would have to be involved with the regional center's investigation to know the facts of a case in order to take action before final decisions of responsibility are made. Compliance also requires the institutions to have repeated contact with the complainant and respondent, which undercuts the goal of reducing victim re-traumatization. Additionally, one interview is not consistent with the requirements under due process, because the respondent must be given an opportunity to question the complainant, which is in opposition to OCR guidance.

---

[28] (Lhamon, 2014)
[29] (Gomez & Smith, 2016)
[30] (Ali, 2011)

AR_00000177

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

OCR regulations do not require a hearing, and specifically recommend that respondents and complainants not directly question one another.[31] Due to the nature of the regional center being a purely investigative model, it would not include a standard hearing. However, it would, as a part of the investigation, allow both complainants and respondents to submit written questions and receive responses from all parties including witnesses. While OCR guidance would sanction such a purely investigative model in which there is no traditional hearing where the accused can question their accuser, the model may not stand up to judicial scrutiny regarding due process for the respondent, as was the case in a claim against the state of Pennsylvania in 2015. [32]

Following fact-gathering, investigators would be required to report a "responsible" or "not responsible" finding based on the evidence collected, using the preponderance-of-evidence standard of proof required by OCR. [33] A finding of "responsible" under this standard would mean that the investigators are more than 50% certain the respondent is responsible, based on the evidence. The finding would be binding on the institution. There are different legal standards for a finding of guilt in the criminal justice system and the finding of responsibility under Title IX, as the reasonable-doubt burden of proof in a criminal case is much higher than the preponderance-of-evidence standard.

Once a finding is determined, the Commonwealth's institutions of higher education will provide notice to both parties in writing about the outcome of the investigation, as required by Title IX and according to OCR's guidance.[34] If there is a finding of responsibility, each institution would be expected to impose an appropriate sanction and other remedies according to its own guidelines and policies.[35]

If an appeal is requested by either party, the school will also follow its own guidelines and policies regarding appeals. Title IX does not require that an institution provide a process for appeals. OCR, however, "does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the

---

[31] (Ali, 2011)
[32] (John Doe II v. The Pennsylvania State University; Eric Barron; and Danny Shaha, 2015)
[33] (Ali, 2011)
[34] (Lhamon, 2014)
[35] (Ali, 2011)

AR_00000178

findings."[36] Most appeals relate to a finding of responsibility, so the institution would
be responsible for reviewing the determination made by the regional center. Many
institutions incorporate hearings into the appeals process, and depending upon its
particular policies, the investigator may have to be present at an appeal hearing.

## A Multidisciplinary Approach

A regional center for the investigation of sexual and gender-based violence would
require the cooperation of various stakeholders including institutions of higher
education, law enforcement and the offices of the commonwealth's attorney. Due to the
criminal nature of these incidents, a certain degree of cooperation is already in effect
through the use of Sexual Assault Response Teams, or coalitions of local agencies that
serve victims of sexual violence. Cooperation is simple when an incident is confined to
a single institution and locality. However, some cases of sexual assault take place
between students at different institutions or in multiple localities, which can make
cooperation difficult, particularly if an incident involves an institution that is not
involved with the regional center, and where a Memorandum of Understanding (MOU)
may not be in place. The model also does not take into account the fact that some
assaults take place outside of Virginia during school breaks.

Other services, such as counseling, health, and adjudicative advisors already are offered
at each institution of higher education in Virginia, as well as in the communities
surrounding each school. Based on anecdotal statements from practitioners in this area,
these community partnerships work well and provide convenient local access to the
necessary services that a victim-complainant might require. Therefore, it is
recommended that the regional center not "re-create the wheel" by also offering or
coordinating these services. Doing so may actually prevent the victim-complainant
from receiving the necessary services in a timely manner, depending on their
geographic location and particular needs. The institutions of higher education will
continue to support these students before, during and after the investigation and
adjudication, so they are best-equipped to provide and coordinate these other services.

Criminal incidents of sexual and gender-based violence would be reported directly to
the regional center for independent and neutral investigation, either by the

---

[36] (Lhamon, 2014)

AR_00000179

complainants, the institution of higher education or law enforcement, depending upon the nature of the incident and to whom it is originally reported. However, this could conflict with the principle of allowing the victim to choose whether or not to pursue an investigation, criminal or otherwise. In the Commonwealth, the majority of complainants do not wish to proceed with a criminal investigation. In keeping with OCR guidance, complainants should have a say with regard to whether or not an investigation occurs. Under this model, depending upon the mode of reporting, the wishes of the complainant may not be considered — for example, if an institution that opts in to the regional center is required to send all of its potentially criminal conduct to the center for investigation, regardless of the wishes of the complainant. This is further complicated when considering the scenario of parties from two different institutions – one that is a participant in the center — and one that is not. If the complainant's institution is not a participant in the center, but the respondent's is, then the complainant would be forced to deal with the investigation through the center because of the respondent's affiliation. This scenario would also require the complainant's institution to deal with the center, potentially without an MOU in place, opening it up to further liability. Further, victims' advocates fear that the regional center being so similar to a law enforcement investigation, and requiring cooperation with the police, could potentially decrease the reporting of incidents of sexual violence, defeating the purpose of the center.

If a center were to be created, due to the wide geographic spread of Virginia's institutions of higher education it would be most effective to establish a regional center as a centrally located brick-and-mortar facility for administrative functions, in addition to a mobile facility equipped for forensic interviews. Incidents of sexual and gender-based violence could be reported to the center — via telephone, email or an anonymous online form — which would launch the investigation.

## Start-up and Operational Costs

The staffing and infrastructure needs for a regional center have been examined, with minimal components in place for the provision of effective services. This includes staffing, office space and equipment. The estimated overall yearly budget of one regional center would be $3,106,617. Start-up costs would require an estimated

AR_00000180

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

additional $168,000, for a total of $3,274,617. Start-up and annual expenses would
include funding for:

| Role | Salary | Benefits | Health Benefits | Total |
|---|---|---|---|---|
| Director of the Regional Center | $150,000 | $36,435 | $18,756 | $205,191 |
| 15 Certified forensically-trained, trauma-informed investigators (FTE) | $110,000 | $26,719 | $12,792 | $2,242,665 |
| 2 Campus liaisons (FTE) | $30,000 | $7,287 | $7,140 | $88,854 |
| Support staff: Webmaster (FTE) | $40,000 | $9,716 | $12,792 | $62,508 |
| Support staff: Financial officer (FTE) | $40,000 | $9,716 | $12,792 | $62,508 |
| Additional staff attorney for the office of the Attorney General (FTE) | $150,000 | $36,435 | $18,756 | $205,191 |
| **TOTAL** | **$520,000** | **$126,308** | **$83,028** | **$2,866,917** |

AR_00000181

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and Gender-Based Violence

| Item | Cost |
|---|---|
| Rent for office space | $150,000 per year |
| Equipment (computers, printers, mobile phones) | $63,000 (21 at $3,000 per employee) |
| Office supplies | $5,000 per year |
| Van outfitted for interviews | $100,000 start-up costs |
| Laptop forensic video equipment with USB-connected cameras | $6,800 start-up costs |
| Lease for state automobiles | $41,400 (15 at $2,760 each) per year |
| Insurance for state automobiles | $4,500 (15 at $300 each) per year |
| Fuel for state automobiles | $27,000 (15 at $1,800 each) per year |
| Professional development costs | $10,000 per year |
| **TOTAL (including staffing costs)** | **$3,274,617** |

Staffing requirements include a director to oversee the entire center and liaise with law enforcement and other government agencies such as the OAG and SCHEV. Additionally, 15 full-time forensically trained, trauma-informed investigators, who must be certified in forensic interviewing, would be needed to fulfill the large caseload. Two campus liaisons would coordinate the investigations between the regional center and the institution including interviews, responses and communicating with each Title IX office. Support staff would include a webmaster, who would build, maintain and monitor the online reporting system, and a financial officer who would be responsible for procurement, audits and other financial reporting. The staffing requirements for an around-the-clock center are complex and require staff that can respond immediately while also taking into account time for personal leave, sick leave, court appearances, training and travel time.

The costs included in the charts above account for a brick-and-mortar, centrally located building for administrative offices, which would not cover all of the public colleges and universities in the Commonwealth. Initially, it would only cover a select test-pilot region — the Richmond area, for example. However, if the pilot center is successful there is the potential for future satellite offices to reach a geographically diverse constituency, which would significantly increase the start-up and operational costs. Each mobile unit includes a one-time start-up cost; however, it is conceivable that the center may need to purchase additional vehicles or invest in forensic video equipment

AR_00000182

that can be used in various locations. The additional regional centers and mobile units could increase the cost by fivefold — upward of $16 million per year.

## Governance and Model for Long-term Shared Financial Support

While devising a pilot regional center, several options for governance structures were considered. This study assumes that the regional centers would be governed and funded as arms of the local commonwealth's attorney in which the center is located, as it is investigating allegations of criminal behavior. However, this approach could impinge on the discretion of the commonwealth's attorneys, and their ethical requirement to protect the innocent as strongly as they engage the guilty. It would require ceding review of a case in their jurisdiction to a "neutral" investigator, and could expose the commonwealth's attorneys to further judicial and media scrutiny.

Additional governance as a separate state agency, or a division within an existing state agency or institution of higher education could also be considered. The agency option could provide additional oversight and expertise on issues related to sexual and gender-based violence at institutions of higher education, while allowing the local commonwealth's attorney's offices to focus on the allegations of criminal behavior. Alternately, the governing structure could be an authority under the guidance of an independent board or representation of local governments where either the center, satellite offices, or institutions of higher education are located. With any option, the governing body would liaise with the center's director to facilitate collaboration among the various constituencies. However, in all of these options, the requirement of the commonwealth's attorney to cede review of a case to a separate investigator and potentially an entire body, poses serious ethical and legal issues.

Institutions of higher education would contribute funds based on an algorithm that accounts for population size and the number of cases each school sends per fiscal year. The financial model in the previous section accounts for a large regional center that has a membership consisting of all of the institutions of higher education in that particular region. For the regional center to be financially feasible it would require that at the minimum a large percentage of institutions participate, which is unlikely to occur given the institutional response to the regional center. Therefore, in order to guarantee its funding, participation must be mandatory for all public two- and four-year institutions.

AR_00000183

## Legislative Requirements

In order for the regional center to be successful, institutional and regional-center immunity must be explicit in the Virginia statute. This may require statutory clarification regarding the immunity of investigators and institutional advocates (for both the complainant and respondent), similar to the laws protecting sworn law enforcement. However, it would only provide immunity for state claims, which would still leave the Commonwealth open to federal lawsuits.

Additionally, legal support for the regional center must come from the Office of the Attorney General, similar to the legal support that is currently provided for each public institution of higher education. Again, this may not require an act of legislation, but it will need to be explicitly recognized by the OAG, and would require the OAG to hire an additional attorney.

## Potential Locations

Virginia is a geographically diverse state, with colleges and universities that reflect this diversity. In order for a regional center for the investigation of sexual and gender-based crimes to be effective, it must be located in a geographically efficient region, with the potential for offices in the further reaches of the Commonwealth in addition to high-density population areas, should they be required.

## Conclusion

Improving investigational outcomes of sexual and gender-based crimes at the Commonwealth's institutions of higher education for both victim-complainants and respondents is a commendable goal. The pilot study detailed above has outlined a way to employ a regional center for the investigation of sexual and gender-based violence, as required by Item 146, Paragraph k, Chapter 780, 2016 Acts of Assembly. While it is possible to create such a regional center, it is not a feasible pilot program for the Commonwealth to pursue at this time. It entails too many legal and structural issues that could end up costing significant sums in duplicate roles, equipment and litigation, while failing to improve outcomes for complainants, respondents and institutions of higher education.

AR_00000184

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

Included in Appendices C and D are examples of thoughtful feedback from
knowledgeable constituents on a proposed regional center. Ellen W. Plummer, associate
vice provost for academic administration at Virginia Tech, submitted a letter on behalf
of the SVAC outlining their concerns regarding the conflation of the educational and
administrative processes with the criminal processes, protecting and supporting the
reporting party, and potential reporting delays, among others. Additionally, David M.
McCoy, president of the Virginia Association of Campus Law Enforcement
Administrators (VACLEA), acknowledged the commitment and effort by SCHEV to
study a regional center in a letter but expressed opposition to a shift in sexual-assault
investigations due to other recent legislative changes related to campus sexual violence
whose effects have yet to be reviewed and assessed.

It is a conclusion of this report, with these concerns and objections in mind, as well as
those outlined in the pilot study, that the Commonwealth of Virginia not pursue a
regional center for the investigation of sexual and gender-based crimes at its institutions
of higher education.

## Appendix A: Acts of Assembly

K. 1. Out of this appropriation, $100,000 the first year from the general fund is
designated to design a pilot program to create a regional center for the investigation of
incidents of sexual and gender-based violence similar to the multi-disciplinary
approach used in child advocacy centers. The pilot program shall include a partnership
between higher education, law enforcement, and state government where criminal
incidents of sexual and gender-based violence could be reported directly to the center
for independent and neutral investigation. The center would be staffed with trauma-
informed investigators who would coordinate with both colleges and universities and
law enforcement to carry out the investigative responsibilities outlined by Title IX and
the Violence Against Women Act. The program design shall include start-up and
operational costs, staffing needs, sample memorandum of understanding between
higher education institutions, law enforcement and Commonwealth's attorneys' offices,
any legislative requirements, and a model for long-term shared financial support. The
center's scope would apply only to allegations of criminal behavior.

AR_00000185

2. The State Council shall communicate the pilot design to the Secretaries of Education and Public Safety and Homeland Security and to the Chairs of the House Appropriations and Education and Senate Finance and Education and Health Committees by August 1, 2017.

## Appendix B: Sample Memorandum of Understanding

I.   A possible framework for a Memorandum of Understanding between higher education institutions, law enforcement, and Commonwealth's Attorneys' offices would include the following elements:

   a.   Statement of agreement between parties describing the purpose of the MOU

   b.   Outline of each party's duties and responsibilities

      i.   Commonwealth's Attorneys

      ii.   All law enforcement agencies with jurisdiction in and around the institutions of higher education reporting to the regional center

      iii.   Institutions of higher education reporting to the regional center

   c.   Signatures of representatives of each of the above

II.   An executed MOU for the Charlottesville-Albemarle area responders is attached in order to clarify the elements of the charge expressed in Item 146, Paragraph k, Chapter 780, 2016 Acts of Assembly.

## Appendix C: Letter from Ellen W. Plummer, Associate Vice Provost for Academic Administration at Virginia Tech on behalf of the Sexual Assault Advisory Committee

## Appendix D: Letter from David M. McCoy, President of the Virginia Association of Campus Law Enforcement Administrators

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

## Works Cited

*The Chronicle's Title IX investigation tracker*. (2017, May 09). Retrieved from The Chronicle
of Higher Education:
http://projects.chronicle.com/titleix/investigations/?search_term=&status=active&
states=Virginia&sector=public&start=&end=

*2016 Virginia Acts of Assembly*. (2016, May 20). Retrieved from Chapter 780:
https://budget.lis.virginia.gov/get/budget/3039/

Ali, R. (2011, April 4). *United States Department of Education Office for Civil Rights Dear
Colleague Letter*. Retrieved from United States Department of Education Web Site:
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

Erdely, S. R. (2014, July 08). A Rape on Campus. *Rolling Stone*. Retrieved from
http://www.rollingstone.com/culture/features/a-rape-on-campus-what-went-
wrong-20150405

Gomez, L. M., & Smith, G. M. (2016). The Regional Center for Investigation and
Adjudication: A Proposed Solution to the Challenges of Title IX Investigations in
Higher Education. *The Penn State Law Review*, 996-997.

*Governor's Task Force On Combating Campus Sexual Violence*. (2015, May 28). Retrieved
from http://www.oag.state.va.us/programs-initiatives/campus-sexual-violence-
task-force

John Doe II v. The Pennsylvania State University; Eric Barron; and Danny Shaha, 4:15-
cv-02108-MWB (The United States District Court for the Middle District of
Pennsylvania November 06, 2015).

Lhamon, C. E. (2014, April 29). *Questions and Answers on Title IX and Sexual Violence*.
Retrieved from https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-
ix.pdf

National Children's Alliance. (2017, January 1). *Standards for Accredited Members*.
Retrieved from National Children's Alliance:
http://www.nationalchildrensalliance.org/sites/default/files/downloads/NCA-
Standards-for-Accredited-Members-2017.pdf

AR_00000187

Pilot Program for a Regional Center for the Investigation of Incidents of Sexual and
Gender-Based Violence

*S.47 - Violence Against Women Reauthorization Act of 2013.* (2013, 03 07). Retrieved from
Congress.gov: https://www.congress.gov/bill/113th-congress/senate-bill/47

Sisario, B., Spencer, H., & Ember, S. (2016, November 04). Rolling Stone Loses
Defamation Case Over Rape Story. *The New York Times.* New York, NY, USA.
Retrieved from https://www.nytimes.com/2016/11/05/business/media/rolling-
stone-rape-story-case-guilty.html?_r=0

State Council of Higher Education for Virginia. (2016, December 06). Sexual Violence
Advisory Committee. Richmond, Virginia, USA. Retrieved from
http://schev.edu/index/agency-info/advisory-committees/sexual-violence-
advisory-committee

*Summary of Budget Actions for the 2014-16 Biennium.* (2016, June 9). Retrieved from
http://sfc.virginia.gov/pdf/Budget_Summary_Post_2016/SFC%20Complete%20Su
mmary%20Document.pdf

The Clery Center. (2017, May 1). *Summary of the Jeanne Clery Act.* Retrieved from Clery
Center: https://clerycenter.org/policy-resources/the-clery-act/

*Title IX and Sex Discrimination.* (2015, April 29). Retrieved from U.S. Department of
Education Office for Civil Rights:
https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html

*Violence Against Women Reauthorization Act of 2013.* (2013, 03 07). Retrieved from
Congress.gov: https://www.congress.gov/bill/113th-congress/senate-bill/47

AR_00000188

# Sexual Assault Response Team (SART)

## Memorandum of Understanding Among

### Charlottesville-Albemarle Community Responders

---

## October 10, 2016

Pursuant to Virginia Code § 15.2-1627.4, this working agreement (hereinafter, "Memorandum of Understanding" or "MOU") is recognized as a collaborative commitment among the undersigned officers, agencies, departments and institutions of higher education to directly support a multi-disciplinary, coordinated response to survivors of sexual assault and other forms of sexual and gender-based violence. This commitment is acknowledged by the signature of each participant's representative.

**All parties agree to:**

- Attend the annual SART meeting and other meetings, as necessary to accomplish the purpose of this MOU;
- Establish and periodically review guidelines for response by the community to sexual assault and other forms of sexual and gender-based violence (hereinafter, referred to as "SART Protocols"), consistent with those established by the Department of Criminal Justice Services pursuant to Va. Code § 9.1-102(37d), including, without limitation: (i) the collection, preservation, and secure storage of evidence from Physical Evidence Recovery Kits (hereinafter PERK) examinations consistent with Va. Code § 19.2-165.1, and (ii) information sharing guidelines consistent with federal and state laws;
- Integrate SART Protocols into their individual responses to incidents of sexual assault and other forms of sexual and gender-based violence, achieving consistent, high-quality, effective responses throughout the Charlottesville-Albemarle community, protecting the confidentiality of survivors of sexual assault in accordance with applicable laws;
- Designate a liaison to actively participate on the SART;
- Promote policies and practices to increase arrest and prosecution rates for sexual assault, including non-stranger sexual assault;
- Participate, as appropriate, in cross-training, education, and prevention efforts with allied professionals, law enforcement personnel, the University of Virginia, other community agencies and institutions of higher education, and representatives from respective Commonwealth's Attorneys Offices regarding sexual assault and other forms of sexual and gender-based violence;
- Participate in the development and approval of SART Protocols and their annual review; and
- Develop SART Protocols to implement the SART MOU in an expedited manner with a goal of achieving mutual agreement on final SART Protocols within 90 days of the effective date of this MOU. This time frame can be extended upon request of any party to this MOU.

AR_00000189

**The Commonwealth's Attorneys agree to:**

- Convene a meeting, at least twice per year, to discuss implementation, review, and refinement of SART Protocols;
- Refer survivors, family members and friends to the Sexual Assault Resource Agency (hereinafter "SARA") for crisis intervention, advocacy, and therapy services, as appropriate;
- Refer survivors, family members and friends to the Victim/Witness Program for information about victims' rights, assistance with filing for victim's compensation, and education regarding options and processes, and to provide court accompaniment throughout the criminal justice system, as appropriate;
- Ensure that an attorney is available to the University of Virginia for consultation at all times, upon request. Principal topic areas for consultation include, but are not limited to, whether the reported behavior is a criminal offense; whether the behavior, if criminal, constitutes a felony or a misdemeanor; and, if criminal, the degree to which the reported behavior presents a significant and articulable threat to the health or safety of a student or to any other member of the community;
- Provide educational outreach and training on prevention and all reporting options, including law enforcement and the University of Virginia, for sexual assault and other forms of sexual and gender-based violence throughout the community;
- Allow a sexual assault advocate, unless declined by the survivor, to be present during interviews by law enforcement; and
- Use Forensic Nurse Examiners (hereinafter "FNE") as witnesses during criminal trials.

**The Albemarle County Police Department, Charlottesville Police Department, and University of Virginia Police Department agree to:**

- Refer all survivors to the hospital or other designated health care center and FNE program for medical treatment and/or a forensic exam when the reported incident is acute, *i.e.*, has occurred within the last 72 hours;
- Inform survivors that they are entitled to a forensic exam regardless of whether the survivor has decided to make a report, talk to law enforcement, or cooperate in a criminal prosecution;
- If the survivor is going to the hospital or police station, direct the Emergency Communications Center (hereinafter "ECC") to activate the SART response (including FNE, on-call detective, and SARA);
- Transport or arrange for transport of survivor to the hospital and, once the PERK exam is complete, transport or arrange for transport of survivors to a safe location;
- Allow the survivor privacy during the physical examination by the FNE by not remaining in the room;
- Receive medical/forensic evidence that has been collected from survivors and/or perpetrators;
- Conform department-established policies to SART Protocols regarding interviews of survivors and evidence collection and storage;
- Allow the sexual assault advocate to be present during interviews and other communications with officers/investigators unless the survivor becomes a suspect in a crime, the environment is not safe for the advocate, the advocate is acting inappropriately, or the survivor expresses a wish that an advocate not be present;

AR_00000190

- Ensure that an on-call detective (or another law enforcement officer designated by the chief of police) is available to confer with representatives of the University of Virginia at all times, upon request;
- Ensure that a law enforcement officer designated by the chief of police is available to confer immediately with the University of Virginia at all times, upon request, regarding the issuance of a timely warning under the Clery Act for sexual offenses;
- During a pending criminal investigation or prosecution, share information, evidence and records concerning that investigation or prosecution with other SART members when doing so: (i) would not compromise any pending criminal investigation or prosecution, (ii) would not violate any confidentiality laws, and (iii) would further SART's purpose in ensuring the most thorough, accurate, consistent and timely criminal investigation, and the most effective criminal prosecution, of sexual assaults and other forms of sexual or gender-based violence;
- Nothing set forth in this MOU shall preclude any law enforcement agency or law enforcement personnel from disclosing law enforcement records to SART partners to the extent permitted by law.

**The University of Virginia agrees to:**

- Prohibit acts of sexual or gender-based violence and other forms of Prohibited Conduct as defined by University policy;
- Contact the designated law enforcement officer[s] for the City of Charlottesville or County of Albemarle on an expedited basis (as soon as possible but within the first 24 hours) after receipt of a report alleging that an act of sexual or gender-based violence occurred within the last 72 hours in those jurisdictions and provide as much information as possible during this initial contact to the extent permitted by law;
- In administering its legal responsibilities under the Clery Act, the responsible University personnel agree to consult, as needed, with the designated law enforcement officer of the law enforcement agency responsible for investigating a criminal incident concerning the continuing danger to the community, if any, and the potential negative impact on law enforcement efforts;
- Assemble a review committee, consisting of at least three persons, including the Title IX Coordinator or designee, an officer of the University Police Department, and a Student Affairs representative, within 72 hours of receiving a report of an act of sexual violence, to determine: (a) whether there is a significant and articulable threat to the health or safety of a student or to any other member of the community; and (b) whether the alleged act of sexual violence constitutes a felony violation as defined by Virginia Code. In making the foregoing decisions, the review committee will consult, as needed, with the on-call Commonwealth's Attorney and appropriate law enforcement representatives without disclosing personally identifiable information;
- Immediately disclose all available information (including the names of the parties, any witnesses, and/or any other third parties with knowledge of the reported incident) to the law enforcement agency responsible for investigating the alleged act of sexual violence, when a review committee determines that there is a significant and articulable threat to the health or safety of a student or to any other member of the community;

Albemarle/Charlottesville Sexual Assault Response Team
Memorandum of Understanding
October 10, 2016

3

- Immediately disclose information to the appropriate Commonwealth's Attorney when the review committee determines that the alleged act of sexual violence constitutes a sex-based felony violation as defined by Virginia Code, Article 7 (§18.2-61 et seq.) of Chapter 4 of title 18.2 of the Code of Virginia.  (Such disclosure will exclude the names and any other information that identifies the parties, any witnesses, and/or any other third parties with knowledge of the reported incident, unless this information was disclosed to law enforcement under the health and safety exception outlined above, in which case, the same (non-redacted) information will be disclosed to the Commonwealth's Attorney);
- In cases where there is a report to a law enforcement agency, to the extent permitted by law, temporarily pause a University investigation to allow for law enforcement to complete its initial fact-finding and, where possible, communicate and cooperate with the law enforcement agency during the initial evidence gathering phase of the investigatory process;
- Encourage survivors to seek immediate medical attention following an incident of sexual assault or exploitation, emphasizing the time sensitivity and potential benefits of a FNE examination;
- Train employees about their reporting obligations under federal and state law;
- Support survivors in understanding any and all reporting options and strongly encourage that they immediately report any sexual or gender-based violence to the applicable law enforcement agency and offer and provide assistance to survivors seeking to connect with the applicable law enforcement agency;
- Work with SART partners to educate the University community, including students, faculty, and staff, about Prohibited Conduct;
- Ensure billing procedures for forensic exams are compliant with the policies of the Virginia Criminal Injuries Compensation Fund (hereinafter "CICF"); and
- Continue to strengthen relations among University and community agencies for the common goals of eliminating and preventing all sexual assault and sexual and gender-based violence.

**The Forensic Nurse Examiner Program agrees to:**

- Promote a reasonable response time from the time the call is received to the time the FNE arrives at the hospital or the University of Virginia Elson Student Health Center (during regular business hours);
- Conduct medical/forensic examinations for sexual assault patients in accordance with best practices and all protocols and procedures approved by the FNE Program;
- Address patient safety and medical care needs;
- Notify SARA that a  patient has been transported or has arrived;
- Encourage/support use of SARA advocates for sexual assault patients and obtain patient permission before introducing the patient to a SARA advocate;
- Maintain chain of custody of forensic evidence and transfer to a law enforcement agency, officer, or to the Division of Consolidated Laboratory Services;
- Collaborate with the local law enforcement agency(s) to obtain an adequate supply of PERKs;
- Be available to criminal justice professionals to review the case when authorized by law; and
- Maintain contact and communication with criminal justice and other professionals as authorized by law.

AR_00000192

**The Sexual Assault Resource Agency agrees to:**

- Dispatch, upon request of the survivor, a person calling on behalf of the survivor, law enforcement, or FNE, a trained sexual assault advocate to the hospital, University of Virginia Elson Student Health Center, or law enforcement agency location to provide accompaniment, emotional support, and information to survivors, family members, and friends;
- Provide crisis intervention, advocacy, therapy, criminal justice information and support, and court preparation and orientation for survivors, as appropriate;
- Coordinate the above services for survivors, family members, and friends with the local Victim/Witness Program, as appropriate;
- Refer survivors to the hospital or the University of Virginia Elson Student Health Center (during regular business hours), as appropriate; and
- During medical exams, police interviews, and court accompaniments, stay strictly within the role of providing support to the survivors.

**The Victim/Witness Programs agree to:**

- Provide referrals to area resources, such as SARA;
- Provide advocacy, criminal justice information and support, courtroom assistance, and court preparation and orientation, as appropriate;
- Coordinate the above services for survivors, family members, and friends with SARA as appropriate;
- Provide assistance in petitioning for protective orders;
- Facilitate the provision of separate waiting areas for survivors and witnesses of crime;
- Provide assistance in the filing and processing of claims with CICF, in obtaining return of the survivor's property when collected as evidence, and in seeking restitution of economic loss;
- Upon request of the survivor, provide notification to friends, relatives and employers of the occurrence of the crime,  provide intervention with employers,  notices of court dates, and status of release of defendants or prisoners from custody;
- Assist survivors in submitting a Victim Impact Statement;
- Ensure that survivors have reasonable notification of upcoming hearing and/or trial dates; and
- Ensure the survivor meets with the Commonwealth's Attorney, as appropriate, prior to hearings and/or trial.

This agreement shall be effective on DATE and shall remain in effect until any party terminates their commitment in writing. The agreement shall be reviewed annually. Any modifications to the agreement must be mutually agreed upon by all parties, documented in writing, and acknowledged by a signature of each agency's representative.

AR_00000193

**Signatures of Agency Representatives:**

**PII**

Robert N. Tracci
County of Albemarle Commonwealth's Attorney

10 - 12 - 16

Date

**PII**

Warner D. "Dave" Chapman
City of Charlottesville Commonwealth's Attorney

10/13/16

Date

**PII**

Ron Lantz
County of Albemarle Chief of Police

10/13/16

Date

**PII**

Alfred S. Thomas, Jr.
City of Charlottesville Chief of Police

10/10/16

Date

**PII**

Teresa A. Sullivan
President, University of Virginia

10/13/16

Date

**PII**

Michael A. Gibson
University of Virginia Chief of Police

10/13/2016

Date

Albemarle/Charlottesville Sexual Assault Response Team
Memorandum of Understanding
October 10, 2016

AR_00000194

**PII**

~~Susan Painter~~                                    $10 - 13-16$
Coordinator, Albemarle County Victim/Witness Program          Date

**PII**

Maggie Cullinan                                      10/12/16
Director, Charlottesville Victim/Witness Assistance Program   Date

**PII**

Benjamin Rexrode                                     10/13/16
Coordinator                                          Date
University of Virginia Victim/Witness Assistance Program

**PII**

Rebecca Weybright                                    10/13/16
Executive Director                                   Date
Sexual Assault Resource Agency

Albemarle/Charlottesville Sexual Assault Response Team
Memorandum of Understanding
October 10, 2016

AR_00000195



**Associate Vice Provost for Academic Administration**
Burruss Hall, Suite 330 **(0132)**
Virginia Tech
800 Drillfield Drive
Blacksburg, Virginia 24061
(540) 231-6122 | Fax: (540) 231-7211
E-mail: eplummer@vt.edu | *www.provost.vt.edu*

June 15, 2017

Peter Blake
Director, State Council of Higher Education for Virginia
101 North 14th Street, 10th Floor
James Monroe Building
Richmond, VA 23219

Dear Mr. Blake:

On behalf of the Sexual Violence Advisory Committee (advisory committee), please allow me the opportunity to thank you, Beverly Covington, and our colleagues at SCHEV for exercising the leadership necessary to establish and regularly convene the advisory committee. As you well know, institutions in the commonwealth are unique in the country for developing practices to respond to reports of sexual violence within a complex framework of federal regulations, legislative requirements unique to the commonwealth, and varied institutional policies and procedures. Since its inception in the fall of 2015, members of the advisory committee have shared information with one another and, when appropriate, provided guidance to SCHEV staff on legislation and policy matters as they pertain to responding to reports of sexual violence at the commonwealth's institutions. SCHEV's willingness to convene and support the advisory committee provides institutional leaders and administrators with valuable opportunities to learn, share, and develop practices that strengthen our institutional responses to the problem of sexual violence.

