

www.saveservices.org

++++++++++++++++++++

https://www.insidehighered.com/news/2017/08/04/little-appetite-rollback-obama-guidelines-campus-sexual-assault

# What's Next on Title IX

Universities and advocates instead hope the regulation-averse Trump administration releases new language clarifying existing guidelines. Education Department says it is weighing numerous proposals before shifting federal policy.

By Andrew Kreighbaum

August 4, 2017

Betsy DeVos, who plans to put her stamp on federal policy governing campus responses to sexual harassment and assault, is in the midst of an extended period of deliberation and gathering input on potential changes.

But there's little appetite from any corner for the Department of Education to completely rescind 2011 Obama administration guidelines that have been at the center of ongoing controversies over how the feds enforce civil rights violations involving gender discrimination. Instead, colleges and universities have asked for more clarity on areas of Title IX policy not addressed by the 2011 Dear Colleague letter or subsequent guidance documents. And representatives of accused students have pushed for more transparency in campus proceedings.

From the perspective of advocates for sexual assault survivors, DeVos's tenure at the department has so far been filled with setbacks. A leaked internal memo in June showed that Acting Assistant Secretary for Civil Rights Candice Jackson had instructed regional investigators not to automatically pursue systemic investigations of civil rights abuses. And the department has been noncommittal on whether it will maintain a public listing of campuses under investigation for Title IX violations.

DeVos herself, though, has said there are problems with current federal policy. After a full-day Title IX summit in Washington last month, she said the department needs to protect all students and needs to do it quickly.

"Today's summit made it clear to me there's work to be done," she said July 14. "This issue is hurting too many students. So we'll get to work to figure out how best to solve this process."

But the university representatives consulted for input by DeVos and Jackson say removing the 2011 guidance would only add to the uncertainty and lack of clarity that critics of the previous administration have frequently complained of.

University groups have insisted that no matter what steps the department takes, campus leaders will still be committed to preventing and addressing sexual assault. But higher ed representatives as well as advocates for Title IX protections said in interviews that rescinding the guidance would be like pulling the rug out from under institutions that have put in serious work to come into compliance.

"Many institutions are doing just fine. They do not want a rollback," said Deborah Brake, a University of Pittsburgh law professor who specializes in Title IX and was a participant in the summit. "They don't want the uncertainty of pulling that guidance."

While the Dear Colleague letter has empowered assault survivors and advocate groups to demand improvements on campus under Title IX, persistent failures by colleges have spurred many to file complaints with the department's Office for Civil Rights. College officials in turn have complained that federal investigations have dragged on for years, leaving a persistent cloud from unresolved cases. Representatives for the accused, meanwhile, say campus proceedings have often trampled over the rights of those students.

**Potential Policy Shift**

So what comes next?

DeVos could still choose to rescind the guidelines, or rescind and replace them with language incorporating the input of stakeholders consulted by the department. She could also leave the Dear Colleague letter in place and issue new guidance clarifying the "gaps" identified by institutions and lawyers working on Title IX. Several participants in discussions at the department also expected that the department could announce a formal public comment period.

"The secretary and her team are still listening to and gathering information from policy experts and stakeholders to ensure that any potential changes to Title IX enforcement get the process right for all parties involved," said a DeVos spokeswoman, Liz Hill. "This will take time, and it's vital that at the end of this process, victims feel protected, the accused have access to due process and universities/colleges have the tools they need to handle these cases with the care, compassion and attention they deserve."

Interested parties hope that the department follows through on those promises for further deliberation. Survivors' advocate groups in particular have requested numerous meetings with DeVos and Jackson after they met with a handful of organizations as part of the July Title IX summit -- a good start, those advocates say, but not nearly enough to understand the protections survivors need on campus. Numerous advocacy groups have called for additional meetings with DeVos and Jackson.

There are policy issues where advocates and universities, or advocates and representatives of accused students, are unlikely to agree. Some of the flash points of disagreement don't stem directly from federal guidance on Title IX. Survivors' and anti-discrimination groups,

for example, were highly critical of the department's shift away from systemic reviews of discrimination.

Ann Hedgepeth, interim vice president of public policy and government relations at the American Association of University Women and a participant in the Title IX summit, said it was a "disappointment" to see the department pulling back on systemic investigations. Many institutions, however, have welcomed that change. Colleges targeted for those investigations say they have dragged on for years without resolution.

Advocates like Hedgepeth also worry that the department will discontinue a public list of institutions under investigation for Title IX violations. A bipartisan group of lawmakers sent DeVos a letter last week urging her to maintain the list. Many colleges and universities, meanwhile, have complained about the list, which they argue functions as a public sanction even when complaints haven't been sustained.

The controversy that surrounded the Title IX summit -- fueled by the invitation of organizations deemed men's rights groups by advocates and by comments from Jackson demeaning the experiences of assault survivors -- might suggest the various sides are far apart in finding any common ground on the issues at stake. But there are certain fixes to current campus procedures that would be accepted by many, if not receive broad support. That could include providing new language in new guidelines laying out best practices for how campus officials should proceed in areas where the 2011 Dear College letter and subsequent guidance are silent, including the ability of parties to submit questions during a misconduct proceeding and interim steps a campus could take during a protracted investigation.

University leaders have also said they want to have a better working relationship with the department so that they can seek technical support on cases without fear of coming under investigation.

And lawyers who have represented students involved in campus sexual misconduct proceedings argue that the department should do more to make sure the process is transparent for both parties.

Kimberly Lau, a partner at Warshaw Burstein LLP who has represented students in Title IX proceedings, said all parties could find consensus on the need for more transparency in the campus-based process.

"Transparency throughout the process for both the complainant and the respondent I think is important. Knowing what your rights are for both sides is important and knowing what to expect," she said. "Often times, these students, frankly, on both sides are confused and left in the dark as to what what exactly to expect next."

Alexandra Brodsky, a fellow at the National Women's Law Center, said not every group

comes to the issue of campus sexual assault in good faith. But she said she's been struck by the number of times she has sat down with an organization coming from another side of the issue and "struggled to find what we disagree on."

"I could imagine many ways that the department could continue to support schools to make sure that their procedures are fair to everyone that could make all good-faith actors happy," Brodsky said.

A number of recent attempts have been made to find common ground on potential changes to current federal policy. An American Bar Association Task Force that included survivor advocates, representatives of accused students, and university officials released a set of recommendations in June. That report encouraged colleges and universities where appropriate to consider alternatives to traditional adjudication models, including restorative justice.

The report also found that complainants and accused students should be given the opportunity to ask questions through the decision makers ruling in the process. Its members did not reach a conclusion on one standard of proof appropriate for all types of investigations.

An American College of Trial Lawyers task force released a report in April with recommendations for improving campus sexual assault investigations that included impartial investigations, access to evidence and some form of cross-examination. The recommendations also call for raising the standard of proof in such investigations from the current preponderance of evidence standards -- a potential change that would receive serious pushback from advocacy groups.

Last year, Know Your IX, which advocates to end sexual violence on campus, released a state policy playbook with recommended reforms at the state level.

Others with legal backgrounds have put forth more novel proposals. Attorneys Gina Maisto Smith and Leslie Gomez have argued for the creation of regional investigation and adjudication centers that would carry out the investigative process in place of campus officials.

A department official said a number of recommendations and white papers on potential improvements to Title IX policy are being considered.

While there are numerous proposals to improve federal guidance, even lawyers who have been critical of the 2011 standards said they were important at the time they were released.

"It was needed in that moment. It prompted a whole bunch of reflection," said Naomi Shatz, a lawyer who has represented both accused students and survivors of assault. "The worst-case scenario would be rescinding it and just leaving a void and not having guidelines."

But Shatz said there are legitimate critiques to be made of the 2011 letter. The guidelines don't encourage campuses to hold unfair or opaque proceedings, she said, but they also

AR_00000474

don't require necessary standards of procedural fairness. The courts have weighed in following several lawsuits brought by accused students, so there is an emerging body of law that provides an idea of what those standards should look like, Shatz said.

Cynthia Garrett, co-president of Families Advocating for Campus Equality, a group that advocates for the rights of accused students, argues that the Dear Colleague letter gave campuses the impression that they needed to "find more students" responsible and that some have done so without observing fairness for both parties. Garrett, who served on the ABA task force, said that federal guidelines should clarify those standards.

"Generally, I don't believe the government should be micromanaging such things. I'm a libertarian. I believe there should be flexibility and campuses ought to be able to do the right thing in their own way," she said. "I think we need detailed guidance to right the wrongs that have resulted from previous guidance."

**A Continuing Process**

University groups say they are committed to preventing and sexual harassment and assault and thoroughly investigating instances when they do occur, no matter what course of action the department takes. But they want more opportunities to shape the eventual decision by DeVos and Jackson.

"We're certainly very eager to be part of that conversation all the way through the process," said Michael Zola, vice president for government relations and policy analysis at the American Association of State Colleges and Universities.

Campus leaders and representatives of accused students say they haven't, prior to this administration, had the kind of chance DeVos has provided to be part of discussions on policy. Terry Hartle, senior vice president for government and public affairs at the American Council on Education, said colleges and universities are hoping for a relationship where the Department of Education's Office for Civil Rights is not perceived as a "gotcha agency." Hartle said there's been no framework before for finding consensus between the three kinds of parties interested in campus sexual misconduct policy -- institutions, survivor groups and representatives of the accused.

The attempt by DeVos to gather wide input was welcomed by many participants. The department has serious work to do with survivor groups and the public, however, after initial missteps. Some who work on Title IX issues say the negative attention aimed at the department could harm attempts to build real public consensus on policy changes.

Shatz said the controversy stemming from Jackson's comments about survivors days before the summit (she told *The New York Times* that 90 percent of campus assault allegations involved regrets over sex or both parties being drunk) and the involvement of certain groups in the session involving accused students cast a shadow over the meetings, even after a public apology from Jackson. And the administration's credibility isn't helped by a video

leaked during the campaign of President Trump bragging about groping women without consent, Shatz said -- or his history of sexual misconduct allegations brought by multiple women.

"The fear this administration is going to try to do whatever it can to backtrack on women's rights is real and based in the statements and actions of people we've elected," she said. Shatz said it's a challenge for the public and advocacy organizations to disentangle personal viewpoints of people in the administration from a recognition that there are improvements to be made to current policies.

"Those groups are not going to give the administration the benefit of the doubt," she said. "I don't know that the administration has earned the benefit of the doubt."

Brodsky said the department has a clear role in protecting students' rights. Her main priority at this point is making sure its leaders hear from survivors, she said.

DeVos and Jackson were attentive and appeared moved by what they heard from survivors in their meetings at the summit, Brodsky said. But she said it's important that they continue to hear what survivors need from their campus after an assault.

"It's not just about being sympathetic in a meeting," she said. "I think it's about realizing why these policies and why department enforcement has been so crucial in recognizing the repercussions for students of policy change."



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

REGION IX
CALIFORNIA

50 UNITED NATIONS PLAZA
MAIL BOX 1200; ROOM 1545
SAN FRANCISCO, CA 94102

July 17, 2017

Dr. Samia Yaqub
President
Butte-Glenn Community College District
3536 Butte Campus Drive
Oroville, California  95965

(In reply, please refer to case no. 09-13-2096.)

Dear President Yaqub:

This letter is to inform you that the U.S. Department of Education (the Department), Office for Civil Rights (OCR), has completed its investigation of the above-referenced complaint against the Butte-Glenn Community College District (District).  The District consists of one community college, Butte College (College), and several satellite campuses.  For purposes of this letter, the term College will be used to refer to both the College and the District.

OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. §1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving financial assistance from the Department.  The College is a recipient of financial assistance from the Department.  Therefore, OCR had jurisdiction to investigate this matter.

The Complainant alleged that the College failed to respond promptly and equitably to notice that she had been subjected to sexual violence by another College student.  The Complainant also alleged that the College's grievance procedures were not compliant with Title IX and that, as such, the process for complainants alleging violations of Title IX with respect to sexual harassment was not equitable.

OCR investigated the following issues:

A.  Whether the College complied with Title IX requirements regarding development and dissemination of  notice of nondiscrimination pursuant to 34 C.F.R. §§ 106.8(a) and 106.9;

B.  Whether the College complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator pursuant to 34 C.F.R § 106.8(a);

C.  Whether the College's sexual harassment and sexual violence policies and procedures, as written, comply with Title IX pursuant to 34 C.F.R § 106.8(b);

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

www.ed.gov

AR_00000477

D. Whether the College provided a prompt and equitable response to incidents of sexual harassment and sexual violence of which it had notice, including the Complainant's report of sexual violence, pursuant to 34 C.F.R. §§ 106.31 and 106.8; and

E. Whether the College's failure to provide a prompt and equitable response to notice of sexual harassment and sexual violence allowed the Complainant and/or affected students to be subjected to or to continue to be subjected to a sexually hostile environment pursuant to 34 C.F.R. §§ 106.31 and 106.8.

LEGAL STANDARDS

*Sexually Hostile Environment and Duty to Respond Promptly and Equitably*

The regulation implementing Title IX, at 34 C.F.R. § 106.31, provides that ". . . no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any . . . education program or activity" operated by recipients of Federal financial assistance.  Sexual harassment that creates a hostile environment is a form of sex discrimination prohibited by Title IX.  Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, including acts of sexual violence.

When a student sexually harasses another student, the harassing conduct creates a hostile environment if it is so severe, persistent, or pervasive that it denies or limits a student's ability to participate in or benefit from the recipient's program or activities.  If a recipient knows or reasonably should know about student-on-student harassment, Title IX requires the recipient to respond in a prompt and equitable manner by taking immediate action to eliminate the harassment, prevent its recurrence, and address its effects.

When responding to alleged sexual harassment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred.  The inquiry must be prompt, reliable, and impartial.  Pending the outcome of a response to a report or an investigation of a complaint, Title IX requires a recipient to take steps to protect the complainant from further harassment as necessary, including taking interim measures.  The recipient also should take steps to prevent any retaliation against the student who made the complaint and/or those who provided information.

A recipient must consider the effects of off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity.  This includes a review of misconduct that did not occur in the context of an education program or activity but may have had such an impact.

*Grievance Procedures and Notice of Nondiscrimination*

34 C.F.R. § 106.8(a) requires each recipient to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulation implementing Title IX, including investigation of any complaint communicated to the recipient alleging any actions which would be prohibited by Title IX.  34 C.F.R. § 106.8(b) requires that a recipient adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action prohibited by Title IX.

Finally, 34 C.F.R. § 106.9 requires each recipient to implement specific and continuing steps to notify applicants for admission and employment, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, that it does not discriminate on the basis of sex in any educational program or activity which it operates, and that it is required by Title IX and its implementing regulation not to discriminate in such a manner. The notice of nondiscrimination must include a statement that inquiries concerning Title IX may be referred to the Title IX Coordinator or to OCR (34 C.F.R. § 106.9(b)) and, the College must provide adequate notification of the contact information, including the name (or title), address, and phone number for the Title IX Coordinator (34 C.F.R. § 106.8).

<u>BACKGROUND AND SUMMARY OF INVESTIGATION</u>

To investigate this matter, OCR conducted an on-site visit and interviewed the Vice President for Student Services, who is the College's Title IX Coordinator (Title IX Coordinator), the Director of Admissions and Records, who has served as the College's Judicial Council Hearing Officer, the College's mental health counselor, the Safe Place and Wellness Program (Safe Place) Coordinator, hearing panel members for the Complainant's appeal hearing, the Complainant and Complainant's family members, the XXXXXXXXX Coach, and the College's former President (President).  OCR reviewed the College's response to oral reports and written complaints of sexual harassment and/or sexual violence during the 2013-2014, 2014-2015, and 2015-2016 school years.  OCR also reviewed College policies and procedures related to sexual harassment and sexual violence in effect during the 2012-2013 through 2016-2017 school years; school climate data; other relevant documents provided by the College in the course of OCR's investigation; and relevant publicly available information.

<u>FACTUAL FINDINGS AND ANALYSIS</u>

### A. Whether the College complied with Title IX requirements regarding development and dissemination of notice of nondiscrimination pursuant to 34 C.F.R. §§ 106.8(a) and 106.9.

OCR examined the existence and dissemination of the College's notice of nondiscrimination from August 2012 (the school year in which the Complainant reported the alleged sexual assault) through March 25, 2017.  OCR found that the College had adopted a Nondiscrimination Policy, Board Policy (BP) 3410, which prohibits discrimination on the basis of several protected categories, including sex.  BP 3410 is available on the College's website.  The College publishes a statement of nondiscrimination, including on the basis of sex, in the annual Course Catalog (Catalog),[1] Career & Technical Education Programs Brochure (CTE Brochure)[2] and online on its Human Resources homepage.[3]  For the entire time period reviewed, the notices in the Catalog, CTE Brochure, and on the Human Resources homepage refer inquiries concerning Title IX to the Title IX Coordinator and include his office address and phone number.  However, these notices fail to provide that Title IX inquiries may also be made to OCR.[4]

Accordingly, OCR found that the College has adopted a notice that prohibits sex discrimination and that the notice has been properly distributed in compliance with 34 C.F.R. § 106.9.  However, because the

---

[1] See http://www.butte.edu/departments/curriculum/catalog/documents.
[2] See http://www.butte.edu/resources/pr_resources/Career_Tech_Bro.pdf.
[3] See http://www.butte.edu/departments/hr/equal_employment.html.
[4] The 2011-2012 Catalog does include the required statement along with OCR's address and phone number.

notice did not include all required information, OCR found that the College was not compliant with Title IX and its implementing regulation, at 34 C.F.R. § 106.9, as to this issue.

**B. Whether the College complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator pursuant to 34 C.F.R § 106.8(a).**

OCR found that the Title IX Coordinator has been designated as the Title IX Coordinator since March 2009 and identified as such on its website and in written materials with the required contact information. The Title IX Coordinator has attended trainings on responding to complaints of sexual harassment and sexual violence, including the Campus Training and Technical Assistance Institute for Campus Disciplinary and Judicial Boards, hosted by the U.S. Department of Justice (DOJ) Office on Violence Against Women and a training from an outside entity. Accordingly, OCR found that the College was in compliance with 34 C.F.R. § 106.8(a) because it designated a Title IX Coordinator who has received training.

**C. Whether the College's sexual harassment and sexual violence policies and procedures, as written, comply with Title IX and the regulation pursuant to 34 C.F.R § 106.8(b).**

OCR reviewed the College's multiple and overlapping BPs and Administrative Procedures (APs) in effect from September 2012 until May 2017.

***Prior Policies and Procedures in effect at the time of the OCR Complainant's report and subsequent complaint process[5]:***

The following policies and procedures were in place in September 2012 when the Complainant filed her sexual assault complaint:

- BP 3430, "Prohibition of Harassment" (adopted November 2008-in effect until May 21, 2013);
- BP 3540, "Sexual and Other Assaults on Campus" (adopted November 12, 2008-still in effect as of May 31, 2017);
- Procedure 5.7, "Sexual Harassment (Uniform Complaint Procedure)" (in effect Spring 2003-still in effect as of May 31, 2017);
- Procedure 5.8, "Unlawful Discrimination (Uniform Complaint Procedure)" (in effect Spring 2003-still in effect as of May 31, 2017); and
- BP 5500, "Standards of Conduct" (in effect December 10, 2008-still in effect as of May 31, 2017) and AP 5500, "Standards of Conduct – Student Discipline" (adopted December 10, 2008- in effect until July 2013).

OCR found that none of the policies or procedures was posted on the College's website at the time the Complainant provided notice to the College regarding the alleged sexual assault in September 2012. BP/AP 5500, the student discipline procedure, provided the only process for a student to complain about being sexually harassed or sexually assaulted by another student. In his March 27, 2013 interview, the Title IX Coordinator acknowledged to OCR that BP/AP 5500 did not meet Title IX standards and required revision because they did not provide an equitable process for complainants. AP 5500 provided respondents with written notice of the allegations and applicable code sections, a

---

[5] The policies and procedures at the time did not have uniform adoption dates and/or effective dates.

AR_00000480

statement of facts supporting the allegations, the right to respond in writing or meet with the Title IX Coordinator, notice of the outcome of the investigation, and a right to present evidence and witnesses during any appeal hearing conducted by the judicial panel after receiving the Title IX Coordinator's determination.  Complainants were afforded none of these rights.

BP 3430, which described the College's prohibition against sexual harassment, did not meet Title IX requirements because it referred students to two separate grievance procedures – AP 3430 and AP 3435 – to file complaints, both of which were in draft form and had not been finalized or adopted by the College.  Similarly, BP 3540, which described the College's prohibition against sexual assault, did not contain a grievance procedure or cross-reference another procedure for resolving complaints because a grievance procedure for sexual assault had not been adopted or finalized by the College.  Both policies were also deficient because they did not apply to notice of sexual harassment that occurred off-campus property in an activity or program of the College or that had an on-campus impact.

The Title IX Coordinator told OCR that Procedures 5.7, "Sexual Harassment, Uniform Complaint Procedure" and 5.8, "Unlawful Discrimination, Uniform Complaint Procedure," applied only to complaints filed against employees, even though this limitation is not stated in the procedures.  OCR found that even as applied to sexual harassment complaints filed against employees, these procedures did not provide an equitable process because complainants, whether students or employees, were not afforded an equal opportunity to present witnesses or other relevant information.  Furthermore, Procedures 5.7 and 5.8 applied only to individuals who believed that they had personally suffered unlawful discrimination or faculty or administrators who learned of unlawful discrimination in their official capacity.  As such, a student who learned of, observed, or witnessed sexual harassment by an employee would be prohibited from filing a complaint and obtaining redress, even though the regulation at 34 C.F.R. 106.8(b) requires a grievance procedure to address "any action" which would be prohibited by Title IX.

OCR also identified a concern because only BP 3430 required reporting of sexual harassment by supervisors. In addition, none of the policies or procedures identified other employees who were responsible to report sexual harassment, such as an employee who has the duty to report to appropriate College officials any misconduct by students or employees.[6]  Accordingly, OCR found the College out of compliance with Title IX requirements with respect to policies and procedures in effect during this time period.

***Recent Policies and Procedures:***

OCR also reviewed the policies and procedures in effect subsequent to the final decision being issued in the Complainant's case:

- Revised BP 3430 and new AP 3430, "Prohibition of Harassment" (adopted May 22, 2013-still in effect as of May 31, 2017),
- New AP 3435, "Discrimination and Harassment Investigations" (adopted July 2013-still in effect as of May 31, 2017);

---

[6] Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Title IX, 62 Fed. Reg. 12034 (Mar. 13, 1997) (rev. 62 Fed. Reg. 66092, Jan. 19, 2001).

AR_00000481

- BP 3540, "Sexual and Other Assaults on Campus" (adopted November 12, 2008-still in effect as of May 31, 2017) and new AP 3540, "Sexual Assaults" (adopted April 2013-still in effect as of May 31, 2017);
- Procedures 5.7, "Sexual Harassment," and 5.8, "Unlawful Discrimination" (adopted Spring 2003-still in effect as of May 31, 2017); and
- BP 5500 (adopted December 10, 2008-still in effect as of on May 31, 2017) and revised AP 5500, "Standards of Conduct: Student Discipline and Title IX Procedures" (adopted July 2013-still in effect as of May 31, 2017).

The current procedures for investigating sexual harassment and sexual assaults are contained in AP 3435, AP 3540, and Procedures 5.7 and 5.8, which overlap with each other, as a stated purpose of all four procedures is to investigate and respond to sexual harassment complaints. However, there are no cross-references between the procedures or adequate notice of which procedure the College will use for any complaint of sexual harassment and/or violence. For example, AP 3435 (discrimination and harassment investigations) and AP 3540 (sexual assaults) do not cross-reference Procedures 5.7 and 5.8 (sexual harassment and unlawful discrimination complaints), which set forth a different process and timeline for investigating and resolving unlawful discrimination and harassment.

The difference between the complaint filing options has significance. For example, Procedures 5.7 and 5.8 contain a two-step appeals process to the College's Board of Trustees and Chancellor's Office that is available for complainants only, whereas the appeal process under AP 3540 is contained in AP 5500 and provides a hearing conducted by the Judicial Council – a panel of faculty, administrators and students -- for complainants and respondents with a final decision by the College President. Under AP 3435 investigations are conducted by the Human Resources (HR) Director whereas under AP 3540 investigations are conducted by the Title IX Coordinator. AP 3435 and Procedures 5.7 and 5.8 state that investigations will be completed within 90 days whereas AP 3540 states that investigations will be completed within 40 days. Procedures 5.7 and 5.8 do not discuss interim remedies, whereas under AP 3540, limited interim remedies, such as no contact orders and temporary suspensions, are considered.

In addition, the College's procedures for addressing student-to-student sexual harassment do not provide for an adequate, reliable, and impartial investigation. AP 3430 refers complainants to AP 3435 for the procedures for reporting and investigating sexual harassment complaints. However, AP 3435 applies only to complaints against employees. AP 3435 states that student-to-student complaints are investigated by the Title IX Coordinator, but does not include an investigative process. Rather, it refers to AP 5500, which only contains an appeal procedure for complaints already investigated with a determination made by the Title IX Coordinator. Procedures 5.7 and 5.8 also apply to complaints of sexual harassment, but do not include a description of the investigative process.

In addition, none of the policies or procedures provides a reasonably prompt timeline for completion of the informal resolution process or information about the investigative process. In this regard, AP 3435 states only that informal resolution could include but is not limited to "mediation, rearrangement of work/academic schedules, providing informal counseling and/or training, etc." Procedures 5.7 and 5.8 state only that, "[e]fforts at informal resolution need not include any investigation unless the responsible District officer determines that an investigation is warranted by the seriousness of the charges."

OCR also found that BP 3430 and AP 3435 and Procedures 5.7 and 5.8 do not include consideration of the effects of off-campus misconduct when evaluating whether there is a hostile environment on campus and do not apply to incidents taking place in an off-campus education program or activity.

Procedures 5.7 and 5.8 do not provide equitable notice to the parties of the outcome of the investigation because the College's investigative report and written notice of the outcome and appeal rights are sent to the complainant, but not the respondent.

While AP 3540 and AP 3435 contain language that the College will take steps to prevent recurrence of sexual assault and harassment, AP 5500 and Procedures 5.7 and 5.8 do not contain this assurance. There are no cross-references between AP 3540/3435 and Procedures 5.7/5.8.

When a recipient chooses to provide an appeal process, it must ensure the process is equitable.  For complaints against employees, AP 3435 and Procedures 5.7 and 5.8 provide an appeal for a complainant, but not a respondent.  The appeal hearing procedure for student-to-student sexual harassment and sexual violence complaints raises concerns about the way in which certain provisions, if invoked, would impact the requesting party.  In this regard, AP 5500 provides an appeal process for student complainants and respondents to a Judicial Council made up of faculty and student members.  It requires each party to present his/her own case to the Judicial Council; if a student chooses not to attend, the student may only present his/her case in writing.  For the absent party, the Judicial Council uses its discretion to determine whether or not to call the absent party's witnesses and which questions to ask.  OCR found that such provisions would create an inequity if the Judicial Council chooses not to call witnesses on behalf of the absent party, instead of ensuring a reliable and equitable process for review and presentation of evidence for both parties.

Accordingly, for the reasons stated herein, OCR found that the College's current procedures and policies, as identified above, are not compliant with Title IX.

> **D. Whether the College provided a prompt and equitable response to incidents of sexual harassment and sexual violence of which it had notice, including the Complainant's report of sexual violence, pursuant to 34 C.F.R. §§ 106.31 and 106.8; and**
>
> **E. Whether the College's failure to provide a prompt and equitable response to notice of sexual harassment and sexual violence allowed the Complainant and/or affected students to be subjected to or to continue to be subjected to a sexually hostile environment pursuant to 34 C.F.R. §§ 106.31 and 106.8.**

<u>OCR Complainant's Sexual Violence Complaint</u>

During the 2012-2013 academic year, the Complainant was a XXXXXXXXX at the College's XXXX campus, played on the XXXXXXX XXXXXXX XXXXXXXXXX team, and had a 3.56 GPA.  On September XX, 2012, the Complainant attended an off-campus party at the residence of XXX XXXXXXX XXXXXXXX XXXXXXX.  The Complainant had been drinking alcohol and alleged that she was raped by another student (Respondent), who was previously unknown to her, XX X XXXXXXXX at the party.  Sometime between 11:30 pm and 1:00 am, Student II and Student VIII began knocking on XXX XXXXXXXX door.  Shortly thereafter, the Respondent came out and Student II found the Complainant XXXXX XX XXX XXXXXXXX XXXXX.  Student II helped the Complainant leave the party and took her to a friend's house where the Complainant vomited and passed out.

At XXXXXXXXXXXXX XXXX XX on September XX, 2012, the Complainant's sister and sister's XXXXXX picked up the Complainant and drove her XX XXX XXXXXXXX XXXXX.  The Complainant's mother arrived sometime after 11:00 am.  Later that day, Student II texted the Complainant the first name of the Respondent and stated that he was XX XXX XXXXXXXX team.  The Complainant's sister then saw a text saying "U ok?" on the Complainant's phone from XXXXXXX XXXXXXXX XXXXXX (Student III). Subsequently, Student III called the Complainant's phone, and Complainant's mother called him back. She told OCR that a man took the phone from Student III, identified himself as the Respondent, used vulgar language, and said he and the Complainant had engaged in sexual acts but not sexual intercourse.

Later on September XX, 2012, the Complainant's mother took her to the hospital where she met with a social worker, a rape crisis advocate and a police officer from the Chico Police Department (Police Department).  The Complainant's hospital documents include notes from her sexual assault exam, which include that the Complainant had bruises XX XXX XXXXX XXXXX, XXXXXXXX XXX XXXX, XXX X XXXXXXXXX XXX XXXXXX XX XXX XX XXX XXXX XX XXX XXXX, XXX XXX XXXXX XXXXX XX XXX XXXX.

On October X, 2012, the Complainant and her mother went to the Safe Place, which serves as an information and support center for the College's students regarding sexual assault.  They met with the Safe Place Coordinator (Coordinator) and reported that the Respondent had raped the Complainant; the Coordinator obtained permission from the Complainant to contact campus police and informed the Complainant that the Title IX Coordinator was responsible for conducting investigations.

The Coordinator stated to the Complainant that she understood the Complainant's immediate concerns to be that she did not feel safe on campus, she had received an allegedly harassing call from the Respondent and Student III, and she wanted no contact with the Respondent.  The Coordinator contacted the Complainant's instructors and arranged for her to pick up assignments, complete classwork, and take examinations at the Safe Place office.  She also arranged for the Complainant to have an escort to classes, park her car next to the Safe Place office so that she did not have to walk to campus from student parking areas, and have after-hours access to the XXXXXXXX XXXX used by athletes so that XXX XXXXXXXX time did not overlap with XXXXXXXX XXXXXXXX.  The Complainant returned to two of her classes with an escort.  She stopped attending one class because of the number of XXXXXXXX XXXXXXX in the class.

The Title IX Coordinator first learned about the incident on October X, 2012 from another administrator who had been contacted by the Athletic Director.  The Title IX Coordinator later learned that the Respondent first reported the rape allegation to his XXXXXXXX Coach on September XX, 2012, who notified the Athletic Director on the same day.  The Title IX Coordinator told OCR that the incident should have been reported directly to him.  On October X, 2012, the Coordinator scheduled a meeting for the Complainant to meet with the Title IX Coordinator on October X, 2012.

On October X, 2012, the Complainant was interviewed by a detective (Detective) from the Police Department.  On October X, 2012, the Complainant's mother, father, sister, and the Coordinator met with the Title IX Coordinator.  The Complainant told OCR that she did not feel emotionally capable of attending.  The Title IX Coordinator told OCR that during this meeting he gave the family a copy of the student misconduct policy and procedure, BP and AP 5500, which he acknowledged to OCR did not include a process for a student to file a sexual harassment or assault complaint.

AR_00000484

On October X, 2012, the Complainant's sister took pictures of additional bruising that had appeared on the Complainant's body, informed the Coordinator, and sent them to the Detective.

On October X, 2012, the Title IX Coordinator contacted the Detective by phone. He informed OCR that in the weeks that followed he spoke with the Detective frequently and considered the Detective to be an expert on sexual assault investigations.

On October X, 2012, the Title IX Coordinator also interviewed the Respondent. According to the interview notes, the Respondent denied the allegation, said it was consensual and that he did not have intercourse with the Complainant; XXXXXXXX XX XXXXXXXXXX XXX XXXXXXXXX. He "was pretty sure the Complainant had been socially drinking," and added that he was not drunk, was "fully in control" of himself and remembered what happened.

The Respondent said that he called his XXXXXXXX Coach on the morning after the incident when he learned of the allegation, and the XXXXXXXX Coach advised the Respondent to call him back if the police contacted him. The Respondent talked to the XXXX Coach who "said everything would be alright." The Respondent told the Title IX Coordinator that he had not met the Complainant prior to the night in question but that she had a reputation XXX XXXX XX XXXXX XXXX XXX XXXXXXXXXXX XXXXX XXXXXX XXX XXX XXXX XX XXXXXXXX. The Respondent provided the names of four friends/teammates (Students III, IV, V and VI) as witnesses.

On October X, 2012, the Complainant's sister received the following text message from Student II:

> …I just want to apologize again for being hesitant about helping. It's just that night u picked her up and I told everyone that I told u everything that happened that night everyone like ridiculed me saying like 'y would u tell her, [the Complainant] prob wouldn't even have remembered if u didn't say anything' and I felt peer pressured to just act like it never happened which is so pathetic and stupid I never should have hesitated and just helped u guys out right away so I'm Srry for that and I would love to call that number and tell them all I saw

As a part of the text Student II also asked the Complainant's sister for the phone number to a crime reporting line, and the sister provided it.

On October X, 2012, the Title IX Coordinator interviewed the XXXX XXXXXXXX Coach, who relayed that the Respondent told him about the rape allegations on September XX, 2012. The Title IX Coordinator solicited the XXXX Coach's opinion about the Respondent's credibility and character. The XXXX Coach told the Title IX Coordinator there had been some talk about the incident by XXXXXXXX XXXXXXX, but he had instructed them to stop. The Title IX Coordinator stated to OCR that he did not follow-up because he thought the XXXX Coach would be in a better position to address the gossip.

The Title IX Coordinator interviewed the Respondent's witnesses individually on October X and XX, 2012. All four had been at the party in question but none of them had observed the Complainant or the Respondent in XX XXXX XXX XXXXXXXX. Two witnesses said that the Respondent told them he had had sexual intercourse with the Complainant. Student IV stated that the incident "is the talk of the weight room" XXXX XX XXXXXXXX XXXXXXX, that he had learned of the allegation from XXX XXXXXXXX XXXX, and that the information had "spread like wildfire."

The Title IX Coordinator solicited the opinions of each of the four witnesses about the Respondent's reputation, and whether they believed that the Respondent had the capacity to engage in the alleged conduct.  He also solicited information about the Complainant's past sexual activity.  XXXXXXX XXX XXX XX XXXX XXX XXXXX XX XXXXXXXXXXX XXXX XXXX XXX XXXXX XXXXXX XXXX XXX XXXXXXXXXXX XXX XXXXXXX XX XXXXXX XXXXXXXX XXXX XXX XXX XXXXXXXX XX XXXXXXX XX XXX XXXX.

On October XX, 2012, the Title IX Coordinator interviewed the Complainant, who was accompanied by her mother and sister and the Coordinator.  The Complainant's sister discussed the details of the incidents, in part, because the Complainant was having great difficulty restating what occurred.  The Complainant told the Title IX Coordinator that she was not going to one of her classes and she only felt safe on campus if a friend or family member was walking with her.  The Complainant stated that her friends, including Student II and VIII, who had helped her after the incident, were afraid to talk to the Detective and would not talk to the Title IX Coordinator.  The Title IX Coordinator did not inquire further.  The Title IX Coordinator told OCR that he perceived the Complainant's demeanor during this interview as cool, non-responsive and fidgety.

During the interview, the Complainant's sister offered to provide the Title IX Coordinator the text messages she had exchanged with Student II and Student III on September XX and October X, 2012, but he said he did not need them.  The Title IX Coordinator acknowledged to OCR that he did not review the text messages prior to reaching his determination.  The Complainant requested that the Title IX Coordinator interview XXX XXXXXXXXX Coach because he had known the Complainant XXXXX XXX XX XX XXXXX XXXXX, was aware of the changes in her behavior after the incident, and could speak to her credibility.  The Complainant requested that he review the photographs that showed her bruises, which she said resulted from the Respondent XXXXXX XXX XXXXXXX XXXXXX XXX XXXXXXXX.  XXX XXXXXXXXXXX XXXX XXXX XXX XXXXX XXXXXX XXX XXXXXX XXXXXXX XXXXXXXXXXX XXX XXXXX XXX XX XXXXXX XXX XX XXXXXXXX XXX XXXXXXXXX XXXX XXXXX XXX XXXXXXXXXX XXXXXXXXXX XX XXX XXXXXXX XXXXXXXX XXXXXXXXXXX XX XXX XXXXXXXXXX.  While OCR questions whether information about sexual reputation would ever be relevant and not likely to create significant prejudice and inequity in an investigation, the Title IX Coordinator did solicit such information about the Complainant from Respondent's witnesses.  The Title IX Coordinator also did not provide an opportunity for the Complainant to rebut such information in the interview.

The Title IX Coordinator informed OCR that after the October XX, 2012 interview he made several unsuccessful attempts to schedule an in-person interview with Student II.  Student II provided an email account of the incident to the Title IX Coordinator and answered specific follow-up questions via email.  The Title IX Coordinator did not interview other witnesses for the Complainant who observed her behavior immediately after the incident and in the subsequent weeks, including Student VIII, her mother and sister, her sister's XXXXXX, the Coordinator, and the XXXXXXXXXX Coach.  The Title IX Coordinator told OCR that he consulted with the Coordinator but considered her an advocate and disregarded her opinion.

OCR interviewed the XXXXXXXXXX Coach, who stated that prior to the incident the Complainant was a free-spirited, independent person.  In the period immediately following the incident, XX XXX XXX XXXX XXXXXXX XX XXXXXXXX, and the Complainant's behavior changed dramatically; she appeared withdrawn, steered clear of social interactions XXXX XXXXX XXXXXXX and would start crying XXXXXX XXXXXXXX.  The XXXXXXXXXX Coach said the team's practice typically included XXXXXXXXXXXX XXXXXXX XX XXX XXXXXX XXXXX XXXXXXXXX XXX XXXXXXXX XXXXX.  After the incident, XX XXXXX XXX XXXXXXXXX XXXXXXX XXX

XXXXXXXXXXX XXX XXX XXXXXXXXXXX and began walking the Complainant XX XXX XXX XXXXX XXXXXXXX. The Complainant did not return to the XXXXXXXXXX team after the season concluded.

During the week of October XX-XX, 2012, the Complainant reviewed the Title IX Coordinator's interview notes from the interviews he had conducted to date, including the statements about her alleged sexual reputation. The following week she provided notes about discrepancies she had identified.

On October XX, 2012, the Title IX Coordinator spoke with the XXXX Coach a second time. He inquired as to whether there had been any rumors, retaliation or intimidation by XXXXXXXX XXXXXXX toward the Complainant. The XXXX Coach told him that there had not.

On October XX, 2012, the Title IX Coordinator conducted a follow-up interview with the Respondent to clarify information that had been provided by the other witnesses. On the same day, the Title IX Coordinator spoke with the Detective. Among other things, the Detective stated that the photos provided by the Complainant were inconclusive, in part because they were of poor quality and lacked a date and time stamp. The Title IX Coordinator told OCR that since the Detective told him that the photographs of the bruises were not conclusive proof of forced sexual contact, he disregarded them, even though proof of forced sexual contact was not an element required by the District's policy for reaching a determination of sexual violence, including rape.

The Coordinator told OCR that as the College's investigation proceeded, the Complainant informed her that she needed other interim measures, such as a mutual no-contact order and restrictions on the Respondent's movement so that the Complainant could walk around campus and go to public spaces, without fear of running into him. However, the Coordinator did not have the authority to implement those specific measures. Under the College's policy, the Title IX Coordinator had the authority to do so, but he informed OCR that he did not consider additional interim measures for the Complainant. The Complainant reported to OCR that the measures that had been implemented were inequitable because she felt forced to isolate herself in the Safe Place office or risk encountering the Respondent on campus.

On or about October, XX, 2012, the Complainant and her family requested a meeting with the President because they felt that the Complainant's voice had not been heard adequately in the meeting with the Title IX Coordinator. On October XX, 2012, the President met with the Complainant and her sister and mother. The President informed OCR that she offered a similar opportunity to the Respondent but he declined. At the outset of the meeting, the President informed the Complainant that the meeting notes would become part of the investigation record. Among other things, the Complainant told the President that she was "terrified" to go to XXXXXXXXXX XXXXXXXX because of the proximity XX XXX XXXXXXXX XXXXX to the weight room. She noted that she had reviewed the witness statement from XXX XXXXXXXX XXXXXX who said that the incident is "the talk of the weight room". The Complainant stated that she felt unable to continue in her normal activities; XXX XXXXXX XXX XXX XXXXXXX XXXXXXXX XXX XXXXX XXX XXXXXXXXX XXXX XXX XXX X XXXX XXXX XXXXX XX XXXXXX XXX XXXXXXXX, XXXXX XXXXX XXXX XXXXXX, XXX XXX XXXX XXXXX XXXXX XXXXXXX XXXXXXXX. She asked to have the Respondent's path restricted around campus and for the College to issue a stay away order. The College did not respond to the Complainant's request.

The Complainant said during this meeting that the Title IX Coordinator had interviewed only student witnesses who would support the Respondent's story. She also told the President that she believed her friends were being manipulated by other students and/or threatened to not cooperate in the investigation. The Complainant again provided the names of three witnesses, Student II, Student VII,

and Student IX.  The Complainant and her family told the President that the Title IX Coordinator had not reviewed certain relevant evidence, for example, the text exchanges with Student II and Student III.  She also stated that XXX XXXXXXXXXX Coach had not been interviewed, although the Title IX Coordinator had interviewed the Respondent's XXXX Coach.

Shortly after this meeting, the President instructed a staff person to XXXXX XXX XXXXXX XXXXXXX XXX XXXXXX XXXX XXX XXX.  The Title IX Coordinator told OCR that he disagreed with this step XXXXXXX XX XXXX XXXX XX XXXX XXXX XXXXXXXXX XX XXX XXXXXXXX.

The Title IX Coordinator informed OCR that prior to the completion of his investigation he referred the Respondent to the College's Mental Health Counselor (Counselor) – a licensed marriage and family therapist – to have the Counselor assess the Respondent's character and credibility.  OCR reviewed the Counselor's office visit notes, which are dated November X, 2012.  The Counselor told OCR that she assessed the Respondent's character and credibility based on his demeanor and the information he provided during the meeting.  The meeting lasted 45 minutes, after which the Counselor opined to the Title IX Coordinator that the Respondent did not present as a threat to anyone else at the time.  The Title IX Coordinator informed OCR and the parties that he relied on Counselor's assessment in making his determination, even though the notes reflect that the assessment was completed after he issued his written determination (see below).  The Title IX Coordinator confirmed to OCR that he was aware that the Complainant was seeing a private therapist.  However, he did not request permission to consult with the therapist or gather character and credibility information about the Complainant from an expert who was similarly situated.  Nevertheless, he told OCR in an interview that he reached a conclusion that the Complainant had XXXXXXXX XXXXXX issues.

On November X, 2012, the Title IX Coordinator issued a one and a half page determination letter to the Complainant and Respondent.  The letter included information from Student II's email statement, and the names of the witnesses interviewed, specifically the Complainant, the Respondent, the XXXX XXXXXXXX Coach, and Students III, IV, V and VI.  It stated that the Title IX Coordinator consulted with the Detective and Counselor in reaching his determination.  The Title IX Coordinator determined, based on "all available evidence" that there was "insufficient evidence for disciplinary action."  The letter stated that the Respondent's continued enrollment at the College was conditional, and that he was required to stay away from the Complainant and not engage in harassment or retaliation.

OCR asked the Title IX Coordinator how he reached his determination.  He stated he evaluated whether the Respondent sexually assaulted the Complainant based on the definition of rape from California Penal Code section 261 and utilized a preponderance of the evidence standard.  When asked to describe the preponderance of the evidence standard, the Title IX Coordinator did not describe a process of weighing the evidence to determine whether something was more likely than not to have occurred. Rather, he described the standard as "a good classic level of need" that involved considering the health and safety of students and the best interests of the institution.  The Title IX Coordinator also described applying the preponderance of evidence standard as "something that comes by the seat of your pants." In describing the evidentiary standard as he applied it in the Complainant's case, he stated that he believed that something happened XX XXX XXXXXXXX but that it was not enough to discipline the Respondent.

OCR asked the Title IX Coordinator how he evaluated the credibility of the Respondent, Complainant and the witnesses interviewed.  The Title IX Coordinator told OCR that based on the Respondent's demeanor in his interviews, the information provided by his witnesses and the lack of a prior criminal history, his

impression was that the Respondent did not have the capacity to rape the Complainant. OCR noted, however, that the Title IX Coordinator learned that the Respondent did not have a prior criminal history on November XX, 2012, 21 days after he had issued his determination. The Title IX Coordinator also told OCR that the Respondent did not have a reputation as a "player", and that the Respondent's "soft-spoken" way in the interviews had "swayed him." The Title IX Coordinator stated that if a student presented as someone who scared him, then that would be sufficient evidence to remove the student from campus.

The Title IX Coordinator acknowledged to OCR that he sought and relied upon evidence of the Complainant's alleged reputation XXX XXXXXX XXXXXXXX from Respondent's XXXXXXXXX, and he stated that in contrast to his positive impression of the Respondent's reputation, the Complainant had a "XXXXXXXX reputation." The Title IX Coordinator told OCR that he spoke with friends of the Respondent who said that the Complainant XXX XXXXXXX X XXX XX XXX XXXX XXX XXXXX XXX XXXXXXXXXX XXX XXX XXX XXXX XXX XX X XXXXX XX XXXXX XXXXX XXXXXXXXX; he said that those things factored into his decision as a "relational" thing. However, none of the interview notes reviewed by OCR reflect that any witness reported observing the Complainant do what the Title IX Coordinator described to OCR. The Title IX Coordinator told OCR that he told XXXXXXXX XXXXXXX to continue to "report anything of interest" regarding the sexual activities of the Complainant.

The Title IX Coordinator confirmed that he did not check the veracity of the statements made about the Complainant by the Respondent's friends with the Complainant or other witnesses. The Title IX Coordinator's note reflects that neither student who made the allegations had first-hand knowledge of or had witnessed any alleged sexual activity by the Complainant. The Title IX Coordinator also did not assess the Respondent's reputation, with respect to prior sexual activity, with the Complainant or with students other than the Respondent's friends XX XXX XXXXXXXX XXXX.

The Title IX Coordinator also confirmed that he did not interview the hospital nurse or obtain documents from the hospital. He told OCR that he did not solicit this evidence because the Detective told him the evidence collection kit XXXXXXX XXXX XXXXXXXX. However, the evidence shows that he was not apprised of any update on the status of the evidence collection kit from the Detective until November XX, 2012, 21 days after he had issued his determination. In addition, he did not inquire regarding XXX XXXXXX XXXX XXX XXXXXXXXXXX XXXXXXX XXX XXXX XXX XX XXX XXXXXXXXXXXXXX XX XXX XXXX.

*Appeal Procedure and Revisions*

On November XX, 2012, the College issued an acknowledgment of the Complainant's November XX, 2012 appeal, which referred to the BP/AP 5500. Pursuant to BP/AP 5500 in effect at the time, the College was required to convene a five member Judicial Council panel, which included two students, two faculty members, one administrator, and one member selected by the Title IX Coordinator to serve as the hearing officer. The hearing officer is a non-voting member who selects the committee chair, answers procedural questions, makes determinations about admissibility of evidence, and conducts the hearing. The hearing officer would select the Chair and provide training for the panel. During the hearing, the College's representative and the respondent student could provide opening statements, call witnesses, introduce testimony, and the College had an opportunity for rebuttal. The burden was on the College to prove "by substantial evidence" that the alleged facts were true. The Judicial Council's decision would be based on the hearing record, as well as the College's investigatory file.

The Title IX Coordinator asked the College's Director of Admissions and Records to serve as the Hearing Officer (Hearing Officer) for the matter, and he agreed.  The Hearing Officer told OCR he had not received any prior training on sexual assault or the Title IX legal standards but had attended training on addressing sexual misconduct; his training on conducting hearings came from discussions with the Title IX Coordinator and the former hearing officer.  On November XX, 2012, the Hearing Officer issued notification letters with a hearing date of November XX, 2012.  The letters informed the parties that they had the right to represent themselves or to be represented, except that they could not be represented by an attorney unless complex legal issues were involved.  Both parties had the right to bring witnesses and to prior inspection of documents.  The Hearing Officer stated to OCR that the College included BP/AP 5500 with the notification letter, even though the College knew the procedures "were insufficient" and had decided to modify the procedures in advance of the hearing.

In a November XX, 2012 letter, Complainant's Counsel requested that the College make several modifications to the hearing process, including permitting the Complainant to submit a written statement in lieu of attendance because it would be extremely difficult for her to personally present the details of her alleged rape to a panel of faculty, administrators and students.

On November XX, 2012, Complainant's sister received a text message from Student II's XXXXXXX, in which Student II's XXXXXXX stated "[Student II] just talked to the detective face to face, told him she thought it was rape. He said no matter what [Student II] says XXXXX XXXXXXXX XXXXX XXXXXX XXXXXXXX XX XX XX XXXXX."  The text exchange was submitted as supplemental evidence to the panel.

On November XX, 2012, the Hearing Officer issued revised notification letters advising that the College would use existing BP/AP 5500 with modifications contained in a two-page appeal procedure to comply with Title IX requirements.  The ad hoc procedure included the following provisions that were different from the original procedures.  Each party would represent themselves at the hearing.  The parties would not be allowed to confront each other or to cross examine each other's witnesses; the parties could request that the panel ask questions of witnesses or inquire into certain issues.  A party could be accompanied by someone of their choice at the hearing, including an attorney, but the attorney or other representative could not present the party's evidence or call witnesses.  The Judicial Council would decide by a preponderance of the evidence whether the Complainant was sexually assaulted or forcibly raped (not defined) by the Respondent and/or whether any specific sections of the Student Code of Conduct were violated.

On or about November XX, 2012, the Complainant withdrew from all her classes after communicating to the Coordinator that she continued to suffer from anxiety and nightmares and was having difficulty concentrating.  The Complainant's sister told OCR that the College's investigation process, including information about her reputation for past sexual activity was being solicited by a College administrator and that rumors were circulating on campus about her and the incident contributed to her inability to continue.  In the days that followed, the College facilitated the withdrawal process and provided a tuition refund for the semester.

On November XX, 2012, Complainant's counsel requested a postponement until November XX, 2012 because some of the modifications in the ad hoc procedure would "deprive the Complainant of the rights afforded to her under BP 5500 and federal law."  After the Respondent also requested postponement, the College delayed the hearing until December X, 2012. The College did not further amend the hearing procedure.

*Judicial Council Formation, Training and Evidence Provided*

OCR interviewed each member of the Judicial Council.  Each member told OCR that prior to their participation in the Complainant's appeal hearing, they had no specific training or experience in reviewing sexual assault claims or with the applicable Title IX legal framework.  Two of the six Judicial Council members had previously been on a hearing panel for a peer sexual harassment case.

The College provided each Judicial Council member with several hundred pages of information related to the appeal two to three days before the hearing.  Several Judicial Council members told OCR that a few days was not sufficient time to review the evidence and, as a result, they did not review all of the evidence prior to the hearing.

The Judicial Council received a document entitled "[College] Title IX Appeal Hearing Training Guidelines" (Training Guidelines).  The Training Guidelines provided definitions of sexual harassment, sexual violence/assault, consent, and mental presence/incapacity and a list of questions for the panel to consider (e.g., Did the accused know, of have reason to suspect, that the alleged victim was incapacitated?), and the burden of proof.  Sexual violence/assault was defined as a "sexual act perpetrated against a person's will or where a person is incapable of giving consent; a single act of sexual assault is sufficiently severe to create a hostile environment...."  Consent was defined, in part, as an individual being capable of controlling her/his physical actions and capable of making rational/reasonable decisions.  Mental presence/incapacity was defined as lacking ability to make reasonable and rational judgments, which may occur as a result of use of alcohol, etc.  The College's policies only included the California Penal Code definition of rape but did not include the definitions of consent, mental presence/incapacity, and sexual assault.

The Judicial Council members stated that they arrived one hour prior to the hearing to receive training.  One Judicial Council member stated that when the hearing started, the Judicial Council was unsure about what they were supposed to be doing and whether their review was de novo.  This member stated that the Judicial Council relied on the College's Counsel and the Hearing Officer to instruct them during the hearing and deliberations.

*Appeal Hearing*

OCR reviewed the transcript and recording of the appeal hearing.  Complainant's Counsel provided an opening statement and indicated that the Complainant was not appearing personally because it was too difficult for her to do so, and that she had requested to be represented by him.  Complainant's Counsel then provided an overview of the Complainant's concerns with the appeal procedures and requested that he be permitted to present the Complainant's case.  The Hearing Officer denied the request.

Complainant's Counsel then requested that the panel hear testimony from the Coordinator, the Complainant's mother and sister, and the sister's XXXXXX.  The Judicial Council determined that the witnesses would not be allowed to make statements or provide unsolicited information, but would be permitted to answer specific questions posed by the Judicial Council.  After the Judicial Council members questioned the Complainant's witnesses, Complainant's Counsel provided a closing statement, which included that the Complainant was intoxicated, and that the Respondent had raped her XXXXX XXXXXXXX XXXXXXX XXX XXXXXX XXX XXXXXXXX.

The Judicial Council called in the Respondent who made an opening statement. He described his version of the events, including that XX XXXXXXXXX XXX XXXXXXXXXX XXXXXXXXX. He denied sexually assaulting or raping the Complainant. He stated that at the party he was not intoxicated and was fully in control of himself. The Judicial Council asked the Respondent questions, primarily focused on his physical contact with the Complainant and why he believed the Complainant had the capacity to consent.

The Respondent called Students III, IV, V, VI, and VII. Unlike the Complainant's witnesses, the Respondent's witnesses were allowed to provide general testimony and describe what they observed the night of the incident and respond to questions from the Respondent. The Judicial Council then asked each witness questions focused on their observations of the Complainant's interaction with the Respondent and the degree to which the Complainant and Respondent appeared intoxicated. The Judicial Council also asked two witnesses to confirm statements they had made about the Respondent initially informing them that he had had sexual intercourse with the Complainant. The Respondent made a closing statement. The hearing closed after Judicial Council members asked the Respondent questions about inconsistencies between his testimony and certain witnesses.

The Complainant submitted a statement, wherein she objected to the Title IX Coordinator inquiring into her sexual reputation in his interviews, denied the allegations pertaining to her reputation, and provided support for the denials. The Complainant wrote about her version of the incident and its impact on her, including that XXX XXX XXXX XXXXXX, XXX XXXXXX XXXXXXXXXXXX XXX XXXXX XXXXXXXXXXX, did not feel safe on campus without an escort, and had dropped out of classes for the fall semester. In a declaration submitted to the panel as supplemental evidence, her sister stated that prior to the incident, the Complainant was independent, social, not easily upset, and goal oriented; after, she would not go alone to XXXXXXXX XX XXXXXX, had trouble doing things outside the home, had frequent breakdowns, and experienced flashbacks of the incident.

*Judicial Council Deliberations*

Following the hearing and with the Hearing Officer and College Counsel present, the Judicial Council deliberated for approximately two to three hours. Judicial Council members told OCR that most of their deliberation focused on the type of sexual contact, whether the Complainant had the capacity to consent, and how a reasonable person in the Respondent's position would have perceived the Complainant's capacity to consent.

With respect to consent, Judicial Council members told OCR that they agreed that the Complainant did not have the capacity to consent because of her level of intoxication. The Chair stated that the deliberation then focused on whether a reasonable person in the Respondent's position would have known that the Complainant was too intoxicated to provide consent. One Judicial Council member told OCR that the College's Counsel and the Hearing Officer were "overly directive" in guiding the deliberation on this question. She informed OCR that the College's Counsel told the Judicial Council that if they determined the Complainant was too drunk to consent and the Respondent was too drunk to know this, then they could not make a finding of sexual assault. This Judicial Council member said this instruction resulted in confusion regarding the appropriate reasonable person standard to apply.

The Judicial Council member stated that the Judicial Council held a vote on whether the Respondent was too intoxicated to know the Complainant could not consent, despite the Respondent's assertion that he was not drunk, was fully in control of himself, and recalled the night's events. The vote was 3:2 in favor

of the Respondent.  The Judicial Council member stated that after that vote, the College's Counsel said that meant there was no sexual assault, which the Judicial Council relied on.

Some Judicial Council members told OCR that it would have been beneficial to ask witnesses follow-up questions and request additional evidence before reaching their decision.  Another Judicial Council member stated specifically that she would have liked to question the Complainant's witnesses again. She stated that the College's Counsel told the members that they had to make a decision based solely on the information they had.

On December XX, 2012, the Judicial Council provided a recommendation letter to the President, wherein they made factual findings by a preponderance of the evidence, including:  1) The Complainant did not have the capacity to consent to XXX XXXXXXX XXXXXXXXXXX; 2) The Respondent reasonably believed that the Complainant did have the capacity to consent and did consent; 3) A reasonable, sober person in a similar situation would believe that the Complainant had the capacity to consent; 4) No harassment occurred; and 5) The incident caused the Complainant to feel that there was a hostile environment on campus.

The Judicial Council recommended that the Respondent attend sexual assault training and that the College examine its policies regarding dissemination of sexual harassment and assault information, provide sexual harassment and assault training to athletics teams, and continue current accommodations and consider additional requests for accommodations for the Complainant.

*President's Review of the Judicial Council Determination*

On December XX, 2012, the President issued letters of finding to the parties.  The President affirmed the factual findings of the Judicial Council with the additional factual finding that "[t]he event traumatized [the Complainant]."   The President revised the remedies recommended by the Judicial Council to require the Respondent Student to attend training and meet with the Title IX Coordinator before enrolling in classes or engaging in any College activities.

<u>Analysis</u>

OCR determined that prior to the appeal, the College violated Title IX by failing to provide a prompt and equitable response, including because the College:  1) failed to provide prompt and effective interim measures; 2) utilized a grievance process that did not meet Title IX requirements; 3) afforded the Complainant an inequitable opportunity to present witnesses and other evidence; 4) allowed and relied on the Respondent's witness statements about the Complainant's past sexual behavior, which may have had a prejudicial effect; and 5) misapplied the preponderance of evidence standard.  In addition, two responsible employees failed to report the sexual assault allegations to the Title IX Coordinator.

*Failure to Provide Prompt and Effective Interim Measures*

OCR found that the Safe Place facilitated several immediate, interim measures, including a parking space at and a study space in the Safe Place office, and an escort to classes.  X---paragraph redacted---X.

However, the Complainant informed the College that she had no way of knowing where the Respondent would be on campus at any given time.  She informed the College that she avoided common areas on campus out of fear that she would come into contact with the Respondent; she ate lunch in the Safe

Place office.  She stopped participating in a class to avoid contact with XXXXXXXX XXXXXXX.  She had requested that the College issue a mutual no contact order, and/or place some restrictions on the Respondent to create a space for her to access her classes and common areas on campus.  The College did not respond to her request.   She completed some of her studies and exams at the Safe Place office for the same reasons and ultimately dropped all classes in late November.  OCR concluded that the Complainant was not provided with equitable access to the College's programs and activities during the investigation because the College placed the burden on the Complainant to avoid the Respondent, and the interim measures had the effect of isolating the Complainant and limiting her access to common areas of campus.  In addition, the Title IX Coordinator did not reassess with the Complainant whether additional or alternate measures would have addressed her concerns related to access to program and activities. As discussed below, in its review of the College's investigative files for sexual harassment and sexual violence matters, OCR identified other students, including Complainant One and Four, for whom the College may not have provided adequate interim measures.

*Failure to Provide an Adequate, Reliable, and Impartial Investigation*

A responsible employee includes any employee who has a duty to report sexual harassment or other misconduct of students to appropriate school officials.  The Title IX Coordinator acknowledged that the XXXX Coach and Athletic Director met this definition and had a duty to report the allegations to him once they learned of them on September XX, 2012.  However, they did not do so.  Based on the XXXX Coach and Athletic Director's positions of leadership and authority and the Title IX Coordinator's acknowledgement of the same, OCR found that these two employees had a duty to report and they failed to do so.

OCR interprets Title IX's requirement of an equitable process to require a recipient to, among other things, afford the parties an equal opportunity to present relevant witnesses and other evidence.  OCR found that the Title IX Coordinator used the student misconduct policy and procedure, BP/AP 5500, to investigate the complaint, despite the fact that it describes a process that the College acknowledged did not meet Title IX requirements because it did not provide for an equitable opportunity for the complainant to present evidence and witnesses.

OCR also found that, in practice, the College provided the Complainant with an inequitable process.  In this regard, the College interviewed all student witnesses identified by the Respondent and accepted all of the Respondent's evidence.  The College sought information about the sexual reputation, character and credibility of both the Respondent and the Complainant from the Respondent's selected student witnesses.  Rumors of the Complainant's past sexual behavior with third parties are not relevant to determining whether the Respondent sexually assaulted her, yet the Title IX Coordinator stated that he relied on this irrelevant and prejudicial information when making his determination.[7]

In contrast, the College did not interview the Complainant's witnesses about her sexual reputation, character and credibility nor were the Complainant's witnesses afforded the opportunity to express their opinions about the sexual reputation, character and credibility of the Respondent.  While the College interviewed the Respondent's coach about his character and credibility, it did not interview the Complainant's coach about the Complainant's character and credibility, even though she requested that

---

[7] Similarly, as described below, in Complainant Two's case, the investigators solicited information about the female student's past sexual history (did not do the same with respect to the male student) and relied on that information, in part, when reaching a credibility determination and making a no violation finding.

the College do so. The College sought the opinions of a mental health counselor about the Respondent's character and credibility, but it did not inquire into whether the Complainant's therapist or other medical professionals, including the nurse who had treated her in relation to the incident, were available to provide the same type of consultation. Although at least two students identified by the Complainant refused to be interviewed, the Title IX Coordinator and President were present with information suggesting that they may have been pressured by other students not to participate in the investigation as evidenced by the October X, 2012 text message, but the College did not pursue an inquiry regarding potential retaliation or intimidation, which is prohibited by Title IX and College policy, and the Title IX Coordinator declined to consider the text message supporting the allegation.

Furthermore, the Title IX Coordinator did not seek to interview witnesses who were with the Complainant close in time to the incident and/or intimately familiar with her behavior and presentation prior to the incident, including the Complainant's family members and XXX XXXXXXXXXX Coach. The Title IX Coordinator's description of the Complainant's behavior to OCR as cool and fidgety during the October XX, 2012 meeting indicates that to the extent that the Complainant's physical presentation and behavior may have been considered, it was in a negative fashion. He told OCR that he reached a conclusion that she had XXXXXXXX XXXXXX issues. However, he did not speak with her therapist.

Because of the unequal treatment with respect to the Complainant's witnesses, testimony and documentary evidence, OCR determined that the College's investigation was inequitable. In addition, based on the Title IX Coordinator's explanation to OCR of how he considered evidence, OCR determined that the College misapplied the preponderance of the evidence standard.

*Inequitable Appeal Process*

Title IX does not require an appeal process, but where a recipient offers an appeal, Title IX requires that the process be prompt and equitable. OCR concluded that the College's handling of the Complainant's appeal failed to meet Title IX standard for equity in three ways: 1) Judicial Council members did not receive consistent instruction on applicable standards, the scope of review, and other elements necessary to issue a reliable determination; 2) Judicial Council members could not ensure an equitable process because they were limited in their examination of Complainant's witnesses; and 3) several Judicial Council members did not review all the evidence prior to the hearing.

Nine days before the hearing date, the College announced ad hoc modifications to BP/AP 5500 that put the burden on the Complainant and the Respondent to present her/his own case, when previously in student misconduct cases the College bore the burden of presentation and proof. When Complainant's counsel voiced concerns that the Complainant was not emotionally capable of presenting the details of the alleged rape and witnesses to a group of teachers, administrators and student peers, the College did not take sufficient steps to ensure that the Judicial Council understood its obligation to provide an equitable appeal process, regardless of whether either party could make such a presentation. As a result, as applied, the process was inequitable because the Judicial Council allowed the Respondent's witnesses to make open ended statements and answer any questions posed by the Respondent. In contrast, the Complainant's witnesses were only allowed to respond to Judicial Council members' questions, which were narrow. The Respondent was also permitted to testify a second time to explain discrepancies between his testimony and his witnesses' testimony. A similar opportunity was not afforded to Complainant's witnesses to return to explain any discrepancies, even though Judicial Council members expressed a desire to obtain further information. Finally, the Judicial Council reviewed prejudicial testimony about the Complainant's alleged sexual history with third parties. Accordingly,

OCR found that the College did not afford an equitable opportunity with respect to the presentation of evidence.

OCR determined that the College's one-hour training on its ad hoc hearing procedures resulted in Judicial Council members being unclear about the applicable legal standards for determining consent, and the standard and scope of the review. The Hearing Officer informed OCR that he had no specific training with respect to Title IX and sexual assault, yet he trained the Judicial Council members. All members of the Judicial Council expressed a lack of confidence in the training provided on consent or in his or her understanding of the consent standard, which was the focus of the deliberations. The Judicial Council reached a conclusion that the Complainant was so intoxicated that she could not have consented to sex. However, the College's legal counsel redirected the members to deciding whether the Respondent could have reasonably known that the Complainant lacked the capacity to consent. Based on the statements of the Judicial Council members, OCR concluded that they were uncertain what the standard was and how to evaluate and weigh the evidence when reaching this determination. Some members thought they were deciding whether a reasonable, sober person would have known that the Complainant lacked the capacity to consent, while others thought they were determining whether a "reasonable drunk person" would have known that the Complainant lacked such capacity.

OCR also found that members of the Judicial Council did not have sufficient time to review the hundreds of pages of evidence provided to them and have access to all relevant information before the hearing deliberations. Judicial Council members who wanted to call back certain witnesses to ask clarifying questions were told by the Hearing Officer and College's legal counsel that they could not do so. There was no review of the physical evidence – photographs of the Complainant's bruises XXX XXX XXXXXXX XXXXXXXXX XX XXX XXXXXXXXX XXX -- by someone trained to understand their meaning, such as a forensic examiner. In addition, at least one Judicial Council member expressed uncertainty as to whether they were to provide a de novo review of the Title IX Coordinator's decision.

Accordingly, OCR found that although prompt, the appeal process was not reliable or equitable.

*Hostile Environment for the Complainant*

In addition to the areas of noncompliance discussed above, OCR found that the College failed to take effective action to stop rumors about the Complainant's sexual history with third parties once it had notice of them. Although neither of the two student witnesses who provided information regarding the Complainant's alleged sexual activity had personally witnessed the conduct, the Title IX Coordinator solicited and accepted the information as fact, reporting to OCR that on three separate occasions the Complainant had "done this", namely "XXXXXXX X XXXX XXXXXXX XXXX X XXXXXXXX XX XXXX XXXX XXXX XXX," a statement not supported by the interview notes reviewed by OCR and denied by the Complainant in her statement submitted to the Judicial Council. He also reported to OCR that he encouraged the Respondent's witnesses to continue to report "anything of interest" about the Complainant, even after the conclusion of the investigation. The College's solicitation of rumors about the Complainant's past sexual activities contributed to the hostile environment. The Complainant was aware of the sexual rumors from the written summary of the witness interviews that she reviewed in late October prior to the appeal hearing. That the Title IX Coordinator, a high level representative of the College, was asking for information about the Complainant's past sexual behavior from the Respondent's friends contributed to her inability to continue at the College.

In addition, the Title IX Coordinator was told by a student witness that the incident was the talk of the weight room but did not take any responsive action other than contacting the XXXX Coach by phone on October XX, 2012.  The knowledge that the incident continued to be discussed on campus by XXXXXXXX XXXXXXX who supported the Respondent contributed to the Complainant's feeling that she could not continue with her day-to-day activities, and was an additional reason why she chose to dis-enroll.

Furthermore, when a school knows or reasonably should know of harassment by other students against witnesses or potential witnesses, it must take immediate and appropriate steps to investigate or otherwise determine what occurred.  OCR found that the Title IX Coordinator and President were on notice that one or more student witnesses felt pressured by College XXXXXXXX XXXX XXXXXXX not to report what they had witnessed or participate in the investigation, yet the College failed to investigate or consider whether there may have been a threat of retaliation in its assessment of whether there was a hostile environment on campus.

OCR also determined that the failure to provide a prompt and equitable process denied or limited the Complainant's ability to participate in or benefit from the College's program.  During the course of the College's resolution, family members, the XXXXXXXXX Coach, and the Complainant stated that the Complainant, who had been independent, happy, and goal-oriented, became incapable of being unaccompanied on campus and had frequent emotional breakdowns.  The Complainant reported difficulty participating in class, XXXXXXXXXX XX X XXXXXXX XXXXXXX, and even eating in the cafeteria due not only to her fear that she would encounter the Respondent but also because the College did not effectively address the gossip about the incident and rumors about her sexual history with third parties following her report.  The Complainant, who had been a 3.56 GPA student XXXXXXX, ultimately decided that she could not concentrate on her classwork and formally withdrew.  While she did return to her studies and graduated XXXX XX XXXXXXXXX XXXXXX XXXX XXX XXXXXXXX XX XXXX, she ceased her participation XX XXX XXXXXXXXXX XXXX and never reenrolled XX XXX XXXXX XXXXXXX XXXXXX.

### Other Reports or Complaints: 2013-2014 to 2015-2016 School Years

The College provided OCR with 15 investigative files for oral reports and written complaints of sexual harassment and sexual violence that it received from the 2013-2014 through 2015-2016 school years.  Through this review of files, OCR identified deficiencies because in more than one case the College did not identify the policy or procedure under which an investigation was being conducted, determine what occurred, assess whether the conduct at issue created a hostile environment for the complaining student, provide notice to one or both parties of the outcome of the investigation, or provide interim measures or remedies to address the discrimination to the complainant.  In regards to two different respondents, the College issued a sanction at the conclusion of the grievance process without making a finding of a conduct violation.  In one case the College solicited and considered information about a complainant's sexual history, which may have had a prejudicial effect on the process; the College also did not provide the Complainant with an opportunity to review the statements made and respond.  In another case, a responsible employee did not promptly report to the Title IX Coordinator.  The following summaries are examples of cases where OCR identified deficiencies in the College's response.

Complainant One:  On March XX, 2014, the Director of the XXXXXX XXXXXX XXXXXXXXX XXX XXXXXXXX XXXXXX (Program Director) notified the Title IX Coordinator that a female student informed an instructor that a male student XXXXXXX XXXXXXXX XXXXXXX XX XXX XXXXXX and had groped her breast with his open hand during a class exercise XX XXXXXX XXXXXXX.  Both students were enrolled in a course through

XXX XXXXXX XXXXXX XXXXXXXXX XXX XXXXXXXX XXXXXX and were employees of an outside agency (Agency).  The Agency initiated an investigation.

The Title IX Coordinator inquired into the length of time to complete the investigation and whether it would be shared with the College.  Later the same day, the Program Director informed the Title IX Coordinator that the Agency had determined that no "impropriety" occurred and that the female student was satisfied with the outcome.  The Title IX Coordinator stated that he appreciated the report and took no further action.

Two days later, on March XX, 2014, an instructor at the College emailed the Safe Place Coordinator to inform her that the female student had reported the incident, and that classmates and Agency staff discouraged her from filing a formal complaint.  The female student alleged that Agency staff required her to participate in a meeting with the male student, even though the female student wanted to file a complaint.

On March XX, 2014, the Safe Place Coordinator and female student met with the Title IX Coordinator.  The Title IX Coordinator's notes of the meeting state that the female student was "distraught" with the outcome of the Agency's investigation and wished to file a formal complaint.  The Safe Place Coordinator requested the female student receive an extension on her upcoming exam because she was not sleeping and struggling to focus.  On March XX, 2014, the Title IX Coordinator's office stated that the College did not have the authority to extend the midterm date XXX XX XXXXXX XXXXXXXXXXXX.

On April X, 2014, the Safe Place Coordinator emailed the Title IX Coordinator that the female student was alleging retaliation by Agency staff, because she was being denied XXXXXXXXXX XXXXXXXX XXXXXXXXXXXX XXXX.  The Title IX Coordinator did not respond to the Safe Place Coordinator's email.

On April X, 2014, the Program Director informed the Title IX Coordinator that the female student would be removed from X XXXXXXXX XXX XXXX XX XXXXX because she was disrupting the class.  Later that same day, the female student emailed the Title IX Coordinator and stated that she had a two hour meeting with Agency staff who pressured her XX XXXXXX.  When she refused, staff told her that she XXXXX XX XXXXXXX.  On April X, 2014, the Title IX Coordinator told the female student that he had been informed that the Agency XXXXX XXXXXXXXXX XXXXXX (XXX) would initiate an investigation.  He encouraged the student to submit a written complaint to his office.  The Agency XXX opened the investigation on April XX, 2014.

On April XX, 2014, the female student XXXXXXXXX X XXXXXXX XXXXXXXXX XX XXX XXXXX XX XXXXXXXXXXXX. XXX XXXXXX XXXXXXX XXXXX XXXX XXX XXXXXXXXX XXX XXXXXXXXXXXX XXX XXXX XXX XXX XXX XXXXXXXX XX XXXXX XX XXXX XXX.

The XXX Officer interviewed the male student on April XX, 2014 and the female student at the end of May 2014.  During this time, the female student began therapy with the College's Counselor, who emailed the Title IX Coordinator that the female student was "very distressed."

On August XX, 2014, the Agency XXX issued a findings letter to the female student and sent a copy to the Title IX Coordinator's office.  The Agency XXX found that Agency staff "mishandled the response to her complaint" but did not find that the male student violated the sexual harassment policy or that the Agency retaliated against her.  After reviewing the Agency XXX's findings letter, the Title IX Coordinator informed the President that the College did not need to take any further steps.

The Agency XXX sent the Title IX Coordinator a letter dated January X, 2015, which stated that the Agency would update applicable manuals to include XXX reporting, disseminate the Agency Sexual Harassment Prevention Policy, and conduct training on sexual harassment investigations for administrators.  The file does not reflect that the January X, 2015 letter was provided to the female student.

Based on the information provided, OCR identified deficiencies in the College's response because:  the Title IX Coordinator did not consider the information before him to determine if interim measures beyond counseling were appropriate;  the investigation was not prompt because it took 11 months to complete; the remedial actions taken by the Agency XXX may not have been shared with the female student; and the College did not assess whether the Agency XXX conducted its investigation in a manner consistent with Title IX requirements or if not, did not conduct its own investigation into the allegations under its grievance procedures, as required by Title IX.

<u>Complainant Two:</u>  On June XX, 2014, a female student filed a sexual harassment complaint, alleging that on June XX, 2014 the male student subjected the female student to unwanted kissing, touching of her breasts under her shirt, and repeat attempts to put his hands down the front of her pants when she was XX XXX XXXX.  The Title IX Coordinator interviewed the female student on June XX, 2014 with the Safe Place Coordinator present; the male student was interviewed on June XX, 2014.  The July X, 2014 investigative report states that investigation addressed allegations of violations of BP 3540, sexual assault.

The investigators provided the female student with a notice of the Title IX investigation and interviewed her on July X, 2014.  The investigators contacted the female student's witnesses on multiple occasions but they would not respond.

The investigators provided the male student with a notice of the Title IX investigation and the allegation, and interviewed him on July X, 2014. The male student stated he and the female student engaged in consensual kissing, and that he "tried to do more with his hands" but that the female student moved his hands away.  On July X, 2014, the investigators interviewed the male student's witnesses, two supervisors of the male and female student.

The credibility assessment portion of the investigative report states the female student's witnesses failed to provide evidence to substantiate her allegation, that other witnesses "questioned [the female student's] integrity", that the female student's account of the incident to her supervisor and to the investigators was different, that the supervisors stated that the female student initiated contact with the male student XX XXXX after the incident, that "[the supervisors] state[d] that the female student … XXX XXXXX XX XX XXXX XXXX XXXXXXX XX XXX XXXX", and that the supervisors thought the male student was a good worker, non-aggressive, and got along well with others.  The investigators concluded that it was "not more than likely that [the male student] violated [BP/AP 3540]."

On August X, 2015, the Title IX Coordinator issued a determination letter to the male student, with a copy to the female student, which included the no violation finding but stated that the Title IX Coordinator had determined that the College would take appropriate action to prevent recurrence of the behavior.  Specifically, the Title IX Coordinator placed the male student on permanent probation and directed him to stay away from the female student.

Based on the information provided to OCR, the College properly notified the male student of the allegations, identified BP 3540 as the applicable policy, reached a prompt determination within 54 days, interviewed or attempted to interview all witnesses, and completed an investigative report with findings that was provided to both parties.  However, OCR identified two deficiencies.  First, the Title IX Coordinator issued a sanction – permanent probation -- to the male student in spite of a no violation finding.  Second, the investigators based their determination in part on the College supervisors' comments about the female student's unrelated sexual interactions with third parties, and the female student was not given an opportunity to rebut statements made by staff supervisors, which may have resulted in an inequitable process.

Complainant Three:  On October X, 2014, a female student reported to campus police that while on a College bus on September XX, 2014, a male student touched her bra strap, and repeatedly rubbed her breasts with his arm without her consent.  The police officer's report stated that after taking the female student's report, he brought her to the Safe Place office. The Safe Place Coordinator assisted her in filing a complaint and provided support, including facilitating an excused absence in a class.

The police officer rode the bus in plain clothes with the female student on two occasions, until she identified the male student, who was previously unknown to her, on October X, 2014, at which time the officer took the male student into custody and questioned him.  The Title IX Coordinator interviewed the male student on November XX, 2014.  The Title IX Coordinator referred the male student to the College's mental health counseling department, but he did not go to the appointment.  The Title IX Coordinator provided a written determination letter to both parties, dated January XX, 2015, which included the allegation, sanctioned the male student with permanent probation, and ordered him to have no contact with the female student but did not identify a conduct violation under the College's policies.

Based on the information provided to OCR, the complaint was resolved timely in approximately three and a half months, and the College took action to investigate the allegation and provided a written determination letter to both parties.  However, OCR is concerned that the process was not equitable for the male student because the letter issued to the male student did not include a determination as to whether the harassing conduct occurred or the policy/procedure under which the determination was made.  Nevertheless, the male student was placed on permanent probation.  If the College determined that the conduct occurred, there is no documentation that would show that the College assessed whether the female student was subjected to a hostile environment based on the incident.

Complainant Four:  On March X, 2016, a female student made an oral report and gave a voluntary written statement to campus police, stating that from about January XX, 2016 to March X, 2016,  a male student in her class commented on and touched her legs, called her multiple times a day, sent her multiple texts a day, sat next to her during class, even when she tried to move away, tried to walk with her after every class and drive her home, and offered her medication to help her relax when she went out.  The female student reported that she arranged to have another female student meet her after class because the male student's behavior was unwelcome and frightened her.  In this regard, the female student reported that she had panic attacks before class and when the male student called her, and that she feared he would find out where she lived.

On March x, 2016, campus police interviewed the male student.  The male student denied touching the female student, and said that he offered the female student his pain medication as a favor, and he offered her rides because he thought she lived near him.  Campus police told the male student to refrain

from contacting or sitting near the female student, and that a copy of the police report would be forwarded to the Title IX Coordinator, who would contact the male student to schedule an interview.

Student Services received the police report on March X, 2016, and determined that the male student had no prior discipline as of March XX, 2016.  On March XX, 2016, the Title IX Coordinator met with the male student and gave him a verbal warning.

Based on the information provided, the complaint was resolved within about fifteen days.  However, OCR identified a deficiency because the documentation that the College provided to OCR does not show that the female student was ever contacted by the Title IX Coordinator, given information about her right to make a written complaint, or referred to Safe Place or offered interim remedies, nor did she receive any other follow-up from anyone at the College.

CONCLUSION

The College has entered into the enclosed Resolution Agreement (Agreement) to address the deficiencies and violations identified in this matter. The Agreement includes but is not limited to:

- Revisions to the College's policies and procedures so that they are compliant with Title IX requirements;
- OCR review of the College's investigations of sexual harassment and sexual violence allegations during the term of the Agreement;
- Development of a confidential system for reviewing and examining oral reports  and written complaints of sexual harassment, which includes information about interim measures, remedies and notice of the outcome;
- Guidance and training for staff regarding the revised policy, procedure and complaint system;
- Student training on the prevention of sexual harassment and sexual violence and reporting and the prohibition on retaliation; and
- Individual remedies for the OCR Complainant.

Based on the commitments made in the enclosed Agreement, OCR is closing the investigation of this complaint as of the date of this letter. When fully implemented, the Agreement is intended to address the violation findings and compliance deficiencies identified in this investigation. OCR will monitor the implementation of the Agreement until the College is in compliance with the statute(s) and regulations at issue in the case.  OCR's determination in this matter should not be interpreted to address the College's compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

This letter sets forth OCR's determination in this case.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  Please be advised that the College may not harass, coerce, intimidate, retaliate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process.  If this happens, the Complainant may file another complaint with OCR alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  In the event that OCR receives such a request, it will seek to protect, to the extent provided by the law, personal information that, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

Thank you for your cooperation in resolving this case.  If you have any questions regarding this letter, please contact Monique Raco-Fuentes and Julie Baenziger at the San Francisco OCR office at (415) 486-5555.

Sincerely,

/s/

Laura Faer
Regional Director

Enc.

## RESOLUTION AGREEMENT
Butte-Glenn Community College District
OCR Case No. 09-13-2096

The Butte-Glenn Community College District is comprised of one community college, Butte College. Throughout the Resolution Agreement (Agreement), the term College is used to refer to both the College and the District. Without admitting to any violation of law, the College agrees to implement this Agreement in the above-referenced case investigated by the U.S. Department of Education, Office for Civil Rights (OCR) under Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulation. The Agreement includes terms that resolve allegations for which OCR identified violations under section 303(b) of OCR's Case Processing Manual (CPM). The Agreement also includes terms in Sections VI. and X. that the College has voluntarily entered into and agreed to in order to resolve an allegation that was not fully investigated prior to the conclusion of the investigation in accordance with section 302 of the CPM.

In addition, the College is entering into the Agreement to assure that it has an environment and culture in which all students feel safe and well supported, and that it responds promptly, effectively, and equitably to incidents of discrimination on the basis of sex, including sexual harassment and sexual violence, in a manner designed to stop the discrimination, prevent its recurrence, and remedy its effects, consistent with the requirements of Title IX.

## I.   NOTICE OF NONDISCRIMINATION

a. Consistent with the requirements of 34 C.F.R. §§ 106.8 and 106.9, the College will amend its notice of nondiscrimination to include the contact information for the Title IX Coordinator (name, title and contact information, including phone number, office and email address) and a statement that inquiries concerning the application of Title IX may be referred to the Title IX Coordinator or OCR and will publish the revised notice in all required locations, including but not limited to the College and Safe Place and Wellness Program (Safe Place) websites, in its promotional materials, the student and employee handbook, application forms and registration materials, student pamphlets, and other electronic and printed publications that provide information to employees, applicants, and students about the College.

b. **Reporting Requirement:**  By September 30, 2017, the College will provide OCR with a copy of its notice of nondiscrimination for review and approval, along with an explanation of the distribution plan and an assurance that the College will continue to distribute the notice of nondiscrimination approved by OCR in compliance with the regulations. Within 45 days of OCR's approval of the notice of nondiscrimination, the College will provide OCR with documentation of its dissemination of the notice of nondiscrimination, including web links to the aforementioned publications containing the notice of nondiscrimination and, to the extent a publication is only provided in print form, the title page of that publication and the page(s) on which notice appears. If the College makes changes to the notice of nondiscrimination and/or distribution plan while this Agreement is in effect, the College will provide the

AR_00000503

revised notice of nondiscrimination and/or distribution plan to OCR within 45 days of such decision for review and approval.

## II.   **TITLE IX COORDINATOR**

a.  The College will identify its Title IX Coordinator and her/his qualifications and ensure that the Title IX Coordinator has received the required training and can fulfill all responsibilities specified in this Agreement. The Title IX Coordinator will have a line of reporting that will provide for sufficient autonomy and authority to effectively execute the responsibilities of the Title IX Coordinator.  The College will develop a statement of roles and responsibilities and mandatory training requirements for the Title IX Coordinator to, at a minimum, include:

   i.   The Title IX Coordinator will have expert knowledge of the Title IX grievance procedure(s) and oversight responsibility for the prompt and equitable response to Title IX disclosures, oral reports, and written complaints (reports) made directly to the Title IX Coordinator and from any individual, including but not limited to students, employees, third parties, and those delegated the responsibility for receiving and/or investigating reports of sex discrimination, including sexual harassment and sexual violence, and will address any patterns or systemic issues that arise during the review of such reports under Title IX and assess overall efficacy of prevention, coordination and response by the College to sexual harassment and sexual violence, including the implementation and efficacy of interim measures, and steps taken to stop discrimination/harassment on the basis of sex found to have occurred, prevent its recurrence, eliminate any hostile environment based on sex and remedy its discriminatory effects on the complainant and others, as appropriate.

   ii.  The Title IX Coordinator will coordinate with appropriate administrators and administrative offices (e.g., academic deans, Vice President of Student Affairs, Human Resources), Safe Place, student and health and counseling services, and law enforcement offices to identify and address any patterns or systemic problems under Title IX and to assess the overall efficacy of the coordination among these various offices.

   iii. The Title IX Coordinator will be responsible for the prompt and equitable investigation of reports alleging sexual harassment and sexual violence; making findings as to whether sexual harassment and/or sexual violence occurred; identifying remedies (including interim measures) necessary to address sexual harassment and/or sexual violence, eliminate any hostile environment, prevent recurrence, and address the effects; and will be available to present any investigative report and/or answer questions about the proceedings below.  To the extent that any of these duties in this subpart will be delegated to other individuals at the College or an external entity, the statement will include what will be delegated to whom and how the Title IX

Coordinator will retain oversight of those who may be delegated such responsibilities in fulfilling these duties.

iv. The Title IX Coordinator will coordinate the duties and activities of any Title IX investigators (and/or Deputy Title IX Coordinators) or an external entity the College designates. The College will develop specific statements of roles and responsibilities for each Title IX investigator and/or Deputy Coordinator that delineate the scope of each individual's duties and their subordinate role to the Title IX Coordinator.

v. The Title IX Coordinator will have sufficient experience and training on the substantive requirements of Title IX and how to investigate reports under Title IX. The Title IX Coordinator will oversee the provision of initial and ongoing training on the substantive requirements of Title IX and how to investigate reports under Title IX to any Deputy Title IX Coordinator, Title IX investigators and any other individuals from any College department or office delegated responsibility for receiving and/or investigating reports of sex discrimination, including sexual harassment and sexual violence.

vi. The Title IX Coordinator will have responsibility for the development, scheduling, and implementation of regular events hosted by or supported by Safe Place and leadership on campus to raise awareness in the campus community about all forms of sex discrimination (including sexual harassment and sexual violence).

vii. The Title IX Coordinator will ensure the development, scheduling and implementation of necessary training and distribution of information for the College community (faculty, coaches, and staff (employees) and students) regarding their Title IX rights and responsibilities, including information about the resources available on and off College property, the duty of responsible employees to share information with the Title IX Coordinator, informal and formal resolution processes, the availability of interim measures, and the right to file a report with local law enforcement and the College simultaneously.

viii. The Title IX Coordinator will be responsible for periodic review and assessment of the College's Title IX policies and procedures to ensure that they comply with Title IX, are consolidated to the maximum extent appropriate to provide an efficient resource for students, faculty, and staff, are consistent with each other or have appropriate cross-references, and are easy to access and understand.

ix. The Title IX Coordinator should not have other job responsibilities that create a conflict of interest with regard to the duties and responsibilities under Title IX.

AR_00000505

x.  The Title IX Coordinator will be responsible for communicating with the campus police regarding the College's obligations under Title IX and serving as a resource on Title IX issues.  The Title IX Coordinator will be given access to campus police records regarding Title IX investigations, so long as it does not compromise the criminal investigation or is not otherwise prohibited by law.  The Title IX Coordinator will ensure training is provided annually to the campus police regarding the College's Title IX obligations and their duties as responsible employees under Title IX.

xi.  The Title IX Coordinator will be responsible for coordinating the development and implementation of annual assessments (e.g., surveys or focus groups) of campus climate with regard to sexual harassment and sexual violence.

b.  **Reporting Requirements:**

i.  By August 15, 2017, the College will provide documentation to OCR showing that it has established the responsibilities of the Title IX Coordinator position in accordance with Section II for OCR review and approval.

ii.  By August 15, 2017, the College will provide OCR with a copy of the statement of Title IX Coordinator's responsibilities and corresponding training requirements to meet those responsibilities for OCR review and approval.

iii.  By September 30, 2017, the College will provide OCR with copies of any electronic links to College publications, websites or other materials where the statement has been published.

iv.  By September 30, 2017, the College will provide OCR with the name and qualifications of the Title IX Coordinator and the Coordinator's training schedule in accordance with II.b.ii.

## III.   POLICIES AND PROCEDURES

a.  The College will revise its policies and procedures, including, but not limited to: BP 3430 and AP 3430 "Prohibition of Harassment"; AP 3435, "Discrimination and Harassment Investigations"; BP 3540 and AP 3540, "Sexual Assaults"; Procedures 5.7 "Sexual Harassment," and 5.8 "Unlawful Discrimination"; and BP 5500 and AP 5500, "Standards of Conduct: Student Discipline and Title IX Procedures," so that they are consistent with Title IX requirements.  The College has determined that it will create one policy and procedure to address sexual harassment and sexual violence and eliminate duplicative policies and procedures.

b.  The College will conduct a comprehensive review of all of the policies and procedures listed in Section III.a., and any additional relevant published College materials through any College department or office, and submit for OCR review and approval revisions to policies and procedures and other related guidance and documents (documents) related to reports of sexual harassment and sexual violence

involving students, faculty, staff and third parties.  To the extent the College retains multiple secondary guidance documents, i.e., Human Resources and Student Conduct Code guidelines and Safe Place brochures, the College will ensure that all documents are consistent with the remaining policy and procedure with respect to defined terms, reporting options and timelines, and investigation and appeal procedures. The College's revisions to policies and procedures will include revising or adding cross-references and links between documents and/or deleting documents, to ensure, at a minimum:

   i.   in addition to the remaining policy and procedure, all other documents will be internally consistent and will not contain conflicting/contradictory information;

   ii.  clear and consistent explanations in all documents of the specific College policy and/or procedure that applies to each type of report investigation;

   iii. the College's commitment to respond to all reports of sexual harassment and sexual violence, as well as any other incidents of sexual harassment and sexual violence of which it knows of should have known;

   iv.  notification to students, employees and third parties about the policy and procedure that shall be utilized for reports of sexual harassment and sexual violence when filed by or against any member of the aforementioned groups;

   v.   consistent definitions of sexual harassment, which must encompass quid pro quo, persistent or pervasive harassment, as well as severe incidents (i.e., sexual violence);

   vi.  consistent definitions or explanation of factors that may impact the ability to consent, including incapacitation;

   vii. a statement that, in determining whether sexual harassment against a student resulted in a sexually hostile environment, the College will consider the conduct in question from both a subjective and objective perspective;

   viii. reasonable and consistent time frames for each major stage of the procedure;

   ix.  consistent and equitable rights and information provided to both parties to a report, including but not limited to an equal opportunity for the parties to access and review evidence, and present witnesses and other evidence and to receive notice of the outcome of the grievance process, including but not limited to the investigation and appeal phases;

   x.   if the College continues to offer an informal resolution process, it will include a description of what the process entails and ensure that it is prompt and equitable;

   xi.  clarification regarding the College's obligation to identify witnesses, seek evidence, and ask questions of the parties and witnesses when resolving reports of sexual harassment and sexual violence;

   xii. a requirement that the College consider the effects of off-campus sexual harassment and sexual violence when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity;

   xiii. a definition of "responsible employee" that is consistent with Title IX requirements and a statement that responsible employees must promptly,

AR_00000507

within 24 hours, report sexual harassment and sexual violence upon receiving notice;

xiv. the name or title, office address, e-mail address, and telephone number of the Title IX Coordinator;

xv. an explicit prohibition against retaliation, which includes witness intimidation and interference, and clarification that reports of any of the aforementioned will be promptly investigated by the College under processes and standards that meet Title IX requirements;

xvi. a statement recognizing that introduction of evidence of the complainant's past sexual relationships with individuals other than the accused may have a prejudicial effect on the proceedings and should not be considered;

xvii. sufficient time for any appeal body to review the investigation record and any supplemental materials prior to the appeal hearing, if an appeal is offered;

xviii. if someone other than the Title IX Coordinator will accept, investigate and resolve the report, clear and consistent designation of the College employee and/or office that is responsible and the specific type of report (e.g., against employees) handled by that employee or office;

xix. clear and consistent assurance that, regardless of which College employee or entity investigates and resolves the report, that the Title IX Coordinator will maintain oversight of the report investigation and resolution, will be provided written notice of the report and the investigation determination, and where sexual harassment/sexual violence is found to have occurred, will oversee the steps the College will take in response;

xx. a description of applicable interim remedies, remedies and sanctions; and
a statement that the Title IX Coordinator, and/or her or his specific designee, will be responsible for coordinating the provision of interim measures through multiple College departments or offices, and in determining and implementing such measures, the Title IX Coordinator will review all available information and seek to minimize the burden on the complainant.

c. **Reporting Requirements**

i. By January 30, 2018, the College will provide OCR with a draft of the revised policy(ies) and procedure(s) and related documents for review and approval.

ii. Within 90 days of receipt of OCR's approval, the College will provide documentation to OCR showing that it has adopted the revised policy and procedure and to the extent necessary, secondary documents as required by Section III, provide notification of the same on its website and through an electronic mail message to all employees and students, and provide documentation to OCR regarding the same, including links to the updated website, a copy of the electronic mail message, a copy of and/or link to any updated printed publications containing the revised policy(ies) and procedure(s), such as the College Catalog, Title IX web page, Student Handbook, Safe Place web page, campus police web page, and any additional documentation that the College has regarding its distribution.

iii. Once the College adopts the revised policy and procedure related to sexual harassment and sexual violence, the College will not substantially modify them during the period of the Agreement without the review and approval of OCR. All requests to modify such policy and procedure must be made in writing at least 90 days before the College proposes to adopt the modification.

## IV.   STAFF TRAINING AND PROFESSIONAL DEVELOPMENT

a. The College will provide comprehensive training overseen by the Title IX Coordinator to Title IX investigators, Human Resources personnel, Student Campus Climate Committee (Student Climate Committee), and campus police, as well as all College employees.

b. Specifically, the Title IX Coordinator, after consulting with Safe Place, will ensure the development and provision of annual comprehensive Title IX training to all College employees. The training will provide an understanding of the College's responsibilities under Title IX to address allegations of sexual harassment, sexual violence, and retaliation. The training will include, at a minimum:

  i. the College's revised policies and procedures for Title IX reports required by Section III.;
  ii. how to inform students and complainants of their right to file Title IX reports and criminal complaints simultaneously;
  iii. an explanation of the duty for responsible employees to share information with the Title IX Coordinator;
  iv. information about the prohibition on retaliation, how to prevent retaliation, and how to investigate complaints of retaliation;
  v. information about the system required by Section VI.; and
  vi. a post-training questionnaire to assess knowledge regarding how to provide a report and respond to sexual harassment and sexual violence.

c. Beginning with the 2017-2018 academic year, the College will ensure that all new employees complete the training in person or through an OCR approved online training, pursuant to Section IV.a.-b., within six months of their employment start date.

d. The Title IX Coordinator will ensure the development and provision of Title IX training for all College employees who are directly involved in receiving, investigating, and/or resolving reports of sex discrimination, including sexual harassment and sexual violence, or who will otherwise assist in the coordination of the College's compliance with Title IX. This annual training will be conducted in person and will include, at a minimum:

  i. the College's revised policies and grievance procedures for Title IX reports;

    ii.  the College's responsibilities under Title IX to address allegations of sexual harassment and sexual violence, whether or not the actions are potentially criminal in nature;

   iii.  the neurobiology of trauma and possible impact on an individual's participation in the grievance process;

   iv.  recognizing and responding to allegations and reports pursuant to Title IX, including conducting interviews of victims of sexual violence and communicating in an impartial and objective manner;

   v.  recognizing and appropriately responding to allegations of retaliation, intimidation, and coercion pursuant to Title IX;

   vi.  how to conduct and document equitable, adequate, prompt, reliable and impartial Title IX investigations, including the appropriate legal standards to apply in a Title IX investigation;

   vii.  protection of information regarding sexual harassment and sexual violence allegations so that only College employees with a need to know receive such information;

  viii.  the link between alcohol and drug use and sexual harassment and sexual violence, including how to address the challenges of investigating incidents involving alcohol or drug use; and

   ix.  a written assessment requiring participants to demonstrate that they have learned the material in the Title IX training.

**e.  Reporting Requirements:**

   i.  By January 30, 2018, the College will identify and report any additional training needed for specific groups of employees, including but not limited to the Title IX Coordinator and Investigators, Safe Place Coordinator, Human Resource personnel, and campus police.

   ii.  By February 28, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will provide OCR with a draft of the proposed staff training materials and the name and title of the trainer described in Section IV. for review and approval.

   iii.  The College will implement the staff training as outlined in Section IV. within 60 days of OCR review and approval and provide documentation that the training has been provided, including a copy of the training materials, dates(s), the name and contact information of the individual(s) who conducted the training, and the sign-in sheet identifying the name and position of each individual who received the training, along with a list of College employees within 15 days of completion.

## V.  TRAINING OF ANY APPEAL BODY

a. The College will ensure that any individuals participating in any body created by the College to hear appeals, including those involved with any level of appeal, shall receive training annually and at least 30 days prior to reviewing any appeal on sexual harassment and sexual violence.

b. The Title IX Coordinator will develop the training materials specific to the appeal body and ensure that this training will be provided in person and shall include but not be limited to:

    i. the College's revised policies and grievance procedures for sexual harassment and sexual violence and the standard of review to be used by the appeal body;

    ii. the College's responsibilities under Title IX to address allegations of sexual harassment and sexual violence in a prompt and equitable manner;

    iii. the College's definitions of sexual harassment, which must encompass quid pro quo, persistent or pervasive harassment, as well as severe incidents (i.e., sexual violence);

    iv. the College's definitions or explanation of factors that may impact the ability to consent, including incapacitation;

    v. how to review evidence, including the weighing of evidence in an impartial and reliable manner; and

    vi. training on the neurobiology of trauma.

c. **Reporting Requirements:**

    i. By November 15, 2017, the College will provide OCR for review and approval the proposed training materials and any agendas to be used in the trainings conducted pursuant to Section V. The College will also provide information, for review and approval, describing the expertise and experience with regard to sexual harassment and sexual violence of the person or persons conducting the training pursuant to Section V.

    ii. By May 1, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will provide documentation to OCR showing that the individuals who are required to receive training in order to serve on any appeal body have received the training as required.

## VI.   REVIEWING AND EXAMINING REPORTS

a. The College will develop and implement a confidential electronic database or other system for reviewing and examining reports (including reports that do not result in the filing of a complaint), investigations, interim measures, and resolutions of student, employee, and third party conduct that may constitute sexual harassment or sexual violence to ensure that such reports are adequately, reliably, promptly and impartially investigated and resolved. The system will require, at a minimum, that:

    i.  all offices, including the campus police department, with the exception of health care professionals and any other individuals who are statutorily prohibited from reporting, will notify the Title IX Coordinator within 24 hours of receiving notice of sex discrimination, including sexual harassment and violence, regardless of whether a formal complaint was filed, for the purpose of ensuring that individuals subject to discrimination are consistently and promptly receiving necessary services and information;

    ii.  the Title IX Coordinator or her or his designee enter into an electronic, confidential database or other system the following fields of information: the date and nature of the complaint or other report (bystander or responsible employee report); the name of the complainant or that the report was anonymous; the location and date of the alleged conduct; the name of the person(s) who received, made or forwarded a report; the name(s) of the respondent; the name(s) of the person(s) assigned to investigate the report; any interim measures taken, and any disciplinary charges issued; the date and a summary of the investigative findings; the date and a summary of the outcome of any appeal; and a summary of the final remedial and disciplinary actions taken, if any; and

    iii.  the Title IX Coordinator shall ensure the maintenance of records of all reports, investigations, findings, the basis for those findings, and appeals, including, but not limited to: the complaint or report; the names of the complainant, the respondent, and witnesses; any statements or other evidence submitted or collected; interview notes; correspondence relating to the investigation; actions taken on behalf of the complainant and/or respondent, including interim measures; actions taken against the respondent; records of past discipline resulting from earlier findings of sexual harassment and/or sexual violence and records of any discipline or proposed discipline with respect to the present conduct; records of findings and outcomes communicated to the parties; and records of any appeals.

**b. Reporting Requirements:**

    i.  By December 15, 2017, the College will provide a draft of the system for reviewing and examining sexual harassment and sexual violence reports described in Section VI. to OCR for review and approval. The College will adopt the system in Section VI. within 60 days of OCR approval.

    ii.  Until such time as OCR closes the monitoring of this Agreement, within 30 days of the end of each semester, the College will provide OCR with a copy of all reports, including all fields of information, entered into the electronic database described in Section VI. above for the preceding semester.

## VII.    STUDENT TRAINING

a.  The Title IX Coordinator, after consulting with Safe Place, will ensure implementation of annual mandatory training as described herein in VII.b. - g. for all students with the exception of those defined in VII.h. below.

b.  The training whether in person and/or online will include, at a minimum, information about:

    i.  the College's revised sexual harassment/sexual violence policies and procedures;

    ii.  the College's prohibition against sexual harassment, sexual violence, and retaliation and how to recognize such forms of sex discrimination when it occurs;

    iii.  how and to whom any incidents of sexual harassment, sexual violence, and retaliation should be reported; and

    iv.  Title IX, the rights this law confers on students, the resources available to students who have experienced sexual harassment, sexual violence and retaliation, and the role and authority of OCR to enforce Title IX.

c.  These sessions should be interactive, presented in lay terms familiar to students, and illustrated with examples relevant to student life at the College, and should provide in-person opportunities throughout the academic year for students to engage in small group discussion about the information presented.  The Title IX Coordinator shall obtain input from the Student Committee, outlined below, and Safe Place regarding the content and manner of delivering the training to maximize the training's effectiveness for students.    These sessions will emphasize:

    i.  definitions or explanation of factors that may impact the ability to consent, including incapacitation;
    ii.  the role of alcohol and other drug use in incidents of sexual harassment and sexual violence, including how such use may relate to consent and incapacitation;
    iii.  clear examples of what types of actions may constitute sex discrimination in the College's programs or activities, including but not limited to different types of sexual harassment and sexual violence;
    iv.  the role of bystanders;

d.  An in-person session will be provided as part of the annual student orientation for new students (including visiting and international students). The College will require all new students who arrive after the in-person orientation has concluded to complete an online training and will provide information about in-person

sessions being offered during the course of the school year.  The College will develop a system to ensure that all students have participated in the mandatory training.

e.  For students with disabilities enrolled in the College's Special Education (SPE) dual enrollment program, the College will modify the training as appropriate to meet the needs of those students as required by Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, and their implementing regulations.

f.  For students dually enrolled with their high school and the College, the College will modify the training as age appropriate to meet the needs of those students.

g.  For students enrolled as English as a Second Language (ESL) learners, the College will develop a process to identify the predominant languages spoken and provide appropriate translation of training materials and/or modify the training to provide equal access to content of the training to ESL students.

h.  For students enrolling solely to attend College trainings of two weeks or less or a contract education class through an employer, the College will develop a mechanism for delivering information upon enrollment about the College's notice of nondiscrimination, prohibitions of sexual harassment, sexual violence, and retaliation, and the College's grievance procedures, such as a disclosure statement for signature provided with enrollment materials or pre-enrollment online material.

i.  **Reporting Requirements**:

   i.  By February 28, 2018, the College will provide OCR, for review and approval, the proposed training materials and any agendas to be used in the trainings conducted pursuant to Section VII.  The College will also provide OCR, for review and approval, information describing the expertise and experience with regard to Title IX of the person or persons conducting the training.

   ii.  By February 28, 2018, the College will provide OCR, for review and approval, the proposed alternative mechanism and any materials to be used to provide the pre-enrollment information as described in Section VII.h.

   iii.  By June 1, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will provide documentation to OCR showing that the individuals who are required to receive the training required by Section VII. have done so.

## VIII.   EDUCATIONAL CLIMATE

a. The Title IX Coordinator will consult with Safe Place and use the results from the College's Campus Climate Survey administered in the 2015-2016 school year to develop and administer one or more annual climate assessments for all students to:

  i. assess students' perceptions and knowledge regarding sexual harassment, sexual violence, and retaliation;
  ii. gather information regarding students' experience of sexual harassment and sexual violence while attending the College, if any;
  iii. determine whether students know when and how to report such conduct;
  iv. gauge students' familiarity with where/how to report and their willingness to report;
  v. identify potential barriers to reporting;
  vi. assess students' familiarity with the College's outreach, education, and prevention efforts to identify which strategies are effective and which may need to be replaced;
  vii. solicit student input on how the College can encourage reporting of sexual harassment, sexual violence, and retaliation and prevent the same; and
  viii. assess bystander experience.

b. Among the tools used to assess climate, the College may choose to conduct anonymous surveys or student focus groups, and/or develop other means of gathering student input regarding the topics in Section VIII. that will be the subject of the annual climate assessments.  The College will include at least one forum or option that allows students to participate anonymously.

c. The College will use the data from each year's assessment to inform its identification of appropriate future climate assessments and the training required under this Agreement.  Based on a review of each climate assessment's results, the Title IX Coordinator will develop a plan of appropriate and responsive actions to present to the President/Superintendent.

d. By December 15, 2017, the Title IX Coordinator will create and facilitate the meetings of a Student Campus Climate Committee (Student Committee) comprised of diverse and representative student members from the College community.  The Student Committee will study existing data and the requirements of Title IX and will identify and recommend strategies for the prevention of incidents of sexual harassment and sexual violence and retaliation, including outreach and educational activities to ensure that students understand their rights, how to prompt bystander intervention, and how to report possible violations of Title IX.  The Student Committee's recommendations will presented to the President/Superintendent in an annual report and shared with the Board of Trustees, who will take appropriate responsive action.

e. **Reporting Requirements:**

i.   By December 15, 2017, the College will provide OCR with the data collected from the 2015-2016 Campus Climate Survey.

ii.  By February 1, 2018, the College will provide for OCR's review and approval a detailed plan for collecting the information in Section VIII., including a copy of any climate assessment or other instrument it proposes to administer or utilize.

iii. By May 15, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will provide OCR with a report documenting that the annual climate assessment and the other means for collecting student input have been completed.  The report will include the cumulative results of the assessments, the Title IX Coordinator's analysis of the results, and the College's proposed actions based on that analysis and the assessment information.

iv.  By March 1, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will send OCR a list of the current membership of the Student Committee, a report detailing the strategies identified and recommended by the Student Committee, and documentation that it has published the Student Committee's report.

v.   By May 1, 2018, and by the same date annually thereafter until such time as OCR closes the monitoring of this Agreement, the College will inform OCR concerning which Student Committee recommendation(s) were adopted and which recommendation(s) were not adopted, as well as the basis for such decisions.

## IX.   **INDIVIDUAL REMEDIES**

a.  The College President will invite the Complainant to a meeting in which the President will explain the ways in which the grievance process has been revised to meet the Title IX requirements for complainants and respondents and provide the Complainant with an opportunity to share concerns regarding her experiences with the College's handling of her 2012 complaint.

b.  To the extent reimbursement has not been provided, the College will reimburse the Complainant for the tuition, fees, books, and instructional materials purchased for classes at the College during the fall 2012 semester.  The College will also reimburse the Complainant for any undergraduate tuition paid through the 2012-2013 and 2013-2014 school year, including related costs for fees, books, and instructional materials.

c.  The College will provide reimbursement to the Complainant for any costs associated with her medical, psychological and emotional support needs related to the September 29, 2012 incident for two years from the date of the incident.

d.  **Reporting Requirements:**

   i.   By August 15, 2017, the College will provide OCR with a draft of the meeting invitation described in Section IX.a. for review and approval.  The College

AR_00000516

will mail the statement to the Student's last known address and email address within ten (10) days of OCR approval.

ii. By August 15, 2017, the College will provide the Complainant with written notification of the College's obligations under Section IX.b.-c. above, including an explanation of how the College will provide reimbursement for any expenses as described in Section IX.b.-c. above.  The College will provide a copy of the notification to OCR within 15 days of issuing it to the Complainant.

iii. By January 15, 2018, the College will verify to OCR that any reimbursement required by Section IX. has been provided to the Complainant.

## X.    REVIEW OF REPORTS

a.  The College will review reports received by the Vice President and/or Director of Human Resources from the 2013-2014 to the 2015-2016 academic years and determine whether there are any investigative steps that should have been completed to ensure an equitable and reliable process for the parties; where a finding of sex discrimination is made, whether there are any appropriate remedies that may still be available, such as counseling or academic adjustments; whether there are investigative steps or remedies necessary to identify and address any extant concerns about sexual harassment, sexual violence or retaliation; and whether a notice of the outcome was provided.

These reviews will at a minimum address the deficiencies identified by OCR during the course of this review, including the deficiencies identified with respect to inequitable treatment of respondents, although the College is not expected to reinvestigate or rehear matters that had been finally resolved under College policy.  After this review, any complainant and/or respondent identified as not having received a prompt and equitable process will receive a written notice of the outcome of this review.  The notice of the outcome will include an offer from the College of remedies and/or explanation of other actions the College proposes to address the deficiencies and an invitation for the individual to contact the College to discuss the proposal, including remedies the individual believes should be offered.

b.  Commencing with academic year 2016-2017, the College will annually submit for OCR's review and approval copies of all reports that allege sexual harassment and sexual violence and documentation related to the investigation of each report, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, documentation regarding interim measures offered and/or provided, any final disposition letters, hearing records, disciplinary records, documentation regarding any appeals, and documentation regarding additional steps taken to stop harassment found to have occurred, prevent its recurrence, and remedy its effects on complainants and others, as appropriate.

c.  **Reporting Requirements:**

    i. By February 23, 2018, the College will provide for OCR's review and approval the results of its review as described in Section X. of this Agreement, including, but not limited to, any proposed notices of the outcome to be issued and any actions taken by the College and remedies put in place by the College as a result of its review. If OCR determines that the College must take any different or further action(s) and/or provide any different or further remedies, OCR will provide the College with notice of the corrective action and an opportunity to discuss the scope of the action.  The College will initiate the corrective action(s) within forty-five (45) calendar days of receipt of OCR's determination.

    ii. Reports and related documentation for academic year 2016-2017 shall be submitted to OCR by December 15, 2017 and annually on the same date thereafter until such time as OCR closes the monitoring of this Agreement.  If OCR determines that the College must take any corrective action(s), OCR will provide the College with notice of the corrective action and an opportunity to discuss the scope of the action.  The College will take the corrective action within forty-five (45) calendar days of receipt of OCR's determination.

## XI.   MONITORING

The College understands that OCR will keep the monitoring of this case open for a minimum of three years and will not close the monitoring of this Agreement until OCR determines that the College has fulfilled its terms and is in compliance with the regulation implementing Title IX, at 34 C.F.R. Part 106, which was at issue in this case.

The College further understands that during the monitoring of this agreement, if necessary, OCR may visit the College, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the College has fulfilled the terms of this Agreement and is in compliance with the regulation implementing Title IX, at 34 C.F.R. Part 106, which was at issue in this case.  By signing this Agreement, the College agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement.

The College understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of this Agreement.  Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce this Agreement, OCR shall give the College written notice of the alleged breach and sixty (60) days to cure the alleged breach.


_____/s/_____          _____07/12/2017_____

Dr. Samia Yaqub, President                                    Date

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Monday, August 07, 2017 11:33 AM |
| **To:** | Jackson, Candice |
| **Subject:** | QA draft - Investigations sections |
| **Attachments:** | QA draft - Investigations sections.docx |

# DPP

# DPP

# DPP

# DPP

# DPP

AR_00000524

# DPP

Page 1206
withheld pursuant to exemption
(b)(5)
of the Freedom of Information and Privacy Act

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 2:05 PM |
| **To:** | Karvonides, Mia |
| **Subject:** | Quick turnaround |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update.docx |

Mia,
This incorporates the initial round of changes requested upstairs. If you could review lightly for clarity and typos, I need to then send this around to the same upstairs crew at about 3:30pm today. Thanks!

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# DPP

# DPP

AR_00000528

# DPP

# DPP

AR_00000530

**Hans Bader**

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Monday, August 07, 2017 2:13 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Interesting law review article relevant to Title IX |
| **Attachments:** | An Accused Student's Right to Cross-Examination in University Sex.pdf |

Attached is an interesting recently-published law review article, "An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings." It might have relevance to issues such as the controversy over the April 4, 2011 "Dear Colleague" letter.

While the Sixth Amendment right to confront witnesses only applies in criminal cases, courts have sometimes ruled that cross-examination was required in campus disciplinary hearings, as a due-process requirement. The attached article lists a substantial number of such rulings -- a larger number than I would have expected – from the Ninth Circuit and other courts.  It looks like the right to cross-examine was usually applied in cases that boiled down to credibility disputes.

(Under state law, such as state Administrative Procedures Acts, college students also sometimes have a general right to cross-examine their accuser, in hearings that can lead to suspension or expulsion, as courts have made clear in cases such as *Arishi v. Washington State University*, 385 P.3d 251 (Wash. App. 2016) and *Liu v. Portland State University*, 383 P.3d 294 (Or. App. 2016). It looks like the attached article does not address that state-law issue. The Supreme Court's *Davis* decision suggested that schools did not need to do things under Title IX that would give rise to "constitutional or statutory" claims against them, 526 U.S. at 649, presumably including state-law claims; one amicus brief in the *Davis* case cited state-law issues, *see* Students for Individual Liberty amicus brief, available at 1998 WL 847365).

By contrast, the Education Department's April 4, 2011 "Dear Colleague" letter urged colleges to restrict cross-examination in sexual harassment and assault cases. As the Office for Civil Rights (OCR) put it in that letter, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." That was odd advice, since the Supreme Court has described cross-examination as the "greatest legal engine ever invented for the discovery of truth" (*Lilly v. Virginia*, 527 U.S. 116, 124 (1999).)

The April 4, 2011 "Dear Colleague" letter, OCR's October 26, 2010 Dear Colleague letter about bullying, and the April 29, 2014 "Questions and Answers" on Title IX, also departed without explanation from past OCR administrative practice by instructing colleges and schools to regulate off-campus conduct.  (A DC Court of Appeals ruling on Friday notes that agencies are not supposed to depart from past agency practice without explanation, and should acknowledge the change in position).

The 2011 Dear Colleague letter also ignored some past OCR rulings in demanding that colleges not allow accused students to appeal findings of guilt unless they also allowed complainants to appeal not-guilty findings — a position that some critics such as FIRE, professor KC Johnson, and legal commentator Stuart Taylor viewed as akin to double jeopardy. Before the Obama administration, OCR had stated that "there is no requirement under Title IX that a recipient provide a victim's right of appeal." (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)). Under the Clinton administration, OCR had approved a school's limiting appeal rights to the accused because "he/she is the one who stands to be tried twice for the same allegation." (Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996)). Similarly, in 2008, OCR

concluded that "appeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

Thanks,

Hans Bader

---

**From:** Hans Bader
**Sent:** Monday, August 7, 2017 11:20 AM
**To:** 'Jackson, Candice' <Candice.Jackson@ed.gov>
**Cc:** 'brandon.sherman@ed.gov' <brandon.sherman@ed.gov>
**Subject:** Interesting Email ("Alarms should be sounding right now")

I received this interesting email below by being on an email list maintained by SAVE, about the resolution of an OCR Title IX investigation by a regional office in July.

The email refers to pre-Obama administrative rulings saying Title IX does not reach off-campus conduct. I don't know which rulings it is referring to, but it might be referring to rulings such as a 2004 ruling by OCR's Dallas office. That ruling noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." See Oklahoma State University letter of findings, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's contrary position, which it later used to find colleges such as Harvard Law School in violation of Title IX, was seemingly at odds with court interpretations of Title IX as *not* applying off campus. For example, a federal appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University*, 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's Davis decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party" (quoting *Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999)).

Harassment under Title IX can be either physical or verbal, so ordering institutions to regulate off-campus harassment could mean regulating not just off-campus assaults, but also off-campus speech and expression. Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), OCR's pressure on schools to investigate what it labels as sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional claims against a school (The *Klein v. Smith* decision held that vulgarity that was clearly punishable in school was nevertheless First Amendment protected outside school, even the vulgarity was uttered to a teacher, and thus presumably had on-campus effects).

Telling colleges and schools they must enforce the same restrictions on and off campus to comply with Title IX may be at odds with the intent of the Supreme Court's *Davis* decision to avoid subjecting schools to the risk of "constitutional or statutory" claims when they enforce Title IX, through language such as its requirement that the harassment occur in a setting under the school's control. (*See Davis v. Monroe County Board of Education*, 526 U.S. 629, 649 (1999) ("the standard set out here is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. ... it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.")).

Thanks,

Hans Bader

---

**From:** Edward Bartlett                    PII
**Sent:** Sunday, August 6, 2017 9:28 PM
**To:**                          PII

PII

PII                    Hans Bader <Hans.Bader@cei.org>;        PII

PII

**Subject:** Alarms should be sounding right now

Good afternoon –

It's now been three weeks since our historic meeting with Secy. Betsy DeVos, and we're beginning to get nervous.

First, *Inside Higher Ed* just published an article, below, that suggests changes at OCR may come later rather than sooner.

Second, Sen. Bob Casey of Pennsylvania is sending out this tweet: "@BetsyDevosED is considering undoing the progress we have made to tackle campus sexual assault. I will oppose her efforts at every turn."

Most worrisome, however, is a recent OCR resolution agreement with Butte College, a community college in Oroville, California – attached.

In the agreement, OCR is demanding that Butte College administrators regulate off-campus conduct, contrary to court rulings and pre-Obama OCR administrative rulings. OCR is also telling colleges that found accused students not responsible that the verdicts were unacceptable when the college considered the complainant's sexual history, even though the courts do permit questions on sexual history for limited purposes.

Bottom line, *"Alarm bells should be sounding."*

We need to ramp up our efforts. So we will be holding a lobbying event in Washington DC in mid-September – tentatively Sept. 14 and 15 -- to meet with lawmakers to regain the momentum. We also hope to set up a meeting with key White House staff. Please consider joining us in DC for this critically important event.

We will be discussing these developments at tomorrow's Campus Justice Coalition call at 5:30pm ET:

- Dial: 
- Code

Our movement has come too far to let the momentum slip away.

Ed

*E. Everett Bartlett, PhD*
President
SAVE: Stop Abusive and Violent Environments
P.O. Box 1221

Rockville, MD 20849
T: 301-801-0608

PII

www.saveservices.org

++++++++++++++++++++++

https://www.insidehighered.com/news/2017/08/04/little-appetite-rollback-obama-guidelines-campus-sexual-assault

# What's Next on Title IX

Universities and advocates instead hope the regulation-averse Trump administration releases new language clarifying existing guidelines. Education Department says it is weighing numerous proposals before shifting federal policy.

By Andrew Kreighbaum

August 4, 2017

Betsy DeVos, who plans to put her stamp on federal policy governing campus responses to sexual harassment and assault, is in the midst of an extended period of deliberation and gathering input on potential changes.

But there's little appetite from any corner for the Department of Education to completely rescind 2011 Obama administration guidelines that have been at the center of ongoing controversies over how the feds enforce civil rights violations involving gender discrimination. Instead, colleges and universities have asked for more clarity on areas of Title IX policy not addressed by the 2011 Dear Colleague letter or subsequent guidance documents. And representatives of accused students have pushed for more transparency in campus proceedings.

From the perspective of advocates for sexual assault survivors, DeVos's tenure at the department has so far been filled with setbacks. A leaked internal memo in June showed that Acting Assistant Secretary for Civil Rights Candice Jackson had instructed regional investigators not to automatically pursue systemic investigations of civil rights abuses. And the department has been noncommittal on whether it will maintain a public listing of campuses under investigation for Title IX violations.

DeVos herself, though, has said there are problems with current federal policy. After a full-day Title IX summit in Washington last month, she said the department needs to protect all students and needs to do it quickly.

"Today's summit made it clear to me there's work to be done," she said July 14. "This issue is hurting too many students. So we'll get to work to figure out how best to solve this process."

But the university representatives consulted for input by DeVos and Jackson say removing

the 2011 guidance would only add to the uncertainty and lack of clarity that critics of the previous administration have frequently complained of.

University groups have insisted that no matter what steps the department takes, campus leaders will still be committed to preventing and addressing sexual assault. But higher ed representatives as well as advocates for Title IX protections said in interviews that rescinding the guidance would be like pulling the rug out from under institutions that have put in serious work to come into compliance.

"Many institutions are doing just fine. They do not want a rollback," said Deborah Brake, a University of Pittsburgh law professor who specializes in Title IX and was a participant in the summit. "They don't want the uncertainty of pulling that guidance."

While the Dear Colleague letter has empowered assault survivors and advocate groups to demand improvements on campus under Title IX, persistent failures by colleges have spurred many to file complaints with the department's Office for Civil Rights. College officials in turn have complained that federal investigations have dragged on for years, leaving a persistent cloud from unresolved cases. Representatives for the accused, meanwhile, say campus proceedings have often trampled over the rights of those students.

**Potential Policy Shift**

So what comes next?

DeVos could still choose to rescind the guidelines, or rescind and replace them with language incorporating the input of stakeholders consulted by the department. She could also leave the Dear Colleague letter in place and issue new guidance clarifying the "gaps" identified by institutions and lawyers working on Title IX. Several participants in discussions at the department also expected that the department could announce a formal public comment period.

"The secretary and her team are still listening to and gathering information from policy experts and stakeholders to ensure that any potential changes to Title IX enforcement get the process right for all parties involved," said a DeVos spokeswoman, Liz Hill. "This will take time, and it's vital that at the end of this process, victims feel protected, the accused have access to due process and universities/colleges have the tools they need to handle these cases with the care, compassion and attention they deserve."

Interested parties hope that the department follows through on those promises for further deliberation. Survivors' advocate groups in particular have requested numerous meetings with DeVos and Jackson after they met with a handful of organizations as part of the July Title IX summit -- a good start, those advocates say, but not nearly enough to understand the protections survivors need on campus. Numerous advocacy groups have called for additional meetings with DeVos and Jackson.

There are policy issues where advocates and universities, or advocates and representatives

of accused students, are unlikely to agree. Some of the flash points of disagreement don't stem directly from federal guidance on Title IX. Survivors' and anti-discrimination groups, for example, were highly critical of the department's shift away from systemic reviews of discrimination.

Ann Hedgepeth, interim vice president of public policy and government relations at the American Association of University Women and a participant in the Title IX summit, said it was a "disappointment" to see the department pulling back on systemic investigations. Many institutions, however, have welcomed that change. Colleges targeted for those investigations say they have dragged on for years without resolution.

Advocates like Hedgepeth also worry that the department will discontinue a public list of institutions under investigation for Title IX violations. A bipartisan group of lawmakers sent DeVos a letter last week urging her to maintain the list. Many colleges and universities, meanwhile, have complained about the list, which they argue functions as a public sanction even when complaints haven't been sustained.

The controversy that surrounded the Title IX summit -- fueled by the invitation of organizations deemed men's rights groups by advocates and by comments from Jackson demeaning the experiences of assault survivors -- might suggest the various sides are far apart in finding any common ground on the issues at stake. But there are certain fixes to current campus procedures that would be accepted by many, if not receive broad support. That could include providing new language in new guidelines laying out best practices for how campus officials should proceed in areas where the 2011 Dear College letter and subsequent guidance are silent, including the ability of parties to submit questions during a misconduct proceeding and interim steps a campus could take during a protracted investigation.

University leaders have also said they want to have a better working relationship with the department so that they can seek technical support on cases without fear of coming under investigation.

And lawyers who have represented students involved in campus sexual misconduct proceedings argue that the department should do more to make sure the process is transparent for both parties.

Kimberly Lau, a partner at Warshaw Burstein LLP who has represented students in Title IX proceedings, said all parties could find consensus on the need for more transparency in the campus-based process.

"Transparency throughout the process for both the complainant and the respondent I think is important. Knowing what your rights are for both sides is important and knowing what to expect," she said. "Often times, these students, frankly, on both sides are confused and left in the dark as to what what exactly to expect next."

Alexandra Brodsky, a fellow at the National Women's Law Center, said not every group comes to the issue of campus sexual assault in good faith. But she said she's been struck by the number of times she has sat down with an organization coming from another side of the issue and "struggled to find what we disagree on."

"I could imagine many ways that the department could continue to support schools to make sure that their procedures are fair to everyone that could make all good-faith actors happy," Brodsky said.

A number of recent attempts have been made to find common ground on potential changes to current federal policy. An American Bar Association Task Force that included survivor advocates, representatives of accused students, and university officials released a set of recommendations in June. That report encouraged colleges and universities where appropriate to consider alternatives to traditional adjudication models, including restorative justice.

The report also found that complainants and accused students should be given the opportunity to ask questions through the decision makers ruling in the process. Its members did not reach a conclusion on one standard of proof appropriate for all types of investigations.

An American College of Trial Lawyers task force released a report in April with recommendations for improving campus sexual assault investigations that included impartial investigations, access to evidence and some form of cross-examination. The recommendations also call for raising the standard of proof in such investigations from the current preponderance of evidence standards -- a potential change that would receive serious pushback from advocacy groups.

Last year, Know Your IX, which advocates to end sexual violence on campus, released a state policy playbook with recommended reforms at the state level.

Others with legal backgrounds have put forth more novel proposals. Attorneys Gina Maisto Smith and Leslie Gomez have argued for the creation of regional investigation and adjudication centers that would carry out the investigative process in place of campus officials.

A department official said a number of recommendations and white papers on potential improvements to Title IX policy are being considered.

While there are numerous proposals to improve federal guidance, even lawyers who have been critical of the 2011 standards said they were important at the time they were released.

"It was needed in that moment. It prompted a whole bunch of reflection," said Naomi Shatz, a lawyer who has represented both accused students and survivors of assault. "The worst-case scenario would be rescinding it and just leaving a void and not having guidelines."

But Shatz said there are legitimate critiques to be made of the 2011 letter. The guidelines

AR_00000537

don't encourage campuses to hold unfair or opaque proceedings, she said, but they also don't require necessary standards of procedural fairness. The courts have weighed in following several lawsuits brought by accused students, so there is an emerging body of law that provides an idea of what those standards should look like, Shatz said.

Cynthia Garrett, co-president of Families Advocating for Campus Equality, a group that advocates for the rights of accused students, argues that the Dear Colleague letter gave campuses the impression that they needed to "find more students" responsible and that some have done so without observing fairness for both parties. Garrett, who served on the ABA task force, said that federal guidelines should clarify those standards.

"Generally, I don't believe the government should be micromanaging such things. I'm a libertarian. I believe there should be flexibility and campuses ought to be able to do the right thing in their own way," she said. "I think we need detailed guidance to right the wrongs that have resulted from previous guidance."

## A Continuing Process

University groups say they are committed to preventing and sexual harassment and assault and thoroughly investigating instances when they do occur, no matter what course of action the department takes. But they want more opportunities to shape the eventual decision by DeVos and Jackson.

"We're certainly very eager to be part of that conversation all the way through the process," said Michael Zola, vice president for government relations and policy analysis at the American Association of State Colleges and Universities.

Campus leaders and representatives of accused students say they haven't, prior to this administration, had the kind of chance DeVos has provided to be part of discussions on policy. Terry Hartle, senior vice president for government and public affairs at the American Council on Education, said colleges and universities are hoping for a relationship where the Department of Education's Office for Civil Rights is not perceived as a "gotcha agency." Hartle said there's been no framework before for finding consensus between the three kinds of parties interested in campus sexual misconduct policy -- institutions, survivor groups and representatives of the accused.

The attempt by DeVos to gather wide input was welcomed by many participants. The department has serious work to do with survivor groups and the public, however, after initial missteps. Some who work on Title IX issues say the negative attention aimed at the department could harm attempts to build real public consensus on policy changes.

Shatz said the controversy stemming from Jackson's comments about survivors days before the summit (she told *The New York Times* that 90 percent of campus assault allegations involved regrets over sex or both parties being drunk) and the involvement of certain groups in the session involving accused students cast a shadow over the meetings, even after a

public apology from Jackson. And the administration's credibility isn't helped by a video leaked during the campaign of President Trump bragging about groping women without consent, Shatz said -- or his history of sexual misconduct allegations brought by multiple women.

"The fear this administration is going to try to do whatever it can to backtrack on women's rights is real and based in the statements and actions of people we've elected," she said. Shatz said it's a challenge for the public and advocacy organizations to disentangle personal viewpoints of people in the administration from a recognition that there are improvements to be made to current policies.

"Those groups are not going to give the administration the benefit of the doubt," she said. "I don't know that the administration has earned the benefit of the doubt."

Brodsky said the department has a clear role in protecting students' rights. Her main priority at this point is making sure its leaders hear from survivors, she said.

DeVos and Jackson were attentive and appeared moved by what they heard from survivors in their meetings at the summit, Brodsky said. But she said it's important that they continue to hear what survivors need from their campus after an assault.

"It's not just about being sympathetic in a meeting," she said. "I think it's about realizing why these policies and why department enforcement has been so crucial in recognizing the repercussions for students of policy change."

## Chapman Law Review

Volume 20 | Issue 2                                                      Article 6

2017

# An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings

William J. Migler

*Chapman University, Fowler School of Law*

Follow this and additional works at: http://digitalcommons.chapman.edu/chapman-law-review

Recommended Citation

William J. Migler, *An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings*, 20 CHAP. L. REV. 357 (2017).
Available at: http://digitalcommons.chapman.edu/chapman-law-review/vol20/iss2/6

This Article is brought to you for free and open access by the Fowler School of Law at Chapman University Digital Commons. It has been accepted for inclusion in Chapman Law Review by an authorized editor of Chapman University Digital Commons. For more information, please contact laughtin@chapman.edu.

AR_00000540



# CHAPMAN LAW REVIEW

Citation: William J. Migler, *An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings*, 20 CHAP. L. REV. 357 (2017).

--For copyright information, please contact chapmanlawreview@chapman.edu.

CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW | ONE UNIVERSITY DRIVE | ORANGE, CALIFORNIA 92866
WWW.CHAPMANLAWREVIEW.COM

AR_00000541

# An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings

*William J. Migler\**

## INTRODUCTION

"Colleges Face Legal Backlash from Men Accused of Sex Crimes."[1] "In Battling Sexual Misconduct, Colleges Build a Bureaucracy."[2] "UC President Napolitano to keep close tabs on Berkeley's actions against sexual Misconduct."[3] "Biden, Gaga team up to raise awareness of sexual assault."[4]

These headlines were taken from news stories regarding on-campus sexual assaults published within just one week, March 23, 2016 to March 30, 2016, by several mainstream news outlets. This recent level of headline volume tracks the rising public interest in the topic of on-campus assaults, with internet searches on the topic peaking around November 2015 and maintaining a high level of searches up to the time of writing.[5]

Spurred on by such media attention and public awareness of the issue, many universities have recently implemented new

---

* J.D. Candidate 2017, Chapman University Dale E. Fowler School of Law. The author would like to thank his father James Migler, mother Valerie Migler, sister Amy Migler, and brother Matthew Migler for their love and support. The author would also like to thank Professor Lawrence Rosenthal for his invaluable guidance with this Note.

1 Associated Press, *Colleges Face Legal Backlash From Men Accused of Sex Crimes*, N.Y. TIMES (Mar. 23, 2016, 1:57 PM), http://www.nytimes.com/apon line/2016/03/23/us/ap-us-universities-sexual-assault.html?_r=0.

2 Anemona Hartocollis, *In Battling Sexual Misconduct, Colleges Build a Bureaucracy*, N.Y. TIMES (Mar. 30, 2016), http://www.nytimes.com/2016/03/30 /us/colleges-beef-up-bureaucracies-to-deal-with-sexual-misconduct.html.

3 Teresa Watanabe, *UC President Napolitano to keep close tabs on Berkeley's actions against sexual misconduct*, L.A. TIMES (Mar. 26, 2016, 2:46 PM), http://www.latimes.com/local/lanow/la-me-ln-napolitano-sexual-misconduct-20160326-story.html [http://perma.cc/6UJ8-5H66].

4 Josh Lederman, *Biden, Gaga team up to raise awareness about sexual assault*, BOS. GLOBE (Mar. 30, 2016), http://www.bostonglobe.com/arts/2016/03/30/biden-gaga-team-raise-awareness-about-sexual-assault/eoCroOODVMwiZ1D9aZHy3L/story.html [http://perma.cc/L5KN-PSCJ].

5 *See* GOOGLE TRENDS, http://www.google.com/trends/ (last visited May 10, 2016) (search "campus sexual assault," "college sexual assault," "university sexual assault policies"). All three search terms show a low in and around June 2013 followed by acceleration in interest peaking around November 2015 with only a moderate decline through April 2016.

357

AR_00000542

*Chapman Law Review*

policies and procedures addressing sexual assault claims on their campuses.[6] While many of these policies have created new departments or procedures to counsel victims and offer psychiatric help and other accommodations,[7] many of these policies altered universities' procedures relating to the investigation and adjudication of sexual assault complaints. These alterations include varying types of procedural safeguards available to accused students in an accompanying disciplinary hearing.[8] Critics of these policies have expressed concern that universities have overreached in their attempts to address this issue and that universities now give the accused too little protection with few procedural safeguards.[9]

This Note examines an accused student's right to one such procedural safeguard in a university disciplinary proceeding: the cross-examination of adverse witnesses. In Part I, this Note addresses the current magnitude of sexual assault on U.S. university campuses and also presents a survey of current university polices addressing this issue.

Part II discusses the relevant considerations in assessing whether an accused student should be permitted to cross-examine adverse witnesses, including the complainant, in a sexual assault case, either personally or through a representative, including counsel. This discussion includes studies on the effectiveness of cross-examination in general and the potential further harm vigorous cross-examination may inflict on a sexual assault victim in particular.

Lastly, Part III discusses the two primary sources of law governing university disciplinary proceedings, Title IX of the Education Amendments of 1972 ("Title IX") and an accused student's rights under the Due Process Clause.

---

6 *See infra* Part I(A).

7 As an example, the University of Washington makes available online brochures, a 24/7 hotline, and several counseling centers for sexual assault victims, available at Title IX – Resources, UNIV. OF WASH., http://compliance.uw.edu/titleIX/resources [http://perma.cc/J42K-FDBE]. Many universities offer similar services.

8 *See infra* Part I(B).

9 *See, e.g.,* Hans Bader, *Proof and Campus Rape: Standards for Campus Disciplinary Proceedings,* FOUND. FOR INDIVIDUAL RIGHTS IN EDUC. (July 8, 2014), http://www.thefire.org/proof-and-campus-rape-standards-for-campus-disciplinary proceedings/ [http://perma.cc/3WNQ-WEQH]; Stuart Taylor Jr. & KC Johnson, *The New Standard for Campus Sexual Assault: Guilty until Proven Innocent,* NAT'L REV. (Dec. 30, 2015, 4:00 AM), http://www.nationalreview.com/article/428910/campus-rape-courts-republicans-resisting [http://perma.cc/UC56-M97Y].

AR_00000543

## I. THE PRESENT STATE OF UNIVERSITY DISCIPLINARY PROCEEDINGS

### A.   Magnitude of Sexual Assault on U.S. Campuses

Under federal law, both private and public universities receiving federal financial assistance must collect and publicize campus crime statistics annually.[10]

In 2014, the last year in which data was available at the time of writing, 11,688 forcible sexual offenses were reported to have occurred either on U.S. university campuses or in university student residence facilities.[11] Divided into separate categories, 8122 rapes[12] and 3566 other forcible sexual assaults were reported.[13] It is important to note, however, that these numbers are likely far lower than the actual incidents of rape and sexual assault on campus, both of which are notoriously underreported crimes.[14]

Sexual assault has also been under-investigated on U.S. campuses. A recent report by Senator Claire McCaskill's office found that 41% of universities surveyed did not conduct one investigation into a sexual assault claim within the past five years, and 21% of responding schools had made fewer investigations than reported incidents of sexual assault on their campuses.[15]

There have been other recent attempts to better quantify the frequency of sexual assault on U.S. campuses. A 2015 survey by the Association of American Universities found that 27.2% of

---

10 20 U.S.C. § 1092(f) (2016) (popularly known as the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act) [hereinafter Clery Act]. The database for these statistics is available at *Campus Safety and Security*, U.S. DEP'T. EDUC., http://ope.ed.gov/campussafety/#/ (last visited May 12, 2016) [http://perma.cc/F8ZV-32LM]. This database allows an end-user to filter Clery Act data by year, type of crime, public or private university, on-campus or off-campus, etc.

11 *Campus Safety and Security*, *supra* note 10 (follow "DICT" hyperlink). The Department of Education defines forcible sexual offenses to encompass "Forcible Rape," "Forcible Sodomy," "Sexual Assault with an Object," and "Forcible Fondling."

12 *Id.* The Department of Education defines rape for Clery Act purposes as "the penetration, no matter how slight, of the vagina or anus, with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." *Id.*

13 *Id.* This number reflects what the Department of Education has called "forcible fondling." *Id.* Fondling is defined as "[t]he touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity." *Id.*

14 In 2014, only 33.6% of rapes/sexual assaults were reported to the police. Jennifer L. Truman & Lynn Langton, *Criminal Victimization, 2014*, BUREAU OF JUST. STAT. (2015), http://www.bjs.gov/content/pub/pdf/cv14.pdf [http://perma.cc/3APC-AHDF].

15 CLAIRE MCCASKILL, SEXUAL VIOLENCE ON CAMPUS 8–9 (2014), http://www.mccaskill.senate.gov/imo/media/doc/SurveyReportwithAppendix.pdf [http://perma.cc/N8XM-3UZ3].

AR_00000544

*Chapman Law Review* [Vol. 20:2

responding female seniors attending U.S. universities had been subjected to some form of sexual assault.[16] Separate surveys have found 90% of sexual assaults were perpetrated by individuals the victim knew before the assault,[17] and about 50% of on-campus sexual assaults involved the use of alcohol.[18] Alcohol, liberally available on college campuses, is known to reduce judgment and impulse control, and impair physical faculties, often leading to non-consensual sexual encounters.[19]

Numerous universities and student activist groups have, in recent years, intensified their efforts to illuminate the vulnerability of college students to sexual assault on campus.[20] As a response, many U.S. universities have introduced new policies, or revamped existing ones, to better combat this problem.[21] This heightened awareness may also be due to several high profile on-campus sexual assault news stories[22] and

---

[16] Richard Pérez-Peña, *1 in 4 Women Experience Sex Assault on Campus*, N.Y. TIMES (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/us/a-third-of-college-women-experience-unwanted-sexual-contact-study-finds.html; David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, WESTAT (Sept. 21, 2015), http://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/Report%20on%20the%20AAU%20Campus%20Climate%20Survey%20on%20Sexual%20Assault%20and%20Sexual%20Misconduct.pdf [http://perma.cc/T7MN-4U9Q].

[17] *Victims and Perpetrators*, NAT'L INST. FOR JUSTICE (Oct. 26, 2010), http://www.nij.gov/topics/crime/rape-sexual-violence/pages/victims-perpetrators.aspx [http://perma.cc/V7SU-G9QY].

[18] Antonia Abbey et al., *Alcohol and Sexual Assault*, NAT'L INST. ON ALCOHOL ABUSE AND ALCOHOLISM, http://pubs.niaaa.nih.gov/publications/arh25-1/43-51.htm [http://perma.cc/U5HG-A7KK].

[19] *See College Drinking*, NAT'L INST. ON ALCOHOL ABUSE AND ALCOHOLISM (Dec. 2015), http://pubs.niaaa.nih.gov/publications/CollegeFactSheet/CollegeFactSheet.pdf (noting that about 60% of college students drink alcohol once a month and about two-thirds of those engaged in binge drinking during that time) [http://perma.cc/M8GD-33M7].

[20] *See, e.g.*, Sarah Ortlip-Sommers, *Students Start Sexual Assault Awareness Group After SoCo*, STANFORD DAILY (Oct. 23, 2015), http://www.stanforddaily.com/2015/10/23/students-start-sexual-assault-awareness-group-after-soco/ [http://perma.cc/59CV-YLYC]; Micaela Corn, *New Pitt Initiatives Address Sexual Assault and Misconduct, Aim to Promote Safety and Awareness*, PITT CHRONICLE (Sept. 14, 2015), http://www.chronicle.pitt.edu/story/new-pitt-initiatives-address-sexual-assault-and-misconduct-aim-promote-safety-and-awareness [http://perma.cc/E9MH-WCHS].

[21] *See, e.g.*, Madison Mills, *Harvard creates new sexual assault policy*, USA TODAY (July 4, 2014, 11:35 AM), http://college.usatoday.com/2014/07/04/harvard-creates-new-sexual-assault-policy/ [http://perma.cc/WDJ5-R5T4]; Samantha Cooney, *Columbia unveils new sexual assault policy*, COLUMBIA SPECTATOR (Aug. 15, 2014, 12:08 PM), http://columbiaspectator.com/news/2014/08/15/columbia-unveils-new-sexual-assault-policy [http://perma.cc/QWY6-426M]; Alison Fu & Sophie Ho, *University of California releases new sexual harassment and violence policy*, THE DAILY CALIFORNIAN (Mar. 10, 2014), http://www.dailycal.org/2014/03/07/university-california-releases-new-sexual-assault-violence-policy/ [http://perma.cc/TVY8-NDYE].

[22] There are several notable examples. In the "Duke Lacrosse Case," three members of the Duke Lacrosse team were accused of rape and other sexual offenses in 2006. Duke University maintains a website chronicling both the news reports and public reaction to the story. *See, e.g.*, *Looking back at the Duke Lacrosse Case*, DUKE OFFICE OF NEWS & COMM., http://today.duke.edu/showcase/lacrosseincident/ [http://perma.cc/AZY8-5RDT].

lawsuits filed against universities, some resulting in six and seven-figure settlements.[23]

On-campus sexual assault has also garnered state and federal governmental scrutiny. In 2014, the Department of Education launched a probe into 55 universities' practices regarding how they conduct campus sexual assault claim investigations.[24] Separate from this probe, the Department of Education's Office of Civil Rights ("OCR") has issued several publications directing universities receiving federal financial assistance on how to comply with Title IX's requirements for investigating and adjudicating sexual assault complaints.[25]

---

Another example is the University of Virginia Rolling Stones magazine article. The magazine ultimately had to retract and apologize to the school for its erroneous reporting of an alleged gang rape of a woman named "Jackie" by members of a UVA fraternity. *See, e.g.*, Roger Yu, *Rolling Stone backs off from U. Va. Rape story*, USA TODAY (Dec. 6, 2014, 8:09 AM), http://www.usatoday.com/story/money/business/2014/12/05/rolling-stone-retracts-uva-story/19954293/ [http://perma.cc/U5PC-3S7Y].

Lastly, many news outlets chronicled the story of Emma Sulkowicz, known to some as the "Mattress Girl." Sulkowicz carried around a mattress wherever she went to protest Columbia University's allegedly inadequate response to her complaint that she was raped by a fellow student. *See, e.g.*, Vanessa Grigoriadis, *Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault*, NYMAG.COM (Sept. 14, 2014, 9:00 PM), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html [http://perma.cc/UWW3-295R].

23 *See* Marc Tracy, *Florida State Settles Suit Over Jameis Winston Rape Inquiry*, N.Y. TIMES (Jan. 25, 2016), http://www.nytimes.com/2016/01/26/sports/football/florida-state-to-pay-jameis-winstons-accuser-950000-in-settlement.html?_r=0 (stating that plaintiff and defendant university agreed to a $950,000 settlement over a claim that the university did not adequately investigate plaintiff's rape complaint); Allison Sherry, *CU settles case stemming from recruit scandal*, DENV. POST (Dec. 6, 2007, 1:00 AM), http://www.denverpost.com/2007/12/05/cu-settles-case-stemming-from-recruit-scandal/ (reporting that University of Colorado settled with a former student for $2.85 million after she was gang raped at a party held for University of Colorado football recruits) [http://perma.cc/SX4K-7NJZ]; Anita Wadhwani & Nate Rau, *Sweeping sex assault suit filed against University of Tennessee*, TENNESSEAN (Feb. 14, 2016, 4:34 PM), http://www.tennessean.com/story/news/2016/02/09/sweeping-sexual-assault-suit-filed-against-ut/79966450/ (reporting that six plaintiffs filed a complaint against University of Tennessee, alleging the university failed to adequately respond to claims of sexual assault) [http://perma.cc/98E6-8VRS]; Andrew M. Duehren & Daphne C. Thompson, *Recent Graduate Sues Harvard Over Sexual Harassment Case*, HARV. CRIMSON (Feb. 18, 2016, 2:15 AM), http://www.thecrimson.com/article/2016/2/18/lawsuit-sexual-harassment-2016/ (reporting that plaintiff filed suit for, among other Title IX violations, a failure to "follow federal guidance on university sexual harassment investigations") [http://perma.cc/4CWY-ELMS].

24 *Press Release: Education Institutions with Open Title IX Sexual Violence Investigations*, U.S. DEP'T OF EDUC. OFF. FOR CIVIL RIGHTS (May 1, 2014), http://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-i [http://perma.cc/ZW6J-FC4Q].

25 *See Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, U.S. DEP'T OF EDUC. OFF. FOR CIVIL RIGHTS (Jan. 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [http://perma.cc/EW26-57Y9]; Russlynn Ali, *Dear Colleague*, U.S. DEP'T OF EDUC. OFF. FOR CIVIL RIGHTS 1, 4 (Apr. 4, 2011), www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter *2011 Dear Colleague Letter*] [http://perma.cc/F87R-ZK74]; Catherine E. Lhamon, *Questions and Answers on Title IX and Sexual Violence*, U.S. DEP'T OF EDUC.

Additionally, California and New York have recently passed new "affirmative consent" legislation that raises the standard for what constitutes consent in an on-campus sexual encounter.[26]

## B.   Current University Policies

There is no Clery Act equivalent when it comes to reporting how many university disciplinary proceedings have arisen from alleged sexual assaults, though it has been posited that the amount of such disciplinary proceedings numbers in the thousands per any given year.[27] Universities are not obligated by federal law to track and report how many disciplinary proceedings they perform a year or how they conduct said proceedings.[28] There have been three surveys regarding how universities conduct their disciplinary proceedings within the past two decades.[29] According to the 1999 Berger & Berger article survey, 86.2% of responding schools allowed an accused student to cross-examine or otherwise confront "witnesses"[30] for an academic misconduct charge.[31] Senator McCaskill's survey, specifically assessing university policies pertaining to sexual assault, found that 67% of responding schools allow a student

---

OFF. FOR CIVIL RIGHTS (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/ docs/qa-201404-title-ix.pdf [http://perma.cc/J5MX-FNSF].

26 *See* CAL. EDUC. CODE § 67386(a)(1) (West 2016) ("Affirmative consent means affirmative, conscious, and voluntary agreement to engage in sexual activity. It is the responsibility of each person involved in the sexual activity to ensure that he or she has the affirmative consent of the other or others to engage in the sexual activity. Lack of protest or resistance does not mean consent, nor does silence mean consent. Affirmative consent must be ongoing throughout a sexual activity and can be revoked at any time. The existence of a dating relationship between the persons involved, or the fact of past sexual relations between them, should never by itself be assumed to be an indicator of consent."); N.Y. EDUC. CODE § 6441 (McKinney 2016) (substantially similar to the California statute).

27 *See* Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. KY. L. REV. 49, 50 (2013).

28 While one may think that Clery Act statistics would be a good proxy for disciplinary proceedings data, that is not the case. The Clery Act requires disclosure of all crimes committed on-campus, including those perpetrated by non-students. Additionally, Clery Act statistics do not track the eventual university disposition, if any, of a reported crime.

29 *See* Curtis J. Berger & Vivian Berger, *Academic Discipline: A Guide to Fair Process for the University Student*, 99 COLUM. L. REV. 289, 295–96 (1999); MCCASKILL, *supra* note 15, at 10–12.

30 The term "witnesses" is vague in both the Berger & Berger article and the McCaskill report because it is not clear whether this includes the complainant, which technically a complainant is a witness, or if it only means other witnesses called by the complainant or university. *See* Berger & Berger, *supra* note 29, at 297–300; MCCASKILL, *supra* note 15, at 108.

31 Berger & Berger, *supra* note 29, at 356–58. According to this survey, 93.1% of public institutions afforded students the right to cross-examine witnesses, contrasted against 81.8% of private institutions. *Id.* Note that the Berger & Berger article was concerned only with adjudicating academic misconduct and not sexual misconduct.

AR_00000547

accused of sexual assault to "question and call witnesses."[32] And in a recently published article, Professor Tamara Rice Lave surveyed the top fifty "flagship" U.S. universities regarding their disciplinary procedures and found that only 10% of those surveyed afford an accused student an unlimited right to cross-examination, while 72% allow for some questioning through a panel or investigator.[33]

For this article, the author has conducted a separate survey[34] examining publicly available university student handbooks and codes of conduct to determine what schools, based on their stated policies, allow an accused student to cross-examine their accuser and other adverse witnesses. The vast majority of these policies are current through the 2015–16 academic year.

According to their stated policies, 29% of universities explicitly allow an accused student to directly question the complainant or other adverse witnesses.[35] Furthermore, 27% of universities do not allow for direct cross-examination of the complainant by the accuser or his/her representative, but do allow for some questioning through either written submissions or via an intermediary party, such as the members of a hearing panel.[36] Lastly, 44% of universities either do not allow

[32] MCCASKILL, *supra* note 15, at 108. Similar to the Berger & Berger survey, the McCaskill survey found public institutions offered cross-examination more readily than private institutions. 87% of responding public schools offer the ability to question witnesses, while only 67% of private not-for-profit schools do so.

Unfortunately, and similarly to the Berger & Berger article, it is ambiguous as to who constitutes a "witness" and what constitutes "questioning" for the purposes of the McCaskill study. As will be noted in the footnotes below, "questioning" may take the form of either the accused student's representative directly questioning witnesses or the accused student being required to first pose questions through the hearing administrators, who will then ask the questions they deem appropriate to a given witness. It is also unclear from the McCaskill survey if the witnesses the accused student is allowed to question are adverse witnesses or only the witnesses the student calls on his behalf.

[33] Tamara Rice Lave, *Ready, Fire, Aim: How Universities are Failing the Constitution in Sexual Assault Cases*, 48 ARIZ. ST. L.J. 637, 658 (2016).

[34] See *infra* App. A for the details of this survey's sampling and research methodology.

[35] See *infra* App. B for the list of universities. It is important to note that this number only includes those schools that allow the accused or his/her representative to directly ask witnesses questions or do not have explicit language to the contrary. This is different than merely allowing the accused and the complainant to be in the same room during a hearing.

[36] See *infra* App. C for the list of universities. *See, e.g., Code of Student Rights, Responsibilities & Conduct*, IND. UNIV. (2016), http://studentcode.iu.edu/procedures/iu-wide/sexual-misconduct.html ("No one other than the hearing panel members, the complainant, and the respondent may pose questions during the hearing. The complainant and respondent may not directly question each other, but may submit questions to the Chair, to be asked of the other party. The Chair or other panel members will review questions prior to posing to the other party to prevent questioning that is not permitted under these proceedings.") [http://perma.cc/9NP2-MZQ4].

*Chapman Law Review* [Vol. 20:2

questioning of witnesses of any kind or do not explicitly give accused students the ability to pose questions to adverse witnesses, be it directly or through a panel.[37] It is necessary to note that these statistics reflect only the stated policies of these universities; some schools allow administrators to adjust the procedures given the facts of a particular case.[38]

In summation, this survey found 56% of schools, in their stated policies and procedures, allow an accused student some form of questioning, while 44% do not. This is a number lower than those found in the McCaskill and Lave surveys.[39]

There may be several reasons for these discrepancies.[40] First, the McCaskill survey was conducted in 2014, a time at the relative beginning of the recent heightened awareness of this issue and before many universities had instituted their new policies.[41]

Second, this Note's survey relied solely on the language of the sampled universities' stated policies and procedures, whereas both the McCaskill and Lave surveys relied on answers given by the universities.[42] It is possible a school which does not provide for an accused student to question witnesses in their stated policies may still, in practice, allow for questioning.

Lastly, the most likely compelling reason for the discrepancies between this Note's survey and the McCaskill and Lave surveys is due to statistical sampling. The McCaskill survey divided the university population into various strata based on enrollment size and equally distributed sampling in those

---

37 See *infra* App. D for the list of universities. This number includes universities that, in their stated policies, allow the adjudicating body to ask questions of, or interview, the accused, the complainant, and other witnesses, but does not give that right to the accused in any form. *See, e.g., Procedures for Handling Complaints Involving Students Pursuant to the Sexual and Gender-Based Harassment Policy*, HARV. UNIV. (2014), http://hls.harvard.edu/content/uploads/2014/09/harvard_sexual_harassment_procedures_s tudent1.pdf (allowing only the university's "Investigative Team" to conduct interviews of the accused, complainant, and other witnesses) [http://perma.cc/36K6-D64X].

38 *See, e.g., Student Conduct System*, BOS. COLLEGE § 5.4 (2016–17), http://www.bc. edu/publications/student guide/judicial.html ("The Dean of Students or designee has the discretion of what format a formal hearing will take based upon the complexity of the case, availability and type of evidence, and the sensitivity of the incident.") [http://perma.cc/4YB8-2VUB].

39 *See supra* notes 32, 33 and accompanying text.

40 Because the creators of both the McCaskill and Lave surveys obtained their information on the basis of anonymity, the surveys leave the identities of the responding schools confidential. It is thus impossible to know exactly how a given school responded and to verify if a given school responded to the survey in the same manner this Note's survey has found. MCCASKILL, *supra* note 15, at 4; Lave, *supra* note 33, at 654.

41 Several high-profile universities announced their new sexual assault policies after the commencement/publication of the McCaskill survey. See *supra* note 21 and accompanying text for several examples.

42 MCCASKILL, *supra* note 15, at 3; Lave, *supra* note 33, at 654.

AR_00000549

strata.[43] The McCaskill survey also specifically included the top fifty most-attended public U.S. institutions and the top forty most-attended private U.S. institutions in its survey, thus giving these schools an outsized weight in the survey's results.[44] Similarly, the Lave study solely included responses from the fifty "flagship" U.S. universities, as defined by the *Journal of Blacks in Higher Education*.[45] This Note's survey made no similar limitation on sampling of the U.S. college and university population and gave no special weight to the top fifty public and forty private universities.

## II. CONSIDERATIONS BEARING ON THE USE OF CROSS-EXAMINATION IN UNIVERSITY DISCIPLINARY PROCEEDINGS INVOLVING ALLEGED SEXUAL ASSAULT

The right to counsel, the right against self-incrimination, and the preponderance of the evidence standard in the context of university disciplinary proceedings have been examined thoroughly by other commentators.[46] This Part focuses on the cross-examination of witnesses in such proceedings adjudicating sexual assault claims, and examines both the possible virtues and disadvantages of requiring universities to give the accused student some use of this venerable fact-finding instrument.

### A.   Cross-examination as a Test of Credibility

The process of cross-examination has been dubbed the "greatest legal engine ever invented for the discovery of truth"[47] and is one of the main points of distinction between Anglo-American common law trials and continental civil law proceedings.[48] A criminal defendant's right to confront and

---

43 *Id.* at 3–4.

44 *Id.* at 4.

45 Lave, *supra* note 33, at 654.

46 *See* Douglas R. Richmond, *Students' Right to Counsel in University Disciplinary Proceedings*, 15 J.C. & U.L. 289, 298–302 (1989) (discussing a student's Due Process right to have counsel present at a disciplinary proceeding); Paul E. Rosenthal, *Speak Now: The Accused Student's Right to Remain Silent in Public University Disciplinary Proceedings*, 97 COLUM. L. REV. 1241, 1260–68 (1997) (discussing whether a student's silence during a university disciplinary proceeding should be allowed as evidence against him); Barclay Sutton Hendrix, *Feather on One Side, a Brick on the Other: Tilting the Scale against Males Accused of Sexual Assault in Campus Disciplinary Proceedings*, 47 GA. L. REV. 591, 610–15 (2012) (discussing the implications of the preponderance of the evidence standard in university disciplinary proceedings, particularly in sexual assault cases after the 2011 Dear Colleague Letter).

47 Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting California v. Green, 399 U.S. 149, 158 (1970)); *see also* JOHN H. WIGMORE, A TREATISE ON THE SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW 1967 (1904).

48 *See* Crawford v. Washington, 541 U.S. 36, 43 (2004) ("The common-law tradition is one of live testimony in court subject to adversarial testing, while the civil law condones examination in private by judicial officers.").

cross-examine his accuser is enshrined in the Sixth Amendment to the U.S. Constitution,[49] and all U.S. jurisdictions generally allow for cross-examination of opposing witnesses in adversarial civil litigation.[50]

The main purported function of cross-examination is to test the veracity of a witness, be it on the stand or at a deposition.[51] This allows the examining party not only a chance to "catch" a witness in a falsehood or half-truth,[52] but it also allows the trier-of-fact to observe the demeanor of the witness and to gauge body language, inflection, and other potential indicia of untruthfulness that comes only with contemporaneous observation.[53] The need for the fact-finder to both listen to and physically observe the testifying witness during questioning is one of the justifications advanced for the rule barring the use of hearsay evidence.[54]

An accused student in a university disciplinary proceeding could benefit from cross-examining his accuser in several ways. First, the only practical defenses to a charge of sexual assault are an outright denial of the underlying facts or consent from the victim to the encounter.[55] Because most sexual assaults occur in a place of seclusion, the complainant may be the only person (other than the perpetrator) with knowledge or information as to the existence of the incident or the identity of the attacker.[56] As

---

[49] U.S. CONST. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .").

[50] *See, e.g.*, FED. R. EVID. 611(b); CAL. EVID. CODE §§ 711, 773 (West 2016).

[51] *See* Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."); *Crawford*, 541 U.S. at 61–62 ("[O]pen examination of witnesses . . . is much more conducive to the clearing up of truth.") (quoting SIR WILLIAM BLACKSTONE, 3 COMMENTARIES ON THE LAWS OF ENGLAND 373 (13th ed. 1800)); Dan Simon, *Adjudicating the Guilty Mind: More Problems with Criminal Trials: The Limited Effectiveness of Legal Mechanisms*, 75 L. & CONTEMP. PROBS., 167, 171 (2012) ("[C]ross examination could improve the diagnosticity of the trial . . . by exposing mistakes or lies in the course of [the] cross-examination itself.").

[52] Simon, *supra* note 51, at 170.

[53] *See* Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 496 (1951) ("[M]aterial facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct . . . ."); FED. R. EVID. 804(b)(1) advisory committee's note ("[O]pportunity to observe demeanor is what in a large measure confers depth and meaning upon oath and cross-examination.").

[54] *See* FED. R. EVID. Article VIII advisory committee's note ("Emphasis on the basis of the hearsay rule today tends to center upon the condition of cross-examination . . . . The belief, or perhaps hope, that cross-examination is effective in exposing imperfections of perception, memory, and narration is fundamental.").

[55] *See* LYNDA LYTLE HOLSTROM & ANN WOLBERT BURGESS, THE VICTIM OF RAPE: INSTITUTIONAL REACTIONS 171 (1974); LAURIE L. LEVENSON & ALEX RICCIARDULLI, CALIFORNIA CRIMINAL LAW § 7:24 (2015) (noting that aside from consent or denial of the events, there are very few other practical defenses to sexual assault).

[56] Robin Charlow, *Bad Acts in Search of a Mens Rea: Anatomy of a Rape*, 71 FORDHAM L. REV. 263, 299 (2002). *But see* Susan Estrich, *Rape*, 95 YALE L.J. 1087, 1088

to the question of the complainant's consent (or lack thereof), the complainant has particular knowledge as to her state of mind leading up to, during, and after the alleged assault.[57] Allowing the accused the opportunity to question the complainant about any contradictory words or actions of the complainant related to the issue of her consent before, during, and after the alleged assault may buttress the accused's defense. Cross-examination would also allow the accused to bring out any potential bias or ulterior motives of the complainant or other adverse witnesses.[58]

Additionally, many schools have adopted a preponderance of the evidence standard for determining liability in sexual assault cases,[59] tracking the Department of Education's guidance.[60] Given the typical lack of physical evidence or other eyewitness testimony, allowing the accused the ability to vigorously question the complainant's testimony may be, in some cases, the best way for the accused to show it is more likely that he did not commit the alleged sexual assault.[61]

---

(1986) (recounting her own rape, the author notes that she could not easily identify her rapist later because "[n]o one had ever told me that if you're raped, you should not shut your eyes and cry for fear that this really is happening. You should keep your eyes open focusing on this man who is raping you so you can identify him when you survive.").

[57] *See* Charlow, *supra* note 56, at 299 ("[T]he dynamics of intimate social interaction between the sexes, in which one's desires may be mixed and are frequently unspoken, only adds to the complexity of the problem, as it often may not be clear whether or not sex was desired."); Alan Wertheimer, *What is Consent? And is it Important?*, 3 BUFF. CRIM. L. REV. 557, 559 (2000) (noting that individuals have their own internal perceptions as to what events are taking place in a sexual encounter).

[58] *See* Davis v. Alaska, 415 U.S. 308, 316 (1974) ("A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness . . . 'is always relevant as discrediting the witness and affecting the weight of his testimony.'") (internal citation omitted); State v. Texter, 594 A.2d 376, 377–78 (R.I. 1991) (finding it was error to preclude defendant, on cross-examination, from questioning the victim as to the potential that she and her husband fabricated a sexual assault claim in retaliation for the defendant accusing the husband of theft).

[59] The vast majority of those schools cited to in Appendices B, C, and D use the preponderance of the evidence standard for sexual assault claims. *See, e.g., Sexual Violence and Sexual Harassment*, UNIV. OF CA. 1, 12 (Dec. 18, 2015). http://policy.ucop.edu/doc/4000385/SVSH ("For all other matters the report will include an analysis and determination by the investigator of whether this [sexual assault] *Policy* has been violated. The investigator will apply the preponderance of evidence standard.") [http://perma.cc/7YAY-97D9].

[60] *2011 Dear Colleague Letter, supra* note 25, at 11 ("[P]reponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.").

[61] *See* Barclay Sutton Hendrix, *A Feather on One Side, a Brick on the Other: Tilting the Scale against Males Accused of Sexual Assault in Campus Disciplinary Proceedings*, 47 GA. L. REV. 591, 617 (2012) (arguing that given the lower evidentiary threshold of a preponderance of the evidence standard, cross-examination is a means to "reduce the risk of an erroneous finding of guilt").

AR_00000552

Lastly, a study found that a witness's susceptibility to common cross-examination "techniques," such as leading questions and double negative questions, can be mitigated if the witness is made aware, even minimally so, of what to expect during cross-examination, improving the witness's ability to accurately testify.[62]

## B.  Cross-Examination May Actually Hinder Fact-Finding in a Sexual Assault Case

There are numerous potential issues with applying courtroom-style cross-examination to a university disciplinary proceeding in general and to cases involving sexual assault victims in particular. By not allowing cross-examination of student sexual assault complainants, issues inherent to cross-examination and issues arising from psychological trauma could be avoided.

### 1. General Issues with Cross-Examination

The first issue is that cross-examination, despite the reverence it receives in the American legal system, is not as effective at finding "the truth" as believed. Research, which virtually all speaks against cross-examination's effectiveness, suggests several things. First, cross-examination does little to affect the testimony of a prepared and/or skillful lying witness.[63] Due to an observed phenomenon known as the "probing effect,"[64] a trier-of-fact may gain false confidence in the testimony of an inaccurate witness when it observes the witness deftly answer questions posed to him/her, despite the witness's actual inaccuracy.[65]

Relatedly, cross-examination does little to affect the testimony of witnesses with mistaken memory.[66] Cross-examination will not be effective in eliciting the "truth" from a witness who honestly, yet mistakenly, believes their memory and relies on that false

---

[62] Jacqueline M. Wheatcroft & Louise E. Ellison, *Evidence in Court: Witness Preparation and Cross-Examination Style Effects on Adult Witness Accuracy*, 30 BEHAV. SCI. & L. 821, 833–36 (2012). The authors note that witness accuracy rose dramatically even when the "preparation" was something as simple as a guidance leaflet detailing what happens during cross-examination. *Id.*

[63] Kevin Jon Heller, *The Cognitive Psychology of Circumstantial Evidence*, 105 MICH. L. REV. 241, 249 (2006).

[64] *Id.* at 249. The "probing effect" "suggest[s] that watching a potential liar being probed causes [triers-of-fact] to become falsely confident that they can distinguish truth from falsity, thereby creating a 'truth bias' that leads them to assume—because they are focusing on the wrong cues—that the liar is telling the truth." *Id.* at 249–50 n.45.

[65] *Id.* at 249.

[66] *See* Simon, *supra* note 51, at 170.

memory for their testimony.[67] This is further exacerbated if the witness is the only witness to a particular fact.[68] In a sexual assault case, cross-examination would do little to derive the truth of an assailant's identity or the grant of consent if the complainant is a skillful liar who has plotted a plausible (but inaccurate) version of the facts or is relying on an honest but false memory.

Second, cross-examination itself may often force witnesses to change their testimony only because of the pressure put on them by the cross-examining attorney.[69] In a 2011 study, 73% of participating witnesses recanted at least one accurate fact stated in their testimony after forceful questioning,[70] 84% of the witnesses conceded at least once that they may have been mistaken as to one fact about which they were actually correct, and 68% of the witnesses conceded they may have been mistaken as to two or more facts.[71] Many commentators note that the use of common cross-examination techniques, such as leading questions, negative feedback,[72] and double or triple negative questions, lead either to confusion, memory distortion, or the witness just relenting and agreeing with the examining attorney.[73]

It is not difficult to imagine that on cross-examination a student sexual assault complainant may become confused and change her testimony if she is subjected to a "rapid-fire mode of questioning" and forced to give quick answers without

---

[67] *Id.* ("Memory research indicates that people tend to trust their memories, regardless of the accuracy of those memorial accounts. Given that mistaken witnesses perceive themselves to be accurate, they are unlikely to be deterred from recounting their (actually false) memories any more than accurate witnesses would be deterred from recounting their (truly correct) ones.").

[68] *Id.* at 171.

[69] It is important to note that a cross-examining attorney is not always trying to elicit the "truth." Rather, he/she is trying to further the interests of his/her client. *See* Sara D. Schotland, *Rape Victims as Mockingbirds: A Law and Linguistics Analysis of Cross-Examination of Rape Complainants*, 19 BUFF. J. GENDER L. & SOC. POL'Y 1, 28 (2010) (noting that a cross-examining criminal defense attorney has "no reason or duty to be polite; rather, the attorney's duty of loyalty requires that (s)he take all ethical steps to secure acquittal").

[70] Tim Valentine & Katie Maras, *The Effect of Cross-Examination on the Accuracy of Adult Eyewitness Testimony*, 25 APPLIED COGNITIVE PSYCHOL. 554, 557–59 (2011) (finding 36% of mock witnesses changed their answer to one fact, 23% changed two answers, and 14% changed three answers, although none of the witnesses changed all four answers).

[71] *Id.* at 559.

[72] Negative feedback in the Valentine & Maras study took the form of the examining attorney "feigning disbelief" as to what the witness just testified to or accusing the witness of lying because they had contradicted another (non-existent) witness. *Id.* at 558–59.

[73] *Id.* at 559; Simon, *supra* note 51, at 172; Mark R. Kebbell & Shane D. Johnson, *Lawyers' Questioning: The Effect of Confusing Questions on Witness Confidence and Accuracy*, 24 LAW & HUM. BEHAV. 629, 634, 637 (2000); Jacqueline M. Wheatcroft et al., *The Influence of Courtroom Questioning Style on Actual and Perceived Eyewitness Confidence and Accuracy*, 9 LEGAL & CRIMINOLOGICAL PSYCHOL. 83, 83 (2004).

AR_00000554

being able to thoroughly explain facts that help support her side of the story.[74]

### 2. Cross-examination of Sexual Assault Complainants

Allowing cross-examination of a sexual assault complainant raises issues separate than those relayed above—it may cause further psychological harm to the complainant.[75] This harm may then cause the complainant to provide inaccurate testimony.[76] It has been posited that cross-examination is one of the reasons sexual assault is vastly underreported,[77] both on campus[78] and in the general population.[79]

It is undebatable that rape is "without question one of the most terrifying crimes in which the victim survives. Its consequences remain with the victim for many years or perhaps a lifetime, often accounting for deep psychological problems."[80] Rape Trauma Syndrome ("RTS") is a form of posttraumatic stress disorder set off by a sexual assault or attempted sexual assault.[81] There are two phases of RTS: the acute phase[82] and the

---

74 Schotland, *supra* note 69, at 28.

75 *See* State v. Sheline, 955 S.W.2d 42, 44 (Tenn. 1997) ("It has been said that the victim of a sexual assault is actually assaulted twice—once by the offender and once by the criminal justice system."); Linda Mohammadian, *Sexual Assault Victims v. Pro Se Defendants: Does Washington's Proposed Legislation Sufficiently Protect Both Sides?*, 22 CORNELL J.L. & PUB. POL'Y 491, 493 (2012) (noting that cross-examination may cause "revictimization" because it forces a complainant to "relive" the assault).

76 *See* Maryland v. Craig, 497 U.S. 836, 857 (1990) (citing Coy v. Iowa, 487 U.S. 1012, 1032 (Blackmun, J., dissenting) (noting that face-to-face confrontation between the accused and a child abuse victim disserves the truth-seeking ends of the Confrontation Clause because the confrontation might so overwhelm the witness as to "prevent the possibility of effective testimony")).

77 *See* Tom Lininger, *Bearing the Cross*, 74 FORDHAM L. REV. 1353, 1357 (2005) ("[V]ictim's willingness to report crimes varies inversely with their fear of embarrassment during cross-examination."); Mohammadian, *supra* note 75, at 503 ("Sexual assault victims . . . fear the legal system because the trial often forces the victims, who may already suffer from psychological trauma, to relive the experience of the attack.").

78 MCCASKILL, *supra* note 15, at 4 (citing to Department of Justice statistics, stating that less than 5% of on-campus rapes are reported to law enforcement).

79 In 2014, only 33.6% of rapes/sexual assaults were reported to the police. Truman, *supra* note 14.

80 Mohammadian, *supra* note 75, at 502–03.

81 *See* Toni M. Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 MINN. L. REV. 395, 425–26 (1986).

82 The acute phase occurs immediately after the attack and is usually indicated by feelings of "shock, fear, humiliation, vulnerability, powerlessness, anxiety, and disgust" as well as physical reactions, such as sleeping disorders, general soreness, headaches, fatigue, gastrointestinal irritability, and genitourinary disturbances. *Id.* at 426–27. The acute phase may last between three and four months. Fiona Mason & Zoe Lodrick, *Psychological Consequences of Sexual Assault*, 27 BEST PRAC. & RES. CLINICAL OBSTETRICS AND GYNAECOLOGY, 27, 31 (2012).

AR_00000555

long-term reorganization phase.[83] The symptoms of RTS may manifest differently in each individual sexual assault victim,[84] and it is these disparate manifestations that may sometimes result in behavior that triers-of-fact may not "expect" from a sexual assault victim.[85]

These RTS symptoms may also affect the ability of the complainant to testify. Because of the trauma, complainants may give contradictory or incomplete testimony that appears to be at odds with their accusations.[86] Such issues may only compound if the complainant's alleged assailant is in view.[87]

Another issue is that in many sexual assault adjudications, the defense's best strategy is to shift the trier-of-fact's attention away from the defendant and onto the complainant, exposing every personal flaw possible in order to undermine her credibility.[88] Such evidence is typically only used to attack the credibility of the complainant and does not necessarily aid the trier-of-fact in determining the truth about what actually occurred.[89] This hard-charging exploration into the sexual assault victim's personal life, as well as the general inference

---

[83] In the long-term reorganization phase, the sexual victim is trying to reorganize her life but may develop anxiety, depression, sexual and interpersonal dysfunction, and may experience "traumatophobias"—defensive avoidance reactions to the circumstances of their sexual assault. Massaro, *supra* note 81, at 426–28.

[84] *See* Mason, *supra* note 82, at 31.

[85] For instance, during an assault, many women do not resist their assailant and many do not immediately report the assault due to disbelief or denial, which is contrary to how most people believe they would react under similar circumstances. *Id.* at 29–30, 32. Additionally, while some women are emotionally demonstrative in the immediate hours and days after their assault, many others remain calm and controlled. *Id.* at 31; Massaro, *supra* note 81, at 425.

[86] *See* Mason, *supra* note 82, at 32 (arguing that while a sexual assault complainant's inconsistent or incomplete testimony is typically misinterpreted to be evidence of fabrication, the inverse should be inferred given the nature of PTSD).

[87] *See id.* at 33 (noting that being reminded or required to recount their sexual assault in a courtroom setting, where their assailant is likely to be, may exacerbate symptoms of PTSD); Lininger, *supra* note 77, at 1360 (noting that a trial may be a complainant's first face-to-face encounter with her assailant and that she may perceive cross-examination as an another attack on her through the defense counsel); *see also* Mohammadian, *supra* note 75, at 493–94 (recounting a case where a sexual assault complainant contemplated suicide rather than be cross-examined by her alleged assailant who was a *pro se* defendant).

[88] *See* Lininger, *supra* note 77, at 1361 (noting that cross-examination of a sexual assault witness is akin to "public psychoanalysis" of the complainant because cross examination may explore "[h]er most private affairs—including her past romantic relationships, her sexual mores, her psychological fortitude, and her loyalty to family members . . . "); Jennifer L. Hebert, *Mental Health Records in Sexual Assault Cases: Striking a Balance to Ensure a Fair Trial for Victims and Defendants*, 83 TEX. L. REV. 1453, 1461 (2005) (noting that the character of a sexual assault complainant is heavily emphasized by the defense because the issue at trial "is not whether a rape actually occurred, but whether people believe a rape occurred").

[89] *See* Lininger, *supra* note 77, at 1360 (noting that defense attorneys will explore any real or perceived character flaws of the complainant during cross-examination).

AR_00000556

that she is either lying or willingly brought about the acts she claims was an assault, may only lead to further trauma.[90]

### III. LEGAL ISSUES SURROUNDING UNIVERSITY DISCIPLINARY PROCEEDINGS

There are several sources of law that bear most directly on the procedural safeguards afforded to accused students in university disciplinary proceedings. A student may have contractual rights to be dealt with in accordance with good faith and fair dealing,[91] or he may have rights under state law.[92] Two other sources of law, and those examined in Part III, are Title IX and the Due Process Clause of the Fourteenth Amendment.

### A. Title IX Rights of Both the Accused and the Complainant

Title IX states "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."[93] Assuming they are enrolled in a university that receives federal funding, both the complainant and accused student have the same general right to be free from sex discrimination by their university. How their respective Title IX rights can be implicated in the context of a university disciplinary proceeding, however, is vastly different.

#### 1. Complainant's Rights Under Title IX

Title IX provides student complainants a private cause of action against their universities when the university has been "deliberately indifferent" to their sexual assault,[94] thereby subjecting complainants to a "hostile environment" on account of

---

90  *See* Mason, *supra* note 82, at 33 (noting that some women suffer severe anxiety when recounting their sexual assault).

91  *See, e.g.,* Berger & Berger, *supra* note 29, at 313–17, 331–37 (arguing, *inter alia*, that Due Process is a contractual right private university students have under the doctrine of good faith and fair dealing). This theory may be available provided that there is no direct, express policy governing disciplinary proceedings.

92  Several states have passed statutes on what types of procedures schools and universities must use in disciplinary proceedings. 22 PA. CODE § 505.3 (2016); S.C. CODE ANN. § 59-63-240 (2016); WASH. ADMIN. CODE § 478-120-095 (2016). Additionally, courts in several states have judicially determined what level of safeguards are required in disciplinary proceedings. *See infra* Part III(B).

93  20 U.S.C. § 1681(a) (1972).

94  Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 633 (1999) (concluding that Title IX grants students a private cause of action against their school for student-on-student sexual harassment when the school "act[s] with *deliberate indifference* to known acts of harassment," so long as the harassment is "so severe, pervasive, and objectively offensive" that it effectively bars the victim's access to an education) (emphasis added).

AR_00000557

their gender.[95] A student complainant may suffer a deprivation of her Title IX rights if the university fails to timely adjudicate, or improperly adjudicates, her sexual assault claim.[96]

The OCR has addressed the use of cross-examination in university disciplinary proceedings in one of its "Dear Colleague" letters, a series of publications addressed to universities which offer guidance[97] on Title IX compliance.[98] In the 2011 Dear Colleague Letter, the OCR stated it "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing."[99] The OCR's reasoning is that "[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment."[100] The 2011 Letter was later supplemented by a 2014 "Questions and Answers on Title IX and Sexual Violence" FAQ which,

---

[95] In this context, a "hostile environment" is one in which a university's deliberate indifference to the sexual harassment of a student causes the student to suffer a constructive deprivation of his or her education. There is a split amongst the authorities as to what constitutes a sufficient level of harassment "so severe, pervasive, and objectively offense" to create a hostile environment. In *Davis*, the Court, in dicta, theorized that, while one incident of student-to-student harassment could be said to implicate Title IX, "it [is] unlikely Congress would have thought such behavior sufficient to rise to this level." *Id.* at 652–53.

Some courts, however, have held that a single incident of rape or violent sexual assault was sufficient to create a hostile environment. *See* Jennings v. U. of N.C., 482 F.3d 686, 720–21 (4th Cir. 2007); Albiez v. Kaminski, No. 09-CV-1127, 2010 WL 2465502, at *6 (E.D. Wis. June 14, 2010) (one incident of sexual assault by the plaintiff's resident advisor sufficient to create hostile environment); S.S. v. Alexander, 177 P.3d 724, 741 (Wash. App. 2008) (plaintiff "did not have to be raped twice before the university was required to appropriately respond to her requests for remediation and assistance. In the Title IX context, there is no 'one free rape' rule.").

[96] *2011 Dear Colleague Letter*, *supra* note 25, at 4 ("If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."); *see also Davis*, 526 U.S. at 633–35, 653–54 (finding a school may be liable for money damages under Title IX for failing to timely address numerous reports of a student's repeated acts of sexual harassment upon the plaintiff).

[97] One very important aspect to note is that these guidance "Letters" are not binding law or even controlling regulations. They are likely to be seen by courts as having *Skidmore* deference—courts can refer to them as a source of persuasive authority but are under no obligation to follow them. *See* Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944) ("We consider that the rulings, interpretations and opinions of the [Wage and Hour Division] Administrator . . . while not controlling upon courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

[98] All of the OCR's "Dear Colleague Letters" and other guidance publications are available at *Sex Discrimination*, U.S. DEP'T OF EDUC. http://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html [http://perma.cc/L24Z-UMZR].

[99] *2011 Dear Colleague Letter*, *supra* note 25, at 12.

[100] *Id.* Under the OCR's guidance then, allowing the accused to cross-examine the complainant directly would open up the university to potential liability under Title IX.

AR_00000558

among other topics, reiterated the OCR's position on cross-examination,[101] but offered a potential alternative:

> A school may choose, instead, to allow the parties to submit questions to a trained third party (e.g., the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.[102]

It should be noted that according to this Note's survey, this is the approach that 27% of schools have taken with their disciplinary proceedings.[103]

As of right now, these OCR publications are only guidance documents and are not binding on any university.[104] However, it is likely within the authority of the Department of Education to promulgate binding regulations[105] on how universities can conduct their disciplinary proceedings, despite the plain language and legislative history of Title IX being silent on the matter. In the plurality decision of *Guardians Ass'n v. Civil Service Comm'n of the City of N. Y.*,[106] the U.S. Supreme Court held that an implementing regulation exceeding the original scope of its statute is valid, so long as it is consistent with the underlying purpose of that statute.[107] In *Guardians*, the Court held that while Title VI itself did not proscribe unintentional racial discrimination, regulations that Title VI implemented to that effect were valid because they were consistent with Title VI's purpose of proscribing racial discrimination in general.[108] As applied to this issue, a Department of Education regulation proscribing cross-examination in disciplinary proceedings for sexual misconduct would likely also be held valid. While Title IX, modeled after Title VI,[109] itself may not address the procedures of

---

[101] Catherine E. Lhamon, *Questions and Answers on Title IX and Sexual Violence*, U.S. DEP'T EDUC. 31 (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [http://perma.cc/9JZC-BKQ4].

[102] *Id.*

[103] *See supra* note 36 and accompanying text.

[104] Indeed, as Part I(B) demonstrates, 29% of schools sampled currently allow an accused student to directly question the complainant, which the OCR has directly advised against. *See supra* note 35 and accompanying text.

[105] A regulation promulgated by an executive branch agency and codified in the Code of Federal Regulations is due deference as long as it is reasonably in furtherance of the statute it is interpreting. *See* Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, 467 U.S. 837, 843–44 (1984).

[106] 463 U.S. 582 (1983).

[107] *See id.* at 591–92.

[108] *Id.* at 582, 590. The majority opinion of Justice White based this holding on the fact that Title VI provided the Department of Labor "sufficient discretion to enforce the statute," so long as such regulations were "not inconsistent with the purpose of Title VI." *Id.* at 591–92.

[109] *See* Cannon v. Univ. of Chi., 441 U.S. 677, 704 (1979) (noting that Title IX was modeled after Title VI).

AR_00000559

university disciplinary proceedings, if the Department of Education can show that these (as of yet hypothetical) regulations further the goal of proscribing sex-based discrimination, such regulations would likely be upheld under *Guardians*.

### 2. Accused Student's Rights Under Title IX

Under Title IX, an accused student does not have an analogous deliberate indifference/hostile environment cause of action that would otherwise be available to a complainant if a university fails to properly address her sexual assault claim. Rather, an accused student can bring an "erroneous outcome discrimination" claim under Title IX which requires he show that, in the course of his discipline, he was the victim of: (1) a flawed procedure, that (2) led to an adverse and erroneous outcome with (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."[110] To support the third element, the accused student must present more than conclusory allegations that the university found against him because of his gender, a standard many accused students fail to meet.[111] While other causes of action may exist for a flawed adjudication process, for an accused student to have a claim under Title IX, he must show a causal link between his gender and his punishment.[112] Thus, if a school

---

[110] Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994). "Such allegations [of gender bias] might include . . . statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

[111] *See, e.g.*, Mallory v. Ohio Univ., 76 Fed. Appx. 634, 639–40 (6th Cir. 2003) (holding there was no erroneous outcome discrimination where accused student plaintiff unsuccessfully argued that the school focused on the complainant's ability to consent rather than other potentially exculpatory evidence); Yu v. Vassar Coll., 97 F. Supp. 3d 448, 476–77 (S.D.N.Y 2015) (holding that there was no erroneous outcome discrimination where the school did not give great weight to Facebook messages the complainant sent to the accused student the day after the assault); Doe v. Univ. of Mass.-Amherst, No. 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015) (finding that, while the plaintiff's pleaded facts may suggest his university "treated [the complainant] more favorably than the Plaintiff," he had not alleged facts showing the unfavorable treatment "was *because* of Plaintiff's sex") (emphasis in original). *But see* Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 768 (D. Md. 2015) (holding that the male accused plaintiff pleaded sufficient facts to state an erroneous outcome discrimination cause of action where he alleged that the university's sexual assault awareness program, influenced in part by the OCR's policy guidance, may have led Salisbury University administrators to conduct a disciplinary proceeding that did not follow the university's stated procedures).

[112] To further illustrate this point, imagine the following scenario:
A university has a policy of adjudicating sexual assault complaints solely by way of coin-toss. On Monday, the university flips a coin as to Complainant A's sexual assault complaint against B. B wins the coin toss, and therefore the university finds that B did not commit a sexual assault and he is due no discipline. On Tuesday, the university flips a coin as to Complainant C's sexual assault complaint against D. C wins the coin toss, and the university therefore finds D has committed a sexual assault and expels him.

*Chapman Law Review* [Vol. 20:2

does not allow an accused student, male or female, the right to some form of cross-examination in a disciplinary proceeding, a male student has no claim to it under an erroneous outcome discrimination theory under Title IX.

## B.  Accused Student's (Potential) Due Process Right to Cross-Examination

Because a university disciplinary proceeding is not a criminal prosecution, an accused student has no Sixth Amendment right to cross-examination in such a proceeding.[113] Rather, constitutional claims lie in the Due Process Clause of the Fourteenth Amendment, which reads in pertinent part, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."[114]

A procedural Due Process claim requires the plaintiff to have either a liberty or property interest at issue, a deprivation of that interest by a State, and that such deprivation occur pursuant to inadequate government procedures.[115] A liberty or property interest can arise not only from the U.S. Constitution, but also from a person's rights under a state law entitling them to some benefit.[116]

In *Goss v. Lopez*,[117] the U.S. Supreme Court held that students in a state's public school system have a property interest in the education to which they are entitled, pursuant to a state statute.[118] The Court went on to find that students have a

---

Complainant A likely has a claim under Title IX because the school has been deliberately indifferent to her complaint by leaving their investigation and adjudication up to mere chance. Conversely, D likely does not have a Title IX erroneous outcome discrimination claim. Because the university adjudicates all sexual assault complaints via coin-toss, D cannot say that the procedures and outcome, as clearly flawed as they are, were done on account of his gender.

113 "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI.

114 U.S. CONST. amend. XIV, § 1.

115 *See* Erwin Chemerinsky, *Procedural Due Process Claims*, 16 TOURO L. REV. 871, 871 (2000).

116 *See* Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).

117 419 U.S. 565 (1975). *Goss* involved a class action lawsuit brought by nine Ohio public school students who were suspended up to ten days for non-academic misconduct. *Id.* at 568–69. Ohio law granted a school principal the right to suspend a student for ten days or expel a student without any form of hearing or notice to either the student or the student's parents. The students in *Goss* were suspended immediately after their alleged misconduct with no hearing as to the underlying facts surrounding each suspension. *Id.* at 570.

118 *Id.* at 573–74 ("The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.").

AR_00000561

liberty interest in having their reputation free from inaccurate charges of misconduct.[119] While never explicitly holding as such, the U.S. Supreme Court has assumed the existence of such constitutional protections for students attending public universities.[120] Such constitutional protections, however, have not been found to exist for students enrolled in private institutions.[121]

There are two Supreme Court cases that guide a court's determination as to what process is due to an accused student when charged with non-academic misconduct: *Goss v. Lopez*[122] and *Mathews v. Eldridge*.[123] In *Goss*, the Court held that when a student is facing a short-suspension (ten days or less), Due Process requires at a minimum that "the student be given oral or

---

[119] *Id.* at 575 ("If [charges of misconduct are] sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution.") (internal footnote omitted).

[120] *See* Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 84–85 (1978); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 222–23 (1985). Several lower federal courts and state courts have explicitly held public university students have a constitutional right to their education. *See, e.g.*, Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 159 (5th Cir. 1961); Woodis v. Westark Cmty. Coll. 160 F.3d 435, 440 (8th Cir. 1998); Nickerson v. Univ. of Alaska Anchorage, 975 P.2d 46, 52 (AK 1999); Danso v. Univ. of Conn., 919 A.2d 1100, 1106 (Conn. Super. Ct. 2007).

[121] *See* Holly Hogan, *The Real Choice in a Perceived "Catch-22": Providing Fairness to Both the Accused and Complaining Students in College Sexual Assault Disciplinary Proceedings*, 38 J.L. & EDUC. 277, 278 n.2 (2009) ("Private colleges generally are not state actors for purposes of due process.").

A private university could be liable for a Due Process claim only if it was found to be a "state actor." While there are several tests for determining whether a private entity becomes a "state actor" based on the underlying facts of a given case, the test most relevant to a private education institution is the "fair attribution" test laid out in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). A private entity performs a state action when they have acted in accordance with a "rule of conduct imposed by the State or by a person whom the State is responsible," and the entity can "fairly be said to be a state actor" because it "has acted together with or has obtained significant aid from state officials." *Id.* at 937. The mere fact that a private entity acts in accordance with a state rule or regulation does not mean they become a state actor, however. *Id.* Therefore, even in the instance where a private university follows the OCR's guidance and does not allow for cross-examination, it is unlikely that a court would find a private university has become a state-actor based solely on this fact.

However, it is not difficult to see a future scenario wherein the OCR or another government entity actively puts pressure, via threat of lawsuit, on private universities to limit procedural protections afforded accused students. Such pressure may meet the "acted together" prong of the *Lugar* test.

Several commentators have argued that an equivalent to the right to Due Process in private university disciplinary proceedings may be founded on theories of contract law or associations law. *See, e.g.*, Berger & Berger, *supra* note 29, at 313–17, 331–37 (arguing, *inter alia*, that Due Process is a contractual right private university students have under the doctrine of good faith and fair dealing).

[122] 419 U.S. 565 (1975).

[123] 424 U.S. 319 (1976).

written notice of the charges against him," an "explanation of the evidence the authorities have [against him]," and the "opportunity to present his side of the story."[124] In these short-suspension instances, cross-examination and other trial-type procedures would impose too much of a burden on schools.[125] The *Goss* Court did posit, though, that in situations where a student was facing a longer suspension or expulsion, Due Process "may require more formal procedures."[126]

However, despite this language, the Court has not considered all long-term punishments deserving of "more formal procedures." In two post-*Goss* cases, *Board of Curators of University of Missouri v. Horowitz*[127] and *Regents of University of Michigan v. Ewing*,[128] the Courts held that students facing permanent expulsions for failing to meet academic standards were not due any more than the *Goss* requirements of notice and opportunity to be heard.[129] What can be inferred from *Horowitz* and *Ewing* then is that it is not only the length of the punishment that determines what procedural protections are due, but also the length of the punishment coupled with whether the decision to discipline turns on subjective evaluative information or objective fact-based determinations.[130] *Horowitz* and *Ewing* control those cases in the former, while *Goss* controls those in the latter, where there is some dispute of fact that requires fact-finding.

The Court's decision in *Mathews v. Eldridge* provides a separate analytical framework to determine how much process is

---

124 *Goss*, 419 U.S. at 581; *see also* Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158–59 (5th Cir. 1961) (fourteen years before *Goss*, the court held that college students were due notice of the accusations against them and an investigative hearing wherein the university could hear and weigh facts from both sides).

125 *Goss*, 419 U.S. at 583. This concern of overburdening schools and universities has been cited by many state appellate courts and lower federal courts as a reason not to extend more trial-type protections beyond what *Goss* requires. *See, e.g.*, *Dixon*, 294 F.2d at 159; Gorman v. Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1988); Scanlon v. Las Cruces Pub. Sch., 172 P.3d 185, 191–92 (N.M. Ct. App. 2007).

126 *Goss*, 419 U.S. at 584.

127 435 U.S. 78 (1978).

128 474 U.S. 214 (1985).

129 *Horowitz*, 435 U.S. at 85–86 n.2 ("We stop short, however, of requiring full trial-type procedures in [academic disciplinary proceedings] . . . [A]n informal give-and-take between the student and the administrative body dismissing him . . . would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context.") (internal citations omitted); *Ewing*, 474 U.S. at 227.

130 *See Horowitz*, 435 U.S. at 89–90 ("Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement . . . [T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking [sic].").

AR_00000563

due to an accused student in a disciplinary proceeding.[131] In *Eldridge*, the Court articulated a three-factor test for courts to determine whether administrative procedures comport with due process requirements: (1) the private interest that will be affected; (2) the risk of "erroneous deprivation" of the private interest through the use of the administrative procedures; and (3) the government's interest in using its set procedures.[132] The Court has applied these factors to a myriad of cases where the central issue was what level of due process protection was sufficient.[133] Aside from Justice Marshall's concurrence and dissent in part in *Horowitz*, the Court has yet to apply the *Eldridge* factors to the question of due process in university disciplinary proceedings.

Lower federal courts and state courts have applied both *Goss* and *Eldridge* (or similar reasoning behind these cases) to the question of whether cross-examination is a due process requirement in university disciplinary proceedings, resulting in a split amongst the jurisdictions. Among the states that have directly decided on the issue,[134] courts in eleven states have held that an accused student has the right to some form of cross-examination of witnesses.[135] Likewise, the Ninth Circuit

---

[131] In his concurrence in part and dissent in part to the *Horowitz* decision, Justice Marshall argued that *Eldridge* supplied a better means to analyze the issue of what due process was required when a student faces an expulsion, rejecting the majority's "academic" versus "disciplinary" distinction. *Id.* at 99–100, 103–07 (Marshall, J., concurring in part and dissenting in part).

[132] Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976).

[133] *See, e.g., id.* at 335–47 (applying the three-factor test to the Social Security Administration's appeals process); Santosky v. Kramer, 455 U.S. 745, 758–69 (1982) (applying the *Eldridge* factors to determine the standard of proof in parental rights termination proceedings); Ake v. Oklahoma, 470 U.S. 68, 77–83 (1985) (applying the factors to the question of an indigent criminal defendant's access to expert psychological testimony); Wilkinson v. Austin, 545 U.S. 209, 224–30 (2005) (applying the factors to the procedures Ohio used to classify prisoners for placement in "Supermax" prison facilities).

[134] The following states, along with the District of Columbia, have yet to have a court directly address this issue: Alabama, Alaska, Arizona, California, Florida, Hawaii, Idaho, Iowa, Louisiana, Maine, Minnesota, Nebraska, Nevada, New Hampshire, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Utah, Wisconsin, and Wyoming. Several of these twenty-three states have had decisions in which cross-examination is briefly mentioned in a list of procedures the accused student was afforded, but the courts in such cases generally gave a conclusory statement that the student's due process rights were protected without determining what listed procedures were actually constitutionally required. *See, e.g.,* Burch v. Moulton, 980 So. 2d 392, 400–01 (Ala. 2007); Shuman v. Univ. of Minn. Law Sch., 451 N.W.2d 71, 75 (Minn. Ct. App. 1990); Braesch v. DePasquale, 265 N.W.2d 842, 846 (Neb. 1978).

[135] Nichols *ex rel.* Nichols v. DeStefano, 70 P.3d 505, 508 (Colo. App. 2002) (holding that a student's inability to question students who gave statements against him amounted to a denial of an "opportunity to be heard"); Bd. of Educ. of New Castle Cty. Vocational Tech. Sch. Dist. v. Clark, 1988 WL 47096, at *1 (Del. Super. Ct. May 3, 1988) (holding that because student was facing expulsion, *Goss* minimum requirements were expanded and student had right to cross-examine witnesses to fully present his case); Colquitt v. Rich Tp. High Sch. Dist. No. 227, 699 N.E.2d 1109, 1116 (Ill. App. Ct. 1998)

and district courts in the First, Second, Third, and Eighth Circuits have held accused students have the right to some form of cross-examination.[136]

Conversely, courts in sixteen states,[137] the First, Second, Fourth, Fifth, Sixth, Tenth, and Eleventh Circuits, and district

---

("[I]n expulsion proceedings, the private interest is commanding, the risk of error from the lack of adversarial testing of witnesses through cross-examination is substantial, and the countervailing governmental interest favoring the admission of hearsay statements is comparatively outweighed."); Smith v. Miller, 514 P.2d 377, 387 (Kan. 1973) (holding that cross-examination is required "when the outcome is directly dependent on the credibility of two witnesses (possibly including the student threatened with expulsion) whose statements are directly conflicting, then cross-examination is imperative in establishing the truth, absent compelling reasons for dispensing with it"); Ryan v. Hofstra Univ., 328 N.Y.S.2d 339, 341 (Sup. Ct. 1972) (finding that a student in a private university had the right to cross-examine witnesses against him in a disciplinary proceeding); Alexander v. Cumberland Cty. Bd. of Educ., 615 S.E.2d 408, 415 (N.C. Ct. App. 2005) (holding that students are due the right to cross-examination if school seeks to impose "long-term suspensions"); Ruane v. Shippensburg Univ., 871 A.2d 859, 862 (Pa. Commw. Ct. 2005) (in a case where the accused student was charged with sexual assault, noting that a Pennsylvania state statute, 22 PA. CODE § 505.3, mandates universities to allow the accused student to question witnesses); Stinney v. Sumter Sch. Dist. 17, 707 S.E.2d 397, 399 (S.C. 2011) (noting that South Carolina state statute § 59-63-240, which allows accused student to cross-examine witnesses at an expulsion hearing, is "constitutionally sufficient"); Texarkana Indep. Sch. Dist. v. Lewis, 470 S.W.2d 727, 736 (Tex. Civ. App. 1971) (holding that cross-examination may be required in situations where witness credibility is at issue); Stone v. Prosser Consol. Sch. Dist. No. 116, 971 P.2d 125, 128 (Wash. Ct. App. 1999) (weighing *Eldridge* factors in favor of accused student and finding that cross-examination is required in an expulsion hearing); North v. W. Va. Bd. of Regents, 233 S.E.2d 411, 417 (W. Va. 1977) (holding that accused student has the right to cross-examine witnesses in a university expulsion hearing).

136 Black Coalition v. Portland Sch. Dist. No. 1, 484 F.2d 1040, 1045 (9th Cir. 1973) (holding that members of a black student union had the right to cross-examine witnesses in their expulsion hearings); Marin v. Univ. of Puerto Rico, 377 F. Supp. 613, 623 (D.P.R. 1973) (including cross-examination in a list of procedures that should be afforded to students before being suspended or expelled); Gomes v. Univ. of Maine System, 365 F. Supp. 2d 6, 16 (D. Me. 2005) (holding student accused of sexual assault and facing expulsion had the right to cross-examine complainant and other witnesses); Donohue v. Baker, 976 F. Supp. 136, 147 (N.D. N.Y. 1997) (holding that because sexual assault cases turn on credibility of complainant, accused university student had the right to question complainant in some form during expulsion hearing); Furey v. Temple Univ., 730 F. Supp. 2d 380, 396 (E.D. Penn. 2010) (finding that student had the right to question police officer whom he allegedly got into an altercation with, particularly after hearing panel aggressively questioned accused student); Fielder v. Bd. of Educ. of Sch. Dist. of Winnebago, 346 F. Supp. 722, 730 (D. Neb. 1972) (while not concluding that cross-examination is a constitutional requirement, the court held that affording accused student the right to cross-examination is "good technique"); Hardie v. Churchill Cnty. Sch. Dist., No. 3:07-CV-310-RAM, 2009 WL 875486, at *4 (D. Nev. Mar. 30, 2009) (recognizing *Black Coalition* affords students facing expulsion the right to cross-examine witnesses).

137 Smith v. Denton, 895 S.W.2d 550, 559 (Ark. 1995) (holding that cross-examination in disciplinary proceeding was not required "in this context"); Danso v. Univ. of Conn., 919 A.2d 1100, 1108 (Conn. Super. Ct. 2007) (citing *Dixon*, the court held that due process is met as long as accused has an opportunity to review statements of accusers and offer a rebuttal); Life Chiropractic Coll., Inc. v. Fuchs, 337 S.E.2d 45, 48 (Ga. Ct. App. 1985) (holding implicitly that there was no right to cross-examination because plaintiff could not show his case would have benefited from it); Reilly v. Daly, 666 N.E.2d 439, 444–45 (Ind. Ct. App. 1996) (holding, in an academic disciplinary proceeding, "all that is required is that the student have an opportunity to elicit the truth about the facts and events at

courts in the Seventh and Eighth Circuits,[138] have found that cross-examination is not required to protect a student's Due Process rights in a disciplinary proceeding.

Parsing through these decisions reveals two important aspects to note. The first is how some courts applied the *Eldridge*

---

issue" and cross-examination is not required for that purpose); Stathis v. Univ. of Kentucky, No. 2004-CA-000556-MR, 2005 WL 1125240, at *3 (Ky. Ct. App. May 13, 2005) (finding that due process was not lacking when student was not allowed to directly cross-examine witnesses); Miller v. Bd. of Educ. of Caroline Cnty., 690 A.2d 557, 560–61 (Md. Ct. Spec. App. 1997) (construing strictly *Goss* and finding that a student is only due notice and an informal hearing); Ding ex rel. Ding v. Payzant, No. 03-5847, 2004 WL 1147450, at *12 (Super. Ct. Mass. May 20, 2004) (holding that the *Goss* minimum requirements are sufficient to protect an accused's due process rights); Lee v. Univ. of Michigan-Dearborn, No. 284541, 2009 WL 1362617, at *4 (Mich. Ct. App. May 12, 2009) (finding that the plaintiff failed to [explain] why cross-examination was required in her case given the burden it would have imposed on the university); Hinds Cnty. Sch. Dist. Bd. of Tr. v. R.B., 10 So.3d 387, 400–401 (Miss. 2008) (holding that due process requires only notice of statements against the accused student and not direct confrontation and cross-examination); Knapp v. Junior C. Dist. of St. Louis Cnty., Mo., 879 S.W.2d 588, 592–93 (Mo. Ct. App. 1994) (finding no state authority that cross-examination is a due process requirement); State v. Clapp, 263 P. 433, 437 (Mont. 1928) (holding, in a case decided almost fifty years before *Goss*, that expulsion was not arbitrary and plaintiff had no right to confront and cross-examine accusing witnesses because university president had no subpoena power); Rockwell v. William Paterson U., 2015 WL 9902440 (Super. Ct. N.J. App. Div. Jan. 25, 2016) (noting that *Goss* provided the "definitive interpretation" of a student's due process rights and accordingly held that cross-examination is not required because *Goss* did not hold so); Scanlon v. Las Cruces Public Sch., 172 P.3d 185, 191–92 (N.M. Ct. App. 2007) (citing its concern for the burden cross-examination would place on schools and the potential for retaliation against witnesses, court held there is no right to cross-examination); Anderson v. Stanton, No. E2009-01081-COA-R3-CV, 2010 WL 2106218, at *8 (Tenn. Ct. App. May 26, 2010) (holding the only requirements for due process are the *Goss* minimum requirements); Nzuve v. Castleton State C., 335 A.2d 321, 324 (Vt. 1975) (citing *Dixon*, held that cross-examination is not required because a student is not entitled to a "full-dress judicial hearing"); Woods v. Winchester Sch. Bd., No. 98-213, 1999 WL 33732641, at *7 (Va. Cir. Ct. July 15, 1999) (holding that only *Goss* minimum requirements are required to protect due process).

138 Gorman v. Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1988); Winnick v. Manning, 460 F.2d 545, 549–50 (2nd Cir. 1972) (holding cross-examination was generally not "essential" in university disciplinary proceedings, but did leave open the possibility it may be required if there is an issue as to witness credibility); Henson v. Honor Comm. of U. Va, 719 F.2d 69, 73–74 (4th Cir. 1983) (holding that cross-examination is not required in expulsion hearing due to failure to meet university academic requirements); Dixon v. Ala. State Bd. of Ed., 294 F.2d 150, 159 (5th Cir. 1961) (holding that only notice and an informal hearing are required, and a student is not entitled to a "full-dress judicial hearing" in a disciplinary proceeding); Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 641 (6th Cir. 2005) (finding cross-examination not required in case where student could not show issue of witness credibility); B.S. ex rel. Schneider v. Bd. of Sch. Tr., Fort Wayne Cmty. Sch., 255 F. Supp. 2d 891, 899–900 (N.D. Ind. 2003) (holding that student facing expulsion due sexual assault claim had no right to cross-examination complainant because school administrators could judge the veracity of the witness through her statements to them); Caston v. Benton Public Sch., No. 4:00CV00215WKU, 2002 WL 562638, at *4–5 (E.D. Ark. Apr. 11, 2002); Brown v. Univ. of Kansas, 599 Fed. Appx. 833, 837–38 (10th Cir. 2015) (*Goss* requirements sufficiently protected due process rights of law student expelled for falsifying information in application); Nash v. Auburn Univ., 812 F. 2d 655, 664 (11th Cir. 1987) (holding that ability of accused student to present his own case through his own witnesses was sufficient to protect student's due process rights and cross-examination was not required).

factors to this issue.[139] While there is disagreement on the ultimate outcome, the courts applying *Eldridge* generally were in agreement on what constituted the competing interests. The accused student's private interest is the continuation of their education and the benefits derived from it, as well as their interest in not bearing the label of a sexual assaulter.[140] The second factor is cross-examination's propensity to be a hedge against erroneous fact-finding.[141] Lastly, the third factor is the university's interest in applying its set procedures and limiting additional administrative costs.[142]

The second noteworthy aspect of this survey is the general treatment of cross-examination itself. In all of the cited cases, not a single court questioned cross-examination's ability to aid a fact-finder, nor made any reference to social science studies similar to those cited in Part II(B) illuminating cross-examination's flaws. Rather, the courts mostly towed the line of rhetoric cited in Part II(A) of cross-examination's unassailable ability to elicit the truth. The courts that held against a right to cross-examination did so mostly out of concern for practical considerations of administering cross-examination,[143] and a recognition that a

---

[139] In the above cited cases, the following decisions applied the *Eldridge* factors to the question of cross-examination of witnesses in university disciplinary proceedings: Bd. of Educ. of New Castle Cty. Vocational Tech. Sch. Dist. v. Clark, 1988 WL 47096, at *1–2 (Del. Super. Ct. May 3, 1988); Stone v. Prosser Consol. School Dist., 971 P.2d 125, 126–27 (Wash. Ct. App. 1999); Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 16 (D. Me. 2005); Furey v. Temple Univ., 730 F. Supp. 2d 380, 396 (E.D. Pa. 2010); Hinds Cty. Sch. Dist. Bd. of Trustees v. R.B., 10 So. 3d 387, 399–401 (Miss. 2008); Rockwell v. William Paterson Univ., 2015 WL 9902440, at *8–9 (N.J. Super. Ct. App. Div. Jan. 25, 2016); Scanlon v. Las Cruces Pub. Sch., 172 P.3d 185, 191 (N.M. Ct. App. 2007); Gorman v. Univ. of Rhode Island, 837 F.2d 7, 16 (1st Cir. 1988); Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 641 (6th Cir. 2005); B.S. ex rel. Schneider v. Bd. of Sch. Trustees, Fort Wayne Cmty. Sch., 255 F. Supp. 2d 891, 899–900 (N.D. Ind. 2003); Caston v. Benton Pub. Sch., No. 4:00CV00215WKU, 2002 WL 562638, at *5 (E.D. Ark. Apr. 11, 2002); Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987).

[140] *See, e.g., Gomes*, 365 F. Supp. 2d at 16 (finding the accused student's private interest "compelling" because the charges could have "a major immediate and life-long impact on their personal life, education, employment, and public engagement") (internal citations omitted).

[141] *See, e.g., Stone*, 971 P.2d at 127 (noting that cross-examination would allow an accused student to test a witness's credibility).

[142] *See, e.g., Scanlon*, 172 P.3d at 191 ("Under the third [*Eldridge*] factor, we weigh the burden that the practice of allowing cross-examination of student witnesses would place on [schools]. The burdens on a school district of having to hold trial-like disciplinary hearings in which they must employ the technical rules of evidence are significant, and could potentially have serious consequences both for school administration and for the safety of the student body.").

[143] *See, e.g., id.* ("Under the third [*Eldridge*] factor, we weigh the burden that the practice of allowing cross-examination of student witnesses would place on [schools]. The burdens on a school district of having to hold trial-like disciplinary hearings in which they must employ the technical rules of evidence are significant, and could potentially have

AR_00000567

school disciplinary proceeding does not require similar treatment as trial courts due to a lesser amount of interests at stake.[144]

## CONCLUSION

This Note has shown there is no consensus as to whether an accused student should have the right to cross-examine adverse witnesses in a university disciplinary proceeding, and that many considerations, both legal and psychological, converge on this issue.

While there is seemingly no scientific evidence supporting the notion that cross-examination is the "greatest legal engine" for determining the truth, it is an unquestioned institution in the American adversarial legal system. Its absence or restriction in proceedings that are adversarial in all but name and whose outcome could determine the course of a young person's life, is quite striking. At the same time, however, forcing a complainant to directly answer questions from the very individual who may have assaulted her is a prospect that rightly makes reasonable people hesitate.

It is unfortunate then, that the legal discussion regarding the right to cross-examination has largely failed to truly explore the costs and benefits of affording an accused student the right to cross-examination in a disciplinary proceeding given the evidence presented by this Note. The numerous opinions cited in this Note are resoundingly conclusory in their reasoning for allowing cross-examination or denying it. Much of the discussion of a right to cross-examination in this context has focused more on the nature of the proceeding itself and the implications of its outcome rather than whether cross-examination, with the limitations presented by this Note, would actually help or hinder the fact-finding aspect of such proceedings.

The increasing significance of the question of how to properly adjudicate campus sexual assault claims requires a far more thorough examination. Universities have become more strident in their investigations and adjudications of these claims, and at the same time, more accused students are arguing that the procedural safeguards afforded them are lacking. Courts, university officials, legislators, and litigants must make note of the sensitivities of the accused and the complainant implicated

---

serious consequences both for school administration and for the safety of the student body.").

[144] *See, e.g.,* Dixon v. Alabama State Bd. of Ed., 294 F.2d 150, 159 (5th Cir. 1961) (holding that only notice and an informal hearing is required, and a student is not entitled to a "full-dress judicial hearing" in a disciplinary proceeding).

by this issue and construct proper legal reasoning, informed in part by the evidence cited in Part II, for why cross-examination should or should not be allowed in disciplinary proceedings.

This Note makes no judgment on what outcome ultimately should be reached after such a thorough examination has taken place; this Note has only sought to present and discuss the legal and psychological considerations bearing on this issue in order to help guide university officials, litigants, and courts to a well-reasoned outcome. However, for the benefit of both the accused students and the complainants, the dissonance between the legal system's veneration of cross-examination and the actual scientific evidence regarding its fact-finding accuracy must be ended, and a true consideration of whether it is proper for a student accused of sexual assault of another student to cross-examine the victim and other adverse witnesses must finally occur.

APPENDIX A: SURVEY METHODOLOGY

**Study Population:** The population for this study consisted of 1062 universities, colleges, and community colleges, representing those institutions of higher learning with enrollment of at least 5000 students as of 2014, the last year data is available. This list was derived from the Department of Education's Clery Act statistic database, wherein a Microsoft Excel Spreadsheet of schools with an enrollment exceeding 5000 students was downloaded, resulting in a list of 3794 schools. Excel's "Remove Duplicates" feature was used to remove the many duplicate entries contained in the list (it appears that the Clery Act database creates a new entry for each different mailing address for a given university), resulting in the list of 1062 unique school entries.

**Sampling Methodology:** Each school entry was alphabetically assigned a whole number. Then, using Excel's "RANDBETWEEN" function, a random whole number between 1 and 1062 was produced in a separate Excel cell. The author would then use that number to find the correspondingly numbered school. The author followed these steps to produce the 100 school population used in this study.

**Research Methodology:** Once the school was identified, the author would perform an internet search for that school's student handbook/code of conduct, which the entirety of the 100 schools sampled had available online, looking particularly for a school's disciplinary proceeding procedures and/or procedures on investigating and resolving sexual misconduct claims.

AR_00000570

APPENDIX B

List of sampled schools that allow direct cross-examination
of witnesses

| School Name | Web Address of Source |
| --- | --- |
| Alabama A&M University | http://www.aamu.edu/campuslife/studentresources/Documents/Code%20of%20Conduct.pdf |
| Bentley University | http://www.bentley.edu/files/2015/09/22/SAF.423.15%20UG%20Student%20Handbook_R5.pdf |
| Central Washington University | http://www.cwu.edu/student-rights/student-rights-appeals |
| Cincinnati State Technical and Community College | http://catalog.cincinnatistate.edu/studentrightsandresponsibilities/studentresponsibilities/ |
| Colorado Christian University | http://www.ccu.edu/uploadedFiles/Pages/Campus_Life/handbook.pdf |
| Cuyamaca College | http://cctest.cuyamaca.edu/campus-life/student-affairs/discipline/disc-hearprocess.aspx |
| Davenport University | http://www.davenport.edu/system/files/STUDENT_CODE.pdf |
| Eastern Michigan University | http://www.emich.edu/policies/policy.php?id=124 |
| El Centro College | http://pol.tasb.org/Policy/Download/358?filename=FMA%28LOCAL%29.pdf |
| Everett Community College | https://www.everettcc.edu/files/students/student-activities/student-rights-responsibilities-and-policies.pdf |
| Gaston College | gaston.edu/student-code-of-conduct/ |
| Indian River State College | https://www.irsc.edu/uploadedFiles/Admissions/DatesandDeadlines/Student-Handbook.pdf |
| Joliet Junior College | jjc.edu/academic-behavior-standards/Pages/code-of-conduct.aspx |
| Norco College | http://www.rccd.edu/administration/board/New%20Board%20Policies/5520AP.pdf |

AR_00000571

| School Name | Web Address of Source |
| --- | --- |
| Norfolk State University | https://www.nsu.edu/student-affairs/student-judicial/student-conduct-process |
| North Central Texas College | http://nctc.smartcatalogiq.com/en/2011-2012/Catalog/North-Central-Texas-College-Student-Handbook/Section-II/Discipline-and-Penalties-Discipline-Hearing-Procedure/Hearing-Committee |
| Northeastern University | https://issuu.com/northeasternuniversity/docs/code_of_conduct_5-29?e=2831976/13566121 |
| Roane State Community College | http://www.roanestate.edu/?9244-RSCC-Policy-SA-06-01-Student-Discipline |
| Stockton University | http://intraweb.stockton.edu/eyos/ossr_site/content/docs/Campus%20Conduct%20Code.pdf |
| The City University of New York - Lehman College | http://policy.cuny.edu/bylaws/article_xv/text/#Navigation_Location |
| The Community College of Baltimore County | http://catalog.ccbcmd.edu/content.php?catoid=26&navoid=1574#protections |
| University of California-Irvine | http://www.dos.uci.edu/conduct/students/code-of-student-conduct-discipline-procedures.php |
| University of Houston | http://www.uh.edu/dos/pdf/student_code_of_conduct.pdf |
| University of Louisiana - Monroe | http://catalog.ulm.edu/content.php?catoid=21&navoid=2540 |
| University of Missouri | https://www.umsystem.edu/ums/rules/collected_rules/programs/ch200/200.020_rules_of_procedures_in_student_conduct_matters |
| University of Montana | http://www.umt.edu/vpsa/documents/Student%20Conduct%20Code%20PDF-%20FINAL%208-27-13.pdf |
| University of North Georgia | http://ung.edu/dean-of-students/student-code-of-conduct/article-4-procedures.php#Rights |
| University of Wisconsin (System) | https://www.students.wisc.edu/doso/reporting-allegations-of-sexual-assault-datingdomestic-violence-and-stalking/ |
| Winston-Salem State University | http://www.wssu.edu/administration/legal-affairs/policies/students/student-code-of-conduct.pdf |

AR_00000572

*Chapman Law Review*

APPENDIX C

List of sampled schools that allow for questioning via
disciplinary panel/investigation team

| School Name | Web Address of Source |
| --- | --- |
| Angelo State University | http://www.angelo.edu/student-handbook/code-of-student-conduct/conduct-procedures-student.php |
| Arkansas State University | http://www.astate.edu/a/student-conduct/files/Student+Handbook+1.8.16.pdf |
| Bloomsburg University of Pennsylvania | http://www.bloomu.edu/policies_procedures/4790 |
| Boise State University | https://deanofstudents.boisestate.edu/scp-codeofconduct/scp-codeofconduct-section5/ |
| Boston College | http://www.bc.edu/publications/studentguide/judicial/boardprocedures.html |
| California State University (System) | http://www.csus.edu/student/Policies_Procedures/Student%20Conduct%20Procedures.html |
| Chapman University | http://www.chapman.edu/students/policies-forms/student-conduct/student-conduct-procedures.aspx |
| Columbia University in the City of New York | http://sexualrespect.columbia.edu/files/sexualrespect/content/080-03147%20Gender%20Based%20Misconduct_JL_v3.pdf |
| Community College of Allegheny County | https://www.ccac.edu/Academic_Rules_and_Regulations.aspx |
| Hofstra University | https://www.hofstra.edu/StudentAffairs/DeanOfStudents/commstandards/commstandards_policies_sexualassault.html |
| Illinois Institute of Technology | https://web.iit.edu/student-affairs/handbook/fine-print/conduct-discipline |
| Indiana University | www.studentcode.iu.edu/procedures/iu-wide/sexualmisconduct.htm |
| Kennesaw State University | http://scai.kennesaw.edu/procedures/sexual-misconduct/formal-resolution.php |
| Marquette University | http://www.marquette.edu/osd/policies/conduct/conduct_procedures.shtml#Conduct_Hearing_Procedures |

| School Name | Web Address of Source |
|---|---|
| Missouri State University – Springfield | http://www.missouristate.edu/studentconduct/12331.htm#Article6 |
| Modesto Junior College | https://www.yosemite.edu/trustees/board_policy/5500%20Standards%20of%20Student%20Conduct.pdf |
| North Dakota State University | https://www.ndsu.edu/fileadmin/policy/601.pdf |
| Rowan University | http://www.rowan.edu/studentaffairs/communitystandards/documents/StudentCodeofConduct09-10Web1.pdf |
| Rutgers University | https://slwordpress.rutgers.edu/studentconduct/wp-content/uploads/sites/46/2016/03/StudentPolicyProhibitingSexualHarassment.pdf |
| State University of New York (System) | http://system.suny.edu/sexual-violence-prevention-workgroup/policies/response/ |
| Temple University | http://policies.temple.edu/PDF/394.pdf |
| Texas Christian University | http://www.studenthandbook.tcu.edu/student_handbook.pdf |
| UC Berkeley | http://policy.ucop.edu/doc/2710641/PACAOS-Appendix-E |
| University of Central Oklahoma | http://www.uco.edu/student-affairs/conduct/files/codeofconduct.pdf |
| University of Cincinnati | https://www.uc.edu/conduct/Code_of_Conduct/nonacademic-misconduct.html |
| University of New England | http://www.une.edu/sites/default/files/Student%20Handbook_8-5-15_FINAL.pdf |
| University of Toledo | http://www.utoledo.edu/policies/main_campus/student_life/pdfs/3364_30_04_Student_code_of_conduct.pdf |

AR_00000574

APPENDIX D

List of sampled schools that do not (explicitly) afford the
right to question witnesses

| School Name | Web Address of Source |
|---|---|
| Auburn University | https://sites.auburn.edu/admin/universitypolicies/Policies/CodeofStudentDiscipline.pdf |
| Benedictine University | https://www.ben.edu/student-life/student-handbook.cfm#Disciplinary-and-Counseling-Records-Procedure |
| Blinn College | http://pol.tasb.org/Policy/Download/1204?filename=FMA%28LOCAL%29.pdf |
| California Baptist University | http://www.thezonelive.com/SchoolStructure/CA_CaliforniaBaptistCollege/handbook.pdf |
| Central Connecticut State University | http://web.ccsu.edu/studentconduct/codeofconduct.asp |
| Cerritos College | http://cms.cerritos.edu/uploads/Board/Board%20Policies/Chapter%205/AP_5520.pdf |
| College of San Mateo | collegeofsanmateo.edu/collegepolicies/disciplinaryprocedures-step2.aspx |
| College of William and Mary | http://www.wm.edu/offices/compliance/policies/proposed_policies/student_misconduct_procedure/index.php#vi |
| Daytona State College | https://www.daytonastate.edu/files/Student_Handbook.pdf |
| Florence-Darlington Technical College | www.fdtc.edu/academics/registrar/student-code-of-conduct-manual-august-2015.pdf |
| Frederick Community College | http://frederick.edu/jobs-hr/policies-and-procedures/policyproceduredocuments/code-of-student-conduct.aspx |
| Frostburg State University | http://www.frostburg.edu/fsu/assets/File/titleix/Procedures.pdf |
| Gadsden State Community College | http://www.gadsdenstate.edu/SexualMisconductPolicy.pdf |
| Harvard University | http://titleix.harvard.edu/files/titleix/files/harvard_student_sexual_harassmnt_procedures.pdf?m=1441919500 |

AR_00000575

| School Name | Web Address of Source |
|---|---|
| Indiana Institute of Technology | http://registrar.indianatech.edu/wp-content/uploads/sites/13/Student-Handbook.pdf |
| Kansas State University | https://policy.ku.edu/IOA/sexual-harassment-sexual-violence-procedures |
| Kutztown University of Pennsylvania | http://www.kutztown.edu/about-ku/administrative-offices/student-conduct/policies-and-procedures.htm |
| Lewis University | http://www.lewisu.edu/welcome/offices/hr/sexualmisconduct.htm |
| Luzerne County Community College | http://www.luzerne.edu/studentlife/LCCC2014-15StudentHandbook.pdf |
| Madison Area Technical College | http://madisoncollege.edu/harassmentdiscrimination |
| Millersville University of Pennsylvania | http://www.millersville.edu/services/judicialaffairs/files/Student%20Code%20of%20Conduct.pdf |
| Monmouth University | http://www.monmouth.edu/uploadedFiles/Content/University/student-life/student-services/SexualMisconductPoliciesAndProcedures.pdf |
| Nashville State Community College | http://www.nscc.edu/content/resources/Student_Code_of_Conduct_Policy.pdf |
| Pitt Community College | http://www.pittcc.edu/experience-pcc/student-services/forms-and-documents/Student-Code-of-Conduct-Policy.pdf |
| Pulaski Technical College | http://www.pulaskitech.edu/current_students/student_handbook.pdf |
| Rowan-Cabarrus Community College | https://www.rccc.edu/catalog-2015-2016/wp-content/uploads/sites/74/2012/06/Title-IX-Reporting.pdf |
| Salt Lake Community College | http://www.slcc.edu/policies/docs/Student_Code_of_Conduct.pdf |
| Southwest Tennessee Community College | http://catalog.southwest.tn.edu/content.php?catoid=8&navoid=417 |
| Stephen F. Austin State University | http://www.sfasu.edu/policies/2.13_Sexual_Misconduct_-_dcd_edits_-_updated.pdf |

AR_00000576

| School Name | Web Address of Source |
|---|---|
| Syracuse University | https://issuu.com/syracuseosrr/docs/student_conduct_system_handbook_fin |
| The City College of San Francisco | https://www.ccsf.edu/en/student-services/StudentAffairs/Conduct/_jcr_content/col2parsys/documentlink_1/file.res/Student%20Code%20of%20Conduct%20&%20Due%20Process.pdf |
| Touro College | https://www.touro.edu/title-ix-policy/ |
| Tufts University | http://oeo.tufts.edu/wp-content/uploads/Sexual-Misconduct-Adjucation-Process-12182015.pdf |
| University of Alaska Anchorage | https://www.uaa.alaska.edu/deanofstudents/studentconduct/judicialreview.cfm#CP_JUMP_1635105 |
| University of Hawaii (System) | studentaffairs.manoa.hawaii.edu/policies/conduct_code/ |
| University of Maryland | http://umuc.edu/policies/studentpolicies/stud15100.cfm |
| University of Minnesota-Duluth | http://regents.umn.edu/sites/regents.umn.edu/files/policies/Student_Conduct_Code.pdf |
| University of Texas at Austin | http://www.policies.utexas.edu/policies/prohibition-sexual-discrimination-sexual-harassment-sexual-assault-sexual-misconduct#responsibilities-procedures |
| University of the Cumberlands | https://www.ucumberlands.edu/downloads/students/handbook.pdf |
| West Georgia Technical College | http://www.westgatech.edu/catalog/studenthandbook.pdf |
| Worcester Polytechnic Institute | https://www.wpi.edu/Images/CMS/CampusLife/code-of-conduct.pdf |
| Worcester State University | http://www.worcester.edu/Student-Conduct/ |
| Yavapai College | https://www.yc.edu/v5content/policies/docs/4-student/4.01.pdf |
| York Technical College | https://www.yorktech.edu/uploadedFiles/Pages/Campus_Life/_content/Student%20Code.pdf |

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Monday, August 07, 2017 2:30 PM |
| **To:** | Jackson, Candice |
| **Subject:** | RE: Quick turnaround |

Got it

---

**From:** Jackson, Candice
**Sent:** Monday, August 07, 2017 2:26 PM
**To:** Karvonides, Mia
**Subject:** Re: Quick turnaround

That was a call made around the table that we'll have to go with. :-)

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Aug 7, 2017, at 2:13 PM, Karvonides, Mia <Mia.Karvonides@ed.gov> wrote:



---

**From:** Jackson, Candice
**Sent:** Monday, August 07, 2017 2:05 PM
**To:** Karvonides, Mia
**Subject:** Quick turnaround

Mia,
This incorporates the initial round of changes requested upstairs. If you could review lightly for clarity and typos, I need to then send this around to the same upstairs crew at about 3:30pm today. Thanks!

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 3:29 PM |
| **To:** | Venable, Joshua; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | Q&A revised after Project Update today |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update.docx |

All:

# AC DPP

Thanks,
Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# AC DPP

# AC DPP

# AC DPP

AR_00000582

# AC DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 4:23 PM |
| **To:** | Menashi, Steven |
| **Subject:** | Fwd: Small change to Letter |
| **Attachments:** | dear colleague 8-7-17.docx; ATT00001.htm |

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Jackson, Candice" <Candice.Jackson@ed.gov>
> **Date:** August 7, 2017 at 3:34:28 PM EDT
> **To:** "Menashi, Steven" <Steven.Menashi@ed.gov>
> **Subject: Small change to Letter**

**AC DPP**

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# AC DPP

# AC DPP

AR_00000586

**Sherman, Brandon**

| | |
|---|---|
| **From:** | Sherman, Brandon |
| **Sent:** | Monday, August 07, 2017 4:28 PM |
| **To:** | Jackson, Candice |
| **Subject:** | RE: Q&A revised after Project Update today-DRAFT / DELIBERATIVE / PRE-DECISIONAL |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update BSS.docx |

Candice,

A few comments for your review.

Thanks,
Brandon

---

**From:** Jackson, Candice
**Sent:** Monday, August 07, 2017 3:47 PM
**To:** Venable, Joshua
**Cc:** Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David; Henderson, Chelsea
**Subject:** Re: Q&A revised after Project Update today

I'm inserting citations now, and can incorporate everyone's feedback before 6pm if folks have time to send it to me before that.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Aug 7, 2017, at 3:45 PM, Venable, Joshua <Joshua.Venable@ed.gov > wrote:

> # DPP

> ---

> **From:** Candice Jackson <Candice.Jackson@ed.gov >
> **Date:** Monday, August 7, 2017 at 3:29 PM
> **To:** Venable Joshua <joshua.venable@ed.gov >, Ebony Lee <Ebony.Lee@ed.gov >, Nathan Bailey <Nathan.Bailey@ed.gov >, Steven Menashi <Steven.Menashi@ed.gov >, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov >, Elizabeth Hill <Elizabeth.Hill@ed.gov >, Brandon Sherman <Brandon.Sherman@ed.gov >, "James, David" <David.James@ed.gov >
> **Cc:** Chelsea Henderson <Chelsea.Henderson@ed.gov >
> **Subject:** Q&A revised after Project Update today

> All:

> # AC DPP

# AC DPP

Thanks,
Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# DPP

AR_00000589

# DPP

AR_00000590

# DPP

AR_00000591

# DPP

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Monday, August 07, 2017 5:34 PM |
| **To:** | Jackson, Candice |
| **Subject:** | QA draft - 8-7-17 REVISED after Project Update (2) (2) |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update (2) (2).docx |

# DPP

# DPP

AR_00000594

# DPP

# DPP

AR_00000596

# DPP

# DPP

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, August 07, 2017 5:52 PM |
| **To:** | Venable, Joshua; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | RE: Q&A revised after Project Update today |
| **Attachments:** | QA draft, 8-7-17 with citations.docx |

> # AC

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

---

**From:** Venable, Joshua
**Sent:** Monday, August 07, 2017 3:45 PM
**To:** Jackson, Candice; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David
**Cc:** Henderson, Chelsea
**Subject:** Re: Q&A revised after Project Update today

> # DPP

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Monday, August 7, 2017 at 3:29 PM
**To:** Venable Joshua <joshua.venable@ed.gov>, Ebony Lee <Ebony.Lee@ed.gov>, Nathan Bailey <Nathan.Bailey@ed.gov>, Steven Menashi <Steven.Menashi@ed.gov>, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov>, Elizabeth Hill <Elizabeth.Hill@ed.gov>, Brandon Sherman <Brandon.Sherman@ed.gov>, "James, David" <David.James@ed.gov>
**Cc:** Chelsea Henderson <Chelsea.Henderson@ed.gov>
**Subject:** Q&A revised after Project Update today

All:

> # AC DPP

Thanks,
Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights

Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000600

# AC DPP

AR_00000601

# AC DPP

AR_00000602

# AC DPP

AR_00000603

# AC DPP

AR_00000604

**Menashi, Steven**

---

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, August 08, 2017 12:00 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Sherman, Brandon; Henderson, Chelsea |
| **Subject:** | RE: Q&A revised after Project Update today |
| **Attachments:** | QA draft 8-7-17b with citations.docx |

# AC WP DPP

---

**From:** Jackson, Candice
**Sent:** Monday, August 7, 2017 5:52 PM
**To:** Venable, Joshua; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David
**Cc:** Henderson, Chelsea
**Subject:** RE: Q&A revised after Project Update today

# AC

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

---

**From:** Venable, Joshua
**Sent:** Monday, August 07, 2017 3:45 PM
**To:** Jackson, Candice; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David
**Cc:** Henderson, Chelsea
**Subject:** Re: Q&A revised after Project Update today

# DPP

---

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Monday, August 7, 2017 at 3:29 PM
**To:** Venable Joshua <joshua.venable@ed.gov>, Ebony Lee <Ebony.Lee@ed.gov>, Nathan Bailey <Nathan.Bailey@ed.gov>, Steven Menashi <Steven.Menashi@ed.gov>, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov>, Elizabeth Hill <Elizabeth.Hill@ed.gov>, Brandon Sherman <Brandon.Sherman@ed.gov>, "James, David" <David.James@ed.gov>
**Cc:** Chelsea Henderson <Chelsea.Henderson@ed.gov>
**Subject:** Q&A revised after Project Update today

All:

# AC DPP

# AC DPP

Thanks,
Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000606

# AC WP DPP

# AC WP DPP

AR_00000608

# AC WP DPP

# AC WP DPP

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Tuesday, August 08, 2017 5:07 PM |
| **To:** | Jackson, Candice |
| **Subject:** | QA draft - 8-7-17 REVISED after Project Update (2) (2) |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update (2) (2).docx |

Hi Candice **DPP**

**DPP**

**DPP** Thanks, Mia

# DPP

# DPP

AR_00000613

# DPP

AR_00000614

# DPP

AR_00000615

# DPP

AR_00000616

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Tuesday, August 08, 2017 5:40 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | QA draft - 8-7-17 REVISED after Project Update (2) (2) - USE THIS ONE |
| **Attachments:** | QA draft - 8-7-17 REVISED after Project Update (2) (2).docx |



# DPP

# DPP

# DPP

# DPP

# DPP

# DPP

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Tuesday, August 08, 2017 6:18 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Davis question |

Hi Candice - I'm going to meet with **DPP**

**DPP**

**DPP**                                        thanks, M

Sent from my iPhone

Begin forwarded message:

> **From:** "Wheeler, Joseph" <Joseph.Wheeler@ed.gov>
> **Date:** August 8, 2017 at 5:45:43 PM EDT
> **To:** "Karvonides, Mia" <Mia.Karvonides@ed.gov>
> **Subject:** **RE: Damages**
>
> Will do.

# DPP

AR_00000623

# DPP

---

**From:** Karvonides, Mia
**Sent:** Tuesday, August 08, 2017 5:42 PM
**To:** Wheeler, Joseph
**Subject:** FW: Damages

Hi Joe

**DPP**

DPP

**DPP**

Thanks, Mia

AR_00000624

**Tricia P. Chastain**

| | |
|---|---|
| **From:** | Tricia P. Chastain |
| **Sent:** | Wednesday, August 09, 2017 6:56 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Georgia--changes to sexual misconduct policy |
| **Attachments:** | Board Presentation Conduct Policies Aug. 8 2017 FINAL.pptx |

Assistant Secretary Jackson,

Attached please find the board presentation on the revisions to USG's sexual misconduct and student conduct policies. These revisions were passed yesterday and are effective Fall semester. Please let me know if you have any questions. Thank you.

Tricia P. Chastain
Executive Vice Chancellor-Administration
University System of Georgia
404.962.3240 (office)
PII (mobile)

# Conduct Policies

Kimberly Ballard-Washington
Associate Vice Chancellor

 UNIVERSITY SYSTEM OF GEORGIA

AR_00000626

# History

- Campus Safety and Security Committee created in Fall 2014

- Committee co-chaired by:
  - President Steve Dorman, Georgia College & State University
  - President Bud Peterson, Georgia Institute of Technology

- Co-chairs created three subcommittees:
  - Police
  - Clery
  - Title IX



UNIVERSITY SYSTEM OF GEORGIA

2

AR_00000627

# Campus Safety and Security Committee

- Presented report to the Board for approval in May 2015

- Recommended:
  - ○ A system-wide sexual misconduct policy
  - ○ Hire a system-wide Title IX administrator

 UNIVERSITY SYSTEM OF GEORGIA

3

AR_00000628

# Board Policies Adopted

- USG system-wide Student Conduct Policy and Sexual Misconduct Policy adopted by the Board in March 2016

- Policies went in to effect July 1, 2016

- Provides a consistent approach to ensuring safety on our campuses

- Protects due process rights of our students

 UNIVERSITY SYSTEM OF GEORGIA

4

# Campus Collaboration

- Met with:
    - Campus Title IX coordinators
    - Student conduct officers
    - Panel members
    - Investigators
    - Other professionals

- Determined some changes to the policies are needed



UNIVERSITY SYSTEM OF GEORGIA

5

AR_00000630

# Proposed Policy Revision

- Increased oversight
  - Require Title IX coordinators and EEO officers to report to the president or his/her designee, and to USG Associate Vice Chancellor for Legal Affairs

  - Report all cases of student misconduct, including sexual misconduct, which could lead to the suspension or expulsion to the USG Associate Vice Chancellor's Office

- Provide consistency in investigations

 UNIVERSITY SYSTEM OF GEORGIA

6

AR_00000631

# Proposed Policy Revision

- A single process for all student conduct cases
  - ○ All student cases adjudicated by the Office of Student Conduct

  - ○ Ensure consistency of adjudication, regardless of alleged violation of conduct

 UNIVERSITY SYSTEM OF GEORGIA

7

AR_00000632

# Prevention and Education

- Title IX coordinators will renew their focus on ensuring campuses are safe from sexual misconduct.

- Title IX coordinators will receive ongoing training to increase expertise in handling cases.

- All incoming freshmen will continue to receive training through alcohol.edu and The Haven.

- Prevention of sexual misconduct training, alcohol.edu and The Haven will be available to all students.



UNIVERSITY SYSTEM OF GEORGIA

8

AR_00000633

# Campus and Community Input

- Individuals and groups assisted with the proposed policy revisions.

- The policy before you today is better because of their input.

 UNIVERSITY SYSTEM OF GEORGIA

9

# Proposed Policy Revisions

- **Recommend Approval of 4.1.7** Student Sexual Misconduct:
    - ○ Title IX coordinators will have a reporting relationship to the Associate Vice Chancellor for Legal Affairs
    - ○ Adjudication procedures removed from the policy

- **Recommend Approval of 4.6.5** Standards for Institutional Student Conduct Investigation and Disciplinary Proceedings:
    - ○ Adjudication for all student conduct cases handled through the Student Conduct Office
    - ○ Duty to report all complaints to office of the Associate Vice Chancellor for Legal Affairs, if such complaint has the possibility of leading to a student's suspension or expulsion

 UNIVERSITY SYSTEM OF GEORGIA

10

**Sherman, Brandon**

| | |
|---|---|
| **From:** | Sherman, Brandon |
| **Sent:** | Wednesday, August 09, 2017 1:39 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Revised Draft |
| **Attachments:** | QA draft 8-7-17b with citations BSS.docx |

Brandon S. Sherman
Senior Counsel to the Assistant Secretary
Office for Civil Rights
U.S. Department of Education
Office: 202-260-1115
Mobile: 202-264-9830
Brandon.Sherman@ed.gov

# DPP

# DPP

# DPP

AR_00000639

# DPP

AR_00000640

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 09, 2017 2:44 PM |
| **To:** | Venable, Joshua; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | RE: Q&A revised after Project Update today |
| **Attachments:** | QA draft 8-9-17 with citations.docx |

```
┌──────────────────────────────────────────────────────────┐
│                     AC DPP                                │
└──────────────────────────────────────────────────────────┘
```
```
┌──────────────────────────────────┐
│            AC DPP                 │     See everyone soon.
└──────────────────────────────────┘
```

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

---

**From:** Venable, Joshua
**Sent:** Wednesday, August 09, 2017 9:00 AM
**To:** Jackson, Candice; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David
**Cc:** Henderson, Chelsea
**Subject:** Re: Q&A revised after Project Update today

```
┌──────────────────────────────────────────────────────────┐
│                     AC DPP                                │
└──────────────────────────────────────────────────────────┘
```

Thanks.

---

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Monday, August 7, 2017 at 5:52 PM
**To:** Venable Joshua <joshua.venable@ed.gov>, Ebony Lee <Ebony.Lee@ed.gov>, Nathan Bailey <Nathan.Bailey@ed.gov>, Steven Menashi <Steven.Menashi@ed.gov>, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov>, Elizabeth Hill <Elizabeth.Hill@ed.gov>, Brandon Sherman <Brandon.Sherman@ed.gov>, "James, David" <David.James@ed.gov>
**Cc:** Chelsea Henderson <Chelsea.Henderson@ed.gov>
**Subject:** RE: Q&A revised after Project Update today

```
┌──────────────────────────────────────────────────────────┐
│                      AC                                   │
└──────────────────────────────────────────────────────────┘
```

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**From:** Venable, Joshua
**Sent:** Monday, August 07, 2017 3:45 PM
**To:** Jackson, Candice; Lee, Ebony; Bailey, Nathan; Menashi, Steven; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; James, David
**Cc:** Henderson, Chelsea
**Subject:** Re: Q&A revised after Project Update today

**DPP**

**DPP**            Thanks.

---

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Monday, August 7, 2017 at 3:29 PM
**To:** Venable Joshua <joshua.venable@ed.gov>, Ebony Lee <Ebony.Lee@ed.gov>, Nathan Bailey <Nathan.Bailey@ed.gov>, Steven Menashi <Steven.Menashi@ed.gov>, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov>, Elizabeth Hill <Elizabeth.Hill@ed.gov>, Brandon Sherman <Brandon.Sherman@ed.gov>, "James, David" <David.James@ed.gov>
**Cc:** Chelsea Henderson <Chelsea.Henderson@ed.gov>
**Subject:** Q&A revised after Project Update today

All:

# AC DPP

Thanks,
Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

# AC DPP

AR_00000643

# AC DPP

# AC DPP

AR_00000645

# AC DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 09, 2017 5:59 PM |
| **To:** | Menashi, Steven |
| **Subject:** | Final draft |
| **Attachments:** | QA draft 8-9-17 revised after Project Update.docx |

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000647

# AC DPP

# AC DPP

# AC DPP

# AC DPP

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Thursday, August 10, 2017 9:25 AM |
| **To:** | Sherman, Brandon |
| **Attachments:** | DCL 8-9-17.docx; ATT00001.htm |

This paragraph placement.

# AC WP DPP

# AC WP DPP

AR_00000654

**OCR**

| | |
|---|---|
| **From:** | OCR |
| **Sent:** | Thursday, August 10, 2017 4:28 PM |
| **To:** | Faiella, Matt; Foster, Richard; Hoogstraten, Anne; Reyes, Alejandro; Wheeler, Joseph; Karvonides, Mia |
| **Cc:** | Butler, Connie; Davis, Sharon D. (OCR); Jackson, Candice; Lee, Michael; Merges, Tamara; Reed, Carla; Scott, Nikisha |
| **Subject:** | FW: DO NOT Weaken Sexual Assault Enforcement Under Title IX |
| **Attachments:** | G 17-015877 PLG.rtf |

Hello

This email correspondence is assigned to PLG for response.
Due Date: 08-24-17

Thank you for your consideration of this note.


Sandy Stover
OCR, Customer Service Team

**From:** Weber, Moni  **PII**
**Sent:** Monday, August 07, 2017 9:32 AM
**To:** OCR
**Subject:** DO NOT Weaken Sexual Assault Enforcement Under Title IX

I understand the Department of Education is considering raising the standard of evidence colleges and universities must use when taking action on sexual assault allegations under Title IX.  Please do not.

The motivation for the change seems to be a concern that some men have been falsely accused of raping women on campus.  I reject this concern. Ideally, of course, education institutions would establish processes that always sort out false claims.  But even if those processes fail on occasion, the number of those failures is minuscule in comparison to the number of college men who sexually assault women on campus every year. Making it even harder for women to prove their allegations will just dissuade women from coming forward with their complaints.  I fear that Colleges and Universities will become training grounds for abusers and the abused alike -- teaching each just how difficult it is to hold perpetrators accountable for their actions.  Those are lessons we do not want any of our future leaders to internalize.

(b)(6)
Monica Weber
**PII**

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, August 11, 2017 8:32 AM |
| **To:** | Bailey, Nathan |
| **Cc:** | Ferguson, Gillum; Hahn, Nicholas; Hill, Elizabeth; Sherman, Brandon; Henderson, Chelsea; Eitel, Robert; Menashi, Steven |
| **Subject:** | Re: LAT: Education Secretary Betsy DeVos kicks off emotional battle over campus sexual assault rules |

This is one of the most balanced mainstream reports I've seen. One of the experts quoted, Dana Scaduto, was in our Summit.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Aug 10, 2017, at 10:49 PM, Bailey, Nathan <Nathan.Bailey@ed.gov> wrote:

http://www.latimes.com/politics/la-na-pol-devos-campus-assault-rules-201708-story.html

Though almost no one is happy with the Obama administration's efforts to prod colleges and universities to more aggressively combat and investigate sexual assault on campus, there is little agreement on how to make things better.

Alleged survivors, accused perpetrators and even school officials all complain that the current system isn't working.

**PII**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Tuesday, August 15, 2017 9:36 AM |
| **To:** | Jackson, Candice; DeVos, Betsy |
| **Subject:** | false accusations |

Not sure where to start and how to keep it simple. First I agree that most of the campus reported rapes are drunken hook ups and the they were consensual at the time. That is my son's case. Then ours snowballs out of control. He was investigated by a campus detective and a beautiful written statement when to the prosecutor when she chose to press charges. It was never once investigated as he could have been innocent, rather it was based on Title IX standards. He looked very guilty on paper until our Criminal Defense attorney started reviewing and was able to point out all the flaws in his investigation. Charges were dismissed with prejudice by the Judge due to the investigating officer and the alleged victim having some sort of potential relationship during the investigation as he went under an internal affairs investigation for inappropriate relations with her. He was reported for inappropriate text between them in reference to the back rub he gave her, telling her he loved her, giving her gifts and many more. We received court orders for both of their phones and he deleted his(I phone 6 - not recoverable) and also refused to turn it over at the IA investigation. She damaged hers prior to turn in and once we got in by sent it to a third party company she refused to supply password. We then obtained court order for password and she still refused so that is how charges were dropped.

The school hearing was a farce at best. The Title IX office never once interviewed my son nor did they even try to outreach to him for an interview. They used the tainted Detectives report for it. It took 7 maths to get theARC hearing and that was only after the school was served notice that an OCR complaint was opened. Imagine the outcome now. He was expelled and during hearing he was never allowed to ask questions to refute for level of intoxication, nor was he allowed to prove his level.

I am frustrated for what this does for true rape cases as even our Criminal Defense took on a civil rape case to help correct some of the damages he did for rape in this case. Kudos to him.

**PII** and several involved in the case and she has also filed suit against the school for momentary damages and even on the OCR complaint she marked no for monetary compensation and then wrote in not yet. Any high level employee that touched this case is not at the school anymore and even our detective was removed from the Special Victims Unit that they created to investigate these cases. So this 1 false accusation has cost many not just my son…. but do to the false accusation he can no longer get into a 4 yr school. The agony of watching him struggle with rejection after rejection is heartbreaking, especially as he was **PII** That is why we have filed suit.

The cost to the school alone for this case is also awful as they have hired independent investigations into the Detective etc. I am sure for a liability reason. With closing this all started with my son going to walk her home at 3am as she lived in a neighbor none for shootings and stabbings and just 2-3days prior there was a stabbing. So much for raising them to do the right thing. My youngest son is now in college and it scars me to death. I have told him under no circumstances is he to help a female. He may call 911 and walk away. It is not safe. Do you realize that under the current guidance that CPR could be misconstrued as sexual assault in a campus kangaroo court. She would be bruised and sore and he would not be allowed to submit evidence to prove his story. Preponderance needs to change and then needs to be enforced. It is just not safe. I am a **PII** and that goes against everything that I believe in, but need to keep my son safe!

Now that suit is filed and public record I can email you.

Thank you for reviewing this and trying to make an equal playing field. Rape is horrible as i was abused as a child and know how it is but a mutual drunken consensual hook up is not assault nor rape



**PII**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Tuesday, August 15, 2017 11:42 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: Requesting a meeting |

Hi Candice -
I hope you don't mind my reaching out to you again - I'm sure you're being inundated with emails from people on both sides of this difficult issue.
I just wanted to add one thing, which I'm sure others have brought up, but just in case....

It would be wonderful if schools could be required to provide falsely accused students with a complete copy of their investigative files.  We tried to obtain our son's but the school refused, citing confidentiality (ridiculous as we were very aware of every single person involved. However, we would have been happy with a names-redacted copy).  I feel a copy of the file would help clear my son's name once and for all.

We have settled with the school, and they have provided a letter which is now a permanent attachment to his transcripts.  In that letter, they actually admit that the sex was consensual! This will probably be helpful as far as my son getting readmitted to another university to finish (he was expelled **PII** **PII** But the letter does nothing to repair the significant emotional damage they have caused. I hope time will do that, but at this point, I'm not so sure.

Thank you for everything you are doing. This is not an easy issue and I'm sure any changes  will be met with huge (loud) resistance. I just hope that people will come to understand the damage done to the falsely accused as well as to real victims of sexual assault.

Warm Regards -

**PII**

**From:** Jackson, Candice <Candice.Jackson@ed.gov>
**Sent:** Tuesday, May 16, 2017 4:52 PM
**To:** **PII**
**Cc:** **PII** @aol.com **PII** @gmail.com
**Subject:** Re: Requesting a meeting

Thanks **PII**

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On May 16, 2017, at 7:33 PM, **PII** wrote:

Absolutely!  I have CC'd the co-presidents, Alison Scott and Cyntia Garrett here.   Thank

you for your interest in FACE!

Best -

PII

---

**From:** Jackson, Candice <Candice.Jackson@ed.gov>
**Sent:** Tuesday, May 16, 2017 4:13 PM
**To:** PII
**Subject:** Re: Requesting a meeting

PII would you ask FACE to email me? Thank you!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Apr 28, 2017, at 9:58 AM,  wrote:

Hi Candice -
Just checking in. I know you're super busy! I'd love the opportunity to chat about due process (or the current lack thereof) on campus. I'm also thinking that perhaps you'd be OK with speaking to Cynthia Garrett from Families Advocating for Campus Equality. She's pretty amazing...she's also an attorney and may be better equipped to speak about the legal aspects of this. She may already have reached out to you? At any rate, if you're still open to talking with me, I'm here at your convenience.

Have a wonderful weekend!
Lynn

PII

---

**From:** Jackson, Candice <Candice.Jackson@ed.gov>
**Sent:** Thursday, April 13, 2017 2:29 PM
**To:** PII
**Subject:** RE: Requesting a meeting

Lynn,
I will have my assistant calendar something for us for the week of April 24.

Best,
Candice

Candice Jackson
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW

Washington, DC 20202

**From:** [PII]
**Sent:** Wednesday, April 12, 2017 3:06 PM
**To:** Jackson, Candice
**Subject:** Re: Requesting a meeting

That would be fine...I've never Skyped, I guess it's about time I learn!
I was actually going to be in D.C. next week, but had to cancel.  I do know there will be other families from FACE in town, though.  Our numbers are growing, unfortunately.

Best -
[PII]

[PII]

**From:** Jackson, Candice <Candice.Jackson@ed.gov>
**Sent:** Wednesday, April 12, 2017 9:18 AM
**To:** [PII]
**Subject:** RE: Requesting a meeting

[PII]

Thank you for reaching out to me. I'd like to schedule a meeting with you, but I have relocated now to Washington, D.C. Would you be able to hold a conference via Skype? If so, I'll have my assistant contact you to schedule a meeting.

Best,
Candice

Candice Jackson
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**From:** Candice Jackson [PII]
**Sent:** Tuesday, April 11, 2017 6:43 PM
**To:** Jackson, Candice
**Subject:** Fwd: Requesting a meeting

Candice Jackson
[PII]
candice@cejacksonlaw.com
** PLEASE NOTE ** As of April 7, 2017, I am relocating to Washington, DC and no longer practicing law. For all legal matters please contact Law Office of Patricia J. Campbell, (360) 989-8800, Patricia@PCampbellLaw.com

Begin forwarded message:

**From:** **PII**
**Date:** April 11, 2017 at 3:51:41 PM EDT
**To:** "**PII**
**Subject:** Requesting a meeting

Dear Ms. Jackson,

Congratulations on your appointment with the Department of Education!!!

I don't know if you're aware of some of the issues on our campuses regarding sexual assault, but it would be a great honor if you would agree to meet with me.  While sexual assault is an issue of great concern, there is the simultaneous issue of falsely accused students.  I am the mother of one of those young men.  What we have experienced at the hands of my son's school is unbelievable.  I don't know if we would have gotten through this ordeal without the help and support of FIRE (Foundation for Individual Rights in Education) and FACE (Families Advocating for Campus Equality). I'd like to share some of our stories with you, as well as discuss what can be done to change what is currently happening.  This is an issue of great concern, but it is not getting the attention it deserves.  I do believe change can occur to restore fairness and equality to our campuses, but it needs to happen quickly.

I live in the **PII** 'd ask for no more than an hour of your time. If possible, I'd like to bring a couple of other moms along (there are an awful lot of us out here!).  I really hope that you will consider my request - I can't begin to explain how important this is to me in an email.

Sincerely,

**PII**

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, August 15, 2017 2:28 PM |
| **To:** | Karvonides, Mia |
| **Subject:** | Fwd: Promoting Fairness in Trauma-Informed Investigation Training |
| **Attachments:** | image001.jpg; ATT00001.htm; image002.png; ATT00002.htm; Promoting Fairness in Trauma-Informed Investigation Training (B1728952xA047C).pdf; ATT00003.htm |

Mia,
The extra time is great, I agree!

I love your suggestions [DPP] Here is one lawyer's observations about how to incorporate trauma-informed training into campus investigations [DPP]

The content of training is a topic we should [DPP]

**DPP**

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** Jeff Nolan <jnolan@DINSE.COM>
> **Date:** August 3, 2017 at 4:00:30 PM EDT
> **To:** "'Candice.Jackson@ed.gov'" <Candice.Jackson@ed.gov>
> **Cc:** "Brandon.Sherman@ed.gov" <Brandon.Sherman@ed.gov>
> **Subject: Promoting Fairness in Trauma-Informed Investigation Training**
>
> Dear Acting Assistant Secretary Jackson:
>
> Please find attached a white paper on the topic that we discussed during our meeting a couple of weeks ago.  I hope it is helpful and responsive to your request for more information about the topic.  I can easily go into much more detail and provide many more examples of how a trauma-informed approach can be employed effectively and fairly in the college and university disciplinary context, and hope you will let me know if a more extended treatment of the topic in writing would be helpful.  Alternatively or additionally, if another meeting with you and/or others to follow up might be helpful, I would be very happy to be involved in that as well.  I look forward to any comments and feedback you might have, and to any opportunity to provide further information.  Thank you for giving

me the opportunity to submit the white paper.

Best,

Jeff

AR_00000663



## Promoting Fairness in Trauma-Informed Investigation Training

### Jeffrey J. Nolan, Esq.[1]

### Dinse, Knapp & McAndrew, P.C.
#### www.dinse.com

## Summary

In recent years, colleges and universities have recognized that the quality of their investigations of reported sexual assault and intimate partner violence can be enhanced if they take account of the neurobiological effects of trauma and understand related behaviors that may be displayed by complainants in some cases.  Institutions appropriately have sought and received training for their investigators and adjudicators on these issues.  This white paper summarizes briefly how trauma-informed training can be presented in a manner that is fully balanced and promotes fairness for both complainants and respondents.

## Background

Trauma-informed investigation and adjudication training programs usually start by sharing information about the neurobiological effects of trauma.  Typically, training program participants learn about how chemicals such as catecholamines, corticosteroids, oxytocin and endogenous opioids may be released into the bloodstream in response to trauma, and how these substances can interfere with the functioning of those portions of the brain (e.g., the hippocampus and amygdala) that are involved with the encoding of memory.  Participants learn

---

[1]     The views expressed in this white paper are the author's, and do not necessarily represent the views of any client or entity for or through which the author has provided training.



that individuals who have experienced a traumatic event therefore may not be able to recall details of the event in a synchronous manner, that they may not be able to recall some details at all, that recollection of details may improve over time, and that their affect when describing the event may initially seem evasive or counterintuitive (e.g., laughing, smiling, or emotionless). Participants usually often learn that hormone-driven responses to traumatic situations may include fighting, fleeing, or freezing (i.e., tonic immobility).[2]

As background, training programs often address how traditional law enforcement interview approaches historically were unsupportive and skeptical, and failed to account for the neurobiological effects of trauma.  The effects of trauma were often misperceived by police officers as attempts at evasion and falsification, which caused officers to unfairly doubt the veracity of reporting parties.[3]  The resulting interaction often discouraged reporting parties from participating in criminal prosecutions.  Videos featuring Dr. Rebecca Campbell, law enforcement officers and prosecutors that were produced for a law enforcement audience explain these issues well and encourage law enforcement officers to create a more "supportive" environment for reporting parties, but understandably, use customary law enforcement terminology such as

---

[2]        The work of Rebecca Campbell, Ph.D., a Professor of Psychology at Michigan State University, is cited routinely on these topics.  *See, e.g.*, "The Neurobiology of Sexual Assault", Rebecca Campbell, Ph.D., National Institute for Justice Research for the Real World Seminar (December 3, 2012) (available at: https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx).

[3]        *See* "Interview with Dr. Rebecca Campbell on the Neurobiology of Sexual Assault, Part I: Telling the difference between trauma versus lying", National Institute of Justice, (available at: https://nij.ncjrs.gov/multimedia/video-campbell.htm).

AR_00000665



"victim", "survivor" and "suspect".[4]  Such videos are routinely used in trauma-informed training

programs for college and university audiences.

Training program participants also often learn that interview approaches such as the

Forensic Experiential Trauma Interview ("FETI") technique have been developed to account for

the potential effects of trauma on memory, by focusing on what a witness is able to recall about

their experience and related sensory details, rather than demanding that the witness "start at the

beginning" and recount all of the details of the event in a complete, synchronous manner.[5]

Training often includes examples of how trauma-informed and FETI techniques have resulted in

better outcomes and more thorough investigations in the criminal justice context, because

reporting parties are encouraged to attempt to provide the information that they are able to

provide, rather than abandoning the process in frustration because they cannot immediately

convince a skeptical police officer by providing a seamless narrative of the event.

Complimentary topics that are often addressed in trauma-informed training programs

include: that a delay between the time of an event and when it is reported is common: that

---

[4]     *See id.  See also* "Sexual Assault: A Trauma-Informed Approach to Law Enforcement First Response,"
Michigan Domestic and Sexual Violence Prevention and Treatment Board (available at:
https://www.youtube.com/watch?v=gtWD1XJrhNo).

[5]     The FETI technique was developed by Russell W. Strand (Retired Senior Special Agent and Retired Chief,
Behavioral Sciences Education & Training Division, United States Army Military Police School.  *See, e.g.*, "The
Forensic Experiential Trauma Interview (FETI)," available at:  http://www.mncasa.org/assets/PDFs/FETI%20-
%20Public%20Description.pdf.  In sum, the FETI technique involves: the interviewer's first asking the witness
"what are you able to tell me about your experience?"; listening patiently and allowing the witness to share whatever
they are able to share initially; asking the witness to "tell the investigator more" about a topic area without
aggressively cross-examining the witness or demanding a chronological account; asking about the witness's feelings
and thought process during the experience; asking the witness what sensory information they are able to recall,
asking about the witness's physical and emotional reaction to the experience; asking what was the most difficult part
of the experience and what the witness cannot forget about the experience; then circling back to seek clarification of
important or potentially contradictory points, <u>after</u> the witness has been encouraged to share their experience as
completely as they are able to through the open-ended interview approach described here.  *See id.* at 3.

AR_00000666



"counterintuitive" behaviors such as a reporting party's continuing to have contact with the alleged perpetrator after a reported sexual assault or intimate partner violence incident is also common; that investigators should avoid phrasing questions in a victim-blaming manner (e.g., "why didn't you call for help, fight back or run away?"); and that interviewing complainants in a respectful, professional, non-judgmental manner can result in their engaging more effectively in the investigation and adjudication process.

## Promoting Fairness to All Parties in a Trauma-Informed Investigation

Obviously, the role of police officers and prosecutors in sexual assault and intimate partner violence cases is distinct from that of college and university investigators and adjudicators.  Police officers and prosecutors work to establish probable cause and advocate for criminal convictions, but they do not determine as ultimate fact-finders whether the law was violated.  By contrast, campus fact-finders must maintain complete neutrality at all times in evaluating reported violations of institutional policies.  If training program participants learn how police officers and advocates apply trauma-informed principles to correct historical failings in the criminal justice system's response to sexual assault and intimate partner violence, without also learning how such principles need to be adapted to the distinct context of campus disciplinary proceedings, then unfairness to respondents, real or perceived, could result.[6]

---

[6]     *See, e.g., Doe v. Brown University*, 210 F.Supp.3d 310, 317, 326, 341 (2016) (in a non-binding portion of its decision, the court criticized the fact that a Title IX panel member essentially refused to consider the complainant's potentially exculpatory post-incident text messages and behavior, because the panel member believed she did not have the expertise to evaluate such evidence in light of statements made by a victims' advocate during training to the effect that victims of trauma often engage in "counterintuitive" behaviors (e.g., continuing to communicate with an alleged perpetrator after an assault, and "not being able to recount a consistent set of facts");

4



Fortunately, a trauma-informed investigation and adjudication approach can be adapted appropriately to, and be applied fairly in, the college and university disciplinary context. The goal of doing so is to promote more complete and nuanced gathering and understanding of complex factual scenarios, which should benefit all parties. Training for investigators and adjudicators can explain how this goal may be accomplished.

First, it should be emphasized in training that while it would not be appropriate for a neutral fact-finder to be actively "supportive" of either a complainant or a respondent in a campus disciplinary proceeding (that role can be played by counselors and advocates, on or off campus), fact-finders can learn from the trauma-informed approach yet maintain impartiality by treating all parties and witnesses in a professional, respectful, non-judgmental manner. It is important to do so because the investigation and adjudication process is likely to cause significant stress to both complainants and respondents, and complainants may additionally be experiencing the effects of trauma (whether or not the evidence ultimately establishes a policy violation). Further, if instructional videos created for law enforcement officers but used in a campus training program advocate for an investigative approach that is actively "supportive" of "victims" in a way that could undermine a respondent's perception of fair treatment if applied without qualification in a campus proceeding, the differences in context should be emphasized in the campus training program.

---

the court emphasized that while it was not suggesting that the University could not train fact-finders on the effects of trauma, it should remind them that all evidence presented had been deemed relevant, and that as fact-finders, they were capable of and obligated to consider all evidence).

AR_00000668



Second, if instructional videos created for law enforcement officers that are used in campus training programs employ customary "victim", "survivor" and "suspect" terminology, the differences in context should, again, be emphasized.  College and university investigators and adjudicators are certainly capable of learning from such videos while substituting more neutral "complainant" and "respondent" terminology in their thinking and communications about campus proceedings.  The point should be made in campus training, however, to eliminate any perception of bias.

Third, it should be emphasized in campus training that while the neurobiological effects of trauma may result in asynchronous recall, gaps in memory, reporting delays, tonic immobility and counterintuitive behaviors by complainants, the reason colleges and university investigators and adjudicators need to understand these phenomena is so that they will not unfairly dismiss a complainant's account simply because such issues are present.  However, the fact that such phenomena may potentially be present in a case should not be understood as establishing that institutional policy <u>was</u> necessarily violated, nor should the presence of such issues cause fact-finders to accept everything a complainant is able to recall as absolutely "true", or fail to seek clarification of inconsistencies.  In other words, a basic understanding of trauma-related research can help fact-finders avoid misinformed judgments about counterintuitive behaviors and memory-related issues, but fact-finders should not substitute scientific findings for evidence, or abdicate their fact-finding responsibility, when determining whether a policy violation occurred in a particular case.

6



Fourth, training should emphasize that it is both equitable and appropriate to use the same basic interview approach with complainants and respondents.  While the FETI technique was developed primarily to gather a more robust evidentiary portrait of how individuals experienced a potentially traumatic event, respondents (who are likely experiencing stress during an interview, if not trauma) can also be given the same opportunity to describe what they are able to remember about the experience, to describe their thought process and sensory perceptions, and to respond to respectfully-phrased clarifying questions regarding inconsistencies.  Indeed, Russell Strand, developer of the FETI technique, suggests that the technique can be used effectively in suspect interviews even in the criminal justice context.[7]  Given this, there is simply no good reason not to use a similarly open-ended approach in complainant and respondent interviews, so long as, again, clarification of inconsistencies is sought from both parties.

Finally, with regard to the complimentary topics that are often addressed in trauma-informed training programs, they should be framed in a balanced manner.  For example, a delay in reporting may or may not be probative of whether a policy violation occurred, but if the issue seems potentially relevant to an investigator or a respondent, a complainant can certainly be asked respectfully about their thought process with regard to reporting the incident when they chose to do so.  As another example, if a complainant has engaged in apparently "normal" communications with a respondent after a reported assault, it is perfectly appropriate for an investigator, in a non-judgmental way, to ask the complainant to "help the investigator

---

[7]        *See* "Turning the Case Upside Down—Rethinking the Art and Science of Suspect Interviews—Suspect FETI" (webinar), presented by Russell W. Strand for the Battered Women's Justice Project (published January, 2017, available at: http://www.bwjp.org/resource-center/resource-results/turning-the-case-upside-down.html).

AR_00000670



understand" the complainant's thought process in doing so.  Fact-finders can then consider the evidence of potentially "counterintuitive" behavior and the complainant's explanation of that behavior along with all of the other evidence gathered in the investigation.  Similarly, while a balanced approach should never require investigators to phrase questions of a complainant in a judgmental "why did you, why didn't you?" manner, if a complainant's behaviors during or after a reported assault are relevant, the complainant can be asked respectfully about what they were feeling, thinking and experiencing at a given moment, so that fact-finders can factor the complainant's response into their overall assessment of the evidence.

The most crucial point to be made in training regarding these issues is that general statements about how <u>some</u> complainants may behave as a result of trauma or related issues should not be substituted for a fact-finder's assessment of the specific evidence in a particular case.

## Conclusion

Applying the lessons learned from scientific research on the neurobiological effects of trauma can enhance the quality of college and university investigations and adjudications of sexual assault and intimate partner violence.  All parties can benefit if trauma-informed training is provided in a manner that is fair, balanced, nuanced, and adapted appropriately to the context of college and university disciplinary proceedings.

8

**Smith, Gina Maisto**

| | |
|---|---|
| **From:** | Smith, Gina Maisto |
| **Sent:** | Thursday, August 17, 2017 9:53 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Gomez, Leslie; Smith, Gina Maisto |
| **Subject:** | OCR Regional Center Highlights.docx |
| **Attachments:** | OCR Regional Center Highlights.docx; ATT00001.htm |

Candice,

Attached is a short overview of the highlights Regional Center model with bullet points for ease of reference.

Please feel free to call with any questions,

Gina and Leslie

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

The current framework for responding to sexual and gender-based harassment and violence poses many challenges for college campuses.  The federal regulatory framework requires a prompt and equitable investigation by trained and/or experienced investigators who are free from bias and conflict of interest.  The investigation must also be timely, thorough and reliable, and yet the very design of Title IX processes on campuses poses barriers to achieving those goals. Some challenges include:

- Limited financial resources at many institutions, which may lead to insufficient dedication of funds or personnel necessary to successfully implement Title IX obligations;

- Inexperienced or insufficiently trained investigators, adjudicators or other implementers;

- An inability to access key evidence or information that may be available through subpoena, search warrant or court order;

- Inconsistent processes across campuses, which can lead to disparate outcomes based on the variations in campus procedures;

- A perception of institutional bias that undercuts faith in the outcomes (based on the perceived self-interest of the institution, which is often viewed to be at odds with the goals of transparency, accountability and reliability in campus processes);

- Lack of coordination between campus and law enforcement processes, leading to multiple or repetitive interviews of the parties and witnesses, potential adverse impacts on the integrity of the investigation, and unnecessary duplication of efforts.

The cumulative impact of these challenges can lead to inadequate or less than thorough investigations, which have the likelihood of leading to inequitable findings based on incomplete development of facts or reliance on information that is not fully developed or supported by other corroborative information.  In addition, because campus cases most often involve the subjective assessment of credibility without consistent standards of care, campus processes are subject to criticism, appeal, and ultimately, civil liability.  Unlike the criminal justice context, there is no immunity for the application of good faith efforts to investigate and adjudicate.

The regional center for investigation and adjudication purports to address (and resolve) many of these challenges.  The model, which is loosely based on the child advocacy center model, would include the following key elements:

- Jurisdiction to investigate cases involving sexual assault, dating violence, domestic violence and stalking (that would otherwise meet state criminal law definitions);

- Provision of victim advocacy and information to ensure that complainants were fully provided with information about both campus and law enforcement options;

- A process to incorporate and recognize victim/complainant agency and autonomy while balancing a complainant's requested course of action with broader campus or public safety concerns;

- Trained and experienced forensic interviewers who would gather and record information from the complainant, respondent and other witnesses;

- Investigators with subpoena power who have the ability to conduct an impartial and thorough investigation;

- A process that provides consistent application of procedural due process requirements and incorporates Title IX and Clery Act (as amended by the Violence Against Women Reauthorization Act of 2013) requirements as well;

- The opportunity for both parties to participate fully in the investigation, including access to the investigation report and materials;

- A fair and impartial adjudication by the center (based on a preponderance of the evidence) that would be returned to campus for sanction and, with the coordinated participation of the complainant, the basis for any criminal charges;

- The center would be staffed and/or funded by a partnership between law enforcement, state and/or federal government, and contributions by educational institutions.

Educational institutions would retain their Title IX responsibilities to provide education and training; to impose interim and ongoing remedies; to assign sanctions; to track patterns and monitor climate; to maintain appropriate documentation; and to take steps designed to eliminate, prevent and address the impacts of sexual and gender-based harassment and violence.

Benefits of the regional center model include:

- Provides a model for timely and efficient responsiveness that seeks to balance individual choice with safety considerations on a case by case basis;

- A coordinated approach that streamlines the investigation processes, improves the reliability of investigations, and reinforces the integrity of the process;

- Access to victim advocacy and related support services through a central location;

- Coordinates federal, state and local laws;

- Acknowledges individual agency and autonomy of complainants;

- Consistent application of standards of care that reinforce procedural due process requirements;

- Fair and impartial investigations that remove the perception of institutional bias;

2

- Increased cooperation, information sharing and collaboration between campuses and law enforcement;

- Improved service to complainants and respondents;

- Increased access to options and information, which enhances informed decision-making;

- Potential increase in reporting; and

- Greater faith in the outcome of the processes.

We understand that the Commonwealth of Virginia recently released a study as to the feasibility of a regional center in the Commonwealth. While well-intentioned, the study did not represent a rigorous evaluation of the challenges or potential solutions. The study identified issues, but did not undertake any meaningful evaluation of how the issues could be addressed. The study also made conclusory statements without providing evidence or data to support those conclusions. Deeper analysis of the concepts would have revealed workable solutions the challenges identified. Further, the study did not take into account the potential benefits of federal sponsorship and support of the regional center model, which would address many of the stated concerns.

3

AR_00000675

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, August 17, 2017 10:08 AM |
| **To:** | Hahn, Nicholas |
| **Subject:** | Regional Centers |
| **Attachments:** | OCR Regional Center Highlights.docx |

Nick,
Here are some fresh bullet points hammering out the layout of proposed pilots for a Regional Center model.
The last paragraph responds specifically to the concerns raised by Virginia in studying whether that state
wanted to pursue a pilot. Just FYI; happy to talk more about it.

Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

AR_00000676

The current framework for responding to sexual and gender-based harassment and violence poses many challenges for college campuses.  The federal regulatory framework requires a prompt and equitable investigation by trained and/or experienced investigators who are free from bias and conflict of interest.  The investigation must also be timely, thorough and reliable, and yet the very design of Title IX processes on campuses poses barriers to achieving those goals. Some challenges include:

- Limited financial resources at many institutions, which may lead to insufficient dedication of funds or personnel necessary to successfully implement Title IX obligations;

- Inexperienced or insufficiently trained investigators, adjudicators or other implementers;

- An inability to access key evidence or information that may be available through subpoena, search warrant or court order;

- Inconsistent processes across campuses, which can lead to disparate outcomes based on the variations in campus procedures;

- A perception of institutional bias that undercuts faith in the outcomes (based on the perceived self-interest of the institution, which is often viewed to be at odds with the goals of transparency, accountability and reliability in campus processes);

- Lack of coordination between campus and law enforcement processes, leading to multiple or repetitive interviews of the parties and witnesses, potential adverse impacts on the integrity of the investigation, and unnecessary duplication of efforts.

The cumulative impact of these challenges can lead to inadequate or less than thorough investigations, which have the likelihood of leading to inequitable findings based on incomplete development of facts or reliance on information that is not fully developed or supported by other corroborative information.  In addition, because campus cases most often involve the subjective assessment of credibility without consistent standards of care, campus processes are subject to criticism, appeal, and ultimately, civil liability.  Unlike the criminal justice context, there is no immunity for the application of good faith efforts to investigate and adjudicate.

The regional center for investigation and adjudication purports to address (and resolve) many of these challenges.  The model, which is loosely based on the child advocacy center model, would include the following key elements:

- Jurisdiction to investigate cases involving sexual assault, dating violence, domestic violence and stalking (that would otherwise meet state criminal law definitions);

- Provision of victim advocacy and information to ensure that complainants were fully provided with information about both campus and law enforcement options;

- A process to incorporate and recognize victim/complainant agency and autonomy while balancing a complainant's requested course of action with broader campus or public safety concerns;

- Trained and experienced forensic interviewers who would gather and record information from the complainant, respondent and other witnesses;

- Investigators with subpoena power who have the ability to conduct an impartial and thorough investigation;

- A process that provides consistent application of procedural due process requirements and incorporates Title IX and Clery Act (as amended by the Violence Against Women Reauthorization Act of 2013) requirements as well;

- The opportunity for both parties to participate fully in the investigation, including access to the investigation report and materials;

- A fair and impartial adjudication by the center (based on a preponderance of the evidence) that would be returned to campus for sanction and, with the coordinated participation of the complainant, the basis for any criminal charges;

- The center would be staffed and/or funded by a partnership between law enforcement, state and/or federal government, and contributions by educational institutions.

Educational institutions would retain their Title IX responsibilities to provide education and training; to impose interim and ongoing remedies; to assign sanctions; to track patterns and monitor climate; to maintain appropriate documentation; and to take steps designed to eliminate, prevent and address the impacts of sexual and gender-based harassment and violence.

Benefits of the regional center model include:

- Provides a model for timely and efficient responsiveness that seeks to balance individual choice with safety considerations on a case by case basis;

- A coordinated approach that streamlines the investigation processes, improves the reliability of investigations, and reinforces the integrity of the process;

- Access to victim advocacy and related support services through a central location;

- Coordinates federal, state and local laws;

- Acknowledges individual agency and autonomy of complainants;

- Consistent application of standards of care that reinforce procedural due process requirements;

- Fair and impartial investigations that remove the perception of institutional bias;

2

- Increased cooperation, information sharing and collaboration between campuses and law enforcement;

- Improved service to complainants and respondents;

- Increased access to options and information, which enhances informed decision-making;

- Potential increase in reporting; and

- Greater faith in the outcome of the processes.

We understand that the Commonwealth of Virginia recently released a study as to the feasibility of a regional center in the Commonwealth.  While well-intentioned, the study did not represent a rigorous evaluation of the challenges or potential solutions.  The study identified issues, but did not undertake any meaningful evaluation of how the issues could be addressed.  The study also made conclusory statements without providing evidence or data to support those conclusions.  Deeper analysis of the concepts would have revealed workable solutions the challenges identified.  Further, the study did not take into account the potential benefits of federal sponsorship and support of the regional center model, which would address many of the stated concerns.

3

AR_00000679

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, August 17, 2017 11:11 AM |
| **To:** | Bailey, Nathan; Hill, Elizabeth; Sherman, Brandon; Menashi, Steven; Henderson, Chelsea; Hahn, Nicholas |
| **Subject:** | Campus sexual assault policies are unfair to the accused. This case shows how. - The Washington Post |

KC Johnson in the Post:

https://www.washingtonpost.com/opinions/campus-sexual-assault-policies-are-unfair-to-the-accused-this-case-shows-how/2017/08/16/2ab6781e-7de0-11e7-a669-b400c5c7e1cc_story.html?utm_term=.62cd7c19d5b4

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

**Cynthia P Garrett**

---

| | |
|---|---|
| **From:** | Cynthia P Garrett |
| **Sent:** | Friday, August 18, 2017 3:07 PM |
| **To:** | Jackson, Candice; Henderson, Chelsea |
| **Cc:** | Scott Alison |
| **Subject:** | Two new Reports you might find very useful |
| **Attachments:** | State Legislative Developments on Campus Sexual Violence- Issues in the Context of Safety NASPA.pdf; Policy_Snapshot_Postsecondary_Campus_Safety.pdf |

These reports were just issued. They provide a comprehensive review of state laws on the issue of campus sexual assault and some policy consideration in the State Legislative Development Report.


Cindy


*Cynthia P Garrett, Co President*
**Families Advocating for Campus Equality**
www.facecampusequality.org
facecampusequality@gmail.com
@FaceCampusEqual



POLICY SNAPSHOT

# Postsecondary Campus Safety

AUG **2017**

## What is the Issue and Why Does it Matter?

State policymakers' top priorities include ensuring the safety, inclusivity and equitability of education environments for all students on higher education campuses. Recent national surveys[1] and media coverage of high-profile cases continue to fuel concerns about the prevalence of sexual violence on college campuses. In addition, gun-related violence in the United States continues to increase[2] and in recent years, the amplification of college and university campus violence involving guns  and weapons resulted in policy debates. Introduced and enacted legislative proposals focus on two top-level campus safety issues: campus sexual violence and guns on campus.

Education Commission of the States and NASPA – Student Affairs Administrators in Higher Education released two issue briefs concerning campus safety. The first, State Legislative Developments on Campus Sexual Violence: Issues in the Context of Safety, addresses legislative developments and offers considerations for state policymakers and leaders in higher education concerning campus sexual violence. The second issue brief, Guns on Campus: The Architecture and Momentum of State Policy Action, offers a detailed summary of state legislative action and higher education system policy decisions that permit or seek to permit guns on campus, as well as actions that prohibit or seek to prohibit guns on campus. In 2016, Education Commission of the States' final project report summarized 2015 and 2016 state legislative activity related to campus sexual violence and guns on campus.

State policymakers concerned with campus safety issues continue to introduce legislation concerning campus sexual violence and guns on campus. The following sections of this Policy Snapshot provide summary information on 2016 and 2017 legislative activities.

AR_00000682

**EDUCATION COMMISSION**
OF THE STATES
Your education policy team.

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

**2016**

## How Many States Considered Campus Sexual Violence Legislation in 2016?

Based on a review of 2016 legislative activity concerning campus sexual violence:

- At least 16 states considered campus sexual violence legislation.
- At least 30 bills were introduced.
- Eight bills were enacted and 22 bills died.

### Which States Considered Campus Sexual Violence Legislation in 2016?



| State | Legislation | Status |
|---|---|---|
| Arizona | H.B 2278 | Died |
| California | A.B. 2908 | Enacted |
| Connecticut | H.B. 5376 | Enacted |
| Delaware | H.B. 1 (H.S. 1) | Enacted |
| Florida | S.B. 1702/H.B. 1309 | Died |
| Georgia | S.B. 322 | Died |
| Hawaii | H.B. 451 | Died |
|  | S.B. 3119/H.B. 2703 | Died |
|  | S.B. 923/H.B. 1249 | Died |
|  | H.B. 2772 | Enacted |
|  | H.B. 597 | Died |
| Illinois | H.B. 5624 | Died |
| Maryland | H.B. 1142 | Died |
| Massachusetts | S.B. 2465 | Died |

| State | Legislation | Status |
|---|---|---|
| Minnesota | H.F. 3100 | Died |
|  | S.F. 3088 | Died |
| Missouri | S.B. 626 | Died |
|  | H.B. 1678/S.B. 1085 | Died |
|  | H.B. 2204 | Died |
|  | S.B. 921 | Enacted |
| New Jersey | S.B. 398/A.B. 557 | Died |
|  | S.B. 396 | Died |
|  | A.B. 2271 | Died |
| New York | A.B. 6632 | Died |
|  | A.B. 5400 | Died |
| Tennessee | S.B. 2019/H.B. 2157 | Died |
| Virginia | H.B. 1321 | Enacted |
|  | H.B. 926 | Died |
|  | S.B. 83 | Enacted |
|  | H.B. 1015 | Enacted |

### Examples of 2016 State Legislation Concerning Campus Sexual Violence

**Connecticut:** H.B. 5376 requires higher education institutions in Connecticut to use an affirmative consent standard when determining, in the context of their required policies on sexual assault and intimate partner violence, whether sexual activity is consensual. The bill requires that the policies include clear statements advising students and employees of the affirmative consent standard. In addition, the bill specifies that the policies must describe the institutions' investigation procedures for students and employees, and requires that an official trained annually in issues relating to sexual assault, stalking and intimate partner violence conduct investigations if students are the respondents. The bill became effective July 1, 2016.

**Missouri:** S.B. 921 requires the governing board of each public institution of higher education in Missouri to engage in discussions with law enforcement agencies and to enter into a memorandum of understanding (MOU) concerning sexual assault, domestic violence, dating violence and stalking involving

AR_00000683

Case 3:18-cv-00535-JSC   Document 134-4   Filed 06/03/19   Page 214 of 312

EDUCATION COMMISSION
OF THE STATES
Your education policy team

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

2016

students on and off campus. The MOU shall contain detailed policies and protocols regarding sexual assault, domestic violence, dating violence and stalking involving students that comports with the best and current professional practices, and set out the procedural requirements for the reporting of an offense, protocol for establishing jurisdiction and criteria for determining when an offense must be reported to law enforcement. The bill became effective Aug. 28, 2016.

**Virginia:** H.B. 1015 permits each public institution of higher education or nonprofit private institution of higher education to request the cooperation of the primary law enforcement agency of the locality in which the institution is located to establish a written MOU with such law enforcement agency to address the prevention of — and response to — criminal sexual assault. The bill was approved March 25, 2016.

## How Many States Considered Guns on Campus Legislation in 2016?

Based on a review of 2016 legislative activity concerning guns on campus:

- At least 19 states considered guns on campus legislation.
- At least 33 bills were introduced.
- Three bills were enacted, 29 bills died and one bill was vetoed.

## Which States Considered Guns on Campus Legislation in 2016?



| State | Legislation | Status |
|---|---|---|
| Alabama | H.B. 12 | Died |
| Alaska | S.B. 174 | Died |
| Arizona | H.B. 2072 | Died |
| | H.B. 2338 | Enacted |
| Colorado | S.B. 17 | Died |
| Florida | H.B. 4001 | Died |
| | S.B. 68 | Died |
| Georgia | H.B. 544 | Died |
| | H.B. 859 | Vetoed |
| Hawaii | S.B. 95 | Died |
| Indiana | H.B. 1055 | Died |
| Kentucky | H.B. 221 | Died |
| Maryland | S.B 906 | Died |
| | H.B. 1002 | Died |
| Michigan | S.B. 442 | Died |
| Mississippi | H.B. 1346 | Died |

| State | Legislation | Status |
|---|---|---|
| Missouri | S.B. 589 | Died |
| | H.B. 1899 | Died |
| Oklahoma | S.B. 1348 | Died |
| | S.B. 1143 | Died |
| | H.B. 2266 | Died |
| | H.B. 1143 | Died |
| | S.B. 557 | Died |
| | H.B. 2660 | Died |
| South Carolina | S.B. 88 | Died |
| Tennessee | H.B. 2131 | Died |
| | S.B. 1991 | Enacted |
| | S.B. 2376 | Enacted |
| | H.B. 1736 | Died |
| Virginia | H.B. 79 | Died |
| | H.B. 761 | Died |
| Washington | H.B. 2867 | Died |
| West Virginia | H.B. 2446 | Died |

AR_00000684

EDUCATION COMMISSION
OF THE STATES
Your education policy team

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

2016

## 2016 Examples of State Legislation Concerning Guns on Campus

**Arizona:** H.B. 2338 prohibits the governing board of an educational institution from adopting or enforcing any policy or rule that prohibits a person from lawfully possessing or carrying a deadly weapon on a public right-of-way or within a person's means of transportation. The bill provides that a deadly weapon, dangerous instrument or explosive that is used, possessed or displayed in violation of a rule established by an educational institution's governing board is no longer subject to destruction and allows for its forfeiture, sale or disposal of, as outlined in the forfeiture of weapons statute. The bill was enacted May 10, 2016.

**Georgia:** H.B. 859 would have authorized the carrying and possession of certain weapons by weapons carry license holders in or on certain buildings, or real property owned by or leased to public institutions of postsecondary education. The provision would not apply to buildings or property used for athletic sporting events or student housing, including fraternity and sorority houses. The bill was vetoed by the governor.

**Tennessee:** S.B. 1991 prohibits public postsecondary institutions from taking any adverse or disciplinary action against an employee or student of the postsecondary institution for such person's transportation and storage of a firearm or firearm ammunition in compliance with present law, while on or using a parking area located on property owned, used or operated by the postsecondary institution. The bill became effective April 14, 2016.

Also in Tennessee, H.B. 1736 permits full-time employees of state public colleges or universities who possess handgun carry permits to carry a handgun while on property owned, operated or controlled by the employing college or university if certain requirements are met. The bill became effective July 1, 2016.

AR_00000685

**2017**

## How Many States Considered Campus Sexual Violence Legislation in 2017?

Based on a review of 2017 legislative activity concerning campus sexual violence (as of August 9, 2017):

- At least 15 states have considered campus sexual violence legislation.
- At least 53 bills have been introduced.
- Ten bills were enacted, 20 bills died and 23 bills are pending.

### Which States Have Considered Campus Sexual Violence Legislation in 2017?



| State | Legislation | Status |
| --- | --- | --- |
| Arkansas | H.B. 1518 | Enacted |
| California | S.B. 169 | Pending |
| | S.B. 331 | Enacted |
| | S.B. 421 | Pending |
| Georgia | H.B. 51 | Died |
| Kansas | S.B. 53 | Died |
| Massachusetts | H 632 | Pending |
| | H 2998 | Pending |
| | S 706 | Pending |
| Maine | L.D. 681 | Pending |
| Minnesota | H.F. 116 | Died |
| | H.F. 2669 | Died |
| | S.F. 1481 | Died |
| | S.F. 2426 | Died |
| North Carolina | H.B. 777 | Pending |
| | H.B. 793 | Pending |
| New Jersey | A 557 | Pending |
| | A 1135 | Pending |
| | A 2062 | Pending |
| | A 2271 | Pending |
| | A 2351 | Pending |
| | A 2635 | Pending |
| | A 2637 | Pending |
| | S 1289 | Pending |
| | S 2429 | Pending |
| | S 3414 | Pending |

| State | Legislation | Status |
| --- | --- | --- |
| New York | A 6642 | Pending |
| | A 7128 | Pending |
| Pennsylvania | H.B. 962 | Pending |
| | H.B. 1633 | Pending |
| | S.B. 547 | Pending |
| Texas | H.B. 16 | Died |
| | H.B. 1096 | Died |
| | H.B. 2243 | Died |
| | H.B. 2404 | Died |
| | H.B. 2918 | Died |
| | H.B. 3187 | Died |
| | H.B. 3195 | Died |
| | H.B. 3818 | Died |
| | S.B. 966 | Enacted |
| | S.B. 967 | Died |
| | S.B. 968 | Enacted |
| | S.B. 969 | Enacted |
| | S.B. 970 | Died |
| | S.B. 2109 | Died |
| Utah | H.B. 326 | Died |
| Virginia | H.B. 1015 | Enacted |
| | H.B. 1016 | Enacted |
| | H.B. 1102 | Enacted |
| | H.B. 1321 | Enacted |
| | S.B. 81 | Died |
| | S.B. 83 | Enacted |
| West Virginia | H.B. 2825 | Died |

AR_00000686

EDUCATION COMMISSION
OF THE STATES
Your education policy team.

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

2017

## 2017 Examples of State Legislation Concerning Campus Sexual Violence

**Georgia:** H.B. 51 limits the ability of postsecondary institutions in Georgia to investigate reports of alleged sexual assault. The bill requires institutions to promptly report such crimes to the campus law enforcement agency or another appropriate law enforcement agency. The bill died.

**Texas:** S.B. 968 requires public and private postsecondary educational institutions to adopt a sexual assault policy applicable to any person employed by or enrolled in the institution. The bill requires public and private postsecondary institutions to provide students and employees an option to electronically report to the institution allegations of sexual harassment, sexual assault, dating violence or stalking committed against or witnessed by the student or employee, regardless of the location at which the alleged offense occurred. The bill became effective June 12, 2017.

Also in Texas, S.B. 969 requires public and private postsecondary institutions to provide amnesty to students who report incidents of sexual assault. The bill requires the commissioner of higher education to establish a nine-member advisory committee comprised of the chief executive officers of the postsecondary educational institution or a representative designated by the officers. The advisory committee would submit recommendations to the Higher Education Coordinating Board regarding rules for implementing provisions of the bill. The bill became effective June 12, 2017.

## How Many States Have Considered Guns on Campus Legislation in 2017?

Based on a review of 2017 legislative activity concerning guns on campus (as of August 9, 2017):

- At least 18 states considered guns on campus legislation.
- 29 bills were introduced.
- Three bills were enacted, 24 bills died and two bills are pending.

## Which States Considered Guns on Campus Legislation in 2017?



| State | Legislation | Status |
|---|---|---|
| Alabama | H.B. 410 | Died |
| Arkansas | H.B. 1249 | Enacted |
| | H.B. 1889 | Died |
| | H.B. 2168 | Died |
| | S.B. 594 | Died |
| | S.B. 660 | Died |
| | S.B. 724 | Enacted |
| Florida | H.B. 803 | Died |
| | S.B. 908 | Died |
| | S.B. 1330 | Died |

AR_00000687

EDUCATION COMMISSION
OF THE STATES
Your education policy team.

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

2017

| State | Legislation | Status |
| --- | --- | --- |
| Georgia | H.B. 280 | Enacted |
| Iowa | S.F. 146 | Died |
| Kansas | H.B. 2074<br>S.B. 235 | Died<br>Died |
| Kentucky | H.B. 249 | Died |
| Louisiana | H.B. 43 | Died |
| Maryland | H.B. 159 | Died |
| Maine | L.D. 1370 | Died |
| Missouri | H.B. 593 | Died |
| North Carolina | H.B. 251<br>S.B. 204 | Pending<br>Pending |
| New Mexico | S.B. 428 | Died |
| South Carolina | H 3262 | Died |
| Texas | H.B. 1915 | Died |
| Virginia | H.B. 79<br>H.B. 761 | Died<br>Died |
| West Virginia | H.B. 2713<br>H.B. 2835 | Died<br>Died |
| Wyoming | H.B. 136 | Died |

## 2017 Examples of State Legislation Concerning Guns on Campus

**Georgia:** H.B. 280 authorizes individuals with a concealed carry license to carry weapons on the property of any public institution of postsecondary education. The bill provides exempt locations where weapons are not allowed, including buildings or property used for athletic sporting events or for student housing — including fraternity and sorority houses. The bill was signed by the governor on May 4, 2017 and became effective July 1, 2017.

**Arkansas:** H.B. 1249 allows individuals who completed a concealed carry training possess a concealed handgun in the buildings and on the grounds of a public university, public college or community college. The bill requires private universities and private colleges that adopted policies expressly disallowing the carrying of a concealed handgun on campus to post notices near building entrances stating the prohibition of guns. The bill is effective Sept. 1, 2017.

**Maryland:** H.B. 159 prohibits, with specified exceptions, a person from carrying or possessing a firearm on the property of a public institution of higher education in Maryland. The bill applies existing criminal penalties to violations and requires a public institution of higher education to post signs to provide notice of the bill's prohibition in prominent locations on the property of the institution, including at entrances to and exits from the property. The bill also requires the Board of Regents for the University System of Maryland to incorporate into their bylaws, policies and procedures the current weapons practice on their campuses. In addition, the bill alters provisions relating to an exception from the prohibition on carrying or possessing specified weapons on specified property for an off-duty or retired law enforcement officer. The bill died.

AR_00000688

The tables below provide the number of bills considered, enacted, died or vetoed, and pending during the 2015, 2016 and 2017 legislative sessions for campus sexual violence and guns on campus. The trend line graphs show the number of bills considered from 2015 through 2017.



| Year | Introduced Legislation | Enacted Legislation | Died or Vetoed Legislation | Pending Legislation |
|------|------------------------|---------------------|----------------------------|---------------------|
| 2015 | 30 | 10 | 20 | 0 |
| 2016 | 30 | 8 | 22 | 0 |
| 2017 | 53 | 10* | 20 | 23 |

*The number of enacted bills may increase after the conclusion of the 2017 legislative sessions.

Note: 2015 and 2016 tracking include legislative activity in four primary policy areas: defining affirmative consent, clarifying and expanding the role of local law enforcement, creating or expanding requirements for transcript notations covering major conduct violations and addressing the role of legal counsel in conduct hearings centered on sexual violence. 2017 tracking includes legislative activity in the four primary policy areas and other issues including prevention and training related to and reporting of campus sexual assault incidences.



AR_00000689

EDUCATION COMMISSION
OF THE STATES
Your education policy team

POLICY SNAPSHOT
POSTSECONDARY CAMPUS SAFETY

| Year | Introduced Legislation | Enacted Legislation | Died or Vetoed Legislation | Pending Legislation |
|------|------------------------|---------------------|----------------------------|---------------------|
| 2015 | 16 | 2 | 14 | 0 |
| 2016 | 33 | 3 | 30 | 0 |
| 2017 | 29 | 3* | 24 | 2 |

*The number of enacted bills may increase after the conclusion of the 2017 legislative sessions.

## Resources

- State Legislative Developments on Campus Sexual Violence: Issues in the Context of Safety
- Guns on Campus: The Architecture and Momentum of State Policy Action
- Partnership to Elevate Policy and Practice: Campus Sexual Violence and Guns on Campus – Final Report

## Endnotes

1. David Cantor, Bonnie Fisher, Susan Chibnall, Reanne Townsend, Hyunshik Lee, Carol Bruce, Gail Thomas, Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct (Washington, D.C.: Association of American Universities, 2015), https://www.aau.edu/sites/default/files/%40%20Files/Climate%20Survey/AAU_Campus_Climate_Survey_12_14_15.pdf (accessed June 1, 2017).

2. "Gun Violence Archive 2017," Gun Violence Archive, 2017, http://www.gunviolencearchive.org/node (accessed June 22, 2017). "Gun Violence Archive 2017," Gun Violence Archive, 2017, http://www.gunviolencearchive.org/node (accessed June 22, 2017).

## AUTHOR

*Lauren Sisneros is a policy analyst in the Postsecondary and Workforce Development Institute at Education Commission of the States. She holds a bachelor's degree in business administration and a master's degree in education, both from Colorado State University. In her spare time, Lauren enjoys spending time with her husband and two children exploring the great outdoors of Colorado. Contact Lauren at **lsisneros@ecs.org** or **303.299.3629**.*

**About Postsecondary Legislative Tracking**

The Postsecondary and Workforce Development Institute at Education Commission of the States tracks legislation on multiple issues related to college readiness and higher education. The team follows the bill's status from introduction through its final action, summarizes key provisions and assigns topics. The policy tracking helps keep an eye on trends, innovative policy approaches and the overall landscape of higher education legislative activity. This information is leveraged for several purposes, including policy snapshots that offer a brief background on a topic, a visual take on recent bills and summaries of selected state legislation.

© 2017 by Education Commission of the States. All rights reserved. Education Commission of the States encourages its readers to share our information with others. To request permission to reprint or excerpt some of our material, please contact us at 303.299.3609 or email askinner@ecs.org.

Education Commission of the States
700 Broadway Suite 810 Denver, CO 80203



# State Legislative Developments on Campus Sexual Violence: *Issues in the Context of Safety*




Andrew Morse
Brian A. Sponsler
Mary Fulton

DECEMBER 2015

AR_00000691

## ABOUT THE PROJECT

NASPA – Student Affairs Administrators in Higher Education and Education Commission of the States (ECS) have partnered to address legislative developments and offer considerations for leaders in higher education and policy on two top-level safety issues facing the higher education community: campus sexual violence and guns on campus. The first in a series jointly released by NASPA and ECS, this publication looks at recent state legislation on campus sexual violence. By offering in-depth analyses of state legislation and framing key issues and considerations for leaders in higher education and policy across the states, NASPA and ECS look to support constructive dialogue toward effective action on campus safety.

## ABOUT THE AUTHORS



*Andrew Morse, Ph.D.,* is director for policy research and advocacy with NASPA – Student Affairs Administrators in Higher Education's Research and Policy Institute. Prior to joining NASPA, Morse served state higher education agencies in Tennessee and Florida, where he provided leadership in research and policy capacities to inform key stakeholders on issues related to access, completion, and the post-college outcomes of baccalaureate graduates. At NASPA, Morse manages a portfolio of policy and research projects to advance the postsecondary success of students and to elevate the student affairs perspective in national policy conversations.



*Brian A. Sponsler,* Ed.D., is the director for the Postsecondary and Workforce Development Institute at ECS. In his role, Brian oversees the strategic direction of the institute's work, leads the teams' policy-research portfolio, and cultivates and maintains relationships with funding partners, higher education policy researchers, policymakers and postsecondary administrators. Prior to joining ECS, Brian served as the vice president for research and policy at NASPA.



*Mary Fulton* is senior policy analyst and project manager in the Postsecondary and Workforce Development Institute at ECS and focuses on issues related to remedial education, college readiness and completion, governance, and accountability, and also serves as a generalist on higher education topics. Previously, she served as a K-12 generalist in the Information Clearinghouse. Mary was a lead staff member for the organization's No Child Left Behind work and arts education project, and was responsible for ECS' daily e-Clips. Throughout the 1990s, Mary served as the organization's school finance expert.

## ACKNOWLEDGEMENTS

The authors would like to acknowledge and thank several colleagues who contributed to this publication. At ECS, we would like to acknowledge Lauren Sisneros, policy analyst, and Zeke Perez, policy researcher, who made significant contributions through policy analysis and construction of the policy database upon which this report lies. We are also grateful for the support of Amy Skinner, ECS director of communications, for her review and contributions to this project. We are grateful for the support of Dr. Amelia Parnell, NASPA's vice president for research and policy, as well as Alexis Wesaw, Director of Data Analytics, for their review and support of this work.

*Updated 12/15/15*

**2**

© 2015 | NASPA

# ISSUE OVERVIEW

In recent years, the effort put forth by colleges and universities to prevent and address incidents of campus sexual violence has come under increased public scrutiny. Fueling concern about the prevalence of campus sexual violence are two recent national surveys reporting that one in five females, one in 20 males, and one in four transgender students experience sexual violence after enrolling in college (Cantor et al., 2015; DiJulio, Norton, Craighill, Clement, & Brodie, 2015). These surveys follow a litany of media reports on alleged incidents of sexual violence on campuses across the United States. The national visibility of campus sexual violence has turned this issue into a top priority for policy action among lawmakers at both the state and federal levels (see "White House Response to Campus Sexual Assault" sidebar).

Against a backdrop of existing federal law and regulation, calls have been made for new state policy action to shape how postsecondary institutions address campus crime in general and campus sexual violence in particular. In 2014, the U.S. Department of Education's

Office for Civil Rights (OCR; 2014) published responses to frequently asked questions related to its 2011 dear colleague letter (OCR, 2011) on Title IX (1972) and sexual violence. Additionally, in 2015, the U.S. Department of Education's Office of Postsecondary Education (OPE) published a dear colleague letter summarizing the final regulatory amendments to the Clery Act (1990) and the Violence Against Women Act (1994) that took effect on July 1, 2015. These documents have significantly influenced how campuses create an environment that supports survivors of sexual violence and establish processes that handle allegations of sexual violence with fairness and equity for all parties involved.

Beyond federal requirements, the higher education community has approached the problem of campus sexual violence with a commitment to prevention. In testimony before the 114th Congress, for instance, Dr. Penny Rue, vice president for campus life at Wake Forest University, outlined a series of common and effective campus-wide approaches, including bystander

intervention and educational programming, to prevent incidents of sexual violence on campus (Preventing and Responding, 2015). Coupled with its compliance with state and federal law—the duty of public stewardship and confidence—the higher

## WHITE HOUSE RESPONSE TO CAMPUS SEXUAL ASSAULT

On January 22, 2014, President Obama established the White House Task Force to Protect Students from Sexual Assault. As part of the work of the task force and partnering organizations, a new resource portal was launched: NotAlone.gov. Accessible to students, institutions, or anyone interested in the subject, this website contains resources for preventing and responding to sexual assault on college and university campuses and in our nation's secondary schools. NotAlone.gov provides information on service centers for crisis situations, the process for filing grievances, and legal guidance.

education community has taken action to educate students about safe sexual behaviors and to equip campus communities with strategies to prevent and reduce incidents of violence.

Given the attention to sexual violence and related policy issues from postsecondary institutions and the federal government, it is not surprising that campus sexual violence has become a top-tier policy issue across the states as well. During the 2015 legislative sessions, at least 29 states introduced or enacted legislation concerning campus sexual violence (Fulton, Sponsler, Sisneros, & Perez, 2015). As state lawmakers have taken action on a variety of policy proposals intended to protect students and support sexual assault survivors, several common policy themes have emerged. An Education Commission of the States (ECS) analysis of state legislative actions in the broad area of campus sexual violence identified four primary policy themes embedded in policies in 23 states:

- **Defining affirmative consent:** State policy has pushed to build a common understanding of welcomed sexual behavior by defining consent in statute or directing institutions to do so.

- **The role of local law enforcement:** State policy has sought to define, clarify, or expand the role of local law enforcement in campus reporting and investigative processes following survivors' disclosure or report of sexual assault to a campus employee.

- **Transcript notation:** State policy has addressed notation of serious violations of a campus' code of conduct, including sexual assault, on student transcripts. The duration of the transcript notation, procedures for its removal, and the process of notation have been considered in statute.

- **The role of legal counsel:** State policy has addressed the role of legal counsel in the campus adjudication process, building upon, supplementing, or extending provisions found in federal regulatory guidelines.

In this policy brief, ECS and NASPA offer a retrospective analysis of state legislative activity during the 2013–2015 legislative sessions that focused on campus sexual violence. We provide detailed descriptions of four major policy themes identified through a content analysis of introduced and enacted legislation and frame considerations for state decision makers and campus leaders. This brief is intended to help inform constructive policy dialogue as the higher education and stakeholder communities continue to deliberate the merits of proposed policy actions to support and affirm educational environments that are safe, inclusive, and equitable for all students on campus.

## Table 1

**Status of State Legislation in the Four Primary Policy Areas, 2013–2015**

| Policy area | Enacted | Died | Pending |
|---|---|---|---|
| **Consent** | California, Hawaii, Illinois, New York | Arizona, Connecticut, Iowa, Kansas, Maryland, Minnesota, Missouri, North Carolina, West Virginia | Massachusetts, New Jersey, Pennsylvania |
| **Law enforcement** | California, Minnesota, New York, Virginia | Delaware, Maryland, Missouri, New Jersey, Oklahoma, Rhode Island | Massachusetts |
| **Transcript notation** | New York, Virginia | California, Maryland | Pennsylvania |
| **Role of counsel** | Arkansas, North Carolina, North Dakota | Massachusetts, South Carolina | |

Note: Adapted from Fulton, M., Sponsler, B. A., Sisneros, L., & Perez Jr., Z. (2015). State policy database on campus sexual violence [unpublished]. Denver, CO: Education Commission of the States.

© 2015 | NASPA

AR_00000694

# STATE POLICY: CAMPUS SEXUAL VIOLENCE

In response to calls for increased public policy to support survivors of campus sexual violence and intensify prevention efforts on campus, state policy leaders have taken a number of legislative actions. During the 2013–2015 legislative sessions, at least 23 states introduced or enacted legislation covering at least one of four primary policy areas: defining affirmative consent, clarifying and expanding the role of local law enforcement, creating or expanding requirements for transcript notations covering major conduct violations, and addressing the role of legal counsel in conduct hearings centered on sexual violence.

Table 1 presents summary information on the number of bills that were enacted, are pending, or failed to emerge from the legislative process for the 2013–2015 legislative sessions. In total, nine states enacted legislation that covered at least one of the four primary policy areas outlined here. In several cases, a state either enacted multiple pieces of legislation or passed a comprehensive policy that covered multiple policy issue areas.

Table 2 summarizes legislative activity in the four primary policy areas and the status of bills for the 2013–2015 legislative sessions—by state. In total, four states enacted laws defining consent and addressing the role of local law enforcement, and three states enacted legislation that addresses the role of counsel at campus disciplinary hearings.

The patterns of policy adoption and consideration presented in Tables 1 and 2 and summarized in Figures 1 and 2 reveal a broad diffusion of policy activity at the state level relating to campus sexual violence. As in many other policy domains, however, not all policy is crafted in the same way

## Table 2

### Status of Legislation in the Four Primary Policy Areas, by State, 2013–2015

| State | Consent | Law enforcement | Transcript notation | Role of counsel |
|---|---|---|---|---|
| Arizona | Died | | | |
| Arkansas | | | | Enacted |
| California | Enacted | Enacted | Died | |
| Connecticut | Died | | | |
| Delaware | | Died | | |
| Hawaii | Enacted | | | |
| Illinois | Enacted | | | |
| Iowa | Died | | | |
| Kansas | Died | | | |
| Maryland | Died | Died | Died | |
| Massachusetts | Pending | Pending | | Died |
| Minnesota | Died | Enacted | | |
| Missouri | Died | Died | | |
| New Jersey | Pending | Died | | |
| New York | Enacted | Enacted | Enacted | |
| North Carolina | Died | | | Enacted |
| North Dakota | | | | Enacted |
| Oklahoma | | Died | | |
| Pennsylvania | Pending | | Pending | |
| Rhode Island | | Died | | |
| South Carolina | | | | Died |
| Virginia | | Enacted | Enacted | |
| West Virginia | Died | | | |

Note: Adapted from Fulton, M., Sponsler, B. A., Sisneros, L., & Perez Jr., Z. (2015). State policy database on campus sexual violence [unpublished]. Denver, CO: Education Commission of the States.

AR_00000695

nor aimed toward the same ends. A detailed content analysis of statutory language is necessary to shed light on the specifics of policy intent and focus. Moreover, for campus leadership and administrators, understanding the content and context of enacted bills is critical to support effective policy implementation.

The following sections present a summary analysis of enacted legislation in the four primary policy areas, highlighting general themes within enacted bills and providing detailed examples of state legislative activity. Each section concludes with considerations and discussion points designed to inform policy makers and campus leaders as they contemplate policy action and move toward successful implementation of laws, rules, and regulations.



**Figure 1.** States that enacted campus sexual violence legislation on at least one primary policy theme



**Figure 2.** States where campus sexual violence legislation on one or more primary policy theme is pending, has died, or both

© 2015 | NASPA

# POLICY THEME: DEFINING AFFIRMATIVE CONSENT

Traditionally the domain of institutional student codes of conduct, affirmative consent standards have been incorporated by a number of states into their multifaceted approaches for preventing and reducing incidents of campus sexual violence. Although post-secondary institutions often include affirmative consent language in their sexual assault policies, the goal of state law is to bring consistency across colleges and raise awareness of the concept of affirmative consent within and beyond a campus community. State efforts to codify affirmative consent definitions also reinforce the movement from a "no means no" to "yes means yes" posture in discussing how consent is obtained, which parties involved in sexual encounters are required to obtain consent, and the frequency with which consent must be obtained.



**Figure 3.** Status of policies on defining affirmative consent across the states (2014-2015)

DIED    ENACTED    PENDING

## THEME OVERVIEW

Since 2014, four states— **California, Hawaii, Illinois,** and **New York**—have enacted legislation that addresses or defines affirmative consent related to sexual activity between students enrolled in a postsecondary institution (Fulton et al., 2015). California, Illinois, and New York's definitions of affirmative consent share the common element of a voluntary or freely given agreement to engage in sexual activity.

The standards clarify that a lack of protest or resistance does not indicate consent. In two of the states, California and New York, the consent to sexual activity must also be consciously or knowingly given. In addition, New York's definition refers to a mutual decision among all participants. All three states' standards indicate circumstances under which a person cannot consent to sexual activity, including when the person is incapacitated due to the use or influence of alcohol or drugs or due to a mental disability, or if the person is asleep or unconscious.

In Hawaii, the legislature established an affirmative consent task force under **Senate Bill 387** of 2015 to review and make recommendations on the University of Hawaii's

executive policy on domestic violence, dating violence, sexual assault, and stalking. The law outlines the charges to the task force, identifies the membership, and requires the task force to consider campus definitions of consent in reviewing the University of Hawaii's sexual assault policies. The task force must submit a report of its findings and recommendations, including any proposed legislation, to the legislature no later than 20 days prior to the convening of the regular sessions of 2016 and 2017. The task force will cease to exist on June 30, 2017.

## STATE POLICY SUMMARIES

This section summarizes state policy actions pertaining to

affirmative consent in California, Illinois, and New York.

**California.** In 2014, California law-makers enacted **Senate Bill 967**, which requires postsecondary systems and institutional governing boards to adopt policies concerning sexual assault, domestic violence, dating violence, and stalking as defined by the Higher Education Act of 1965. The governing boards must adopt these policies to receive state funds for student financial assistance, and the policies must include the following elements:

- An affirmative consent standard in determination of whether consent was given by a complainant. Affirmative consent is defined as affirmative, conscious, and voluntary agreement to engage in sexual activity. It is the responsibility of each person involved in the sexual activity to ensure that he or she has the affirmative consent of the other or others to engage in sexual activity. Lack of protest or resistance does not mean consent, nor does silence mean consent.

- Specified in the law, circumstances under which the accused will not be granted an excuse from obtaining affirmative consent include:

  › The accused individual's belief in affirmative consent arose from the intoxication or recklessness of the accused.

  › The accused did not take reasonable steps to ascertain whether the complainant affirmatively consented.

- The preponderance of the evidence standard will be used

to examine the elements of the complaint against the accused.

- Circumstances under which the complainant is unable to give consent include:

  › The complainant was asleep or unconscious.

  › The complainant was incapacitated due to the influence of drugs, alcohol, or medication so that the complainant could not understand the fact, nature, or extent of the sexual activity.

  › The complainant was unable to communicate due to a mental or physical condition.

**Illinois.** Illinois enacted the Preventing Sexual Violence in Higher Education Act in 2015 (**H.B. 821**) requiring all higher education institutions to adopt a comprehensive policy concerning sexual violence, domestic violence, dating violence, and stalking consistent with federal and state law. Among other provisions, institutions' policies must include a definition of consent that includes specified criteria, but permits institutions to define *consent* in a more demanding manner; state policy sets a minimal definition of consent that may be used at the institutional level.

The definition of consent must, at a minimum, recognize that (a) consent is a freely given agreement to sexual activity; (b) a person's lack of verbal or physical resistance, or submission resulting from the use or threat of force does not constitute consent; (c) a person's manner of dress does not constitute consent; (d) a person's consent to past sexual activity

does not constitute consent to future sexual activity; (e) a person's consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another; (f) a person can withdraw consent at any time; and (g) a person cannot consent to sexual activity if that person is unable to understand the nature of the activity or give knowing consent due to circumstances, including and without limitation to the following:

- The person is incapacitated due to the use or influence of alcohol or drugs;

- The person is asleep or unconscious;

- The person is under age; or

- The person is incapacitated due to a mental disability.

**New York.** In 2015 New York enacted **Assembly Bill 8244** requiring that all institutions adopt the following definition of affirmative consent as part of their code of conduct:

Affirmative consent is a knowing, voluntary and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

**8**

© 2015 | NASPA

Each institution's code of conduct must reflect the following principles as guidance for the institutional community:

- Consent to any sexual act or prior consensual sexual activity between or with a party does not necessarily constitute consent to any other sexual act;

- Consent is required regardless of whether the person initiating the act is under the influence of drugs or alcohol (or both);

- Consent may be initially given but withdrawn at any time;

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent;

- Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm;

- When consent is withdrawn or can no longer be given, sexual activity must stop.

## CONSIDERATIONS FOR CAMPUS AND POLICY LEADERS

State-level policy that defines affirmative consent for sexual activity within postsecondary settings has raised a number of issues on which policy makers and campus leadership should reflect as they move toward implementation or consideration of policy actions.

- Some due-process advocates have raised questions about rights for the accused, particularly since affirmative consent laws shift the burden of demonstrating the affirmation of consent from the survivor to the accused (Department of Education [ED], 2014). Providing clarity around the process for determining when consent was given, and how it was obtained, is critical to implementation and to ensuring all students are aware of the standards required to determine if sexual activity is consensual. Campus officials will need to make sure the affirmative consent policies are consistently and fairly applied and that an unreasonable or uneven burden is not placed on a single party.

- In some circumstances, especially when both persons engaged in sexual activity are intoxicated, there could be uncertainty about who initiated the sexual activity, causing ambiguity as to who is the party responsible for obtaining consent. Outlining how these assessments will be made, and the standards for their evaluation during campus disciplinary hearings, is an important consideration. In particular, questions have arisen about the practicality and reasonableness of institutions or states requiring affirmative consent at each stage of a sexual encounter. Clarity is needed about how individuals can demonstrate consent has been obtained.

- Part of successfully implementing affirmative consent standards in a postsecondary setting requires an examination of how these definitions align or do not align with a state's criminal code related to sexual violence. As New York sought to address in their affirmative consent law, it is possible that campus level standards of obtaining and affirming consent will be unaligned with the standards applied in criminal proceedings. Policy makers, institutional representatives, and students themselves should be made aware of and understand the implications of these potential differences and the impact on campus judicial hearings and public criminal cases.

AR_00000699

# POLICY THEME: THE ROLE OF LOCAL LAW ENFORCEMENT

The heightened attention to sexual violence has led to evaluation of how expediently and responsibly postsecondary institutions respond to incidents of sexual violence, fueling a national conversation about whether and when law enforcement should be notified of such occurrences. A central issue in policy deliberations is protection of the rights of the survivor to decide whether to report a sexual assault to local law enforcement, while simultaneously ensuring that investigation of a potential crime is thorough and launched in a timely manner. Supporting local law enforcement agencies in fully investigating sexual violence and related crimes requires intentional collaboration between law enforcement and campus authorities.



**Figure 4.** Status of policies on the role of local law enforcement across the states (2014-2015)

## THEME OVERVIEW

Since 2014, four states—**California, Minnesota, New York,** and **Virginia**—have enacted legislation addressing the responsibilities of postsecondary institutions to inform sexual assault survivors of their right to report the crime to law enforcement officials; the process by which institutions enter into a memorandum of understanding (MOU) with local police jurisdictions; or requirements that incidents of sexual violence be reported to local law enforcement. Two states—Minnesota and New York—have taken explicit legislative action affirming the rights of sexual assault survivors to decide whether to refer a case to law enforcement.

California and Virginia established requirements for reporting sexual assault crimes to law enforcement. Specifically, California law requires postsecondary institutions to adopt policies to ensure the reporting of violent crimes, sexual assaults, or hate crimes to local law enforcement immediately or as soon as reasonably possible. Virginia law requires that acts of sexual violence be reported to the Title IX coordinator who then reports the information to an internal review committee. A representative of law enforcement sits on the review committee and helps determine whether to disclose the information to the law enforcement agency responsible for any forthcoming investigation. Virginia law also requires the local attorney for the state to be notified of campus criminal felony assault investigations.

## STATE POLICY SUMMARIES

This section summarizes state policy actions in these four states pertaining to the relationship between campus and local law enforcement, and related provisions.

**California.** As a condition of eligibility to participate in the state-based financial aid Cal Grant Program, **Assembly Bill 1433** (2014) requires postsecondary system

and public and private institutional governing boards to adopt policies to ensure that campuses immediately, or as soon as practicably possible, disclose to campus or local law enforcement any report by a survivor of a violent crime, sexual assault, or hate crime that is received by campus security. The disclosure should not identify the survivor, unless he or she consents after being informed of the right to have personally identifying information withheld. The law prohibits a report to a local law enforcement agency from identifying the alleged assailant if the survivor does not consent to being identified. These requirements do not constitute a waiver of, or exception to, any law providing for the confidentiality of information.

In addition, **Assembly Bill 913** (2015) amended state statute to reaffirm that campus law enforcement agencies have the primary authority for providing police or security services, including the investigation of criminal activity, to their campuses. The law revises existing requirements for governing boards of community college districts to mandate that their campuses enter into written agreements with local law enforcement agencies. These agreements must clarify which law enforcement agency has operational responsibilities for investigating violent crimes and be made public by January 1, 2016. Similar agreements with law enforcement agencies are already required for the governing boards of the California State University, the University of California, and independent postsecondary institutions.

**Minnesota.** Under **Senate File 5** (2015), campuses within the Minnesota State Colleges and Universities System as well as private institutions that are eligible for state student financial aid must allow sexual assault survivors to decide whether to refer a case to law enforcement and take measures to protect their privacy. Consistent with laws governing access to student records, the institutions must provide a student who chooses to report a sexual assault with access to their description of the incident.

The law, which revised state statute (§ 135A. 15), further requires higher education institutions to enter into a memorandum of understanding (MOU) with the primary local law enforcement agency that serves the campus. The MOU must provide delineation and information sharing protocols for investigative responsibilities; protocols for investigations, including standards for notification and communication, and measures to promote evidence preservation; and a method of sharing information about specific crimes, when directed by the survivor, and a method of sharing crime details anonymously. A campus would be exempt from this requirement if it establishes a sexual assault protocol team with local law enforcement to facilitate cooperation and collaboration.

**New York.** As part of a comprehensive campus sexual assault law, **Assembly Bill 8244** (2015), New York requires every higher education institution to adopt and implement a students' bill of rights as part of its code of conduct that is distributed annually, made available on each institution's website,

and posted in residence halls and campus centers. The students' bill of rights must include a statement that "all students have the right to make a report to local law enforcement and/or state police." Each institution must ensure that reporting individuals are advised of their right to notify university police or campus security, local law enforcement, or state police. Institutions also must ensure that individuals are provided with protections and accommodations, including no contact orders, between the reporting student and the respondent.

**Virginia.** Virginia enacted **Senate Bill 721** in 2015 that requires employees of public and private higher education institutions who obtain information that an act of sexual violence has been committed against a student to report to the Title IX coordinator as soon as practicable. The Title IX coordinator is required to report to a review committee, which must meet within 72 hours of receiving the information. The review committee must comprise the Title IX coordinator, a representative of law enforcement, and a student affairs representative. If the review committee determines that disclosure of the information regarding the alleged act of sexual violence is necessary to protect the health and safety of the survivor or other individuals, the law enforcement representative must disclose the information, including personally identifiable information, to the law enforcement agency responsible for investigating. The Title IX coordinator must notify the survivor that such disclosure is being made. If the alleged act of sexual violence constitutes a felony, the

© 2015 | NASPA

11

law enforcement representative must, within 24 hours, consult the local attorney for the commonwealth or another prosecutor and provide the information received by the review committee.

A second Virginia law enacted in 2015, **House Bill 1785**, amends state statute to require that mutual aid agreements between campus police forces and law enforcement agencies contain provisions to notify the local attorney for the commonwealth within 48 hours of beginning an investigation that involves a felony criminal sexual assault. Public and private higher education institutions without campus police forces must enter into memoranda of understanding with local law enforcement agencies or state police, which are required to issue the same notifications to the local attorney for the commonwealth.

## CONSIDERATIONS FOR CAMPUS AND POLICY LEADERS

State policy in the area of campus sexual violence has targeted the roles and responsibilities of local law enforcement and campus leaders in the process of reporting and documenting campus sexual assaults. Issues of student confidentiality, the ability of local law enforcement to conduct expedient criminal investigations, and the differing requirements and standards used in campus disciplinary proceedings and criminal investigations and prosecutions have raised a number of issues for policy makers and campus leaders to consider as they move toward implementation or consideration of additional policy actions.

- Mandatory reporting requirements could have a chilling effect on student reporting of a sexual assault to a campus official, particularly if students are reluctant to engage with law enforcement or in the legal process. Students need to understand the confidentiality provisions included in law, and institutional leaders and local policing authorities need to carefully navigate new policy within the contours of existing and superseding federal requirements as outlined in Title IX and articulated by recent guidance by the OCR. To ensure students are best supported, transparent, consistent, and enforced implementation is critical.

- Policy actions and campus support systems must prioritize the rights and choices of survivors. Sexual assault survivors need to be made aware of all of their options for pursuing justice and/or support, including campus adjudication processes, support services, and the criminal justice system. Survivors also need to understand the potential implications of reporting crimes to law enforcement and expectations for their participation in the legal process. To this end, state and campus policies should enable the survivor to choose her or his path for resolution or support, whether through the campus or the criminal courts (or both). The role of advisors, one that guarantees confidentiality and that outlines a full array of options to inform the

independent decision making of survivors, is central in articulating a clear and consistent message of support.

- Mandatory reporting requirements may create conflicts with federal law. Current law requires institutions of higher education that receive federal funds to inform survivors of their rights to decline to notify law enforcement about being victimized (Institutional and Financial Assistance Information for Students, 2015). To this point, campus leaders and state decision makers should engage in constructive dialogue on the different purposes and degree of authority of campus disciplinary proceedings with criminal investigations led by law enforcement officials and consider these differences carefully to avoid conflicts.

- Requirements for MOUs will need to take into account institutional capacity and, in some cases, their interaction with multiple and overlapping law enforcement agencies or jurisdictions. To be implemented as designed, it is a prerequisite that institutional and local law enforcement leadership are behind the goals and desired outcomes of a well-crafted MOU related to the handling of sexual violence cases in a particular jurisdiction. Moreover, MOUs should account for campus responsibilities under federal law to affirm the rights of survivors to decide whether and how to pursue resolution and support after an incident of sexual violence.

# 12

© 2015 | NASPA

# POLICY THEME: TRANSCRIPT NOTATION

**S**tudents who have been accused of or found responsible for sexual violence and other conduct code violations are often able to transfer without the receiving institution's knowledge because this information typically is not noted on their transcripts. According to a recent survey by the American Association of Collegiate Registrars and Admissions Officers (2015, p. 3), about fifteen percent of colleges that responded currently note on a student transcript whether the student is ineligible to reenroll due to a "major" disciplinary violation.

Recent high-profile incidents of campus sexual assault by transfer students have prompted some state policy makers to call for greater transparency of student's disciplinary dismissals and more consistent protocols for sharing this information among postsecondary institutions (New, 2015; Witherspoon, 2015). The overall goals of policy in this area are to improve campus safety and security, hold offenders accountable, and minimize institutions' potential liability if a student with a conduct violation applies for a transfer.

## THEME OVERVIEW

In 2015, two states—**New York** and **Virginia**—enacted laws that require postsecondary education institutions to make a notation for code of conduct violations on transcripts. Under the New York and Virginia laws, transcript notations must indicate whether



**Figure 5.** Status of policies on transcript notation across the states (2015)

a student has been suspended or expelled for violation of an institution's code of conduct, including for sexual violence. Both states also require campuses to include a notation if a student withdrew while under investigation for such a conduct violation. In addition, the laws address the circumstances under which the notations must be removed, typically if a student's responsibility for the violation has been vacated or after the suspension has been served.

A similar transcript notation bill in California passed the legislature but was vetoed by the governor in October 2015. **Senate Bill 968** would have required public and private institutions to indicate a student's ineligibility to reenroll on the transcript due to suspension or expulsion and to require the documentation to remain on

the transcript for as long as the sanction was applied by the institution's conduct board. In his veto message, Governor Jerry Brown stated that colleges currently have the ability to make a transcript notation for suspension or expulsion and that additional policy in this area is unnecessary.

## STATE POLICY SUMMARIES

This section summarizes state policy actions in New York and Virginia pertaining to the notation of serious code of conduct violations on student transcripts.

**New York.** As part of **Assembly Bill 8244** (2015), higher education institutions must include a notation on the transcripts of students who were suspended or expelled after being found responsible for a code of conduct violation that

was violent in nature – including sexual violence. This law applies to institutions chartered by the New York Board of Regents or incorporated by a special act of the legislature that maintains a campus in New York.

The crimes that warrant a transcript notation are those that meet the reporting requirements under the Clery Act, including sexual violence. Institutions must make a notation on a student's transcript if the student withdraws while the conduct charges are pending and declines to complete the disciplinary process. Campuses must publish a policy on transcript notations and an accompanying appeal process for the accused to seek removal of a transcript notation for a suspension; notations for expulsion cannot be removed. If a finding of responsibility for the violation is vacated, the transcript notation must be removed.

**Virginia.** Under Virginia **Senate Bill 1193** (2015), public higher education institutions or private colleges and universities that are eligible to receive funds from the state's Tuition Assistance Grant

Program or financing from the College Building Authority are required to include a notation on a student's transcript if he or she has been permanently suspended, has been permanently dismissed, or withdrew while under investigation for a violation of the institution's code of conduct. Campuses must notify students if such documentation is made on their transcripts. Institutions must also adopt procedures to remove the notation from students' records if they are subsequently found not to have been in violation or completed their suspension and determined to be in good standing according to the institution's code of conduct.

## CONSIDERATIONS FOR CAMPUS AND POLICY LEADERS

State policies concerning transcript notation have received increased attention during policy debates about institutional response to campus sexual violence. Although the intent of policy in this area is typically to support clear and consistent

information sharing, several considerations should be addressed as policy makers and institutional leaders navigate the implementation of enacted laws or consider the merits of proposed legislation.

- Definitions of misconduct vary widely among institutions, including for specific violations related to sexual encounters, so the specific nature of the violation might not be clear on the transcript notation. What constituents a major violation of a campus conduct code is ambiguous and may differ from institution to institution.

- Campus administrators might be concerned about running afoul of the Family Educational Rights and Privacy Act (FERPA; 2015), which dictates the manner in which institutions are allowed to share a student's records with the college to which he or she plans to transfer. However, current FERPA law does grant substantial latitude to institutions to disclose student records to other institutions.

**14**

© 2015 | NASPA

# POLICY THEME: THE ROLE OF LEGAL COUNSEL

Violations of an institution's code of student conduct result in a disciplinary proceeding. The public interest in campus crime—including incidents of sexual violence—has resulted in state-level consideration of students' rights to fair disciplinary processes. As state policy has developed in this area, attention has been given to the formal role legal counsel may play in institutional disciplinary hearings—a distinction from the mere presence of an advisor to consult with a student individually. From 2013 to 2015, the role of legal counsel in the disciplinary process has been deliberated by elected leaders across four states. Deliberations have focused on at least three areas of policy action: First, lawmakers have looked at expanding student due process rights in general. Second, policy makers have sought to expand the engagement of outside legal counsel in institutional hearings. Third, state leaders have proposed legislation to permit either the accused or the survivor (or both) to allow legal counsel to fully participate in campus conduct proceedings (see Table 2).

## THEME OVERVIEW

Three states, **Arkansas, North Carolina,** and **North Dakota** have adopted policy that speaks directly to the role of legal counsel in institutional disciplinary hearings, but a clear definition of this role is not articulated in



**Figure 6.** Status of policies on the role of legal counsel across the states (2013-2015)

DIED    ENACTED    PENDING

the law. In addition, two states – Massachusetts and South Carolina – introduced legislation in 2014 or 2015 concerning a student's or student organization's right to be represented by an attorney during institutional disciplinary hearings that may result in the suspension or expulsion of the student.

## STATE POLICY SUMMARIES

This section summarizes state policy action pertaining to the role of counsel in campus conduct proceedings in North Carolina.

**North Carolina.** North Carolina's legislation, **House Bill 843** of 2013, requires that a student who is accused of violating the institution's disciplinary or conduct rules have the right to be represented

by a licensed attorney or non-attorney advocate who may fully participate during any disciplinary procedure or other procedure regarding the alleged violation. However, a student will not have the right to be represented by a licensed attorney or non-attorney advocate in either of the following circumstances:

- If the institution has implemented a student honor court which is fully staffed by students to address such violations.
- For any allegation of academic dishonesty, as defined by the constituent institution.

The law also provides student organizations recognized by the institution the right to be

AR_00000705

represented by a licensed attorney or non-attorney advocate, with similar limitations.

## CONSIDERATIONS FOR CAMPUS AND POLICY LEADERS

Currently, federal regulatory guidance issued by the U.S. Department of Education (ED) provides for students engaged in sexual violence conduct hearings to have an advisor of the student's choice be present during institutional disciplinary proceedings. This includes individuals who may be attorneys or others drawn from the legal profession. However, federal regulation allows institutions to define the roles that advisors may play in disciplinary hearings. The extent of engagement and involvement in the process is a locally based decision and is deemed to be in compliance with federal

regulation as long as it is applied equally and consistently to the accuser and accused (United States Department of Education, 2014). State policy, such as the North Carolina law, deals with the role of the advisor and extends this concept to an advisor representing a student—a meaningful and important distinction. As state leaders consider similar policy actions, it is important to take into account several factors.

The extent to which lawyers can participate in campus disciplinary hearings may be confusing if legislation does not define terms such as *representation* and *fully participate* in clear and implementable language.

The presence of representative legal counsel may undermine the purpose of campus disciplinary hearings that aim to determine whether a student has violated the institution's conduct code and often serve to provide both disciplinary and educational outcomes.

Campus judicial hearings were not created, nor do they intend, to replace or replicate criminal proceedings. The presence of representative legal counsel is likely to fundamentally shift the dynamic of institutional judicial proceedings and outcomes.

Legislation that expands the role of legal counsel in campus judicial conduct hearings raises concerns about a postsecondary institution's ability to maintain compliance with a student's Title IX rights in cases where significant delays in the campus proceedings emerge. The complexity of some campus judicial conduct hearings involving sexual violence does not mitigate an institution's obligation to meet Title IX compliance guidelines. Institutional leaders need to make sure that processes are in place, even in cases where legal counsel has an active role in conduct hearings, to ensure timely completion of hearings in compliance with Title IX requirements.

**16**

© 2015 | NASPA

# CONCLUDING THOUGHTS

Across many states, institutional leaders are realigning policy and practice to comply with newly enacted state laws that change campus approaches to preventing and handling incidents of sexual violence. In other states, institutional leaders face the prospect that these changes may soon come to their campuses. State policy makers concerned with campus safety, both in general and specifically as it pertains to preventing sexual violence, have taken a number of policy actions, outlined here, to support survivors and provide for what is intended to be a transparent, expedient, and consistent institutional response to these horrific acts.

This brief intends to help both institutional and policy leaders think through key issues on four major policy themes that have emerged from policy dialogue on campus-based sexual violence across the states: affirmative consent, role of law enforcement, transcript notation, and the role of legal counsel. Toward that end, this publication serves as a resource to help raise issues for discussion with state decision makers as they deliberate the merits of these policy themes in their states and campus administrators who seek to implement rules and regulations on their respective campuses. Further, this publication serves as a resource for institutional leaders who need to navigate distance between the intent of enacted laws and effective strategies to guide implementation within the broader goal to sustain safe, inclusive, and equitable environments for all students.

Given the importance and complexity of this issue, it is imperative that state decision makers join leaders in the higher education community to engage in transparent discussions about effective and credible approaches to address the threat of sexual violence on campus. Getting the policies right on campus-based sexual assault is both a national imperative and duty of care owed to our nation's students.

AR_00000707

## Appendix A
### State Legislation in the Four Primary Policy Areas: Enacted, 2013–2015

| | Primary policy areas | | | |
|---|---|---|---|---|
| State | Affirmative consent | Law enforcement | Transcript notation | Role of counsel |
| Arkansas | | | | H.B. 1892 (2015) |
| California | S.B. 967 (2014) | A.B. 913  (2015) A.B. 1433 (2014) | | |
| Hawaii | S.B. 387 (2015) | | | |
| Illinois | H.B. 821 (2015) | | | |
| Minnesota | | S.F. 5 (2015) | | |
| New York | A.B. 8244 (2015) | A.B. 8244 (2015) | A.B. 8244 (2015) | |
| North Carolina | | | | H.B. 843 (2013) |
| North Dakota | | | | S.B. 2150 (2015) |
| Virginia | | S.B. 712/H.B. 1930 (2015) H.B. 1785 (2015) | S.B. 1193 (2015) | |

## Appendix B
### Four Primary Policy Areas by State:
### Legislation that Died or Was Vetoed, 2013–2015

| | Primary policy areas | | | |
|---|---|---|---|---|
| State | Affirmative consent | Law enforcement | Transcript notation | Role of counsel |
| Arizona | H.B. 2474 (2015) | | | |
| California | | | A.B. 968 (2015) | |
| Connecticut | S.B. 636 (2015) | | | |
| Delaware | | H.B. 1 (2015) | | |
| Iowa | H.F. 390/S.F 79 (2015) | | | |
| Kansas | H.B. 2266 (2015) | | | |
| Maryland | H.B. 138 (2015) H.B. 667 (2015) H.B. 839 (2015) | H.B. 749/S.B. 817 (2015) S.B. 578 (2015) | H.B. 749/S.B.817 (2015) | |
| Massachusetts | | | | H.B. 3492 (2014) |
| Minnesota | S.F. 2126/H.F. 1689 (2015) | | | |
| Missouri | H.B. 412 (2015) | H.B. 595 (2015) | | |
| New Jersey | | S.B. 2382/A.B. 3652 (2014) | | |

© 2015 | NASPA

| Primary policy areas | | | | |
|---|---|---|---|---|
| **State** | **Affirmative consent** | **Law enforcement** | **Transcript notation** | **Role of counsel** |
| North Carolina | H.B. 815 (2015) S.B. 474 (2015) S.B. 505 (2015) | | | |
| Oklahoma | | S.B. 553 (2015) | | |
| Rhode Island | | H.B. 5034 (2015) | | |
| South Carolina | | | | H.B. 3453 (2015) |
| West Virginia | H.B. 2690 (2015) | | | |

Note: The transcript notation bill, A.B. 968, in California was vetoed by the governor. Primary legislation was enacted in seven states. Primary legislation died in 17 states.

# References

American Association of Collegiate Registrars and Admissions Officers. (2015). 2015 U.S. higher education transcript practices and best practice opinions: Results of the AACRAO 2015 Academic Record and Transcript Survey. Washington, DC: Author. http://www.aacrao.org/docs/default-source/PDF-Files/2015-transcript-practices-at-u-s-institutions-(1).pdf?sfvrsn=4

Cantor, D., Fisher, B., Chibnall, S., Townsend, R., Lee, H., Bruce, C., & Thomas, G. (2015). Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct. Rockville, MD: Westat. https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/Report%20on%20the%20AAU%20Campus%20Climate%20Survey%20on%20Sexual%20Assault%20and%20Sexual%20Misconduct.pdf

DiJulio, B., Norton, M., Craighill, P., Clement, S., & Brodie, M. (2015, June). Survey of current and recent college students on sexual assault. Washington, DC: Kaiser Family Foundation. http://kff.org/other/poll-finding/survey-of-current-and-recent-college-students-on-sexual-assault/

Family Educational Rights and Privacy Act. (2015). 34 C.F.R. § 9931. http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html

Fulton, M., Sponsler, B. A., Sisneros, L., & Perez Jr., Z. (2015). State policy database on campus sexual violence [unpublished]. Denver, CO: Education Commission of the States.

Institutional and Financial Assistance Information for Students (2015). 34 C.F.R. §668.46. http://www.ecfr.gov/cgi-bin/text-idx?SID=fae9c74b239176ef06c7881466c045c2&mc=true&node=se34.3.668_146&rgn=div8

New, J. (2015, July 10). Requiring a red flag [Blog post]. Inside Higher Ed. https://www.insidehighered.com/news/2015/07/10/states-requiring-colleges-note-sexual-assault-responsibility-student-transcripts

Preventing and responding to sexual assault on college campuses: Hearing before the Subcommittee on Higher Education and Workforce Training, U.S. House of Representatives, 114th Cong. 1 (September 10, 2015) (Testimony of Penny Rue). http://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=399274

U.S. Department of Education. (2014). Negotiated rulemaking 2013–2014 Violence Against Women Act (VAWA). Washington, DC: Author. Retrieved from https://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html

U.S. Department of Education Office for Civil Rights. (2011, April 4). Dear colleague letter from Assistant Secretary for Civil Rights Russlynn Ali. Washington, DC: Author. http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

U.S. Department of Education Office for Civil Rights. (2014, April 29). Questions and answers on Title IX and sexual violence. Washington, DC: Author. http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

U.S. Department of Education Office of Postsecondary Education. (2015, July 22). Implementation of the final VAWA regulations. Washington, DC: Author. http://www.ifap.ed.gov/dpcletters/GEN1515.html

Witherspoon, T. (2015, August 20). Baylor football player convicted of sexual assault. Waco Tribune. http://www.wacotrib.com/news/courts_and_trials/baylor-football-player-convicted-of-sexual-assault/article_00adce9a-be02-515c-ad4e-f8e5149df707.html

AR_00000709

# NASPA Resources on Campus Sexual Violence Law and Policy

Cantalupo, N. (2015). An Open Letter to Elected Leaders in All 50 States. NASPA – Student Affairs Administrators in Higher Education. Washington, DC. Retrieved from http://www.naspa.org/images/uploads/main/Joint_omnibus_bill_statement_letterhead.pdf

Cantalupo, N. (2014). 5 Things Student Affairs Professionals Should Know About Campus Gender-Based Violence. NASPA Research and Policy Institute 5 Things Issue Brief Series. NASPA – Student Affairs Administrators in Higher Education. Washington, DC.

Sun, J., Rossi Scott, L., Sponsler, B., & Hutchens, N. (2014). Legal Links Addendum: Understanding Campus Obligations for Student-to-Student Sexual Harassment. Legal Links: Connecting Student Affairs and Law (Vol. 1, Issue 1). NASPA Research and Policy Institute. NASPA – Student Affairs Administrators in Higher Education. Washington, DC.

Sun, J., Rossi Scott, L., Sponsler, B., & Hutchens, N. (2013). Understanding Campus Obligations for Student-to-Student Sexual Harassment. Legal Links: Connecting Student Affairs and Law (Vol. 1, Issue 1). NASPA Research and Policy Institute. NASPA – Student Affairs Administrators in Higher Education. Washington, DC.

For more information about NASPA Resources and Publications on Campus Sexual Violence Law and Policy, please contact NASPA's Research and Policy Institute by email at rpi@naspa.org or by phone at 202.265.7500.

**20**

© 2015 | NASPA

**Sherman, Brandon**

| | |
|---|---|
| **From:** | Sherman, Brandon |
| **Sent:** | Monday, August 21, 2017 5:22 PM |
| **To:** | Jackson, Candice; Menashi, Steven; Eitel, Robert; Bailey, Nathan |
| **Subject:** | FW: submission to OCR |
| **Attachments:** | Fairness for All Students.pdf |

---

**From:** Jeannie Suk Gersen [mailto:jsg@law.harvard.edu]
**Sent:** Monday, August 21, 2017 5:20 PM
**To:** Sherman, Brandon
**Subject:** FW: submission to OCR

Dear Brandon,
Please find attached a submission that Janet Halley, Nancy Gertner, and Betsy Bartholet, and I made today to OCR as a comment for "Evaluation of Existing Regulations."
Thank you,
Jeannie
--
Jeannie Suk Gersen
John H. Watson, Jr. Professor of Law
Harvard Law School

Email: jsg@law.harvard.edu
HLS: http://hls.harvard.edu/faculty/directory/10869/Gersen/
NewYorker: http://goo.gl/9oW2Vh
Twitter: @jeanniesuk

FAIRNESS FOR ALL STUDENTS UNDER TITLE IX

Elizabeth Bartholet, Nancy Gertner, Janet Halley and Jeannie Suk Gersen

August 21, 2017

We are professors at Harvard Law School who have researched, taught, and written on Title IX, sexual harassment, sexual assault, and feminist legal reform. We were four of the signatories to the statement of twenty eight Harvard Law School professors, published in the Boston Globe on October 15, 2014, that criticized Harvard University's newly adopted sexual harassment policy as "overwhelmingly stacked against the accused" and "in no way required by Title IX law or regulation."

We welcome the current opportunity to assess the response to campus sexual harassment, including sexual assault. In the past six years, under pressure from the previous Administration, many colleges and universities all over the country have put in place new rules defining sexual misconduct and new procedures for enforcing them. While the Administration's goals were to provide better protections for women, and address the neglect that prevailed before this shift, the new policies and procedures have created problems of their own, many of them attributable to directives coming from the Department of Education's Office for Civil Rights (OCR).  Most of these problems involve unfairness to the accused; some involve unfairness to both accuser and accused; and some are unfair to victims. OCR has an obligation to address the unfairness that has resulted from its previous actions and the related college and university responses.

In 2011, OCR issued a "Dear Colleague Letter" which gave colleges and universities instructions on how to regulate this area.  That document was never opened for notice and comment and as a result does not itself have the force of law and could not add new obligations for regulated parties. Nevertheless the previous Administration's OCR threatened colleges and universities with the institution-wide cutoff of all federal funding if they did not

AR_00000712

Fairness for All Students

comply with the Dear Colleague Letter's instructions, including ones that had never before been considered legally required by Title IX.  Terrified, administrators not only complied; they over-complied.  Below is a list of some of the most severe problems left in the wake of this overcorrection.

Definitions of sexual wrongdoing on college campuses are now seriously overbroad.  They go way beyond accepted legal definitions of rape, sexual assault, and sexual harassment.  They often include sexual conduct that is merely unwelcome, even if it does not create a hostile environment, even if the person accused had no way of knowing it was unwanted, and even if the accuser's sense that it was unwelcome arose after the encounter.  The definitions often include mere speech about sexual matters.  They therefore allow students who find class discussion of sexuality offensive to accuse instructors of sexual harassment.  They are so broad as to put students engaged in behavior that is overwhelmingly common in the context of romantic relationships to be accused of sexual misconduct. Overbroad definitions of sexual wrongdoing are unfair to all parties, and squander the legitimacy of the system.

Though OCR did not require schools to treat accused students unfairly in the investigation and adjudication process, its tactics put pressure on them to stack the system so as to favor alleged victims over those they accuse.  The procedures for enforcing these definitions are frequently so unfair as to be truly shocking. Some colleges and universities fail even to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses. Some schools fail to provide hearings or to allow the accused student's lawyer to attend or speak at hearings. Some bar the accused from putting questions to the accuser or witnesses, even through intermediaries. Some schools hold hearings in which the accuser participates while remaining unseen behind a partition. Some schools deny parties the right to see the investigative report or get copies for their lawyers for preparing an appeal. Some schools allow appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker.

AR_00000713

## Fairness for All Students

Moreover, many schools improperly house the functions of investigation and adjudication in dedicated Title IX offices. These are compliance offices with strong incentives to ensure the school stays in OCR's good graces to safeguard the school's federal funding. Title IX officers have reason to fear for their jobs if they hold a student not responsible or if they assign a rehabilitative or restorative rather than a harshly punitive sanction. Many Title IX offices run all the different functions in the process, acting as prosecutor, judge, jury, and appeals board. Appeals are to an administrator in the institution's Title IX apparatus, rather than to a person who is structurally independent and not invested in the outcome. Some Title IX officers even take on the role of advisor to an accuser through the process of complaint, investigation, adjudication, or appeal, which means they are not neutral.  They do so, moreover, without providing analogous support to the accused.

Compounding matters, many institutions follow the "investigator only" or "single investigator" model, wherein the investigator is also the adjudicator. In this model, there is no hearing.  One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time.  This makes the investigator all-powerful.  Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose, because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

These common arrangements together offend two requirements of fairness: *neutral* decisionmakers who are independent of the school's compliance interest, and *independent* decisionmakers providing a check on arbitrary and unlawful decisions.

These substantive and procedural fairness issues are exacerbated by OCR's requirement that institutions use a preponderance of the evidence standard rather than a higher standard such as clear and convincing evidence. To be sure, our legal system uses the preponderance standard – which means "more

AR_00000714

Fairness for All Students

likely than not" – in many important fora, such as civil trials.  But civil trials have many features that have been developed over centuries to produce an overall system fair to both parties, including an independent and neutral initial decisionmaker and appeal body, legal counsel, a hearing with rules of evidence, and a right of appeal that relates to all aspects of the decision. Dropping the preponderance standard into the severely skewed playing field of the new OCR-inspired procedures risks holding innocent students responsible.

It is extremely important for colleges and universities to have robust policies and procedures to address sexual wrongdoing on campus.  Schools' struggles with providing fair procedures have led some observers to throw up their hands and propose 1) that schools should not decide these cases at all; 2) that schools should toss these cases off to law enforcement instead; and 3) that schools should be legally required to refer all reports of criminal acts to law enforcement regardless of whether the schools also adjudicate the cases (sometimes called "mandatory referral"). These proposals are irresponsible. A school must be able to discipline students for violating its conduct codes and protect its students from harm, whether or not the violations are also crimes. Often the conduct involved is not a crime – for example, much sexual harassment as defined by law is not criminal conduct. And even if a violation of the school's policy is also a crime, schools should be free to discipline the offending student without satisfying the very strict evidentiary standards that govern in criminal law and make it so hard to convict.  Also, requiring schools to report all reported sexual misconduct to the police without the alleged victim's permission interferes with that person's autonomy, given the important privacy and relationship issues at stake.

OCR must continue to recognize the responsibility of colleges and universities to address sexual harassment and sexual assault in their communities. But in shouldering their burden, schools owe fairness to *all* students: the accuser and the accused. And they owe it to all their students to develop substantive definitions of sexual misconduct that don't invite arbitrary enforcement against innocuous conduct. Only when schools adopt both fair procedures and fair substantive definitions will the sanctions they levy send the message that sexual misconduct is unacceptable.  Now, instead, they send a dreadful

AR_00000715

## Fairness for All Students

message, that fairness is somehow incompatible with treating sexual misconduct seriously. That message is wholly unnecessary.

In the next phase of reform, it is crucial that OCR make clear that schools must treat all students fairly. To that end, some basic principles of fairness should be observed. Schools must:

Return to the Supreme Court's definition of sexual harassment: unwelcome sexual conduct that is sufficiently severe or pervasive to interfere with the victim's educational opportunity.  Repeatedly the Court has said that a reasonable person test must be applied in determining whether conduct was wrongful, to provide a necessary check on arbitrary accusations. To impose liability, the decisionmaker must find that a reasonable person in the accuser's position would experience the incident to be abusive, and also that a reasonable person in the defendant's position would have known that the conduct was unwelcome. These traditional reasonable person limits are central to preserving academic freedom and individual autonomy.

Provide parties with the complaint and inform them of the factual basis of the complaint, the evidence gathered, and the identities of witnesses.

Provide a hearing and allow the parties the opportunity to hear the testimony in real time and to offer amendments and corrections.

Allow parties to bring counsel to any interviews and hearings, and allow counsel to speak to assert the parties' rights.

Allow parties to ask questions of other parties and witnesses in a meaningful way, even if through intermediaries rather than face-to-face or in direct confrontation.

Use a preponderance of the evidence standard *only if* all other requirements for equal fairness are met.

AR_00000716

Provide parties copies of reports produced by investigators and adjudicators.

Separate the Title IX compliance officer role from the roles of advising individual students considering filing complaints, investigation, adjudication, and appeal of individual cases.

Separate the functions of investigator, adjudicator, and appeal into different individuals or panels independent of each other, and not invested in the outcome of previous stages of the case.

Allow appeals on any grounds, rather than limit them narrowly.

We urge OCR to thoughtfully undertake much-needed refinement or replacement of the guidance provided in the 2011 Dear Colleague Letter, to better protect the rights of sexual assault victims and accused students along the lines we recommend here.

Most of the procedural principles listed above are reflected in the procedures that Harvard Law School adopted in 2015, with OCR's approval. We attach those procedures to this statement.

Additionally, OCR should abandon its senseless blanket disapproval of mediation or restorative approaches to accusations of sexual misconduct. An exclusively disciplinary or punitive approach needlessly deprives victims of options that may benefit them in the pursuit of equal educational opportunity.

Finally, it is urgent that OCR undertake to study the disproportionate impact on racial minorities of discipline for campus sexual misconduct, just as OCR has previously done for discipline in elementary and secondary schools. Our experience as lawyers and researchers in this area leads us to fear a significant risk of race discrimination in college discipline cases. That risk must be transparently analyzed as part of the project of enforcing sex discrimination law.

AR_00000717

Fairness for All Students

The unfairness that currently infects colleges and universities' procedures is in no way necessary to address the problem of sexual misconduct.  Indeed, it is counter-productive, undermining the legitimacy of the important project of addressing sexual misconduct.  To address sexual misconduct effectively, appropriate definitions of misconduct must be developed that avoid risk to the relational autonomy of students and academic freedom in the classroom. Equally important is the development of procedures providing fair treatment to both accuser and accused.  That is the challenge of the next crucial stage of reform in the service of Title IX's mandate against sex discrimination in education.

Attachments:

Elizabeth Bartholet *et al.*, *Rethink Harvard's Sexual Harassment Policy*, Bos. Globe (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html

Nancy Gertner, *Sex, Lies, and Justice*, American Prospect (Jan. 12, 2015), http://prospect.org/article/sex-lies-and-justice

Janet Halley, *Trading the Megaphone for the Gavel in Title IX Enforcement*, 123 Harv. L. Rev. F. 103 (2015), https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/

Jacob Gersen & Jeannie Suk Gersen, *The Sex Bureaucracy*, Chron. Higher Educ. (Jan. 6, 2017), http://www.chronicle.com/article/The-College-Sex-Bureaucracy/238805

Harvard Law School Sexual Harassment Resources and Procedures for Students, https://hls.harvard.edu/content/uploads/2015/07/HLSTitleIXProcedures150629.pdf

AR_00000718

## Fairness for All Students

Inquiries please contact:

Elizabeth Bartholet, ebarthol@law.harvard.edu

Nancy Gertner, ngertner@law.harvard.edu

Janet Halley, jhalley@law.harvard.edu

Jeannie Suk Gersen, jsg@law.harvard.edu

AR_00000719

OPINION

# Rethink Harvard's sexual harassment policy



Michael Fein/Bloomberg

OCTOBER 15, 2014

*In July, Harvard University announced a new university-wide policy aimed at preventing sexual harassment and sexual violence based on gender, sexual orientation, and gender identity.*

9

*The new policy, which applies to all schools within the university and to all Harvard faculty, administrators, and students, sets up the Office for Sexual and Gender-Based Dispute Resolution to process complaints against students. Both the definition of sexual harassment and the procedures for disciplining students are new, with the policy taking effect this academic year. Like many universities across the nation, Harvard acted under pressure imposed by the federal government, which has threatened to withhold funds for universities not complying with its idea of appropriate sexual harassment policy.*

*In response, 28 members of the Harvard Law School Faculty have issued the following statement:*

AS MEMBERS of the faculty of Harvard Law School, we write to voice our strong objections to the Sexual Harassment Policy and Procedures imposed by the central university administration and the Corporation on all parts of the university, including the law school.

We strongly endorse the importance of protecting our students from sexual misconduct and providing an educational environment free from the sexual and other harassment that can diminish educational opportunity. But we believe that this particular sexual harassment policy adopted by Harvard will do more harm than good.

As teachers responsible for educating our students about due process of law, the substantive law governing discrimination and violence, appropriate administrative decision-making, and the rule of law generally, we find the new sexual harassment policy inconsistent with many of the most basic principles we teach. We also find the process by which this policy was decided and imposed on all parts of the university inconsistent with the finest traditions of Harvard University, of faculty governance, and of academic freedom.

Among our many concerns are the following:

**Harvard has adopted procedures** for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation. Here our concerns include but are not limited to the following:

■ The absence of any adequate opportunity to discover the facts charged and to confront witnesses and present a defense at an adversary hearing.

■ The lodging of the functions of investigation, prosecution, fact-finding, and appellate review in one office, and the fact that that office is itself a Title IX compliance office rather than an entity that could be considered structurally impartial.

■ The failure to ensure adequate representation for the accused, particularly for students unable to afford representation.

**Harvard has inappropriately** expanded the scope of forbidden conduct, including by:

■ Adopting a definition of sexual harassment that goes significantly beyond Title IX and Title VII law.

■ Adopting rules governing sexual conduct between students both of whom are impaired or incapacitated, rules which are starkly one-sided as between complainants and respondents, and entirely inadequate to address the complex issues in these unfortunate situations involving extreme use and abuse of alcohol and drugs by our students.

AR_00000721

**Harvard has pursued** a process in arriving at its new sexual harassment policy which violates its own finest traditions of academic freedom and faculty governance, including by the following:

■ Harvard apparently decided simply to defer to the demands of certain federal administrative officials, rather than exercise independent judgment about the kind of sexual harassment policy that would be consistent with law and with the needs of our students and the larger university community.

■ Harvard failed to engage a broad group of faculty from its different schools, including the law school, in the development of the new sexual harassment policy. And Harvard imposed its new sexual harassment policy on all the schools by fiat without any adequate opportunity for consultation by the relevant faculties.

■ Harvard undermined and effectively destroyed the individual schools' traditional authority to decide discipline for their own students. The sexual harassment policy's provision purporting to leave the schools with decision-making authority over discipline is negated by the university's insistence that its Title IX compliance office's report be totally binding with respect to fact findings and violation decisions.

We call on the university to withdraw this sexual harassment policy and begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.

The goal must not be simply to go as far as possible in the direction of preventing anything that some might characterize as sexual harassment. The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom. The law that the Supreme Court and lower federal courts have developed under Title IX and Title VII attempts to balance all these important interests. The university's sexual harassment policy departs dramatically from these legal principles, jettisoning balance and fairness in the rush to appease certain federal administrative officials.

We recognize that large amounts of federal funding may ultimately be at stake. But Harvard University is positioned as well as any academic institution in the country to stand up for principle in the face of funding threats. The issues at stake are vitally important to our students, faculties, and entire community.

*Elizabeth Bartholet*

*Scott Brewer*

*Robert Clark*

*Alan Dershowitz, Emeritus*

*Christine Desan*

*Charles Donahue*

*Einer Elhauge*

AR_00000722

*Allen Ferrell*

*Martha Field*

*Jesse Fried*

*Nancy Gertner*

*Janet Halley*

*Bruce Hay*

*Philip Heymann*

*David Kennedy*

*Duncan Kennedy*

*Robert Mnookin*

*Charles Nesson*

*Charles Ogletree*

*Richard Parker*

*Mark Ramseyer*

*David Rosenberg*

*Lewis Sargentich*

*David Shapiro, Emeritus*

*Henry Steiner, Emeritus*

*Jeannie Suk*

*Lucie White*

*David Wilkins*

AR_00000723

# Sex, Lies and Justice

**Can we reconcile the belated attention to rape on campus with due process?**

**By Nancy Gertner**

January 12, 2015

*This article appears in the Winter 2015 issue of* The American Prospect *magazine.* **Subscribe here**.

 ampus sexual assaults are horrifying, made all the worse because the settings are bucolic and presumed safe—leafy campuses, ivy-walled universities. Assaults are reported in dormitories, off-campus

13

AR_00000724

apartments, and fraternity houses, in elite and non-elite institutions, from one end of the country to the other. Title IX (of the Education Amendments of 1972) was supposed to promote equal opportunity in any educational program receiving federal money. But until recently, Title IX was dormant and largely ignored. The enforcer, the federal government, had been a paper tiger. Universities were not reporting, much less dealing with, either sexual harassment or explicit sexual violence. Sexual misconduct impairs a woman's ability to function as an equal in an academic environment—and by extension menaces all women. Unless a woman is safe, all the other guarantees of equal treatment are irrelevant.

### President Barack Obama, in a January 25, 2014, speech, assured his listeners that "anyone out there who has ever been assaulted: You are not alone. We have your back. I've got your back."

In 2011, the government's approach changed dramatically: A "Dear Colleague" letter on sexual violence was sent to colleges and universities from the Department of Education's Office for Civil Rights (OCR), pointedly reminding them of their obligations under Title IX and presaging aggressive enforcement. By August 2013, the public face of the department's enforcement efforts was Catherine Lhamon, assistant secretary at the Office for Civil Rights, a zealous advocate, formerly head of impact litigation at Public Counsel, a public interest law firm; before that, she was assistant legal director of the ACLU of Southern California. At a July 2014 meeting of college administrators, Lhamon made the threat of disciplinary action unmistakable: While no school accused of violating Title IX had ever lost its federal funding, "do not think it's an empty threat," she warned them. A department **website** announced the campaign against sexual violence on campus, **Not Alone**. President Barack Obama, in a January 25, 2014, speech, assured his listeners that "anyone out there who has ever been assaulted: You are not alone. We have your back. I've got your back." Even the department's language changed, no longer referring antiseptically to a complainant and an accused but rather to victims or survivors, and perpetrators.

To feminists—I among them—it was about time that pressure was brought to

AR_00000725

bear on educational institutions. Too often colleges and universities had excused or turned a blind eye to the crimes of serial sexual predators. The media, after often dismissing the claims of rape victims, was finally more sympathetic, covering accounts of sexual violence from the University of Virginia to Yale and Harvard. This kind of sustained attention was precisely what was needed to come to grips with the problem. Nothing less would have done the trick. Indeed, nothing had worked before. It was as if women, especially young women, had to speak especially loudly and especially often to finally be heard—a not unfamiliar concept.

The problem was that the issues surrounding campus sexual assault were more complicated than the public debate reflected. How were universities and colleges to deal with the range of campus sexual encounters—a continuum from violent rape, to sex fueled by alcohol impairing all involved, to the expectations about women and men in the so-called "hookup culture," to consensual sex followed by second thoughts. There are plenty of bright lines such as forcible rape—but also blurry ones. Genuine ambivalence and ambiguous signals seem almost inherent in courtship and sexuality, especially in first encounters. Where should the Title IX violation line be? What was a reasonable adjudication process? What was the role of the criminal justice system in cases in which university conduct codes overlapped with possible prosecutions?

Further, how were colleges and universities to balance the interests of the complainant with those of the accused? Just as the complainants must be treated with dignity and their rights to a fair resolution of their charges be respected, so too must those accused of sexual misconduct. You don't have to believe that there are large numbers of false accusation of sexual assault—I do not—to insist that the process of investigating and adjudicating these claims be fair. In fact, feminists should be especially concerned, not just about creating enforcement proceedings, but about their fairness. If there is a widespread perception that the balance has tilted from no rights for victims to no due process for the accused, we risk a backlash. Benighted attitudes about rape and skepticism about women victims die hard. It takes only a few celebrated false accusations of rape to turn the clock back.

AR_00000726

# Rape, I insisted, is a crime to which women— including me—feel uniquely vulnerable, no matter who they are, no matter what their class, their race, their status.

I come to this issue—campus sexual assault—from all sides. This is not because I was a federal judge for 17 years, where "considering all sides" was part of the job definition. I left the bench in 2011 to teach at Harvard Law School, among other things. I am an unrepentant feminist, a longtime litigator on behalf of women's rights, as my memoir, *In Defense of Women*, reflects. Rape, I insisted, is a crime to which women—including me— feel uniquely vulnerable, no matter who they are, no matter what their class, their race, their status. No one should have been surprised that I supported stronger enforcement of Title IX, more training for investigators, more services for complainants, systematic assessments of the state of enforcement on college campuses, and other tough remedies. What surprised many, however, was that I was one of 28 Harvard professors who signed a letter opposing Harvard University's new sexual harassment and sexual assault policies, policies introduced ostensibly in response to pressures from the Department of Education.

When I was a lawyer, I understood how inadequate the law was in addressing sexual violence at all. I worked for changes to the retrograde definition of rape in statutes around the country and their disrespectful treatment of rape victims, laws that were a throwback to medieval conceptions about women. I lobbied for rape shield laws that limited the defense counsel's cross-examination of a woman about her prior sexual experiences. So little did the law trust a woman's account of rape that some states required that a woman's accusations be corroborated by independent evidence, a requirement to which no other crime victim was subject. The definition of the crime focused on the woman's conduct, whether she had resisted "to the utmost;" a simple "no" did not suffice. To the extent that the man's conduct was considered at all, the statutes required that he use force before his acts amounted to rape; drugging a woman, or having sex with one wholly incapacitated by alcohol, was not enough. And date rape was never prosecuted no matter what the circumstances.

AR_00000727

But I was also a criminal defense lawyer. I understood more than many how unfair the criminal process could be, how critical the enforcement of a defendant's rights were to the integrity and, even more, to the reliability of the criminal justice system. I understood what it meant to have a defendant's liberty hanging in the balance, how long terms of imprisonment could wreak havoc on the lives of defendants and their families. I appreciated the stigma of the very accusation, which persists—especially today on the Internet—even if the accused is exonerated. And I understood the racial implications of rape accusations, the complex intersection of bias, stereotyping, and sex in the prosecution of this crime.

I reconciled the pressures pushing me in opposite directions by choosing not to represent men accused of rape, while bringing civil lawsuits for women against the universities or the building owners that failed to provide them with adequate security, or against psychiatrists and psychologists who sexually abused them. I steered clear of prosecutions for rape—except for one case.

ADVERTISEMENT

A young man, a freshman at a local college at the time the incident happened and a friend of a former roommate of mine, was referred to me. (In my memoir, I call him "Paul.") He'd had sex with a classmate, his very first sexual encounter; he believed his classmate had consented. And while we can never know what went on between them, the facts—her actions, her words, the testimony of others—made her charges wholly unconvincing. A few examples: She went out of her way to invite him to her parents' home a short time after the sex to stay for the weekend. Nine months after their sexual encounter, she claimed to have been raped and mentioned his name following the breakup of a different relationship and her hospitalization for depression. She accused Paul during a conversation with her father, but accused another male student while speaking to a classmate. Witnesses reported nothing out of the ordinary that evening, no evidence of drinking, no impairment, not even anxiety about

AR_00000728

what had occurred. Her account itself was improbable, internally inconsistent, and contradicted by the evidence and the testimony of her own classmates. While from decades of work on rape and my women's rights advocacy, I understood that this young woman could be telling the truth—that her behavior in the days and weeks after the sex, and even her multiple accounts of what went on, could be explained by post-traumatic stress disorder, or simply embarrassment—her account seemed unlikely.

By the late 1980s, when the accusations against Paul were brought, the women's movement had succeeded in making some of the changes for which I and others had fought. The popular media finally reported on the horror of date rape and its consequences. District attorneys and police belatedly began to prosecute the offense. The definition of rape changed in states across the country, although progress was far from uniform. Gone was the mandatory corroboration requirement and limitless attacks on a woman's "chastity," whatever that meant in the late 20th century. Still, we were a long way from adequately dealing with these issues. There were many jurisdictions where change came slowly or not at all, where prosecutors and even courts not so subtly sided with perpetrators and blamed victims.

While I believed that Paul had been wrongly accused, and would be exonerated, true to my practice I declined to represent him. I asked one of my law partners to step in, and then watched with horror as the prosecution unfolded.

The atmosphere surrounding date rape had changed more dramatically than I had appreciated, at least in Massachusetts. The district attorney, though he fully understood the weaknesses of the case, felt compelled to bring the charges lest he face political repercussions, for being yet another politician ignoring a woman's pain. Even the grand jury ignored their serious doubts about the case and indicted Paul. As I later learned from one of its members, they felt comfortable indicting Paul because I was rumored to be representing him and they assumed he would be acquitted. And the judge—with life tenure—likewise felt the pressure. The judge was critical; my partner decided to waive the jury when a program on date rape was aired on the eve of the trial. While the judge expressed his skepticism throughout the trial—every single comment of his pointed to reasonable doubt about Paul's guilt—his verdict was "guilty." He did not say so explicitly, but the message seemed clear. If he

18

acquitted Paul, he would be pilloried in the press. "Judge acquits rapist," the headlines would scream. But if he convicted Paul, no one would notice.

## Just because the legal system has moved away from the view that all rape accusations are contrived does not mean it must move to the view that none are.

I took over the appeal. The brief my firm filed was what I described as a feminist brief: Just because the legal system has moved away from the view that all rape accusations are contrived does not mean it must move to the view that none are. This conviction was not just technically imperfect, I argued, it was a true injustice. I was successful. The Massachusetts Supreme Judicial Court reversed Paul's conviction on a procedural error, the trial court's evidentiary rulings. The prosecutor could have retried the case, but, thankfully, chose not to do so.

After decades of feminist advocacy (the case establishing the right to choose abortion in Massachusetts, the first introduction of Battered Woman Syndrome in a defense to a murder charge, and on and on), I was picketed by a women's rights group when I spoke on a panel following the reversal of Paul's case; I was a "so-called women's rights attorney," one sign announced, simply because I had represented a man accused of rape. When I explained why, including the fact that I believed he was innocent, a demonstrator yelled, "That is irrelevant!" The experience was chilling; to the picketers, a wrongful conviction and imprisonment simply did not matter. Paul would have been incarcerated, but for my firm's advocacy and the appellate court's independent review. Still, advocacy and appellate review could only go so far: Though the charges against Paul were dropped, he was expelled from the college he had been attending; he struggled to reapply years later and finally get his degree. Worse yet, he continues to suffer from the stigma of the accusation to this day, many, many decades later.

As a federal judge, I did not have much occasion to address the issues with which I had been so concerned as a lawyer. Rape is principally a state, not federal, crime. I did deal with accusations of sexual harassment in the

AR_00000730

workplace, fully appreciating the extent to which sexual harassment obstructs equal opportunity and discriminates against women.  I wrote articles decrying the state of civil rights enforcement in the federal courts. And on the criminal side, while I did everything I could to mitigate the harsh effects of onerous drug sentencing, I had no problem sentencing sex traffickers as harshly as the law allowed.

Still, I could not forget Paul's case. It shaped the context in which I saw the university sexual assault controversy.  As in the '80s, women mobilized against institutions that had woefully failed to deal with sexual violence and sexual harassment. While the movement had successfully raised public awareness about violence and harassment in homes, on the streets, and in workplaces, many police, prosecutors, and courts were stuck in an earlier era of victim-blaming. And progress seemed to have stalled at the doors of the academy, where at least some institutions still dissuaded women from bringing complaints while they shielded alleged perpetrators.

I n the summer of 2014, Harvard issued its new *Sexual Harassment Policy and Procedures.* It contained both new procedures for when students are accused of Title IX violations and new definitions of the covered conduct. While ostensibly in response to the Office for Civil Rights' pressures, they were released without OCR's approval. In some respects, they go beyond what the 2011 "Dear Colleague" letter spelled out.

OCR has clearly mandated that universities and colleges evaluate accusations of rape under a preponderance of the evidence standard. A preponderance of the evidence is in fact the lowest standard of proof that the legal system has to offer. In effect, if the evidence leans in favor of the victim to any degree, say 50.01 percent, that is sufficient. OCR's rationale was that this was the standard for suits alleging civil rights violations, like sexual harassment. True enough, except for the fact that civil trials at which this standard is implemented follow months if not years of discovery—where each side finds out about the other's case, knows the evidence and the accusations, and has lawyers to ask the right questions. Not so with the new Harvard regime, which has no lawyers, no meaningful sharing of information, no hearings. It is the worst of both worlds, the lowest standard of proof, coupled with the least protective

AR_00000731

procedures.

The new standard of proof, coupled with the media pressure, effectively creates a presumption in favor of the woman complainant. If you find against her, you will see yourself on *60 Minutes* or in an OCR investigation where your funding is at risk. If you find for her, no one is likely to complain.

But Harvard's new policy goes further than OCR's mandated preponderance standard. Harvard establishes a fact-finding process that takes place entirely within the four corners of a single office, the Title IX compliance office. The Title IX officer has virtually unreviewable power from the beginning of the proceeding to its end. The officer deals directly with the complaining witness, advises her, determines if the case should be investigated, proceeds to an informal or to a formal resolution. If there is a formal investigation, the Title IX officer appoints and trains the "Investigative Team," which consists of one investigator, who is also an employee of the Title IX office, and a designee of the school with which the accused is affiliated. The investigative team notifies the accused of the written charges, giving him one week to respond. While he has a short deadline, there is no time limit for the complainant's accusations, no period of time within which she must complain—what the law calls a statute of limitations.

Thereafter, the team interviews the parties and, if it deems appropriate, witnesses identified by the parties as well as any others it decides to consult. The team issues a final report on a preponderance standard and working jointly with the Title IX officer—who was in fact involved in the investigation throughout—may provide recommendations concerning the appropriate sanctions to the individual schools. There is an appeal, but it is to that same Title IX officer and only on narrow grounds. While the final sanction is determined by the individual school, the fact-findings on which that sanction is based—this critical administrative report—cannot be questioned.

As the letter of the 28 faculty members noted, this procedure does not remotely resemble any fair decision-making process with which any of us were familiar: All of the functions of the sexual assault disciplinary proceeding—investigation, prosecution, fact-finding, and appellate review— are in one office, we wrote, and that office is a Title IX compliance office, hardly an impartial entity. This is, after all, the office whose job it is to see to it

21

that Harvard's funding is not jeopardized on account of Title IX violations, an office which has every incentive to see the complaint entirely through the eyes of the complainant.

Nothing in the new procedure requires anything like a hearing at which both sides offer testimony, size up the respective witnesses, or much less cross-examine them. Nothing in the new procedure enables accuser and accused to confront each other in any setting, whether directly (which surely may be difficult for the accuser) or at the very least through their representatives. Nor is there any meaningful opportunity for discovery of the facts charged and the evidence on which it is based; the respondent gets a copy of the accusations and a preliminary copy of the team's fact findings, to which he or she can object—again within seven days, a very short time—but not all of the information gathered is necessarily included. Everything is filtered through the investigative team, which decides the scope of the investigation, the credibility of witnesses, and whom to interview and when.

ADVERTISEMENT

Nothing in the OCR's 2011 "Dear Colleague" letter called for a proceeding remotely like this. Indeed, the letter underscored the need for an "adequate, reliable and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence," and to have access to any information that would be used at the "hearing." And while the 2014 White House "Not Alone" report mentioned that some schools had a "single, trained investigator" doing "the lion's share of fact finding," as in Harvard's policy, it did not—and I would argue, should not—require such an approach.

Nor is there any meaningful role for lawyers in the Harvard policy. The parties may use a "personal adviser" who can be a lawyer, but that adviser may not speak for their advisees at the only relevant stage in this policy, the interview with the investigative team, "although they may ask to suspend the interviews briefly if they feel their advisees would benefit from a short

AR_00000733

break." (Indeed, this description sounds like a grand jury proceeding, which is notoriously one-sided, controlled entirely by the prosecutor with no role for the defendant's lawyer, within the hearing room.) Harvard makes no provision for representation of the accused, particularly for students unable to afford counsel, as the letter of the 28 professors notes. Richer students will have lawyers; poorer students will not. Nothing should prevent a university with Harvard's resources from providing lawyers for those who cannot afford them, as, for example, Columbia University does. In contrast, the complainant has advisers and advocates from the Title IX office at the outset of the proceeding, advocates especially provided for under the policy. The respondents are left to their own resources.

As the 28 law school faculty members' letter noted, even the definition of the misconduct is skewed. The new Harvard standards governing sexual conduct between students when both are impaired or incapacitated are "starkly one sided" and "inadequate to address the complex issues involved in these unfortunate situations involving extreme use and abuse of alcohol and drugs by our students." "Impairment" and "incapacitation" are not the same, under the law. Sex with an individual who is incapacitated or unconscious, who does not understand what is happening, is plainly egregious, and is rape by any modern definition. But "impairment" because of alcohol is surely a different matter. Worse yet, the policy is not equally applied: The accused's "impairment" based on drugs or alcohol is not at all relevant; it is not an argument for his "diminished capacity" as it might be under the criminal law of some jurisdictions. Instead, the policy treats him as if he were fully sober, fully responsible for his acts. The complainant's "impairment" is another matter. If both parties are drunk, but not unconscious, not incapacitated, and only impaired by their drinking, and they have sex, only he is responsible under Harvard's policy.

In fact, there is no reason to believe that the students themselves define what Professor Janet Halley of Harvard Law School calls "drunk/drunk" cases as rape at all. While 10 percent of female MIT undergraduates in a recent study identified themselves as having "been sexually assaulted," 44 percent reported having sex while being incapacitated by drugs or alcohol. Plainly, some of the students did not regard sex under those circumstances as sexual assault. The unfairness of this policy is nowhere clearer when the misconduct allegations

AR_00000734

are also the subject of a criminal investigation. The policy requires that the respondent be advised to get a lawyer—again on his own dime—before he provides any statement, but the investigation may well proceed at the discretion of the Title IX office. And should that investigation continue—given his silence—he stands a good chance of losing the disciplinary proceeding and being subject to academic sanctions. At the same time, should a legal prosecution end with dismissed charges or an acquittal, there is no provision for a reconsideration of the academic sanctions.

Sexual assault advocates will argue that this is as it should be. It will be traumatic for the complainant to confront her accuser, even if only through her representatives rather than directly. It will be traumatic for the complainant to be asked to repeat her story over again. A speedy resolution is critical to her recovery, they would suggest. These arguments, however, assume the outcome—that the complainant's account is true—without giving the accused an opportunity to meaningfully test it. However flawed, the way we test narratives of misconduct—on whichever side—is by questioning the witness, by holding hearings, by sharing the evidence that has been gathered, by giving everyone access to lawyers, by assuring a neutral fact-finder. While we know from the Innocence Project that even these "tests" can produce wrongful convictions, they are at least more likely to produce reliable results than the opposite—a one-sided, administrative proceeding, with a single investigator, judge, jury, and appeals court.

Indeed, the Office for Civil Rights has agreed to investigate a claim of a wrongful accusation of sexual assault at Brandeis University. A male student was found guilty of assaulting his ex-lover, also a man. He claims that the school's investigation was skewed, that he was not permitted to respond fully to the accusations, that his accuser had counsel while he did not, and that his counter allegations were not sufficiently credited in Brandeis's investigation. In effect, the complainant is arguing that a flawed, unfair process undermines his Title IX rights to equal participation in university life. While all of the details of the Brandeis complaint are not clear at this time, to the extent that Harvard's new procedures mirror those of Brandeis, Harvard may also be vulnerable to wrongful-accusation charges.

Some will say that all of this shows that a university has no business at all dealing with sexual misconduct accusations, which amount to a crime. The

24

AR_00000735

police should be called; the sanction should not simply be suspension or expulsion but prison. And in a criminal trial, there is no question about due process; the accused has the benefit of all the rights guaranteed in the Constitution. Indeed, Yale Law Professor Jed Rubenfeld argues that recourse to university remedies rather than a criminal prosecution for rape trivializes the offense, and may even enable serial predators to get away with their crimes.

Yet women are right to be skeptical about the criminal justice system—about full-blown criminal trials and appeals and the toll they take on witnesses and accusers, about the higher standard of criminal proof, beyond a reasonable doubt, which, though justified by the risk of imprisonment, can leave many claims un-redressed. To be sure, there is overlap between the two—when a student accused of misconduct under Title IX is also vulnerable to a criminal prosecution—but they cannot be mutually exclusive. In any event, Title IX's definition of sexual misconduct and sexual harassment is appropriately broader, more nuanced than even the recent statutory definitions of rape. While the colleges and universities abandoned their role as parens patriae (de facto parents) decades ago, in a sense, Title IX has invited them back in, policing sexual activities and misconduct—although, according to some commentators, not paying enough attention to the conditions that make that misconduct possible, like alcohol and drugs. Still, just because prison is not a risk hardly means that Title IX disciplinary proceedings are without serious consequences for those accused, and surely does not justify a process as one-sided as is Harvard's.

There are plainly other options, other ways of protecting the rights of both students who bring complaints and of those they accuse. The policy adopted by Oberlin College offers an instructive counter-example. This is all the more interesting, since Oberlin has a reputation as a left-wing and politically correct college. Indeed, the college was widely ridiculed last year when a professor proposed a conduct code requiring teachers to give "trigger warnings" when a class included material that might upset some students. (Oberlin quickly shelved that proposal.) Yet Oberlin's procedure on sexual misconduct may be a model for other schools.

Oberlin has devised a symmetrical due process proceeding. In language suggested by the students, the parties to the case are termed "reporting party" and "responding party" rather than victim and perpetrator. After a

25

preliminary assessment, designed both to provide support to the complainant and to determine whether there is reasonable cause to move to a fact-finding panel, a disciplinary proceeding may be called. Both parties may present information, call witnesses, and, in lieu of a cross-examination, may forward questions that they want the panel to ask the other party. The three panelists are trained administrators, none of whom is part of the Title IX office. "That would be a conflict of interest," says Meredith Raimondo, Oberlin's Title IX director. In the event that punishment is meted out, the responding party has the right of appeal to the dean of students, who is also not affiliated with the Title IX office. If the complainant feels the outcome is unfair, she may also appeal. This policy was created by a task force that included students, faculty, and administrators meeting over the course of 18 months. "We feel there can be great harm when the process is seen as biased against reporting parties," says Raimondo, "and there can be great harm when it is perceived to be biased against responding parties."

## We put our work at risk when the media can dredge up the shibboleths about false accusations of rape, a collective "We told you so" tapping into old attitudes.

F eminists should be concerned about fair process, even in private institutions where the law does not require it, because we should be concerned about reliable findings of responsibility. We put our decades-long efforts to stop sexual violence at risk when men come forward and credibly claim they were wrongly accused. We put our work at risk when the media can dredge up the shibboleths about false accusations of rape, a collective "We told you so" tapping into old attitudes. The recent feeding frenzy around Rolling Stone's account of a gang rape at the University of Virginia campus shows just how much damage can be done by the claim that a rape report was flawed—damage to the women making the accusations, to the men who are accused, and to the cause of combating sexual violence.

There is no question that we have to confront sexual misconduct on campus

AR_00000737

and elsewhere as aggressively and comprehensively as we can. There is no question that we have to lift the protection offered the star athlete, confront the administrators more concerned with the man's future than with a woman's trauma, challenge the atmosphere of impunity at fraternity houses and social clubs. And we can do so without turning every disciplinary proceeding into a full-blown trial, without imposing the maximum due process protections, on the one hand, or an administrative Star Chamber, on the other. It isn't necessary to jettison every modicum of a fair process to redress decades-long inattention to these issues. It never is. As I argued in Paul's case, we should not substitute a regime in which women are treated without dignity for one in which those they are accusing are similarly demeaned. Indeed, feminists should be concerned about fair process, not just because it makes fact-findings more reliable and more credible, but for its own sake.

*This article has been updated.*

# About Us

TAP                              Magazine

# Subscribe

Help support our non-profit journalism
- One year of our print magazine for $19.95
- One year of our digital magazine for $9.95
- a combined print/digital subscription for $24.95

Order Now

AR_00000738

# Topics

Politics
Economy
Labor
World
Race & Ethnicity
Gender & Sexuality
Cities & Communities
Education
Health & Social Policy
Religion
Immigration
Culture
Science, Tech, Environment

# Newsletters

Get the *Prospect's* newsletters free:
- Today's Prospect (Monday and Wednesday)

Or one or more of the following weekly newsletters:
- The Labor Prospect (Tuesday)
- The Democracy Prospect (Thursday)
- The Weekly Prospect (Friday)

Sign Up

AR_00000739

# TRADING THE MEGAPHONE FOR THE GAVEL
# IN TITLE IX ENFORCEMENT

*Janet Halley*[*]

When feminist advocates on campus sexual assault "speak truth to power," they speak for (and often as) victims and survivors. In that position, it's perfectly fair for them to pick and choose the constituencies to which they give voice. They can and should specialize. But as feminists issue a series of commands from within the federal government about what the problem of campus sexual violence is and how it must be handled, and as they build new institutions that give life to those commands, they become part of governmental power. Now that they have the power to adjudicate cases and determine sanctions, they are facing the full range of cases. For those feminists — and I would argue they should include, by now, the advocacy branch — the days of specialization should be over. It is time to govern. The current moment is a classic opportunity to observe how advocates turn their rhetorical tools and social-movement protest into institutional government.

The paradigm cases of the movement have been women drugged at fraternity parties and raped by groups of men, or women staggering home from these parties with the supposed help of men who proceed to rape them there. Included in that paradigm are women who have agreed to have some sex and find themselves forced to have much more, or much different, sex than they signed on for. If those were the only cases that the new system was destined to address, it would be no big deal to trade the megaphone for the gavel.

But there are lots of harder cases. How will feminists handle them? Denial and a taboo on blaming the victim have been the favored strategies among advocates: will their allure carry over into governance? My own hope is that governance feminists designing and running a new campus sexual assault establishment can acknowledge the full weight of the responsibility they are taking on.

In what follows, I set out "ideal types" of several species of "hard cases" I've encountered over the years of my involvement in sexual harassment enforcement, advocacy, scholarship, and teaching. Each of them will come up, some of them often, in the new Title IX student-discipline institutions. Moreover, each of them raises policy concerns

---

[*] Royall Professor of Law, Harvard Law School.

AR_00000740

that will never be addressed in the language of a single-purpose social movement but that are at the core of responsible government.

## CIVIL LIBERTIES FRAMED AS INDIFFERENCE TO ABUSED WOMEN

Consider the case of Anna, a freshman at Hobart and William Smith Colleges who reported being raped at a party in the first weeks of her freshman year. The *New York Times*'s bombshell article exposing this case — *Reporting Rape, and Wishing She Hadn't: How One College Handled a Sexual Assault Complaint*[1] — has become a rallying cry for reform advocates.[2] A reasonable conclusion from the *Times* article is that at least some institutions of higher education systematically undervalue victims, protect wrongdoers, and expose their women students — whether through misogyny and patriarchal bias, callous indifference, or sheer incompetence — to a male-dominant hostile environment.

But read more carefully, Anna's case is more ambiguous. To my mind, there is no question that she was raped, almost certainly by more than one man. Her injuries as reported by emergency-room personnel could not be explained any other way. The problem was figuring out how many people were involved, whether the encounters were consensual, and, if one or more sexual assaults occurred, who was responsible for them.

The prosecutor and the Colleges' Board collected different evidence in Anna's case, and the published record provides only glimpses of what they gathered.[3] But it seems clear that Anna was alleging sexual assault in two settings: first at a fraternity-house party, and later at a

---

[1] Walt Bogdanich, *Reporting Rape, and Wishing She Hadn't*, N.Y. TIMES, July 12, 2014, http://www.nytimes.com/2014/07/13/us/how-one-college-handled-a-sexual-assault-complaint.html.

[2] *See, e.g., Thoughts on Hobart and William Smith Colleges Case*, TITLE IX BLOG (July 14, 2014, 3:30 PM), http://title-ix.blogspot.com/2014/07/thoughts-on-hobart-and-william-smith.html [http://perma.cc/98FG-A2JY] (activist assessment); *see also, e.g.*, Edward F. Dragan, *Campus Sexual Assault and Harassment Lawsuits: Title IX Standards and Questions of Liability*, EDUC. EXPERT (Aug. 14, 2014), http://education-expert.com/2014/08/college-university-campus-sexual-assault-lawsuits-standards-care-questions-liability [http://perma.cc/F347-ENTH] (published advice to schools).

[3] In what follows, I rely on the *New York Times*' *Reporting Rape* story, *see supra* note 1, and disclosures made to the press by the prosecutor, R. Michael Tantillo, as reported in the local press, *see* Mike Hibbard, *DA Says No Basis for Sexual Assault Charge in HWS Case*, FINGER LAKES TIMES (July 21, 2014, 3:07 PM), http://www.fltimes.com/news/article_7f181016-0fc0-11e4-9637-001a4bcf887a.html [http://perma.cc/2DQE-2VHP], and on the Colleges' website, *see* Sean Carroll, *D.A.: The* New York Times *Got It Wrong*, HOBART & WILLIAM SMITH COLLEGES (July 21, 2014, 8:06 AM), http://www.hws.edu/news/media/r3wham.aspx [http://perma.cc/LUF6-DL6H]. For a refutation of Hibbard's claims, see *Inga Parsons' Complete Statement to the* Finger Lakes Times, FINGER LAKES TIMES (July 23, 2014, 10:55 AM), http://www.fltimes.com/hws_anna/article_142f7fe8-1275-11e4-8e86-0019bb2963f4.html [http://perma.cc/VU9H-NCPA].

AR_00000741

campus-wide party at a facility known as the Barn. Anna identified her alleged assailant at the fraternity party, but the prosecutor had testimony, some of which he disclosed publicly, that led him to believe that her sexual contacts there were consensual. The Board also could have heard that or similar evidence. The Board could have decided, even on a preponderance standard, that the contacts at the fraternity were not supported by enough evidence to hold the identified student responsible for wrongdoing.

In my own assessment of the published record, the Barn is almost certainly where Anna sustained the injuries discovered later at the hospital. Through alcohol-induced memory loss, however, Anna was unable to remember what happened at the Barn; according to the *Times*, she could not remember being there at all. Thus, for the contacts for which evidence of sexual assault was clear, the problem of identification looms large. Three students were suspected and questioned by the Board. The identity of one of them was supported by disclosures to Anna by a bystander who was present both at the fraternity house and at the Barn. He also told the prosecutor what he saw. But he refused to testify before the Colleges' Board. Anna testified to the bystander's identification, but, had the Board relied solely on that, it would have imposed a finding of responsibility on a student on the basis of Anna's report of the bystander's report — that is, on hearsay. The publicly available information provides not even that level of certainty about the other two students who were suspected. To be sure, some of the suspected students changed their stories as the police and Colleges' investigations proceeded, calling the credibility of their denials into question. But there was no direct evidence identifying them, or any other students present at the Barn, as Anna's assailant there. The Board could have decided, even on a preponderance standard, that it could not hold any *particular* student responsible. And that does not seem to me like shoddy or biased work: it seems like a reasonable call that college and university boards *should* make in cases where the identity of the wrongdoer cannot be established, lest they hold students responsible for expellable offenses on a guess.

Advocacy that blazons Anna's story as an open-and-shut case of rape makes complete sense: what happened to Anna was brutal victimization, pure and simple. A student culture in which a rape like this one can happen is seriously broken. But the story does not appear to be in fact what it stands for today in the debate over campus sexual assault: a paradigm instance of institutional failure to sanction wrongdoing. The firestorm of blame heaped on Hobart and William Smith bore an unacknowledged but alarming message: that the Colleges had

AR_00000742

to assign blame to one or more of their students despite their complete
lack of direct evidence about which of them actually deserved it.[4]

The furor over Anna's case amounts to pressure on schools to hold
students responsible for serious harm even when — precisely when —
there can be no certainty about who is to blame for it.  Such calls are
core to every witch hunt.  Speaking as a feminist governor to other
feminist governors,[5] I have this simple message: we have to pull back
from this brink.

### FACILITATING BIAS AGAINST AND DISPROPORTIONATE IMPACT ON SEXUALLY STIGMATIZED MINORITIES

From Emmett Till[6] to the Central Park Five,[7] American racial his-
tory is laced with vendetta-like scandals in which black men are ac-
cused of sexually assaulting white women that become reverse scan-
dals when it is revealed that the accused men were not wrongdoers at
all.  No reader of *To Kill a Mockingbird* should be able to forget how
this American classic convinces its readers that some of these accusa-
tions will be based on racially exploitative evasions of responsibility by

---

[4] *See, e.g., Rape on Campus: Anna's Trauma*, N.Y. TIMES, July 15, 2014, http://www.nytimes
.com/2014/07/16/opinion/the-rape-case-hobart-and-william-smith-and-readers-respond.html;
Jessica Wakeman, New York Times *Cover Story Reveals How Hobart & William Smith Massive-
ly Failed Student Rape Victim*, THE FRISKY (July 14, 2014), http://www.thefrisky
.com/2014-07-14/new-york-times-cover-story-reveals-how-hobart-william-smith-massively-failed-
student-rape-victim [http://perma.cc/564Q-JRNC]. Condemnation of college and university proce-
dures was premature in the notorious University of Virginia rape allegation as well. The melt-
down of the notorious *Rolling Stone* article about a brutal gang rape in a fraternity at the Univer-
sity of Virginia left readers unsure whether the harm suffered by the anonymous woman student
was fictitious, exaggerated, or somewhat accurately described but falsely attributed to members of
the fraternity named in the story. *See* Sabrina Rubin Erdely, *A Rape on Campus: A Brutal As-
sault and Struggle for Justice at UVA*, ROLLING STONE (Nov. 19, 2014),
http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119 [http://perma.cc/3GF4
-QVDB] (the original story); T. Rees Shapiro, *Key Elements of Rolling Stone's U-Va. Gang Rape
Allegations in Doubt*, WASH. POST (Dec. 5, 2014), http://www.washingtonpost.com/local/education/u
-va-fraternity-to-rebut-claims-of-gang-rape-in-rolling-stone/  2014/12/05/5fa5f7d2-7c91-11e4-84d4
-7c896b9oabdc_story.html [http://perma.cc/EF8C-JVWA] (the initial *Washington Post* story un-
dermining Erdely's account); Will Dana, *A Note to Our Readers*, ROLLING STONE (Dec. 5,
2014), http://www.rollingstone.com/culture/news/a-note-to-our-readers-20141205 [http://perma.cc
/P4L7-NL5V] (a partial retraction).

[5] For my argument that feminists sometimes do gain control over levers of power, see Janet
Halley, *Rape at Rome: Feminist Interventions in the Criminalisation of Sex-Related Violence in
Positive International Criminal Law*, 30 MICH. J. INT'L L. 1 (2008). The claim is not that femi-
nists then get everything they want; rather, that they have a will to power and sometimes succeed
in their efforts to become governors.

[6] *See generally* STEPHEN J. WHITFIELD, A DEATH IN THE DELTA: THE STORY OF
EMMETT TILL (1988).

[7] Robert D. McFadden & Susan Saulny, *A Crime Revisited: The Decision; 13 Years Later,
Official Reversal in Jogger Attack*, N.Y. TIMES (Dec. 6, 2002), http://www.nytimes.com/2002/12
/06/nyregion/a-crime-revisited-the-decision-13-years-later-official-reversal-in-jogger-attack.html.

AR_00000743

white women who willingly had sex with black men and then disavowed it as rape.

But nothing so malign need be at work when black men show up in the dock: morning-after remorse can make sex that seemed like a good idea at the time look really alarming in retrospect; and the general social disadvantage that black men continue to carry in our culture can make it easier for everyone in the adjudicative process to put the blame on them. Similar dynamics affect gay men, lesbians, and trans individuals: being attracted to them can so shock some people that the easiest way back to equanimity is to attack *them*. Remember *Boys Don't Cry*.

One of the most dangerous effects of the U.S. Department of Education Office for Civil Rights (OCR) campaign to force institutions of higher education to take sexual harassment and sexual assault on campus more seriously[8] is the idea — vividly manifested in the institutional reforms adopted at Harvard University last summer[9] — that a single-purpose Title IX office, specializing exclusively in sexual and gender-based harassment, is the right institutional response. Title IX, after all, is dedicated solely to sex discrimination;[10] the Harvard Title IX Office, dedicated exclusively to enforcing the University's new rules on sexual and gender-based harassment, has no mandate to ensure racial equality. Case after Harvard case that has come to my attention, including several in which I have played some advocacy or

---

[8] Of the OCR's documents on sexual harassment, only the 2001 *Revised Sexual Harassment Guidance* was ever opened for comment. *See* OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES 2 (2001), http://www2.ed.gov /about/offices/list/ocr/docs/shguide.pdf [http://perma.cc/67CH-9KKD]. The severe restrictions under which institutions now labor — for instance, the insistence on the notorious preponderance standard — emerged only in the 2011 Dear Colleague Letter and the 2014 *Questions and Answers on Title IX and Sexual Violence*, neither of which was ever opened for comment. *See* "Dear Colleague" Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [http://perma.cc /WQ79-SGXC] [hereinafter DCL]; OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE (2014), http://www2.ed .gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [http://perma.cc/JWS9-T2M2] [hereinafter Q&A]. However much the Department of Education says it is enforcing "the law" when it insists on compliance with the latter two documents, any administrative law student knows that it is in fact enforcing its own policy choices.

[9] In July of 2014, Harvard announced a new Sexual and Gender-Based Harassment Policy applicable to all who belong to the University community, whether as students, employees, or guests, and new Procedures for Handling Complaints Against Students. For Harvard's policies, see *Title IX & Gender Equity*, HARV. U.: OFF. ASSISTANT TO THE PRESIDENT FOR INSTITUTIONAL DIVERSITY AND EQUITY, http://diversity.harvard.edu/pages/title-ix-sexual -harassment (last visited Feb. 10, 2015) [http://perma.cc/8W4U-LFRX].

[10] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (2012).

adjudication role, has involved black male respondents, but the institution cannot "know" this because it has not been thought important enough to monitor for racial bias.

The best way to correct for this, in my view, is to reduce the Title IX Office to a compliance-monitoring role, and get it out of the business of adjudicating cases. (This would, incidentally, be entirely consistent with the OCR's announced policy documents.[11]) Cases should go to a body charged with fairness to *all* members of our community, and with particular charges not only to secure sex equality but also to be on the lookout for racial bias and racially disproportionate impact and for discrimination on the basis of sexual orientation and gender identity — not only against complainants but also against the accused.

## CASES INVOLVING SEXUAL MESSAGES
## THAT ARE CULTURALLY CODED

Campuses are multicultural environments, bringing together people from a wide range of backgrounds sounding in socioeconomic class, cultural and linguistic vocabularies, and historical experience. Across these cultural lines, communication about many things, including matters relating to sex, sexuality, and gender, can be torqued by the incommensurability of the parties' social codes and their inconsistent and even clashing sexual moralities. The question raised by the cultural defense in criminal law comes up here: when two cultures come into conflict over the meaning of a sexual encounter, which one wins? Adjudicators have to anticipate that their own experiences and biases may play a role in the way that they answer.

For example, a classic casebook rape case, *State v. Rusk*,[12] involved Pat, a white female complaining witness from a middle-class suburb outside Baltimore and Eddie, a white male defendant from a poor, inner-city background in Baltimore proper, a city notorious then and now for its toughness. When they met at a local bar, she was working as a secretary and he was out of work, trying to get by fixing and then selling cars he bought through the want ads. What makes this a classic casebook rape case is that the jury might not have believed Pat's testimony that Eddie threatened her physically (by taking her keys and "lightly choking" her when they were having sex); Eddie categorically denied ever doing either of these things and the jury could have thought that these actions were not proved beyond a reasonable doubt. It nevertheless convicted, and the only other evidence available to

---

[11] *See* DCL, *supra* note 8, at 7–8; Q&A, *supra* note 8, at 10–11, 25.

[12] 424 A.2d 720 (Md. 1981). For an in-depth analysis of this case, see Jeannie C. Suk, *"The Look in His Eyes": The Story of* Rusk *and Rape Reform, in* CRIMINAL LAW STORIES 171 (Donna Coker & Robert Weisberg eds., 2013).

AR_00000745

support the element of a threat of force was what Pat called "the look in his eye," that is, her entirely subjective belief that he was threatening her. *State v. Rusk* therefore raises the question: is entirely subjective evidence of a threat of force sufficient to establish guilt?

Many feminists have argued that Pat's subjective belief not only should but must suffice to establish a threat of force. But in this case — *if* it turns on a disagreement between Pat and Eddie about the significance of their gestures in a gendered script for communicating consent or nonconsent — that may mean committing the legal system to supporting Pat's white middle-class assumptions about how men and women communicate with each other when they go home together after a night out drinking, and to assigning to Eddie's understandings the moral freight associated with criminal negligence, recklessness, or even intentional coercion.

Is that what the legal system should be doing in a complex society marked by immense cultural diversity? Maybe not, or maybe not always. To the extent that the campus-sexual-assault movement expresses the priorities and visions of white middle-class women, it may not be providing us with everything we need to know to make fair decisions in cases involving class, race, and other key differences.

But current pressures are building a sex harassment enforcement system that is indifferent to these concerns. The OCR insists that all participants in the processing of sexual harassment complaints receive training that makes them competent to render prompt and equitable decisions,[13] and Harvard complies. I have a copy of the PowerPoint slides shown to colleagues at Harvard Law School in the Fall Semester of 2014, as the outline for their required training.[14] Approximately two-thirds of the document is devoted to quotations from OCR documents and the Harvard Policy and Procedures about the standard to apply and the procedures to be used. The remaining third of the document (and thus the entire remainder of the training) provides a sixth-grade level summary of selected neurobiological research. The takeaway lesson of these pages is that a victim of sexual assault may experience trauma, which in turn causes neurological changes, which in turn can result in "tonic immobility." Tonic immobility, in turn, can cause the victim to appear incoherent and to have emotional swings, memory fragmentation, and "flat affect." Her story "may come out fragmented or 'sketchy,'" and she can be "[m]isinterpreted as being cavalier about [the event] or lying." These problems, in turn, can

---

[13] DCL, *supra* note 8, at 4, 6, 12; Q&A, *supra* note 8, at 38–40.

[14] Mia Karvonides & William McCants, Harvard Law School Administrative Board Title IX Training (October 23, 2014) (on file with author).

AR_00000746

cause police and sexual harassment investigators to dismiss serious claims, tragically because of symptoms of the trauma itself.[15]

So far, that is the only training provided to Harvard personnel handling sexual harassment claims directed to the social and psychological dynamics surrounding sexual assault. It is 100% aimed to convince them to believe complainants, precisely *when* they seem unreliable and incoherent. Without disputing the importance of the insights included in this section of the training, one can ask: precisely what do they prove? Surely not a claim that, *because* a complainant appears incoherent and unreliable, she *has* been assaulted. Meanwhile, the immense social, cultural, and psychological differences that can affect the credibility and coherence of *both* parties' accounts do not seem, yet, to warrant any mention. On all of those, cultural incompetence is okay.

### Cases Involving Drinking and/or Drugs

This very large class of cases includes sexual intercourse or other sexual contact with persons who have been administered mind-altering substances without their knowledge or consent. It is such a grave wrong to impose that experience, along with its vulnerabilities, on another person without their knowledge and consent that I think we can all agree those are among the easy cases: anyone who does that and proceeds to have sexual contact with his victim is a serious wrongdoer. Also among the easy cases: someone having sex with an unconscious person who has not, before falling asleep or passing out, given consent to such contact. No question, people who do either of these things are serious wrongdoers.

But let's expose ourselves to the harder cases, where a person complaining about sexual contact as unwanted, unconsented to, or in any other way wrongful, was at the time of the conduct *voluntarily* altered by drugs or alcohol. It includes sexual contact with a person who is not unconscious but severely impaired. Ditto but only somewhat impaired. It includes people whose preferences and judgments differ in their substance-affected state from those they would have entertained or made while stone-cold sober. It embraces cases brought by women who have willingly consumed drugs and/or alcohol, and who gave their assent to sexual activity (in the sense that they signaled willingness or desire), but who did not consent (that is, they did not actually subjectively give a free consent to engage in sexual activity),[16] or who were confused about whether to consent or not but who "went along"

---

[15] *Id.*

[16] *See* Mark Kelman, *Thinking About Sexual Consent*, 58 STAN. L. REV. 935, 946 (2005) (book review).

AR_00000747

(that is, assented without making a decision either way) because they feared social conflict or social awkwardness if they didn't accede to importunities for — or accept gentle offers of — sexual contact. It includes women who assented and consented competently after consuming alcohol or drugs and who, on becoming sober the next day — or months, or even years, later — sincerely reject that idea that they *could have* consented. It includes women who did all of that and now — the next day, or months, or even years later — reject the idea that they *should have* consented and enter into a state of bad faith denial of the fact that they *did* consent. It even, apparently, includes at least one woman whose *mother* rejected the idea that her daughter should or could have consented, and who insisted that her daughter submit a sexual assault complaint to signal moral rejection of the sexual conduct in question.[17]

The cases differ, moreover, in the degree of incapacitation and/or impairment, and this is not merely a factual but also a morally difficult definitional question. Setting aside sex with unconscious persons and persons deliberately intoxicated without their knowledge and consent (the easy cases), we could say a person is incapacitated only when rendered physically incapable of intentionally signaling her consent: "falling down drunk." Or we could say that she is incapacitated whenever she has lost any of the capacity to reason that she enjoys while stone-cold sober. Or we could set the breaking point somewhere on the spectrum between these two extremes. Thus, we could distinguish incapacitation and impairment, reserving the former for some extreme state of mental and/or physical dysfunction, and recognizing impairment along a spectrum of differences from the person's (or the average person's) reasoning capabilities while stone-cold sober. We could say that she has to be *really* impaired or only a *little* impaired to be held incapable of giving consent (even if she did assent or even consent). We could assume she was impaired simply because the consumption of drugs and/or alcohol, in any appreciable amount, does in fact alter one's preferences.

Compound all of that with the differences between incapacitation or impairment, however we define them, *at the time*, with a frequent concomitant of heavy drug and alcohol use: *memory loss*. This poses more than merely evidentiary problems and credibility issues in cases involving alcohol and drug use, though those are severe enough in themselves. Do we want to say that the sex assented to and engaged in by a person who forgets most or all of the details the next day

---

[17] *See* Emily Yoffe, *The College Rape Overcorrection*, SLATE (Dec. 7, 2014, 11:53 PM), http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html [http://perma.cc/M3WM-BTHB]. The accused in this case was held responsible and expelled. *Id.*

was — for the reason of memory loss alone — done by a person who was morally or legally incapacitated?  Sometimes we will say yes, for instance when we think that memory loss was caused not by drinking or drug use but by psychological dissociation from intensely aversive experience.  But what if it is selective; what if it is self-serving; what if it is motivated by unconscious racial bias or by a felt need to disavow shame, avert a *crise de conscience*, or pacify an angry parent, spouse, or partner?

I have arrayed these cases on three spectrums from easy to hard: first by the character of the alleged victim's assent and consent (*vel non*); second by the degree to which we are willing to say she was sufficiently incapacitated or impaired that we are willing to set aside the fact of assent and/or consent; and third by the degree to which we are willing to say that memory loss reliably indicates lack of consent. Many would say that, toward the end of my sequences, we are back in the range of easy cases, though easy now because they are prepared to say that no valid claim of sexual misconduct should be based on the "case types" appearing there.[18]

I think it's merely irresponsible to dismiss this difficult range of cases by saying that women students are being slipped date-rape drugs in numbers so high that the difficult ranges of my three spectrums are, in real life, null sets, or even so small that they can be administratively assimilated to the date-rape-drug cases.[19]  No: young women are willingly drinking heavily and using powerful drugs.  So are young men. It is an immense public health problem.

This raises a final layer of difficulty: by far most of these cases arise in a student drinking culture that promotes heavy drinking and drug use — often rising to the level of *extreme* drinking and drug use — precisely for the disinhibition and altered consciousness that

---

[18] Query whether the case reported in this article is hard or easy: Nicole Ng & Vivian Wang, *Enough Alcohol to Call It Rape?*, YALE DAILY NEWS (Nov. 7, 2014), http://yaledailynews .com/blog/2014/11/07/after-uwc-complaint-two-students-wait [http://perma.cc/266G-RHR8]. Here, a woman undergraduate at Yale drank until she was "hammered" and then contacted a male student she had just broken up with, sending a series of text messages that she claimed were efforts to deflect any resumption of sexual relations but that read to me like come-ons.  The recipient testified that he thought they manifested ambivalence.  He knew she had been drinking but not how much: the testimony supporting her claim that she was extremely inebriated was from the complaining witness herself and friends who had not been eyewitnesses.  She invited him to her room, and he testified that she initiated sexual contact when they entered it together.  She thought that her having no memory of this meant that the factfinder was required to find that it hadn't happened.  The Yale sexual harassment process resulted in a finding of no violation.  Nicole Ng & Vivian Wang, *After Holloway Sides with UWC, Complainant Elects Against Appeal*, YALE DAILY NEWS (Nov. 13, 2014), http://yaledailynews.com/blog/2014/11/13/uwc-appeals-process-questioned [http://perma.cc/H9DA-RSFW].

[19] *See, e.g.*, Diane L. Rosenfeld, *Uncomfortable Conversations: Confronting the Reality of Campus Sexual Assault*, 128 HARV. L. REV. F. (forthcoming 2015).

they provide.  Students consuming these substances at large parties or in their own rooms with a few friends may want the titillation and have no plans to engage in sex; some may also intend to have a lot of sex, intimate or casual; many may take a "wait and see" attitude about adding sex to the general revels.  But the drinking culture means that, in case after case, *both the complainant and the respondent* were voluntarily ingesting mind-altering substances.

And now look at the Harvard University Policy's language governing cases of incapacitation and impairment:

> [W]hen a person is so impaired or incapacitated as to be incapable of requesting or inviting the conduct, conduct of a sexual nature is deemed unwelcome, provided that the Respondent knew or reasonably should have known of the person's impairment or incapacity.  The person may be impaired or incapacitated as a result of drugs or alcohol or for some other reason, such as sleep or unconsciousness.  A Respondent's impairment at the time of the incident as a result of drugs or alcohol does not, however, diminish the Respondent's responsibility for sexual or gender-based harassment under this Policy.[20]

This language supposedly settles all the hard questions I have been asking by tilting a per se rule in favor of the complainant and an irrebutable presumption against the respondent.  But it leaves open every application I've imagined on all three of my spectrums.  You could limit the scope of this paragraph by interpreting it to say that if the complainant *did* request or invite, she was *capable* of requesting or inviting: assent would bar a finding of unwelcomeness.  But a far more expansive understanding is also completely possible, allowing every single case on all three of my spectrums to lead to a finding that conduct was unwelcome *solely* because of the complainant's drug or alcohol consumption.  You could intensify the pro-accuser effect of that interpretation by also denying the accused any mitigation because of his.  Similarly, a narrow or expansive interpretation could be given to respondent's knowledge or imputed knowledge of complainant's incapacity or impairment.  These are not just fact questions; they are policy choices.

But note also the steep asymmetry between the consequences of drinking and drug use for the complainant and for the respondent: for the former, intoxication is, to one degree or another, the basis for a per se finding of unwantedness even when assent — even when *consent* — has been given; but for the latter, it has no mitigating effect on his conduct.  And now let us say that two Harvard students — one male, one female — have sex after drinking, using drugs, or both, that

---

[20] HARVARD UNIV., SEXUAL AND GENDER-BASED HARASSMENT POLICY 3 (2014), http://diversity.harvard.edu/files/diversity/files/harvard_sexual_harassment_policy.pdf [http://perma.cc/YF8T-VPC2].

each of them feels intense remorse and moral horror about it afterward, and that they both rush the next morning to the Title IX Office with
complaints. Let's say they drop their complaints on the receptionist's desk simultaneously. Which of them gets the benefit of the per se imputation of unwelcomeness, and which of them carries the heavy handicap of no mitigation? The woman and not the man? Both of them? Neither?

I think this mental experiment reveals that a bias in favor of complainants and against respondents is embedded in this rule — a bias that almost certainly aligns with a bias for women and against men in the design of the Harvard paragraph on intoxication. *When so much of the drinking and drug use by students in the contemporary cultural scene is actively sought out by men and women alike*, and when so many of the sexual encounters are fueled by heavy consumption of consciousness-altering substances *by both parties*, I think feminist governors have to think hard about what they are doing when they try, through provisions like this and by advocating their expansive interpretation, to predetermine women as victims and men as wrongdoers.

One justification for biasing the system to favor women and disfavor men is a perception that, in the campus drinking culture, men have more power than women, along with a social-change intuition that a rule shifting bargaining power over sex decisions from the former to the latter, precisely through the threat of predetermined victimhood and guilt, will be an effective way to change that culture. This logic makes sense: get them by the balls and their hearts and minds will follow. But it is not cost free. It entails a decision to impose a serious moral stigma and life-altering penalties on men who may well be innocent. Doing this will, in turn, delegitimize the system. And it entails a commitment to the idea that women should not and do not bear any responsibility for the bad things that happen to them when they are voluntarily drunk, stoned, or both. This commitment cuts women off — in theory and in application — from assuming agency about their own lives. Since when was that a *feminist* idea?

## CASES ARISING FROM THE BREAKUP OF LONG-TERM INTIMATE RELATIONSHIPS

Where there is no evidence of physical abuse, accusations of sexual misconduct arising after the breakup of long-term relationships can — and *should be* — very hard to sort out. These cases involve not only what he or she says happened but what he or she says it *meant* in the private language of each relationship. The adjudicator steps into a *Rashomon*-like maze in which identical episodes have such dramatically different valences that both sides can be truthfully and credibly telling their own understandings and experiences without offering a

AR_00000751

decisionmaker any plausible basis of decision other than his or her own cultural assumptions and biases.  I have participated in some cases that seemed to boil down to whether or not the adjudicator understood projective identification — the psychic dynamic in which one partner to an intense intimacy projects *into* the other his or her own fears of and desires for the other, successfully soliciting that person to receive, reproduce, ratify, or enact those fears or desires.[21]  Projective identification profoundly confuses the self/other distinction, establishing a kind of intersubjectivity that baffles efforts to determine that patterns in the relationship originated in *one* of the partners and *not* the other.  And no one participates in the management of high-conflict *divorces* without taking into account the role of spite in some spouses' negotiation and litigation strategies[22] — but somehow we have imagined sexual harassment charges to be pure of distorting motives like these.

None of this is to deny that some breakups are precipitated or accompanied by acute sexual harassment, everything from quid pro quo to subtle but disadvantaging use of institutional power.  But sometimes it's just an immiserating breakup, morphed into the form of a sexual misconduct charge.

## IMPACTS WITHOUT MISCONDUCT

Here is the case that woke me, personally, up to the dangers of an unthinkingly broad, advocacy-based definition of sexual harassment.  An employee, who disclosed eventually that she had been the victim of sexual abuse as a child and was ever-vigilant about her personal security, brought repeated complaints of sexual harassment against male faculty.  She experienced being physically bumped by a male faculty member in the tight quarters of a copy room to be a sexual assault so humiliating that she could not communicate directly any more with that person.  Hallway eye contact that lasted too long had the same effect on her — giving rise to an accusation against another faculty member for repeated unwanted sexual conduct.  Eventually we realized that these complaints would keep coming in and, on investigation, keep failing to meet any reasonableness standard.  It was a tragic situation — the episodes were both severe and persistent for her, and severely limited her work activities, but we could not keep entertaining the idea that they were sexual harassment.

---

[21] *See* Jean Laplanche & Jean-Bertrand Pontalis, THE LANGUAGE OF PSYCHOANALYSIS 356–57 (Donald Nicholson-Smith trans., W.W. Norton & Co. 1973) (1967) (entry on "Projective Identification").

[22] *See* Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950, 968, 974, 976 (1979).

AR_00000752

It is not at all clear to me that this case, which occurred more than a decade ago, would be handled the same way today. Then, we were working in a framework that required sexual harassment enforcers to identify a wrongdoer. But the "prevention" branch of hostile environment policy emanating from advocates and the OCR[23] is eroding the link between harm and wrongdoing. Increasingly, schools are being required to institutionalize *prevention*, to control the *risk* of harm, and to take regulatory action to protect the *environment*. Academic administrators are welcoming these incentives, which harmonize with their risk-averse, compliance-driven, and rights-indifferent worldviews and justify large expansions of the powers and size of the administration generally.

I recently assisted a young man who was subjected by administrators at his small liberal arts university in Oregon to a month-long investigation into all his campus relationships, seeking information about his possible sexual misconduct in them (an immense invasion of his and his friends' privacy), and who was ordered to stay away from a fellow student (cutting him off from his housing, his campus job, and educational opportunity) — all because he *reminded her* of the man who had raped her months before and thousands of miles away. He was found to be completely innocent of any sexual misconduct and was informed of the basis of the complaint against him only by accident and off-hand. But the stay-away order remained in place, and was so broadly drawn up that he was at constant risk of violating it and coming under discipline for *that*.

When the duty to prevent a "sexually hostile environment" is interpreted this expansively, it is affirmatively indifferent to the restrained person's complete and total innocence of any misconduct whatsoever.

In a related development, OCR increasingly implies that the only adequate "interim measure" that can protect a complainant in the Title IX process is the exclusion of the accused person from campus pending resolution of the complaint. To be sure, in these cases the accused may eventually be found to be responsible for violations, sometimes very serious ones. But advocates and the OCR are arguing that *all* complainants are trauma victims subject to continuing trauma if

---

[23] In dealing with sexual harassment, schools must "end such conduct, prevent its recurrence, and address its effects." DCL, *supra* note 8, at 2. OCR advises that schools' basic obligations are to "end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities." Q&A, *supra* note 8, at 2–3.

AR_00000753

the persons they accuse continue in school: merely "seeing" the harasser is deemed traumatic.[24]

These cases are becoming increasingly easy.   Interim measures and environmental security provisions are justified as "merely administrative," the equivalent of determining that more lights should be installed on campus walkways or that food safety certificates should be required for all vending machines.   And like merely administrative acts conducive to public safety, they follow a strict liability model. But ending or hobbling someone's access to education should be much harder than that.   It may well be that the only effective way to convince people that this tendency is dangerous is to point to the rights they invade: rights to privacy, to autonomy, to due process.   But the tendency *itself* is due for scrutiny.   *Assuming* danger, risk, and holistic environmental contamination ensures that restrictions will go into effect even where the facts don't justify them.   Will decisionmakers — and in particular governance feminist decisionmakers — be able to resist this trend?

---

[24] DCL, *supra* note 8, at 13 n.33.

AR_00000754

The College Sex Bureaucracy - The Chronicle of Higher Education

# THE CHRONICLE OF HIGHER EDUCATION

SUBSCRIBE TODAY FOR 🔒 PREMIUM ACCESS

LOG IN    SUBSCRIBE

☰ SECTIONS    THE CHRONICLE REVIEW: **THE COLLEGE SEX BUREAUCRACY**

**THE CHRONICLE REVIEW**

# The Sex Bureaucracy

## To fight assault, the feds have made colleges clumsy monitors of students' sex lives.

*By Jacob Gersen and Jeannie Suk Gersen* | JANUARY 06, 2017  ✔ PREMIUM



André Chung for The Chronicle Review

Often with the best of intentions, the federal government in the past six years has presided over the creation of a sex bureaucracy that says its aim is to reduce sexual violence but that is actually enforcing a contested vision of sexual morality and disciplining those who deviate from it.

Many observers assume that today's important campus sexual-assault debate is concerned with forcible or coerced sex, or with taking advantage of someone who is too drunk to be able to consent. But the definition of sexual assault has stretched enormously, in ways that would have been unimaginable just a few years ago. Indeed, the concept of sexual misconduct has grown to include most voluntary and willing sexual conduct.

Behind this elastic idea of sexual misconduct is a web of well-meaning federal statutes, especially Title IX, which prohibits sex discrimination in education, and the Violence Against Women Act, which, in its 2013 reauthorization, requires colleges to publicly disclose how they define, prevent, investigate, and discipline sexual misconduct. Under President Obama, the Department of Education's interpretations of those laws have greatly expanded the control exercised by the federal government over sexual conduct.

AR_00000755

1/6/17, 8:55 AM

In essence, the federal government has created a sex bureaucracy that has in turn conscripted officials at colleges as bureaucrats of desire, responsible for defining healthy, permissible sex and disciplining deviations from those supposed norms. The results are not only cringeworthy but also unfair, potentially racially discriminatory, and detrimental to the crucial fight against sexual violence.

# College officials have been conscripted as bureaucrats of desire. The results undermine the fight against sexual violence.

With a new administration set to take office, a host of open questions arises about what President-elect Donald J. Trump and his appointees will do with the sex bureaucracy's reins. Will they stay the course? Will they abandon the current trajectory, lessening the role of the federal government in establishing norms of sexual conduct? Or, as seems more likely, will they use the extensive administrative apparatus at their command to advance a different, retrograde vision of sexual morality?

Title IX became law in 1972. Since then, what it means to discriminate "on the basis of sex" has evolved through a process of judicial and agency interpretation. Today the phrase "Title IX complaint" commonly refers to an allegation of sexual misconduct by one college student against another, but this view was alien at the time of the law's enactment. The Department of Education's Office for Civil Rights, known as OCR, is the lead agency for Title IX. Early regulations implementing Title IX required colleges to establish their own internal grievance procedures, so that individuals would have a forum to complain about their institution's sex discrimination.

Since the 1990s, OCR and the courts have established that sex discrimination under Title IX includes sexual harassment. As a result, the mandate not to discriminate on the basis of sex includes a college's obligation to ensure that harassing conduct by employees or students doesn't create a hostile environment. According to this legal logic, if a college did not have effective policies and procedures in place to address

AR_00000756

harassing conduct that is pervasive or severe enough to create a hostile environment, the college would be discriminating on the basis of sex and in violation of Title IX.

In 2011, OCR announced a spate of new interpretations of Title IX in its "Dear Colleague" letter explaining how colleges that receive federal funds must address allegations of sexual violence. The letter argued that because sexual violence is a form of sexual harassment, colleges' responses to sexual violence are also governed by Title IX's ban on sex discrimination. Most colleges have long had procedures to handle student discipline, including for sexual assault and other sexual misconduct. But the 2011 "Dear Colleague" letter made clear that a college's sexual-conduct policies, including the investigatory and disciplinary processes, are mandatory and dictated by OCR's interpretations of Title IX, whatever they might be. Before 2011, OCR had taken inconsistent positions on what was required of colleges, sometimes stating even that they were "under no obligation to conduct an independent investigation" of an allegation of sexual assault if it "involved a possible violation of the penal law, the determination of which is the exclusive province of the police and the office of the district attorney."

The past five years have seen hundreds of investigations into colleges whose sexual-misconduct policies and procedures differ from OCR's wishes. Although many investigations remain unresolved, the modus operandi has been to announce an investigation and then negotiate college-by-college "resolution agreements" — lengthy documents that specify the defects in the college's sexual-conduct policies and procedures and include an agreement that the institution will take specific steps to ensure compliance with OCR's views. The office has no legal authority to force colleges to do anything that the law — whether a statute or regulation — does not mandate. But it has pressured colleges to take measures that are clearly beyond what the law requires, and colleges have entered these resolution agreements "voluntarily" to resolve OCR investigations and avoid public-relations nightmares. For example, OCR told colleges to put in place measures that, as the "Dear Colleague" letter put it, "may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment." In other words, Title IX compliance meant disciplining "potentially problematic conduct" *before* it became unlawful.

AR_00000757

Case 3:18-cv-00535-JSC    Document 134-4    Filed 06/03/19    Page 288 of 312          1/6/17, 8:55 AM

As part of a federal investigation, OCR sent a letter to the University of Montana in 2013 stating that, rather than limit sexual-harassment claims to unwelcome conduct that creates a hostile environment, the university should define sexual harassment "more broadly" as "any unwelcome conduct of a sexual nature." By that definition, touching a person's hand during a date in a romantic way, sending a text message expressing romantic attraction — or, for that matter, asking for consent to have sex, could qualify as sexual harassment, and has, on some campuses. The college's failure to prohibit, investigate, and discipline this conduct would then be unlawful, according to OCR's broad definition, even if the conduct itself had not created a hostile environment.

**Under the rubric of preventing sexual violence, colleges are now deep in the business of providing advice on sex and relationships. And they're not good at it.**

OCR explicitly made the Montana letter a "blueprint" for the reform of other colleges' sexual-misconduct policies, and the push to expand the definition of sexual harassment has steadily continued. On September 9, 2016, OCR informed Frostburg State University that it was violating Title IX because its sexual-harassment policy stated that "in assessing whether a particular act constitutes sexual harassment forbidden under this policy, the rules of common sense and reason shall prevail." The university's policy continued: "The standard shall be the perspective of a reasonable person within the campus community." Could it really be that a university engages in sex discrimination by using the perspective of a reasonable person to evaluate conduct, a standard that has long been a key feature of sexual-harassment law, civil tort law, and criminal law?

The sex bureaucracy's insistence that using reasonableness and common sense is illegal would be amusing if the stakes for individuals and institutions were not so high. The lives of both individual complainants and students accused in the complaints are often seriously altered by findings or nonfindings of responsibility for sexual misconduct. In addition to the

AR_00000758

Case 3:18-cv-00535-JSC   Document 134-4   Filed 06/03/19   Page 289 of 312

reputational costs of being seen as soft on sexual violence, colleges have been threatened with defunding by the federal government if they maintain policies and procedures that do not satisfy OCR. And colleges are now regularly defending lawsuits brought by students disciplined under the very procedures that colleges adopted to appease OCR.

Because sex without consent is sexual assault, and sex with consent is just sex, the meaning of consent carries the weight of nearly the entire legal regime. How to define and evaluate consent is a subject of legal, political, and cultural dispute. While regulations that implement the Violence Against Women Act of 2013 require colleges to publish a definition of consent for purposes of disciplining sexual misconduct, the government has not provided a universal definition. Each college has been left to come up with its own, and some have produced definitions that seem to prohibit the vast majority of actual sexual conduct.

As consent became the distinguishing feature of permissible sexual conduct, many colleges, parents, and advocacy groups offered common-sense advice: If there is any ambiguity about consent, stop. Don't take the absence of "no" to mean "yes." Make sure your partner is not just willing but enthusiastic. Soon, asking for and receiving a clear "yes" for each discrete act during a sexual encounter became a common requirement. At some colleges, enthusiasm became not just precautionary advice but also a definitional requirement of consent itself. Here, for instance, is the University of Wyoming's version: "Anything less than voluntary, sober, enthusiastic, verbal, noncoerced, continual, active, and honest consent is Sexual Assault." By that standard, moving forward even after a clear assent that is less than enthusiastic is, by definition, sexual assault.

So, too, could be sexual conduct with someone who is not completely sober or who agrees to have sex after repeated requests (potential pressure constituting coercion). Because some colleges' expansive definitions render much if not most sex that occurs on campus a technical violation of the rules, there is wide discretion and leeway for a participant in a sexual encounter to interpret or label the incident as sexual misconduct. This definitional overinclusiveness makes it difficult for both colleges and students to distinguish serious cases of sexual assault and harassment from cases in which the absence of affirmative or enthusiastic agreement

AR_00000759

nonetheless accompanied a genuinely voluntary decision to engage in sexual conduct. Students who wereat the time willing to have sex can still bring complaints against their partners, and under the college's rules, such complaints should be considered valid.

If the difference between consent and nonconsent turns on whether agreement to each discrete act (e.g., kiss, touching of each body part, penetration) in a sexual encounter was affirmative or enthusiastic, we will increasingly see students who believe they were victimized after they willingly engaged in sexual activity. One might ask, if a person was actually willing, why would he or she afterward bring a complaint? It is not because the complaint is fraudulent, but because a common feature of human sexuality is ambivalence — both wanting and not wanting at the same time, or wanting at one time and later wishing one hadn't. This is an acute and pervasive challenge for college administrators, because legal ambiguity and sexual ambivalence are a dangerous combination. When everybody is technically violating an overly broad policy but only a small and unpredictable subset is investigated and disciplined for it, largely at the discretion of the partner who decides whether to complain, the results will not be fair. Worse, it distracts from the important fight against sexual violence and erodes the legitimacy of serious efforts to combat it.

You may think that an enlarged definition of sexual assault, even one that leads to incidents of overpunishment, is acceptable if it also reduces sexual violence against women. But sexual-conduct policies are gender neutral. Women who do not receive affirmative consent for each step of a sexual encounter with a man, or if the man was not entirely sober, have also violated those policies. Men are beginning to file Title IX complaints against women, because, according to the absurdly broad policy definition, they can claim to have been sexually assaulted.

A set of adjudicatory procedures that are fair, neutral, and rigorous could serve as a check, albeit imperfect, on vague and overinclusive policy definitions. Even if most sexual encounters could formally qualify as sexual misconduct, robust and rigorous adjudication might accurately sort cases that are worthy of discipline from those that are not. Unfortunately, since 2011, colleges have adopted inadequate and unfair procedures, perhaps in overzealous efforts to avoid negative attention by OCR.

AR_00000760

1/6/17, 8:55 AM



André Chung for The Chronicle Review

Many students disciplined under these new policies have sued their colleges, arguing that the procedures used to investigate and adjudicate the complaints were unfair and unlawful. Such cases provide a glimpse both at the sexual conduct that is being disciplined by the sex bureaucracy and at how the campus adjudicatory process holds up in court.

In one federal case in 2015, a male student sued Washington and Lee University after being expelled for "nonconsensual sexual intercourse" with a female student. His court complaint claimed that the university's Title IX officer in charge of the proceeding had earlier given a presentation arguing "regret equals rape," a position she framed as "a new idea everyone, herself included, is starting to agree with." The complaint said the officer, citing an article titled, "Is It Possible That There is Something In Between Consensual Sex and Rape … And That It Happens to Almost Every Girl Out There?," from a website called Total Sorority Move, had suggested "that sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express."

The accused student claimed that the Title IX officer had not shown him a copy of the accuser's complaint in a timely fashion, refused his request to have a lawyer participate in the proceedings, failed to interview several of his suggested witnesses, selectively omitted facts from the investigative report, denied his request to record the hearing, and hindered him from putting questions to the accuser, who attended the hearing behind a partition. After the court denied the university's motion to dismiss the case, the parties settled.

Another federal case last year involved two male undergraduates at Brandeis University who had a sexual relationship that lasted almost two years. After they broke up, one of them attended a campus session on sexual assault, and his thinking about his former boyfriend began to change. He filed a complaint with the university, alleging "numerous

AR_00000761

inappropriate, nonconsensual interactions" during the relationship. While sleeping together, he said, his boyfriend occasionally woke him up with kisses, and sometimes continued kissing him when he wanted to go back to sleep. When they showered together, his boyfriend looked at his genitals. At the start of their romance, his boyfriend once put a hand on his clothed groin while they watched a movie together. A year and a half into their relationship, his boyfriend once tried to perform oral sex when the accuser didn't want it, and they quarreled and then made up.

The university found the accused ex-boyfriend "responsible" in each of these incidents and placed a record in his student file that he had been disciplined for "sexual misconduct, lack of consent, taking advantage of incapacitation, sexual harassment, physical harm, and invading personal privacy." On

## What will the Trump administration do with the sex bureaucracy he's inheriting?

social media and elsewhere, the accuser referred to himself as a victim of sexual assault and called his ex-boyfriend his "attacker," "rapist," and "a threat to the safety of the well-being of the entire campus." The accused student filed a federal lawsuit against the university. In refusing to grant the university's motion to dismiss the suit, the judge found plausible the accused student's claim of unfair procedures, including Brandeis's failure to give him notice of specific charges, allow him to have counsel, or permit him to cross-examine the complainant or witnesses. The student then dropped the lawsuit, because, given the cost of continuing it, he felt vindicated by the court's ruling.

In September, a federal judge concluded that Brown University had breached a student's reasonable expectations about the university's disciplinary process by applying a new affirmative-consent definition to an earlier incident. Brown's new definition specified that consent obtained through "manipulation" was invalid; in a text exchange before the sexual encounter, the female complainant told the male student that he was trying to manipulate her, and he responded, "I'm trying to manipulate you a lot." Finding that the accused student's responsibility for sexual misconduct very likely turned on Brown's use of the new consent definition, the court held

AR_00000762

Case 3:18-cv-00535-JSC   Document 134-4   Filed 06/03/19   Page 293 of 312

that he was entitled to a new hearing. In November, another federal court held that the University of Cincinnati's failure to allow an accused student to put at least written cross-examination questions to the complainant violated constitutional due process.

On both procedural and substantive grounds, courts applying federal and state law have increasingly recognized unfairness in sexual-misconduct policies and practices adopted by colleges. And in October, in the wake of multiple court decisions in favor of accused students during the past year, OCR itself found that Wesley College, in Delaware, had violated Title IX with the unfair procedures it used to expel a male student accused of live-streaming without consent an otherwise consensual sexual encounter. The college's investigation had omitted an interview of the accused, and he had not been given the incident report before the hearing or a chance to provide or challenge evidence.

Because many new definitions of consent on campus diverge rather starkly from anything familiar in criminal law or civil tort law, colleges have developed educational campaigns, categorized as sexual-violence-prevention programs mandated by the Violence Against Women Act. Clark University's consent materials, subtitled "Doing It With the Lights On," tell students, "We want you to have great sex if you choose to have sex — safer, mutually enjoyable, consensual sex." The University of Wyoming has a "Don't Kill the Mood" section in its consent materials, that explains: "Asking for consent not only shows that you respect and care for your partner, but it also shows your creativity and can even make the sexual interaction more intimate." Students are instructed that consent should be verbal — "'Yes.' Or even, 'Yes, Yes, Oh! Yes!' " — and are offered phrases to use in a sexual encounter:

Baby, you want to make a bunk bed: me on top, you on bottom?Would you like to try an Australian kiss? It's like a French kiss, but "Down Under."I've got the ship. You've got the harbor. Can I dock for the night?

Putting aside whether such utterances reduce the ambiguity of sexual encounters, these instructions are not about rape, sexual assault, sexual harassment, or sexual violence. They are how-to's for sexual arousal, proposition, and seduction. Moreover, in a statement such as, "Consent is about real, honest, confident and open communication," consent stands in

AR_00000763

for a whole normative world of assumptions about what makes sex and relationships good, satisfying, worthwhile, meaningful, and fulfilling. About this, Wyoming is especially explicit: "By communicating what you want and need from your sexual relationship (and your relationship outside the bedroom), you will develop a more caring, responsive, respectful love life."

Under the rubric of preventing sexual violence, colleges are now deep in the business of providing advice on sex and relationships. And they're not good at it.

The shift toward anticipating potentially problematic behavior before it occurs is a feature of what might be called the public-health model of sexual violence. This model of prevention centers on identifying factors that increase the risk of sexual violence. For example, the Department of Education requires colleges to publish their sexual-violence-prevention programs, which must "consider risk factors for sexual violence." The government's compendium of risk factors for sexual violence, assembled by the federal Centers for Disease Control and Prevention, includes "lack of employment opportunities," "poverty," a "lack of institutional support from police and judicial system," and "hyper-masculinity." Colleges are supposed to use these risk factors to formulate and target their sexual-violence-prevention programs. Ohio University's "Black Men's Think Tank" and "Healthy Masculinity Working Group," for example, are categorized by the university in its annual security report as focusing on "Relationship Level" risk factors; the "Better Bystanders" program focuses on individual risk factors, and the "Sober Sex" posters are classified as community-level interventions. This individual, relationship, and community (or environmental) risk-factor framework is taken almost verbatim from the CDC.

When the campus community is told by the federal government that students with the above risk factors are more likely to commit sexual violence, it is not hard to imagine that when it comes to accusation, investigation, and adjudication, those individuals

AR_00000764



**Read More About 'Yes Means Yes'**

Affirmative-consent rules are intended to set clear standards for what's required of students. And they're changing how colleges adjudicate alleged assaults.

- 'Yes' to Sex? Students Consider What That Looks and Sounds Like ⓘ PREMIUM
- As Consent Rules Change, Big Questions Come to the Surface ⓘ PREMIUM
- The Legal Limits of 'Yes Means Yes'
- What 'Yes Means Yes' Means for Colleges' Sex-Assault Investigations ⓘ PREMIUM

will also be perceived as more likely to be perpetrators.

Last September, a black male student who had been accused of sexual assault by a white female student sued the University of Pennsylvania, claiming that an unfair investigation process discriminated on the basis of race, in violation of federal civil-rights laws. Elsewhere, OCR itself has acknowledged the serious risk of race discrimination in student discipline in elementary and secondary schools, and has gone so far as to issue guidance on "how to identify, avoid, and remedy discriminatory discipline." According to OCR, African-American students "are more than three times as likely as their white peers" to be expelled or suspended, and those substantial racial disparities "are not explained by more frequent or more serious misbehavior by students of color."

When it comes to sexual misconduct in higher education, however, OCR has so far been silent about the risk of racial bias. The race of the parties in sexual-misconduct cases is not included in existing federal reporting requirements, so the issue is difficult to study and expose. Indeed, colleges may interpret their obligations under the Family Educational Rights and Privacy Act (Ferpa) as preventing the release of such data — if they even compile and save such information, which they are not legally required to do.

Among administrators, lawyers, and faculty members involved in sexual-misconduct cases, however, stories of disproportionate racial impact are common. "Case after Harvard case that has come to my attention, including

AR_00000765

several in which I have played some advocacy or adjudication role, has involved black male respondents," writes Janet Halley, our colleague at Harvard Law School. "But the institution cannot 'know' this because it has not been thought important enough to monitor for racial bias." It is incumbent on OCR, as well as colleges and universities, to study and address the potential for race discrimination in sexual-assault allegations.

Sexual norms change, and colleges have often been at the forefront of that change. What is different this time around is that the shift has been supervised by the federal government. Under the guise of sexual-violence prevention and discipline, the sex bureaucracy has grown to oversee sexual matters in a way that defies common sense and renders most sexual interactions impermissible.

What will President-elect Trump do with the sex bureaucracy he's inheriting? Ignoring it isn't a real option. Federal legal requirements are now intertwined with college bureaucracies. Once institutions are created, offices staffed, policies promulgated, and disciplinary boards have begun meting out punishments, existing practices are likely to continue even if the federal agency loses interest or cedes the field. An expansive bureaucratic apparatus operating on every campus in the country would remain to carry on a life and motivation of its own.



(http://projects.chronicle.com/titleix/?cid=T9WIDGET)
In this era of enforcement, the government is conducting 300 investigations of colleges for possibly mishandling reports of sexual violence.

**So far, 58 cases have been resolved.**

Search our investigation tracker by institution or keyword:

Seach...                                           Go

It is possible that the Trump administration will retract the 2011 "Dear Colleague" Letter. But unless OCR adopts new interpretations of federal law that forbid the very practices it has required for the past five years, it is hard to imagine colleges making costly wholesale changes to the sex bureaucracy they have expended great resources to build. The many institutions that are

AR_00000766

bound by resolution agreements they entered into with Obama's OCR will continue to be bound by them, unless OCR goes so far as to invalidate the existing agreements, which is highly unlikely. Inertia is now on the sex bureaucracy's side.

There is little in the historical record to suggest that any president — much less this one — would give up power and control on this order of magnitude. The sex bureaucracy is probably here to stay. During the campaign, a videotape emerged of Trump bragging about assaulting women, which was followed by a dozen women's accusations that he had assaulted or harassed them. His administration, in turn, may want to appear tough on sexual violence. Meanwhile, it will be filled with people who have gone on the record against premarital sex and homosexuality. The new administration will use the sex bureaucracy to advance its own version of sexual morality.

The norms of sexual conduct embraced by activists in recent years are, of course, not the same as the sexual morality potentially imposed from the right. But common ground between them may not be so elusive in the sex bureaucracy. Almost the entire domain of sexual interaction is now regulated under the guise of sexual-violence prevention, on which right and left can agree. The sex bureaucracy will therefore not only survive the change in administration, but it may flourish. What is more, future iterations may more explicitly reveal how an expansive regulation of problematic sex and a conservative project of sexual morality can converge.

*Jacob Gersen and Jeannie Suk Gersen are professors at Harvard Law School. This essay is adapted from an article published in the* California Law Review.

1255 Twenty-Third St., N.W.
Washington, D.C. 20037

Copyright © 2017 The Chronicle of Higher Education

AR_00000767

As approved 12/18/2014

HLS Sexual Harassment Resources and Procedures for Students

1.  Resources and Reports Relating to Sexual or Gender-Based Harassment.
HLS is committed to equal opportunity, respect, fairness and
nondiscrimination, and to taking appropriate steps to end any harassment,
prevent its recurrence, and, where appropriate, remedy its effects.  To that end,
HLS has a **Title IX Unit**, currently consisting of a **Title IX Coordinator**
(currently, the Associate Dean and Dean for Academic and Faculty Affairs) and
two **Deputy Title IX Coordinators** (currently, the Associate Dean and Dean
of Students and the Assistant Dean and Chief Human Resources Officer),
whose purpose is to oversee implementation of the Harvard University Sexual
and Gender-Based Harassment Policy (the "**Policy**").  This includes receiving
reports of sexual or gender-based harassment (see 1.2 below), determining
interim measures, supervising investigation and resolution of complaints under
these procedures, and informing students about the Policy and these
procedures (including 1.1 through 1.8 below).  Each Title IX Coordinator is an
experienced administrator trained in identifying and responding to sexual
harassment and its harm to equal educational opportunity, as understood in
light of principles of academic freedom and free speech, and other aspects of
Title IX and the Policy.

1.1  Confidential Resources.  The HLS community should be aware of relevant
**confidential** resources, which are available both before and after a person
communicates with any Title IX coordinator about potential violations of the
Policy:

- Harvard University Office of Sexual Assault Prevention and Response
- Harvard Chaplains
- RESPONSE Peer Counseling
- UHS Counseling and Mental Health Services

These resources can provide confidential advice and counseling.  Information
disclosed by an individual to these counselors will not be disclosed to a Title IX
Coordinator or any other person without an individual's express written
permission, unless there is an imminent threat of serious harm to the individual
or others, or a legal obligation requires disclosure (e.g., if there is suspected
abuse of a minor).  These counselors can provide more information about the
extent of confidentiality.

Under applicable law, many members of HLS community – including faculty

AR_00000768

and senior administrators – may be required to report incidents to the Title IX Unit, and so may not be able to keep the matter completely confidential.  The Title IX coordinators themselves may be required to investigate and seek to address Policy violations, and so may not be able to keep the matter completely confidential.  If a student's information may not be kept confidential, the student will be notified of the information that will be disclosed, to whom, and why.  The above confidential resources may be useful to consult as a first step.

1.2   <u>Reports of Title IX Violations</u>.  Individuals are encouraged to report any violation of the Policy to the Title IX Unit.  Contact information for the Title IX coordinators is here:

- Catherine Claypoole, HLS Interim Title IX Coordinator
  Griswold 200
  1525 Massachusetts Avenue
  Cambridge, MA  02138
  claypoole@law.harvard.edu

- Kevin Moody, HLS Deputy Title IX Coordinator
  Hauser 010
  1575 Massachusetts Avenue
  Cambridge, MA 02138
  kmoody@law.harvard.edu

- Marcia Sells, HLS Deputy Title IX Coordinator
  WCC 3039
  1585 Massachusetts Avenue
  Cambridge, MA  02138
  msells@law.harvard.edu

Reports of sexual harassment, including sexual assault and sexual violence will be processed under the Procedures detailed herein when both the complainant and the respondent are HLS students.  If either the complainant or the respondent is a non-HLS student, the University's <u>Procedures for Handling Complaints Against Students</u> will be used, and, when the respondent is an HLS student, will be supplemented by the Law School's Interschool Sexual Harassment Procedures.  The Law School's Administrative Board Procedures will not be used for complaints of sexual harassment, including sexual assault or sexual violence.

AR_00000769

1.3.1  <u>Anonymous Reports</u>.  Persons may wish to report violations of the Policy anonymously.  If a person reporting a potential violation self-identifies but asks to remain anonymous, the Title IX Unit will decide how to proceed, taking into account the person's wishes, the University's commitment to providing a safe and non-discriminatory environment, and the right of any person accused of a violation of the Policy to have notice of allegations if any action may be taken that would affect the accused.  It may not be possible to guarantee the reporting party anonymity in certain circumstances.

1.3.2  <u>Informal Reports</u>.  Individuals may wish to file a formal complaint about a Policy violation (see 2.1 below), or to report informally (i.e., without initiating a formal complaint).  The Title IX Unit shall inform anyone making an informal report that he or she may initiate a formal complaint at any time, regardless of what steps are being or have been taken in response to an informal report.  Reporting persons should be aware that although the Title IX Unit will often be able to maintain confidentiality of reporting persons, the Title IX Unit may sometimes be required to take actions to protect the safety of HLS community members that may result in the identity of the reporting person being disclosed (to the police, for example).  Reporting persons are encouraged to consult with the confidential resources identified above before self-identifying to the Title IX Unit.  When reporting persons seek to remain anonymous or have their identities kept confidential, they will be informed that honoring such a request may limit the ability of HLS to respond fully to any reported event, including discipline against a reported person, that the Policy prohibits retaliation, and that HLS will take steps intended to prevent retaliation and to respond to it strongly if it occurs.

1.3.3  <u>Informal Process</u>.  If the Title IX Unit concludes that it is possible to resolve a matter, whether after a formal complaint or an informal report, in a prompt, fair and adequate manner through an informal process involving and with the consent of the parties (including the reporting person and person whose conduct may have violated the Policy), the Title IX Unit may seek to do so.  After a formal complaint is made, this informal process may be used only if the complainant affirmatively seeks such a process, and any party may terminate or decline any informal process at any time, without penalty.  No person reporting that he or she has been sexually assaulted will be asked to mediate or reach a resolution of the report directly with a person alleged to have committed the assault.  Before using any informal process, the Title IX Unit will notify those involved about the advantages and disadvantages of the process, and establish and notify those involved about reasonable timeframes

AR_00000770

for the process.  The Title IX Unit will report to the Title IX Committee (see 6 below) about the use, timeliness and outcomes of the informal process, without disclosing parties' names.

1.3.4  <u>Legal Advice</u>.  When reported conduct by any person might constitute criminal conduct, the person whose conduct is reported should, and the reporting person may wish to, seek legal counsel before making any written or oral statements, and seek advice about how his or her participation in an informal process could affect any criminal case in which he or she is or may become involved.

1.4  <u>Leniency on Other Policy Violations</u>.  To encourage reports of violations of the Policy, HLS may at any point in an investigation or proceeding offer leniency with respect to violations of other HLS policies that may come to light as a result of such reports, depending on the circumstances.

1.5  <u>Timeliness</u>.  Reports may be made at any time, regardless of how much time has elapsed.  Those with information about violations of the Policy are encouraged to report as soon as possible.  Prompt reporting allows for prompt and effective responses. If a person who violated the Policy is no longer employed or a student at the time of a report, HLS may not be able to take action against that person.  Reports may be valuable in allowing HLS to support affected individuals, prevent recurrences or address the effects of reported conduct.

1.6  <u>Interim Measures</u>.  As described in 5 below, HLS through its Title IX Unit will provide prompt and reasonable interim measures to support and protect the safety of all parties, the educational environment, and the HLS community; to deter retaliation; and to preserve the integrity of the investigation and resolution process.

1.7  <u>Criminal Complaints and Police Assistance</u>.  Any member of the HLS community may at any time also file a criminal complaint or seek assistance in preserving physical evidence from the Harvard University Police.  Information on those resources can be found here:

- <u>Harvard University Police Department</u>
  1033 Massachusetts Avenue
  6th Floor, Cambridge, MA  02138
  Urgent:  617-495-1212
  Business:  617-495-1215

AR_00000771

HLS and the Title IX Unit will assist anyone reporting or accused of Title IX violations in contacting law enforcement officials.

1.8  Process Confidentiality.  To encourage parties and witnesses to participate in these procedures (including anonymous reports, informal reports, and formal complaints), all involved should keep confidential any information they receive in the course of their participation, other than to consult with advisors and attorneys, and incidental to seeking support and advice from family, clergy, health professionals, and others playing a similar role, all of whom should also be advised by anyone seeking their support to keep such information confidential.  To balance the interest of protecting confidential information and encouraging participation in these procedures by parties and witnesses, on the one hand, against the interest of participants in being able to disclose confidential information to family, clergy, health professionals, and others, on the other hand, the Title IX Committee (see 6 below) shall develop instructions on the confidentiality obligations of parties and witnesses.  Disclosure of confidential information received in participating in these procedures has the potential to compromise the integrity of these procedures and may be viewed as retaliation that violates the Policy.  Upon the initiation of an investigation, the Title IX Unit shall remind the parties, in writing, of their obligations regarding confidentiality.  Public disclosure of confidential information received as a result of participation in these procedures may constitute a violation of HLS standards of conduct, and shall be subject to these procedures as a related matter (see 2.7 below).

2.  Complaints and Investigations.  HLS is committed to providing a fair and prompt investigation of violations of the Policy.  During any investigation and resolution of a complaint, both complainants and respondents have the opportunity to obtain counsel or assistance from lawyers or advisers of their choice (see 2.3 below), to have an impartial adjudication (see 3 below), to present witnesses and relevant evidence and have the complaint reviewed at a hearing (see 3.3 below), and to appeal (see 4 below).  HLS will promptly and concurrently notify the parties in writing of the outcome of any formal complaint or appeal (see 2.4.1, 3.5.3 and 4.4).

2.1  Formal Complaints.  A formal complaint shall state (if known to the complainant) the name(s) of the persons involved in and witnesses to the conduct, describe the conduct, identify to the extent reasonably possible the dates and places of the conduct.  The complaint shall be signed and dated by the complainant.  The Title IX Unit shall promptly provide a copy of the

AR_00000772

complaint to all respondents named in the complaint.

2.2  Investigations Generally.  To protect complainants, respondents, and the HLS community, allegations of violations of the Policy will be investigated promptly (see 2.4.4 and 2.4.5) and fairly by or under the supervision of the Title IX Unit.  Investigations may be initiated whenever warranted, including in response to a formal complaint, in the absence of a formal complaint, or after a formal complaint has been withdrawn.  Where a complainant specifically requests a complaint not be investigated, an investigation may be initiated if the Title IX Unit determines that the facts warrant an investigation.  The Title IX Unit will take into account concerns articulated by complainants and respondents, the best interest of the community, fairness to all concerned, and the University's legal obligations under Title IX.  Investigations under these procedures may be carried out prior to, simultaneously with, or after criminal or civil proceedings (see also 2.4.4 and 2.4.5 below).  Any investigator will be impartial and unbiased, will disclose any real or reasonably perceived conflicts of interest, and have training in investigating and evaluating conduct under the Policy, including applicable confidentiality requirements.  The Title IX Committee (see 6 below) will periodically review and provide general guidance to the Title IX Unit on the qualifications and conduct of investigators.

2.3  Advisors and Counsel.  All parties may consult with advisors of their choice, including an attorney, at any point in the process.  The Title IX Unit will notify parties that they may consult with advisors (including an attorney), and the names of potential advisors (including attorneys). HLS will provide financial assistance to parties unable to afford an attorney who would like to do so, subject to reasonable fee structures and limits determined from time to time by the Title IX Committee (see 6 below).  Ordinarily, an investigator (see 2.4.2 below) will speak directly with a complainant and respondent, and each may have an advisor or attorney present, and if a student requests, the student's advisor or attorney may participate in the conversation.

2.4.1  Initial Assessments.  The Title IX Unit will make an initial assessment following a report or complaint about a violation of the Policy.  Based on that assessment, the Title IX Coordinator may act as follows:  (a) if the conduct, even if substantiated, would not violate the Policy, the Title IX Coordinator may dismiss the complaint; (b) if the conduct (or complaint) is outside the scope of the Policy, but within the scope of another policy, refer the matter to another office; (c) if the Title IX Coordinator concludes that it is possible to resolve the case in a prompt, fair and adequate manner through an informal process involving and with the consent of both the complainant and

AR_00000773

respondent, the Title IX Coordinator may seek to do so (subject to limits in 1.3.3 above); or (d) if the conduct, if substantiated, would violate the Policy, the Title IX Coordinator may initiate an investigation. Before the commencement of any investigation or proceeding, the parties shall be promptly notified in writing of the result of this initial assessment. In any case, the Title IX Coordinator may also identify and implement appropriate interim measures (see 5 below).

2.4.2 <u>Investigations and Investigatory Record</u>. If the result of the initial assessment is an investigation, such investigations will generally include individual interviews of the complainant, respondent, and any relevant witnesses. The investigator will keep and preserve a record of the investigation. This record will be the basis for any recommended findings by the investigator (see 3.3 below).

2.4.3. <u>Notice and Opportunity to Respond</u>. The record prepared by the investigator (see 2.4.2 above) will be shared promptly and equally with complainant and respondent, redacted if and to the extent required by and consistent with law. Each party will have an opportunity to meet again with the investigator, respond in writing, and request gathering of additional information by the investigator. If additional information is gathered, it will become part of the record and shared with all parties, who again will have an opportunity to respond. The parties will be updated at regular intervals of the status of the investigation.

2.4.4 <u>Timeframes</u>. HLS will seek to complete any investigation and resulting disciplinary process (including a decision on any remedies) within 45 business days after receipt of a complaint. HLS will seek to complete any appeal within 20 business days after receipt of the appeal. An investigator may impose reasonable timeframes on all parties to allow the timely completion of a proceeding. Timeframes for all phases of a process apply to all parties equally. Investigations will continue according to these timeframes during summer and other times HLS classes are not in session.

2.4.5 <u>Extensions</u>. There may be circumstances requiring longer timeframes. Timeframes may be extended, for example, in the interest of the integrity and completeness of the investigation, to accommodate witness availability, or to comply with requests by or not to prejudice investigations or processes of external law enforcement, or for other legitimate reasons, including the complexity of the investigation and the severity or extent of alleged misconduct. HLS will notify the parties of any extensions of timeframes. Although

AR_00000774

cooperation with law enforcement may require temporary suspensions of an HLS investigation, HLS will promptly resume its investigation upon being advised that law enforcement's evidence gathering is completed.  HLS will not wait for the conclusion of criminal proceedings to begin its investigation, and will provide appropriate interim measures throughout, including during suspensions and extensions.  The Title IX Unit will work with the parties to balance the value of promptness with the value of in-person meetings in an investigation.

2.5  <u>Cooperation</u>.  HLS expects members of the HLS community, including witnesses, to cooperate with an investigation.  It is understood that there may be circumstances in which complainants may wish to limit their participation, and a complainant may choose to do so, although HLS may be obligated to conduct an investigation.  It is understood that respondents may be advised not to provide information in circumstances that could prejudice their rights in external proceedings, and a respondent may choose not to do so, although HLS may be obligated to conduct an investigation.  HLS will not draw any adverse inferences from silence in such circumstances, but may impose interim measures, reach findings and implement any or all of the remedies available under 3.5.1 through 3.6 below, as appropriate.

2.6  <u>Sexual History</u>.  The parties' sexual histories will not generally be a subject of an investigation or questions at a hearing (see 3.4 below).  However, the history of relations among parties may be relevant.  For example, if "unrequested or uninvited conduct" is at issue,[1] the sexual history between the parties may be relevant to determining whether the conduct was unrequested and uninvited during the incident in question, although it must be remembered that even in the context of a relationship, an acceptance of a request for one sexual act does not imply acceptance for another sexual act, and an acceptance of a request on one occasion does not constitute acceptance on a subsequent occasion. In addition, under very limited circumstances, sexual history may be relevant to explain injury, to provide proof of a pattern or of repeated events, or for another specific question raised by an allegation.  The investigator shall determine the relevance of evidence to the investigation and whether its relevance is outweighed by the dangers of unfair prejudice, confusion, or undue delay, and the adjudicatory panel will determine such matters at a hearing.

2.7  <u>Related Matters and Coordination</u>.  The Title IX Unit shall generally consolidate investigations of multiple related complaints under the Policy, and

---

[1] Policy at 2.

shall also generally consolidate investigations of complaints under other HLS or University policies that are factually related to a Policy violation investigation. The Administrative Board and the Title IX Unit shall coordinate their efforts in such cases, and the Administrative Board Chair shall ordinarily suspend Administrative Board proceedings for any matter covered by the Policy or factually related to such a matter, refer the matter to the Title IX Coordinator, and so notify the parties.

3  Adjudications; Standard of Proof.  When the Title IX Coordinator determines to conduct or supervise an investigation (see 2.4.1 above), in order to permit a timely hearing should one be requested by any party (see 3.3 below), the Title IX Unit or a delegate will initiate the scheduling and the parties' selection of a three-person adjudicatory panel, as set forth in 3.2 below.  If used, such a panel will determine if the Title IX Coordinator has shown by a preponderance of the evidence that the Policy has been violated, and will adjudicate related matters under other policies in accordance with those policies.

3.1  Adjudicators' Qualifications.  All panelists shall be trained in evaluating conduct under the Policy and these procedures, including applicable confidentiality requirements, have relevant expertise and experience, be impartial, unbiased, and independent of the community (i.e., not current students, faculty, administrators, or staff of Harvard University), will disclose any real or reasonably perceived conflicts of interest or recuse themselves in a particular case, as appropriate, and to the extent feasible reflect the value of diversity in all its forms and meet such other criteria as the Title IX Committee (see 6 below) may from time to time establish.  A list of no fewer than twelve qualified panelists shall be chosen under the supervision of the Title IX Committee, and maintained and kept up to date by the Title IX Unit.

3.2  Selection of Adjudicators.  Each specific adjudicatory panel will be determined as follows:  each of the complainant and respondent may choose from the list of qualified panelists one adjudicator; and the two adjudicators so chosen will choose a third from the same list, who shall chair the panel.  This panel of three will adjudicate the complaint.  If the investigation does not involve a complainant, the Title IX Coordinator shall designate a panelist in place of the complainant.

3.3  Pre-Hearing Dispositions, Reports, and Requests for Hearings.  If, at the completion of the investigation, the Title IX Coordinator or the investigator concludes there is no plausible basis for a finding of a violation of the Policy, the investigation may be terminated and the parties so notified.  If the Title IX

AR_00000776

Coordinator concludes that it is possible to resolve the case in a prompt, fair and adequate manner through an informal process involving and with the consent of both the complainant and respondent (subject to the limits in 1.3.3 above), the Title IX Coordinator may seek to do so.  If the Title IX Coordinator or investigator believes no such informal resolution is possible, and concludes that there is a plausible basis for finding a violation of the Policy, the Title IX Coordinator or investigator will prepare a report stating the plausible basis for finding a violation of the Policy.  The Title IX Unit will provide the report to each party, and inquire of the complainant and the respondent whether either desires an oral hearing (a "**hearing**").  If any party desires a hearing, the Title IX Coordinator will schedule a hearing with the adjudicatory panel. Otherwise, the adjudicatory panel will make its decision based on the investigator's report, the investigation record, any further written materials the parties wish to submit to the panel (which shall be provided to the other parties), and any written materials other parties submit in response.

3.4  <u>Conduct of Hearings</u>.  At any hearing, the parties will have equal opportunity to participate, with up to two advisors (including up to one attorney).  The adjudicatory panel shall determine the conduct of the hearing, subject to these procedures and the Policy, and shall be provided with reasonable support and administrative assistance by HLS.  Formal rules of evidence will not apply, and the panel may set reasonable time limits (subject to 2.4.4 and 2.4.5) and other regulations for the hearing.  The investigator will present the results of the investigation, and the parties will have an equal opportunity to respond.  The parties will also have an equal opportunity to present witnesses and relevant evidence and have questions asked of other parties (see 3.4.1 below), and to ask questions of the investigator.  Hearings shall not be open to the public.  The only participants shall be the parties, their advisors and attorneys, witnesses, the adjudicators and any staff they may need for the conduct of the hearing, the Title IX Coordinators and, with prior notice to the chair of the adjudicatory panel, any member of the Title IX Committee.  A transcript of the hearing shall be kept and made available to the parties.

3.4.1  <u>Questions at Hearings</u>.  These procedures recognize the potential harm to the parties of having questions asked directly by another party, and the potential for the prospect of such a form of questioning to deter legitimate complaints, while also recognizing that direct questions may provide a party with a greater ability to test the truth of claims by another party than other methods of questioning.  Reflecting these competing interests:  (a) parties may not directly address each other in the hearing; (b) if requested by a party, the panel will arrange for means to allow questions to be posed to the parties out

AR_00000777

of the physical presence of the other parties and their advisors and attorneys, all of whom may watch from a separate, private room via closed-circuit television; (c) questions to be posed on behalf of one party to another party must be asked through the chair of the adjudicatory panel, including "live" questions during the hearing and in response to answers by those being questioned, via electronic text or other methods, and (d) the chair of the panel will ask in substance all relevant questions a party submits that are not prohibited by these procedures (see 2.6 and 3.4 above).

3.5   Post-Hearing Dispositions and Remedy-Relevant Evidence.   The adjudicatory panel will determine by majority vote whether a violation of the Policy has occurred, and will write a decision (which may incorporate the investigator's report, as the panel deems desirable) stating the basis for their conclusion.  All adjudicators shall sign the final decision (including any dissent) as a record of their deliberations and dispositions.  The parties will be notified of their decision (see 3.5.3 below).  Each party may submit evidence or written argument relevant to remedies or mitigation up to two business days after receiving the final decision, and will have one business day to respond to evidence submitted by any other party.

3.5.1   Determination of Remedies.   The panel will also determine remedies, by a majority vote.  The remedies may include those described in 3.6 below. Remedies shall take into account the severity and impact of the conduct, the gravity and circumstances of the violation, including the awareness and intent of the parties, the impact of the violation on the complainant, the safety of the community, the student's previous disciplinary history (based on consultations with the Secretary and the Chair of the Administrative Board), any evidence submitted by the parties relevant to remedies, and the goals of the Policy and these procedures, including HLS's commitment to equal opportunity, respect, fairness and nondiscrimination.  Remedies shall also take into account remedies imposed in prior cases at HLS, both within and outside the context of the Policy, based on consultations with the Administrative Board Chair and Secretary.

3.5.2   Adjudication of Related Matters.   The panel will adjudicate any related matters in accordance with relevant policies, and state their conclusions as to those matters in the same decision (see 2.7 above).

3.5.3   Notice of Disposition and Remedies.   Subject to law, all parties to a formal complaint shall be promptly and contemporaneously provided with a copy of the panel's decision, including a description of remedies, as well as a

AR_00000778

statement as to their appeal rights.

3.6  Remedies Available.  Violations of the Policy may result in the following remedies:  (1) Measures similar in kind to the interim measures listed in 5 below, such as a one-way no contact order, or changing academic schedules or restricting access to activities or facilities, except that following a finding that a respondent violated the Policy, no burden of such measures will fall on a complainant.  Such measures may be put into place pending appeals.
(2) Warnings that do not become part of a student's individual permanent record, but which may be considered in future disciplinary proceedings.
(3) Reprimands, i.e., more serious warnings that become part of a student's individual permanent record.  (4) Disciplinary probation for a set period of time, during which further violations of the Policy or other HLS policies will be grounds for suspension or dismissal, and during which counseling and formal apology may be required.  (5) Suspensions, which may be conditional or unconditional.  Conditions may include without limitation counseling and formal apology.  (6) Loss of campus housing or on-campus employment.
(7) Restriction of access to space, resources, and activities.  (8) Withholding of degree.  (9) Dismission or expulsion.

4  Appeals.  Each party (respondent and complainant) may request an impartial appeal.

4.1  Appeal Board.  All appeals will be decided by a faculty board consisting of the faculty members of the Administrative Board, each of whom shall have received training under the Policy (including Title IX and applicable confidentiality requirements) and these procedures.  Members of the appeal board shall be impartial and unbiased, and shall disclose any real or reasonably perceived conflicts of interest, or recuse themselves, as appropriate.

4.2  Grounds for Appeal.  Grounds for appeal consist of (1) substantial relevant information not presented and that reasonably could not have been presented during the adjudication; (2) an excessive or insufficient remedy; (3) procedural unfairness, procedural error, or misinterpretation of the Policy's substantive legal standards that substantially affected the outcome; or (4) a conclusion that, on the record as a whole, no reasonable panel could have reached the same outcome using the same evidentiary standard.

4.3  Appeal Outcomes.  The appeal board may uphold the original decision and remedy if any; alter the remedy; or return the case to the adjudicatory panel for further proceedings.

AR_00000779

4.4  <u>Appeal Procedures</u>.  The deadline for appeals is the fifth business day after the party requesting the appeal has been notified of the adjudicatory panel's decision.  Requests for an appeal shall be in writing to the Title IX Coordinator. If any party requests an appeal, all parties shall be notified of the appeal, how to participate, and the outcome.  Appeals will ordinarily be on the written record. The appeal board may by majority vote request an oral presentation on specific issues identified by the appeal board.  The appeal board will determine procedures for any such oral presentations, consistent with the principles in 3 above, including equal opportunity for all parties to participate.

5  <u>Scope of and Process for Interim Measures</u>.  On receipt of a report or complaint concerning a possible Policy violation, a Title IX Coordinator will identify reasonable and appropriate interim measures to meet the goals stated in 1.6 above.  Interim measures may be provided regardless of whether a formal complaint is filed.  To the extent feasible given the nature of the relief, any person significantly affected by an interim measure may seek a prompt review of interim measures for abuse of discretion from all other HLS Title IX Coordinators, who shall either approve or revise the measures.

5.1  <u>Types of Interim Measures</u>.  Interim measures may include:  (1) Access to counseling services, and assistance in arranging an initial appointment; (2) Access to tutoring or other academic support, including rescheduling of or extra time for exams and assignments; (3) Changes in class schedules, including the ability to transfer course sections or withdraw from a course without penalty; (4) Change in work schedules or job assignments; (5) Changes in campus housing; (6) Provision of medical services; (7) "No contact" orders (administrative remedy designed to curtail or bar contact or communications between or among individuals); (8) Provision of escort services; (9) Any other measures consistent with law and HLS's educational mission that can be used to achieve the goals of the Policy.  Degrees will ordinarily not be awarded to a respondent while a formal complaint under these procedures is pending.

5.2  <u>Design of, Procedures for, and Monitoring of Interim Measures</u>.  Interim measures should be designed in a fair manner to meet the goals stated in 1.6 above and so as to minimize the impact on all affected, including any complainant and respondent in a formal case under these procedures. Requests for interim measures should be directed to one of the Title IX coordinators, who will collaborate with the HLS Dean of Students in monitoring or supervising the monitoring of the implementation of such measures and coordinating any response by HLS with other offices at Harvard

AR_00000780

and with law enforcement if needed.  All members of the HLS community are encouraged to report to the Title IX Coordinator any failure to abide by restrictions imposed by interim measures.  Violations of such restrictions are violations of the Policy.

6  Title IX Committee.  The Dean shall designate a standing committee (the **Title IX Committee**) consisting of tenured faculty (other than faculty members of the Administrative Board who serve as the appeals board under these procedures), based on suggestions from faculty members and reflecting to the extent feasible diversity in all its forms.  This committee will be responsible for monitoring the use, timeliness and outcomes of informal resolutions (see 1.3.3 above); appropriate instructions regarding confidentiality (see 1.8 above); the method and conduct of investigations chosen by the Title IX Coordinator (see 2.2 above); after consultation with the Dean for Administration, setting reasonable regulations for compensation of attorneys on behalf of students (see 2.3 above); approving and periodically reviewing and if necessary revising adjudicator criteria (3.1 above); and reviewing generally the use of interim measures (see 5 above).  The committee shall consult regularly with student liaisons designated by the student government in consultation with the Dean of Students.  The Title IX Committee shall report to the Dean and the faculty at least once a year on any significant decisions of interpretation or implementation of the Policy and these procedures by the Title IX Unit, the appeal board, the adjudicators, or the investigators.  The Title IX Committee will be kept fully informed by all participants about any decisions or practices that may be of concern to the faculty, will be advised by the faculty of matters that are of particular concern to faculty members, and will be free to propose to the faculty changes to or interpretations of these procedures.  The Title IX Committee's manner of reporting and consultation will be designed to provide needed or legally required confidentiality of information it receives.

7  Records.  The Title IX Coordinator shall maintain records of notices, communications, assessments, records, and reports specifically required under these Procedures, including under 2.3 (notice regarding rights to advisors and attorneys), 2.4.1 (initial assessments), 2.4.2 (investigation records), 3.3 (investigation reports), 3.4 (hearing transcripts), 3.5 (decisions), and 4 (appeals).  Student disciplinary records will be maintained separately, in accordance with HLS policies.  All records under this section shall be maintained at least as long as any legally required period.

AR_00000781

**Robb Jones**

| | |
|---|---|
| **From:** | Robb Jones |
| **Sent:** | Tuesday, August 22, 2017 11:57 AM |
| **To:** | Jackson, Candice |
| **Subject:** | United Educators' Title IX Studies on Campus Sexual Assault |
| **Attachments:** | 2015 Sexual_assault_claim_study.pdf; Alyssa's RRB -- Sexual Assault Claims Study.pdf; RRB Review of Student-Perpetrator Claims (1).pdf; RRB Review of Student-Victim Sexual Assault Claims 2017.pdf |

Ms. Jackson:  I was on the call with the NACUA folks on August 11 and am following up with the United Educators Claims Studies involving Title IX and campus sexual assaults.  Thank you again for the time you spent with us and I am happy to answer any questions or discuss these further if you would wish.

**Robb Jones** | Sr. Vice-President and General Counsel for Claims Management
......................................................................
**United Educators** | **Prevention and Protection for Education**
Suite 500 7700 Wisconsin Avenue
Bethesda, MD 20814
**phone 301.215.6402**
www.UE.org | EduRiskSolutions.org

*Follow me on Twitter:  @RobbJones_UE*
Stay connected to UE: LinkedIn, Twitter, and YouTube

AR_00000782