

EduRiskSolutions.org



# Confronting Campus Sexual Assault:
## An Examination of Higher Education Claims

Recent legal and regulatory mandates require virtually all colleges and universities to investigate and adjudicate reports of sexual assault. An analysis of claims reported to United Educators (UE) reveals that institutions respond to cases of sexual assault that the criminal justice system often considers too difficult to succeed at trial and obtain a conviction. Our data indicates these challenging cases involve little or no forensic evidence, delays in reporting, use of alcohol, and differing accounts of consent.

AR_00000783

# Claims Data and Methodology

## Definitions

We use the term "claim" throughout this report to mean a demand for damages as well as an event that could potentially give rise to legal action. Given the serious nature of student sexual assaults, UE policies require reporting of sexual assaults regardless of whether a threat of litigation exists. Accordingly, this study includes sexual assaults that were reported to the institution but never developed into a demand for damages or lawsuit.

Language is important when discussing sexual assaults. Throughout this report, we use the term "victim" to refer to an individual who alleges he or she has been sexually assaulted and "perpetrator" to refer to the individual who allegedly committed the act. These terms are consistent with language used by governmental agencies and organizations that publish sexual violence statistics. Our use of the term "victim" rather than "survivor" is not intended to diminish the strength of those who came forward to report a sexual assault. Likewise, our use of the term "perpetrator" is not intended as acceptance of the truth of the allegations against an individual.

For the purposes of this study, "sexual assault" is defined to include a range of conduct, including sexual coercion, nonconsensual sexual touching (i.e., fondling and kissing), and nonconsensual sexual intercourse, including vaginal, oral, or anal penetration.

Shortly after the U.S. Department of Education's Office for Civil Rights (OCR) issued its April 4, 2011, "Dear Colleague" letter (DCL), UE published *Sexual Assault: Weathering the Perfect Storm*, which examined student sexual assault claims reported from 2006 to 2010.[1] Our current study, *Confronting Campus Sexual Assault*, examines the nature of campus sexual assaults post-DCL to help educational institutions evaluate their strategies for responding to and preventing campus sexual assaults.

For this study, UE collected and analyzed data from claim files that:

- Involved a student victim

- Included allegations of sexual assault

- Occurred at a higher education institution

- Were reported to UE between Jan. 1, 2011, and Dec. 31, 2013

This study excluded claims involving allegations that faculty or staff sexually assaulted students. Also excluded were claim files for which the gender of both parties and whether they were students was unknown. The final data set included 305 claims reported from 104 colleges and universities throughout the United States. Files were reviewed individually to examine:

- Perpetrator and victim characteristics

- Circumstances of the assault

- Response from the institution

- Resulting litigation

Our analysis is subject to several limitations and conditions. Claims analysts and attorneys maintain claim files to manage litigation and resolve claims against UE members. Because research is not the primary purpose of claim files, our analysis is limited by the information contained in them. Nevertheless, the files contain valuable information that would otherwise be unavailable through other means such as self-report surveys. For example, a claim file can capture a more complete picture of campus sexual assault because it includes information from both parties as well as the institution's investigation and adjudication processes.

Finally, our analysis reflects only UE claims data and should not be generalized to represent all reports of sexual assault on college campuses. The claims data, however, enables institutions to draw some meaningful conclusions for use in responding to and preventing sexual violence on their campus.

---

1   Different methodology was used to obtain a larger data set for this study than in the previous study. We recommend that you not draw conclusions from any differences in the findings between the studies.

AR_00000784

# Key Findings

## Frequency

As Figure 1 illustrates, prior to the DCL and for two years thereafter, UE saw a steady decline in the total number of reported sexual assault claims. However, by the end of 2013, the total number of claims more than doubled. We likely can attribute this increase to more institutions publicizing their policies and heightened campus awareness of sexual assault—whether from student-led advocacy or other means.

While this study draws from data through 2013, claims are also likely to increase in 2014 and beyond as institutions evolve their handling of sexual assaults to comply with Title IX and the Violence Against Women Act (VAWA).

## Perpetrator Characteristics

- **Male.** Nearly all (99 percent) of the perpetrators were men.

- **Student.** As Figure 2 shows, 84 percent of perpetrators were students at the same college or university as the victim.

- **Athletics and Greek life.** Fifteen percent of perpetrators were athletes, and 10 percent were members of a fraternity.

- *Multiple perpetrator sexual assaults.* Ten percent of all sexual assault claims involved a single victim and two or more perpetrators. More than half of multiple perpetrator sexual assaults involved athletes (40 percent) or fraternity members (13 percent). Our review of these claims suggests a subculture within some fraternities and teams that promotes hypermasculinity, sexual aggression, and excessive alcohol consumption. These sociocultural factors may encourage students within these groups to engage in or excuse sexual violence. Claims examples include:

  - Members of a football team were accused of taking turns sexually assaulting a student who was unconscious from drinking too much.

  - University basketball players pursued a female student who they described as "shy," "quiet," and "lonely" because she was "easy" to obtain sex from. Players had sex with the victim on multiple occasions. In one instance, five players showed up at her residence hall to have sex with her.



Figure 1

## Claims Reported
2010-2013

DCL Released April 2011

89 — 2010
78 — 2011
73 — 2012
154 — 2013

AR_00000785

- **Serial perpetrators.** One in five perpetrators was accused of sexually assaulting more than one student; 44 percent of these repeat perpetrators were athletes (20 percent) or fraternity members (24 percent). While the institution generally learned of potential multiple victims only after one victim came forward, in a few instances the perpetrator had previously been accused of violating the institution's sexual misconduct policy. For example, one institution placed a student on disciplinary probation and required him to do community service after he admitted to nonconsensual sexual touching of a female student. He sexually assaulted another student the following semester, this time escalating to nonconsensual sexual intercourse.

## Victim Characteristics

- **Female.** Most (94 percent) victims were women.

- **Knew the perpetrator.** The majority (90 percent) of victims knew the perpetrator. The perpetrator was most often the victim's friend, acquaintance, classmate, boyfriend, or ex-boyfriend.

- **First- and second-year students.**[2] Nearly three-fourths (73 percent) of sexual assault victims were freshmen or sophomores (Figure 3). The highest rate of victimization occurred during freshman year, followed by a sharp decline sophomore year and every year thereafter. First-year students were also most vulnerable to multiple perpetrator sexual assaults. They accounted for 88 percent of those victims.

- **Reluctance to report sexual assault.** Nearly 40 percent of victims delayed reporting the sexual assault to their college or university. On average, victims delayed 11 months. A review of these claims revealed several reasons for the lengthy delay in reporting, including:

  □ *The victim blamed herself because she was intoxicated.* Three-quarters of the victims who delayed in reporting consumed alcohol prior to the sexual assault. In fact, 26 percent of victims who delayed reporting had no clear memory of the assault.

---

2   This study only presents findings on victims' class year because there was insufficient information on perpetrators' class year in the claims files.



Figure 2

**Perpetrator Profile**
for Sexual Assault

16% Non-Student Perpetrator

Student perpetrator 84%

10% Stranger

5% Visitor

Other (1%)

**Strangers:** Perpetrators that were unseen or the victim did not recognize.

**Visitors:** Nonstudents visiting the campus who were acquaintances of the victim or other student.

**Other:** Family members and nonstudent acquaintances; these off-campus incidents were reported to the institution because the victim wanted protection from the perpetrator coming to campus.

AR_00000786

- *The victim did not immediately label the incident a sexual assault.* In most cases, the victim labeled the incident a sexual assault only after talking with friends or attending prevention training.

- *The victim and perpetrator were in a romantic relationship.* We saw a slightly higher rate of delay when the victim and perpetrator were in a dating relationship. Nearly 60 percent of the victims in this subgroup did not immediately report their sexual assault to the institution and only came forward after the relationship ended.

- *One in five victims did not want the institution to investigate their sexual assault or take disciplinary action against the perpetrator.* In 52 percent of these claims, institutions did not investigate the complaint or could not complete their investigation, for two primary reasons:

  - The institution honored the victim's request and did not investigate or take disciplinary action against the perpetrator

  - The institution chose to investigate against the victim's wishes, and the victim became uncooperative, making it difficult to complete the investigation

Examples of these situations included:

- A university could not investigate a sexual assault complaint after the victim reported the assault as part of her recovery and refused to identify the perpetrator.

- A resident assistant (RA) reported a sexual assault to campus police that a victim shared in confidence with him. The college did not complete its investigation after the victim recanted her original statement to the RA.

- A student reported an incident of nonconsensual sexual contact but was unsure if it was "actually sexual assault." Although she did not want the university to investigate, she did want them to issue a no-contact order. The university complied, and the following semester the student changed her mind and requested a formal Title IX investigation.



Figure 3

## Victims by Class Year

- Freshmen
- Sophomores
- Juniors
- Seniors
- Grad students
- Other

54%
19%
12%
11%
3%
1%

AR_00000787

## The Circumstances of Campus Sexual Assault

### Location

- **More than half (60 percent) of sexual assaults occurred on campus.** The most frequent location for sexual assaults was the victim or perpetrator's residence hall (53 percent).

- **Role of off-campus parties.** In 41 percent of claims, the victim and perpetrator attended the same off-campus party before going back to campus, where the sexual assault occurred. These off-campus parties included institution-recognized sorority and fraternity houses, athletic team houses, and students' off-campus residences. Nearly 80 percent of the victims who attended off-campus parties were first and second-year students ( Figure 4).

The data suggest that easy access to alcohol by underage students may explain the number of sexual assaults that occurred after off-campus parties. The binge drinking and large amounts of alcohol consumed at these parties is evident by our finding that 66 percent of the victims who had no clear memory of the assault drank alcohol at an off-campus party prior to the assault.



**78% of Sexual Assaults Involved Alcohol**

### Connection to Alcohol

More than three-fourths (78 percent) of sexual assaults involved the perpetrator, victim, or both consuming alcohol. Both the perpetrator and victim consumed alcohol in 88 percent of sexual assaults involving alcohol. These findings seem to reflect the high rate at which students use alcohol in their sexual encounters.

We saw the lowest rate of alcohol use when the victim and perpetrator were in a dating relationship. Only 36 percent of the sexual assaults occurring in a dating relationship involved alcohol.

Figure 4

## Victim Attendance at Off-Campus Parties

 Freshmen
 Sophomores
 Juniors
Seniors



9%
13%
26%
52%

AR_00000788

## Methods of Sexual Assault[3]

Figure 5 shows the frequency of each method of sexual assault seen in the claims.

- **Incapacitated sexual assault.**[4] Incapacitation of the victim was the most frequent method of sexual assault seen in the claims (Figure 5). Examples include:

    - A student with no recollection of consenting to sexual intercourse was described by the perpetrator as "drunk but in control." Other witnesses described the perpetrator holding the victim up to walk and the victim as "clearly drunk" and "drunk but not stumbling down."

    - A student alleged that an intoxicated friend propositioned him for sex when he helped her

---

3  The dynamics of campus sexual assault are complex, and perpetrators may use more than one method to assault a victim. For example, a victim could be under the influence of alcohol and meet the standard for incapacitation, but the perpetrator may choke or hold the victim down to carry out the assault. For the purposes of this study, we looked only at the primary method used and therefore classified assaults such as this example as sexual assault by physical force.

4  For this study, it did not matter if the perpetrator gave the victim alcohol or other drugs, if the victim voluntarily consumed alcohol without involvement from the perpetrator, or if the institution's adjudication determined incapacitation for it to be classified as an incapacitated sexual assault.

to bed after she threw up and passed out in a bathroom. During the college's investigation he stated that the victim never said "no," "stop," or struggled.

- A group of students walked to an off-campus residence after a party where they were drinking. One of the students fell asleep on the living room sofa and woke to find another student having sex with her.

All of the study's incapacitated sexual assaults involved alcohol. In 89 percent of these claims, both the victim and perpetrator were drinking (Figure 7). The remaining 11 percent of assaults involved only the victim consuming alcohol. While we could not identify the perpetrator's intent in these claims, the unequal levels of intoxication could indicate that a small number of perpetrators targeted intoxicated students. In fact, serial perpetrators most frequently used a victim's incapacitation to carry out the assault (Figure 6).

- **Drug-facilitated sexual assault.**[5] We saw a low rate of claims in which the victim was incapacitated due to unknowingly ingesting a knock-out or date rape drug. Examples of drug-facilitated sexual assaults include:

---

5  For the purposes of this study, it did not matter if drugs were found in the victim's system.



Figure 5

## Methods of Sexual Assault

| | | |
|---|---|---|
| **33%** | **Incapacitation** | *Victim was unable to consent because he/she was drunk, passed out, or asleep.* |
| **29%** | **Physical force** | *Perpetrator used physical force or threats of force to carry out assault.* |
| **18%** | **Failed consent** | *Perpetrator used no force, threat of force, or coercion, but ignored or misinterpreted cues or inferred consent from silence or lack of resistance.* |
| **13%** | **Sexual coercion** | *Perpetrator continued to engage in sexual contact after the victim hesitated or refused, but did not use force.* |
| **7%** | **Drug-facilitated** | *Victim was incapacitated due to unknowingly ingesting a knock-out or date rape drug.* |

AR_00000789



□ A victim described meeting the perpetrator at an off-campus party. She was already intoxicated when she arrived at the party and remembered the perpetrator giving her a "strong" drink. Later in the evening she blacked out and remembered only pieces of the assault.

□ A student woke up in her dorm room after drinking with friends at an off-campus party. She thought she may have been sexually assaulted and went to the emergency room. An examination at the hospital revealed MDMA or "Molly" in her system. The student told investigators that she only drank at the party and did not take any drugs.

■ **Sexual assault by physical force.** More than one-fourth (29 percent) of perpetrators used physical force or threats of force to carry out the assault (Figure 5). Examples include:

□ A student consented to sexual intercourse, but when it started to hurt, she asked her partner to stop. He continued with sexual intercourse, telling her that it would "stop hurting in a second."

□ A student consented to protected sex, but when there was no condom he was held down and sexually assaulted.

□ A student was walking to the bathroom at a fraternity house party when she was pulled into an empty room by an unknown man who beat and raped her.





Figure 6

## Methods of Sexual Assault by Serial Perpetrators

| | |
|---|---|
| **43**% | Incapacitation |
| **23**% | Physical force |
| **21**% | Failed consent |
| **10**% | Sexual coercion |
| **3**% | Drug-facilitated |

AR_00000790

None of the perpetrators used weapons. Instead, the perpetrator most often exploited the victim's vulnerability from intoxication. Overall, alcohol was involved in about half of the physical force sexual assaults with both parties consuming alcohol in most of these claims (Figure 7). Although we cannot determine each party's level of intoxication, the victims claimed they communicated to the other person they did not want to engage in sex. As a result, the perpetrator needed to use some force or threat of force to carry out the assault. The fact that 11 percent of the claims involving alcohol involved only the perpetrator consuming alcohol could also suggest that alcohol consumption by some students enables them to more easily use force to obtain sex when their partner hesitates or resists.

**Failed consent.** In a number of the claims, the perpetrator used no force, threat of force, or coercion, but instead ignored or misinterpreted cues or inferred consent from silence or lack of resistance. Examples of failed consent include:

- A student never asked if he had consent for sex. He believed, however, that his partner consented because she kissed him and helped take off his clothes although she was silent when they were having sex.

- A student engaged with another student in consensual kissing and touching in her dorm room. They briefly began having sexual intercourse before the female student asked the male student to stop because she was a virgin. The male student said he stopped and talked with the victim before he got dressed and left her room. The female student said that the male student stopped when she told him to, but that he still took things further than she wanted to.

- A student reported to her college that she thought she was sexually assaulted by another student. She told investigators that "I did not want to have sex, but it wasn't like I resisted."

We classified these as failed consent sexual assaults, and they accounted for 18 percent of the study's claims (Figure 5). More than two-thirds (70 percent) of failed consent sexual assaults involved alcohol. In those claims, both the perpetrator and victim consumed alcohol 63 percent of the time (Figure 7). In the remaining 7 percent of claims, only the perpetrator was under the influence. This could support the idea that alcohol consumption by some students contributes to misinterpreting sexual interest or ignoring their partner's hesitation.



Figure 7

## Alcohol Consumption
By Method of Sexual Assault

- Both parties were drinking
- Perpetrator only
- Victim only

70% of **failed consent** claims involved alcohol

100% of **incapacitation** claims involved alcohol

51% of **physical force** claims involved alcohol

65% of **sexual coercion** claims involved alcohol

| Failed consent | Incapacitation | Physical force | Sexual coercion |
| --- | --- | --- | --- |
| 63% / 7% | 89% / 11% | 40% / 11% | 28% / 37% |

AR_00000791

Failed consent sexual assaults also had the highest rate of freshman victims. Nearly half of all victims were freshmen. This seems to suggest that students new to the college environment have difficulty with sexual communications, especially when alcohol is involved.

- **Sexual coercion.** The least frequent method of sexual assault was sexual coercion or situations in which one party used no physical force but continued to engage in sexual contact after the other hesitated or refused.[6] However, for assaults occurring in a dating relationship, sexual coercion was the most frequent method—accounting for nearly 60 percent of these claims. Compared to other methods of sexual assault, sexual coercion claims had the lowest rates of alcohol use, although alcohol was still a contributing factor in 65 percent of the claims. Examples of sexual coercion claims include:

  - During a sexual assault investigation an institution found several students who described the perpetrator as "persistent," "wearing you down," and "making you go further than you wanted to go."

  - A student reported that her boyfriend took consensual naked photos of her, but then threatened to post them on social media unless she engaged in certain sex acts.

  - A pledge was ordered to perform oral sex on someone in order to receive a bid from the fraternity.



6 The fact that we looked only at the primary method used to carry out the assault may be one reason for the lower rate of sexual coercion claims. Several of the physical force sexual assault claims involved the perpetrator using physical force after the victim hesitated or resisted.



### Figure 8

## Outcomes After Institution Received Sexual Assault Report

| | |
|---|---|
| **45%** | Perpetrator found responsible |
| **25%** | Perpetrator found not responsible |
| **23%** | Institution did not investigate or adjudicate |
| **7%** | Perpetrator withdrew prior to adjudication outcome |

AR_00000792

*Friend* **Ex-Boyfriend** Acquaintance **Boyfriend**
**Classmate**
# 90% of Victims Knew the Perpetrator

## The Institution's Response to Sexual Assault Complaints

### Instances in Which the Institution Did Not Investigate or Adjudicate a Sexual Assault Report

In 23 percent of the claims, the institution did not investigate or adjudicate students' sexual assault complaints (Figure 8) for the following reasons:

- **Victims were uncooperative.** In more than half of these claims, the victim asked the institution not to investigate, and the institution honored that request or the victim became uncooperative, preventing the institution from fully adjudicating the complaint (Figure 9). Examples included:

  - A student was forcibly raped in her residence hall by another student. Her friend persuaded her to report the sexual assault

to campus police, and the school launched an investigation. The perpetrator hired an attorney and stopped cooperating with the school's investigation. The victim also became uncooperative because she was afraid she would lose her boyfriend and did not want to be known as the "girl who got raped." The perpetrator withdrew from school and the college never completed its investigation.

  - A student came forward to report that her friend was sexually assaulted while passed out from drinking. During the college's investigation the victim became uncooperative because she feared her parents would find out about the rape. The victim ultimately recanted, saying she and the perpetrator engaged in consensual sex.



Figure 9

## Reasons for No Investigation or Adjudication

- Uncooperative victim
- Unable to identify perpetrator
- Perpetrator withdrew
- Relied on police investigation

4%
13%
20%
63%

AR_00000793

- **Victim could not identify perpetrator.** In 20 percent of these claims, victims had no clear memory of the assault, which impeded their ability to identify a perpetrator to investigate.

- **Perpetrator withdrew.** In 13 percent of these claims, the perpetrator withdrew from the institution before the complaint could be fully adjudicated.

- **Institution relied on a police investigation.** In 4 percent of these claims, the institution failed to use its internal process because it inappropriately relied on the criminal justice system to make a determination for them. For example, a student pressed charges with local police after he was sexually assaulted. He sought help from the institution for a no-contact order, which the institution issued. The institution, however, did not conduct an investigation because it believed that the criminal justice system would punish the perpetrator, which would remove the threat to the victim and the campus community.

- **Victim delayed reporting the sexual assault.** Based on this claims data, we suspect that victim delay in reporting may have contributed to an institution's inability to fully adjudicate a sexual assault report. On average, the complaints that were not fully adjudicated were reported to the institution 17 months after the alleged assault.