In 2016, SCHEV received a legislative charge to study and design a pilot for a "regional center for the investigation of incidents of sexual and gender-based violence at the commonwealth's institutions…" Ashley Lockhart has done a very thorough job of preparing a draft proposal that outlines a model for a regional center. Advisory committee members read the draft proposal, discussed its merits and disadvantages.

In short, the advisory committee cannot find a way to support the creation of a regional center. The disadvantages outweigh the possible advantages posed by the prospect of centralizing investigations and adjudications of reports.

Feedback on the proposed regional center model is organized thematically.

**Conflating educational/administrative processes with criminal processes**

The regional center model is based on the multidisciplinary approach used in child advocacy centers whose mission is to investigate reports of abuse and neglect involving

*Invent the Future*

a minor. The framework of a child advocacy center rests upon <u>shared</u> understandings of criminal and civil law designed to protect minors.

Institutions of higher education use a framework of policies expressed as contracts between adults (students) and the institution. When responding to reports of misconduct, colleges and universities pursue an investigation as a breach of a contract and do not (cannot) determine if misconduct is criminal in nature. Criminal investigations are conducted solely by law enforcement. In addition to operating within state and federal law and regulations, an institution's student and employee conduct policies are shaped by the mission, heritage, and culture of the institution. For example, the community colleges and the four-year institutions each have distinct policies and processes for investigations and adjudication. Within most institutions, misconduct is investigated and adjudicated as a violation of policy within an educational mission and framework.

The board of visitors at each of the institutions in the commonwealth has the obligation to oversee the discipline of students. Consequently, each institution's student code of conduct reflects the unique guidance and requirements of its board. It is difficult to imagine how personnel at a regional center could determine responsibility for violating an institution's policy and articulate appropriate sanctions. These decisions are made at each institution by trained administrators who have knowledge of the institution's policies, processes for protecting the rights of all parties, and case precedents upon which sanctions and subsequent appeals might be determined.

The regional center is predicated upon a determination that the reported misconduct is criminal in nature. Most institutional policies and processes are designed to respond to and discern responsibility for violating institutional policy and not criminal behavior. The US Department of Education, Office of Civil Rights (OCR) requires that institutions use the "preponderance of the evidence" as the standard for determining responsibility. In the criminal system, responsibility is determined using a standard of "beyond a reasonable doubt". These standards cannot be employed simultaneously.

The proposed regional center will attend to reports of misconduct that is determined to be criminal in nature. However, it is illogical to suggest that institutional investigators will be able to apply the two standards (guilt beyond a reasonable doubt versus a preponderance of the evidence) in a consistent and realistic fashion. If the correct standard is not used, institutions can be found responsible by OCR for violating Title IX, and found liable for due process or Title IX violations by the courts.

**Protecting and Supporting the Reporting Party**

Protecting the rights of the person who is the victim of sexual violence ought to be paramount in all response practices and policies. Current federal, state, and institutional obligations threaten to undermine the right of the reporting party to decide when, and with whom, to share the information regarding the incident(s) sexual violence. In the

AR_00000197

proposed model for a regional center, institutions that opt-in would be required to send all matters involving potentially criminal conduct (sexual assault, stalking, dating violence, cyber-stalking, etc.) involving a respondent who is a student of that institution to the center for investigation, *regardless of the wishes of the victim*.

The hallmark of the OCR guidance is that victims should have some say in what happens. Our concerns with maintaining victim choice and control over this process become even more significant when considering the scenario of parties from two different institutions – one that is a participant in the center and one that is not.  For example, imagine two universities in the same region of the state. University A (UA) is a participant in the center and University B (UB) is not. A UA student sexually assaults a UB student.  The victim (the UB student), would be forced to undergo an investigation through the center because the UA student attends an institution that has opted-in to the center.

Best practice is to honor the wishes of the reporting party or victim by providing confidential options whenever possible and to offer as many alternatives for seeking assistance and redress as is feasible. Recent experience with mandated reporting has had the effect, at some institutions, of reducing the number of individuals who seek help from administrators because the reporting party does not want their information investigated or shared. Frequently, they are seeking support and do not want to participate in administrative processes designed to determine responsibility.

**Possible Delays**

Several federal and state obligations require that institutions secure facts regarding a report of sexual violence as soon as feasible. The OCR requires a timely response to a report and requires that institutions provide interim accommodations to the parties involved in a report. The federal Clery Act requires timely warnings of safety and security concerns to institutional communities, and state statute requires that institutions employ the expertise of a campus-based threat assessment team and review team to determine when conduct might be a threat to safety.

Turning over a report of sexual violence to a regional center does not absolve an institution of its obligations to respond, provide appropriate accommodations, assess threat, and warn the institution's community. Institutions have to know some facts associated with a report of sexual violence to take appropriate action well-before investigations are completed and decisions of responsibility are made with whether misconduct occurred. For assessing threat, knowledge of the facts of the incident is required to make recommendations on interim suspension of the respondent or other actions.

Stalking and relationship violence cases are complex and can have serious safety consequences. Many of our institutions have international populations where the issues

AR_00000198

of violence get additionally complicated by people's visa status. A centralized function might not be in a position to act quickly to protect a victim of battering or stalking who is scared to report and might risk deportation of her or himself and/or the respondent.

The reality of a timely institutional response to a report of sexual violence frequently requires that the reporting party speak with trained administrators with the authority to provide guidance, activate needed accommodations, and – if necessary – alert the institution's communities of a possible threat. Most institutions currently employ the best practice of coordinating, over time, an iterative and trauma-informed response to a report of sexual violence. The addition of a regional center might inadvertently delay the institution's ability to respond in a timely and appropriate way to the reporting party, the responding party, and the institution's communities.

**Possible Legal Issues**

Institutions have a legal liability to the reporting party and to the respondent. The regional center model may impede institutions from following applicable law under Title IX and the due process clause. Under the proposed model, once a person is found responsible for a conduct policy violation by personnel at the center, the sanctioning of the responsible party would be the responsibility of the institution. For example, if a respondent is dismissed from school, that individual will claim the loss of a protected property interest, i.e., attending the public institution. The institution will have the obligation of defending the action taken by the regional center even though it had no input into the decision. There is no corresponding responsibility held by the regional center. Consequently, the institution becomes an insurer of the center even though it has had no oversight ability.

One of the main features of the model for the center is civil immunity for the institutions that participate.  First, it seems highly unlikely that the General Assembly would pass any legislation that gives institutions of higher education immunity in the area of sexual violence.  Second, even if the General Assembly were to approve statutory immunity, it would only apply to state actions.  Most of the suits we have seen are filed in federal court because they are based in due process violation, Title IX violation, or both.

A legal question exists because the creation of a regional center would generate processes for sexual misconduct cases that would be distinct from institutional processes for infractions of the criminal laws [e.g. theft, or simple assault].  The courts may have reservations about processing different types of offenses differently.

**Logistical Barriers**

In areas of Virginia with less dense population (Southwest Virginia, for example) it is foreseeable that a center could be two to three hours from the reporting party or victim. Requiring a victim to travel could deter reporting and potentially re-traumatize victims. In

AR_00000199

addition, consider a scenario in which an act of sexual violence occurs in a location far from the institution and involves multiple jurisdictions with pending criminal investigations. To provide the necessary collaboration with the criminal investigations, this matter would go to the regional center causing disruption, potential trauma to the victim, and increasing costs to all involved.

It is not clear from the proposed model how student confidentiality would be addressed. Institutions go to great lengths to protect student records. Without carefully crafted and approved agreements, institutional administrators would not be free to share information without the consent of the parties involved in the report. Within the institution, appropriate information sharing is sanctioned.

## Funding

The expectation that institutions will contribute financially to the regional center is not realistic. It is unclear how the costs for the regional centers will be apportioned. If institutions do not want to participate in the regional center, will they still have to pay to support the centers?

In addition, there are no cost savings at the institutional level if the institutions assist in funding a regional center. Should a regional center be created, each college and university will continue to be required to have appropriate personnel and associated costs in place for responding to complaints at their institution. Essentially, institutions might perceive this as "paying" twice for federal and state mandates for which no resources are allocated.

## Duplication and Complexity

Institutions are obligated to respond to reports of sexual violence as possible violations of policy. Institutions will continue to have to provide ample resources to respond to reports and will invest in recurring prevention, education, and outreach efforts. The regional center approach will not result in a financial savings to most institutions.

A regional center might add additional bureaucracy to an already complicated system. A regional center would require the articulation of additional agreements and has the potential to increase the possibility of missteps. Several institutions report that the addition of OCR-required investigations has resulted in fewer reports or diverting reports of sexual violence from law enforcement and victim advocates. The addition of administrative investigations has not had the intended result. Fewer, not more, victims are reporting and getting help.

## Alternatives

The advisory committee welcomes the invitation to consider alternatives to a regional center. Preferred partners for the institutions continue to be SCHEV and the Education Section of the Attorney General's Office.

While unable to support the implementation of a regional center, the advisory committee continues to identify needs associated with responding to reports of sexual violence.

An interest in incentivizing multi-institution trainings and education that result in institution and state-specific policies, processes, and programs. Sharing costs for a variety of training and the development of educational and prevention programs would benefit multiple institutions

Provide funds to support travel of in-state institutional colleagues who are willing to share expertise with the commonwealth's colleges and universities.  For example, among the members of the advisory committee are professionals with experience in administrative investigations, student conduct hearings, criminal investigations, policy development, prevention and education program development, and survey instrumentation. The advisory committee could offer small teams to institutions who might welcome assistance and may not have resources necessary for expensive national vendors or programs.
Provide funds to further support the multidisciplinary on and off-campus Sexual Assault Response Teams.

The commonwealth would benefit from an infusion of Sexual Assault Nurse Examiners (SANE nurse). An allocation of funds to support training nurses and to incentivize hospitals.

Many thanks for your continued leadership. We appreciate the opportunity to provide guidance and support to SCHEV and to our institutions.

On behalf of the Sexual Assault Advisory Committee,

Ellen W. Plummer
Member of the Committee

AR_00000201



# VIRGINIA ASSOCIATION OF CAMPUS
# LAW ENFORCEMENT ADMINISTRATORS

July 13, 2017

Ashley Lockhart
Policy Specialist
State Council of Higher Education for Virginia

Pilot Program for a Regional Center for the Investigation of Sexual and Gender Based Violence

Dear Ashley:

The Virginia Association of Campus Law Enforcement Administrators (VACLEA) acknowledges the commitment and effort by SCHEV to complete the study for the pilot program. However, VACLEA opposes this shift in investigations.

In addition to current federal review, which may affect Title IX processes, our association believes those legislative changes implemented over the past few years related to sexual violence at institutions of higher education have made a positive impact in the Commonwealth and should be given more time to review outcomes prior to a major shift in practice.

VACLEA continues to work closely with the Virginia Center for School and Campus Safety within DCJS as well as the DCJS Division of Programs and Services particularly with victim services related to advocates, SART's and crisis centers.

Specific examples include the completion of the DCJS training "Trauma Informed Sexual Assault Investigations", which launches this summer, and the revision to *Virginia Code 23.1-806-Reporting of Acts of Sexual Violence*, which added the use of a review committee. Both of these examples achieve the primary goals that the regional center program seeks to offer.

VACLEA continues to support increasing the number of Forensic Nurse Examiners across Virginia. The number of cases and consults conducted by a Sexual Assault Nurse Examiner continues to climb as reports of sexual assault increase. An appropriate staffing model across Virginia will provide quality service to not only the VACLEA community but to all the citizens in the Commonwealth impacted by sexual violence.



David M. McCoy
President
Virginia Association of Campus Law Enforcement Administrators

880 Technology Park Drive, Suite 100 • Glen Allen, VA 23059
Phone: (804) 285-8227 • Fax: (804) 285-3363

AR_00000202

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, August 01, 2017 2:12 PM |
| **To:** | Sherman, Brandon |
| **Subject:** | Two versions |
| **Attachments:** | Clarification re Title IX and Sexual Violence.Clean.07-31-17 (per EDs).docx; Preamble Letter Draft 7-31-17.docx |

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# DPP

AR_00000204

# DPP

# DPP

AR_00000206

# DPP

AR_00000207

# DPP

AR_00000208

# DPP

# DPP

# DPP

# DPP

# DPP

# DPP

# DPP

# DPP

AR_00000216

# DPP

AR_00000217

# DPP

AR_00000218

# DPP

AR_00000219

# DPP

AR_00000220

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 02, 2017 11:50 AM |
| **To:** | Menashi, Steven |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Docs for your drafting purposes |
| **Attachments:** | ABA TASK FORCE RECOMMENDATIONS - TASK FORCE REPORT ONLY.pdf; OCR 2014 Q&A.pdf; 2011 DCL.pdf; ACTL White Paper on Campus Sexual Assault.pdf; OCR 2001 Guidance.pdf; Penn Law Faculty Open Letter.pdf |

Attached:
- ABA Task Force white paper
- ACTL Task Force white paper
- Penn Law open letter
- OCR's 2001 Guidance
- OCR's 2011 DCL
- OCR's 2014 Q&As

In addition to the attached docs, here's the link to the short DCL under the Bush Admin (2006) reaffirming the 2001 Guidance: https://www2.ed.gov/about/offices/list/ocr/letters/sexhar_-2006.html

Here's a link to the Harvard Law Faculty open letter:
http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html

```
┌─────────────────────────────────────────────────────────┐
│                                                           │
│                    AC DPP                                 │
│                                                           │
└─────────────────────────────────────────────────────────┘
```

Thanks so much Steve!

Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:*
http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf.
OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.
[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

AR_00000222

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.
[4] *Id.* at 5-5.
[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.
[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.
[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.
[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

Page 3 – Dear Colleague Letter: Sexual Violence

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance,* and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g., Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as...severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know how to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.
[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.
[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

Page 6 – Dear Colleague Letter: Sexual Violence

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance.* Recipients should then implement changes as needed.

   (A) *Notice of Nondiscrimination*

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

### (B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

Page 8 – Dear Colleague Letter: Sexual Violence

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

(C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

Page 9 – Dear Colleague Letter: Sexual Violence

*Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

(A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

(B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

Page 10 – Dear Colleague Letter: Sexual Violence

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Page 11 – Dear Colleague Letter: Sexual Violence

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] See, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); Price Waterhouse v. Hopkins, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); id. at 260 (White, J., concurring in the judgment); id. at 261 (O'Connor, J., concurring in the judgment). The 2001 Guidance noted (on page vi) that "[w]hile Gebser and Davis made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the Davis Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." See also Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. See 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. See Steadman v. SEC, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

(C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

occurred in a classroom during school hours with a single complainant.

(D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.,* whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

### Education and Prevention

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

[35] non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

Page 16 – Dear Colleague Letter: Sexual Violence

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]
- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).
[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

Page 17 – Dear Colleague Letter: Sexual Violence

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:

*Counseling and Training*

- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  - o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  - o how to conduct Title IX investigations
  - o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*

- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  - o what constitutes sexual harassment or violence
  - o what to do if a student has been the victim of sexual harassment or violence
  - o contact information for counseling and victim services on and off school grounds
  - o how to file a complaint with the school
  - o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

AR_00000238

Page 18 – Dear Colleague Letter: Sexual Violence

- what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - know the school's prohibition against sex discrimination, including sexual harassment and violence
  - recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - understand how and to whom to report any incidents
  - know the connection between alcohol and drug abuse and sexual harassment or violence
  - feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.
[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

Page 19 – Dear Colleague Letter: Sexual Violence

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

## Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND
VICTIM PROTECTIONS:  RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN
RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT

The Executive Committee of the ABA Criminal Justice Section commissioned the Task Force on
College Due Process Rights and Victim Protections in November 2016. Immediately after,
extensive efforts were made to find members that represented all interested parties: victims, the
accused, universities, other stakeholders, and national experts. The Task Force was fully
constituted in the winter of 2017, and it ended up including two voting members who were
originally liaisons from the ABA Commission on Domestic and Sexual Violence and the ABA
Section of Civil Rights and Social Justice. This elevation was made in recognition of their
significant contributions.

Although the Task Force worked expeditiously, it did so because members were eager to try to
have a positive impact on this critical area of public policy. The Task Force believed it likely that
the new administration would release new directives to replace the 2011 Dear Colleague Letter,
issued by the U.S. Department of Education Office for Civil Rights. In the greatest of traditions
of the ABA and the Criminal Justice Section, members wanted to contribute to the public
discussion.

The Task Force drafted these *Recommendations* to provide guidelines to colleges and
universities in resolving allegations of campus sexual misconduct. They are aspirational and
reflect the Task Force's collective judgment for a fair process. These *Recommendations* do not
represent the views of one person or even a group of people but the views of the collective whole
for which there was complete consensus among all Task Force members. The recommendations
were necessarily the product of extensive discussions and compromise. Various stakeholders
agreed to bend on certain provisions in order to obtain other provisions of import to them and in
order to reach unanimity. These *Recommendations* are not exhaustive. The Task Force
recognizes that it did not discuss every relevant issue, but it aimed to address the more salient
ones. Nor are the *Recommendations* intended to be mandated detailed scripts or to limit the
discretion of schools to adopt different procedures. Instead they are intended to provide schools
with useful guidelines. In addition, not all of these recommendations are consistent with the 2011
Dear Colleague Letter. On May 6, the ABA Criminal Justice Section Council voted unanimously
to endorse these *Recommendations* for publication.[1]

Throughout these *Recommendations*, the Task Force uses the word "should" which recognizes
the diversity among schools and the lack of authority in requiring schools to have certain
provisions. Where the law requires a school to have a certain provision mandatory language is
used.

---

[1] Although these *Recommendations* were unanimously endorsed for publication by the Criminal Justice Section
Council, they have not been endorsed by any other section of the ABA, including the ABA Commission on Domestic and
Sexual Violence and the ABA Section of Civil Rights and Social Justice.

Complainant refers to the alleged victim, although the Task Force acknowledges that sometimes they may not be the same person. Respondent refers to the alleged perpetrator. The Task Force also refers to complainant and respondent in the singular even though there may be more than one. The decision-maker refers to the person(s) who determine whether a violation occurred.

## I.   SCHOOL'S RIGHT AND RESPONSIBILITY TO ADDRESS CAMPUS SEXUAL MISCONDUCT

Title IX prohibits sex discrimination in educational programs or activities that receive federal financial assistance. Sex discrimination includes sexual harassment and sexual misconduct. The Department of Education and federal courts have interpreted this federal law to require schools to respond to allegations of student sexual misconduct in a timely and effective manner.

### A.   Cooperation with, and Independence from, Law Enforcement

The Task Force recognizes the school's responsibility to address sexual misconduct on its campus for protection of its community. Schools should be able to determine whether a violation of school policy has occurred regardless of whether there has been a violation of criminal law. Where police investigation has been initiated, schools should work cooperatively with law enforcement to the extent permissible by state and federal law.

### B.   Investigate Both Sides

The school's investigator must conduct a prompt, fair, and impartial investigation. The investigation should be thorough, and both parties should have the right to participate by identifying witnesses and identifying and/or providing relevant information to the investigator. Investigators should equally seek out both inculpatory and exculpatory evidence.

### C.   Confidentiality

Schools should put in place provisions to guard against the improper disclosure of confidential information created or gathered during an investigation. Parties, witnesses, investigators, decision-makers, and advisors should abide by these provisions. Schools should notify parties about the scope and limits of the school's ability to maintain confidentiality. For example, a school may have to provide documents in compliance with a court subpoena.

### D.   Retaliation

Schools should put in place provisions to protect all parties from retaliation. Such provisions should be published to the campus community and available for review at all times. Such policies should also be communicated to all participants, including witnesses, throughout the investigative and adjudicatory process. Such policies should also clearly communicate the means through which any individual can securely report perceived retaliation.

AR_00000242

## II.    RESOLVING ALLEGATIONS OF SEXUAL MISCONDUCT

Schools have several options for resolving allegations of sexual misconduct.

### A.    <u>Alternatives to Traditional Adjudication</u>

Where appropriate, the Task Force encourages schools to consider non-mediation alternatives to resolving complaints that are research or evidence-based, such as Restorative Justice processes. Both parties must freely and voluntarily agree to such processes in order for them to be utilized, and they may withdraw their consent to the process at any time, stopping its use.

### B.    <u>Adjudicatory versus Investigatory Model</u>

Both the adjudicatory and the investigatory model begin with an investigation, but they differ in the process for determining whether a violation of school policy occurred. The adjudicatory model has a hearing in which both parties are entitled to be present, evidence is presented, and the decision-maker(s) determine(s) whether a violation of school policy has occurred. This does not require the parties to be present in the same room.  For instance, the parties could be in two separate rooms but able to see and hear each other via video-conferencing. The Task Force emphasizes that the decision-maker(s) should be able to see and hear the parties in order to assess their credibility, and at a minimum, the parties should be able to hear one another.

In the investigatory model, by contrast, the decision-maker(s) consider(s) only the investigation report in determining whether a violation occurred. Sometimes the investigator is also the decision-maker (the single investigator model), and sometimes the decision-maker is different from the investigator. Although the decision-maker(s) may sometimes request to hear from a witness, the parties are not entitled to be present for that testimony in the investigatory model.

In considering the differences between the adjudicatory and investigatory model, the Task Force has a preference for the adjudicatory model because it can offset any potential for investigator bias, and it allows the decision-maker(s) to hear live testimony from the parties.  It was the consensus of the Task Force that the single investigator model, which consists of having an investigator also serve as the decision-maker, carries inherent structural fairness risks especially as it relates to cases in which suspension or expulsion is a possibility. Should a school choose to use the investigatory model, the Task Force recommends that the investigator and the decision-maker be different persons and adopt additional procedural protections consist with these recommendations.

The Task Force acknowledges that some schools use a hybrid model, which contains elements of both the investigatory and adjudicatory model. For classification purposes, the Task Force considers a model adjudicatory only if the parties have the right to a hearing in which evidence is presented, the parties are present, and a decision-maker who is not also the investigator determines whether a violation occurred. As described in Section IV below – if there are at least

3

three decision-makers and they are making their decision unanimously - it is appropriate to use the lower standard of proof as defined in Section IV-D.

## III. PROCEDURAL PROTECTIONS

The Task Force believes that both parties should have robust procedural protections.

### A.      Counsel/Advocate

The Violence Against Women Authorization Act of 2013 requires that in cases of sexual assault, both parties have the right to an advisor of their choosing, who may be an attorney or third party advocate. All advisors, including attorney advisors, must adhere to all conditions and obligations required by the school's process. The school should provide the advisor with the same access to information available to the party. Minimally, the advisor should have the right to communicate with the party in oral or written form during all meetings and proceedings. Should a party prefer, the school should provide the party with an advisor who has been trained in the school's sexual misconduct policies and can assist the party. The school should have more than one advisor to give the party choice, but is not required to provide an attorney advisor. Where a student is working with an advisor and that advisor has an obligation to report to the university, the student should be made aware of the potential conflict of interest.

### B.      Notice

Both parties should be provided with written notice as contemporaneously as is practical that a school or its designated investigator will commence a formal investigation. This notice should include the date of the alleged incident if known, a summary of the alleged facts, a summary of the specific policy violation(s) under investigation by the school, and instructions on how to access the relevant policy and adjudicatory process. It should also include information about their right to an advisor, described above. This notice should be provided before the investigation begins. If the initial complaint is made to the school investigator then notice should be provided before the responding party's interview with the investigator, regardless of whether the responding party decides to make a statement.

### C.      Discovery

The school should prepare an initial comprehensive investigation report and should notify both parties contemporaneously of the availability of the report. This report should include information such as party statements, witness statements, and any inculpatory or exculpatory information collected during the investigation. Schools should disclose a list of information obtained during the course of the investigation even if it was not considered relevant evidence for the decision-maker(s). Both parties should have a reasonable opportunity to review the report with their advisor, if they choose to have one, and to request information be included or removed by the school from the final report. The school should designate a person other than the investigator or the decision-maker(s) to determine which information is included in the final

4

report, taking into consideration the issues raised by each party and school policy. The student's advisor, if there is one, should have the right to participate fully in this pre-hearing stage of the process. Once the final investigation report is prepared, both parties and their advisors, if they have them, should have reasonable access to it and should have the right to provide a reasonable written response, which will be provided along with the final investigation report to the decision-maker(s) for consideration of whether a policy violation has occurred. This reasonable written response should not reference any evidence that has been formally excluded from the final investigation report, however either party may always appeal the improper exclusion of evidence from the final investigation report.

## D.   **Impartial Decision-maker**

As a matter of fundamental fairness, schools and their designated personnel must be fair, impartial, and free of conflicts of interest. Both the investigator and the decision-maker(s) should receive fair and balanced training on how to objectively investigate and adjudicate these matters. Parties should be advised of the identity of the designated personnel in advance of decision-making so that they have sufficient time to raise concerns so as to avoid unnecessary delay and error.

## E.   **Silence**

In the interest of fundamental fairness, and recognizing the prospects of parallel or follow-on criminal proceedings, the respondent's silence should not be the basis of a finding of responsibility. The Task Force emphasizes that as long as it comports with the standards articulated in Section III-C and Section IV-D below, the complainant's statement may serve as the sole basis for a finding of responsibility.

## F.   **Appeal**

The Task Force recommends that both parties have a right to appeal. The grounds for appeal should be limited to (1) new information not known or available at the time of the hearing; (2) procedural error that materially affected the findings of fact (this includes improperly excluding or including evidence); (3) the imposition of a sanction disproportionate to the findings in the case (that is, too lenient or too severe); or (4) the conduct as found by the decision-maker does not violate school policy (this is not intended to allow an appeal for new fact-finding). A successful appeal on the first two grounds should generally result in a remand for a new hearing to determine whether a violation occurred. If the appellate officer finds the fourth ground to be true then the finding of responsibility should simply be reversed. Recognizing the benefits of finality, the Task Force favors a single level of direct/formal appeal.

## IV.   THE HEARING

The Task Force recommends an adjudicatory hearing to determine whether the respondent committed sexual misconduct.

AR_00000245

## A.    Standards for Evidence at Hearing

In general, evidence may be presented during a hearing if it is relevant, not unduly repetitious, and the sort of information a reasonable person would find reliable. Evidence is relevant if (1) it bears on a fact of consequence in the case, or (2) it reflects on the credibility of a testifying party or witness in a material way. Evidence may be excluded if it is unfairly prejudicial or if it is needlessly duplicative. Character and reputation evidence regarding the parties (both positive and negative) should be excluded from the decision-making stage. Evidence of the past sexual history of the parties should be disfavored and admitted only when it provides compelling evidence on a disputed issue of relevance to the misconduct charge or its defense.

It is appropriate for some witness statements to be presented in written form, such as a statement signed by the witness or as recorded by the investigator.  The decision-maker should exercise caution at considering second hand statements as true. ("John told me that he saw...") It is rare if ever appropriate to consider as true a third hand statement or something more removed.  ("John told me that Zelda told him that she saw…").

If a witness statement is important for establishing whether the alleged misconduct occurred then whenever possible, that witness should appear in person. Live testimony will allow the decision-maker to better assess witness credibility and determine whether a violation occurred.  Members of the college community (other than the parties themselves as explained in Section C below) have an obligation to provide relevant evidence if called upon to do so.

## B.    Recording Proceedings

The hearing should be recorded or transcribed. Reasonable care should be taken to create a quality recording and minimize technical problems.

## C.    Participation in the Proceedings

Neither the complainant nor the respondent should be required to participate in the proceedings. However, the decision-maker(s) should not consider either party's personal account of what happened unless that party is available for questioning by the decision-maker(s) and the other party. A party who chooses to remain silent may still present evidence (other than a personal statement) or question the evidence that is presented by the school or the other party. The decision-maker(s) may always consider a party's evidence and questioning of the evidence as well as a party's general denial of the allegations.

## D.    Asking Questions

The complainant and respondent may not question one another or other witnesses directly, but should be given an ongoing opportunity during the proceeding to offer questions to be asked through the decision-maker(s), who will determine whether to ask them.  The investigator should be available for questioning by the decision-maker(s) and the parties.

AR_00000246

## V.   DETERMINING WHETHER A VIOLATION OCCURRED

Regardless of the method a school uses to determine whether a violation occurred, the Task Force urges that the following protections be put in place.

### A.   Composition of Panel

Recognizing that there are different models that could provide for a fair and equitable resolution, the Task Force favors having at least three people separate from the investigator decide whether a violation occurred. The Task Force recognizes that there are inherent benefits to having a diverse panel when deciding responsibility or sanctions. A panel can be diverse across a number of dimensions including gender, race, age, sexual orientation, and position within the university. The inclusion of students can also provide an important perspective.

### B.   Necessary Vote for Finding of Responsibility

Schools should require a unanimous vote among decision-makers for a finding of school policy violation and a finding of responsibility.

### C.   Insufficient Evidence and Outcome

If there is insufficient credible, reliable, and relevant evidence for the decision-maker(s) to find that a violation occurred then the student must be found not responsible.

### D.   Standard of Proof

The Task Force spent considerable time discussing the standard of proof to be used by decision-maker(s) in determining whether a violation has occurred. Some Task Force members thought it was unfair to have a lower standard of proof when respondents were facing suspension and possible expulsion, coupled with the potential collateral consequences that accompany a finding of responsibility. Other Task Force members considered it unjust to have an elevated standard of proof given the historical challenges complainants often faced in getting schools to respond adequately to allegations of sexual misconduct. For purposes of the school disciplinary system, everyone was in agreement that the standard should not be beyond a reasonable doubt. Additionally, the preconceived notions attached to the commonly used standards of proof troubled some Task Force members.  Specifically, some Task Force members did not agree with the common interpretation of "preponderance of the evidence" as requiring a mechanical weighing of the evidence in which a mere feather is enough to tip the scales towards a finding of responsibility. At the same time, other Task Force members felt "clear and convincing evidence" is a vague standard and thus easily subject to potential abuse. In light of these concerns, the Task Force believes that it is best to avoid labels and instead articulate the appropriate basis for a finding of responsibility, with corresponding instructions (preferably in written form) provided to the decision-maker to ensure a clear understanding of the manner in which they should consider,

AR_00000247

review, and weigh the evidence. The Task Force's recommendation is the product of compromise.