## Institution's Adjudication of Sexual Assault Complaints

The perpetrator was found responsible in 45 percent of the study's student-on-student sexual assaults, while 25 percent of perpetrators were found not responsible. In 7 percent of the claims, the institution improperly ended the adjudication process without reaching a decision when the perpetrator withdrew from the institution (▥ Figure 8).



Figure 10

## Sanctions

43% Expulsion

25% < 1 year
12% > 1 year
2% Unknown
Suspension

Non-separation sanctions

9% Limited access to campus

6% Disciplinary probation

3% Counseling or training

AR_00000794

- **Expulsion was the most frequent sanction.**
Our data suggest that when sexual assaults are adjudicated, institutions frequently impose their severest sanction. Only 18 percent of claims involved sanctions in which the perpetrator did not receive a suspension or expulsion (Figure 10). In these instances, the student perpetrator was most frequently removed from on-campus housing and permitted access only to academic buildings on campus.

- **Method of sexual assault and likelihood of expulsion.** The method used by the perpetrator to carry out the assault may have been a factor in an institution's choice of sanction. More than four-fifths (82 percent) of expulsion sanctions were for perpetrators who either took advantage of a victim's incapacitation or used physical force (Figure 11). Disciplinary probation and lesser sanctions were most often imposed by institutions when the sexual assault involved failed consent (Figure 11).

## Investigation and Adjudication of Complaints Against Athlete Perpetrators

- **Athletic department involvement in sexual assault investigations.** Our study found no athletic departments overseeing an institution's sexual assault investigation when athletes were involved. There were only two instances in which the athletic department had any role in the process. In both claims, the coaches initially thought the incidents involved only physical fighting and punished the players. When they learned that the incidents involved sexual contact, the coaches stepped back while the institution conducted a Title IX investigation. In each instance, the perpetrator was found responsible for violating the institution's sexual misconduct policy.

- **Adjudications involving athlete perpetrators.** Given the frequent media attention that describes institutions treating athletes more favorably and not holding them accountable for sexual misconduct, it was surprising that our claims data showed that almost two-thirds of athlete perpetrators were found responsible through the institution's adjudication process (Figure 12).

- **Addressing the role of team culture in athlete perpetrated sexual assaults.** While the claims data show that most athlete perpetrators were held accountable for violating the institution's sexual misconduct policy, the team itself was often overlooked during an institution's investigation. In a quarter of the multiple perpetrator assaults by athletes, the institution never assessed whether



Figure 11

## Expulsion vs. Disciplinary Probation
By Method of Sexual Assault

Expulsion
Disciplinary probation

Failed consent: 13% / 43%
Incapacitation: 41% / 22%
Physical force: 41% / 26%
Sexual coercion: 5% / 9%

AR_00000795



**94%** of Victims Were **Female**

**41%** *of Sexual Assaults Involved* **OFF-CAMPUS PARTIES**

the perpetrator's conduct was part of a larger team culture that created a hostile educational environment. In one claim, for example, a disciplinary committee found two athletes not responsible for sexual assault, but the investigation revealed that the team frequently threw parties at which players would take turns having sex with "drunk girls." The institution's investigation did not examine whether the team's conduct was a violation of the institution's sexual harassment policy or other provisions of the student code of conduct.

## Litigation Arising From Campus Sexual Assaults

More than one-fourth (28 percent) of the sexual assaults reported to UE resulted in litigation.[7] As Figure 14 illustrates, there was an equal rate of OCR complaints and lawsuits filed against educational institutions.

---

7  The term "litigation" in this study refers to lawsuits, complaints filed with OCR, and demand letters from claimants that may never result in a lawsuit or OCR complaint.

Over the three-year period, UE and its members spent approximately $17 million defending and resolving sexual assault claims. Defending the institution's investigation and adjudication process was costly. Approximately $9.3 million (or 64 percent of the total losses) was spent on defense costs. Half of these costs were for defending institutions in OCR investigations.

### Litigation Brought by Victims

Victims brought the most litigation against educational institutions and accounted for 68 percent of the litigated claims in this study. All of the OCR complaints filed against educational institutions were initiated by victims. Victim-driven litigation was also the most costly for institutions. It accounted for 84 percent (or $14.3 million) of the total losses.

Litigation does not appear to be driven by adjudicatory findings, but it may be driven by the severity of the sanctions issued. For example, in 48 percent of litigation brought by victims, the institution found the perpetrator responsible for

Figure 12

## Athlete Perpetrators and Adjudicator Findings



Not responsible **24%**

Responsible **63%**

**13%** Withdrew prior to adjudication outcome

AR_00000796

violating its sexual misconduct policy. However, in only one-third of these cases where there was a finding of responsibility was the perpetrator expelled.

## Victims' Allegations

▮ **Title IX**

◻ *Discouraged pursuit of a complaint.* Nearly three-quarters of the litigation initiated by victims alleged a Title IX violation (▥ Figure 15). Less than half (41 percent) of these Title IX claims alleged that the institution discouraged the victim from pursuing an internal complaint or reporting the assault to the police. Examples include:

- Allegations that a staff member told the victim that the perpetrator had been "punished enough."

- A college dean telling a victim that he would try to get the perpetrator to withdraw from the institution so she would not have to deal with the disciplinary process.

- When trying to manage expectations about the investigation and disciplinary process, a staff member told a victim to expect a "grueling" process if she wished to pursue her complaint.

◻ *Failed to conduct timely investigation.* Additionally, victims' Title IX claims frequently alleged that the institution did not conduct a timely investigation. A review of these claim files revealed that many of the allegations concerned students and staff misunderstanding reporting obligations and confidentiality under the institution's sexual misconduct policy. Examples include:

- A student reported that she was sexually assaulted to a counselor at the university's counseling center. The student thought her disclosure would launch a Title IX investigation, but the counselor never disclosed the assault due to confidentiality.

- A student told her resident advisor (RA) that she was sexually assaulted, but the RA never reported it to the college's Title IX coordinator. A friend of the victim eventually reported the assault to the Title IX coordinator and the institution began its investigation.

- A student athlete told her coach that she had been missing practice because she had been raped earlier in the semester. The coach notified the athletic director who recommended that she direct the



Figure 13

## Athlete Perpetrators and Sanctions

41% Expulsion

24% Disciplinary probation

23% Suspension 1 year or less

6% Suspension greater than 1 year

6% Withdrew prior to sanctions

AR_00000797

student to the counseling center. Neither contacted the Title IX coordinator or campus police.

☐ *Inadequate sanctions.* Nearly a quarter of victims' Title IX claims alleged that the sanctions imposed were inadequate and created a hostile environment for the victim on campus. Examples include:

- A perpetrator was permanently removed from campus housing after being found responsible for sexual harassment and sexual assault. The victim challenged the sanction alleging that it was inadequate and that the perpetrator had received special treatment due to his popularity.

- A student complained when her perpetrator received only a one-semester suspension and 10 hours of community service after he was found responsible for nonconsensual sexual intercourse.

▦ **Negligence.** Nearly half (40 percent) of victims alleged that the institution was negligent in its investigation or negligent in training staff to handle sexual assault reports (▦ Figure 15). Victims' claims against the institution were particularly compelling when the adjudicator's written decision signaled problems with understanding the dynamics of sexual assault or the institution's sexual misconduct policy. Examples include:

☐ A hearing panel had trouble understanding and applying the preponderance of the evidence standard to a sexual misconduct case. It ultimately found the student not responsible, but noted in its decision that it was "more likely than not" that the perpetrator failed to obtain the victim's consent.

☐ An institution's sexual misconduct policy provided that students should not assume consent and that it was the responsibility of the initiator of the sexual contact to confirm the other party's consent. A disciplinary committee found two students not responsible for violating the sexual misconduct policy, but noted in its written decision that the students "acted recklessly" in assuming the victim's consent and ignored all of the "signals of apprehension, anxiety, and mixed messages."



Figure 14

## Litigation* Against Educational Institutions

- OCR complaint — 28%
- Perpetrator lawsuit — 17%
- Victim lawsuit — 11%
- Demand letter — 
- 44%

*The term "litigation" in this study refers to lawsuits, complaints filed with OCR, and demand letters from claimants that may never result in a lawsuit or OCR complaint.

AR_00000798

☐ A hearing panel found a student not responsible for violating the institution's sexual misconduct policy, but ordered him to participate in consent training because they were troubled by his admission that he had sex with other intoxicated students besides the victim.

■ **Breach of contract.** Nearly one-third (32 percent) of victims alleged the institution failed to follow its own process and procedures when investigating and adjudicating sexual assault reports (Figure 15). In their breach of contract claims, victims most often challenged the sanctions imposed on the perpetrator. Specifically, a seemingly arbitrary appeal process and negotiating with the perpetrator to avoid litigation formed the basis of victims' breach of contract claims. Examples include:

☐ After finding a student responsible for violating the institution's sexual misconduct policy, the disciplinary committee recommended expulsion. The student appealed and the president reduced the sanction to one-semester suspension. The president did not articulate a reason for reducing the sanction or communicate the change to the victim.

☐ A student was found responsible for sexual assault and suspended, but while he appealed the decision, his attorney negotiated a settlement to avoid litigation. The student was able to choose whether to proceed to a new hearing or withdraw from the institution and receive a tuition refund.

☐ An institution considered an accused student's appeal because his attorney threatened litigation, although the student failed to meet the appeal filing deadline and did not have sufficient grounds for the appeal under the institution's grievance policy.

☐ As a result of negotiating with the perpetrator, an institution agreed not to issue the recommended sanction until after the accused student withdrew, enabling him to transfer to another college.

## Litigation Brought by Perpetrators

Nearly one-third (32 percent) of the litigation against institutions was initiated by students accused of sexual assault. Sanctions often drove the litigation. More than half of the perpetrators who brought litigation had been expelled from the institution. However, a little more than a third of the perpetrators were given

Figure 15

## Victim Allegations



| | |
|---|---|
| 72% | Title IX |
| 40% | Negligence |
| 32% | Breach of contract |
| 28% | Fraud |
| 5% | Intentional infliction of emotional distress |

*The complainant often makes multiple allegations against the institution.*

AR_00000799



light sanctions or no sanctions at all. Additionally, 72 percent of perpetrators who sued the institution also sued the victim for defamation or slander. These findings may suggest that, for some perpetrators, litigation is a means to repair their reputation.

**Perpetrators' Allegations**

Figure 16 depicts the five most frequent allegations made by perpetrators against educational institutions.

▪ **Negligence and breach of contract claims rooted in the adjudicatory process.** Student perpetrators were most often dissatisfied with the institution's adjudicatory process and challenged its fairness. Typical allegations included:

☐ The institution imposed harsh and disproportionate sanctions.

☐ The institution did not consider the student's good disciplinary and academic records when imposing sanctions.

☐ To show a pattern of predatory behavior, the institution considered allegations of prior misconduct that were either unrelated to the pending matter or were unsubstantiated.

☐ The institution did not consider exculpatory evidence such as text messages from the victim in which she did not refer to the incident as sexual assault.

☐ The institution did not allow the student to present evidence about the victim's sexual history or reputation.

▪ **Title IX.** In their Title IX claims, perpetrators focused on the institution's sexual misconduct policy. Specifically, they argued that the policies and process were inherently discriminatory toward men or that an unfair outcome was reached to stave off adverse OCR findings. For example, a perpetrator alleged that the university found male students responsible for sexual assault based on their gender regardless of the evidence or lack thereof.



### Figure 16
## Perpetrator Allegations

| | |
|---|---|
| **79**% | Negligence |
| **79**% | Breach of contract |
| **57**% | Title IX |
| **57**% | Intentional infliction of emotional distress |
| **50**% | Due process violations |

*The complainant often makes multiple allegations against the institution.*

AR_00000800

▪ **Requests for injunctive relief.** More than a third (36 percent) of perpetrators sought a temporary restraining order (TRO) or preliminary injunction to stop the institution's adjudication process or the imposition of sanctions. Courts granted approximately 20 percent of perpetrators' requests. This tells us that some courts are willing to examine the fairness of an institution's policy and process. Examples include:

☐ A court denied a student's request to be immediately readmitted to the university, but ordered the institution to reconsider the length of the suspension imposed. The institution ultimately decided to shorten the suspension and allow the student to return to campus prior to the victim's graduation.

☐ A student was at the end of his final semester before graduating when he was found responsible for sexual assault and suspended. He filed a TRO, which the court granted. The student was allowed back on campus to finish his courses and graduated from the institution.

☐ Although the court denied a student's TRO, it voiced several concerns about the institution's internal process and noted that it seemed "arbitrary and capricious."

## Conclusion



UE claims show that colleges and universities respond to some of the most difficult sexual assault cases. Although addressing student sexual assaults is a formidable task, the information from this study can help institutions understand this complex environment and develop an integrated and comprehensive plan for responding to and preventing sexual assaults on campus.

## Acknowledgment

"Confronting Campus Sexual Assault" was prepared under the direction of Alyssa Keehan, JD, director of risk research at UE. Emily Caputo, JD, served as the primary researcher, and Hillary Pettegrew, JD, and Melanie Bennett, JD, served as assisting researchers.



United Educators

EduRisk™ provides education-specific risk management resources to colleges and schools and is a benefit of membership with United Educators (UE). As a member-owned company, UE is committed to helping educational institutions by offering stable pricing, targeted insurance coverage, extensive risk management resources, and exceptional claims handling.

**To learn more, please visit** www.UE.org.

AR_00000801



# Access More Resources Online

EduRiskSolutions.org, home to the risk management information schools and campuses need to ensure student safety and to promote a positive work environment. Articles, blogs, risk assessments, and webinar recordings are readily available when you need them—from behind your desk or on the go with EduRisk's mobile-friendly format. And, training administrators can explore blended learning programs, preview online courses, and obtain assistance with implementing training.

The material appearing in this publication is presented for informational purposes and should not be considered legal advice or used as such.

Copyright © 2015 by United Educators Insurance, a Reciprocal Risk Retention Group. All rights reserved. Permission to post this document electronically or to reprint must be obtained from United Educators.

UE-113199 01/15



**United Educators**

# Risk Research Bulletin
### Student Affairs

# Student Sexual Assault: Weathering the Perfect Storm

*By Alyssa S. Keehan, Senior Risk Management Counsel*

Incidents of student-on-student sexual assault are a "perfect storm," a confluence of some of the most difficult student risk management issues—alcohol, mental health, and sexual violence. The safety and liability risks posed by student sexual assault are significant and made more challenging because the underlying circumstances are often unclear. Most situations involve acquaintances, no witnesses, and an unclear memory of events due to alcohol abuse.

From 2006-2010, United Educators (UE) received 262 claims of student-perpetrated sexual assault, which generated more than $36 million in losses for UE and our members. The claims data show that students accused of perpetrating a sexual assault are just as likely to sue the institution as accusing students. As colleges review their student sexual assault practices in light of the April 2011 "Dear Colleague" letter (DCL) from the U.S. Department of Education's Office for Civil Rights (OCR), institutions should strive to provide a fair and impartial response to both parties until the matter is resolved.

## UE Claims Data

### Student-on-Student Sexual Assault

In UE's five-year study, 96 percent of the student-on-student sexual assault claims involved acquaintances. Students accused of assault brought 54 percent of the claims and comprised 72 percent of the financial losses—composed of legal fees and payments to claimants. The remaining claims and losses were brought by accusers.

I. Breakdown of Claims and Losses



AR_00000803

**Common Factors in the Claims**

In 92 percent of the claims with losses, the accuser was under the influence of alcohol, and more than 60 percent of accusers were so intoxicated that they had no clear memory of the assault. In addition, 63 percent of the accusers were first-year students. Prior to the assault, 33 percent of the accusers battled mental health issues such as eating disorders,[1] personality disorders, suicide attempts, or trauma from a previous sexual assault. Another frequent factor was varsity athletes as alleged perpetrators. Although athletes are about 10-15 percent of an institution's student population, they comprised 25 percent of the study's alleged perpetrators.

II. Common Claims Factors



**Liability Theories**

Three-quarters of the student sexual assault claims resulted in litigation. Claimants argued that educational institutions:

- Did not follow their policies and procedures
- Had confusing or unclear policies and procedures
- Did not respond promptly or reasonably to an assault report
- Treated the victim or the perpetrator cruelly or unfairly

These four issues translated into the following causes of action (in order of frequency): negligence, breach of contract, Title IX violations, intentional infliction of emotional distress, and fraud. Less commonly alleged causes of action included defamation, due process violations, and breach of the covenant of good faith and fair dealing.

## Lessons From the Claims

The following strategies focus on promoting fair and impartial behavior by colleges in responding to complaints of sexual assault, administering the disciplinary process, and communicating with others about student sexual assault.

---

1   Although conditions such as an eating disorder may seem unrelated to sexual assault, prior mental health issues become important in determining emotional distress damages for a victim.

## Responding to Complaints of Student Sexual Assault

**Lesson 1:** *Promptly investigate sexual assault complaints.*

The DCL states that most investigations should be completed within 60 days of the initial report unless there are complicating factors such as multiple incidents. Principles of tort law also dictate that an institution should respond promptly when notified of a risk. In nearly half of the claims studied, the institution's investigation took longer than three months to complete, or no investigation was conducted. This delay or inaction angered both parties. Accusers thought the institution did not take their complaint seriously, and the accused thought the process was unnecessarily drawn out, causing them additional stress.

Institutions should prevent the following traps from stopping or delaying investigation:

- **Waiting for a parallel police investigation to conclude.** The DCL requires prompt investigation but allows institutions to temporarily delay investigations while law enforcement collects evidence. Institutions should begin their own investigation before the criminal investigation concludes. If police request a delay of more than 10 days, institutions should obtain a written directive from the police specifying a date when the institution may begin.

- **The victim prefers not to pursue the complaint.** Under Title IX, the obligation to protect the greater campus community from sexual assault supersedes an accuser's wishes. Therefore, an institution cannot honor an accuser's request not to investigate a complaint. An accuser who requests anonymity should be advised that he or she will be protected from retaliation and that anonymity may limit the school's ability to respond. In deciding how to proceed, institutions must weigh the complainant's anonymity request against the accused's potential danger to other students. The following sample language is based upon Haverford College's sexual assault policy and explains this important requirement well.

  > *"While the college will make every effort to safeguard the identities of students who seek help or report, as a requirement of Title IX the college must investigate and take action once it becomes aware of a sexual assault allegation whether or not the student chooses to pursue a complaint."*

- **The alleged student perpetrator is no longer a student.** In about 25 percent of UE's claims, the institution terminated its investigation after the alleged perpetrator withdrew from the college. In these situations, institutions should still complete the investigation and note on the student's transcript that he or she withdrew while a disciplinary action was pending. These actions are helpful if the student attempts to re-enroll or apply at another institution and to bring closure for the complainant.

- **The incident occurred several months before the student submits a complaint.** Many student discipline policies impose a limited time period for reporting assaults such as six months, two years, or "as long as one of the parties is a student." These time limitations are controversial. While OCR is silent on the reporting periods, institutions should not require an unreasonably short period for reporting incidents. In the claims reviewed, the accuser often did not immediately report the incident, but waited days, weeks, or months before coming forward. Institutions should allow ample time for reporting sexual assaults, but their policies should warn that the time elapsing between an incident and its report could negatively affect the quality of the evidence and the investigation.

- **The parties want to resolve the matter informally**. Before offering an informal resolution option[2], an institution should investigate the underlying complaint. Consider this scenario based on a UE claim:

  > *A student reports an assault, and the college (without investigating) offers to resolve the matter informally. The student agrees and, through the informal resolution process, reaches an agreement with the accused. After a few months, the accusing student tells her parents about the assault. Angry, the parents file a complaint with OCR. OCR investigates and tells the institution that it must investigate the underlying complaint. The accused student tells the institution that if it re-opens the matter to investigate, he will sue for breaching the terms of the resolution agreement.*

  Failure to conduct an investigation forced the institution to breach the terms of its resolution agreement. An investigation is also important for determining whether an informal resolution is appropriate. For example, if the institution's investigation reveals that the accused student was the subject of a prior sexual assault complaint or that he has assaulted others, informal resolution is not a good option.

**Lesson 2:** *Clearly understand how local police, campus security, and student discipline will coordinate response to sexual assaults.*

Many claims indicated slow or poor coordination between local police and the institution's representatives. As a result, complaints were not resolved in a timely manner. Accusers were not informed about the status of their complaints or the entity—local police, campus security, or student discipline—handling it. To avoid these problems, consider the following actions:

- **Draft or update a memorandum of understanding (MOU) between local law enforcement and the institution addressing:**
  - Which law enforcement body has jurisdiction for investigating crimes occurring on campus and off campus on property owned or not owned by the institution
  - How local law enforcement will inform the institution about reports it receives involving students, faculty, and staff
  - Who from the institution will act as liaison with local law enforcement and vice versa
  - How local law enforcement will keep the institution informed of investigations involving students, faculty, and staff
  - The general timeframe needed by local law enforcement to conduct a sexual assault investigation, such as three days, 10 days, or more

- **Ensure representatives from student discipline, campus security, and local police communicate regularly.** On a quarterly or at least an annual basis, institutional representatives should meet with local law enforcement to discuss any coordination issues and review the terms of the MOU. Large institutions with numerous reports may need more frequent meetings.