The Task Force believes that the following standard of proof is only appropriate under an adjudicatory model with at least a three-person panel of decision-makers, using a unanimity requirement, and with the procedural protections set forth in these recommendations. The Task Force recommends that this standard be provided in written form to the decision-makers and the parties and advisors, if there are any, before deliberations begin:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

In a model where there is only one decision-maker, the Task Force believes that there should be a higher standard of proof. (The Task Force acknowledges that this recommendation is not in line with the 2011 Dear Colleague Letter). The Task Force recommends that this higher standard of proof be provided in written form to the decision-maker before deliberations begin.

> *The decision-maker should first evaluate the quality of the evidence. The decision-maker should consider all of the evidence regardless of who provided it. Any evidence the decision-maker finds to be of high quality should be given more weight than any evidence the decision-maker finds to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-maker should only find the respondent responsible for alleged misconduct if the evidence firmly convinces the decision-maker to reasonably conclude that a finding of responsibility is justified. That is, the decision-maker should find that there is sufficient evidence that is relevant, probable, and persuasive to firmly convince him or her that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility significantly outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

8

**E.**     <u>Sanction</u>

In the event of a finding of responsibility, the consensus of the Task Force is that a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis taking into account the facts and circumstances including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offense, and the effect on the victim and/or complainant as well as the university community. The Task Force believes that a presumption of expulsion may have unintended consequences such as discouraging reporting and a finding of responsibility.

AR_00000249

## Task Force Participants

**Chair**

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team
Seyfarth Shaw LLP
Chicago, IL & Washington D.C.

**Reporter**

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

**Members**

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

AR_00000250

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

**Liaison**

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**ABA Staff Liaison**

**Patrice Payne**
Senior Staff Attorney, Criminal Justice Section
Washington D.C.

AR_00000251



# WHITE PAPER ON
# CAMPUS SEXUAL ASSAULT INVESTIGATIONS

Task Force on the Response of Universities and Colleges to
Allegations of Sexual Violence

Approved by the Board of Regents
March 2017

AR_00000252

# MISSION STATEMENT OF THE
# AMERICAN COLLEGE OF TRIAL LAWYERS

The American College of Trial Lawyers is an invitation only fellowship of exceptional trial lawyers of diverse backgrounds from the United States and Canada. The College thoroughly investigates each nominee for admission and selects only those who have demonstrated the very highest standards of trial advocacy, ethical conduct, integrity, professionalism and collegiality. The College maintains and seeks to improve the standards of trial practice, professionalism, ethics, and the administration of justice through education and public statements on important legal issues relating to its mission. The College strongly supports the independence of the judiciary, trial by jury, respect for the rule of law, access to justice, and fair and just representation of all parties to legal proceedings.

◆ ◆ ◆

*"In this select circle, we find pleasure and charm in the illustrious company of our contemporaries and take the keenest delight in exalting our friendships."*

—Hon. Emil Gumpert,
Chancellor-Founder, ACTL

American College of Trial Lawyers
19900 MacArthur Boulevard, Suite 530
Irvine, California  92612
Telephone: (949) 752-1801
Facsimile: (949) 752-1674
Website: www.actl.com
Email: nationaloffice@actl.com

Copyright © 2017
American College of Trial Lawyers
All Rights Reserved.

AR_00000253

# AMERICAN COLLEGE OF TRIAL LAWYERS

## CHANCELLOR-FOUNDER
Hon. Emil Gumpert
(1895-1982)

## OFFICERS
**BARTHOLOMEW J. DALTON**, *President*
**SAMUEL H. FRANKLIN**, *President-Elect*
**JEFFREY S. LEON, LSM**, *Treasurer*
**DOUGLAS R. YOUNG**, *Secretary*
**MICHAEL W. SMITH**, *Immediate Past President*

## BOARD OF REGENTS

**RITCHIE E. BERGER**
Burlington, Vermont

**KATHLEEN FLYNN PETERSON**
Minneapolis, Minnesota

**SUSAN J. HARRIMAN**
San Francisco, California

**THOMAS M. HAYES III**
Monroe, Louisiana

**PAUL J. HICKEY**
Cheyenne, Wyoming

**JOHN J. L. HUNTER, Q.C.**
Vancouver, British Columbia

**W. FRANCIS MARION, JR.**
Greenville, South Carolina

**ELIZABETH N. MULVEY**
Boston, Massachusetts

**WILLIAM J. MURPHY**
Baltimore, Maryland

**C. RUFUS PENNINGTON III**
Jacksonville, Florida

**DANIEL E. REIDY**
Chic/o, Illinois

**STEPHEN G. SCHWARZ**
Rochester, New York

**KATHLEEN M. TRAFFORD**
Columbus, Ohio

**ROBERT K. WARFORD**
San Bernardino, California

**ROBERT E. WELSH, JR.**
PhilŸelphia, Pennsylvania

--------------------

DENNIS J. MAGGI, CAE, Executive Director

# AMERICAN COLLEGE OF TRIAL LAWYERS

## PAST PRESIDENTS

1950-51 EMIL GUMPERT*
Los Angeles, California

1951-52 C. RAY ROBINSON*
Merced, California

1952-53 CODY FOWLER*
Tampa, Florida

1953-54 E. D. BRONSON*
San Francisco, California

1954-55 CODY FOWLER*
Tampa, Florida

1955-56 WAYNE E. STICHTER*
Toledo, Ohio

1956-57 JESSE E. NICHOLS*
Oakland, California

1957-58 LEWIS C. RYAN*
Syracuse, New York

1958-59 ALBERT E. JENNER, JR.*
Chicago, Illinois

1959-60 SAMUEL P. SEARS*
Boston, Massachusetts

1960-61 LON HOCKER*
Woods Hole, Massachusetts

1961-62 LEON JAWORSKI*
Houston, Texas

1962-63 GRANT B. COOPER*
Los Angeles, California

1963-64 WHITNEY NORTH SEYMOUR*
New York, New York

1964-65 BERNARD G. SEGAL*
Philadelphia, Pennsylvania

1965-66 EDWARD L. WRIGHT*
Little Rock, Arkansas

1966-67 FRANK G. RAICHLE*
Buffalo, New York

1967-68 JOSEPH A. BALL*
Long Beach, California

1968-69 ROBERT W. MESERVE*
Boston, Massachusetts

1969-70 HON. LEWIS F. POWELL, JR.*
Washington, District of Columbia

1970-71 BARNABAS F. SEARS*
Chicago, Illinois

1971-72 HICKS EPTON*
Wewoka, Oklahoma

1972-73 WILLIAM H. MORRISON*
Portland, Oregon

1973-74 ROBERT L. CLARE, JR.*
New York, New York

1974- AUSTIN W. LEWIS*
New Orleans, Louisiana

1975-76 THOMAS E. DEACY, JR.
Kansas City, Missouri

1976-77 SIMON H. RIFKIND*
New York, New York

1977-78 KRAFT W. EIDMAN*
Houston, Texas

1978-79 MARCUS MATTSON*
Los Angeles, California

1979-80 JAMES E. S. BAKER*
Chicago, Illinois

1980-81 JOHN C. ELAM*
Columbus, Ohio

1981-82 ALSTON JENNINGS*
Little Rock, Arkansas

1982-83 LEON SILVERMAN*
New York, New York

1983-84 GAEL MAHONY*
Boston, Massachusetts

1984-85 GENE W. LAFITTE
New Orleans, Louisiana

1985-86 GRIFFIN B. BELL*
Atlanta, Georgia

1986-87 R. HARVEY CHAPPELL, JR.*
Richmond, Virginia

1987-88 MORRIS HARRELL*
Dallas, Texas

1988-89 PHILIP W. TONE*
Chicago, Illinois

1989-90 RALPH I. LANCASTER, JR.
Portland, Maine

1990-91 CHARLES E. HANGER*
San Francisco, California

1991-92 ROBERT B. FISKE, JR.
New York, New York

1992-93 FULTON HAIGHT*
Santa Monica, California

1993-94 FRANK C. JONES*
Atlanta, Georgia

1994-95 LIVELY M. WILSON*
Louisville, Kentucky

1995-96 CHARLES B. RENFREW
San Francisco, California

1996-97 ANDREW M. COATS
Oklahoma City, Oklahoma

1997-98 EDWARD BRODSKY*
New York, New York

1998-99 E. OSBORNE AYSCUE, JR.
Charlotte, North Carolina

1999-2000 MICHAEL E. MONE
Boston, Massachusetts

2000-2001 EARL J. SILBERT
Washington, District of Columbia

2001-2002 STUART D. SHANOR
Roswell, New Mexico

2002-2003 WARREN B. LIGHTFOOT
Birmingham, Alabama

2003-2004 DAVID W. SCOTT, Q.C.
Ottawa, Ontario

2004-2005 JAMES W. MORRIS, III
Richmond, Virginia

2005-2006 MICHAEL A. COOPER
New York, New York

2006-2007 DAVID J. BECK
Houston, Texas

2007-2008 MIKEL L. STOUT
Wichita, Kansas

2008-2009 JOHN J. (JACK) DALTON
Atlanta, Georgia

2009-2010 JOAN A. LUKEY
Boston, Massachusetts

2010-2011 GREGORY P. JOSEPH
New York, New York

2011-2012 THOMAS H. TONGUE
Portland, Oregon

2012-2013 CHILTON DAVIS VARNER
Atlanta, Georgia

2013-2014 ROBERT L. BYMAN
Chicago, Illinois

2014-2015 FRANCIS M. WIKSTROM
Salt Lake City, Utah

2015-2016 MICHAEL W. SMITH
Richmond, Virginia

* Deceased

# TASK FORCE ON THE RESPONSE OF UNIVERSITIES AND COLLEGES TO ALLEGATIONS OF SEXUAL VIOLENCE

**CHAIR**
**PAMELA ROBILLARD MACKEY**
DENVER, COLORADO

**MEMBERS**
**RITCHIE E. BERGER**
BURLINGTON, VERMONT

**ELIZABETH N. MULVEY**
BOSTON, MASSACHUSETTS

**EARL J. SILBERT**
WASHINGTON, DISTRICT OF COLUMBIA

**A. GILCHRIST SPARKS III**
WILMINGTON, DELAWARE

# TABLE OF CONTENTS

American College of Trial Lawyers Position Statement Regarding
Campus Sexual Assault Investigations .................................................................................. 1

American College of Trial Lawyers White Paper on Campus Sexual Assault Investigations ............... 3

  Historical Background .......................................................................................... 3

    OCR's Influence on College Sexual Assault Investigations ......................................... 3

    Procedures.......................................................................................................... 4

    Investigations on Campus...................................................................................... 5

    Appeals from Investigations .................................................................................. 7

    OCR's Title IX Investigations of Colleges and Universities ........................................ 7

    Legal Landscape: Scholars, Commentators, and the Courts Respond ......................... 8

  ACTL's Recommendations......................................................................................11

    Need For Procedural Due Process ..........................................................................11

    Need For Impartial Investigations ......................................................................... 12

    The Right to Counsel, Access Evidence, and Notice of Allegations ......................... 14

    Some Form of Cross-Examination .......................................................................... 16

    The Inadequacy of Preponderance of the Evidence Standard ................................... 16

  Conclusion ......................................................................................................... 18

AR_00000257

# AMERICAN COLLEGE OF TRIAL LAWYERS
# POSITION STATEMENT REGARDING
# CAMPUS SEXUAL ASSAULT INVESTIGATIONS

*The American College of Trial Lawyers maintains and seeks to improve the standards of trial practice, professionalism, ethics, and the administration of justice through education and public statements on important legal issues relating to its mission. The College strongly supports the independence of the judiciary, trial by jury, respect for the rule of law, access to justice, and fair and just representation of all parties to legal proceedings.*

ACTL recognizes, and is deeply concerned by, the problem of sexual assaults on college campuses. ACTL believes in the importance of protecting all students from sexual misconduct and ensuring that they are provided an educational environment free of sexual harassment.

ACTL also believes that it is important to ensure that students investigated for, or charged with, sexual assault or misconduct violations be afforded basic fairness and due process.

There have been recent statements by respected faculty from a number of law schools declaring that those subject to such investigations or charges are being denied fundamental rights. For example, 28 members of the Harvard Law School Faculty in their statement expressed their belief that: "Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[1] Similarly, 16 members of the Penn Law School Faculty in an open letter addressing guidelines issued by the U.S. Department of Education's Office of Civil Rights ("OCR") to enforce Title IX of the Education Amendments Act of 1972, opined: "Although we appreciate the efforts by Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness. We do not believe that providing justice for victims of sexual assault requires subordinating so many protections long deemed necessary to protect from injustice those accused of serious offenses."[2] In another open letter addressing these issues, professors of law from institutions across the United States stated their belief that: "Through a series of … directives and enforcement actions, OCR has steadily expanded the definition of sexual harassment and imposed a growing range of responsibilities on colleges to curb such conduct. As a result, free speech and due process on campus are now imperiled."[3]

These concerns about fairness and due process have been echoed in a number of recent

---

[1]     Opinion, "Rethink Harvard's sexual harassment policy." *The Boston Globe*, October 15, 2014. http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html.
[2]     Schow, Ashe, "UPenn law professors speak out against new campus sexual assault policy," *Washington Examiner*, February 18, 2015, http://www.washingtonexaminer.com/upenn-law-professors-speak-out-against-new-campus-sexual-assault-policy/article/2560365.
[3]     Law Professors' Open Letter Regarding Campus Free Speech and Sexual Assault, May 17, 2016.

AR_00000258

decisions by state and federal judges in cases brought by accused or disciplined students.[4]  There is no clear consensus as to how much process is constitutionally or contractually required to be provided to the subjects of such investigations, and the outcome often depends on whether the institution is public or private. Some courts, in addition to expressing concern as to the adequacy of the process provided students, have recognized other avenues of possible relief, including statutory claims such as under Title IX.[5]

In this position statement and accompanying white paper, ACTL submits its recommended standards for these investigations.

1.      Sexual misconduct investigations and hearings should be conducted with due consideration for any appearance of partiality, including that which might arise from the factfinder's other responsibilities or affiliations.

2.      The subject of a sexual misconduct investigation should promptly be provided with the details of the allegations and advised of his/her right to consult legal counsel.

3.      The subject of a sexual misconduct investigation has the right to be advised and accompanied by legal counsel at all stages of the investigation.

4.      The parties to a sexual misconduct investigation should be permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, in order to test the veracity of witnesses and documents.

5.      The subject of a sexual misconduct investigation should be provided with access to all evidence at a meaningful time and in a meaningful manner so that he/she can adequately respond to it.

6.      The standard of proof for "responsibility" should be clear and convincing evidence.

7.      Factfinders in sexual misconduct investigations and hearings should produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review.

---

4        See, e.g., *Doe v. Rectors and Visitors of George Mason Univ.*, 132 F.Supp.3d 712 (E.D.Va 2015); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015); *Doe v. Columbia Univ.*, 101 F.Supp.3d 356 (S.D.N.Y. 2015), *judgment vacated by Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).
5        See, e.g., *Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016); *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016); *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561 (D. Mass. 2016); *Doe v. Middlebury Coll.*, No.1:15-cv-192-jgm, 2015 WL 5488109 (D. Vt. Sept. 16, 2015).

AR_00000259

# AMERICAN COLLEGE OF TRIAL LAWYERS WHITE PAPER ON CAMPUS SEXUAL ASSAULT INVESTIGATIONS

In 2011, in response to increased concern over sexual assaults on university campuses, the U.S. Department of Education's Office for Civil Rights (OCR) issued a Dear Colleague Letter outlining the procedures private and public higher education institutions must follow in investigating and adjudicating sexual harassment complaints under Title IX.[1] The letter and its 2014 clarification have generated difficult legal questions, with institutions forced to balance their responsibilities under federal law, their desire to treat both complaining parties and alleged perpetrators fairly, and the substantial resources dedicated toward sexual assault prevention, training, and investigation. In an August 2016 article, a law professor described the dilemma facing educational institutions:

> The schools in these cases must feel themselves to be in an impossible position. On the one hand, they must take sexual assault seriously and remedy their previously neglectful handling of claims. Not doing enough means risking a federal Title IX investigation, with the threat of losing federal funding . . . . But, when schools do too much, they face potential lawsuits from accused students for violating, among other things, Title IX. When it comes to sexual-assault cases, campus administrators could be forgiven for feeling on a knife's edge.[2]

Judges have also recognized the difficulties colleges and universities face in balancing these competing interests, with one federal judge noting in a September 2016 decision that universities are "in a double bind. Either they come under public fire for not responding to allegations of sexual assault aggressively enough or they open themselves to Title IX claims simply by enforcing rules against alleged perpetrators."[3]

ACTL believes that in a well-intentioned effort to address the significant problem of campus sexual assault, OCR has established investigative and disciplinary procedures that, in application, are in many cases fundamentally unfair to students accused of sexual misconduct. This white paper analyzes the issues and recommends specific improvements.

## HISTORICAL BACKGROUND

### OCR's Influence on College Sexual Assault Investigations

On April 29, 2014, OCR published "Questions and Answers about Title IX and Sexual Violence," a document intended to clarify campuses' legal requirements under Title IX as articulated

---

[1]     As set forth on DOE's website: "The mission of the Office for Civil Rights is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights."

[2]     Jeannie Suk Gersen, *College Students Go to Court Over Sexual Assault*, The New Yorker (Aug. 5, 2016), http://www.newyorker.com/news/news-desk/colleges-go-to-court-over-sexual-assault.

[3]     *Austin v. Univ. of Oregon*, __ F.Supp.3d __, Nos. 6:15-cv-02257-MC and 6:16-cv-00647-MC, 2016 WL 4708540 at *9 (D. Or. Sept. 8, 2016).

AR_00000260

in the April 4, 2011 "Dear Colleague" letter on sexual violence.[4] All higher education institutions that receive federal funds must comply; according to a press release from DOE, schools that "violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action."[5]

According to Catherine Lhamon, Assistant Secretary for Civil Rights, the legal bases of the Dear Colleague Letters (DCLs) stem from the United States Supreme Court's confirmation that, under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(D), agencies may issue guidance without notice-and-comment procedures; such guidance does not have the force and effect of law but rather, is intended to advise the public of the construction of Title IX.[6]

According to the 2014 Q&A, a federally funded school violates a student's Title IX rights regarding student-on-student sexual violence if:

1.     The alleged conduct "is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program"; that is, it creates a "hostile environment"; and

2.     The school, after receiving notice, "fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects."[7]

This standard is applied in both administrative enforcements of Title IX and where injunctive relief is sought. Where damages are sought, the standard is actual knowledge and deliberate indifference.

**Procedures**

In order to be Title IX compliant, an institution must disseminate a notice of nondiscrimination, designate at least one employee as a Title IX coordinator, and adopt and publish grievance procedures for resolving sexual harassment and sexual violence complaints. The grievance procedures must contain the following:

•     Notice to students and employees of the procedures, including where complaints may be filed;

•     A statement of the institution's jurisdiction over Title IX complaints;

---

4       Office for Civil Rights, "Questions and Answers about Title IX and Sexual Violence," *U.S. Dep't of Education* (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Q&A].
5       Department of Education, U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations (May 1, 2014), http://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-i.
6       Letter from Catherine E. Lhamon, Ass. Sec. for Civil Rights, Dep't of Educ. to Sen. James Lankford, Chairman, Subcommittee on Regulatory Affairs and Federal Management at 2 (Feb. 17, 2016) [hereinafter Lhamon Letter] (citing *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199 (2015)).
7       *Id.* at 10.

AR_00000261

- "Adequate" definitions of sexual harassment and hostile environments;

- Reporting protocols, including policies on confidential reporting;

- Identification of responsible employees;

- Provisions for "adequate, reliable, and impartial investigation of complaints," including opportunity for both parties to present witnesses and evidence;

- Notice of interim measures that may be taken to protect students;

- Application of the preponderance of the evidence standard which is to be used for deciding complaints;

- Established, prompt time frames for the complaint process;

- Notice of potential remedies for students and sanctions against perpetrators;

- Written notice to both parties of the outcome of the complaint; and

- Assurance the institution will employ measures to prevent recurrence of sexual violence and allay discriminatory effects on the complainant.[8]

Although Title IX permits institutions to use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to handle sexual violence allegations, OCR emphasizes that any procedures used for sexual violence complaints "must meet the Title IX requirement of affording a complainant a prompt and equitable resolution . . . including applying the preponderance of the evidence standard of review."[9]

**Investigations on Campus**

OCR utilizes the term "investigation" to refer to the fact-finding process and any hearing and decision-making protocol an institution uses to determine: "(1) whether or not the conduct occurred; and (2) if the conduct occurred, what actions the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence."[10]  OCR cautions that imposing sanctions against a perpetrator without additional remedies "likely will not be sufficient to eliminate the hostile environment and prevent recurrences."[11]

Investigations must be "adequate, reliable, impartial, and prompt"; they must also include an opportunity for both parties to present witnesses and other evidence.  A hearing is not necessarily required.[12]  The investigation may include: conducting interviews of the parties and witnesses,

---

| | |
|---|---|
| 8 | 2014 Q&A at 12-13. |
| 9 | *Id.* at 14. |
| 10 | *Id.* at 25. |
| 11 | *Id.* |
| 12 | *Id.* at 25. |

reviewing law enforcement investigation documents, reviewing student files, and examining other relevant evidence.  An institution "must give the complainant any rights that it gives to the alleged perpetrator."[13]  Accordingly:

- If the institution permits one party to have an attorney or advisor, or restricts the ability of attorneys or advisors to speak or participate, it must apply this rule equally;

- If the institution permits one party to submit expert testimony, it must apply this rule equally;

- If the institution allows for an appeal, it must apply this rule equally;

- Both complainant and alleged perpetrator must be informed in writing of the outcome of the complaint and any appeal; and[14]

- The institution "must use a preponderance-of-the-evidence" standard in any Title IX proceeding.[15]

Institutions should notify complainants that they may file a criminal complaint and must refrain from dissuading a complainant from doing so.[16]  OCR notes that because a Title IX investigation will never result in incarceration, "the same procedural protections and legal standards [present in a criminal investigation] are not required."[17]  Title IX investigations are "not discretionary"; they must be conducted even if a criminal investigation is ongoing or terminates without an arrest.[18]  Although an institution may be required to temporarily delay a fact-finding investigation while law enforcement gathers evidence, an institution should work with campus police, law enforcement, and prosecutors to identify when evidence-gathering is complete so that the school may "promptly resume and complete its fact-finding for the Title IX investigation."[19]

If the institution uses a hearing process, it may determine whether it allows the parties to be present for the entirety of the hearing, with the caveat that permission to one party to be present must be granted equally to both parties.[20]  An institution "must not require a complainant to be present at the hearing as a prerequisite to proceed."[21]  If requested, the institution should ensure the parties do not have to be in the same room together at the same time.

OCR also "strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing."[22]

---

13      *Id.* at 26.
14      *Id.*
15      *Id.*
16      *Id.*
17      *Id.* at 27.
18      *Id.*
19      *Id.* at 28.
20      *Id.* at 30.
21      *Id.*
22      *Id.* at 31.

AR_00000263

OCR states that a 60-calendar day timeframe for the entire investigative process—not including appeals—is typical.  Although OCR does not require investigations to be completed within sixty days, it will evaluate "on a case-by-case basis" whether the prompt and equitable standard has been met.[23]

## Appeals from Investigations

The appeals process "must be equal for both parties."[24]  An appeal mechanism is not required by Title IX; however, OCR recommends that an institution provide an appeals process "where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is disproportionate to the findings."[25]  Although the institution has latitude in designing an appeals process, it must still "provide[] prompt and equitable resolutions of sexual violence complaints," while taking steps "to protect the complainant in the educational setting."[26]

## OCR's Title IX Investigations of Colleges and Universities

As of 2015, OCR was investigating more than 100 colleges and universities as to whether they failed to "fairly investigate and adjudicate cases of sexual violence" under Title IX.[27]  In 2014, OCR took, on average, 1,469 days to complete an investigation, compared to 379 in 2009.[28]  In June 2016, it was reported that there were 246 ongoing investigations into 195 colleges and universities, with an additional sixty-eight Title IX investigations into sixty-one institutions' handling of sexual harassment.[29]

At the conclusion of its investigations, OCR publishes resolution letters and agreements, stating whether an institution's policies and notices are compliant with the regulation implementing Title IX and what remedial actions need to be taken.

With regards to the reporting of sexual assault statistics, the Department of Education has also been aggressive in enforcing the Clery Act, issuing fines to eight schools in 2013, although no more than three had been issued per year in the preceding twenty-two years.[30]  From January 2013 to December 2016, thirty schools were fined.[31]  On November 3, 2016, the Department announced it would fine Pennsylvania State University nearly $2.4 million for its violations of the Clery Act and

---

23      *Id.* at 32.
24      *Id.* at 38.
25      *Id.* at 37.
26      *Id.*
27      Jake New, Justice Delayed, *Inside Higher Ed* (May 6, 2015), https://www.insidehighered.com/news/2015/05/06/ocr-letter-says-completed-title-ix-investigations-2014-lasted-more-4-years.
28      *Id.*
29      Tyler Kingkade, There Are Far More Title IX Investigations of Colleges than Most People Know, *Huffington Post* (Jun. 16, 2016), http://www.huffingtonpost.com/entry/title-ix-investigations-sexual-harassment_us_575f4b0ee4b053d433061b3d.
30      Rebecca Lacher & Pedro A. Ramos, U.S. Department of Education Levies More Fines for Clery Act Violations, *Mondaq* (Jan. 30, 2014), http://www.mondaq.com/unitedstates/x/289764/Education/US+Department+Of+Education+Levies+More+Fines+For+Clery+Act+Violations.
31      Federal Student Aid, Clery Act Reports, *U.S. Dep't of Education* (2016), https://studentaid.ed.gov/sa/about/data-center/school/clery-act-reports.

AR_00000264

the Drug-Free Schools and Communities Act—"by far the largest fine ever imposed under the law."[32]

While OCR has issued many decisions criticizing colleges and universities for various failures to protect the Title IX rights of the complainant, the Office's first decision finding that the rights of an *accused* had been violated was released on October 12, 2016.  The decision found that Wesley College discriminated on the basis of sex against a male student accused of planning and implementing the nonconsensual videotaping of a sexual encounter by "subject[ing] him to an inequitable grievance and appeal process."[33]  In its letter, OCR found that resolution of the complaint was "not equitable" because the accused student was not: afforded his resolution options, given an opportunity to share his story and benefit from an investigation of that story, permitted to challenge evidence the College relied on, or provided an adequate opportunity to defend himself at the hearing.[34]  Even in this determination, however, OCR provided no guidance as to specific procedures institutions must or even should implement to protect the rights of accused students, apart from providing them with some form of notice and some type of opportunity to respond.

**Legal Landscape: Scholars, Commentators, and the Courts Respond**

In her August 5, 2016 article, Professor Gersen argues that that the position that college campuses are unable to provide procedural fairness, such that sexual assault investigations should be left to criminal justice authorities, "represents a false choice"; due process is possible "outside the court system" and should be employed in institutional investigations as a "check on pressures to trample fairness for the accused."[35]  That concern is reflected in numerous letters, policy statements, articles and an increasing number of judicial decisions, echoing the belief that the requirements imposed by OCR have resulted in accused students being "railroaded" through the campus disciplinary systems, bereft of adequate due process protections in the face of deeply serious charges.

For example, in May 2011, the advocacy group Foundation for Individual Rights in Education (FIRE) published an open letter to OCR's Assistant Secretary for Civil Rights expressing concerns that the 2011 DCL left institutions "uncertain as to their obligation to provide due process protections."[36]  Quoting from the 2014 Q&A, in which OCR specifically cautions that institutions "should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant," FIRE asserted that such "unnecessarily opaque and deeply troubling" language "invites the potential for abuse."[37]

Recently, several courts have recognized that the processes utilized by certain universities for investigating and disciplining students accused of sexual misconduct fail to comport with due

---

32      Jake New, Historic Fine for Penn State. *Inside Higher Ed* (Nov. 4, 2016), https://www.insidehighered.com/news/2016/11/04/education-departments-historic-sanction-against-penn-state-clery-violations.
33      Letter from Beth Gellman-Beer, Supervisory Attorney of OCR Philadelphia to Robert E. Clark III, President of Wesley College at 1 (Oct. 12, 2016), http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term.
34      *Id.* at 24.
35      Gersen, *supra*, at 35.
36      Letter from Will Creeley, Dir. of Legal & Pub. Advocacy, Found. for Individual Rights in Educ. (FIRE), to Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ. (May 5, 2011) [hereinafter FIRE Letter], https://www.thefire.org/fire-letter-to-office-for-civil-rights-assistant-secretary-for-civil-rights-russlynn-ali-may-5-2011.
37      2014 Q&A at 13; FIRE Letter.

AR_00000265

process.[38]  For example, in *Doe v. Rectors and Visitors of George Mason University*, the court found that the procedures followed by the university, a state entity, had deprived the accused student of a protected liberty interest—the charge of sexual misconduct "plainly call[ed] into question [the] plaintiff's good name, reputation, honor, or integrity," altered his legal status as a student, and had the potential to impact his future educational and employment endeavors.[39]  The court ruled that the University failed to afford constitutionally adequate process—it did not provide the student with notice of the full scope of the charges against him (a defect that was not cured during the subsequent appeals), which in turn impacted his opportunity to be heard and put on evidence that addressed the context in which the charges arose.[40]  Administrators also had off-the-record and ex-parte meetings with the complainant without informing the accused student what had transpired therein; one administrator assigned the appeal to himself despite having had "extensive ex parte contact with [the complainant] over the summer" and admitted he had "prejudged the case."[41]  Sanctions were also imposed on the student without a basis for the decision.  The court held that although any one of the procedural irregularities in isolation would not rise to a constitutional violation, the "accumulation of mistakes" resulted in a violation of due process.[42]

In *Doe v. University of Southern California*, the court partially affirmed a student's petition for a writ of administrative mandate challenging his suspension.[43]  The court found that the student had been deprived of notice and hearing where he was "not provided any information about the factual basis of the charges against him, he was not allowed to access any evidence used to support those accusations unless he actively sought it through a written request, and he was not provided with any opportunity to appear directly before the decision-making panel to rebut the evidence presented against him."[44]

The First Circuit held in *Cloud v. Trustees of Boston University* that the disciplinary hearings of private universities must be conducted with "basic fairness" and that court-established evidentiary and procedural rules may be referred to "in measuring the adequacy and fairness of the hearing."[45]  In

---

[38]     A number of law professors and other scholars have also joined the criticism of OCR and its DCLs. *See e.g.* KC Johnson & Stuart Taylor Jr., Stanford Sex Assault Case: Sentence Was Too Short—But the System Worked, *The Washington Post* (Jun. 9, 2016), https://www.washingtonpost.com/opinions/stanford-case-shows-why-the-justice-system-should-handle-campus-sexual-assault/2016/06/08/38a6af24-2cf2-11e6-9b37-42985f6a265c_story.html?utm_term=.120ccbcc4f1c (noting that "[t]he procedural rules [required by OCR] are systematically slanted against the accused" and that "accusers are not subject to meaningful cross-examination, which the Supreme Court has called 'the greatest legal engine ever invented for the discovery of truth.' "); Law Professors' Open Letter Regarding Campus Free Speech and Sexual Assault, SAVE (May 16, 2016), http://www.saveservices.org/wp-content/uploads/Law-Professor-Open-Letter-May-16-2016.pdf (stating disciplinary policies "must afford due process protections that are appropriate to the particular circumstances, considering the harm it has caused to other students, the degree to which the conduct has interfered with other students' access to educational benefits, and the severity of potential sanctions.  These due process protections include informing students of the specific conduct at issue, providing them with access to all evidence, assuring students enjoy the assistance of an independent advocate, affording them the right to cross-examination, and utilizing the appropriate standard of proof"); Members of Harvard Law School Faculty, Rethink Harvard's Sexual Harassment Policy, *Boston Globe* (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (alleging Harvard's policies for adjudicating cases of sexual misconduct, which do not ensure counsel for the accused, an opportunity to discover facts, confront witnesses, and present a defense at a hearing, and restrict all components of the adjudication to a Title IX compliance office, "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation").