- **Keep the parties informed.** The DCL requires that institutions give periodic status updates to the parties. In UE's claims, failure to communicate often fueled the parties' anger against the institution.

---

2    While OCR does not consider traditional face-to-face mediation appropriate for resolving sexual assault complaints, OCR has recognized that other types of informal resolution, such as "shuttle diplomacy," may be appropriate.

**Lesson 3:** *Document the institution's initial meeting with the victim.*

Following report of an assault, accusers often had a different recollection than the institution about what was discussed and decided. During this first meeting, accusers were often emotional, which can affect memory, cause confusion about rights and resources available, and create ambivalence about filing a complaint.

For these reasons, UE recommends that institutions follow the initial meeting with a letter to the complainant that summarizes the options and resources provided to the student. Institutions should request a signed acknowledgment of receipt as well as a written statement indicating the course of action the student wishes to pursue. Institutions may also consider sending a later email repeating the information from the letter and asking whether the student has further questions or needs assistance. This provides documentation to:

- Victims regarding their available rights and resources.

- Victims' parents wanting to know what the institution has done in response to their child's reported assault.

- The institution by providing a record, in the event of litigation, of what it discussed with the victim.

- The institution for complying with OCR's Title IX regulations. OCR requires that when a student reports an assault, a school must apprise them of:

  - The institution's investigation process, including the importance of treating both parties equitably

  - The institution's formal and informal resolution procedures, making clear that students are not required to work out issues directly with each other and that mediation is not used in sexual assault cases

  - The availability of on- or off-campus counseling services

  - Possible academic accommodations

  - The institution's prohibition against and the steps it will take to protect complainants from retaliation

**Lesson 4:** *Refrain from concluding whether an assault occurred in an investigator's report.*

In a few claims, the investigator concluded in a written report whether an assault occurred. These conclusions drove claims when the college's hearing panel reached a different decision. Even when a hearing committee agrees with the investigator's conclusions, litigants can attack the investigator's report for unduly influencing the panel's decision. For these reasons, institutions should require that investigators stick to the facts and not opine about whether an assault occurred. Rather, an investigative report should highlight the strengths and weaknesses of a complaint and determine if there is enough evidence to proceed with a hearing. To manage expectations, institutions should present their investigate reports using language such as:

> *"This report outlines the facts based upon the evidence gathered during the investigation. Additional facts may be developed prior to or during the hearing of this case. The decision to grant a hearing does not compel a particular finding by the Board nor does it suggest that the evidentiary burden will be met."*

## Administering the Disciplinary Process

***Lesson 5:*** *Provide the accuser and the accused each with an institutional liaison to navigate the disciplinary process.*

While most institutions provide resources and support to students alleging sexual assault, many do not provide similar resources to accused students. One-third of the claims brought by the accused alleged the institution provided them with unequal support. Accused students felt the lack of support showed institutional bias and a presumption of guilt. UE recommends that institutions provide each party with a trained liaison familiar with the institution's process and code of conduct. Liaisons explain the process, arrange for academic or other accommodations, explain a case's strengths and weaknesses, ease anxieties, and show the parties that the college is committed to a fair process.

***Lesson 6:*** *Carefully consider the role of lawyers in disciplinary hearings.*

In the claims, institutions often banned lawyers from their disciplinary hearings. Due to the quasi-judicial nature of these hearings and the high stakes of their decisions, these bans upset the parties—particularly the accused. UE recommends that institutions clarify that disciplinary hearings are an informal process for determining whether a student has violated the college's discipline code. These hearings are not adversarial and not akin to court proceedings. For example, The Rhode Island School of Design's student code of conduct uses the following language:

> *"The Code is neither a criminal nor a civil code and does not operate like one. Our expectations for our fellow community members are for a significantly higher standard of conduct than the bare minimum prescribed by law…Because the purposes of the Code are different from the purposes of law, the procedures by which the Code is implemented are, by design, more informal and less adversarial than those of a court…"*
> www.risd.edu/Policies/Code_of_Student_Conduct/Purpose_Definitions

As an alternative to banning lawyers from the discipline process, many institutions allow them to participate in a non-advocacy role. Lawyers are not allowed to cross-examine or speak on their client's behalf but can quietly advise them. If there is a concurrent criminal investigation, institutions *should allow* lawyers to participate in a non-advocacy role at hearings.

***Lesson 7:*** *Pay attention to how evidence is collected and permitted at hearings.*

In nearly half the claims, one party contested how evidence was gathered or what evidence was allowed at the disciplinary hearing. Usually, a party perceived that he or she was not allowed to present evidence that told his or her full side of the story or that the other party's evidence was treated differently. For example, some complained they were prohibited from presenting evidence about a prior sexual relationship or that their witnesses were required to wait much longer than the other party's witnesses before giving their testimony. To ensure the parties feel their evidence has been fairly and appropriately considered, consider these practices:

- **Select investigators and hearing officers with the "right" temperament.** When selecting investigators and hearing officers, *temperament is more important than academic qualifications.* Colleges should look for individuals who are nonjudgmental, good listeners, and well organized.

AR_00000808

- **Train investigators and hearing officers.** To ensure investigators and hearing officers remain fair and impartial, institutions should provide training, preferably from trainers who are not advocates. While advocates possess relevant expertise, their bias for a particular perspective can affect the real and perceived impartiality of the institution's hearing. For training, consider using:

  - Law enforcement or district attorneys who specialize in sexual assault cases

  - Outside counsel with experience investigating and handling sexual assault cases

  - National conferences addressing campus sexual assault

  - In-house experts, such as institution researchers who are studying the issues of alcohol or sexual violence

  Additional training recommendations are contained in the Resources section.

- **Provide equal access to each party's evidence.** OCR requires that, prior to the hearing, both parties have the same rights to obtain timely access to information that will be used at the hearing, such as each other's written statements. Similarly, during the hearing, the parties should have the same rights to present evidence and witnesses, including character witnesses.

- **Do not unreasonably restrict evidence.** Institutions should use the following guidelines for allowing evidence:

  - Institutions should look for ways to allow the parties to feel heard and err on the side of allowing rather than excluding information. For example, if a party or his or her parents want to submit a written statement, allow this if a copy of the statement is provided to both sides.

  - In the institution's code of conduct, use broad language that gives the institution flexibility on what evidence to allow. The following excerpt from Duke University's student conduct policy is a good example.

  > *"The hearing panel will decide what testimony, witnesses, or other information is relevant, and may exclude information or a witness that is deemed immaterial or irrelevant."*
  > www.studentaffairs.duke.edu/conduct/about/ucbhearings

### Lesson 8: *Separate other punishable behavior of the perpetrator or the victim, such as alcohol or drug consumption, from the alleged sexual assault.*

As mentioned, UE's claims demonstrate that the majority of student sexual assaults occur in connection to other prohibited campus behavior, such as alcohol use. When a hearing combines charges for an assault with other misconduct, negative consequences can result. For example, it can inhibit an accuser from reporting, make it difficult for institutions to keep the issues separate, and cause the parties to believe the institution is biased against them. In 25 percent of claims studied, accusers and accused students felt their admission of guilt for other behavior affected the outcome of their sex assault case. OCR also recommends that institutions address other rule violations separately from a sexual violence allegation.

AR_00000809

To promote a fair hearing process for complaints of sexual assault, consider using one of these approaches:

- Give immunity to both the accused and the accuser for drug and alcohol violations occurring in connection with an assault
- Hold a separate hearing for related nonassault infractions of the student discipline code

**Lesson 9:** *Provide both parties with adequate time and information to prepare for a hearing.*

Complaints about the lack of advance notice of the hearing, evidence, and charges were made in 60 percent of claims initiated by the accused. In some cases, the institution gave as little as 12 hours' notice of an impending hearing while the majority gave about three days. Also, none of the code of conduct policies from UE's claims addressed whether the institution would provide advance notice of the evidence and charges.

While there is no legal standard, UE recommends that *institutions should strive to provide the accused and accuser with at least five days' notice of a discipline hearing and three days' notice of the evidence and charges*. Due to the serious nature of the charges and the potential penalty, the parties may need time to find and consult with a lawyer. Moreover, the parties will probably need time to understand the charges and the evidence and prepare their case. The parties may also want time for their parents to travel to the institution and provide them with moral support during the hearing.

## Communicating With Others About Student Sexual Assault

**Lesson 10:** *Consider the role of parents when addressing student sexual assault.*

In more than half of the study's claims, parents were noted as a key factor. Parents complained that the institution did not notify them about the assault or keep them informed of the institution's response, react quickly enough to their child's reported assault, or consider the impact of the accusation on them or their child.

To incorporate parents in an institution's response, consider including information for parents about sexual assault in college policies, websites, and other communications. For example, institutions can state when parents will be notified of an assault involving their child and what parents should do if their child reports or is accused of assault.

In addition, institutions should address the issue of parental notification in the initial meetings with the accuser and accused. Document these discussions. While institutions do not need to encourage parents to attend hearings, they should allow attendance upon parent or student request. In UE's experience, parents become angry and suspicious when they believe the institution is keeping key information from them.

**Lesson 11:** *Train students on the connection between alcohol and student sexual assault.*

Alcohol was a significant factor in nearly all of the claims studied. Student training programs should address the connection between alcohol and sexual assault. Institutions may also consider addressing other common factors from the claims, such as a student's age and mental health.

The following are examples of training on the alcohol and student sexual assault connection:

- The University of Pacific conducts joint student education programs on alcohol and sexual misconduct that target populations known for high alcohol use, such as Greeks, athletes, and first-year students. www.pacific. edu/Campus-Life/Safety-and-Conduct/Student-Conduct/Sexual-Assault-Prevention-Program.html

- Boston University trains local bar owners about student sexual assault and how to identify situations that may lead to an assault. www.bu.edu/today/2011/talking-about-alcohol-and-sexual-violence/

- Columbia University has created a list of tips to reduce a student's risk of becoming a perpetrator or victim of sexual assault when alcohol is involved. http://health.columbia.edu/topics/violence/alcohol-sexual-assault

### Lesson 12: *Use a multidisciplinary team model to improve response to, and prevention of, student sexual assaults.*

A well-coordinated response to a student sexual assault involves several departments, such as the Title IX coordinator, dean of students, campus security, student discipline, counseling, and academics. Poor communication between these departments drove claims by leaving gaps in the institution's response. Consider this example:

> *After being sexually assaulted, a student struggled academically for months. She decided to report the matter to the institution's Title IX coordinator. The student told the coordinator that she would like to pursue the matter criminally, too. The coordinator said she would pass along the report to police. A day after the student made the report, the institution placed her on academic probation, which upset her. The Title IX coordinator neglected to tell police about the assault.*

To avoid similar communication problems, institutions should consider taking these steps:

- **Create or use an existing multidisciplinary team to coordinate resources for students reporting sexual assault.** Multidisciplinary teams facilitate timely communication and include varied, expert perspectives, increasing the likelihood that the college's actions will be prompt, thoughtful, and informed. Threat assessment or student behavioral concerns teams can serve as good models.

- **Use an existing student behavioral concerns team to prevent sexual assaults.** Many accused and accusing students in the claims were struggling or acting out prior to the assault. Some had attempted suicide, been hospitalized for intoxication, or been previously accused of a sexual assault. A college's behavioral concerns or threat assessment team typically strives to intervene with students displaying concerning behaviors and can play a role in preventing student sexual assault.

### Lesson 13: *Develop a public relations strategy for student sexual assault.*

An alleged sexual assault can quickly develop into a communications crisis for a college. How an institution communicates to various audiences about an alleged assault significantly affects whether the parties involved feel fairly treated and the institution suffers any reputational damage. To ensure institutions are prepared, consider taking these steps *before* a sexual assault develops into communications crisis:

- **Create a team of key decision makers.** Effective communication in a crisis requires input from many campus departments. To streamline the process of gathering necessary input during a crisis, create a multidisciplinary team of campus representatives that includes the director of public affairs or communications, the head of campus law enforcement, the president, dean of students, general counsel, and head of IT.

AR_00000811

- **Develop messages that answer the questions likely to be posed during the crisis.** If a campus sexual assault receives media attention, institutions should try to anticipate questions they will be asked. Colleges should refrain from speculation and should instead emphasize that they take the allegations seriously and have a process to deal with the allegations.

- **Identify and train media spokespeople.** All individuals on an institution's communications team should receive media training from a reputable public relations firm or an in-house expert so they can effectively deliver the institution's key messages. Institutions should clearly identify and limit the number of spokespeople in a crisis to ensure a unified and consistent message.

## Conclusion

Student sexual assault combines higher education's most confounding issues, such as alcohol, mental health, and sexual violence. UE's claims show that institutions should not develop procedures unreasonably favoring the accuser or accused. Rather, from a safety, liability, and reputational perspective, institutions need to establish practices that assure a fair and impartial response to both parties.

## Resources

### Title IX Training Resources

- **Margolis Healy and Associates**
  www.margolis-healy.com/
  Margolis Healy is a consulting firm of nationally recognized experts who specialize in higher education safety issues, including sexual violence. Its training workshops have addressed the following areas of Title IX compliance: understanding the procedural rights of victims and alleged perpetrators, the Clery Act, the student judicial process, understanding the nature of violence against women in crimes on campuses, defining roles and confronting conflict among stakeholders, and conducting an investigation. The firm often collaborates with UE Select Counsel Jeff Nolan, who frequently consults and trains on legal aspects of Title IX.

- **Gina Smith, Ballard Spahr**
  www.ballardspahr.com/people/attorneys/smith_gina.aspx
  Smith is a law firm partner and former Philadelphia district attorney who specializes in the investigation and prosecution of sex crimes and child abuse. She conducts training for various university constituencies, including sexual assault response teams, judicial hearing boards, and members of the campus community. Smith and her team also advise colleges and universities about sexual misconduct investigations and policies, changes in the law, and investigations into charges of sexual misconduct, including sexual violence.

- **Kathryn Bender**
  http://triangleadr.com/meet-the-specialist/
  Bender is a lawyer with more than 25 years of experience practicing law, including serving as in-house counsel to a private university, attorney for a state university system, and serving on the Board of the National Association of College and University Attorneys. Bender conducts training for Title IX coordinators.

- **Amy Foerster, Saul Ewing**
  www.saul.com/attorneys/bio.aspx?attId=765
  Foerster is a lawyer who co-chairs Saul Ewing's Higher Education Practice Group. Prior to joining the firm, she was a senior deputy attorney general with the Pennsylvania Office of Attorney General, where she defended the commonwealth against claims brought under Title IX.

AR_00000812

■ **The Association of Student Conduct Administration**
www.theasca.org/
The Association for Student Conduct Administration (ASCA) comprises professional educators responsible for administering standards of student conduct within colleges and universities. ASCA annually provides training programs for conduct administrators. The Donald D. Gehring Campus Judicial Affairs Training Institute provides training on basic judicial, mediation, and legal issues, and advanced training for more experienced conduct administrators.

## United Educators Resources

■ **"UE's Title IX Advisory Series 1-6", 2011.**
www.ue.org/Learn/TitleIXAdvisory.aspx
The advisory series breaks down the issues covered by OCR's "Dear Colleague" letter into six topics: FAQs about the DCL, requirements for Title IX coordinators, revising nondiscrimination policies and grievance procedures, responding to complaints and conducting investigations, conducting hearings in sexual assault and harassment cases, and required training and prevention measures. Each advisory summarizes the basic compliance requirements imposed by OCR and contains citations to helpful documents such as model institutional policies, OCR Title IX compliance reviews of colleges, and previous OCR guidance addressing Title IX and sexual harassment.

■ **"Checklist for Complying With OCR's 'Dear Colleague' Letter on Student Sexual Assault and Harassment."** *From the UE Toolbox*, 2011.
www.ue.org/Libraries/Shared_RML/Title_IX_Advisory_Checklist_for_Complying_With_OCR_s_Dear_
Colleague_Letter.sflb.ashx
This publication covers the topics that educational institutions should address when reviewing and revising their policies and practices on student sexual assault and harassment. Many items covered are specifically discussed in the DCL, while some are practices recommended by United Educators.

■ **"Challenging Issues in Complying With Title IX on Student Sexual Assault and Harassment."**
*Webinar jointly sponsored by United Educators, the American Council on Education, College and University Personnel Administrators, and the National Association of College and University Attorneys.*
**November 2011.**
www.ue.org/Learn/TitleIXAdvisory.aspx
In this webinar archived and downloadable on UE's website, legal and student affairs experts addressed the major challenges colleges face in interpreting and implementing the DCL, lessons from studying UE's student sexual assault claims, and specific steps for institutions to take in complying with the DCL.

■ **"A Guide to Developing a Campus Crisis Communications Plan."** *Risk Research Bulletin*,
**December 2009.**
www.ue.org/Libraries/Shared_RML/Risk_Research_Bulletin_Crisis_Communications_--_12-09.sflb.ashx
This publication highlights the key steps an institution should take in creating an effective crisis communications plan. For example, it identifies how to set objectives to guide an institution's crisis response, the types of crisis likely to occur on a campus, and the best communication modes for reaching key campus constituencies.

AR_00000813

Education's Own Insurance Company.

 **United Educators**

Two Wisconsin Circle, Fourth Floor
Chevy Chase, MD 20815
phone/301.907.4908
fax/301.907.4830
www.ue.org

United Educators Insurance, a Reciprocal Risk Retention Group, is a licensed insurance company owned and governed by more than 1,160 member colleges, universities, independent schools, public school districts, public school insurance pools, and related organizations throughout the United States. Our members range from small private schools to multicampus public universities.

UE was created in 1987 to be "Education's Own Insurance Company" on the recommendation of a national task force organized by the National Association of College and University Business Officers. Our mandate is to provide a long-term, stable alternative to the cyclical unavailability and erratic pricing of commercial liability insurance. We understand the special nature of education and are committed to reducing the overall cost of risk for our policyholders. UE members benefit from tailored coverages as well as value-added, education-specific services in claims and risk management. United Educators is Rated A (Excellent) by A.M. Best.

For more information, visit our website at www.ue.org or call us at (301) 907-4908.

The material appearing in this publication is presented for informational purposes and should not be considered legal advice or used as such.

Copyright © 2011 by United Educators Insurance, a Reciprocal Risk Retention Group. All rights reserved. Contents of this document are for members of United Educators only. Permission to post this document electronically or to reprint must be obtained from United Educators.

*United Educators has a Best's Rating of A (August 2011). For the latest rating, access www.ambest.com.*



AR_00000814



EduRisk
By United Educators

Risk Research Bulletin

# Review of Student–Perpetrator Sexual Assault Claims With Losses

Based on in-depth research into our higher education student sexual assault claims, United Educators (UE) has produced a series of publications[1] that highlight important findings from the claims. Institutions can use these findings to assess how they handle sexual violence on their own campuses. The findings have included, for example, allegations made most frequently by victims and perpetrators, practices that ensure a fair internal process for both parties, and common mistakes in investigations and adjudications that anger one party and complicate or make impossible a resolution. As the law governing student sexual assault evolves, UE's members should be familiar with the lessons and recommendations resulting from our claims research.

**Terminology.** This publication uses the term "victim(s)" to refer to students who allege that they were sexually assaulted and the term "perpetrator(s)" to refer to the individuals who allegedly committed the assaults. "Sexual assault" means a range of misconduct that includes sexual coercion, nonconsensual sexual touching (i.e., fondling and kissing) and nonconsensual sexual intercourse with vaginal, oral, or anal penetration.

[1] "Student Sexual Assault: Weathering the Perfect Storm" (2011); "Confronting Campus Sexual Assault: An Examination of Higher Education Claims" (2015); "Review of Student-Perpetrator Sexual Assault Claims With Losses" (2016).

AR_00000815

UE recently released "Review of Student-Victim Sexual Assault Claims With Losses." In this companion publication, UE reviews claims[2] with losses from student *perpetrators* of sexual assault over the same time period, 2011 to 2015. Specifically, this publication examines claims that:

▌ Were brought by student perpetrators of sexual assault at UE higher education members and reported to UE from Jan. 1, 2011, through Dec. 31, 2015

▌ Resulted in financial loss to the member institution and/or UE, including payments to claimants, such as settlements and verdicts, and defense costs

All perpetrators in this claims review were male. Ninety-six percent of the claims involved alleged assaults of females by males, and the remaining 4 percent involved male-on-male assault allegations.