[39]     149 F.Supp. 3d 602, 613-14 (E.D. Va. 2016) (quotation omitted).

[40]     *Id.* at 617.

[41]     *Id.* at 619.

[42]     *Id.* at 621.

[43]     246 Cal. App. 4th 221 (2016).

[44]     *Id.* at 248.

[45]     720 F.2d 721, 725 (1st Cir. 1983).

AR_00000266

March 2016, the District of Massachusetts relied in part on *Cloud* to hold that a complaint plausibly alleged a violation of basic fairness where a private university failed to provide a student accused of sexual misconduct with "a variety of procedural protections . . . many of which, in the criminal context, are the most basic and fundamental components of due process of law," including no right to notice of charges, counsel, confrontation of the accuser, cross-examination of witnesses, examination of evidence or witness statements, or an effective appeal.[46]

In June 2016, a student who had been disciplined after being found responsible for sexual misconduct filed a lawsuit against both the university and the Department of Education alleging in part that requiring institutions to use a preponderance of the evidence standard violates the APA, insofar as it constituted rule-making without notice and an opportunity for public comment, an action taken in excess of statutory authority, and an arbitrary and capricious action.[47]  A decision on the Department's motion to dismiss is pending.

Concerns over the partiality of investigators and adjudicators have also been the subject of a number of lawsuits.  For example, in *Doe v. Brandeis University*, the District of Massachusetts critiqued Brandeis University's Special Examiner Process, in which a "single individual was essentially vested with the powers of an investigator, prosecutor, judge, and jury"; the court remarked that the dangers of combining these powers in a single individual, with few rights to appeal and review, are "obvious."[48]  Similarly, in *Doe v. Washington & Lee University*, the Western District of Virginia concluded that bias existed on the part of the University's Title IX officer that was material to the outcome of the student's disciplinary proceeding "due to the considerable influence she appears to have wielded in those proceedings," where the Title IX officer had presented an article positing that "sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations," a factual situation paralleling the circumstances under which the student was found responsible for sexual misconduct.[49]

Although there have been increasing numbers of suits filed by students found responsible for sexual misconduct, no clear judicial trends have yet emerged.   For example, in a November 22, 2016 decision, the Fourth Appellate District of the California Court of Appeal reversed a superior court's determination that a male student accused of sexual misconduct was not afforded a fair hearing, that substantial evidence did not support the university panel's decision to suspend him, and that the Dean and university regents "improperly increased his punishment in response to his

---

46      *Doe v. Brandeis Univ.,* 177 F.Supp. 3d 561, 603 (D. Mass. 2016).  Compare *Doe v. Trustees of Boston Coll.,* No. 15-cv-10790, 2016 WL 5799297 at *21 (D. Mass. Oct. 4, 2016) (finding institution provided "basic fairness" when disciplinary process was in accord with school policies, student was given prompt notice of charge and factual allegations against him, he had benefit of attorney-advisor in hearing and could present testimony, and he received two reviews of the board's decision).

47      *See* Amended Complaint, *Doe v. Lhamon*, No. 1:16-cv-01158-RC (D.D.C. Aug. 15, 2016).

48      *Doe*, 177 F. Supp. 3d at 606.

49      No. 6:14-cv-00052, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015); *see also Sahm v. Miami Univ.*, 110 F.Supp. 3d 774, 778 (S.D. Ohio 2015) ("The thrust of the allegations against [the Title IX coordinator"] appears to be that her multiple roles as a part-time police officer, a member of the Task Force on the Prevention of Sexual Assault, and a Title IX investigator made her biased against [the plaintiff] during her investigation of the alleged assault of [the complainant].  The factual assertion that she discouraged a witness from testifying at the disciplinary hearing is troubling.  However, these facts pleaded against [the Title IX coordinator] do not suggest a gender bias against males so much as against students accused of sexual assault"), *but see Doe v. Univ. of Cincinnati*, 173 F.Supp.3d 586, 601-602 (S.D. Ohio 2016) (concluding that because school disciplinary boards are entitled to a presumption of honesty and impartiality, a plaintiff must allege specific statements indicating bias or a pattern of decision-making indicating gender was an influence, beyond simply sexual assault training provided to staff members and pressure exerted on universities by OCR).

AR_00000267

appealing the Panel's decision and recommended sanctions."[50]  The appellate court found that, under the "extremely deferential substantial evidence standard of review," there was sufficient evidence to buttress the panel's decision, given the complainant's testimony at the hearing and the investigator's report.[51]  Further, the court did not find the process unfair, noting that the accused student "was provided with notice of his alleged violation, informed regarding the basis of that violation, and given the opportunity to put forth his defense."[52]  Finally, the court found that the dean was authorized to sanction the student—as the panel was empowered only to give recommendations—and did so "per the applicable sanctioning guidelines."[53]  Although the court acknowledged that the university's procedures "were not perfect" and noted it had "some concerns," it ultimately concluded that on the record, it could not find the process unfair.[54]

Some courts have held that even in public institutions, the Due Process Clause "does not compel a university to allow cross-examination at all"[55]; others have found that "[a]ccused students do not have the right to be actively represented by an attorney at a disciplinary hearing"[56] and that there is no prohibition against the use of hearsay evidence in school disciplinary hearings or refraining from assigning the burden of proof to either party.[57]

## ACTL'S RECOMMENDATIONS

ACTL has the following concerns relating to the present state of campus sexual misconduct investigations, many of which directly arise from OCR's policies and promulgations and which adversely impact the rights of students accused of sexual misconduct.

### Need For Procedural Due Process

ACTL recognizes that colleges and universities face a difficult task in accommodating the inherent tension between fairness to accused students and to complainants and achieving a proportionate balance. However, basic fairness requires that sexual misconduct investigations provide accused students with effective procedural protections.  As one federal judge has noted, in such investigations, the stakes are "very high," as students are charged with serious offenses "that carry the potential for substantial public condemnation and disgrace."[58]

Although disciplinary policies at public universities must comport with the Fourteenth Amendment, "those same protections are not available to students enrolled in private colleges and

---

50      *Doe v. Regents of the Univ. of Cal.*, D068901, __ Cal. Rptr. 3d __, 2016 WL 6879293 at * 1 (Cal. App. 4th Nov. 22, 2016).
51      *Id*. at *2.
52      *Id*.
53      *Id*.
54      *Id*.
55      *Doe v. Ohio State Univ*, No. 2:15-cv-2830, 2016 WL 692547 at *7 (S.D. Ohio Feb. 22, 2016), *report and recommendation adopted*, No. 2:15-cv-2830, 2016 WL 1578750 (S.D. Ohio Apr. 20, 2016).
56      *Johnson v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, No. 12-515, 2013 WL 5298484 at *10-11 (E.D.Pa. Sept. 19, 2013).
57      *Doe*, 173 F.Supp.3d at 603.
58      *Id*. at 604.

AR_00000268

universities."[59]  ACTL believes that all students, whether at public or private institutions, who are accused of sexual misconduct should be guaranteed due process protections.  To that end, ACTL submits that accused students should be:

- **Provided with an investigation or hearing conducted with due consideration for any appearance of partiality, including any that might arise from the factfinder's other responsibilities or affiliations;**

- **Promptly provided with the details of the allegations and advised of their right to consult legal counsel;**

- **Provided the right to be advised and accompanied by legal counsel at all stages of the investigation or hearing;**

- **Provided with access to all evidence at a meaningful time and in a meaningful manner, so that they can adequately respond to it;**

- **Permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, in order to test the veracity of witnesses and documents;**

- **Provided with a process where the standard of proof for responsibility should be clear and convincing evidence; and**

- **Provided with written findings of fact on completion of the investigation or hearing sufficiently detailed to permit meaningful appellate review.**

**Need For Impartial Investigations**

A critical piece of procedural justice is the belief that an individual has been investigated and sentenced by an impartial factfinder.[60]  The judicial system strives to avoid both actual impropriety and the appearance thereof; regardless of whether misconduct occurred, courts should guard against actions or appearances that may "reasonably cause an objective observer to question [a factfinder's] impartiality."[61]

OCR describes its 2011 DCL as a "guidance document" that "does not add requirements to existing law."[62]  But, in the words of one court, the power of the Dear Colleague Letters stems from the Department of Education's ability to  "hold[] the specter of loss of federal funds as a sword over . . .

---

59      *Beauchene v. Mississippi Coll.*, 986 F.Supp.2d 755, 765 (S.D. Miss. 2013) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982)); *see also* 2011 DCL at 12 ("Public and state-supported schools must provide due process to the alleged perpetrator.").

60      *See, e.g., Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The due process requirement that a litigant's claim be heard by a fair and impartial factfinder applies to administrative as well as judicial proceedings."); *In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man is permitted to try cases where he has an interest in the outcome.").

61      *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988); *cf Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").

62      2011 DCL at 1 n.1.  *See also* Lhamon Letter at 3 (Feb. 17, 2016) ("[I]t is Title IX and the regulation, which have the force and effect of law, that OCR enforces, not OCR's 2011 (or any other) DCL.  OCR's 2011 DCL simply serves to advise the public of the construction of the regulation it administers and enforces.").

AR_00000269

universities' heads in the event it were to find that [a] university failed to comply with Title IX."[63]

As one professor observed, faced with the threat of a federal investigation, coupled with a possible loss of federal funding, "schools could even be said to have a financial stake in the outcomes of the cases they decide—a possible conflict of interest."[64]  Title IX officials, some of whom, as the aforementioned cases discuss, have been accused of partiality in their handling of complaints, owe their position to the 2011 DCL, which required colleges and universities to designate a Title IX coordinator.[65]

Concerns of withdrawal of federal funding, combined with media attention surrounding campus sexual assault, may cause universities—consciously or not—to err on the side of protecting or validating the complainant at the expense of the accused.  These not-so-subtle pressures may contribute to partial and discriminatory investigations and the absence of protection for the accused. One former federal judge has noted that the preponderance of the evidence standard, in combination with media pressure, "effectively creates a presumption in favor of the woman complainant.  If you find against her, you will see yourself on *60 Minutes* or in an OCR investigation where your funding is at risk.  If you find for her, no one is likely to complain."[66]

Recently, in the first case of its kind to reach a federal circuit court, the Second Circuit reversed the district court's dismissal of a complaint alleging Columbia University violated Title IX by demonstrating sex bias in its investigation and suspension of the accused student for alleged sexual assault.[67]  In reviewing the complaint, the court found that the student pled sufficient facts—the investigator and panel did not seek out his identified witnesses, comply with Columbia's procedures protecting alleged perpetrators, or reach conclusions supported by the weight of the evidence—to support an inference Columbia was motivated in its actions by "pro-female, anti-male bias . . . adopted to refute criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to female students' charges of sexual assaults by male students."[68]

In order to enhance subjective and objective procedural fairness and reduce the incidence of conflicts of interest, educational institutions should: (1) screen for and assign only individuals without actual or perceived bias to participate in the disciplinary process; and (2) consider identifying individuals and organizations outside universities that can act as investigators and/or decision-makers in Title IX cases, such that universities are not forced to police their own compliance with federal law. OCR should also embody within its policy documents the need for investigations and hearings to be conducted with due consideration for even the appearance of partiality arising from the factfinder's other responsibilities or affiliations within the institution.

---

63      *Doe*, 166 F.Supp.3d at 181.

64      Gersen, *supra*; *see also* Hartocollis, *supra* (noting that "[m]ore than 200 colleges and universities are under federal investigation for the way they have handled complaints of sexual misconduct, up from 55 [in 2014].").

65      *See* Hartocollis, *supra* (observing that Title XI coordinators can earn $50,000-$150,000 a year, that the Association of Title IX Administrators has 5,000 members and has "doubled in size for each of the past two years", and that schools like Harvard and Yale have between thirty and fifty individuals working as Title IX supporters and coordinators).

66      Nancy Gertner, Sex, Lies, and Justice: Can We Reconcile the Belated Attention to Rape on Campus with Due Process?, The American Prospect at 8 (Winter 2011).

67      *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

68      *Id.* at 56.  *See also Doe*, 166 F.Supp.3d at 189 (finding complaint plausibly alleged gender bias motivating investigation and punishment levied against male student accused of sexual assault sufficient to sustain a Title IX claim); *Doe*, 2015 WL 4647996 at *10 (finding student plausibly pled a Title IX claim in alleging the university's disciplinary procedures "amount to a practice of railroading accused students" and that gender bias motivated his expulsion (quotation omitted)).

AR_00000270

ACTL understands that many schools use a so-called investigative model in college disciplinary proceedings. However, with that model, we believe there is a heightened need for investigators to be qualified, appropriately trained, and impartial, since there is no separate adjudicative body to hear and weigh evidence and make findings of fact. To that end, any model should ensure there is an opportunity for meaningful appellate review by requiring the issuance of written findings of fact that adequately set forth the basis for any recommendation or decision.[69]

**The Right to Counsel, Access Evidence, and Notice of Allegations**

ACTL strongly believes that there are considerable benefits to extending accused students these procedural protections, whether at a private or public institution, beyond the simple but undeniable value of making investigations as equitable as possible.

Students at private universities may invoke due process protections if "they meet the threshold requirement of showing that the State somehow involved itself in what would otherwise be deemed private activity."[70] In expanding Title IX's protections, creating a mandatory Title IX investigative process (mandating hiring of a Title IX coordinator), and outlining acceptable procedures (mandating use of preponderance of evidence standard), the federal government has arguably "involved itself" in the disciplinary protocols of individual universities.[71] In recognition of its untraditional, expansive role, as well as its ability to command compliance through fines and the withholding of federal funding, we believe that OCR should amend its guidance letters to provide due process protections for accused students at both private and public institutions.

There is also a growing body of evidence demonstrating that the presence of procedural justice is critical to an individual's acceptance of the outcome of dispute. Scholars have found that individuals who believe that a dispute resolution process was fair but the outcome unfair are almost as satisfied as those who believe both were fair, an explanation credited to, among other things, the "importance to one's self-esteem of being treated fairly by authoritative individuals and institutions . . . and the possibility that lay individuals used their assessment of process fairness to help them assess ambiguous outcomes."[72]

---

69      *Accord* Conor Friedersdorf, *What Should the Standard of Proof Be in Campus Rape Cases?*, *The Atlantic* (Jun. 17, 2016), http://www.theatlantic.com/politics/archive/2016/06/campuses-sexual-misconduct/487505/ ("...if the 'preponderance of the evidence' standard survives both litigation and debate, it ought to at least be paired with procedural reforms that guarantee that the accused on campuses are transparently told the charges against them, given access to evidence, allowed legal representation, and otherwise afforded *at least* the same rights and safeguards against injustice that they'd have in a civil case with comparable stakes." (emphasis in original)).

70      *Beilis v. Albany Med. College of Union Univ.*, 525 N.Y.S. 2d 932, 934 (N.Y. App. Div. 1988).

71      See *Remy v. Howard Univ.*, 55 F.Supp. 2d 27, 29 (D. D.C. 1999) ("[T]he government must exert control over an institution before a body becomes subject to governmental . . . restrictions.").

72      Deborah A. Hensler, *Our Courts, Ourselves: How the Alternative Dispute Resolution Movement is Re-Shaping Our Legal System*, 108 Penn. St. L. Rev. 165, 179 n. 63 (2003); *see also* Rebecca Hollander-Blumoff & Tom R. Tyler, *Procedural Justice in Negotiation: Procedural Fairness, Outcome Acceptance, and Integrative Potential*, 33 Law & Soc. Inquiry 473, 491 (2008) (reporting result of studies suggesting "people were more willing to accept a decision that was reached via a procedure in which they felt treated fairly"); Tamar R. Birckhead, *Toward a Theory of Procedural Justice for Juveniles*, 57 Buff. L. Rev. 1447, 1454 (2008) (noting that "when juveniles perceive that they have been treated fairly by law enforcement and the courts—a judgment shown not to be dependent upon the outcome of the case—they are less likely to recidivate."); Deborah Epstein, *Procedural Justice: Tempering the State's Response to Domestic Violence*, 43 Wm. & Mary L. Rev. 1843, 1875 (2002) (arguing research suggests safety of domestic violence victims can be aided by attending to batterers' perception of fairness, as "fair treatment affects compliance regardless of whether the ultimate result is viewed as right or wrong").

AR_00000271

Ensuring procedural justice in campus sexual assault investigations thus serves a dual purpose. First, it affirms the critically important sexual assault prevention goals of Title IX and the Department of Education. The problem of campus sexual assault is widely recognized to have reached "epidemic levels." [73] An Association of American Universities (AAU) study of 150,000 students at 27 colleges and universities showed that 27.2% of female college seniors reported they had "experienced some kind of unwanted sexual contact . . . carried out by incapacitation, usually due to alcohol or drugs, or by force."[74]

Procedural justice can reduce recidivism and ensure sexual assault investigations are regarded with seriousness and respect, ending the backlash incurred by any public perception that these investigations serve only to railroad and scapegoat individual men. As one retired federal district judge, now a lecturer at Harvard Law School, writes:

> You don't have to believe that there are large numbers of false accusation[s] of sexual assault—I do not—to insist that the process of investigating and adjudicating these claims be fair. In fact, feminists should be especially concerned, not just about creating enforcement proceedings, but about their fairness. If there is a widespread perception that the balance has tilted from no rights for victims to no due process for the accused, we risk a backlash. Benighted attitudes about rape and skepticism about women victims die hard. It takes only a few celebrated false accusations of rape to turn the clock back.[75]

Second, if alleged perpetrators are treated fairly, they are more likely to accept a decision of culpability, perhaps leading to less litigation against colleges and universities, which would in turn free up institutional resources better used for sexual assault education and prevention.[76]

In sum, ACTL believes that by ensuring accused students are afforded due process protections—including a fair and impartial investigator/decision maker, the right to notice of the allegations, access to evidence, some form of cross-examination, assistance by counsel, with the standard of proof by clear and convincing evidence, and written factual findings and conclusions—educational institutions can simultaneously ensure investigations are fair and equitable, promote procedural justice, comply with the U.S. Constitution, and enhance public confidence in their adjudicative procedures and the broader goal of prevention.

---

[73] Abby Ohlheiser, *Study Finds 'Epidemic' of Sexual Assault Among First-Year Women At One U.S. College, The Wash. Post* (May 20, 2015), http://www.washingtonpost.com/news/grade-point/wp/2015/05/20/study-finds-epidemic-of-sexual-assault-among-first-year-women-at-one-u-s-college/.

[74] Richard Pérez-Peña, 1 in 4 Women Experience Sex Assault on Campus, *NY Times* (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/us/a-third-of-college-women-experience-unwanted-sexual-contact-study-finds.html.

[75] Gertner, *supra,* at 3.

[76] *See, e.g.,* Anemona Hartocollis, *Colleges Spending Millions to Deal With Sexual Misconduct Complaints, NY Times* (Mar. 29, 2016), http://www.nytimes.com/2016/03/30/us/colleges-beef-up-bureaucracies-to-deal-with-sexual-misconduct.html (observing that responding to a lawsuit "can run into the high six or even seven figures, not counting a settlement or verdict"); *Doe v. Brown Univ.*, 166 F.Supp. 3d 177, 180 (D. R. I. 2016) ("This case is one of a number of recent actions in the federal district courts in which a male student has sued a university that found him responsible for committing sexual assault after an allegedly flawed and deficient disciplinary proceeding.").

AR_00000272

**Some Form of Cross-Examination**

ACTL believes OCR's goal of protecting victims from re-victimization can be balanced with due process. For example, the *Doe v. University of Southern California* court rejected the argument that confrontation and cross-examination of witnesses was necessary in an investigation involving student sexual assault, echoing the concerns of the 2011 DCL that allowing an alleged perpetrator to directly question an alleged victim "may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment."[77] However, the court noted that there are "alternate ways" to enable accused students to hear the evidence against them and it cited cases where, for example, a complainant's testimony was tape-recorded and played for the accuser, a screen was placed between the parties, or testimony was given through closed-circuit television.[78]

Similarly, concern about students questioning one another in such cases has been addressed by some colleges and universities by permitting the accused to submit questions to a third-party, such as the investigator, to be asked of the complainant. At the University of Delaware, investigators provide both the complainant and the respondent a chance to "present questions they believe should be asked of the other party and witnesses and the opportunity to respond to statements made by others," though only in instances where it has been "deemed appropriate by the investigator."[79] The University of Dayton provides accused students with the right to request a hearing board to "consider their submitted questions for other parties (investigators, complainant, witnesses) at the hearing in those cases that go before the University Hearing Board."[80] Similarly, although Indiana University prevents complainants and respondents from directly questioning each other at sexual misconduct hearings, it permits the parties to submit questions to the chair of the hearing panel to be asked of other parties, although the chair or other panel members "will review questions prior to posing to the other party to prevent questioning that is not permitted under these proceedings."[81]

**The Inadequacy of Preponderance of the Evidence Standard**

It is well accepted that the standard of proof in most noncriminal adjudications is preponderance of the evidence. In *Addington v. Texas*, the Supreme Court noted that such a standard is appropriate in a "typical civil case involving a monetary dispute between private parties" where society at large has a "minimal concern with the outcome."[82] However, the Court observed that an intermediate standard is "no stranger to the civil law" and can be used in civil cases "involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant."[83] Where the interests at stake "are deemed to be more substantial than mere loss of money,"—for example, where a defendant risks "having his reputation tarnished erroneously"—a plaintiff's burden of proof is often

---

77     246 Cal. App. 4th at 245 (quoting 2011 DCL at 12).
78     *Id.* at 245 n.12.
79     Office of the President, *Sexual Misconduct Policy*, University of Delaware at 23 (Aug. 5, 2016), available at http://sites.udel. edu/sexualmisconduct/files/2016/08/20160809-Sexual-Misconduct-Policy-1muljdr.pdf.
80     University of Dayton, *Sexual Harassment/Misconduct Policy* (n.d.), available at https://udayton.edu/studev/dean/civility/sexual_ harassment_misconduct.php.
81     IU Office of Student Welfare and Title IX, *Sexual Misconduct*, Indiana University at 12 (revised Aug. 25, 2016), available at http://policies.iu.edu/policies/categories/administration-operations/equal-opportunity/sexual-misconduct.pdf.
82     441 U.S. 418, 423 (1979).
83     *Id.* at 424.

AR_00000273

increased to clear and convincing evidence.[84]

The suitability of the clear and convincing evidentiary standard for sexual assault investigations is striking.  Such cases are not "typical civil" matters based exclusively on "monetary dispute[s]"; moreover, as expressed through position statements from the White House, both national political parties, and state governments across the country, society has a significant interest in preventing and investigating sexual violence.[85]  Further, alleged perpetrators risk a substantial tarnishing of their reputation.  As the Supreme Court recognized in *Goss v. Lopez*, charges of misconduct leading to a suspension can "seriously damage…students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."[86]  In such cases:

> [T]he private interest is compelling.  The Plaintiffs faced charges of sexual assault against a fellow student, charges that could have led to their expulsions and did lead to their suspensions.  The potential consequences reach beyond their immediate standing at the University.  The Supreme Court has noted that where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied . . . The Plaintiffs argue, and this Court accepts, that these charges could have a major immediate and life-long impact on their personal life, education, employment, and public engagement.[87]

The "majority" of courts addressing the constitutionally required evidentiary standard for school disciplinary proceedings "have held that due process requires disciplinary decisions to be based on 'substantial evidence.' "[88]

Judge Gertsen described the current regime as "the worst of both worlds, the lowest standard of proof, coupled with the least protective procedures."[89]  Recognition of the significant adverse consequences to students found responsible in sexual misconduct disciplinary proceeding, combined with the absence of virtually all of the procedural rights provided in civil lawsuits, such as voir dire, trial by judge or jury, or full cross-examination, compels an accompanying call for a higher standard of proof.[90]

84      *Id.*; *see. e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (applying clear and convincing evidence standard to terminations of parental rights); *Woodby v. INS*, 385 U.S. 37, 48-49 (1966) (applying standard to deportation proceeding); *see also Tijani v. Willis*, 430 F.3d 1241, 1245 (9th Cir. 2005) (recognizing Supreme Court has affirmed principle that "a heightened burden of proof" is on the State in civil proceedings where "the individual interests at stake…are both particularly important and more substantial than mere loss of money." (quotations omitted)).

85      *Addington*, 441 U.S. at 423.

86      419 U.S. 565, 575 (1975).

87      *Gomes v. Univ. of Maine Sys.*, 365 F.Supp.2d  6, 16 (D. Me. 2005) (citations and quotations omitted).

88      Lavinia M. Weizel, Note, *The Process That Is Due: Preponderance of the Evidence As the Standard of Proof for University Adjudications of Student-on-Student Sexual Assault Complaints*, 53 B.C.L. Rev. 1613, 1633 (2012).

89      Gertsen, *supra*, at 8.

90      *Compare* Chris Loschiavo & Jennifer L. Wallace, *The Preponderance of Evidence Standard: Use in Higher Education Campus Conduct Processes*, Association for Student Conduct Administration (n.d.) ("When both students have so much to lose, depending on the outcome of the hearing, preponderance is the appropriate standard . . . the expelled student can make a new beginning at another institution.") with *Doe*, 177 F.Supp. 3d at 607 ("[T]his was not a criminal proceeding, and Brandeis is not a governmental entity. Nonetheless [the student] was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense.  He was ultimately found 'responsible,' and received a penalty that may permanently scar his life and career.").

AR_00000274

## **CONCLUSION**

ACTL strongly supports efforts to remedy the longstanding failure to adequately address the problem of sexual misconduct, particularly on college campuses.  But we believe that OCR has imposed on colleges and universities an investigative and adjudicative system that does not ensure basic fairness for accused students.  Under the current system everyone loses: accused students are deprived of fundamental fairness, complainants' experiences are unintentionally eroded and undermined, and colleges and universities are trapped between the two, while facing a potential loss of federal funding.

ACTL advocates for a system that encompasses essential elements of due process:  a fair and impartial investigation and hearing by qualified factfinders, and granting students the right to be advised and accompanied by counsel, to be permitted some form of cross-examination, to examine the evidence, to receive adequate written factual findings, and to be found responsible only if the evidence satisfies the clear and convincing standard.  These steps would enhance procedural justice and ensure the confidence of participants and the public in the fairness of Title IX investigations on campus.

AR_00000275

American College of Trial Lawyers
(Phone) 949-752-1801   (Fax) 949-752-1674
Website:  www.actl.com
Email: nationaloffice@actl.com

AR_00000276

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education**
**Office for Civil Rights**

AR_00000277

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the Federal Register "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  Gebser v. Lago Vista Independent School District (Gebser), 524 U.S. 274 (1998), and Davis v. Monroe County Board of Education (Davis), 526 U.S. 629 (1999). The Court held in Gebser that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages. See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding. The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092). A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance. In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance. In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being. Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn. As with the 1997 guidance, the revised guidance applies to students at every level of education. School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

AR_00000279

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well- publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

AR_00000280

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

### Harassment by Teachers and Other School Personnel

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees. These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students. The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students. In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing. We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services." However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

AR_00000281

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment. We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping. Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways. The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program. Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists. We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created. We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages. We disagree. First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

AR_00000282

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program. In determining whether harassment is actionable, both <u>Davis</u> and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing <u>Oncale</u>)), and the <u>Davis</u> Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action. A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students. Other commenters, by contrast, commended OCR for recognizing that <u>Gebser</u> and <u>Davis</u> did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point. While <u>Gebser</u> and <u>Davis</u> made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the <u>Davis</u> Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

**Effective Response**

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools. We disagree. Effectiveness has always been the measure of an adequate response under Title IX. This does not mean a school must overreact out of fear of being judged inadequate. Effectiveness is measured based on a reasonableness standard. Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.

# The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX. The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

AR_00000283

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

AR_00000284

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

AR_00000285

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS[1] BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

# I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

# II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

# III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

AR_00000287

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

AR_00000288

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]   A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]   The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

4

# V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered.  The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex.  If it does, the second issue is the nature of the school's responsibility to address that conduct.  As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

## A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34]  Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct.  Harassment of this type is generally referred to as hostile environment harassment.[36]  This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment.  Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex.  OCR considers the conduct from both a subjective[38] and objective[39] perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40]  Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

AR_00000290

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- The degree to which the conduct affected one or more students' education.  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program.  For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- The type, frequency, and duration of the conduct.  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical.  For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46]  Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

AR_00000291

and relationship between the alleged harasser and the subject or subjects of the harassment.  For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- The number of individuals involved.  Sexual harassment may be committed by an individual or a group.  In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group.  Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context.  For certain types of conduct, there may be "safety in numbers."  For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students.  On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment.  For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred.  Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus.  Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50]  Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area.  On the other hand, harassing conduct in a public place may be more humiliating.  Each incident must be judged individually.

- Other incidents at the school.  A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment.  Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

   It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists.  Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

## 2. Welcomeness

   The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome.  Conduct is unwelcome if

AR_00000292

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]  Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]  For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]  Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection.  Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]  The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so.  Similarly, certain types of disabilities could affect a student's ability to do so.