## Defense Costs Drove Losses

From 2011 to 2015, victims brought about 25 percent more claims than did perpetrators, and the average loss per claim was significantly higher: $346,460 for victims, compared to $187,461 for perpetrators. Far more than in the victim claims, however, the losses in perpetrator claims were driven by defense costs, which accounted for 71 percent of losses. By contrast, defense costs made up only 37 percent of losses in victim claims. While only one perpetrator claim had a loss exceeding $1 million, that entire amount was defense costs.

**Claim resolutions.** The perpetrator claims included one trial, which resulted in a defense verdict for the college, but its defense cost more than $500,000. A pre-trial settlement proved impossible because the perpetrator demanded multiple millions of dollars. Of the remaining claims, nearly half (46 percent) were still open, 27 percent were settled for an average of $57,635, and another quarter were dropped. In some dropped claims, the perpetrators did not appeal the dismissal of their lawsuits, but most simply stopped pursuing their claims for unknown reasons.

---

[2] "Claim" has the same definition in both reviews: an event that could give rise to legal action as well as a demand for damages. UE policies generally require members to report all student sexual assaults about which they are notified, regardless of whether a party threatens legal action.

[3] This group of claims included both the claim with the highest total loss (more than $1 million) and the only trial (in which defense costs exceeded half a million dollars).

### Perpetrator Claims Loss Data

**Total losses:** $8,998,135

- Average loss per claim: $187,461
- Highest: $1,076,860
- 13% of claims incurred loss of $500,000 or more
- 40% incurred loss of $200,000 or more

**Total defense costs:** $6,359,429 (71% of total losses)

- Average: $132,488
- Highest: $1,076,860
- 23% of claims incurred defense costs of $200,000 or more
- 31% incurred defense costs of $100,000 or more

## Actions Challenged by Perpetrators

The severity of the sanction drove many of the perpetrators' claims. Nearly half were brought by a perpetrator who was expelled; a third of those claimants were seniors dismissed from school shortly before graduation. Challenges to suspensions comprised about a quarter of the claims, with the suspension period ranging from several weeks to at least two years or as long as the victim was enrolled at the school. In the remaining claims, perpetrators challenged the institutional process even when the sanction imposed was relatively light, such as a no-contact order or a disciplinary warning, or the perpetrators were found not responsible and thus received no sanctions.[3] But here, the accused student was often barred from campus before being found not responsible and alleged the education interruptions caused harm.

> **Example:** *An accused student was given a second disciplinary hearing after the first had serious procedural problems. He was found not responsible but missed a month of school, had to drop several classes, and suffered reputational damage (e.g., a professor publicly characterized the student as a "rapist").*

AR_00000816

**Legal attacks on victims.** Sometimes not only institutions but also sexual assault victims face legal action by perpetrators. In 15 percent of UE claims, perpetrators directly attacked victims by adding them as defendants to lawsuits against schools or suing them separately.

> **Example:** A perpetrator kept threatening to sue the institution but did not. Instead, he filed a defamation lawsuit against the victim, whose attorney reported numerous contacts from the perpetrator's lawyer urging the victim to disavow her internal complaint against his client. Another perpetrator who sued the victim for defamation promptly dropped his lawsuit after she withdrew criminal charges against him.

**Perpetrators seeking exoneration.** In about 40 percent of claims, perpetrators exclusively or primarily sought exoneration. Exoneration for these purposes includes a degree from the institution (for perpetrators expelled shortly before graduation) or readmission to school. However, exoneration most frequently means expungement of the perpetrators' disciplinary records. Common examples of expungement are removing transcript references to expulsion, suspension, or other discipline, or changing the reason for a perpetrator's withdrawal from school to "voluntary" from, for example, "withdrew while disciplinary charges were pending." Perpetrators typically sought expungement so they could more easily apply to transfer or to graduate school, or because they believed it would help restore their damaged reputations.

In most cases, institutions refused to consider total record expungement, viewing their disciplinary process—and the results—as central to their academic mission, the integrity of which had to be protected. However, in some claims schools agreed to modify transcript notations or to adopt a specific scripted answer for transfer or graduate schools inquiring about an applicant.

Notably, claims in which perpetrators exclusively or primarily sought exoneration incurred higher total losses. The total average loss for this group of claims was $285,944, compared to the average loss of $187,461 for all perpetrator claims.

## Perpetrators' Legal Challenges

**Private litigation.** In UE's claims review, private litigation by perpetrators—defined as lawsuits and demand letters threatening to sue—generated nearly all the losses. In contrast, with victim claims, close to a quarter (22 percent) of losses were defense costs incurred in Office for Civil Rights (OCR) administrative complaints or reviews. The three claims perpetrators brought most frequently in lawsuits against institutions were breach of contract, Title IX violations, and negligence.

**Breach of contract** was alleged most frequently, in 67 percent of the lawsuits. Perpetrators typically claimed that the school failed to follow its own student handbook or other disciplinary procedures for sexual misconduct cases. Breach of contract claims can be risky for institutions because internal disciplinary procedures are rarely perfect; perpetrators and their counsel will scrutinize the investigation and hearing records closely. Even if no major mistakes were made, they sometimes find enough minor errors to argue that the whole process was fatally flawed. While many of these claims ultimately fail because courts seldom expect perfect internal processes, they frequently are drawn out and become costly to defend.

**Title IX violations** were claimed in 60 percent of the lawsuits. These claims, however, rarely succeed in court because they are very difficult to prove. For Title IX purposes, a male perpetrator must show that he was treated less favorably in the internal process because of his gender. Few perpetrators have been able to show this.



AR_00000817

> **Example:** *In his Title IX claim, a perpetrator argued that the school's focus on prevention and training about sexual assault created a "hostile environment" for male students. The claim was dismissed.*

> **Example:** *Several male perpetrators unsuccessfully claimed their institutions violated Title IX by not allowing them to make "cross complaint" allegations of sexual misconduct against female victims within internal proceedings initiated by the victims. In each case, the perpetrator could, and sometimes was invited to, file a separate complaint of sexual assault against the victim but failed to do so. No perpetrator demonstrated or even argued that a female student was allowed to file a similar cross complaint against a male student and thus was treated more favorably than men under Title IX.*

**Negligence** was alleged in 40 percent of suits filed by perpetrators. These perpetrators typically claimed that the institution conducted a negligent investigation or negligently trained officials involved in the disciplinary process, violating its duty of care to the perpetrator. Negligence allegations are especially risky when it is clear that individuals involved in the internal process made mistakes because they were not properly prepared, such as investigators who did not understand which findings they needed to make or adjudicators who did not know which standard of proof to apply.

Perpetrators also brought a variety of other types of claims against their schools in lawsuits, such as conspiracy, fraud, and estoppel, etc. Of these, two other types of claims were relatively common: intentional or negligent infliction of emotional distress (27 percent of lawsuits) and defamation (23 percent of lawsuits).

## Demand letters

About one quarter of perpetrator claims involved attorney demand letters, which most frequently alleged breach of contract or general due process violations by the institution, followed closely by claimed Title IX violations. In these demand letters, allegations of Title IX violations were particularly vague or even nonsensical. For example, one attorney—whose client was found not responsible—argued that the institution should have simply dismissed the victim's sexual assault complaint on its face (ignoring the school's legal obligation to conduct some investigation of complaints once put on notice of them) and contended the failure to do so violated his client's Title IX rights. Another lawyer accused an institution of engaging in a conspiracy with the district attorney to bring criminal charges against his client, who had already graduated when he was accused of participating in a campus gang rape. In the demand letter, the lawyer stated that this supposed conspiracy somehow violated Title IX. Neither attorney made any attempt to explain how the client was treated differently on the basis of his sex.



AR_00000818

**Plaintiffs seeking anonymity.** In 21 percent of claims, perpetrators attempted to remain anonymous by suing under a pseudonym (i.e., "John Doe") or requesting to do so. Institutions often must decide whether to oppose this request. This is not always an obvious decision. For example, sometimes shielding the perpetrator's identity can also help protect the victim. In most claims, however, institutions did oppose these "John Doe" requests and courts sometimes denied them. One judge observed that the public had a general interest in the justice system, the institution was required to defend itself publicly, and the perpetrator failed to show extraordinary circumstances justifying why "he alone" should benefit from anonymity.

**Problematic plaintiffs' counsel.** In a third of perpetrator claims, plaintiffs' counsel were "frequent fliers" who repeatedly brought similar claims against the same institution or others. Institutions usually were more reluctant to settle with their clients for fear of stoking additional litigation. Moreover, in 13 percent of claims, the counsel representing perpetrators were clearly unfamiliar with the laws governing campus sexual assault or otherwise out of their depth. In some cases, the lawyers specialized in completely unrelated areas, such as real estate or tax law. In others, they were friends or relatives of the perpetrator. In these situations, the institutions' in-house counsel or defense counsel needed to spend time and resources educating the perpetrators' attorneys about the governing law, which complicated and dragged out resolution of the claims.

> *Examples:* A perpetrator's attorney, who was his cousin, asked "who?" when the institution noted that the perpetrator could file a complaint with the OCR. In multiple claims, attorneys for accused students demanded rights applicable under criminal law. One attorney insisted, despite repeated explanations of the distinctions between a criminal court and a school's internal disciplinary process, that a private college must allow his client "legal representation" during the internal hearing—with the lawyer speaking on the client's behalf—and should "compel" witnesses to testify.



AR_00000819

## OCR Complaints

In victim claims, 22 percent of losses arose from OCR matters. But in perpetrator claims, only 4 percent of losses were attributable to administrative complaints of discrimination filed with OCR. In contrast to its reaction to victim complaints, OCR appeared to take little interest in these perpetrator complaints. In three-quarters of claims involving OCR complaints by perpetrators, OCR's data requests to the institution were significantly narrower, and consequently less burdensome to the institutions, than comparable data requests in typical victims' OCR complaints. In victim complaints, OCR usually requested information about other complaints and applicable policies for a three-year period, but in most perpetrator complaints, OCR sought information relating only to the individual complainant's case.[4]

## Findings and Recommendations From Claims Losses

This section highlights key findings from the claims of factors that drove or contributed to losses. The findings, illustrated by claim examples, are followed by UE's recommendations for addressing similar issues, which may help other institutions ensure fair treatment of both parties and avoid or mitigate losses.

## Unclear Policy Language

▌ Insufficient written descriptions of policies and procedures

> **Example:** An institution's sparse written description of its internal hearing process failed to indicate who was required or permitted to attend the hearing, how testimony would be handled, and whether or how the parties would be notified of the outcome. Following a confused and disjointed hearing that school officials later accused each other of mishandling, a perpetrator was found not responsible. However, he was not notified of the outcome and sued after being kept off campus for almost a month.

**Recommendation:** Victims and perpetrators are equally entitled to know what to expect during the school's internal process. Regardless of the investigation/adjudication model it uses (e.g., single investigator, hearing panel), each school should carefully review the student handbook and all other relevant policies and procedures for completeness, clarity, and consistency. In addition to explaining the victim's options (e.g., formal reporting, confidential disclosure), they should describe steps the school may take once an allegation is made or a formal complaint is filed, interim measures, and detailed information about the disciplinary process. Schools should work with experienced counsel to conduct this review of their internal processes.

▌ Failure to make standard of proof clear

> **Example:** An institution's sexual misconduct policy did not specify which standard of proof would apply in internal disciplinary proceedings. A perpetrator sued after he was found responsible for sexual assault in a final determination that also failed to clarify the standard applied.

**Recommendation:** This problem is easily remedied. Institutions should ensure that all relevant policies and procedures consistently identify preponderance of the evidence as the applicable standard of proof.[5] (Adjudicators also must be trained to use the correct standard of proof, as discussed in "Inadequate Training of Hearing Officials.")

---

[4]   In one perpetrator complaint, OCR issued a broad data request very similar to those for most victim complaints, but after the perpetrator filed a lawsuit, OCR quickly dismissed his complaint on the basis that he filed suit. In UE's claims review, OCR did not take similar action when a victim with a pending administrative complaint filed a lawsuit.

[5]   Although it is possible that OCR under the new presidential administration may issue further guidance on the standard of proof, currently the "preponderance of the evidence" standard under existing guidance applies.

AR_00000820



## Poor Investigation Practices

▌ Investigators with inappropriate tone or demeanor

> **Example:** *A campus security officer who had trouble transitioning from municipal police work and was characterized internally as a "loose cannon," implied that the student perpetrator was "[Jerry] Sandusky" during an interview, establishing a hostile tone and decreasing the chances of the perpetrator's cooperation.*

**Recommendation:** When selecting investigators, focus more on their temperament and ability to listen without judgment than on professional experience. Merely having a background in police work does not qualify someone to conduct campus sexual assault investigations, unless they have specialized training in interviewing sexual assault victims and perpetrators.

▌ Poorly vetted external investigators

> **Example:** *The first time an institution used an external investigator, deficiencies in his work (e.g., incomplete interviews) helped generate a claim by the perpetrator. The investigator later suggested that his work might have been more thorough if he had been paid more.*

**Recommendation:** Although using an external investigator is often necessary or wise, institutions should thoroughly vet each investigator's qualifications, experience, and temperament. Before retaining a new external investigator, check references from other institutions. Be cautious about giving a brand-new external investigator a first job on your campus.

▌ Lack of clarity about the investigator's role

> **Example:** *An investigator prematurely released a report before it was reviewed by the Title IX coordinator, a usual step in the institution's process. The report stated that both parties drank to the point of "incapacitation," both were "equally responsible," and finding the perpetrator responsible when both were heavily intoxicated would constitute "gender discrimination." The hearing panel disregarded parts of the report, finding the perpetrator responsible and suspending him. His attorney sent a demand letter protesting the "unfair disciplinary action" on the basis of the disagreement between the investigator and the hearing panel.*

**Recommendation:** In training investigators, be very clear about their role and responsibilities in your process. Distinguish between things they are expected to do (e.g., assess the credibility of parties and witnesses, determine whether a policy violation occurred, etc.) and things they should not do (e.g., draw legal conclusions, such as referring to "gender discrimination," or speculate about future consequences of a possible outcome.)

AR_00000821

▌ Inadequate investigator training

> **Example:** *A victim claimed a sexual encounter with her boyfriend, just before he admitted to cheating on her, was sexual assault. Several internal investigators who interviewed the parties and multiple witnesses believed the boyfriend's account and concluded the victim lacked credibility. They made no specific credibility findings in their report—incorrectly believing it was not part of their job—and the male student was found responsible and sued.*
>
> **Example:** *Attorneys for several perpetrators attacked investigations that, instead of making specific factual findings based on the evidence, referred generally to "the testimony" of parties and witnesses or "the facts" of the case.*

**Recommendations:** Your institution's procedures and training should clarify whether investigators are expected to assess credibility or recommend a finding on responsibility. Additionally, your institution should train investigators to explain their findings in detail and connect them to the evidence. Judges generally defer to thoughtful and well-supported internal disciplinary results, even if the court might have reached a different result. They are far less likely to show deference if there is no way to tell how the outcome was reached.

▌ Investigations compromised by external factors

> **Examples:** *In multiple claims, including several against institutions where OCR was actively investigating complaints from student victims, perpetrators alleged the campus atmosphere was hostile to them and made fair treatment impossible. In one matter, a Title IX coordinator interviewed both parties and determined no formal investigation was warranted. However, shortly after a group of female students filed an unrelated Title IX complaint, the matter was suddenly reopened with a formal investigation, and the perpetrator was ultimately found responsible.*

**Recommendation:** Usually, both parties to a campus sexual assault matter are the institution's students and are entitled to the same procedural protections and general equitable treatment. Particularly if your institution is subject to an open OCR investigation or to the influence of active victims' advocacy groups, avoid allowing a "victim-centric" atmosphere to take hold on campus and potentially taint an investigation—or at least handing perpetrators an easy argument that this occurred.



AR_00000822

## Problematic Adjudication Practices

▌ Unclear use of different hearing models

> **Example:** *An institution's internal process allowed for a hearing before a panel of multiple members or a single officer, at the school's discretion. The institution was unable to explain why a particular perpetrator who was found responsible received a panel hearing, when it had used a single officer in multiple hearings before and after his.*

**Recommendation:** If your policy allows the institution to choose between different hearing models, carefully evaluate why one model is preferable to another for any given case and be prepared to explain any departures from recent practice.

▌ Poor selection of hearing panelists

> **Example:** *The sole investigator in a sexual assault case was assigned to the hearing panel in the same matter, in which his comments indicated bias in favor of the victim. Although the finding of responsibility was eventually reversed on appeal, the perpetrator still brought a claim based on interruption to his education and harm to his reputation.*

**Recommendation:** If an institution uses a panel model, it needs to keep the investigation and adjudication functions separate. An individual should not serve on the hearing panel of any matter he or she investigated.

> **Example:** *A perpetrator was accused of separate acts of sexual assault against three female students over a year. The institution held three separate hearings but assigned the same panelists in all three, instructing them that in each matter they could consider the facts in the other two matters as background. After he was found responsible and expelled, the perpetrator sued.*

**Recommendation:** Regardless of whether this approach is legally permissible, it creates the appearance of unfairness to the perpetrator. If alleged assaults are separate events, it is better to have different panels hear them and handle separately the question of what, if any, evidence relating to the other assaults may be admitted in each proceeding. Such situations are relatively rare but they illustrate why institutions should have a sufficiently large pool of available hearing officials.

> **Example:** *During litigation of the perpetrator's claim, a school discovered that a panel member who had done victims' advocacy work had—shortly before the hearing at which the perpetrator was found responsible—reported to the Title IX coordinator that she herself experienced an unrelated campus sexual assault.*

**Recommendation:** Vet potential hearing officials before assigning them to a specific matter. While a background in advocacy work is not necessarily disqualifying, a recent personal history of sexual assault should be. As with the preceding example, it's important to ensure that enough trained panelists are available in case late substitutions are necessary.

AR_00000823

▌ Inadequate training of hearing officials

> **Example:** *Panel members did not understand the standard of proof they should apply. In several places, the final determination explicitly referred to "preponderance of the evidence," but in others it was clear from the context that the panel actually applied the higher "clear and convincing" standard of proof.*

**Recommendation:** Regardless of the model it uses, an institution must ensure that responsible officials understand and apply the preponderance of the evidence standard. It may be wise for an attorney experienced in litigating campus sexual assault matters to help train hearing officials, particularly on this topic.

> **Example:** *In several claims, perpetrators' attorneys challenged written disciplinary determinations that provided no rationale for the outcome and/or the sanctions.*

**Recommendation:** Train all adjudicators to explain their final written determinations and any sanctions in detail with specific references to supporting evidence. Judges are less likely to defer to the outcome of an internal disciplinary process if the documentation offers little or no explanation for how the decision was reached.

> **Example:** *While litigation initiated by the perpetrator was pending, a student panel member revealed that she had never believed there was a sexual assault, only a "miscommunication" between the parties. She did not make her opinion clear during deliberations and simply "went along" with the majority panel view that the perpetrator should be found responsible.*

**Recommendation:** Despite OCR disapproval of the practice, some institutions continue to use students on hearing panels because they provide a valuable perspective. If your school is among them, consider providing additional training to student members that stresses the importance of making their own independent judgments.



AR_00000824

▌ Careless sanctioning and appeal practices

> *Example: An institution was unable to conduct a formal disciplinary process because several female students refused to file complaints or cooperate with an investigation of athletes they indicated (when the school followed up on widely circulated rumors) had engaged in unwanted group sex with them. A coach lectured the whole team, some of whose members admitted to the group sex but alleged it was consensual, about appropriate behavior. Some members posted mocking remarks on social media, angering the administration, which insisted that several athletes involved in the group sex be kicked off the team. One of the athletes sued.*

**Recommendation:** Institutions need to be extremely cautious and seek legal advice before imposing discipline on students who have not been found responsible for misconduct, including sexual assault. If the president or another high-ranking administrator appears inclined to go outside the normal process, in-house or trusted outside counsel should outline the risks of doing so.

> *Example: A perpetrator was found responsible for sexual assault and suspended. He appealed the sanction, and the official hearing the appeal considered for the first time the perpetrator's history of unrelated misconduct, although the school's policy didn't state whether the official was allowed to consider new evidence on appeal. The official expelled the perpetrator, who sued.*

**Recommendation:** If an institution allows appeals, the procedures should spell out the grounds for appeal, the type of evidence that may be considered, under what circumstances exceptions may be made, and whether an appeal official can increase or reduce sanctions. Ensure that individuals hearing appeals are well trained on all aspects of the procedures and understand the limits of their authority.