8

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

9

## 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed. The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

AR_00000295

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63] Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth- grade student in a school hallway. Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways. Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class. In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

11

of aid, benefits, or services to students.  However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program.  Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX.  If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program.  The school, therefore, has engaged in its own discrimination.  It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.  (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

### 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67]  As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations.  On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68]  In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program.  As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70]  For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes.  However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back.  (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

AR_00000297

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

13

AR_00000298

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79]  (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.")  These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations.  By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied.  If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84]  (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR.  This is true in cases

AR_00000299

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence).  This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85]  Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

# VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.  These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86]  As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed.  What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment.  The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works.  If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.  The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors.  However, in all cases the inquiry must be prompt, thorough, and impartial.  (Requests by the student who

AR_00000300

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint.  For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation.  Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate.  In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified.  In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88]  Appropriate steps should be taken to end the harassment.  For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89]  A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90]  In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student.  Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed.  If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created.  For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment.  If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record.  Other measures may include, if appropriate, directing a harasser to apologize to the harassed student.  If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93]  For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

AR_00000301

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances.  As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95]  At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation.  To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have.  In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment.  In all cases, a school should discuss confidentiality standards and concerns with the complainant initially.  The school should inform the student that a confidentiality request may limit the school's ability to respond.  The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs.  If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees.  Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students.  The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

17

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student.  Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.  The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment.  There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant.  Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual.  In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action.  In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school.  Those steps can be very effective in preventing further harassment.

## C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student.  If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response.  These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter.  If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

AR_00000303

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome.  If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation.  If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place.  Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations.  However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it.  Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment.  Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98]  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100]  Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints.  However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment.  Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

AR_00000304

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

20

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]   The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]   Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]   While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]   Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]   OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]   Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

AR_00000306

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution. The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment. Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]). In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117] In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

AR_00000307

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

    <u>Answer:</u>  Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

    <u>Example 2:</u>  A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must a school do in response?

    <u>Answer:</u>  Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

AR_00000308

_____

## Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX. 20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E. If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance. 28 CFR 42.604. Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964. For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General. This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

24

(professor's spanking of university student may constitute sexual conduct under Title IX); <u>Doe v. Petaluma</u>, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim);  <u>Denver School Dist. #2</u>, OCR Case No. 08-92-1007 (same to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); <u>Nashoba Regional High School</u>, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also <u>Shoreline School Dist.</u>, OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); <u>Dartmouth Public Schools</u>, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); <u>San Francisco State University</u>, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); <u>Analy Union High School Dist.</u>, OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987).  See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance.  (See section on "Harassment by Teachers and Other Employees.")  See <u>Brown v. Hot, Sexy, and Safer Products, Inc.</u>, 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees.  (See section on "Harassment by Teachers and Other Employees.")  For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10] Cf. <u>John Does 1 v. Covington County Sch. Bd.</u>, 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

AR_00000310

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that sex discrimination consisting of same-sex sexual harassment can violate Title VII's prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997 guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds, 171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65, 1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other students, including both boys and girls, sufficient to raise a claim under Title IX); John Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by a male teacher.)  It can also occur in certain situations if the harassment is directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334, 1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment, but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex, court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee.)  In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g., pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both.  Thus, in Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband.  In both cases, according to the court, the remarks were based on sex in that they were made with an intent to demean each member of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct. 733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

26

---

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

27

may be actionable even if the harassment is not sexual in nature); <u>Hicks</u>, 833 F.2d at 1415; <u>Eden Prairie Schools, Dist. #272</u>, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] <u>Davis</u>, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); <u>Franklin</u>, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See <u>Sexual Harassment Guidance</u>, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, <u>id.</u> at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

AR_00000313

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated– – "... if the victim does not subjectively perceive the environment to be abusive, the

AR_00000314

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." 510 U.S. at 21-22.

[39] See Davis, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); Elgamil v. Syracuse University, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing Harris); Booher v. Board of Regents, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same). See Oncale, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing Harris, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment. This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., Ellison, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See Davis, 526 U.S. at 651, citing both Oncale, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., Davis, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); Doe v. Petaluma, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); Modesto City Schools, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); Weaverville Elementary School, OCR Case No. 09-91-1116 (students left school due to the harassment). Compare with College of Alameda, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] Doe v. Petaluma, 830 F.Supp. at 1566.

[43] See Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing Waltman; see also Hall, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., Elgmil 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Andrews, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986).

[45] 34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf.</u> <u>Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf.</u> <u>Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf.</u> <u>Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

AR_00000316

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

32

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b).  Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination.  Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

33

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642. The concept of a "responsible employee" under our guidance is broader. That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations. 34 CFR 106.8(a).

[76] 34 CFR 106.31. See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach. See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises .... The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

34

AR_00000319

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gebser, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gebser, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

AR_00000320

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment –– to inform the school community that harassment will not be tolerated.  Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e).  The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent.  Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b).  This requirement has been part of the Title IX regulations since their inception in 1975.  Thus, schools have been required to have these procedures in place since that time.  At the elementary and secondary level, this responsibility generally lies

AR_00000321

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

37

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated.  While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way.  However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors.  The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

AR_00000323

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones.)

AR_00000324



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

### Questions and Answers on Title IX and Sexual Violence[1]

Title IX of the Education Amendments of 1972 ("Title IX")[2] is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance (hereinafter "schools", "recipients", or "recipient institutions") must comply with Title IX.[3]

On April 4, 2011, the Office for Civil Rights (OCR) in the U.S. Department of Education issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence ("DCL").[4] The DCL explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with the requirements of Title IX.[5] Specifically, the DCL:

- Provides guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police) and address sexual violence.

---

[1] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf. The Office for Civil Rights (OCR) issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.
[2] 20 U.S.C. § 1681 *et seq.*
[3] Throughout this document the term "schools" refers to recipients of federal financial assistance that operate educational programs or activities. For Title IX purposes, at the elementary and secondary school level, the recipient generally is the school district; and at the postsecondary level, the recipient is the individual institution of higher education. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office.
[4] Available at http://www.ed.gov/ocr/letters/colleague-201104.html.
[5] Although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment.

AR_00000325

- Provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.

- Discusses proactive efforts schools can take to prevent sexual violence.

- Discusses the interplay between Title IX, the Family Educational Rights and Privacy Act ("FERPA"),[6] and the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act ("Clery Act")[7] as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator.

- Provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.

The DCL supplements OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, issued in 2001 (*2001 Guidance*).[8] The *2001 Guidance* discusses in detail the Title IX requirements related to sexual harassment of students by school employees, other students, or third parties. The DCL and the *2001 Guidance* remain in full force and we recommend reading these Questions and Answers in conjunction with these documents.

In responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects. In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.

Authorized by

/s/

Catherine E. Lhamon                          April 29, 2014
Assistant Secretary for Civil Rights
_____

[6] 20 U.S.C. §1232g; 34 C.F.R. Part 99.
[7] 20 U.S.C. §1092(f).
[8] Available at http://www.ed.gov/ocr/docs/shguide.html.

AR_00000326

**Notice of Language Assistance**
**Questions and Answers on Title IX and Sexual Violence**

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

給英語能力有限人士的通知：如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵：Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

영어 미숙자를 위한 공고: 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

iii

**TABLE OF CONTENTS**

Notice of Language Assistance ..................................................................................................... iii

A.  A School's Obligation to Respond to Sexual Violence ............................................................. 1

    A-1.  What is sexual violence? .............................................................................................. 1

    A-2.  How does Title IX apply to student-on-student sexual violence? ........................................ 1

    A-3.  How does OCR determine if a hostile environment has been created? ............................. 1

    A-4.  When does OCR consider a school to have notice of student-on-student sexual
          violence? ........................................................................................................................ 2

    A-5.  What are a school's basic responsibilities to address student-on-student sexual
          violence? ........................................................................................................................ 2

    A-6.  Does Title IX cover employee-on-student sexual violence, such as sexual abuse of
          children? ......................................................................................................................... 3

B.  Students Protected by Title IX ............................................................................................... 5

    B-1.  Does Title IX protect all students from sexual violence? ................................................... 5

    B-2.  How should a school handle sexual violence complaints in which the complainant
          and the alleged perpetrator are members of the same sex? ............................................... 5

    B-3.  What issues may arise with respect to students with disabilities who experience
          sexual violence? ............................................................................................................. 6

    B-4.  What issues arise with respect to international students and undocumented
          students who experience sexual violence? .......................................................................... 7

    B-5.  How should a school respond to sexual violence when the alleged perpetrator is
          not affiliated with the school? ......................................................................................... 9

C.  Title IX Procedural Requirements ......................................................................................... 9

    C-1.  What procedures must a school have in place to prevent sexual violence and
          resolve complaints? ......................................................................................................... 9

    C-2.  What information must be included in a school's notice of nondiscrimination? .............. 10

    C-3.  What are a Title IX coordinator's responsibilities? ......................................................... 10

    C-4.  Are there any employees who should not serve as the Title IX coordinator? .................. 11

    C-5.  Under Title IX, what elements should be included in a school's procedures for
          responding to complaints of sexual violence? .................................................................. 12

    C-6.  Is a school required to use separate grievance procedures for sexual violence
          complaints? .................................................................................................................... 14

AR_00000328

D. **Responsible Employees and Reporting** .................................................................**14**

    D-1. Which school employees are obligated to report incidents of possible sexual
          violence to school officials? ................................................................................ 14

    D-2. Who is a "responsible employee"? ...................................................................... 15

    D-3. What information is a responsible employee obligated to report about an incident
          of possible student-on-student sexual violence? ............................................... 16

    D-4. What should a responsible employee tell a student who discloses an incident of
          sexual violence? ................................................................................................. 16

    D-5. If a student informs a resident assistant/advisor (RA) that he or she was subjected
          to sexual violence by a fellow student, is the RA obligated under Title IX to report
          the incident to school officials? ......................................................................... 17

E. **Confidentiality and a School's Obligation to Respond to Sexual Violence** .............................**18**

    E-1. How should a school respond to a student's request that his or her name not be
          disclosed to the alleged perpetrator or that no investigation or disciplinary action
          be pursued to address the alleged sexual violence? .......................................... 18

    E-2. What factors should a school consider in weighing a student's request for
          confidentiality? ................................................................................................. 21

    E-3. What are the reporting responsibilities of school employees who provide or
          support the provision of counseling, advocacy, health, mental health, or sexual
          assault-related services to students who have experienced sexual violence? ................. 22

    E-4. Is a school required to investigate information regarding sexual violence incidents
          shared by survivors during public awareness events, such as "Take Back the
          Night"? ............................................................................................................... 24

F. **Investigations and Hearings** .............................................................................**24**

    F-1. What elements should a school's Title IX investigation include? ....................... 24

    F-2. What are the key differences between a school's Title IX investigation into
          allegations of sexual violence and a criminal investigation? .............................. 27

    F-3. How should a school proceed when campus or local law enforcement agencies are
          conducting a criminal investigation while the school is conducting a parallel Title IX
          investigation? .................................................................................................... 28

    F-4. Is a school required to process complaints of alleged sexual violence that occurred
          off campus? ........................................................................................................ 29

    F-5. Must a school allow or require the parties to be present during an entire hearing? ........ 30

AR_00000329

F-6.  May every witness at the hearing, including the parties, be cross-examined? ................ 31

F-7.  May the complainant's sexual history be introduced at hearings? ................................... 31

F-8.  What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation? ......................................................... 31

G.  Interim Measures ...................................................................................................................**32**

G-1.  Is a school required to take any interim measures before the completion of its investigation?.................................................................................................................... 32

G-2.  How should a school determine what interim measures to take? ................................... 33

G-3.  If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?................................................... 33

H.  Remedies and Notice of Outcome ........................................................................................**34**

H-1.  What remedies should a school consider in a case of student-on-student sexual violence? ............................................................................................................................. 34

H-2.  If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options? ........................... 36

H-3.  What information must be provided to the complainant in the notice of the outcome? ............................................................................................................................ 36

I.   Appeals ....................................................................................................................................**37**

I-1.  What are the requirements for an appeals process?........................................................ 37

I-2.  Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient? ............... 38

J.   Title IX Training, Education and Prevention ........................................................................**38**

J-1.  What type of training on Title IX and sexual violence should a school provide to its employees?........................................................................................................................ 38

J-2.  How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence? ............................................................................ 39

J-3.  What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?........................................................... 40

J-4.  What type of training on sexual violence should a school provide to its students?.......... 41

AR_00000330

**K. Retaliation**..............................................................................................**42**

    K-1.  Does Title IX protect against retaliation? ...........................................................42

**L. First Amendment** ......................................................................................**43**

    L-1.  How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?..........................................................................................................43

**M. The Clery Act and the Violence Against Women Reauthorization Act of 2013**......................**44**

    M-1. How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs? ......................44

    M-2. Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?.......................................................44

**N. Further Federal Guidance**.........................................................................**45**

    N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance? ..............................................................................................45

    N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence? ................................................................45

AR_00000331

## A. A School's Obligation to Respond to Sexual Violence

**A-1. What is sexual violence?**

**Answer:** Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, other students, or third parties. All such acts of sexual violence are forms of sex discrimination prohibited by Title IX.

**A-2. How does Title IX apply to student-on-student sexual violence?**

**Answer:** Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, *i.e.* creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.[9]

**A-3. How does OCR determine if a hostile environment has been created?**

**Answer:** As discussed more fully in OCR's *2001 Guidance*, OCR considers a variety of related factors to determine if a hostile environment has been created; and also considers the conduct in question from both a subjective and an objective perspective. Specifically, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. Indeed, a single or isolated incident of sexual violence may create a hostile environment.

---

[9] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 643 (1999).

Page 1 – Questions and Answers on Title IX and Sexual Violence

**A-4. When does OCR consider a school to have notice of student-on-student sexual violence?**

**Answer:** OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence. See question D-2 regarding who is a responsible employee.

A school can receive notice of sexual violence in many different ways. Some examples of notice include: a student may have filed a grievance with or otherwise informed the school's Title IX coordinator; a student, parent, friend, or other individual may have reported an incident to a teacher, principal, campus law enforcement, staff in the office of student affairs, or other responsible employee; or a teacher or dean may have witnessed the sexual violence.

The school may also receive notice about sexual violence in an indirect manner, from sources such as a member of the local community, social networking sites, or the media. In some situations, if the school knows of incidents of sexual violence, the exercise of reasonable care should trigger an investigation that would lead to the discovery of additional incidents. For example, if school officials receive a credible report that a student has perpetrated several acts of sexual violence against different students, that pattern of conduct should trigger an inquiry as to whether other students have been subjected to sexual violence by that student. In other cases, the pervasiveness of the sexual violence may be widespread, openly practiced, or well-known among students or employees. In those cases, OCR may conclude that the school should have known of the hostile environment. In other words, if the school would have found out about the sexual violence had it made a proper inquiry, knowledge of the sexual violence will be imputed to the school even if the school failed to make an inquiry. A school's failure to take prompt and effective corrective action in such cases (as described in questions G-1 to G-3 and H-1 to H-3) would violate Title IX even if the student did not use the school's grievance procedures or otherwise inform the school of the sexual violence.

**A-5. What are a school's basic responsibilities to address student-on-student sexual violence?**

**Answer:** When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E). If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its

AR_00000333

effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[10] The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. For additional information on interim measures, see questions G-1 to G-3.

If a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately. For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes, the school may need to permit the complaining student to retake the classes without an academic or financial penalty (in addition to any other remedies) in order to address the effects of the sexual violence.

**A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children?**

**Answer:** Yes. Although this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against

---

[10] Throughout this document, unless otherwise noted, the term "complainant" refers to the student who allegedly experienced the sexual violence.

AR_00000334

sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. But in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Early signs of inappropriate behavior with a child can be the key to identifying and preventing sexual abuse by school personnel.

A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL. Recipients should refer to OCR's *2001 Guidance* for further information about Title IX obligations regarding harassment of students by school employees. In addition, many state and local laws have mandatory reporting requirements for schools working with minors. Recipients should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations.

With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual. When a school is on notice that a school employee has sexually harassed a student, it is responsible for taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects. Indeed, even if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

A school should take steps to protect its students from sexual abuse by its employees. It is therefore imperative for a school to develop policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. For example, this could include implementing codes of conduct, which might address what is commonly known as grooming – a desensitization strategy common in adult educator sexual misconduct. Such policies and procedures can ensure that students, parents, and

AR_00000335

school personnel have clear guidelines on what are appropriate and inappropriate interactions between adults and students in a school setting or in school-sponsored activities. Additionally, a school should provide training for administrators, teachers, staff, parents, and age-appropriate classroom information for students to ensure that everyone understands what types of conduct are prohibited and knows how to respond when problems arise.[11]

## B.  Students Protected by Title IX

**B-1.  Does Title IX protect all students from sexual violence?**

**Answer:**  Yes. Title IX protects all students at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; male and female students; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins.

**B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?**

**Answer:**  A school's obligation to respond appropriately to sexual violence complaints is the same irrespective of the sex or sexes of the parties involved. Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex. A school must investigate and resolve allegations of sexual violence involving parties of the same sex using the same procedures and standards that it uses in all complaints involving sexual violence.

Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. Indeed, lesbian, gay, bisexual, and transgender (LGBT) youth report high rates of sexual harassment and sexual violence. A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it

---

[11] For additional informational on training please see the Department of Education's Resource and Emergency Management for Schools Technical Assistance Center – Adult Sexual Misconduct in Schools: Prevention and Management Training, available at http://rems.ed.gov/Docs/ASM_Marketing_Flyer.pdf.

Page 5 – Questions and Answers on Title IX and Sexual Violence

AR_00000336

uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence.

If a school's policies related to sexual violence include examples of particular types of conduct that violate the school's prohibition on sexual violence, the school should consider including examples of same-sex conduct. In addition, a school should ensure that staff are capable of providing culturally competent counseling to all complainants. Thus, a school should ensure that its counselors and other staff who are responsible for receiving and responding to complaints of sexual violence, including investigators and hearing board members, receive appropriate training about working with LGBT and gender-nonconforming students and same-sex sexual violence. See questions J-1 to J-4 for additional information regarding training.

Gay-straight alliances and similar student-initiated groups can also play an important role in creating safer school environments for LGBT students. On June 14, 2011, the Department issued guidance about the rights of student-initiated groups in public secondary schools under the Equal Access Act. That guidance is available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html.

### B-3.  What issues may arise with respect to students with disabilities who experience sexual violence?

**Answer:**  When students with disabilities experience sexual violence, federal civil rights laws other than Title IX may also be relevant to a school's responsibility to investigate and address such incidents.[12] Certain students require additional assistance and support. For example, students with intellectual disabilities may need additional help in learning about sexual violence, including a school's sexual violence education and prevention programs, what constitutes sexual violence and how students can report incidents of sexual

---

[12] OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. See 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 et seq. and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context. The Department of Education's Office of Special Education Programs in the Office of Special Education and Rehabilitative Services administers Part B of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. 1400 et seq. and 34 C.F.R. part 300. IDEA provides financial assistance to states, and through them to local educational agencies, to assist in providing special education and related services to eligible children with disabilities ages three through twenty-one, inclusive.

AR_00000337

violence. In addition, students with disabilities who experience sexual violence may require additional services and supports, including psychological services and counseling services. Postsecondary students who need these additional services and supports can seek assistance from the institution's disability resource office.

A student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services. At the elementary and secondary education level, this may trigger a school's child find obligations under IDEA and the evaluation and placement requirements under Section 504, which together require a school to evaluate a student suspected of having a disability to determine if he or she has a disability that requires special education or related aids and services.[13]

A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner that is accessible to students and employees with disabilities, for example, by providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training. See question J-4 for more detailed information on student training.

**B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence?**

**Answer:** Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status.[14] A school should ensure that all students regardless of their immigration status, including undocumented students and international students, are aware of their rights under Title IX. A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner accessible to students who are English language learners. OCR recommends that a school coordinate with its international office and its undocumented student program coordinator, if applicable, to help communicate information about Title IX in languages that are accessible to these groups of students. OCR also encourages schools to provide foreign national complainants with information about the U nonimmigrant status and the T nonimmigrant status. The U nonimmigrant status is set

---

[13] *See* 34 C.F.R. §§ 300.8; 300.111; 300.201; 300.300-300.311 (IDEA); 34 C.F.R. §§ 104.3(j) and 104.35 (Section 504). Schools must comply with applicable consent requirements with respect to evaluations. *See* 34 C.F.R. § 300.300.

[14] OCR enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination by recipients of federal financial assistance on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

Page 7 – Questions and Answers on Title IX and Sexual Violence

AR_00000338

aside for victims of certain crimes who have suffered substantial mental or physical abuse as a result of the crime and are helpful to law enforcement agency in the investigation or prosecution of the qualifying criminal activity.[15] The T nonimmigrant status is available for victims of severe forms of human trafficking who generally comply with a law enforcement agency in the investigation or prosecution of the human trafficking and who would suffer extreme hardship involving unusual and severe harm if they were removed from the United States.[16]

A school should be mindful that unique issues may arise when a foreign student on a student visa experiences sexual violence. For example, certain student visas require the student to maintain a full-time course load (generally at least 12 academic credit hours per term), but a student may need to take a reduced course load while recovering from the immediate effects of the sexual violence. OCR recommends that a school take steps to ensure that international students on student visas understand that they must typically seek prior approval of the designated school official (DSO) for student visas to drop below a full-time course load. A school may also want to encourage its employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence to approach the DSO on the student's behalf if the student wishes to drop below a full-time course load. OCR recommends that a school take steps to ensure that its employees who work with international students, including the school's DSO, are trained on the school's sexual violence policies and that employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence are aware of the special issues that international students may encounter. See questions J-1 to J-4 for additional information regarding training.

A school should also be aware that threatening students with deportation or invoking a student's immigration status in an attempt to intimidate or deter a student from filing a Title IX complaint would violate Title IX's protections against retaliation. For more information on retaliation see question K-1.

_____

[15] For more information on the U nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/questions-answers-victims-criminal-activity-u-nonimmigrant-status.

[16] For more information on the T nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status.

AR_00000339

**B-5. How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?**

**Answer:** The appropriate response will differ depending on the level of control the school has over the alleged perpetrator. For example, if an athlete or band member from a visiting school sexually assaults a student at the home school, the home school may not be able to discipline or take other direct action against the visiting athlete or band member. However (and subject to the confidentiality provisions discussed in Section E), it should conduct an inquiry into what occurred and should report the incident to the visiting school and encourage the visiting school to take appropriate action to prevent further sexual violence. The home school should also notify the student of any right to file a complaint with the alleged perpetrator's school or local law enforcement. The home school may also decide not to invite the visiting school back to its campus.

Even though a school's ability to take direct action against a particular perpetrator may be limited, the school must still take steps to provide appropriate remedies for the complainant and, where appropriate, the broader school population. This may include providing support services for the complainant, and issuing new policy statements making it clear that the school does not tolerate sexual violence and will respond to any reports about such incidents. For additional information on interim measures see questions G-1 to G-3.

**C. Title IX Procedural Requirements**

*Overview*

**C-1. What procedures must a school have in place to prevent sexual violence and resolve complaints?**

**Answer:** The Title IX regulations outline three key procedural requirements. Each school must:

(1) disseminate a notice of nondiscrimination (see question C-2);[17]

(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX (see questions C-3 to C-4);[18] and

---

[17] 34 C.F.R. § 106.9.
[18] *Id.* § 106.8(a).

AR_00000340

(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints (see questions C-5 to C-6).[19]

These requirements apply to all forms of sex discrimination and are particularly important for preventing and effectively responding to sexual violence.

Procedural requirements under other federal laws may also apply to complaints of sexual violence, including the requirements of the Clery Act.[20] For additional information about the procedural requirements in the Clery Act, please see http://www2.ed.gov/admins/lead/safety/campus.html.

*Notice of Nondiscrimination*

**C-2.   What information must be included in a school's notice of nondiscrimination?**

**Answer:**  The notice of nondiscrimination must state that the school does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner. The notice must state that questions regarding Title IX may be referred to the school's Title IX coordinator or to OCR. The school must notify all of its students and employees of the name or title, office address, telephone number, and email address of the school's designated Title IX coordinator.[21]

*Title IX Coordinator*

**C-3.   What are a Title IX coordinator's responsibilities?**

**Answer:**  A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all

---

[19] *Id.* § 106.8(b).
[20] All postsecondary institutions participating in the Higher Education Act's Title IV student financial assistance programs must comply with the Clery Act.
[21] For more information on notices of nondiscrimination, please see OCR's Notice of Nondiscrimination (August 2010), available at http://www.ed.gov/ocr/docs/nondisc.pdf.

Page 10 – Questions and Answers on Title IX and Sexual Violence

AR_00000341

reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities.

Because the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school, this individual (when properly trained) is generally in the best position to evaluate a student's request for confidentiality in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students. A school may determine, however, that another individual should perform this role. For additional information on confidentiality requests, see questions E-1 to E-4. If a school relies in part on its disciplinary procedures to meet its Title IX obligations, the Title IX coordinator should review the disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX as discussed in question C-5.

In addition to these core responsibilities, a school may decide to give its Title IX coordinator additional responsibilities, such as: providing training to students, faculty, and staff on Title IX issues; conducting Title IX investigations, including investigating facts relevant to a complaint, and determining appropriate sanctions against the perpetrator and remedies for the complainant; determining appropriate interim measures for a complainant upon learning of a report or complaint of sexual violence; and ensuring that appropriate policies and procedures are in place for working with local law enforcement and coordinating services with local victim advocacy organizations and service providers, including rape crisis centers. A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.

If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

**C-4. Are there any employees who should not serve as the Title IX coordinator?**

**Answer:** Title IX does not categorically preclude particular employees from serving as Title IX coordinators. However, Title IX coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating

AR_00000342

the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest.

*Grievance Procedures*

**C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?**

**Answer:** Title IX requires that a school adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination, including sexual violence. In evaluating whether a school's grievance procedures satisfy this requirement, OCR will review all aspects of a school's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

(1)   notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

(2)   application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;

(3)   provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;

(4)   designated and reasonably prompt time frames for the major stages of the complaint process (see question F-8);

(5)   written notice to the complainant and alleged perpetrator of the outcome of the complaint (see question H-3); and

(6)   assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

AR_00000343

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the school processes complaints, a school's Title IX grievance procedures should also explicitly include the following in writing, some of which themselves are mandatory obligations under Title IX:

(1)   a statement of the school's jurisdiction over Title IX complaints;

(2)   adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment;

(3)   reporting policies and protocols, including provisions for confidential reporting;

(4)   identification of the employee or employees responsible for evaluating requests for confidentiality;

(5)   notice that Title IX prohibits retaliation;

(6)   notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

(7)   notice of available interim measures that  may be taken to protect the student in the educational setting;

(8)   the evidentiary standard that must be used (preponderance of the evidence) (*i.e.*, more likely than not that sexual violence occurred) in resolving a complaint;

(9)   notice of potential remedies for students;

(10)  notice of potential sanctions against perpetrators; and

(11)  sources of counseling, advocacy, and support.

For more information on interim measures, see questions G-1 to G-3.

The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions. Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

AR_00000344

A school's procedures and practices will vary in detail, specificity, and components, reflecting differences in the age of its students, school size and administrative structure, state or local legal requirements (*e.g.*, mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

**C-6.  Is a school required to use separate grievance procedures for sexual violence complaints?**

**Answer:**  No. Under Title IX, a school may use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to resolve sexual violence complaints. However, any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), including applying the preponderance of the evidence standard of review. As discussed in question C-3, the Title IX coordinator should review any process used to resolve complaints of sexual violence to ensure it complies with requirements for prompt and equitable resolution of these complaints. When using disciplinary procedures, which are often focused on the alleged perpetrator and can take considerable time, a school should be mindful of its obligation to provide interim measures to protect the complainant in the educational setting. For more information on timeframes and interim measures, see questions F-8 and G-1 to G-3.

**D.  Responsible Employees and Reporting**[22]

**D-1.  Which school employees are obligated to report incidents of possible sexual violence to school officials?**

**Answer:**  Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known. As explained in question C-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or

_____

[22] This document addresses only Title IX's reporting requirements. It does not address requirements under the Clery Act or other federal, state, or local laws, or an individual school's code of conduct.

Page 14 – Questions and Answers on Title IX and Sexual Violence

complaint was initially filed with another individual or office, subject to the exemption for school counseling employees discussed in question E-3.

**D-2. Who is a "responsible employee"?**

**Answer**:  According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.[23]

A school must make clear to all of its employees and students which staff members are responsible employees so that students can make informed decisions about whether to disclose information to those employees. A school must also inform all employees of their own reporting responsibilities and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.

Whether an employee is a responsible employee will vary depending on factors such as the age and education level of the student, the type of position held by the employee, and consideration of both formal and informal school practices and procedures. For example, while it may be reasonable for an elementary school student to believe that a custodial staff member or cafeteria worker has the authority or responsibility to address student misconduct, it is less reasonable for a college student to believe that a custodial staff member or dining hall employee has this same authority.

As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The

---

[23] The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998), and *Davis*, 524 U.S. at 642. The concept of a "responsible employee" under OCR's guidance for administrative enforcement of Title IX is broader.

Page 15 – Questions and Answers on Title IX and Sexual Violence

school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. For additional information on a school's responsibilities to address student-on-student sexual violence, see question A-5. For additional information on training for school employees, see questions J-1 to J-3.

**D-3.  What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence?**

**Answer:** Subject to the exemption for school counseling employees discussed in question E-3, a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.

To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures. For more information on appropriate training for school employees, see question J-1 to J-3.

**D-4.  What should a responsible employee tell a student who discloses an incident of sexual violence?**

**Answer**: Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report the names of the alleged perpetrator and student involved in the alleged sexual violence, as well as relevant facts regarding the alleged incident (including the date, time, and location), to the Title IX coordinator or other appropriate school officials, (ii) the student's option to request that the school maintain his or her confidentiality, which the school (*e.g.*, Title IX coordinator) will consider, and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services (*e.g.*, sexual assault resource centers, campus health centers, pastoral counselors, and campus mental health centers). As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request

AR_00000347

and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

**D-5.  If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials?**

**Answer:**  As discussed in questions D-1 and D-2, for Title IX purposes, whether an individual is obligated under Title IX to report alleged sexual violence to the school's Title IX coordinator or other appropriate school designee generally depends on whether the individual is a responsible employee.

The duties and responsibilities of RAs vary among schools, and, therefore, a school should consider its own policies and procedures to determine whether its RAs are responsible employees who must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee.[24] When making this determination, a school should consider if its RAs have the general authority to take action to redress misconduct or the duty to report misconduct to appropriate school officials, as well as whether students could reasonably believe that RAs have this authority or duty. A school should also consider whether it has determined and clearly informed students that RAs are generally available for confidential discussions and do not have the authority or responsibility to take action to redress any misconduct or to report any misconduct to the Title IX coordinator or other appropriate school officials. A school should pay particular attention to its RAs' obligations to report other student violations of school policy (*e.g.*, drug and alcohol violations or physical assault). If an RA is required to report other misconduct that violates school policy, then the RA would be considered a responsible employee obligated to report incidents of sexual violence that violate school policy.