▌ Reluctance to assist perpetrators found not responsible

> *Example: A perpetrator was barred from campus for six weeks during the disciplinary process. He was found not responsible but brought a claim because the ban prevented him from finishing the semester. Despite the outcome, officials of the institution overtly sympathized with the victim and dragged their feet on accommodating the student with extensions or other measures to help him get back on track academically.*

**Recommendation:** Institutions should respect their own internal process and act in accordance with the outcome in each case. In addition, officials should not allow justifiable empathy for an alleged victim to overshadow the alleged perpetrator's right to fair treatment. If he is found not responsible, officials should provide accommodations to help him resume his college career. Depending on the circumstances, this might include some tuition forgiveness or help transferring to another school.



AR_00000825

## Perpetrator misunderstanding of consent

- Perpetrators assumed that consent could not be withdrawn

> **Example:** *A sexual encounter began as consensual, but when the victim began protesting and showing signs of discomfort, the perpetrator ignored her objections and kept having intercourse with her.*

- Perpetrators believed that using a written agreement was an effective way to obtain consent

> **Example:** *A perpetrator argued that because a victim had signed a written "contract" purporting to grant consent for future sexual activity with him, she could not claim any sexual encounter between them was nonconsensual.*

- Perpetrators did not understand the effect of alcohol or drugs on capacity to consent

> **Example:** *A perpetrator admitted giving the victim, who was already drunk, a "small amount" of drugs, and continually insisted that she "seemed to enjoy herself" during the encounter.*



**Recommendations:** As in UE's publication, "Review of Student-Victim Sexual Assault Claims With Losses," students' poor understanding of consent was a minefield for perpetrators, victims, and schools. Institutions should focus significant training resources on this issue.

- Review your school's definition of consent in the student handbook and other applicable policies for clarity and consistency. Include short examples of consensual and nonconsensual situations.

- Begin providing student training on consent before first year begins, either in person during orientation or online. Again, include examples of consensual and nonconsensual situations.

- Offer small-group, interactive training workshops focusing on consent when first-year students arrive. Consider using UE claims examples or redacted facts from past misconduct matters as case studies.

Ensure that all education and training for students on consent addresses the impact of alcohol and other drugs on individuals' ability to give consent.

### Effect of Alcohol on Consent

Nearly 60 percent of claims by perpetrators involved the use of alcohol by one or both parties. In several claims, drug use was confirmed or suspected as well. The problem is the same in claims brought by victims or perpetrators: Use of alcohol or drugs in connection with a sexual encounter at best muddies and at worst destroys the parties' ability to navigate consent. In several claims, victims said they were not "incapacitated" by alcohol but stated their memories of the encounters were "fuzzy" or "hazy" and that they did not consent to sex. In a few claims, victims drank so much that they had no memory of the encounters, including one woman who was hospitalized due to her dangerous level of intoxication.

AR_00000826

**Title IX, consent, and alcohol.** Multiple perpetrators argued that the "incapacitation negates consent" policies at their institutions were enforced only against men and thus violated Title IX. These perpetrators were unable to prove their Title IX allegations because they could point to no cases in which men filed sexual assault complaints against women and were treated differently under the incapacitation policy. One perpetrator filed a separate complaint of sexual assault against a female student, claiming she was the aggressor, he was too drunk to consent to sex, and the institution's response violated Title IX. The institution dismissed his complaint, based on his own earlier testimony in the female student's original sexual assault complaint against him, that he was *not* incapacitated or too drunk to consent. Given his own admission on the critical issue of incapacitation and consent, the perpetrator could not show that he was treated less favorably than women under the policy.

## Conclusion

Higher education institutions faced with allegations of student sexual assault have a duty to be fair and impartial to both parties, which means assessing all relevant policies, procedures, and practices and making necessary improvements. Your institution can use the findings and recommendations in this publication to help meet your obligations. This review can also help you respond effectively if an alleged victim or perpetrator challenges your actions and can help mitigate any resulting losses.

*By Hillary Pettegrew, senior risk management counsel*

## Resources

EduRisk Title IX and Campus SaVE Act Resources



EduRisk™ Solutions provides education-specific risk management resources to colleges and schools, and is a benefit of membership with United Educators (UE) Insurance. As a member-owned company, UE is committed to helping educational institutions by offering stable pricing, targeted insurance coverage, extensive risk management resources, and exceptional claims handling.

**To learn more, please visit** www.UE.org.

The material appearing in this publication is presented for informational purposes and should not be considered legal advice or used as such.

Copyright © 2017 by United Educators Insurance, a Reciprocal Risk Retention Group. All rights reserved. Contents of this document are for members of United Educators only. Permission to post this document electronically or to reprint must be obtained from United Educators.

UE-113284  4/17

AR_00000827



## Risk Research Bulletin

# Review of Student-Victim Sexual Assault Claims With Losses

From 2011 through 2015, United Educators (UE) received notice of approximately 1,000 higher education incidents in which a student allegedly was a victim of campus sexual assault. Although many of these matters never developed, a minority of claims[1] incurred significant losses (settlements, verdicts, and/or defense costs) averaging nearly $350,000 each, with a few resulting in losses exceeding $1 million. This publication reviews the recurring factors in those losses, as well as other findings, and UE's recommendations.

**Terminology.** This publication uses the term "victim" to refer to a student who alleges that he or she was sexually assaulted and the term "perpetrator(s)" to refer to the person(s) who allegedly committed the sexual assault. "Sexual assault" means a range of misconduct that includes sexual coercion, nonconsensual sexual touching (i.e., fondling and kissing), and nonconsensual sexual intercourse with vaginal, oral, or anal penetration.

1  "Claim" for these purposes means an event that could give rise to legal action as well as a demand for damages. UE's policies generally require members to report all student sexual assaults about which they are notified, regardless of whether legal action is threatened.

AR_00000828

UE's two previous studies[2] of student sexual assault claims included all claims brought by victims and perpetrators with or without a monetary loss. This review, however, examines only claims that:

▮ Were brought by student **victims** of sexual assault at UE higher education members and reported to UE from Jan. 1, 2011, through Dec. 31, 2015

▮ Involved nonemployee perpetrators[3]

▮ Resulted in a financial loss to the member institution and/or UE (including payments—verdicts and settlements—to claimants and defense costs)

## OCR Matters and Litigation

Losses in UE's claims occurred in two types of matters: those involving the Office for Civil Rights (OCR) because either it undertook a compliance review or victims threatened or filed complaints with OCR; and those involving private litigation brought by victims.

## OCR Matters

OCR can become involved in a matter through a compliance review or an administrative complaint alleging Title IX violations.[4] An institution facing OCR in a student sexual assault matter can anticipate a time-consuming[5] and expensive process. OCR claims accounted for about 22 percent of losses in UE's review. All these losses were defense costs because, although OCR can initiate administrative enforcement proceedings against an institution that it determines is noncompliant with Title IX, unlike a court, OCR cannot award money damages to individuals.

---

2  "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," 2015; Student Sexual Assault: Weathering the Perfect Storm, 2011.

3  All but two of the perpetrators were also students; the exceptions were a residence hall intruder and a stranger on a study abroad trip.

4  Nearly all UE's OCR matters were complaints, with one compliance review. As explained in OCR's *Case Processing Manual*, an OCR complaint is a written statement alleging that the rights of one or more specific individuals were violated. Regulations also require OCR to initiate periodic compliance reviews to evaluate practices of recipients of federal funding; these reviews "address issues of strategic significance in civil rights areas facing educational institutions."

5  As of late September 2016, according to *The Chronicle of Higher Education*'s "Investigation Tracker," since April 2011 OCR had opened 330 investigations of institutions for possible mishandling of sexual violence allegations. Of these, 57 (approximately 19 percent) had been resolved; the others remained open.

### Claims Loss Data

- Total losses: $21,826,989
- Average loss per claim: $346,460
- Largest loss: $2 million
- Defense costs: $8,110,267 (37% of losses)
- Average defense costs per claim: $128,734

Defending OCR matters can be costly because of their scope. In compliance reviews, OCR examines an institution's general response to complaints of sexual violence, which requires providing detailed information about complaints received during the review period, as well as institutional policies, procedures, and practices. But even for complaints, OCR typically issues broad data requests seeking similar information for a multiyear period about other complaints as well as campus policies and training efforts. In addition, it usually conducts multiday site visits that include individual interviews and focus groups.

Moreover, OCR may proceed with investigating a Title IX complaint even if it tacitly acknowledges the claims are weak. For example, one investigator told an institution that, although she did not find the victim's allegations credible, "management" insisted on a full investigation and site visit.

Finally, even after OCR completes investigations, institutions often remain in limbo. Voluntary resolution agreements (VRAs), a common method of resolving these matters, have become increasingly difficult to obtain. OCR regional offices frequently advise institutions that they need advance approval from the D.C. headquarters to negotiate VRAs.



**22%**

OCR claims accounted for about 22% of losses in UE's review

AR_00000829

## Litigation

In this review, "litigation" includes any demand for damages, such as attorney demand letters, and lawsuits threatened or filed on behalf of a student sexual assault victim. Demand letters represented the largest share of losses, approximately 45 percent, while lawsuits accounted for roughly 32 percent. Demand letters and lawsuits most frequently asserted two causes of action: negligence and Title IX violations.

**Negligence**, which was alleged in 75 percent of the lawsuits, is relatively straightforward. Juries understand the central argument that a school breached its legal duty of care to a student, causing injury. Common negligence allegations in UE's claims included that a school:

- Failed to properly train staff on the institution's sexual violence policies and responding to reports of sexual assault

- Failed to take reasonable steps to protect student safety

- Permitted negligent security practices, such as failing to maintain doors, locks, or alarms in residence halls in good repair

- Lacked an adequate campus security force

- Failed to discipline known sexual harassers in accordance with the student code of conduct

- Knowingly failed to prevent underage drinking

- Admitted perpetrators it knew or had reason to know had a history of violence or other undesirable behavior, such as excessive drinking

**Title IX** violations, although easily asserted in demand letters, are difficult to prove in court, explaining in part why they were included in only 38 percent of the lawsuits. To win a Title IX claim in court, a plaintiff must show "deliberate indifference," meaning that an official with the authority to address the problem had actual knowledge of sexual harassment or violence but ignored or refused to remedy it. *Note:* This stringent standard applies only in court cases; it does not bind OCR in addressing administrative Title IX complaints.

Commonly alleged Title IX violations in demand letters and lawsuits included that an institution:

- Had a flawed reporting process that discouraged victims from reporting assaults

- Failed to properly train officials about their Title IX obligations

- Knew that sexual assaults occurred but did not warn students

- Consistently imposed the lightest possible sanctions on perpetrators found responsible for sexual assault

- Retaliated against sexual assault victims who filed OCR complaints or spoke to the media



AR_00000830

# Findings and Recommendations From Claims Losses

Significant recurring findings in this review are followed by UE's recommendations to help institutions avoid or address similar problems.

▮ **Failure to ensure Title IX coordinators and investigators have appropriate training or experience often led to losses.** Every school must ensure that its Title IX coordinator and investigators understand their roles and applicable policies and procedures. Some Title IX coordinators and investigators are not prepared, potentially exposing institutions to losses when student victims pursue legal action based on their mistakes.

> **Example:** A newly appointed Title IX coordinator had attended a single two-day Title IX seminar and lacked investigation experience. In her first case, the coordinator conducted cursory interviews, after which the victim complained that she was unable to tell her full story. After a lengthy delay in resolving the matter—attributable in part to the Title IX coordinator's inexperience—the victim filed an OCR complaint.

> **Example:** A student who claimed to be among multiple victims of one perpetrator said the college's inexperienced investigator stated that he had met with the perpetrator, who did not strike him as someone who would behave as the victim described. The investigator later could not clearly recall whether he had made that statement. The victim joined in filing an OCR complaint.



AR_00000831

**Recommendations.** Finding skilled, experienced Title IX coordinators is challenging. Institutions often need to look for less experienced candidates and train them. Schools should assess individual candidates' temperament and general capability, such as a demeanor that is nonjudgmental, and an ability to calmly and compassionately listen to difficult personal accounts. It is also critical to provide adequate training.

Start with internal and community training resources. HR staff with experience in workplace investigations, for example, could train student affairs employees to investigate student sexual assaults. Schools should not allow victims' advocates to dominate training, but they can seek input from free or low-cost resources, such as a campus women's center or local rape crisis center. Local police can be a valuable training resource, particularly if they have a unit that specializes in sexual assault cases. Some campus police at larger institutions have such units. Also, in-house or outside counsel often participate in training Title IX coordinators and investigators; some outside attorneys offer free or reduced-cost training.

Many paid training options exist, but schools should consult peer institutions for recommendations. They also should ensure that the training covers important elements such as trauma-informed investigation techniques. For example, the Trauma-Informed Sexual Assault Investigation and Adjudication Institute was developed by the National Center for Campus Public Safety as directed by the White House task force in its "Not Alone" report. After significant pilot testing, NCCPS began offering the program in 2016.

OCR guidance requires every institution to have a Title IX coordinator on staff, but it doesn't require the same for investigators. For smaller schools, external investigators can be cost-effective and offer a perception of greater independence and impartiality. Schools that use outside attorneys to investigate, as many do, should avoid firms whose lawyers might later defend the school in legal action. In all cases, external investigators must be familiar with the institution's policies and procedures.



AR_00000832

▌ **Employee confusion over reporting obligations contributed to losses.** This problem manifested itself in two ways.

First, employees misunderstood the distinction between sexual assault reporting channels and confidential disclosure options. Under OCR's Title IX guidance and the amendments to the Clery Act by the Violence Against Women Reauthorization Act of 2013 (VAWA), schools must have procedures for officially reporting sexual assaults so the school can investigate and separate offices or resources through which victims can choose to disclose their assaults confidentially, with no investigation by the school. In some claims, employees who were not clear about this difference made ultimately costly errors.

> *Example:* A female student reported a sexual assault to a college employee who mistakenly believed he was a confidential resource and did not share with the Title IX coordinator any reports of sexual assault he received. The college first learned of the victim's assault allegation through the media and a demand letter from her attorney.

> *Example:* A female student disclosed her sexual assault to a resident advisor (RA) but asked him not to say anything. Although the school expected RAs to report such information to the Title IX coordinator, he complied with the victim's request. The institution did not learn of the student's assault until she reported it to another official more than a year later. Despite her original request to the RA, the student joined in an OCR complaint and sent a demand letter complaining that her disclosure to the RA constituted notification on which the school should have acted.

Second, some employees who received initial student complaints made serious missteps in responding. All school employees do not have to understand Title IX intricacies, but they should recognize the need to involve someone else.

> *Example:* After a male athlete accused a teammate of sexual assault, his attorney's demand letter focused not on the assault but on the college's response. A medical exam of the victim showed no evidence of a sexual assault, but the college suspended the perpetrator after he admitted to punching the victim. The school settled with the victim quickly because the coach, to whom the victim first complained, forced the victim and perpetrator to meet privately, leading to a second physical altercation.

> *Example:* A female student claimed a male student sexually assaulted her during a study abroad trip after both drank heavily. Her attorney's demand letter attacked the actions of the institution's on-site staff, claiming they failed to contact the home campus or an attorney on retainer in the foreign country, gave the victim incorrect information about her reporting options, and discouraged her from contacting local police.

**Recommendations.** Institutions must not only maintain distinct options for reporting and for confidential disclosure but also must explain them clearly to all employees whom students are likely to contact. Written explanations should be provided through the website, faculty and employee handbooks, and periodic emails to the campus community. Institutions should also cover this information verbally in new employee orientation sessions and in regular department and faculty meetings.

AR_00000833

In addition, schools must educate all staff regarding which of them are "responsible employees" under Title IX, and explain this means they are required to report to the Title IX coordinator any information they receive about sexual violence against a student. OCR defines a responsible employee as one who has the authority to take action to address sexual violence, who has been assigned the duty to report to the school sexual or other types of misconduct by students, or whom a student could reasonably believe has this authority or duty.

Finally, institutions should make all off-campus trip leaders and employees at satellite locations aware of their responsibility to respond appropriately if a student alleges sexual assault. The specifics depend on the institution's policies and local laws in study abroad, but the top priorities include ensuring the victim's safety and notifying home campus officials.

▍ **Even when perpetrators were found responsible, victim dissatisfaction with sanctions helped generate losses.** In some claims, victims challenged the original sanctions against perpetrators, and in others victims took legal action after the sanctions were altered.

> **Example:** *A victim who believed the sanctions imposed on her perpetrator—a no-contact order and online training—were too lenient filed an OCR complaint alleging she felt unsafe and no longer trusted the school's promise of zero tolerance for sexual assault.*

> **Example:** *A perpetrator found responsible for sexual assault of a female freshman appealed his expulsion because general negative character evidence was improperly admitted during the hearing. On rehearing, he was again found responsible but his sanction was reduced to a two-year suspension. There was no clear policy basis for the reduction, and by the time of the rehearing, several other students had accused the same perpetrator of sexual assault. The angry victim, who attempted unsuccessfully to get a clear explanation of the reasons for the reduced sanction, joined in filing an OCR complaint.*

**Recommendations.** Institutions cannot guarantee that victims will be satisfied with the sanctions imposed on perpetrators, but they can reduce the chances of an unhappy victim suing or going to OCR. First, schools should ensure the sanctions are consistent with institutional policy and past practice in similar cases, and they should be proportionate to the level of misconduct. Before finalizing sanctions against a student perpetrator, institutions should consider having an official not involved in the case or an outside attorney review them to ensure they meet these standards.

Second, schools must exercise special care before reconsidering sanctions on appeal. Reducing sanctions frustrates victims, especially if they are taken by surprise or feel the institution is hiding something. In general, sanctions should not be changed on appeal without a clear basis for doing so. For example, it may be justified if the written policy allows appeals on the basis of new evidence, and the perpetrator submits new probative evidence on appeal, rather than simply making a new argument that could have been made originally.

AR_00000834

▪ **Victims pursued costly legal action based on retaliation after they filed complaints.** Institutions need to remain vigilant for and respond quickly to retaliation reports. In several claims, victims took legal action focusing not on their assaults but on their institutions' failure to respond promptly and effectively to alleged harassment and retaliation after they filed internal complaints.

> *Example:* A victim initially did not file a complaint against the male student she accused of sexual assault and only asked the dean of students to issue a no-contact order as an interim measure. Months later, she filed a complaint against the perpetrator for violating the no-contact order by speaking to her and telling a man who was with her to be careful. The victim eventually filed an OCR complaint alleging that the school failed to stop the harassment she reported.

> *Example:* An institution first received notice that a victim was suffering harassment and retaliation by the perpetrator's friends through a letter from her attorney demanding that no-contact orders be issued. School employees had not made clear to the victim how to report such problems directly.

**Recommendations.** Institutions should ensure that all employees involved in handling student sexual assault complaints understand that retaliation is prohibited, are familiar with its forms, and know how to respond effectively. Employees also must be able to explain the retaliation prohibition clearly to parties and witnesses, since many people don't understand that retaliation is forbidden regardless of the truth of the alleged victim's accusation. It may be helpful to have an attorney participate in this employee training.

▪ **Poor student understanding of consent generated losses.** The failure of victims, perpetrators, or both to understand and apply the critical concept of consent to sexual activity was a significant problem in UE's claims. Misunderstandings about consent were especially evident in the 22 percent of claims involving parties who had a romantic relationship or close friendship before the assault.

> *Example:* In multiple claims, victims who said they didn't want sex but did not explicitly refuse claimed they felt "pressured" by boyfriends or close male friends into having sex. One victim wanted no physical contact beyond kissing but said she finally gave in to the perpetrator's repeated requests for sex so she could go to sleep. Her perpetrator expressed remorse and stated he truly thought she consented, but then admitted he should have paid attention to her "mixed messages."

> *Example:* A male student later accused of sexual assault by a female student texted her after their first encounter asking if she wanted to "hook up" again. She replied that she hadn't wanted to have sex the first time and he responded in that case, it was "[her] fault" for giving in. The victim, who waffled about formally reporting, also displayed confusion about consent and stated that she still "wasn't sure" whether she had been sexually assaulted.

### Alcohol and Consent

One or both parties consumed alcohol in more than half of these claims. Anecdotes illustrate that excessive drinking continues to play a major role in campus sexual assault, including on the parties' ability to navigate consent. For example, a male student who drank no alcohol escorted home a female student who was intoxicated to the point of slurring words and needing assistance to stand. He admitted having seen her drink heavily and taking her home because he feared for her safety, but still engaging in oral sex. Under the school's policy, a party was unable to give valid consent if a reasonable person would believe that party to be incapacitated by alcohol.