If an RA is a responsible employee, the RA should make every effort to ensure that *before* the student reveals information that he or she may wish to keep confidential, the student understands the RA's reporting obligation and the student's option to request that the school maintain confidentiality. It is therefore important that schools widely disseminate policies and provide regular training clearly identifying the places where students can seek confidential support services so that students are aware of this information. The RA

_____

[24] Postsecondary institutions should be aware that, regardless of whether an RA is a responsible employee under Title IX, RAs are considered "campus security authorities" under the Clery Act. A school's responsibilities in regard to crimes reported to campus security authorities are discussed in the Department's regulations on the Clery Act at 34 C.F.R. § 668.46.

AR_00000348

should also explain to the student (again, before the student reveals information that he or she may wish to keep confidential) that, although the RA must report the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location to the Title IX coordinator or other appropriate school designee, the school will protect the student's confidentiality to the greatest extent possible. Prior to providing information about the incident to the Title IX coordinator or other appropriate school designee, the RA should consult with the student about how to protect his or her safety and the details of what will be shared with the Title IX coordinator. The RA should explain to the student that reporting this information to the Title IX coordinator or other appropriate school designee does not necessarily mean that a formal complaint or investigation under the school's Title IX grievance procedure must be initiated if the student requests confidentiality. As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

Regardless of whether a reporting obligation exists, all RAs should inform students of their right to file a Title IX complaint with the school and report a crime to campus or local law enforcement. If a student discloses sexual violence to an RA who is a responsible employee, the school will be deemed to have notice of the sexual violence even if the student does not file a Title IX complaint. Additionally, all RAs should provide students with information regarding on-campus resources, including victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. RAs should also be familiar with local rape crisis centers or other off-campus resources and provide this information to students.

## E.  Confidentiality and a School's Obligation to Respond to Sexual Violence

### E-1.  How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence?

**Answer:** Students, or parents of minor students, reporting incidents of sexual violence sometimes ask that the students' names not be disclosed to the alleged perpetrators or that no investigation or disciplinary action be pursued to address the alleged sexual violence. OCR strongly supports a student's interest in confidentiality in cases involving sexual violence. There are situations in which a school must override a student's request

AR_00000349

for confidentiality in order to meet its Title IX obligations; however, these instances will be limited and the information should only be shared with individuals who are responsible for handling the school's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, a school should ensure that the information is maintained in a secure manner. A school should be aware that disregarding requests for confidentiality can have a chilling effect and discourage other students from reporting sexual violence. In the case of minors, state mandatory reporting laws may require disclosure, but can generally be followed without disclosing information to school personnel who are not responsible for handling the school's response to incidents of sexual violence.[25]

Even if a student does not specifically ask for confidentiality, to the extent possible, a school should only disclose information regarding alleged incidents of sexual violence to individuals who are responsible for handling the school's response. To improve trust in the process for investigating sexual violence complaints, a school should notify students of the information that will be disclosed, to whom it will be disclosed, and why. Regardless of whether a student complainant requests confidentiality, a school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. For additional information on interim measures see questions G-1 to G-3.

For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate

---

[25] The school should be aware of the alleged student perpetrator's right under the Family Educational Rights and Privacy Act ("FERPA") torequest to inspect and review information about the allegations if the information directly relates to the alleged student perpetrator and the information is maintained by the school as an education record. In such a case, the school must either redact the complainant's name and all identifying information before allowing the alleged perpetrator to inspect and review the sections of the complaint that relate to him or her, or must inform the alleged perpetrator of the specific information in the complaint that are about the alleged perpetrator. *See* 34 C.F.R. § 99.12(a) The school should also make complainants aware of this right and explain how it might affect the school's ability to maintain complete confidentiality.

Page 19 – Questions and Answers on Title IX and Sexual Violence

and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary. See question K-1 regarding retaliation.

If the student still requests that his or her name not be disclosed to the alleged perpetrator or that the school not investigate or seek action against the alleged perpetrator, the school will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. As discussed in question C-3, the Title IX coordinator is generally in the best position to evaluate confidentiality requests. Because schools vary widely in size and administrative structure, OCR recognizes that a school may reasonably determine that an employee other than the Title IX coordinator, such as a sexual assault response coordinator, dean, or other school official, is better suited to evaluate such requests. Addressing the needs of a student reporting sexual violence while determining an appropriate institutional response requires expertise and attention, and a school should ensure that it assigns these responsibilities to employees with the capability and training to fulfill them. For example, if a school has a sexual assault response coordinator, that person should be consulted in evaluating requests for confidentiality. The school should identify in its Title IX policies and procedures the employee or employees responsible for making such determinations.

If the school determines that it can respect the student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to respond to the complaint consistent with the request. Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual allegation of sexual violence, other means may be available to address the sexual violence. There are steps a school can take to limit the effects of the alleged sexual violence and prevent its recurrence without initiating formal action against the alleged perpetrator or revealing the identity of the student complainant. Examples include providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; providing training and education materials for students and employees; changing and publicizing the school's policies on sexual violence; and conducting climate surveys regarding sexual violence. In instances affecting many students, an alleged perpetrator can be put on notice of allegations of harassing behavior and be counseled appropriately without revealing, even indirectly, the identity of the student complainant. A school must also take immediate action as necessary to protect the student while keeping the identity of the student confidential. These actions may include providing support services to the student and changing living arrangements or course schedules, assignments, or tests.

AR_00000351

**E-2.   What factors should a school consider in weighing a student's request for confidentiality?**

**Answer:**  When weighing a student's request for confidentiality that could preclude a meaningful investigation or potential discipline of the alleged perpetrator, a school should consider a range of factors.

These factors include circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (e.g., whether there have been other sexual violence complaints about the same alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators). These factors also include circumstances that suggest there is an increased risk of future acts of sexual violence under similar circumstances (e.g., whether the student's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group). Other factors that should be considered in assessing a student's request for confidentiality include whether the sexual violence was perpetrated with a weapon; the age of the student subjected to the sexual violence; and whether the school possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence).

A school should take requests for confidentiality seriously, while at the same time considering its responsibility to provide a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. For example, if the school has credible information that the alleged perpetrator has committed one or more prior rapes, the balance of factors would compel the school to investigate the allegation of sexual violence, and if appropriate, pursue disciplinary action in a manner that may require disclosure of the student's identity to the alleged perpetrator. If the school determines that it must disclose a student's identity to an alleged perpetrator, it should inform the student prior to making this disclosure. In these cases, it is also especially important for schools to take whatever interim measures are necessary to protect the student and ensure the safety of other students. If a school has a sexual assault response coordinator, that person should be consulted in identifying safety risks and interim measures that are necessary to protect the student. In the event the student requests that the school inform the perpetrator that the student asked the school not to investigate or seek discipline, the school should honor this request and inform the alleged perpetrator that the school made the decision to go forward. For additional information on interim measures see questions G-1 to G-3. Any school officials responsible for

AR_00000352

discussing safety and confidentiality with students should be trained on the effects of trauma and the appropriate methods to communicate with students subjected to sexual violence. See questions J-1 to J-3.

On the other hand, if, for example, the school has no credible information about prior sexual violence committed by the alleged perpetrator and the alleged sexual violence was not perpetrated with a weapon or accompanied by threats to repeat the sexual violence against the complainant or others or part of a larger pattern at a given location or by a particular group, the balance of factors would likely compel the school to respect the student's request for confidentiality. In this case the school should still take all reasonable steps to respond to the complaint consistent with the student's confidentiality request and determine whether interim measures are appropriate or necessary. Schools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence. Hence, a student who initially requests confidentiality might later request that a full investigation be conducted.

**E-3.  What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence?**

**Answer:**  OCR does not require campus mental-health counselors, pastoral counselors, social workers, psychologists, health center employees, or any other person with a professional license requiring confidentiality, or who is supervised by such a person, to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. Although these employees may have responsibilities that would otherwise make them responsible employees for Title IX purposes, OCR recognizes the importance of protecting the counselor-client relationship, which often requires confidentiality to ensure that students will seek the help they need.

Professional counselors and pastoral counselors whose official responsibilities include providing mental-health counseling to members of the school community are not required by Title IX to report *any* information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee.[26]

---------------------------------

[26] The exemption from reporting obligations for pastoral and professional counselors under Title IX is consistent with the Clery Act. For additional information on reporting obligations under the Clery Act, see Office of Postsecondary Education, *Handbook for Campus Safety and Security Reporting* (2011), available at http://www2.ed.gov/admins/lead/safety/handbook.pdf. Similar to the Clery Act, for Title IX purposes, a pastoral counselor is a person who is associated with a religious order or denomination, is recognized by that religious

AR_00000353

OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors. They include all individuals who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers, or health centers ("non-professional counselors or advocates"), including front desk staff and students. OCR wants students to feel free to seek their assistance and therefore interprets Title IX to give schools the latitude not to require these individuals to report incidents of sexual violence in a way that identifies the student without the student's consent.[27] These non-professional counselors or advocates are valuable sources of support for students, and OCR strongly encourages schools to designate these individuals as confidential sources.

Pastoral and professional counselors and non-professional counselors or advocates should be instructed to inform students of their right to file a Title IX complaint with the school and a separate complaint with campus or local law enforcement. In addition to informing students about campus resources for counseling, medical, and academic support, these persons should also indicate that they are available to assist students in filing such complaints. They should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary.

In order to identify patterns or systemic problems related to sexual violence, a school should collect aggregate data about sexual violence incidents from non-professional counselors or advocates in their on-campus sexual assault centers, women's centers, or

---

order or denomination as someone who provides confidential counseling, and is functioning within the scope of that recognition as a pastoral counselor. A professional counselor is a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification. This definition applies even to professional counselors who are not employees of the school, but are under contract to provide counseling at the school. This includes individuals who are not yet licensed or certified as a counselor, but are acting in that role under the supervision of an individual who is licensed or certified. An example is a Ph.D. counselor-trainee acting under the supervision of a professional counselor at the school.

[27] Postsecondary institutions should be aware that an individual who is counseling students, but who does not meet the Clery Act definition of a pastoral or professional counselor, is not exempt from being a campus security authority if he or she otherwise has significant responsibility for student and campus activities. See fn. 24.

Page 23 – Questions and Answers on Title IX and Sexual Violence

health centers. Such individuals should report only general information about incidents of sexual violence such as the nature, date, time, and general location of the incident and should take care to avoid reporting personally identifiable information about a student. Non-professional counselors and advocates should consult with students regarding what information needs to be withheld to protect their identity.

**E-4.   Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"?**

**Answer:**  No. OCR wants students to feel free to participate in preventive education programs and access resources for survivors. Therefore, public awareness events such as "Take Back the Night" or other forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint. The school should instead respond to these disclosures by reviewing sexual assault policies, creating campus-wide educational programs, and conducting climate surveys to learn more about the prevalence of sexual violence at the school. Although Title IX does not require the school to investigate particular incidents discussed at such events, the school should ensure that survivors are aware of any available resources, including counseling, health, and mental health services. To ensure that the entire school community understands their Title IX rights related to sexual violence, the school should also provide information at these events on Title IX and how to file a Title IX complaint with the school, as well as options for reporting an incident of sexual violence to campus or local law enforcement.

**F.   Investigations and Hearings**

*Overview*

**F-1.   What elements should a school's Title IX investigation include?**

**Answer:**  The specific steps in a school's Title IX investigation will vary depending on the nature of the allegation, the age of the student or students involved, the size and administrative structure of the school, state or local legal requirements (including mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

For the purposes of this document the term "investigation" refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions

the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.[28] Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures. For additional information on training, see question J-3.

When investigating an incident of alleged sexual violence for Title IX purposes, to the extent possible, a school should coordinate with any other ongoing school or criminal investigations of the incident and establish appropriate fact-finding roles for each investigator. A school should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event. If the investigation includes forensic evidence, it may be helpful for a school to consult with local or campus law enforcement or a forensic expert to ensure that the evidence is correctly interpreted by school officials. For additional information on working with campus or local law enforcement see question F-3.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without additional remedies, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. If a school typically processes complaints of sexual violence through its disciplinary process and that process, including any investigation and hearing, meets the Title IX requirements discussed above and enables the school to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, then the school may use that process to satisfy its Title IX obligations and does not need to conduct a separate Title IX investigation. As discussed in question C-3, the Title IX coordinator should review the disciplinary process

---

[28] This answer addresses only Title IX's requirements for investigations. It does not address legal rights or requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws.

Page 25 – Questions and Answers on Title IX and Sexual Violence

AR_00000356

to ensure that it: (1) complies with the prompt and equitable requirements of Title IX; (2) allows for appropriate interim measures to be taken to protect the complainant during the process; and (3) provides for remedies to the complainant and school community where appropriate. For more information about interim measures, see questions G-1 to G-3, and about remedies, see questions H-1 and H-2.

The investigation may include, but is not limited to, conducting interviews of the complainant, the alleged perpetrator, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing student and personnel files; and gathering and examining other relevant documents or evidence. While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.[29] Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.

- The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

- If the school provides for an appeal, it must do so equally for both parties.

- Both parties must be notified, in writing, of the outcome of both the complaint and any appeal (see question H-3).

---

[29] As explained in question C-5, the parties may have certain due process rights under the U.S. Constitution.

Page 26 – Questions and Answers on Title IX and Sexual Violence

AR_00000357

*Intersection with Criminal Investigations*

**F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation?**

**Answer:**  A criminal investigation is intended to determine whether an individual violated criminal law; and, if at the conclusion of the investigation, the individual is tried and found guilty, the individual may be imprisoned or subject to criminal penalties. The U.S. Constitution affords criminal defendants who face the risk of incarceration numerous protections, including, but not limited to, the right to counsel, the right to a speedy trial, the right to a jury trial, the right against self-incrimination, and the right to confrontation. In addition, government officials responsible for criminal investigations (including police and prosecutors) normally have discretion as to which complaints from the public they will investigate.

By contrast, a Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards are not required. Further, while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

Of course, criminal investigations conducted by local or campus law enforcement may be useful for fact gathering if the criminal investigation occurs within the recommended timeframe for Title IX investigations; but, even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation.

A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so either during or after the school's internal Title IX investigation. Title IX does not require a school to report alleged incidents of sexual violence to law enforcement, but a school may have reporting obligations under state, local, or other federal laws.

AR_00000358

**F-3. How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation?**

**Answer:** A school should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, it is important for a school to understand that during this brief delay in the Title IX investigation, it must take interim measures to protect the complainant in the educational setting. The school should also continue to update the parties on the status of the investigation and inform the parties when the school resumes its Title IX investigation. For additional information on interim measures see questions G-1 to G-3.

If a school delays the fact-finding portion of a Title IX investigation, the school must promptly resume and complete its fact-finding for the Title IX investigation once it learns that the police department has completed its evidence gathering stage of the criminal investigation. The school should not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges. OCR recommends that a school work with its campus police, local law enforcement, and local prosecutor's office to learn when the evidence gathering stage of the criminal investigation is complete. A school may also want to enter into a memorandum of understanding (MOU) or other agreement with these agencies regarding the protocols and procedures for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. Any MOU or other agreement must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably, and must comply with the Family Educational Rights and Privacy Act ("FERPA") and other applicable privacy laws.

The DCL states that in one instance a prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances. OCR understands that this example may not be representative and that the law enforcement agency's process often takes more than ten days. OCR recognizes that the length of time for evidence gathering by criminal investigators will vary depending on the specific circumstances of each case.

AR_00000359

*Off-Campus Conduct*

**F-4.  Is a school required to process complaints of alleged sexual violence that occurred off campus?**

**Answer:**  Yes. Under Title IX, a school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.

A school must determine whether the alleged off-campus sexual violence occurred in the context of an education program or activity of the school; if so, the school must treat the complaint in the same manner that it treats complaints regarding on-campus conduct. In other words, if a school determines that the alleged misconduct took place in the context of an education program or activity of the school, the fact that the alleged misconduct took place off campus does not relieve the school of its obligation to investigate the complaint as it would investigate a complaint of sexual violence that occurred on campus.

Whether the alleged misconduct occurred in this context may not always be apparent from the complaint, so a school may need to gather additional information in order to make such a determination. Off-campus education programs and activities are clearly covered and include, but are not limited to: activities that take place at houses of fraternities or sororities recognized by the school; school-sponsored field trips, including athletic team travel; and events for school clubs that occur off campus (*e.g.*, a debate team trip to another school or to a weekend competition).

Even if the misconduct did not occur in the context of an education program or activity, a school must consider the effects of the off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity because students often experience the continuing effects of off-campus sexual violence while at school or in an off-campus education program or activity. The school cannot address the continuing effects of the off-campus sexual violence at school or in an off-campus education program or activity unless it processes the complaint and gathers appropriate additional information in accordance with its established procedures.

Once a school is on notice of off-campus sexual violence against a student, it must assess whether there are any continuing effects on campus or in an off-campus education program or activity that are creating or contributing to a hostile environment and, if so, address that hostile environment in the same manner in which it would address a hostile environment created by on-campus misconduct. The mere presence on campus or in an

AR_00000360

off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment. A school should also take steps to protect a student who alleges off-campus sexual violence from further harassment by the alleged perpetrator or his or her friends, and a school may have to take steps to protect other students from possible assault by the alleged perpetrator. In other words, the school should protect the school community in the same way it would had the sexual violence occurred on campus. Even if there are no continuing effects of the off-campus sexual violence experienced by the student on campus or in an off-campus education program or activity, the school still should handle these incidents as it would handle other off-campus incidents of misconduct or violence and consistent with any other applicable laws. For example, if a school, under its code of conduct, exercises jurisdiction over physical altercations between students that occur off campus outside of an education program or activity, it should also exercise jurisdiction over incidents of student-on-student sexual violence that occur off campus outside of an education program or activity.

_Hearings_[30]

**F-5.  Must a school allow or require the parties to be present during an entire hearing?**

**Answer:** If a school uses a hearing process to determine responsibility for acts of sexual violence, OCR does not require that the school allow a complainant to be present for the entire hearing; it is up to each school to make this determination. But if the school allows one party to be present for the entirety of a hearing, it must do so equally for both parties. At the same time, when requested, a school should make arrangements so that the complainant and the alleged perpetrator do not have to be present in the same room at the same time. These two objectives may be achieved by using closed circuit television or other means. Because a school has a Title IX obligation to investigate possible sexual violence, if a hearing is part of the school's Title IX investigation process, the school must not require a complainant to be present at the hearing as a prerequisite to proceed with the hearing.

---

[30] As noted in question F-1, the investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards  in cases involving allegations of sexual violence.

Page 30 – Questions and Answers on Title IX and Sexual Violence

**F-6.  May every witness at the hearing, including the parties, be cross-examined?**

**Answer:**  OCR does not require that a school allow cross-examination of witnesses, including the parties, if they testify at the hearing. But if the school allows one party to cross-examine witnesses, it must do so equally for both parties.

OCR strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence. Allowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment. A school may choose, instead, to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.

**F-7.  May the complainant's sexual history be introduced at hearings?**

**Answer:**  Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted. Further, a school should recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence. The school should also ensure that hearings are conducted in a manner that does not inflict additional trauma on the complainant.

*Timeframes*

**F-8.  What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation?**

**Answer:**  As noted in the DCL, the 60-calendar day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable as required by Title IX.

AR_00000362

OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process.

Because timeframes for investigations vary and a school may need to depart from the timeframes designated in its grievance procedures, both parties should be given periodic status updates throughout the process.

### G.  Interim Measures

### G-1.  Is a school required to take any interim measures before the completion of its investigation?

**Answer:**  Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate. The school should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. If a school does not offer these services on campus, it should enter into an MOU with a local victim services provider if possible.

Even when a school has determined that it can respect a complainant's request for confidentiality and therefore may not be able to respond fully to an allegation of sexual violence and initiate formal action against an alleged perpetrator, the school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the

AR_00000363

complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred.

**G-2. How should a school determine what interim measures to take?**

**Answer:** The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. A school should consider a number of factors in determining what interim measures to take, including, for example, the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant (*e.g.*, civil protection orders).

In general, when taking interim measures, schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case.

**G-3. If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?**

**Answer:** No. Interim measures are determined by a school on a case-by-case basis. If a school determines that it needs to offer counseling to the complainant as part of its Title IX obligation to take steps to protect the complainant while the investigation is ongoing, it must not require the complainant to pay for this service.

AR_00000364

## H.  Remedies and Notice of Outcome[31]

**H-1.  What remedies should a school consider in a case of student-on-student sexual violence?**

**Answer:**  Effective remedial action may include disciplinary action against the perpetrator, providing counseling for the perpetrator, remedies for the complainant and others, as well as changes to the school's overall services or policies. All services needed to remedy the hostile environment should be offered to the complainant. These remedies are separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of the school's investigation. In any instance in which the complainant did not take advantage of a specific service (*e.g.*, counseling) when offered as an interim measure, the complainant should still be offered, and is still entitled to, appropriate final remedies that may include services the complainant declined as an interim measure. A refusal at the interim stage does not mean the refused service or set of services should not be offered as a remedy.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without more, likely will not be sufficient to satisfy its Title IX obligation to eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. Additional remedies for the complainant and the school community may be necessary. If the school's student disciplinary procedure does not include a process for determining and implementing these remedies for the complainant and school community, the school will need to use another process for this purpose.

Depending on the specific nature of the problem, remedies for the complainant may include, but are not limited to:

- Providing an effective escort to ensure that the complainant can move safely between classes and activities;

---

[31] As explained in question A-5, if a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to be subjected to a hostile environment. In this case, in addition to the remedies discussed in this section, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

Page 34 – Questions and Answers on Title IX and Sexual Violence

AR_00000365

- Ensuring the complainant and perpetrator do not share classes or extracurricular activities;

- Moving the perpetrator or complainant (if the complainant requests to be moved) to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;

- Providing comprehensive, holistic victim services including medical, counseling and academic support services, such as tutoring;

- Arranging for the complainant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty; and

- Reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the sexual violence and the misconduct that may have resulted in the complainant being disciplined.[32]

Remedies for the broader student population may include, but are not limited to:

- Designating an individual from the school's counseling center who is specifically trained in providing trauma-informed comprehensive services to victims of sexual violence to be on call to assist students whenever needed;

- Training or retraining school employees on the school's responsibilities to address allegations of sexual violence and how to conduct Title IX investigations;

- Developing materials on sexual violence, which should be distributed to all students;

- Conducting bystander intervention and sexual violence prevention programs with students;

- Issuing policy statements or taking other steps that clearly communicate that the school does not tolerate sexual violence and will respond to any incidents and to any student who reports such incidents;

---

[32] For example, if the complainant was disciplined for skipping a class in which the perpetrator was enrolled, the school should review the incident to determine if the complainant skipped class to avoid contact with the perpetrator.

Page 35 – Questions and Answers on Title IX and Sexual Violence

- Conducting, in conjunction with student leaders, a campus climate check to assess the effectiveness of efforts to ensure that the school is free from sexual violence, and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students if, for example, the sexual violence created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Developing a protocol for working with local law enforcement as discussed in question F-3.

When a school is unable to conduct a full investigation into a particular incident (*i.e.*, when it received a general report of sexual violence without any personally identifying information), it should consider remedies for the broader student population in response.

**H-2. If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options?**

**Answer:** If there are limited sections of required courses offered at a school and both the complainant and perpetrator are required to take those classes, the school may need to make alternate arrangements in a manner that minimizes the burden on the complainant. For example, the school may allow the complainant to take the regular sections of the courses while arranging for the perpetrator to take the same courses online or through independent study.

**H-3. What information must be provided to the complainant in the notice of the outcome?**

**Answer:** Title IX requires both parties to be notified, in writing, about the outcome of both the complaint and any appeal. OCR recommends that a school provide written notice of the outcome to the complainant and the alleged perpetrator concurrently.

For Title IX purposes, a school must inform the complainant as to whether or not it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant or any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the school has taken to eliminate the hostile environment, if the school finds one to exist, and prevent recurrence. The perpetrator should not be notified of the individual remedies offered or provided to the complainant.

AR_00000367

Sanctions that directly relate to the complainant (but that may also relate to eliminating the hostile environment and preventing recurrence) include, but are not limited to, requiring that the perpetrator stay away from the complainant until both parties graduate, prohibiting the perpetrator from attending school for a period of time, or transferring the perpetrator to another residence hall, other classes, or another school. Additional steps the school has taken to eliminate the hostile environment may include counseling and academic support services for the complainant and other affected students. Additional steps the school has taken to prevent recurrence may include sexual violence training for faculty and staff, revisions to the school's policies on sexual violence, and campus climate surveys. Further discussion of appropriate remedies is included in question H-1.

In addition to the Title IX requirements described above, the Clery Act requires, and FERPA permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases (as opposed to all harassment and misconduct covered by Title IX) not just those sanctions that directly relate to the complainant.[33]

## I.    Appeals

**I-1.    What are the requirements for an appeals process?**

**Answer:**  While Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. If a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties. The specific design of the appeals process is up to the school, as long as the entire grievance process, including any appeals, provides prompt and equitable resolutions of sexual violence complaints, and the school takes steps to protect the complainant in the educational setting during the process. Any individual or body handling appeals should be trained in the dynamics of and trauma associated with sexual violence.

If a school chooses to offer an appeals process it has flexibility to determine the type of review it will apply to appeals, but the type of review the school applies must be the same regardless of which party files the appeal.

---

[33] 20 U.S.C. § 1092(f) and 20 U.S.C. § 1232g(b)(6)(A).

Page 37 – Questions and Answers on Title IX and Sexual Violence

AR_00000368

**I-2.  Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient?**

**Answer:**  The appeals process must be equal for both parties. For example, if a school allows a perpetrator to appeal a suspension on the grounds that it is too severe, the school must also allow a complainant to appeal a suspension on the grounds that it was not severe enough. See question H-3 for more information on what must be provided to the complainant in the notice of the outcome.

**J.   Title IX Training, Education and Prevention**[34]

**J-1.  What type of training on Title IX and sexual violence should a school provide to its employees?**

**Answer:**  A school needs to ensure that responsible employees with the authority to address sexual violence know how to respond appropriately to reports of sexual violence, that other responsible employees know that they are obligated to report sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual violence. A school should ensure that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential. A school should provide training to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors. Training for employees should include practical information about how to prevent and identify sexual violence, including same-sex sexual violence; the behaviors that may lead to and result in sexual violence; the attitudes of bystanders that may allow conduct to continue; the potential for revictimization by responders and its effect on students; appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language; the impact of trauma on victims; and, as applicable, the person(s) to whom such misconduct must be reported. The training should also explain responsible employees' reporting obligation, including what should be included in a report and any consequences for the failure to report and the procedure for responding to students' requests for confidentiality, as well as provide the contact

---

[34] As explained earlier, although this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act.

Page 38 – Questions and Answers on Title IX and Sexual Violence

AR_00000369

information for the school's Title IX coordinator. A school also should train responsible employees to inform students of: the reporting obligations of responsible employees; students' option to request confidentiality and available confidential advocacy, counseling, or other support services; and their right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement. For additional information on the reporting obligations of responsible employees and others see questions D-1 to D-5.

There is no minimum number of hours required for Title IX and sexual violence training at every school, but this training should be provided on a regular basis. Each school should determine based on its particular circumstances how such training should be conducted, who has the relevant expertise required to conduct the training, and who should receive the training to ensure that the training adequately prepares employees, particularly responsible employees, to fulfill their duties under Title IX. A school should also have methods for verifying that the training was effective.

### J-2.   How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence?

**Answer:**  Title IX requires a school to take prompt and effective steps reasonably calculated to end sexual harassment and sexual violence that creates a hostile environment (*i.e.*, conduct that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program and activity). But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

OCR therefore recommends that a school train responsible employees to report to the Title IX coordinator or other appropriate school official any incidents of sexual harassment or sexual violence that may violate the school's code of conduct or may create or contribute to the creation of a hostile environment. The school can then take steps to investigate and prevent any harassment or violence from recurring or escalating, as appropriate. For example, the school may separate the complainant and alleged perpetrator or conduct sexual harassment and sexual violence training for the school's students and employees. Responsible employees should understand that they do not need to determine whether the alleged sexual harassment or sexual violence actually occurred or that a hostile environment has been created before reporting an incident to the school's Title IX coordinator. Because the Title IX coordinator should have in-depth knowledge of Title IX and Title IX complaints at the school, he or she is likely to be in a better position than are other employees to evaluate whether an incident of sexual

AR_00000370

harassment or sexual violence creates a hostile environment and how the school should respond. There may also be situations in which individual incidents of sexual harassment do not, by themselves, create a hostile environment; however when considered together, those incidents may create a hostile environment.

**J-3.  What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?**

**Answer:** All persons involved in implementing a school's grievance procedures (*e.g.*, Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurobiological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds.

In rare circumstances, employees involved in implementing a school's grievance procedures may be able to demonstrate that prior training and experience has provided them with competency in the areas covered in the school's training. For example, the combination of effective prior training and experience investigating complaints of sexual violence, together with training on the school's current grievance procedures may be sufficient preparation for an employee to resolve Title IX complaints consistent with the school's grievance procedures. In-depth knowledge regarding Title IX and sexual violence is particularly helpful. Because laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience.

AR_00000371

**J-4.   What type of training on sexual violence should a school provide to its students?**

**Answer:**  To ensure that students understand their rights under Title IX, a school should provide age-appropriate training to its students regarding Title IX and sexual violence. At the elementary and secondary school level, schools should consider whether sexual violence training should also be offered to parents, particularly training on the school's process for handling complaints of sexual violence. Training may be provided separately or as part of the school's broader training on sex discrimination and sexual harassment. However, sexual violence is a unique topic that should not be assumed to be covered adequately in other educational programming or training provided to students. The school may want to include this training in its orientation programs for new students; training for student athletes and members of student organizations; and back-to-school nights. A school should consider educational methods that are most likely to help students retain information when designing its training, including repeating the training at regular intervals. OCR recommends that, at a minimum, the following topics (as appropriate) be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;
- the school's definition of consent applicable to sexual conduct, including examples;
- how the school analyzes whether conduct was unwelcome under Title IX;
- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;
- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;
- the school's grievance procedures used to process sexual violence complaints;
- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;
- effects of trauma, including neurobiological changes;
- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;
- strategies and skills for bystanders to intervene to prevent possible sexual violence;
- how to report sexual violence to campus or local law enforcement and the ability to pursue law enforcement proceedings simultaneously with a Title IX grievance; and
- Title IX's protections against retaliation.

The training should also encourage students to report incidents of sexual violence. The training should explain that students (and their parents or friends) do not need to determine whether incidents of sexual violence or other sexual harassment created a

AR_00000372

hostile environment before reporting the incident. A school also should be aware that persons may be deterred from reporting incidents if, for example, violations of school or campus rules regarding alcohol or drugs were involved. As a result, a school should review its disciplinary policy to ensure it does not have a chilling effect on students' reporting of sexual violence offenses or participating as witnesses. OCR recommends that a school inform students that the school's primary concern is student safety, and that use of alcohol or drugs never makes the survivor at fault for sexual violence.