AR_00000835

Problems understanding or interpreting consent appeared in some claims with athlete perpetrators, especially when more than one perpetrator was involved. Although athlete perpetrators accounted for only 16 percent of the claims overall, they made up 63 percent of claims with multiple perpetrators.

> **Example:** *A male athlete texted about "teaming up" to a teammate he knew was having sex with a female student. The woman agreed the second athlete could enter the room but denied she consented to have sex with him. The second athlete admitted he never asked for the victim's consent to have sex— but said his text was a request to his teammate to participate in the sexual activity.*

**Recommendations.** Consistent with OCR expectations for Title IX compliance and the separate VAWA requirements[6], students must be trained on the meaning of consent under institutional policies and applicable law. Many institutions find in-person discussion sessions using hypotheticals, which allow participants to consider nuanced situations and debate whether consent exists, to be most effective. Especially for schools in states such as California and New York that impose an "affirmative consent" standard, legal counsel should ensure all training materials accurately describe the applicable standard.

Because many college freshmen have had little if any sex education, schools should try to begin the process before they arrive on campus. For example, as a condition of registration, institutions may require incoming freshmen to complete a basic online course or participate in summer orientation sessions about healthy relationships and consent. This is also a good time to begin discussing the role of alcohol in sexual assault and other risks associated with excessive drinking.

Once students are on campus, it can be effective to involve them directly in developing and leading training. For example, Rutgers, Yale, and Colorado College have developed peer training programs, which include significant consent components, to combat sexual violence.

In addition, institutions should consider providing targeted training about consent to certain groups, such as athletes or Greek organizations. Sexual assault claims against athletes in particular tend to be high-profile and damaging to a school's reputation, regardless of outcome.



6  See "Federal Training Requirements for Students"

AR_00000836

■ **Parties' mental health conditions complicated resolution of sexual assault claims.** Almost one quarter (21 percent) of the claims involved issues pertaining to a party's mental health[7], defined to include a personal or family history of suicide attempts, eating disorders, and trauma from past sexual assaults. Such conditions can trap schools grappling with sexual assault allegations in expensive "no-win" situations.



> **Example:** A female student, who appeared disturbed but never claimed a disability or requested accommodations, alleged that multiple male students touched her inappropriately at different times. After the victim admitted during the investigation that she had invented some incidents, the school disciplined her for making false reports. She filed an OCR complaint that included allegations of retaliation and disability discrimination.

> **Example:** Two female students claimed sexual assaults by a male student both had dated. The perpetrator requested a delay in the scheduled spring hearing as an accommodation under the Americans with Disabilities Act (ADA) for his bipolar disorder. The school agreed to delay the hearing until fall, but the perpetrator transferred. Meanwhile, the victims filed an OCR complaint. Because the perpetrator then refused to participate and both victims had graduated and become uncooperative, the college decided not to hold a hearing and permanently banned the perpetrator from campus. Despite these complications, OCR was dissatisfied with the initial delay and eventual suspension of the hearing.

**Mental health problems and consent.** Schools sometimes have to consider the effect of mental health problems when determining if consent for sexual activity existed. For example, one female victim claimed she suffered from depression that made her unable to resist the perpetrator's sexual advances throughout their relationship. She further claimed that the perpetrator's own mental health problems created additional pressure on her to submit for fear of upsetting him.

---

7  In most claims the victim had a mental health condition; in one claim both parties had such a condition, and in another claim only the perpetrator did. Because this review included only victim-initiated claims with losses and victims frequently need to show the assault's adverse impact on their mental health to help prove damages, the files contained more information about their mental health status than about the perpetrators' status.

AR_00000837

**Recommendations.** If either party in a sexual assault matter raises a mental health issue, an institution should promptly consult legal counsel to determine whether disability accommodations may be necessary. In a twist on those circumstances, a school also needs immediate legal advice on how to proceed if it has reason to suspect that a party may suffer from a mental health condition, but that individual does not raise the issue.

▌ **Negligent security contributed to large losses.** Compared to some other issues contributing to losses, such as students' lack of knowledge about consent, security concerns may seem relatively simple to address. However, security missteps disturbingly factored into several large losses.

> **Example:** A person assigned to work at the front desk of a residence hall failed to show up for a shift without notifying anyone. While the desk was unoccupied, a male student carried an unconscious female student through the lobby to his room, where she was sexually assaulted by multiple perpetrators.

> **Example:** Although it knew that a residence hall security door was repeatedly propped open by students, campus security took no effective action to stop the practice. This door was also in very poor condition and the alarm that should have sounded frequently malfunctioned, but several repair requests were disregarded. On two occasions, the same intruder entered the building through this door; he attempted to sexually assault one student in her room and raped a second student in the bathroom. An investigation revealed additional problems: No Clery Act timely warning or emergency notification was issued after either attack, and while two security guards were supposed to work the night shift, only one was on duty the night of the second attack.

**Recommendations.** Although few of UE's student sexual assault claims involve such serious security lapses, institutions should carefully review their security systems for needed improvement. Conducting an independent audit of security policies, practices and personnel is wise. Institutions should consider contacting a local police department to perform such an audit or recommend someone who can.

In addition to ensuring that campus security responds promptly to reported problems, especially in residence halls, institutions need to educate students on the importance of following security procedures. UE's claims could be used as examples of the potential consequences of failing to comply.

Finally, institutions should review their policies regarding timely warnings or emergency notifications under the Clery Act. Schools must evaluate each sexual assault report to determine if it meets the requirements for issuing either type of notice—and should document the reasons for the final decision.



AR_00000838

—

## Conclusion

No institution can completely insulate itself from legal action by a student who has been victimized by campus sexual violence. Schools can, however, reduce the chances that they will incur significant monetary losses in such cases by reviewing these findings and recommendations, examining their own policies and practices for similar problem areas, and taking prompt and effective action to address them.

*By Hillary Pettegrew, senior risk management counsel*

## Resources

EduRisk Title IX and Campus SaVE Act Resources





EduRisk™ Solutions provides education-specific risk management resources to colleges and schools, and is a benefit of membership with United Educators (UE) Insurance. As a member-owned company, UE is committed to helping educational institutions by offering stable pricing, targeted insurance coverage, extensive risk management resources, and exceptional claims handling.

**To learn more, please visit** www.UE.org.

The material appearing in this publication is presented for informational purposes and should not be considered legal advice or used as such.

Copyright © 2016 by United Educators Insurance, a Reciprocal Risk Retention Group. All rights reserved. Contents of this document are for members of United Educators only. Permission to post this document electronically or to reprint must be obtained from United Educators.

UE-113276  11/16

AR_00000839

**Sage Carson**

| | |
|---|---|
| **From:** | Sage Carson |
| **Sent:** | Tuesday, August 22, 2017 4:47 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Thank You for Meeting with Know Your IX |

Dear Assistant Secretary Jackson,

Thank you for meeting with us to discuss our concerns and listen to our perspectives. As you know, Title IX has been essential to our and other organizations' work on combating gender violence in schools.

Since the regulatory process will put everything in the Dear Colleague Letter (DCL) on the table, we were heartened to hear that the Department of Education is interested in speaking to survivors across the country who have benefited from Title IX and the DCL. Please let me know how we can be of assistance in setting up those meetings. We would love to help in selecting locations to host listening sessions and to connect you to students.

Alyssa and myself were also excited to hear of your interest in the bipartisan Campus Accountability & Safety Act, as well as your interest in aggregate data and the article from our co-founder Alexandra Brodsky. As we discussed in our meeting, we wanted to pass along two additional articles. One article from our co-founder Dana Bolger discusses schools' financial obligation under Title IX. Another article by Alyssa Peterson, whom you met during our meeting, offers recommendations on balancing systemic change on campus with the individual needs of complainants.

We were truly appreciative of your apology. Many of the survivors we work with, as well as many on our team, were assaulted when drunk and constantly face rape myths and denials of their trauma. It was also extremely important for us to hear you say that Title IX was here to stay, as many survivors are concerned that their rights are at risk. As such, we feel that it would mean a great deal to survivors and build confidence in the Department's commitment to ending sexual violence if you would write an op-ed denouncing rape myths and many of the false ideas that have been spread in the media. With school starting during the next few weeks for many students across the country, we look forward to seeing a statement from you and the Department soon.

I welcome another meeting between us, and I hope to further discuss our Policy Playbook that we shared with you. Please let me know if you would like to meet again. We will also continue to send information to Chelsea about the survivor groups that would like to schedule listening sessions with your office.

Thank you,
Sage Carson

--
Sage Carson
Manager, Know Your IX

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, August 22, 2017 5:37 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Q-A |
| **Attachments:** | Q-A 8-22-17.docx |

AR_00000841

# AC WP DPP

AR_00000842

# AC WP DPP

AR_00000843

# AC WP DPP

AR_00000844

# AC WP DPP

# AC WP DPP

AR_00000846



**PII**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Wednesday, August 23, 2017 12:23 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: Please turn back the DCL |

Thanks for reading my email and for the quick reply!

We are all hopeful that you and Secretary DeVos will help bring back due process and civil liberties to college campuses.

Many of us who have been through this with our sons are focused and committed to working on bringing about change. I just want to help make some good come out of the anguish we went through.

Anybody with sons is only any given Saturday night away from this nightmare themselves!

Please help bring about change by turning back the DCL.

Thanks!

On Tue, Aug 22, 2017 at 6:45 AM Jackson, Candice <Candice.Jackson@ed.gov> wrote:
> I really appreciate hearing from you. I can only imagine the pain you and your son have been
> through. We are working hard to make our Title IX system work for everyone.
>
> All my best,
> Candice
>
>
> Candice Jackson
> Office for Civil Rights
> U.S. Dept. of Education
> *Sent from my iPhone*
>
> On Aug 21, 2017 at 9:43 PM, **PII** @gmail.com> wrote:
>
>> Dear Assistant Secretary Jackson,
>>
>> I'm writing to ask you to please work to turn back the massive government overreach
>> of the 2011 Dear Colleague Letter that came out of the OCR.
>>
>> It has had huge negative impact on SO many college boys, including my son.
>>
>> Being held responsible for a false accusation of sexual assault cost him his **PII** at a college he loved, his final college year with dear friends and his last season as a leader and major contributor to **PII**

AR_00000847

The mental and emotional toll on him and our family cannot be over stated. He learned early and painfully that life isn't always fair and that truth doesn't always bring justice.

He was denied due process and civil liberties, as have hundreds of college boys across the country. I believe it's becoming an epidemic.

Please consider this plea.

I hope to hear back from you.

Sincerely,

**PII**

(For my son's privacy and safety, I feel it necessary to use a pseudonym)

AR_00000848

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, August 29, 2017 10:11 AM |
| **To:** | Jackson, Candice |
| **Attachments:** | DCL 8-28-17.docx |

AR_00000849

# AC WP DPP

# AC WP DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, August 30, 2017 9:20 AM |
| **To:** | Sherman, Brandon |
| **Subject:** | Fwd: DELIBERATIVE/PRE-DECISIONAL: latest draft (clean) |
| **Attachments:** | Q-A 8-22-17 clean.docx; ATT00001.htm |

Didn't get the attachment on my last email.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

# DPP

# DPP

AR_00000854

# DPP

AR_00000855

# DPP

AR_00000856

# DPP

**Sherman, Brandon**

| | |
|---|---|
| **From:** | Sherman, Brandon |
| **Sent:** | Wednesday, August 30, 2017 12:10 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: OCR/ASCA meeting follow-up |
| **Attachments:** | TIX Examples of Process working well.pdf; ATT00001.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Jill L. Creighton, ASCA President 2017-2018" <president@theasca.org>
> **Date:** August 30, 2017 at 12:06:36 PM EDT
> **To:** <brandon.sherman@ed.gov>
> **Cc:** "Henderson, Chelsea" <Chelsea.Henderson@ed.gov>
> **Subject: OCR/ASCA meeting follow-up**
>
> Dear Brandon,
>
> Thank you for taking the time to meet with me and the ASCA Leadership Team last month.  It was a pleasure to speak with you.  I am writing to follow-up on a few items from our discussion.
>
> 1. I want to extend a formal invitation for you, Deputy Assistant Secretary Candice Jackson, and/or Secretary DeVos to attend our Annual Conference as **either a featured speaker or as a general attendee**.  We will gather February 21-24, 2018 in Jacksonville, FL.  We are aware that travel your budget may be tight, so we are happy to work with you to provide travel arrangements.
> 2. In our meeting, I provided you with a hard copy of the ASCA Gold Standard for managing campus sexual misconduct.  The electronic link to the executive summary is here, and the full Gold Standard Report is here.
> 3. Should you be interested in reading more about student conduct best practices from a practitioner lens, please see our library of Whitepapers on the preponderance of evidence standard, attorneys in the conduct process, courts vs. campuses, and threat assessment.
> 4. I have compiled a few examples of when a Title IX campus process has gone well for all parties involved, and I have attached those as a PDF to this email.  I have a few examples of when things were challenging as well, and I am happy to share those with you in a follow-up phone call should you be interested.  Most of these cases have to do with under-trained panelists asking inappropriate questions or not enough resources to divide the labor of investigating and adjudicating a case.
> 5. You expressed interest in learning more about the ASCA Sexual Misconduct Institute Curriculum.  Our summer institute concluded in mid-July, but the introduction, learning objectives, and agenda can be found on the institute's website http://ascatitleix.com/institute -info/.
> 6. Should there be an opportunity for ASCA to contribute to any negotiated rule-making

AR_00000858

process, comment on any pending changes in guidance, or continue to discuss student conduct and Title IX practice, I am hoping continue to dialogue with OCR/DoED in any capacity that may be helpful.

Warm Regards,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Jill L. Creighton, B.A., Ed.M
She/Her/Hers
Association for Student Conduct Administration (ASCA) | President, 2017-2018

president@theasca.org
P from US: (212)-998-4430
P from non-US: (001) or +1 then 212-998-4430

 Please consider the environment and print only when necessary

AR_00000859

Example 1: Non-residential 2 year Community College

This situation shows how requirements by OCR worked to protect a student and community from violence.  We became aware of a dating violence relationship between two nursing students.  The complainant's friends reported the information to the institution.  They reported the complainant came to class on multiple occasions with bruises on her body.  Further, the complainant reported to her friends that the respondent choked her on one occasion.  These behaviors took place off campus. We met with the complainant who confirmed all the behaviors.  She did not respond in relation to a question about choking. Initially, she did not want to take any action against the respondent.

We conducted a lethality assessment, which showed she was at an increased risk of fatal harm by the respondent.  Yet, the complainant stated she did not believe the behavior would happen again.  She stated if it did, she would move forward with a complaint.  The behavior occurred again, and she did not want to move forward with a complaint.  Because of OCR's guidance that we are required to address instances of sexual violence that occur off campus when it has a continuing effect on campus and because we are required to move forward in cases where there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence, we informed the complainant we would need to move forward for the sake of her safety and encouraged her to get a protective order off campus.  She did so, and we put a no contact order in place, interimly suspended the respondent, and continued our process.

Given the nursing program is a cohort model, we wanted to lessen the impact of the suspension on the respondent's studies because he had not yet had his hearing and he could potentially be found not responsible.  So, we allowed the respondent to take tests in the testing center, receive materials for class, and allowed him to continue his clinicals because the complainant was not there and he was not a known risk to other students.  The respondent admitted the behavior, and blamed the behavior on the complainant.  The complainant ended the relationship because of the investigation.

The investigation led to a hearing where the committee of trained individuals looked at both sides of the story.  Although the behavior was severe, the committee looked for a reasonable response that would allow both students to continue their education.  They suspended the student for 2 semesters, so he would be put in a separate cohort from her.  This is an example of the guidance working well because the college was encouraged by OCR to address this off campus behavior and address it against the complainant's wishes because of the great effect the behavior had. This resulted in the college protecting the student and community from further harm including potential escalation of physical violence.

<u>Example 2: Public, land-grant 4-year institution</u>

A male student was reported for dating violence in reference to an incident occurring off-campus with his on-again, off-again girlfriend.  The male student was intoxicated and was upset about the female student communicating with another male and not joining him for an event that he invited her to.  Both students agreed to a single administrator hearing, and the male student was accompanied by an attorney.  A restorative justice approach was used in the hearing, and both students were clearly able to express how they were feeling both during and after the incident.  The respondent was sanctioned to an extensive on-campus substance abuse program, in addition to other educational sanctions.  The complainant was pleased with the outcome and that the respondent was going to get the help that he needed related to substance abuse. The respondent even volunteered to come back to speak with new members of the student conduct hearing board to share what it is like to be a respondent in the student conduct process.


<u>Example 3: Private, large research institution</u>

A respondent was reported for two incidents of sexual misconduct by two separate complainants. The respondent met with investigators over the course of several meetings. Throughout the investigation, the respondent presented as distraught and concerned about the situations themselves as well as the outcome of the investigation.  The fact pattern demonstrated by a preponderance of the evidence that the respondent was responsible for violating the student code of conduct.   At the conclusion of the hearing, the respondent, unprovoked, walked over to the investigator's office and said, "This isn't how I wanted things to turn out.  But, thank you, [Investigator's name], for making me feel heard."

**PII**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Monday, September 04, 2017 9:46 PM |
| **To:** | DeVos, Betsy; Jackson, Candice |
| **Subject:** | Praying for you! Repeal DCL11 |

Betsy and Candice:
Please know that I am pray for you and your department everyday. As you probably already know, my family and I desperately hope that you will repeal the Dear Colleague Letter. My son, **PII** **PII** has been terribly hurt by a false accusation.
He is currently **PII** but will need to transfer to another school in **PII** We are on a timeline - time is running out. There are not any schools willing to take him because of the Title IX finding.
He does not have any criminal charges but he is being treated like a criminal.
We hope the removal of the DCL11 will not only vindicate my son but prevent this from happening to others.
I just read a news report that you may make this change this week. I certainly hope this is true.
We know that God and truth will prevail!
God bless you,

**PII**

**Ferguson, Gillum**

| | |
|---|---|
| **From:** | Ferguson, Gillum |
| **Sent:** | Monday, July 31, 2017 6:49 PM |
| **To:** | Venable, Joshua; Bailey, Nathan; Jackson, Candice; Hill, Elizabeth; Sherman, Brandon; Eitel, Robert; Menashi, Steven |
| **Cc:** | Hahn, Nicholas |
| **Subject:** | RE: DeVos is right: Sexual assault cases should not ignore due process |
| **Attachments:** | WTAS - Title IX.docx |

Josh,

See attached for the latest WTAS doc. This focuses on positive media reaction, both editorials and opinion columns. Also working on adding quotes from thought leaders, academics, activists, etc., but wanted to give you this in the meantime. If there are any changes you'd like let us know.

Thanks,
Gillum

---

**From:** Venable, Joshua
**Sent:** Monday, July 31, 2017 9:06 AM
**To:** Bailey, Nathan; Jackson, Candice; Hill, Elizabeth; Sherman, Brandon; Eitel, Robert; Menashi, Steven
**Cc:** Hahn, Nicholas; Ferguson, Gillum
**Subject:** Re: DeVos is right: Sexual assault cases should not ignore due process

Can we get an updated, comprehensive WTAS package?