It is also important for a school to educate students about the persons on campus to whom they can confidentially report incidents of sexual violence. A school's sexual violence education and prevention program should clearly identify the offices or individuals with whom students can speak confidentially and the offices or individuals who can provide resources such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. It should also identify the school's responsible employees and explain that if students report incidents to responsible employees (except as noted in question E-3) these employees are required to report the incident to the Title IX coordinator or other appropriate official. This reporting includes the names of the alleged perpetrator and student involved in the sexual violence, as well as relevant facts including the date, time, and location, although efforts should be made to comply with requests for confidentiality from the complainant. For more detailed information regarding reporting and responsible employees and confidentiality, see questions D-1 to D-5 and E-1 to E-4.

## K.  Retaliation

### K-1.  Does Title IX protect against retaliation?

**Answer:**  Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

AR_00000373

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary. At a minimum, this includes making sure that the complainant and his or her parents, if the complainant is in elementary or secondary school, and witnesses know how to report retaliation by school officials, other students, or third parties by making follow-up inquiries to see if there have been any new incidents or acts of retaliation, and by responding promptly and appropriately to address continuing or new problems. A school should also tell complainants and witnesses that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation, but will also take strong responsive action if it occurs.

## L.  First Amendment

### L-1.  How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?

**Answer:**  The DCL on sexual violence did not expressly address First Amendment issues because it focuses on unlawful physical sexual violence, which is not speech or expression protected by the First Amendment.

However, OCR's previous guidance on the First Amendment, including the 2001 Guidance, OCR's July 28, 2003, Dear Colleague Letter on the First Amendment,[35] and OCR's October 26, 2010, Dear Colleague Letter on harassment and bullying,[36] remain fully in effect. OCR has made it clear that the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. Therefore, when a school works to prevent

---

[35] Available at http://www.ed.gov/ocr/firstamend.html.
[36] Available at http://www.ed.gov/ocr/letters/colleague-201010.html.

Page 43 – Questions and Answers on Title IX and Sexual Violence

AR_00000374

and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers.

Title IX protects students from sex discrimination; it does not regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX. Title IX also does not require, prohibit, or abridge the use of particular textbooks or curricular materials.[37]

## M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013

### M-1.  How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs?

**Answer:**  Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. For additional information about the Clery Act and its regulations, please see http://www2.ed.gov/admins/lead/safety/campus.html.

### M-2.  Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?

**Answer:**  No. The Violence Against Women Reauthorization Act has no effect on a school's obligations under Title IX or the DCL. The Violence Against Women Reauthorization Act amended the Violence Against Women Act and the Clery Act, which are separate statutes. Nothing in Section 304 or any other part of the Violence Against Women Reauthorization Act relieves a school of its obligation to comply with the requirements of Title IX, including those set forth in these Questions and Answers, the 2011 DCL, and the *2001 Guidance*. For additional information about the Department's negotiated rulemaking related to the Violence Against Women Reauthorization Act please see http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html.

_____

[37] 34 C.F.R. § 106.42.

Page 44 – Questions and Answers on Title IX and Sexual Violence

## N.  Further Federal Guidance

**N-1. Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance?**

**Answer:**  Anyone who has questions regarding this guidance, or Title IX should contact the OCR regional office that serves his or her state. Contact information for OCR regional offices can be found on OCR's webpage at https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. If you wish to file a complaint of discrimination with OCR, you may use the online complaint form available at http://www.ed.gov/ocr/complaintintro.html or send a letter to the OCR enforcement office responsible for the state in which the school is located. You may also email general questions to OCR at ocr@ed.gov.

**N-2. Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence?**

**Answer:**  Yes. OCR's policy guidance on Title IX is available on OCR's webpage at http://www.ed.gov/ocr/publications.html#TitleIX. In addition to the April 4, 2011, Dear Colleague Letter, OCR has issued the following resources that further discuss a school's obligation to respond to allegations of sexual harassment and sexual violence:

- Dear Colleague Letter: Harassment and Bullying (October 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf

- *Sexual Harassment: It's Not Academic* (Revised September 2008), http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf

- *Revised Sexual Harassment Guidance: Harassment of Students by Employees, Other Students, or Third Parties* (January 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

AR_00000376

In addition to guidance from OCR, a school may also find resources from the Departments of Education and Justice helpful in preventing and responding to sexual violence:

- Department of Education's Letter to Chief State School Officers on Teen Dating Violence Awareness and Prevention (February 28, 2013)
  https://www2.ed.gov/policy/gen/guid/secletter/130228.html

- Department of Education's National Center on Safe Supportive Learning Environments
  http://safesupportivelearning.ed.gov/

- Department of Justice, Office on Violence Against Women
  http://www.ovw.usdoj.gov/

AR_00000377

**OPEN LETTER FROM MEMBERS OF THE PENN LAW SCHOOL FACULTY**

**SEXUAL ASSAULT COMPLAINTS: PROTECTING COMPLAINANTS AND THE ACCUSED STUDENTS AT UNIVERSITIES**

In response to guidelines issued by the U. S. Department of Education's Office of Civil Rights ("OCR") to enforce Title IX of the Education Amendments Act of 1972, the University of Pennsylvania has adopted new procedures for investigating and adjudicating complaints of sexual assault. Although we appreciate the efforts by Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness. We do not believe that providing justice for victims of sexual assault requires subordinating so many protections long deemed necessary to protect from injustice those accused of serious offenses. We also believe that, given the complexities of the problem, OCR's process has sacrificed the basic safeguards of the lawmaking process and that those safeguards are critically necessary to formulate sound regulatory policy.

As law teachers who instruct students on the basic principles of due process of law, proper administrative procedures, and rules of evidence designed to ensure reliable judgments, we are deeply concerned by these developments and take this opportunity to express our views in this expanding national debate. We start by setting forth the priorities and principles that guide our views.

*First*, we fully recognize serious concerns about the problem of sexual assaults on college campuses. Although our comments and criticisms focus on universities' procedures for adjudicating sexual assault complaints, we recognize the far more important issue: how can universities help to change the culture and attitudes that lead to sexual assaults? Our first priority should be to reduce the frequency of assaults. After-the-fact disciplinary proceedings, while useful, cannot by themselves adequately protect our students. Universities must take more steps to deal with excessive use of alcohol and drugs, substances that all too often fuel the conditions that lead to contested sexual assault complaints. There is also broad agreement that students need clear rules defining what constitutes consensual sexual conduct, but there are too often troubling ambiguities on questions such as what constitutes valid consent, and such ambiguities leave students vulnerable to sometimes unpredictable, after-the-fact assessments of their behavior.

*Second,* we also recognize that there must be comprehensive protections for those who are abused and seek either criminal prosecution or University

1

administrative sanctions.   Accordingly, we fully support procedures that ensure confidentiality in reporting incidents of sexual assault, counseling for victims, full and fair investigations by University officials trained in the dynamics of this type of offense, referral of cases to the police where such action is requested by the complainant and, where appropriate, informal resolution of complaints.  Ultimately, however, a student who denies the charges is entitled to a fair hearing before being subjected to serious, life-changing sanctions.   These cases are likely to involve highly disputed facts, and the "he said/she said" conflict is often complicated by the effects of alcohol and drugs.

*Third*, we support effective enforcement of Title IX at universities, as all agree that sexual assaults seriously interfere with students' rights to equal educational opportunities.  It is not altogether clear, however, why the federal government requires such serious cases to be handled by campus tribunals staffed by academics, instead of by professional judges and lawyers.  Perhaps it is time to funnel the more serious cases through the criminal justice process and to make that process much more accessible to and supportive of sexual assault complainants.

*Fourth,* in addressing the issue of sexual assault, the federal government has sidestepped the usual procedures for making law.  Congress has passed no statute requiring universities to reform their campus disciplinary procedures.  OCR has not gone through the notice-and-comment rulemaking required to promulgate a new regulation.  Instead, OCR has issued several guidance letters whose legal status is questionable.  It is this guidance that purports to require universities to retreat from the clear-and-convincing standard of proof to a preponderance-of-the-evidence standard, which requires a finding of responsibility even if the factfinder is almost 50% sure that the accused student is not guilty.  In addition, OCR has used threats of investigation and loss of federal funding to intimidate universities into going further than even the guidance requires.

*Fifth*, this lawmaking process has sacrificed the traditional safeguards that accompany traditional lawmaking procedures.   Both the legislative process and notice-and-comment rulemaking are transparent, participatory processes that afford the opportunity for input from a diversity of viewpoints.  That range of views is critical because this area implicates competing values, including privacy, safety, the functioning of the academic community, and the integrity of the educational process for both the victim and the accused, as well as the fundamental fairness of the disciplinary process.  A formal lawmaking process would have required the federal government to deliberate, strike reasonable balances, and offer an explicit justification for its policy judgments.  Formal lawmaking would have required the

2

federal government, as in other areas of regulatory policy, to consider explicitly the costs of its proposed policies as well as the benefits. In addition, adherence to a rule-of-law standard would have resulted in procedures with greater legitimacy and buy-in from the universities subject to the resulting rules.

With these priorities and principles in mind, we offer the following comments and suggestions about the procedures needed to adjudicate fairly those few cases that are not resolved during the investigation. In these cases, there are no good reasons to disregard the fundamental and time-tested principles that ensure reliable fact determinations. We recognize that student disciplinary hearings are not criminal trials and therefore do not require all constitutional guarantees. What is required is fundamental fairness, including (1) the right to the assistance of counsel in preparation for and conduct of the hearing, (2) the right to cross-examine witnesses against the accused student and to present defense witnesses and evidence, and (3) the right to a fair and unbiased hearing panel.

Procedures that universities have adopted in response to the threatened loss of federal funding are deficient. We are pleased that Penn, unlike many universities, has retained at least a partial hearing as a requirement for a finding of responsibility, but this hearing still falls far short of ensuring fundamental fairness. Under the new Penn protocol, an Investigating Officer (currently a former prosecutor) will review the complaint and determine whether it provides cause for a full investigation. If so, the Investigating Officer and a member of the faculty or administration (the "Investigative Team") will conduct a full investigation. During this phase, although the complainant and the accused student are entitled to the advice of counsel or an advisor, neither side is permitted "to present statements, seek the production of evidence or question witnesses." The Investigative Team will then provide a report with conclusions as to the veracity of the complainant (and other witnesses) and the conduct of the accused student.

For a case to reach the hearing phase, the Investigative Team need find by only a preponderance of the evidence that the accused student is responsible. Further, the report, with a narrative of all of the facts and circumstances on which the Investigative Team has made a determination of responsibility, will be provided to the panel. And although the panel has the duty to hear again from the witnesses, it is difficult to understand, particularly in light of the absence of fair hearing procedures, how a panel would not defer to the "expertise" of the Investigative Team, which has already conducted a full investigation.

3

More specifically:

1. The protocol prohibits a lawyer or other representative for the accused student from cross-examining any of the witnesses against the accused. Although the Department of Education's guidance strongly discourages allowing the *accused* to cross-examine the complainant personally, it permits the accused student's lawyer or other representative to do so, as long as each side has equal rights to cross-examine. Cross-examination has long been considered as perhaps the most important procedure in reaching a fair and reliable determination of disputed facts. Rather than abolishing cross-examination, it would be much fairer to impose reasonable limits, including a ban on irrelevant questions regarding the sexual history and sexual orientation of the complainant; control over unfair, oppressive, or overbearing cross-examination; and even separation of the complainant and accused during the hearing. Further, although the protocol permits the accused student to submit questions to the panel to be asked during its "interview" of witnesses, they must be submitted in advance and the decision to ask these questions is entirely discretionary. More importantly, no one should think that questioning by panel members is an adequate substitute for the far more informative and effective cross-examination by a student's representative.

2. As noted, the panel is provided with a full report that finds that the accused student has engaged in sexual assault. And even though the panel has the accused's objections to the report and is under a duty to "interview" the parties and to review all of the evidence, and may (but need not) interview other "key witnesses" and seek additional evidence if it chooses to do so, a panel of teachers and administrators is likely to defer to findings made by an "expert" Investigating Officer and a faculty member or administrator. Our legal system is based on checks and balances precisely because of the risks associated with concentrating so much power in the hands of a single investigator or Investigative Team. What is needed is a procedure that allows the accused student's lawyer or representative to challenge the Investigative Team's version of events, to ensure that the panel will hear all the evidence that is submitted by both sides and reach its own conclusions as to the veracity of witnesses and the responsibility of the accused student. And it should not be forgotten that these proceedings are conducted in the shadow of threats of a Department of Education investigation for failure to properly investigate and sanction

4

students for alleged misconduct. The threat of loss of federal funding risks coloring the proceedings, particularly because a hearing panel may not feel free to acquit without repercussions.

3. The hearing panel consists of three persons drawn from the University faculty as well as a non-voting Disciplinary Hearing Officer, and a decision holding the accused student responsible may be made not only by a mere preponderance of the evidence, but by a 2-1 vote. An evidentiary standard of clear and convincing evidence to convict provides a more durable safeguard against wrongful "convictions." The preponderance standard may be required by the OCR guidance, but that mandate provides all the more reason for otherwise scrupulously fair procedures and a unanimous decision before a student can be expelled from the University and be stigmatized as a sexual offender. To require anything less than unanimity for the imposition of serious sanctions is unacceptable.

4. The protocol does not adequately protect the accused student's right against self-incrimination in cases in which there may be a criminal prosecution. Although the protocol properly allows the University to grant a prosecutor's request to defer proceedings that might adversely influence a criminal investigation or trial, there is no reciprocal opportunity for the accused, who may be forced to the cruel choice of defending the University charges at the risk of compromising his rights in the criminal case.

Our concerns about fundamental fairness are not academic or theoretical in nature. There are documented cases of a rush to judgment on charges of sexual misconduct at universities, including the Duke Lacrosse case and the recent events at the University of Virginia. In the criminal justice system, there have been a large number of post-conviction exonerations of persons convicted of serious crimes, including many sexual assault cases. Due process of law is not window dressing; it is the distillation of centuries of experience, and we ignore the lessons of history at our peril. All too often, outrage at heinous crimes becomes a justification for shortcuts in our adjudicatory processes. These actions are unwise and contradict our principles. We can and should provide protection and support for those who are subject to sexual abuse, and at the same time provide a fair process that is calculated to yield a reliable factual determination. Ultimately, there is nothing

5

inconsistent with a policy that both strongly condemns and punishes sexual misconduct and ensures a fair adjudicatory process.

David Rudovsky
Senior Fellow

Stephanos Bibas
Professor of Law and Criminology

Shyamkrishna Balganesh
Professor of Law

Mitchell Berman
Leon Meltzer Professor of Law

Stephen B. Burbank
David Berger Professor for the Administration of Justice

Jill E. Fisch
Perry Golkin Professor of Law

Jonah B. Gelbach
Associate Professor of Law

Leo Katz
Frank Carano Professor of Law

Seth Kreimer
Kenneth W. Gemmill Professor of Law

Howard Lesnick
Jefferson B. Fordham Professor of Law

Charles W. Mooney Jr.
Charles A. Heimbold, Jr. Professor of Law

Stephen J. Morse
Ferdinand Wakeman Hubbell Professor of Law;
Professor of Psychology and Law in Psychiatry

Stephen Perry
John J. O'Brien Professor of Law

6

Chris William Sanchirico
Samuel A. Blank Professor of Law, Business, and Public Policy

Reed Shuldiner
Alvin L. Snowiss Professor of Law

Amy Wax
Robert Mundheim Professor of Law

February 18, 2015

*Titles are listed for institutional affiliation purposes only and do not indicate the approval of the University of Pennsylvania or Penn Law*

7

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 02, 2017 5:45 PM |
| **To:** | Menashi, Steven |
| **Subject:** | Lawsuit numbers |

Steve

**AC DPP**

# AC DPP

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

AR_00000385

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 02, 2017 10:02 PM |
| **To:** | Hahn, Nicholas |
| **Subject:** | The Misguided Idea of the War Over Campus Sexual Assault |

Nick - this new piece is by one of the experts we hosted at our T9 Summit. It is excellent in laying things out; could be really useful. She's a self-labeled feminist, though she represents both complainants and respondents in these situations and has dealt first hand with the ways process failures affect both.

http://m.huffpost.com/us/entry/us_59827310e4b094ff5a3f0bbc/amp?ncid=engmodushpmg00000004

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

**Laura Dunn**

| | |
|---|---|
| **From:** | Laura Dunn |
| **Sent:** | Thursday, August 03, 2017 11:15 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: HuffPost piece |
| **Attachments:** | OCR Case examples.docx |

Hello Candice,

This appears to be a marketing piece placed to raise the profile of a firm and an attorney who are not well known in this space. Many of the suggestions are already things prescribed under federal law and guidance as well. Her complainant about schools still playing games with both sides is valid, which is why enforcement of existing law and guidance matters most. I do agree with her conclusion that both parties, accuser and accused, have similar interests in a fair process on campus and should not be set up to oppose each other. This is basically what the ABA CJS Task Force realized, hence our ability to come to consensus efforts.

Moving forward, I want to flag that SurvJustice and EROC come from perspectives. SurvJustice is a nonpartisan legal organization staffed by attorneys who focus on policies and procedures regardless of politics, whereas EROC is a student support organization run by activists who align more with the traditional women's rights coalition around such issues. I believe both our perspectives are valuable, but they are distinctly different so it may be worthwhile to create a separate conversational space moving forward to offer our differing perspectives.

Attached, please find a quick summary regarding some of our cases with retaliatory cross complaints and due process lawsuits resulting in remands to complicate cases. These are just a sampling as this is a growing trend and many cases are actively being processed still.

I am out all next week on vacation, but look forward to speaking tomorrow.

Sincerely,

Laura L. Dunn, J.D.
Founder & Executive Director
*she/her/hers

P.S. Giving $5 or more will help SurvJustice win a $5,000 bonus through the Macy's Crowdrise - please give today: https://tinyurl.com/SurvJustice-5give

*"Injustice anywhere is a threat to justice everywhere."* ~ Rev. Martin Luther King, Jr.

SurvJustice, Inc. • 1015 15th Street NW, Suite 632 • Washington, D.C. • 20005

Office: 202-869-0699 • Fax: 202-869-0696

www.survjustice.org

@SurvJustice

**CONFIDENTIALITY NOTICE**

This electronic mail message contains information that is or may be legally privileged, confidential, proprietary in nature, or otherwise protected by law from disclosure, and is intended only for the use of the addressee(s) named below. If you are not the intended recipient, an addressee, or the person responsible for delivering this to an addressee, please be advised that reading, using, copying, or distributing any part of this message is strictly prohibited. If you have received this electronic mail message in error, please contact me immediately and take the steps necessary to delete the message from your system.

On Thu, Aug 3, 2017 at 8:16 AM, Jackson, Candice <Candice.Jackson@ed.gov> wrote:

http://m.huffpost.com/us/entry/us_59827310e4b094ff5a3f0bbc/amp?ncid=engmodushpmg00000004

Hello Laura, Jess, Annie! I spotted this piece last night and I'd love to hear your responses to it. I know we have a call together soon, but feel free to email any thoughts on the meantime, or to save for discussion. I'm curious what you think of the tone, approach, and specific proposals.

Many thanks!
Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

AR_00000388

## TITLE IX
## Frivolous Cross Claims

**Ohio:** After the Complainant reported a sexual assault to local police and informally reported to a university in official the Accused student filed a cross-complaint of sexual assault with the university and local police upon the advice of his defense attorney, which he admitted on the record during a campus hearing. SurvJustice helped the complainant file a retaliation complaint for this bad-faith report, but the school proceeded anyways. Ultimately, the university found accused student responsible for sexual assault and determined that the Complainant did not violate school policy in any way, but also did not find the accused student had engaged in retaliation despite his admission during the hearing. The university suspended the Accused student until after the Complainant graduates.

**Indiana:** The Complainant reported dating violence, stalking, and sexual harassment by her ex-boyfriend to a university. The university subsequently found the Accused student responsible for four school policy violations, including dating violence, and suspended him with the opportunity to apply for readmission. During the campus hearing, the Accused student admitted to stealing the Complainant's keys and breaking into her car to move it around as a way to retaliate against her for not dating him again. Upon his appeal, the university upheld his sanctions. However, the Accused then filed a retaliatory false complaint alleging that the Complainant for "damaged his reputation" and violating the No Contact Order that was put in place to protect her. Instead of dismissing the retaliatory complaint outright, given that the Accused student had already been found responsible for dating violence, the university withheld the Complainant's diploma and forced her to defend herself during a lengthy investigation process which is culminating in a forthcoming hearing. Complainant's job prospects are being harmed during this process as she cannot say she has graduated yet.

**New Hampshire:** The Complainant had been dating the accused student for a year when he pushed her at a winter dance in front of witnesses. Thereafter, he started to stalk her and attempted to break into her dorm room as part of a pattern of dating violence. The Complainant reported the accused student for attempting to break through a window of her residence hall, which resulted in a no contact order. The school facilitated couples counseling between the parties before lifting the no contact order, but shortly thereafter the accused student entered the residence hall of the Complainant and violently raped her until roommates intervened. The local police investigated and the campus found the student responsible resulting in a suspension. When the prosecutor sought charges, the accused student threatened to file campus charges against the Complainant if she did not drop the charges. When the prosecutor sought to move forward with the case, the accused student filed a cross-complaint with the school for the same incident he had been found responsible for, which resulted in her being found responsible and expelled. A civil lawsuit is now pending by the victim for violations of Title IX.

## Due Process Case Remands

**New York:** During her last week of college, a fellow classmate sexually assaulted "Sarah" on SUNY Cortland's campus. Sarah had been drinking at a bar when she ran into the student, danced with him, consensually kissed him, and gave him her number to connect on a later date. Upon leaving the bar, Sarah realized she had been abandoned by her friend, whom she called to ensure she could get picked up. The accused student offered to have her wait at his home for her friend, so they left the bar together. Upon entering his home to wait for her ride, the accused asked her back to his room and put his hockey helmet on her while they talked and joked. Upon placing the helmet on her, the accused got sexually aggressive and Sarah felt unable to get away from him. She started texting friends asking for them to come sooner and help her, but the accused pushed her onto the bed, got on top of her, knocked the phone from her hand, and proceeded to rape her. SUNY found him responsible for sexual assault, and he appealed through the civil courts and won a remand with increased due process protections. SUNY then adjudicated the matter again and found him responsible again. He recently appealed the case through civil courts and unanimously lost his most recent appeal in Spring 2017. Through this four year experience, Sarah has had to repeatedly travel across the country to attend campus hearings and has had to retain civil counsel to intervene in the civil lawsuit given the implications of her rights and privacy as a third party during these appeals.

**Rhode Island:** One day the Complainant got a text message from a fellow student who participated in the same student group. She had never given him the number, but he had tracked her down through the student group. He proceeded to engage her in sexual conversation, which led to her making clear she had a boyfriend and was not interested in anything occurring. To ensure there was no awkwardness during student group events, Complaint agreed to watch a movie as friends in a public place with the fellow student. When she arrived, the student brought her to a secluded room in a campus building and proceeded to sexually assault her without consent. The Complainant reported to campus and he was found responsible. Upon appeal, the school held its decision until a pending civil lawsuit by the accused student had been fully adjudicated. The lawsuit ended in a remand, but the school did not make a decision on the appeal. The Complainant reasserted her complaint and the accused student chose to un-enroll to avoid a new campus hearing.

**Indiana:** After the school suspended an accused student for dating violence, stalking, and harassment, he filed a civil injunction and related lawsuit. This lawsuit gained media attention, which resulted in alarm and distress to the Complainant. Although the lawsuit remains, the accused student obtained an injunction that permitted him to return to campus to take his final exams, which caused the Complainant alarm and distress as the school had refused to provide accommodations, such as a safer parking lot spot, to avoid running into the accused who had previously stalked and harassed her in campus parking lots.

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, August 03, 2017 11:53 AM |
| **To:** | Hahn, Nicholas |
| **Subject:** | Due process failure details |
| **Attachments:** | OCR Case examples.docx; ATT00001.htm |

Nick - this was some further info I was waiting to receive from a [DPP] survivor advocacy group. There's some [DPP] here. Thanks! Happy to discuss any time.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

## TITLE IX
## Frivolous Cross Claims

**Ohio:** After the Complainant reported a sexual assault to local police and informally reported to a university in official the Accused student filed a cross-complaint of sexual assault with the university and local police upon the advice of his defense attorney, which he admitted on the record during a campus hearing. SurvJustice helped the complainant file a retaliation complaint for this bad-faith report, but the school proceeded anyways. Ultimately, the university found accused student responsible for sexual assault and determined that the Complainant did not violate school policy in any way, but also did not find the accused student had engaged in retaliation despite his admission during the hearing. The university suspended the Accused student until after the Complainant graduates.

**Indiana:** The Complainant reported dating violence, stalking, and sexual harassment by her ex-boyfriend to a university. The university subsequently found the Accused student responsible for four school policy violations, including dating violence, and suspended him with the opportunity to apply for readmission. During the campus hearing, the Accused student admitted to stealing the Complainant's keys and breaking into her car to move it around as a way to retaliate against her for not dating him again. Upon his appeal, the university upheld his sanctions. However, the Accused then filed a retaliatory false complaint alleging that the Complainant for "damaged his reputation" and violating the No Contact Order that was put in place to protect her. Instead of dismissing the retaliatory complaint outright, given that the Accused student had already been found responsible for dating violence, the university withheld the Complainant's diploma and forced her to defend herself during a lengthy investigation process which is culminating in a forthcoming hearing. Complainant's job prospects are being harmed during this process as she cannot say she has graduated yet.

**New Hampshire:** The Complainant had been dating the accused student for a year when he pushed her at a winter dance in front of witnesses. Thereafter, he started to stalk her and attempted to break into her dorm room as part of a pattern of dating violence. The Complainant reported the accused student for attempting to break through a window of her residence hall, which resulted in a no contact order. The school facilitated couples counseling between the parties before lifting the no contact order, but shortly thereafter the accused student entered the residence hall of the Complainant and violently raped her until roommates intervened. The local police investigated and the campus found the student responsible resulting in a suspension. When the prosecutor sought charges, the accused student threatened to file campus charges against the Complainant if she did not drop the charges. When the prosecutor sought to move forward with the case, the accused student filed a cross-complaint with the school for the same incident he had been found responsible for, which resulted in her being found responsible and expelled. A civil lawsuit is now pending by the victim for violations of Title IX.

## Due Process Case Remands

**New York:** During her last week of college, a fellow classmate sexually assaulted "Sarah" on SUNY Cortland's campus. Sarah had been drinking at a bar when she ran into the student, danced with him, consensually kissed him, and gave him her number to connect on a later date. Upon leaving the bar, Sarah realized she had been abandoned by her friend, whom she called to ensure she could get picked up. The accused student offered to have her wait at his home for her friend, so they left the bar together. Upon entering his home to wait for her ride, the accused asked her back to his room and put his hockey helmet on her while they talked and joked. Upon placing the helmet on her, the accused got sexually aggressive and Sarah felt unable to get away from him. She started texting friends asking for them to come sooner and help her, but the accused pushed her onto the bed, got on top of her, knocked the phone from her hand, and proceeded to rape her. SUNY found him responsible for sexual assault, and he appealed through the civil courts and won a remand with increased due process protections. SUNY then adjudicated the matter again and found him responsible again. He recently appealed the case through civil courts and unanimously lost his most recent appeal in Spring 2017. Through this four year experience, Sarah has had to repeatedly travel across the country to attend campus hearings and has had to retain civil counsel to intervene in the civil lawsuit given the implications of her rights and privacy as a third party during these appeals.

**Rhode Island:** One day the Complainant got a text message from a fellow student who participated in the same student group. She had never given him the number, but he had tracked her down through the student group. He proceeded to engage her in sexual conversation, which led to her making clear she had a boyfriend and was not interested in anything occurring. To ensure there was no awkwardness during student group events, Complaint agreed to watch a movie as friends in a public place with the fellow student. When she arrived, the student brought her to a secluded room in a campus building and proceeded to sexually assault her without consent. The Complainant reported to campus and he was found responsible. Upon appeal, the school held its decision until a pending civil lawsuit by the accused student had been fully adjudicated. The lawsuit ended in a remand, but the school did not make a decision on the appeal. The Complainant reasserted her complaint and the accused student chose to un-enroll to avoid a new campus hearing.

**Indiana:** After the school suspended an accused student for dating violence, stalking, and harassment, he filed a civil injunction and related lawsuit. This lawsuit gained media attention, which resulted in alarm and distress to the Complainant. Although the lawsuit remains, the accused student obtained an injunction that permitted him to return to campus to take his final exams, which caused the Complainant alarm and distress as the school had refused to provide accommodations, such as a safer parking lot spot, to avoid running into the accused who had previously stalked and harassed her in campus parking lots.

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, August 03, 2017 3:16 PM |
| **To:** | Hahn, Nicholas |
| **Subject:** | Fwd: DRAFT-DELIBERATIVE |
| **Attachments:** | Preamble Letter Draft 7-31-17.docx; ATT00001.htm |

# DPP
Thanks Nick.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

AR_00000394

# DPP

# DPP

# DPP

AR_00000397

# DPP

# DPP

AR_00000399

# DPP

# DPP

AR_00000401

# DPP

# DPP

# DPP

# DPP

# DPP

# DPP

**Jeff Nolan**

| | |
|---|---|
| **From:** | Jeff Nolan |
| **Sent:** | Thursday, August 03, 2017 4:00 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Promoting Fairness in Trauma-Informed Investigation Training |
| **Attachments:** | Promoting Fairness in Trauma-Informed Investigation Training (B1728952xA047C).pdf |

Dear Acting Assistant Secretary Jackson:

Please find attached a white paper on the topic that we discussed during our meeting a couple of weeks ago. I hope it is helpful and responsive to your request for more information about the topic. I can easily go into much more detail and provide many more examples of how a trauma-informed approach can be employed effectively and fairly in the college and university disciplinary context, and hope you will let me know if a more extended treatment of the topic in writing would be helpful. Alternatively or additionally, if another meeting with you and/or others to follow up might be helpful, I would be very happy to be involved in that as well. I look forward to any comments and feedback you might have, and to any opportunity to provide further information. Thank you for giving me the opportunity to submit the white paper.

Best,

Jeff



**Jeffrey J. Nolan, Esq.**
*Director*

Dinse, Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402
W: 802-864-5751
jnolan@dinse.com | Bio

**Disclaimer**

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and confidential information intended only for the individual or entity named above. Any dissemination, use, distribution, copying or disclosure of this communication by any other person or entity is strictly prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-864-5751) and return the original transmission to problem@dinse.com.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**.



## Promoting Fairness in Trauma-Informed Investigation Training

### Jeffrey J. Nolan, Esq.[1]

### Dinse, Knapp & McAndrew, P.C.
www.dinse.com

### Summary

In recent years, colleges and universities have recognized that the quality of their investigations of reported sexual assault and intimate partner violence can be enhanced if they take account of the neurobiological effects of trauma and understand related behaviors that may be displayed by complainants in some cases. Institutions appropriately have sought and received training for their investigators and adjudicators on these issues. This white paper summarizes briefly how trauma-informed training can be presented in a manner that is fully balanced and promotes fairness for both complainants and respondents.