---

**From:** Nathan Bailey <Nathan.Bailey@ed.gov>
**Date:** Saturday, July 29, 2017 at 4:56 PM
**To:** Candice Jackson <Candice.Jackson@ed.gov>, Elizabeth Hill <Elizabeth.Hill@ed.gov>, Brandon Sherman <Brandon.Sherman@ed.gov>, Bob Eitel <Robert.Eitel@ed.gov>, Steven Menashi <Steven.Menashi@ed.gov>, Venable Joshua <joshua.venable@ed.gov>
**Cc:** "Hahn, Nicholas" <Nicholas.Hahn@ed.gov>, Gilllum Ferguson <Gillum.Ferguson@ed.gov>
**Subject:** Re: DeVos is right: Sexual assault cases should not ignore due process

This is great. Some others that have popped, ICYMI

http://www.toledoblade.com/Editorials/2017/07/29/Betsy-DeVos-asserts-rights-of-accused-in-campus-rape-cases.html

http://reason.com/archives/2017/07/29/accused-student-says-he-was-told-to-stay

http://thefederalist.com/2017/07/26/college-students-falsely-accused-sexual-assault-good-couple-weeks/

http://www.nationalreview.com/article/449759/betsy-devos-campus-sexual-assault-end-kangaroo-courts

---

**From:** "Jackson, Candice" <Candice.Jackson@ed.gov>
**Date:** Friday, July 28, 2017 at 11:31 AM

**To:** Bailey Nathan <nathan.bailey@ed.gov >, "Hill, Elizabeth" <Elizabeth.Hill@ed.gov >, "Sherman, Brandon" <Brandon.Sherman@ed.gov>, "Eitel, Robert" <Robert.Eitel@ed.gov >, "Menashi, Steven" <Steven.Menashi@ed.gov >, Joshua Venable <joshua.venable@ed.gov >, "Hahn, Nicholas" <Nicholas.Hahn@ed.gov >
**Subject:** DeVos is right: Sexual assault cases should not ignore due process

The supportive op-eds continue to roll out...


https://www.usatoday.com/story/opinion/2017/07/28/betsy-devos-right-sexual-assault-cases-due-process-kc-johnson-stuart-taylor-column/493320001/


Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

# What They Are Saying – Title IX Sexual Assault Guidance

*Last updated: July 31, 2017*

(b)(5)

## Editorials

### Sexual Assault Reeducation: Betsy DeVos Strikes Blow for Due Process
**New York Daily News – Editorial**
July 13, 2017
*Stand strong there, Madame Secretary — because it's about time someone in charge reined in a discipline regime gone destructively off track. ...*

*Going forward, the Trump administration's guidance must return professional law enforcement to its proper place, including open proceedings where clear and convincing evidence is the standard of proof.*

### Campus Rape? Call the Police
**Chicago Tribune – Editorial**
July 16, 2017
*Civil authorities, who have no agenda to protect a school or to shortchange an alleged victim or perpetrator, still are best suited to mete out justice. All the more reason for college administrators to swiftly hand allegations of rape and other sex crimes to the people best qualified to deal with them — local cops and prosecutors...*

*One option would be this rewrite of the 2011 letter: 'Dear Colleague, Someone reports a campus sexual assault? Call the cops.'*

### Betsy DeVos's Due Process
**Wall Street Journal – Editorial**
July 19, 2017
*Sexual assault charges deserve to be investigated, but liberal academia is using Title IX to silence ideological opponents, often complaining that peaceful dissent constitutes actionable harassment on the basis of gender or sexual orientation. Mrs. DeVos is right to revisit the Obama-era guidance that has turned the law into an ideological weapon, and part of that is learning from its victims.*

### Yes, It's Time To Revisit Obama's Title IX Campus Sexual Assault Guidance
**Fort Worth Star-Telegram – Editorial**
July 20, 2017

Page 1003
withheld pursuant to exemption
(b)(5)
of the Freedom of Information and Privacy Act

*Anyone who truly cares about civil rights will see that DeVos' decision to revisit the Title IX guidelines and to invite the perspectives of all those involved is not only necessary but long overdue.*

Betsy Devos Asserts Rights Of Accused In Campus Rape Cases

**Toledo Blade – Editorial**

July 29, 2017

*It is not yet clear what Secretary DeVos' policy on campus rape will be. But if it treats both victims and the accused as important, it will be better than the policy she inherited.*

# Opinion Columns

DeVos's Title IX Summit Buoys Hopeful Stakeholders on Both Sides

**Weekly Standard – Alice Lloyd**

July 13, 2017

*The former president sold the guidance as proof of his progressive credentials. But its irreversible damage to the rule of law stands testament to a legacy of well-intentioned overreach doing more harm than good.*

Trump's Office of Civil Rights Is on the Right Path

**National Review – Elliot Kaufman**

July 13, 2017

The Trump administration should withdraw the 'Dear Colleague' letter.

Trump's Education Department Takes on the Campus-Rape Lie

**National Review – David French**

July 17, 2017

*Kangaroo courts aren't the answer for crises of character. Betsy DeVos is right to reexamine the radical policies of the failed recent past.*

Betsy DeVos Isn't "Enabling Rape Deniers" by Pushing for Due Process on College Campuses

**Reason – Nick Gillespie**

July 18, 2017

*As Columbia University settles a case with a student found innocent of sexual assault, the Secretary of Education is rolling back a bad Obama-era policy.*

Will Betsy DeVos fix Obama's toxic campus sexual assault policy?

**Boston Globe – Dante Ramos**

July 19, 2017

*For any reforms to stick, campus communities need to understand that revisiting the "Dear Colleague" letter doesn't have to be part of some ideological crusade on DeVos's part, or the result of a misplaced tolerance for sexual predators. It's a matter of deciding which rules best protect the rights of everyone involved and help an investigation get closest to the truth.*

Dear Betsy: End the Kafkaesque Kangaroo Courts of Title IX
**National Review – Tiana Lowe**
July 24, 2017
*The true flaw of Obama's letter was the fact that it expanded the authority of a broken system — and limited its capacity to find facts by, for example, discouraging the cross-examination of accusers — rather than fundamentally repairing it. This has resulted in show trials conducted by hapless administrators who lack the power to subpoena evidence, operating either parallel to or in lieu of a criminal investigation.*

College Students Falsely Accused Of Sexual Assault Have A Good Couple of Weeks
**The Federalist – Ashe Schow**
July 26, 2017
*[A] group of accused students (including one woman) met with Education Secretary Betsy DeVos in Washington DC. This would never have happened during the Obama administration, which supported a culture insisting everyone believe that no one lies about sexual assault (even if there are not consequences for such a lie). ... A fair process that includes due process does not impede justice.*

Betsy Devos Is Right: In College Sexual Assault Cases, Due Process Matters
**USA Today – KC Johnson and Stuart Taylor**
July 28, 2017
*The Obama-era Office for Civil Rights lowered standards for convicting college students of sexual assault. We need to protect all students' rights.*

Accused Student Says He Was Told to 'Stay Quiet' About His Own Lack of Consent
**Reason – Samantha Harris**
July 29, 2017
*Since Betsy DeVos became secretary of education, there have been some signals that OCR might rethink its aggressive micromanagement of schools' procedures for handling sexual misconduct.*

AR_00000867

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Thursday, August 24, 2017 12:33 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Gettler, Rachel; Wheeler, Joseph; Faiella, Matt; Reyes, Alejandro |
| **Subject:** | Clery Act chart |
| **Attachments:** | Clery Act chart (draft 8-24-17).docx |

Hi Candice,



Best, Mia

AR_00000868

# DPP

AR_00000869

# DPP

# DPP

AR_00000871

# DPP

AR_00000872

# DPP

# DPP

# DPP

AR_00000875

# DPP

AR_00000876

# DPP

AR_00000877

# DPP

AR_00000878

# DPP

AR_00000879

**Cynthia P Garrett**

---

| | |
|---|---|
| **From:** | Cynthia P Garrett |
| **Sent:** | Tuesday, September 05, 2017 1:23 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Henderson, Chelsea; Scott Alison |
| **Subject:** | FACE; Eliminating the Presumption of Innocence |
| **Attachments:** | ABA-Due-Process-Task-Force-Recommendations-and-Report.pdf |

Candice-

I thought you might find useful my below response to today's Inside Higher Ed article which quotes Laura Dunn's opinion that there should be no presumption of innocence in campus adjudications. (https://www.insidehighered.com/news/2017/09/05/new-report-ranks-colleges-due-process-protections)

Since the ABA Task Force meetings I have spent quite a bit of time considering the victim advocate perspective on this issue, which includes the belief that finding the accused not responsible is effectively a finding that the accuser is lying. In practice this together with the absence of a presumption of innocence eliminate the possibility of a middle ground - the decision makers must choose one side or the other.

As I explain below, tying the hands of administrators by requiring them to choose one party over another inevitably forces them to make decisions in which they do not believe. Absolutely crazy when you think about the ramifications of eliminating the presumption and structuring the process as a contest where one party must win and the other lose.

Also note how close FIRE's recommendations (referenced in the article) are to those proposed by the ABA Task Force.

And a question: have you found any solutions for addressing the sticky issue of active or closed campus disciplinary cases?

Cindy

*Cynthia P Garrett, Co President*
**Families Advocating for Campus Equality**
www.facecampusequality.org
facecampusequality@gmail.com
@FaceCampusEqual

Begin forwarded message:

**From:** Cynthia P Garrett <␣␣␣␣PII␣␣␣␣@gmail.com>
**Subject: Families Advocating for Campus Equality; Fairness Questioned**
**Date:** September 5, 2017 at 8:47:23 AM MST
**To:** Bauer-Wolf Jeremy <jeremy@insidehighered.com>

Jeremy-

Nice job on today's article.  I wanted to mention a couple of things about the issues raised.

First, the idea that there should be no presumption of innocence. That was something raised during our ABA Criminal Justice Section Task Force discussions earlier this year. There I learned from victim advocates that whenever an accused student is found not responsible, victim advocates interpret that as essentially calling the accuser a liar. They believe the presumption effectively stacks the deck against the accuser and that there is no middle ground -  either it's X or Y.  We would call that a zero-sum game.

That perspective is a, if not *the* primary reason campus administrators make mistakes -- on both sides. I know it's been said many times before, but is worth repeating here: he said/she said disputes are the most difficult cases even for highly experienced criminal investigators and judges. Let that sink in.  These experts spend their lives encountering such issues and they find such cases are nearly impossible to unravel.  Yet we expect campus administrators to achieve what experts with years of experience cannot do -- choose on party over the other.

Practically, when the message to the decision makers is "you do not have the option to say I do not know; you must choose one party over the other" of course they are going to guess or flip a coin. They have no choice.  No wonder then that campus administrators made mistakes; they are being forced to issue decisions in which they cannot honestly say they believe.

FIRE's recommendations are very close to those issued by the ABA last June (attached below), and if you read our explanation of the standard of evidence -- which by the way is given no name due to misconceptions about the preponderance standard -- we included a requirement that decision makers actually be convinced, or *believe the incident did or did not occur,* in order to issue a decision one way or another.

 The ABA recommendation on the standard of evidence for cases in which there is an adjudicatory hearing reads:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*
>
> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously*

*convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

We have advised Candice Jackson that there needs to be a "no finding" option and a tie must go to the accused student. Those who advocate for the zero-sum option are doing a disservice to both the accuser and the accused because curtailing the ability of decision makers to make a decision in which they actually believe is no different than a coin toss.

Thanks,

Cynthia

*Cynthia P Garrett, Co President*
**Families Advocating for Campus Equality**
www.facecampusequality.org
facecampusequality@gmail.com
@FaceCampusEqual

ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS: RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT

The Executive Committee of the ABA Criminal Justice Section commissioned the Task Force on College Due Process Rights and Victim Protections in November 2016. Immediately after, extensive efforts were made to find members that represented all interested parties: victims, the accused, universities, other stakeholders, and national experts. The Task Force was fully constituted in the winter of 2017, and it ended up including two voting members who were originally liaisons from the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice. This elevation was made in recognition of their significant contributions.

Although the Task Force worked expeditiously, it did so because members were eager to try to have a positive impact on this critical area of public policy. The Task Force believed it likely that the new administration would release new directives to replace the 2011 Dear Colleague Letter, issued by the U.S. Department of Education Office for Civil Rights. In the greatest of traditions of the ABA and the Criminal Justice Section, members wanted to contribute to the public discussion.

The Task Force drafted these *Recommendations* to provide guidelines to colleges and universities in resolving allegations of campus sexual misconduct. They are aspirational and reflect the Task Force's collective judgment for a fair process. These *Recommendations* do not represent the views of one person or even a group of people but the views of the collective whole for which there was complete consensus among all Task Force members. The recommendations were necessarily the product of extensive discussions and compromise. Various stakeholders agreed to bend on certain provisions in order to obtain other provisions of import to them and in order to reach unanimity. These *Recommendations* are not exhaustive. The Task Force recognizes that it did not discuss every relevant issue, but it aimed to address the more salient ones. Nor are the *Recommendations* intended to be mandated detailed scripts or to limit the discretion of schools to adopt different procedures. Instead they are intended to provide schools with useful guidelines. In addition, not all of these recommendations are consistent with the 2011 Dear Colleague Letter. On May 6, the ABA Criminal Justice Section Council voted unanimously to endorse these *Recommendations* for publication.[1]

Throughout these *Recommendations*, the Task Force uses the word "should" which recognizes the diversity among schools and the lack of authority in requiring schools to have certain provisions. Where the law requires a school to have a certain provision mandatory language is used.

---

[1] Although these *Recommendations* were unanimously endorsed for publication by the Criminal Justice Section Council, they have not been endorsed by any other section of the ABA, including the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice.

Complainant refers to the alleged victim, although the Task Force acknowledges that sometimes they may not be the same person. Respondent refers to the alleged perpetrator. The Task Force also refers to complainant and respondent in the singular even though there may be more than one. The decision-maker refers to the person(s) who determine whether a violation occurred.

## I. SCHOOL'S RIGHT AND RESPONSIBILITY TO ADDRESS CAMPUS SEXUAL MISCONDUCT

Title IX prohibits sex discrimination in educational programs or activities that receive federal financial assistance. Sex discrimination includes sexual harassment and sexual misconduct. The Department of Education and federal courts have interpreted this federal law to require schools to respond to allegations of student sexual misconduct in a timely and effective manner.

### A.    Cooperation with, and Independence from, Law Enforcement

The Task Force recognizes the school's responsibility to address sexual misconduct on its campus for protection of its community. Schools should be able to determine whether a violation of school policy has occurred regardless of whether there has been a violation of criminal law. Where police investigation has been initiated, schools should work cooperatively with law enforcement to the extent permissible by state and federal law.

### B.    Investigate Both Sides

The school's investigator must conduct a prompt, fair, and impartial investigation. The investigation should be thorough, and both parties should have the right to participate by identifying witnesses and identifying and/or providing relevant information to the investigator. Investigators should equally seek out both inculpatory and exculpatory evidence.

### C.    Confidentiality

Schools should put in place provisions to guard against the improper disclosure of confidential information created or gathered during an investigation.  Parties, witnesses, investigators, decision-makers, and advisors should abide by these provisions. Schools should notify parties about the scope and limits of the school's ability to maintain confidentiality. For example, a school may have to provide documents in compliance with a court subpoena.

### D.    Retaliation

Schools should put in place provisions to protect all parties from retaliation. Such provisions should be published to the campus community and available for review at all times. Such policies should also be communicated to all participants, including witnesses, throughout the investigative and adjudicatory process.  Such policies should also clearly communicate the means through which any individual can securely report perceived retaliation.

AR_00000884

II.    RESOLVING ALLEGATIONS OF SEXUAL MISCONDUCT

Schools have several options for resolving allegations of sexual misconduct.

A.    **Alternatives to Traditional Adjudication**

Where appropriate, the Task Force encourages schools to consider non-mediation alternatives to resolving complaints that are research or evidence-based, such as Restorative Justice processes. Both parties must freely and voluntarily agree to such processes in order for them to be utilized, and they may withdraw their consent to the process at any time, stopping its use.

B.    **Adjudicatory versus Investigatory Model**

Both the adjudicatory and the investigatory model begin with an investigation, but they differ in the process for determining whether a violation of school policy occurred. The adjudicatory model has a hearing in which both parties are entitled to be present, evidence is presented, and the decision-maker(s) determine(s) whether a violation of school policy has occurred. This does not require the parties to be present in the same room.  For instance, the parties could be in two separate rooms but able to see and hear each other via video-conferencing. The Task Force emphasizes that the decision-maker(s) should be able to see and hear the parties in order to assess their credibility, and at a minimum, the parties should be able to hear one another.

In the investigatory model, by contrast, the decision-maker(s) consider(s) only the investigation report in determining whether a violation occurred. Sometimes the investigator is also the decision-maker (the single investigator model), and sometimes the decision-maker is different from the investigator. Although the decision-maker(s) may sometimes request to hear from a witness, the parties are not entitled to be present for that testimony in the investigatory model.

In considering the differences between the adjudicatory and investigatory model, the Task Force has a preference for the adjudicatory model because it can offset any potential for investigator bias, and it allows the decision-maker(s) to hear live testimony from the parties.  It was the consensus of the Task Force that the single investigator model, which consists of having an investigator also serve as the decision-maker, carries inherent structural fairness risks especially as it relates to cases in which suspension or expulsion is a possibility. Should a school choose to use the investigatory model, the Task Force recommends that the investigator and the decision-maker be different persons and adopt additional procedural protections consist with these recommendations.

The Task Force acknowledges that some schools use a hybrid model, which contains elements of both the investigatory and adjudicatory model. For classification purposes, the Task Force considers a model adjudicatory only if the parties have the right to a hearing in which evidence is presented, the parties are present, and a decision-maker who is not also the investigator determines whether a violation occurred. As described in Section IV below – if there are at least

3

three decision-makers and they are making their decision unanimously - it is appropriate to use the lower standard of proof as defined in Section IV-D.

## III. PROCEDURAL PROTECTIONS

The Task Force believes that both parties should have robust procedural protections.

### A.    Counsel/Advocate

The Violence Against Women Authorization Act of 2013 requires that in cases of sexual assault, both parties have the right to an advisor of their choosing, who may be an attorney or third party advocate. All advisors, including attorney advisors, must adhere to all conditions and obligations required by the school's process. The school should provide the advisor with the same access to information available to the party. Minimally, the advisor should have the right to communicate with the party in oral or written form during all meetings and proceedings. Should a party prefer, the school should provide the party with an advisor who has been trained in the school's sexual misconduct policies and can assist the party. The school should have more than one advisor to give the party choice, but is not required to provide an attorney advisor. Where a student is working with an advisor and that advisor has an obligation to report to the university, the student should be made aware of the potential conflict of interest.

### B.    Notice

Both parties should be provided with written notice as contemporaneously as is practical that a school or its designated investigator will commence a formal investigation. This notice should include the date of the alleged incident if known, a summary of the alleged facts, a summary of the specific policy violation(s) under investigation by the school, and instructions on how to access the relevant policy and adjudicatory process. It should also include information about their right to an advisor, described above. This notice should be provided before the investigation begins. If the initial complaint is made to the school investigator then notice should be provided before the responding party's interview with the investigator, regardless of whether the responding party decides to make a statement.

### C.    Discovery

The school should prepare an initial comprehensive investigation report and should notify both parties contemporaneously of the availability of the report. This report should include information such as party statements, witness statements, and any inculpatory or exculpatory information collected during the investigation. Schools should disclose a list of information obtained during the course of the investigation even if it was not considered relevant evidence for the decision-maker(s). Both parties should have a reasonable opportunity to review the report with their advisor, if they choose to have one, and to request information be included or removed by the school from the final report. The school should designate a person other than the investigator or the decision-maker(s) to determine which information is included in the final

4

report, taking into consideration the issues raised by each party and school policy. The student's advisor, if there is one, should have the right to participate fully in this pre-hearing stage of the process. Once the final investigation report is prepared, both parties and their advisors, if they have them, should have reasonable access to it and should have the right to provide a reasonable written response, which will be provided along with the final investigation report to the decision-maker(s) for consideration of whether a policy violation has occurred. This reasonable written response should not reference any evidence that has been formally excluded from the final investigation report, however either party may always appeal the improper exclusion of evidence from the final investigation report.

**D.     Impartial Decision-maker**

As a matter of fundamental fairness, schools and their designated personnel must be fair, impartial, and free of conflicts of interest. Both the investigator and the decision-maker(s) should receive fair and balanced training on how to objectively investigate and adjudicate these matters. Parties should be advised of the identity of the designated personnel in advance of decision-making so that they have sufficient time to raise concerns so as to avoid unnecessary delay and error.

**E.     Silence**

In the interest of fundamental fairness, and recognizing the prospects of parallel or follow-on criminal proceedings, the respondent's silence should not be the basis of a finding of responsibility. The Task Force emphasizes that as long as it comports with the standards articulated in Section III-C and Section IV-D below, the complainant's statement may serve as the sole basis for a finding of responsibility.

**F.     Appeal**

The Task Force recommends that both parties have a right to appeal. The grounds for appeal should be limited to (1) new information not known or available at the time of the hearing; (2) procedural error that materially affected the findings of fact (this includes improperly excluding or including evidence); (3) the imposition of a sanction disproportionate to the findings in the case (that is, too lenient or too severe); or (4) the conduct as found by the decision-maker does not violate school policy (this is not intended to allow an appeal for new fact-finding). A successful appeal on the first two grounds should generally result in a remand for a new hearing to determine whether a violation occurred. If the appellate officer finds the fourth ground to be true then the finding of responsibility should simply be reversed. Recognizing the benefits of finality, the Task Force favors a single level of direct/formal appeal.

**IV.    THE HEARING**

The Task Force recommends an adjudicatory hearing to determine whether the respondent committed sexual misconduct.