### Background

Trauma-informed investigation and adjudication training programs usually start by sharing information about the neurobiological effects of trauma. Typically, training program participants learn about how chemicals such as catecholamines, corticosteroids, oxytocin and endogenous opioids may be released into the bloodstream in response to trauma, and how these substances can interfere with the functioning of those portions of the brain (e.g., the hippocampus and amygdala) that are involved with the encoding of memory. Participants learn

---

[1] The views expressed in this white paper are the author's, and do not necessarily represent the views of any client or entity for or through which the author has provided training.

AR_00000409



that individuals who have experienced a traumatic event therefore may not be able to recall details of the event in a synchronous manner, that they may not be able to recall some details at all, that recollection of details may improve over time, and that their affect when describing the event may initially seem evasive or counterintuitive (e.g., laughing, smiling, or emotionless). Participants usually often learn that hormone-driven responses to traumatic situations may include fighting, fleeing, or freezing (i.e., tonic immobility).[2]

As background, training programs often address how traditional law enforcement interview approaches historically were unsupportive and skeptical, and failed to account for the neurobiological effects of trauma.  The effects of trauma were often misperceived by police officers as attempts at evasion and falsification, which caused officers to unfairly doubt the veracity of reporting parties.[3]  The resulting interaction often discouraged reporting parties from participating in criminal prosecutions.  Videos featuring Dr. Rebecca Campbell, law enforcement officers and prosecutors that were produced for a law enforcement audience explain these issues well and encourage law enforcement officers to create a more "supportive" environment for reporting parties, but understandably, use customary law enforcement terminology such as

---

[2]  The work of Rebecca Campbell, Ph.D., a Professor of Psychology at Michigan State University, is cited routinely on these topics.  *See*, *e.g.*, "The Neurobiology of Sexual Assault", Rebecca Campbell, Ph.D., National Institute for Justice Research for the Real World Seminar (December 3, 2012) (available at: https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx).

[3]  *See* "Interview with Dr. Rebecca Campbell on the Neurobiology of Sexual Assault, Part I: Telling the difference between trauma versus lying", National Institute of Justice, (available at: https://nij.ncjrs.gov/multimedia/video-campbell.htm).

AR_00000410

  


"victim", "survivor" and "suspect".[4]  Such videos are routinely used in trauma-informed training programs for college and university audiences.

Training program participants also often learn that interview approaches such as the Forensic Experiential Trauma Interview ("FETI") technique have been developed to account for the potential effects of trauma on memory, by focusing on what a witness is able to recall about their experience and related sensory details, rather than demanding that the witness "start at the beginning" and recount all of the details of the event in a complete, synchronous manner.[5] Training often includes examples of how trauma-informed and FETI techniques have resulted in better outcomes and more thorough investigations in the criminal justice context, because reporting parties are encouraged to attempt to provide the information that they are able to provide, rather than abandoning the process in frustration because they cannot immediately convince a skeptical police officer by providing a seamless narrative of the event.

Complimentary topics that are often addressed in trauma-informed training programs include: that a delay between the time of an event and when it is reported is common: that

---

[4]      *See id.  See also* "Sexual Assault: A Trauma-Informed Approach to Law Enforcement First Response," Michigan Domestic and Sexual Violence Prevention and Treatment Board (available at: https://www.youtube.com/watch?v=gtWD1XJrhNo).

[5]      The FETI technique was developed by Russell W. Strand (Retired Senior Special Agent and Retired Chief, Behavioral Sciences Education & Training Division, United States Army Military Police School. *See, e.g.,* "The Forensic Experiential Trauma Interview (FETI)," available at: http://www.mncasa.org/assets/PDFs/FETI%20-%20Public%20Description.pdf.  In sum, the FETI technique involves: the interviewer's first asking the witness "what are you able to tell me about your experience?"; listening patiently and allowing the witness to share whatever they are able to share initially; asking the witness to "tell the investigator more" about a topic area without aggressively cross-examining the witness or demanding a chronological account; asking about the witness's feelings and thought process during the experience; asking the witness what sensory information they are able to recall, asking about the witness's physical and emotional reaction to the experience; asking what was the most difficult part of the experience and what the witness cannot forget about the experience; then circling back to seek clarification of important or potentially contradictory points, after the witness has been encouraged to share their experience as completely as they are able to through the open-ended interview approach described here.  *See id.* at 3.

3



"counterintuitive" behaviors such as a reporting party's continuing to have contact with the alleged perpetrator after a reported sexual assault or intimate partner violence incident is also common; that investigators should avoid phrasing questions in a victim-blaming manner (e.g., "why didn't you call for help, fight back or run away?"); and that interviewing complainants in a respectful, professional, non-judgmental manner can result in their engaging more effectively in the investigation and adjudication process.

**<u>Promoting Fairness to All Parties in a Trauma-Informed Investigation</u>**

Obviously, the role of police officers and prosecutors in sexual assault and intimate partner violence cases is distinct from that of college and university investigators and adjudicators. Police officers and prosecutors work to establish probable cause and advocate for criminal convictions, but they do not determine as ultimate fact-finders whether the law was violated. By contrast, campus fact-finders must maintain complete neutrality at all times in evaluating reported violations of institutional policies. If training program participants learn how police officers and advocates apply trauma-informed principles to correct historical failings in the criminal justice system's response to sexual assault and intimate partner violence, without also learning how such principles need to be adapted to the distinct context of campus disciplinary proceedings, then unfairness to respondents, real or perceived, could result.[6]

---

[6]     *See, e.g., Doe v. Brown University*, 210 F.Supp.3d 310, 317, 326, 341 (2016) (in a non-binding portion of its decision, the court criticized the fact that a Title IX panel member essentially refused to consider the complainant's potentially exculpatory post-incident text messages and behavior, because the panel member believed she did not have the expertise to evaluate such evidence in light of statements made by a victims' advocate during training to the effect that victims of trauma often engage in "counterintuitive" behaviors (e.g., continuing to communicate with an alleged perpetrator after an assault, and "not being able to recount a consistent set of facts");

AR_00000412



Fortunately, a trauma-informed investigation and adjudication approach can be adapted appropriately to, and be applied fairly in, the college and university disciplinary context. The goal of doing so is to promote more complete and nuanced gathering and understanding of complex factual scenarios, which should benefit all parties. Training for investigators and adjudicators can explain how this goal may be accomplished.

First, it should be emphasized in training that while it would not be appropriate for a neutral fact-finder to be actively "supportive" of either a complainant or a respondent in a campus disciplinary proceeding (that role can be played by counselors and advocates, on or off campus), fact-finders can learn from the trauma-informed approach yet maintain impartiality by treating all parties and witnesses in a professional, respectful, non-judgmental manner. It is important to do so because the investigation and adjudication process is likely to cause significant stress to both complainants and respondents, and complainants may additionally be experiencing the effects of trauma (whether or not the evidence ultimately establishes a policy violation). Further, if instructional videos created for law enforcement officers but used in a campus training program advocate for an investigative approach that is actively "supportive" of "victims" in a way that could undermine a respondent's perception of fair treatment if applied without qualification in a campus proceeding, the differences in context should be emphasized in the campus training program.

---

the court emphasized that while it was not suggesting that the University could not train fact-finders on the effects of trauma, it should remind them that all evidence presented had been deemed relevant, and that as fact-finders, they were capable of and obligated to consider all evidence).

AR_00000413



Second, if instructional videos created for law enforcement officers that are used in campus training programs employ customary "victim", "survivor" and "suspect" terminology, the differences in context should, again, be emphasized. College and university investigators and adjudicators are certainly capable of learning from such videos while substituting more neutral "complainant" and "respondent" terminology in their thinking and communications about campus proceedings. The point should be made in campus training, however, to eliminate any perception of bias.

Third, it should be emphasized in campus training that while the neurobiological effects of trauma may result in asynchronous recall, gaps in memory, reporting delays, tonic immobility and counterintuitive behaviors by complainants, the reason colleges and university investigators and adjudicators need to understand these phenomena is so that they will not unfairly dismiss a complainant's account simply because such issues are present. However, the fact that such phenomena may potentially be present in a case should not be understood as establishing that institutional policy was necessarily violated, nor should the presence of such issues cause fact-finders to accept everything a complainant is able to recall as absolutely "true", or fail to seek clarification of inconsistencies. In other words, a basic understanding of trauma-related research can help fact-finders avoid misinformed judgments about counterintuitive behaviors and memory-related issues, but fact-finders should not substitute scientific findings for evidence, or abdicate their fact-finding responsibility, when determining whether a policy violation occurred in a particular case.

6



Fourth, training should emphasize that it is both equitable and appropriate to use the same basic interview approach with complainants and respondents. While the FETI technique was developed primarily to gather a more robust evidentiary portrait of how individuals experienced a potentially traumatic event, respondents (who are likely experiencing stress during an interview, if not trauma) can also be given the same opportunity to describe what they are able to remember about the experience, to describe their thought process and sensory perceptions, and to respond to respectfully-phrased clarifying questions regarding inconsistencies. Indeed, Russell Strand, developer of the FETI technique, suggests that the technique can be used effectively in suspect interviews even in the criminal justice context.[7]  Given this, there is simply no good reason not to use a similarly open-ended approach in complainant and respondent interviews, so long as, again, clarification of inconsistencies is sought from both parties.

Finally, with regard to the complimentary topics that are often addressed in trauma-informed training programs, they should be framed in a balanced manner. For example, a delay in reporting may or may not be probative of whether a policy violation occurred, but if the issue seems potentially relevant to an investigator or a respondent, a complainant can certainly be asked respectfully about their thought process with regard to reporting the incident when they chose to do so. As another example, if a complainant has engaged in apparently "normal" communications with a respondent after a reported assault, it is perfectly appropriate for an investigator, in a non-judgmental way, to ask the complainant to "help the investigator

---

[7]      *See* "Turning the Case Upside Down—Rethinking the Art and Science of Suspect Interviews—Suspect FETI" (webinar), presented by Russell W. Strand for the Battered Women's Justice Project (published January, 2017, available at: http://www.bwjp.org/resource-center/resource-results/turning-the-case-upside-down.html).

AR_00000415



understand" the complainant's thought process in doing so. Fact-finders can then consider the evidence of potentially "counterintuitive" behavior and the complainant's explanation of that behavior along with all of the other evidence gathered in the investigation. Similarly, while a balanced approach should never require investigators to phrase questions of a complainant in a judgmental "why did you, why didn't you?" manner, if a complainant's behaviors during or after a reported assault are relevant, the complainant can be asked respectfully about what they were feeling, thinking and experiencing at a given moment, so that fact-finders can factor the complainant's response into their overall assessment of the evidence.

The most crucial point to be made in training regarding these issues is that general statements about how <u>some</u> complainants may behave as a result of trauma or related issues should not be substituted for a fact-finder's assessment of the specific evidence in a particular case.

**<u>Conclusion</u>**

Applying the lessons learned from scientific research on the neurobiological effects of trauma can enhance the quality of college and university investigations and adjudications of sexual assault and intimate partner violence. All parties can benefit if trauma-informed training is provided in a manner that is fair, balanced, nuanced, and adapted appropriately to the context of college and university disciplinary proceedings.

AR_00000416

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Friday, August 04, 2017 1:53 PM |
| **To:** | Jackson, Candice; Sherman, Brandon |
| **Subject:** | Draft/Deliberative |
| **Attachments:** | Dear Colleague 8-4-17.docx |

AR_00000417

# AC WP DPP

# AC WP DPP

AR_00000419

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, August 04, 2017 2:56 PM |
| **To:** | Menashi, Steven; Eitel, Robert; Hill, Elizabeth; Bailey, Nathan; Venable, Joshua; Sherman, Brandon; James, David; Lee, Ebony |
| **Subject:** | Fwd: Draft/Deliberative |
| **Attachments:** | dear colleague 8-4-17.docx; ATT00001.htm |

Project letter draft is attached, as drafted by **AC DPP** change made.

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Henderson, Chelsea" <Chelsea.Henderson@ed.gov>
> **Date:** August 4, 2017 at 2:40:48 PM EDT
> **To:** "Jackson, Candice" <Candice.Jackson@ed.gov>
> **Subject: RE: Draft/Deliberative**

> ---
> **From:** Jackson, Candice
> **Sent:** Friday, August 04, 2017 2:35 PM
> **To:** Henderson, Chelsea
> **Subject:** Fwd: Draft/Deliberative

> Candice Jackson
> Office for Civil Rights
> U.S. Dept. of Education
> *Sent from my iPhone*

> Begin forwarded message:

>> **From:** "Menashi, Steven" <Steven.Menashi@ed.gov>
>> **Date:** August 4, 2017 at 1:52:31 PM EDT
>> **To:** "Jackson, Candice" <Candice.Jackson@ed.gov>, "Sherman, Brandon" <Brandon.Sherman@ed.gov>
>> **Subject: Draft/Deliberative**

# AC DPP

# AC DPP

**Sherman, Brandon**

| | |
|---|---|
| **From:** | Sherman, Brandon |
| **Sent:** | Friday, August 04, 2017 3:32 PM |
| **To:** | Jackson, Candice; Menashi, Steven; Eitel, Robert; Hill, Elizabeth; Bailey, Nathan; Venable, Joshua; James, David; Lee, Ebony |
| **Subject:** | RE: Draft/Deliberative |
| **Attachments:** | Dear Colleague 8-4-17.BSS.docx |

# AC DPP

Brandon

---

**From:** Jackson, Candice
**Sent:** Friday, August 04, 2017 2:56 PM
**To:** Menashi, Steven; Eitel, Robert; Hill, Elizabeth; Bailey, Nathan; Venable, Joshua; Sherman, Brandon; James, David; Lee, Ebony
**Subject:** Fwd: Draft/Deliberative

# AC DPP

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Henderson, Chelsea" <Chelsea.Henderson@ed.gov >
> **Date:** August 4, 2017 at 2:40:48 PM EDT
> **To:** "Jackson, Candice" <Candice.Jackson@ed.gov >
> **Subject: RE: Draft/Deliberative**

---

**From:** Jackson, Candice
**Sent:** Friday, August 04, 2017 2:35 PM
**To:** Henderson, Chelsea
**Subject:** Fwd: Draft/Deliberative

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Menashi, Steven" <Steven.Menashi@ed.gov>
> **Date:** August 4, 2017 at 1:52:31 PM EDT
> **To:** "Jackson, Candice" <Candice.Jackson@ed.gov>, "Sherman, Brandon"
> <Brandon.Sherman@ed.gov>
> **Subject: Draft/Deliberative**

AR_00000424

# AC DPP

# AC DPP

AR_00000426

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Sunday, August 06, 2017 11:08 AM |
| **To:** | Karvonides, Mia |
| **Subject:** | Fwd: Draft Intro/Preamble |
| **Attachments:** | Clarification re Title IX and Sexual Violence.Clean.07-31-17.docx; ATT00001.htm; Clarification re Title IX and Sexual Violence.Tracked.07-31-17.docx; ATT00002.htm |

FYI

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Ashley, Carol" <Carol.Ashley@ed.gov>
> **Date:** July 31, 2017 at 7:12:56 PM EDT
> **To:** "Henderson, Chelsea" <Chelsea.Henderson@ed.gov>, "Faiella, Matt"
> <Matt.Faiella@ed.gov>, "Reyes, Alejandro" <Alejandro.Reyes@ed.gov>, "Patel, Shiwali"
> <Shiwali.Patel@ed.gov>, "Wheeler, Joseph" <Joseph.Wheeler@ed.gov>, "Gettler, Rachel"
> <Rachel.Gettler@ed.gov>, "Battle, Sandra" <Sandra.Battle@ed.gov>, "Yao, Alice"
> <Alice.Yao@ed.gov>, "Sherman, Brandon" <Brandon.Sherman@ed.gov>, "Wills, Randolph"
> <Randolph.Wills@ed.gov>, "Chang, Lisa" <Lisa.Chang@ed.gov>
> **Cc:** "Jackson, Candice" <Candice.Jackson@ed.gov>
> **Subject: RE: Draft Intro/Preamble**
>
> Hi All,
>
> ```
> DPP
> ```
>
> Thanks for all your work on the draft!
>
> Carol
>
> ---
> **From:** Henderson, Chelsea
> **Sent:** Friday, July 28, 2017 2:42 PM
> **To:** Faiella, Matt; Reyes, Alejandro; Patel, Shiwali; Wheeler, Joseph; Gettler, Rachel; Battle, Sandra; Yao, Alice; Sherman, Brandon; Wills, Randolph; Ashley, Carol; Chang, Lisa
> **Cc:** Jackson, Candice
> **Subject:** RE: Draft Intro/Preamble
>
> Attached.
>
> **From:** Henderson, Chelsea

AR_00000427

**Sent:** Friday, July 28, 2017 2:41 PM
**To:** Faiella, Matt; Reyes, Alejandro; Patel, Shiwali; Wheeler, Joseph; Gettler, Rachel; Battle, Sandra; Yao, Alice; Sherman, Brandon; Wills, Randolph; Ashley, Carol; Chang, Lisa
**Cc:** Jackson, Candice
**Subject:** Draft Intro/Preamble

Hi everyone,

I just wanted to make sure this draft was circulated to all (b)(5) who participated in our T9 Team + HQ (b)(5) Enforcement meetings. Thanks to (b)(5) Title IX team for putting it together.

Have a great weekend,
Chelsea


Chelsea C. Henderson
Office for Civil Rights
US Department of Education
O: 2024535799
C: 2027147942
E: Chelsea.Henderson@ed.gov

# DPP

AR_00000429

# DPP

# DPP

AR_00000431

# DPP

AR_00000432

# DPP

# DPP

AR_00000434

# DPP

AR_00000435

# DPP

**Alice Wagner**

| | |
|---|---|
| **From:** | Alice Wagner |
| **Sent:** | Sunday, August 06, 2017 8:17 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Alice Wagner |
| **Attachments:** | Title IX Investiation Proceedings Final .pdf |

Hi Ms. Candice Jackson,

I hope all is well and moving nicely along with changes to Title IX.  I completed the proposal of the concept we spoke about on July 25, 2017.  I believe it will be a viable option for reducing False Allegations in the beginning of the complaint.

Please let me know your thoughts and any changes you feel are needed. I can add or change anything you feel is needed.

I will be in **PII** but will check my emails if possible. I am not sure about internet service i **PII** Could you please reply that you received this proposal?

Best Regards,
Alice Wagner
**PII**
texting is ok



A proposal on case proceedings for complaints of sexual harassment, assault, and rape

Title IX

Complaint Case Procedures and Guidelines

Alice Wagner

AR_00000438

# Content

- Purpose of this concept/proposal
    - Amending Laws
    - Confirmation Bias
- Compliance Officer Training
    - Compliance Team
    - Initial Intake Counseling
- Complainant's Written Summary Submitted
- Respondent's Written Summer Submitted
- Review of Complaint: Mediation, Internal investigation and Criminal Court
    - Appeal Process
    - Additional Components

AR_00000439

# What is the purpose of this concept in case proceedings of sexual and physical assault cases?

The purpose of this concept is to provide a fair and balance proceeding in handling sexual and physical assault cases. The suggested case proceeding does not reflect amendments needed of the laws that steers filing of an EEOC complaint. Modifying public law verbiage on sexual harassment, rape, and physical assault must be written in clear and concise language that are measurable evidence based standards. If this proposal is a viable option, the next step would be to amended the laws associated with this proposal.

What this proposal does do is offer a proceeding that has potential to weed out any claims that do not have merit or meets the criteria of the standards of the law. Hopefully giving more credence to true victim of sexual harassment, assault, and physical assault. It provides a fair and balanced review of the initial compliant being submitted in which all parties involved in a claim receive due process.

Amending laws to be more measurable by using evidence based standards.

Items to address prior to establishing case proceeding manual.

_____

1. Standards of evidence based laws

   ➢ Sexual harassment

   ➢ Physical Assault

   ➢ Rape

* In order to implement the suggested complaint process it is imperative that sexual and physical assault/harassment laws be written as evidence based standards that are measureable. Statistics on rape and sexual harassment cases are ambiguous and not sufficiently measurable.

* An allegation can not be *uncertain or questionable in nature. A case can not be taken unless there is a way to quantify the accusation.*

# What is confirmation bias and why is it dangerous?

Before implementing the DOE Civil Rights case manual proceeding in handling rape, sexual harassment, and assaults forming a team that prevents bias towards a specific group should be address. This proposal suggest to form a compliance team that will review the intake complaint and response from the accused to assess the validity of the accusation as it pertains to the specific law.

* A compliance team will consist of a three person panel in order to provide balance. The panel will meet to discuss the findings and make a collaborative decision on next steps. In the article, "Avoiding Psychological Bias in Decision Making" it states, psychological bias is the tendency to make decisions or take action in an unknowingly irrational way. To overcome it, look for ways to introduce objectivity into your decision making, and allow more time for it." Hence, a compliance team will need to take time to assess the complaint. The article suggest to, "use tools that help you assess background information systematically, surround yourself with people who will challenge your opinions, and listen carefully and empathetically to their views – even when they tell you something you don't want to hear". Working with a team from different backgrounds will help eliminate bias decision based on employers' agenda. It mentions that *confirmation bias* "happens when you look for information that supports your existing beliefs, and reject data that go against what you believe." This can lead making biased decisions, because people don't factor in all of the relevant information. According a 2013 study, "it found that confirmation bias can affect the way that people view statistics. Its authors report that people have a tendency to infer information from statistics that supports their existing beliefs, even when the data support an opposing view." That makes confirmation bias a potentially serious problem to overcome when people need to make a non-bias based decision. In order to avoiding psychological bias in decision making the team should be made up of fair and balanced group of people trained in the area of the law associated with the complaint. If the decision is left to only one or two people that represent the University/Employer, then it can be assumed the decision as to next steps will be made in the best interest of the University/Employer.

* https://www.mindtools.com/pages/article/avoiding-psychological-bias.htm

* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2319992##

# Compliance Officer's Certification

## Required Course Work

* Sexual Harassment Law
* Rape Law
* Physical Assault Law
* False Allegation Law
* Mental Health Issues
* False Memories
* Non Bias Training
* Case Proceeding Manual
* Mediation Proceedings

## Job Description Requirement

* A compliance officer must be a certified trained personal that has received training in the course required curriculum.

* Degrees in Psychology or Administration. (?)

* Issued a Title IV Certification of Training or License.

AR_00000443

# Initial Intake Counseling

- Complainant brings an initial complaint to the Compliance Officer.

- Compliance Officer will meet with the complainant to discuss the proceeding in filing a claim.

- Complainant will be instructed of the case proceeding protocols.

- Three things will be discussed in the initial meeting:

  - ✓ Law pertaining to complaint – Made very clear to the complainant

  - ✓ Accountability Clause – for both sides

  - ✓ Written Complaint Form

- Complainant will be given a choice to proceed at this moment or bring the written form back in 72 hrs. if she/he wished to proceed. Counseling can be offered at this time to further discuss the alleged incident and understanding of the proceeding.

# Compliance Team

- A compliance team will consist of three person panel.

    - Compliance Officer – A highly qualified trained position in all areas of the law and case proceedings.

    - Outside Arbitrator – non biased impartial firm- the purpose of an arbitrator is to provide a fair review the findings. This arbitrator could be an EEOC mediator., but not employed by the DOE.

    - Law Enforcement - The purpose of a compliance team is to bring a balanced view to the case proceedings. Having a Law Enforcement officer take part in the review of the findings will help in deciding if the case should proceeds in the criminal courts.

AR_00000445

# Complainant's Written Statement Submitted

- A written signed complaint is submitted after the initial intake. The signed complaint has a check list that the following has taken place:
  - ✓ Law Provided with evidence based standards and initialed
  - ✓ Accountability clause was given and initialed
  - ✓ Written Statement is true and without malice and initialed.
- Complainant will be instructed that respondent will be given a chance to submit a written statement regarding the incident.
- Complainant will be advised that upon reviewing both statements a decision on how to proceed will be provided with 10 days, unless immediate intervention is warranted.

# Respondent's Written Statement Submitted

* Compliance Officer will provide within 24hrs upon receiving the complainant's written statement a request via a disciplinary letter to the respondent that a complaint has been submitted. Respondent may bring counsel/a union representative to the meeting.

* Compliance Officer will meet with the respondent within two days of notice.

* Respondent will be instructed of the case proceeding protocols.

* Three things will be discussed in the initial meeting:

    ✓ Law pertaining to complaint

    ✓ Accountability Clause

    ✓ Written Complaint Form

* Respondent will be advised of her/his rights to seek legal counseling and the claim being brought forward.

* Respondent will be required to submit a signed written statement of his/her account of the situation.

* Respondent will be given 72 hrs. to response to complaint.

* If Respondent does not respond to complaint in 72 hrs., the case will be issued to the Compliance Team for reviewed.

# Review of Complaint

- Compliance Team will meet to analysis the two written statements and evidences as it pertains to the law associated with the complaint.

- The team must decide on how the statements measure up to the standards set forth in the law as described by the complainant and respondent.

- The team will decide on three avenue of actions:

  - Mediation – all parties sit in one room to discuss and resolve the situation

  - Internal investigation – a thorough investigation of witness and make a determination of the findings.

  - Criminal Courts - case will be recommended to the criminal courts sector. This can only be done if the Law Enforcement Officer states that the findings warrant a criminal action.

# Appeal Process

* The compliance officer will meet with both parties to advise as to the proceeding the compliance team has recommended.

* The parties may appeal the decision within 5 days of the decision, unless the case will be handed over to the criminal courts.

* All parties will be kept in formed of the complaint being brought forward without compromising the investigation.

# Components that will follow if this proposal is considered a viable option.

- Mediation, Internal Investigation, and Criminal Court proceedings.

- Amendments to sexual harassment law, rape, and physical assault.

- Trainings to be addressed for Compliance Team members.

- Continued discussion on improving the rights of true victims of crimes.

- Diminishing false allegation with an accountability clause that is enforceable.

- Non Biased Mediator/ Arbitrator

- Appeal Process

AR_00000450

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Sunday, August 06, 2017 8:39 PM |
| **To:** | Jackson, Candice |
| **Subject:** | topics document first draft 08062017/confidential & privleged |
| **Attachments:** | topics document first draft 08062017.docx |

HI Candice –

I didn't get as far as I had hoped. In particular, I ran out of time to start including the citations to the 2001 (b)(5) guidance and the attached is really a rough, rough draft.  I hope that this is sufficient to help you prepare for the outline for the meeting tomorrow. I usually come in at 9 but I'll plan to be in the office by 8 tomorrow in case I can help as you prepare for your 10 a.m. meeting.

Good luck tonight - Mia

# DPP

# DPP

AR_00000453

# DPP

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Monday, August 07, 2017 10:13 AM |
| **To:** | Jackson, Candice |
| **Subject:** | hostile environment, etc |
| **Attachments:** | Document1.docx |



# DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 10:17 AM |
| **To:** | Karvonides, Mia |
| **Subject:** | Investigations sections |
| **Attachments:** | Q&A draft - Investigations sections.docx |

# DPP

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000457

# DPP

# DPP

AR_00000459

# DPP

# DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 10:47 AM |
| **To:** | Karvonides, Mia |
| **Subject:** | Draft for redlining |
| **Attachments:** | Q&A draft - Investigations sections.docx |

Thank you!

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000462

# DPP

# DPP

# DPP

# DPP

# DPP

AR_00000467

# DPP

AR_00000468

**Hans Bader**

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Monday, August 07, 2017 11:20 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Interesting Email ("Alarms should be sounding right now") |
| **Attachments:** | OCR investigation RA-Butte-College-09-13-2096.pdf; OCR investigation LOF-Butte-College-09-13-2096.pdf |

I received this interesting email below by being on an email list maintained by SAVE, about the resolution of an OCR Title IX investigation by a regional office in July.

The email refers to pre-Obama administrative rulings saying Title IX does not reach off-campus conduct. I don't know which rulings it is referring to, but it might be referring to rulings such as a 2004 ruling by OCR's Dallas office. That ruling noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." See Oklahoma State University letter of findings, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's contrary position, which it later used to find colleges such as Harvard Law School in violation of Title IX, was seemingly at odds with court interpretations of Title IX as *not* applying off campus. For example, a federal appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University,* 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's Davis decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party" (quoting *Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999)).

Harassment under Title IX can be either physical or verbal, so ordering institutions to regulate off-campus harassment could mean regulating not just off-campus assaults, but also off-campus speech and expression. Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), OCR's pressure on schools to investigate what it labels as sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional claims against a school (The *Klein v. Smith* decision held that vulgarity that was clearly punishable in school was nevertheless First Amendment protected outside school, even the vulgarity was uttered to a teacher, and thus presumably had on-campus effects).

Telling colleges and schools they must enforce the same restrictions on and off campus to comply with Title IX may be at odds with the intent of the Supreme Court's *Davis* decision to avoid subjecting schools to the risk of "constitutional or statutory" claims when they enforce Title IX, through language such as its requirement that the harassment occur in a setting under the school's control. (*See Davis v. Monroe County Board of Education*, 526 U.S. 629, 649 (1999) ("the standard set out here is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. ... it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.")).

Thanks,

Hans Bader



**From:** Edward Bartlett
**Sent:** Sunday, August 6, 2017 9:28 PM
**To:**

Hans Bader <Hans.Bader@cei.org>

**Subject:** Alarms should be sounding right now

Good afternoon –

It's now been three weeks since our historic meeting with Secy. Betsy DeVos, and we're beginning to get nervous.

First, *Inside Higher Ed* just published an article, below, that suggests changes at OCR may come later rather than sooner.

Second, Sen. Bob Casey of Pennsylvania is sending out this tweet: "@BetsyDevosED is considering undoing the progress we have made to tackle campus sexual assault. I will oppose her efforts at every turn."

Most worrisome, however, is a recent OCR resolution agreement with Butte College, a community college in Oroville, California – attached.

In the agreement, OCR is demanding that Butte College administrators regulate off-campus conduct, contrary to court rulings and pre-Obama OCR administrative rulings. OCR is also telling colleges that found accused students not responsible that the verdicts were unacceptable when the college considered the complainant's sexual history, even though the courts do permit questions on sexual history for limited purposes.

Bottom line, *"Alarm bells should be sounding."*

We need to ramp up our efforts. So we will be holding a lobbying event in Washington DC in mid-September – tentatively Sept. 14 and 15 -- to meet with lawmakers to regain the momentum. We also hope to set up a meeting with key White House staff. <u>Please consider joining us in DC for this critically important event.</u>

We will be discussing these developments at tomorrow's Campus Justice Coalition call at 5:30pm ET:

- Dial 
- Cod

Our movement has come too far to let the momentum slip away.

Ed

*E. Everett Bartlett, PhD*
President
SAVE: Stop Abusive and Violent Environments
P.O. Box 1221
Rockville, MD 20849
T: 301-801-0608