AR_00000887

## A.     Standards for Evidence at Hearing

In general, evidence may be presented during a hearing if it is relevant, not unduly repetitious, and the sort of information a reasonable person would find reliable. Evidence is relevant if (1) it bears on a fact of consequence in the case, or (2) it reflects on the credibility of a testifying party or witness in a material way. Evidence may be excluded if it is unfairly prejudicial or if it is needlessly duplicative. Character and reputation evidence regarding the parties (both positive and negative) should be excluded from the decision-making stage. Evidence of the past sexual history of the parties should be disfavored and admitted only when it provides compelling evidence on a disputed issue of relevance to the misconduct charge or its defense.

It is appropriate for some witness statements to be presented in written form, such as a statement signed by the witness or as recorded by the investigator.  The decision-maker should exercise caution at considering second hand statements as true. ("John told me that he saw...") It is rare if ever appropriate to consider as true a third hand statement or something more removed.  ("John told me that Zelda told him that she saw…").

If a witness statement is important for establishing whether the alleged misconduct occurred then whenever possible, that witness should appear in person. Live testimony will allow the decision-maker to better assess witness credibility and determine whether a violation occurred.  Members of the college community (other than the parties themselves as explained in Section C below) have an obligation to provide relevant evidence if called upon to do so.

## B.     Recording Proceedings

The hearing should be recorded or transcribed. Reasonable care should be taken to create a quality recording and minimize technical problems.

## C.     Participation in the Proceedings

Neither the complainant nor the respondent should be required to participate in the proceedings. However, the decision-maker(s) should not consider either party's personal account of what happened unless that party is available for questioning by the decision-maker(s) and the other party. A party who chooses to remain silent may still present evidence (other than a personal statement) or question the evidence that is presented by the school or the other party. The decision-maker(s) may always consider a party's evidence and questioning of the evidence as well as a party's general denial of the allegations.

## D.     Asking Questions

The complainant and respondent may not question one another or other witnesses directly, but should be given an ongoing opportunity during the proceeding to offer questions to be asked through the decision-maker(s), who will determine whether to ask them.  The investigator should be available for questioning by the decision-maker(s) and the parties.

AR_00000888

## V.   DETERMINING WHETHER A VIOLATION OCCURRED

Regardless of the method a school uses to determine whether a violation occurred, the Task Force urges that the following protections be put in place.

### A.   <u>Composition of Panel</u>

Recognizing that there are different models that could provide for a fair and equitable resolution, the Task Force favors having at least three people separate from the investigator decide whether a violation occurred. The Task Force recognizes that there are inherent benefits to having a diverse panel when deciding responsibility or sanctions. A panel can be diverse across a number of dimensions including gender, race, age, sexual orientation, and position within the university. The inclusion of students can also provide an important perspective.

### B.   <u>Necessary Vote for Finding of Responsibility</u>

Schools should require a unanimous vote among decision-makers for a finding of school policy violation and a finding of responsibility.

### C.   <u>Insufficient Evidence and Outcome</u>

If there is insufficient credible, reliable, and relevant evidence for the decision-maker(s) to find that a violation occurred then the student must be found not responsible.

### D.   <u>Standard of Proof</u>

The Task Force spent considerable time discussing the standard of proof to be used by decision-maker(s) in determining whether a violation has occurred. Some Task Force members thought it was unfair to have a lower standard of proof when respondents were facing suspension and possible expulsion, coupled with the potential collateral consequences that accompany a finding of responsibility. Other Task Force members considered it unjust to have an elevated standard of proof given the historical challenges complainants often faced in getting schools to respond adequately to allegations of sexual misconduct. For purposes of the school disciplinary system, everyone was in agreement that the standard should not be beyond a reasonable doubt. Additionally, the preconceived notions attached to the commonly used standards of proof troubled some Task Force members.  Specifically, some Task Force members did not agree with the common interpretation of "preponderance of the evidence" as requiring a mechanical weighing of the evidence in which a mere feather is enough to tip the scales towards a finding of responsibility. At the same time, other Task Force members felt "clear and convincing evidence" is a vague standard and thus easily subject to potential abuse. In light of these concerns, the Task Force believes that it is best to avoid labels and instead articulate the appropriate basis for a finding of responsibility, with corresponding instructions (preferably in written form) provided to the decision-maker to ensure a clear understanding of the manner in which they should consider,

AR_00000889

review, and weigh the evidence. The Task Force's recommendation is the product of compromise.

The Task Force believes that the following standard of proof is only appropriate under an adjudicatory model with at least a three-person panel of decision-makers, using a unanimity requirement, and with the procedural protections set forth in these recommendations. The Task Force recommends that this standard be provided in written form to the decision-makers and the parties and advisors, if there are any, before deliberations begin:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

In a model where there is only one decision-maker, the Task Force believes that there should be a higher standard of proof. (The Task Force acknowledges that this recommendation is not in line with the 2011 Dear Colleague Letter). The Task Force recommends that this higher standard of proof be provided in written form to the decision-maker before deliberations begin.

> *The decision-maker should first evaluate the quality of the evidence. The decision-maker should consider all of the evidence regardless of who provided it. Any evidence the decision-maker finds to be of high quality should be given more weight than any evidence the decision-maker finds to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-maker should only find the respondent responsible for alleged misconduct if the evidence firmly convinces the decision-maker to reasonably conclude that a finding of responsibility is justified. That is, the decision-maker should find that there is sufficient evidence that is relevant, probable, and persuasive to firmly convince him or her that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility significantly outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

AR_00000890

**E.**     <u>**Sanction**</u>

In the event of a finding of responsibility, the consensus of the Task Force is that a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis taking into account the facts and circumstances including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offense, and the effect on the victim and/or complainant as well as the university community. The Task Force believes that a presumption of expulsion may have unintended consequences such as discouraging reporting and a finding of responsibility.

AR_00000891

# REPORT
## ABA CRIMINAL JUSTICE SECTION
### TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS

The 2015 AAU Campus Climate Survey found 1 in 4 women surveyed from 27 Institutes of Higher Education (IHEs) had been raped or sexually assaulted while in college.[1] Although the authors cautioned that the results were not nationally representative,[2] they were consistent with a 2007 National Institute of Justice funded study that found 1 in 5 women at two large public universities had been similarly victimized.[3] In 2011, the Department of Education Office for Civil Rights (OCR) issued its Dear Colleague Letter (DCL), in which it called the statistics on sexual violence "deeply troubling and a call to action for the nation."[4] OCR was responding to a culture in which some schools weren't taking victims seriously and sometimes even dissuading them from pursuing charges.[5] After reminding universities that sexual violence constitutes a form of discrimination under Title IX,[6] OCR told universities that in order to be in compliance with Title IX, they had to change disciplinary proceedings to more effectively hold offenders accountable.[7]

Some applaud OCR's efforts[8]-including at least ninety professors who signed a White

---

[1]   See DAVID CANTOR ET AL., REPORT ON THE AAU CAMPUS CLIMATE SURVEY ON SEXUAL ASSAULT AND SEXUAL MISCONDUCT, 23–26 (2015), https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

[2]   Id. at xv.

[3]   See CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY vii (2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. A 2016 Bureau of Justice Statistics Campus Climate Survey studied the frequency of unwanted sexual contact in the 2014-2015 academic year among undergraduates at nine institutions of higher education (IHEs). See CHRISTOPHER KREBS ET AL., BUREAU OF JUSTICE STATISTICS RESEARCH AND DEVELOPMENT SERIES, CAMPUS CLIMATE SURVEY VALIDATION STUDY FINAL TECHNICAL REPORT (2016), https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf. Krebs et al. found that the prevalence rate for completed sexual assault among undergraduate females averaged 10.3% across the nine IHEs, with a range of 4.2%-20%. Sexual assault included completed sexual battery (prevalence rate averaged 5.6% across the nine IHEs) and completed rape (prevalence rate averaged 4.1% across the nine IHE's). 2016 CAMPUS CLIMATE SURVEY at 69. Researchers also estimated the prevalence rate for completed sexual assault since entering undergraduate school and across lifetime, but they urged caution in interpreting these results. Id. at 73.

[4]   Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, to Colleague 2 (Apr. 4, 2011) [hereinafter Dear Colleague Letter], http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[5]   See Kristen Lombardi, A Lack of Consequences for Sexual Assault, CTR. FOR PUB. INTEGRITY (Feb. 24, 2010, 12:00 PM), http://www.publicintegrity.org/2010/02/24/4360/lack-consequences-sexual-assault; Kayla Webley, Big Shame on Campus, MARIE CLAIRE (Oct. 16, 2013), http://www.marieclaire.com/politics/news/a8217/big-shame-on-campus/; Vanessa Grigoriadis, Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault, N.Y. MAG.: THE CUT (Sept. 21, 2014), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html.

[6]   Dear Colleague Letter, supra note 4 at 1.

[7]   Id. at 1–3, 7–14.

[8]   See Lavinia M. Weizel, Note, The Process That is Due: Preponderance of the Evidence as the Standard of Proof for University Adjudications of Student-on-Student Sexual Assault Complaints, 53 B.C. L. REV. 1613, 1642–55 (2012); Amy Chmielewski, Note, Defending the Preponderance of the Evidence Standard in College Adjudications of Sexual Assault, BYU EDUC. & L.J. 143, 149–56 (2013).

Paper in support of the DCL[9]-for raising the profile of the harm often suffered by victims of sexual assault and forcing schools to confront the issue on campuses. Others contend that OCR's enforcement approach was too heavy-handed and that, in an effort to appease OCR, universities have not provided sufficient procedural protections to the accused.[10] For example, members of the law faculty at both Harvard and the University of Pennsylvania have publicly called for greater procedural rights for accused students.[11] The popular press has also started to shine a spotlight on the experiences of men who say their universities never gave them a meaningful chance to defend themselves before finding them responsible for sexual misconduct and expelling them.[12] Even OCR and the Department of Justice have on occasion found that a school did not provide sufficient procedural protection to an accused student.[13]

Historically, courts for the most part have sided with schools. Writing for the majority in

---

[9]   Katherine K. Baker, Deborah L. Blake & Nancy Chi Cantalupo, et al., Title IX and the Preponderance of the Evidence: A White Paper, FEMINIST LAW PROFESSORS (Aug. 4, 2016), http://www.feministlawprofessors.com/wp-content/uploads/2016/08/Title-IX-Preponderance-White-Paper-signed-10.3.16.pdf.

[10]   See William A. Jacobson, Accused on Campus: Charges Dropped, But the Infamy Remains, LEGAL INSURRECTION (May 16, 2015, 8:30 PM), http://legalinsurrection.com/2015/05/accused-on-campus-charges-dropped-but-the-infamy-remains/; see also Naomi R. Shatz, Feminists, We Are Not Winning the War on Campus Sexual Assault, HUFFINGTON POST (Oct. 29, 2014, 6:44 PM), http://www.huffingtonpost.com/naomi-shatz/feminists-we-are-not-winn_b_6071500.html. See generally Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. KY. L. REV. 49 (2013); Barclay Sutton Hendrix, Note, A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings, 47 GA. L. REV. 591, 594 (2013); Ryan D. Ellis, Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus, 32 REV. LITIG. 65, 80–81 (2013).

[11]   See Elizabeth Bartholet et al., Rethink Harvard's Sexual Harassment Policy, BOSTON GLOBE (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html; David Rudovsky et al., Open Letter from Members of the Penn Law School Faculty, Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities, PHILLY.COM (Feb. 18, 2015), http://media.philly.com/documents/OpenLetter.pdf.

[12]   See Tovia Smith, Some Accused of Sexual Assault on Campus Say System Works Against Them, NPR (Sept. 3, 2014, 3:31 AM), http://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them; see also Emily Yoffe, The College Rape Overcorrection, SLATE (Dec. 7, 2014, 11:53 PM), http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html; Teresa Watanabe, More College Men Are Fighting Back Against Sexual Misconduct Cases, L.A. TIMES (June 7, 2014, 6:15 PM), http://www.latimes.com/local/la-me-sexual-assault-legal-20140608-story.html.

[13] See United States Department of Education ("DOE") Office for Civil Rights ("OCR"), Letter of Resolution in Wesley College, OCR Complaint No. 03-15-2329 (Sept. 30, 2016). (available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-b.pdf) (finding that Wesley College violated Title IX by failing to provide accused students with essential procedural protections, not adhering to the safeguards provided for in its own disciplinary policies and procedures; and not providing the accused student a full opportunity to respond to the complaint, rebut the allegations, or defend himself at his hearing). See also United States Department of Justice Civil Rights Division, Letter re Title IX and Title IV Investigation of University of New Mexico (April 22, 2016) (available at https://www.justice.gov/crt/file/843926/download) (finding that the University of New Mexico's investigative process: failed to adequately inform respondents of the option to provide their own version of events or to help identify pertinent witnesses or evidence; lacked provisions requiring that complainants and respondents be provided regular updates regarding the investigation, which caused confusion and negatively impacted both students; and did not have adequate procedures in place to provide academic accommodations to respondent students that had been temporarily banned from campus for safety reasons).

AR_00000893

*Piarowski v. Illinois Community College*, Judge Posner explained why: "We are reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference."[14] Recently, however, in the wake of intensifying accused student litigation, courts across the country have started finding that aspects of the procedures and practices used at a number of schools to investigate and adjudicate reports of sexual misconduct violate principles of fundamental fairness, and in the case of public institutions, procedural due process.[15] For instance, on March 31, 2016, the Massachusetts District Court ruled in favor of a Brandeis University student who had been found responsible for "serious sexual transgressions."[16] The court wrote, "Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process."[17] The court was particularly troubled by the deprivation of the right to cross-examine the complainant[18] as well as the lack of notice about the underlying allegations.[19]

This Task Force was created to evaluate and address procedural protections for both victims and the accused. It was comprised of a diverse assortment of leading figures who together represented the interests of all of those at the table: victims, the accused, universities, and others. The Task Force's job was to come up with a set of recommendations that would protect the due process rights of the accused while also protecting the rights of victims. Despite the enormous undertaking (and some might say potential for irreconcilable differences), the Task Force was able to reach consensus on a set of recommendations. In so doing, the Task Force expounds upon the work previously undertaken by the ABA Commission on Domestic & Sexual Violence in 2015. This report provides some additional clarification and discussion to our recommendations.

# I.   Schools Rights and Responsibilities

## A.   Cooperation and Independence from law Enforcement

Some have suggested that universities should not adjudicate allegations of campus sexual assault or that the criminal justice system should take the lead. A recent bill in Georgia, for

---

[14] Piarowski v. Illinois Community College Dist. 515, 759 F.2d 625, 629 (7th Cir.1985).

[15] See Jake New, Court Wins for Accused, INSIDE HIGHER EDUC. (Nov. 5, 2015), https://www.insidehighered.com/news/2015/11/05/more-students-punished-over-sexual-assault-are-winning-lawsuits-against-colleges. Some argue that because of the coercive actions of OCR, private schools have become state actors, which means that those students are entitled to the same constitutional rights as students at a public university. See Tamara Rice Lave, A Critical Look at how Top Colleges and Universities Are Adjudicating Sexual Assault, 71 U MIAMI L. R. 276 (2017).

[16] Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *4 (D. Mass. Mar. 31, 2016).

[17] Id. at *6.

[18] Id. at *33–35 ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns. . . . Here, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding.").

[19] Id. at *33–34.

3

instance, would have forbidden schools from handling campus sexual assault unless and until there was a criminal investigation.[20] The Task Force was concerned that if a campus proceeding were tied to the criminal justice system that many instances of sexual misconduct would never be addressed. The Task Force believes it is appropriate for schools to resolve allegations of campus sexual misconduct for the protection and betterment of the campus community, as long as they do so fairly.

### B. Investigation

Advocates for complainants and respondents have both experienced schools not conducting a prompt, fair, and impartial investigation. All Task Force members agreed that it was critical for schools to fully and fairly investigate both sides of a complaint of sexual misconduct.

### C. Confidentiality

The Task Force spoke at length about issues regarding confidentiality. The Task Force wanted to ensure that the parties had access to necessary information in order to fairly adjudicate their case, but at the same time, it wanted to protect against confidential information being improperly distributed or disclosed. The Task Force was also concerned about parties not understanding the limits of school confidentiality, and members agreed it was imperative that they be informed.

## II. Resolving Allegations of Sexual Misconduct

### A. Alternatives to Traditional Adjudication

The Task Force encourages schools to consider non-mediation alternatives to traditional adjudication such as restorative justice processes (RJ). The Task Force stresses that these alternatives should be research or evidence based and not simply a means or escape mechanism for schools to avoid fully and fairly resolving allegations of campus sexual misconduct. Since there is a lot of misunderstanding about restorative justice, this report will provide a brief description.[21] Before doing so, the Task Force wants to emphasize that RJ is only appropriate in certain circumstances, such as when the offender does not pose an immediate or ongoing danger. In addition, both parties must agree to participate in RJ, and should they withdraw their consent at any time, the process must be stopped.

As Tom Tyler explains: "Restorative Justice argues that the social goal that should dominate reactions to transgressions is to resolve the dispute via reintegrative shaming

---

[20] Jeremy Bauer-Wolf, *Who Should Investigate Sexual Assaults*, INSIDE HIGHER ED, April 11, 2017; https://www.insidehighered.com/news/2017/04/11/controversial-georgia-sexual-assault-bill-prompts-debate-reporting.

[21] This section on restorative justice is taken in its entirety from the Task Force Reporter's article on campus sexual assault. Tamara Rice Lave, *Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases* 48 ARIZONA STATE LAW JOURNAL 637, 696-700 (2016).

4

[which] . . . combines strong disapproval of bad conduct with respect for the person who committed those bad acts. The goal is restoring victims, offenders and the community."[22] Unlike mediation, which treats parties as neutral, the starting point for RJ is that "harm has been done and someone is responsible for repairing it."[23] This distinction is important because the 1997 Guidance Document,[24] the 2001 Guidance Document,[25] and the 2011 Dear Colleague Letter[26] told schools that they could not use mediation in cases of sexual assault, even if voluntary.

Although RJ is geared towards reintegrating the transgressing student back into the community, it is also dedicated to helping the victim heal and move forward. "A consensus of published studies is that sexual assault victims need to tell their own stories about their own experiences, obtain answers to questions, experience validation as a legitimate victim, observe offender remorse for harming them, (and) receive support that counteracts isolations and self-blame."[27] RJ responds to these needs. In conferencing (the most widely used model of RJ), the first meeting begins with the responsible person (otherwise known as the respondent or the accused) describing and taking responsibility for what he did and the victim describing the impact of the violation.[28] Family and friends of both are present for support and are given the opportunity to explain the impact of the harm.[29] A written redress plan is later formalized that describes "the concrete means through which the responsible person will be held accountable and remedy the impacts on victims and the community."[30] This can include counseling (sex offender treatment, drug and alcohol interventions, and anger management), community service, and victim restitution.[31] A one-year supervision period is put in place to monitor the responsible person and make sure that he meets his commitments.[32]

RJ has been shown to be effective at lowering recidivism and empowering victims in both academic and non-academic settings. A 2014 study by David Karp and Casey Sacks compared outcomes across three different college disciplinary processes: model code (a term

---

[22]   See Tom R. Tyler, Restorative Justice and Procedural Justice: Dealing with Rule Breaking, 62 J. SOC. JUST. 307, 315 (2006).

[23]   Mary P. Koss et al., Campus Sexual Misconduct: Restorative Justice Approaches to Enhance Compliance with Title IX Guidance, 15 TRAUMA, VIOLENCE, & ABUSE 242, 246 (2014). Koss argues that this distinction is important: Judicial "responses to sexual misconduct must acknowledge and obviate the negative effects of societal and individual norms that operate to silence victims and create opportunities for reabuse. When someone has been harmed by another person, mediation that provides neutrality and treats parties as equal partners in the resolution process is inappropriate." Id. at 245–46. Koss also argues that because of this difference, colleges can adopt RJ and not be in violation of the DCL. Id. at 246.

[24]   Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, U.S. DEP'T OF EDUC., http://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html (last visited Nov. 7, 2016) [hereinafter Sexual Harassment Guidance 1997].

[25]   U.S. DEP'T OF EDUC. OFFICE OF CIVIL RIGHTS, U.S. DEP'T OF EDUC., REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (2001) [hereinafter REVISED SEXUAL HARASSMENT GUIDANCE], https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf at 21.

[26] Dear Colleague Letter, supra note 4 at 2.

[27]   Koss et al., supra note 22, at 246–47.

[28]   Id. at 248.

[29]   Id.

[30]   Id.

[31]   Id.

[32]   Id.

AR_00000896