used for the more traditional hearing conducted by a single hearing officer or panel),[33] restorative justice, and a combination of the two.[34] Karp and Casey used data from the STARR project, which has a total of 659 complete cases,[35] gathered from 18 colleges and universities across the United States[36] Although they cautioned that their results may be limited by the fact that they had few suspension-level cases, their findings showed that RJ provided a positive alternative to more traditional disciplinary proceedings. They "consistently found that restorative justice practices have a greater impact on student learning than model code hearings."[37]

Furthermore, RJ has been successfully adopted for juvenile sex offenses and adult sex crimes. RESTORE is one such program that uses conferencing, a widely used RJ methodology.[38] Mary Koss evaluated RESTORE using a sample of 66 cases involving sex crimes. Although caution is necessary due to the small sample size, the results are promising. Koss found that 63% of victims and 90% of responsible persons chose RJ; 80% of responsible persons completed all elements of their redress plan within one year (12 months), and post-conference surveys showed that in excess of 90% of all participants, including the victims, agreed that they felt supported, listened to, treated fairly and with respect, "and believed that the conference was a success."[39] Importantly, there were no incidents involving physical threats, and standardized assessments showed decreases in victim posttraumatic stress disorder symptoms from intake to post conference.[40]

Even if RJ is not used as an alternative resolution process, schools should consider using it as a complement to a formal adjudicatory hearing. Koss has outlined how this can be done.[41] For instance, it could be used to determine the appropriate sanction after a finding of responsibility has been made and/or as a reintegration process once the responsible student has finished his sanction.

## B. The Adjudicatory versus Investigatory Model

The Task Force has a preference for the adjudicatory model versus the investigatory model because it allows for live testimony and it helps to offset bias. The Task Force was particularly concerned by the use of the single model investigatory model, in which the same person who investigates also determines whether a violation of school policy occurred.

---

[33]   David R. Karp & Casey Sacks, Student Conduct, Restorative Justice, and Student Development: Findings from the STARR Project: A Student Accountability and Restorative Research Project, 17 CONTEMP. JUST. REV. 154, 156 (2014). "The model code calls for a hearing process that is conducted by a single hearing officer or a volunteer board, often composed of students, faculty, and staff. While proponents of the model code highlight that the hearing is not a criminal trial, it has many of the similarities to the courtroom process." Id.

[34]   See id.

[35]   Id. at 162.

[36]   Id. at 160.

[37]   Id. at 169.

[38]   See Koss et al., supra note 22, at 248.

[39]   Id. (internal citation omitted).

[40]   Id.

[41]   See Koss et al., supra note 22, at 250, 252–53.

AR_00000897

As the Supreme Court acknowledged in *Withrow v. Larkin* (1975), a "fair trial in a fair tribunal is a basic requirement of due process"[42] and it applies to both court cases and hearings before administrative agencies. [43] "Not only is a biased decisionmaker constitutionally unacceptable," the Court wrote, "but 'our system of law has always endeavored to prevent even the probability of unfairness.'"[44] Congress recognized the importance of role separation when it unanimously passed the Administrative Procedure Act (APA) in 1946.[45] The APA *specifically* bars an individual from performing both an investigatory and an adjudicatory role.[46]

### a.   *Implicit Bias*[47]

Part of the problem with putting everything in the hands of one person is that even an administrator with the best of intentions is almost certainly biased in some way.[48] This poses a concern not just for accused students but also the student who reports being the victim of sexual misconduct. Implicit biases (or unconscious stereotypes) have been shown to affect judgment and produce discriminatory behavior.[49] These include biases based on race, gender, ethnicity, nationality, social status, and weight.

### b.   *Confirmation Bias*[50]

Confirmation bias— the tendency for people to seek or interpret evidence in a manner that is partial to existing beliefs, expectations or an existing hypothesis[51]—poses a particular challenge to the fairness of the single-model investigatory model. Confirmation bias has "proven strikingly robust across diverse domains of human thinking, including logical problem solving, social interaction and medical reasoning."[52]

Researchers have also shown how confirmation bias can infect criminal investigations. Kassin, Goldstein and Savitsky (2003) demonstrated that interrogators who had been cued to believe that most suspects were guilty chose more guilt-presumptive questions, used more

---

[42]   Withrow v. Larkin, 421 U.S. 35, 46 (1975) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

[43]   Gibson v. Berryhill, 411 U.S. 564, 579 (1973).  This paragraph was taken from Ready, Fire, Aim supra note 19 at 672.

[44]   Withrow, 421 U.S. at 47 (quoting In re Murchison, 349 U.S. at 136).  The Task Force acknowledges that Court has held that combining investigatory and adjudicatory functions does not necessarily violate due process, but the cases in which it upheld the combination of functions differ in important ways from the university proceedings at issue here.  See Lave, supra note 20 at 673-674.

[45]   See Walter Gellhorn, The Administrative Procedure Act: The Beginnings, 72 VA. L. REV. 219, 231–32 (1986) (internal citations omitted). The Task Force thanks Ed Rubin for this point.

[46]   See Administrative Procedure Act, 5 U.S.C. §§ 554 (d)(2), 557 (2012).

[47]   This section on implicit bias was taken from Ready, Fire, Aim, supra note 20 at 674-75.

[48]   For a comprehensive overview of studies showing bias in the courtroom, see Jerry Kang et al., Implicit Bias in the Courtroom, 59 UCLA L. REV. 1124 (2012).

[49.]   See John T. Jost et al., The Existence of Implicit Bias is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies that No Manager Should Ignore, 29 RESEARCH ORG. BEHAV. 39, 51 (2009).

[50] This section on confirmation bias is taken from Ready, Fire, Aim, supra note 20 at 676-77.

[51]   Raymond S. Nickerson, Confirmation Bias: A Ubiquitous Phenomenon in Many Guises, 2 REV. GEN. PSYCHOL. 175, 175 (1998).

[52]   Karl Ask et al., The 'Elasticity' of Criminal Evidence: A Moderator of Investigator Bias, 22 APPLIED COGNITIVE PSYCHOL. 1245, 1246 (2008) (internal citations omitted).

AR_00000898

interrogation techniques (including the presentation of false evidence), were more aggressive in questioning innocent suspects, and more likely to view a suspect as guilty.[53] They also found that an interrogator's presumption of guilt affected the behavior of those being questioned and made impartial observers more likely to judge them guilty.[54] Ask and Granhag (2007) found that experienced investigators judged witness statements differently depending on whether the statement was consistent or inconsistent with their initial theory.[55] Although Ask, Rebelius, and Granhag showed that investigators will be more receptive to certain kinds of evidence (such as DNA), the kind of evidence that is most likely to be proffered at college adjudicatory hearings, witness testimony, is the most subject to confirmation bias.[56]

Confirmation bias means that the accused student is unlikely to be treated fairly when the same person who is conducting the investigation will also be rendering the final determination in the case. As the court explained in *Doe v. Brandeis University*:

> The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.[57]

## IV.   The Hearing

### C.   Participation in the Proceedings

The Task Force's recommendations for admissibility of personal statements are modeled on a defendant's Sixth Amendment confrontation rights (testimonial statements are inadmissible unless the declarant is unavailable and has been subject to prior cross examination)[58] and the federal rules of evidence (a defendant cannot simply admit his own prior statement about what happened).[59] Importantly, The Task Force's recommendations provide less opportunity for confrontation than is provided by the Sixth Amendment, however they do provide for the opportunity for both parties to ask questions through the hearing chair.  In addition, they do not allow either side to present their personal statement about what occurred unless they are willing to be questioned by both the school and indirectly by the other party.

---

[53]   Saul M. Kassin, Christine C. Goldstein & Kenneth Savitsky, Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt, 27 L. & HUM. BEHAV. 187, 187 (2003).

[54]   Id.

[55]   Karl Ask & Par Anders Granhag, Motivational Bias in Criminal Investigators' Judgments of Witness Reliability, 37 J. APPLIED SOC. PSYCHOL. 561, 579 (2007).

[56]   Karl Ask et al., supra note 54, at 1257–58.

[57]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *36 (D. Mass. Mar. 31, 2016).

[58]   Crawford v Washington 541 U.S. 36 (2004).

[59]   See U.S. v Phelps 572 F. Supp. 262, 265 (E.D. Ky. 1983) ("The statement of a party may be introduced as an admission only when offered against that party. This principle is reflected by the standard but often unanalyzed objection that such testimony by a party constitutes a 'self-serving declaration.'")

## D. Asking Questions[60]

Part of the reason why the Task Force prefers the adjudicatory method is because it gives the decision-maker(s) the opportunity to hear live testimony, both from the parties and from witnesses. Not giving the accused the right to question his accuser seriously impairs his right to a fair and accurate determination of responsibility. In *Goldberg v. Kelley* (1970), the Supreme Court wrote that in almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[61] The right to ask questions is not a mere formality; the Court has called cross-examination "the 'greatest legal engine ever invented for the discovery of truth'."[62] As the court in *Doe v. Brandeis University* explained, cross-examination is particularly important in credibility contests where there are no witnesses or other extrinsic evidence.[63]

Social science research supports the importance courts and the Task Force place in cross-examination. Although researchers have shown people are not very good at judging a person's veracity based on his demeanor,[64] cross-examination is still an important vehicle for discerning truth.[65] This is because a witness's cognitive limitations make it demonstrably more difficult for him to consistently answer spontaneous questions under live cross-examination if he is being insincere.[66] In addition, there is certain observable behavior that has been linked to deception, such as vocal tension and pitch.[67] At least one study has shown that subjects are more than twice as effective at detecting deception when they are able to observe a speaker's body and hear his voice as opposed to simply reviewing a written transcript.[68]

Although the Task Force recognizes the importance of questioning, it also acknowledges the value of protecting victims from unnecessary trauma.[69] The Task Force believes that

---

[60]   This section on asking question is taken from Ready, Fire, Aim supra note 20 at 678-80.

[61]   Goldberg v. Kelly, 397 U.S. 254, 269 (1970).

[62]   Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting California v. Green, 399 U.S. 149, 158 (1970)).

[63]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *35 (D. Mass. Mar. 31, 2016).

[64]   See Aldert Vrij, Why Professionals Fail to Catch Liars and How They Can Improve, 9 LEGAL & CRIMINOLOGICAL PSYCHOL. 159, 166-167 (2004); see also Bella M. De Paulo et al., Cues to Deception, 129 PSYCHOL. BULL. 74 (2003) (conducting a meta-analysis of 120 independent samples and finding that behavior commonly associated with deception such as unwillingness to maintain eye contact were not in fact related).

[65]   See Raymond LaMagna, Note, (Re)Constitutionalizing Confrontation: Reexamining Unavailability and the Value of Live Testimony, 79 S. CAL. L. REV. 1499, 1506 (2006).

[66]   Chris William Sanchirico, Evidence, Procedure, and the Upside of Cognitive Error, 57 STAN. L. REV. 291, 332–44 (2004).

[67]   See De Paulo et al., supra note 66 at 95–96.

[68]   See Michael J. Saks, What Do Jury Experiments Tell Us About How Juries (Should) Make Decisions, 6 S. CAL. INTERDISC. L.J. 1, 21–22 (1997).

[69]   Some researchers reported that criminal proceedings are a negative experience for victims, calling them "disruptive" (Patricia Cluss et al., The Rape Victim: Psychological Correlates of Participation in the Legal Process, 10 CRIM. JUST. & BEHAV. 342, 354 (1983)), "hurtful" (Rebecca Campbell et al., Preventing the "Second Rape": Rape Survivors' Experiences with Community Service Providers, 16 J. INTERPERSONAL VIOLENCE 1239, 1250 (2001)), or "suggest[ing] that [they] are frequently a source of secondary victimization for the crime victims involved" (Uli Orth, Secondary Victimization of Crime Victims by Criminal Proceedings, 15 SOC. JUST. RES. 313, 321 (2002)). Others studies came to a different conclusion about the effect of legal proceedings on victim well-being. Frazier and Haney found that victims had a negative impression of the legal system, but their "findings [did] not support the belief that victims experience a 'secondary victimization' due to their involvement with the criminal

AR_00000900

allowing questions to be asked through the decision-maker balances these two important interests. Although the Task Force recognizes that such a process interrupts the spontaneity of direct questioning, it has the benefit of having an independent person assess whether the question is relevant and appropriate. It also removes the potential trauma from having a victim be directly questioned by her assailant. Although such a barrier may not be appropriate in the criminal justice context, the Task Force believes it is appropriate in the school context.

## V.   Determining whether a violation occurred

### A. Composition of Panel[70]

The Task Force was concerned by how bias can undermine fair decision-making. Specialized training has been shown to reduce bias[71] as has a longstanding and deep personal commitment to eradicating personal bias.[72] Ironically, the commitment to be objective may just exacerbate the problem. Studies have shown that subjects who profess to be objective are more likely to make biased decisions.[73]

Changing the context in which people are rendering decisions, however, may be the most effective way of promoting objectivity. Specifically, a larger and more diverse hearing body has been shown to increase the quality of deliberation and reduce bias. One study looked at the effects of having a racially homogeneous versus a heterogeneous jury.[74] It found that on every relevant measure, racially heterogeneous groups outperformed homogeneous ones. Not only did racially diverse groups spend more time deliberating, but also they discussed a wider range of case facts and personal perspectives. They also made fewer factual errors than all-white juries.[75] It is for these and other reasons that the Task Force recommends that there be at least three decision-makers who determine whether a violation occur and that the panel be diverse.

## Conclusion

Adjudicating campus sexual assault is a high stakes event. If a school finds a person responsible for sexual misconduct who did *not* actually do it (i.e., a false positive), then that person will unfairly suffer potentially life-altering consequences. If, on the other hand, a school

---

justice system. (Patricia A. Frazier & Beth Haney, Sexual Assault Cases in the Legal System: Police, Prosecutor, and Victim Perspectives, 20 LAW & HUM. BEHAV. 607, 620, 626) (1996)).

[70]   This discussion on Composition of Panel is taken from Ready, Fire, Aim supra note 20 at 675.

[71]   See Kang et al., supra note 47 at 1227.

[72]   Gordon B. Moskowitz et al., Preconsciously Controlling Stereotyping: Implicitly Activated Egalitarian Goals Prevent the Activation of Stereotypes, 18 SOC. COGNITION 151, 155 (2000).

[73]   Eric Luis Uhlmann & Geoffrey L. Cohen, "I Think It, Therefore It's True": Effects of Self-Perceived Objectivity on Hiring Discrimination, 104 ORGANIZATIONAL BEHAV. & HUM. DECISION PROCESSES 207, 210–11 (2007).

[74]   Samuel R. Sommers, On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations, 90 J. PERSONALITY & SOC. PSYCHOL. 597, 597 (2006).

[75]   A diverse hearing body has another benefit. Ultimately, whoever is deciding the case must assess the credibility of witnesses, which can be difficult when people come from different cultures. See Vrij, supra note 66 at 167.

AR_00000901

finds a person not responsible who *did* commit the misconduct (i.e., a false negative) then the school has deprived a victim of justice and potentially endangered the entire community.

With stakes this high, the Task Force agreed that fair processes are critical. Advocates for victims want to ensure that schools don't simply dismiss them as untruthful, and advocates for respondents want to make sure that schools don't just assume that they are guilty. Similarly, representatives of schools want to keep their communities safe, while at the same time having processes that minimize mistakes. All agreed that the best way to achieve this fair and objective approach was by having the school fully and fairly investigate both sides of the story and then provide an impartial forum for determining what occurred.

The Task Force believes that these recommendations go far towards achieving these goals. The Task Force recognizes that colleges and universities are not all alike, and that limited resources may constrain the ability of schools to follow some of these recommendations. The Task Force hopes, however, that it has provided a clear path for colleges and universities to fully and fairly adjudicate allegations of campus sexual misconduct – or at least strive earnestly to do so.

11

**Task Force Participants**

<u>**Chair**</u>

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team
Seyfarth Shaw LLP
Chicago, IL & Washington D.C.

<u>**Reporter**</u>

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

<u>**Members**</u>

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

AR_00000903

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

**<u>Liaison</u>**

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**<u>ABA Staff Liaison</u>**

**Patrice Payne**
Senior Staff Attorney, Criminal Justice Section
Washington D.C.

13

**S. Daniel Carter**

| | |
|---|---|
| **From:** | S. Daniel Carter |
| **Sent:** | Tuesday, September 05, 2017 4:19 PM |
| **To:** | DeVos, Betsy; press@ed.gov |
| **Cc:** | Jackson, Candice |
| **Subject:** | Title IX Sexual Violence Guidance (Formal Letter Attached) |
| **Attachments:** | DeVos090517.pdf |

Dear Secretary DeVos:

Thank you for your recent, and diligent interest in Title IX's impact on how colleges and universities address the very serious issue of campus sexual violence. Thank you also for recently making a point of stressing the importance of enforcing the federal Jeanne Clery Act, which also contains provisions dealing with this issue. I'm hopeful that the outcome of this attention will be to arrive at a balanced approach that leads to safer campuses.

I'm aware that there has been specific interest in the Office for Civil Rights (OCR) April 4, 2011 Dear Colleague Letter (DCL) on Title IX's application to "Sexual Violence" cases. While this letter is noteworthy for focusing much needed attention to these matters, the essence of it reflects longstanding law, guidance, and practice as was intended by those of us who requested it. The DCL has made significant progress in combatting long documented discrimination against survivors of campus sexual violence. Please do not rescind or weaken this important guidance.

The essence of Title IX is of course equality and fairness. Accordingly, should you feel it is necessary to take any further steps to make sure that no individuals in our nation's educational communities face discrimination, whether they be survivors or individuals accused of sexual violence please do so in a way that does not roll back the clock on the progress survivors, and the institutions that work to meet their needs have made over the last six years. Additionally, any sudden changes now at the beginning of the academic year could be significantly disruptive to schools, so a long-term process is more sound.

Should additional guidance be forthcoming, I would respectfully suggest an update to OCR's "Sexual Harassment Guidance", last promulgated in 2001. With a public notice and comment period this would enable all stakeholders – survivors, accused, and schools – and their advocates to provide substantive policy and legal input to the Department towards a goal of a thoroughly balanced framework.

Please let us know if we can be of any assistance to you during this process.

--
S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
***Helping to create a safe learning environment
for all within the academic community.***
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz
https://www.linkedin.com/in/sdccampussafety/



September 5, 2017

The Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Dear Secretary DeVos:

Thank you for your recent, and diligent interest in Title IX's impact on how colleges and universities address the very serious issue of campus sexual violence. Thank you also for recently making a point of stressing the importance of enforcing the federal Jeanne Clery Act, which also contains provisions dealing with this issue. I'm hopeful that the outcome of this attention will be to arrive at a balanced approach that leads to safer campuses.

I'm aware that there has been specific interest in the Office for Civil Rights (OCR) April 4, 2011 Dear Colleague Letter (DCL) on Title IX's application to "Sexual Violence" cases. While this letter is noteworthy for focusing much needed attention to these matters, the essence of it reflects longstanding law, guidance, and practice as was intended by those of us who requested it. The DCL has made significant progress in combatting long documented discrimination against survivors of campus sexual violence. Please do not rescind or weaken this important guidance.

The essence of Title IX is of course equality and fairness. Accordingly, should you feel it is necessary to take any further steps to make sure that no individuals in our nation's educational communities face discrimination, whether they be survivors or individuals accused of sexual violence please do so in a way that does not roll back the clock on the progress survivors, and the institutions that work to meet their needs have made over the last six years. Additionally, any sudden changes now at the beginning of the academic year could be significantly disruptive to schools, so a long-term process is more sound.

Should additional guidance be forthcoming, I would respectfully suggest an update to OCR's "Sexual Harassment Guidance", last promulgated in 2001. With a public notice and comment period this would enable all stakeholders – survivors, accused, and schools – and their advocates to provide substantive policy and legal input to the Department towards a goal of a thoroughly balanced framework.

Please let us know if we can be of any assistance to you during this process.

Sincerely,

S. Daniel Carter, President

**National Coalition For Men Carolinas**

| | |
|---|---|
| **From:** | National Coalition For Men Carolinas |
| **Sent:** | Tuesday, September 05, 2017 4:35 PM |
| **To:** | Jackson, Candice |
| **Subject:** | NCFM Carolinas - draft concerning Title IX related regulations |
| **Attachments:** | NCFM Carolinas - Recommended Rules for OCR Consideration Regarding Handling of Title IX Sexual Misconduct Cases.docx |

Candice,

Attached to this email is a draft of a report issued by our organization that highlights recommendations for the issuance of new Title IX related policies/regulations that would restore impartiality and balance the scales of jurisprudence for college students involved with a sexual misconduct disciplinary case.

We offer our thoughts as an organization that knows from first-hand experience how well-intentioned administrators have fumbled investigations that caused a rush to judgment, a presumption of guilt and ultimately a miscarriage of justice for both the accused and complainant students.

This report seeks to address and correct fundamental flaws by establishing fundamental elements of due   process.

Please contact me at your earliest convenience should you have any questions, comments or suggestions on how to improve this draft.

Thank you.

Best regards,

Greg

Gregory J. Josefchuk
President
National Coalition For Men Carolinas (NCFMC)
Tel: (828) 478-2281
http://www.ncfmcarolinas.com/

### THE NEED FOR NEW TITLE IX RELATED REGULATIONS - 34 C.F.R. Part 106

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.

These recommendations are submitted to the U.S. Department of Education by the Carolinas chapter of the National Coalition For Men (NCFM) a non-partisan men's human rights organization that advocates on behalf of men, women and children who find themselves discriminated against or treated in a harmful way. Our organization calls for the U.S. Department of Education Office for Civil Rights (OCR) to withdraw guidance previously issued under the Obama administration by OCR to universities in the handling of disciplinary cases related to Title IX of the Educational Amendments of 1972. In this regard, we endorse and support the issuance of new Title IX related regulations following the rulemaking process as established by Congress.

While higher education faces many challenges today, the issue of how to handle sexual misconduct on college campuses is firmly planted in the national spotlight. No one denies that sexual assault on college campuses is a serious matter that warrants attention yet the prescribed cure by the Department of Education under the previous administration was worse than the disease inasmuch as it has done violence to the concept of the presumption of innocence and eviscerates due process for any student facing a Title IX university disciplinary hearing.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000908

As previously stated, Title IX prohibits discrimination on the basis of sex in education programs or publicly funded institutions. Over the years, this has come to encompass investigating cases of alleged sexual harassment and sexual assault. In 2011, the Office for Civil Rights, under the Obama administration's Education Department, informed colleges that they should deploy a 'preponderance of the evidence' standard in campus sexual-assault hearings which requires a 50 percent plus a feather outcome, to determine guilt. Title IX related sexual assault cases should require the burden of proof minimally to be that of a "clear and convincing evidence" standard used when adjudicating allegations with life-altering outcomes.

It seems inconceivable that our nation has forgotten the painful lessons learned at the expense of so many college men falsely accused of rape. Perhaps the following examples can serve as a brief yet vital reminder of Title IX related injustices faced by college students today:

• Duke Lacrosse case – gang rape hoax; the three accused college men ultimately were declared innocent by the Attorney General of North Carolina but not until after their young lives and family names were irreparably destroyed.

• UVa case – the recent infamous Rolling Stone gang rape hoax story that resulted in vandalism and threats of violence made against innocent fraternity members. As has been recognized, the story was a fabrication that perpetuates a harmful myth that depicts fraternity men as rapists in waiting who ply woman with alcohol in order to use sexual violence against them.

• Amherst College case – male student walked his girlfriend's roommate back to her dorm after a party and while he was passed out the roommate accuser performed a sex act on

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

3

him that she admitted to. Twenty-one months later she accused him of sexual assault. Amherst said his account of being blacked out was credible but still ruled against him and expelled him.

• Columbia University case - male student was terrorized by a jilted female student who determined to ruin his life. Even though Columbia exonerated him of any wrongdoing, his accuser made his life a living hell by publicly naming him as a rapist and then made him a target of public ridicule and humiliation by the accuser carrying a mattress around campus as her "art project". The accused student and his family had to endure the humiliation and shame of seeing his accuser up on stage carrying her mattress during their graduation ceremony. The male student was subjected to discrimination under Columbia's toxic campus environment, yet neither Columbia nor OCR stepped in to protect this male student's Title IX rights.

• CSU-Pueblo case – pre-med male student who had consensual sex with a casual friend who had invited him up to her room, undressed and got in bed with him. The next morning, a friend of the woman's noticed a hickey on the woman's neck. When she learned the woman had sex with a prominent football player, she surmised her friend had been raped and reported that to university authorities. CSU-Pueblo suspended him even though the female student told the university that the sex was consensual and that he did nothing wrong.

These cases represent just a small sampling of the approximately 180 lawsuits filed against universities in which male student plaintiffs allege being denied due process, subjected to what can only be described as a kangaroo court process and summarily expelled as a direct result of flawed directives issued and enforced by the Office of Civil Rights (OCR) within the Department of Education.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000910

Universities are not the proper institution to prosecute a rape case. In this regard, we would echo testimony provided to Congress by Molly Corbett Broad, President of the American Council on Education, who stated:

"Conducting education and providing information is an area where college officials have vast experience. We must redouble our education efforts on sexual assault, and as I noted earlier, institutions are moving aggressively to do this. But performing investigations and adjudicating cases is a far more difficult challenge. We lack the authority to subpoena witnesses, control evidence and impose legal standards. Our disciplinary and grievance procedures were designed to provide appropriate resolution of institutional standards for student conduct, especially with respect to academic matters. They were never meant for misdemeanors, let alone felonies. While we take our obligations to the victims/survivors of sexual assault very seriously and are fully aware of our responsibilities with respect to sexual assaults, our on-campus disciplinary processes are not proxies for the criminal justice system, nor should they be."   (ACT letter to Senate HELP committee issued June 25, 2014 https://docs.wixstatic.com/ugd/81633a_e6349f914edd434792c9f9848b6ea5a8.pdf)

That universities are ill-equipped and doing a rather poor job in handling Title IX related disciplinary cases is perhaps best illustrated by Proskauer's Higher Education Group which recently released a report on lawsuits brought by students accused of sexual misconduct. The Proskauer report reviewed 130 federal and state court complaints filed by students across the country between January 2011 and December 2016 who claimed violation of their rights during a Title IX investigation and/or adjudication. An analysis of "mistakes" cited in the 130 cases found:

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

- Violations of disciplinary procedures = 3.8%

- Insufficient/improper interim measures = 4.6%

- School made inappropriate public comments re: accused/incident = 6.9%

- Insufficient notice to accused of hearing/charges = 10%

- Insufficient/improper training of school personnel = 11.5%

- Improper use or exclusion of witness testimony at hearing or in investigation = 12.3%

- Evidence of gender bias in investigation and/or hearing = 15.4%

- Improper/insufficient policies, or failure to conform to recorded policies = 17.7%

- Other failures in hearing (evidentiary issues, failure to follow hearing protocol, impartiality of hearing board members) = 46.2%

- Failures in the investigation = 46.9%

(http://docs.wixstatic.com/ugd/81633a_1d04d45c9a3c433eb6d5f487bb516b0d.pdf)

Clearly defined regulations around the proper way to handle Title IX related sexual misconduct cases that embrace a presumption of innocence, impartial investigations and a balanced and fair approach to gathering reliable information with the objective of reaching equitable outcomes is greatly needed.

The Education Department must not impugn or deny a student's fundamental right to due process. Furthermore, sexual assault should not be swept under the rug by universities, and neither should due process rights of students be tossed out the door. Protecting the rights of sexual assault victims and accused students are not mutually exclusive and should not be treated as a zero-sum game.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

6

OCR guidance that predisposes college men as rapists is where we stand today which is an aberration to civil liberties. That the only evidence needed to warrant a college student's permanent removal from campus, forever ending one's educational attainment while branding them a rapist for life, is an unsubstantiated accusation is beyond unconscionable.

Flawed policies like the 2011 Dear Colleague Letter directive have promulgated rules that waste millions of taxpayer dollars and foster false beliefs that university campuses are default sanctuaries for sexually violent male students. We need to reverse discriminatory beliefs like these in higher education by developing policies that are fair and equitable.

The Department needs to develop regulations which: 1. protect students from being subjected to biased or discriminatory treatment whenever a Title IX related sexual misconduct or harassment case is pursued and, 2. withdraws and replaces flawed Department guidance documents issued by the Office for Civil Rights (OCR) in April 4, 2011 commonly referred to as the 2011 Dear Colleague Letter (DCL) and also in April 29, 2014 referred to as Questions and Answers on Title IX and Sexual Violence .

Most postsecondary institutions provide a high-quality education that equips students with new knowledge and skills and prepares them for their careers in an educational environment that is free from discrimination which is consistent with the directives of Title IX. However, when postsecondary institutions fail to provide fair and equal treatment to their students and make life-altering disciplinary decisions by demonstrating outcomes that clearly and consistently favor one gender over another by the denial of due process, they violate both the mandate of Title IX which promises all students an educational environment free from discrimination regardless of gender and federal regulations as contained in 34 C.F.R. Part 106

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

which prohibits discrimination on the basis of sex in education institutions receiving federal financial assistance.

OCR needs to issue Title IX regulations that give students access to consistent, clear, and transparent processes that provide fair and equal treatment to both the accuser (the reporting party) and the accused (the responding party); that ensure impartiality in the investigation and adjudication of Title IX related misconduct cases; that provide due process for students; and that warn students, using plain language issued by the Department, about schools which have seen lawsuits filed against them by students alleging denial of due process or the mishandling of their case related to a Title IX disciplinary hearing--so that students can make more informed enrollment decisions.

We endorse regulations that bring clarity to the unique concerns that arise in sexual harassment cases. Specifically, OCR need's to return to foundational requirements contained in their Revised Sexual Harassment Guidance issued on January 19, 2001, namely :

- Guidance about key Title IX requirements and how they relate to sexual harassment and sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish equitable grievance procedures.
- Guidance on proactive efforts schools can take to prevent sexual violence on campus.
- Examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual harassment and sexual violence.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000914

New regulations are needed to establish a standard that offer the following due process rights to students enrolled at schools:

- The right to written notice of the accuser's complaint with full details of the accusation and with adequate time provided to the accused student in order to prepare a defense;

- The right to students to be represented by counsel, at their own personal expense, and that the student' counsel is granted full participation throughout the proceedings (meaning throughout the investigation and adjudication process);

- The right to examine and have copies provided to the student parties of all evidence obtained by the university, including the university investigator's notes and reports, with special attention provided by the university to gather and provide to both parties all exculpatory evidence;

- The right of the accused student to know the identity of the accuser;

- The right to cross-examine all witnesses, including the accused and the accuser, and the right to call expert witnesses when questions arise, such as whether alcohol or drugs substantially impaired the ability of parties to give consent;

- The right to object to members of the tribunal because of prejudicial bias or conflicts of interest;

- The right for the accused student to remain silent and not provide a statement to college investigators or the campus tribunal, which when exercising this right shall not be construed as an admission of wrongdoing;

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

- The right for the accused to file a counter-claim if evidence indicates violations of the school's student code of conduct or related policies by the reporting student. The exercise of this right cannot be a basis for a claim of retaliation by the school against the accused student;

- The right to have the university produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review in sexual misconduct hearings and;

- The accused student solely shall be provided appellate rights and an appellate review shall be provided in a timely manner so as not to impede a student's educational progress.

It is imperative that new regulations are created that use at minimum the clear and convincing evidentiary standard for all Title IX sexual misconduct related hearings. Victims' rights advocates correctly argue that a lower burden of proof makes it easier to ensure that the guilty are punished. But there is also a mathematically inevitable corollary: a lower burden of proof increases the probability of concluding that the innocent are guilty. A celebrated study conducted by John Villasenor, Professor of Electrical Engineering, Public Policy and Management at UCLA and Visiting Professor of Law, UCLA Luskin School of Public Affairs presented a framework for calculating the risk that an innocent defendant, when subjected to a judicial proceeding using the preponderance of the evidence standard, will be found guilty. "This is a particularly critical issue in light of the significant growth on U.S. college and university campuses of Title IX proceedings which, due to a 2011 mandate from the U.S. Department of Education, must be conducted using preponderance of the evidence standard. Even under the

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

most conservative mathematical assumptions possible under the framework and examples presented herein, this article has demonstrated that an innocent defendant faces a five times higher risk of being wrongly found guilty when a preponderance of the evidence standard is used as opposed to under a beyond a reasonable doubt standard. Under many circumstances, including the more realistic (relative to the 'conservative' model) probability models explored here, the relative risk would be even higher, often by a very large margin." (*A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard*; Law, Probability and Risk, Volume 15, Issue 4, 1 December 2016, Pages 223–237)

Additionally, schools should train and appoint 3-person campus tribunals, who will at all times apply fairness and impartiality to their hearing process and subsequent deliberations. Given the range of disciplinary sanctions up to and including expulsion, Title IX campus tribunals should require a unanimous decision before a student can be suspended or expelled.  Faculty of the University of Pennsylvania School of Law have said that in regard to that university's three-member tribunal, implementing "scrupulously fair proceedings" requires "a unanimous decision before a student can be expelled from the University and be stigmatized as a sexual offender. To require anything less than unanimity for the imposition of serious sanctions is unacceptable." (Open Letter from Members of The Penn Law School Faculty Regarding Sexual Assault Complaints: *Protecting Complainants and the Accused Students at Universities - Feb. 18, 2015 at* http://media.philly.com/documents/OpenLetter.pdf )

Definitions of sexual wrongdoing on college campuses are now seriously overbroad. They go way beyond accepted legal definitions of rape, sexual assault, and sexual harassment. The definitions often include mere speech about sexual matters which allow students who find

*This document contains priviledged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

class discussion of sexuality offensive to accuse instructors of sexual harassment. They are so broad as to put students engaged in behavior that is overwhelmingly common in the context of romantic relationships to be accused of sexual misconduct. Overbroad definitions of sexual wrongdoing are unfair to all parties, and squander the legitimacy of the system. (Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX*, Aug. 21, 2017).

We would hope that OCR would take this opportunity to adopt a clear and consistent definition of sexual harassment that stays within the bounds of Title IX and Title VII law as opposed to straying significantly beyond. Furthermore, rules governing sexual conduct between students both of whom are impaired or incapacitated need to be promulgated, rules which are even-handed as opposed to starkly one-sided between complainants (accusers) and respondents (accused), and that adequately address the complex issues in situations involving use and potentially abuse of alcohol and drugs by college students.

While some terms such as "victims" or "survivors" may be appropriate at certain stages, such as post-conviction, those terms are inappropriate at other stages, such as during an investigation. These terms are appropriate when delivering medical treatment to a victim or remedial services to survivors of rape or sexual assault in a post-conviction context. They are not appropriate, however, in regulations dealing with campus disciplinary processes or during the investigatory phase of an anticipated administrative proceeding, where the truth is not yet known and the use of such terms could skew the investigation and the proceedings. In these contexts, the terms "complaining witness" or "accuser" are more appropriate. (The Heritage

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

Foundation LEGAL MEMORANDUM No. 211 | July 25, 2017 *Campus Sexual Assault: Understanding the Problem and How to Fix It* by Hans von Spakovsky).

New regulations need to provide definition and standardization to ambiguous sexual misconduct related terms. We suggest that proposed regulations provide the following definitions and examples:

- **Sex discrimination** refers to treating a person differently because of that person's sex. As a general rule, sex discrimination occurs when a school has a policy or practice that treats men different from women. This could be an affirmative policy—men's sports teams receive special perks that women's teams do not—or it could be the absence of a policy. In the Title IX context, "deliberate indifference" to sexual harassment by an institution is an example of the latter.

- **Sexual harassment**, is one type of sex discrimination. "Harassment," even when not sexual, is always difficult to define. In general, sexual harassment is a pattern of intimidation or bullying relating to one's sex or the sexual act. The Supreme Court of the United States has given some guidance: In the context of Title IX, actionable sexual harassment by an institution occurs when an institution (1) has actual knowledge of sexual harassment; (2) is deliberately indifferent to that sexual harassment; and (3) the sexual harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an education opportunity or benefit."  Sexual harassment must refer only to behavior that could reasonably be expected to actually interfere with a student's equal access

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

to federally subsidized educational programming and meets the legal standard promulgated by the Supreme Court.

- **Sexual violence** refers to a violation of a state criminal statute and involves non-consensual sexual contact with violence by one person against another. Some of this conduct might constitute a misdemeanor; other conduct such as rape and aggravated sexual assault are felonies. This conduct is squarely within the criminal realm. All reasonable people know that sexual violence is illegal; that it harms victims physically and psychologically; and that it threatens the peace and safety of college communities. Colleges have a duty to foster an atmosphere of mutual respect that will help prevent these types of crimes. But they also have a legal duty to publicly disclose these crimes that are reported to their campus police or security department under the Clery Act.

- **Rape** is the most serious type of criminal sexual assault. Rape is defined by the FBI as "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without consent of the victim." Each state has its own definition of rape, which may vary slightly from the FBI's definition. Schools should report rape to law enforcement. (The Heritage Foundation LEGAL MEMORANDUM No. 211 | July 25, 2017 *Campus Sexual Assault: Understanding the Problem and How to Fix It* by Hans von Spakovsky).

It's worth noting that there remains in the public domain debate surrounding the question of consent. New regulations should include a definition of consent. In that regard, we

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

would suggest using the definition of consent as defined by Congress which in the context of rape and sexual assault is stated as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from use of force, threat of force, or placing another person in fear does not constitute consent." (*Manual for Courts-Martial*, Article 120(g)(8)(A) (2012 edition).

We suggest new regulations also require schools to:

- Prohibit the use of lawsuit waivers for Title IX disciplinary matters;

- Require schools to disclose to and notify the Secretary of judicial filings and dispositions related to any legal proceeding filed by a student against their school related to the handling of their Title IX disciplinary case.

There are typically three aspects involved in the disposition of a Title IX sexual misconduct complaint and they are:

1. Notification of a complaint

2. Investigation of a complaint

3. Adjudication of a complaint

Each of these stages have essential elements which school's need to incorporate into their policies so as to ensure consistent, clear, and transparent processes that provide fair and equal treatment to both the accuser and the accused. We have outlined these stages and their respective due process elements in the following table. Lastly, we have provided a suggested outline that OCR should utilize when issuing new regulations and/or Title IX related guidance.

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

AR_00000921

| Item | Notification | Investigation | Adjudication |
|---|---|---|---|
| 0 | Universities shall provide formal, detailed notification to students facing a Title IX investigation relating to sexual misconduct or harrassment and shall include the following elements in the notification document: | Universities shall provide to employees tasked with conducting Title IX related investigations specialized training that requires the mastery of the following investigative work elements: | Universities shall conduct Title IX related hearings in a manner that is fair and impartial and shall provide the following elements of due process throughout the adjudication process: |
| 1 | The identity of the complainant (accuser); | Conducting work in a sensitive, fair and impartial manner throughout the investigation; | The accused party shall have the right to face his/her accuser unless he/she has explicity waived this right; |
| 2 | A description of the violation being alleged and the date, time and location of where the alleged violation took place; | Conducting work that meets applicable confidentiality requirements; | The parties must have an equal opportunity to present relevant witnesses and other evidence; |
| 3 | A description of the investigative process; | Gathering (and preserving) inculpatory and exculpatory evidence; | The parties shall have the right to question and cross-examination each other and witnesses; |
| 4 | Reference to all procedures, policies and student rights applicable during the investigative process; | Identifying and locating potential witnesses to arrange interviews; | The parties shall have the right to be represented by an attorney who shall be allowed to fully participate in the questioning and cross-examination of the parties and witnesses |
| 5 | Assurance that the investigator has been trained in handling investigations in a sensitive and impartial manner and will afford a presumption of innocence to the accused throughout the investigation; | Conducting witness interviews in a sensitive, transparent, non-threatening, and non-adversarial manner; | The parties shall be provided two weeks advance notice of the hearing and which shall contain the time, date and location of the hearing and shall further reference all procedures, policies and student rights applicable during the hearing process; |
| 6 | A recommendation for the accused student to seek legal counsel with notice provided that information and evidence provided to the university in the course of the investigation may be deemed admissible in a court of law; | Taking and preserving legible, detailed witness interview notes; | The parties shall be provided with a copy of the investigation's report to include copies of all gathered evidence and witness interview notes which shall be provided to the parties at least two weeks prior to the time of the scheduled hearing; |
| 7 | Assurance that the university will provide an adequate, reliable, fair and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence. | Summarizing and communicating the veracity of the evidence gathered during the investigation in a manner that is free from pre-judgment determination. In other words, the investigator's formal report should allow for the evidence to speak for itself. | The parties shall be provided with the name or names of the person or persons who have been chosen to act in the capacity of the hearing authority at least two weeks prior to the time of the scheduled hearing and if either party raises a verifiable concern of a conflict of interest, the university shall remove and replace the person or persons from the hearing authority role; |
| 8 | The right for a student to remain silent and an assurance that adverse inferences or comments cannot be made by the investigator as a result of the student's silence. | | Inculpatory and exculpatory evidence shall be admitted as evidence into the hearing; |
| 9 | Three day written notice provided prior to any initial meeting and/or contact with an investigator with the right to have the student's attorney present during any and all meetings between the student and the investigator. | | The standard used for Title IX sexual misconduct or harrassment cases shall be the clear and convincing evidentiary standard; |
| 10 | A copy provided to the parties of the notification. | | The accused party shall have the right to appeal where the university sanction disrupts the accused student's educational progress; |

*This document contains privileged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

REVISED GUIDANCE ON TITLE IX AND SEXUAL VIOLENCE

Suggested Outline of Contents

I.    Introduction

II.   Title IX Requirements Related to Sexual Harassment and Sexual Violence

      A.  Definitions
      B.  Schools' Obligations to Respond
      C.  Procedural Requirements
            1.  Notice of nondiscrimination
            2.  Designation of Title IX coordinator
            3.  Publish grievance procedures

III.  Prompt and Equitable Grievance Procedures

IX.   Role of Title IX Coordinators

      A.  Overseeing complaints
      B.  Confidentiality
      C.  Notification
      D.  Assigning an investigator
            1.  Fairness and impartiality
            2.  Conflicts of interest
            3.  Fact-finding experience
            4.  Inclusion of exculpatory evidence
            5.  Suspension of investigation due to criminal investigation
      E.  Providing copies of collected evidence to student parties

X.    Due Process Rights

      A.  Notification of disciplinary charges
      B.  Notification of disciplinary hearing
      C.  Right to counsel participation
      D.  Right to Title IX investigator report
      E.  Right to inclusion of exculpatory evidence
      F.  Right to question accuser, accused and witnesses
      G.  Right to remain silent
      H.  Right to remove hearing panelist due to conflict of interest
      I.   Right to file a non-retaliatory counterclaim
      J.   Right to a meaningful record
      K.  Appellate rights

XI.   Campus disciplinary tribunal

      A.  Make up of panel
      B.  Independence from Title IX office (conflict of interest)
      C.  Training requirements
      D.  Fairness and impartiality
      E.  Adjudication
      F.  Clear and convincing evidentiary standard
      G.  Unanimity for imposition of sanctions

*This document contains priviieged and confidential information and shall not be reproduced or distributed without obtaining written consent of The National Coalition For Men Carolinas (NCFMC)*

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Wednesday, September 06, 2017 9:06 AM |
| **To:** | [PII] @gmail.com |
| **Subject:** | Re: MORE AMMUNITION FOR THURSDAY |

Thanks!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 5, 2017, at 11:59 PM, [PII] @gmail.com" < [PII] @gmail.com> wrote:

> **Court Slams Rape Rules; Change at DoE Coming This Week One Drink + One Kiss = Both**
> **Guilty of Sexual Assault**
>
> **Court Rules Against That Miami University of Ohio Violated Student's Rights In Sexual**
> **Abuse Case**
>
> **Fairness Questioned New report from FIRE says many colleges' disciplinary systems**
> **deny students due process**
>
> **FIRE - Spotlight on Due Process**:
>     "Due process and fundamental fairness are **in crisis** on America's college and university
> campuses. Colleges today investigate and punish offenses ranging from vandalism and
> housing violations to felonious acts of sexual assault, taking on the responsibility—**often**
> **at the behest of the federal government**—to punish offenses that are arguably better
> left to courts and law enforcement. But this willingness to administer what is effectively a
> **shadow justice system** has **not been accompanied by a willingness to provide even**
> **the most basic procedural protections** that should accompany accusations of serious
> wrongdoing.
>
>     For the first time, the Foundation for Individual Rights in Education has rated the top 53
> universities in the country (according to *U.S. News & World Report*) based on **10**
> **fundamental elements of due process**. The **findings are dire**." [emphasis added]
>
> **JOHN F. BANZHAF III, B.S.E.E., J.D., Sc.D.**
> Professor of Public Interest Law
> George Washington University Law School,
> FAMRI Dr. William Cahan Distinguished Professor,
> Fellow, World Technology Network,
> Founder, Action on Smoking and Health (ASH),
> 2000 H Street, NW, Wash, DC 20052, USA
> (202) 994-7229 // (703) 527-8418 [(b)(6)]

http://banzhaf.net/ [ **PII** ] gmail.com @profbanzhaf

[ **PII** ] @gmail.com wrote:

Thank you for taking the time to reply.

In the hope of providing further assistance, I have collected in one file three different emails I previously send out urging the repeal of the Department's policy on campus sexual assault.

I write to share them with you, not primarily to persuade you, but rather because the file contains numerous quotations and clickable links which you may find helpful.

You can access it by going to:
Emails Sent During Administration Transition Period About the urgent need to rescind the Department of Education's directive regarding date rapes on college campuses containing numerous citations and quotations                    http://banzhaf.net/sexualassault.html

**JOHN F. BANZHAF III, B.S.E.E., J.D., Sc.D.**
Professor of Public Interest Law
George Washington University Law School,
FAMRI Dr. William Cahan Distinguished Professor,
Fellow, World Technology Network,
Founder, Action on Smoking and Health (ASH),
2000 H Street, NW, Wash, DC 20052, USA
(202) 994-7229 // [ **PII** ]
http://banzhaf.net/ [ **PII** ] Tgmail.com  @profbanzhaf

Jackson, Candice wrote:

Thank you for this suggested approach. I will likely follow up after reviewing it in detail.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Jul 14, 2017, at 12:48 PM, [ **PII** ] @gmail.com"
[ **PII** ] @gmail.com> wrote:

Dear Ms. Jackson

I write, as a well known public interest law professor whose proposals regarding Title IX have been

featured in InsideHigherEd, U.S. News, Washington
Times, Voice of America, NY Times, National Public
Radio, etc., to suggest an alternative approach, which
should at least be tested if not implemented, if your
department wants colleges to remain involved in date
rape allegations.

This proposal represents a compromise between the
two groups you just met with, and should largely
satisfy the genuine concerns of both.  In summary it
would help insure:
* a fair and unbiased investigation and adjudication
of sexual assault claims with clear and standardized
procedural protections for the complainant,
respondent, and the university;
* a procedure free from claims of bias, partiality,
conflicts of interest, and any reasons to favor
complainant over respondent or visa versa;
* a much simpler and quicker - but at the same time
more comprehensive - investigation should your
department wish -or have - to undertake one;
* much less need for your department to become
involved in setting or policing standards, procedures,
and related policies;
* substantial savings in compliance costs for the
colleges involved.

### SUMMARY

I respectfully suggest that your department permit,
encourage (perhaps with a grant), and eventually
perhaps even require colleges and universities in
cities (such as greater Boston) where there are many
in a small geographical area, to establish a
consortium for the uniform, fair, prompt, and
unbiased investigation and adjudication of all sexual
assault claims involving member colleges.

The consortium would be funded equitably (e.g., on
the basis of undergraduate enrollment) and operated
by an independent board of directors appointed by
the member schools.  Member schools would agree
that all complaints of sexual assault would be
investigated and adjudicated by the consortium
employees under the control of the consortium
directors, and no representative from a member
school could have any involvement with the
investigation and/or adjudication of any complaint
involving his or her school.

## INVESTIGATION

Because the consortium would be handling the large numbers of complaints expected to be generated by dozens of member colleges, it can afford - and will - hire several experienced sex crime investigators who will do nothing but conduct investigations related to allegations of campus sexual assault, including rape.

Employing even one highly-trained sex-crimes investigator on a full-time basis is something which is very expensive and probably wasteful even for large universities, and prohibitively expensive for small colleges.  After all, many colleges may not have even one valid complaint of sexual assault to investigate in any given year,

Unlike campus police, Title IX administrators, deans and others, these persons would be full-time professional investigators with the experience and necessary sensitivity to fully and fairly investigate sex crime complaints, including obtaining all relevant evidence, maintaining a chain of custody of evidence, etc.

Moreover, since there will be several, they can and should operate as a team, developing and then following standard procedures and protocols, and serving as a check and balance upon each other and upon every investigation.

More importantly, there can be no legitimate claim of bias or unfairness.

Complainants cannot reasonable complain, as they do now, that colleges have a strong incentive to cover up such matters, especially if they involve star athletes, sons of major donors, etc.

Similarly, respondents will not be able to reasonably claim that the investigators have a strong incentive to boost conviction numbers, and to deliberately overlook exonerating evidence, simply to satisfy the perceived demands of the Department of Education, to justify their current employment positions on campus, etc.

## ADJUDICATION

Currently, adjudications of claims of sexual assault

deemed worthy of a formal hearing are carried out by a hodgepodge of college panels, often made up of faculty from widely disparate disciplines (including some from other countries with different customs and traditions, and for whom English may be a second or even third language), staff (including some clearly biased like Title IX administrators, those otherwise involved and often invested in dealing with sex discrimination and related matters, and all subject to pressure from the college), and sometimes a few students who hardly have the maturity and experience to fairly judge what is often a serious crime, and who are often under the control of college officials.

In stark contrast, complaints referred to the consortium, and deemed worthy of a formal hearing after a thorough investigation by the consortium's experienced and impartial sex crimes investigators, would be heard by a panel selected impartially by the consortium, and made up of law professors, practicing or retired attorneys, retired judges, etc. who have the skill and experience necessary to decide difficult and sensitive sex-related legal issues based upon the evidence, and strictly in accordance with the procedures established by the consortium.

They, unlike Title IX employees, deans, etc., will understand that, at least regarding hearings involving state schools, the Constitution requires that the respondent facing possible punishment is entitled to the full protection afforded by due process.

They should also be aware that the U.S. Supreme Court's decision in Mathews v. Eldridge, 424 U.S. 319 (1976), provides clear guidance as to which procedural protections - e.g., to present and to cross examine witnesses, have access to all relevant evidence, to be represented by an attorney, etc. - are required by due process.

Too often these decisions are made by administrators with little or no legal training, and deny complainants basic rights, as a well-publicized complaint by more than a dozen Harvard law professors about procedures at the own university demonstrated.

Even more importantly, there would be no need for Title IX employees to "prep" members of the panel about deciding cases.  This is a frequent procedure

AR_00000928

which often biases a proceeding when the fact
finders may be told beforehand that they should
ignore inconsistencies in the complainant's
statements and testimony, that very few complaints
of rape are false or exaggerated, etc. - a secret
presentation clearly favoring one side which would
never be permitted in a proper civil or criminal
proceeding, in arbitration, etc.

Most importantly, since none of fact finders will have
any relationship with the college and/or with the
investigation preceding the hearing, there can be no
reasonable complaint of bias or favoritism - as there
almost always are when a college adjudicates its own
cases.

## OTHER ADVANTAGES

Aside from providing a means of investigating and
adjudicating claims of sexual assault in a way which
seemingly resolves the complaints and
dissatisfactions both sides have when colleges
perform these functions for themselves, and assuring
procedures which are fair, uniform, and most
importantly free from bias or pressures, joining such
a consortium would probably be much less expensive
for members, and would avoid the need for each
college - including even the smallest - to try to
structure and carry out these functions on it own.

It would also be easier for whatever oversight the
Department concludes is necessary because its
investigators would be looking at one central body
which handles such cases for dozens of colleges on a
regular and consistent basis, rather than having to
investigate many individual colleges and their often-
shifting and frequently-unclear procedures.

In summary, such a procedure would appear to be a
reasonable compromise addressing the major
complaints of all stakeholders (including the
colleges), and one which at the very least should be
tested.  If such consortia work in major cities, that
itself would be a major improvement on the current
system which satisfies no one.

Moreover, if it works in large cities with a large
number of colleges, consortia covering a larger
geographical area (e.g., Southern Florida) might then
be tested.

**PS**:  While I am probably best known for my antismoking activities (e.g., banning cigarette commercials, and prohibiting smoking in an ever growing number of public and even private places, I have brought over 100 successful legal actions attacking sex discrimination against women; forced formerly all-male clubs (e.g., the Cosmo Club in DC) and all-male state universities (e.g., The Citadel) to admit women for the first time, and earned the nickname of the "Father of Potty Parity" by reducing the longer time females frequently have to spend waiting to use restrooms in public places.

Respectfully submitted,

**JOHN F. BANZHAF III, B.S.E.E., J.D., Sc.D.**
Professor of Public Interest Law
George Washington University Law School,
FAMRI Dr. William Cahan Distinguished Professor,
Fellow, World Technology Network,
Founder, Action on Smoking and Health (ASH),
2000 H Street, NW, Wash, DC 20052, USA
(202) 994-7229 // **PII**
http://banzhaf.net/ **PII** ATgmail.com
@profbanzhaf

**Hans Bader**

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Wednesday, September 06, 2017 11:01 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Claim about Education Department "longstanding policy" |

Senators Murray and Casey have erroneously argued that the Obama Education Department's April 4, 2011 Dear Colleague letter merely restated "longstanding policy" in the Education Department dating back to 1995.

Earlier this year, I explained why this is untrue, since the Dear Colleague Letter conflicted with prior rulings of the Education Department's Office for Civil Rights under the Bush and Clinton administrations regarding issues such as whether colleges have to regulate off-campus conduct, and whether they must restrict the appeal rights of accused people unless they give corresponding appeal rights to accusers (something that civil liberties groups like FIRE have argued is akin to double jeopardy). The Dear Colleague Letter's demand that schools regulate conduct in settings not within their "control" was also in tension with contrary language in the Supreme Court's *Davis* decision. *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999); *Roe v. St. Louis University,* 746 F.3d 874, 884 (8th Cir. 2014) (rejecting Title IX lawsuit over off-campus rape, citing *Davis*); Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004) (a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient."); *see also* Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996) (approving a school's limiting appeal rights to the accused because "he/she is the one who stands to be tried twice for the same allegation," directly contradicting the later position of the April 4, 2011 Dear Colleague letter).

(The demand for regulation of off-campus conduct was suggested earlier in the Obama Education Department's October 26, 2010 Dear Colleague letter about bullying, discussed at this link and this link, and made even more explicit in its April 29, 2014 Questions and Answers on Title IX and Sexual Violence, discussed at this link. None of these guidance documents acknowledged prior conflicting OCR rulings or court case law. The 2014 Questions and Answers claim schools must not just take action against, but also "remedy" the "effects" of, harassment, even though the Supreme Court's *Davis* decision said that "Title IX imposes no such requirements" on school officials to "'remedy' peer harassment," or "purg[e] their schools of actionable peer harassment," as long as they make meaningful efforts to end it. 526 U.S. at 648-49).

Thus, it has been argued that the Obama administration acted arbitrarily and capriciously by issuing guidance that "glosses over or swerves from prior precedents without discussion." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971). An agency has a "duty to explain its departure from prior norms." *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973). "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision-making.'" *Jicarilla Apache Nation v. U.S. Department of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (*quoting Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C.Cir.2003); *accord INS v. Yang*, 519 U.S. 26, 32 (1996) (must be "avowed alteration" of past policy to validly abrogate it).

(There is *one* aspect of the Dear Colleague Letter, which, despite being criticized by FIRE, is consistent with the policy of a couple regional OCR offices under prior administrations; but the reasoning given for that policy in the Dear Colleague Letter is flawed, as I discuss at this link and this link.)

Thanks for taking the time to read this.

Hans Bader

https://www.cnsnews.com/commentary/hans-bader/time-end-obama-era-fed-micromanagement-colleges-under-title-ix

# Time to End Obama-Era Fed Micromanagement of Colleges Under Title IX

By Hans Bader | February 22, 2017 | 11:22 AM EST

Vice President Pence says he and President Trump "believe that education is a state and local function that should be controlled by" states, not the federal government. A great way to restore local control would be rescind the Obama administration's federal micromanagement of college discipline. Under Obama, the Education Department sometimes pressured colleges to do things that could lead to lawsuits being filed against them by their students.

For example, the Education Department's April 4, 2011 "Dear Colleague" letter urged colleges to restrict cross-examination in sexual harassment and assault cases. As its Office for Civil Rights (OCR) put it in that letter, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." When schools take that advice, it can violate a student's rights under a state's Administrative Procedure Act (APA). Under many state APAs, students have a right to cross-examine their accuser, as courts have made clear in cases such as *Arishi v. Washington State University*, 385 P.3d 251 (Wash. App. 2016) and *Liu v. Portland State University*, 383 P.3d 294 (Or. App. 2016).

(It is conceivable that the advice in the "Dear Colleague" letter could also lead to violations of *federal* law at colleges that follow it. In a few campus disciplinary cases, such as *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997), and *Doe v. Univ. of Cincinnati*, 2016 WL 6996194 (S.D. Oh. 2016), judges have ruled that some cross-examination *was* constitutionally required on due-process grounds to test the credibility of the accuser. But the Supreme Court has not ruled on whether cross-examination is ever required by the federal constitution in the college setting, even though it lauded cross-examination as the "greatest legal engine ever invented for the discovery of truth" in its decision in *Lilly v. Virginia*, 527 U.S. 116, 124 (1999).)

The Education Department's "Dear Colleague" Letter purported to apply the federal sex discrimination law Title IX. But it misconstrued Title IX, as I explain in detail at this link. Moreover, in advising colleges to restrict the rights of their students, it ignored language in a 1999 Supreme Court ruling that emphasized that schools don't need to risk violating the rights of their students to comply with Title IX. In setting forth a standard for when schools need to take action against sexual harassment or assault by students, the Supreme Court said that "the standard set out here is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. … [I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." (*See Davis v. Monroe County Board of Education*, 526 U.S. 629, 649 (1999)).

The Supreme Court plainly meant to allow colleges to avoid acting in ways giving rise to statutory claims against them under both federal and state law, since it was in response to a dissenting opinion that cited both federal and state laws limiting the ability of schools to discipline students (such as state constitutional provisions). *See Davis*, at pg. 649, citing the dissenting opinion in *Davis*, at pp. 666-668).

In addition to ignoring the Supreme Court, this Obama-era "Dear Colleague" letter also wrongly imposed new

obligations on schools without notice and comment, in violation of the Administrative Procedure Act (as I explained earlier). For example, it "ignored past Office for Civil Rights rulings authored by its own career lawyers and civil servants in forcing colleges to investigate off-campus conduct. Such 'unexplained departures from precedent' are arbitrary and capricious, as the D.C. Circuit Court of Appeals noted in *Ramaprakash v. FAA* (2003). The Obama administration also ignored two federal appeals court rulings, and language in a Supreme Court decision, by demanding that colleges do so."

In its April 4, 2011 letter, the Office for Civil Rights told colleges they "have an obligation" to investigate even when an incident "occurred off school grounds." This contradicted what OCR's career staff told colleges in Title IX rulings during the Bush administration, when I worked there. For example, OCR's Dallas office noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." *See* Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's contrary position, which it later used to find colleges such as Harvard Law School in violation of Title IX, is clearly at odds with court interpretations of Title IX as *not* applying off campus, as I have noted in the past. For example, a federal appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University,* 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's Davis decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party" (quoting *Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999)).

Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), the Obama-era OCR's pressure on schools to investigate what it labeled as verbal sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional lawsuits against a school. That pressure was thus at odds with the intent of the Supreme Court's *Davis* decision to avoid subjecting schools to the risk of "constitutional or statutory claims."

The "Dear Colleague" letter issued by the Obama-era Office for Civil Rights in 2011 also wrongly ignored past agency rulings in demanding that colleges not allow accused students to appeal findings of guilt unless they also allowed complainants to appeal not-guilty findings — a position that some critics viewed as akin to double jeopardy.

Before the Obama administration, OCR had stated that "there is no requirement under Title IX that a recipient provide a victim's right of appeal." (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)).

Under the Clinton administration, OCR had approved a school's limiting appeal rights to the accused because "he/she is the one who stands to be tried twice for the same allegation." (Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996)).

Similarly, under the Bush administration, OCR had concluded that "appeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

*Hans Bader practices law in Washington, D.C. After studying economics and history at the University of Virginia and law at Harvard, he practiced civil-rights, international-trade, and constitutional law.*

**Cynthia P Garrett**

| | |
|---|---|
| **From:** | Cynthia P Garrett |
| **Sent:** | Wednesday, September 06, 2017 12:27 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Henderson, Chelsea; Scott Alison |
| **Subject:** | FACE; First two Op Eds |
| **Attachments:** | A journey with IX FINAL.docx; Op-ed JK FINAL.docx |

Candice ·

Here are the first two Op Eds, as promised.

Cindy

My journey into the Title IX abyss began with a phone call. My son did not call me, his friend did. Time stopped. My heart pounded. I dropped everything at work and raced to campus. I called the Title IX office as I drove -- they tried to evade me but relented when I refused to leave until I had answers.

We were told the charge was sexual misconduct, which could mean anything from "sticking a finger into a nose, a tongue into an ear, a penis into a vagina, without consent." I'm not sure how I had the wherewithal to ask about his rights, but they hadn't mentioned how this would affect him, so I asked. A long pause, shuffling of papers, sideways glances. "Google the Dear Colleague Letter April 2011" I was told. Dear Colleague Letter? I wrote that down. They told us to trust the system, that highly trained campus personnel would uncover the truth, and admonished us that attorneys were not welcome and would only hinder the process.

I discovered security had taken our son out of his dorm room late at night and questioned him for hours. He was instructed not to call his parents, threatened with immediate expulsion if he discussed the situation with anyone. They assured him if he just told the truth he would be back in his dorm room within a week

Security had moved him to an isolated room across campus, banned him from most of the grounds and sent out a campus alert about a rape at the same time security showed up at his dorm room. He was so terrified of breaking the rules that he didn't leave the room. He was so ashamed of being accused of rape that he didn't eat, couldn't sleep. When he walked to class, he faced looks of disgust, was shunned by professors and students, already marked a predator. He cried often. He was alone. He had no one.

He met with investigators, provided a written statement and a list of witnesses. We waited for months. When he was called to a final meeting, I waited outside. He emerged pale as a ghost. He vomited. He fell to the ground. Found responsible. The investigators had not talked to any of his witnesses. Swirling thoughts in my mind. Shaking. I didn't understand. Speechless, I realized he'd been guilty upon accusation, the outcome prewritten.

He was allowed "viewing times" to read the investigation report under the Dean's watchful eye, and limited to taking cursory notes. He tried, took notes and what he found was incredible. He refused to accept the decision and so a hearing was scheduled. His dad and I waited in the hall. Again he went in alone, just a kid defending himself against professionals, his questions ignored and his witnesses absent. Expelled.

They had worked behind closed doors, manipulating and driving the predetermined outcome. Each day brought a new level of shock at the depths they would go. It knocked our family to our knees and shook us to the core.

After the expulsion, we took him home to heal. The long fight for his future had left him reeling and raw. He was in depression's grasp, his smile and laughter gone.

And then at work one day something deep inside told me to go home. For some reason I went straight to the garage, opened the door, my gaze drawn upward. Fingers fumbling around a rope. What kind of rope? Where did he get that? I glance down, tennis shoes teetering on a large bucket. My face meets his. Tears slowly stream down his face. He is broken. He is lost. His face ashen. I start to shake. "This isn't the way. Things will get better" my voice cracks through my tears. Sobs. He Sobs. I help him down, take

the rope off from around his neck. I hold him -- tight like I'm pulling him from the depths. And I am. And I won't let go. I will fight. For both of us.

In the end our son was proven innocent, we were fortunate the truth did come out. But the damage was already done.

Title IX needs reform. We need prevention and education, accommodations and support for any student assaulted on campus.  But we also need balance. Fairness. Honesty. Transparency. And safeguards to ensure the innocent aren't abandoned in the search for the truth.

If there were one thing I could say to elected leaders, it would be this: My son's life matters. The injustice we suffered is preventable only by measured reform with all voices heard.

For justice.

For all.


*Janine McDowell*

*The author's name is a pseudonym. Due to the nature of the allegations, the social stigma associated with being accused on campus, and the continued healing of the student and family, it is necessary to protect the student's identity*

.

I am the parent of a student who was wrongfully accused of sexual assault and expelled from his university. My family and closest friends do not know this. Like most, they would conclude that my son did something horrific, that he harmed or took advantage of someone against their will or while they were unable to resist. Nothing could be further from the truth. Unless you experience firsthand the Title IX machine operating on college campuses, you will not understand that "sexual assault" has a very different meaning on campus. You will not know that current policy by the Department of Education's Office for Civil Rights (OCR) provides no fundamental fairness for accused students and denies them the ability to defend themselves against such heinous accusations.

Our descent into the twisted inner workings of a campus Title IX investigation began with a phone call on a warm spring evening. In a shaking voice, my oldest son told me his brother was suicidal and hospitalized. His friends had called 911 after witnessing his despair and realizing the situation was quickly moving beyond their control. It was the end of a months-long grueling Title IX investigation and my son had been found responsible for a campus sexual assault conduct code violation. He was devastated, traumatized, despondent. He had endured a frightening process that would have life-altering consequences without help or guidance.

Our son was too ashamed to tell us he was going through an investigation. He was certain there had been mutual consent in his encounter. The Title IX investigator informed him that the school preferred students handle disciplinary proceedings themselves and reassured him an attorney would not be necessary. He trusted his school and believed he would be exonerated if he just told the truth. Although he and his accuser had been drinking during their night together, neither had stumbled, slurred words or exhibited any red-flag behavior. Many months after their hook up she decided her alcohol consumption that evening had invalidated her consent and filed a Title IX complaint. The investigation by the school's Title IX office was a sham. Our son faced a school investigator with a clear disdain for fraternity men, an agenda to establish a "tough on sexual assault" reputation and a need to appease the OCR that had recently opened an investigation into his school's Title IX proceedings. This same investigator who also decided his fate, twisted his words, took them out of context, and ignored evidence that should have exonerated him. Everything his accuser said on the other hand, was believed despite inconsistencies and conflicting testimony. He was expelled, she graduated.

We have spent hundreds of thousands of dollars intended for our retirement on legal fees to right the wrong committed against our son and to restore his future and reputation. We have spent thousands of dollars on therapy for our son to help him through the trauma he suffered at the hands of his school.

Issues surrounding Title IX adjudication of sexual assault on campus are enormously complex. The broad definitions of sexual assault can include anything from a stolen kiss to drunk regretted sex to forcible rape. Add to this, the conduct code definition of intoxication is a moving target that campus administrators struggle to identify. How much is too much to consent? Most Americans would be shocked to learn the rights universities deny to accused students: no presumption of innocence, no knowledge of the charges, no right to cross examination, no rules to ensure evidence is relevant and reliable, and no right to an attorney or even a parent who can support or speak on their behalf. Yet based on a low preponderance standard - a mere 50% plus a feather – a student can be found responsible for sexual assault, a scarlet letter that will follow him for the rest of his life.

For too long, victims of sexual assault were not taken seriously by their schools. A Dear Colleague Letter issued by the OCR in April 2011 had the noble intent of creating a system to provide better support and

protection.  The tragic consequence of this policy is that accused students are denied rights fundamental to our system of justice.

There are currently over 180 known lawsuits by accused students against their universities and to date, 61 courts have found in their favor.  Additionally, there are over 300 schools under investigation by the OCR for mishandling sexual assault complaints.  The current system is not working for anyone.  We can do better.


Anonymous

*The author's name is withheld to protect her son's privacy.*

**Lisa Anderson**

---

| | |
|---|---|
| **From:** | Lisa Anderson |
| **Sent:** | Wednesday, September 06, 2017 2:02 PM |
| **To:** | Henderson, Chelsea |
| **Cc:** | Jackson, Candice; DeVos, Betsy |
| **Subject:** | Letter from a survivor's mother |
| **Attachments:** | A Mother's Letter to Candice Jackson.pdf |

Hi Chelsea,

Would you mind giving this letter from a survivor's mother to Deputy Assistant Secretary Jackson and Secretary DeVos? Her daughter is one of our clients who has suffered unimaginable pain as a result of being raped and subjected to vicious, public retaliation.

Wishing you empowerment,

Lisa

Lisa Anderson
Executive Director
Atlanta Women for Equality
P.O. Box 33521
Decatur, GA 30033
(404) 624-6822
lisa@atlantawomenforequality.org
www.atlantawomenforequality.org

**DISCLAIMER:** This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

September 6, 2017

Dear Ms. Jackson;

Sexual assault is a unique crime:  unlike other crimes, victims often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victims' distress.  I am very sorry to say that our family knows this to be true. My daughter is the survivor of sexual assault on her college campus.

My daughter did not initially report her assault….she wanted it to 'go away'/'not be true'….she wanted to go about being a typical college student.  What my daughter discovered was that she was unable to repress her trauma.  While it may seem coincidental, my daughter also had friends who were sexually assaulted. Sadly, this is not uncommon.  One in five women will be the victim of sexual assault on their college campuses, with most being assaulted in their first semester.

Initially my sweet child sought help from counseling services, which provided valuable information and support, but my daughter finally decided that she needed to report her assault because she was experiencing crippling Post Traumatic Stress, and she did not want her perpetrator to assault other girls. **Thanks to Title IX, she was able to report her assault through the university**.

Reporting her assault was the beginning of my daughter's attempt at reclaiming her life; the beginnings of a very long road to recovery. Students must be able to report sexual assault to their universities.  If this safeguard is not in place, thousands of student's educational rights will be violated; it will be like putting blinders on and pretending that campus sexual assault does not exist.

As a society we need to continue to move forward, when we talk about how to properly deal with our epidemic of college sexual assault.  The university where my daughter was a student had policies in place to handle her report of sexual assault; because of this, her rights as a student pursuing an education on campus were protected.  This protection included helping her communicate with her professors and other university departments while maintaining her confidentiality.  As a result, our family remains hopeful that she will be able to complete her education.

I respectfully urge you to continue to uphold Title IX and the elements of the 2011 guidelines in order to allow all students equal access to their education.

Sincerely,

A Concerned Parent

(*remaining anonymous to protect my daughter's identity*)

AR_00000940

**Hans Bader**

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Thursday, September 07, 2017 9:28 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: Confidential / Embargo copy |

Notice and comment might make sense for one issue (preponderance), where OCR had not previously taken a position squarely at odds with the Dear Colleague Letter), but not other issues (such as off-campus conduct regulation) where the Dear Colleague Letter was at odds with both pre-Obama OCR precedent, and federal court rulings, making notice and comment unnecessary to reject the Dear Colleague letter's unexplained changes to OCR policy. For those other issues, I think OCR would be perfectly reasonable just to explain that conflict  in withdrawing the Dear Colleague letter, and resolve those issues in favor of pre-Obama OCR precedent, based on the principle that agencies should not take a position that "glosses over or swerves from prior precedents without discussion." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971).

OCR could accompany the withdrawal of the Dear Colleague letter with the explanation that it conflicts with past agency practice about at least two things. It could explain that it conflicts with past administrative practice (and court rulings) about the reach of Title IX, by forcing colleges to regulate off-campus conduct and restrict accused people's appeal rights. A short description of a few such conflicts is found at this link, citing, e.g., Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004) ("a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient.").

In withdrawing the letter, it could also seek notice and comment on another issue where the Dear Colleague Letter may not have conflicted with typical past administrative practice, but took a position on a national basis (previously taken by two of OCR's regional offices, but not others) that raised concern among civil-liberties groups like FIRE: namely, the preponderance issue, which is the only thing non-Title IX experts seem to think the Dear Colleague letter did.

If no explanation accompanies the withdrawal of the Dear Colleague letter, there could end up being a conflict between pre-2011 and post-2011 OCR letters of findings as to whether colleges have to regulate off-campus conduct, and whether they have to restrict accused people's appeal rights, since the pre-Obama practice on those subjects was changed by the 2011 Dear Colleague Letter.

As a practical matter, my guess is that left-leaning agency staff will adhere to the latter post-2011 practice (which followed the Dear Colleague letter) unless the Dear Colleague letter is withdrawn FOR THE STATED REASON that it conflicted with pre-2011 practice.

So the April 4, 2011 Dear Colleague letter should be not just withdrawn, but withdrawn for the stated reason that it changed past agency practice without explanation.

In one respect, the Dear Colleague Letter also conflicted with court rulings, which is a reason to withdraw it immediately, without going through notice and comment. The Dear Colleague Letter's demand that schools regulate conduct in settings not within their "control" was in tension with contrary language in the Supreme Court's *Davis* decision about schools only being liable for conduct in settings within their control, language relied upon by federal judges to dismiss Title IX lawsuits over off-campus misconduct. *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999); *Roe v. St. Louis University,* 746 F.3d 874, 884 (8th Cir. 2014) (rejecting Title IX lawsuit over off-campus rape, citing *Davis*); Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004) ("a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient.").

(The demand for regulation of off-campus conduct was suggested earlier in the Obama Education Department's October 26, 2010 Dear Colleague letter about bullying, discussed at this link and this link, and the April 4, 2011 Dear Colleague letter's position about this was made even more explicit in its April 29, 2014 Questions and Answers on Title IX and Sexual Violence, discussed at this link. None of these guidance documents acknowledged prior conflicting pre-Obama OCR rulings or court case law. The 2014 Questions and Answers claim schools must not just take action against, but also "remedy" the "effects" of, harassment, even though the Supreme Court's *Davis* decision said that "Title IX imposes no such requirements" on school officials to "'remedy' peer harassment," or "purg[e] their schools of actionable peer

harassment," as long as they make meaningful efforts to end it. 526 U.S. at 648-49).

The Dear Colleague letter's regulation of the appeal process does not seem to violate any court rulings, but it does conflict with earlier OCR rulings under the Clinton and Bush administrations.  See, e.g., Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996) (approving a school's limiting appeal rights to the accused because "he/she is the one who stands to be tried twice for the same allegation," directly contradicting the later position of the April 4, 2011 Dear Colleague letter).

Similarly, under the Bush administration, OCR had stated that "there is no requirement under Title IX that a recipient provide a victim's right of appeal." (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)). And it concluded that "appeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

The Dear Colleague letter completely failed to acknowledge its conflict with prior OCR practice.
Thus, it has been argued that the Obama administration acted arbitrarily and capriciously by issuing guidance that "glosses over or swerves from prior precedents without discussion."  *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C. Cir. 1971).  An agency has a "duty to explain its departure from prior norms." *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973). "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision-making.'" *Jicarilla Apache Nation v. U.S. Department of the Interior,* 613 F.3d 1112, 1120 (D.C. Cir. 2010) (quoting *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C.Cir.2003); *accord INS v. Yang*, 519 U.S. 26, 32 (1996) (must be "avowed alteration" of past policy to validly abrogate it).

Thanks for taking the time to read this.

---

**From:** Jackson, Candice <Candice.Jackson@ed.gov>
**Sent:** Wednesday, September 6, 2017 9:11 PM
**To:** Hans Bader
**Subject:** Re: Confidential / Embargo copy

Thank YOU, Hans! Your insights are invaluable.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 6, 2017, at 7:24 PM, Hans Bader <Hans.Bader@cei.org> wrote:

> Thank you and Bless You!
>
> If
>
>> *The era of "rule by letter" is over.*
>
> Then the Department could withdraw the April 4, 2011 Dear Colleague letter, explaining that it conflicts with past administrative practice (and court rulings) about the reach of Title IX, by micromanaging school discipline.  A short description of a few such conflicts is found here: https://www.cnsnews.com/commentary/hans-bader/time-end-obama-era-fed-micromanagement-colleges-under-title-ix
>
> It's not an exhaustive list.  I imagine you and other Title IX experts could come up with additional examples.
>
> It could also seek notice and comment on other issues where the Dear Colleague Letter did not conflict with past administrative practice, but took new positions, or took positions that raised

concern among civil-liberties groups like FIRE (like on the preponderance issue).

Thanks for working in this thankless area.

Hans

_____

**From:** Jackson, Candice [mailto:Candice.Jackson@ed.gov]
**Sent:** Wednesday, September 6, 2017 7:00 PM
**To:** Hans Bader <Hans.Bader@cei.org>
**Subject:** Confidential / Embargo copy

Hans,
I wanted to make sure you had a chance to see the attached excerpts from the speech
scheduled for tomorrow at 12:15pmEST. We need to keep this document strictly confidential
until after the speech tomorrow, but feel free to call me (night or day) to talk it over!

Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Thursday, September 07, 2017 10:48 AM |
| **To:** | Jackson, Candice |
| **Attachments:** | DCL 9-7-17.docx; Q-A 9-7-17.docx |

AR_00000944

**Hans Bader**

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Thursday, September 07, 2017 2:33 PM |
| **To:** | Jackson, Candice |
| **Subject:** | "Education Secretary Takes Aim at Federal College Discipline Rules" |

Here is CEI's take on Secretary DeVos's speech:

https://cei.org/blog/education-secretary-takes-aim-federal-college-discipline-rules

# Education Secretary Takes Aim at Federal College Discipline Rules

Hans Bader • September 7, 2017

In a major speech today, Education Secretary Betsy DeVos indicated that the Education Department may withdraw some of the regulatory "dark matter" discussed by CEI's Wayne Crews, such as its April 4, 2011 "Dear Colleague" letter micromanaging college discipline.

Crews' 2016 congressional testimony described how agencies violate the Administrative Procedure Act by issuing "dark matter"—binding rules that have not gone through the notice and comment process mandated by federal law. As examples, he gave the Obama Education Department's 2011 Dear Colleague letter about sexual assault and harassment, and its October 26, 2010 letter about school bullying.

Secretary DeVos apparently agrees. She said that:

> For too long, rather than engage the public on controversial issues, the Department's Office for Civil Rights has issued letters from the desks of un-elected and un-accountable political appointees....
>
> Washington dictated that schools must use the lowest standard of proof....
>
> The era of "rule by letter" is over.
>
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today.

Her reference to "the lowest standard of proof" refers to a demand made by the Obama administration's April 4, 2011 "Dear Colleague" letter. It demanded that colleges and schools use a "preponderance" standard rather than a "clear and convincing evidence" standard for one category of accusations: sexual harassment or assault. This demand is legally suspect, since colleges should be able to use either burden of proof if they choose.

A generation ago, most colleges used a "clear and convincing" evidence standard in student and faculty discipline cases, to safeguard due process. As James Picozzi noted in 1987 in the *Yale Law Journal*, "Courts, universities, and student defendants all seem to agree that the appropriate standard of proof in student

disciplinary cases is one of 'clear and convincing' evidence." (James M. Picozzi, *University Disciplinary Process: What's Fair, What's Due, and What You Don't G*et, 96 Yale L. J. 2132, 2159 n. 17 (1987).

As a result of the 2011 Dear Colleague letter, Ivy League universities such as Cornell, Princeton, Yale, and Harvard Law School lowered the burden of proof in sexual harassment and assault cases. Although colleges stopped using the clear-and-convincing standard for harassment and assault allegations, many of them (such as Duke University, or the University of Virginia's Honor System) still use a higher burden of proof for other types of allegations, such as vandalism, non-sexual assaults, or honor code violations

The Education Department's April 4, 2011 "Dear Colleague" letter also urged colleges to restrict cross-examination in sexual harassment and assault cases. As its Office for Civil Rights (OCR) put it in that letter, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." When schools take that advice, it can violate a student's rights under a state's Administrative Procedure Act (APA).  Under some state APAs, students have a right to cross-examine their accuser, as courts have made clear in cases such as *Arishi v. Washington State University*, 385 P.3d 251 (Wash. App. 2016) and *Liu v. Portland State University*, 383 P.3d 294 (Or. App. 2016). The U.S. Supreme Court has called  cross-examination the "greatest legal engine ever invented for the discovery of truth" in its decision in *Lilly v. Virginia*, 527 U.S. 116, 124 (1999).

The 2011 Dear Colleague Letter also ignored past Office for Civil Rights rulings by telling schools to regulate and investigate off-campus conduct. In its April 4, 2011 letter, the Office for Civil Rights told colleges they "have an obligation" to investigate even when an incident "occurred off school grounds." This contradicted what OCR's career staff told colleges in Title IX rulings during the Bush administration, when I worked there. For example, OCR's Dallas office noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." *See* Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's position was at odds with court rulings saying Title IX does not require regulation of off-campus conduct, as I have noted in the past. For example, an appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University, * 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's *Davis* decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party."

Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), the Obama-era OCR's pressure on schools to investigate what it labeled as verbal sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional lawsuits against a school. That pressure was thus at odds with the Supreme Court's *Davis* decision, which said that Title IX liability does not require schools to do things that could give rise to "constitutional or statutory claims" against them.

This Obama administration demand for regulation of off-campus speech and conduct resulted in absurdities such as a Title IX investigation of Prof. Laura Kipnis for an essay published off campus in the *Chronicle of Higher Education*, "Sexual Paranoia Strikes Academe." Hypersensitive students claimed the essay constituted "sexual harassment." The students then accused Kipnis of "retaliation" when she took issue with their charges on Twitter. Only after an outcry from free speech advocates were charges dismissed months later.

As Secretary DeVos noted:

*Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes.*

*Any perceived offense can become a full-blown Title IX investigation.*

*But if everything is harassment, then nothing is.*

*Punishing speech protected by the First Amendment trivializes actual harassment. It teaches students the wrong lesson about the importance of free speech in our democracy.*

*Harassment codes which trample speech rights derail the primary mission of a school to pursue truth.*

The Obama administration helped fuel pressure for campus censorship through its demands that colleges adopt overly broad definitions of verbal "sexual harassment," as I discussed in the *Chronicle of Higher Education* in 2013. The demands led to colleges adopting definitions of verbal "sexual harassment" broader than those struck down by federal courts as overly broad in First Amendment rulings such as *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008).

The "Dear Colleague" letter issued by the Obama-era Office for Civil Rights in 2011 also wrongly ignored past Education Department rulings in demanding that colleges not allow accused students to appeal findings of guilt unless they also allowed complainants to appeal not-guilty findings — a position that some civil liberties groups viewed as akin to double jeopardy.

Under the Clinton administration, OCR had conceded that a school need not let accusers challenge not-guilty verdicts, because it is the accused who "stands to be tried twice for the same allegation." (Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996)). This position was reaffirmed in the Bush Administration. Contrary to the Dear Colleague Letter, it noted that "there is no requirement under Title IX that a recipient provide a victim's right of appeal," (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)), "whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

The Obama administration's April 4, 2011 Dear Colleague letter completely failed to acknowledge its conflict with prior OCR practice. Thus, it acted arbitrarily and capriciously in violation of the Administrative Procedure Act by issuing guidance that "glosses over or swerves from prior precedents without discussion." (*Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971)).

This violated the Education Department's "duty to explain its departure from prior norms." (*Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)).

"An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision-making." (*Jicarilla Apache Nation v. U.S. Department of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010)).

**Hans Bader**

---

| | |
|---|---|
| **From:** | Hans Bader |
| **Sent:** | Thursday, September 07, 2017 2:35 PM |
| **To:** | Sherman, Brandon |
| **Subject:** | "Education Secretary Takes Aim at Federal College Discipline Rules" |

Here is Competitive Enterprise Institute's reaction to Secretary DeVos's speech (agreeing in relevant part):

https://cei.org/blog/education-secretary-takes-aim-federal-college-discipline-rules

# Education Secretary Takes Aim at Federal College Discipline Rules

Hans Bader • September 7, 2017

In a major speech today, Education Secretary Betsy DeVos indicated that the Education Department may withdraw some of the regulatory "dark matter" discussed by CEI's Wayne Crews, such as its April 4, 2011 "Dear Colleague" letter micromanaging college discipline.

Crews' 2016 congressional testimony described how agencies violate the Administrative Procedure Act by issuing "dark matter"—binding rules that have not gone through the notice and comment process mandated by federal law. As examples, he gave the Obama Education Department's 2011 Dear Colleague letter about sexual assault and harassment, and its October 26, 2010 letter about school bullying.

Secretary DeVos apparently agrees. She said that:

> For too long, rather than engage the public on controversial issues, the Department's Office for Civil Rights has issued letters from the desks of un-elected and un-accountable political appointees....
>
> Washington dictated that schools must use the lowest standard of proof....
>
> The era of "rule by letter" is over.
>
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today.

Her reference to "the lowest standard of proof" refers to a demand made by the Obama administration's April 4, 2011 "Dear Colleague" letter. It demanded that colleges and schools use a "preponderance" standard rather than a "clear and convincing evidence" standard for one category of accusations: sexual harassment or assault. This demand is legally suspect, since colleges should be able to use either burden of proof if they choose.

A generation ago, most colleges used a "clear and convincing" evidence standard in student and faculty discipline cases, to safeguard due process. As James Picozzi noted in 1987 in the *Yale Law Journal*, "Courts, universities, and student defendants all seem to agree that the appropriate standard of proof in student

disciplinary cases is one of 'clear and convincing' evidence." (James M. Picozzi, *University Disciplinary Process: What's Fair, What's Due, and What You Don't G*et, 96 Yale L. J. 2132, 2159 n. 17 (1987).

As a result of the 2011 Dear Colleague letter, Ivy League universities such as Cornell, Princeton, Yale, and Harvard Law School lowered the burden of proof in sexual harassment and assault cases. Although colleges stopped using the clear-and-convincing standard for harassment and assault allegations, many of them (such as Duke University, or the University of Virginia's Honor System) still use a higher burden of proof for other types of allegations, such as vandalism, non-sexual assaults, or honor code violations

The Education Department's April 4, 2011 "Dear Colleague" letter also urged colleges to restrict cross-examination in sexual harassment and assault cases. As its Office for Civil Rights (OCR) put it in that letter, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." When schools take that advice, it can violate a student's rights under a state's Administrative Procedure Act (APA).  Under some state APAs, students have a right to cross-examine their accuser, as courts have made clear in cases such as *Arishi v. Washington State University*, 385 P.3d 251 (Wash. App. 2016) and *Liu v. Portland State University*, 383 P.3d 294 (Or. App. 2016). The U.S. Supreme Court has called cross-examination the "greatest legal engine ever invented for the discovery of truth" in its decision in *Lilly v. Virginia*, 527 U.S. 116, 124 (1999).

The 2011 Dear Colleague Letter also ignored past Office for Civil Rights rulings by telling schools to regulate and investigate off-campus conduct. In its April 4, 2011 letter, the Office for Civil Rights told colleges they "have an obligation" to investigate even when an incident "occurred off school grounds." This contradicted what OCR's career staff told colleges in Title IX rulings during the Bush administration, when I worked there. For example, OCR's Dallas office noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." *See* Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's position was at odds with court rulings saying Title IX does not require regulation of off-campus conduct, as I have noted in the past. For example, an appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University,* 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's *Davis* decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party."

Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), the Obama-era OCR's pressure on schools to investigate what it labeled as verbal sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional lawsuits against a school. That pressure was thus at odds with the Supreme Court's *Davis* decision, which said that Title IX liability does not require schools to do things that could give rise to "constitutional or statutory claims" against them.

This Obama administration demand for regulation of off-campus speech and conduct resulted in absurdities such as a Title IX investigation of Prof. Laura Kipnis for an essay published off campus in the *Chronicle of Higher Education*, "Sexual Paranoia Strikes Academe." Hypersensitive students claimed the essay constituted "sexual harassment." The students then accused Kipnis of "retaliation" when she took issue with their charges on Twitter. Only after an outcry from free speech advocates were charges dismissed months later.

As Secretary DeVos noted:

*Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes.*

*Any perceived offense can become a full-blown Title IX investigation.*

*But if everything is harassment, then nothing is.*

*Punishing speech protected by the First Amendment trivializes actual harassment. It teaches students the wrong lesson about the importance of free speech in our democracy.*

*Harassment codes which trample speech rights derail the primary mission of a school to pursue truth.*

The Obama administration helped fuel pressure for campus censorship through its demands that colleges adopt overly broad definitions of verbal "sexual harassment," as I discussed in the *Chronicle of Higher Education* in 2013. The demands led to colleges adopting definitions of verbal "sexual harassment" broader than those struck down by federal courts as overly broad in First Amendment rulings such as *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008).

The "Dear Colleague" letter issued by the Obama-era Office for Civil Rights in 2011 also wrongly ignored past Education Department rulings in demanding that colleges not allow accused students to appeal findings of guilt unless they also allowed complainants to appeal not-guilty findings — a position that some civil liberties groups viewed as akin to double jeopardy.

Under the Clinton administration, OCR had conceded that a school need not let accusers challenge not-guilty verdicts, because it is the accused who "stands to be tried twice for the same allegation." (Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996)).  This position was reaffirmed in the Bush Administration. Contrary to the Dear Colleague Letter, it noted that "there is no requirement under Title IX that a recipient provide a victim's right of appeal," (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)), "whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

The Obama administration's April 4, 2011 Dear Colleague letter completely failed to acknowledge its conflict with prior OCR practice. Thus, it acted arbitrarily and capriciously in violation of the Administrative Procedure Act by issuing guidance that "glosses over or swerves from prior precedents without discussion." (*Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971)).

This violated the Education Department's "duty to explain its departure from prior norms." (*Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)).

"An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision-making." (*Jicarilla Apache Nation v. U.S. Department of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010)).

**Cynthia P Garrett**

| | |
|---|---|
| **From:** | Cynthia P Garrett |
| **Sent:** | Thursday, September 07, 2017 2:59 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Scott Alison |
| **Subject:** | Fwd: CJS Task Force on College Due Process highlighted today by DeVos |

See Laura Dunn's statement below. An unhappy camper.

I did not hear the Secretary say all guidance was being rescinded "without any vetted replacement plan."

Honestly I do not understand what the fuss is --- no one is suggesting removing victim protections or ignoring their cases or concerns. I felt DeVos made that very clear. Sometimes I think ideology interferes with the ability to listen objectively -- perhaps they feel as though they've lost their Dear Colleague Letter and that clouds their judgment?

We have not yet heard from the media person but will be sending a few more op eds this afternoon.

Cindy


> For Commentary:
> Laura L. Dunn, Executive Director
> Laura.Dunn@survjustice.org<mailto:Laura.Dunn@survjustice.org> > [ PII ] (cell) >
@SurvJustice
>
>
>
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/images/5c4f5223-5d11-4313-843c-3
db2dce277f0.jpg]<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dma
nage2.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3Dac19a81dd6-26e-3D1b8ac06
aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUik
Etg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=-SKY8h48R3JFHMB9NAZpL9hKpFWz
ClRl6DRZnheDHWs&e=>
>
>
> Increasing the Prospect of Justice for Survivors
>
>
> SurvJustice Responds to DeVos' Rollback of Title IX > Protections for Campus Rape Survivors
>
> Washington D.C. (Sept. 7, 2017) - Today, Education Secretary Betsy DeVos made campuses safer for
rapists<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage.com_trac

k_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D48aa8e8d93-26e-3D1b8ac06aeb&d=DwMGaQ&c
=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZ
N3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=br8_B3BzYeaJTcYuBN2DctQ1l3HgyFZxTNNYkphcHU
A&e=> by putting the concerns of survivors on par with those accused. The Department is callously
rescinding important Obama era guidance on Title IX that protects victims of campus sexual assault.
This occurred just weeks into the new school year, during what experts call the "red zone" because
most sexual assaults against female students will occur at this time.
>
> As the only student survivor and activist invited as a VIP guest of Vice President Biden to the release
of the 2011 Title IX guidance, known commonly as the Dear Colleague Letter, SurvJustice Founder and
Executive Director Laura L. Dunn, Esq. is outraged. "This removal of all guidance without any vetted
replacement plan from the department leaves schools without standards during the new school year,"
said Dunn, noting scandals at Baylor University, Penn State, Yale University, University of Tennessee,
and Bingham Young University which show just how far schools will go to favor those accused over
survivors without accountability measures.
>
> In 2010, the Center for Public Integrity<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjus
tice.us12.list-2Dmanage1.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3Dda1a9a983e-
26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIo
YraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=3AZBk8otu_CFUl
HjgaXxQrT94ow120lWVgK5LMWtbVU&e=> and NPR<https://urldefense.proofpoint.com/v2/url?u=http-
3A__survjustice.us12.list-2Dmanage1.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D8
ca692ad85-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMx
aEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=tifkF
JsXiR4MxBxiu_VcNq1vh88H6Hb6Nh9Y0vJLz2E&e=> featured Dunn's struggle for justice at the
University of Wisconsin - Madison. This investigative series into campus sexual assault helped spur
the Obama administration to revisit Title IX enforcement and release a new guidance specifically on
campus sexual violence on April 4, 2011. "It was seven years to the exact day that two men - fellow
crew teammates - raped me on campus," said Dunn, and "this guidance represented my moment of
justice as my story helped improve federal enforcement to protect future survivors."
>
> Upon graduating law school in 2014, Dunn founded the national nonprofit SurvJustice, which is still
the only legal organization helping survivors of campus sexual violence in campus hearings across the
country. Dunn served on the ABA Criminal Justice Section Task Force on College Due
Process<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage.com
_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D4c0fd03db9-26e-3D1b8ac06aeb&d=DwM
GaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMy
hsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=Th-wMvwFDpZ3HTxJxpBGpIogR39_8VyXy3ngm
012-7g&e=> highlighted today by DeVos. The SurvJustice legal team knows campuses must continue
improving campus proceedings, but "fair process for those accused and equity under Title IX for those
victimized are not mutually exclusive," said Staff Attorney Carly N. Mee, Esq. "Both can exist without
rolling back Title IX guidance to disadvantage and harm survivors while letting campuses off the hook,"
said Mee, a public survivor herself who spoke out while attending Occidental College.
>
> The rescission of Title IX guidance comes after several efforts under the Trump administration to roll
back civil rights enforcements and protections. "This administration apparently believes that America
is only 'great again' when there are no civil rights protections left for those historically abused and
marginalized," said SurvJustice Board President Austin King, Esq. "It is no surprise that a President who
bragged about sexually assaulting women is now removing critical protections for survivors." Despite
the outrage, SurvJustice will continue working to ensure that any future actions by the Department

AR_00000952

ensure equal access to justice for survivors.
> ####
> SurvJustice, Inc. is a D.C.-based national not-for-profit organization that increases the prospect of justice for all survivors through effective legal assistance, policy advocacy, and institutional training. To learn more, please visit www.survjustice.org<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage1.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3Dd464be0ea0-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UloYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=TmMYtOfI5OJPFJYKl8DNE_GX6lp-dGexLlpZwwdrKQA&e=>.
>
>
>
>
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/images/fbe01a41-0bce-48ad-97aa-69f7722e93e5.jpg]
>
>
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/images/7851294c-bb73-4b48-bfbf-dbc02f7da7d8.jpg]
>
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/images/66eb0c05-b57c-4b97-acd9-d4fa16be1b04.jpg]
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/images/8cb6bf9d-824e-4a79-be7e-7365d01f916f.jpg]
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/_compresseds/c338d8eb-c1bd-40f6-8e06-484afcfb237c.jpg]
>
> [https://gallery.mailchimp.com/77efdac06bcd636646d70f415/_compresseds/2253ffda-0f84-4329-8652-86423af35d30.jpg]
>
>
>
> DONATE TODAY<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D4d89d03c17-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UloYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=w4DClL95pH-1LyqCoyHryMQMyPEmADcQXMoBkuMwSlM&e=>
>
>
>
> [https://cdn-images.mailchimp.com/icons/social-block-v2/color-twitter-48.png]<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D57761d178c-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrN

h2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYt
wDGA31NbXqrZraU&s=boXJXclOd-I57mpm1xX-uQIzLi8vQjd7wSZukQQ7Btk&e=>
>
>
>
>
> [https://cdn-images.mailchimp.com/icons/social-block-v2/color-facebook-48.png]<https://urldefe
nse.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage1.com_track_click-3Fu-3D77ef
dac06bcd636646d70f415-26id-3D06c5398c72-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84Jb
rNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJ
YtwDGA31NbXqrZraU&s=x3Cc559GIE9MmDS3clPRAVDFyFCkjAGF0Uqqf_xr6r8&e=>
>
>
>
>
> [https://cdn-images.mailchimp.com/icons/social-block-v2/color-link-48.png]<https://urldefense.proof
point.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage2.com_track_click-3Fu-3D77efdac06bcd6
36646d70f415-26id-3Da7839ccae5-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=f
F9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31N
bXqrZraU&s=KuPs9V466X7qWrzOmsNba40CKelOvp-pW-X4S2fxiyc&e=>
>
>
>
>
> [https://cdn-images.mailchimp.com/icons/social-block-v2/color-pinterest-48.png]<https://urldefense.
proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-2Dmanage1.com_track_click-3Fu-3D77efdac0
6bcd636646d70f415-26id-3D1780dd71d8-26e-3D1b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84J
brNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkH
JYtwDGA31NbXqrZraU&s=uyTzS8XibG7dZU8cNoJ8I2YGVbFBWCJrxS5qcHnycC8&e=>
>
>
>
>
>
>
>
>
> Copyright © 2017 SurvJustice Inc., All rights reserved.
> wwww.survjustice.org<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustice.us12.list-
2Dmanage.com_track_click-3Fu-3D77efdac06bcd636646d70f415-26id-3D57c9c2338e-26e-3D1b8ac06a
eb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UIoYraQN6KoFNaUikE
tg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=bUtkgSiUGN6AYy2yEhmOxy0MSy4pL
jEf7m51pEOx0og&e=>
>
> Our mailing address is:
> SurvJustice, Inc.
> 1015 15th Street NW, Suite 632
> Washington D.C. 20005
>

> Want to change how you receive these emails?
> You can update your preferences<https://urldefense.proofpoint.com/v2/url?u=http-3A__survjustic
e.us12.list-2Dmanage.com_profile-3Fu-3D77efdac06bcd636646d70f415-26id-3D8b7ec7d313-26e-3D1
b8ac06aeb&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh2g&r=fF9UCOYsGCEmcPLMxaEW_C2UloYraQN6Ko
FNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtwDGA31NbXqrZraU&s=99qODJZrQlI7vh1Nfpw2_8
qaPDBMy-UStyz1Bd2QLEU&e=> or unsubscribe from this list<https://urldefense.proofpoint.com/v2/url?
u=http-3A__survjustice.us12.list-2Dmanage.com_unsubscribe-3Fu-3D77efdac06bcd636646d70f415-26i
d-3D8b7ec7d313-26e-3D1b8ac06aeb-26c-3D92b1123d10&d=DwMGaQ&c=fMwtGtbwbi-K_84JbrNh
2g&r=fF9UCOYsGCEmcPLMxaEW_C2UloYraQN6KoFNaUikEtg&m=dMyhsSiZN3_8n_0KWDBrxPJkHJYtw
DGA31NbXqrZraU&s=5par9bPdMxwk7R0Q-_WRM29vEy9i-TVmNc21qCrZ_Ng&e=>
>
>
>
>
>
>
>

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Thursday, September 07, 2017 5:12 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: Secretary's speech; Senator's claim about Education Department "longstanding policy" |

Begin forwarded message:

**From:** Hans Bader <Hans.Bader@cei.org>
**Date:** September 7, 2017 at 4:14:36 PM EDT
**To:** "Steven.Menashi@ed.gov" <Steven.Menashi@ed.gov>
**Subject: Secretary's speech; Senator's claim about Education Department "longstanding policy"**

I agree with Secretary DeVos's speech today, for the reasons I give at this link:
https://cei.org/blog/education-secretary-takes-aim-federal-college-discipline-rules

Senator Murray (D-Wash.) has erroneously argued that the Obama Education Department's April 4, 2011 Dear Colleague letter merely restated "longstanding policy" in the Education Department.

In the item below, I explain why this is untrue: The Dear Colleague Letter's demands conflicted with prior rulings of the Education Department's Office for Civil Rights under the Bush and Clinton administrations on issues such as whether colleges have to regulate off-campus conduct, and whether they must restrict the appeal rights of accused people unless they give corresponding appeal rights to accusers (something that civil liberties groups like FIRE have argued is akin to double jeopardy). The Dear Colleague Letter's demand that schools regulate off-campus conduct also conflicted with court rulings and language in the Supreme Court's *Davis* decision.

(There is *one* controversial aspect of the Dear Colleague Letter, which, despite being criticized by FIRE, is consistent with the policy of a couple regional OCR offices under prior administrations; but the reasoning given for that policy in the Dear Colleague Letter is deeply flawed, as I discuss at this link and this link.)

Thanks for taking the time to read this.

Hans Bader

https://www.cnsnews.com/commentary/hans-bader/time-end-obama-era-fed-micromanagement-colleges-under-title-ix

# Time to End Obama-Era Fed

# Micromanagement of Colleges Under Title IX

By Hans Bader | February 22, 2017 | 11:22 AM EST

Vice President Pence says he and President Trump "believe that education is a state and local function that should be controlled by" states, not the federal government. A great way to restore local control would be rescind the Obama administration's federal micromanagement of college discipline. Under Obama, the Education Department sometimes pressured colleges to do things that could lead to lawsuits being filed against them by their students.

For example, the Education Department's April 4, 2011 "Dear Colleague" letter urged colleges to restrict cross-examination in sexual harassment and assault cases. As its Office for Civil Rights (OCR) put it in that letter, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing." When schools take that advice, it can violate a student's rights under a state's Administrative Procedure Act (APA).  Under many state APAs, students have a right to cross-examine their accuser, as courts have made clear in cases such as *Arishi v. Washington State University*, 385 P.3d 251 (Wash. App. 2016) and *Liu v. Portland State University*, 383 P.3d 294 (Or. App. 2016).

(It is conceivable that the advice in the "Dear Colleague" letter could also lead to violations of *federal* law at colleges that follow it. In a few campus disciplinary cases, such as *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997), and *Doe v. Univ. of Cincinnati*, 2016 WL 6996194 (S.D. Oh. 2016), judges have ruled that some cross-examination *was* constitutionally required on due-process grounds to test the credibility of the accuser. But the Supreme Court has not ruled on whether cross-examination is ever required by the federal constitution in the college setting, even though it lauded cross-examination as the "greatest legal engine ever invented for the discovery of truth" in its decision in *Lilly v. Virginia*, 527 U.S. 116, 124 (1999).)

The Education Department's "Dear Colleague" Letter purported to apply the federal sex discrimination law Title IX. But it misconstrued Title IX, as I explain in detail at this link. Moreover, in advising colleges to restrict the rights of their students, it ignored language in a 1999 Supreme Court ruling that emphasized that schools don't need to risk violating the rights of their students to comply with Title IX. In setting forth a standard for when schools need to take action against sexual harassment or assault by students, the Supreme Court said that "the standard set out here is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. … [I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims."  (*See Davis v. Monroe County Board of Education*, 526 U.S. 629, 649 (1999)).

The Supreme Court plainly meant to allow colleges to avoid acting in ways giving rise to statutory claims against them under both federal and state law, since it was in response to a dissenting opinion that cited both federal and state laws limiting the ability of schools to discipline students (such as state constitutional provisions. *See Davis*, at pg. 649, citing the dissenting opinion in *Davis*, at pp. 666-668).

In addition to ignoring the Supreme Court, this Obama-era "Dear Colleague" letter also wrongly imposed new obligations on schools without notice and comment, in violation of the Administrative

Procedure Act (as I explained earlier). For example, it "ignored past Office for Civil Rights rulings authored by its own career lawyers and civil servants in forcing colleges to investigate off-campus conduct. Such 'unexplained departures from precedent' are arbitrary and capricious, as the D.C. Circuit Court of Appeals noted in *Ramaprakash v. FAA* (2003). The Obama administration also ignored two federal appeals court rulings, and language in a Supreme Court decision, by demanding that colleges do so."

In its April 4, 2011 letter, the Office for Civil Rights told colleges they "have an obligation" to investigate even when an incident "occurred off school grounds." This contradicted what OCR's career staff told colleges in Title IX rulings during the Bush administration, when I worked there. For example, OCR's Dallas office noted that "a University does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." *See* Oklahoma State University ruling, OCR Complaint No. 06-03-2054, at pg. 2 (June 10, 2004).

The Obama OCR's contrary position, which it later used to find colleges such as Harvard Law School in violation of Title IX, is clearly at odds with court interpretations of Title IX as *not* applying off campus, as I have noted in the past. For example, a federal appeals court rejected a lawsuit by a student over an off-campus sexual assault in *Roe v. St. Louis University*, 746 F.3d 874, 884 (8th Cir. 2014). Quoting the Supreme Court's Davis decision, it noted that "The Supreme Court has made it clear, however, that to be liable [under] Title IX, a University must have had control over the situation in which the harassment or rape occurs," which is not the case for an "off campus party" (quoting *Davis v. Monroe County Board of Education*, 526 U.S. 629, 645 (1999)).

Since free-speech protections are stronger outside of school than within K-12 schools (*see, e.g., Klein v. Smith* (1986)), the Obama-era OCR's pressure on schools to investigate what it labeled as verbal sexual "harassment" (such as vulgar speech) outside of school could give rise to constitutional lawsuits against a school. That pressure was thus at odds with the intent of the Supreme Court's *Davis* decision to avoid subjecting schools to the risk of "constitutional or statutory claims."

The "Dear Colleague" letter issued by the Obama-era Office for Civil Rights in 2011 also wrongly ignored past agency rulings in demanding that colleges not allow accused students to appeal findings of guilt unless they also allowed complainants to appeal not-guilty findings — a position that some critics viewed as akin to double jeopardy.

Before the Obama administration, OCR had stated that "there is no requirement under Title IX that a recipient provide a victim's right of appeal." (University of Cincinnati, OCR Complaint No. 15-05-2041 (Apr. 13, 2006)).

Under the Clinton administration, OCR had approved a school's limiting appeal rights to the accused because "he/she is the one who stands to be tried twice for the same allegation." (Skidmore College, OCR Complaint No. 02-95-2136 (Feb. 12, 1996)).

Similarly, under the Bush administration, OCR had concluded that "appeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University." (Suffolk University Law School, OCR Complaint No. 01-05-2074 (Sept. 30, 2008)).

*Hans Bader practices law in Washington, D.C. After studying economics and history at the University of Virginia and law at Harvard, he practiced civil-rights, international-trade, and constitutional law.*

**Cynthia P Garrett**

---

| | |
|---|---|
| **From:** | Cynthia P Garrett |
| **Sent:** | Thursday, September 07, 2017 6:58 PM |
| **To:** | Ferguson, Gillum |
| **Cc:** | Jackson, Candice; Henderson, Chelsea; Scott Alison |
| **Subject:** | Re: Families Advocating for Campus Equality: Op Eds for Publication |
| **Attachments:** | N Wolfinger Op Ed FINAL.docx |

One more Op Ed, this by a professor.

Cynthia

> On Sep 7, 2017, at 3:18 PM, Cynthia P Garrett < PII @gmail.com> wrote:
>
> Thank you!
>
>> On Sep 7, 2017, at 3:14 PM, Ferguson, Gillum <Gillum.Ferguson@ed.gov>
>> wrote:
>>
>> Thank you Cynthia, both for sending and for your kind words. Will take a look at
>> these this evening and get back to you.
>>
>> Best,
>> Gillum
>>
>> _____
>> **From:** Cynthia P Garrett [ PII @gmail.com]
>> **Sent:** Thursday, September 07, 2017 5:56 PM
>> **To:** Ferguson, Gillum
>> **Cc:** Jackson, Candice; Henderson, Chelsea; Scott Alison
>> **Subject:** Families Advocating for Campus Equality: Op Eds for Publication
>>
>> Mr. Fergusen,
>>
>> As you know Candice Jackson has asked FACE to provide Op Eds to be published
>> in connection with Secretary DeVos' speech today.
>>
>> Here are four:
>>
>> We may have one more coming.
>>
>> Please let us know if you need anything further,
>>
>> Sincerely,

Cindy and Alison

P.S. in searching Google to be sure we knew your correct gender (you never know these days) I came across your wedding site - congratulations and we hope it goes well!

*Cynthia P Garrett and Alison Scott, Co Presidents*
**Families Advocating for Campus Equality**
www.facecampusequality.org
facecampusequality@gmail.com
@FaceCampusEqual

Like most, I support the broad aims of Title IX pertaining to gender equity on college campuses. Colleges and the criminal justice system alike have sometimes responded to sexual assault with deplorable laxity.  But these issues have nothing to do with the hijacking of Title IX resulting from the Department of Education's Office for Civil Rights' (OCR) 2011 "Dear Colleague" letter (DCL). I speak from personal experience as a survivor of a Title IX inquisition at the University of Utah, where I've been a tenured professor for almost two decades. This is my story about how a Title IX regulatory regime designed to crack down on sexual assault managed to ensnare a professor for telling colleagues how he proposed to his wife.

As is customary, I was not immediately notified I was facing sexual harassment charges or a Title IX investigation. Instead, in July 2016 the University "consultant" in the Office of Equal Opportunity and Affirmative Action requested a meeting to discuss an "important and confidential OEO/AA matter." Initially, my inquisitor refused to tell me I was accused of sexual harassment and discrimination. I was fortunately able to obtain the charges in writing only after convincing the Title IX investigator I was out of state indefinitely and unable to meet in person. The investigator then became much more conciliatory once he learned I'd retained counsel the second I received the complaint. Most of the accused, particularly students, aren't so fortunate.

The complaint cited conversations I'd had with three female junior colleagues over drinks and pizza more than fifteen years earlier. Our conversations were often off-color (anyone who's ever had a drink with coworkers might relate.) Though my unnamed accuser was never identified in the Title IX proceedings, it clearly was one of these colleagues. Specifically, I was alleged to have "recounted stories to female faculty members related to your proposal to your wife, and how you proposed at a strip club during a lap dance." As this was true-- except the part about the lap dance--it was the only possible story I could tell about my marriage proposal.

Another more nebulous allegation of gender discrimination concerned my reaction to an external review of a department program with which I agreed, to which I had allegedly "yelled:" "I feel vindicated! This is exactly what I've been saying all along!"  According to the complaint, I had reacted this way only "because the director or the program [sic] is a woman." My department head is indeed a woman. If my department head had been a man, would I have been accused of misandry?

I'd had other conflicts with my university and my initial reaction to the allegations was that the University was resorting to new means of hassling me. At that time I was unaware of national opposition to the DCL spearheaded by organizations like Families Advocating for Campus Equality and FIRE, various legal experts, and documented by Laura Kipnis. But to a considerable extent, the Title IX crisis had flown under the radar due to campus procedures enjoining the accused from discussing Title IX allegations, as well as the justified fear of public condemnation.

AR_00000962

I was investigated for four months, but had retained capable counsel and wasn't unduly worried about the possibility of a guilty finding.  The price I paid can be measured in my time drafting memos and the $14,000 I incurred in attorney's fees. The taxpayers also paid my university inquisitor and inconvenienced twelve of my colleagues in the course of investigating me. The charges were dismissed without a formal hearing. The fact that I had the funds to pay for a top-drawer defense attorney undoubtedly ensured my exoneration.

My university is not entirely at fault for wasting so much time and money on a frivolous complaint. The 2011 DCL threatens schools with extensive and costly compliance reviews if they don't vigorously pursue Title IX cases. The OCR also publishes a list of colleges and universities accused of mishandling Title IX cases prior to any finding of their wrongdoing. Schools therefore have strong incentive to pursue every case brought to their attention no matter how flimsy.

The pursuit of frivolous Title IX cases like mine is an insult to victims of genuine sexual violence. These cases merit decisive action in the criminal justice system, not in university tribunals poorly equipped to balance effective prosecution that protects the rights of all involved.

Nicholas H. Wolfinger, University of Utah; Professor of Family and Consumer Studies and Adjunct Professor of Sociology. His most recent book is *Soul Mates: Religion, Sex, Love, and Marriage among African Americans and Latinos* (with W. Bradford Wilcox; Oxford University Press, 2016).

AR_00000963

**From:** Jackson, Candice
**Sent:** Friday, September 08, 2017 7:48 AM
**To:** Eitel, Robert; Venable, Joshua; Lee, Ebony; Bailey, Nathan; Hill, Elizabeth; Sherman, Brandon; Menashi, Steven; Hahn, Nicholas; Ferguson, Gillum
**Subject:** WSJ Ed Board

There are many terrific articles on the speech but this is one of my favorites:

https://www.wsj.com/articles/the-devos-guidance-speech-1504826255

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

**The DeVos Guidance Speech**

The Education Secretary takes on Obama's assault on campus due process.



Education Secretary Betsy DeVos speaks at George Mason University in Arlington, Va., Sept. 7. PHOTO: JACQUELYN MARTIN/ASSOCIATED PRESS

*By*
*The Editorial Board*
Sept. 7, 2017 7:17 p.m. ET

115 COMMENTS

- 
- 
- 

• • Education Secretary Betsy DeVos on Thursday gave one of the most important and defining speeches to emerge from the Trump Administration. It deserves to be read in full.

Her subject, long anticipated in the academic community, was the Obama Education Department's 2011 "guidance letter" to all institutions of higher learning on conducting investigations of sexual abuse under the federal education law known as Title IX. As expected, Mrs. DeVos and the head of her civil-rights office, Candice Jackson, intend to replace the current Title IX guidance after a period of public comment. The DeVos speech, however, was about much more than a bureaucratic revision.

1

Let's review the origins of the 2011 guidance letter. Its nominal purpose was to address unanswered complaints on campuses by victims of sexual assault—a real problem.

The Obama Education Department's response was to circumvent Congress and neglect normal executive-branch rule-making procedures mandated in the Administrative Procedure Act, such as soliciting public comment. Instead, it simply jammed the policy through by sending out a "Dear Colleague" letter, including an explicit threat that noncomplying schools could lose federal funding.

Mrs. DeVos's speech is a meticulous deconstruction of the damage done when progressive activists like those who populated the Obama Administration believe their ends justify whatever legal and administrative obliteration it takes.

"Rather than engage the public on controversial issues, the (Obama) Department's Office for Civil Rights has issued letters from the desks of unelected and unaccountable political appointees," Mrs. DeVos said. "Instead of working with schools on behalf of students, the prior administration weaponized the Office for Civil Rights to work against schools and against students."

With the original Dear Colleague letter, the Obama Administration introduced a new judicial standard, in which students accused of sexual misconduct could be severely punished based on a mere "preponderance of evidence." Mrs. DeVos noted that these high-stakes cases—with lifetime consequences for both sides—are brought before a "school administrator who will act as judge and jury."

The result, unsurprisingly, has been a travesty of injustice, incompetence and inconsistency as schools struggled to comply. Many institutions, often small colleges with limited resources, are now engulfed in lawsuits flowing, again unsurprisingly, from these kangaroo courts.

Secretary DeVos opened her speech with the hope that "every person—even those who feel they disagree—will lend an ear to what I outline today." It is a faint hope.

Even before she gave the speech, 20 Democratic attorneys general, of all people, wrote a letter warning against "a rushed, poorly-considered effort to roll back current policies." After the speech, teachers union president Lily Eskelsen Garcia of the National Education Association said the DeVos proposal to rethink sexual-assault adjudication "offends our collective conscience."

Well, hers anyway—this from a union that makes it nearly impossible to dismiss incompetent or even rule-breaking teachers.

AR_00000965

Mrs. DeVos in her address goes more than the extra mile to include the valid concerns of victims, the accused, their parents, school administrators and what used to be commonly held notions of decency and justice.

The secretary deserves credit for taking on this legal and administrative nightmare, which she inherited from an Administration that specialized in creating them. She deserves support from the academic community in finding a way back to a solution.

*Appeared in the September 8, 2017, print edition.*

AR_00000966

LAMAR ALEXANDER, TENNESSEE, CHAIRMAN

MICHAEL B. ENZI, WYOMING                PATTY MURRAY, WASHINGTON
RICHARD BURR, NORTH CAROLINA            BERNARD SANDERS (I), VERMONT
JOHNNY ISAKSON, GEORGIA                 ROBERT P. CASEY, JR., PENNSYLVANIA
RAND PAUL, KENTUCKY                     AL FRANKEN, MINNESOTA
SUSAN M. COLLINS, MAINE                 MICHAEL F. BENNET, COLORADO
BILL CASSIDY, M.D., LOUISIANA           SHELDON WHITEHOUSE, RHODE ISLAND
TODD YOUNG, INDIANA                     TAMMY BALDWIN, WISCONSIN
ORRIN HATCH, UTAH                       CHRISTOPHER S. MURPHY, CONNECTICUT
PAT ROBERTS, KANSAS                     ELIZABETH WARREN, MASSACHUSETTS
LISA MURKOWSKI, ALASKA                  TIM KAINE, VIRGINIA
TIM SCOTT, SOUTH CAROLINA               MARGARET WOOD HASSAN, NEW HAMPSHIRE

DAVID P. CLEARY, STAFF DIRECTOR
EVAN SCHATZ, DEMOCRATIC STAFF DIRECTOR

http://help.senate.gov

**United States Senate**

COMMITTEE ON HEALTH, EDUCATION,
LABOR, AND PENSIONS

WASHINGTON, DC 20510-6300

September 8, 2017

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Secretary DeVos,

I urge you to leave in place the current U.S. Department of Education ("Department") Dear
Colleague on Title IX of the Education Amendments of 1972 (Title IX), often referred to as the
'2011 guidance.' Your comments yesterday indicate that you are planning to fundamentally
change the Department's approach to addressing sexual harassment and sexual assault in our
nation's schools in a way that will undermine survivors' rights. There have been confusing and
contradictory statements from the Department about whether you intend to leave the 2011
Guidance in place until you decide what approach you will take to addressing campus sexual
assault. Rescinding the 2011 guidance will cause further confusion for schools about what their
responsibilities are and allow them to return to a time when students coming forward to share
their experiences of sexual assault are once again swept under the rug. I ask that you clarify that
the existing guidance remains in place.

For over 40 years, Title IX has improved access to educational programs and benefits by
prohibiting schools from discriminating against individuals on the basis of sex. As a part of
complying with this landmark civil rights law, schools must respond promptly and effectively to
sexual assault and sexual harassment. By indicating you are changing what the Department
expects from schools, you risk undermining the effectiveness of this law.

As Secretary, upholding students' safety and civil rights must be a top priority of yours. You
indicated that you plan to find a "better way" to enforce Title IX than the previous
Administration did. The 2011 guidance was a part of the Administration's dedication to listening
to the needs of survivors and ensuring that schools are held accountable for sexual assault and
harassment. It is very concerning that you appear to be reassessing that approach, particularly in
light of other decisions you have made, including continuing to leave Candice Jackson in place
as Acting Secretary of Civil Rights despite her disturbing comments that 90 percent of sexual
assault accusations stem from intoxication or regret.

AR_00000967

You must make it clear to schools and to survivors of sexual assault that the Department expects schools to take sexual assault seriously. That means leaving current guidance in place as you develop a path forward. I hope that you will consider my request and please contact my staff, Laurel Sakai or Carly Rush at (202) 224-5501 if you have any questions.

Sincerely,

PATTY MURRAY
United States Senator
Ranking Member, Senate Health,
Education, Labor and Pensions Committee

**Michael J. Rice**

| | |
|---|---|
| **From:** | **PII** |
| **Sent:** | Friday, September 08, 2017 10:44 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Thanks! |

Ms. Jackson;

It was so inspirational to listen to Ms. DeVos at George Mason University via YouTube.
Hopefully my Falsely Accused son **PII** will be able to remove his "Scarlet Letter", now that
Due Process has returned to (all) students.
Always hopeful.

God Bless;

**PII**

**Keith Whitaker**

| | |
|---|---|
| **From:** |  |
| **Sent:** | Friday, September 08, 2017 10:47 AM |
| **To:** | DeVos, Betsy |
| **Cc:** | Jackson, Candice |
| **Subject:** | "Dear Colleague" Letter |

Dear Secretary DeVos,

Thank you for your courageous speech yesterday. I strongly support your intention to revoke or rescind the previous administration's guidance on investigating and adjudicating claims of sexual assault on college campuses.

Best wishes,

**PII**

**Mark Herring**

| | |
|---|---|
| **From:** |  |
| **Sent:** | Friday, September 08, 2017 12:19 PM |
| **To:** | Jackson, Candice |

Dear Assistant Secretary jackson

I applaud Secretary DeVos's decision to revoke the 2011 guidelines regarding campus sexual misconduct.  Unfortunately, we tend to forget that whatever government subsidizes, we simply get more of it.  And when the 2011 guidelines appeared, in essence subsidizing the reporting of sexual misconduct, the numbers skyrocketed.

Make no mistake about it.  Sexual misconduct is not to be tolerated and when descried, and must be prosecuted to the fullest extent of the law.  The 2011 guidelines, however, obfuscated every encounter between individuals to such an extent that even a cursory greetings could be misinterpreted as flagitious.

I stand with your decision to revoke the 2011 guidelines!

(I am wholly responsible for this email and it in no way reflects the support or lack thereof of my employer.)

Cordially

**PII**

**Reyes, Alejandro**

| | |
|---|---|
| **From:** | Reyes, Alejandro |
| **Sent:** | Friday, September 08, 2017 12:31 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Karvonides, Mia; Faiella, Matt; Henderson, Chelsea |
| **Subject:** | Revised Letter Title IX Sexual Misconduct |
| **Attachments:** | Document1 (plg 9-8-2017)v2.docx |

Hello,

Mia asked me to forward the attached draft your way. Let us know if you have any questions.

Thank you,
Alejandro

Alejandro T. Reyes
Director, Program Legal Group
Office for Civil Rights
U.S. Department of Education
Office: (202) 453-6639
Mobile: [ PII ]
alejandro.reyes@ed.gov

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Friday, September 08, 2017 1:39 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: OMB Comments for ED's Sexual Violence Rescission DCL |
| **Attachments:** | DCLOMBComments.docx; ATT00001.htm; Q-A 9-7-17 OMB (edits).docx; ATT00002.htm |

Begin forwarded message:

> **From:** "Mar, Sharon EOP/OMB" <[(b)(6)]on_Mar@omb.eop.gov>
> **Date:** September 8, 2017 at 1:08:14 PM EDT
> **To:** "Menashi, Steven" <Steven.Menashi@ed.gov>, "McFadden, Elizabeth"
> <Elizabeth.McFadden@ed.gov>
> **Cc:** "Rao, Neomi J. EOP/OMB" <Neomi.J.Rao[(b)(6)]@omb.eop.gov>, "Harris, Jeffrey M.
> EOP/OMB" <Jeffrey.M.Harris[(b)(6)]@omb.eop.gov>, "Hunt, Alex T. EOP/OMB"
> <Alexander_T._Hunt[(b)(6)]@omb.eop.gov>
> **Subject:** **OMB Comments for ED's Sexual Violence Rescission DCL**

Steve,

# DPP

Thanks,

Sharon Mar
Senior Advisor to the Deputy Administrator
OMB | Office of Information and Regulatory Affairs
Tel: [(b)(6)]395.6466 | Fax: [(b)(6)]395.5167 | [(b)(6)]@omb.eop.gov

# DPP

AR_00000974

# DPP

# DPP

AR_00000976

# DPP

AR_00000977

# DPP

# DPP

AR_00000979

# DPP

AR_00000980

**Jill Pasteris**

| | |
|---|---|
| **From:** |  |
| **Sent:** | Friday, September 08, 2017 2:28 PM |
| **To:** | DeVos, Betsy; Jackson, Candice |
| **Subject:** | Support for revoking "Dear Colleague" directives |

To:  Betsy DeVos, Secretary, Department of Education, and Candice
Jackson, Acting Assistant Secretary on Civil Rights

       As a long-time university educator, I have been troubled by
the specific wording of the "Dear Colleague letter on sexual
violence" that went out to all colleges and universities in
2011.  Although I strongly believe that sex offenders should be
punished and that students should be protected from predatory
practices on campus, I believe that both the accused and the accuser
should be treated with respect and under due process.  Colleges and
universities are not for the most part well equipped to handle legal
cases, but the "Dear Colleague" letter forced them to attempt to act
as though they were.  Both members of the legal community and many of
those involved in Title IX proceedings have recognized the lack of
due process in such hearings and the verdicts/punishments that
followed (e.g., expulsion from the academic institution and public defamation).

       I support the rescinding of the current "Dear Colleague"
directives, as well as the proposed "notice-and-comment process" and
public hearings on the issues that caused the original letter to be
sent.  I agree that the participation of all types of concerned
groups, including members of the legal community, is essential in
such hearings.

Sincerely,



**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Friday, September 08, 2017 9:38 AM |
| **To:** | Ware, Angela |
| **Subject:** | FW: Title 9 |

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 8:58 AM
**To:** ⌐ PII ¬
**Subject:** RE: Title 9

Dear Mr. ⌐ PII ¬
Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

---

**From:** ⌐ PII ¬ Gonder [mailto:CGonder@fca.org]
**Sent:** Friday, September 08, 2017 2:07 AM
**To:** DeVos, Betsy
**Subject:** Title 9

Dear Secretary DeVos,

Thank you for your efforts to change Title 9 policy, specifically how colleges administer this mandate.

My son was falsely accused of sexual violence and we went through a horrible ordeal to clear his name. It was an unfair and illegitimate process that should be abolished. The system is weighted against the accused and extremely flawed and un-American.

Can you please do everything you can to ensure that young men (like my son) do not have their lives ruined by this flawed Obama-era policy?

Thank you for all you are doing.

Sincerely yours,

⌐ **PII** ¬

**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Friday, September 08, 2017 9:40 AM |
| **To:** | Ware, Angela |
| **Subject:** | FW: Title IX |

-----Original Message-----
From: Catoe, Tracy On Behalf Of DeVos, Betsy
Sent: Friday, September 08, 2017 8:42 AM
To: **PII**
Subject: RE: Title IX

Dear **PII**

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

-----Original Message-----
From: **PII** @gmail.com]
Sent: Thursday, September 07, 2017 6:35 PM
To: DeVos, Betsy
Subject: Title IX

Secretary DeVos,
I email you today just after hearing your statement regarding Title IX. My name is Hanna and I'm 17
years old, turning 18 soon. Coming next fall, I will attend a college or university. Aside from any
worries I have of assimilating to my new environment and excelling in my classes, I now worry- even
more so than prior- about the way my body and mind will be protected. Title IX is in place in order to
not only protect students against predators, but also to give them peace of mind knowing they can talk
about the injustices done towards them with a lawful backing that will persecute violators.

One line in particular from your statement hit me the hardest. "If everything is harassment, then
nothing is harassment."

AR_00000983

Imagine being me. Scratch that. Imagine being someone at a higher risk of sexual harassment. Imagine being a transgender person of color, whom are statistically proven to be at a greater risk. Imagine being them and let that line from your statement sink in.

Did your nerves flare? Did your face grow pale? Did your stomach feel unsettled?

That statement, your statement, was bone chilling. Your statement will only fuel a generation of adults who will feel as if there are no repercussions for actions they have done to make another human being uncomfortable, whether it be mentally or physically.
We need the protections provided under Title IX. They are for our ultimate safety. The Title is "broad" for a reason, and that is to include all forms of sexual harassment. There are so many things that can be done to a person that CAN and SHOULD be considered sexual harassment. There is no room to protect the accused. To inflict that kind of pain on to another is brutal and disgusting. It leaves a lasting impact on the victim's psyche, making them susceptible to panic attacks and overall anxiety in social situations. If Title IX becomes narrower, you will be left with a group of victims who feel nothing but alone in their situations in the wake of a reduction to the protections previously allocated to their bodies.

I urge you to rethink everything you currently perceive to be wrong with Title IX. My generation urges you to rethink it. Please. Please put yourself in our shoes. Please keep our worries on your mind when evaluating the Title further. Please take everything I have stated seriously.
Thank you



**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Friday, September 08, 2017 9:41 AM |
| **To:** | Ware, Angela |
| **Subject:** | FW: Please listen to survivors and commit to preserving the 2011 and 2014 Sexual Violence Guidance |

-----Original Message-----
From: Catoe, Tracy On Behalf Of DeVos, Betsy
Sent: Friday, September 08, 2017 8:37 AM
To: [ PII ]@gmail.com'
Subject: RE: Please listen to survivors and commit to preserving the 2011 and 2014 Sexual Violence Guidance

Dear [ **PII** ]

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you. Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

-----Original Message-----
From: [ **PII** ]@gmail.com]
Sent: Thursday, September 07, 2017 5:45 PM
To: DeVos, Betsy
Subject: Please listen to survivors and commit to preserving the 2011 and 2014 Sexual Violence Guidance

Dear Secretary DeVos:

Re: Comments regarding Evaluation of Existing Regulations (Docket # ED-2017- OS-0074)

Schools should be safe havens for children and all of them ---every single one--- should be treated with kindness and respect. Schools should be the place they know they are going to be protected, and where they know help is at hand. How callous, how unkind, how very unChristian your views are on this matter. Our schools should be run in such a way that they set an example for every student: of how to treat people with respect and how to assist those who are struggling or in trouble. In other words, how to be a good citizen for our country.

Sincerely,



**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Friday, September 08, 2017 9:41 AM |
| **To:** | Ware, Angela |
| **Subject:** | FW: Title IX Feedback and Concerns |

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 8:36 AM
**To:** [ PII ]
**Subject:** RE: Title IX Feedback and Concerns

Dear [ **PII** ]

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

**From:** [ **PII** @gmail.com]
**Sent:** Thursday, September 07, 2017 4:47 PM
**To:** DeVos, Betsy
**Subject:** Title IX Feedback and Concerns

Hi Betsy,

I hope you're well in America today.

Many women are not.

As you may not realize, most rapes are under-reported and often dismissed in court and by police officers.
Campuses have shown time after time they're more willing to protect star athletes than believe women who report
abuse. You probably have many women in your life who were sexually assaulted or molested or harassed and were
likely unable to prove it. The court of law does not favor believing women, so really, your actions here are just in line
with that.

Maybe you don't care.

How little you evolve the justice system. I'm not surprised by this, though maybe one day you will wake up to find
you have done little to aid and empower other women or victims of abuse. And that might be surprising to you. But
it's not surprising to me. But for now I suppose you think you're doing the right thing.

But what you're doing is unconscionable. It's disgraceful. It's in alignment with this administration's total desire to
reverse anything Obama implemented, even at the risk of your own supporters. Not everything a Democrat puts in
place needs to be attacked by the GOP, and there was no need to rescind this. Anyway, the law is the law, so
good luck with that.

You've shown time and again you're not on the right side of history. Well, good for you for getting to show your true face to the world; that must be personally empowering for you to get to maintain a mask of sociopathy in the face of immense abuse and pain others experience. But your personal false actualization and greed will only go so far.

In the end, the only thing that matters is the kindness and empathy we extend to those who suffer, as we must suffer. I do feel sorry for your wrecked shivering spirit and the light inside you that must be closed as tight as a wasp's nest. Please be well. Please stop hurting people.

Best,



**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Friday, September 08, 2017 9:36 AM |
| **To:** | Ware, Angela |
| **Subject:** | FW: Public Comment on Title IX Enforcement |

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 9:04 AM
**To:** PII
**Subject:** RE: Public Comment on Title IX Enforcement

Dear PII
Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

**From:** PII [@gmail.com]
**Sent:** Thursday, September 07, 2017 9:45 PM
**To:** DeVos, Betsy; Office of the Secretary
**Subject:** Public Comment on Title IX Enforcement

Dear Secretary DeVos,

Since I cannot find a more appropriate portal through which to enter my public comment which you solicited with your remarks to the students and faculty of George Mason University, please consider my email.

I ask you to preserve the 2011 and 2014 Sexual Violence Guidance set up by the Obama administration for Title IX cases on college campuses. Only a small fraction (2-10%) of rape reports are false, while the vast majority of rapes are never even reported. Shifting the balance of rights back in the direction of the accuser as you signaled in your remarks today will undermine trust in the system, and likely decrease the instances of reported rapes still further. ONE IN FIVE WOMEN (and one in four transgender people) is sexually assaulted in college - in my eyes, as a recent college graduate who has seen the effects on my own campus, this constitutes a national crisis. And universities have proved over and over that they cannot be trusted to handle this alone. There are, of course, improvements that could be made to the existing guidance, but delivering more rights to the accused is not one of them. Following through with this change betrays rape survivors - and particularly the most vulnerable students. I urge you to reconsider.

A concerned citizen,



**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, September 08, 2017 5:20 PM |
| **To:** | Andrea Ann Pitts |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | Re: VP Biden's call to action today - interesting, thought you should be aware |

Andrea,
I'd love to meet with you next week! I'm copying my assistant Chelsea to set something up. I can meet after hours if my daytime calendar is booked up.

Thank you for your encouraging words!

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 8, 2017, at 4:43 PM, Andrea Ann Pitts < @hotmail.com> wrote:

>  Secretary DeVos,
>
>  Thank you so much for your courageous speech yesterday! Every word you spoke was truthful and factual.  It sickens and saddens me today that you are getting torched in the press and everywhere else.  I encourage you to stay strong!!  Who are these people that think everyone doesn't deserve due process?  It simply amazes me.
>
>  Today, Biden gave a speech where he was over emotional and said frankly, stupid things. He clearly has not done his homework as you and Director Jackson have done.
>
>  I've asked our FACE family members to start a Twitter campaign to this fact and wanted you to know.  Keep being strong!  My family and especially my son Elliott, THANKS YOU!!
>
>  I'll be in town next week (14th/15th) meeting with staffers about this very issue, telling my family's story and trying to garner more support. I'm sure it's silly of me to ask, but, If either of you are free for lunch, coffee, or a glass of wine after work (does your day ever end?), let me know! Would love to meet!  From what Cindy, Jonathan, and others tell me, you're both wonderful and reasonable people.

Thank you again and STAY STRONG!!!


Andrea Pitts



PS: Hi Edgar!!  I bet it's been CRAZY around there! You stay strong too!!


**************************************************************************
********
FACE family:


Here's what the VP doesn't understand or even realizes... that in the world he is supporting, under the current Title IX directive/guidelines, his actions depicted in EACH OF THESE PHOTOS, would be actionable as sexual harassment and/or misconduct. If any of these girls/women had been drinking (even one drink!) earlier that day, he could easily be found responsible.  In both cases, his life is changed for the worse, forever!


For those that follow the VP, this seems like an easy Twitter campaign to launch. It doesn't have to be nasty - let's not meet his nasty with our nasty - I could see something like this twitter with any of these photo's posted....


"VP, need you to know any of these are sexual harassment or misconduct under 2011 TIX. Add alcohol?  You're kicked out. I kid you not. #doyourhomework"


Thoughts?

Andrea


<joe b 4.JPG>

<joe b 3.JPG>

<joe b 2.JPG>

<joe b 1.JPG>

**Louis and Lynn Chandler**

| | |
|---|---|
| **From:** |  |
| **Sent:** | Friday, September 08, 2017 6:04 PM |
| **To:** | DeVos, Betsy; Jackson, Candice; info@saveservice.org |
| **Subject:** | "sexual misconduct" on our campuses |

Secretary DeVos,

I wish to take this opportunity to congratulate you on your bold initiative to roll back some of the more egregious regulations regarding so called sexual "misconduct" on our campuses. I have had experience with the intimidation of male students at our colleges and feel strongly it is time that a more balanced perspective be adopted.

I applaud your insight in righting this wrong of the first issues in the effort to rescue higher education from the grip of political activists and their agenda of extreme political correctness.

Best wishes,

**PII**

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Friday, September 08, 2017 6:15 PM |
| **To:** | Jackson, Candice |
| **Attachments:** | DCL 9-8-17.docx |

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, September 08, 2017 6:25 PM |
| **To:** | Karvonides, Mia |
| **Subject:** | The Bad Science Behind Campus Response to Sexual Assault - The Atlantic |

Yoffe - part 2 of 3. Not sure when Part 3 comes out. I've worked with Elizabeth Loftus as an expert witness in civil litigation. This whole series is surprising to see in The Atlantic.

https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Friday, September 08, 2017 6:45 PM |
| **To:** | Jackson, Candice |
| **Attachments:** | Q-A 9-8-17.docx |

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, September 08, 2017 6:54 PM |
| **To:** | Jeff Nolan |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Re: Promoting Fairness in Trauma-Informed Investigation Training |

Thank you Jeff! Indeed, the topic of training is one we want to discuss further with you as we proceed into proposed regulations.

I'm curious how you react to this Atlantic piece that came out today:
https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/

Thanks,
Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 8, 2017, at 6:50 PM, Jeff Nolan <jnolan@DINSE.COM> wrote:

> Dear Acting Assistant Secretary Jackson:
>
> I'm en route home after presenting three days of "trauma-informed and fair" sexual assault investigation training for the Virginia Department of Criminal Justice Services, during which we of course shared the livestream of yesterday's speech with the participants. Obviously, you've got a lot of work ahead; if you think I could be helpful to the upcoming notice and comment process given the thoughts I've shared about trauma-informed and fair training, and the perspective I have gained from working with many small colleges (in addition to large universities) over the years, I hope you will let me know. Thanks.
>
> Best,
>
> Jeff
>
> ---
> **From:** Sherman, Brandon [Brandon.Sherman@ed.gov]
> **Sent:** Tuesday, August 15, 2017 10:08 AM
> **To:** Jeff Nolan; Jackson, Candice
> **Subject:** RE: Promoting Fairness in Trauma-Informed Investigation Training
>
> Thanks, Jeff. I look forward to reading.
>
> ---
> **From:** Jeff Nolan [mailto:jnolan@DINSE.COM]
> **Sent:** Monday, August 14, 2017 7:02 PM
> **To:** Jackson, Candice
> **Cc:** Sherman, Brandon

AR_00000996

**Subject:** RE: Promoting Fairness in Trauma-Informed Investigation Training

You are welcome.  I hope you have a nice evening.

---

**From:** Jackson, Candice [mailto:Candice.Jackson@ed.gov]
**Sent:** Monday, August 14, 2017 7:01 PM
**To:** Jeff Nolan
**Cc:** Sherman, Brandon
**Subject:** Re: Promoting Fairness in Trauma-Informed Investigation Training

Thank you for this! I am eager to review it.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Aug 14, 2017, at 7:00 PM, Jeff Nolan <jnolan@DINSE.COM> wrote:

> Hello again, Acting Assistant Secretary Jackson:
>
> I expect you probably receive hundreds of emails every day, so I just wanted to re-send this to be sure that you received it, and to offer again that if there is anything I could do to be helpful in terms of meeting or speaking with your folks about the approach described in the white paper, I would be happy to do that.  Please just let me know.  Thank you.
>
> Best,
>
> Jeff
>
> ---
> **From:** Jeff Nolan
> **Sent:** Thursday, August 03, 2017 4:01 PM
> **To:** 'Candice.Jackson@ed.gov'
> **Cc:** Brandon.Sherman@ed.gov
> **Subject:** Promoting Fairness in Trauma-Informed Investigation Training
>
> Dear Acting Assistant Secretary Jackson:
>
> Please find attached a white paper on the topic that we discussed during our meeting a couple of weeks ago.  I hope it is helpful and responsive to your request for more information about the topic.  I can easily go into much more detail and provide many more examples of how a trauma-informed approach can be employed effectively and fairly in the college and university disciplinary context, and hope you will let me know if a more extended treatment of the topic in writing would be helpful.  Alternatively or additionally, if another meeting with you and/or others to follow up might be helpful, I would be very happy to be involved in that as well.  I look forward to any comments and feedback you might have, and to any opportunity to provide further information.  Thank you for giving me the opportunity to submit the white paper.
>
> Best,

Jeff

<image001.j
pg>                **Jeffrey J. Nolan, Esq.**
                   *Director*

                   Dinse, Knapp & McAndrew, P.C.
                   209 Battery Street
                   P.O. Box 988
                   Burlington, VT 05402
                   W: 802-864-5751
                   jnolan@dinse.com | Bio
                   <image002.png>

**Disclaimer**

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client
privileged and confidential information intended only for the individual or entity named
above. Any dissemination, use, distribution, copying or disclosure of this communication
by any other person or entity is strictly prohibited. Should you receive this transmission
in error, please notify the sender by telephone (802-864-5751) and return the original
transmission to problem@dinse.com.

This email has been scanned for viruses and malware, and may have been automatically
archived by **Mimecast Ltd**.

<Promoting Fairness in Trauma-Informed Investigation Training
(B1728952xA047C).pdf>

**Disclaimer**

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and
confidential information intended only for the individual or entity named above. Any dissemination,
use, distribution, copying or disclosure of this communication by any other person or entity is strictly
prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-
864-5751) and return the original transmission to problem@dinse.com.

This email has been scanned for viruses and malware, and may have been automatically archived by
**Mimecast Ltd**.

**Disclaimer**

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and
confidential information intended only for the individual or entity named above. Any dissemination,
use, distribution, copying or disclosure of this communication by any other person or entity is strictly
prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-
864-5751) and return the original transmission to problem@dinse.com.

This email has been scanned for viruses and malware, and may have been automatically archived by
**Mimecast Ltd**.

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Sunday, September 10, 2017 9:26 AM |
| **To:** | Jeff Nolan |
| **Cc:** | Sherman, Brandon |
| **Subject:** | Re: Promoting Fairness in Trauma-Informed Investigation Training |

Jeff,
This is really helpful. I'll look into the possibility of one of us attending the Virginia presentation. Three days would be hard to commit to -- is there one day in particular that would make the most sense for Brandon or me to sit in?

Thanks,
Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 9, 2017, at 2:35 PM, Jeff Nolan <jnolan@DINSE.COM> wrote:

> Hello Acting Assistant Secretary Jackson:
>
> That article is really interesting.  I've spent many hours now co-presenting training programs where law enforcement-focused videos featuring Dr. Campbell were played (I didn't choose to include them, but I don't have control over those aspects of the curricula), and I have developed the approach of piping up to emphasize that those videos need to be placed in context, and that while we can learn from them as higher education investigators and adjudicators, the language of the videos (e.g., "victim/survivor") should not be used by us, and we cannot rely on them to the extent that they reflect a perspective that is anything but neutral.  I made the point about distinguishing between the law enforcement and higher education contexts in the white paper I forwarded to you, and had the Campbell videos in mind when making that point.
>
> As the Atlantic article notes, Dr. Campbell's perspective has become an expected part of trauma-informed training programs, and I have included the basics in training programs, but I have emphasized that information about the neurobiology of trauma may explain a complainant's behavior and testimony in a given case, but also that it may not explain the behavior, and that we must always interview for clarification (i.e., essentially cross-examine complainants and respondents, in a professional, non-judgmental way) when their behavior and testimony is not corroborated by other information or is contrary to their view on whether the policy was violated or not, and base our decisions only on the facts of the particular case, not assumptions about trauma or its effects.  This approach is reflected in the attached PowerPoint, which I presented in July for associates at my office.  You'll see that some slides are a bit dated in discussing the 2011 DCL, but the

AR_00000999

pertinent points for this discussion start at slides 41-53 (discussion of respondent claims) and continue on 55 (making sure that general population statistics (which I think should be referenced if we are to meet the Clery Act's mandate that officials be trained annually on issues related to IPV, sexual assault and stalking) are never mis-used to support a finding of responsibility in a particular case.  I then include what has become the standard information about the neurobiology of trauma.  Just so you know, the snippet of a Rebecca Campbell video I showed only addresses hormones, and does not include the inflammatory assertion (noted in the Atlantic article) that a "victim's memories are accurate, even if fragmented".  I'm glad Dr. Campbell retracted that as reflected in the article, but videos where she asserts that are still widely used in training.  Knowing that that assertion has been distributed so widely, I specifically made the point in the Virginia DCJS program in Lynchburg yesterday that as higher education investigators and adjudicators, we cannot accept that assertion by Dr. Campbell, and instead must test all statements by all witnesses against corroborating evidence, and not assume that anyone is or is not necessarily remembering facts accurately.  The Atlantic article is inspiring me to delve further into current thinking in the "neurobiology of trauma" field, and I may make curricular changes in programs where I have the leeway to do so.

Even if time and further inquiry reveal that Dr. Campbell's views are subject at least to debate, that would not undermine my approach because, as you'll see in slides 65-79 of the attached, I phrase the information as this is what, again, "may" or "can" happen as a result of trauma.  I do not assert that certain things always happen because a psychologist says so.  The crux of my approach is at slides 80-82, which I hope are self-explanatory.  I'm using a similar approach in the Virginia DCJS program, and by the time I got to those slides in my presentation yesterday in Lynchburg, I had probably expressed those sentiments 25 times at various relevant points over the previous two and a half days.  I truly believe that trauma-informed training can be fully fair, but the message has to be nuanced, and it can go off track if not approached carefully.  As you may have gathered, I can go on about this topic all day, so I'll stop there for now and hope we can follow up as would be helpful for you.

If any OCR folks are interested, we're presenting the Virginia DCJS program at Virginia Tech September 26-28 and at Thomas Nelson Community College in Hampton, Virginia October 23-25.  I'm sure DCJS would be happy to have anyone from OCR at either program.

In terms of further conversations, please just let me know whatever would work for you.  I'm happy to meet in D.C., have a phone conference, or both.  Thanks very much.

Best,

Jeff
_____
From: Jackson, Candice [Candice.Jackson@ed.gov]
Sent: Friday, September 08, 2017 6:53 PM
To: Jeff Nolan
Cc: Sherman, Brandon
Subject: Re: Promoting Fairness in Trauma-Informed Investigation Training

Thank you Jeff! Indeed, the topic of training is one we want to discuss further with you as we proceed into proposed regulations.

I'm curious how you react to this Atlantic piece that came out today:
https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/

Thanks,
Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
Sent from my iPhone

On Sep 8, 2017, at 6:50 PM, Jeff Nolan <jnolan@DINSE.COM<mailto:jnolan@DINSE.COM>> wrote:

Dear Acting Assistant Secretary Jackson:

I'm en route home after presenting three days of "trauma-informed and fair" sexual assault investigation training for the Virginia Department of Criminal Justice Services, during which we of course shared the livestream of yesterday's speech with the participants.  Obviously, you've got a lot of work ahead; if you think I could be helpful to the upcoming notice and comment process given the thoughts I've shared about trauma-informed and fair training, and the perspective I have gained from working with many small colleges (in addition to large universities) over the years, I hope you will let me know.  Thanks.

Best,

Jeff
_____
From: Sherman, Brandon [Brandon.Sherman@ed.gov<mailto:Brandon.Sherman@ed.gov>]
Sent: Tuesday, August 15, 2017 10:08 AM
To: Jeff Nolan; Jackson, Candice
Subject: RE: Promoting Fairness in Trauma-Informed Investigation Training

Thanks, Jeff. I look forward to reading.

From: Jeff Nolan [mailto:jnolan@DINSE.COM]
Sent: Monday, August 14, 2017 7:02 PM
To: Jackson, Candice
Cc: Sherman, Brandon
Subject: RE: Promoting Fairness in Trauma-Informed Investigation Training

You are welcome.  I hope you have a nice evening.

From: Jackson, Candice [mailto:Candice.Jackson@ed.gov]
Sent: Monday, August 14, 2017 7:01 PM
To: Jeff Nolan
Cc: Sherman, Brandon
Subject: Re: Promoting Fairness in Trauma-Informed Investigation Training

Thank you for this! I am eager to review it.
Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
Sent from my iPhone

On Aug 14, 2017, at 7:00 PM, Jeff Nolan <jnolan@DINSE.COM<mailto:jnolan@DINSE.COM>> wrote:
Hello again, Acting Assistant Secretary Jackson:

I expect you probably receive hundreds of emails every day, so I just wanted to re-send this to be sure that you received it, and to offer again that if there is anything I could do to be helpful in terms of meeting or speaking with your folks about the approach described in the white paper, I would be happy to do that.  Please just let me know.  Thank you.

Best,

Jeff

From: Jeff Nolan
Sent: Thursday, August 03, 2017 4:01 PM
To: 'Candice.Jackson@ed.gov<mailto:Candice.Jackson@ed.gov>'
Cc: Brandon.Sherman@ed.gov<mailto:Brandon.Sherman@ed.gov>
Subject: Promoting Fairness in Trauma-Informed Investigation Training

Dear Acting Assistant Secretary Jackson:

Please find attached a white paper on the topic that we discussed during our meeting a couple of weeks ago.  I hope it is helpful and responsive to your request for more information about the topic.  I can easily go into much more detail and provide many more examples of how a trauma-informed approach can be employed effectively and fairly in the college and university disciplinary context, and hope you will let me know if a more extended treatment of the topic in writing would be helpful.  Alternatively or additionally, if another meeting with you and/or others to follow up might be helpful, I would be very happy to be involved in that as well.  I look forward to any comments and feedback you might have, and to any opportunity to provide further information.  Thank you for giving me the opportunity to submit the white paper.

Best,

Jeff

<image001.jpg><http://www.dinse.com/>

Jeffrey J. Nolan, Esq.
Director

Dinse, Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402
W: 802-864-5751
jnolan@dinse.com<mailto:jnolan@dinse.com> |
Bio<http://www.dinse.com/attorneys/jeffrey-j-nolan.html>

<image002.png><http://www.linkedin.com/pub/jeffrey-nolan/14/24a/a8b>

Disclaimer

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and confidential information intended only for the individual or entity named above. Any dissemination, use, distribution, copying or disclosure of this communication by any other person or entity is strictly prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-864-5751) and return the original transmission to problem@dinse.com<mailto:problem@dinse.com>.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd.
<Promoting Fairness in Trauma-Informed Investigation Training (B1728952xA047C).pdf>

Disclaimer

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and confidential information intended only for the individual or entity named above. Any dissemination, use, distribution, copying or disclosure of this communication by any other person or entity is strictly prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-864-5751) and return the original transmission to problem@dinse.com<mailto:problem@dinse.com>.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd.

Disclaimer

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and confidential information intended only for the individual or entity named above. Any dissemination, use, distribution, copying or disclosure of this communication by any other person or entity is strictly prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-864-5751) and return the original transmission to problem@dinse.com<mailto:problem@dinse.com>.

AR_00001003

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd.

Disclaimer

CONFIDENTIALITY NOTICE: This email transmission may contain attorney/client privileged and confidential information intended only for the individual or entity named above. Any dissemination, use, distribution, copying or disclosure of this communication by any other person or entity is strictly prohibited. Should you receive this transmission in error, please notify the sender by telephone (802-864-5751) and return the original transmission to problem@dinse.com.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd.

<Dinse Investigation Training July 2017.pptx>

**Karvonides, Mia**

---

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Sunday, September 10, 2017 1:41 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Q&A draft deliberative/privileged |
| **Attachments:** | Q-A 9-7-17 plg.docx |

Hi Candice – Sorry for not sending this earlier but perhaps we can walk through it during our call at 2 pm.  Do you want to call my cell?  Thanks, Mia

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, September 11, 2017 7:34 AM |
| **To:** | Karvonides, Mia |
| **Subject:** | Re: Q&A draft deliberative/privileged follow up |

**DPP** Thanks Mia!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 11, 2017, at 6:52 AM, Karvonides, Mia <Mia.Karvonides@ed.gov> wrote:

Good morning



Good luck with your meeting this morning - heading to the pool a bit late.

Sent from my iPhone

On Sep 10, 2017, at 6:02 PM, Jackson, Candice <Candice.Jackson@ed.gov> wrote:

Thanks Mia - for everything!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 10, 2017, at 5:58 PM, Karvonides, Mia <Mia.Karvonides@ed.gov> wrote:

Here you go – I think I caught everything we discussed.  See you tomorrow - Mia

**From:** Jackson, Candice

**Sent:** Sunday, September 10, 2017 1:44 PM
**To:** Karvonides, Mia
**Subject:** Re: Q&A draft deliberative/privileged

No worries! Sure, I'll call you at 2pm.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 10, 2017, at 1:41 PM, Karvonides, Mia
<Mia.Karvonides@ed.gov> wrote:

> Hi Candice – Sorry for not sending this earlier but
> perhaps we can walk through it during our call at 2 pm.
> Do you want to call my cell?  Thanks, Mia
>
> <Q-A 9-7-17 plg.docx>

<Q-A 9-10-17 554pm draft deliberative privileged.docx>

**Candice Jackson**

| | |
|---|---|
| **From:** | Candice Jackson |
| **Sent:** | Monday, September 11, 2017 9:06 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: commentary |

Candice Jackson
(818) 481-4565
candice@cejacksonlaw.com
**\*\* PLEASE NOTE \*\*** As of April 7, 2017, I am relocating to Washington, DC and no longer practicing law. For all legal matters please contact Law Office of Patricia J. Campbell, (360) 989-8800, Patricia@PCampbellLaw.com

Begin forwarded message:

> **From:** KC Johnson < PII @gmail.com>
> **Date:** September 9, 2017 at 6:43:01 PM EDT
> **To:** Candice Jackson <candice@cejacksonlaw.com>
> **Cc:** Stuart Taylor < PII @gmail.com>
> **Subject: Re: commentary**
>
> Candice,
>
> Definitely, if I'm not teaching, or if I am, could in theory phone in. Will also be in DC 9-29 and 10-2.
>
> John Podhoretz had suggested my piece out of a recognition--which became clear to me as I was writing it--that there really wasn't a broad analysis searching for common trends from the opinions, and there have been so many of them, it can be easy to get lost in the weeds. I think it was effective in that respect.
>
> A list (some of whom you already know):
>
> --Patricia Hammil (Conrad & O'Brien, Philadelphia)--she has argued what became the two strongest district court opinions (Brandeis and Notre Dame), and has handled quite a few others. Very successful in this area, really sharp.
>
> --Max Stern (Todd & Weld, Boston)--he argued two of the highest-profile cases (Amherst and Jack Montague, the Yale basketball captain, still ongoing). The Amherst case was brilliantly litigated--he got assigned an Obama-judge, ex-DA, who had decided for UMass-- a public university--in a comparable case. Just overwhelmed the judge with evidence.
>
> --Josh Engel (Engel & Martin, Cincinnati)--in tough circuit b/c of precedent, but a recent good string--victories w/OSU, Cincinnati, Miami (latter 2 profiled in my piece); UC case

AR_00001008

pending before 6th Circuit, and could produce an opinion asserting some right to x-exam--which could, of course, also undermine a portion of the DCL.

--Kimberly Lau (Warshaw Burstein, NYC)--she has two very cleverly-argued wins making Title IX claims (Cornell, UCSB); the UCSB case is now before the 9th Circuit. She's also done a lot of cases that haven't reached the litigation stage.

--Rob Cary (Williams & Connolly)--Stuart knows him much better than I do; he's been involved in a couple of campus cases (lacrosse most prominently); also was on ABA committee that drafted its campus sexual assault recommendations.

--Mark Hathaway has his own firm in LA and has handled most of the state court cases in CA--Occidental, USC (including the kicker's case), UCSD, Riverside. Somewhat mixed record, but that's b/c he's dealing with a state judiciary that isn't exactly great on these issues.

--Andrew Miltenberg has his own firm in NYC--has handled lots of cases, including some that are a little on the weak side factually. But also has some big wins--Columbia case, Grant Neal at Colorado-Pueblo, Penn State.

--Eric Rosenberg--based in Ohio, litigates almost entirely in state courts.

KC

On Sat, Sep 9, 2017 at 5:38 PM, Candice Jackson <candice@cejacksonlaw.com> wrote:
Great! We'll find a time soon then. Justin is on my list too.

Candice Jackson
(818) 481-4565
candice@cejacksonlaw.com
** PLEASE NOTE ** As of April 7, 2017, I am relocating to Washington, DC and no longer practicing law. For all legal matters please contact Law Office of Patricia J. Campbell, (360) 989-8800, Patricia@PCampbellLaw.com

On Sep 9, 2017, at 5:16 PM, Stuart Taylor < PII @gmail.com> wrote:

Dear Candice,

Thanks for this nice invitation.

I'd be glad to meet. I am free most of the next two weeks except Sept 13 and 14.

I think you know Justice Dillon. KC knows the other leading attorneys in this line of work better than I do.

Best, Stuart

On Sat, Sep 9, 2017 at 1:20 PM, Candice Jackson
<candice@cejacksonlaw.com> wrote:

> This was extraordinarily well done. I'd like to see if Stuart, KC and a few
> attorneys who have represented accused students in court could meet
> with my staff and me soon.
>
> Candice Jackson
> (818) 481-4565
> candice@cejacksonlaw.com
> ** PLEASE NOTE ** As of April 7, 2017, I am relocating to Washington,
> DC and no longer practicing law. For all legal matters please contact Law
> Office of Patricia J. Campbell, (360) 989-8800,
> Patricia@PCampbellLaw.com
>
> On Sep 8, 2017, at 5:58 PM, Stuart Taylor <@gmail.com>
> wrote:
>
>> Another great piece by KC, summarizing the court decisions.
>> *Commentary* posted it early to play off the DeVos publicity; it's also on the
>> cover in the Oct. print issue
>>
>> Stuart
>>
>> https://www.commentarymagazine    .com/articles/campus    -sex-crime-
>> tribunals  -losing/

**Washington, Wendell**

---

| | |
|---|---|
| **From:** | Washington, Wendell |
| **Sent:** | Monday, September 11, 2017 8:36 AM |
| **To:** | Washington, Wendell |
| **Subject:** | Title IX |

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 2:56 PM
**To:** [ PII ]@gmail.com'
**Subject:** FW: Title IX

Dear PII
Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

---

**From:** Press
**Sent:** Friday, September 08, 2017 2:26 PM
**To:** DeVos, Betsy
**Subject:** FW: Title IX

---

**From:** [ PII @gmail.com]
**Sent:** Friday, September 08, 2017 2:24 PM
**To:** 'ocr@ed.gov.'
**Cc:** Press
**Subject:** Title IX

Dear Secretary DeVos,
Thank you for standing up for the rule of law. You rightly said, "One person denied due process is one too many."

I think OCR should immediately send a new a letter to all universities rescinding the infamous "Dear Colleague" letter that has trampled due process for hundreds.

Cordially,



**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, September 11, 2017 9:17 AM |
| **To:** | Henderson, Chelsea |
| **Cc:** | Karvonides, Mia |
| **Subject:** | Listening Session re Due Process |

Chelsea DPP

# DPP

DPP Thanks!

https://www.commentarymagazine.com/articles/campus-sex-crime-tribunals-losing/

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

--Patricia Hammil (Conrad & O'Brien, Philadelphia)--she has argued what became the two strongest district court opinions (Brandeis and Notre Dame), and has handled quite a few others. Very successful in this area, really sharp.

--Max Stern (Todd & Weld, Boston)--he argued two of the highest-profile cases (Amherst and Jack Montague, the Yale basketball captain, still ongoing). The Amherst case was brilliantly litigated--he got assigned an Obama-judge, ex-DA, who had decided for UMass-- a public university--in a comparable case. Just overwhelmed the judge with evidence.

--Josh Engel (Engel & Martin, Cincinnati)--in tough circuit b/c of precedent, but a recent good string--victories w/OSU, Cincinnati, Miami (latter 2 profiled in my piece); UC case pending before 6th Circuit, and could produce an opinion asserting some right to x-exam-- which could, of course, also undermine a portion of the DCL.

--Kimberly Lau (Warshaw Burstein, NYC)--she has two very cleverly-argued wins making Title IX claims (Cornell, UCSB); the UCSB case is now before the 9th Circuit. She's also done a lot of cases that haven't reached the litigation stage.

--Rob Cary (Williams & Connolly)--Stuart knows him much better than I do; he's been involved in a couple of campus cases (lacrosse most prominently); also was on ABA committee that drafted its campus sexual assault recommendations.

--Mark Hathaway has his own firm in LA and has handled most of the state court cases in CA--Occidental, USC (including the kicker's case), UCSD, Riverside. Somewhat mixed

record, but that's b/c he's dealing with a state judiciary that isn't exactly great on these issues.

--Andrew Miltenberg has his own firm in NYC--has handled lots of cases, including some that are a little on the weak side factually. But also has some big wins--Columbia case, Grant Neal at Colorado-Pueblo, Penn State.

--Eric Rosenberg--based in Ohio, litigates almost entirely in state courts.

AR_00001013

**Catoe, Tracy**

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | Monday, September 11, 2017 7:09 AM |
| **To:** | Washington, Wendell |
| **Subject:** | FW: many thanks for your recent decision |

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 1:40 PM
**To:** PII
**Subject:** RE: many thanks for your recent decision

Dear PII

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

**From:** PII [@email.arizona.edu]
**Sent:** Friday, September 08, 2017 11:56 AM
**To:** DeVos, Betsy
**Subject:** many thanks for your recent decision

Dear Secretary DeVos:

"Education Secretary Betsy DeVos intends to revoke former President Obama's
2011 guidelines for schools investigating campus sexual misconduct, she told
CBS News' Jan Crawford in an exclusive interview Thursday."

Many thanks for the above courageous decision. It is indeed the correct and moral one.
Sincerely,



**Henderson, Chelsea**

| | |
|---|---|
| **From:** | Henderson, Chelsea |
| **Sent:** | Monday, September 11, 2017 9:32 AM |
| **To:** | Shaheen, Patrick; Menashi, Steven; Rosenfelt, Phil; Ellis, Kathryn; Santos, Vanessa; Gettler, Rachel; Wheeler, Joseph; Patel, Shiwali; Yao, Alice; Sherman, Brandon; Karvonides, Mia; Faiella, Matt; Reyes, Alejandro; McFadden, Elizabeth; Malawer, Hilary; Disario, Rachel; Brinton, Jedediah; Riemer, Jeffrey (Justin); Tucker, Michelle |
| **Cc:** | Jackson, Candice |
| **Subject:** | 9/20 Meeting Material |
| **Attachments:** | Villasenor.T9.pdf |

Hi all—attached is material in preparation for our Sept 20 meeting with Professor Villasenor.

Thanks!
Chelsea

*Law, Probability and Risk* (2016) **15**, 223–237
Advance Access publication on October 14, 2016

doi:10.1093/lpr/mgw006

# A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard

JOHN VILLASENOR[†]

*Professor of Electrical Engineering, Public Policy and Management, UCLA; Visiting Professor of Law, UCLA Luskin School of Public Affairs, 337 Charles Young Dr. East, Los Angeles, CA 90095, USA; National Fellow, Hoover Institution, Stanford University; Nonresident Senior Fellow, Brookings Institution*

[Received on 15 June 2016; revised on 3 September 2016; accepted on 9 September 2016]

Conviction in criminal trials in the USA, the UK and many other common law countries requires establishing a defendant's guilt beyond a reasonable doubt. By contrast, in Title IX proceedings at American colleges and universities, allegations of wrongdoing are adjudicated according to a much lower 'preponderance of the evidence' standard. Victims' rights advocates correctly argue that a lower burden of proof makes it easier to ensure that the guilty are punished. But there is also a mathematically inevitable corollary: a lower burden of proof increases the probability of concluding that the innocent are guilty. This article provides a framework for using information regarding false conviction probabilities in criminal trials to model the probability of false guilty verdicts in Title IX proceedings in American colleges and universities. The quantitative results presented herein show that an innocent defendant faces a dramatically increased risk of conviction when tried under the preponderance of the evidence standard as opposed to under the beyond a reasonable doubt standard.

*Keywords:* burden of proof; preponderance of the evidence; beyond a reasonable doubt; Title IX.

## 1. Introduction

In relation to the U.S. federal statute known as Title IX, there has been dramatic recent growth in what amounts to a parallel justice system at American colleges and universities. While the concept of campus disciplinary proceedings in relation to issues such as academic dishonesty dates back centuries, since 2011 American institutions of higher education have been under a federal mandate relating to Title IX to decide guilt or innocence in relation to accusations of sexual violence and sexual harassment. And, under the same federal mandate, these accusations must be adjudicated not under the 'beyond a reasonable doubt' burden of proof used in criminal courts, but instead under the much lower 'preponderance of the evidence' standard.

There is a robust policy debate regarding both the merits and the perils of using on-campus tribunals[1] to assess guilt or innocence for actions that constitute serious crimes. This article aims to

---

[†]Corresponding author. Email: villa@ee.ucla.edu

[1] These on-campus tribunals are convened in addition to, not in place of, any proceedings in the traditional criminal justice system.

© The Authors [2016]. Published by Oxford University Press.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted reuse, distribution, and reproduction in any medium, provided the original work is properly cited.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001016

contribute to that debate by examining an issue that is of critical importance in any justice system: the probability of false convictions.

Given the recency and procedural opacity of campus Title IX tribunals, it will be many years, if ever, before a sufficient body of data exists to directly examine the rates of false guilty findings in this context. To help address this gap, this article proposes that information regarding the much better studied issue of false convictions in the traditional criminal justice system can be used, with the aid of an appropriately designed and parameterized probabilistic model, and with suitable adjustments to account for the different burden of proof levels, to make inferences regarding the probabilities of false determinations of guilt in the context of Title IX proceedings.

The approach is based on the premise that in any justice system, when considered in the aggregate over a large number of proceedings, the assessments regarding the probability of guilt reached by triers of fact can be mathematically modelled using random variables.[2] More specifically, one random variable can be used to model the decisions of a tribunal with respect to innocent defendants and a different random variable can be used to model the decisions of the tribunal with respect to guilty defendants. The probability distributions associated with these random variables overlap, reflecting the fact that no justice system is perfect: sometimes the guilty are acquitted and sometimes the innocent are convicted. More formally, expressed in the language of hypothesis testing, under a 'type I' error, an innocent defendant is wrongly convicted[3] and under a 'type II' error, a guilty defendant is wrongly declared innocent.[4]

There is a trade-off between these two types of errors. If the burden of proof necessary to find a defendant guilty is very low, there will be an unacceptably high rate of innocent defendants being found guilty (i.e. too many type I errors). If the burden of proof is made higher, type I errors become less frequent but type II errors become more common. At the hypothetical other end of the spectrum—i.e. a system in which guilt can be declared only when there is 100% confidence that the defendant is truly guilty—then there will be many type II errors; i.e. many guilty people will be wrongly declared innocent.

The 'beyond a reasonable doubt' standard used in criminal trials represents a widely accepted solution that balances this trade-off while also reflecting the belief, long present in English and American law, that to wrongly convict an innocent defendant presents a greater injustice than wrongly acquitting a guilty one.[5] The issue of what specific level of confidence to associate with beyond a reasonable doubt has been the subject of long-standing interest in the legal literature. Enquiries on this issue have aimed to answer the following question: when a tribunal is asked to render a decision, what is the confidence threshold regarding the likelihood of guilt that must be exceeded to satisfy 'beyond a reasonable doubt'?

Studies of the assessed likelihood of guilt associated with beyond a reasonable doubt have often yielded probabilities of approximately 90%. For example, in a 1970s law review article, Simon and Mahan reported results from a survey of judges that yielded a median response of 88% as the requisite

---

[2] The use of probabilistic concepts in association with decisions in a legal context is not new, and there is a wide range of views on when and how those concepts should be applied. See e.g. ALLEN, R. J. & STEIN, A. (2013) Evidence, probability, and the burden of proof. *Arizona Law Review*, **55**, 557 and the references cited therein; and SCHWARTZ, D. L. & SEAMAN, C. B. (2013) Standards of proof in civil litigation: an experiment from patent law. *Harvard Journal of Law and Technology*, **26**, 429 and the references cited therein.

[3] In this context, a type I error occurs when the null hypothesis (i.e. that the defendant is innocent) is incorrectly rejected.

[4] In this context, a type II error occurs when the null hypothesis (i.e. that the defendant is innocent) should be rejected, but is not.

[5] Despite Blackstone's oft-quoted statement '[B]etter that ten guilty persons escape, than that one innocent suffer' (BLACKSTONE, W. (1769) *Commentaries on the laws of England, Book the fourth*, Clarendon Press, Oxford, p. 352), views on exactly how 'much' worse it is to convict an innocent person than to acquit a guilty person have ranged widely. See e.g. VOLOKH. A. (1997) *n Guilty Men. University of Pennsylvania Law Review*, **146**, 173.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001017

probability threshold.[6] Simon and Mahan also surveyed prospective jurors and college students and reported median probabilities of 86% and 91% respectively.[7] In an early 1980s survey of 171 federal judges by McCauliff, the median probability level associated with beyond a reasonable doubt was 90% and the average was 90.3%.[8] Other probability thresholds that have been suggested include 95%[9] and 'well above' 80%.[10]

By contrast, the 'preponderance of the evidence'[11] standard used in Title IX proceedings on U.S. campuses is a much lower burden of proof. This is often expressed using the phrase 'more likely than not', meaning that a tribunal is instructed to return a guilty finding if its assessment of the likelihood of guilt exceeds 50%. Inevitably, there will be many defendants who would be declared innocent if the evidence is evaluated using a beyond a reasonable doubt standard but found guilty if that same evidence is evaluated using a preponderance of the evidence standard. Consider a tribunal that, after weighing the evidence, believes that there is a 70% likelihood that the defendant is guilty. Given the corresponding 30% likelihood of innocence, the tribunal could not reasonably find the defendant guilty beyond a reasonable doubt. Yet under a preponderance of the evidence standard, the tribunal would declare the defendant to be guilty.

It is a mathematical and logical inevitability that the odds that an innocent defendant will be found guilty are higher under a preponderance of the evidence standard than under a beyond a reasonable doubt standard. This article aims to move beyond this qualitative characterization and offer a framework for quantitatively evaluating the issue of false guilty verdicts under a preponderance of the evidence standard.

The remainder of this article is organized as follows. Section 2 provides background regarding Title IX and on the 2011 letter from the U.S. Department of Education that spurred the growth in on-campus Title IX tribunals and the associated preponderance of the evidence standard. Section 3 describes the probabilistic modelling framework and provides numerical results for several different probability models. Additional discussion and analysis are presented in Section 4 and conclusions are offered in Section 5.

## 2. Title IX and the preponderance of the evidence standard

Title IX, which was enacted by the U.S. Congress as part of the Education Amendments of 1972,[12] provides that 'No person in the United States shall, on the basis of sex, be excluded from participation

---

[6] SIMON, R. J. & MAHAN, L. (1971) Quantifying burdens of proof: a view from the bench, the jury, and the classroom. *Law and Society Review*, **5**, 319, 324.

[7] *Ibid.*

[8] See MCCAULIFF, C. M. A. (1982) Burdens of proof: degrees of belief, quanta of evidence, or constitutional guarantees? *Vanderbilt Law Review*, **35**, 1293, 1325. McCauliff did not report a median or an average; the respective values of 90% and 90.3% provided herein were computed using the data in the table on p. 1325 of McCauliff.

[9] See e.g. WEINSTEIN, J. B. & DEWSBURY I. (2006) Comment on the meaning of 'proof beyond a reasonable doubt'. *Law, Probability, and Risk*, **5**, 167, 169 (stating '[w]e personally favour burden of proof in the realm of 95+% probability of guilt').

[10] See FRANKLIN, J. (2006) Case comment—*United States v. Copeland*, 369 F. Supp. 2d 275 (E.D.N.Y. 2005): quantification of the 'proof beyond reasonable doubt' standard. *Law, Probability, and Risk*, **5**, 159, 165 (stating 'proof beyond reasonable doubt means "well above a probability of 0.8". Any suggestion from a jury that 0.8 or less is adequate can be ruled out, while the qualification 'well above' will avoid any suggestions that something just above 0.8 is in fact adequate, and will not obstruct any later attempts to quantify the standard more exactly.').

[11] The preponderance of the evidence standard is widely used in civil litigation. However, in this article, the focus is on the use of that standard to make determinations regarding guilt in the context of campus Title IX tribunals.

[12] Pub. L. No. 92-318, 86 Stat. 235 (1972), codified at 20 U.S.C. §§ 1681–1688. The associated implementing regulations are at 34 C.F.R. § 106.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001018

in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'[13] Title IX is extremely broad in scope, impacting all U.S. universities, colleges, and elementary and secondary schools that receive federal funds. During the first several decades after its enactment, much of the attention regarding Title IX focused on its impact on athletic programmes, in particular in relation to the relative participation rates of men and women in sports.

Recent years have seen a significant expansion of the impact of Title IX on U.S. institutions of higher education. In April 2011, the Office of Civil Rights (OCR) within the U.S. Department of Education issued a letter[14] stating that '[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.' The letter also stated that 'Title IX regulations require all recipients [of federal financial assistance] to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.'[15]

In addition, the OCR letter addressed the issue of burden of proof, stating that 'in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)'.[16] Notably, OCR explicitly rejected the 'clear and convincing' standard, a burden of proof that lies between preponderance of the evidence and beyond a reasonable doubt, writing that 'the "clear and convincing" standard . . . is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.'[17]

There has been vigorous debate regarding both the response of university administrations[18] to OCR's requirements as well as whether OCR overstepped its authority[19] by issuing what amounts to new regulation without the requisite notice and comment opportunities required under the

[13] 20 U.S.C. §1681(a).

[14] U.S. Dept. of Education, OCR (4 April 2011) Dear Colleague letter, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [accessed 14 June 2016].

[15] 34 C.F.R. § 106.8(b) provides that 'A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.'

[16] Dear Colleague letter, *supra* n. 14 at 11, parentheses in original.

[17] *Ibid.*

[18] See e.g. the 2014 letter from 28 Harvard Law School faculty members asserting that 'Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.' BARTOLET, E. *et al.* (15 October 2014) Rethink Harvard's Sexual Harassment Policy. *The Boston Globe*, https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html. See also COHN, J. (1 October 2012) Campus Is a Poor Court for Students Facing Sexual-Misconduct Charges. *Chronicle of Higher Education.* http://chronicle.com/article/Campus-Is-a-Poor-Court-for/134770/ (stating that under the preponderance of the evidence standard required by OCR, 'without any of the safeguards designed to increase the reliability and fairness of civil trials, the risk of erroneous findings of guilt increases substantially, especially when a fact finder is asked to decide only if it is merely 50.01 percent more likely that a sexual assault occurred'). See also the counterpoint raised in HOGSHEAD-MAKAR, N. & and SOKOLOW, B. A. (15 October 2012) Setting a Realistic Standard of Proof in Sexual-Misconduct Cases, *Chronicle of Higher Education*, http://chronicle.com/article/Setting-a-Realistic-Standard/135084/ (arguing that the preponderance of the evidence standard is 'is the only standard that is equally fair to men and women').

[19] See e.g. the 7 January 2016 letter from Senator James Lankford (Chair of the Subcommittee on Regulatory Affairs and Federal Management, Committee on Homeland Security and Government Affairs) to Acting Secretary John B. King, Jr. of the U.S. Department of Education, expressing 'continued alarm regarding' OCR's Dear Colleague letters of 23 October 2010 (on harassment and bullying) and 4 April 2011 (on sexual violence). https://www.scribd.com/doc/294821262/Sen-Lankford-letter-to-Education-Department [accessed 14 June 2016].

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001019

rule-making provisions of the Administrative Procedure Act.[20] However, colleges and universities are understandably unwilling to risk jeopardizing their federal funding, so have treated the OCR letter as if it was binding regulation. As a result, the preponderance of the evidence standard has been very widely adopted on U.S. college and university campuses.

This standard has an enormous potential negative impact on the subset of defendants in Title IX proceedings who are innocent. Wrongly accused defendants face the sobering prospect of having their cases adjudicated under a system in which the threshold for declaring them guilty is only a hair over 50%. This means that even if the tribunal reviewing the evidence concludes there is a 49% chance that a defendant did not engage in the accused conduct, he or she will be pronounced guilty. In addition to receiving punishment imposed by their educational institution, defendants wrongly found guilty will often be subject to widespread opprobrium on social media, including by people unaware of or uninterested in the fact that a low burden of proof that was used in reaching the guilty verdict. Given the high social costs of improper findings of guilt in this context, it is important to understand the statistics that will govern how often they will occur. An additional issue is that a lower burden of proof may increase the likelihood that proceedings will be initiated in the first place. As Allen has written (in an article addressing burdens of proof generally, not in the context of Title IX proceedings), 'what the standard is affects the decisions that people make about whether to risk trial. If the standard is lowered, prosecutors will have the incentive to bring cases that they would not bring if the standard is higher.'[21]

## 3. When an innocent defendant is found guilty: modelling the probabilities

### 3.1   *Framing the probabilities*

In any proceeding designed to assess guilt or innocence, there are multiple ways to measure the probabilities associated with false findings of guilt. One possibility is to measure the probability that an innocent defendant will be found guilty. This can be expressed as the conditional probability $P(\text{conviction} \mid \text{innocent})$; i.e. the probability that a person will be convicted given that he or she is innocent. Another way to measure false convictions is to consider the fraction of all convicted persons who are innocent. This can be expressed $P(\text{innocent} \mid \text{conviction})$; i.e. the probability that a person who has been convicted is innocent. These two probabilities are related through Bayes' theorem.

For example, consider a group of 100 people accused of independent acts wrongdoing, 84 of whom are guilty and 16 of whom are innocent. Suppose a tribunal convicts[22] 76 of the 84 guilty people but acquits the remaining 8. In addition, suppose that the tribunal acquits 12 of the 16 innocent people but erroneously declares 4 of them guilty. Thus, in this example $P(\text{conviction} \mid \text{innocent}) = 0.25$, since 4 of the 16 innocent people were found guilty. In addition, $P(\text{innocent} \mid \text{conviction}) = 0.05$, since 4 of the 80 people found guilty were in fact innocent.[23]

---

[20] Pub. L. No. 79-104, 60 Stat. 237 (1946). Rule-making under the Administrative Procedure Act is codified at 5 U.S.C. § 553.

[21] ALLEN, R. J. (2014) Burdens of proof. *Law, Probability, and Risk*, **13**, 195, 212.

[22] The terms 'convict' and 'conviction' herein are used generically to describe the outcome when a tribunal concludes that a defendant is guilty. When discussing Title IX proceedings specifically, phrases such as 'find guilty' will be used as the persons conducting those proceedings are not empowered to criminally convict defendants.

[23] As noted in the text, $P(\text{conviction} \mid \text{innocent})$ and $P(\text{innocent} \mid \text{conviction})$ are related through Bayes' theorem. In this example, the probability of conviction $P(\text{conviction})$ is 0.8 (since 80 out of the 100 defendants were convicted) and the probability of being innocent is 0.16 (since 16 of the 100 defendants are innocent). Under Bayes' theorem, $P(\text{conviction} \mid \text{innocent}) = \frac{P(\text{innocent} \mid \text{conviction})P(\text{conviction})}{P(\text{innocent})} = (0.05)(0.8)/(0.16) = 0.25$.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001020

While both $P$(conviction | innocent) and $P$(innocent | conviction) are important metrics, they measure very different things. From the standpoint of someone who has been wrongly accused and is facing a trial, the fact that in the example above $P$(innocent | conviction) = 0.05—i.e. that 'only' 5% of those found guilty are in fact innocent—would furnish little comfort. Instead, the far more pertinent metric is $P$(conviction | innocent) (25% in the above example), since it is a direct measure of the odds of a miscarriage of justice with respect to a wrongly accused person.

This article focuses primarily on the probability that an accused innocent person will be found guilty, $P$(conviction | innocent), though through Bayes' theorem the results presented here could be mapped to $P$(innocent | conviction). More specifically, this article focuses on modelling the decisions of a tribunal in possession of imperfect information, and tasked with making a determination of the probability that an innocent defendant (whose innocence is unknown to the tribunal) is guilty.

## 3.2   Modelling tribunal decisions using probability density functions

With respect to any particular defendant, a tribunal is asked to make a binary decision: either the defendant can be declared guilty or the defendant can be declared innocent.[24] However, to arrive at that decision the tribunal first assesses guilt along a continuum, with that assessment subsequently mapped to one of the binary outcomes. For example, a jury in a bank robbery trial might collectively conclude that there is a 99% chance that the defendant committed the crime, and, therefore, decide that he is guilty beyond a reasonable doubt. Alternatively, if the same jury instead believes that there is only a 20% chance that the defendant committed the crime, they will return a verdict of innocent. Note that while the above examples cite specific likelihood values, the decision process used by a jury or other tribunal can be probabilistically modelled even if the persons on it never explicitly contemplate or discuss specific numerical probabilities. For instance, the members of a jury might conclude that they are 'very sure' that the defendant did indeed rob the bank, and on that basis decide to return a verdict of guilty. By contrast, if the jury concludes that the defendant 'probability didn't' rob the bank, they will know—even if they never make an explicit mathematical comparison—that this does not satisfy beyond a reasonable doubt, and will return a verdict of innocent.

Against this backdrop, a tribunal's assessments of the probability of guilt can be modelled as realizations of a random variable described by a probability density function $f_X(x)$ that must be zero in the range outside the interval $0 \leq x \leq 1$ since the range of valid probabilities is bounded (in percentage terms) between 0% and 100%. If the assessed probability exceeds the threshold associated with the applicable burden of proof, the tribunal will return a verdict of guilty; otherwise, the verdict will be innocent.

For Title IX proceedings on U.S. college and university campuses, the preponderance of the evidence standard is used. Under this standard, if the tribunal concludes that the likelihood that the defendant committed the accused act exceeds 50%, the tribunal will declare him or her to be guilty.[25] Given this threshold and a probability density function that models decisions regarding

---

[24] Of course, there is also the possibility of a hung jury, or its equivalent, in which no decision is reached. However, in this article we focus on the situation in which a finding regarding guilt or innocence is rendered. In addition, this article focuses on the assessment of guilt as a single decision—i.e. whether the defendant is, or is not, guilty. This single decision can in some instances correspond to an aggregation of multiple sub-decisions (e.g. a defendant is found guilty only if he or she is found to have committed both of acts 'A' and 'B').

[25] In general, it would theoretically be possible to argue that 'preponderance of the evidence' might be interpreted to require a threshold other than 50% (e.g. 60%). However, in the context of Title IX proceedings, the explicit instruction to assess whether 'it

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001021

innocent defendants, it is straightforward[26] to identify the probability that an innocent defendant will be declared guilty.

The same approach can also be used to find the probability that an innocent defendant will be declared guilty under a beyond a reasonable doubt standard. The difference, of course, is that the requisite confidence threshold for a tribunal to declare guilt under that standard is much higher. Consistent with the studies cited earlier, this article will use a beyond a reasonable doubt threshold of 90%,[27] though the approach presented here can easily be applied for different threshold levels. All else being equal, the probability of a guilty verdict for an innocent defendant will be much higher under the preponderance of the evidence standard than under the beyond a reasonable doubt standard.

### 3.3   *Comparing false convictions across different burden of proof levels*

This framework makes it possible to relate the probabilities of wrongful conviction under different burden of proof levels. In other words, given a particular probability that an innocent defendant will be found guilty under the beyond a reasonable doubt standard, the model here allows computation of the corresponding probability of finding an innocent defendant guilty under the preponderance of the evidence standard.

This is useful because while there is very little information regarding the statistics of false findings of guilt in campus Title IX proceedings, the issue of false convictions in criminal trials has been a topic of long-standing interest and research.[28] False convictions are in turn a subset of a broader class of problematic outcomes that can occur in adjudicative proceedings. In his 2004 book titled *Errors of Justice*, Forst explained that an 'error of justice is any departure from an optimal outcome of justice for a criminal case'.[29] This includes errors of impunity (i.e. when a criminal escapes conviction) as well as errors of due process (which include cases when an innocent person is convicted).[30]

Despite the requirement of proof 'beyond a reasonable doubt' in criminal trials, false convictions appear to occur with alarming frequency. In a widely cited 2014 paper published in the *Proceedings of the National Academy of Sciences*, Gross *et al.* reported on a study of exonerations among death-sentenced defendants in the USA over a period of three decades and found that 'if all death-sentenced

---

is more likely than not that sexual harassment or violence occurred' (see Dear Colleague letter, *supra* n. 14 at 11) constitutes a *de facto* instruction to return a guilty verdict if the defendant is deemed more than 50% likely to have committed the accused act.

[26] More specifically, computing the probability that an innocent defendant will be found guilty requires finding the area under the pdf in the range $0.5 < x \leq 1$.

[27] Under this threshold for beyond a reasonable doubt, computing the probability that an innocent defendant will be declared guilty requires finding the area under the pdf in the range $0.9 < x \leq 1$.

[28] See e.g. GARRETT, B.L. (2012) *Convicting the Innocent: Where Criminal Prosecutions Go Wrong*, Harvard University Press, Cambridge, MA.

[29] FORST, B. (2004) *Errors of Justice: Nature, Sources, and Remedies*, Cambridge University Press, New York. The quoted sentence is on p. 4. In addition, in chapter 6 (pp. 57–65) of *Errors of Justice*, Forst provides an analysis that is both relevant and complementary to the approach presented in the present article. Forst provides a series of tables and figures exploring the impact of conviction rates on groups of hypothetical defendants in which various percentages (70, 80 and 90%) of those defendants are truly guilty. Among other things, the figures and tables explore the number of 'offenders freed per innocent convicted' (figures 6.1a and 6.1b) as well as the 'number of offenders acquitted per innocent person found guilty' (table 6.5). By contrast, the present article presents a general framework based on underlying probability distributions, and then applies that framework to enable information regarding false conviction rates under one burden of proof standard (beyond a reasonable doubt) to be used to infer false conviction rates under a different burden of proof standard (preponderance of the evidence). In addition, the present article explores the impact of several specific probability density functions on the outcomes.

[30] *Ibid.* at pp. 4 and 5. In Forst, errors of due process include not only false convictions but also more broadly cases in which an innocent person 'is harassed, detained, or sanctioned' as well as 'excessive intrusions against those who violate the law'.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001022

defendants remained under sentence of death indefinitely, at least 4.1% would be exonerated. We conclude that this is a conservative estimate of the proportion of false conviction among death sentences in the United States.'[31]

The 4.1% figure is likely conservative in another sense as well, since it arises from a study focused only on death-sentenced defendants. Among those defendants who were found guilty of capital crimes but not sentenced to death, as Gross *et al.* noted, 'the rate of innocence must be higher'.[32] Among the much broader set of people who have been convicted for any crime at all, the rate could be even higher.

It is also important to note that Gross *et al.* were examining the fraction of innocent persons among those who had been convicted, and further, sentenced to death. To convert this using Bayes' theorem to the probability that an innocent person, once charged with capital murder, would be convicted and sentenced to death, would require knowledge of conviction rates (among all capital murder defendants, both guilty and innocent), and further, the fraction of those convicted who are sentenced to death. It would also require knowledge of the fraction of defendants who were innocent.

There is some published information regarding conviction rates more broadly. For example, one source from the U.S. Department of Justice gives a 70% conviction rate for murder (including but not limited to capital murder) defendants whose cases were adjudicated in a 1-year tracking period.[33] In addition, Gross *et al.* note examples of U.S. states where between 29% and 49% of those convicted of capital murder are actually sentenced to death. In combination, this suggests that at least in approximate terms, the probability that an innocent defendant, once charged with capital murder, will be found guilty and also sentenced to death is likely to be in the range of several percent or higher.[34] Of course, the overwhelming majority of crimes are not capital murder. For prosecutions of more general crimes, the probability that an innocent person will be found guilty may be higher than what application (through Bayes' theorem) of the results from Gross *et al.* might suggest because, among other reasons, non-capital crimes do not involve an additional determination regarding whether to apply the death sentence.

More broadly, it is not necessary for the purposes of the present article to identify the specific probability that an innocent but nonetheless criminally charged defendant will be found guilty under the beyond a reasonable doubt standard. Rather, the goal of the foregoing discussion is to show gen-

---

[31] GROSS, S. R., O'BRIEN, B., HUE, C. and KENNEDY, E. H. (2014) Rate of false conviction of criminal defendants who are sentenced to death. *Proceedings of the National Academy of Sciences*, 11, 7230. It is also worth noting that in a 2006 *New York Times* op-ed, an Oregon District Attorney estimated the rate of false convictions at 0.027% (MARQUIS, J. (20 January 2006) The Innocent and the Shamed. *New York Times*). This 0.027% rate was in turn cited by Justice Scalia in *Kansas* v. *Marsh*, 548 U.S. 163, 182 (2006) (Justice Scalia concurring in the judgment). However, this rate was rebutted by Gross *et al.* (at p. 7235).

[32] *Ibid.* at 7235.

[33] See U.S. Department of Justice, Bureau of Justice Statistics. *What is the probability of conviction for felony defendants?* http://www.bjs.gov/index.cfm?ty=qa&iid=403 [accessed 14 June 2016]. This is approximately consistent with other reported statistics. In *Errors of Justice* (supra n. 29) at p. 58, Forst, citing several other publications from the Bureau of Justice Statistics as well as his own prior work, writes (with respect to criminal trials generally, not necessarily murder) that 'available data from state and local prosecutors and courts suggest that the current standard of evidentiary proof results in about 75% of all persons whose cases come to trial being found guilty'.

[34] This is the case because $P$(conviction and death sentence | innocent) = $P$(innocent | conviction and death sentence) $P$(conviction and death sentence)/$P$(innocent). $P$(conviction and death sentence) can be roughly estimated at $0.7 \times 0.29 = 0.2$, corresponding to an estimated 70% capital murder conviction rate and lower (conservative) 29% rate of sentencing those convicted of capital murder to death cited above. If the fraction of innocent defendants is 20%, that would mean that if $P$(innocent | conviction and death sentence) is 0.04 in accordance with the 'conservative estimate' provided by Gross *et al.*, then $P$(conviction and death sentence | innocent) would also be 0.04, or 4%. In the unlikely event that 40% of defendants were innocent (and again assuming $P$(innocent | conviction and death sentence) is 0.04), that would reduce $P$(conviction and death sentence | innocent) to 0.02, or 2%. If 10% of defendants were innocent, $P$(conviction and death sentence | innocent) would be 0.08, or 8%.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001023

erally that numbers in the range of several percent are not only reasonable but in fact likely conservative. Thus, the following analysis will ask and answer the following two questions: first, if the probability that an innocent person, once charged, will be found guilty under the beyond a reasonable doubt standard is 4%, all else being equal, what is the probability of such a person being found guilty under the preponderance of the evidence standard? Secondly, if the probability that an innocent person, once charged, will be found guilty under the beyond a reasonable doubt standard is 1%, all else being equal, what is the probability of such a person of being found guilty under the preponderance of the evidence standard? We will consider these questions for several different probability models.

### 3.4   *Results for various probability models*

The above approach admits an arbitrary choice of probability density functions. However, the range of choices can be narrowed by assuming that the probability density function, which as noted above can be non-zero only in the range $0 \leq x \leq 1$, is monotonically decreasing within that range. This reflects the fact that on average a tribunal considering evidence involving an innocent defendant should be more likely to conclude that there is a lower probability of guilt than a higher probability of guilt.[35]

The first function considered is a truncated normal distribution (also called a truncated Gaussian distribution).[36] If the truncated normal distribution is placed with its maximum[37] at $x = 0$, then there is only one further degree of freedom. That degree of freedom is removed when a particular probability of conviction under the beyond a reasonable doubt standard is specified.[38] Figure 1a shows a truncated normal distribution for modelling a tribunal's assessment of the likelihood of guilt of an innocent defendant. The distribution is parameterized[39] so that there is a 4% probability that a tribunal using a beyond a reasonable doubt threshold of 90% will return a guilty verdict, as shown by the shaded region in the figure spanning the horizontal axis from 0.9 to 1. Figure 1b shows the same curve as in Fig. 1a but shaded to show the range of assessed likelihoods of guilt (i.e. those exceeding 50%) that would lead to a guilty verdict under the preponderance of the evidence standard. Under this model, when the

---

[35] More formally, a monotonically decreasing pdf will ensure that given any two different but equally wide ranges of probabilities (e.g. from 10% to 15% and from 60% to 65%), when adjudicating the case of an innocent defendant, the tribunal has a greater likelihood of concluding that the probability of guilt lies in the lower range than the higher range.

[36] A regular (non-truncated) normal distribution with mean $x = \mu$ and standard deviation $\gamma$ has a pdf $f_X(x) = \frac{1}{\gamma\sqrt{2\pi}} \exp - \left(\frac{(x - \mu)^2}{2\gamma^2}\right)$. (In this equation using '$\gamma$' instead of the more conventional '$\sigma$' will help reduce the potential for confusion since, after truncation, the standard deviation will change.) To truncate the normal distribution, multiplication by a rect function is performed, where rect$\left(\frac{x-b}{W}\right)$ is defined to have value 1 in the range $b - \frac{W}{2} \leq x \leq b + \frac{W}{2}$ and zero otherwise. For the model in this article, $\mu=0$ (since, for an innocent defendant, the maximum of the pdf should occur at a probability of guilt equal to zero) and the rect function is parameterized by $b = 0.5$ and $W = 1$ (since probabilities of guilt must be in the range from 0% to 100%, meaning that the truncation must occur outside the range from $0 \leq x \leq 1$). In addition, truncation requires rescaling to ensure that the non-truncated portion has a total area of 1. The resulting pdf is $f_X(x) = \frac{\frac{1}{\gamma\sqrt{2\pi}}\exp - \left(\frac{x^2}{2\gamma^2}\right)}{\frac{1}{2}\mathrm{erf}\left(\frac{1}{2\sqrt{2}}\right)}$ rect$(x - 0.5)$, where erf$(z)$ is the error function defined by erf$(z) = \frac{2}{\sqrt{\pi}} \int_0^z \exp(-\tau^2)d\tau$.

[37] Maximum here is assumed to refer to the peak of a normal distribution, where the slope is zero. It is possible, of course, to envision other truncations in which the peak is removed, and in which the maximum would not have a zero slope.

[38] The statement that there is one further degree of freedom assumes, as specified earlier, that beyond a reasonable doubt is associated with a 90% threshold. Of course, removing that constraint and allowing values other than 90% introduces an additional degree of freedom.

[39] For Figures 1a and 1b, $\gamma = 0.5843$ was used in the equation for the truncated normal distribution, *supra* n. 36.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001024

232                                    J. VILLASENOR



FIG. 1. A probability density function in accordance with the truncated normal distribution model. As shown by the shaded regions, an innocent person facing a 4% of being found guilty under the beyond a reasonable doubt standard would face a 33% probability of being found guilty under a preponderance of the evidence standard. (a) Beyond a reasonable doubt. (b) Preponderance of the evidence.



FIG. 2. A probability density function in accordance with the truncated normal distribution model. As shown by the shaded regions, an innocent person facing a 1% of being found guilty under the beyond a reasonable doubt standard would face a 19% probability of being found guilty under a preponderance of the evidence standard. (a) Beyond a reasonable doubt. (b) Preponderance of the evidence.

preponderance of the evidence standard is used to judge an innocent defendant, a guilty verdict would be returned with probability 33%.

Figure 2a illustrates a truncated normal distribution parameterized[40] so that there is a 1% probability that a tribunal using a beyond a reasonable doubt threshold of 90% will return a guilty verdict despite the defendant's innocence. As shown in Fig. 2b, the corresponding probability of a guilty verdict under the preponderance of the evidence standard is 19%.

[40] For Figures 2a and 2b, $\gamma = 0.5843$ was used in the equation for the truncated normal distribution. *supra* n. 36.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001025



FIG. 3. A probability density function in accordance with the truncated exponential model. As shown by the shaded regions, an innocent person facing a 4% of being found guilty under the beyond a reasonable doubt standard would face a 29% probability of being found guilty under a preponderance of the evidence standard. (a) Beyond a reasonable doubt. (b) Preponderance of the evidence.

Another possible model is a truncated one-sided exponential distribution.[41] This distribution is shown in Fig. 3a parameterized[42] so that there is a 4% probability that a tribunal using a beyond a reasonable doubt threshold of 90% will return a guilty verdict. Figure 3b shows the same curve as in Fig. 3a, but with the shading corresponding to a guilty finding of an innocent defendant when the preponderance of the evidence standard is used. As indicated in Fig. 3b, the resulting probability is 29%. It is also possible to generate a truncated exponential distribution (plot not shown) where there is a 1% probability that a tribunal using a beyond a reasonable doubt threshold of 90% will return a guilty verdict, and then to compute the resulting probability of a guilty verdict (which is 13%) under the preponderance of the evidence standard.

It is also interesting to examine the most conservative model possible in terms of minimizing the difference between the conviction probabilities for the two burden of proof levels under consideration here. Put another way, this conservative model, while unrealistic, represents the answer to the question: given an innocent defendant and a particular probability of conviction of that defendant under the beyond a reasonable doubt standard, what is the form of the probability density function that will minimize the probability of conviction of that defendant under the preponderance of the evidence standard? This model is shown in Fig. 4a for the case where an innocent defendant stands a 4% probability of being convicted under the beyond a reasonable doubt standard. Figure 4b shows the same distribution, shaded to show the probability of conviction if the preponderance of the evidence standard is used.

As the figure shows, this minimizes the area under the distribution in the range between 0.5 and 0.9.[43] It should be emphasized that while this is clearly an unrealistic model (among other reasons,

---

[41] A non-truncated exponential pdf can be specified by $f_X(x) = \lambda \exp(-\lambda x) u(x)$, where $\lambda$ is positive and $u(x)$ is a unit step function that has value 1 for nonnegative $x$ and zero otherwise. The corresponding cdf is $F_X(x) = (1 - \exp(-\lambda x)) u(x)$. As with the truncated normal function discussed previously (*supra*, n. 36), truncation over the range from 0 to 1 can be accomplished by multiplying by rect $(x - 0.5)$ and appropriately renormalizing, yielding the truncated exponential pdf $f_X(x) = \frac{\lambda}{1 - \exp(-\lambda)} \exp(-\lambda x) \text{rect}(x - 0.5)$. (The unit step function is no longer needed since it is subsumed by the rect function).
[42] For Figures 3a and 3b, $\lambda = 1.76$ was used in the equation for the truncated exponential distribution. See *ibid*.
[43] Of course if there were no constraints at all, minimization of the pdf in the range from 0.5 to 0.9 would require setting the pdf to zero in that range while maintaining it at a non-zero level in the range 0.9 to 1. However, this would violate the requirement

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001026

234                                J. VILLASENOR



FIG. 4. A probability density function in accordance with the most conservative possible model. As shown by the shaded regions, an innocent person facing a 4% of being found guilty under the beyond a reasonable doubt standard would face a 20% probability of being found guilty under a preponderance of the evidence standard. (a) Beyond a reasonable doubt. (b) Preponderance of the evidence.

TABLE 1 *Probabilities of conviction of an innocent defendant under the preponderance of the evidence standard (bottom row) as a function of assumed probabilities of conviction of an innocent defendant under the beyond a reasonable doubt standard (top row)*

|  | Model: truncated normal distribution (%) | | Model: truncated exponential distribution (%) | | Model: conservative (%) | |
|---|---|---|---|---|---|---|
| If the probability that an innocent person, once charged, will be found guilty under the beyond a reasonable doubt standard is: | 4 | 1 | 4 | 1 | 4 | 1 |
| Then the probability that an innocent person, once charged, will be found guilty under the preponderance of the evidence standard is: | 33 | 19 | 29 | 13 | 20 | 5 |

because of the sharp drop-off at 0.5 on the horizontal axis), it is useful because, given the other constraints, it provides a lower bound on the probability of conviction under the preponderance of the evidence standard.

The results from the above examples[44] can be summarized in Table 1.

discussed earlier that the pdf must be monotonically decreasing. The pdf shown in Figure 4 is non-increasing in the interval from 0.5 to 1, so represents what a monotonically decreasing pdf could approach, in the limit, over this range.

[44] In the interest of brevity, the curves for the truncated exponential distribution for the case where $P_{BRD}$(conviction | innocent) = 1% (obtained when the equation for the truncated exponential pdf, *supra* n. 41, is parameterized by $\lambda = 3.88$; 'BRD' indicates 'beyond a reasonable doubt') are not shown, though the corresponding probabilities are included in the table.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001027

## 4. Discussion

One of the most interesting aspects of the results in Table 1 is the relatively limited impact of the choice of model on the outcome. For example, for the case where conviction under the beyond a reasonable doubt standard occurs with 4% probability, the truncated normal and exponential models provide conviction probabilities under the preponderance of the evidence standard of 33% and 29%, respectively, a difference of only four percentage points despite the significant differences between those two models.[45] Even when the conviction probability is minimized using the conservative model, the result is a still-sobering 20%. For the case where conviction under the beyond a reasonable doubt standard occurs with 1% probability, the differences among the models are wider but still not enormous, with the truncated normal and exponential models providing conviction probabilities under the preponderance of the evidence standard of 19% and 13%, respectively.

It is also interesting to use the numbers in the table to form ratios indicating how much higher the risk of an improper guilty verdict is under the preponderance of the evidence standard than under the beyond a reasonable doubt standard. Under the (unrealistic) conservative model (the right two columns in the table), that ratio is 5, i.e. for that model, moving from beyond a reasonable doubt to preponderance of the evidence increases the probability of finding an innocent defendant guilty by a factor of 5.[46] For the more realistic truncated normal and exponential models, the ratios are higher. Among the examples discussed here, the maximum ratio occurs for the truncated normal model if conviction under the beyond a reasonable doubt standard occurs with 1% probability: in that case, moving to a preponderance of the evidence standard would multiply the risk of finding an innocent defendant guilty by a factor of 19. The inescapable conclusion—which is not at all unexpected but is borne out here in stark quantitative terms—is that the preponderance of the evidence standard places innocent defendants at dramatically greater risk of improper guilty findings.

It is important to address some counterarguments that could be raised with respect to the approach used in this article. One counterargument would be to assert that comparing criminal trials under a beyond a reasonable doubt standard to Title IX proceedings at U.S. universities under a preponderance of the evidence standard is an apples to oranges comparison. This is a true statement, but not in a way that favours the counterargument. As multiple legal experts have pointed out,[47] campus Title IX proceedings often lack many of the most basic features of due process that help ensure the rights of the accused in criminal trials. Thus, using the same probability model for both settings is in at least this respect unfairly generous to Title IX proceedings. Put another way, innocent defendants in Title IX proceedings may be even *more* exposed to guilty verdicts than the approach used here suggests.

Another potential counterargument could question the choice of probability models (the truncated normal and exponential distributions) used in this article. The response to this is twofold. First, the truncated normal and exponential distributions are well-known models applicable to a broad range of phenomena. While we do not have enough information to know the 'true' model that characterizes tribunal decisions regarding guilt (or whether there is even any single model that would suffice),

---

[45] Among other differences, the truncated Gaussian has a form in the vicinity of the origin that is concave downward (i.e. shaped like a portion of an umbrella), while the truncated exponential has a form that is concave upward (i.e. shaped like a portion of an upside down umbrella).

[46] Given the flat nature of the pdf in the conservative model, the ratio of 5 is a simple consequence of the fact that the 50% threshold associated with preponderance of the evidence is five times as far from 100% as is the 90% threshold associated with beyond a reasonable doubt.

[47] See e.g. Bartolet *et al.*, *supra* n. 18 and Cohn, *supra* n. 18.

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

AR_00001028

considering both truncated normal and exponential models provides insight into how different models impact the risk of false conviction.[48]

Secondly, as the values in the table above show, among the more realistic models—and thus excluding the conservative model shown in Fig. 4—there is surprisingly little variation in the results. In other words, while the choice of probability model matters, it does not alter the overarching conclusions regarding the dramatically increased exposure faced by innocent defendants when a preponderance of the evidence standard is used instead of beyond a reasonable doubt.

An additional counterargument would question the choice in the examples above to use 4% and 1% for the probabilities of conviction of innocent defendants in criminal trials under the beyond a reasonable doubt standard. In response, it should be emphasized that the analysis could just as easily be performed for different conviction of rates of innocent defendants under a beyond a reasonable doubt standard. Also, given the discussion in Section 3.3 regarding applying Bayes' theorem in light of the conclusions of Gross *et al.*, the true rate of convictions for innocent criminal defendants is very unlikely to be 'lower' than 1%. In short, the choice to consider 1% is conservative. After all, it would strain credulity to suggest that verdicts in the criminal justice system are so accurate that fewer than 1 out of every 100 innocent people subjected to criminal trials are found guilty. Additionally considering 4% has the dual advantage of being more likely to be realistic, and also, when combined with the 1% results, enabling insight into how changes in the rate of improper findings of guilt under a beyond a reasonable doubt standard correlate to the rate of improper findings of guilt under the preponderance of the evidence standard. Finally, it is important to emphasize that this article presents a generalized framework that is not tied to the specific probability models (truncated normal and exponential) or false beyond a reasonable doubt conviction probabilities (1% and 4%) explored here. Once this framework is created, it is straightforward to apply it in many different ways.

A final, overarching potential counterargument would hold that the very idea of using probabilistic concepts with respect to burdens of proof is problematic. There are plenty of examples of statements on both sides of this argument. After all, it is impossible to reconcile the position of a U.S. federal appeals court judge who wrote:

> All burdens of persuasion deal with probabilities. The preponderance standard is a more-likely-than-not rule, under which the trier of fact rules for the plaintiff if it thinks the chance greater than 0.5 that the plaintiff is in the right. The reasonable doubt standard is much higher, perhaps 0.9 or better.[49]

with that of another U.S. federal appeals court judge, who wrote 'I believe that the entire effort to quantify the standard of proof beyond a reasonable doubt is a search for fool's gold.'[50] Similarly, while one can find a law review article arguing that decisions in the legal system involve 'an *evidence threshold*, denoted here by $x^T$, which indicates the value of $x$ above which liability will be assigned and below which there is no liability',[51] one can also find law review articles stating that there are 'serious

[48] Generally, normal distributions are more common than exponential distributions. However, an exponential distribution is helpful to include as an example of a more conservative model (conservative in the sense that, for a given probability of conviction under a beyond a reasonable doubt standard, the risk faced by an innocent defendant is lower under the exponential model than under the normal model).

[49] *Brown* v. *Bowen*, 847 F.2d 342, 354 (7th Cir. 1988).

[50] *In Re As. H.*, 851 A.2d 456, 463 (D.C. 2004) (Judge Farrell dissenting).

[51] KAPLOW, L. (2012) Burden of proof. *Yale Law Journal*, **121**, 738, 758 (emphasis in original).

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false by National Library of Education user on 11 September 2017

AR_00001029

and fundamental impediments to scholars hoping to articulate a probabilistic theory of evidence',[52] and that '[m]ost evidence scholars believe that adjudicative factfinding is fundamentally incompatible with mathematical probability.'[53]

It is well beyond the scope of this article to attempt to resolve the decades-old dispute over the best role for probability theory in modelling legal proceedings. Rather, the approach in this article is premised on the belief that, as imperfect as probabilistic models may be in the legal context, they nonetheless can be highly instructive in illustrating—or at least in framing—the quantitative consequences of decisions regarding which burden of proof standard to apply.

## 5. Conclusions

This article has presented a framework for calculating the risk that an innocent defendant, when subjected to a judicial proceeding using the preponderance of the evidence standard, will be found guilty. This is a particularly critical issue in light of the significant growth on U.S. college and university campuses of Title IX proceedings which, due to a 2011 mandate from the U.S. Department of Education, must be conducted using preponderance of the evidence standard. Even under the most conservative mathematical assumptions possible under the framework and examples presented herein, this article has demonstrated that an innocent defendant faces a five times higher risk of being wrongly found guilty when a preponderance of the evidence standard is used as opposed to under a beyond a reasonable doubt standard. Under many circumstances, including the more realistic (relative to the 'conservative' model) probability models explored here, the relative risk would be even higher, often by a very large margin. While the examples presented in this article used truncated normal and exponential distributions, the framework is general and can be applied to any probability model.

In any justice system, including the systems that U.S. colleges and universities have created in response to recent interpretations of the requirements of Title IX, the pool of defendants will include both those who are guilty and those who are innocent. Victims' rights advocates correctly argue that a lower burden of proof makes it easier to ensure that the guilty are punished.[54] Without in any way diminishing the importance of holding the guilty to account, a holistic understanding of the social impacts of these on-campus justice systems requires exploring not only their effectiveness in punishing the guilty but also the exposures faced by those who are innocent but nonetheless find themselves exposed to proceedings to establish guilt. It should come as no surprise that when the burden of proof is preponderance of the evidence, the risks faced by innocent defendants will be substantial. This article has demonstrated in quantitative terms just how substantial those risks can be.

---

[52] CHENG, E. K. (2013) Reconceptualizing the Burden of Proof. *Yale Law Journal*, **122**, 1254, 1257.

[53] ALLEN, R. J. & STEIN, A. (2013) Evidence, probability, and the burden of proof. *Arizona Law Review*, **55**, 557, 562.

[54] See e.g. Hogshead-Makar & Sokolow, *supra* n. 18 (writing that 'a higher standard, such as clear and convincing evidence, would make it less likely that those who commit sexual misconduct would be held accountable'.).

Downloaded from https://academic.oup.com/lpr/article-abstract/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
by National Library of Education user
on 11 September 2017

**Bailey, Nathan**

| | |
|---|---|
| **From:** | Bailey, Nathan |
| **Sent:** | Monday, September 11, 2017 11:57 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Venable, Joshua; Sherman, Brandon; Eitel, Robert; Menashi, Steven; Hill, Elizabeth; Ferguson, Gillum; Hahn, Nicholas |
| **Subject:** | NY Post and Boston Globe |

Two more worth reading today:

## DeVos is totally right to roll back insane 'anti-rape' rules

Karol Markowicz, New York Post
http://nypost.com/2017/09/10/devos-is-totally-right-to-roll-back-insane-anti-rape-rules/

""One rape is one too many, one assault is one too many, one aggressive act of harassment is one too many," says DeVos. But also, "one person denied due process is one too many."

She's right. Yet on campuses across the country, more and more young men are losing their due-process rights and suffering tragic consequences — oft-times even when the accuser herself refuses to back the charges."

### Revise campus sex assault policies, but don't scrap them

Boston Globe Editorial
http://www.bostonglobe.com/opinion/editorials/2017/09/09/revise-campus-sex-assault-policies-but-don-scrap-them/WouBEEzUQJvdkJ2RmXwi8L/story.html

"But having a tribunal of college administrators reach conclusions about what really happened late at night in a dorm room or frat house is not the best path to justice. Local law enforcement should be part of any campus policy to address sexual assault.

In her George Mason University speech, DeVos put down these markers when it comes to addressing campus sexual assault: "One rape is too many. One assault is too many. One aggressive act of harassment is one too many. One person denied due process is one too many."

She deserves a chance to spell out exactly
what that means in terms of actual policy..."

AR_00001031

On Sep 9, 2017, at 10:25 PM, Bailey, Nathan <Nathan.Bailey@ed.gov> wrote:

http://www.nydailynews.com/opinion/justice-campus-article-1.3481364

Sent from my iPhone

On Sep 9, 2017, at 2:54 PM, Bailey, Nathan <Nathan.Bailey@ed.gov> wrote:

https://www.nytimes.com/2017/09/08/opinion/betsy-devos-title-iv.html?mcubz=3

@gmail.com

| | |
|---|---|
| **From:** | @gmail.com |
| **Sent:** | Monday, September 11, 2017 3:23 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Important Article and Issues |

This article may be important because it suggests that the power of Sec. Devos to change sexual assault policies may be limited by statute.  SEE:

What Devos Can't Change *** Education Secretary's Speech on Title IX Implied She Could End Many Policies Suggested by Obama Administration, But Many Policies on Campus Sexual Assault Investigations Are Enshrined in Law

Your department may able to get around some of the problems using your ability to define (re-define) words in the statute under the Chevron doctrine.

At the very least I thought it was important that you at least be aware of the article and the arguments since you may be getting questions about it from the media.

Good luck!

**JOHN F. BANZHAF III, B.S.E.E., J.D., Sc.D.**
Professor of Public Interest Law
George Washington University Law School,
FAMRI Dr. William Cahan Distinguished Professor,
Fellow, World Technology Network,
Founder, Action on Smoking and Health (ASH),
2000 H Street, NW, Wash, DC 20052, USA
(202) 994-7229 // (703) 527-8418
http://banzhaf.net/ PII gmail.com  @profbanzhaf

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Monday, September 11, 2017 3:42 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Q-A 9-10-17 554pm draft deliberative privileged with minor edit in first para |
| **Attachments:** | Q-A 9-10-17 554pm draft deliberative privileged RG edits.docx |

Hi Candice –

# DPP

Thanks, Mia

11. National Review Editors: *DeVos Takes on Lawless Campus Tribunals* – Sept. 8
12. Washington Post Editorial Board: *Betsy DeVos's remarks on campus sex assault were right on target* – Sept. 8
13. Frederick M. Hess & Grant Addison: *DeVos Moves to Rein in the Campus Kangaroo Courts* – Sept. 8
14. KC Johnson: *The Campus Sex-Crime Tribunals Are Losing* – Sept. 8
15. Jeannie Suk Gersen: *Betsy DeVos, Title IX, and the "Both Sides" Approach to Sexual Assault* – Sept. 8
16. Greg Piper: *DeVos endangers rape victims by seeking public input on rules, critics say* – Sept. 8
17. Adam Harris and Eric Kelderman: *Citing Obama-Era Failures, DeVos Will Replace Landmark Directive on Sexual Assault* – Sept. 7
18. KC Johnson and Stuart Taylor: *DeVos Pledges to Restore Due Process* – Sept. 7
19. Hans Bader: *Education Secretary Takes Aim at Federal College Discipline Rules* – Sept. 7
20. Robby Soave: *Betsy DeVos: The Era of Weaponized Title IX in Campus Rape Cases Is Over* – Sept. 7

Source: http://www.saveservices.org/sexual -assault/editorials/2017/

AR_00001035

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, September 12, 2017 8:34 AM |
| **To:** | Faer, Laura |
| **Subject:** | Re: Qs/Comments |

Laura,

**DPP**

**DPP** Thank you, truly.

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 11, 2017, at 8:19 PM, Faer, Laura <Laura.Faer@ed.gov> wrote:

Candice -  Thank you again for the talking points.  My staff sent a few comments/questions regarding the speech **DPP**

**DPP**

**DPP** Thank you very much. **DPP**

**DPP**



**DPP**

# DPP

Thank you, Laura Faer

AR_00001037



**PII**

September 8, 2017

U.S. Department of Education
Office of the Secretary
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Secretary DeVos,

I went to bed to the news of you rolling back Title IX sexual assault guidelines, and I woke up with this letter in mind.

I've worked in education for a long time – first as a classroom teacher, now in education law and policy.

When I read about you wanting to make it harder for men to be convicted of sexual assault on college campuses, I wanted to do something but I worried about how a public statement would affect my job, my reputation, my livelihood. So I'm reaching out to you directly, woman to woman.

I am a survivor of sexual assault and sexual abuse. It has taken me years to be able to say those words out loud, and to write them on paper.

For me and for so many other women, shame is a huge part of our experience of sexual abuse. Something about the experience being physically violated in such a horrific way usually creates a whole lot of fear and shame – at least it did for me.

This is why it's so important that you pass laws and policies that make clear to women that you believe and support them when they report that they've been assaulted. And why our justice systems must do everything they help these young women in finding peace, however that happens for them.

Trust me, I know that men are falsely accused of rape, particularly men of color. This happened to one of my best friends in high school, and it traumatized him and his family. Nevertheless, the vast majority of women who say that they have been sexually assaulted have actually been sexually assaulted.

For this reason, and for so many others, I beg you to keep the protections in tact that the Title IX guidelines put in place. If know you do have to modify them somewhat to make good on some kind of public statement or private promise, but please just change them a tiny bit.

And make clear that you stand with survivors. Meet with us, talk with us, ask us our stories. I'm here. I'm wanting and willing to share, and I know so many brave women who are too – I can give you their names.

Finally, through my work as a classroom teacher and in education policy, I've spent time in many low-performing schools – I taught in one, and I've visited them across the country. For the past 12 hours, I've been wondering why instead of creating policies that will help kids in these schools learn to read and write, you've chosen to protect the rights of people who are accused of sexual assault.

That's on you, Secretary DeVos. With all due respect, that's on you.



**PII**

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, September 12, 2017 6:40 PM |
| **To:** | Hahn, Nicholas |
| **Subject:** | Re: Have you seen this? |

Very nice!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 12, 2017, at 5:24 PM, Hahn, Nicholas <Nicholas.Hahn@ed.gov> wrote:

> Good news:
>
> http://www.bloomberg.com/view/articles/2017-09-12/devos-s-right-call-on-sexual-assault
>
> ---
>
> **From:** Jackson, Candice
> **Sent:** Tuesday, September 12, 2017 3:23 PM
> **To:** Hahn, Nicholas
> **Subject:** Re: Have you seen this?
>
> I spotted this this morning...yikes. If anything, it's more evidence of how broken the status quo is...
>
> Candice Jackson
> Office for Civil Rights
> U.S. Dept. of Education
> *Sent from my iPhone*
>
> On Sep 12, 2017, at 2:57 PM, Hahn, Nicholas <Nicholas.Hahn@ed.gov> wrote:
>
> > http://www.thecollegefix.com/post/36618/
> >
> > --
> > Nicholas G. Hahn III
> > Director of Speechwriting
> > U.S. Department of Education
> > 400 Maryland Avenue SW
> > Washington, D.C. 20202
> > 202-260-7405

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, September 12, 2017 6:59 PM |
| **To:** | Jackson, Candice |
| **Attachments:** | DCL 9-12-17.docx; Q-A 9-12-17.docx |

AR_00001040

**Faiella, Matt**

---

| | |
|---|---|
| **From:** | Faiella, Matt |
| **Sent:** | Wednesday, September 13, 2017 11:43 AM |
| **To:** | Sherman, Brandon; Reyes, Alejandro |
| **Cc:** | Karvonides, Mia |
| **Subject:** | RE: Complaints |
| **Attachments:** | 02952136_OCR-#98135-v1-02952136_RES.DOC; 15052041_OCR-#483850-v1-UNIVERSITY_OF_CINCINNATI-CLOLTR-R-FINAL_(SIGNED)....pdf; 01052074_OCR-#254743-v1-Final_Res_Ltr_R.PDF; 06032054_OCR-#15242-v1-Closure_Letter_-__R_(OK_State_Univ_)_(06032054).doc; 06032054_OCR-#15243-v1-Commitment_to_Resolve_(OK_State_Univ_)_(06032054)....doc |

Brandon,

Attached are the materials you requested.

Thanks,
Matt

---

**From:** Sherman, Brandon
**Sent:** Wednesday, September 13, 2017 10:09 AM
**To:** Faiella, Matt; Reyes, Alejandro
**Cc:** Karvonides, Mia
**Subject:** RE: Complaints

Just the OCR rulings.

Thanks

---

**From:** Faiella, Matt
**Sent:** Wednesday, September 13, 2017 9:56 AM
**To:** Sherman, Brandon; Reyes, Alejandro
**Cc:** Karvonides, Mia
**Subject:** RE: Complaints

Hi Brandon,

```
                          DPP
```

Thanks,
Matt

---

**From:** Sherman, Brandon
**Sent:** Wednesday, September 13, 2017 9:14 AM
**To:** Reyes, Alejandro; Faiella, Matt
**Subject:** Complaints

**DPP**

Thanks,
Brandon

**DPP**

Brandon S. Sherman
Senior Counsel to the Assistant Secretary
Office for Civil Rights
U.S. Department of Education
Office: 202-260-1115
Mobile: 202-264-9830
Brandon.Sherman@ed.gov

Page 2 - Dr. David Porter

OCR DOCKET #:  02-95-2136
CLOSURE DATE:  02/12/96
NAME OF SIGNEE:  SHARYN MARTIN

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Dr. David Porter
President
Skidmore College
815 North Broadway
Saratoga Springs, New York  12866-1632

Re:  Case No. 02-95-2136

Dear Dr. Porter:

This letter is to notify you of the determination of the New York
Regional Office for Civil Rights (OCR) regarding the closure of
the above-referenced complaint.  The complainant alleges that the
Skidmore College (the College) discriminates on the basis of sex.
Specifically, the complainant alleges that the College failed to
take appropriate action following her sexual assault by a student
(the Student) by:

1.    (a) not allowing the complainant to give testimony outside of
      the Student's presence; (b) providing its results only to the
      Student; (c) not explaining the basis for its determination;
      and (d) not taking appropriate disciplinary action against
      the Student, or providing the complainant with counseling;

2.    not providing the complainant the opportunity to appeal the
      decision rendered at the administrative hearing, while
      providing the Student with the opportunity to appeal; and

3.    not assisting the complainant in consulting with her teachers
      to request additional time to prepare for examinations and to
      submit a term paper at a later date, which the complainant
      needed because of the trauma she underwent as a result of the
      sexual harassment.

OCR has jurisdiction over complaints alleging discrimination on
the basis of sex in programs or activities that receive Federal
financial assistance from the U.S. Department of Education (the
Department).  OCR has jurisdiction over these complaints pursuant
to Title IX of the Education Amendments of 1972 (Title IX), as
amended, 20 U.S.C. § 1681 et seq., and its implementing regulation

Page 6 -  Dr. David Porter

Following the incident, the complainant spoke with the Dean of Student Office to request that the College inform two of her professors about the incident and her need for flexibility in regards to her course work.  The complainant stated that necessary assistance was not provided by her professors.  However, the College sent a memo to the professors explaining the complainant's absences and requesting that she be extended flexibility.  Both professors excused the complainant's absences, and one told the complainant to contact him if additional assistance was needed. The complainant did not request any additional assistance from either professor.  Based on this, OCR finds that there is insufficient evidence to support a violation of Title IX.

This concludes OCR's consideration of this complaint.  This letter is not intended, nor should it be construed, to cover any issues regarding the College's compliance with Title IX that are not discussed herein.

The College is reminded that retaliation or harassment against any person who has filed a complaint, participated in, or cooperated with an OCR investigation is prohibited.

Under the Freedom of Information Act, 5 U.S.C. § 552, it may be necessary to release this document and related correspondence and records upon request.  In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy.

We appreciate the cooperation and assistance you and your staff provided to us during this investigation.  If you have any questions regarding this matter, please contact Ms. Diane Castro, Equal Opportunity Specialist, at (212) 637-6311.

                              Sincerely,


                              Sharyn Martin
                              Compliance Team Leader

Page 7 -  Dr. David Porter

<<<<< OCR LOF ADDENDUM SHEET >>>>>

Collection Type:  &CLC&  Case Letter Collection

Document Type: &RES&  CIS Resolution Letter after 12/03/1993

Case Docket Number: &02952136&

Active Region.....: &R02& New York

Institution Type.: &N2& Postsecondary Institution

General Basis:
&GB-SEX& .... Sex

Type Of Case: &T1& Complaint

Recipient Name: SKIDMORE COLLEGE

Recipient City: SARATOGA SPRINGS     St: &NY&  Zip: 12866

Authority:  &TITLE9&

Resolution Code(s)/Specific Bases/Issue(s) and Date(s) - YYYY/MM/DD
&RC41&  - &SB10& SEX - Discrimination against female
 &S7399& Other Student Rights Issue 1996/02/12

&RC41&  - &SB10& SEX - Discrimination against female
 &S8204& Grievance Procedures/Due Process 1996/02/12

AR_00001045

June 10, 2004

Ref. No.: 06032054

Dr. David Schmidly, President
Oklahoma State University
107 Whitehurst
Stillwater, OK  74078

Dear Dr. Schmidly:

The U.S. Department of Education, Office for Civil Rights, Southern Division, Dallas Office, has completed its consideration of the above-referenced complaint received on [ PII ] filed against Oklahoma State University (OSU or University), Stillwater, Oklahoma.  The complainant alleged that OSU discriminated against his daughter, the alleged injured party (AIP), on the basis of sex.  Specifically, the complaint alleged that OSU:

1. Failed to respond to notice of the AIP's alleged sexual harassment; and

2. Failed to maintain grievance procedures that provide for the prompt and equitable resolution of student complaints alleging discrimination on the basis of sex.

OCR is responsible for determining whether organizations that receive or benefit from Federal financial assistance from the U.S. Department of Education or an agency that has delegated investigative authority to this Department are in compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, and its implementing regulation at 34 C.F.R. Part 106. Title IX states:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The University is a recipient of Federal financial assistance from the U.S. Department of Education. Therefore, OCR has jurisdictional authority to process this complaint for resolution.

During the course of its investigation, OCR obtained, reviewed, and analyzed documentation from OSU as well as the complainant, and conducted interviews with the complainant, the AIP and staff of OSU.  With regard to allegation one, OCR determined that there is insufficient evidence to support a finding that OSU discriminated against the AIP by failing to respond to notice of alleged

Page 2- Dr. David Schmidly, President

sexual harassment.  With regard to the second allegation, OCR determined that OSU had failed to maintain grievance procedures that provide for the prompt and equitable resolution of student complaints alleging discrimination on the basis of sex.  Also, during the course of the OCR investigation, we examined whether the OSU had provided notice of the identity and office address and telephone number of its Title IX Coordinator and determined that the University had not done so.  The bases for OCR's determinations are summarized below.

**Allegation 1:  OSU failed to respond to notice of the AIP's alleged sexual harassment.**

The AIP alleged that four OSU football players sexually assaulted her on ⸢   **PII**   ⸥ at the residence of one of the players, and that OSU failed to respond to notice of alleged sexual harassment (the sexual assault).

The AIP's alleged sexual assault was widely reported in the newspapers and it was apparent from these reports that it occurred in an off-campus residence not owned or controlled by OSU. The AIP's identity was not revealed in the news accounts. The Student Conduct Officer requested a copy of the police report, which revealed that the alleged assault occurred in an off-campus location and did not involve a university-related event.  The AIP's name was redacted. An Assistant Dean became aware of the AIP's identity when the AIP informed her that she was the victim in the news accounts. The Assistant Dean informed OCR that she did not report the conversation with the AIP to any other university official because she assumed that those who needed to know already knew as a result of the wide publicity.

OCR has determined that OSU had notice of alleged sexual harassment of the AIP occurring off campus. However, the notice indicated clearly that the alleged assault did not take place in a University program or activity.  A university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient.  OCR's investigation, which included a thorough review of documents provided by both the AIP and recipient, together with numerous telephone interviews of the AIP and recipient employees, substantiated that the alleged sexual assault of ⸢ **PII** ⸥ ⸢ **PII** ⸥ took place off-campus in a private residence.  Therefore, OSU did not have an obligation to take any action under Title IX.

**Allegation 2:  OSU failed to maintain grievance procedures that provide for the prompt and equitable resolution of student complaints alleging discrimination on the basis of sex.**

OSU officials informed OCR that the grievance procedures for use by students to raise allegations of sex discrimination, including sexual harassment are contained in Section IV of the OSU *Student Rights and Responsibilities Governing Student Behavior.*  This section, entitled Disciplinary Responsibility, provides that a faculty member, staff member or student may file a complaint against a student alleging that a violation of the Code of Conduct has occurred.  It also states that OSU itself may initiate a complaint.  It lists examples of actions that are "unacceptable" and for which students are subject to disciplinary action.  The list includes sexual misconduct, sexual harassment, and "Any act which allegedly violates federal, and/or state law, local ordinances or university policies on University premises or at university sponsored or supervised activities."  Section IV also contains the procedures and the steps to be followed by a student

Page 3- Dr. David Schmidly, President

filing a complaint alleging a violation of the Code of Conduct, including an informal administrative hearing and a formal hearing process for allegations for which suspension or expulsion are possible, and for student discrimination grievances.

OCR's investigation revealed, however, that information provided to students regarding the procedure to be used and where to file a complaint alleging discrimination on the basis of sex is confusing and unclear, thereby thwarting the prompt and equitable resolution of such allegations. Section XIII of the *Rights and Responsibilities* document, entitled Other University Policies, under the heading Sexual Harassment and Discrimination, states that grievance procedures for students are available in the Office of the Vice President for Student Affairs, Associate Vice President for Multicultural Affairs, Campus Life Office, and the Director of Student Services in the respective academic colleges, suggesting that some procedures other than those in the *Rights and Responsibilities* document exist and are to be used for resolving allegations of sex discrimination. It does not refer to the *Rights and Responsibilities* document as containing the grievance procedures.

Another portion of the *Rights and Responsibilities* document also implies that there is another grievance procedure. Appendix B to the *Rights and Responsibilities* document concerns sexual harassment and states that grievance procedures are available for students in the Office of the Vice President for Student Services, the Student Activity Center, and the Director of Student Services in the respective colleges. Further, a different section of Appendix B (§2.03 under a subheading entitled Procedures), states: "persons who have a complaint alleging sexual harassment should state their complaint through normal administrative channels. Individual administrators empowered to receive complaints shall include department heads, academic deans, directors or administrative supervisors of an operational unit." The term "normal administrative channels" is not defined anywhere in the *Rights and Responsibilities* document. Also, OCR was informed that only the University staff specifically named as empowered to receive a complaint of sexual harassment/assault has a duty to pass along to the appropriate University official(s) information they are provided by a student regarding an alleged incident of sexual harassment. Any faculty/staff that are not specifically named would not be required by any University policy to report an alleged act of sexual harassment unless they personally witnessed the harassment/assault.

In addition, Appendix C to the *Rights and Responsibilities* document, entitled Sexual Misconduct, which provides information regarding sexual assault and harassment, states: "To consult about or report incidents of sexual harassment, against a student, go to the OSU student conduct office, and against OSU employees, go to the OSU Affirmative Action Office."

The *Rights and Responsibilities* document indicates that the Student Conduct Office should be contacted to help guide those who want to file a complaint. According to the Director of the Student Conduct Office, she handles those complaints that allege student-on-student sexual harassment. The Director of Affirmative Action handles complaints alleging employee-on-employee harassment. The individual identified as holding the title of Title IX Coordinator, however, only investigates complaints alleging employee-on-student complaints. This information is not contained in any of the sections of the above-described document.

Page 4- Dr. David Schmidly, President

Based on the foregoing, OCR determined that while the University possesses grievance procedures, they are not clear or easily understood so as to effectively provide students with sufficient knowledge of where to find the procedures, how they work, or how, and with whom to file a complaint alleging discrimination on the basis of sex. Therefore, they do not provide for the prompt and equitable resolution of complaints they may be raised under Title IX and its implementing regulation.

Additionally, during its investigation, OCR was informed of the name and position of the OSU official designated as the Title IX Coordinator for the University. However, OSU's current policies and publications do not contain a reference to the Title IX Coordinator, nor do they provide his identity, location and telephone number as required by the Title IX regulation. Based on the information and documentation reviewed by OCR in this investigation, OCR has determined that OSU has not provided the required notification regarding the Title IX Coordinator.

On May 7, 2004, OSU submitted the enclosed Commitment to Resolve (CTR). OCR has determined that upon full implementation, the CTR will satisfactorily resolve allegation two and the aforementioned concern regarding a Title IX Coordinator. As is our procedure, OCR will monitor OSU's implementation of this CTR per the language and deadlines contained therein. Should OSU fail to fully implement the action steps as set forth in the CTR, OCR will immediately resume its case processing activities.

This letter is not intended, nor should it be construed, to cover other civil rights issues that may exist, but are not included herein. Under OCR procedures we are obligated to advise the complainant and institution against which a complaint is filed that intimidation or retaliation against a complainant is prohibited by regulations enforced by this agency. Specifically, the regulations enforced by OCR, directly or by reference, state that no recipient or other person shall intimidate, threaten, coerce or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted or participated in any manner in a investigation, proceedings or hearing held in connection with a complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Thank you for your cooperation. If you have any questions concerning this matter, please call me at 214-880-4911.

Sincerely,


Sandra W. Stephens
Team Leader

Enclosure: As stated

**Commitment to Resolve**
**Oklahoma State University (OSU)**
**OCR Case Number: 06032054**

In order to resolve the allegation in the above referenced complaint regarding the prompt and equitable resolution of complaints of discrimination based on sex, Oklahoma State University (OSU or University) makes the following commitments to the Office for Civil Rights (OCR), pursuant to Title IX of the Education Amendments of 1972 (Title IX).  OSU will implement the commitments specified below, within the specified timeframes:

1.  By __May 14__, 2004, OSU will designate at least one employee as its Title IX Coordinator, the responsible employee designated to coordinate its efforts to comply with Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §1681, and its implementing regulation at 34 C.F.R. Part 106 (2003), which prohibit discrimination on the basis of sex.

2.  By __June 1__, 2004, OSU will publish the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) by sending electronic messages to employees and to students enrolled at OSU.

3.  By __July 1__, 2004, OSU will publish the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) by inserting notices on (1) electronic employee applications and other University publications that provide general information to employees about employee services and University policies.  In addition, by inserting notices in (2) the on-line versions of the current *OSU Student Rights and Responsibilities Governing Student Behavior* publication, University Catalog, course schedule, and other University publications (e.g., student general information bulletin) that provide general information to students about student services and University policies and inserting notices on electronic student applications.

4.  By __July 1__, 2004, OSU will begin conspicuously posting notices of the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) in the following manner and in the following places:

    - Campus bulletin boards;
    - Campus housing;
    - The student union;
    - The University's web site;
    - Disseminated through organizational notifications; and
    - Other sites on campus where general campus information is disseminated to students and employees.

5.  By __August 1__, 2004, as print publications are revised, OSU will begin including the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) in the OSU *Student Rights and Responsibilities*

*Governing Student Behavior* publication, University course catalogs, and other publications (e.g., student general information bulletins) in which general campus information is disseminated to students and employees.

6. Publication of the name and title, office address and telephone number of the designated Title IX Coordinator(s) will continue indefinitely for all subsequent publications and printings, pursuant to Title IX and its implementing regulation, 34 C.F.R. §106.9 (2003).

7. By ___August 1___, 2004, OSU will review and revise its current Title IX grievance procedures (paragraph IV. Disciplinary Responsibility of the *Student Rights and Responsibilities* publication) to ensure the prompt and equitable resolution of complaints alleging discrimination based on sex.  The Title IX grievance procedures will include, but are not limited to, the following components:

    a.  The form in which a written complaint is to be filed;
    b.  Timeframes for filing a complaint;
    c.  Timeframes for the conducting of an investigation;
    d.  Manner in which an investigation is to be conducted, and how a decision will be made;
    e.  Process to ensure the impartiality of an investigation;
    f.  Right to present information relevant to the complaint;
    g.  Afford the parties the opportunity to be advised by an individual of his or her choice throughout the proceeding;
    h.  The time within which a complainant shall expect a response regarding the disposition of the investigation;
    i.  The basis upon which the disposition is made and the authority of the person(s) involved in the decision of an equitable and prompt remedy;
    j.  Afford the complainant an opportunity to comment/dispute the investigative findings;
    k.  Prohibition against retaliation; and
    l.  Confidentiality of complaint filing, investigation and disposition.

8. The Title IX grievance procedures will:
    a.  Be contained within a document whose title and content clearly reflect that the grievance procedures are encompassed therein.
    b.  Clearly delineate the scope of the grievance procedures i.e., what it is, who may utilize it and who it applies to.
    c.  Clearly state that the grievance procedure may be used to file a complaint by students against both students and employees and define the term "grievance."
    d.  Reflect that OSU will document the filing of all complaints and conduct an appropriate investigation of all complaints filed pursuant to the grievance procedures.

AR_00001051

    e. Designate a timeframe to respond to a complainant and document this response. The response will acknowledge receipt of the complaint and what action(s) OSU will take.

    f. If the grievance procedures contain a definition of "discrimination," the definition should not contain any language that limits discrimination to conduct directed at an individual.

    g. Ensure that any disciplinary investigation procedures are not applied to or take the place of investigations of complaints of discrimination based on sex, including sexual harassment, that are processed pursuant to the grievance procedures.

Title IX does not require a separate sexual harassment complaint procedure. OSU assures OCR that if it chooses to adopt a separate sexual harassment complaint procedure, it will comply with the requirements outlined above.

9. By ___August 1___, 2004, OSU will review and revise its sexual harassment policies (Policies) to ensure the inclusion of the following:

    a. The name and title, office address and telephone number of the designated Title IX Coordinator(s), together with a description of his/her role in the complaint process;

    b. The identity of individuals (or offices) with whom a complainant may file a complaint;

    c. A provision requiring all faculty members and administrators who receive a complaint concerning sexual harassment on campus, in a college-related event or venue, or observes conduct that he/she believes may constitute sexual harassment on campus or in a college-related event or venue, to report the complaint or observations to the Title IX Coordinator(s) or his/her designee;

    d. Clear and understandable language cross-referencing the Policies to the University's grievance procedure under which claims of discrimination on the basis of sex are investigated and resolved; and

    e. The possible remedies and sanctions the University may impose as a result of its investigation.

10. OSU will provide all University students and all employees with written notice regarding the availability of the 1) Title IX sexual harassment policies, and 2) grievance procedure, for resolving Title IX complaints, together with information on the manner in which they may obtain a copy of the Policies and grievance procedure.

    a. By ___August 1___, 2004, OSU will send electronic messages containing the notice to all University employees and insert the notice in the on-line versions of University publications that provide general information to employees about employee services and University policies. In addition, OSU will insert such notices in the on-line versions of the current OSU *Student Rights and*

AR_00001052

*Responsibilities Governing Student Behavior* publication, course schedule, and other University publications (e.g., student general information bulletins) that provide general information to students about student services and University policies.

b.   By   August 15   , 2004, OSU will insert such notices in the print version of the OSU *Student Rights and Responsibilities Governing Student Behavior* publication and any other University publications (e.g., student general information bulletins) that provide general information to students about student services and University policies.

11.   Reporting to OCR:

a.   Within 30 days of publication, OSU will provide OCR with copies of all publications that have been created or revised to incorporate the specific notification information specified in ¶¶ 2. – 5. and 10. above, and that have been distributed in accordance with this Commitment.

b.   On or before   July 1   , 2004, OSU will provide OCR with a draft copy of the revised sexual harassment policies for OCR's review and comment.

c.   On or before   July 1   , 2004, OSU will provide OCR with a draft copy of the revised or newly created grievance procedure for OCR's review and comment.

d.   On or before   August 1   , 2004, OSU will provide OCR with the final revised sexual harassment policies.

e.   On or before   August 1   , 2004, OSU will provide OCR with the final revised grievance procedure.

/s/ Dr. Schmidly

_____
Dr. David J. Schmidly, President
Oklahoma State University, Stillwater, Oklahoma


Date Signed:   May 7, 2004

AR_00001053

Page 3- Dr. David Schmidly, President

filing a complaint alleging a violation of the Code of Conduct, including an informal administrative hearing and a formal hearing process for allegations for which suspension or expulsion are possible, and for student discrimination grievances.

OCR's investigation revealed, however, that information provided to students regarding the procedure to be used and where to file a complaint alleging discrimination on the basis of sex is confusing and unclear, thereby thwarting the prompt and equitable resolution of such allegations. Section XIII of the *Rights and Responsibilities* document, entitled Other University Policies, under the heading Sexual Harassment and Discrimination, states that grievance procedures for students are available in the Office of the Vice President for Student Affairs, Associate Vice President for Multicultural Affairs, Campus Life Office, and the Director of Student Services in the respective academic colleges, suggesting that some procedures other than those in the *Rights and Responsibilities* document exist and are to be used for resolving allegations of sex discrimination.  It does not refer to the *Rights and Responsibilities* document as containing the grievance procedures.

Another portion of the *Rights and Responsibilities* document also implies that there is another grievance procedure.  Appendix B to the *Rights and Responsibilities* document concerns sexual harassment and states that grievance procedures are available for students in the Office of the Vice President for Student Services, the Student Activity Center, and the Director of Student Services in the respective colleges. Further, a different section of Appendix B (§2.03 under a subheading entitled Procedures), states:  "persons who have a complaint alleging sexual harassment should state their complaint through normal administrative channels.  Individual administrators empowered to receive complaints shall include department heads, academic deans, directors or administrative supervisors of an operational unit."  The term "normal administrative channels" is not defined anywhere in the *Rights and Responsibilities* document.  Also, OCR was informed that only the University staff specifically named as empowered to receive a complaint of sexual harassment/assault has a duty to pass along to the appropriate University official(s) information they are provided by a student regarding an alleged incident of sexual harassment. Any faculty/staff that are not specifically named would not be required by any University policy to report an alleged act of sexual harassment unless they personally witnessed the harassment/assault.

In addition, Appendix C to the *Rights and Responsibilities* document, entitled Sexual Misconduct, which provides information regarding sexual assault and harassment, states:  "To consult about or report incidents of sexual harassment, against a student, go to the OSU student conduct office, and against OSU employees, go to the OSU Affirmative Action Office."

The *Rights and Responsibilities* document indicates that the Student Conduct Office should be contacted to help guide those who want to file a complaint.  According to the Director of the Student Conduct Office, she handles those complaints that allege student-on-student sexual harassment.  The Director of Affirmative Action handles complaints alleging employee-on-employee harassment.  The individual identified as holding the title of Title IX Coordinator, however, only investigates complaints alleging employee-on-student complaints.  This information is not contained in any of the sections of the above-described document.

Page 4- Dr. David Schmidly, President

Based on the foregoing, OCR determined that while the University possesses grievance procedures, they are not clear or easily understood so as to effectively provide students with sufficient knowledge of where to find the procedures, how they work, or how, and with whom to file a complaint alleging discrimination on the basis of sex. Therefore, they do not provide for the prompt and equitable resolution of complaints they may be raised under Title IX and its implementing regulation.

Additionally, during its investigation, OCR was informed of the name and position of the OSU official designated as the Title IX Coordinator for the University. However, OSU's current policies and publications do not contain a reference to the Title IX Coordinator, nor do they provide his identity, location and telephone number as required by the Title IX regulation. Based on the information and documentation reviewed by OCR in this investigation, OCR has determined that OSU has not provided the required notification regarding the Title IX Coordinator.

On May 7, 2004, OSU submitted the enclosed Commitment to Resolve (CTR). OCR has determined that upon full implementation, the CTR will satisfactorily resolve allegation two and the aforementioned concern regarding a Title IX Coordinator. As is our procedure, OCR will monitor OSU's implementation of this CTR per the language and deadlines contained therein. Should OSU fail to fully implement the action steps as set forth in the CTR, OCR will immediately resume its case processing activities.

This letter is not intended, nor should it be construed, to cover other civil rights issues that may exist, but are not included herein. Under OCR procedures we are obligated to advise the complainant and institution against which a complaint is filed that intimidation or retaliation against a complainant is prohibited by regulations enforced by this agency. Specifically, the regulations enforced by OCR, directly or by reference, state that no recipient or other person shall intimidate, threaten, coerce or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted or participated in any manner in a investigation, proceedings or hearing held in connection with a complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Thank you for your cooperation. If you have any questions concerning this matter, please call me at 214-880-4911.

Sincerely,

Sandra W. Stephens
Team Leader

Enclosure:  As stated

**Commitment to Resolve**
**Oklahoma State University (OSU)**
**OCR Case Number: 06032054**

In order to resolve the allegation in the above referenced complaint regarding the prompt and equitable resolution of complaints of discrimination based on sex, Oklahoma State University (OSU or University) makes the following commitments to the Office for Civil Rights (OCR), pursuant to Title IX of the Education Amendments of 1972 (Title IX).  OSU will implement the commitments specified below, within the specified timeframes:

1.  By __May 14__, 2004, OSU will designate at least one employee as its Title IX Coordinator, the responsible employee designated to coordinate its efforts to comply with Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §1681, and its implementing regulation at 34 C.F.R. Part 106 (2003), which prohibit discrimination on the basis of sex.

2.  By __June 1__, 2004, OSU will publish the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) by sending electronic messages to employees and to students enrolled at OSU.

3.  By __July 1__, 2004, OSU will publish the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) by inserting notices on (1) electronic employee applications and other University publications that provide general information to employees about employee services and University policies.  In addition, by inserting notices in (2) the on-line versions of the current *OSU Student Rights and Responsibilities Governing Student Behavior* publication, University Catalog, course schedule, and other University publications (e.g., student general information bulletin) that provide general information to students about student services and University policies and inserting notices on electronic student applications.

4.  By __July 1__, 2004, OSU will begin conspicuously posting notices of the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) in the following manner and in the following places:

    •  Campus bulletin boards;
    •  Campus housing;
    •  The student union;
    •  The University's web site;
    •  Disseminated through organizational notifications; and
    •  Other sites on campus where general campus information is disseminated to students and employees.

5.  By __August 1__, 2004, as print publications are revised, OSU will begin including the name and title, office address, and telephone number of the individual(s) designated as the Coordinator(s) in the OSU *Student Rights and Responsibilities*

*Governing Student Behavior* publication, University course catalogs, and other publications (e.g., student general information bulletins) in which general campus information is disseminated to students and employees.

6. Publication of the name and title, office address and telephone number of the designated Title IX Coordinator(s) will continue indefinitely for all subsequent publications and printings, pursuant to Title IX and its implementing regulation, 34 C.F.R. §106.9 (2003).

7. By ___August 1___, 2004, OSU will review and revise its current Title IX grievance procedures (paragraph IV. Disciplinary Responsibility of the *Student Rights and Responsibilities* publication) to ensure the prompt and equitable resolution of complaints alleging discrimination based on sex.  The Title IX grievance procedures will include, but are not limited to, the following components:

   a. The form in which a written complaint is to be filed;
   b. Timeframes for filing a complaint;
   c. Timeframes for the conducting of an investigation;
   d. Manner in which an investigation is to be conducted, and how a decision will be made;
   e. Process to ensure the impartiality of an investigation;
   f. Right to present information relevant to the complaint;
   g. Afford the parties the opportunity to be advised by an individual of his or her choice throughout the proceeding;
   h. The time within which a complainant shall expect a response regarding the disposition of the investigation;
   i. The basis upon which the disposition is made and the authority of the person(s) involved in the decision of an equitable and prompt remedy;
   j. Afford the complainant an opportunity to comment/dispute the investigative findings;
   k. Prohibition against retaliation; and
   l. Confidentiality of complaint filing, investigation and disposition.

8. The Title IX grievance procedures will:
   a. Be contained within a document whose title and content clearly reflect that the grievance procedures are encompassed therein.
   b. Clearly delineate the scope of the grievance procedures i.e., what it is, who may utilize it and who it applies to.
   c. Clearly state that the grievance procedure may be used to file a complaint by students against both students and employees and define the term "grievance."
   d. Reflect that OSU will document the filing of all complaints and conduct an appropriate investigation of all complaints filed pursuant to the grievance procedures.

AR_00001057

    e. Designate a timeframe to respond to a complainant and document this response. The response will acknowledge receipt of the complaint and what action(s) OSU will take.

    f. If the grievance procedures contain a definition of "discrimination," the definition should not contain any language that limits discrimination to conduct directed at an individual.

    g. Ensure that any disciplinary investigation procedures are not applied to or take the place of investigations of complaints of discrimination based on sex, including sexual harassment, that are processed pursuant to the grievance procedures.

Title IX does not require a separate sexual harassment complaint procedure. OSU assures OCR that if it chooses to adopt a separate sexual harassment complaint procedure, it will comply with the requirements outlined above.

9. By ___August 1___, 2004, OSU will review and revise its sexual harassment policies (Policies) to ensure the inclusion of the following:

    a. The name and title, office address and telephone number of the designated Title IX Coordinator(s), together with a description of his/her role in the complaint process;

    b. The identity of individuals (or offices) with whom a complainant may file a complaint;

    c. A provision requiring all faculty members and administrators who receive a complaint concerning sexual harassment on campus, in a college-related event or venue, or observes conduct that he/she believes may constitute sexual harassment on campus or in a college-related event or venue, to report the complaint or observations to the Title IX Coordinator(s) or his/her designee;

    d. Clear and understandable language cross-referencing the Policies to the University's grievance procedure under which claims of discrimination on the basis of sex are investigated and resolved; and

    e. The possible remedies and sanctions the University may impose as a result of its investigation.

10. OSU will provide all University students and all employees with written notice regarding the availability of the 1) Title IX sexual harassment policies, and 2) grievance procedure, for resolving Title IX complaints, together with information on the manner in which they may obtain a copy of the Policies and grievance procedure.

    a. By ___August 1___, 2004, OSU will send electronic messages containing the notice to all University employees and insert the notice in the on-line versions of University publications that provide general information to employees about employee services and University policies. In addition, OSU will insert such notices in the on-line versions of the current OSU *Student Rights and*

AR_00001058

*Responsibilities Governing Student Behavior* publication, course schedule, and other University publications (e.g., student general information bulletins) that provide general information to students about student services and University policies.

b. By ___August 15___, 2004, OSU will insert such notices in the print version of the OSU *Student Rights and Responsibilities Governing Student Behavior* publication and any other University publications (e.g., student general information bulletins) that provide general information to students about student services and University policies.

11.   Reporting to OCR:

a. Within 30 days of publication, OSU will provide OCR with copies of all publications that have been created or revised to incorporate the specific notification information specified in ¶¶ 2. – 5. and 10. above, and that have been distributed in accordance with this Commitment.

b. On or before ___July 1___, 2004, OSU will provide OCR with a draft copy of the revised sexual harassment policies for OCR's review and comment.

c. On or before ___July 1___, 2004, OSU will provide OCR with a draft copy of the revised or newly created grievance procedure for OCR's review and comment.

d. On or before ___August 1___, 2004, OSU will provide OCR with the final revised sexual harassment policies.

e. On or before ___August 1___, 2004, OSU will provide OCR with the final revised grievance procedure.

/s/ Dr. Schmidly

_____

Dr. David J. Schmidly, President
Oklahoma State University, Stillwater, Oklahoma


Date Signed: ___May 7, 2004___

AR_00001059

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Wednesday, September 13, 2017 1:10 PM |
| **To:** | Jackson, Candice |
| **Subject:** | standard of proof used prior to 2011 DCL |

Candice –

(b)(5)



**From:** Karvonides, Mia
**Sent:** Wednesday, September 13, 2017 12:49 PM
**To:** Patel, Shiwali; Wheeler, Joseph
**Cc:** Reyes, Alejandro; Faiella, Matt; Gettler, Rachel

**Subject:** question



# DPP

AR_00001061

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Wednesday, September 13, 2017 5:07 PM |
| **To:** | Jackson, Candice; Sherman, Brandon; Kissel, Adam; Eitel, Robert |
| **Attachments:** | Q-A 9-13-17.docx; Q-A 9-13-17 clean.docx |

AR_00001062

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Thursday, September 14, 2017 3:49 PM |
| **To:** | Jackson, Candice; Sherman, Brandon; Eitel, Robert; Venable, Joshua |
| **Attachments:** | DCL 9-14-17.docx; Q-A 9-14-17.docx |

AR_00001063

**Karvonides, Mia**

| | |
|---|---|
| **From:** | Karvonides, Mia |
| **Sent:** | Thursday, September 14, 2017 3:49 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Q-A 9-13-17 (ocr edits 9-14x) privileged deliberative confidential |
| **Attachments:** | Q-A 9-13-17 (ocr edits 9-14x).docx |

Here you go!

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, September 14, 2017 6:54 PM |
| **To:** | Menashi, Steven |
| **Subject:** | By Muddying On-Campus Sexual Assault Policies, DeVos Is Making Students—and Schools—Less Safe - Rewire |

https://rewire.news/article/2017/09/11/on-campus-policies-devos-students-schools-safe/

I haven't seen this reported more broadly, but check out near the end of this article - a link to a DOJ memo dated Feb 2017.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Jackson, Candice

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, September 15, 2017 8:56 AM |
| **To:** | Bailey, Nathan; Hill, Elizabeth; Ferguson, Gillum; Eitel, Robert; Menashi, Steven; Sherman, Brandon |
| **Subject:** | Fwd: BIG NEWS: 73% of American Adults agree with DeVos's statement about replacing the Obama-era guidelines on sexual assault on college campuses |

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

http://www.rasmussenreports.com/public_content/politics/current_events/social_issues/most_americans_agree_with_devos_on_sexual_misconduct_on_campuses

# Most Americans Agree With DeVos on Sexual Misconduct on Campuses

Wednesday, September 13, 2017

During a speech at George Mason University's Antonin Scalia Law School last week about sexual assault on campus, education Secretary Betsy DeVos stated, "Every survivor of sexual misconduct must be taken seriously. Every student accused of sexual misconduct must know that guilt is not predetermined." Despite outcry that looking out for both the victim and the accused sweeps the issue of sexual assault under the rug, a strong majority of Americans agrees with DeVos's statement, but are split on whether the federal government should even be involved in these matters.

A new Rasmussen Reports national telephone and online survey finds that 73% of American Adults agree with DeVos's statement about replacing the Obama-era guidelines on sexual assault on college campuses. Just six percent (6%) disagree, and a sizeable 20% are not sure how they feel about her statement. (To see survey question wording, click here.)

Americans in general are split, however, on whether sexual assault on campus is an area that the federal government has any business being involved in. Forty-seven percent (47%) say the federal government should be involved, but 40% disagree. Thirteen percent (13%) are not sure whether the government should be involved in cases of sexual assault on college campuses at all.

Seventy-five (75%) of Americans say the issue of sexual assault on college campuses is a serious issue, while 15% disagree. This includes 44% who say the issue is Very Serious and just 3% who say it's Not At All Serious. The number who see sexual violence on college campuses as a serious problem is up from 71% in September 2014.

Women and adults under 40 are more likely than men and older adults to say that sexual assault on college campuses is a Very Serious problem. They are also slightly more likely to agree with DeVos's statement.

In September 2014, just after California became the first state to pass a "yes means yes" bill which requires affirmative consent before sexual activity on state-funded campuses, 38% of Americans believed sexual assault on campus is an issue the federal government should be involved in.

The survey of 1,000 American Adults was conducted on September 10-11, 2017 by Rasmussen Reports. The margin of sampling error is +/- 3 percentage points with a 95% level of confidence. Field work for all Rasmussen Reports surveys is conducted by Pulse Opinion Research, LLC. See methodology.

Fifty-six percent (56%) of Americans ages 18 to 39 think sexual assault on campus is an issue the federal government should be involved in, a view shared by 43% of those ages 40 to 64 and 35% of voters above the age of 65.

A majority of Americans across all political parties agree with DeVos's remarks.

Fifty-two percent (52%) of Republicans think the federal government should stay out of issues of sexual assault on campus, while 57% of Democrats think it's an issue that should involve the federal government. Americans not affiliated with either major party are evenly divided on this question.

Fifty-one percent (51%) of adults who are not married think the federal government should be involved with sexual assault issues on college campuses. Forty-six percent (46%) of married adults don't think the federal

AR_00001067

government should get involved in these issues. Adults with children at home are slightly more likely than those without children to say that the federal government should be involved in these matters.

Most voters across the demographic board consider sexual violence at colleges and universities a serious problem.

Just eight percent (8%) of all adults said in September 2014 that college and university campuses can ever be made completely safe from violent incidents.

Thirty-nine percent (39%) of adults think there is less freedom of speech on U.S. college campuses today than there has been in the past.

Nearly half of Americans believe colleges and universities do not do enough to monitor students' behavior.

## United States Senate

WASHINGTON, DC 20510

September 14, 2017

The Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

Dear Secretary DeVos,

We write with concern regarding your recent announcement that the U.S. Department of
Education ("Department") intends to "revoke or rescind" the current guidance addressing
enforcement of Title IX of the Education Amendments of 1972 ("Title IX") related to sexual
harassment, including sexual violence, and to undertake a formal rulemaking process to create
new Title IX regulations on this topic. The current guidance is critical to ensuring that schools
understand and take seriously their responsibilities under the law, and we urge you to leave the
current guidance in place. Rescinding the guidance would be a step in the wrong direction in
addressing the national epidemic of campus sexual assault.

For over four decades, Title IX has improved access to educational programs and benefits by
prohibiting schools from discriminating against individuals on the basis of sex. In order to
comply with this landmark civil rights law, schools must respond promptly and effectively to
sexual violence and sexual harassment. Last week, you indicated that you plan to take a different
approach to enforcing this law, including an end to the use of Dear Colleague letters and
guidance. Confusingly, Department spokespersons have also now indicated that while the
Department writes new regulations, you plan to rescind the existing guidance and replace it with
new temporary guidance. This shows neither a dedication to a fully transparent process including
robust stakeholder engagement, nor a commitment to supporting survivors in obtaining justice
and ensuring they are safe on campus.

Students around the country are just starting school and wondering if the Department will
continue to protect and enforce their rights under Title IX. Schools have policies in place that
were developed based on the existing guidance, and putting out new temporary guidance will
only confuse both schools and students as to how your Department and the Office for Civil
Rights (OCR) plans to enforce Title IX. If the Department moves forward with a rulemaking
process to change its enforcement of Title IX, we urge the Department to make clear to schools,
parents, and students that the Department will continue to enforce the existing Title IX
guidelines. This is the only way to avoid serious disruption and uncertainty on campuses, and to
demonstrate that the Department continues to take the problem of campus sexual assault
seriously. Rather than rescinding the existing Title IX guidance, you should be focusing on using
all available resources at OCR to ensure there are staff available to answer questions from
schools, students, and parents as well as to fully investigate complaints.

1

We ask that you uphold a fully transparent process, including the opportunity for substantive stakeholder engagement in the development of any potential changes to the Department's enforcement of Title IX. We also ask that you respond to this letter before you take any steps to rescind existing Title IX guidance. Thank you for your attention to this matter.

Sincerely,

PATTY MURRAY
United States Senator

ROBERT P. CASEY, Jr.
United States Senator

RICHARD BLUMENTHAL
United States Senator

KIRSTEN GILLIBRAND
United States Senator

CLAIRE MCCASKILL
United States Senator

CHARLES E. SCHUMER
United States Senator

TAMMY BALDWIN
United States Senator

MICHAEL F. BENNET
United States Senator

SHERROD BROWN
United States Senator

MARIA CANTWELL
United States Senator

CATHERINE CORTEZ MASTO
United States Senator

TAMMY DUCKWORTH
United States Senator

2

DIANNE FEINSTEIN
United States Senator

AL FRANKEN
United States Senator

KAMALA D. HARRIS
United States Senator

MARGARET WOOD HASSAN
United States Senator

MAZIE K. HIRONO
United States Senator

TIM KAINE
United States Senator

AMY KLOBUCHAR
United States Senator

PATRICK J. LEAHY
United States Senator

EDWARD J. MARKEY
United States Senator

ROBERT MENENDEZ
United States Senator

BERNARD SANDERS
United States Senator

JEANNE SHAHEEN
United States Senator

JON TESTER
United States Senator

JACK REED
United States Senator

3

AR_00001071

RICHARD J. DURBIN
United States Senator

THOMAS R. CARPER
United States Senator

CHRISTOPHER A. COONS
United States Senator

4

AR_00001072

**S. Daniel Carter**

---

| | |
|---|---|
| **From:** | S. Daniel Carter |
| **Sent:** | Friday, September 15, 2017 9:20 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: Interim Title IX Guidance & The Clery Act |

You're welcome. I very much appreciate how diligently you are gathering information from a multitude of stakeholders and perspectives.

If I or any members of my team, which on this aspect of campus safety includes two survivors Meghan Wright and Kathy Redmond who conduct training sessions on various sexual assault related issues, can be of assistance to you please don't hesitate to call on us. My cell phone is 865-414-1617.

--

S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

---

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Friday, September 15, 2017 at 9:07 AM
**To:** "S. Daniel Carter" <s.daniel.carter@safecampuses.biz>
**Subject:** Re: Interim Title IX Guidance & The Clery Act

Thank you for this input. I keep up with your work and articles and find this information and perspective very helpful.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 15, 2017, at 9:00 AM, S. Daniel Carter <s.daniel.carter@safecampuses.biz> wrote:

> Dear Secretary DeVos:
>
> Although I would prefer that the 2011 Title IX "Dear Colleague Letter" (DCL) remain in place prior to the completion of the upcoming notice and comment period on Title IX guidance, if you move forward with interim guidance I would like to draw your attention to key elements of the Jeanne Clery Act that will likely help to address concerns of both sexual violence survivors and the accused.
>
> Most notably, as I outline in more detail in my blog at the link below, in sexual assault, dating violence, domestic violence, and stalking cases at institutions of higher education the Clery Act requires that disciplinary proceedings must be a "prompt, fair, and impartial process from the initial investigation to the final result". Additionally, officials conducting such proceedings must "not have a conflict of interest or bias for or against the accuser or the accused". These are

guarantees intended to protect both the "the accuser and the accused".

Enumerated procedural safeguards for both parties include, among other things, the right to have an attorney present, and "timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearing". The purpose of these protections is to avoid the type of problems you discussed in your Title IX announcement last week. I firmly believe that if you were to highlight them it would go a long way to addressing many of the longstanding concerns accused students and their advocates have brought to your attention. While concerns will certainly remain about the DCL's protections, I think this would also help reassure survivors and their advocates.

I hope these insights will be useful to you, and thank you in advance for your consideration.

http://www.huffingtonpost.com/entry/the-federal-jeanne-clery-act-already-addresses-many_us_59bb128ce4b06b71800c37f7

--
S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Sunday, September 17, 2017 9:12 AM |
| **To:** | Hans Bader |
| **Subject:** | Re: "Civil Rights Experts Issue Report on Unjustified Federal Meddling in Education" |

Thanks Hans!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 15, 2017, at 7:17 PM, Hans Bader <Hans.Bader@cei.org> wrote:

> In a paper released on Tuesday, lawyers and academics took a look at some of the Obama Education Department's Dear Colleague letters (including about sexual harassment & assault; race and school discipline; and transgender mandates) and disagreed with their interpretation of Title IX and Title VI.
>
> On Wednesday, a column in the Wall Street Journal by Jason Riley called for the withdrawal of one of those letters, the January 8, 2014 *Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline* (see the *second* item below), which I wrote about in the recently released paper, and also discuss in the *first* item below.
>
> Thanks for taking the time to read these items.
>
> Hans Bader
>
> 1.
>
> https://cei.org/blog/civil-rights-experts-issue-report-unjustified-federal-meddling-education

# Civil Rights Experts Issue Report on Unjustified Federal Meddling in Education

Hans Bader • September 15, 2017
On September 12, the Federalist Society's Regulatory Transparency Project released a paper about illegal overreaching by the Obama-era Education and Justice Departments, which resulted in policies that still persist today. The paper, written mostly by people with a civil rights background, examines three areas in which the federal government attempted to micromanage educational institutions by imposing new rules that never went through the legally-prescribed rulemaking process and purported to do so based on antidiscrimination statutes passed many years ago. These rules dealt with three areas: (1) transgender bathroom, locker, and dormitory room access

AR_00001075

under Title IX, a statute which bans discrimination based on "sex," not "gender identity"; (2) investigations by colleges and schools of sexual assault and harassment claims, also under Title IX; and (3) school districts that suspend more students of one race than another, or whose discipline policies have an unintentional "disparate impact," under Title VI, a statute which bans intentional racial discrimination.

I am the principal author of the portion of the paper dealing with topic (3), the 2014 Obama administration "Dear Colleague" letter that pressured schools to have equal suspension rates for different ethnic groups, even if the only reason ethnic groups had different suspension rates was because of students' conduct, not racism – *i.e.,* different ethnic groups had different rates of violating school rules.

The Trump administration has taken some action on the first two areas, rescinding two of the Obama administration's "guidance" documents on transgender issues, and suggesting last week that it would rescind one of the Obama administration's "Dear Colleague" letters on campus sexual harassment and assault tribunals (I agreed with Education Secretary Betsy Devos's decision to do so).

Roger Clegg of the Center for Equal Opportunity, a member of the Project, wrote in *National Review* that he hopes that the Trump administration will also take action on the third area, school district discipline policies, noting that the Manhattan Institute's "Jason Riley has an excellent column in the *Wall Street Journal*…about why the Obama administration's guidance on school discipline and race was bad law and bad policy."

Riley, an African-American, points out that the guidance, and the disciplinary policies recommended by the Obama Education Department, have harmed many of the minority students they were supposed to help:

> The effects are being felt in schools across the country, leaving black and Hispanic students, the policy's theoretical beneficiaries, worse off.
>
> After the Los Angeles school district, where more than 82% of students are Latino or black, ended suspensions for nonviolent offenses, the district reported that the number of students who said they felt safe in school dropped to 60% from 72%. When Chicago curbed suspensions, students and teachers felt the increased disorder. And following New York City's reforms making it more difficult to keep disruptive kids out of the classroom, the schools that showed increased fighting, gang activity and drug use tended to be those with the highest percentages of minority students.

Moreover, Riley notes, there is no evidence that disparities in school suspension rates between different races reflect white racism:

> ...these disparities persist in schools with black and Hispanic principals, teachers and administrators, who would have no reason to single out minorities for punishment unless the behavior warranted it.

Moreover, there is also little evidence for the Obama administration's suggestion that suspensions do not advance an important educational goal except in the most extreme cases, a controversial contention known as the "school to prison pipeline" theory.

Opponents of suspension also claim that it harms children down the road…But the "school-to-prison pipeline" theory, which has been advocated by activists with the Civil Rights Project at UCLA, among others, has come under increasing scrutiny. There's plenty of evidence that someone who gets suspended is more likely to drop out of school, but there's little evidence that the suspension caused the dropping out. In fact, a March paper posted by the University of Arkansas found that students who had been suspended were doing better in math and reading after one year. Suspensions were correlated with improved academic outcomes—the opposite of the chain of negative effects that opponents predicted.

In short, it appears that students who violate school rules are more likely to drop out than other students regardless of whether a school suspends them or not (presumably because rule-violators are the sort of people who, by nature, are more likely to drop out, and later end up in jail, to begin with). And a short suspension appears to make many disruptive students behave better, and learn more, in school.

Curbing suspensions of disruptive students harms many of the classmates of disruptive students, especially minority students. Prof. Joshua Kinsler found that "in public schools with discipline problems, it hurts those innocent African American children academically to keep disruptive students in the classroom," and "cutting out-of-school suspensions in those schools *widens* the black-white academic achievement gap." Similarly, education researcher Max Eden noted in the *New York Post* that a "study by a University of Georgia professor found that efforts to decrease the racial-suspension gap actually increase the racial achievement gap."

This is at odds with the claims by Obama's Education Secretary Arne Duncan, who suggested in announcing the new rules that suspensions generally do not advance important educational goals, and thus are illegal if a school does not achieve racial proportionality in suspension rates. Confusing cause and effect, and endorsing the "school-to-prison pipeline" theory, Duncan noted that "suspended students are less likely to graduate on time—and are more likely to repeat a grade, drop out of school, and become involved in the juvenile justice system."

Since these remarks by Duncan prefaced the Obama administration's Dear Colleague letter to the nation's schools about how to change their school discipline rules, they were widely interpreted as casting doubt on schools' ability to suspend even extremely disruptive students if a school did not have racially proportional suspension rates. That is because the Dear Colleague Letter banned racially disproportionate suspension rates resulting even from "neutral," and "evenhanded" application of colorblind discipline rules, unless they could show that the suspension policy advanced "important educational" goals. [*See* Obama Education & Justice Departments, *Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline*, January 8, 2014, at pp. 11, 13, 18-19].

Demanding racial proportionality in suspension rates, as Duncan effectively did, leads to unfairness and racial double standards. Such demands are unconstitutional and a violation of Title VI's ban on racial quotas. The Seventh Circuit Court of Appeals made this clear in striking down as unconstitutional a provision that forbade a "school district to refer a higher percentage of minority students than of white students for discipline unless the district purges all 'subjective' criteria from its disciplinary code," concluding that that constituted a forbidden racial quota. As it noted, "racial disciplinary quotas violate equity" by "either systematically overpunishing the innocent or systematically underpunishing the guilty," and thus violate the requirement that "discipline be administered without regard to race or ethnicity." (*People Who Care v. Rockford Board of*

*Education*, 111 F.3d 528, 538 (7th Cir. 1997)).

You can find the Federalist Society paper, which was written by its "Race & Sex Working Group," at this link.  It is titled, "A Review of Department of Education Programs: Transgender Issues, Racial Quotas in School Discipline, and Campus Sexual Assault Mandates." It is co-authored mostly by people with a civil rights background, including law professor and civil rights commissioner Gail Heriot; former Civil Rights Commission director Linda Chavez;  and former Deputy Assistant Attorney General for Civil Rights Roger Clegg.

Lawyer and journalist Stuart Taylor, who used to cover legal affairs and the Supreme Court for *The New York Times*, also helped write it, as the primary author of the section dealing with campus sexual assault and harassment. I was included in the Working Group because I used to practice civil rights law, including a stint at the Education Department's Office for Civil Rights.

2. https://www.wsj.com/articles/another-obama-policy-betsy-devos-should-throw-out-1505256976

# Another Obama Policy Betsy DeVos Should Throw Out

A 2014 guidance letter on racial disparities in school discipline has helped create classroom chaos.
Education Secretary Betsy DeVos touring a Grand Rapids, Mich., school, Aug. 1.
Photo: Neil Blake/Associated Press



By
Jason L. Riley
Sept. 12, 2017 6:56 p.m. ET
129 COMMENTS
When Education Secretary Betsy DeVos announced last week that the Trump administration would revisit its predecessor's "guidance" on adjudicating accusations of campus sexual assault, she added that "the era of 'rule by letter' is over." Well, not quite. A second instance of the Education Department's overreach under President Obama, this one involving discipline in public schools, remains firmly in place.

In 2012 the Education Department released a study showing that black students were three times as likely to be suspended and expelled as their white counterparts. Two years later, the department issued a "Dear Colleague" letter warning school districts to address this racial imbalance, or else. The letter said that even if a disciplinary policy "is neutral on its face—meaning that the policy itself does not mention race—and is administered in an evenhanded manner" the district still could face a federal civil-rights investigation if the policy "has a *disparate impact*, *i.e.*, a disproportionate and unjustified *effect* on students of a particular race."

The threat worked. Fending off charges of discrimination can be expensive and

AR_00001078

embarrassing, so spooked school districts chose instead to discipline fewer students in deference to Washington. The Obama guidance didn't start the trend—suspensions were down nearly 20% between 2011 and 2014—but the letter almost certainly hastened it. The effects are being felt in schools across the country, leaving black and Hispanic students, the policy's theoretical beneficiaries, worse off.

After the Los Angeles school district, where more than 82% of students are Latino or black, ended suspensions for nonviolent offenses, the district reported that the number of students who said they felt safe in school dropped to 60% from 72%. When Chicago curbed suspensions, students and teachers felt the increased disorder. And following New York City's reforms making it more difficult to keep disruptive kids out of the classroom, the schools that showed increased fighting, gang activity and drug use tended to be those with the highest percentages of minority students.

Somehow racial balance in the rates of suspension and expulsion has become more important than school safety. As Max Eden, my colleague at the Manhattan Institute, wrote in a March report, these policies turn the focus toward the well-being of the bullies rather than their victims. "Advocates of discipline reform often say that they are concerned that a suspension may have negative effects on the student being disciplined," Mr. Eden wrote. "They are largely unconcerned about the potential of discipline reform to increase classroom disruption and schoolhouse disorder—and the harmful consequences of that disorder for well-behaved and engaged students." When you diminish a teacher's and a principal's authority to discipline students, you undermine their ability to do their job. Disorder only begets more disorder; students who misbehave and face no consequences soon have imitators.

Yet civil-rights activists, liberal academics, policy makers and others calling for fewer suspensions—come what may—insist that what explains imbalances in school discipline is racism, not varying rates of misbehavior. Never mind that these disparities persist in schools with black and Hispanic principals, teachers and administrators, who would have no reason to single out minorities for punishment unless the behavior warranted it. Arne Duncan, the education secretary under Mr. Obama when the "Dear Colleague" letter was issued, said in 2014 that racially uneven discipline is "not caused by differences in children" and that "it is adult behavior that needs to change."

Opponents of suspension also claim that it harms children down the road. A suspended student, for example, is more likely to drop out of school and be incarcerated as an adult. But the "school-to-prison pipeline" theory, which has been advocated by activists with the Civil Rights Project at UCLA, among others, has come under increasing scrutiny. There's plenty of evidence that someone who gets suspended is more likely to drop out of school, but there's little evidence that the suspension caused the dropping out. In fact, a March paper posted by the University of Arkansas found that students who had been suspended were doing better in math and reading after one year. Suspensions were correlated with improved academic outcomes—the opposite of the chain of negative effects that opponents predicted.

That means the 2014 guidance, which is wreaking havoc on schools, was justified with what Mr. Eden described to me as "old and limited evidence," now called into question by "new and more robust evidence." Mrs. DeVos can't fix this mess soon enough.

Appeared in the September 13, 2017, print edition.

**S. Daniel Carter**

| | |
|---|---|
| **From:** | S. Daniel Carter |
| **Sent:** | Sunday, September 17, 2017 12:06 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Re: Interim Title IX Guidance & The Clery Act |

Assistant Secretary Jackson,

As you know, I'm hopeful that the Department will consider leaving the DCL in place during the upcoming public notice and comment period. It is my belief that a great many of the problems Secretary DeVos and you have heard about this year stem more from your immediate predecessor's overreach rather than the DCL itself. Notably, as I point out in my latest blog linked below, the DCL specifically directs schools to uphold due process and requires or recommends procedural safeguards for both the accused and accuser. Secretary DeVos has already had a major impact on how schools understand what is expected of them, and if this can be tied to the protections enumerated in the DCL I'm hopeful this can accomplish your goals.

I recognize that there is significant controversy and disagreement about the "preponderance of the evidence" standard. I can only point out that OCR was requiring this of institutions at least as early as 1995 – covering reports of sexual harassment occurring as early as 1991, and that as courts have pointed out this standard is consistent with due process requirements especially in the presence of specific procedural safeguards like those laid out in the DCL as well as the Clery Act.

I hope you will take the time to read my blog, which also discusses aspects of how the DCL came to be that aren't that widely known, and share with your colleagues as a part of your decision making process. As always I stand ready to answer any questions you may have, and assist however I can.

http://www.huffingtonpost.com/entry/in-defense-of-the-title-ix-dear-colleague-letter_us_59bddb9ae4b06b71800c3a2f
--
S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

_____

**From:** "S. Daniel Carter" <s.daniel.carter@safecampuses.biz>
**Date:** Friday, September 15, 2017 at 9:20 AM
**To:** Candice Jackson <Candice.Jackson@ed.gov>
**Subject:** Re: Interim Title IX Guidance & The Clery Act

You're welcome. I very much appreciate how diligently you are gathering information from a multitude of stakeholders and perspectives.

If I or any members of my team, which on this aspect of campus safety includes two survivors Meghan Wright and Kathy Redmond who conduct training sessions on various sexual assault related issues, can be of assistance to you please don't hesitate to call on us. My cell phone is 865-414-1617.
--

S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

---

**From:** Candice Jackson <Candice.Jackson@ed.gov>
**Date:** Friday, September 15, 2017 at 9:07 AM
**To:** "S. Daniel Carter" <s.daniel.carter@safecampuses.biz>
**Subject:** Re: Interim Title IX Guidance & The Clery Act

Thank you for this input. I keep up with your work and articles and find this information and perspective very helpful.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 15, 2017, at 9:00 AM, S. Daniel Carter <s.daniel.carter@safecampuses.biz> wrote:

Dear Secretary DeVos:

Although I would prefer that the 2011 Title IX "Dear Colleague Letter" (DCL) remain in place prior to the completion of the upcoming notice and comment period on Title IX guidance, if you move forward with interim guidance I would like to draw your attention to key elements of the Jeanne Clery Act that will likely help to address concerns of both sexual violence survivors and the accused.

Most notably, as I outline in more detail in my blog at the link below, in sexual assault, dating violence, domestic violence, and stalking cases at institutions of higher education the Clery Act requires that disciplinary proceedings must be a "prompt, fair, and impartial process from the initial investigation to the final result". Additionally, officials conducting such proceedings must "not have a conflict of interest or bias for or against the accuser or the accused". These are guarantees intended to protect both the "the accuser and the accused".

Enumerated procedural safeguards for both parties include, among other things, the right to have an attorney present, and "timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearing". The purpose of these protections is to avoid the type of problems you discussed in your Title IX announcement last week. I firmly believe that if you were to highlight them it would go a long way to addressing many of the longstanding concerns accused students and their advocates have brought to your attention. While concerns will certainly remain about the DCL's protections, I think this would also help reassure survivors and their advocates.

I hope these insights will be useful to you, and thank you in advance for your consideration.

http://www.huffingtonpost.com/entry/the_-federal-jeanne-clery-act-already-addresses-many_us_59bb128ce4b06b71800c37f7

--

S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

**Candice Jackson**

---

| | |
|---|---|
| **From:** | Candice Jackson |
| **Sent:** | Monday, September 18, 2017 9:01 AM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: Federalist Society paper including my section on campus rape controversy |
| **Attachments:** | Federalist RTP-Sept 12 paper.pdf; ATT00001.htm; Stuart Taylor-comments on federal campus sex mandates.docx; ATT00002.htm |

Begin forwarded message:

**From:** Stuart Taylor [ PII @gmail.com>
**Date:** September 12, 2017 at 1:03:37 PM EDT
**To:** Candice Jackson <candice@cejacksonlaw.com>
**Subject: Federalist Society paper including my section on campus rape controversy**

Candice,

I attach a PDF of a paper released today by the Race & Sex Working Group (to which I am a consultant) of the Federalist Society's Regulatory Transparency Project.

The title ("Interpreting Titles No Tiny Task") is silly and completely nondescriptive. I don't know how that happened, and I will try to get it changed. The three sections are about transgender issues in schools, racial quotas in school discipline, and (university) campus sexual assault mandates.

The last section , which I drafted , is on pages 12-22. It is similar if not identical to the comments that I posted on the DOE website on or about July 7, which I also attach. Suggestions for reform are summarized on p. 21-22.

Below is a link to the online version, including links to bios of the Race & Sex Working G roup :
https://regproject.org/paper/  interpreting -titles -no -tiny-task/

When you begin the notice-and-comment process, I plan to submit as comments the relevant portion of this paper and (if KC agrees and our publisher consents) a PDF of our book.

Best, Stuart



# Interpreting Titles No Tiny Task

## Race & Sex Working Group

Hans Bader

Linda Chavez (Chair)

Roger Clegg

Gail Heriot

Stuart Taylor, Jr. (Unpaid Consultant)

This paper was the work of multiple authors. No assumption should be made that any or all of the views expressed are held by any individual author. In addition, the views expressed are those of the authors in their personal capacities and not in their official/professional capacities.

**To cite this paper:** H. Bader, et al., "Interpreting Titles No Tiny Task", released by the Regulatory Transparency Project of the Federalist Society, September 12, 2017 (https://regproject.org/wp-content/uploads/RTP-Race-Sex-Working-Group-Paper.pdf).

12 September 2017

AR_00001085

# Table of Contents

Executive Summary                                    3-4

Transgender Guidance                                 4-7

Racial Quotas in School Discipline                   7-12

Campus Sexual Assault Mandates                       12-22

AR_00001086

## Executive Summary

Perhaps nowhere in the regulatory field have government efforts gone as far astray from the letter and intent of the law as they have in the arena of race and sex discrimination in education. Laws passed in the 1960s and '70s to protect individuals from invidious discrimination based on race, color, national original, sex or religion have over the years been reinterpreted through regulations to expand prohibited actions far beyond actual discriminatory behavior to include any action that might lead to different outcomes for racial minorities and women in school assignments, university admissions, sports funding and, most recently, disciplinary procedures in public schools, colleges, and universities. In addition, the Education Department has even attempted to prohibit schools from restricting locker rooms and bathrooms based on sex instead of the more fluid definition of gender identity.

Two civil rights provisions in particular have been subject to this kind of expansive enforcement through regulation: Title VI of the 1964 Civil Rights Act and Title IX of the 1972 Education Act Amendments. Title VI provides, in short, that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title IX declares, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance"; however, the Act goes on to cite several exceptions, including a specific prohibition against "require[ing] any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist. . . ." The laws seem straightforward and commendable, insuring that individuals receive equal treatment and opportunity without regard to race or sex — characteristics, which have, until recently in the case of sex, been regarded as immutable.

However, as the three sections of this paper demonstrate, these provisions have now been stretched beyond recognition through a series of memoranda and guidance issued by the Department of Education (DoEd) regarding their enforcement. For example, DoEd issued a guideline to schools to allow students to use locker room and bathroom facilities based on their gender-identity instead of their biological sex. DoEd has also pressured schools to change disciplinary procedures so that minority students not be disciplined at higher levels than white students, in effect imposing racial quotas in suspensions. Lastly, we examine how DoEd has compelled colleges and universities to change their adjudicatory process for alleged sexual assaults. Now is an opportune time to determine how we can restore the original intent of Title VI and Title IX, and stop federal agencies from engaging in coercive pressure on schools and universities to promote social engineering on race and sex.

This paper details several areas where a single federal administrative agency has replaced the legitimate function of the legislature to define discrimination based on race, color, national origin, sex, and religion. While the Constitution gives the executive branch the authority to implement the law, it does not grant it authority to redefine, expand beyond recognition, or upend the laws passed

3

by Congress. In the three areas outlined here, the remedy is a simple one: rescind the guidances on access to intimate facilities based on gender identity, school discipline, and campus sex mandates. But these actions alone are insufficient. A careful analysis of all existing regulations under Title VI and Title IX, including a review of relevant court decisions, should be undertaken to determine which regulations can and should be modified or rescinded to comport with both the law and common sense.

I.      Transgender Guidance

*On February 22, 2017, the new Administration, as one of its first acts in the area of education policy, issued a new Dear Colleague Letter on the subject of transgenderism. The new Dear Colleague Letter rescinds the Dear Colleague Letter of May 13, 2016 as well as an earlier letter from a mid-level Department of Education staff member, both of which are discussed below. The stated reason for the rescission was "to further and more completely consider the legal issues involved." On March 6, 2017, as a result of the earlier Dear Colleague Letter's rescission, the Supreme Court vacated the judgment in Gloucester County School District v. G.G., which is also referred to below, and remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of the February 22, 2017 guidance document. The following material was written before either of these events. Because both the outcome of the Gloucester County case and the ultimate resolution of the transgender issue are still in doubt, this paper's contributors include the material.*

The right to be different is what freedom is all about. Freedom-loving Americans should therefore stoutly resist government efforts to force conventional notions of masculinity or femininity on private citizens.

But there is not much of that going on these days. Instead we are getting something that Americans should resist at least as forcefully: Bureaucratic directives that create legal obligations out of thin air.

One such directive is the Department of Education's transgender locker room policy, which the Supreme Court will soon be examining. The case — *Gloucester County School District v. G.G.* — is just one of several cases relating to that policy pending in federal courts around the country.

*Gloucester County* concerns an anatomically female student, referred to in the litigation as "G.G.," who psychologically identifies as a boy and wants to use the boys' restrooms, locker room, and showers. In 2015, a mid-level DoEd staff member informed the largely rural Virginia school district that it must comply with G.G.'s wishes if it wants to keep its federal funding. That staff member's instruction was followed up with an official "Dear Colleague Letter," issued jointly by DoEd and the Department of Justice on May 13, 2016, laying out the same view in greater detail. The letter was addressed to all federally funded schools and universities across the nation.

This *should be* one of the easier cases to come before the Court. A longstanding American custom holds that communal restrooms, locker rooms, and showers should be separated by sex. Up until very recently, nearly everyone understood sex to be a biological concept and anatomy to be its primary indicator.

4

The custom was not established by law. In theory, the owners of communal facilities could choose some other determinant — like the newly-popular concept of "gender identity" or even astrological sign — if that was what they wanted. But, while no doubt a few under-the-radar exceptions to the rule occurred, few facilities openly departed from the general custom.

DoEd is now uprooting this custom and replacing it with a one-size-fits-all mandate. According to the "Dear Colleague Letter" of May 13, 2016, henceforth, federally funded schools must separate students based on gender identity rather than actual sex in assigning intimate facilities. Put more clearly, anatomically intact males must be permitted to use the restrooms, locker rooms, and showers for females if they say they identify psychologically as females (and vice versa). The policy applies to athletic teams also, although the letter's language is more vague when it discusses athletics.

DoEd's argument is that it is simply interpreting a regulation issued pursuant to Title IX of the Education Amendments of 1972. It further argues that pursuant to a Supreme Court case called *Auer v. Robbins*, courts are legally obligated to defer to its interpretation of that rule. But neither Title IX nor the regulation at issue mandates putting anatomical boys in girls' showers. Indeed, the 92nd Congress, which passed Title IX in 1972, and President Gerald Ford, who signed the regulation into law in 1975, would be astonished at this "interpretation."

Title IX bans sex discrimination only. There appears to be no near-in-time examples where "sex" or "discrimination" was used as DoEd now demands.

To the contrary, for decades, the terms "gender" and "gender identity" have been used, especially in the LGBT community, to contrast with "sex." While "sex" is an anatomical and biological concept, when the term "gender" is used, it is thought to be a state of mind. A "transsexual" has undergone a "sex-change operation," while a "transgender" simply shares habits and traits with the opposite sex, while retaining the body of the sex he or she was born with.

One of the original transgender activists, Virginia Prince, an anatomical male who dressed and lived as a woman, put it this way in 1969: "I, at least, know the difference between sex and gender, and have simply elected to change the latter and not the former. If a word is necessary, I should be termed 'transgenderal.'"[1]

Thus, even in the unlikely event that Members of the 92nd Congress thought about the concept of gender identity in 1972, Title IX's proper interpretation would be the same: It is about sex, not gender identity.[2]

---

[1] Virginia Prince, *Change of Sex or Gender*, 10 Transvestia 53, 60 (1969), quoted in Richard Elkins & Dave King, The Transgender Phenomenon 82 (2006).

[2] Note that even if the 92nd Congress meant what we now call "gender identity" instead of sex, it would not justify the DoEd's policy that transgender individuals must be grouped with the sex they identify with rather than their anatomical sex. A ban on discrimination on the basis of gender identity would prevent federally-funded schools and universities from treating anatomical males who identify as females from being treated differently than anatomical males who identify as males. DoEd is not prohibiting discrimination on the basis of gender identity, but rather insisting on it.

5

The regulation that DoEd cites as the basis of its argument does not help its argument at all, because it does not require anything. It states that schools *may* maintain "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are comparable. This is a permissive dispensation, not a mandate. The Supreme Court had earlier held that separate is inherently unequal in the context of race.[3] With sex, the regulation clarifies that, separate intimate facilities are a reasonable privacy and safety protection and thus permissible.

Prior to the "Dear Colleague Letter," were federally funded schools and universities *permitted* to assign intimate facilities on the basis of gender identity instead of sex? Yes, of course. There was nothing to prevent it. They could have done it on the basis of Student Number or the first letter of the student's surname. They chose not to.

Whether one believes DoEd's policy should be the law is not the point. It is not the law, and this is a nation of laws. Congress may pass such a law if it finds it desirable. But in the absence of Congressional action, DoEd cannot unilaterally impose its will.

It is not at all clear, however, that DoEd's approach is good policy even if it were the law. Trying to help a transgender student is often a delicate matter. The transgender policy makes the job harder by tying the hands of teachers and principals. Sometimes, in a local school principal's judgment, the best solution may be exactly what DoEd purports to require: Let him use the intimate facilities assigned to his "preferred sex." Sometimes the students who must share these facilities with him do not mind.

But in other cases, the affected students will feel their privacy or sense of security has been violated. Their feelings matter, too. Hence, sometimes the best thing may be to keep him with the members of his sex rather than his gender. In still other cases, the right solution may be to allow him to single-user facilities, as happened in G.G., or to faculty facilities. Indeed, some transgender students may prefer such an approach. *Every case is different.*

The difficulties are compounded by the fact with precious few exceptions, one's sex is either male or female. On the other hand, gender turns out to be a complex subject. In the UCLA's National Transgender Discrimination Survey, 31% of transgender respondents identified either strongly or somewhat with a "Third Gender." Similarly, 38% identified with "Two Spirit" — presumably meaning that at times they identify as female and at other times they identify as male.

It is impossible to predict with certainty what the Supreme Court will do with the *Gloucester County* case. It is entirely possible the Court will hold that DoEd's policy inaccurately states the law. But it is also possible that the case will get bogged down in questions concerning the proper level of deference to administrative agencies in the interpretation of their own regulations under *Auer v. Robbins*. The incoming Administration should therefore strongly consider simply withdrawing the lawless "Dear Colleague Letter" of May 13, 2016.

---

[3] *Brown v. Board of Education*, 347 U.S. 483 (1954).

6

Note that the transgender locker room policy is not a left/right issue. Organizations as far left as the Women's Liberation Front and as far right as the Eagle Forum Education and Legal Defense Fund have filed friend-of-the-court briefs urging the Court to intervene on behalf of the school district. Rather, this is about the rule of law. Can government agencies "interpret" the law to be whatever they want it to be? Or are they obliged to enforce it as written and agreed to by our elected representatives?

The rule of law is about preventing those in positions of authority from exercising arbitrary power. At one time or another, it protects us all, certainly very much including transgender persons. No doubt, the rule of law has been taking it on the chin lately. But if we stand idly by as it is further battered, we will all miss it when it's gone.

## II.    Racial Quotas in School Discipline

The Department of Education is telling schools to discriminate based on race.

In January of 2014, DoEd issued a guidance to the nation's schools. That guidance insists that a school can be guilty of violating Title VI of the Civil Rights Act solely due to "neutral," "evenhanded" application of discipline rules that leads to "significant adverse effects" on blacks compared to whites.[4] This adverse effect of nondiscriminatory discipline is said to be an impermissible "disparate impact" on minority students.

The guidance goes so far as to claim that "substantial racial disparities" in school suspension rates across the country were the product of intentional discrimination (racism) by schools, not just "disparate impact," since there is no evidence of "more frequent" misbehavior by minority students.[5] This assertion, citing academics like Russell Skiba,[6] is at odds with the Seventh Circuit Court of Appeals' ruling that local disparities do not show racism when they do not exceed these national disparities.[7]

For years, the courts have recognized that schools are not guilty of discrimination merely because black students get suspended from school at a higher rate than white students, since the higher rate

---

[4] *See Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline*, Jan. 8, 2014, pp. 11-12.; *see also* Joshua Dunn, *Disparate distortions: Obama administration doublespeak undermines school discipline*, Jan. 8, 2014, goo.gl/znszGD.

[5] *Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline*, Jan. 8, 2014, pg. 4.

[6] *Id.*, citing R.J. Skiba, et al, *The Color of Discipline*: *Sources of Racial and Gender Disproportionality in School Punishment*, 34 Urban Rev. 317 (2002).

[7] *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 111 F.3d 528, 538 (7th Cir. 1997) (court's conclusion that the higher black suspension rate was not the product of racism was reinforced by the fact that "the disparity in minority and white referrals is smaller in the Rockford school district than in the nation as a whole."); *compare* Russell J. Skiba, et al., *African American Disproportionality in School Discipline: The Divide Between Best Evidence and Legal Remedy*, 54 N.Y.L. Sch. L. Rev. 1071, 1105-08 (2009) (attacking the *People Who Care* decision for upholding "race neutral academic judgments," and being part of a "colorblind" jurisprudence, without specifically mentioning its rejection of racial quotas in school discipline).

7

may just reflect higher rates of misbehavior.[8] For example, blacks are more likely than whites to be poor,[9] and suffer from family breakdown,[10] and these characteristics are correlated with higher rates of misbehavior.[11] As one federal appeals court observed, "disparity does not, by itself, constitute discrimination."[12] And still another noted, "Racial disciplinary quotas violate equity" by "either systematically overpunishing the innocent or systematically underpunishing the guilty," and thus violate the requirement that "discipline be administered without regard to race or ethnicity."[13]

Putting aside constitutionality, it is questionable whether DoEd has any statutory authority to impose "disparate impact" rules on schools. The Supreme Court has ruled that disparate impact is not the basis for a lawsuit under Title VI, only "intentional" discrimination is.[14] DoEd claims that while the Title VI statute itself does not reach disparate impact, *regulations* under it can and do (an idea that the *Sandoval* decision described as "strange" in footnote 6 of its opinion).[15]

DoEd states that even if the only reason a school punishes more black students for unauthorized "use of electronic devices" is because black students actually "are engaging in the use of electronic devices at a higher rate than students of other races," it can still be liable for disparate impact. *See Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline, Jan. 8, 2014, pp. 11-12.* This expands the disparate impact concept to racial quotas, which is way beyond what most courts would permit, even under statutes that permit disparate impact claims, such as the workplace discrimination statute, Title 7 of the Civil Rights Act.[16]

Thus, the percentage of black students disciplined should be compared not to the black percentage of the student body, but to the percentage of those students whose behavior potentially qualified them for discipline. It is the pool of *qualified* people that matters, not that general population, when

---

[8] *See, e.g., Belk v. Charlotte-Mecklenburg Board of Education*, 269 F.3d 305, 332 (4th Cir. 2001) (en banc) (although "statistics show that of the 13,206 students disciplined from 1996–98, sixty-six percent were African–American," this "'disparity does not, by itself, constitute discrimination,'" and provides "no evidence" that the school district "targets African–American students for discipline."); *Coalition to Save Our Children v. State Board of Education*, 90 F.3d 752, 775 (3d Cir. 1996)(rejecting the "assumption 'that "undiscipline" or misbehavior is a randomly distributed characteristic among racial groups'"); *Tasby v. Estes*, 643 F.2d 1103 (5th Cir. 1981).

[9] U.S. Bureau of the Census, Table 1: Income and Earnings Summary Measures by Selected Characteristics: 2013 and 2014 (white non-Hispanic median income of $60,256, compared to black median income of $35,398), http://www2.census.gov/programs-surveys/demo/tables/p60/252/table1.pdf.

[10] National Vital Statistics Report, *Births: Final Data for 2014*, pg. 41, Table 15 (Dec. 23, 2015) (70.4% of black infants in 2014 were born out of wedlock, compared to 29.2% of non-Hispanic whites, 52.9% of Hispanics, and 16.4% of Asians), https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_12.pdf.

[11] *See* Rachel Dinkes, et al., *Indicators of School Crime and Safety: 2007* (2007), pg. 26 (serious "discipline problems" were much higher in schools with many poor kids than in schools with few kids in "poverty"; frequent "verbal abuse of teachers" occurred at nearly five times the rate), http://nces.ed.gov/pubs2008/2008021.pdf; Tom Loveless, *The 2017 Brown Center Report on American Education: How Well Are American Students Learning?*, Brookings Institution, at 30-31 ("black students are also more likely to come from family backgrounds associated with school behavior problems...children ages 12–17 that come from single-parent families are at least twice as likely to be suspended as children from two-parent families."), goo.gl/7MavML.

[12] *Belk v. Charlotte-Mecklenburg Board of Education*, 269 F.3d 305, 332 (4th Cir. 2001).

[13] *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 111 F.3d 528, 538 (7th Cir. 1997).

[14] *Alexander v. Sandoval*, 532 U.S. 275 (2001).

[15] *See id.* at 286 n.6.

[16] 42 U.S.C. 2000e-2.

AR_00001092

making this comparison. The proper comparison is between those students "selected" for discipline and those who are in some sense "qualified" for discipline by virtue of their behavior. As the Supreme Court has noted in the employment context, "if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities."[17] To make this comparison, important non-racial factors such as a student's socio-economic status and home environment should first be taken into account before concluding a racial disparity is meaningful.[18]

Perhaps tacitly recognizing this weakness, DoEd does occasionally in its guidance focus on specific *aspects* of discipline that might be more amenable to a legal challenge. For example, it suggests that harsh zero-tolerance rules have a "disparate impact" on minority students,[19] a point made more explicitly by attorney general Eric Holder.[20] He took aim at "zero-tolerance school discipline practices that, while well-intentioned and aimed at promoting school safety, affect black males at a rate three times higher than their white peers." But Holder's assumption (that nondiscretionary discipline increases the ratio of suspended blacks to suspended whites) was wrong. As expert James P. Scanlan notes, harsh "discipline policies tend to yield smaller racial differences in discipline rates than more lenient ones." The "Department of Education's own report shows that relative racial" differences in discipline rates "are larger in districts with zero tolerance policies than those without such policies," such as Los Angeles and Denver.[21] Getting rid of zero-tolerance usually reduces suspensions of white offenders even more than of black offenders. That is why, as Walter Olson notes, "zero-tolerance policies were adopted in the first place in part as a defense for administrators against disparate-impact charges."[22] Yet, as Scanlan notes, President Barack Obama's administration pressured various school districts into curbing zero-tolerance policies, under the mistaken assumption that this would reduce their "racial disparities" in suspensions.

The guidance also discusses the subjectivity of certain offenses, and speculates that this could result in them being enforced more harshly against blacks. But that is not usually the case. A federal appeals court noted that subjectivity is not the reason blacks are suspended at higher rates than whites. Indeed, blacks are suspended at even higher rates for "very objective" offenses than

---

[17] *Ward's Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 652 (1989).

[18] *See Caridad v. Metro-North Commuter R.R. Co.*, 191 F.3d 283, 292-93 (2d Cir. 1999) (disparate-impact analysis "controlled for various factors that one would expect to be relevant to the likelihood of disciplinary action," such as "age" and "union vs. management status").

[19] *See Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline*, Jan. 8, 2014, p. 19.

[20] *Eric Holder: Systemic, Subtle Racism Is Much More Damaging Than High-Profile Rants*, Huffington Post, May 17, 2014, goo.gl/QUdZSP.

[21] James Scanlan, *Viewpoint: Racial Differences in School Discipline Rates*, The Recorder, June 22, 2012, goo.gl/94Mipx.

[22] *See* Walter Olson, *DoJ: school discipline must follow disparate-impact standards*, Overlawyered, Jan. 10, 2014, goo.gl/8aky5p.

9

"subjective" ones.[23] This finding belies the claims of academics like Russell Skiba, cited by DoEd,[24] who claims that blacks are more likely to be sent to the principal's office for "subjective" offenses, while whites are more likely to be sent for "objective" offenses. Skiba reached this dubious conclusion by arbitrarily labeling vague offenses as "objective" when they were often committed by whites (such as "obscene language"), and objectively harmful offenses as "subjective" when they were committed heavily by blacks (such as "threats").[25]

Even if there are racial disparities in suspension rates, a court would not find "disparate impact" if the school policy has a "substantial legitimate educational justification."[26] Curbs on suspensions of students who routinely disrupt class or violate important school rules harm, not help, black students, who are often victims of violence perpetrated by students of their own race. As Professor Joshua Kinsler found, "in public schools with discipline problems, it hurts those innocent African American children academically to keep disruptive students in the classroom," and "cutting out-of-school suspensions in those schools *widens* the black-white academic achievement gap."[27] Although rules against "disrupting classes" are to some extent "subjective," this is simply unavoidable; they serve "important disciplinary criteria," so they cannot be banned in the name of racial balancing.[28]

As education writer Joanne Jacobs notes, "The federal push for 'no-disparate-impact' disciplinary policies — linking suspension and expulsion rates to race and ethnicity — is unpopular with the public and teachers, the [2015 Education Next] poll found."[29] As Education Next notes, "*A majority of people oppose the federal government's new policy on school discipline.* More than 50% disagree with the mandate that schools must not expel or suspend black and Hispanic students at higher rates than other students. Just 21% back the idea."[30] Even the teachers' unions are split on the Title VI racial school discipline guidance, with both the American Federation of Teachers and the National School Boards Association opposing it.[31]

---

[23] *Coalition to Save Our Children v. State Bd. of Educ. of State of Del.*, 90 F.3d 752, 775 (3d Cir. 1996) ("statistical data demonstrate a comparable or greater racial disproportion for those offenses for which [state] law mandates suspension, which [plaintiff's expert] called "very objective" offenses, than for those offenses he viewed as less objective.").

[24] *See Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline*, Jan. 8, 2014, pg. 4.

[25] Russell J. Skiba, et al., *African American Disproportionality in School Discipline: The Divide Between Best Evidence and Legal Remedy*, 54 N.Y.L. Sch. L. Rev. 1071, 1089 (2009), *citing The Color of Discipline,* 34 Urban Rev. 317 (2002). "Obscene language" is a much vaguer category than "threats." *Compare Reno v. ACLU*, 521 U.S. 844 (1997) (rule against "obscene or indecent" messages was too vague to be criminally punishable) with *Virginia v. Black*, 538 U.S. 343 (2003) (ban on threats is valid).

[26] *See Elston v. Talladega Cnty Bd. of Educ.*, 997 F.2d 1394, 1412-1413 (11th Cir. 1993).

[27] Kinsler, *School Discipline: A Source or Salve for the Racial Achievement Gap?*, 54 Int'l Econ. Rev. 355 (2013); *see also* Andrew J. Coulson, *Zero Tolerance: Causes, Consequences, and Alternatives*, Cato Institute, Dec. 12, 2012, goo.gl/mIp89f (Senate testimony quoting Kinsler).

[28] *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 538 (7th Cir. 1997).

[29] Joanne Jacobs, *Support slips for Core, other reforms*, JoanneJacobs.com, Aug. 19, 2015, goo.gl/uAEVhi.

[30] Michael B. Henderson, Paul E. Peterson & Martin West, *The 2015 EdNext Poll on School Reform*, in 16 Education Next 9, 17 (2016), goo.gl/wYrgjc.

[31] *See* Alyson Klein, *House Republicans Question Obama Administration's Discipline Guidance*, Education Week, Feb. 14, 2014, goo.gl/fQMBKD.

AR_00001094

In a piece titled "Federal Racial Discipline Quotas Create Chaos In St. Paul Schools," Katherine Kersten describes how Saint Paul Superintendent Valeria Silva's policies to reduce minority suspension rates to the level of white students created chaos and violence in a large urban school district. As she notes,[32] Silva's

> policies, initiated in 2010, launched the St. Paul schools on a downward spiral of chaos and violence. In December 2015, Ramsey County attorney John Choi labeled the situation "a public health crisis." In 2015, assaults on teachers in St. Paul schools reported to his office tripled compared to 2014, and were up 36 percent over the previous four-year average. On Silva's watch, the city's high schools have become menacing places where gangs of out-of-control teens prowl the halls, and "classroom invasions" by students settling private disputes are commonplace. Tumultuous brawls are a fact of life. Today, fights that "might have been between two individuals" can grow into "melees involving up to 40 or 50 people," according to Steve Linders, a St. Paul police spokesman. Roving packs often attack individuals, and police have had to use chemical irritants to break up what they call "riots." Teachers fear for their safety. In the last school year, a vicious student assault landed one in the hospital with a traumatic brain injury. Another was punched repeatedly in the chest, while another required staples for a head wound.

> . . . . The discipline policies that gave rise to this chaos sprang from Silva's embrace of "racial equity" ideology. In St. Paul, as across the nation, black students as a group are referred for discipline at higher rates than their peers. Silva made eliminating this racial gap a top priority. In Silva's view, the gap is caused by teachers' racial bias and cultural insensitivity, not by higher rates of misconduct by black students. She mandated "white privilege" training for all district personnel, eliminated "continual willful disobedience" as a suspendable offense, and shifted many special education students with behavior problems — students who are disproportionately black — to mainstream classrooms. Now unruly kids just chat with a "behavior specialist" or are shifted to another classroom to act up again. . . .

> [T]he federal government is now imposing Silva-style "racial equity" discipline policies on school districts around the country under a "disparate impact" interpretation of civil rights law.

This "disparate impact" approach is bad policy and bad law. It pushes school districts to discipline students with an eye on racial numbers, either abandoning valid procedures, or applying them so that some students are not disciplined, and others are, because of race. Those who will be most hurt are fellow students (often themselves poor and minority students) and their teachers, who are now likely to be confronted with threatening and disruptive students. This is inconsistent with the underlying federal statute, Title VI, which prohibits differential treatment based on race, and only that.

---

[32] See Kersten, *Federal Racial Discipline Quotas Create Chaos In St. Paul Schools*, The Federalist, July 29, 2016, goo.gl/GU3DuJ.

11

This disparate-impact approach, then, should not be used at all. DoEd should clarify this, by issuing new, formal regulations clarifying that Title VI does not ban disparate impact. Congress should also ban disparate-impact rules. That clarity might look something like this: (1) A disparity only matters if it results from something in the school's disciplinary process, not the mere fact that more students in one racial group misbehave; (2) the school need only point to a legitimate interest served by the policy, not a life-or-death "necessity" or "substantial" need; (3) the school need only point to evidence that it furthers that interest, not meet a formal burden of proof on that issue; and (4) plaintiff's suggestion of an alternative approach to serving that interest is not sufficient to demonstrate a violation of the law.[33]

## III.  Campus Sexual Assault Mandates

The President Barack Obama Education Department created, and the President Donald Trump Administration has inherited, a regime of federally directed regulation of almost all accusations of sexual assault on campuses and often beyond — along with a broad range of other, entirely lawful activities classified by universities as "sexual misconduct." In one of his many statements supporting this regime, President Obama explained that "[w]e're here to talk today about an issue that is a priority for me, and that's ending campus sexual assault."[34]

But as former Vice President Joe Biden has tacitly admitted, by claiming in January 2017 that the percentage of college women victimized by sexual assault is "the same" today as it was in 1995,[35] the mandates imposed on thousands of universities from 2011 through 2017 in the form of "guidance" as to the supposed requirements of Title IX apparently have not reduced the incidence of campus sexual assault at all. Indeed, these mandates may have indirectly made the problem worse in various ways including, channeling victims away from law enforcement so that offenders avoid prison.[36]

In the name of protecting college women from sexual violence, the Education Department's Office for Civil Rights (OCR) effectively ordered more than 7,000 higher education institutions — all those that receive federal money — to investigate and adjudicate all allegations by their students of sexual assault and harassment, whether or not reported to or acted on by police. OCR also required schools

---

[33] *See Smith v. City of Jackson*, 544 U.S. 228, 240-42 (2005) (institution need only show that its policy was one "reasonable" way of furthering a "legitimate goal," and not that no alternative policy would have worked as well); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 660 (1989) (institution bears only burden of "production," not "persuasion", in justifying its rule; the person alleging discrimination must show that the disparity was the institution's "fault" in the sense of being caused by its decision-making process, rather than being caused by external factors, such as a "dearth" of "qualified" minority applicants).

[34] "Remarks by the President at 'It's on Us' Campaign Rollout," September 19, 2014, https://www.whitehouse.gov/the-press-office/2014/09/19/remarks-president-its-us-campaign-rollout.

[35] http://www.chronicle.com/blogs/ticker/in-letter-to-college-presidents-biden-urges-continued-fight-against-sexual-assault/116335.

[36] *See, e.g.,* Adam Goldstein, "Rape Is a Crime, Treat It as Such" (opinion), *Room for Debate* (blog), *New York Times*, March 12, 2013, http://www.nytimes.com/roomfordebate/2013/03/12/why-should-colleges-judge-rape-accusations/rape-is-a-crime-treat-it-as-such ("[The] best case scenario" of a university's disciplinary process is that a rapist is expelled and out "walking the streets," which is also "the worst case outcome of the criminal justice process").

12

to use federally prescribed procedures — all of which increase the likelihood of guilty findings — to determine whether accused students are guilty (often called "responsible") or innocent. The financial costs of this regime to the universities alone probably approach or exceed $1 billion per year, plus many millions more in taxpayer dollars to pay OCR's enforcement staff and in legal costs to families of accused students.[37]

For an especially telling picture of how the OCR-driven campus sex regime works, consider a case at Amherst College, in Massachusetts.[38] Fearful, as most colleges are, of being attacked by OCR for any perceived hesitation to expel accused males regardless of the evidence, Amherst expelled a male student based on a female student's claim in October 2013 that he had forced her to perform oral sex — more than 20 months before. The reality, as he was later able to prove, was that *she* had assaulted (or at least seduced) *him*, by performing oral sex when he was intoxicated to a state of near unconsciousness in her room.

A few hours after their encounter, and after the female student had summoned a second male student for another sexual encounter, she had regrets. Her first sexual encounter that night had been her roommate's boyfriend, and that became socially awkward for her. She began telling people that the boyfriend had assaulted her. Later, she joined a group of campus rape activists. Many months after that, she formally accused her victim of victimizing her. Amherst's investigation was pathetic. The woman's testimony was incoherent and bizarre. And the hearing — before a panel of three extreme feminist ideologues — was grossly unfair. After being expelled, the now-former male student hired a lawyer who asked around and easily found a wealth of text-messages that had been exchanged by the student's accuser with other students, in which she admitted that, in reality, she had assaulted (or at least seduced) him. But when he sought readmission based on this evidence, Amherst said the case was closed.[39]

The Obama Administration's energetic lawmaking in this realm began in earnest after the President, seeking to recover politically from congressional Democrats' disastrous defeat in the 2010 elections, decided on a series of aggressive executive actions designed to fire up his most passionate supporters.[40] These included self-proclaimed feminists, who had for decades been spreading the myth that the nation's universities were in the grip of a "rape culture" characterized by hostility or

---

[37] For the sake of brevity, this paper does not explore at any length the Obama Administration's role in imposing "harassment" rules on universities that serve mainly to punish students and faculty alike for speech ("verbal conduct") that others claim to be "unwelcome" — even, in the Administration's words, if an "objectively reasonable person of the same gender in the same situation" would *not* find the speech offensive. *See* https://www.justice.gov/sites/default/files/opa/legacy/2013/05/09/um-ltr-findings.pdf; https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/; Samantha Harris and Greg Lukianoff, "Executive Branch Overreach and the Accelerating Threats to Due Process and Free Speech on Campus," in *Liberty's Nemesis: The Unchecked Expansion of the State*, ed. Dean Reuter and John Yoo (New York: Encounter Books, 2016).
[38] The facts are laid out in KC Johnson and Stuart Taylor, Jr., *The Campus Rape Frenzy: The Attack on Due Process at America's Universities* (Encounter Books 2017).
[39] *Id.* 8.
[40] *Id.* 33-36.

13

jeopardy. (No such requirement exists for other disciplinary offenses.) Third, the letter told schools to speed up investigations, which critics said made it difficult for accused students to mount a defense. Fourth, it ordered schools to impose "interim" punishments, based on unproven and uninvestigated allegations, to prevent accused students from coming into contact with their accusers.

Fifth, and perhaps most important, the Dear Colleague letter strongly discouraged campus authorities from allowing cross-examination of accusers. Critics called this an especially crippling blow to fairness because it deprived accused students of what the Supreme Court has called "beyond any doubt the greatest legal engine ever invented for the discovery of truth."[16] Three years later, in 2014, the Education Department even suggested that allowing cross-examination of an accuser might -- all by itself -- violate Title IX and thus risk a huge financial penalty.[17]

Each of the changes decreed by the Obama Administration increased the chances of a guilty finding. So did the Administration's pattern of effectively portraying as soft on rapists -- by publicly announcing that they were under investigation -- schools that OCR considered insufficiently pro-accuser.[18] All this amounted to a de facto presumption that accused students are guilty -- unless proven innocent by overwhelming evidence. And even proof of innocence has sometimes been ignored by colleges in their eagerness to please their federal overseers.[19]

Aggravating the impact on accused students of the OCR-mandated procedures is that many universities have weakened due process protections even more than the Obama OCR explicitly required, in part to win favor with OCR and campus rape activists and in part for ideological reasons. Many if not most universities, for example, bar accused students' lawyers (if any) from participating in campus proceedings; deny accused students timely access to the specific allegations and evidence to be used against them, and even to exculpatory evidence in the university's hands; limit their ability to call witnesses to testify; deny them any right to an impartial panel or decisionmaker; and put their fates in the hands of a single campus sex bureaucrat (or a few) who are under great pressure from OCR to find accused students guilty.[20]

At the same time, universities' definitions of sexual assault have "stretched enormously, in ways that would have been unimaginable just a few years ago," in the words of Harvard Law professors Jacob Gerson and Jeannie Suk Gerson. "Indeed, the concept of sexual misconduct has grown to include most voluntary and willing sexual conduct. . . . Under President Obama, the Department of Education's interpretations of those laws have greatly expanded the control exercised by the federal government over sexual conduct."[21]

President Obama and others justified the Administration's actions by advancing the stunning claim that 1 in 5 college women is sexually assaulted while enrolled.[22] In fact, the best Justice Department statistics suggest that fewer than 1 in 100 are raped and about 3 in 100 suffer less serious sexual assaults -- still far too many, but an order of magnitude less than 1 in 5.[23] The several surveys that have advanced the 1-in-5 claim have been highly misleading. They have avoided asking respondents directly whether they had been sexually assaulted, because few would say yes. They have inflated the number of alleged "sexual assaults" by counting a wide range of lawful and commonplace behaviors as rape or sexual assault, and by assuming that

3

AR_00001098

every accusation by a survey respondent is true. They have also had very low response rates that probably skewed the results by inflating the number of supposed sexual assaults even more.[24]

Similarly misleading, as noted above, have been the efforts by the Administration and many others to create the impression that **the number of campus rapes has grown alarmingly and that campuses are especially dangerous places for young women, as Senator Kirsten Gillibrand (D-CT) has asserted.**[25]

Accusers' rights groups and inaccurate media coverage have intensified the Obama-driven pressure to find guilty as many accused students as possible. And thousands of universities have been so cowed by Obama Administration threats to ruin their reputations or impose large financial penalties that only one, Oklahoma Wesleyan University, has dared challenge OCR in court, in *Doe v. Lhamon*. The case is pending.[26]

The Obama policies went far beyond federal rules first laid down in the 1990s interpreting Title IX to require that colleges take unspecified (but usually quite modest) steps to adjudicate sexual assault allegations involving their own students.

Critics claim that these rules were misguided even in their infancy, since colleges and universities lack the tools and expertise to investigate serious crimes. They can't legally require witnesses to testify. They can't subpoena photographic, electronic, or other evidence. They have no training in use of scientific evidence. They operate in deep secrecy, required by federal privacy law. Many of the professors and campus officials who adjudicate campus sexual assault claims are "trained" to believe accusers and disbelieve accused students, and barely feign impartiality. And the intellectual environment on gender issues at most campuses is so pro-accuser that due process is widely seen as an obstacle to fairness.[27] As a result, estimated a recent study by UCLA professor John Villasenor, in today's campus sexual assault tribunals, an innocent student has as much as a 1-in-3 chance of being found guilty.[28]

Critics say that the OCR's approach, cheered on by Obama White House events and announcements, imposed incalculable human costs on thousands of people, including scores, probably hundreds, of innocent, wrongly accused students whose lives have been ruined, or at best severely damaged, and their families. The consequences including destroyed reputations, inability to get into another college, severe depression, post-traumatic stress disorder, and even, in a few cases, suicide or attempted suicide.[29] More than 150 students who say they were wrongly accused have sued their schools for violating their constitutional or contractual rights; many have had success in the courts.[30] And although most courts have held that private universities are not bound by the Constitution, Professor Jed Rubenfeld, of Yale law School, has argued that private colleges are liable for due process violations when "the government has induced [them] to engage in conduct that would be unconstitutional if state actors engaged in that conduct directly."[31]

The financial costs are also huge, if difficult to measure, apart from OCR's $107 million budget, much of which goes to campus sex investigators.[32] One careful estimate, which appears to err on the low side, is that universities spend well over $700 million a year on

4

administrators whose main jobs are to police students' sexual activities. The arithmetic: Some 7,000 schools have at least one part-time or full-time, and often many full-time, "Title IX Coordinators," required by OCR, whose main job nowadays is to regulate campus sex; OCR tells schools that they "must have the full support of your institution."[33] Plus outside investigators, campus police, sex counselors, and the time spent by faculty and administrators adjudicating cases. Plus costly student surveys seemingly designed to appease OCR by exaggerating the incidence of sexual assault. And more. [34]

Many schools have large staffs of sex bureaucrats, whom they hired under pressure from the Obama Administration, which issued in April 2015 another "Dear Colleague" letter. This one stressed that all universities receiving federal money must designate "Title IX Coordinators" to police alleged sexual misconduct. Harvard University alone, which is a fraction of the size of many large universities, has some 50 Title IX coordinators and staffers and six more staffers in the Office of Sexual Assault Prevention and Response; they, in turn, regulate 33 proctors and tutors living in undergraduate houses.[35] Tiny Swarthmore, with some 1,500 students, has at least six sex bureaucrats.[36]

In addition, there are the costs imposed on schools (as well as taxpayers) by OCR's more than 300[37] "Title IX investigations," each of them stretching out for years. There are the additional costs imposed by the many lawsuits against universities both by student accusers who say they were mistreated and by the more than 150 accused students who say they were railroaded by Kafkaesque campus kangaroo courts, including large settlement payments.[38]

As commentator and law professor Glenn Harlan Reynolds summarized the campus mindset, "If there's a 'campus rape crisis,' that means that we need new rules, bigger budgets, and expanded power and self-importance for all involved, with the added advantage of letting you call your political opponents (or anyone who threatens funding) 'pro rape.' If we focus on the truth, however—rapidly declining rape rates already, without any particular 'crisis' programs in place—then voters, taxpayers, and university trustees will probably decide to invest resources elsewhere. So for politicians and activists, a phony crisis beats no crisis."[39]

Has the degrading of due process and fairness for accused males made campuses safer for women? Not, as indicated on p. 1 above, if one takes literally the words of January 5 open letter to universities by former Vice President Biden, one of the most passionate crusaders for presuming accusers truthful and accused students guilty, that the percentage of college women victimized by sexual assault is "the same" now as it was in 1995.[40]

Still, a powerful coalition led by campus rape activists, Democratic politicians, especially in blue states, some Republicans, many university officials and professors, dozens of women's groups (such as the National Women's Law Center and the American Association of University Women), the K-12 teachers unions, and others are ready to mount passionate opposition to any effort to reverse the Obama policies, which they contend are necessary to protect campus sexual assault victims.[41]

On the other side, a few members of Congress have objected to the OCR's campus sex mandates. Republican Senators Lamar Alexander of Tennessee, chairman of the Senate

5

Education Committee and a former Secretary of Education, and James Lankford of Oklahoma accused OCR officials of usurping Congress' power to make laws.[42] The Trump victory, propelled in part by voters' anger at federal meddling in private lives and at politically correct academics, may prompt more members of Congress to question federal oversight of campus sex.

Indeed, the 2016 Republican Party Platform stated that sexual assault "must be promptly investigated by civil authorities and prosecuted in a courtroom, not a faculty lounge. Questions of guilt or innocence must be decided by a judge and jury, with guilt determined beyond a reasonable doubt. Those convicted of sexual assault should be punished to the full extent of the law. The Obama Administration's distortion of Title IX to micromanage the way colleges and universities deal with allegations of abuse contravenes our country's legal traditions and must be halted before it further muddles this complex issue and prevents the proper authorities from investigating and prosecuting sexual assault effectively with due process."[43]

In addition, some groups with strong establishment credentials -- including the American College of Trial Lawyers[44] and the American Bar Association's Task Force on College Due Process Rights and Victims,[45] which is expected to issue a report in May -- have found very serious fault with the Obama OCR's campus sex commands. Even more trenchant in their criticisms have been the Foundation for Individual Rights in Education (FIRE), the nation's foremost campus civil liberties group;[46] Families Advocating for Campus Equality (FACE), an impressive organization of families of students who say they were falsely accused;[47] Stop Abusive and Violent Environments (SAVE),[48] which works for "evidence-based solutions to end sexual assault and domestic violence," and which has prepared a detailed critique of the Obama Administration's regulation of campus sex[49] and proposed remedial federal legislation;[50] scores of prominent law professors -- many of them politically progressive[51] -- including 28 from Harvard,[52] 16 from the University of Pennsylvania,[53] and many others;[54] and a growing number of judges around the country, as illustrated by the eleven decisions cited in this endnote.[55] Educational leaders have also been critical, as when Janet Napolitano, president of the University of California system, that "OCR investigations often take years to complete, leaving institutions under a cloud of suspicion and in limbo regarding the legal sufficiency of their policies and practices."[56]

Napolitano's trenchant criticisms -- coming from a Democratic former governor and Obama Homeland Security secretary -- are an especially telling indication of how President Obama entrusted the leadership of OCR, and other civil rights agencies, to extreme leftist ideologues. Even as he was about to leave office, Obama appointed one such -- Catherine Lhamon, who headed OCR from 2013 to 2017 -- to a 6-year term as chair of the U.S. Commission of Civil Rights.

Even the company that has probably profited most from the campus rape frenzy -- the National Center for Higher Education Risk Management (the NCHERM GROUP), which provides Title IX training to colleges around the country, recently warned: "Some pockets in higher education have twisted the 2011 Office for Civil Rights (OCR) Dear Colleague Letter

6

(DCL) and Title IX into a license to subvert due process and to become the sex police."[57] And an important rape victims association, Rape, Incest & Abuse National Network (RAINN) also rejected the Obama OCR's approach.[58] "Victims advocates have complained that the DCL is 'harming those that it purports to protect,' and a frustrated Stanford rape survivor criticized her school's OCR-enforced policies as contributing 'to a greater culture of disbelief and anger' toward victims."[59]

Some of these critics, including FACE and (implicitly) FIRE, have called for the Trump Administration to revoke some or all of the Obama OCR's campus sex commands. That could be done with a stroke (or a few strokes) of the pen, since OCR did not (for the most part) conduct the notice-and-comment rulemaking proceedings necessary to make Obama-era guidance into binding federal regulations.

But revoking the Obama commands, by itself, would leave in force at most schools the extremely pro-accuser procedures that the Obama Administration required universities to adopt, and would leave in place the thousands of campus sex bureaucrats that the Obama Administration pressured them to hire -- not to mention the campus culture of presuming the guilt of accused males. And while courts have increasingly upheld lawsuits by accused students against their schools, it seems likely that not much will change unless the Trump Administration or Congress or both are proactive in forcing change.

Congress seems unlikely to act. If the Trump Administration decides to act forcefully, as critics including FACE have urged, its options would include conducting a notice-and-comment rulemaking process that includes (1) gathering the wealth of evidence that many colleges and universities have been violating Title IX by discriminating systematically against accused persons -- almost all of them male -- in campus discipline for alleged sexual misconduct; and (2) specifying procedures that must be used to protect due process rights in any and all campus disciplinary proceedings that involve sex or gender.

Those procedures could include rights to notice of the allegations and a fair hearing before an impartial and independent panel; to have panel members instructed that an accused is presumed innocent until proven guilty by clear and convincing evidence; to be given timely notice of all allegations, the investigator's report and all exculpatory evidence before the hearing; to have ample time to prepare a defense; to active representation by a lawyer; to have the lawyer or another representative cross-examine all witnesses, including the accuser; to call witnesses; and to a meaningful appeal of any adverse finding.[60]

The Administration could also cut OCR's budget to limit its ability to regulate campus sex. And, of course, it could encourage colleges to work more closely with police and prosecutors and to channel sexual assault accusations into the criminal justice system.

---

[1] "Remarks by the President at 'It's on Us' Campaign Rollout," September 19, 2014, https://www.whitehouse.gov/the-press-office/2014/09/19/remarks-president-its-us-campaign-rollout/
[2] http://www.chronicle.com/blogs/ticker/in-letter-to-college-presidents-biden-urges-continued-fight-against-sexual-assault/116335/
[3] See, e.g., Adam Goldstein, "Rape Is a Crime, Treat It as Such" (opinion), *Room for Debate* (blog), *New York Times*, March 12, 2013, http://www.nytimes.com/roomfordebate/2013/03/12/why-should-colleges-judge-rape-accusations/rape-is-a-crime-treat-it-as-such ("[The] best case scenario" of a university's disciplinary

7

process is that a rapist is expelled and out "walking the streets," which is also "the worst case outcome of the criminal justice process").

[4] See, e.g., Nancy Gertner, "Sex, Lies, and Justice: Can we reconcile the belated attention to rape on campus with due process?" *American Prospect*, Jan. 2015 ("If there is a widespread perception that the balance has tilted from no rights for victims to no rights for the accused, we risk a backlash.")

[5] See, e.g., Jacob E. Gerson, "How the Feds Use Title IX to Bully Universities," *Wall Street Journal, January 24, 2016* ("This kind of policy-making process—or, rather, policy-making without process—is unlawful and wrong."); KC Johnson and Stuart Taylor, Jr., *The Campus Rape Frenzy: The Attack on Due Process at America's Universities* 39 (Encounter Books 2017).

[6] See text at notes 43-59, *infra*.

[7] Joe Palazzolo, "Harvard Law Professor: Feds' Position on Sexual-Assault Policies Is 'Madness,'" *Law Blog*, *Wall Street Journal*, December 31, 2014, http://blogs.wsj.com/law/2014/12/31/harvard-law-professor-feds-positionon- sexual-assault-policies-is-madness.

[8] For the sake of brevity, this paper does not explore at any length the Obama Administration's role in imposing "harassment" rules on universities that serve mainly to punish students and faculty alike for speech ("verbal conduct") that others claim to be "unwelcome" -- even, in the Administration's words, if an "objectively reasonable person of the same gender in the same situation" would *not* find the speech offensive. See https://www.justice.gov/sites/default/files/opa/legacy/2013/05/09/um-ltr-findings.pdf /; https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/; Samantha Harris and Greg Lukianoff, "Executive Branch Overreach and the Accelerating Threats to Due Process and Free Speech on Campus," in *Liberty's Nemesis: The Unchecked Expansion of the State*, ed. Dean Reuter and John Yoo (New York: Encounter Books, 2016).

[9] The facts are laid out in *The Campus Rape Frenzy, supra.*

[10] *Id.* 8.

[11] *Id.* 33-36.

[12] See, *e.g., id.* 67-84.

[13] *Id.* 55-56; Sinozich and Langton, *Special Report: Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013*, https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf/

[14] U.S. Dept of Education, Office for Civil Rights, Dear Colleague Letter on Sexual Violence (April 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "DCL").

[15] *See, e.g.,* Hans Bader, *Education Dept Unlawfully Changes Burden of Proof in College Sexual Harassment Cases*, College Insurrection, Sept. 12, 2002, http://collegeinsurrection.com/2012/09/education-dept-unlawfully-changes-burden-of-proof-in-college-sexual-harassment-cases/; Susan Kruth, *Princeton Adopts 'Preponderance' Standard, Reaches Agreement with Department of Education*, The Torch (FIRE), Nov. 10, 2014, https://www.thefire.org/princeton-adopts-preponderance-standard-reaches-agreement-department-education/. "Courts, universities, and student defendants all seem to agree that the appropriate standard of proof in student disciplinary cases is one of 'clear and convincing' evidence." James M. Picozzi, *University Disciplinary Process: What's Fair, What's Due, and What You Don't Get*, 96 Yale L. J. 2132, 2159 n. 17 (1987). The Education Department's reasoning for imposing a low "preponderance" standard on school disciplinary proceedings was that this "is the standard of proof established" for lawsuits brought in federal court. Therefore, it claimed, preponderance must also be "the appropriate standard for" schools to use in "investigating allegations of sexual harassment or violence." But in civil suits, that standard applies to whether the *school* violated Title IX by behaving inappropriately, not whether *students* or staff engaged in harassment. Students cannot violate Title IX; only schools can be sued under Title IX, not individuals. *See, e.g.,* Smith v. Metropolitan School District (1997). Federal courts have held that there is no violation of the civil rights laws merely because harassment occurs, as long as the institution investigates in good faith in response to the allegation of harassment. Cf. *Swenson v. Potter*, 271 F.3d 1184, 1196 (9th Cir. 2001), *quoting Harris v. L & L Wings*, 132 F.3d 978, 984 (4th Cir. 1997); Harris v. L & L Wings, 132 F.3d 978, 984 (4th Cir. 1997); Knabe v. Boury Corporation, 114 F.3d 407 (3rd Cir. 1997).

[16] *See*, e.g., *Lilly v. Virginia*, 527 U.S. 116, 124 (1999).

[17] *Questions and Answers on Title IX and Sexual Violence* (Washington, D.C.: U.S. Dept. of Education, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf/; *Campus Rape Frenzy* 36-40, 203.

[18] *Id.* 195.

[19] See, e.g., *id.* 158-161.

8

[20] *Id. passim.*
[21] http://www.chronicle.com/article/The-College-Sex-Bureaucracy/238805
[22] See, e.g., Office of the Press Secretary, The White House, "Remarks by the President at 'It's On Us' Campaign Rollout" (press release), September 19, 2014, https://www.whitehouse.gov/the-press-office/2014/09/19/remarks-president-its-us-campaign-rollout/; DCL at 2.
[23] Sinozich and Langton, *Special Report: Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013*, https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf/; see *Campus Rape Frenzy* 43-46.
[24] *Id.* 46-53.
[25] *Id.* 55; "Kirsten Gillibrand: 'We Will Not Allow These Crimes to Be Swept under the Rug Any Longer,'" *Time*, May 15, 2014, http://time.com/100144/kirsten-gillibrand-campus-sexual-assault/
[26] *Id.* 252; FIRE, "Complaint in '*Doe v. Lhamon*," https://www.thefire.org/complaint-doe-v-lhamon/.
[27] *E.g., Campus Rape Frenzy* 168-169.
[28] John Villasenor, "A probabilistic framework for modeling false Title IX 'convictions' under the preponderance of evidence standard," Law, Probability & Risk (2016),
https://academic.oup.com/lpr/article/15/4/223/2549058/A-probabilistic-framework-for-modelling-false
[29] *See, e.g.,* Hans Bader, *OCR's Liberal Bent Pushes Schools to Expel Innocent Students Accused of Sexual Assault*, CNS News, Sept. 25, 2015 ("see the examples given here, here, here, here, here, and here at *Minding the Campus*"), http://www.cnsnews.com/commentary/hans-bader/ocrs-liberal-bent-pushes-schools-expel-innocent-students-accused-sexual; Blake Neff, *Brown University Railroaded Student Accused Of Rape*, Judge Rules, Daily Caller, Sept. 29, 2016,
http://dailycaller.com/2016/09/29/brown-university-railroaded-student-accused-of-rape-judge-rules/ (discussing *Doe v. Brown University*, Findings of Fact and Conclusions of Law, Sept. 28, 2016, D.R.I. Civil Action No. 16-017), https://kcjohnson.files.wordpress.com/2013/08/brown-ii-decision.pdf; Greg Piper, *Federal judge validates due-process lawsuit against Brandeis by student accused of rape*, The College Fix, April 1, 2016,
http://www.thecollegefix.com/post/26855/)(discussing *Doe v. Brandeis Univ.*, D. Mass. Civil Action No. 15-11557, Memorandum & Order, March 31, 2016, https://kcjohnson.files.wordpress.com/2013/08/brandeis-decision.pdf); *Campus Rape Frenzy passim*; http://www.nationalreview.com/article/446681/thomas-klocke-suicide-texas-university-student-commits-suicide-after-being-accused/
[30] E.g., Campus Rape Frenzy *168-169, passim.*http://www.abajournal.com/news/article/advocacy_group_says_title_ix_lawsuits_from_young_men_are_on_the_rise/?utm_source=maestro&utm_medium=email&utm_campaign=weekly_email
[31] Jed Rubenfeld, *Privatization, State Action, and Title IX: Do Campus Sexual Assault Hearings Violate Due Process?* Yale Law School, Public Law Research Paper No. 588 (Oct. 2016) 20,
https://papers.ssrn.com/sol3/papers2.cfm?abstract_id=2857153
[32] https://www2.ed.gov/about/overview/budget/budget17/justifications/z-ocr.pdf
[33] See, e.g., U.S. Dept of Education, Office for Civil Rights, Dear Colleague Letter on Title IX Coordinators, by Catherine E. Lhamon, Assistant Secretary of Education for Civil Rights (April 24, 2015),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf/
("I write to remind you that all school districts, colleges, and universities receiving Federal financial assistance must designate at least one employee to coordinate their efforts to comply with and carry out their responsibilities under Title IX. . . . These designated employees are generally referred to as Title IX coordinators. . . . To be effective, a Title IX coordinator must have the full support of your institution. It is therefore critical that all institutions provide their Title IX coordinators with the appropriate authority and support necessary for them to carry out their duties and use their expertise to help their institutions comply with Title IX.")
[34] https://www.prlog.org/12610894-kill-campus-rape-rule-says-house-freedom-caucus-report.html/ Professor John Banzhaf, of the George Washington University Law School, estimated that "if each administrator devoted only 50% of his or her time to complaints about sexual assault -- especially since little effort is required at this point [to] assure compliance with the primary and original purpose of Title IX which was to equalize athletic opportunities -- and each cost only $200,000 in salary, benefits, support staff, etc., the cost of this alone in student tuition dollars would be about $700 million a year." This does not include the time and resources devoted to Title IX problems by others at the university, including campus police, deans, faculty and others on disciplinary panels. Nor does it include the large costs of conducting sexual assault surveys or the ubiquitous -- and largely ineffective -- campus rape programs.
[35] *Campus Rape Frenzy* 206 and sources cited therein.

9

[36] *Id*. 160-161.

[37] http://projects.chronicle.com/titleix/

[38] *Campus Rape Frenzy* 95. Banzhaf reported that "according to a Risk Research Bulletin put out by insurance company United Educators (UE), student-on-student sexual assaults -- which UE termed 'a perfect storm' of 'alcohol, mental health, and sexual violence' -- cost its members more than $36 million in losses from 2006-2010." Banzhaf added: "Since the UE represents only about 1,200 educational institutions -- including independent schools and public school districts, as well as colleges and universities -- and because, according to many reports, the number of complaints and campus proceedings exploded only after that time period, it is likely that the sum of losses at all colleges and universities to date is much higher and will continue to grow."

[39] Glenn Harlan Reynolds, "The Great Campus Rape Hoax," *USA Today*, December 15, 2014, http://www.usatoday.com/story/opinion/2014/12/14/campus-rape-uva-crisis-rolling-stone-politicscolumn/20397277/ Reynolds has also pointed out: "Higher education . . . is one of the Democratic Party's biggest sources of support: Financial (according to Open Secrets, 4 of the top 10 organizations furnishing donors to the Obama 2016 campaign were universities: The University of California was #1, ahead of Google, and the others were Harvard, Stanford and Columbia), ideological (faculties lean far-left and the lefty faculty members tend to be much more outspoken, on average, than the conservative or libertarian faculty), and grassroots, with students, faculty and administrators serving as foot-soldiers (sometimes with university funding) for Democratic candidates and causes. And as Case Western University law professor George Dent notes, "Most state colleges and universities now serve as political action committees for the left, and their political spending dwarfs that of all other PACs."

[40] http://www.chronicle.com/blogs/ticker/in-letter-to-college-presidents-biden-urges-continued-fight-against-sexual-assault/116335/

[41] https://nwlc.org/wp-content/uploads/2016/07/2016.7.13-Title-IX-Support-Sign-On-Letter.final_.pdf/

[42] *Campus Rape Panic* 39, 191, 195, 274, 275.

[43] https://www.gop.com/platform/renewing-american-values/

[44] American College of Trial Lawyers (ACTL), White Paper on Campus Sexual Assault Investigations, March 2017, at p. 11, (various provisions of ACTL's paper are paraphrased or summarized unless otherwise indicated) https://www.actl.com/library/press-release-2017-new-standards-campus-sexual-assault-investigations-provide-fairness-all ("Under the current system, everyone loses.")

[45] http://www.americanbar.org/groups/criminal_justice/committees/campus.html

[46] See, e.g., https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2017/01/23092433/fire-letter-to-pres_dt.pdf/; http://www.stuarttaylorjr.com/wp-content/uploads/2017/FIRE-Letter-to-Candice-Jackson-4-26-17.pdf/

[47] See https://www.facecampusequality.org/; see also http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/WE-CAN-DO-BETTER-POSITION-PAPER-FINAL.pdf/; http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/FACE-DUE-PROCESS-RECOMMENDATIONS-FINAL.pdf/; http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/ALEXANDER-TESTIMONY-Senate-HELP-SUBMITTED-7-28-2015.pdf/

[48] http://www.saveservices.org/

[49] http://www.saveservices.org/wp-content/uploads/Six-Year-Experiment-in-Campus-Jurisprudence.pdf/

[50] http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/CEFTA-2.26.2017.pdf/

[51] See, e.g., Jacob Gerson and Jennie Suk, *The Sex Bureaucracy*, 104 California Law Review Issue 4 (2016); Gertner, *supra*.

[52] See https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html/.

[53] https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/?utm_term=.350791812f58

[54] See, e.g., (more than 20) "Law Professors' Open Letter regarding Campus Free Speech and Sexual Assault," *Wall Street Journal*, May 16, 2016, http://online.wsj.com/public/resources/documents/Law-Professor-Open-Letter-May-16-2016.pdf/; see Jacob Gershman, "Dershowitz and Other Professors Decry 'Pervasive andSevere Infringement' of Student Rights," *Law Blog, Wall Street Journal*, May 18, 2016; http://blogs.wsj.com/law/2016/05/18/dershowitz-andother-professors-decry-pervasive-and-severe-infringement-of-studentrights/; (National Association of Scholars President) Peter Wood, "Letter to Members of Congress: Rein in the DoED's Office for Civil Rights," March 4, 2015, https://www.nas.org/articles/letter_to_senators_dont_expand_the_does_office_for_civil_rights/

10

AR_00001105

[55] See, e.g., Families Advocating for Campus Equality, "Campus Sexual Misconduct: We Can Do Better": "[C]ourts across the United States are beginning to agree that DCL-mandated disciplinary procedures lead to biased and often predetermined results. A few of the more egregious examples:

• Federal District Judge Mark Mastroianni, of Massachusetts, refused to dismiss an expelled student's Title IX discrimination claims, finding Amherst acted with "deliberate indifference" when it refused to investigate and ignored evidence supporting the student's claim that he was in reality the victim. *Doe v. Amherst College*, Civil Action No. 15-30097-MGM(Feb. 27, 2017) (blacked-out-drunk male student given oral sex by his girlfriend's roommate who later accused him of rape; text messages the accuser sent later that evening revealed she knew he was too intoxicated to lie for her).

• Federal District Judge William E. Smith, of Rhode Island, allowed an accused student's Title IX claim to proceed based on allegations that Brown had banned him from campus without an investigation or hearing, refused him access to evidence and prevented him from defending himself. *Doe v Brown*, C.A. No. 1:15-cv-00144-S-LDA (D. R.I., Feb. 22, 2016).

• A New York appellate court reversed a lower court dismissal of an accused student's claim against the State University of New York and criticized the school's reliance on weak hearsay evidence. *Haug v State University of New York*, No. 522632, (State of New York, Appellate Division, Third Judicial Dept., Apr. 6, 2017).

• Federal District Judge T.S. Ellis III, of the Eastern District of Virginia, granted an accused student summary judgment, finding the school's "accumulation of mistakes" violated the student's liberty interest by 'plainly call[ing] into question plaintiffs "good name, reputation, honor, or integrity." *Doe v. Rectors and Visitors of George Mason University*, 149 F.Supp. 3d 602, 613-14 (E.D. Va. 2016) (quotation omitted).

*Federal District Judge Dennis Saylor, of Massachusetts, criticized Brandeis' failure to provide an accused student "a variety of procedural protections . . . many of which, in the criminal context, are the most basic and fundamental components of due process of law." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603 (D. Mass. 2016).

• Federal District Judge Norman K. Moon, of the Western District of Virginia, found there was potential gender bias because the Title IX officer had opined "sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations." *Doe v. Washington & Lee University,* No. 6:14-cv-00052, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015).

• The U.S. Court of Appeals for the Second Circuit found an accused student had sufficiently pled anti-male gender bias based on "pro-female, anti-male bias . . . adopted to refute criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to female students' charges of sexual assaults by male students." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (Leval, J.).

• Judge Joel Wohlfeil, of the County of San Diego Superior Court, found San Diego State University's disciplinary process *"enough to shock the Court's conscience." John Doe v. Rivera (SDSU),* No: 37-2015-00029558-CU-WM-CTL (San Diego County Sup. Court, Feb. 1, 2017 Minute Order)(emphasis added).

* Judge Timothy Fall, of the Yolo County Superior Court, found that due process had "completely been obliterated" by UC Davis. *John Doe. v. Donald Dudley, Director of Student Judicial Affairs, et al.*, No. PT 15-1253 (Yolo County Sup. Court, Sept. 22, 2015).

• A California Court of Appeals found the University of Southern California had violated the student's due process rights by not giving him a chance to defend himself. *John Doe v University of Southern California*, 246 Cal. App. 4th 221 (2016).

• Judge John D. Molloy, of the Riverside County (California) Superior Court, granted a student's stay of his expulsion and criticized LaSierra University administrators for seeking to expel the student without a hearing, identifying witnesses or disclosing evidence. *John Doe v Marnie Straine, Interim Title IX Coordinator, et al.*, Case Case No. RIC 1606115 (Riverside County Sup. Court, July 15, 2016) (Student was denied "factual basis of the charges against him," "access[to] any evidence," and "opportunity to appear directly before the decision-making panel to rebut the evidence presented against him.")

[56] Janet Napolitano. "Only Yes Means Yes: An Essay on University Policies Regarding Sexual Violence and Sexual Assault," 33 Yale Law and Policy Review 396-397 (2014)
http://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=1684&context=ylpr/

[57] The 2017 NCHERM Group White Paper: Due Process and the Sex Police,
https://www.ncherm.org/wordpress/wpcontent/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf

[58] https://rainn.org/news-room/rainn-urges-whitehouse-task-force-to-overhaul-colleges-treatment-of-rape.

11

[59] http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/WE-CAN-DO-BETTER-POSITION-PAPER-FINAL.pdf/

[60] See Stuart Taylor, Jr., "How to End Campus Injustice with the Stroke of a Pen," *Wall Street Journal,* April 10, 2017, https://www.wsj.com/articles/how-to-end-a-campus-injustice-with-the-stroke-of-a-pen-1491864934. For much more detailed suggestions, see Families Advocating for Campus Equality, "Due Process Procedures Necessary in Campus Sexual Misconduct Disciplinary Proceedings," http://www.stuarttaylorjr.com/wp-content/uploads/2017/05/FACE-DUE-PROCESS-RECOMMENDATIONS-FINAL.pdf/

12

AR_00001107

**Manalo, Alvin**

| | |
|---|---|
| **From:** | Manalo, Alvin |
| **Sent:** | Monday, September 18, 2017 10:33 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Henderson, Chelsea |
| **Subject:** | Re: PLEASE HELP |

Thank you Candice. I'll let Jessica and Dougie know today and see if they would like you to reach out to the parent directly.

Sent from my iPhone

On Sep 18, 2017, at 9:46 AM, Jackson, Candice <Candice.Jackson@ed.gov> wrote:

> What a terrible experience it sounds like this family has had. I respectfully recommend that I arrange to talk with this parent about her experience. Thanks Alvin.
>
> Candice Jackson
> Office for Civil Rights
> U.S. Dept. of Education
> *Sent from my iPhone*
>
> On Sep 18, 2017, at 9:43 AM, Manalo, Alvin <Alvin.Manalo@ed.gov> wrote:
>
>> Good morning Candice,
>>
>> We received the Title IX related meeting request for the Secretary below. Should we refer to OCR like the previous ones?
>>
>> Thanks!
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** [PII] @gmail.com>
>>> **Date:** September 17, 2017 at 8:00:48 AM EDT
>>> **To:** "Manalo, Alvin" <Alvin.Manalo@ed.gov>
>>> **Subject: RE: PLEASE HELP**
>>>
>>> Mrs, Manalo,
>>>
>>> My daughter was sexually assaulted at school in the [PII] school year. She has had problems ever since. She has been in counseling since it happened. She is suicidal and on medications because of this. The school made sure that they were

not in the same classes. I had no idea until **PII** that they were supposed to do an investigation. I've had problems with the school working with me and my daughter she has anxiety. She is in fear of going to school. This has been going on for years now. **PII** Now the therapist and I were trying to get her back in school this year and have a successful year. But was unable to do so, because this boy still attends her school. Her Title IX rights have been violated year after year and had I known this in the past, I would have done something about it. Now I do know and I've gone to the Police Department, the Sheriff's Office, Department of Family and Children Service. The Sheriff's Office did the forensic interview and have determined that she has been sexually assaulted. My daughter would just like to talk to Mrs. DeVos about her fear, anxiety and trauma she has been through the **PII** years because the school did not follow policies.

Thanks in Advance,

**PII**

On Sep 11, 2017 11:02 AM, "Manalo, Alvin" <Alvin.Manalo@ed.gov> wrote:

Ms **PII**

Thank you for your message to Secretary Betsy DeVos to request that she speak to your **PII** old daughter. It'll be helpful for the Secretary's scheduling staff if you can provide additional information on your request. Please describe the matter your daughter is interested in discussing and if you have any specific dates in mind for a meeting/call. Once you're able to provide this information I'll go ahead and forward it to the Secretary's schedulers to review.

Once again, thank you for your kind request.

Best regards,

Alvin Manalo

Scheduling and Advance

Office of the Secretary

U.S. Department of Education

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Monday, September 18, 2017 12:01 PM |
| **To:** | Menashi, Steven |
| **Subject:** | Fwd: OCR resolution letters and appeals |
| **Attachments:** | Rider resolution letter.PDF; ATT00001.htm |

Passing this along from staff; AC DPP

DPP

**AC DPP**

Thanks Steve!

Candice

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Karvonides, Mia" <Mia.Karvonides@ed.gov>
> **To:** "Jackson, Candice" <Candice.Jackson@ed.gov>
> **Subject: FW: OCR resolution letters and appeals**
>
> Don't know if this is still open for discussion, but more research from Rachel.
>
> ---
>
> **From:** Gettler, Rachel
> **Sent:** Monday, September 18, 2017 11:28 AM
> **To:** Karvonides, Mia
> **Cc:** Wheeler, Joseph; Reyes, Alejandro; Faiella, Matt; Patel, Shiwali
> **Subject:** OCR resolution letters and appeals
>
> Mia,



# DPP

Let me know if you have other questions.

Thanks,
Rachel

AR_00001112

**S. Daniel Carter**

| | |
|---|---|
| **From:** | S. Daniel Carter |
| **Sent:** | Monday, September 18, 2017 4:42 PM |
| **To:** | Catoe, Tracy |
| **Cc:** | Jackson, Candice |
| **Subject:** | Re: Title IX Sexual Violence Guidance (Formal Letter Attached) |

Ms. Catoe,

Thank you again for your response. I have written one more blog post on this subject which I think may be of benefit to the Secretary and others as these issues are considered. I hope you will consider sharing it with those involved, and that the Department will find it useful.

http://www.huffingtonpost.com/entry/in-defense-of-the-title-ix-dear-colleague-letter_us_59bddb9ae4b06b71800c3a2f

In short the DCL as written calls for upholding due process and enumerates required as well as suggested procedural safeguards for both the accused and accuser. I think many of the issues experienced and reported by accused students have resulted from OCR not enforcing these provisions as they should have been, with one exception cited in my post, not the DCL itself. As the process moves forward with notice and comment on new formal guidance I would respectfully ask the Secretary to please emphasize enforcement of these existing requirements rather than issuing "interim guidance".
--
S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz

**From:** "Catoe, Tracy" <Tracy.Catoe@ed.gov> on behalf of Betsy DeVos <Betsy.DeVos@ed.gov>
**Date:** Wednesday, September 6, 2017 at 7:11 AM
**To:** "s.daniel.carter@safecampuses.biz" <s.daniel.carter@safecampuses.biz>
**Subject:** FW: Title IX Sexual Violence Guidance (Formal Letter Attached)

Dear Mr. Carter:
Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review and further handling.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

**From:** Press
**Sent:** Tuesday, September 05, 2017 4:27 PM
**To:** DeVos, Betsy

**Subject:** FW: Title IX Sexual Violence Guidance (Formal Letter Attached)

---

**From:** S. Daniel Carter [mailto:s.daniel.carter@safecampuses.biz]
**Sent:** Tuesday, September 05, 2017 4:19 PM
**To:** DeVos, Betsy
**Cc:** Jackson, Candice
**Subject:** Title IX Sexual Violence Guidance (Formal Letter Attached)

Dear Secretary DeVos:

Thank you for your recent, and diligent interest in Title IX's impact on how colleges and universities address the very serious issue of campus sexual violence. Thank you also for recently making a point of stressing the importance of enforcing the federal Jeanne Clery Act, which also contains provisions dealing with this issue. I'm hopeful that the outcome of this attention will be to arrive at a balanced approach that leads to safer campuses.

I'm aware that there has been specific interest in the Office for Civil Rights (OCR) April 4, 2011 Dear Colleague Letter (DCL) on Title IX's application to "Sexual Violence" cases. While this letter is noteworthy for focusing much needed attention to these matters, the essence of it reflects longstanding law, guidance, and practice as was intended by those of us who requested it. The DCL has made significant progress in combatting long documented discrimination against survivors of campus sexual violence. Please do not rescind or weaken this important guidance.

The essence of Title IX is of course equality and fairness. Accordingly, should you feel it is necessary to take any further steps to make sure that no individuals in our nation's educational communities face discrimination, whether they be survivors or individuals accused of sexual violence please do so in a way that does not roll back the clock on the progress survivors, and the institutions that work to meet their needs have made over the last six years. Additionally, any sudden changes now at the beginning of the academic year could be significantly disruptive to schools, so a long-term process is more sound.

Should additional guidance be forthcoming, I would respectfully suggest an update to OCR's "Sexual Harassment Guidance", last promulgated in 2001. With a public notice and comment period this would enable all stakeholders – survivors, accused, and schools – and their advocates to provide substantive policy and legal input to the Department towards a goal of a thoroughly balanced framework.

Please let us know if we can be of any assistance to you during this process.
--
S. Daniel Carter, President
Safety Advisors for Educational Campuses, LLC
***Helping to create a safe learning environment***
***for all within the academic community.***
P.O. Box 2019, Thomson, GA 30824
202-684-6471 | Fax 706-522-9196
s.daniel.carter@safecampuses.biz
https://www.linkedin.com/in/sdccampussafety/

**Edward Bartlett**

| | |
|---|---|
| **From:** | Edward Bartlett |
| **Sent:** | Monday, September 18, 2017 7:10 PM |
| **To:** | Jackson, Candice |
| **Subject:** | RE: BIG NEWS: 73% of American Adults agree with DeVos's statement about replacing the Obama-era guidelines on sexual assault on college campuses |

Candice – We've now identified 13 editorial boards that have come out in support of major campus reforms, and many have explicitly endorsed the DeVos plan.

Cheers,
Ed

1. ***Wall Street Journal*: The DeVos Guidance Speech** – Sept. 7: "The result, unsurprisingly, has been a travesty of injustice, incompetence and inconsistency as schools struggled to comply. Many institutions, often small colleges with limited resources, are now engulfed in lawsuits flowing, again unsurprisingly, from these kangaroo courts."

2. ***Washington Post*: Betsy DeVos's Remarks on Campus Sex Assault Were Right on Target** – Sept. 8: "At the same time, legitimate questions have been raised about whether there was an overreach by the Obama administration in its prescriptions that resulted in imbalances and injustices. Ms. DeVos, while crediting the Obama administration for bringing the issue of campus sexual assaults "into the light of day," blasted the current system as failing both victims and the accused and being too onerous for administrators."

3. ***National Review*: DeVos Takes on Lawless Campus Tribunals** – Sept. 8: "The individual stories are harrowing, and DeVos provided startling examples in her speech. Schools have punished students even though the alleged "victim" claimed that nothing happened. They've investigated and punished professors and students for engaging in First Amendment–protected speech. They've refused to allow students to introduce exculpatory evidence."

4. ***Detroit News*: Make Justice Goal in Campus Assault Cases** – Sept. 9: "Sticking to the Constitution's due process clause is the best way to protect both the accuser and the accused. Efforts to bend that document to favor one or the other always cheat the cause of justice….'Due process is the foundation of any system of justice that seeks a fair outcome,' DeVos said. We agree."

5. ***Boston Globe*: Revise Campus Sex Assault Policies, But Don't Scrap Them** – Sept. 9: "Victims deserve support, respect, and a clear-cut system for reporting and adjudicating their allegations. There's no sympathy here for perpetrators of sexual assault who whine afterwards about how their lives were ruined by what amounts to their own actions. But having a tribunal of college administrators reach conclusions about what really happened late at night in a dorm room or frat house is not the best path to justice. Local law enforcement should be part of any campus policy to address sexual assault."

6. ***USA Today*: Campus Rape Cases Don't Deserve Second-Class Justice** – Sept. 10: "Sexual assaults are serious crimes best handled by the criminal justice system. The most stringent punishment schools can order is expulsion…In other words, due process is not some legal technicality. It's a matter of fairness that lies at the heart of America's justice system.

7. ***Bloomberg*: DeVos's Right Call on Sexual Assault** — Sept. 12: "Schools overreacted in ways that have disregarded basic due-process rights and made a mockery of

justice….Some do not even notify students who stand accused in writing. In many cases, these due-process procedures offer less protection than those established for other types of student misconduct."

8. ***Times-Tribune*** (Scranton, PA): **DeVos Right on Assaults** – Sept. 12: "The current system too often swaps one injustice for another, replacing neglect of victims with an assumed guilt of the accused. DeVos is correct to seek a better course."

9. ***The Economist***: **The Trump administration's approach to rape on campus is welcome** — Sept. 14: "Because the OCR letter was sent without time for notice and comment—steps that Ms DeVos is rightly taking in revising the policies now—the letter lacked the force of law. Still, colleges were cowed into compliance after the OCR threatened to cut off federal funding to offending institutions."

10. ***Orange County Register*** (California): **Campus Sexual Assault Policies Need Revision** – Sept. 14: "Like many overzealous state interventions, the federal government's actions were well-intentioned…But the government, and universities under its direction, have gone too far, and, as a result, threatened and violated the rights of the innocent."

11. ***Santa Barbara Sun***: **Campus Sexual Assault Policies Need Revision** — Sept. 14: "The current system not only violates the rights and educational opportunities of innocent students wrongfully accused, it also cheapens the plight of legitimate rape victims. There is no reason we should have to choose between protecting victims of sexual assault and contravening the rights of the accused through an unfair process."

12. ***Quad-City Times*** (Iowa): ***Leave Rape Investigations to Police*** – Sept. 15: In "society's haste to rectify one injustice, a new one was created where the accused are often punished before the facts are known. Due process — a tenet of American justice — is sacrificed at the altar of expediency."

13. ***St. Louis Post-Dispatch***: **Like Her or Not, Betsy DeVos Made the Right Call on Campus Rape Courts** – Sept. 16: "It's been all too convenient in the past for universities to encourage rape victims to keep their complaints quiet and allow a disciplinary panel to resolve the matter. Seemingly sympathetic counselors will warn victims about the invasiveness of a police investigation and the likelihood that the victim's past sexual history would be brought up in a court proceeding."

---

**From:** Jackson, Candice [mailto:Candice.Jackson@ed.gov]
**Sent:** Friday, September 15, 2017 8:56 AM
**To:** EDWARD BARTLETT LAST_NAME <edwardbartlett@comcast.net>
**Subject:** Re: BIG NEWS: 73% of American Adults agree with DeVos's statement about replacing the Obama-era guidelines on sexual assault on college campuses

Thanks!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On Sep 15, 2017, at 8:43 AM, EDWARD BARTLETT LAST_NAME `PII` @comcast.net> wrote:

Great news!

http://www.rasmussenreports.com/public_content/politics/current_events/soc

ial_issues/most_americans_agree_with_devos_on_sexual_misconduct_on_campuses

# Most Americans Agree With DeVos on Sexual Misconduct on Campuses

Wednesday, September 13, 2017

During a speech at George Mason University's Antonin Scalia Law School last week about sexual assault on campus, education Secretary Betsy DeVos stated, "Every survivor of sexual misconduct must be taken seriously. Every student accused of sexual misconduct must know that guilt is not predetermined." Despite outcry that looking out for both the victim and the accused sweeps the issue of sexual assault under the rug, a strong majority of Americans agrees with DeVos's statement, but are split on whether the federal government should even be involved in these matters.

A new Rasmussen Reports national telephone and online survey finds that 73% of American Adults agree with DeVos's statement about replacing the Obama-era guidelines on sexual assault on college campuses. Just six percent (6%) disagree, and a sizeable 20% are not sure how they feel about her statement. (To see survey question wording, click here.)

Americans in general are split, however, on whether sexual assault on campus is an area that the federal government has any business being involved in. Forty-seven percent (47%) say the federal government should be involved, but 40% disagree. Thirteen percent (13%) are not sure whether the government should be involved in cases of sexual assault on college campuses at all.

Seventy-five (75%) of Americans say the issue of sexual assault on college campuses is a serious issue, while 15% disagree. This includes 44% who say the issue is Very Serious and just 3% who say it's Not At All Serious. The number who see sexual violence on college campuses as a serious problem is up from 71% in September 2014.

Women and adults under 40 are more likely than men and older adults to say that sexual assault on college campuses is a Very Serious problem. They are

AR_00001117

also slightly more likely to agree with DeVos's statement.

In September 2014, just after California became the first state to pass a "yes means yes" bill which requires affirmative consent before sexual activity on state-funded campuses, 38% of Americans believed sexual assault on campus is an issue the federal government should be involved in.

The survey of 1,000 American Adults was conducted on September 10-11, 2017 by Rasmussen Reports. The margin of sampling error is +/- 3 percentage points with a 95% level of confidence. Field work for all Rasmussen Reports surveys is conducted by Pulse Opinion Research, LLC. See methodology.

Fifty-six percent (56%) of Americans ages 18 to 39 think sexual assault on campus is an issue the federal government should be involved in, a view shared by 43% of those ages 40 to 64 and 35% of voters above the age of 65.

A majority of Americans across all political parties agree with DeVos's remarks.

Fifty-two percent (52%) of Republicans think the federal government should stay out of issues of sexual assault on campus, while 57% of Democrats think it's an issue that should involve the federal government. Americans not affiliated with either major party are evenly divided on this question.

Fifty-one percent (51%) of adults who are not married think the federal government should be involved with sexual assault issues on college campuses. Forty-six percent (46%) of married adults don't think the federal government should get involved in these issues. Adults with children at home are slightly more likely than those without children to say that the federal government should be involved in these matters.

Most voters across the demographic board consider sexual violence at colleges and universities a serious problem.

Just eight percent (8%) of all adults said in September 2014 that college and university campuses can ever be made completely safe from violent incidents.

AR_00001118

Thirty-nine percent (39%) of adults think there is less freedom of speech on U.S. college campuses today than there has been in the past.

Nearly half of Americans believe colleges and universities do not do enough to monitor students' behavior.

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, September 19, 2017 10:00 AM |
| **To:** | Karvonides, Mia; Faiella, Matt; Reyes, Alejandro |
| **Subject:** | Q&A draft for T9 Team |
| **Attachments:** | Q-A 9-15-17.docx |

This is the latest draft; since yesterday ther _____ DPP _____

DPP                                                          Thanks all.

Candice

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**Jackson, Candice**

---

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Tuesday, September 19, 2017 1:28 PM |
| **To:** | Eitel, Robert; Bailey, Nathan; Hill, Elizabeth; Sherman, Brandon; Menashi, Steven |
| **Subject:** | Is There A 'Better Way' To Handle Campus Sexual Assault? : NPR |

A reasonable report from NPR on the ABA and ACTL approaches:

http://www.npr.org/2017/09/19/552006625/devos-looks-for-better-way-to-handle-campus-sexual-assault

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, September 19, 2017 2:14 PM |
| **To:** | Eitel, Robert; Jackson, Candice; Oppenheim, Peter |
| **Attachments:** | DCL 9-19-17.docx; Q-A 9-19-17.docx |

AR_00001122

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Tuesday, September 19, 2017 6:07 PM |
| **To:** | Jackson, Candice; Sherman, Brandon; Eitel, Robert |
| **Subject:** | RE: |
| **Attachments:** | DCL 9-19-17 clean.docx; Q-A 9-19-17 clean.docx |



# DPP

**OCR**

| | |
|---|---|
| **From:** | OCR |
| **Sent:** | Wednesday, September 20, 2017 10:02 AM |
| **To:** | Faiella, Matt; Foster, Richard; Hoogstraten, Anne; Karvonides, Mia; Reyes, Alejandro; Wheeler, Joseph |
| **Cc:** | Butler, Connie; Davis, Sharon D. (OCR); Jackson, Candice; Lee, Michael; Merges, Tamara; Reed, Carla; Scott, Nikisha |
| **Subject:** | FW: Protect Title IX for the victims |
| **Attachments:** | G 17-018075 PLG.rtf |

Hello

This email correspondence is assigned to PLG for response.
Due Date:  10-04-17

Thank you for your consideration of this note.

Sandy Stover
OCR, Customer Service Team

**From:** PII @gmail.com]
**Sent:** Monday, September 11, 2017 6:11 PM
**To:** OCR
**Subject:** Protect Title IX for the victims

In a country plagued by deep and dangerous inequities and issues in public education, Betsy DeVos has chosen to hone in on ONE problem facing higher education that she apparently deems Very Important: the protections afforded by Title IX and how they're not fair to people accused of sexual assault.

Candice Jackson needs to get her facts straight as 90% of sexual assault victims do NOT fall into the category of Oops, I was drunk. Regardless of the percentage, being drunk does not permit someone to have sex with them when they are incapacitated.

There is already a problem in the school system discouraging sexual assault victims to come forward and this is just another way to suppress the victim. You should be working to clear the way for victims to speak up when sexually assaulted, not stifle them.

This is unnecessary and entirely counterproductive. It is the exact opposite direction of where many colleges and universities are headed. It does NOT support survivors and sends a clear and dangerous signal to would-be assaulters.

Our educational system needs to stop protecting the boys, stop making policy to protect their money, and start creating a safe please for women to be and learn.



**OCR**

| | |
|---|---|
| **From:** | OCR |
| **Sent:** | Wednesday, September 20, 2017 11:32 AM |
| **To:** | Faiella, Matt; Foster, Richard; Hoogstraten, Anne; Karvonides, Mia; Reyes, Alejandro; Wheeler, Joseph |
| **Cc:** | Butler, Connie; Davis, Sharon D. (OCR); Jackson, Candice; Lee, Michael; Merges, Tamara; Reed, Carla; Scott, Nikisha |
| **Subject:** | FW: Title IX |
| **Attachments:** | G 17-018094 PLG.rtf |

Hello

This email correspondence is assigned to PLG for response.
Due Date:  10-04-17

Thank you for your consideration of this note.


Sandy Stover
OCR, Customer Service Team



-----Original Message-----
From: [PII] @yahoo.com
Sent: Monday, September 11, 2017 7:01 PM
To: OCR
Subject: Title IX

I am from [PII] New York and I am  very concerned about Betsy Devos ' effort to dismantle Title IX . This will weaken protections for survivors of sexual assault. I am writing to request keeping these protections in place .
Thank you.

[PII]

Sent from my iPhone

.

**OCR**

| | |
|---|---|
| **From:** | OCR |
| **Sent:** | Wednesday, September 20, 2017 11:46 AM |
| **To:** | Faiella, Matt; Foster, Richard; Hoogstraten, Anne; Karvonides, Mia; Reyes, Alejandro; Wheeler, Joseph |
| **Cc:** | Butler, Connie; Davis, Sharon D. (OCR); Jackson, Candice; Lee, Michael; Merges, Tamara; Reed, Carla; Scott, Nikisha |
| **Subject:** | FW: Title IX |
| **Attachments:** | G 17-018099 PLG.rtf |

Hello

This email correspondence is assigned to PLG for response.
Due Date:  10-04-17

Thank you for your consideration of this note.

Sandy Stover
OCR, Customer Service Team

**From:** [ PII @hotmail.com]
**Sent:** Tuesday, September 12, 2017 5:43 AM
**To:** OCR
**Subject:** Title IX

Hello,

I am concerned about Betsy DeVos' efforts to dismantle Title IX  which would weaken protections for survivors of sexual assault. I am emailing to request keeping these protections in place.
Thank you.

PII

**OCR**

| | |
|---|---|
| **From:** | OCR |
| **Sent:** | Wednesday, September 20, 2017 12:03 PM |
| **To:** | Faiella, Matt; Foster, Richard; Hoogstraten, Anne; Karvonides, Mia; Reyes, Alejandro; Wheeler, Joseph |
| **Cc:** | Butler, Connie; Davis, Sharon D. (OCR); Jackson, Candice; Lee, Michael; Merges, Tamara; Reed, Carla; Scott, Nikisha |
| **Subject:** | FW: Title IX |
| **Attachments:** | G 17-018109 PLG.rtf |

Hello

This email correspondence is assigned to PLG for response.
Due Date: 10-04-17

Thank you for your consideration of this note.


Sandy Stover
OCR, Customer Service Team



-----Original Message-----
From: [PII]
Sent: Tuesday, September 12, 2017 12:08 PM
To: OCR
Subject: Title IX

I'm contacting you to urge Secretary DeVos to maintain the critical Title IX (Title 9) protections for survivors of campus sexual assault as guided by the 2011 Dear Colleague Letter. This is a serious and troubling epidemic, and it is vital that schools maintain strong policy guidelines to protect its vulnerable students.

We have fought too long and too hard to het our voices heard to turn back now. Victims of sexual assault must be heard. Their attackers should not receive more protection than those assaulted. Maybe she should talk to some of those victims and hear their stories before making any changes.

**PII**

Sent from my iPhone

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Wednesday, September 20, 2017 2:29 PM |
| **To:** | Jackson, Candice |
| **Subject:** | FW: DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs |
| **Attachments:** | DCL 9-15-17 (DOJ2).docx; Q-A 9-15-17 (DOJ2).docx |

_____

**From:** Dickey, Jennifer (OLP) [mailto:Jennifer.B.Dickey@usdoj.gov]
**Sent:** Wednesday, September 20, 2017 2:23 PM
**To:** Menashi, Steven; Jeffrey.M.Harris@omb.eop.gov
**Cc:** Williams, Beth A (OLP); Jones, Kevin R (OLP); Crytzer, Katherine (OLP); Newman, Ryan (OLP); Cox, Stephen (OASG); Murray, Brian (OASG)
**Subject:** DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs

Steve and Jeff,

(b)(5)
As discussed, attached are DOJ's combined comments on the DCL/Q&A.  We appreciate your careful
consideration of them.

Best,

Jennifer B. Dickey
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm 4244
Washington, D.C. 20530
Direct: 202.514.2456
Cell: 202.353.5489

**From:**
**Sent:** Wednesday, September 20, 2017 3:37 PM
**Subject:** FW: In regards to Title IX

---

**From:** Catoe, Tracy
**Sent:** Wednesday, September 20, 2017 7:02 AM
**To:** Ware, Angela
**Subject:** FW: In regards to Title IX

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Monday, September 18, 2017 2:25 PM
**To:**      PII
**Subject:** RE: In regards to Title IX

Dear      PII
Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.
Thank you again for contacting us.
Sincerely,
T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

---

**From:**                        PII
**Sent:** Monday, September 18, 2017 2:03 PM
**To:** DeVos, Betsy
**Subject:** In regards to Title IX

Dear Betsy Devos,
As a politically moderate high-school student who is headed to college next year I have a few concerns regarding your recent title 9 actions. Let me ask you a question, do you believe there is such thing as a lesser person?

If you have any remnant of a spine you would say you do not think any human is lesser than another based off qualities they cannot control. Second question, do you think that people are inherently evil? Again, most likely you say no, some people do evil things while not being born evil, it is the culture which raised the individual to fault for wrongdoings.

Your recent decisions regarding Title IX (Public Law No. 92-318, 86 Stat. 235 (June 23, 1972), codified at 20 U.S.C. §§ 1681–1688) have made me question the state of your spine. No human is lesser than another because of qualities they are unable to control, including gender dysmorphia, even if it is a mental condition they do not choose the condition much like someone with ALS doesn't choose that condition but do we tell them to quit pretending and walk? The fact of the matter is that students of public universities deserve equal treatment and equal rights to enjoy privileges of other students. INCLUDING TRANSGENDER STUDENTS, these people have a condition, they don't just pretend to be something that gets them bullied and

AR_00001129

oppressed. Open your eyes and sit up straight with whatever content of a spine you have, and see we are all just kids wanting to feel safe and have fun, please.

On the topic of feeling safe, if somebody reports sexual violence students should not be doubted or persecuted for claiming victimhood. False reports of rape and other sex crimes is an arguably evil act and instead of persecuting the girls who are legitimately abused or violated we should take a step back and look at how our culture is responsible for the false reports of sex crimes. Yes, all are innocent until proven guilty but does that say anything about all victims are wrong until proven, right? No, all claims should be treated with the assumption the victim has been violated, and the accused is innocent until further proof. These girls need someplace to go, someone to talk to, not a school board assuming they are making up stories.

Regards,

PII

**From:**
**Sent:**                 Wednesday, September 20, 2017 4:03 PM
**Subject:**              FW: Considerations for Making Universities Safe from Sexual Assaults


-----Original Message-----
From: DeVos, Betsy
Sent: Wednesday, September 20, 2017 11:10 AM
To: **PII**
Subject: RE: Considerations for Making Universities Safe from Sexual Assaults

This acknowledgement is sent on behalf of Secretary of Education Betsy DeVos.


Dear **PII**

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review and further
handling.

Thank you again for contacting us.

Sincerely,
Edgar Mayes

Director of Correspondence and
Communications Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

-----Original Message-----
From: **PII** @comcast.net]
Sent: Tuesday, September 19, 2017 9:39 PM
To: DeVos, Betsy
Subject: Considerations for Making Universities Safe from Sexual Assaults


Dear Secretary DeVos:

I am encouraged by your recent speech at George Mason University regarding putting an end to
Obama's Title IX letter that had effectively transferred sexual harassment and rape crimes from the
criminal justice system with due process to university administrators. As you stated in your
speech, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process
either protects everyone, or it protects no one. The notion that a school must diminish due process
rights to better serve the "victim" only creates more victims."

As a parent, I understand that the problems caused by sexual harassment and rape on college campuses are very real, painful and lasting. Your speech set forth many of the problems with the Obama process, and I agree with the many points you made. I would like to provide additional considerations as you move forward to design a better approach to address this problem that is a plague upon our children and the universities across the nation.

First, to minimize the problem we need to enforce the rule of law. Today, university administrators across the nation encourage a lawless society. University administrations direct their university police - frequently in coordination with city police forces - to not protected conservatives speaking on campuses. The police allow rioting and violent mobs - which include students and professors, as well as roaming marauders (e.g. Antifa) - to attack the "deplorables" and destroy property as they please. Peaceful protests on campuses and in college towns are a thing of the past.

University administrations also flaunt immigration law, with special privileges and services and protections granted to illegal immigrants. Furthermore, Harvard - arguably the nation's most prestigious university - honored Chelsea Manning, who was convicted of treason and placing the lives of Americans at risk, to be a fellow and speak at Harvard. Why does Harvard reward a convicted traitor with a speaking platform at the world's most prestigious university to highlight the fact that liberal crimes against the government are above the law? Harvard's administration (as well as Obama, who pardoned Manning), show no respect for the law.

If university administrations show no respect for our laws, why should the students? If the administrations pick and choose which laws to adhere to, why shouldn't students do the same? If professors encourage violence toward the police, why should the students respect the police when they try to enforce the law? Why should the students trust the police to protect them from rapists? Why should victims expect any support from the police if they report a rape? After all, many students march with Black Lives Matter, which calls the police racist murderers. Why should rapists worry about raping someone and breaking the law? Rapists may easily conclude their victims will never report it to the police, whom students despise. How will rapists ever be convicted if the police is not able to gather any evidence due to mistrust? Stopping sexual attacks requires everyone - especially university administrations and professors - to respect the law and the police. University administrations and professors need to lead by example. They need to develop trust between the police and the community and to demonstrate that the law will be enforced.

Second, we need to move away from a "victim blaming" process that allocates blame to the victim. Sexual attacks and rape are caused by predators with sick minds, and such aggressors should be severely punished once convicted by the criminal justice system. If a woman wears revealing clothes, has a flirting manner, or has one too many beers, that is irrelevant to the guilt of the aggressor. There is too much effort in analyzing these issues and then allocating responsibility of the rape to both the aggressor and the victim. If the woman (or man) says "no," the responsibility is ALL on the aggressor, who makes a conscious decision to attack the victim. The cause is the twisted mind of the aggressor who decides to attack the victim. The analysis of the conditions surrounding the event may be useful in educating students about situations to avoid so as to reduce the risk, but the analysis should NOT assign a share of responsibility to the victim.

Third, students should have a safe campus and safe student housing (dorms). In order to protect students, universities need to do more than simply review the process to investigate rapes after they occur. Universities need to prevent rapes by improving security systems, standards and practices. Dorm lifestyles and rooms should be examined. I recognize this is old school, but are coed dorms essential to college education? How can dorm "security" standards be upgraded and improved? Are the

minimum-wage, marginally trained dorm security staffs adequate? Should so much responsibility be placed on RAs, who are simply students with limited training and maturity, to "police" the many activities within dorms? Should more security cameras/systems be installed? Should universities be inspected and audited (e.g., inspector general's within the Education Department) with respect to implementing and complying with standards? Should safety performance reports be available to the public to assist families in selecting schools?

Fourth, universities should take action to better protect students once a rape is reported. If the accused aggressors are not in jail, the police should be allowed to provide some monitoring of the accused on campus (especially within dorms). The victim may be in the terrible position of seeing the accused not only on campus but in their dorm where they sleep.

The mission of the Department of Education is to "promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access." Somehow, you have inherited addressing the problem of solving sexual harassment and rape on campuses. I encourage you to place a high priority on addressing the problem and to work with the other stakeholders to find the best solutions. I also encourage you to apply real, urgent pressures on universities to (i) develop metrics and publish records of sexual assaults on or near campuses, (ii) endorse the rule of law (and arrest those who break the law) and (iii) improve security standards on campuses, especially dorms. Publishing records may be an effective means to shame universities into improving performance. Withholding federal funds and grants to universities may also be necessary.

I would appreciate a response from you.

Regards,



**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Wednesday, September 20, 2017 9:12 PM |
| **To:** | Jackson, Candice; Sherman, Brandon; Kissel, Adam |
| **Attachments:** | DCL 9-20-17.docx; Q-A 9-20-17.docx |

AR_00001134

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Wednesday, September 20, 2017 11:48 PM |
| **To:** | Dickey, Jennifer (OLP); Jeffrey.M.Harris@omb.eop.gov |
| **Cc:** | Williams, Beth A (OLP); Jones, Kevin R (OLP); Crytzer, Katherine (OLP); Newman, Ryan (OLP); Cox, Stephen (OASG); Murray, Brian (OASG); Jackson, Candice; Brinton, Jed |
| **Subject:** | RE: DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs |
| **Attachments:** | DCL 9-20-17 clean.docx; Q-A 9-20-17 clean.docx; DCL 9-20-17 redline.docx; Q-A 9-20-17 redline.docx |

I have attached updated documents. **DPP**

**DPP** Thanks for your consideration.

---

**From:** Dickey, Jennifer (OLP) [mailto:Jennifer.B.Dickey@usdoj.gov]
**Sent:** Wednesday, September 20, 2017 2:23 PM
**To:** Menashi, Steven; Jeffrey.M.Harris@omb.eop.gov
**Cc:** Williams, Beth A (OLP); Jones, Kevin R (OLP); Crytzer, Katherine (OLP); Newman, Ryan (OLP); Cox, Stephen (OASG); Murray, Brian (OASG)
**Subject:** DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs

Steve and Jeff,

As discussed, attached are DOJ's combined comments on the DCL/Q&A. We appreciate your careful consideration of them.

Best,

Jennifer B. Dickey
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm 4244
Washington, D.C. 20530
Direct: 202.514.2456
Cell: 202.353.5489

**Menashi, Steven**

---

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Wednesday, September 20, 2017 11:51 PM |
| **To:** | Jackson, Candice; Sherman, Brandon; Kissel, Adam |
| **Subject:** | RE: |
| **Attachments:** | DCL 9-20-17 clean.docx; Q-A 9-20-17 clean.docx |

**Blanchard, Timothy**

| | |
|---|---|
| **From:** | Blanchard, Timothy |
| **Sent:** | Thursday, September 21, 2017 10:27 AM |
| **To:** | Karvonides, Mia; Rapport, Adele; Chandra, Meena Morey; August, Taylor; Battle, Sandra |
| **Cc:** | Jackson, Candice; Henderson, Chelsea |
| **Subject:** | RE: resolution letters cited in upcoming Q&A (confidential/privileged/deliberative) |

Hi All!



Hope that helps,

Tim

**From:** Karvonides, Mia
**Sent:** Thursday, September 21, 2017 9:55 AM
**To:** Rapport, Adele; Chandra, Meena Morey; Blanchard, Timothy; August, Taylor; Battle, Sandra
**Cc:** Jackson, Candice; Henderson, Chelsea
**Subject:** resolution letters cited in upcoming Q&A (confidential/privileged/deliberative)
**Importance:** High

Dear Adele, Meena, Tim, Taylor and Sandy:

(b)(5)
As you know, a Q&A document on campus sexual assault will be released by the Department tomorrow. Within that draft document, there are statements with references to OCR resolution letters. For each RD on this email, there are one or more letters that originated out of your region. I am also including Sandy who will share this email with the EDs and asking for their input as well.

Cut/pasted below you will find the statement from the draft document followed by a corresponding FN with the OCR letters mentioned (see highlighted sections).

Please review the below and reply to Candice and me with any concerns or considerations regarding cases cited from your regions. Concerns may include characterization of the cited case and/or related to the ongoing status of the case or other activity with the involved recipient. If you would like to speak with Candice and/or me today,

(b)(5)

please reach out to Chelsea who will help with scheduling a time to speak. This is a close hold correspondence and input is needed as soon as possible today.

Thank you all for your help on this.

Best,
Mia

DPP

Mia Karvonides

Acting Deputy Assistant Secretary for Policy
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave., SW
4E310
Washington, DC 20202

_____



AR_00001139

**Chandra, Meena Morey**

| | |
|---|---|
| **From:** | Chandra, Meena Morey |
| **Sent:** | Thursday, September 21, 2017 10:54 AM |
| **To:** | Blanchard, Timothy; Karvonides, Mia; Rapport, Adele; August, Taylor; Battle, Sandra |
| **Cc:** | Jackson, Candice; Henderson, Chelsea |
| **Subject:** | RE: resolution letters cited in upcoming Q&A (confidential/privileged/deliberative) |

Hi All –

I am responding regarding two cases:



I am happy to discuss this further in a conference call with anyone on this thread.

Meena

---

**From:** Blanchard, Timothy
**Sent:** Thursday, September 21, 2017 10:27 AM
**To:** Karvonides, Mia; Rapport, Adele; Chandra, Meena Morey; August, Taylor; Battle, Sandra
**Cc:** Jackson, Candice; Henderson, Chelsea
**Subject:** RE: resolution letters cited in upcoming Q&A (confidential/privileged/deliberative)

Hi All!



DPP

Hope that helps,

Tim

---

**From:** Karvonides, Mia
**Sent:** Thursday, September 21, 2017 9:55 AM
**To:** Rapport, Adele; Chandra, Meena Morey; Blanchard, Timothy; August, Taylor; Battle, Sandra
**Cc:** Jackson, Candice; Henderson, Chelsea
**Subject:** resolution letters cited in upcoming Q&A (confidential/privileged/deliberative)
**Importance:** High

Dear Adele, Meena, Tim, Taylor and Sandy:

(b)(5)

As you know, a Q&A document on campus sexual assault will be released by the Department tomorrow. Within that draft document, there are statements with references to OCR resolution letters. For each RD on this email, there are one or more letters that originated out of your region. I am also including Sandy who will share this email with the EDs and asking for their input as well.

Cut/pasted below you will find the statement from the draft document followed by a corresponding FN with the OCR letters mentioned (see highlighted sections).

Please review the below and reply to Candice and me with any concerns or considerations regarding cases cited from your regions. Concerns may include characterization of the cited case and/or related to the ongoing status of the case or other activity with the involved recipient. If you would like to speak with Candice and/or me today, please reach out to Chelsea who will help with scheduling a time to speak. This is a close hold correspondence and input is needed as soon as possible today.

Thank you all for your help on this.

Best,
Mia



DPP



# DPP

Mia Karvonides
Acting Deputy Assistant Secretary for Policy
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave., SW
4E310
Washington, DC 20202

_____

_____

# DPP

# DPP

AR_00001143

**Jones, Kevin R (OLP)**

| | |
|---|---|
| **From:** | Jones, Kevin R (OLP) |
| **Sent:** | Thursday, September 21, 2017 2:14 PM |
| **To:** | Harris, Jeffrey M. EOP/OMB; Menashi, Steven; Dickey, Jennifer (OLP) |
| **Cc:** | Williams, Beth A (OLP); Crytzer, Katherine (OLP); Newman, Ryan (OLP); Cox, Stephen (OASG); Murray, Brian (OASG); Jackson, Candice; Brinton, Jed |
| **Subject:** | RE: DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs |

# DPP

-- Kevin R. Jones, DAAG, OLP  (202) 514-4604

---

**From:** Harris, Jeffrey M. EOP/OMB [mailto:Jeffrey.M.Harris@omb.eop.gov] (b)(6)
**Sent:** Thursday, September 21, 2017 1:16 PM
**To:** Menashi, Steven <Steven.Menashi@ed.gov>; Dickey, Jennifer (OLP) <jdickey@jmd.usdoj.gov>
**Cc:** Williams, Beth A (OLP) <bawilliams@jmd.usdoj.gov>; Jones, Kevin R (OLP) <kjones@jmd.usdoj.gov>; Crytzer, Katherine (OLP) <kcrytzer@jmd.usdoj.gov>; Newman, Ryan (OLP) <RNewman@jmd.usdoj.gov>; Cox, Stephen (OASG) <scox@jmd.usdoj.gov>; Murray, Brian (OASG) <bmurray@jmd.usdoj.gov>; Jackson, Candice <Candice.Jackson@ed.gov>; Brinton, Jed <Jed.Brinton@ed.gov>
**Subject:** RE: DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs

(b)(5)

OIRA is good with these versions of the documents.  Please let me know ASAP if there are any additional (b)(5) changes before publication.  Many thanks.

Jeff

---

**From:** Menashi, Steven [mailto:Steven.Menashi@ed.gov]
**Sent:** Wednesday, September 20, 2017 11:48 PM
**To:** Dickey, Jennifer (OLP) <Jennifer.B.Dickey@usdoj.gov>; Harris, Jeffrey M. EOP/OMB <Jeffrey.M.Harris@omb.eop.gov>
**Cc:** Williams, Beth A (OLP) <Beth.A.Williams@usdoj.gov>; Jones, Kevin R (OLP) <Kevin.R.Jones@usdoj.gov>; Crytzer, Katherine (OLP) <Katherine.Crytzer2@usdoj.gov>; Newman, Ryan (OLP) <Ryan.Newman@usdoj.gov>; Cox, Stephen (OASG) <Stephen.J.Cox@usdoj.gov>; Murray, Brian (OASG) <Brian.Murray@usdoj.gov>; Jackson, Candice <Candice.Jackson@ed.gov>; Brinton, Jed <Jed.Brinton@ed.gov>
**Subject:** RE: DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs

I have attached updated documents. DPP

**DPP** Thanks for your consideration.

---

**From:** Dickey, Jennifer (OLP) [mailto:Jennifer.B.Dickey@usdoj.gov]
**Sent:** Wednesday, September 20, 2017 2:23 PM
**To:** Menashi, Steven; Jeffrey.M.Harris@omb.eop.gov (b)(6)

**Cc:** Williams, Beth A (OLP); Jones, Kevin R (OLP); Crytzer, Katherine (OLP); Newman, Ryan (OLP); Cox, Stephen (OASG); Murray, Brian (OASG)
**Subject:** DOJ comments on Ed's Sexual Assault Rescission DCL/FAQs

Steve and Jeff,

(b)(5)
As discussed, attached are DOJ's combined comments on the DCL/Q&A.  We appreciate your careful consideration of them.

Best,

Jennifer B. Dickey
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm 4244
Washington, D.C. 20530
Direct: 202.514.2456
Cell: 202.353.5489

**Menashi, Steven**

| | |
|---|---|
| **From:** | Menashi, Steven |
| **Sent:** | Thursday, September 21, 2017 6:31 PM |
| **To:** | Jackson, Candice |
| **Subject:** | Fwd: Title IX materials |
| **Attachments:** | DCL 9-20-17 clean OGC edits 9-21-17.docx; ATT00001.htm; Q-A 9-20-17 clean OGC edits 09-21-17.docx; ATT00002.htm |

Begin forwarded message:

**From:** "Rosenfelt, Phil" <Phil.Rosenfelt@ed.gov>
**Date:** September 21, 2017 at 6:08:32 PM EDT
**To:** "Brinton, Jed" <Jed.Brinton@ed.gov>
**Cc:** "Menashi, Steven" <Steven.Menashi@ed.gov>
**Subject: FW: Title IX materials**

Jed: I tried to reach you by phone in the office after **WP DPP** But I could not reach you.

**WP DPP**

# WP DPP

**WP DPP** Please let me know if there is a number I can reach you at to discuss these a little later. Thanks.

Phil

---

**From:** Santos, Vanessa
**Sent:** Thursday, September 21, 2017 4:31 PM
**To:** Ellis, Kathryn; Rosenfelt, Phil
**Cc:** Siegel, Brian; Malawer, Hilary; Amann, Amanda; Friendly, Deborah; Disario, Rachel; McFadden, Elizabeth; Tucker, Michelle
**Subject:** RE: Title IX materials

Hi Phil,



# WP DPP

WP DPP Please let me know if you have any questions or concerns.

Vanessa

---

**From:** Ellis, Kathryn
**Sent:** Thursday, September 21, 2017 1:16 PM
**To:** Rosenfelt, Phil
**Cc:** Siegel, Brian; Malawer, Hilary; Amann, Amanda; Friendly, Deborah; Disario, Rachel; McFadden, Elizabeth; Santos, Vanessa
**Subject:** RE: Title IX materials

Hi Phil,

I apologize for interrupting PII
chance, perhaps later this evening if DPP

DPP

Thanks,

Kathy

---

**From:** Rosenfelt, Phil
**Sent:** Thursday, September 21, 2017 9:38 AM
**To:** Santos, Vanessa
**Cc:** Siegel, Brian; Malawer, Hilary; Amann, Amanda; Friendly, Deborah; Disario, Rachel; Ellis, Kathryn; McFadden, Elizabeth
**Subject:** RE: Title IX materials

Vanessa WP DPP
WP DPP
WP DPP Thanks for everyone's quick review of this.

Phil

---

**From:** Santos, Vanessa
**Sent:** Thursday, September 21, 2017 9:21 AM
**To:** Ellis, Kathryn; McFadden, Elizabeth
**Cc:** Rosenfelt, Phil; Siegel, Brian; Malawer, Hilary; Amann, Amanda; Friendly, Deborah; Disario, Rachel
**Subject:** RE: Title IX materials

# WP DPP

---

**From:** Ellis, Kathryn
**Sent:** Thursday, September 21, 2017 8:09 AM
**To:** McFadden, Elizabeth
**Cc:** Rosenfelt, Phil; Santos, Vanessa; Siegel, Brian; Malawer, Hilary; Amann, Amanda; Friendly, Deborah; Disario, Rachel
**Subject:** Re: Title IX materials

**WP DPP**

**WP DPP**    Thanks

Sent from my iPhone

On Sep 21, 2017, at 7:48 AM, McFadden, Elizabeth <Elizabeth.McFadden@ed.gov > wrote:

> Adding Hilary, Amanda, Rachel, and Debbie.  I will forward them the documents in a separate email.
>
> Sent from my iPhone
>
> On Sep 21, 2017, at 6:11 AM, Rosenfelt, Phil <Phil.Rosenfelt@ed.gov > wrote:
>
>> ATTORNEY-CLIENT DELIBERATIVE, AND CONFIDENTIAL DOCUMENT
>>
>> Colleagues:  Good morning    **WP DPP**
>>
>> # WP DPP
>>
>> Phil
>>
>>
>> <DCL 9-20-17 clean.docx>
>> <Q-A 9-20-17 clean.docx>

# United States Senate

WASHINGTON, DC 20510

July 19, 2017

The Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Dear Secretary DeVos,

We write with serious and immediate concern regarding actions taken by the Department of Education ("the Department") that have the potential to systemically undermine critical protections for students under Title IX specific to the safeguards for victims of campus sexual assault. We are frustrated and appalled by the fact that the Department appears to be abandoning its long-standing commitment to holding educational institutions accountable for protecting students from sexual harassment, including sexual violence. As Senators who are deeply committed to ensuring a safe learning environment for all students, we are seeking an assurance from you that the Department will continue to uphold the Title IX protections related to campus sexual assault. Further, we would welcome a meeting with you to discuss the importance of these protections for all students.

Below is an outline of the Department's actions that have led us to believe that the Department is stepping back from its commitment to enforcing Title IX related to campus sexual assault. We cannot stress strongly enough how damaging it would be to roll back the protections afforded to students under Title IX.

- **January 17, 2017** – During your Senate confirmation hearing before the Senate Committee on Health, Education, Labor & Pensions, you refused to commit to upholding the guidance set forth in the 2011 Dear Colleague letter by OCR.

- **May 23, 2017** – The Fiscal Year 2018 Budget Request that the Department submitted to Congress included a request for decreased funding for OCR. The Department estimated that this funding cut would result in 46 fewer full-time staff in the Office for Civil Rights. The Department requested this staff cut despite the fact that Congress has recognized the need for increased funding for staff at OCR over the past several years. In addition, the

AR_00001149

Department acknowledged in its Budget Request that OCR has an increased workload due to a significant uptick in the number of complaints it receives each year, and that a decreased staff level may lead to longer case-processing times.

**June 8, 2017** – Your Acting Assistant for Civil Rights Candice Jackson, who is charged with enforcing Title IX among other civil rights statutes on behalf of the Department of Education, issued an internal staff memo to OCR's regional directors instructing them to narrow the scope of investigations related to Title IX postsecondary education sexual violence complaints.

- **July 12, 2017** – In an interview published in *The New York Times*, your Acting Assistant Secretary for Civil Rights Candice Jackson cast doubt on the legitimacy of campus sexual assault cases saying, "the accusations – 90 percent of them – fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she decided that our last sleeping together was not quite right.'" Ms. Jackson has since apologized, calling her remarks "flippant." Despite the apology, we find it deeply disturbing that the Department's chief civil rights officer would perpetuate the false notion that rape is just a drunken encounter or date gone wrong.

  Ms. Jackson also indicated in her interview with *The New York Times* that the Department is considering withholding the list of institutions of higher education that are under investigation by OCR for alleged violations of Title IX related to campus sexual violence. This list is an important mechanism for transparency and consumer information, and we urge you to continue to publish this information on a weekly basis.

- **July 13, 2017** – You held a series of Title IX listening sessions with three distinct groups of stakeholders, which were described by the Department as follows: survivors of sexual violence; students who have been falsely accused and disciplined under Title IX; and representatives of education institutions and subject matter experts. In remarks to reporters after these meetings, while you acknowledged an understanding of why Title IX protections are needed, you indicated that the Department intends to make changes to the way OCR handles complaints of campus sexual violence. You stated that, "There was a time when women were essentially dismissed." We would like to point out that many survivors of campus sexual violence continue to be dismissed. We implore you to continue to meet with survivors of campus sexual assault and to listen to their stories before you take any further actions that could jeopardize survivors' rights under Title IX.

Given the seriousness of the July 12, 2017 comments, we are calling on you to remove Ms. Jackson from the position of Acting Assistant Secretary for Civil Rights. The remarks were not just "flippant;" they were ignorant and dangerous. These comments, along with a series of other actions taken by Ms. Jackson to weaken OCR protections for students show that she is

unqualified for the position and should be removed as Acting Assistant Secretary for Civil Rights.

In addition, we look forward to receiving a written response from you that outlines the ways in which you plan to uphold the civil rights protections of survivors of campus sexual assault by August 15, 2017 and we reiterate our offer to meet with you to discuss the importance of Title IX protections related to campus sexual assault.

Sincerely,

Kirsten Gillibrand
United States Senator

Claire McCaskill
United States Senator

Richard Blumenthal
United States Senator

AR_00001151

# Congress of the United States
## Washington, DC 20515

June 23, 2017

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20301

Dear Secretary DeVos:

As you begin to craft the priorities of the U.S. Department of Education, we ask you to consider an issue of great importance: protecting young people from sexual and dating violence. As you know, K-12 schools have a responsibility under Title IX to take measures to prevent sexual violence and harassment in schools and to promptly investigate these instances when they occur.  We request that you prioritize efforts to combat sexual violence and harassment at K-12 schools by maintaining the 2011 Title IX guidance document issued by the Department and to supporting other critical programs that combat sexual violence in our schools.

All children deserve a learning environment in K-12 schools that is free from sexual violence and harassment.  While sexual violence and harassment has received great attention at the collegiate level, we know that most of the behavior we see on our college campuses didn't begin there. Many of the attitudes and behaviors begin much earlier, and if addressed early might prevent more serious incidents of rape and sexual assault.  Sexual harassment and assault, including cyber bullying that often accompanies assaults, can have a profound effect on victims, forcing many to drop out of school and in some of the most devastating instances drive a student to take her or his own life.

The numbers illustrate this point far too well.  Sexual and family violence are two of the biggest drivers of youth suicide, and are also unseen drivers of absenteeism and drop-out, particularly for girls. According to the Centers for Disease Control and Prevention, 40 percent of rape victims were first raped before the age of 18, and youth suicide is increasing, with the rate of suicide among 10-14 year olds doubling since 2007. In a study conducted by the National Women's Law Center in January of 2017, more than 1 in 5 girls ages 14 to 18 reported being kissed or touched without their consent.  The same study found that 68 percent of survivors had difficulty concentrating in class and another 30 percent reported being absent from school because they felt unsafe at school.  Continued strong focus of Title IX programs would decrease these numbers.

As you know, under Title IX schools have a responsibility to address and prevent sexual violence and harassment.  In 2011, the Department of Education issued guidance to K-12 schools — in response to their request for more information — regarding how they can meet their Title IX obligations.  This guidance document provides clear guidelines to schools on how to respond to reported incidents of sexual violence and harassment.  By providing clarity to schools on how to respond, the guidance has driven a more thorough and fair process for all involved.  We believe it is vital this guidance be maintained and ask you to preserve it throughout your tenure as Secretary.

In addition to maintaining the guidance document, we ask that you support training and education for Title IX coordinators and school personnel in K-12 schools.  Schools need this targeted technical assistance to ensure they have the training to fairly and adequately enforce the intent of the law.  Having a knowledgeable and well-trained faculty is essential to ensuring our K-12 schools are free from sexual harassment and violence, and we hope the Department will continue to provide this support.

PRINTED ON RECYCLED PAPER

Finally, as you continue your work as Secretary of Education we ask you to engage in active outreach and dialogue with survivors of sexual assault in K-12 schools and their advocates. This is essential to ensuring the Department is hearing from all voices and is crafting policies that are responsive to the needs of victims. This is an important part of ensuring that our K-12 schools are safe spaces for all.

We believe you share our commitment to these issues and were encouraged by your comments in March of this year when you said, "We all have a common responsibility to ensure every student has access to a safe and nurturing learning environment."

We ask the Department to preserve the 2011 Title IX guidance for K-12, schools, support Title IX coordinators at K-12 schools, and engage the voice of victims of assault as the Department moves forward in these areas. We look forward to working with you to ensure that our K-12 schools are free from sexual assault and violence.

Sincerely,

Debbie Dingell
Member of Congress

Ryan Costello
Member of Congress

Ann McLane Kuster
Member of Congress

Patrick Meehan
Member of Congress

Jackie Speier
Member of Congress

David Joyce
Member of Congress

Bobby Scott
Member of Congress

Tom Reed
Member of Congress

AR_00001153

Mike Thompson
Member of Congress

Suzanne Bonamici
Member of Congress

David Scott
Member of Congress

Stacey Plaskett
Member of Congress

Al Green
Member of Congress

Elizabeth Esty
Member of Congress

Sheila Jackson Lee
Member of Congress

Donald Norcross
Member of Congress

Diana DeGette
Member of Congress

Richard M. Nolan
Member of Congress

Jerry McNerney
Member of Congress

Gwenn Moore
Member of Congress

Luis Gutierrez
Member of Congress

Emanuel Cleaver
Member of Congress

Judy Chu
Member of Congress

José E. Serrano
Member of Congress

Frederica Wilson
Member of Congress

David Cicilline
Member of Congress

Sander M. Levin
Member of Congress

Mark Pocan
Member of Congress

Adam Smith
Member of Congress

Bonnie Watson Coleman
Member of Congress

Juan Vargas
Member of Congress

Dwight Evans
Member of Congress

Lois Frankel
Member of Congress

John Yarmuth
Member of Congress

James P. McGovern
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Carol Shea-Porter
Member of Congress

Anna Eshoo
Member of Congress

Tom O'Halleran
Member of Congress

Katherine Clark
Member of Congress

AR_00001156

Lucille Roybal-Allard
Member of Congress

Carolyn B. Maloney
Member of Congress

Jamie Raskin
Member of Congress

Elise M. Stefanik
Member of Congress

Colleen Hanabusa
Member of Congress

André Carson
Member of Congress

Jared Huffman
Member of Congress

Marcy Kaptur
Member of Congress

A. Donald McEachin
Member of Congress

Mark Takano
Member of Congress

AR_00001157

Susan Davis
Member of Congress

Jacky Rosen
Member of Congress

AR_00001158

# Congress of the United States
## Washington, DC 20515

September 19, 2017

The Honorable Betsy DeVos
Secretary of Education
United States Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Secretary DeVos:

On September 7, 2017 you delivered a major speech at George Mason University announcing the beginning of a "notice and comment" period for the Department of Education's Title IX guidance to colleges and universities and announced your intention to replace the existing guidance with a "workable, effective, and fair system." We share your stated goal at the outset of this process. Title IX should protect students from discrimination and sexual violence while ensuring all students are afforded due process.

According to the *Campus Climate Survey Validation Study*, 87 percent of sexual assault survivors do not report their assaults to campus officials. Underreporting of sexual violence a tragedy and endangers campus communities. The experiences of survivors must be the focus of any conversation about sexual violence on campus to ensure they have faith in, and are treated fairly by, the disciplinary process. Any final rule on Title IX must not have a chilling effect on reporting.

Because attending a college or university is not deemed to be a state-protected right, but rather a privilege, Republican and Democratic Administrations have maintained that preponderance of evidence is the proper evidentiary standard for campus disciplinary proceedings. Preponderance of evidence is used in civil legal proceedings where there is similarly no threat to an individual's liberty. This standard balances the rights of both parties involved in the disciplinary process by recognizing that each has an equal stake in the outcome of a case. We urge you to maintain preponderance of evidence as the evidentiary standard in all campus sexual violence proceedings.

Survivors of sexual violence should have the option to engage law enforcement and file criminal charges against their attacker; however, this does not replace the obligation of colleges and universities to remedy sexual misconduct under Title IX. Similarly, in recognition of a survivor's interest in controlling their response to an alleged incident, colleges and universities should respect a survivor's choice to withdraw from a disciplinary proceeding without prejudice. Every campus should implement fair disciplinary proceedings and provide trauma-informed support for both survivors and the accused. The Department of Education must provide technical assistance to colleges and universities to ensure schools successfully implement fair practices on campus.

As identified by the Centers for Disease Control and Prevention (CDC) in their *Sexual Violence on Campus: Strategies for Prevention* report, comprehensive sexual violence prevention makes campuses safer. We urge you to encourage colleges and universities to implement comprehensive prevention programs that are developmentally appropriate for students, administered by well-trained staff using a variety of teaching methods, engage with all students

PRINTED ON RECYCLED PAPER

over the course of the school year, incorporate evidence-based methods, and are tailored to the needs of each campus.

Students, families, and administrators are uniquely positioned to understand what is happening on campuses today. During your review of Title IX, we encourage you to consult with all parties involved in these campus proceedings – especially survivors. Colleges and universities, thanks to the advocacy of survivors and with guidance from the federal government, have made great strides addressing cases of sexual violence since the Dear Colleague Letter was released in 2011. We hope your review is transparent and builds upon this hard-won progress.

Sincerely,

Ann McLane Kuster
Member of Congress

Patrick Meehan
Member of Congress

Jackie Speier
Member of Congress

Susan Davis
Member of Congress

Ted Poe
Member of Congress

Pramila Jayapal
Member of Congress

Tom Reed
Member of Congress

Debbie Dingell
Member of Congress

Carlos Curbelo
Member of Congress

Lynn Jenkins
Member of Congress



COMMONWEALTH OF PENNSYLVANIA

## OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

July 19, 2017

The Honorable Elisabeth DeVos
Secretary
United States Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Secretary DeVos:

We are writing to express our serious concern over reports that your office is preparing to roll back important protections for survivors of sexual assault on college campuses.

As Attorneys General, we see the impact campus sexual assault has on survivors, educational institutions, and our communities. Incidents of sexual assault on colleges and universities are widespread: the American Association of Universities (AAU) has found that 23 percent of female undergraduates were the victims of sexual assault or sexual misconduct due to physical force, threats of force, or incapacitation.[1] The federal government's own studies have reached similar conclusions: the U.S. Department of Justice's Bureau of Justice Statistics found that, on average, 20.5% of college women had experienced sexual assault since entering college[2] while the Centers for Disease Control and Prevention found that one in five of women experienced sexual assault in her lifetime.[3] Moreover, the vast majority of these incidents go unreported. In fact, the AAU study concluded that reporting rates for some types of assaults were as low as 5 percent, in part due to survivors' concerns about coming forward.

Thanks to the tireless work of survivors and advocates, our nation is beginning to understand the full scope of this epidemic. The Department of Education's current guidance reaffirms the obligation of colleges and universities to protect survivors of sexual assault.

---

[1] AAU Climate Survey on Sexual Assault and Sexual Misconduct (2015), https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[2] Campus Climate Survey Validation Study, Final Technical Report, Appx. E, https://www.bjs.gov/content/pub/pdf/App_E_Sex-Assault-Rape-Battery.pdf.

[3] National Intimate Partner and Sexual Violence Survey, https://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf.

AR_00001161

The Honorable Elisabeth DeVos
July 19, 2017
Page 2 of 4

Among other provisions, the guidance reaffirms that Title IX requires institutions to use a "preponderance of the evidence" standard in investigating allegations of sexual harassment or domestic violence. While we recognize that there is a great deal more that can be done to protect students and agree on the importance of ensuring that investigations are conducted fairly, a rushed, poorly-considered effort to roll back current policies sends precisely the wrong message to all students. Yet there is every indication that is exactly the approach your Department is taking.

In particular, we were deeply troubled by the comments attributed to Acting Assistant Secretary for Civil Rights Candice Jackson, who claimed that ninety percent of campus sexual assault allegations "fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right'." While we appreciate that Ms. Jackson has issued an apology, her comments communicate to survivors of campus sexual assault that the Department does not take their concerns seriously and that it is not committed to continuing its current efforts to combat this epidemic on our college campuses. Coming on the heels of news that she has directed the Office for Civil Rights to reduce its efforts to identify systematic problems in conducting investigations, we have serious concerns as to whether Ms. Jackson can be entrusted to oversee a fair, thorough process in evaluating the Department's policies in this area.

Despite our concerns, we are committed to working collaboratively with your Department to address the problem of sexual assault on America's college campuses. But any effort in this area must be deliberate and allow for meaningful input from all stakeholders, and it must focus on the ultimate goal of ensuring that all students are protected from discrimination, including sexual harassment, assault, stalking and domestic violence, under Title IX. To that end, we urge you to directly engage with a broad, representative group of stakeholders, including survivors, victims' rights advocates, law enforcement, and a bipartisan group of Attorneys General from around the country, so we can take action together to end the scourge of sexual violence on our college and university campuses. Furthermore, we urge you to continue to implement and uphold these important civil rights protections so that all students are able to learn in a safe environment free from violence and discrimination.

We stand ready to partner with you in this effort and look forward to your response.

Sincerely,

JOSH SHAPIRO
Pennsylvania Attorney General

HECTOR BALDERAS
Attorney General of New Mexico

The Honorable Elisabeth DeVos
July 19, 2017
Page 3 of 4

XAVIER BECERRA
California Attorney General

GEORGE JEPSEN
Connecticut Attorney General

MATTHEW DENN
Delaware Attorney General

KARL A. RACINE
Attorney General for the
District of Columbia

DOUGLAS S. CHIN
Hawaii Attorney General

LISA MADIGAN
Illinois Attorney General

TOM MILLER
Iowa Attorney General

ANDY BESHEAR
Kentucky Attorney General

JANET T. MILLS
Maine Attorney General

BRIAN E. FROSH
Maryland Attorney General

MAURA HEALEY
Massachusetts Attorney General

LORI SWANSON
Minnesota Attorney General

ERIC T. SCHNEIDERMAN
New York Attorney General

JOSH STEIN
Attorney General of North Carolina

The Honorable Elisabeth DeVos
July 19, 2017
Page 4 of 4

ELLEN F. ROSENBLUM
Oregon Attorney General

PETER F. KILMARTIN
Rhode Island Attorney General

T.J. DONOVAN
Vermont Attorney General

MARK R. HERRING
Virginia Attorney General

# Congress of the United States
## Washington, DC 20515

July 24, 2017

The Honorable Betsy DeVos
Secretary
Department of Education
Washington, DC 20528

Dear Secretary DeVos:

We are writing to express our concern that the Department of Education is undoing critical progress on enforcement of Title IX. This landmark law prohibits all sex discrimination in education and directs schools to establish procedures for handling cases of sexual assault.

We were dismayed by the recent interview in which Acting Assistant Secretary of the Department of Education's Office for Civil Rights, Candice Jackson, said that almost all sexual assault investigations fall into the category of drunken mistakes or bad breakups. These comments undermine the epidemic of sexual assault on college campuses. A 2015 survey found that one in four women at a number of leading universities experienced sexual assault while in college.

Many survivors are afraid to come forward for fear no one will believe them or that they will be blamed. Instead of allaying these fears, Ms. Jackson's comments reinforce them. It is appalling to hear anyone engage in such blatant victim blaming, especially when coming from the person charged with protecting our students from sexual assault. It is important she apologized. Unfortunately, the apology seems hollow given recent actions by the Department of Education to undermine Title IX.

Under your leadership, the Department of Education has weakened the Office for Civil Rights, the agency responsible for enforcing Title IX protections. Despite public statements of support for Title IX, the Department has cut the Office's resources and rolled back crucial guidances.

Politics aside, all parents want their children to feel safe at school. We hope you will work with us to achieve this goal. If you are serious about addressing campus sexual assault, we ask that you start by denouncing these comments. We also ask that you continue to meet with survivors of sexual assault and their families to better understand the impact of Title IX, and consider policy changes that strengthen the Department of Education's Office for Civil Rights and its enforcement of Title IX. We look forward to your response articulating support for these protections.

Sincerely,

AR_00001165

SUSAN A. DAVIS
Member of Congress

LOIS FRANKEL
Member of Congress

GRACE F. NAPOLITANO
Member of Congress

VAL DEMINGS
Member of Congress

NIKI TSONGAS
Member of Congress

DINA TITUS
Member of Congress

JOYCE BEATTY
Member of Congress

JACKIE SPEIER
Member of Congress

BARBARA LEE
Member of Congress

SHEILA JACKSON-LEE
Member of Congress

GWEN MOORE
Member of Congress

JUDY CHU
Member of Congress

SUZANNE BONAMICI
Member of Congress

CAROL SHEA-PORTER
Member of Congress

DONALD M. PAYNE, JR.
Member of Congress

JERROLD NADLER
Member of Congress

RAJA KRISHNAMOORTHI
Member of Congress

BRENDA LAWRENCE
Member of Congress

ANN MCLANE KUSTER
Member of Congress

TONY CARDENAS
Member of Congress

TED W. LIEU
Member of Congress

JAMES P. MCGOVERN
Member of Congress

RICHARD M. NOLAN
Member of Congress

BETTY MCCOLLUM
Member of Congress

SEAN PATRICK MALONEY
Member of Congress

LUCILLE ROYBAL-ALLARD
Member of Congress

ELEANOR HOLMES NORTON
Member of Congress

MICHAEL F. DOYLE
Member of Congress

JIMMY GOMEZ
Member of Congress

GRACE MENG
Member of Congress

AR_00001167

ALMA ADAMS
Member of Congress

CAROLYN B. MALONEY
Member of Congress

LOUISE M. SLAUGHTER
Member of Congress

KATHERINE CLARK
Member of Congress

MARK TAKANO
Member of Congress

LISA BLUNT ROCHESTER
Member of Congress

DWIGHT EVANS
Member of Congress

BONNIE WATSON COLEMAN
Member of Congress

RAUL M. GRIJALVA
Member of Congress

HENRY C. "HANK" JOHNSON JR.
Member of Congress

FREDERICA WILSON
Member of Congress

NYDIA VELÁZQUEZ
Member of Congress

JUAN VARGAS
Member of Congress

JULIA BROWNLEY
Member of Congress

BILL FOSTER
Member of Congress

JIM COOPER
Member of Congress

ROBIN L. KELLY
Member of Congress

JARED POLIS
Member of Congress

JACKY ROSEN
Member of Congress

JAN SCHAKOWSKY
Member of Congress

DEBBIE WASSERMAN SCHULTZ
Member of Congress

ANNA G. ESHOO
Member of Congress

NITA M. LOWEY
Member of Congress

PRIVILEGED-CONFIDENTIAL-DELIBERATIVE

**MEMORANDUM**

TO:      Mia Karvonides, Acting DAS for Policy

FROM:    Joseph Wheeler, Acting Title IX Team Leader, PLG

              Rachel Gettler, Staff Attorney, Title IX Team, PLG

DATE:    September 13, 2017

RE:       Supreme Court Decisions on Title IX Standards for Sexual Harassment Cases



Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

PRIVILEGED-CONFIDENTIAL-DELIBERATIVE                    DRAFT

**DPP**

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

PRIVILEGED-CONFIDENTIAL-DELIBERATIVE                                    DRAFT

# DPP

# DPP

3

Withheld pursuant to exemption
(b)(5)
of the Freedom of Information and Privacy Act

Privileged-Confidential-Deliberative                                      Draft 9/15/17

# MEMORANDUM

TO:            Mia Karvonides, Acting DAS for Policy
FROM:          Joseph Wheeler, Acting Title IX Team Leader, PLG
               Rachel Gettler, Staff Attorney, Title IX Team, PLG
DATE:          September 15, 2017
RE:            **DPP**



Withheld pursuant to exemption
(b)(5)
of the Freedom of Information and Privacy Act

Privileged-Confidential-Deliberative                                    Draft 9/15/17

# DPP

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Privileged-Confidential-Deliberative                                    Draft 9/15/17

**DPP**

**DPP**

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Privileged, Draft, Deliberative, Attorney-Work Product, September 13, 2017

# DPP

Withheld pursuant to exemption
(b)(5)
of the Freedom of Information and Privacy Act

Confidential, for internal discussion purposes only                    DRAFT 9-15-2017

# DPP

Withheld pursuant to exemption (b)(5) of the Freedom of Information and Privacy Act

Confidential, for internal discussion purposes only

DRAFT 9-15-2017

**DPP**

Confidential, for internal discussion purposes only                    DRAFT 9-15-2017

# DPP



# PII

September 11, 2017

# PII

2017 SEP 14 AM 11: 53
OS - EXEC SEC

**Re: <u>Title IX Due Process, etc.</u>**

Dear Secretary DeVos:

I write as a followup to your Thursday speech at George Mason University addressed to an appropriate revisiting of "guidance letters," which many viewed not merely reinterpreted, but literally unilaterally jawboned colleges and universities to adopt (and apply) student discipline which is perceived as strong on ideology, but short on fairness.

There clearly is a "cottage industry" which is both emotionally (and financially) invested in a system with is jerry-built to result in findings which may lead to student expulsion, and rob charged students of a fair shake, and not merely a thinly veiled "kangaroo court." K.C. Johnson and Stuart Taylor's page A-17 Friday Wall Street Journal op-ed piece says it well.

Students need a "bill of rights" which strikes the appropriate balance between the accuser, and the accused. The use of the term "survivor" dramatically suggests something happened. The appropriate term is "accuser" (or "alleged victim"). A "clear and convincing" evidentiary standard, rather than a "preponderance of the evidence" standard, is prudent to insure that schools expel true predators, and not young students who participate in alcohol fueled intimate encounters.

Much of life is a "pendulum." The Obama Administration rightly focused appropriate attention on a vital subject, but, I submit, went too far. You have the opportunity to undertake to swing the disciplinary pendulum back to the moderate center. Keep up the good work! For too long, a system of kangaroo courts have operated on college campuses, out of fear the federal government would penalize schools. It is time to end a "reign of terror."

Very truly yours,

# PII

RBA/gr

AR_00001180

Sept 11, 2017

Betsy De Vos
IBJ Dept of Education
400 Maryland Ave, SW
Washington, DC 20202

OS-EXEC SEC
2017 SEP 19   AM 10 48

I am writing concerning your recent announcement that you plan to revamp Title IX provisions for dealing with sexual assault accusations on College Campuses.

As a concerned citizen I strongly urge you to reconsider your opinion. Sexual assault on college campuses is a huge issue that impedes the rights of young women to receive an education. Statistics show that nearly 60% of all rape cases go unreported, and that incidents of false or baseless cases of accusation are only between 3-10% of all cases.

The title IX provisions put in place by the previous administration were necessary and needed. Please do your part and don't cave to special interest groups!

Sincerely,



PII

PII

**Subject:**           FW: Considerations for Making Universities Safe from Sexual Assaults

-----Original Message-----
From: DeVos, Betsy
Sent: Wednesday, September 20, 2017 11:10 AM
To: [ PII ]
Subject: RE: Considerations for Making Universities Safe from Sexual Assaults

This acknowledgement is sent on behalf of Secretary of Education Betsy DeVos.


Dear Mr. Clark:

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review and further handling.

Thank you again for contacting us.

Sincerely,
Edgar Mayes

Director of Correspondence and
Communications Control Unit
Office of the Secretary
U.S. Department of Education
Washington, DC 20202

-----Original Message-----
From: [ PII ] [@comcast.net]
Sent: Tuesday, September 19, 2017 9:39 PM
To: DeVos, Betsy
Subject: Considerations for Making Universities Safe from Sexual Assaults


Dear Secretary DeVos:

I am encouraged by your recent speech at George Mason University regarding putting an end to Obama's
Title IX letter that had effectively transferred sexual harassment and rape crimes from the criminal justice
system with due process to university administrators. As you stated in your speech, "Due process is the
foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it
protects no one. The notion that a school must diminish due process rights to better serve the "victim" only
creates more victims."

As a parent, I understand that the problems caused by sexual harassment and rape on college campuses are
very real, painful and lasting. Your speech set forth many of the problems with the Obama process, and I
agree with the many points you made. I would like to provide additional considerations as you move
forward to design a better approach to address this problem that is a plague upon our children and the
universities across the nation.

First, to minimize the problem we need to enforce the rule of law. Today, university administrators across
the nation encourage a lawless society. University administrations direct their university police - frequently
in coordination with city police forces - to not protected conservatives speaking on campuses. The police
allow rioting and violent mobs - which include students and professors, as well as roaming marauders (e.g.
Antifa) - to attack the "deplorables" and destroy property as they please. Peaceful protests on campuses and

in college towns are a thing of the past.

University administrations also flaunt immigration law, with special privileges and services and protections granted to illegal immigrants. Furthermore, Harvard - arguably the nation's most prestigious university - honored Chelsea Manning, who was convicted of treason and placing the lives of Americans at risk, to be a fellow and speak at Harvard. Why does Harvard reward a convicted traitor with a speaking platform at the world's most prestigious university to highlight the fact that liberal crimes against the government are above the law? Harvard's administration (as well as Obama, who pardoned Manning), show no respect for the law.

If university administrations show no respect for our laws, why should the students? If the administrations pick and choose which laws to adhere to, why shouldn't students do the same? If professors encourage violence toward the police, why should the students respect the police when they try to enforce the law? Why should the students trust the police to protect them from rapists? Why should victims expect any support from the police if they report a rape? After all, many students march with Black Lives Matter, which calls the police racist murderers. Why should rapists worry about raping someone and breaking the law? Rapists may easily conclude their victims will never report it to the police, whom students despise. How will rapists ever be convicted if the police is not able to gather any evidence due to mistrust? Stopping sexual attacks requires everyone - especially university administrations and professors - to respect the law and the police. University administrations and professors need to lead by example. They need to develop trust between the police and the community and to demonstrate that the law will be enforced.

Second, we need to move away from a "victim blaming" process that allocates blame to the victim. Sexual attacks and rape are caused by predators with sick minds, and such aggressors should be severely punished once convicted by the criminal justice system. If a woman wears revealing clothes, has a flirting manner, or has one too many beers, that is irrelevant to the guilt of the aggressor. There is too much effort in analyzing these issues and then allocating responsibility of the rape to both the aggressor and the victim. If the woman (or man) says "no," the responsibility is ALL on the aggressor, who makes a conscious decision to attack the victim. The cause is the twisted mind of the aggressor who decides to attack the victim. The analysis of the conditions surrounding the event may be useful in educating students about situations to avoid so as to reduce the risk, but the analysis should NOT assign a share of responsibility to the victim.

Third, students should have a safe campus and safe student housing (dorms). In order to protect students, universities need to do more than simply review the process to investigate rapes after they occur. Universities need to prevent rapes by improving security systems, standards and practices. Dorm lifestyles and rooms should be examined. I recognize this is old school, but are coed dorms essential to college education? How can dorm "security" standards be upgraded and improved? Are the minimum-wage, marginally trained dorm security staffs adequate? Should so much responsibility be placed on RAs, who are simply students with limited training and maturity, to "police" the many activities within dorms? Should more security cameras/systems be installed? Should universities be inspected and audited (e.g., inspector general's within the Education Department) with respect to implementing and complying with standards? Should safety performance reports be available to the public to assist families in selecting schools?

Fourth, universities should take action to better protect students once a rape is reported. If the accused aggressors are not in jail, the police should be allowed to provide some monitoring of the accused on campus (especially within dorms). The victim may be in the terrible position of seeing the accused not only on campus but in their dorm where they sleep.

The mission of the Department of Education is to "promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access." Somehow, you have inherited addressing the problem of solving sexual harassment and rape on campuses. I encourage you to place a high priority on addressing the problem and to work with the other stakeholders to find the best solutions. I also encourage you to apply real, urgent pressures on universities to (i) develop metrics and publish records of sexual assaults on or near campuses, (ii) endorse the rule of law (and arrest those who break the law) and (iii) improve security standards on campuses, especially dorms. Publishing records may be an effective means to shame universities into improving performance. Withholding federal funds and

grants to universities may also be necessary.

I would appreciate a response from you.

Regards,



**From:** Catoe, Tracy
**Sent:** 11 Sep 2017 13:49:22 +0000
**To:** Ware, Angela
**Subject:** FW: Title XI concern as an accused student

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Monday, September 11, 2017 7:54 AM
**To:** PII
**Subject:** RE: Title XI concern as an accused student

Dear Mr. Dearth:

Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.

Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)

Deputy Director of Correspondence

Office of the Secretary

Washington, DC 20202

**From:** PII PII @gmail.com]
**Sent:** Friday, September 08, 2017 9:08 PM
**To:** DeVos, Betsy
**Subject:** Title XI concern as an accused student

Dear Mrs. DeVos,

My name is PII and I'm currently a student at California State University, Long Beach PII After hearing your speech yesterday on September 7th, 2017, I felt a huge sigh of relief that you along with the Trump administration are going to make some real big changes on making America great again so I'm e-mailing you to let you know what you're doing is the right thing by making serious changes in the way schools handle these situations regarding Title XI PII

PII



Sincerely,

PII

AR_00001186

| From: | Catoe, Tracy |
|---|---|
| Sent: | 8 Sep 2017 13:40:24 +0000 |
| To: | Ware, Angela |
| Subject: | FW: Title IX |

-----Original Message-----
From: Catoe, Tracy On Behalf Of DeVos, Betsy
Sent: Friday, September 08, 2017 8:42 AM
To: [ PII ]
Subject: RE: Title IX

Dear Ms. **PII**

Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

-----Original Message-----
From: **PII**        **PII**        @gmail.com]
Sent: Thursday, September 07, 2017 6:35 PM
To: DeVos, Betsy
Subject: Title IX

Secretary DeVos,
I email you today just after hearing your statement regarding Title IX. My name is Hanna and I'm 17 years
old, turning 18 soon. Coming next fall, I will attend a college or university. Aside from any worries I have
of assimilating to my new environment and excelling in my classes, I now worry- even more so than prior-
about the way my body and mind will be protected. Title IX is in place in order to not only protect students
against predators, but also to give them peace of mind knowing they can talk about the injustices done
towards them with a lawful backing that will persecute violators.

One line in particular from your statement hit me the hardest. "If everything is harassment, then nothing is
harassment."

Imagine being me. Scratch that. Imagine being someone at a higher risk of sexual harassment. Imagine
being a transgender person of color, whom are statistically proven to be at a greater risk. Imagine being
them and let that line from your statement sink in.

Did your nerves flare? Did your face grow pale? Did your stomach feel unsettled?

That statement, your statement, was bone chilling. Your statement will only fuel a generation of adults who
will feel as if there are no repercussions for actions they have done to make another human being
uncomfortable, whether it be mentally or physically.

AR_00001187

We need the protections provided under Title IX. They are for our ultimate safety. The Title is "broad" for a reason, and that is to include all forms of sexual harassment. There are so many things that can be done to a person that CAN and SHOULD be considered sexual harassment. There is no room to protect the accused. To inflict that kind of pain on to another is brutal and disgusting. It leaves a lasting impact on the victim's psyche, making them susceptible to panic attacks and overall anxiety in social situations. If Title IX becomes narrower, you will be left with a group of victims who feel nothing but alone in their situations in the wake of a reduction to the protections previously allocated to their bodies.

I urge you to rethink everything you currently perceive to be wrong with Title IX. My generation urges you to rethink it. Please. Please put yourself in our shoes. Please keep our worries on your mind when evaluating the Title further. Please take everything I have stated seriously.
Thank you,

PII

**From:**          Catoe, Tracy
**Sent:**          8 Sep 2017 13:36:27 +0000
**To:**            Ware, Angela
**Subject:**       FW: Public Comment on Title IX Enforcement

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 9:04 AM
**To:** 'Hazel Galloway'
**Subject:** RE: Public Comment on Title IX Enforcement

Dear Ms PII

Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.

Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)

Deputy Director of Correspondence

Office of the Secretary

Washington, DC 20202

**From:** PII PII @gmail.com]
**Sent:** Thursday, September 07, 2017 9:45 PM
**To:** DeVos, Betsy; Office of the Secretary
**Subject:** Public Comment on Title IX Enforcement

Dear Secretary DeVos,

Since I cannot find a more appropriate portal through which to enter my public comment which you solicited with your remarks to the students and faculty of George Mason University, please consider my email.

I ask you to preserve the 2011 and 2014 Sexual Violence Guidance set up by the Obama administration for Title IX cases on college campuses. Only a small fraction (2-10%) of rape reports are false, while the vast majority of rapes are never even reported. Shifting the balance of rights back in the direction of the accuser as you signaled in your remarks today will undermine trust in the system, and likely decrease the instances of reported rapes still further. ONE IN FIVE WOMEN (and one in four transgender people) is sexually assaulted in college - in my eyes, as a recent college graduate who has seen the effects on my own campus, this constitutes a national crisis. And universities have proved over and over that they cannot be trusted to handle this alone. There are, of course, improvements that could be made to the existing guidance, but

delivering more rights to the accused is not one of them. Following through with this change betrays rape survivors - and particularly the most vulnerable students. I urge you to reconsider.

A concerned citizen,

**PII**

**PII**

**From:**      Catoe, Tracy
**Sent:**      11 Sep 2017 13:47:24 +0000
**To:**        Edmondson, Monique
**Subject:**   FW: George Mason Speech - Thank You

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Monday, September 11, 2017 8:05 AM
**To:**  PII
**Subject:** RE: George Mason Speech - Thank You

Dear PII

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.

Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)

Deputy Director of Correspondence

Office of the Secretary

Washington, DC 20202

---

**From:** PII [@gmail.com]
**Sent:** Saturday, September 09, 2017 10:11 AM
**To:** DeVos, Betsy
**Subject:** George Mason Speech - Thank You

The Honorable Betsy DeVos
September 9, 2017


Dear Secretary DeVos:

This note is to thank you for your September 7 George Mason University speech and new policy outline.  After six years of Washington-sponsored Title IX unfairness I am very pleased to see someone - you - finally stepping up to correct the over-correction that the last administration created.

PII

PII                                                         Although you
didn't highlight his case in your speech, it would have fit right in among the cases of injustice of

which you spoke.  Our hope is that your words this week will give the university pause and cause them to adjust and balance their approach.

Please consider this a note of support for you, your broader efforts at educational reform, and your specific efforts to fix Title IX investigations.

Sincerely,

**PII**

Begin forwarded message:

**From:** **PII** @gmail.com>
**Date:** August 18, 2017 at 10:24:32 AM CDT
**To:** betsy.devos@ed.gov
**Cc:** **PII** @gmail.com>
**Subject: Title IX Harassment Investigation Injustice - Urgent Help Request**

The Honorable Betsy DeVos
August 18, 2017

Dear Secretary DeVos:

**PII**

He is also caught up in a Title IX sexual harassment investigation and will probably **PII** As you well know, once a young man is accused by a university of a Title IX harassment violation he is almost certain to be found "responsible" because of the complete lack of accountability, transparency, and due process typical of the so-called investigations that most universities claim to conduct.

This letter is our hail-Mary pass to try to help our son.  He is a decent, honorable man and, we've been told, **PII** All he needs is a fair, open, process where he is allowed to face his accuser and question witnesses under oath - but of course he won't get that.  The most likely outcome is that he will be yet another

victim of the witch hunt taking place across the country that is ruining the lives of young men like him.

If you can see fit to intercede on  behalf, please do so as soon as you can, before it's too late.  If it is too late for him, it doesn't have to be too late for the next set of victims.  Please make eliminating or reforming these Title IX persecutions a top priority.

Sincerely,

**PII**

PS: To any Staffer who first opens this - whether you agree or disagree with our characterization of what is happening across the country, <u>we beg you</u> to please pass this along to Secretary DeVos

**From:**     Catoe, Tracy
**Sent:**      8 Sep 2017 13:48:05 +0000
**To:**        Ware, Angela
**Subject:**   FW: You are brave


-----Original Message-----
From: Catoe, Tracy On Behalf Of DeVos, Betsy
Sent: Friday, September 08, 2017 9:48 AM
To: 'PJ Goetz'
Subject: RE: You are brave

Dear Ms

Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202



-----Or──────ssage-----
From: 
Sent: Friday, September 08, 2017 9:41 AM
To: DeVos, Betsy
Subject: You are brave

As I watched your speech yesterday the flood gates of tears opened and my soul cried for over an hour.
We have stood outside the gates of justice banging on the door until our hands were bloodied. No one
seemed to notice. All we were looking for was common sense and a chance for our voices to be heard. I
know you will be attacked for your bravery and my prayers are for your protection. In the course of
history only a few have been brave enough to stand up for the rights of others. You have become a
personal example for me as a teacher in our public school system and a mother. Thank you for your
bravery. You have brought hope to the hopeless. And without hope there is no action. For those unfairly
accused they now understand someone has heard their cries and they are less alone.

My prayers and thoughts are with you.

**PII**

**PII** Phone
Notice: In accordance with the Federal Health Portability Act (HIPAA), this email/attachment may contain
protected health or legal information and is for the sole appropriate professional use of the intended
recipient(s). Any unauthorized use, disclosure, dissemination or copying of this information is prohibited.

We accept no responsibility for any loss or damages suffered by any person(s) other than the addressee as a result of decisions made or actions taken based on this communications or otherwise.  If you receive this in error, please notify the sender immediately and delete the information from your computer.

AR_00001195



**PII**

**PII**

Sept. 16, 2017

Honorable Elisabeth DeVos,
Secretary, U.S. Dept. of Education (USDOE)

U.S. Department of Education.
400 Maryland Avenue, SW.
Washington, D.C. 20202.

Dear Madam Secretary,

I read the online transcript of your remarks at George Mason University concerning Title IX with great interest. I totally concur with your comments that:

- "Instead of working with schools on behalf of students, the prior administration weaponized the Office for Civil Rights to work against schools and against students."
- "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one."
- "One person denied due process is one too many."



**PII**





I strongly encourage you to institute reform of Title IX to provide definitive guidelines and procedures in assessing sexual harassment cases in academia to include **mandating due process** to provide protection for all parties involved.

Please do not succumb to the criticism, pressure and vitriol of those who want to continue the status quo with their skewed view of equity and justice. I'll be praying for your success.

Respectfully

**PII**

Attach: CV

Page 3

AR_00001198

# Congress of the United States
## Washington, DC 20515

September 19, 2017

The Honorable Betsy DeVos
Secretary of Education
United States Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Secretary DeVos:

On September 7, 2017 you delivered a major speech at George Mason University announcing the beginning of a "notice and comment" period for the Department of Education's Title IX guidance to colleges and universities and announced your intention to replace the existing guidance with a "workable, effective, and fair system." We share your stated goal at the outset of this process. Title IX should protect students from discrimination and sexual violence while ensuring all students are afforded due process.

According to the *Campus Climate Survey Validation Study*, 87 percent of sexual assault survivors do not report their assaults to campus officials. Underreporting of sexual violence a tragedy and endangers campus communities. The experiences of survivors must be the focus of any conversation about sexual violence on campus to ensure they have faith in, and are treated fairly by, the disciplinary process. Any final rule on Title IX must not have a chilling effect on reporting.

Because attending a college or university is not deemed to be a state-protected right, but rather a privilege, Republican and Democratic Administrations have maintained that preponderance of evidence is the proper evidentiary standard for campus disciplinary proceedings. Preponderance of evidence is used in civil legal proceedings where there is similarly no threat to an individual's liberty. This standard balances the rights of both parties involved in the disciplinary process by recognizing that each has an equal stake in the outcome of a case. We urge you to maintain preponderance of evidence as the evidentiary standard in all campus sexual violence proceedings.

Survivors of sexual violence should have the option to engage law enforcement and file criminal charges against their attacker; however, this does not replace the obligation of colleges and universities to remedy sexual misconduct under Title IX. Similarly, in recognition of a survivor's interest in controlling their response to an alleged incident, colleges and universities should respect a survivor's choice to withdraw from a disciplinary proceeding without prejudice. Every campus should implement fair disciplinary proceedings and provide trauma-informed support for both survivors and the accused. The Department of Education must provide technical assistance to colleges and universities to ensure schools successfully implement fair practices on campus.

As identified by the Centers for Disease Control and Prevention (CDC) in their *Sexual Violence on Campus: Strategies for Prevention* report, comprehensive sexual violence prevention makes campuses safer. We urge you to encourage colleges and universities to implement comprehensive prevention programs that are developmentally appropriate for students, administered by well-trained staff using a variety of teaching methods, engage with all students

PRINTED ON RECYCLED PAPER

over the course of the school year, incorporate evidence-based methods, and are tailored to the needs of each campus.

Students, families, and administrators are uniquely positioned to understand what is happening on campuses today. During your review of Title IX, we encourage you to consult with all parties involved in these campus proceedings – especially survivors. Colleges and universities, thanks to the advocacy of survivors and with guidance from the federal government, have made great strides addressing cases of sexual violence since the Dear Colleague Letter was released in 2011. We hope your review is transparent and builds upon this hard-won progress.

Sincerely,

Ann McLane Kuster
Member of Congress

Patrick Meehan
Member of Congress

Jackie Speier
Member of Congress

Susan Davis
Member of Congress

Ted Poe
Member of Congress

Pramila Jayapal
Member of Congress

Tom Reed
Member of Congress

Debbie Dingell
Member of Congress

Carlos Curbelo
Member of Congress

Lynn Jenkins
Member of Congress

AR_00001200

09/17/17

Betsy Devos, _____ ____ OS-EXEC SEC

2017 SEP 25  AM 10 47

I am a student at Northeastern University, and as a woman, a student, and a feminist who has multiple close friends who have experienced sexual assault on their various college campuses, I was outraged and appauled at your comments on September 7th, about taking action to better protect those accused of sexual assault. I'm confused as to why it is not blindingly obvious to you that it is the victims of the assaults who are in need of greater support. Clearly you are out of touch with the realities that survivors face on college campuses. I have many friends who have been detered from pressing charges against their assailants because the process their school would put them through would be grueling, drawn out, degrading, further traumatizing, and not private. Meanwhile the perpetrator is free to walk free, go

①

AR_00001201

to class, socialize, and be a potential threat to others. Our society shames women and justifies the actions of boys and men when they are clearly criminal. Your elected platform gives you the opportunity to have a positive impact on education, but you have decided to focus on the aspects of our school systems that are already fractured, and break~~ing~~ them further by SUPPORTING RAPISTS. I beg you to empathize and educate yourself.

Sincerely,

PII

PII

AR_00001202

| | |
|---|---|
| **From:** | Catoe, Tracy |
| **Sent:** | 11 Sep 2017 13:46:03 +0000 |
| **To:** | Ware, Angela |
| **Subject:** | FW: Title IX |

-----Original Message-----
From: Catoe, Tracy On Behalf Of DeVos, Betsy
Sent: Monday, September 11, 2017 8:27 AM
To: [ PII ]@yahoo.com'
Subject: FW: Title IX

Dear Mr. [ PII ]

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.
Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)
Deputy Director of Correspondence
Office of the Secretary
Washington, DC 20202

-----Original Message-----
From: Betancourt, Alberto
Sent: Sunday, September 10, 2017 7:45 PM
To: DeVos, Betsy
Subject: FW: Title IX

FYI.

V/R

Al.

Alberto "Al" Betancourt
Press Officer
Media and Customer Relations | Office of Communications & Outreach U.S. Department of Education |
400 Maryland Avenue, S.W. | Washington, D.C. 20202
(phone) 202.453.5753 | alberto.betancourt@ed.gov

-----Original Message-----
From: [ PII ]@yahoo.com]
Sent: Saturday, September 09, 2017 4:45 PM
To: Press
Subject: Title IX

Secretary Devos,        Thank you for you comments on the abuses of title IX within the context of campus assaults. The elimination of constitutional protections of the accused as well as the presumption of innocence should leave all Americans aghast. Colleges should be expected to protect all students equally, with no pre-disposed inclination as to verdict.        Your efforts to end this despicable practice is commendable. Due process is not just an expectation, it is a constitutional right for all. Everywhere. Thank you again for your decision to end this wrong-headed and discriminatory practice.

**PII**

.

**Subject:**                FW: Thank you!

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 8:27 AM
**To:** Ware, Angela
**Subject:** FW: Thank you!

**From:** PII [@gmail.com]
**Sent:** Thursday, September 07, 2017 4:20 PM
**To:** DeVos, Betsy
**Cc:** Jackson, Candice
**Subject:** Thank you!

Secretary Devos,

As a mother of a wrongfully accused son, I want to thank you from the bottom of my heart for your speech and your attitude of fairness for all!!!

It brought me to tears!

Your remarks give me hope that we can work toward a system that is just, constitutional and respectful!

God bless you!

**PII**

(pseudonym used to ensure safety and privacy of my son)

**Subject:**              FW: Support for Your Decision on Title IX

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 8:52 AM
**To:** 'Robert Paquette'
**Subject:** RE: Support for Your Decision on Title IX

Dear Professor Paquette:

Thank you for your e-mail to Secretary of Education Betsy DeVos. We appreciate hearing from you.

Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)

Deputy Director of Correspondence

Office of the Secretary

Washington, DC 20202

**From:** PII      PII
**Sent:** Friday, September 08, 2017 7:06 AM
**To:** DeVos, Betsy; Jackson, Candice
**Subject:** Support for Your Decision on Title IX

Dear Secretary of Education Devos:

Please allow me to lend my voice of support for your decision to revise the Obama-era guidelines regarding Title IX.

I have taught at an elite liberal arts institution for thirty-six years. During that time I have watched any number of issues politicized by a faculty with a herd-like mentality, lurching ever farther left. It can be an intimidating force even to the strongest college presidents and their boards of trustees.

I listened to every word in your speech yesterday. It was an impressive performance. I do not underestimate the courage that went into it. Congratulations. It is a vital step toward the return of sanity and justice to college campuses.

Sincerely,





Stop Abusive and Violent Environments
P.O. Box 1221 • Rockville, MD 20849
Tel: 301.801.0608
www.saveservices.org

September 11, 2017

**The Honorable Betsy DeVos**
U.S. Secretary of Education
Lyndon Baines Johnson (LBJ)
Department of Education Building
400 Maryland Ave, SW
Washington, DC 20202

Dear Secretary DeVos,

I am writing to express SAVE's gratitude for your compelling remarks last week concerning the need for Title IX policy reform. We were very encouraged by your commitment to protecting *all* students and your recognition that the current system of campus sexual assault investigations and adjudications have consistently failed to "get it right."

Correctly, during your speech, you noted, "Acts of sexual misconduct are reprehensible, disgusting, and unacceptable." We could not agree more. Victims of sexual assault must be treated with respect and taken seriously when they come forward and report allegations to the school, investigators, or other confidants. Just as importantly, students who are accused of sexual misconduct must be confident that investigators will not make any predetermined assumptions, but engage in an unbiased pursuit of the truth.

During the month of September SAVE will engage the media and federal lawmakers to promote a more balanced response to campus assaults by encouraging enhanced law enforcement involvement for criminal allegations and ensuring due process protections in campus proceedings. With these simple adjustments, the rights of both parties will be guarded and the school communities can be confident that the findings will be fair and accurate.

SAVE fully supports your efforts to replace the current broken system because, "There is nothing inconsistent with a policy that both strongly condemns and punishes sexual misconduct and ensures a fair adjudicatory process." Thank you again for taking the lead on this important issue. Please feel free to contact me if SAVE can help advance your goals.

Sincerely,

Christopher J. Perry, Esq.
Deputy Executive Director

cc: Candice Jackson, Deputy Assistant Secretary

AR_00001207

**From:**      Washington, Wendell
**Sent:**      11 Sep 2017 12:36:15 +0000
**To:**        Washington, Wendell
**Subject:**   Title IX

---

**From:** Catoe, Tracy **On Behalf Of** DeVos, Betsy
**Sent:** Friday, September 08, 2017 2:56 PM
**To:** [ PII ]@gmail.com'
**Subject:** FW: Title IX

Dear PII

Thank you for your e-mail to Secretary of Education Betsy DeVos.  We appreciate hearing from you.

Your communication has been forwarded to the appropriate staff member for review.

Thank you again for contacting us.

Sincerely,

T. Tracy Catoe (Ms.)

Deputy Director of Correspondence

Office of the Secretary

Washington, DC 20202

---

**From:** Press
**Sent:** Friday, September 08, 2017 2:26 PM
**To:** DeVos, Betsy
**Subject:** FW: Title IX



**From:** [ PII ] [ PII ]@gmail.com]
**Sent:** Friday, September 08, 2017 2:24 PM
**To:** 'ocr@ed.gov.'
**Cc:** Press
**Subject:** Title IX

Dear Secretary DeVos,
Thank you for standing up for the rule of law. You rightly said, "One person denied due process is one too many."

I think OCR should immediately send a new a letter to all universities rescinding the infamous "Dear Colleague" letter that has trampled due process for hundreds.

Cordially,





*September 13ᵗʰ, 2017*

*abts10.org*

*associationofbigtenstudents@gmail.com*

***Big Ten Student Governments urge the Department of Education to include student leaders in the conversations surronding Title IX regulations.***

## Dear Secretary of Education Betsy DeVos,

On Thursday, September 9th, 2017, you announced your intention to eliminate or replace current Title IX guidelines regarding sexual misconduct on college campuses. We—leaders, members, and advocates of our campus communities—have been watching the Title IX evaluation process carefully. Title IX and those policies that fall under its purview are essential to providing students with a safe and equitable education and college experience.

Sexual assault is an issue on college campuses across the nation. Sexual violence and misconduct is a terrible reality for too many students, which is why addressing these issues is a top priority for our student government organizations. We recognize that we must protect our students and support survivors in every way possible. One in five women will be sexually assaulted while at an institute of higher education. LGBT+ students are sexually assaulted at similarly high rates—21% of transgender, genderqueer and gender nonconforming students have been subject to sexual violence.[1,2,3]

The safety of our campus communities is paramount, and it is our responsibility—and yours—to advocate for students and ensure we have done everything possible to keep them safe. We welcome the opportunity to examine the current process and procedures at work on our campuses—and the campuses of our peer institutions—as there is always opportunity for improvement. However, we strongly oppose the complete erasure of Title IX policies regarding sexual misconduct or other changes that would erode much needed protections for student victim-survivors. Eliminating Title IX guidelines will put these students in jeopardy. It will send a message to students and survivors that they are not cared for, that they are not supported. We instead advocate for a stronger system to combat the prevalence of sexual assault and misconduct on college campuses.

---

[1] Krebs, Christopher P., Ph.D., Christine H. Lindquist, Ph.D., Tara D. Warner, M.A., Bonnie S. Fisher, Ph.D., and Sandra L. Martin, Ph.D. "The Campus Sexual Assault (CSA) Study." (n.d.): n. pag. www.ncjrs.gov. Dec. 2007. Web. 3 Apr. 2017.
[2] "Statistics About Sexual Violence." National Sexual Violence Resource Center. National Sexual Violence Resource Center, 2015. Web. 3 Apr. 2017.
[3]

Title IX policies affect every one of the over 500,000 students that make up the Big Ten community, as well as the over 20 million students enrolled in other institutions of higher education across our nation. It is essential that students—the constituency most impacted by these policies—are represented in this discussion over Title IX. Therefore, we believe it is of the utmost importance that student leaders representing the Big Ten institutions be present and part of the Department of Education's deliberations regarding Title IX and the regulations that impact student bodies so strongly across the nation.

We urge you to include students in all decision-making and evaluation discussions regarding Title IX and sexual misconduct policies for institutions of higher education.

Sincerely,

**Samantha Geisinger**
Executive Director, ABTS

**Daniel Niersbach**
Student Body President, Indiana University

**Katherine Rifiotis**
Associate Director, ABTS

**Jacob Simpson**
Student Body President, University of Iowa

**Max Hurst**
Legislative Director, ABTS

**AJ Pruitt**
Student Body President, University of Maryland

**Nicholas Karafilis**
Secretary, ABTS

**Anushka Sarkar**
Student Body President, University of Michigan

**Camille Sippel**
Treasurer, ABTS

**Lorenzo Santavicca**
Student Body President, Michigan State University

**Andriana Kurzenberger**
Conference Coordinator, ABTS

**Trish Palermo**
Student Body President, University of Minnesota

**Raneem Shamseldin**
Student Body President, University of Illinois

**Joseph Zach**
Student Body President, University of Nebraska

**Nehaarika Mulukutla**

Student Body President, Northwestern University

**Sam Eschker**

Student Body President, Purdue University

**Andrew Jackson**

Student Body President, Ohio State University

**Evan Covello**

Student Body President, Rutgers University

**Katie Jordan**

Student Body President, Penn State University

**Katrina Morrison**

Student Body President, University of Wisconsin

**Joe Cohn**

| | |
|---|---|
| **From:** | Joe Cohn |
| **Sent:** | Wednesday, May 03, 2017 10:52 AM |
| **To:** | Jackson, Candice |
| **Cc:** | Robert Shibley |
| **Subject:** | Message from FIRE |
| **Attachments:** | Cohn Ed and Workforce Testimony 091015.pdf |

Dear Assistant Secretary Jackson:

Thank you for this opportunity to discuss colleges' and universities' handling of campus sexual assault allegations under Title IX.

Most Title IX implementing regulations do not pertain to this issue. 34 C.F.R. § 106.8, the regulation requiring institutions to provide grievance procedures, below, contains no specifications for disciplinary procedures related to sexual misconduct except that procedures adopted pursuant to Title IX must "provid[e] for prompt and equitable resolution of student and employee complaints." This requirement does not preclude the involvement of law enforcement.

**34 C.F.R. § 106.8 Designation of responsible employee and adoption of grievance procedures.**

(a) *Designation of responsible employee.* Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.

(b) *Complaint procedure of recipient.* A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

The Department of Education's Office for Civil Rights 1997 *Sexual Harassment Guidance* specifies that a school's obligations under Title IX are not obviated by the involvement of law enforcement:

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct. Police investigations or reports may be useful in terms of fact-gathering. However, because legal standards for criminal conduct are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond

AR_00001212

promptly. [Footnote omitted.]

The 2001 *Revised Sexual Harassment Guidance* reiterates this understanding and further states that "[i]n cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified."

The 2011 "Dear Colleague" letter goes further, again restating the 1997 *Guidance*'s understanding but stating that "[c]onduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation." While the 2011 Dear Colleague letter provides that "[a] school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation," it also requires schools to proceed with their own grievance procedures while law enforcement undertakes an investigation or criminal proceeding:

> Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation. Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement. [Footnote omitted.]

As OCR noted in footnote 10 of the 2011 Dear Colleague letter, federal courts have concluded that a single instance of sexual assault may create a hostile environment on the basis of sex, constituting discrimination under Title IX and the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633 (1999).

As a result, schools are required to respond to both criminal and noncriminal conduct to fulfill their obligations under Title IX. As the American Association of University Professors noted in its 2016 report *The History, Uses, and Abuses of Title IX*, equating non-physical sexual harassment with sexual assault has serious consequences for student and faculty rights:

> The OCR now conflates conduct and speech cases. The 2011 "Dear Colleague" letter

broadly defines sexual harassment under Title IX as ranging from the most serious conduct of "sexual violence" (including rape, sexual assault, sexual battery, and sexual coercion) to a hostile environment based on speech. Further, while the 2011 letter focuses on student-on-student sexual violence, it adds that the same principles of enforcement will apply to all types of sexual harassment cases, which include speech or conduct of a sexual or nonsexual (but gender-based) nature. Yet the letter does not include any statements or warnings about the need to protect academic freedom and free speech in sexual-harassment cases, including those involving hostile-environment allegations. With this conflation of sexual violence (which is also criminal conduct) and sexual harassment (including a hostile environment based on speech), concerns about the need to protect academic freedom and free speech seem to have been relegated to the background or ignored completely.

Moreover, it is important to understand that even in the context of physical sexual conduct (rather than speech), colleges often prohibit more than is prohibited by law. Thus, not every instance of physical sexual conduct to which a college responds under Title IX may be subject to criminal prosecution.

For a discussion of why the involvement of law enforcement is critically important to protect all members of the campus community, please see my 2015 commentary in *The Washington Post*, "Colleges are not the place to try rape cases," below. Perhaps most usefully, my testimony before the Subcommittee on Higher Education and Workforce Training of the U.S. House Committee on Education and the Workforce regarding the Safe Campus Act, attached, provides an in-depth discussion of this issue. That bill, introduced in July 2015, would have increased the role of law enforcement in dealing with campus assault allegations while also providing a number of due process protections for students accused of sexual misconduct.

Thank you for your attention to this important matter. Please do not hesitate to contact me if you have any questions or concerns we can address.

Sincerely,

Joe Cohn
Legislative & Policy Director
Foundation for Individual Rights in Education
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
(215) 717-3473
(215) 717-3440 fax
twitter: @JoeatFIRE

Help FIRE Defend and Promote Free Speech on Campus with a Tax Deductible Donation Today.
www.thefire.org/donate


**Colleges are not the place to try rape cases**
By Joe Cohn
January 16, 2015

https://www.washingtonpost.com/opinions/colleges-are-not-the-place-to-try-rape-cases/2015/01/16/7d7e44be-9d87-11e4-a7ee-526210d665b4_story.html?utm_term=.bdefb39b09d7

Sexual assault on campus catapulted into the national consciousness in 2014 in part because of the White House's hotly contested assertion that as many as "one in five women is a survivor of attempted or completed sexual violence while in college." November's sensational Rolling Stone article about the alleged rape of a University of Virginia student, and the subsequent media coverage of the story's unraveling, ensure that campus sexual assault will continue to be front and center in 2015.

Criticism of colleges' responses to allegations of sexual assault has poured in from every direction. Victims' rights advocates argue that college administrators are politically motivated to sweep accusations under the carpet. Civil libertarians and law professors cite the lack of meaningful procedural safeguards for the accused. College administrators quietly express frustration that they are being forced to decide these cases when they are ill-equipped to do so.

Many have asked why universities are handling sexual assault — a felony — at all. The simple answer is that courts and federal agencies have interpreted Title IX to require universities to respond to known instances of sexual discrimination in a manner that is reasonably calculated to redress the discrimination and prevent its recurrence. (Sexual violence is considered an extreme form of sex discrimination.) But how exactly colleges should respond remains unsettled.

Some have suggested that colleges should embrace policies that severely curtail the due process rights of accused students. Victims' rights advocates increasingly plead that such curtailments are acceptable because Title IX has a different goal than the criminal justice system. In a recent column in Politico, Yale Law School students Elizabeth Deutsch and Alexandra Brodsky argue that Title IX is concerned with equal access to educational opportunities, whereas the criminal justice system "does not and cannot respond to these equality concerns." Therefore, the students conclude, relying on law enforcement to provide the sole solution is inadequate, and providing meaningful due process in campus hearings is unnecessary. Sen. Claire McCaskill (D-Mo.) articulated a similar point during a recent hearing.

Title IX and the criminal justice system do have different goals. The former aims to eliminate discrimination, while the latter aims to punish the guilty and get predators off the streets. But regardless of the ultimate purpose of the inquiry, it always begins with the same question: Are the allegations true? Brodsky, Deutsch, McCaskill and others gloss over the huge difference in the competencies and capabilities of law enforcement professionals and university administrators in making these determinations. Tinkering with campus procedures — by changing the definition of consent or lowering the burden of proof, for example — doesn't bridge this fundamental divide.

Expecting amateur college panels to consistently make sound judgments about felonies without access to forensic evidence or the ability to subpoena witnesses or get testimony under oath is unreasonable. And when allegations of sexual assault go without proper investigation for months

or years, as was allegedly the case at the University of Virginia, it becomes difficult or impossible for anyone to determine the truth. This erodes confidence in the system and leads people on all sides to retreat to prejudice rather than fact.

To fulfill their legal and moral obligations under Title IX, colleges should focus on tasks they are competent to perform: conducting preventive education, securing counseling for alleged victims and providing academic and housing accommodations to keep students safe while the wheels of justice turn. Colleges should also quickly connect student complainants to medical resources and law enforcement, and they should provide them with the resources they need to navigate the criminal justice system. Colleges are capable of fulfilling such responsibilities successfully. These accommodations could even be implemented on an interim basis while a criminal case is adjudicated in court, to be removed when appropriate or should an accusation be unsubstantiated.

Victims' rights advocates must accept that the criminal justice system is better suited for the adjudication of sexual assault cases. Law enforcement has tools to conduct thorough investigations that colleges lack, and courts have the procedural competency and evidentiary expertise to achieve a fair and just result. Further, only courts have the power to hand down the proper punishment when a guilty finding is secured. (We are, after all, talking about rape.) And, importantly, only courts can put serial predators in a place where they cannot prey on others, whether enrolled in college or not.

If the criminal justice system has too often failed victims of sexual assault, then it should be reformed to ensure that allegations are promptly and effectively pursued. Demanding that universities play a role they have proven incapable of fulfilling — and which, even if executed perfectly, leaves predators on the streets and ignores the plight of young people who aren't enrolled in college — is doomed to failure. The solution is to assign universities and law enforcement professionals complementary, rather than overlapping, responsibilities.



FIRE
Foundation for Individual
Rights in Education

September 10, 2015

Chairwoman Virginia Foxx
U.S. House Committee on Education and the Workforce
Subcommittee on Higher Education and Workforce Training
2181 Rayburn House Office Building
Washington, D.C. 20515

Ranking Member Ruben Hinojosa
U.S. House Committee on Education and the Workforce
Subcommittee on Higher Education and Workforce Training
2181 Rayburn House Office Building
Washington, D.C. 20515

Re: Preventing and Responding to Sexual Assault on Campus

Dear Chairwoman Foxx, Ranking Member Hinojosa, and honorable members of the
Committee:

The Foundation for Individual Rights in Education (FIRE; thefire.org) is a nonpartisan,
nonprofit organization dedicated to defending student and faculty rights on America's
college and university campuses. These rights include freedom of speech, freedom of
assembly, legal equality, due process, religious liberty, and sanctity of conscience—the
essential qualities of individual liberty and dignity.

FIRE thanks the Committee for dedicating the time to address the issue of sexual assault on
campus. To supplement the oral testimony I provided at today's hearing, below please find a
detailed overview of FIRE's concerns regarding the adjudication of allegations of sexual
assault on campus and our analysis of relevant legislation pending in Congress.

I. Solutions Must Take the Rights of All Students Into Account

As we explained in our Comment to the White House Task Force to Protect Students From
Sexual Assault ("Task Force"), due process rights are one of FIRE's core concerns. *See*
Attachment A. While there is no doubt that institutions of higher education are both legally
and morally obligated to effectively respond to known instances of sexual assault, public
institutions are also required by the Constitution to provide meaningful due process to the
accused. *Goss v. Lopez*, 419 U.S. 565, 584 (1975); *Dixon v. Alabama State Board of Education*,
294 F.2d 150 (5th Cir. 1961). FIRE has long maintained that these two responsibilities need
not be in tension.

AR_00001217

As I am sure each of the members of the Committee would agree, access to higher education is critical—especially in today's economy, where a college degree is so often a requirement for career advancement. Given the high stakes for both the accusers and the accused in campus sexual assault disciplinary hearings, it should be beyond question that neither student's educational opportunities should be cut short unjustly. Just as it is morally wrong and unlawful for a college to sweep allegations of sexual assault under the carpet, it is also inexcusable both ethically and legally to expel an accused student after a hearing that provides inadequate procedural safeguards. As recent news reports have demonstrated all too well, both of these regrettable outcomes occur at campuses across the country with alarming frequency. *See* Attachment B.

Institutions adjudicating guilt or innocence in sexual assault cases must do so in a fair and impartial manner that is reasonably calculated to reach the truth. This should be self-evident. Indeed, in the April 4, 2011, "Dear Colleague" letter issued by the Department of Education's Office for Civil Rights (OCR), the agency acknowledged that "a school's investigation and hearing processes cannot be equitable unless they are impartial."

Disappointingly, however, OCR's own rhetoric and actions have been decidedly one-sided, emphasizing the rights of the complainant while paying insufficient attention to the rights of the accused. For example, OCR has mandated that institutions utilize our judiciary's lowest burden of proof, the "preponderance of the evidence" standard, despite the absence of any of the fundamental procedural safeguards found in the civil courts of law from which that standard comes. Without the basic procedural protections that courts use (like rules of evidence, discovery, trained legal advocates, the right to cross-examine witnesses, and so forth), campus tribunals are making life-altering findings using a low evidentiary threshold that amounts to little more than a hunch that one side is right. This mandate is not just unfair to the accused—it reduces the accuracy and reliability of the findings and compromises the integrity of the system as a whole.

Perhaps predictably, OCR's lopsided focus has had negative consequences for the rights of accused students in sexual assault adjudications conducted in recent years. As the partners of the National Center for Higher Education Risk Management (NCHERM) stated in a May 2014 open letter: "We hate even more that in a lot of these cases, the campus is holding the male accountable in spite of the evidence — or the lack thereof — because they think they are supposed to, and that doing so is what OCR wants." *See* Attachment C. NCHERM's statement was remarkable not only because of the organization's extensive client list—per the group's website, it currently provides legal services to over 65 colleges and universities and consulting services to thousands of clients—but also because Brett Sokolow, NCHERM's founder, President, and Chief Executive Officer, has been an outspoken proponent of federal involvement in campus sexual assault adjudication, describing himself as an "activist" for victims' rights. In other words, OCR's mandates have had such a negative effect on campus justice that even outspoken proponents of those mandates are voicing serious concern.

Critics may have legitimate grievances with the way campus tribunals have often treated accusers. But exchanging institutional disregard for accusers for an institutional disregard for the accused is not an acceptable outcome and does not advance justice. FIRE is hopeful that the Education and Workforce Committee will tackle this important issue in a way that addresses the needs of all students.

## II. Concerns about Institutional Competency

Thus far, a great deal of the discussion about how to best address sexual assaults on college campuses has accepted the premise that university administrators are qualified to serve as fact-finders and adjudicators. But if there is one thing that all sides of this issue agree on, it is this: Few, if any, schools have demonstrated the competence necessary to capably respond to the problem of sexual assault on campus. Too many campus administrators inject their biases into the process, while the rest, despite often trying their best, simply lack the necessary expertise or proper tools. This is the reality of the current system. It is very difficult to craft legislative remedies to the basic problems presented by entrusting the adjudication of allegations of serious criminal misconduct to a campus judicial system that was not intended to handle serious crimes and which will never have the appropriate tools or resources to do so. The current arrangement benefits no one, and its readily apparent failures should lead us all to question the wisdom of doubling down on this broken system.

FIRE is not alone in our assessment that campus judiciaries are ill-equipped to adjudicate sexual assault cases. This concern was expressed eloquently by the Rape, Abuse and Incest National Network (RAINN) in its comment submitted to the White House Task Force:

> It would never occur to anyone to leave the adjudication of a murder in the hands of a school's internal judicial process. Why, then, is it not only common, but expected, for them to do so when it comes to sexual assault? We need to get to a point where it seems just as inappropriate to treat rape so lightly.

> While we respect the seriousness with which many schools treat such internal processes, and the good intentions and good faith of many who devote their time to participating in such processes, the simple fact is that these internal boards were designed to adjudicate charges like plagiarism, not violent felonies. The crime of rape just does not fit the capabilities of such boards. They often offer the worst of both worlds: they lack protections for the accused while often tormenting victims.

*See* Attachment D, p. 9.

University of California system President Janet Napolitano recently expressed a similar sentiment in an article published in the *Yale Law & Policy Review*. She cautioned, "the federal government's expectations, especially related to investigations and adjudication, seem better-suited to a law enforcement model rather than the complex, diversely populated community found on a modern American campus."[1] On this point, she is right.

Campus disciplinary boards lack the ability to collect, hold, and interpret forensic evidence. They lack the ability to subpoena witnesses and evidence or even put under oath those who appear voluntarily. The parties typically lack the representation of experienced, qualified

---

[1] Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 YALE L. & POL'Y REV. 387, 398-99 (2015).

legal counsel, and they do not have the right to discovery. These proceedings are not governed by the rules of evidence and often disregard the right to confront adverse witnesses. The fact-finder—often a single investigator—decides whether there was a sexual assault under the low "preponderance of the evidence" standard. Put simply, expecting these tribunals to reach reliable, impartial, and just results is unrealistic.

Training requirements for the campus administrators (and sometimes even students and faculty) handling these cases are unlikely to sufficiently fix the core disjunction between the competencies of institutions of higher education and the grave responsibilities inherent in the adjudication of sexual assault allegations. Sexual assault allegations are often nuanced and complex, which is one of the reasons why they present challenges to even the trained professionals employed by our criminal justice system. As the NCHERM partners observed: "[T]he public and the media need to understand that campus [sexual assault] complaints are not as clear-cut as the survivors at [victims' advocacy group] Know Your IX would have everyone believe." *See* Attachment C.

Victims of sexual assault deserve justice. Justice can only be served by competent professionals. Instead of creating a parallel justice system staffed by inexperienced, partial, and unqualified campus administrators to adjudicate campus sexual assault, policymakers should instead take this opportunity to improve and expand the effectiveness and efficiency of our criminal justice system to ensure that it provides an appropriately thorough, prompt, and fair response to allegations of campus sexual assault. Professional law enforcement and courts have the benefit of years of expertise, forensics, and legal tools like subpoenas and sworn testimony that are not available to campus adjudicators. These resources should be brought to bear on campus.

The hurried rush to find the accused guilty described by NCHERM in its open letter was inevitable in the current legal environment, where the federal government has mandated low evidentiary standards, called into doubt accused students' right to cross-examine their accusers, interchangeably used the terms "victims" and "complainants" in pre-hearing contexts, and actually instructed institutions that in some instances they may take "disciplinary action against the harasser" even "prior to the completion of the Title IX and Title IV investigation/resolution"—in other words, before anyone has actually been found responsible for the offense. The inescapable perception of a top-down federal bias against the accused is solidified by the fact that to the best of FIRE's knowledge, OCR has yet to take corrective measures against any institution for lack of impartiality against the accused or to intervene on an accused student's behalf in any of the civil rights lawsuits they have filed, despite numerous examples of colleges punishing accused students with little if any evidence and after using embarrassingly minimal procedural safeguards.

Again, the perception of bias on the part of OCR is having a real effect on the reliability of campus adjudication across the country. After all, when deciding a case under the preponderance of the evidence, even a light thumb on the scales of justice can affect the outcome. One disturbing example comes from Occidental College, where the institution expelled a male student after finding that the female student was incapacitated, despite a 24-minute-long text message conversation showing the complainant taking deliberate steps to sneak away from her friends and into the young man's dorm room for the express purpose of having sex. In one text she asks him, "do you have a condom," and then she messaged a friend, "I'mgoingtohave sex now" [sic]. It cannot be a coincidence that this

result arrived on the heels of OCR launching a Title IX investigation into Occidental's handling of sexual assault claims, demonstrating the real harm caused when institutions feel pressured to reach guilty findings. Indeed, FIRE's involvement in this issue was spurred by a case in which an accused college student, Caleb Warner, was found responsible for sexual assault by the University of North Dakota despite evidence that not only did not support his guilt, but that was sufficiently in Warner's favor as to cause local law enforcement to pursue his *accuser* for filing a false police report. *See* Attachment E.

Leaving the investigation and adjudication of sexual assault allegations to law enforcement professionals and our courts of law would reduce or eliminate the involvement of self-interested universities, thus producing a more fundamentally fair process for all involved. Campus adjudicators with real or perceived interests in securing certain judicial outcomes undermine the reliability of the process. Indeed, the importance of disinterested judicial review was emphasized by Senators Gillibrand and McCaskill in their efforts to transfer sexual assault hearings from the jurisdiction of military tribunals, which boast far more protective procedures than campus tribunals, to civilian courts.

Finally, college tribunals are an inadequate forum for addressing serious felonies. If complainants are reluctant to go to law enforcement, that problem must be addressed directly by working with law enforcement. Diverting sexual assault cases from the criminal justice system to campus courts is dangerous. The harshest sanction a university can impose on a rapist is expulsion. Campus courts are unequipped to provide either the necessary process due the accused or the punishment justice demands for the victim and society if the accused is found guilty. We must stop pretending that campus tribunals are adequate alternatives to criminal justice and prioritize referring complainants to law enforcement professionals, so we have the chance to remove dangerous criminals from our communities. We must stop circumventing the criminal justice system. Continuing to do so is dangerous.

## III. Analysis of Pending Legislation

### A.    The Campus Accountability and Safety Act

The Campus Accountability and Safety Act (CASA) would continue to rely on campus judiciaries to reach factual determinations and punish those deemed responsible for committing these heinous crimes. While the bill will not alleviate the risk of unjust findings caused by assigning ill-equipped campus administrators the responsibility of adjudicating these important cases, it does offer some improvements over the status quo. CASA contains some provisions FIRE supports: It requires that institutions enter into agreements with local law enforcement agencies, and prohibits institutions from adjudicating cases against student athletes in special proceedings. Other provisions, however, require amendment.

*Neutral Language*

CASA treats the problem of addressing sexual assault on campus as a one-sided issue of supporting "victims," instead of protecting the rights of both complainants and the accused. The bill presumes the guilt of all accused students, referring to accusers as "victims" throughout the legislation, even when referring to them in the pre-adjudication context.

Failure to use neutral language that refers to accusers as "complainants" prior to adjudication signals to institutions that Congress does not value impartiality.

### *Unequal Assignment of University Resources*

CASA would institutionalize inequality within sexual assault proceedings by providing substantial resources to complainants—for example, a "confidential advisor"—without providing similar resources to the accused. This imbalance is at odds with regulations implementing the reauthorization of the Violence Against Women Act (VAWA), which require colleges to provide "the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[2] Additionally, OCR has interpreted Title IX's implementing regulations to require that colleges allowing advisors to participate "at any stage of the proceedings ... must do so equally for both parties."[3] As OCR observes, "[a] balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions." FIRE supports CASA's determination to provide resources to help complainants navigate the system, but urges Congress to provide similar resources to the accused.

### *Trauma-Informed Training for Fact-Finders*

Adding to the imbalance, CASA mandates that university employees responsible for "resolving complaints of reported sex offenses or sexual misconduct policy violations" must receive training on "the effects of trauma, including the neurobiology of trauma." While trauma-informed training may be appropriate for first responders and those conducting initial interviews, providing that training to campus adjudicators undermines the impartiality of the process. The bill should be amended to make clear that such training is not to be provided to fact-finders, who are supposed to be impartial.

### *Penalty Provision*

CASA's penalty provision allows colleges to be fined 1 percent of their operating budgets per violation. While we presume this provision was intended to provide a more realistically enforceable penalty than the current penalty structure under Title IX—which subjects institutions to a loss of all federal funding—this provision potentially *increases* penalties. Federal dollars are only one source of funding for institutions. So, for example, if the Department of Education finds more than 15 violations at an institution that receives 15 percent of its operating budget via federal funds, the potential penalty will be greater than it is under the current system. Indeed, OCR claimed to have found over 40 unique violations at the University of Montana in 2013.[4] The penalty provision must be capped.

---

[2] Advisor of Choice (§ 668.46(k)(2)(iii) and (iv)), 79 Fed. Reg. 62773 (Oct. 20, 2014).

[3] DEPARTMENT OF EDUCATION OFFICE FOR CIVIL RIGHTS QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE, http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[4] Joseph Cohn, *Legislative Rush on Campus Sexual Assault Threatens Student Rights*, THE TORCH (Sept. 29, 2014), https://www.thefire.org/legislative-rush-campus-sexual-assault-threatens-student-rights/.

B.  Safe Campus Act and Fair Campus Act

Introduced in July, the Safe Campus Act and the Fair Campus Act offer alternative approaches to combating campus sexual assault. Unlike CASA, both bills include meaningful due process protections. While substantially similar, the bills differ in one key way: Under the Safe Campus Act, an institution is precluded from conducting disciplinary hearings regarding allegations of sexual assault unless the complainant reports the allegation to law enforcement. The Fair Campus Act does not include this provision.

Both bills provide accusing and accused students with the right to hire lawyers to actively represent them in the campus hearings and the right to examine witnesses, and both bills require institutions to make inculpatory and exculpatory evidence available to all parties—a requirement that is shockingly absent from many campus disciplinary procedures. The bills reduce conflicts of interest by prohibiting individuals from playing multiple roles in the investigatory and adjudicatory process—preventing, for example, an investigator from serving as an adjudicator. If campuses are to continue to adjudicate sexual assaults, these provisions are obvious and necessary improvements that FIRE supports.

Both bills provide a safe harbor to students who either report or are witnesses to allegations of sexual assault made in good faith, so that they could not be disciplined by their institution for non-violent violations of the student code discovered as a result of investigations into the allegations. This provision will help students come forward with information, to everyone's benefit.

In addition to these important provisions, both bills would repeal the Department of Education's Office for Civil Rights' (OCR) misguided and unlawfully imposed mandate to colleges to use the preponderance of the evidence standard. Doing so would return the decision as to which standard of proof to employ in sexual misconduct hearings to individual states, campus systems, or individual campuses, many of which previously used higher, more appropriate standards such as that of "clear and convincing evidence."

The Safe Campus Act allows the complainant to make the decision as to whether sexual assault allegations should be reported to law enforcement. (FIRE's preference is to require all allegations to be reported.) To encourage more complainants to report allegations to the proper authorities, the bill prohibits institutions from taking action on the complaints unless they choose to report the allegation to law enforcement.

FIRE agrees with the bill's sponsors that punitive interim measures should be waived if a complainant does not report the accusation to law enforcement for investigation. FIRE does recommend, however, that non-punitive interim measures and accommodations be made available regardless of the student's decision to report. While colleges have unsurprisingly proved incapable of competently determining the truth or falsity of felony allegations, they are well-equipped to secure counseling for alleged victims, provide academic and housing accommodations, secure necessary medical attention, and provide general guidance for students who navigate the criminal justice system. Institutions should perform those functions regardless of a complainant's decision to report the incident.

## IV. Recommendations

The current approach to campus sexual assault adjudication has failed. Legislation may not be able to bridge the vast competency gap between the capabilities of educational institutions and courts coordinating with law enforcement, but it can prioritize linking complainants with the proper authorities and medical professionals; help reduce bias; provide ample resources for education, prevention efforts and counseling services; set forth a framework for providing students with housing and academic accommodations; give institutions the tools to protect their campuses on an interim basis while the wheels of justice turn; and provide all affected parties with meaningful rights that will help them protect their own interests.

If Congress determines that campus tribunals must continue adjudicating these cases, there are steps that can be taken to improve their effectiveness and fairness. First and foremost, our public policy should encourage reporting allegations to law enforcement authorities and give them the space to conduct their professional investigations without interference.

The government should drop its insistence that institutions use the preponderance of the evidence standard. The legal argument that the preponderance standard is the only acceptable standard under Title IX is incorrect, as FIRE has catalogued in our prior correspondences with the Office for Civil Rights. More importantly, the use of this low standard, particularly when decoupled from meaningful due process protections, is unjust. Instead, the government should be encouraging institutions to use the "clear and convincing" standard of evidence, which requires more than just a "50%-plus-a-feather" level of confidence that the evidence supports one side over the other, but less certainty than the criminal courts' "beyond a reasonable doubt" standard. The government should also encourage institutions that continue to use the preponderance of the evidence standard to add additional due process protections—for example, to provide accused students with a meaningful opportunity for cross-examination in cases where credibility is an issue.

Congress may also improve the reliability and fairness of campus disciplinary hearings by requiring institutions to allow student complainants and accused students to have legal representation actively participate in those proceedings. Typically, the university represents the complainant's interests by bringing and prosecuting the charges against the accused party. Universities are free to employ lawyers to conduct this function, but this right is typically not extended to student respondents. Notably, the recent passage of the Violence Against Women Reauthorization Act of 2013 included a provision that "the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice."[5] The Department of Education has (correctly) interpreted this to include the right to have a lawyer present.[6] But for this measure to truly make a difference, Congress must make clear

---

[5] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54.

[6] Violence Against Women Act, 79 Fed. Reg. 62,751 (Oct. 20, 2014).

AR_00001224

that the advisor may actively participate in the process. Right to counsel legislation making this change passed with overwhelming bipartisan support in North Carolina and North Dakota. *See* Attachments F and G. Allowing both students to have their own counsel actively participate in the process will serve as an important check to ensure that a college proceeds in a just manner.

Congress should also note that statements made by students during on-campus proceedings or in meetings with campus officials are admissible against them in criminal court. By participating without a lawyer, accused students have essentially waived their Fifth Amendment rights. Accused students lucky enough even to recognize this problem are still forced to choose between defending themselves on campus or defending themselves in criminal courts. An example of this dilemma is the case of Ben Casper, a former student at The College of William & Mary, who on the advice of his criminal defense lawyer did not participate in his campus disciplinary proceeding, instead defending himself in his criminal trial. Ben was found not guilty of all the charges against him at trial, but has been refused the opportunity to return to William & Mary.

Further, there are disturbing signs that university administrators are actively exploiting this issue in order to undermine the Fifth Amendment. In July, Susan Riseling, the chief of police and associate vice chancellor at the University of Wisconsin–Madison, was quoted bragging to the International Association of College Law Enforcement Administrators that she was able to circumvent due process protections and secure a criminal conviction of a student by using the statements he made during the campus procedures against him in his criminal trial. Speaking candidly, she told her audience, "It's Title IX, not Miranda. Use what you can." *See* Attachment H. Requiring institutions to allow legal advocacy in the campus tribunal will go a long way towards fixing this problem.

Participation of legal counsel will also help the process itself; the example of criminal and civil courts amply demonstrates that hearings proceed much more smoothly when both sides are represented by counsel than when *pro se* litigants are forced to navigate a process with which they are unfamiliar. As the authors of the Sixth Amendment recognized, hearings with the assistance of legal professionals are far more likely to lead to just results than those without.

Congress could also improve campus procedures by prohibiting institutions from allowing individuals to perform multiple roles during the adjudicatory process. Campus advocates should not serve as investigators. Investigators should not serve as adjudicators, and adjudicators should not hear appeals. Preventing the commingling of these responsibilities is an important check that reduces the risk of one person's bias permeating the entire process. The Safe Campus Act and the Fair Campus Act include provisions to this effect.

Another step Congress may take to ensure that campus tribunals are more effective and fair is to require institutions to include sexual contact with an incapacitated person in their definitions of sexual assault and rape, and to provide an appropriately precise definition of incapacitation. "Incapacitation" is qualitatively different from mere "intoxication." This is a distinction with a real difference. If one is "incapacitated," one has moved far beyond mere intoxication; indeed, one can no longer effectively function and thus cannot consent. Courts have recognized that simple intoxication does not necessarily equal incapacitation, and

therefore does not necessarily foreclose consent.[7] College policies must recognize this distinction, as well, perhaps by mirroring state definitions of incapacitation.

V. Conclusion

Sexual assault is one of the most heinous crimes a person can commit. Those found guilty should be punished to the fullest extent allowed by law. But precisely because sexual assault is such a serious crime, ensuring that each case is referred to law enforcement and providing those accused with due process is absolutely vital. As FIRE President Greg Lukianoff has observed: "Due process is more than a system for protecting the rights of the accused; it's a set of procedures intended to ensure that findings of guilt or innocence are accurate, fair, and reliable."[8]

FIRE is under no illusion that there is a simple solution to the problem of sexual assault on campus. But by lowering the bar for finding guilt, eliminating precious due process protections, and entrusting unqualified campus employees and students to safeguard the interests of all involved, we are creating a system that is impossible for colleges to administer, and one that will be even less fair, reliable, and accurate than before. Congress can help reverse this trend by taking all students' interests into account. To accomplish that, Congress should include the best aspects of each pending bill in a comprehensive, balanced bill.

Thank you for addressing this important issue and for considering FIRE's input. We are deeply appreciative of this opportunity to share our perspective and offer our assistance to you as you move forward. Please do not hesitate to contact us if FIRE may be of further assistance.

Respectfully submitted,

PII

Joseph Cohn
Legislative & Policy Director
Foundation for Individual Rights in Education

---

[7] *See, e.g.*, *Commw. v. Leblanc*, 900 NE.2d 127, 133 (Mass. App. Ct. 2009).

[8] FIRE RESPONDS TO WHITE HOUSE TASK FORCE'S FIRST REPORT ON CAMPUS SEXUAL ASSAULT, Apr. 29, 2014, https://www.thefire.org/fire-responds-to-white-house-task-forces-first-report-on-campus-sexual-assault/.

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Friday, May 26, 2017 9:52 AM |
| **To:** | Faiella, Matt; Reyes, Alejandro |
| **Subject:** | Fwd: ABA Task Force Report |
| **Attachments:** | Recommendations (May 25 2017).pdf; ATT00001.htm; Recommendations plus report (May 25 2017).pdf; ATT00002.htm; Relevant Experience of Task Force Participants.pdf; ATT00003.htm |

For our Title IX Team and especially in preparation for the June 1 listening session we are hosting on Title IX/due process issues. Thanks!

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

Begin forwarded message:

> **From:** "Kathleen C. Santora" <kcs@nacua.org>
> **Date:** May 26, 2017 at 9:48:39 AM EDT
> **To:** Candice Jackson <Candice.Jackson@ed.gov>
> **Cc:** "Pamela J. Bernard" <Pam.Bernard@duke.edu>
> **Subject: ABA Task Force Report**
>
> Candice --
>
> Pam Bernard, Vice President and General Counsel at Duke, has shared with me a
> DRAFT  copy of the report and recommendations of the ABA Task Force on College Due
> Process and Victim Protection (related to sexual misconduct issues). Pam was a member
> of the task force and the criminal justice section (which created the task force) authorized
> her to share it with me; the task force leadership also agreed I could share it with you (and
> were pleased to have me do so).
>
> Pam will be part of the OCR June 1 meeting on due process and we both thought it would
> be helpful for you to have an early copy.
>
> Note it is a draft so not for widespread distribution, and is expected to be released June 1.
> A couple of notes that Pam shared:
>
> The only thing that may change between this DRAFT version and the June 1 version is
> whether we continue to include the supermajority language, and there will be: (1) addition
> of 2016 DOJ Campus Climate Validation Survey and (2) the 2016 Wesley College resolution
> agreement.
>
> Pam noted that The Task Force was quite diverse in viewpoints as reflected in the member

AR_00001227

list, and the different points of view also had bearing on what issues were selected as the key points.

I hope it is helpful to you to have an early draft.

Kathleen

Kathleen Curry Santora
President & CEO
NACUA

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

### ABA TASK FORCE ON COLLEGE DUE PROCESS AND VICTIM PROTECTION RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT

The Executive Committee of the ABA Criminal Justice Section commissioned the Task Force on Campus Due Process and Victim Protection in November 2016. Immediately after, extensive efforts were made to find members that represented all interested parties: victims, the accused, universities, other stakeholders, and national experts. The Task Force was fully constituted in the winter of 2017, and it ended up including two voting members who were originally liaisons from the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice. This elevation was made in recognition of their significant contributions.

Although the Task Force worked expeditiously, it did so because members were eager to try to have a positive impact on this critical area of public policy.  The Task Force believed it likely that the new administration would release new directives to replace the 2011 Dear Colleague Letter, issued by the U.S. Department of Education Office for Civil Rights. In the greatest of traditions of the ABA and the Criminal Justice Section, members wanted to contribute to the public discussion.

The Task Force drafted these *Recommendations* to provide guidelines to colleges and universities in resolving allegations of campus sexual misconduct. These recommendations do not represent the views of one person or even a group of people but the views of the collective whole for which there was complete consensus among all the Task Force members. The recommendations were necessarily the product of extensive discussions and compromise.  Various stakeholders agreed to bend on certain provisions in order to obtain other provisions of import to them and in order to reach unanimity. These *Recommendations* are not exhaustive. The Task Force recognizes that it did not discuss every relevant issue, but it aimed to address the more salient ones. Nor are the *Recommendations* intended to be mandated detailed scripts or to limit the discretion of schools to adopt different procedures. Instead they are intended to provide schools with useful guidelines. In addition, not all of these recommendations are consistent with the 2011 Dear Colleague Letter. The *Recommendations* are aspirational and reflect our collective judgment for a fair process. On May 6, the ABA Criminal Justice Section Council voted unanimously to endorse these Recommendations for publication.[1]

Throughout these recommendations, the Task Force uses the word "should" which recognizes the diversity among schools and the lack of authority in requiring schools to have certain provisions. Where the law requires a school to have a certain provision mandatory language is used.

Complainant refers to the alleged victim, although the Task Force acknowledges that sometimes they may not be the same person. Respondent refers to the alleged perpetrator. The Task Force

---

[1] Although these Recommendations were unanimously endorsed for publication by the Criminal Justice Section, they have not been endorsed by any other section of the ABA, including the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice.

AR_00001229

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

also refers to complainant and respondent in the singular even though there may be more than one. The decision-maker refers to the person(s) who determine whether a violation occurred.

## I.   SCHOOL'S RIGHT AND RESPONSIBILITY TO ADDRESS CAMPUS SEXUAL MISCONDUCT

Title IX prohibits sex discrimination in educational programs or activities that receive federal financial assistance. Sex discrimination includes sexual harassment and sexual misconduct. The Department of Education and federal courts have interpreted this federal law to require schools to respond to allegations of student sexual misconduct in a timely and effective manner.

### A.   **Cooperation with, and Independence from, Law Enforcement**

The Task Force recognizes the school's responsibility to address sexual misconduct on its campus for protection of its community. Schools should be able to determine whether a violation of school policy has occurred regardless of whether there has been a violation of criminal law. Where police investigation has been initiated, schools should work cooperatively with law enforcement to the extent permissible by state and federal law.

### B.   **Investigate Both Sides**

The school's investigator must conduct a prompt, fair, and impartial investigation. The investigation should be thorough, and both parties should have the right to participate by identifying witnesses and identifying and/or providing relevant information to the investigator. Investigators should equally seek out both inculpatory and exculpatory evidence.

### C.   **Confidentiality**

Schools should put in place provisions to guard against the improper disclosure of confidential information created or gathered during an investigation. Parties, witnesses, investigators, decision-makers, and advisors should abide by these provisions. Schools should notify parties about the scope and limits of the school's ability to maintain confidentiality. For example, a school may have to provide documents in compliance with a court subpoena.

### D.   **Retaliation**

Schools should put in place provisions to protect all parties from retaliation. Such provisions should be published to the campus community and available for review at all times. Such policies should also be communicated to all participants, including witnesses, throughout the investigative and adjudicatory process. Such policies should also clearly communicate the means through which any individual can securely report perceived retaliation.

## II.   RESOLVING ALLEGATIONS OF SEXUAL MISCONDUCT

Schools have several options for resolving allegations of sexual misconduct.

2

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

### A. <u>Alternatives to Traditional Adjudication</u>

Where appropriate, the Task Force encourages schools to consider non-mediation alternatives to resolving complaints that are research or evidence-based, such as Restorative Justice processes. Both parties must freely and voluntarily agree to such processes in order for them to be utilized, and they may withdraw their consent to the process at any time, stopping its use.

### B. <u>Adjudicatory versus Investigatory Model</u>

Both the adjudicatory and the investigatory model begin with an investigation, but they differ in the process for determining whether a violation of school policy occurred. The adjudicatory model has a hearing in which both parties are entitled to be present, evidence is presented, and the decision-maker(s) determine(s) whether a violation of school policy has occurred. This does not require the parties to be present in the same room.  For instance, the parties could be in two separate rooms but able to see and hear each other via video-conferencing. The Task Force emphasizes that the decision-maker(s) should be able to see and hear the parties in order to assess their credibility, and at a minimum, the parties should be able to hear one another.

In the investigatory model, by contrast, the decision-maker(s) consider(s) only the investigation report in determining whether a violation occurred. Sometimes the investigator is also the decision-maker (the single investigator model), and sometimes the decision-maker is different from the investigator. Although the decision-maker(s) may sometimes request to hear from a witness, the parties are not entitled to be present for that testimony in the investigatory model.

In considering the differences between the adjudicatory and investigatory model, the Task Force has a preference for the adjudicatory model because it can offset any potential for investigator bias, and it allows the decision-maker(s) to hear live testimony from the parties.  It was the consensus of the Task Force that the single investigator model, which consists of having an investigator also serve as the decision-maker, carries inherent structural fairness risks especially as it relates to cases in which suspension or expulsion is a possibility. Should a school choose to use the investigatory model, the Task Force recommends that the investigator and the decision-maker be different persons and adopt additional procedural protections consist with these recommendations.

The Task Force acknowledges that some schools use a hybrid model, which contains elements of both the investigatory and adjudicatory model.  For classification purposes, the Task Force considers a model adjudicatory only if the parties have the right to a hearing in which evidence is presented, the parties are present, and a decision-maker who is not also the investigator determines whether a violation occurred. As described in Section IV below – if there are at least three decision-makers and they are making their decision unanimously - it is appropriate to use the lower standard of proof as defined in Section IV-D.

### III. PROCEDURAL PROTECTIONS

AR_00001231

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

The Task Force believes that both parties should have robust procedural protections.

## A.    Counsel/Advocate

The Violence Against Women Authorization Act of 2013 requires that in cases of sexual assault, both parties have the right to an advisor of their choosing, who may be an attorney or third party advocate. All advisors, including attorney advisors, must adhere to all conditions and obligations required by the school's process. The school should provide the advisor with the same access to information available to the party. Minimally, the advisor should have the right to communicate with the party in oral or written form during all meetings and proceedings. Should a party prefer, the school should provide the party with an advisor who has been trained in the school's sexual misconduct policies and can assist the party. The school should have more than one advisor to give the party choice, but is not required to provide an attorney advisor. Where a student is working with an advisor and that advisor has an obligation to report to the university, the student should be made aware of the potential conflict of interest.

## B.    Notice

Both parties should be provided with written notice as contemporaneously as is practical that a school or its designated investigator will commence a formal investigation. This notice should include the date of the alleged incident if known, a summary of the alleged facts, a summary of the specific policy violation(s) under investigation by the school, and instructions on how to access the relevant policy and adjudicatory process. It should also include information about their right to an advisor, described above. This notice should be provided before the investigation begins. If the initial complaint is made to the school investigator then notice should be provided before the responding party's interview with the investigator, regardless of whether the responding party decides to make a statement.

## C.    Discovery

The school should prepare an initial comprehensive investigation report and should notify both parties contemporaneously of the availability of the report. This report should include information such as party statements, witness statements, and any inculpatory or exculpatory information collected during the investigation. Schools should disclose a list of information obtained during the course of the investigation even if it was not considered relevant evidence for the decision-maker(s). Both parties should have a reasonable opportunity to review the report with their advisor, if they choose to have one, and to request information be included or removed by the school from the final report. The school should designate a person other than the investigator or the decision-maker(s) to determine which information is included in the final report, taking into consideration the issues raised by each party and school policy. The student's advisor, if there is one, should have the right to participate fully in this pre-hearing stage of the process. Once the final investigation report is prepared, both parties and their advisors, if they have them, should have reasonable access to it and should have the right to provide a reasonable written response, which will be provided along with the final investigation report to the decision-maker(s) for consideration

AR_00001232

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

of whether a policy violation has occurred. This reasonable written response should not reference any evidence that has been formally excluded from the final investigation report, however either party may always appeal the improper exclusion of evidence from the final investigation report.

**D.      Impartial Decision-maker**

As a matter of fundamental fairness, schools and their designated personnel must be fair, impartial, and free of conflicts of interest. Both the investigator and the decision-maker(s) should receive fair and balanced training on how to objectively investigate and adjudicate these matters. Parties should be advised of the identity of the designated personnel in advance of decision-making so that they have sufficient time to raise concerns so as to avoid unnecessary delay and error.

**E.      Silence**

In the interest of fundamental fairness, and recognizing the prospects of parallel or follow-on criminal proceedings, the respondent's silence should not be the basis of a finding of responsibility. The Task Force emphasizes that as long as it comports with the standards articulated in Section III-C and Section IV-D below, the complainant's statement may serve as the sole basis for a finding of responsibility.

**F.      Appeal**

The Task Force recommends that both parties have a right to appeal. The grounds for appeal should be limited to (1) new information not known or available at the time of the hearing; (2) procedural error that materially affected the findings of fact (this includes improperly excluding or including evidence); (3) the imposition of a sanction disproportionate to the findings in the case (that is, too lenient or too severe); or (4) the conduct as found by the decision-maker does not violate school policy (this is not intended to allow an appeal for new fact-finding). A successful appeal on the first two grounds should generally result in a remand for a new hearing to determine whether a violation occurred. If the appellate officer finds the fourth ground to be true then the finding of responsibility should simply be reversed. Recognizing the benefits of finality, the Task Force favors a single level of direct/formal appeal.

**IV.    THE HEARING**

The Task Force recommends an adjudicatory hearing to determine whether the respondent committed sexual misconduct.

**A.      Standards for Evidence at Hearing**

In general, evidence may be presented during a hearing if it is relevant, not unduly repetitious, and the sort of information a reasonable person would find reliable. Evidence is relevant if (1) it bears on a fact of consequence in the case, or (2) it reflects on the credibility of a testifying party or witness in a material way. Evidence may be excluded if it is unfairly prejudicial or if it is needlessly

5

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

duplicative. Character and reputation evidence regarding the parties (both positive and negative) should be excluded from the decision-making stage. Evidence of the past sexual history of the parties should be disfavored and admitted only when it provides compelling evidence on a disputed issue of relevance to the misconduct charge or its defense.

It is appropriate for some witness statements to be presented in written form, such as a statement signed by the witness or as recorded by the investigator.  The decision-maker should exercise caution at considering second hand statements as true. ("John told me that he saw...") It is rare if ever appropriate to consider as true a third hand statement or something more removed.  ("John told me that Zelda told him that she saw…").

If a witness statement is important for establishing whether the alleged misconduct occurred then whenever possible, that witness should appear in person. Live testimony will allow the decision-maker to better assess witness credibility and determine whether a violation occurred.  Members of the college community (other than the parties themselves as explained in Section C below) have an obligation to provide relevant evidence if called upon to do so.

**B.      Recording Proceedings**

It was the consensus of the Task Force that the hearing should be recorded or transcribed. Reasonable care should be taken to create a quality recording and minimize technical problems.

**C.      Participation in the Proceedings**

Neither the complainant nor the respondent should be required to participate in the proceedings. However, the decision-maker(s) should not consider either party's personal account of what happened unless that party is available for questioning by the decision-maker(s) and the other party. A party who chooses to remain silent may still present evidence (other than a personal statement) or question the evidence that is presented by the school or the other party. The decision-maker(s) may always consider a party's evidence and questioning of the evidence as well as a party's general denial of the allegations.

**D.      Asking Questions**

The complainant and respondent may not question one another or other witnesses directly, but should be given an ongoing opportunity during the proceeding to offer questions to be asked through the decision-maker(s), who will determine whether to ask them.  The investigator should be available for questioning by the decision-maker(s) and the parties.

**V.      DETERMINING WHETHER A VIOLATION OCCURRED**

Regardless of the method a school uses to determine whether a violation occurred, the Task Force urges that the following protections be put in place.

AR_00001234

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## A.   Composition of Panel

Recognizing that there are different models that could provide for a fair and equitable resolution, the Task Force favors having at least three people separate from the investigator decide whether a violation occurred. The Task Force recognizes that there are inherent benefits to having a diverse panel when deciding responsibility or sanctions. A panel can be diverse across a number of dimensions including gender, race, age, sexual orientation, and position within the university. The inclusion of students can also provide an important perspective.

## B.   Necessary Vote for Finding of Responsibility

Schools should require a unanimous vote among decision-makers for a finding of school policy violation and a finding of responsibility. In the event of a four or more person panel, a supermajority vote is sufficient. For instance, three of four panelists (75%) would be sufficient for a finding of school policy violation and a finding of responsibility.

## C.   Insufficient Evidence and Outcome

If there is insufficient credible, reliable, and relevant evidence for the decision-maker(s) to find that a violation occurred then the student must be found not responsible.

## D.   Standard of Proof

The Task Force spent considerable time discussing the standard of proof to be used by decision-maker(s) in determining whether a violation has occurred. Some Task Force members thought it was unfair to have a lower standard of proof when respondents were facing suspension and possible expulsion, coupled with the potential collateral consequences that accompany a finding of responsibility. Other Task Force members considered it unjust to have an elevated standard of proof given the historical challenges complainants often faced in getting schools to respond adequately to allegations of sexual misconduct. For purposes of the school disciplinary system, everyone was in agreement that the standard should not be beyond a reasonable doubt. Additionally, the preconceived notions attached to the commonly used standards of proof troubled some Task Force members.  Specifically, some Task Force members did not agree with the common interpretation of "preponderance of the evidence" as requiring a mechanical weighing of the evidence in which a mere feather is enough to tip the scales towards a finding of responsibility. At the same time, other Task Force members felt "clear and convincing evidence" is a vague standard and thus easily subject to potential abuse. In light of these concerns, the Task Force believes that it is best to avoid labels and instead articulate the appropriate basis for a finding of responsibility, with corresponding instructions (preferably in written form) provided to the decision-maker to ensure a clear understanding of the manner in which they should consider, review, and weigh the evidence. The Task Force's recommendation is the product of compromise.

The Task Force believes that the following standard of proof is only appropriate under an adjudicatory model with at least a three-person panel of decision-makers, using a unanimity

AR_00001235

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

requirement, and with the procedural protections set forth in these recommendations. The Task Force recommends that this standard be provided in written form to the decision-makers and the parties and advisors, if there are any, before deliberations begin:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

In a model where there is only one decision-maker, the Task Force believes that there should be a higher standard of proof. (The Task Force acknowledges that this recommendation is not in line with the 2011 Dear Colleague Letter). The Task Force recommends that this higher standard of proof be provided in written form to the decision-maker before deliberations begin.

> *The decision-maker should first evaluate the quality of the evidence. The decision-maker should consider all of the evidence regardless of who provided it. Any evidence the decision-maker finds to be of high quality should be given more weight than any evidence the decision-maker finds to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-maker should only find the respondent responsible for alleged misconduct if the evidence firmly convinces the decision-maker to reasonably conclude that a finding of responsibility is justified. That is, the decision-maker should find that there is sufficient evidence that is relevant, probable, and persuasive to firmly convince him or her that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility significantly outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

E.   <u>Sanction</u>

In the event of a finding of responsibility, the consensus of the Task Force is that a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis taking into account the facts and circumstances

AR_00001236

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offense, and the effect on the victim and/or complainant as well as the university community. The Task Force believes that a presumption of expulsion may have unintended consequences such as discouraging reporting and a finding of responsibility.

9

AR_00001237

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## Task Force Participants

### Chair

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team Seyfarth Shaw LLP
Chicago, IL & Washington D.C.

### Reporter

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

### Members

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

10

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

**Liaison**

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**ABA Staff Liaison**

**Patrice Payne**
Senior Staff Attorney, Criminal Justice Section
Washington D.C.

11

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

### ABA TASK FORCE ON COLLEGE DUE PROCESS AND VICTIM PROTECTION RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT

The Executive Committee of the ABA Criminal Justice Section commissioned the Task Force on Campus Due Process and Victim Protection in November 2016. Immediately after, extensive efforts were made to find members that represented all interested parties: victims, the accused, universities, other stakeholders, and national experts. The Task Force was fully constituted in the winter of 2017, and it ended up including two voting members who were originally liaisons from the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice. This elevation was made in recognition of their significant contributions.

Although the Task Force worked expeditiously, it did so because members were eager to try to have a positive impact on this critical area of public policy. The Task Force believed it likely that the new administration would release new directives to replace the 2011 Dear Colleague Letter, issued by the U.S. Department of Education Office for Civil Rights. In the greatest of traditions of the ABA and the Criminal Justice Section, members wanted to contribute to the public discussion.

The Task Force drafted these *Recommendations* to provide guidelines to colleges and universities in resolving allegations of campus sexual misconduct. These recommendations do not represent the views of one person or even a group of people but the views of the collective whole for which there was complete consensus among all the Task Force members. The recommendations were necessarily the product of extensive discussions and compromise. Various stakeholders agreed to bend on certain provisions in order to obtain other provisions of import to them and in order to reach unanimity. These *Recommendations* are not exhaustive. The Task Force recognizes that it did not discuss every relevant issue, but it aimed to address the more salient ones. Nor are the *Recommendations* intended to be mandated detailed scripts or to limit the discretion of schools to adopt different procedures. Instead they are intended to provide schools with useful guidelines. In addition, not all of these recommendations are consistent with the 2011 Dear Colleague Letter. The *Recommendations* are aspirational and reflect our collective judgment for a fair process. On May 6, the ABA Criminal Justice Section Council voted unanimously to endorse these Recommendations for publication.[1]

Throughout these recommendations, the Task Force uses the word "should" which recognizes the diversity among schools and the lack of authority in requiring schools to have certain provisions. Where the law requires a school to have a certain provision mandatory language is used.

Complainant refers to the alleged victim, although the Task Force acknowledges that sometimes they may not be the same person. Respondent refers to the alleged perpetrator. The Task Force

---

[1] Although these Recommendations were unanimously endorsed for publication by the Criminal Justice Section, they have not been endorsed by any other section of the ABA, including the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice.

AR_00001240

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

also refers to complainant and respondent in the singular even though there may be more than one. The decision-maker refers to the person(s) who determine whether a violation occurred.

## I.   SCHOOL'S RIGHT AND RESPONSIBILITY TO ADDRESS CAMPUS SEXUAL MISCONDUCT

Title IX prohibits sex discrimination in educational programs or activities that receive federal financial assistance. Sex discrimination includes sexual harassment and sexual misconduct. The Department of Education and federal courts have interpreted this federal law to require schools to respond to allegations of student sexual misconduct in a timely and effective manner.

### A.   Cooperation with, and Independence from, Law Enforcement

The Task Force recognizes the school's responsibility to address sexual misconduct on its campus for protection of its community. Schools should be able to determine whether a violation of school policy has occurred regardless of whether there has been a violation of criminal law. Where police investigation has been initiated, schools should work cooperatively with law enforcement to the extent permissible by state and federal law.

### B.   Investigate Both Sides

The school's investigator must conduct a prompt, fair, and impartial investigation. The investigation should be thorough, and both parties should have the right to participate by identifying witnesses and identifying and/or providing relevant information to the investigator. Investigators should equally seek out both inculpatory and exculpatory evidence.

### C.   Confidentiality

Schools should put in place provisions to guard against the improper disclosure of confidential information created or gathered during an investigation. Parties, witnesses, investigators, decision-makers, and advisors should abide by these provisions. Schools should notify parties about the scope and limits of the school's ability to maintain confidentiality. For example, a school may have to provide documents in compliance with a court subpoena.

### D.   Retaliation

Schools should put in place provisions to protect all parties from retaliation. Such provisions should be published to the campus community and available for review at all times. Such policies should also be communicated to all participants, including witnesses, throughout the investigative and adjudicatory process. Such policies should also clearly communicate the means through which any individual can securely report perceived retaliation.

## II.   RESOLVING ALLEGATIONS OF SEXUAL MISCONDUCT

Schools have several options for resolving allegations of sexual misconduct.

AR_00001241

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## A.   Alternatives to Traditional Adjudication

Where appropriate, the Task Force encourages schools to consider non-mediation alternatives to resolving complaints that are research or evidence-based, such as Restorative Justice processes. Both parties must freely and voluntarily agree to such processes in order for them to be utilized, and they may withdraw their consent to the process at any time, stopping its use.

## B.   Adjudicatory versus Investigatory Model

Both the adjudicatory and the investigatory model begin with an investigation, but they differ in the process for determining whether a violation of school policy occurred. The adjudicatory model has a hearing in which both parties are entitled to be present, evidence is presented, and the decision-maker(s) determine(s) whether a violation of school policy has occurred. This does not require the parties to be present in the same room.  For instance, the parties could be in two separate rooms but able to see and hear each other via video-conferencing. The Task Force emphasizes that the decision-maker(s) should be able to see and hear the parties in order to assess their credibility, and at a minimum, the parties should be able to hear one another.

In the investigatory model, by contrast, the decision-maker(s) consider(s) only the investigation report in determining whether a violation occurred. Sometimes the investigator is also the decision-maker (the single investigator model), and sometimes the decision-maker is different from the investigator. Although the decision-maker(s) may sometimes request to hear from a witness, the parties are not entitled to be present for that testimony in the investigatory model.

In considering the differences between the adjudicatory and investigatory model, the Task Force has a preference for the adjudicatory model because it can offset any potential for investigator bias, and it allows the decision-maker(s) to hear live testimony from the parties.  It was the consensus of the Task Force that the single investigator model, which consists of having an investigator also serve as the decision-maker, carries inherent structural fairness risks especially as it relates to cases in which suspension or expulsion is a possibility. Should a school choose to use the investigatory model, the Task Force recommends that the investigator and the decision-maker be different persons and adopt additional procedural protections consist with these recommendations.

The Task Force acknowledges that some schools use a hybrid model, which contains elements of both the investigatory and adjudicatory model.  For classification purposes, the Task Force considers a model adjudicatory only if the parties have the right to a hearing in which evidence is presented, the parties are present, and a decision-maker who is not also the investigator determines whether a violation occurred. As described in Section IV below – if there are at least three decision-makers and they are making their decision unanimously - it is appropriate to use the lower standard of proof as defined in Section IV-D.

## III. PROCEDURAL PROTECTIONS

AR_00001242

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

The Task Force believes that both parties should have robust procedural protections.

**A.      Counsel/Advocate**

The Violence Against Women Authorization Act of 2013 requires that in cases of sexual assault, both parties have the right to an advisor of their choosing, who may be an attorney or third party advocate. All advisors, including attorney advisors, must adhere to all conditions and obligations required by the school's process. The school should provide the advisor with the same access to information available to the party. Minimally, the advisor should have the right to communicate with the party in oral or written form during all meetings and proceedings. Should a party prefer, the school should provide the party with an advisor who has been trained in the school's sexual misconduct policies and can assist the party. The school should have more than one advisor to give the party choice, but is not required to provide an attorney advisor. Where a student is working with an advisor and that advisor has an obligation to report to the university, the student should be made aware of the potential conflict of interest.

**B.      Notice**

Both parties should be provided with written notice as contemporaneously as is practical that a school or its designated investigator will commence a formal investigation. This notice should include the date of the alleged incident if known, a summary of the alleged facts, a summary of the specific policy violation(s) under investigation by the school, and instructions on how to access the relevant policy and adjudicatory process. It should also include information about their right to an advisor, described above. This notice should be provided before the investigation begins. If the initial complaint is made to the school investigator then notice should be provided before the responding party's interview with the investigator, regardless of whether the responding party decides to make a statement.

**C.      Discovery**

The school should prepare an initial comprehensive investigation report and should notify both parties contemporaneously of the availability of the report. This report should include information such as party statements, witness statements, and any inculpatory or exculpatory information collected during the investigation. Schools should disclose a list of information obtained during the course of the investigation even if it was not considered relevant evidence for the decision-maker(s). Both parties should have a reasonable opportunity to review the report with their advisor, if they choose to have one, and to request information be included or removed by the school from the final report. The school should designate a person other than the investigator or the decision-maker(s) to determine which information is included in the final report, taking into consideration the issues raised by each party and school policy. The student's advisor, if there is one, should have the right to participate fully in this pre-hearing stage of the process. Once the final investigation report is prepared, both parties and their advisors, if they have them, should have reasonable access to it and should have the right to provide a reasonable written response, which will be provided along with the final investigation report to the decision-maker(s) for consideration

AR_00001243

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

of whether a policy violation has occurred. This reasonable written response should not reference any evidence that has been formally excluded from the final investigation report, however either party may always appeal the improper exclusion of evidence from the final investigation report.

**D.      Impartial Decision-maker**

As a matter of fundamental fairness, schools and their designated personnel must be fair, impartial, and free of conflicts of interest. Both the investigator and the decision-maker(s) should receive fair and balanced training on how to objectively investigate and adjudicate these matters. Parties should be advised of the identity of the designated personnel in advance of decision-making so that they have sufficient time to raise concerns so as to avoid unnecessary delay and error.

**E.      Silence**

In the interest of fundamental fairness, and recognizing the prospects of parallel or follow-on criminal proceedings, the respondent's silence should not be the basis of a finding of responsibility. The Task Force emphasizes that as long as it comports with the standards articulated in Section III-C and Section IV-D below, the complainant's statement may serve as the sole basis for a finding of responsibility.

**F.      Appeal**

The Task Force recommends that both parties have a right to appeal. The grounds for appeal should be limited to (1) new information not known or available at the time of the hearing; (2) procedural error that materially affected the findings of fact (this includes improperly excluding or including evidence); (3) the imposition of a sanction disproportionate to the findings in the case (that is, too lenient or too severe); or (4) the conduct as found by the decision-maker does not violate school policy (this is not intended to allow an appeal for new fact-finding). A successful appeal on the first two grounds should generally result in a remand for a new hearing to determine whether a violation occurred. If the appellate officer finds the fourth ground to be true then the finding of responsibility should simply be reversed. Recognizing the benefits of finality, the Task Force favors a single level of direct/formal appeal.

**IV.      THE HEARING**

The Task Force recommends an adjudicatory hearing to determine whether the respondent committed sexual misconduct.

**A.      Standards for Evidence at Hearing**

In general, evidence may be presented during a hearing if it is relevant, not unduly repetitious, and the sort of information a reasonable person would find reliable. Evidence is relevant if (1) it bears on a fact of consequence in the case, or (2) it reflects on the credibility of a testifying party or witness in a material way. Evidence may be excluded if it is unfairly prejudicial or if it is needlessly

AR_00001244

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

duplicative. Character and reputation evidence regarding the parties (both positive and negative) should be excluded from the decision-making stage. Evidence of the past sexual history of the parties should be disfavored and admitted only when it provides compelling evidence on a disputed issue of relevance to the misconduct charge or its defense.

It is appropriate for some witness statements to be presented in written form, such as a statement signed by the witness or as recorded by the investigator.  The decision-maker should exercise caution at considering second hand statements as true. ("John told me that he saw...") It is rare if ever appropriate to consider as true a third hand statement or something more removed.  ("John told me that Zelda told him that she saw…").

If a witness statement is important for establishing whether the alleged misconduct occurred then whenever possible, that witness should appear in person. Live testimony will allow the decision-maker to better assess witness credibility and determine whether a violation occurred.  Members of the college community (other than the parties themselves as explained in Section C below) have an obligation to provide relevant evidence if called upon to do so.

## B.      Recording Proceedings

It was the consensus of the Task Force that the hearing should be recorded or transcribed. Reasonable care should be taken to create a quality recording and minimize technical problems.

## C.      Participation in the Proceedings

Neither the complainant nor the respondent should be required to participate in the proceedings. However, the decision-maker(s) should not consider either party's personal account of what happened unless that party is available for questioning by the decision-maker(s) and the other party. A party who chooses to remain silent may still present evidence (other than a personal statement) or question the evidence that is presented by the school or the other party. The decision-maker(s) may always consider a party's evidence and questioning of the evidence as well as a party's general denial of the allegations.

## D.      Asking Questions

The complainant and respondent may not question one another or other witnesses directly, but should be given an ongoing opportunity during the proceeding to offer questions to be asked through the decision-maker(s), who will determine whether to ask them.  The investigator should be available for questioning by the decision-maker(s) and the parties.

## V.      DETERMINING WHETHER A VIOLATION OCCURRED

Regardless of the method a school uses to determine whether a violation occurred, the Task Force urges that the following protections be put in place.

AR_00001245

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## A.   Composition of Panel

Recognizing that there are different models that could provide for a fair and equitable resolution, the Task Force favors having at least three people separate from the investigator decide whether a violation occurred. The Task Force recognizes that there are inherent benefits to having a diverse panel when deciding responsibility or sanctions. A panel can be diverse across a number of dimensions including gender, race, age, sexual orientation, and position within the university. The inclusion of students can also provide an important perspective.

## B.   Necessary Vote for Finding of Responsibility

Schools should require a unanimous vote among decision-makers for a finding of school policy violation and a finding of responsibility. In the event of a four or more person panel, a supermajority vote is sufficient. For instance, three of four panelists (75%) would be sufficient for a finding of school policy violation and a finding of responsibility.

## C.   Insufficient Evidence and Outcome

If there is insufficient credible, reliable, and relevant evidence for the decision-maker(s) to find that a violation occurred then the student must be found not responsible.

## D.   Standard of Proof

The Task Force spent considerable time discussing the standard of proof to be used by decision-maker(s) in determining whether a violation has occurred. Some Task Force members thought it was unfair to have a lower standard of proof when respondents were facing suspension and possible expulsion, coupled with the potential collateral consequences that accompany a finding of responsibility. Other Task Force members considered it unjust to have an elevated standard of proof given the historical challenges complainants often faced in getting schools to respond adequately to allegations of sexual misconduct. For purposes of the school disciplinary system, everyone was in agreement that the standard should not be beyond a reasonable doubt. Additionally, the preconceived notions attached to the commonly used standards of proof troubled some Task Force members.  Specifically, some Task Force members did not agree with the common interpretation of "preponderance of the evidence" as requiring a mechanical weighing of the evidence in which a mere feather is enough to tip the scales towards a finding of responsibility. At the same time, other Task Force members felt "clear and convincing evidence" is a vague standard and thus easily subject to potential abuse. In light of these concerns, the Task Force believes that it is best to avoid labels and instead articulate the appropriate basis for a finding of responsibility, with corresponding instructions (preferably in written form) provided to the decision-maker to ensure a clear understanding of the manner in which they should consider, review, and weigh the evidence. The Task Force's recommendation is the product of compromise.

The Task Force believes that the following standard of proof is only appropriate under an adjudicatory model with at least a three-person panel of decision-makers, using a unanimity

AR_00001246

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

requirement, and with the procedural protections set forth in these recommendations.  The Task Force recommends that this standard be provided in written form to the decision-makers and the parties and advisors, if there are any, before deliberations begin:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

In a model where there is only one decision-maker, the Task Force believes that there should be a higher standard of proof. (The Task Force acknowledges that this recommendation is not in line with the 2011 Dear Colleague Letter). The Task Force recommends that this higher standard of proof be provided in written form to the decision-maker before deliberations begin.

> *The decision-maker should first evaluate the quality of the evidence. The decision-maker should consider all of the evidence regardless of who provided it. Any evidence the decision-maker finds to be of high quality should be given more weight than any evidence the decision-maker finds to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-maker should only find the respondent responsible for alleged misconduct if the evidence firmly convinces the decision-maker to reasonably conclude that a finding of responsibility is justified. That is, the decision-maker should find that there is sufficient evidence that is relevant, probable, and persuasive to firmly convince him or her that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility significantly outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

E.    **Sanction**

In the event of a finding of responsibility, the consensus of the Task Force is that a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis taking into account the facts and circumstances

8

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offense, and the effect on the victim and/or complainant as well as the university community. The Task Force believes that a presumption of expulsion may have unintended consequences such as discouraging reporting and a finding of responsibility.

9

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## REPORT
## ABA TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTION

The 2015 AAU Campus Climate Survey found 1 in 4 women surveyed from 27 Institutes of Higher Education (IHEs) had been raped or sexually assaulted while in college.[2]  Although the authors cautioned that the results were not nationally representative,[3] they were consistent with a 2007 National Institute of Justice study that found 1 in 5 women at two large public universities had been similarly victimized.[4] In 2011, the Department of Education Office for Civil Rights (OCR) issued its Dear Colleague Letter (DCL), in which it called the statistics on sexual violence "deeply troubling and a call to action for the nation."[5] OCR was responding to a culture in which some schools weren't taking victims seriously and sometimes even dissuading them from pursuing charges.[6] After reminding universities that sexual violence constitutes a form of discrimination under Title IX,[7] OCR told universities that in order to be in compliance with Title IX, they had to change disciplinary proceedings to more effectively hold offenders accountable.[8]

Some applaud OCR's efforts[9]-including at least ninety professors who signed a White Paper in support of the DCL[10]-for raising the profile of the harm suffered by victims of sexual assault and forcing schools to confront the issue on campuses. But others contend that OCR's enforcement approach was too heavy-handed and that, in an effort to appease OCR, universities have not provided sufficient procedural protections to the accused.[11] For example, members of the

---

[2]   See DAVID CANTOR ET AL., REPORT ON THE AAU CAMPUS CLIMATE SURVEY ON SEXUAL ASSAULT AND SEXUAL MISCONDUCT, 23–26 (2015), https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

[3]   Id. at xv.

[4]   See CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY vii (2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.

[5]   Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, to Colleague 2 (Apr. 4, 2011) [hereinafter Dear Colleague Letter], http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[6]   See Kristen Lombardi, A Lack of Consequences for Sexual Assault, CTR. FOR PUB. INTEGRITY (Feb. 24, 2010, 12:00 PM), http://www.publicintegrity.org/2010/02/24/4360/lack-consequences-sexual-assault; Kayla Webley, Big Shame on Campus, MARIE CLAIRE (Oct. 16, 2013), http://www.marieclaire.com/politics/news/a8217/big-shame-on-campus/; Vanessa Grigoriadis, Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault, N.Y. MAG.: THE CUT (Sept. 21, 2014), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html.

[7]   Dear Colleague Letter, supra note 4 at 1.

[8]   Id. at 1–3, 7–14.

[9]   See Lavinia M. Weizel, Note, The Process That is Due: Preponderance of the Evidence as the Standard of Proof for University Adjudications of Student-on-Student Sexual Assault Complaints, 53 B.C. L. REV. 1613, 1642–55 (2012); Amy Chmielewski, Note, Defending the Preponderance of the Evidence Standard in College Adjudications of Sexual Assault, BYU EDUC. & L.J. 143, 149–56 (2013).

[10]   Katherine K. Baker, Deborah L. Blake & Nancy Chi Cantalupo, et al., Title IX and the Preponderance of the Evidence: A White Paper, FEMINIST LAW PROFESSORS (Aug. 4, 2016), http://www.feministlawprofessors.com/wp-content/uploads/2016/08/Title-IX-Preponderance-White-Paper-signed-10.3.16.pdf.

[11]   See William A. Jacobson, Accused on Campus: Charges Dropped, But the Infamy Remains, LEGAL INSURRECTION (May 16, 2015, 8:30 PM), http://legalinsurrection.com/2015/05/accused-on-campus-charges-dropped-but-the-infamy-remains/; see also Naomi R. Shatz, Feminists, We Are Not Winning the War on Campus Sexual

10

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

law faculty at both Harvard and the University of Pennsylvania have publicly called for greater procedural rights for accused students.[12] The popular press has also started to shine a spotlight on the experiences of men who say their universities never gave them a meaningful chance to defend themselves before finding them responsible for sexual misconduct and expelling them.[13]

Historically, courts for the most part have sided with schools. Writing for the majority in *Piarowski v. Illinois Community College*, Judge Posner explained why: "We are reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference."[14] Recently, however, in the wake of intensifying accused student litigation, courts across the country have started finding that aspects of the procedures and practices used at a number of schools to investigate and adjudicate reports of sexual misconduct violate principles of fundamental fairness, and in the case of public institutions, procedural due process.[15] For instance, on March 31, 2016, the Massachusetts District Court ruled in favor of a Brandeis University student who had been found responsible for "serious sexual transgressions."[16] The court wrote, "Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process."[17] The court was particularly troubled by the deprivation of the right to cross-examine the complainant[18] as well as the lack of

Assault, HUFFINGTON POST (Oct. 29, 2014, 6:44 PM), http://www.huffingtonpost.com/naomi-shatz/feminists-we-are-not-winn_b_6071500.html. See generally Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. KY. L. REV. 49 (2013); Barclay Sutton Hendrix, Note, A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings, 47 GA. L. REV. 591, 594 (2013); Ryan D. Ellis, Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus, 32 REV. LITIG. 65, 80–81 (2013).

[12] See Elizabeth Bartholet et al., Rethink Harvard's Sexual Harassment Policy, BOSTON GLOBE (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html; David Rudovsky et al., Open Letter from Members of the Penn Law School Faculty, Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities, PHILLY.COM (Feb. 18, 2015), http://media.philly.com/documents/OpenLetter.pdf.

[13] See Tovia Smith, Some Accused of Sexual Assault on Campus Say System Works Against Them, NPR (Sept. 3, 2014, 3:31 AM), http://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them; see also Emily Yoffe, The College Rape Overcorrection, SLATE (Dec. 7, 2014, 11:53 PM), http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html; Teresa Watanabe, More College Men Are Fighting Back Against Sexual Misconduct Cases, L.A. TIMES (June 7, 2014, 6:15 PM), http://www.latimes.com/local/la-me-sexual-assault-legal-20140608-story.html.

[14] Piarowski v. Illinois Community College Dist. 515, 759 F.2d 625, 629 (7th Cir.1985).

[15] See Jake New, Court Wins for Accused, INSIDE HIGHER EDUC. (Nov. 5, 2015), https://www.insidehighered.com/news/2015/11/05/more-students-punished-over-sexual-assault-are-winning-lawsuits-against-colleges. Some argue that because of the coercive actions of OCR, private schools have become state actors, which means that those students are entitled to the same constitutional rights as students at a public university. See Tamara Rice Lave, A Critical Look at how Top Colleges and Universities Are Adjudicating Sexual Assault, 71 U MIAMI L. R. 276 (2017).

[16] Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *4 (D. Mass. Mar. 31, 2016).

[17] Id. at *6.

[18] Id. at *33–35 ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns. . . . Here, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial

AR_00001250

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

notice about the underlying allegations.[19]

    This Task Force was created to evaluate and address procedural protections for both victims and the accused. It was comprised of a diverse assortment of leading figures who together represented the interests of all of those at the table: victims, the accused, universities, and others. The Task Force's job was to come up with a set of best practices that would protect the due process rights of the accused while also protecting the rights of victims. Despite the enormous undertaking (and some might say potential for irreconcilable differences), the Task Force was able to reach consensus on a set of best practices. In so doing, the Task Force expounds upon the work previously undertaken by the ABA Commission on Domestic & Sexual Violence in 2015. This report provides some additional clarification and discussion to our recommendations.

## I.  Schools Rights and Responsibilities

### A.  Cooperation and Independence from law Enforcement

    Some have suggested that universities should not adjudicate allegations of campus sexual assault or that the criminal justice system should take the lead. A recent bill in Georgia, for instance, would have forbidden schools from handling campus sexual assault unless and until there was a criminal investigation.[20] The Task Force was concerned that if a campus proceeding were tied to the criminal justice system that many instances of sexual misconduct would never be addressed. The Task Force believes it is appropriate for schools to resolve allegations of campus sexual misconduct for the protection and betterment of the campus community, as long as they do so fairly.

### B.  Investigation

    Advocates for complainants and respondents have both experienced schools not conducting a prompt, fair, and impartial investigation. All Task Force members agreed that it was critical for schools to fully and fairly investigate both sides of a complaint of sexual misconduct.

### C.  Confidentiality

    The Task Force spoke at length about issues regarding confidentiality. The Task Force wanted to ensure that the parties had access to necessary information in order to fairly adjudicate their case, but at the same time, it wanted to protect against confidential information being improperly distributed or disclosed. The Task Force was also concerned about parties not understanding the limits of school confidentiality, and members agreed it was imperative that they be informed.

## II.  Resolving Allegations of Sexual Misconduct

---

effect on the fairness of the proceeding.").
    [19] Id. at *33–34.
    [20] Jeremy Bauer-Wolf, Who Should Investigate Sexual Assaults, INSIDE HIGHER ED, April 11, 2017; https://www.insidehighered.com/news/2017/04/11/controversial-georgia-sexual-assault-bill-prompts-debate-reporting.

AR_00001251

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

### A.  Alternatives to Traditional Adjudication

The Task Force encourages schools to consider non-mediation alternatives to traditional adjudication such as restorative justice processes (RJ). The Task Force stresses that these alternatives should be research or evidence based and not simply a means or escape mechanism for schools to avoid fully and fairly resolving allegations of campus sexual misconduct. Since there is a lot of misunderstanding about restorative justice, this report will provide a brief description.[21] Before doing so, the Task Force wants to emphasize that RJ is only appropriate in certain circumstances, such as when the offender does not pose an immediate or ongoing danger. In addition, both parties must agree to participate in RJ, and should they withdraw their consent at any time, the process must be stopped.

As Tom Tyler explains: "Restorative Justice argues that the social goal that should dominate reactions to transgressions is to resolve the dispute via reintegrative shaming [which] . . . combines strong disapproval of bad conduct with respect for the person who committed those bad acts. The goal is restoring victims, offenders and the community."[22] Unlike mediation, which treats parties as neutral, the starting point for RJ is that "harm has been done and someone is responsible for repairing it."[23] This distinction is important because the 1997 Guidance Document,[24] the 2001 Guidance Document,[25] and the 2011 Dear Colleague Letter[26] told schools that they could not use mediation in cases of sexual assault, even if voluntary.

Although RJ is geared towards reintegrating the transgressing student back into the community, it is also dedicated to helping the victim heal and move forward. "A consensus of published studies is that sexual assault victims need to tell their own stories about their own experiences, obtain answers to questions, experience validation as a legitimate victim, observe offender remorse for harming them, (and) receive support that counteracts isolations and self-

---

[21]   This section on restorative justice is taken in its entirety from the Task Force Reporter's article on campus sexual assault. Tamara Rice Lave, Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases 48 ARIZONA STATE LAW JOURNAL 637, 696-700 (2016).

[22]   See Tom R. Tyler, Restorative Justice and Procedural Justice: Dealing with Rule Breaking, 62 J. SOC. JUST. 307, 315 (2006).

[23]   Mary P. Koss et al., Campus Sexual Misconduct: Restorative Justice Approaches to Enhance Compliance with Title IX Guidance, 15 TRAUMA, VIOLENCE, & ABUSE 242, 246 (2014). Koss argues that this distinction is important: Judicial "responses to sexual misconduct must acknowledge and obviate the negative effects of societal and individual norms that operate to silence victims and create opportunities for reabuse. When someone has been harmed by another person, mediation that provides neutrality and treats parties as equal partners in the resolution process is inappropriate." Id. at 245–46. Koss also argues that because of this difference, colleges can adopt RJ and not be in violation of the DCL. Id. at 246.

[24]   Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, U.S. DEP'T OF EDUC., http://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html (last visited Nov. 7, 2016) [hereinafter Sexual Harassment Guidance 1997].

[25]   U.S. DEP'T OF EDUC. OFFICE OF CIVIL RIGHTS, U.S. DEP'T OF EDUC., REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (2001) [hereinafter REVISED SEXUAL HARASSMENT GUIDANCE], https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf at 21.

[26]   Dear Colleague Letter, supra note 4 at 2.

AR_00001252

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

blame."[27] RJ responds to these needs. In conferencing (the most widely used model of RJ), the first meeting begins with the responsible person (otherwise known as the respondent or the accused) describing and taking responsibility for what he did and the victim describing the impact of the violation.[28] Family and friends of both are present for support and are given the opportunity to explain the impact of the harm.[29] A written redress plan is later formalized that describes "the concrete means through which the responsible person will be held accountable and remedy the impacts on victims and the community."[30] This can include counseling (sex offender treatment, drug and alcohol interventions, and anger management), community service, and victim restitution.[31] A one-year supervision period is put in place to monitor the responsible person and make sure that he meets his commitments.[32]

RJ has been shown to be effective at lowering recidivism and empowering victims in both academic and non-academic settings. A 2014 study by David Karp and Casey Sacks compared outcomes across three different college disciplinary processes: model code (a term used for the more traditional hearing conducted by a single hearing officer or panel),[33] restorative justice, and a combination of the two.[34] Karp and Casey used data from the STARR project, which has a total of 659 complete cases,[35] gathered from 18 colleges and universities across the United States[36] Although they cautioned that their results may be limited by the fact that they had few suspension-level cases, their findings showed that RJ provided a positive alternative to more traditional disciplinary proceedings. They "consistently found that restorative justice practices have a greater impact on student learning than model code hearings."[37]

Furthermore, RJ has been successfully adopted for juvenile sex offenses and adult sex crimes. RESTORE is one such program that uses conferencing, a widely used RJ methodology.[38] Mary Koss evaluated RESTORE using a sample of 66 cases involving sex crimes. Although caution is necessary due to the small sample size, the results are promising. Koss found that 63% of victims and 90% of responsible persons chose RJ; 80% of responsible persons completed all elements of their redress plan within one year (12 months), and post-conference surveys showed that in excess of 90% of all participants, including the victims, agreed that they felt supported, listened to, treated fairly and with respect, "and believed that the conference was a success."[39] Importantly, there were no incidents involving physical threats, and standardized assessments

---

[27]   Koss et al., supra note 22, at 246–47.
[28]   Id. at 248.
[29]   Id.
[30]   Id.
[31]   Id.
[32]   Id.
[33]   David R. Karp & Casey Sacks, Student Conduct, Restorative Justice, and Student Development: Findings from the STARR Project: A Student Accountability and Restorative Research Project, 17 CONTEMP. JUST. REV. 154, 156 (2014). "The model code calls for a hearing process that is conducted by a single hearing officer or a volunteer board, often composed of students, faculty, and staff. While proponents of the model code highlight that the hearing is not a criminal trial, it has many of the similarities to the courtroom process." Id.
[34]   See id.
[35]   Id. at 162.
[36]   Id. at 160.
[37]   Id. at 169.
[38]   See Koss et al., supra note 22, at 248.
[39]   Id. (internal citation omitted).

14

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

showed decreases in victim posttraumatic stress disorder symptoms from intake to post conference.[40]

Even if RJ is not used as an alternative resolution process, schools should consider using it as a complement to a formal adjudicatory hearing.  Koss has outlined how this can be done.[41]  For instance, it could be used to determine the appropriate sanction after a finding of responsibility has been made and/or as a reintegration process once the responsible student has finished his sanction.

## B. The Adjudicatory versus Investigatory Model

The Task Force has a preference for the adjudicatory model versus the investigatory model because it allows for live testimony and it helps to offset bias.  The Task Force was particularly concerned by the use of the single model investigatory model, in which the same person who investigates also determines whether a violation of school policy occurred.

As the Supreme Court acknowledged in *Withrow v. Larkin* (1975), a "fair trial in a fair tribunal is a basic requirement of due process"[42] and it applies to both court cases and hearings before administrative agencies. [43] "Not only is a biased decisionmaker constitutionally unacceptable," the Court wrote, "but 'our system of law has always endeavored to prevent even the probability of unfairness.'"[44] Congress recognized the importance of role separation when it unanimously passed the Administrative Procedure Act (APA) in 1946.[45] The APA *specifically* bars an individual from performing both an investigatory and an adjudicatory role.[46]

### a.   *Implicit Bias*[47]

Part of the problem with putting everything in the hands of one person is that even an administrator with the best of intentions is almost certainly biased in some way.[48] This poses a concern not just for accused students but also the student who reports being the victim of sexual misconduct. Implicit biases (or unconscious stereotypes) have been shown to affect judgment and produce discriminatory behavior. [49] These include biases based on race, gender, ethnicity, nationality, social status, and weight.

---

[40]      Id.

[41]      See Koss et al., supra note 22, at 250, 252–53.

[42]      Withrow v. Larkin, 421 U.S. 35, 46 (1975) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

[43]      Gibson v. Berryhill, 411 U.S. 564, 579 (1973).  This paragraph was taken from Ready, Fire, Aim supra note 19 at 672.

[44]      Withrow, 421 U.S. at 47 (quoting In re Murchison, 349 U.S. at 136).  The Task Force acknowledges that Court has held that combining investigatory and adjudicatory functions does not necessarily violate due process, but the cases in which it upheld the combination of functions differ in important ways from the university proceedings at issue here.  See Lave, supra note 20 at 673-674.

[45]      See Walter Gellhorn, The Administrative Procedure Act: The Beginnings, 72 VA. L. REV. 219, 231–32 (1986) (internal citations omitted). The Task Force thanks Ed Rubin for this point.

[46]      See Administrative Procedure Act, 5 U.S.C. §§ 554 (d)(2), 557 (2012).

[47]      This section on implicit bias was taken from Ready, Fire, Aim, supra note 20 at 674-75.

[48]      For a comprehensive overview of studies showing bias in the courtroom, see Jerry Kang et al., Implicit Bias in the Courtroom, 59 UCLA L. REV. 1124 (2012).

[49]      See John T. Jost et al., The Existence of Implicit Bias is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies that No Manager Should Ignore, 29 RESEARCH ORG. BEHAV. 39, 51 (2009).

AR_00001254

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

### b.   *Confirmation Bias*[50]

Confirmation bias— the tendency for people to seek or interpret evidence in a manner that is partial to existing beliefs, expectations or an existing hypothesis[51]—poses a particular challenge to the fairness of the single-model investigatory model. Confirmation bias has "proven strikingly robust across diverse domains of human thinking, including logical problem solving, social interaction and medical reasoning."[52]

Researchers have also shown how confirmation bias can infect criminal investigations. Kassin, Goldstein and Savitsky (2003) demonstrated that interrogators who had been cued to believe that most suspects were guilty chose more guilt-presumptive questions, used more interrogation techniques (including the presentation of false evidence), were more aggressive in questioning innocent suspects, and more likely to view a suspect as guilty.[53] They also found that an interrogator's presumption of guilt affected the behavior of those being questioned and made impartial observers more likely to judge them guilty.[54] Ask and Granhag (2007) found that experienced investigators judged witness statements differently depending on whether the statement was consistent or inconsistent with their initial theory.[55] Although Ask, Rebelius, and Granhag showed that investigators will be more receptive to certain kinds of evidence (such as DNA), the kind of evidence that is most likely to be proffered at college adjudicatory hearings, witness testimony, is the most subject to confirmation bias.[56]

Confirmation bias means that the accused student is unlikely to be treated fairly when the same person who is conducting the investigation will also be rendering the final determination in the case. As the court explained in *Doe v. Brandeis University*:

> The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.[57]

## IV.   The Hearing

### C.  Participation in the Proceedings

The Task Force's recommendations for admissibility of personal statements are modeled on a defendant's Sixth Amendment confrontation rights (testimonial statements are inadmissible

---

[50] This section on confirmation bias is taken from Ready, Fire, Aim, supra note 20 at 676-77.

[51]   Raymond S. Nickerson, Confirmation Bias: A Ubiquitous Phenomenon in Many Guises, 2 REV. GEN. PSYCHOL. 175, 175 (1998).

[52]   Karl Ask et al., The 'Elasticity' of Criminal Evidence: A Moderator of Investigator Bias, 22 APPLIED COGNITIVE PSYCHOL. 1245, 1246 (2008) (internal citations omitted).

[53]   Saul M. Kassin, Christine C. Goldstein & Kenneth Savitsky, Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt, 27 L. & HUM. BEHAV. 187, 187 (2003).

[54]   Id.

[55]   Karl Ask & Par Anders Granhag, Motivational Bias in Criminal Investigators' Judgments of Witness Reliability, 37 J. APPLIED SOC. PSYCHOL. 561, 579 (2007).

[56]   Karl Ask et al., supra note 54, at 1257–58.

[57]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *36 (D. Mass. Mar. 31, 2016).

AR_00001255

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

unless the declarant is unavailable and has been subject to prior cross examination)[58] and the federal rules of evidence (a defendant cannot simply admit his own prior statement about what happened). [59] Importantly, The Task Force's recommendations provide less opportunity for confrontation than is provided by the Sixth Amendment, however they do provide for the opportunity for both parties to ask questions through the hearing chair.  In addition, they do not allow either side to present their personal statement about what occurred unless they are willing to be questioned by both the school and indirectly by the other party.

### D.  Asking Questions[60]

Part of the reason why the Task Force prefers the adjudicatory method is because it gives the decision-maker(s) the opportunity to hear live testimony, both from the parties and from witnesses. Not giving the accused the right to question his accuser seriously impairs his right to a fair and accurate determination of responsibility. In *Goldberg v. Kelley* (1970), the Supreme Court wrote that in almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[61] The right to ask questions is not a mere formality; the Court has called cross-examination "the 'greatest legal engine ever invented for the discovery of truth'."[62] As the court in *Doe v. Brandeis University* explained, cross-examination is particularly important in credibility contests where there are no witnesses or other extrinsic evidence.[63]

Social science research supports the importance courts and the Task Force place in cross-examination. Although researchers have shown people are not very good at judging a person's veracity based on his demeanor,[64] cross-examination is still an important vehicle for discerning truth.[65] This is because a witness's cognitive limitations make it demonstrably more difficult for him to consistently answer spontaneous questions under live cross-examination if he is being insincere.[66] In addition, there is certain observable behavior that has been linked to deception, such as vocal tension and pitch.[67] At least one study has shown that subjects are more than twice as

---

[58]   Crawford v Washington 541 U.S. 36 (2004).

[59]   See U.S. v Phelps 572 F. Supp. 262, 265 (E.D. Ky. 1983) ("The statement of a party may be introduced as an admission only when offered against that party. This principle is reflected by the standard but often unanalyzed objection that such testimony by a party constitutes a 'self-serving declaration.'")

[60]   This section on asking question is taken from Ready, Fire, Aim supra note 20 at 678-80.

[61]   Goldberg v. Kelly, 397 U.S. 254, 269 (1970).

[62]   Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting California v. Green, 399 U.S. 149, 158 (1970)).

[63]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *35 (D. Mass. Mar. 31, 2016).

[64]   See Aldert Vrij, Why Professionals Fail to Catch Liars and How They Can Improve, 9 LEGAL & CRIMINOLOGICAL PSYCHOL. 159, 166-167 (2004); see also Bella M. De Paulo et al., Cues to Deception, 129 PSYCHOL. BULL. 74 (2003) (conducting a meta-analysis of 120 independent samples and finding that behavior commonly associated with deception such as unwillingness to maintain eye contact were not in fact related).

[65]   See Raymond LaMagna, Note, (Re)Constitutionalizing Confrontation: Reexamining Unavailability and the Value of Live Testimony, 79 S. CAL. L. REV. 1499, 1506 (2006).

[66]   Chris William Sanchirico, Evidence, Procedure, and the Upside of Cognitive Error, 57 STAN. L. REV. 291, 332–44 (2004).

[67]   See De Paulo et al., supra note 66 at 95–96.

AR_00001256

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

effective at detecting deception when they are able to observe a speaker's body and hear his voice as opposed to simply reviewing a written transcript.[68]

Although the Task Force recognizes the importance of questioning, it also acknowledges the value of protecting victims from unnecessary trauma.[69] The Task Force believes that allowing questions to be asked through the decision-maker balances these two important interests. Although the Task Force recognizes that such a process interrupts the spontaneity of direct questioning, it has the benefit of having an independent person assess whether the question is relevant and appropriate. It also removes the potential trauma from having a victim be directly questioned by her assailant. Although such a barrier may not be appropriate in the criminal justice context, the Task Force believes it is appropriate in the school context.

## V.   Determining whether a violation occurred

### A. Composition of Panel[70]

The Task Force was concerned by how bias can undermine fair decision-making. Specialized training has been shown to reduce bias[71] as has a longstanding and deep personal commitment to eradicating personal bias.[72] Ironically, the commitment to be objective may just exacerbate the problem. Studies have shown that subjects who profess to be objective are more likely to make biased decisions.[73]

Changing the context in which people are rendering decisions, however, may be the most effective way of promoting objectivity. Specifically, a larger and more diverse hearing body has been shown to increase the quality of deliberation and reduce bias. One study looked at the effects of having a racially homogeneous versus a heterogeneous jury.[74] It found that on every relevant measure, racially heterogeneous groups outperformed homogeneous ones. Not only did racially

---

[68]   See Michael J. Saks, What Do Jury Experiments Tell Us About How Juries (Should) Make Decisions, 6 S. CAL. INTERDISC. L.J. 1, 21–22 (1997).

[69]   Some researchers reported that criminal proceedings are a negative experience for victims, calling them "disruptive" (Patricia Cluss et al., The Rape Victim: Psychological Correlates of Participation in the Legal Process, 10 CRIM. JUST. & BEHAV. 342, 354 (1983)), "hurtful" (Rebecca Campbell et al., Preventing the "Second Rape": Rape Survivors' Experiences with Community Service Providers, 16 J. INTERPERSONAL VIOLENCE 1239, 1250 (2001)), or "suggest[ing] that [they] are frequently a source of secondary victimization for the crime victims involved" (Uli Orth, Secondary Victimization of Crime Victims by Criminal Proceedings, 15 SOC. JUST. RES. 313, 321 (2002)). Others studies came to a different conclusion about the effect of legal proceedings on victim well-being. Frazier and Haney found that victims had a negative impression of the legal system, but their "findings [did] not support the belief that victims experience a 'secondary victimization' due to their involvement with the criminal justice system. (Patricia A. Frazier & Beth Haney, Sexual Assault Cases in the Legal System: Police, Prosecutor, and Victim Perspectives, 20 LAW & HUM. BEHAV. 607, 620, 626) (1996)).

[70]   This discussion on Composition of Panel is taken from Ready, Fire, Aim supra note 20 at 675.

[71]   See Kang et al., supra note 47 at 1227.

[72]   Gordon B. Moskowitz et al., Preconsciously Controlling Stereotyping: Implicitly Activated Egalitarian Goals Prevent the Activation of Stereotypes, 18 SOC. COGNITION 151, 155 (2000).

[73]   Eric Luis Uhlmann & Geoffrey L. Cohen, "I Think It, Therefore It's True": Effects of Self-Perceived Objectivity on Hiring Discrimination, 104 ORGANIZATIONAL BEHAV. & HUM. DECISION PROCESSES 207, 210–11 (2007).

[74]   Samuel R. Sommers, On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations, 90 J. PERSONALITY & SOC. PSYCHOL. 597, 597 (2006).

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

diverse groups spend more time deliberating, but also they discussed a wider range of case facts and personal perspectives. They also made fewer factual errors than all-white juries.[75] It is for these and other reasons that the Task Force recommends that there be at least three decision-makers who determine whether a violation occur and that the panel be diverse.

**Conclusion**

Adjudicating campus sexual assault is a high stakes event. If a school finds a person responsible for sexual misconduct who did *not* actually do it (i.e., a false positive), then that person will unfairly suffer potentially life-altering consequences. If, on the other hand, a school finds a person not responsible who *did* commit the misconduct (i.e., a false negative) then the school has deprived a victim of justice and potentially endangered the entire community.

With stakes this high, the Task Force agreed that fair processes are critical. Advocates for victims want to ensure that schools don't simply dismiss them as untruthful, and advocates for respondents want to make sure that schools don't just assume that they are guilty. Similarly, representatives of schools want to keep their communities safe, while at the same time having processes that minimize mistakes.  All agreed that the best way to achieve this fair and objective approach was by having the school fully and fairly investigate both sides of the story and then provide an impartial forum for determining what occurred.

The Task Force believes that these recommended best practices go far towards achieving these goals. The Task Force recognizes that colleges and universities are not all alike, and that limited resources may constrain the ability of schools to follow some of these recommendations. The Task Force hopes, however, that it has provided a clear path for colleges and universities to fully and fairly adjudicate allegations of campus sexual misconduct – or at least strive earnestly to do so.

---

[75]    A diverse hearing body has another benefit. Ultimately, whoever is deciding the case must assess the credibility of witnesses, which can be difficult when people come from different cultures. See Vrij, supra note 66 at 167.

AR_00001258

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

## **Task Force Participants**

### **Chair**

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team Seyfarth
Shaw LLP
Chicago, IL & Washington D.C.

### **Reporter**

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

### **Members**

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

20

DRAFT (MAY 25, 2017) – NOT FOR PUBLIC RELEASE

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

**Liaison**

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**ABA Staff Liaison**

**Patrice Payne**
Senior Staff Attorney, Criminal Justice Section
Washington D.C.

21

**<u>Relevant Experience of Task Force Participants</u>**

**<u>Chair</u>**

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team
Seyfarth Shaw LLP
Chicago, IL & Washington D.C.

(Andrew was a federal prosecutor for eight years.)

**<u>Reporter</u>**

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

(Tamara has published one op-ed and three scholarly articles on campus sexual assault. She co-sponsored a 2016 AALS Hot Button panel on the issue, which the Weekly Standard described as "A real dialogue for a change." Tamara has also been an advisor for students in sexual misconduct cases. Before getting her PhD, Tamara was a deputy public defender in San Diego where she handled a variety of cases, including child molestation and rape.)

**<u>Members</u>**

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

(Pam is among a group of higher-education Title IX experts, administrators, and lawyers who has advised Senator Clair McCaskill's staff, members of the White House Task Force to Protect Students From Sexual Assault, and the Department of Education and its Office of Civil Rights.)

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

(Carrie was the White House Advisor on Violence Against Women from March 2015-January 2016. She advised President Obama and Vice-President Biden on domestic violence and sexual assault issues.)

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

1

(Rob has represented students alleged to have committed sexual assault. He was one of the lawyers in the infamous 2006 Duke Lacrosse case.)

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

(Laura is a victim-turned-victims' rights attorney who has represented complainants in campus hearings across the country. Senator Patrick Leahy recognized Dunn on the floor of the U.S. Senate while Chairman of the Senate Judiciary Committee and Vice President Joe Biden invited her as a VIP guest to the signing of the 2013 VAWA Reauthorization as well as the release of the It's On Us Campaign at the White House. Laura is a member of the ABA Commission on Domestic and Sexual Violence, and a liaison for the ALI Sexual and Gender Based Misconduct Project.)

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

(Cynthia advocates across the country for students alleged to have committed sexual misconduct.)

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

(Marcos has represented students in campus sexual misconduct hearings.)

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

(Janet advises schools with regard to sexual misconduct and is an instructor for the National Association of College and University Attorney's popular Title IX coordinator training course. She has spoken at more than 500 schools and conference and is the co-author of the NCAA's manual on gender equity.)

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

(Bridget served as E.O. Officer for Policy and Legal Compliance and Deputy Title IX Coordinator at the University of Virginia, where she managed the University's compliance with a variety of employment and civil rights laws, including Title IX. During her tenure at UVA, Bridget helped revised the University's Title IX policies and procedures, trained faculty and staff, conducted and managed investigations into reports of misconduct, and

2

served on the threat assessment panel responsible for evaluating University action with respect to allegations of sexual or gender-based harassment and violence.)

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

(Robin is a member of the ABA Civil Rights and Social Justice (CRSJ) Section. From 2003 to 2009, Robin was director of the Commission on Domestic Violence at the American Bar Association.)

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

(Laura is responsible for oversight, implementation and coordination of programs and offices that ensure equity and access across the Stanford community, including Title IX and sexual violence prevention programs. She has been an advisory member to the Stanford Board on Judicial Affairs since 2008 and part of the Provost's Task Force on Sexual Assault. Laura helped draft the current Student Title IX Process as well as the Administrative Title IX Process. Laura is also a former deputy district attorney who prosecuted both juvenile sexual assault and misdemeanor domestic violence cases.)

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

(Brenda is the Project Director for the United States Department of Justice, National Institute of Corrections Cooperative Agreement on Addressing Prison Rape. She is also a board member of the Black Women's Health Initiative.)

**<u>Liaison</u>**

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

(Mary is co-editor a two book series for the American Psychological Association, *Violence Against Women and Children (2011)*. She published the first national study on acquaintance rape in 1987 and developed the most frequently used survey to measure unwanted sexual experiences. She is a member of the working group to develop a Best Practices manual for the assessment of campus climate and a second group to develop and advocate for innovation in collegiate response to sexual misconduct within OCR and VAWA guidelines. She has been selected by the American Public Health Association and the US Departments of Justice and Education to serve on the CDC Think Tank to create a

AR_00001263

comprehensive approach to sexual violence prevention as part of *Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault.* She was the 8th recipient of the Visionary Award from End Violence Against Women International, the law enforcement training and technical assistance organization. In 2013 the Mary P. Koss Profile in Courage Award was created by the One in Four USA Organization to honor her career contributions to using science to heighten awareness of rape.)

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

(Elise has worked primarily on programs that focus on the design, implementation, and evaluation of interventions related to adolescent substance abuse, trauma-informed care, sexual health, and sexual violence. She is currently a project manager for two federally-funded sexual violence prevention and response projects at MEZCOPH, and serves as the site preceptor for undergraduate students who are interested in sexual assault research and policy.)

4

@aol.com

| | |
|---|---|
| **From:** | **PII** @aol.com |
| **Sent:** | Tuesday, May 30, 2017 2:05 PM |
| **To:** | Jackson, Candice |
| **Cc:** | **PII** @aol.com |
| **Subject:** | Thank You |
| **Attachments:** | AFalseAccusationCanSpellEndOfCollegeMalesFutureBostonGlobe.doc; SBIAffirmativeConsentUYoungMensRightsinPeril.docx; SexTheNewWarOnMenNCFM.docx; TheDenialOfDueProcessMayBankruptUniversitiesNCFM.docx; NCFMAdviserGordonFinleyTheRealReasonDemocratsOpposeEducatioSecretaryBetsyDeVos.docx |

Ms. Jackson, thank you very much for your kind call today.  It's always nice to know that someone actually reads what you write.  I am pasting below and attaching five other pieces I have written on issues related to sexual assault that I have on my home computer.  Please feel free to contact me if you have any questions.

Gordon E. Finley, Ph.D.
Professor of Psychology Emeritus
Florida International University
Miami
cell: **PII**
faculty web site: **http://psychology.fiu.edu/faculty/gordon-finley/**
Research & scholarly publications uploaded on ResearchGate:
https://www.researchgate.net/profile/Gordon_Finley/stats
-------------------------

# A false accusation can spell end of college male's future

The letter below was published in *The Boston Globe* on Saturday October 18, 2014 and is followed by the responded to op-ed signed by 28 former and current members of the Harvard Law Faculty demanding that Harvard change it's sexual misconduct policy to provide greater protections for the accused.

Gordon E. Finley, Ph.D.

# A false accusation can spell end of college male's future

http://www.bostonglobe.com/opinion/editorials/2014/10/17/false-accusation-can-spell-end-college-male-future/LZaqmN6RNjNX6hYdrbs16H/story.html

RE "RETHINK Harvard's sexual harassment policy" (Op-ed, Oct. 15): While the

AR_00001265

legal critiques of the Harvard Law School faculty members are critically important, so too, from a psychological perspective, are false sexual allegations by women. Such allegations are dismissed by proponents of affirmative consent policies, who say that women never lie about rape, or who cite a 3 percent to 8 percent rate of false allegations.

A recent summary of the false abuse and rape allegation literature can be found in a 2013 book by Phillip Cook and Tammy Hodo titled "When Women Sexually Abuse Men." While statistics in this literature are problematic, Cook and Hodo report four studies that found false allegation rates of 62 percent, 41 percent, 50 percent, and 60 percent.

Proponents of these policies also demand an evidentiary standard of "preponderance," which basically is a coin toss where all a university administrative committee needs to deem a man guilty of sexual assault and expel him is a smidgen above 50 percent.

This "preponderance" standard raises the likelihood that a college male who engaged in consensual sex will be wrongly convicted and expelled. Once this happens, that college male has no future.

Fair?

Gordon E. Finley

Miami

---

http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html?s_campaign=8315

## Rethink Harvard's sexual harassment policy

*In July, Harvard University announced a new university-wide policy aimed at preventing sexual harassment and sexual violence based on gender, sexual orientation, and gender identity.*
*The new policy, which applies to all schools within the university and to all Harvard faculty, administrators, and students, sets up the Office for Sexual and Gender-Based Dispute Resolution to process complaints against students. Both the definition of sexual harassment and the procedures for disciplining students are new, with the policy taking effect this academic year. Like many universities across the nation, Harvard acted under pressure imposed by the federal government, which has threatened to withhold funds for universities not complying with its idea of appropriate sexual harassment policy.*

*In response, 28 members of the Harvard Law School Faculty have issued the following statement:*

AS MEMBERS of the faculty of Harvard Law School, we write to voice our strong objections to the Sexual Harassment Policy and Procedures imposed by the central university administration and the Corporation on all parts of the university, including the law school.

We strongly endorse the importance of protecting our students from sexual misconduct and providing an educational environment free from the sexual and other harassment that can diminish educational

opportunity. But we believe that this particular sexual harassment policy adopted by Harvard will do more harm than good.

As teachers responsible for educating our students about due process of law, the substantive law governing discrimination and violence, appropriate administrative decision-making, and the rule of law generally, we find the new sexual harassment policy inconsistent with many of the most basic principles we teach. We also find the process by which this policy was decided and imposed on all parts of the university inconsistent with the finest traditions of Harvard University, of faculty governance, and of academic freedom.

Among our many concerns are the following:

**Harvard has adopted procedures** for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation. Here our concerns include but are not limited to the following:

■ The absence of any adequate opportunity to discover the facts charged and to confront witnesses and present a defense at an adversary hearing.

■ The lodging of the functions of investigation, prosecution, fact-finding, and appellate review in one office, and the fact that that office is itself a Title IX compliance office rather than an entity that could be considered structurally impartial.

■ The failure to ensure adequate representation for the accused, particularly for students unable to afford representation.

**Harvard has inappropriately** expanded the scope of forbidden conduct, including by:

■ Adopting a definition of sexual harassment that goes significantly beyond Title IX and Title VII law.

■ Adopting rules governing sexual conduct between students both of whom are impaired or incapacitated, rules which are starkly one-sided as between complainants and respondents, and entirely inadequate to address the complex issues in these unfortunate situations involving extreme use and abuse of alcohol and drugs by our students.

**Harvard has pursued** a process in arriving at its new sexual harassment policy which violates its own finest traditions of academic freedom and faculty governance, including by the following:

■ Harvard apparently decided simply to defer to the demands of certain federal administrative officials, rather than exercise independent judgment about the kind of sexual harassment policy that would be consistent with law and with the needs of our students and the larger university community.

■ Harvard failed to engage a broad group of faculty from its different schools, including the law school, in the development of the new sexual harassment policy. And Harvard imposed its new sexual harassment policy on all the schools by fiat without any adequate opportunity for consultation by the relevant faculties.

■ Harvard undermined and effectively destroyed the individual schools' traditional authority to decide discipline for their own students. The sexual harassment policy's provision purporting to leave the schools with decision-making authority over discipline is negated by the university's insistence that its Title IX compliance office's report be totally binding with respect to fact findings and violation decisions.

We call on the university to withdraw this sexual harassment policy and begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.

The goal must not be simply to go as far as possible in the direction of preventing anything that some might

characterize as sexual harassment. The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom. The law that the Supreme Court and lower federal courts have developed under Title IX and Title VII attempts to balance all these important interests. The university's sexual harassment policy departs dramatically from these legal principles, jettisoning balance and fairness in the rush to appease certain federal administrative officials.

We recognize that large amounts of federal funding may ultimately be at stake. But Harvard University is positioned as well as any academic institution in the country to stand up for principle in the face of funding threats. The issues at stake are vitally important to our students, faculties, and entire community.

*Elizabeth Bartholet*

*Scott Brewer*

*Robert Clark*

*Alan Dershowitz, Emeritus*

*Christine Desan*

*Charles Donahue*

*Einer Elhauge*

*Allen Ferrell*

*Martha Field*

*Jesse Fried*

*Nancy Gertner*

*Janet Halley*

*Bruce Hay*

*Philip Heymann*

*David Kennedy*

*Duncan Kennedy*

*Robert Mnookin*

*Charles Nesson*

*Charles Ogletree*

*Richard Parker*

*Mark Ramseyer*

*David Rosenberg*

*Lewis Sargentich*

*David Shapiro, Emeritus*

*Henry Steiner, Emeritus*

*Jeannie Suk*

*Lucie White*

*David Wilkins*

------------------

## 'Affirmative Consent' U

**Young Men's Rights in Peril**

The op-ed below was published as the lead opinion piece in *The Santa Barbara Independent* on Monday August 11, 2014 and comments are invited at the end of the critique. For re-posting this copyrighted material, please use the link below. While the focus is on California's SB 967 the issues raised also apply to bills currently introduced in Congress.

Dianna Thompson and Gordon E. Finley, Ph.D.

http://www.independent.com/news/2014/aug/11/affirmative-consent-u/

# 'Affirmative Consent' U

By Dianna Thompson and Gordon E. Finley

Young Men's Rights in Peril

**Monday, August 11, 2014**

Rape and sexual assault are very serious crimes, and we applaud efforts to protect both male and female students on California campuses. However, SB 976 introduced by State Senators Kevin de Leon (D-Los Angeles) and Hannah-Beth Jackson (D-Santa Barbara) would initiate harmful changes with disastrous consequences for California's sons.

The bill adopts the "preponderance of evidence" standard. That is a lower bar than the "beyond reasonable doubt" standard used in the criminal courts or the middle-ground "clear and convincing evidence" standard typically used in matters with serious consequences to the accused. In the college

AR_00001269

setting, the accused will be saddled with a lifetime "sex offender" stigma because of an ambiguous social interaction, not a forcible rape.

The U.S. Department of Justice data reveals that rape on college campuses has declined precipitously from 1995 to a historic low today. Rather than celebrate this achievement, SB 967 radically redefines "sexual assault" to include almost any touching of one person by another without prior "affirmative consent."

To avoid being accused of sexual assault, consent must be ongoing throughout a sexual encounter and can be revoked at any time — including months later. Regardless of whether an existing dating relationship between the people involved existed, or past sexual encounters with each other happened, it can't be assumed to be an indicator of consent.

SB 967 moved to the Assembly after a report, authored by the White House Task Force to Protect Students from Sexual Assault, stated that one in five women are sexually assaulted while at college. This statistic is utterly false and scores of articles point this out.

## False Allegations

Tragically, SB 967 would dramatically increase the number of he said/she said sexual assault allegations. When bill co-author Assemblymember Bonnie Lowenthal (D-Long Beach) was asked how an innocent person is to prove he or she indeed received consent, Lowenthal said, "Your guess is as good as mine. I think it's a legal issue. Like any legal issue, that goes to court."

The problem is that under SB 967, allegations of sexual assault do not go to court but rather to a university administrative committee comprised of faculty, students, and administrators. Such committees deny California's accused sons of the kinds of basic evidentiary, due process, and cross-examination rights found in criminal courts. Sexual assault charges should be handled by those trained to do so — the police and the criminal justice system.

While being a victim is devastating, so too is being falsely accused. In 2002, Wanetta Gibson falsely accused fellow California high school student Brian Banks of rape. Luckily, Brian was exonerated in 2012 after Wanetta was later caught on tape admitting that he was innocent.

## Lawsuits

Critically, a growing number of the students who have been disciplined or expelled for false allegations of sexual assault are filing lawsuits against their schools. The number of publically reported lawsuits filed by sons whose lives have been ruined by campus tribunals now exceed 30 and are growing daily.

As Californians, do you want your educational tax dollars spent to pay off totally unnecessary lawsuits?

## Reduced Male Attendance

Today's educational gender gap is the opposite of what it was in the 1960s. Then, about 60 percent of advanced degrees were awarded to men. Today it is about 40 percent. California's sons already are in the minority, and their number would be further reduced by the hostile and dangerous work environment SB 967 would create on campus.

Parents and sons will run a very high risk of losing their education dollars while the son would be permanently banned from further higher education because of his "conviction." Why would any parent want to support SB 967 and expose their sons to the prospects of lifelong losses in finances, education, employment, marriage, family formation, and home buying?

Attenuating sexual misconduct on the part of both male and female perpetrators is without question a worthy cause. However, seeking that goal by denying due process, evidentiary, and cross-examination protections of the accused is unfair to the accused and fails to meet the U.S. Supreme Court standard of "Equal Justice Under Law."

We urge the sons and the parents of sons in California to band together to defeat SB 967.

*Dianna Thompson is director of Stop Abuse for Everyone. Gordon E. Finley is professor emeritus of psychology at Florida International University.*

---- --------

# *Sex: The New War on Men*

Gordon E. Finley, Ph.D.

The op-ed below was posted on the web site of the National Coalition for Men and several other web sites in early May 2014.

http://ncfm.org/2014/05/action/ncfm-advisor-gordon-finley-ph-d-sex-the-new-war-on-men/

# Sex: The New War on Men

## Gordon E. Finley, Ph.D.

It cannot have escaped anyone's notice that on May Day (May 1, 2014), and within hours of one another, the nation and the media have been bombarded with more than a half dozen exquisitely choreographed and coordinated reports demanding action based on claims of skyrocketing sexual assaults occurring on campus and on the battlefield.

But are these claims plausible? I argue not.

Singly, or in combination, all of these claims suffer from one or more of the following five fatal flaws.

1. Sexual allegations made by females are not taken as allegations but rather as "settled fact." These claims do not even consider the possibility that women might lie about any manner of things sexual and there is no statistical correction for false sexual allegations.

AR_00001271

2.  Women commit sexual assaults on men but female sexual perpetrators only rarely are prosecuted and male reports of abuse by female sexual predators only rarely are believed.

3.  In order to "cook" the rapidly rising numbers needed for political effect, the Obama Administration has demanded that all investigations lower the standard of proof required for conviction or expulsion from "clear and convincing" evidence to a "preponderance" of evidence, which basically is a coin toss.

4.  In order to falsely boost the rapidly rising numbers needed for political effect, the Obama Administration has moved the goal posts by expanding the definition of "sexual assault" to activities and circumstances most citizens would not even remotely consider to be rape.  The former definition of forcible rape has morphed into anything sexual without "consent" and with the determination of "consent" left entirely up to the woman, even to be determined on the morning after.

5.  Forcible rape is ranked second only to murder as a serious crime.  Yet, Obama and the Progressives want to remove the investigation and prosecution of sexual crimes from the venues of the police and the courts and rather transfer these responsibilities to unqualified but ideologically sympathetic administrative units in universities and the military where the conclusion is foregone.  Under Obama and the Progressives, men are stripped of all due process and cross-examination rights that they normally would be guaranteed in a court of law. Truly innocent men have no way to prove their innocence.

Finally: Men — don't drink and have **sex**.  A core principle of the Obama Administration's New World Order is this: If alcohol crosses anyone's lips, the male automatically is guilty of sexual assault and the female automatically is an innocent victim. With the consumption of any amount of alcohol, consensual *sex* does not exist.

The overwhelming onslaught of exquisitely choreographed and coordinated claims suggests that Obama and the Progressives are launching a War on Men to get the votes of women and advance their political base.  This War clearly is designed to create not only "hostile work environments" but "dangerous work environments" for men on campus and in the military.  This War further appears to be designed to eliminate men from the institutions to which they have striven and attained in the past and rapidly to make these coveted, prestigious and high paying positions open only to the political base of Obama and the Progressives.

Will Congress and the nation succumb to this loss of due process for men?

One hopes not.  In my view, the words engraved above the entrance to the United States Supreme Court should prevail and apply equally to the sexual lives of both men and women:  "Equal Justice Under Law."

*Gordon E. Finley, Ph.D. is Emeritus Professor of Psychology at Florida International University.  His faculty web site is:*

http://psychology.fiu.edu/faculty/gordon-finley/

-----------------

# The Denial of Due Process May Bankrupt Universities

The op-ed below was posted on the web site of the National Coalition for Men and several others on or about August 24, 2014.

Gordon E. Finley, Ph.D.

http://ncfm.org/2014/08/action/ncfm-adviser-gordon-finley-urges-governor-brown-not-to-sign-sb-967-which-denies-due-process-to-college-students-accused-of-sexual-assault/

# The Denial of Due Process May Bankrupt Universities

Gordon E. Finley, Ph.D.

With now literally hundreds of editorials and op-eds taking positions both pro and con on California's SB 967 – as well as the broader issue of "affirmative consent" for sexual relations — it is virtually certain that the California legislature will pass and send to Governor Brown's desk SB 967 in the coming week. The bill is titled: "Student safety: sexual assault."

Writing as a faculty member of more than four decades in four universities, it is tragically clear that this campus rape crusade bill presumes the veracity of accusers (a.k.a. "survivors") and likewise presumes the guilt of accused (virtually all men).  This is nice for the accusers – both false accusers as well as true accusers — but what about the **due process** rights of the accused?

Critically, and the reason why men are winning very substantial lawsuits against universities, is that the fact that the current campus rape crusade explicitly denies men fundamental *due process* rights such as the right to a lawyer, the right to cross-examine, and the right to evidentiary standards (clear and convincing evidence) appropriate to the consequences for the accused. Simultaneously, the campus rape crusade provides every conceivable aid and assistance to the accusers to prosecute the accused. This would be difficult to describe as "fair."

If the ideologically tainted advocates in the administration, in Congress, and on campus continue this crusade against male students, it is possible that colleges and universities – as well as taxpayers — will be spending more money on administering these laws and on lawsuit pay-outs than on instruction.  Further, and as more and more men win due process denial lawsuits (this is a slam dunk because the denial of due process for the accused explicitly is written into the laws) the rate of such lawsuits will grow exponentially.

The solutions are to drop the fraudulent "1 in 5″ campus rape claims of the administration, return to the definition of "Forcible Rape" (rather than "affirmative consent") for sexual assault, and prosecute crimes that are

AR_00001273

ranked second only to murder in the criminal justice system which is trained and designed to investigate and prosecute them.

In deciding whether to sign or veto SB 967, the guiding principle should be that which is engraved above the entrance to the U.S. Supreme Court: "Equal Justice Under Law."

Governor Brown, I urge you to veto SB 967 and send it back to the legislature with the request that any future laws regarding sexual misconduct provide equal protection and full due process to both California's sons and daughters.

Anything less would be a dereliction of duty.

*Gordon E. Finley, Ph.D. is Professor of Psychology Emeritus at Florida International University. His faculty web site is:*

http://psychology.fiu.edu/faculty/gordon-finley/

--------------------

# NCFM Adviser Gordon Finley, The Real Reason Democrats Oppose Education Secretary Betsy DeVos

The op-ed below was posted on The National Coalition For Men website on Monday, February 13, 2017.

http://ncfm.org/2017/02/news/discrimination-news/discrimination-against-men-news/ncfm-adviser-gordon-finley-the-real-reason-democrats-oppose-education-secretary-betsy-devos/

## The Real Reason Democrats Oppose Education Secretary Betsy DeVos

Gordon E. Finley, Ph.D.

Like the proverbial elephant in the living room, the most powerful concern that Democrats never raised against **Betsy DeVos** following her confirmation hearing was her unwillingness to promise Democrats – during the hearing – that

she would keep President Obama's fraudulent narrative on the false campus rape crisis campaign against college men in the Department of Education's Office for Civil Rights.

The false narrative of the campus rape crisis deprived male students of their due process rights in campus kangaroo courts, expelled them based on false accusations and ruined their lives — all in the service of maintaining the supremacy of identity and gender politics in the national political order.  This is the real reason Democrats pulled an all-nighter just prior to the senate confirmation vote in an attempt to unseat her. They did not want to lose their most powerful weapon against men – false sexual abuse allegations.

Knowing in advance the likely outcome of the senate confirmation vote, the all-nighter was a really dumb and costly stunt by Democrats.

Thus, I would give the strongest possible urging to now Secretary DeVos and President Trump to reverse former President Obama's "Dear Colleague" letter and all the investigations and threats of loss of federal funds that followed from it. Second, I would urge that federal funding be withdrawn from any college or university that continues to implement the evidence-free Obama campus rape crisis false narrative and maintains the horrific torture and massive expense of what some have called a bloated "Sex Bureaucracy" in colleges and universities.

Taking these two actions would be a win-win for students, parents, taxpayers, lower tuition, smaller loans and – as an afterthought – educational quality.

*Gordon E. Finley, Ph.D. is Professor of Psychology Emeritus at Florida International University in Miami.*

*- fin -*

# A false accusation can spell end of college male's future

The letter below was published in *The Boston Globe* on Saturday October 18, 2014 and is followed by the responded to op-ed signed by 28 former and current members of the Harvard Law Faculty demanding that Harvard change it's sexual misconduct policy to provide greater protections for the accused.

Gordon E. Finley, Ph.D.

# A false accusation can spell end of college male's future

http://www.bostonglobe.com/opinion/editorials/2014/10/17/false-accusation-can-spell-end-college-male-future/LZaqmN6RNjNX6hYdrbs16H/story.html

RE "RETHINK Harvard's sexual harassment policy" (Op-ed, Oct. 15): While the legal critiques of the Harvard Law School faculty members are critically important, so too, from a psychological perspective, are false sexual allegations by women. Such allegations are dismissed by proponents of affirmative consent policies, who say that women never lie about rape, or who cite a 3 percent to 8 percent rate of false allegations.

A recent summary of the false abuse and rape allegation literature can be found in a 2013 book by Phillip Cook and Tammy Hodo titled "When Women Sexually Abuse Men." While statistics in this literature are problematic, Cook and Hodo report four studies that found false allegation rates of 62 percent, 41 percent, 50 percent, and 60 percent.

Proponents of these policies also demand an evidentiary standard of "preponderance," which basically is a coin toss where all a university administrative committee needs to deem a man guilty of sexual assault and expel him is a smidgen above 50 percent.

This "preponderance" standard raises the likelihood that a college male who engaged in consensual sex will be wrongly convicted and expelled. Once this happens, that college male has no future.

Fair?

Gordon E. Finley

Miami

http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-
policy/HFDDiZN7nU2UwuUuWMnqbM/story.html?s_campaign=8315

# Rethink Harvard's sexual harassment policy

*In July, Harvard University announced a new university-wide policy aimed at preventing sexual harassment and sexual violence based on gender, sexual orientation, and gender identity.*

*The new policy, which applies to all schools within the university and to all Harvard faculty, administrators, and students, sets up the Office for Sexual and Gender-Based Dispute Resolution to process complaints against students. Both the definition of sexual harassment and the procedures for disciplining students are new, with the policy taking effect this academic year. Like many universities across the nation, Harvard acted under pressure imposed by the federal government, which has threatened to withhold funds for universities not complying with its idea of appropriate sexual harassment policy.*

*In response, 28 members of the Harvard Law School Faculty have issued the following statement:*

AS MEMBERS of the faculty of Harvard Law School, we write to voice our strong objections to the Sexual Harassment Policy and Procedures imposed by the central university administration and the Corporation on all parts of the university, including the law school.

We strongly endorse the importance of protecting our students from sexual misconduct and providing an educational environment free from the sexual and other harassment that can diminish educational opportunity. But we believe that this particular sexual harassment policy adopted by Harvard will do more harm than good.

As teachers responsible for educating our students about due process of law, the substantive law governing discrimination and violence, appropriate administrative decision-making, and the rule of law generally, we find the new sexual harassment policy inconsistent with many of the most basic principles we teach. We also find the process by which this policy was decided and imposed on all parts of the university inconsistent with the finest traditions of Harvard University, of faculty governance, and of academic freedom.

Among our many concerns are the following:

**Harvard has adopted procedures** for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation. Here our concerns include but are not limited to the following:

■ The absence of any adequate opportunity to discover the facts charged and to confront witnesses and present a defense at an adversary hearing.

AR_00001277

■ The lodging of the functions of investigation, prosecution, fact-finding, and appellate review in one office, and the fact that that office is itself a Title IX compliance office rather than an entity that could be considered structurally impartial.

■ The failure to ensure adequate representation for the accused, particularly for students unable to afford representation.

**Harvard has inappropriately** expanded the scope of forbidden conduct, including by:

■ Adopting a definition of sexual harassment that goes significantly beyond Title IX and Title VII law.

■ Adopting rules governing sexual conduct between students both of whom are impaired or incapacitated, rules which are starkly one-sided as between complainants and respondents, and entirely inadequate to address the complex issues in these unfortunate situations involving extreme use and abuse of alcohol and drugs by our students.

**Harvard has pursued** a process in arriving at its new sexual harassment policy which violates its own finest traditions of academic freedom and faculty governance, including by the following:

■ Harvard apparently decided simply to defer to the demands of certain federal administrative officials, rather than exercise independent judgment about the kind of sexual harassment policy that would be consistent with law and with the needs of our students and the larger university community.

■ Harvard failed to engage a broad group of faculty from its different schools, including the law school, in the development of the new sexual harassment policy. And Harvard imposed its new sexual harassment policy on all the schools by fiat without any adequate opportunity for consultation by the relevant faculties.

■ Harvard undermined and effectively destroyed the individual schools' traditional authority to decide discipline for their own students. The sexual harassment policy's provision purporting to leave the schools with decision-making authority over discipline is negated by the university's insistence that its Title IX compliance office's report be totally binding with respect to fact findings and violation decisions.

We call on the university to withdraw this sexual harassment policy and begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community.

The goal must not be simply to go as far as possible in the direction of preventing anything that some might characterize as sexual harassment. The goal must instead be to fully address sexual harassment while at the same time protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom. The law that the Supreme Court and lower federal courts have developed under Title IX and Title VII attempts to balance all these important interests. The university's sexual harassment policy departs dramatically from these legal principles, jettisoning balance and fairness in the rush to appease certain federal administrative officials.

We recognize that large amounts of federal funding may ultimately be at stake. But Harvard University is positioned as well as any academic institution in the country to stand up for principle in

the face of funding threats. The issues at stake are vitally important to our students, faculties, and entire community.

*Elizabeth Bartholet*

*Scott Brewer*

*Robert Clark*

*Alan Dershowitz, Emeritus*

*Christine Desan*

*Charles Donahue*

*Einer Elhauge*

*Allen Ferrell*

*Martha Field*

*Jesse Fried*

*Nancy Gertner*

*Janet Halley*

*Bruce Hay*

*Philip Heymann*

*David Kennedy*

*Duncan Kennedy*

*Robert Mnookin*

*Charles Nesson*

*Charles Ogletree*

*Richard Parker*

*Mark Ramseyer*

*David Rosenberg*

*Lewis Sargentich*

*David Shapiro, Emeritus*

*Henry Steiner, Emeritus*

*Jeannie Suk*

*Lucie White*

*David Wilkins*

AR_00001280

# NCFM Adviser Gordon Finley, The Real Reason Democrats Oppose Education Secretary Betsy DeVos

The op-ed below was posted on The National Coalition For Men website on Monday, February 13, 2017.

http://ncfm.org/2017/02/news/discrimination-news/discrimination-against-men-news/ncfm-adviser-gordon-finley-the-real-reason-democrats-oppose-education-secretary-betsy-devos/



## The Real Reason Democrats Oppose Education Secretary Betsy DeVos

Gordon E. Finley, Ph.D.

Like the proverbial elephant in the living room, the most powerful concern that Democrats never raised against **Betsy DeVos** following her confirmation hearing was her unwillingness to promise Democrats –

AR_00001281

during the hearing – that she would keep President Obama's fraudulent narrative on the false campus rape crisis campaign against college men in the Department of Education's Office for Civil Rights.

The false narrative of the campus rape crisis deprived male students of their due process rights in campus kangaroo courts, expelled them based on false accusations and ruined their lives — all in the service of maintaining the supremacy of identity and gender politics in the national political order.  This is the real reason Democrats pulled an all-nighter just prior to the senate confirmation vote in an attempt to unseat her. They did not want to lose their most powerful weapon against men – false sexual abuse allegations.

Knowing in advance the likely outcome of the senate confirmation vote, the all-nighter was a really dumb and costly stunt by Democrats.

Thus, I would give the strongest possible urging to now Secretary DeVos and President Trump to reverse former President Obama's "Dear Colleague" letter and all the investigations and threats of loss of federal funds that followed from it. Second, I would urge that federal funding be withdrawn from any college or university that continues to implement the evidence-free Obama campus rape crisis false narrative and maintains the horrific torture and massive expense of what some have called a bloated "Sex Bureaucracy" in colleges and universities.

Taking these two actions would be a win-win for students, parents, taxpayers, lower tuition, smaller loans and – as an afterthought – educational quality.

*Gordon E. Finley, Ph.D. is Professor of Psychology Emeritus at Florida International University in Miami.*



**The Real Reason Democrats Oppose Education Secretary Betsy DeVos**

## 'Affirmative Consent' U

**Young Men's Rights in Peril**

The op-ed below was published as the lead opinion piece in *The Santa Barbara Independent* on Monday August 11, 2014 and comments are invited at the end of the critique.  For re-posting this copyrighted material, please use the link below. While the focus is on California's SB 967 the issues raised also apply to bills currently introduced in Congress.

Dianna Thompson and Gordon E. Finley, Ph.D.

http://www.independent.com/news/2014/aug/11/affirmative-consent-u/

## 'Affirmative Consent' U
By Dianna Thompson and Gordon E. Finley

Young Men's Rights in Peril

**Monday, August 11, 2014**

Rape and sexual assault are very serious crimes, and we applaud efforts to protect both male and female students on California campuses. However, SB 976 introduced by State Senators Kevin de Leon (D-Los Angeles) and Hannah-Beth Jackson (D-Santa Barbara) would initiate harmful changes with disastrous consequences for California's sons.

The bill adopts the "preponderance of evidence" standard. That is a lower bar than the "beyond reasonable doubt" standard used in the criminal courts or the middle-ground "clear and convincing evidence" standard typically used in matters with serious consequences to the accused. In the college setting, the accused will be saddled with a lifetime "sex offender" stigma because of an ambiguous social interaction, not a forcible rape.

The U.S. Department of Justice data reveals that rape on college campuses has declined precipitously from 1995 to a historic low today. Rather than celebrate this achievement, SB 967 radically redefines "sexual assault" to include almost any touching of one person by another without prior "affirmative consent."

To avoid being accused of sexual assault, consent must be ongoing throughout a sexual encounter and can be revoked at any time — including months later. Regardless of whether an existing dating relationship between the people involved existed, or past sexual encounters with each other happened, it can't be assumed to be an indicator of consent.

SB 967 moved to the Assembly after a report, authored by the White House Task Force to Protect Students from Sexual Assault, stated that one in five women are sexually assaulted while at college. This statistic is utterly false and scores of articles point this out.

**False Allegations**

Tragically, SB 967 would dramatically increase the number of he said/she said sexual assault allegations. When bill co-author Assemblymember Bonnie Lowenthal (D-Long Beach) was asked how an innocent person is to prove he or she indeed received consent, Lowenthal said, "Your guess is as good as mine. I think it's a legal issue. Like any legal issue, that goes to court."

The problem is that under SB 967, allegations of sexual assault do not go to court but rather to a university administrative committee comprised of faculty, students, and administrators. Such committees deny California's accused sons of the kinds of basic evidentiary, due process, and cross-examination rights found in criminal courts. Sexual assault charges should be handled by those trained to do so — the police and the criminal justice system.

While being a victim is devastating, so too is being falsely accused. In 2002, Wanetta Gibson falsely accused fellow California high school student Brian Banks of rape. Luckily, Brian was exonerated in 2012 after Wanetta was later caught on tape admitting that he was innocent.

**Lawsuits**

Critically, a growing number of the students who have been disciplined or expelled for false allegations of sexual assault are filing lawsuits against their schools. The number of publically reported lawsuits filed by sons whose lives have been ruined by campus tribunals now exceed 30 and are growing daily.

As Californians, do you want your educational tax dollars spent to pay off totally unnecessary lawsuits?

**Reduced Male Attendance**

Today's educational gender gap is the opposite of what it was in the 1960s. Then, about 60 percent of advanced degrees were awarded to men. Today it is about 40 percent. California's sons already are in the minority, and their number would be further reduced by the hostile and dangerous work environment SB 967 would create on campus.

Parents and sons will run a very high risk of losing their education dollars while the son would be permanently banned from further higher education because of his "conviction." Why would any parent want to support SB 967 and expose their sons to the prospects of lifelong losses in finances, education, employment, marriage, family formation, and home buying?

Attenuating sexual misconduct on the part of both male and female perpetrators is without question a worthy cause. However, seeking that goal by denying due process, evidentiary, and cross-examination protections of the accused is unfair to the accused and fails to meet the U.S. Supreme Court standard of "Equal Justice Under Law."

We urge the sons and the parents of sons in California to band together to defeat SB 967.

*Dianna Thompson is director of Stop Abuse for Everyone. Gordon E. Finley is professor emeritus of psychology at Florida International University.*

# *Sex: The New War on Men*

Gordon E. Finley, Ph.D.

The op-ed below was posted on the web site of the National Coalition for Men and several other web sites in early May 2014.

http://ncfm.org/2014/05/action/ncfm-advisor-gordon-finley-ph-d-sex-the-new-war-on-men/

# Sex: The New War on Men

## Gordon E. Finley, Ph.D.

It cannot have escaped anyone's notice that on May Day (May 1, 2014), and within hours of one another, the nation and the media have been bombarded with more than a half dozen exquisitely choreographed and coordinated reports demanding action based on claims of skyrocketing sexual assaults occurring on campus and on the battlefield.

But are these claims plausible?  I argue not.

Singly, or in combination, all of these claims suffer from one or more of the following five fatal flaws.

1.  Sexual allegations made by females are not taken as allegations but rather as "settled fact."  These claims do not even consider the possibility that women might lie about any manner of things sexual and there is no statistical correction for false sexual allegations.

2.  Women commit sexual assaults on men but female sexual perpetrators only rarely are prosecuted and male reports of abuse by female sexual predators only rarely are believed.

3.  In order to "cook" the rapidly rising numbers needed for political effect, the Obama Administration has demanded that all investigations lower the standard of proof required for conviction or expulsion from "clear and convincing" evidence to a "preponderance" of evidence, which basically is a coin toss.

4.  In order to falsely boost the rapidly rising numbers needed for political effect, the Obama Administration has moved the goal posts by expanding the definition of "sexual assault" to activities and circumstances most citizens would not even remotely consider to be rape.  The former definition of forcible rape has morphed into anything sexual without "consent" and with the determination of "consent" left entirely up to the woman, even to be determined on the morning after.

AR_00001285

5.  Forcible rape is ranked second only to murder as a serious crime.  Yet, Obama and the Progressives want to remove the investigation and prosecution of sexual crimes from the venues of the police and the courts and rather transfer these responsibilities to unqualified but ideologically sympathetic administrative units in universities and the military where the conclusion is foregone.  Under Obama and the Progressives, men are stripped of all due process and cross-examination rights that they normally would be guaranteed in a court of law. Truly innocent men have no way to prove their innocence.

Finally: Men — don't drink and have **sex**.  A core principle of the Obama Administration's New World Order is this: If alcohol crosses anyone's lips, the male automatically is guilty of sexual assault and the female automatically is an innocent victim. With the consumption of any amount of alcohol, consensual *sex* does not exist.

The overwhelming onslaught of exquisitely choreographed and coordinated claims suggests that Obama and the Progressives are launching a War on Men to get the votes of women and advance their political base.  This War clearly is designed to create not only "hostile work environments" but "dangerous work environments" for men on campus and in the military.  This War further appears to be designed to eliminate men from the institutions to which they have striven and attained in the past and rapidly to make these coveted, prestigious and high paying positions open only to the political base of Obama and the Progressives.

Will Congress and the nation succumb to this loss of due process for men?

One hopes not.  In my view, the words engraved above the entrance to the United States Supreme Court should prevail and apply equally to the sexual lives of both men and women:  "Equal Justice Under Law."

*Gordon E. Finley, Ph.D. is Emeritus Professor of Psychology at Florida International University.  His faculty web site is:*

http://psychology.fiu.edu/faculty/gordon-finley/

AR_00001286

# The Denial of Due Process May Bankrupt Universities

The op-ed below was posted on the web site of the National Coalition for Men and several others on or about August 24, 2014.

Gordon E. Finley, Ph.D.

http://ncfm.org/2014/08/action/ncfm-adviser-gordon-finley-urges-governor-brown-not-to-sign-sb-967-which-denies-due-process-to-college-students-accused-of-sexual-assault/

# The Denial of Due Process May Bankrupt Universities

Gordon E. Finley, Ph.D.

With now literally hundreds of editorials and op-eds taking positions both pro and con on California's SB 967 – as well as the broader issue of "affirmative consent" for sexual relations — it is virtually certain that the California legislature will pass and send to Governor Brown's desk SB 967 in the coming week. The bill is titled: "Student safety: sexual assault."

Writing as a faculty member of more than four decades in four universities, it is tragically clear that this campus rape crusade bill presumes the veracity of accusers (a.k.a. "survivors") and likewise presumes the guilt of accused (virtually all men). This is nice for the accusers – both false accusers as well as true accusers — but what about the **due process** rights of the accused?

Critically, and the reason why men are winning very substantial lawsuits against universities, is that the fact that the current campus rape crusade explicitly denies men fundamental *due process* rights such as the right to a lawyer, the right to cross-examine, and the right to evidentiary standards (clear and convincing evidence) appropriate to the consequences for the accused. Simultaneously, the campus rape crusade provides every conceivable aid and assistance to the accusers to prosecute the accused. This would be difficult to describe as "fair."

If the ideologically tainted advocates in the administration, in Congress, and on campus continue this crusade against male students, it is possible that colleges and universities – as well as taxpayers — will be spending more money on administering these laws and on lawsuit pay-outs than on instruction. Further, and as more and more men win due process denial lawsuits (this is a slam dunk because the denial of due process for the accused explicitly is written into the laws) the rate of such lawsuits will grow exponentially.

The solutions are to drop the fraudulent "1 in 5″ campus rape claims of the administration, return to the definition of "Forcible Rape" (rather than "affirmative consent") for sexual assault, and

AR_00001287

prosecute crimes that are ranked second only to murder in the criminal justice system which is trained and designed to investigate and prosecute them.

In deciding whether to sign or veto SB 967, the guiding principle should be that which is engraved above the entrance to the U.S. Supreme Court: "Equal Justice Under Law."

Governor Brown, I urge you to veto SB 967 and send it back to the legislature with the request that any future laws regarding sexual misconduct provide equal protection and full due process to both California's sons and daughters.

Anything less would be a dereliction of duty.

*Gordon E. Finley, Ph.D. is Professor of Psychology Emeritus at Florida International University. His faculty web site is:*

http://psychology.fiu.edu/faculty/gordon-finley/

**Wheeler, Joseph**

| | |
|---|---|
| **From:** | Wheeler, Joseph |
| **Sent:** | Wednesday, May 31, 2017 4:14 PM |
| **To:** | Jackson, Candice |
| **Cc:** | Faiella, Matt; Reyes, Alejandro; Ferg-Cadima, James; Gettler, Rachel; Kasior, Anna |
| **Subject:** | Briefing materials on title IX due process |
| **Attachments:** | OCR staff recent communications with members of FACE-FIRE-NACUA.docx; background TPs for due process groups (draft 5-30-17).docx |
| **Importance:** | High |

Candice,

Attached are briefing materials that may be helpful to review in advance of tomorrow's listening session with NACUA, FACE, and FIRE re Title IX and due process for accused students. The "talking points" cover many of the key issues that these groups might raise and **DPP**
**DPP**
We also compiled a summary of past communications between OCR and these three groups. Let us know if you have any questions.

-Joe

<<OCR staff recent communications with members of FACE-FIRE-NACUA.docx>> <<background TPs for due process groups (draft 5-30-17).docx>>

# DPP

AR_00001290

# DPP

# DPP

# DPP

AR_00001293

# DPP

AR_00001294

# DPP

# DPP

**Jackson, Candice**

| | |
|---|---|
| **From:** | Jackson, Candice |
| **Sent:** | Thursday, June 01, 2017 10:14 AM |
| **To:** | eric.treene@usdoj.gov |
| **Subject:** | FW: Discussion with Families Advocating for Campus Equality |
| **Attachments:** | TABLE of DUE PROCESS RECOMMENDATIONS FINAL.pdf; FACE DUE PROCESS RECOMMENDATIONS FINAL.pdf; WE CAN DO BETTER POSITION PAPER FINAL.pdf; Sex Bureaucracy Suk + Gerson.pdf; NCHERM White Paper clean.pdf; ACTL Task_Force_Allegations_of_Sexual_Violence_White_Paper_FINAL.pdf |

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

---

**From:** Cynthia P Garrett [mailto: PII @gmail.com]
**Sent:** Thursday, May 18, 2017 10:36 PM
**To:** Jackson, Candice
**Cc:** Scott Alison
**Subject:** Re: Discussion with Families Advocating for Campus Equality

Candice,

I will know more on Monday, but  many of our recommendations are very similar to Stanford's current test policy, attached below.

In the meantime, as promised, here are some documents you may find helpful, though the Taylor-Johnson book is perhaps one of the best compilations I could suggest.  You also may wish to read Laura Kipnis' book, "Unwanted Advances." Kipnis is a Northwestern professor who was subjected to a Title IX process.  Kipnis is now being sued by one of the students she criticized. (https://www.insidehighered.com/news/2017/05/17/graduate-student-who-subject-title-ix-critic-laura-kipniss-new-book-sues-defamation.)

Though it is a Table I prepared for California lawmakers to oppose SB169, which is California's attempt to codify the 2011 Dear Colleague Letter, the attached "Table of Due Process Recommendations" may be helpful in that it discusses Stanford's sexual misconduct policy provisions in comparison to SB169.  Other than adopting the Dear Colleague Letter (which it identifies as a "regulation") SB169 itself includes just a few provisions which are mostly duplicate those in the 2011 Dear Colleague Letter.

The Table also compares recommendations from the recent white papers issued by the American College of Trial Lawyers and NCHERM (both attached) -- the latter is the group run by Brett Sokolow which has made millions providing Title IX training to campuses across the country.  NCHERM has made almost a 180 degree turnaround in its white paper (as discussed in some of the other attached documents), chastising schools for

their failure to provide due process.

The Table's last column provides FACE's recommendations, which are essentially a combination of Stanford's recommendations and my suggestion based on FACE students' experiences and my participation in the ABA Task Force. That is as much as I can say for now, but the final ABA Report should be available soon.

The attached "FACE Due Process Recommendations" puts much of what is in the last column of the Table in list form.

FACE's "We Can Do Better" position paper (attached) was used during our recent meetings in Congress, and has many excellent article and court decisions cited. I would point specifically to the article by Harvard Law professors Jeannie Suk and Jacob Gerson entitled "The Sex Bureaucracy," which I have also attached for your convenience.

Please let me know if you would like any of the court decisions or articles cited as I have copies of most.

Cindy

*Cynthia P Garrett, Co President*
**Families Advocating for Campus Equality**
www.facecampusequality.org
facecampusequality@gmail.com
@FaceCampusEqual

On May 18, 2017, at 6:56 PM, Jackson, Candice <Candice.Jackson@ed.gov> wrote:

Tom Wheeler at DOJ would likely also want to know what you are able to share about the ABA task force.

Candice Jackson
Office for Civil Rights
U.S. Dept. of Education
*Sent from my iPhone*

On May 18, 2017, at 9:52 PM, Cynthia P Garrett <@gmail.com> wrote:

Candice-

I think it is important you know that the DOJ Office on Violence Against Women is funding a "Commission" to produce Title IX disciplinary procedure guidelines, some of which are inconsistent (more victim-oriented) with what our Task Force is proposing. Since we will be including a DOJ official in our discussion, I thought you should be aware of this if you are not already.

Cindy

On May 18, 2017, at 6:21 PM, Jackson, Candice
<Candice.Jackson@ed.gov> wrote:

This is really helpful to know, Cindy. At any point in that process
where you are able to share results, I'd appreciate seeing them.

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**From:** Cynthia P Garrett [mailto: PII @gmail.com]
**Sent:** Thursday, May 18, 2017 9:19 PM
**To:** Jackson, Candice
**Subject:** Re: Discussion with Families Advocating for Campus Equality

You are absolutely not a pest!  We are all as anxious as you to address
this issue in a more balanced manner.

Incidentally, I am on an American Bar Association Task Force
addressing the issue of campus Title IX disciplinary procedures and
hopefully our report will be out soon.  The Task Force included
representatives from all sides of this issue and we were able to come to
a consensus.  We all gave a little and although I would have preferred a
couple provisions be different, overall the recommendations will be a
vast improvement over the status quo.

The Report has been approved by the ABA's Criminal Justice Section
but there are other sections which may not provide their approval.
There are limitations on what I can divulge at this point, but we have a
conference call scheduled on Monday so I should know more when we
speak on Wednesday.

Cindy

On May 18, 2017, at 6:11 PM, Jackson, Candice
<Candice.Jackson@ed.gov> wrote:

I appreciate this, Cindy. I hate to be a pest about it but I
really want to keep these conversations moving forward.

Candice Jackson
Acting Assistant Secretary for Civil Rights
Dep. Ass. Sec. for Strategic Operations & Outreach
Office for Civil Rights
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

---

**From:** Cynthia P Garrett [mailto: **PII** @gmail.com]
**Sent:** Thursday, May 18, 2017 9:11 PM
**To:** Jackson, Candice
**Subject:** Re: Discussion with Families Advocating for Campus Equality

Candice-

I just spoke with Ed Bartlett and he will contact you this evening.

I can't imagine anyone involved in this issue *not* wanting to meet with you!

Cindy

> On May 18, 2017, at 6:08 PM, Jackson, Candice <Candice.Jackson@ed.gov> wrote:
>
> Thanks!
>
> Candice Jackson
> Acting Assistant Secretary for Civil Rights
> Dep. Ass. Sec. for Strategic Operations & Outreach
> Office for Civil Rights
> U.S. Department of Education
> 400 Maryland Ave. SW
> Washington, DC 20202
>
> ---
>
> **From:** Cynthia P Garrett [mailto **PII** @gmail.com]
> **Sent:** Thursday, May 18, 2017 9:07 PM
> **To:** Jackson, Candice
> **Subject:** Re: Discussion with Families Advocating for Campus Equality
>
> Never mind - I see you did ask me to contact him, which I will do now.
>
> Cindy
>
>> On May 18, 2017, at 6:03 PM, Cynthia P Garrett

 @gmail.com>
wrote:

Candice-

I just spoke with him late this afternoon about scheduling a meeting with you.  He is definitely interested and the hold up may be that he is trying to find out the schedules of a couple others he would like to include on the call.

Would you like me to call him?

Cindy

> On May 18, 2017, at 6:00 PM, Jackson, Candice <Candice.Jackson @ed.gov> wrote:
>
> Cindy,
> I'm glad we have a conference call set up for next week!
>
> I emailed Ed Bartlett today and haven't heard back from him; would you be willing to contact him to see if he's interested in following up on Roger Clegg's suggestion that OCR meet with SAVE?
>
> Thanks,
> Candice
>
> Candice Jackson

Acting Assistant
Secretary for Civil
Rights
Dep. Ass. Sec. for
Strategic
Operations &
Outreach
Office for Civil
Rights
U.S. Department of
Education
400 Maryland
Ave. SW
Washington, DC
20202

_____

**From:** Cynthia P
Garrett
[mailto: **PII**
@gmail.com]
**Sent:** Thursday,
May 18, 2017
12:58 PM
**To:** Jackson,
Candice
**Cc:** Wheeler, Tom
(CRT); Scott Alison
**Subject:** Re:
Discussion with
Families
Advocating for
Campus Equality

Thank you!


On
May
18,
2017
, at
9:32
AM,
Jacks
on,
Cand
ice
<Can
dice.
Jacks
on@
ed.go
v>
wrot
e:

Leader passcode 2055242 Participant passcode 5877798

<Mail Attachment.ics>

AR_00001303



# WHITE PAPER ON
# CAMPUS SEXUAL ASSAULT INVESTIGATIONS

http://files.constantcontact.com/dbc236ec501/9b906384-177d-42df-9e1a-bcb6f62d9340.pdf

Task Force on the Response of Universities and Colleges to
Allegations of Sexual Violence

Approved by the Board of Regents
March 2017

AR_00001304

# MISSION STATEMENT OF THE
## AMERICAN COLLEGE OF TRIAL LAWYERS

The American College of Trial Lawyers is an invitation only fellowship of exceptional trial lawyers of diverse backgrounds from the United States and Canada. The College thoroughly investigates each nominee for admission and selects only those who have demonstrated the very highest standards of trial advocacy, ethical conduct, integrity, professionalism and collegiality. The College maintains and seeks to improve the standards of trial practice, professionalism, ethics, and the administration of justice through education and public statements on important legal issues relating to its mission. The College strongly supports the independence of the judiciary, trial by jury, respect for the rule of law, access to justice, and fair and just representation of all parties to legal proceedings.

◆ ◆ ◆

*"In this select circle, we find pleasure and charm in the illustrious company of our contemporaries and take the keenest delight in exalting our friendships."*

—Hon. Emil Gumpert,
Chancellor-Founder, ACTL

American College of Trial Lawyers
19900 MacArthur Boulevard, Suite 530
Irvine, California 92612
Telephone: (949) 752-1801
Facsimile: (949) 752-1674
Website: www.actl.com
Email: nationaloffice@actl.com

Copyright © 2017
American College of Trial Lawyers
All Rights Reserved.

AR_00001305

# AMERICAN COLLEGE OF TRIAL LAWYERS

## CHANCELLOR-FOUNDER
Hon. Emil Gumpert
(1895-1982)

## OFFICERS
**BARTHOLOMEW J. DALTON**, *President*
**SAMUEL H. FRANKLIN**, *President-Elect*
**JEFFREY S. LEON, LSM**, *Treasurer*
**DOUGLAS R. YOUNG**, *Secretary*
**MICHAEL W. SMITH**, *Immediate Past President*

## BOARD OF REGENTS

**RITCHIE E. BERGER**
Burlington, Vermont

**KATHLEEN FLYNN PETERSON**
Minneapolis, Minnesota

**SUSAN J. HARRIMAN**
San Francisco, California

**THOMAS M. HAYES III**
Monroe, Louisiana

**PAUL J. HICKEY**
Cheyenne, Wyoming

**JOHN J. L. HUNTER, Q.C.**
Vancouver, British Columbia

**W. FRANCIS MARION, JR.**
Greenville, South Carolina

**ELIZABETH N. MULVEY**
Boston, Massachusetts

**WILLIAM J. MURPHY**
Baltimore, Maryland

**C. RUFUS PENNINGTON III**
Jacksonville, Florida

**DANIEL E. REIDY**
Chicago, Illinois

**STEPHEN G. SCHWARZ**
Rochester, New York

**KATHLEEN M. TRAFFORD**
Columbus, Ohio

**ROBERT K. WARFORD**
San Bernardino, California

**ROBERT E. WELSH, JR.**
Philadelphia, Pennsylvania

_____

DENNIS J. MAGGI, CAE, Executive Director

AR_00001306

# AMERICAN COLLEGE OF TRIAL LAWYERS

## PAST PRESIDENTS

1950-51 EMIL GUMPERT*
Los Angeles, California

1951-52 C. RAY ROBINSON*
Merced, California

1952-53 CODY FOWLER*
Tampa, Florida

1953-54 E. D. BRONSON*
San Francisco, California

1954-55 CODY FOWLER*
Tampa, Florida

1955-56 WAYNE E. STICHTER*
Toledo, Ohio

1956-57 JESSE E. NICHOLS*
Oakland, California

1957-58 LEWIS C. RYAN*
Syracuse, New York

1958-59 ALBERT E. JENNER, JR.*
Chicago, Illinois

1959-60 SAMUEL P. SEARS*
Boston, Massachusetts

1960-61 LON HOCKER*
Woods Hole, Massachusetts

1961-62 LEON JAWORSKI*
Houston, Texas

1962-63 GRANT B. COOPER*
Los Angeles, California

1963-64 WHITNEY NORTH SEYMOUR*
New York, New York

1964-65 BERNARD G. SEGAL*
Philadelphia, Pennsylvania

1965-66 EDWARD L. WRIGHT*
Little Rock, Arkansas

1966-67 FRANK G. RAICHLE*
Buffalo, New York

1967-68 JOSEPH A. BALL*
Long Beach, California

1968-69 ROBERT W. MESERVE*
Boston, Massachusetts

1969-70 HON. LEWIS F. POWELL, JR.*
Washington, District of Columbia

1970-71 BARNABAS F. SEARS*
Chicago, Illinois

1971-72 HICKS EPTON*
Wewoka, Oklahoma

1972-73 WILLIAM H. MORRISON*
Portland, Oregon

1973-74 ROBERT L. CLARE, JR.*
New York, New York

1974- AUSTIN W. LEWIS*
New Orleans, Louisiana

1975-76 THOMAS E. DEACY, JR.
Kansas City, Missouri

1976-77 SIMON H. RIFKIND*
New York, New York

1977-78 KRAFT W. EIDMAN*
Houston, Texas

1978-79 MARCUS MATTSON*
Los Angeles, California

1979-80 JAMES E. S. BAKER*
Chicago, Illinois

1980-81 JOHN C. ELAM*
Columbus, Ohio

1981-82 ALSTON JENNINGS*
Little Rock, Arkansas

1982-83 LEON SILVERMAN*
New York, New York

1983-84 GAEL MAHONY*
Boston, Massachusetts

1984-85 GENE W. LAFITTE
New Orleans, Louisiana

1985-86 GRIFFIN B. BELL*
Atlanta, Georgia

1986-87 R. HARVEY CHAPPELL, JR.*
Richmond, Virginia

1987-88 MORRIS HARRELL*
Dallas, Texas

1988-89 PHILIP W. TONE*
Chicago, Illinois

1989-90 RALPH I. LANCASTER, JR.
Portland, Maine

1990-91 CHARLES E. HANGER*
San Francisco, California

1991-92 ROBERT B. FISKE, JR.
New York, New York

1992-93 FULTON HAIGHT*
Santa Monica, California

1993-94 FRANK C. JONES*
Atlanta, Georgia

1994-95 LIVELY M. WILSON*
Louisville, Kentucky

1995-96 CHARLES B. RENFREW
San Francisco, California

1996-97 ANDREW M. COATS
Oklahoma City, Oklahoma

1997-98 EDWARD BRODSKY*
New York, New York

1998-99 E. OSBORNE AYSCUE, JR.
Charlotte, North Carolina

1999-2000 MICHAEL E. MONE
Boston, Massachusetts

2000-2001 EARL J. SILBERT
Washington, District of Columbia

2001-2002 STUART D. SHANOR
Roswell, New Mexico

2002-2003 WARREN B. LIGHTFOOT
Birmingham, Alabama

2003-2004 DAVID W. SCOTT, Q.C.
Ottawa, Ontario

2004-2005 JAMES W. MORRIS, III
Richmond, Virginia

2005-2006 MICHAEL A. COOPER
New York, New York

2006-2007 DAVID J. BECK
Houston, Texas

2007-2008 MIKEL L. STOUT
Wichita, Kansas

2008-2009 JOHN J. (JACK) DALTON
Atlanta, Georgia

2009-2010 JOAN A. LUKEY
Boston, Massachusetts

2010-2011 GREGORY P. JOSEPH
New York, New York

2011-2012 THOMAS H. TONGUE
Portland, Oregon

2012-2013 CHILTON DAVIS VARNER
Atlanta, Georgia

2013-2014 ROBERT L. BYMAN
Chicago, Illinois

2014-2015 FRANCIS M. WIKSTROM
Salt Lake City, Utah

2015-2016 MICHAEL W. SMITH
Richmond, Virginia

\* Deceased

# TASK FORCE ON THE RESPONSE OF UNIVERSITIES AND COLLEGES TO ALLEGATIONS OF SEXUAL VIOLENCE

**CHAIR**
**PAMELA ROBILLARD MACKEY**
DENVER, COLORADO

**MEMBERS**
**RITCHIE E. BERGER**
BURLINGTON, VERMONT

**ELIZABETH N. MULVEY**
BOSTON, MASSACHUSETTS

**EARL J. SILBERT**
WASHINGTON, DISTRICT OF COLUMBIA

**A. GILCHRIST SPARKS III**
WILMINGTON, DELAWARE

# TABLE OF CONTENTS

American College of Trial Lawyers Position Statement Regarding
Campus Sexual Assault Investigations ............................................................................. 1

American College of Trial Lawyers White Paper on Campus Sexual Assault Investigations ............... 3

    Historical Background ........................................................................................................ 3

        OCR's Influence on College Sexual Assault Investigations ........................................ 3

        Procedures ..................................................................................................................... 4

        Investigations on Campus ............................................................................................ 5

        Appeals from Investigations ........................................................................................ 7

        OCR's Title IX Investigations of Colleges and Universities ..................................... 7

        Legal Landscape: Scholars, Commentators, and the Courts Respond ...................... 8

    ACTL's Recommendations ............................................................................................. 11

        Need For Procedural Due Process .............................................................................. 11

        Need For Impartial Investigations ............................................................................. 12

        The Right to Counsel, Access Evidence, and Notice of Allegations ........................ 14

        Some Form of Cross-Examination ............................................................................. 16

        The Inadequacy of Preponderance of the Evidence Standard ................................... 16

    Conclusion ...................................................................................................................... 18

AR_00001309

# AMERICAN COLLEGE OF TRIAL LAWYERS
# POSITION STATEMENT REGARDING
# CAMPUS SEXUAL ASSAULT INVESTIGATIONS

*The American College of Trial Lawyers maintains and seeks to improve the standards of trial practice, professionalism, ethics, and the administration of justice through education and public statements on important legal issues relating to its mission. The College strongly supports the independence of the judiciary, trial by jury, respect for the rule of law, access to justice, and fair and just representation of all parties to legal proceedings.*

ACTL recognizes, and is deeply concerned by, the problem of sexual assaults on college campuses. ACTL believes in the importance of protecting all students from sexual misconduct and ensuring that they are provided an educational environment free of sexual harassment.

ACTL also believes that it is important to ensure that students investigated for, or charged with, sexual assault or misconduct violations be afforded basic fairness and due process.

There have been recent statements by respected faculty from a number of law schools declaring that those subject to such investigations or charges are being denied fundamental rights. For example, 28 members of the Harvard Law School Faculty in their statement expressed their belief that: "Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[1] Similarly, 16 members of the Penn Law School Faculty in an open letter addressing guidelines issued by the U.S. Department of Education's Office of Civil Rights ("OCR") to enforce Title IX of the Education Amendments Act of 1972, opined: "Although we appreciate the efforts by Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness. We do not believe that providing justice for victims of sexual assault requires subordinating so many protections long deemed necessary to protect from injustice those accused of serious offenses."[2] In another open letter addressing these issues, professors of law from institutions across the United States stated their belief that: "Through a series of … directives and enforcement actions, OCR has steadily expanded the definition of sexual harassment and imposed a growing range of responsibilities on colleges to curb such conduct. As a result, free speech and due process on campus are now imperiled."[3]

These concerns about fairness and due process have been echoed in a number of recent

---

[1]     Opinion, "Rethink Harvard's sexual harassment policy." *The Boston Globe*, October 15, 2014. http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UvuUuWMnqbM/story.html.
[2]     Schow, Ashe, "UPenn law professors speak out against new campus sexual assault policy," *Washington Examiner*, February 18, 2015, http://www.washingtonexaminer.com/upenn-law-professors-speak-out-against-new-campus-sexual-assault-policy/article/2560365.
[3]     Law Professors' Open Letter Regarding Campus Free Speech and Sexual Assault, May 17, 2016.

AR_00001310

decisions by state and federal judges in cases brought by accused or disciplined students.[4]  There is no clear consensus as to how much process is constitutionally or contractually required to be provided to the subjects of such investigations, and the outcome often depends on whether the institution is public or private. Some courts, in addition to expressing concern as to the adequacy of the process provided students, have recognized other avenues of possible relief, including statutory claims such as under Title IX.[5]

In this position statement and accompanying white paper, ACTL submits its recommended standards for these investigations.

1.      Sexual misconduct investigations and hearings should be conducted with due consideration for any appearance of partiality, including that which might arise from the factfinder's other responsibilities or affiliations.

2.      The subject of a sexual misconduct investigation should promptly be provided with the details of the allegations and advised of his/her right to consult legal counsel.

3.      The subject of a sexual misconduct investigation has the right to be advised and accompanied by legal counsel at all stages of the investigation.

4.      The parties to a sexual misconduct investigation should be permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, in order to test the veracity of witnesses and documents.

5.      The subject of a sexual misconduct investigation should be provided with access to all evidence at a meaningful time and in a meaningful manner so that he/she can adequately respond to it.

6.      The standard of proof for "responsibility" should be clear and convincing evidence.

7.      Factfinders in sexual misconduct investigations and hearings should produce written findings of fact and conclusions sufficiently detailed to permit meaningful appellate review.

---

4       See, e.g., *Doe v. Rectors and Visitors of George Mason Univ.*, 132 F.Supp.3d 712 (E.D.Va 2015); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015); *Doe v. Columbia Univ.*, 101 F.Supp.3d 356 (S.D.N.Y. 2015), *judgment vacated by Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).
5       See, e.g., *Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016); *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016); *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561 (D. Mass. 2016); *Doe v. Middlebury Coll.*, No.1:15-cv-192-jgm, 2015 WL 5488109 (D. Vt. Sept. 16, 2015).

AR_00001311

# AMERICAN COLLEGE OF TRIAL LAWYERS WHITE PAPER ON CAMPUS SEXUAL ASSAULT INVESTIGATIONS

In 2011, in response to increased concern over sexual assaults on university campuses, the U.S. Department of Education's Office for Civil Rights (OCR) issued a Dear Colleague Letter outlining the procedures private and public higher education institutions must follow in investigating and adjudicating sexual harassment complaints under Title IX.[1] The letter and its 2014 clarification have generated difficult legal questions, with institutions forced to balance their responsibilities under federal law, their desire to treat both complaining parties and alleged perpetrators fairly, and the substantial resources dedicated toward sexual assault prevention, training, and investigation. In an August 2016 article, a law professor described the dilemma facing educational institutions:

> The schools in these cases must feel themselves to be in an impossible position. On the one hand, they must take sexual assault seriously and remedy their previously neglectful handling of claims. Not doing enough means risking a federal Title IX investigation, with the threat of losing federal funding . . . . But, when schools do too much, they face potential lawsuits from accused students for violating, among other things, Title IX. When it comes to sexual-assault cases, campus administrators could be forgiven for feeling on a knife's edge.[2]

Judges have also recognized the difficulties colleges and universities face in balancing these competing interests, with one federal judge noting in a September 2016 decision that universities are "in a double bind. Either they come under public fire for not responding to allegations of sexual assault aggressively enough or they open themselves to Title IX claims simply by enforcing rules against alleged perpetrators."[3]

ACTL believes that in a well-intentioned effort to address the significant problem of campus sexual assault, OCR has established investigative and disciplinary procedures that, in application, are in many cases fundamentally unfair to students accused of sexual misconduct. This white paper analyzes the issues and recommends specific improvements.

## HISTORICAL BACKGROUND

### OCR's Influence on College Sexual Assault Investigations

On April 29, 2014, OCR published "Questions and Answers about Title IX and Sexual Violence," a document intended to clarify campuses' legal requirements under Title IX as articulated

---

[1]       As set forth on DOE's website: "The mission of the Office for Civil Rights is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights."

[2]       Jeannie Suk Gersen, *College Students Go to Court Over Sexual Assault*, The New Yorker (Aug. 5, 2016), http://www.newyorker.com/news/news-desk/colleges-go-to-court-over-sexual-assault.

[3]       *Austin v. Univ. of Oregon*, __ F.Supp.3d __, Nos. 6:15-cv-02257-MC and 6:16-cv-00647-MC, 2016 WL 4708540 at *9 (D. Or. Sept. 8, 2016).

AR_00001312

in the April 4, 2011 "Dear Colleague" letter on sexual violence.[4]  All higher education institutions that receive federal funds must comply; according to a press release from DOE, schools that "violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action."[5]

According to Catherine Lhamon, Assistant Secretary for Civil Rights, the legal bases of the Dear Colleague Letters (DCLs) stem from the United States Supreme Court's confirmation that, under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(D), agencies may issue guidance without notice-and-comment procedures; such guidance does not have the force and effect of law but rather, is intended to advise the public of the construction of Title IX.[6]

According to the 2014 Q&A, a federally funded school violates a student's Title IX rights regarding student-on-student sexual violence if:

1.      The alleged conduct "is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program"; that is, it creates a "hostile environment"; and

2.      The school, after receiving notice, "fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects."[7]

This standard is applied in both administrative enforcements of Title IX and where injunctive relief is sought. Where damages are sought, the standard is actual knowledge and deliberate indifference.

**Procedures**

In order to be Title IX compliant, an institution must disseminate a notice of nondiscrimination, designate at least one employee as a Title IX coordinator, and adopt and publish grievance procedures for resolving sexual harassment and sexual violence complaints. The grievance procedures must contain the following:

•       Notice to students and employees of the procedures, including where complaints may be filed;

•       A statement of the institution's jurisdiction over Title IX complaints;

---

4       Office for Civil Rights, "Questions and Answers about Title IX and Sexual Violence," *U.S. Dep't of Education* (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Q&A].
5       Department of Education, U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations (May 1, 2014), http://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-i.
6       Letter from Catherine E. Lhamon, Ass. Sec. for Civil Rights, Dep't of Educ. to Sen. James Lankford, Chairman, Subcommittee on Regulatory Affairs and Federal Management at 2 (Feb. 17, 2016) [hereinafter Lhamon Letter] (citing *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199 (2015)).
7       *Id.* at 10.

• 4 •

- "Adequate" definitions of sexual harassment and hostile environments;

- Reporting protocols, including policies on confidential reporting;

- Identification of responsible employees;

- Provisions for "adequate, reliable, and impartial investigation of complaints," including opportunity for both parties to present witnesses and evidence;

- Notice of interim measures that may be taken to protect students;

- Application of the preponderance of the evidence standard which is to be used for deciding complaints;

- Established, prompt time frames for the complaint process;

- Notice of potential remedies for students and sanctions against perpetrators;

- Written notice to both parties of the outcome of the complaint; and

- Assurance the institution will employ measures to prevent recurrence of sexual violence and allay discriminatory effects on the complainant.[8]

Although Title IX permits institutions to use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to handle sexual violence allegations, OCR emphasizes that any procedures used for sexual violence complaints "must meet the Title IX requirement of affording a complainant a prompt and equitable resolution . . . including applying the preponderance of the evidence standard of review."[9]

**Investigations on Campus**

OCR utilizes the term "investigation" to refer to the fact-finding process and any hearing and decision-making protocol an institution uses to determine: "(1) whether or not the conduct occurred; and (2) if the conduct occurred, what actions the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence."[10]  OCR cautions that imposing sanctions against a perpetrator without additional remedies "likely will not be sufficient to eliminate the hostile environment and prevent recurrences."[11]

Investigations must be "adequate, reliable, impartial, and prompt"; they must also include an opportunity for both parties to present witnesses and other evidence.  A hearing is not necessarily required.[12]  The investigation may include: conducting interviews of the parties and witnesses,

---

8      2014 Q&A at 12-13.
9      *Id.* at 14.
10     *Id.* at 25.
11     *Id.*
12     *Id.* at 25.

AR_00001314

reviewing law enforcement investigation documents, reviewing student files, and examining other relevant evidence.  An institution "must give the complainant any rights that it gives to the alleged perpetrator."[13]  Accordingly:

- If the institution permits one party to have an attorney or advisor, or restricts the ability of attorneys or advisors to speak or participate, it must apply this rule equally;

- If the institution permits one party to submit expert testimony, it must apply this rule equally;

- If the institution allows for an appeal, it must apply this rule equally;

- Both complainant and alleged perpetrator must be informed in writing of the outcome of the complaint and any appeal; and[14]

- The institution "must use a preponderance-of-the-evidence" standard in any Title IX proceeding.[15]

Institutions should notify complainants that they may file a criminal complaint and must refrain from dissuading a complainant from doing so.[16]  OCR notes that because a Title IX investigation will never result in incarceration, "the same procedural protections and legal standards [present in a criminal investigation] are not required."[17]  Title IX investigations are "not discretionary"; they must be conducted even if a criminal investigation is ongoing or terminates without an arrest.[18]  Although an institution may be required to temporarily delay a fact-finding investigation while law enforcement gathers evidence, an institution should work with campus police, law enforcement, and prosecutors to identify when evidence-gathering is complete so that the school may "promptly resume and complete its fact-finding for the Title IX investigation."[19]

If the institution uses a hearing process, it may determine whether it allows the parties to be present for the entirety of the hearing, with the caveat that permission to one party to be present must be granted equally to both parties.[20]  An institution "must not require a complainant to be present at the hearing as a prerequisite to proceed."[21]  If requested, the institution should ensure the parties do not have to be in the same room together at the same time.

OCR also "strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing."[22]

---

13      *Id.* at 26.
14      *Id.*
15      *Id.*
16      *Id.*
17      *Id.* at 27.
18      *Id.*
19      *Id.* at 28.
20      *Id.* at 30.
21      *Id.*
22      *Id.* at 31.

AR_00001315

OCR states that a 60-calendar day timeframe for the entire investigative process—not including appeals—is typical.  Although OCR does not require investigations to be completed within sixty days, it will evaluate "on a case-by-case basis" whether the prompt and equitable standard has been met.[23]

**Appeals from Investigations**

The appeals process "must be equal for both parties."[24]  An appeal mechanism is not required by Title IX; however, OCR recommends that an institution provide an appeals process "where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is disproportionate to the findings."[25]  Although the institution has latitude in designing an appeals process, it must still "provide[] prompt and equitable resolutions of sexual violence complaints," while taking steps "to protect the complainant in the educational setting."[26]

**OCR's Title IX Investigations of Colleges and Universities**

As of 2015, OCR was investigating more than 100 colleges and universities as to whether they failed to "fairly investigate and adjudicate cases of sexual violence" under Title IX.[27]  In 2014, OCR took, on average, 1,469 days to complete an investigation, compared to 379 in 2009.[28]  In June 2016, it was reported that there were 246 ongoing investigations into 195 colleges and universities, with an additional sixty-eight Title IX investigations into sixty-one institutions' handling of sexual harassment.[29]

At the conclusion of its investigations, OCR publishes resolution letters and agreements, stating whether an institution's policies and notices are compliant with the regulation implementing Title IX and what remedial actions need to be taken.

With regards to the reporting of sexual assault statistics, the Department of Education has also been aggressive in enforcing the Clery Act, issuing fines to eight schools in 2013, although no more than three had been issued per year in the preceding twenty-two years.[30]  From January 2013 to December 2016, thirty schools were fined.[31]  On November 3, 2016, the Department announced it would fine Pennsylvania State University nearly $2.4 million for its violations of the Clery Act and

---

23    *Id.* at 32.
24    *Id.* at 38.
25    *Id.* at 37.
26    *Id.*
27    Jake New, Justice Delayed, *Inside Higher Ed* (May 6, 2015), https://www.insidehighered.com/news/2015/05/06/ocr-letter-says-completed-title-ix-investigations-2014-lasted-more-4-years.
28    *Id.*
29    Tyler Kingkade, There Are Far More Title IX Investigations of Colleges than Most People Know, *Huffington Post* (Jun. 16, 2016), http://www.huffingtonpost.com/entry/title-ix-investigations-sexual-harassment_us_575f4b0ee4b053d433061b3d.
30    Rebecca Lacher & Pedro A. Ramos, U.S. Department of Education Levies More Fines for Clery Act Violations, *Mondaq* (Jan. 30, 2014), http://www.mondaq.com/unitedstates/x/289764/Education/US+Department+Of+Education+Levies+More+Fines+For+Clery+Act+Violations.
31    Federal Student Aid, Clery Act Reports, *U.S. Dep't of Education* (2016), https://studentaid.ed.gov/sa/about/data-center/school/clery-act-reports.

AR_00001316

the Drug-Free Schools and Communities Act—"by far the largest fine ever imposed under the law."[32]

While OCR has issued many decisions criticizing colleges and universities for various failures to protect the Title IX rights of the complainant, the Office's first decision finding that the rights of an *accused* had been violated was released on October 12, 2016.  The decision found that Wesley College discriminated on the basis of sex against a male student accused of planning and implementing the nonconsensual videotaping of a sexual encounter by "subject[ing] him to an inequitable grievance and appeal process."[33]  In its letter, OCR found that resolution of the complaint was "not equitable" because the accused student was not: afforded his resolution options, given an opportunity to share his story and benefit from an investigation of that story, permitted to challenge evidence the College relied on, or provided an adequate opportunity to defend himself at the hearing.[34]  Even in this determination, however, OCR provided no guidance as to specific procedures institutions must or even should implement to protect the rights of accused students, apart from providing them with some form of notice and some type of opportunity to respond.

**Legal Landscape: Scholars, Commentators, and the Courts Respond**

In her August 5, 2016 article, Professor Gersen argues that that the position that college campuses are unable to provide procedural fairness, such that sexual assault investigations should be left to criminal justice authorities, "represents a false choice"; due process is possible "outside the court system" and should be employed in institutional investigations as a "check on pressures to trample fairness for the accused."[35]  That concern is reflected in numerous letters, policy statements, articles and an increasing number of judicial decisions, echoing the belief that the requirements imposed by OCR have resulted in accused students being "railroaded" through the campus disciplinary systems, bereft of adequate due process protections in the face of deeply serious charges.

For example, in May 2011, the advocacy group Foundation for Individual Rights in Education (FIRE) published an open letter to OCR's Assistant Secretary for Civil Rights expressing concerns that the 2011 DCL left institutions "uncertain as to their obligation to provide due process protections."[36]  Quoting from the 2014 Q&A, in which OCR specifically cautions that institutions "should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant," FIRE asserted that such "unnecessarily opaque and deeply troubling" language "invites the potential for abuse."[37]

Recently, several courts have recognized that the processes utilized by certain universities for investigating and disciplining students accused of sexual misconduct fail to comport with due

---

32      Jake New, Historic Fine for Penn State. *Inside Higher Ed* (Nov. 4, 2016), https://www.insidehighered.com/news/2016/11/04/education-departments-historic-sanction-against-penn-state-clery-violations.
33      Letter from Beth Gellman-Beer, Supervisory Attorney of OCR Philadelphia to Robert E. Clark III, President of Wesley College at 1 (Oct. 12, 2016), http://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term.
34      *Id.* at 24.
35      Gersen, *supra*, at 35.
36      Letter from Will Creeley, Dir. of Legal & Pub. Advocacy, Found. for Individual Rights in Educ. (FIRE), to Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ. (May 5, 2011) [hereinafter FIRE Letter], https://www.thefire.org/fire-letter-to-office-for-civil-rights-assistant-secretary-for-civil-rights-russlynn-ali-may-5-2011.
37      2014 Q&A at 13; FIRE Letter.

AR_00001317

process.[38]  For example, in *Doe v. Rectors and Visitors of George Mason University*, the court found that the procedures followed by the university, a state entity, had deprived the accused student of a protected liberty interest—the charge of sexual misconduct "plainly call[ed] into question [the] plaintiff's good name, reputation, honor, or integrity," altered his legal status as a student, and had the potential to impact his future educational and employment endeavors.[39]  The court ruled that the University failed to afford constitutionally adequate process—it did not provide the student with notice of the full scope of the charges against him (a defect that was not cured during the subsequent appeals), which in turn impacted his opportunity to be heard and put on evidence that addressed the context in which the charges arose.[40]  Administrators also had off-the-record and ex-parte meetings with the complainant without informing the accused student what had transpired therein; one administrator assigned the appeal to himself despite having had "extensive ex parte contact with [the complainant] over the summer" and admitted he had "prejudged the case."[41]  Sanctions were also imposed on the student without a basis for the decision.  The court held that although any one of the procedural irregularities in isolation would not rise to a constitutional violation, the "accumulation of mistakes" resulted in a violation of due process.[42]

In *Doe v. University of Southern California*, the court partially affirmed a student's petition for a writ of administrative mandate challenging his suspension.[43]  The court found that the student had been deprived of notice and hearing where he was "not provided any information about the factual basis of the charges against him, he was not allowed to access any evidence used to support those accusations unless he actively sought it through a written request, and he was not provided with any opportunity to appear directly before the decision-making panel to rebut the evidence presented against him."[44]

The First Circuit held in *Cloud v. Trustees of Boston University* that the disciplinary hearings of private universities must be conducted with "basic fairness" and that court-established evidentiary and procedural rules may be referred to "in measuring the adequacy and fairness of the hearing."[45]  In

---

38      A number of law professors and other scholars have also joined the criticism of OCR and its DCLs. *See e.g.* KC Johnson & Stuart Taylor Jr., Stanford Sex Assault Case: Sentence Was Too Short—But the System Worked, *The Washington Post* (Jun. 9, 2016), https://www.washingtonpost.com/opinions/stanford-case-shows-why-the-justice-system-should-handle-campus-sexual-assault/2016/06/08/38a6af24-2cf2-11e6-9b37-42985f6a265c_story.html?utm_term=.120ccbcc4f1c (noting that "[t]he procedural rules [required by OCR] are systematically slanted against the accused" and that "accusers are not subject to meaningful cross-examination, which the Supreme Court has called 'the greatest legal engine ever invented for the discovery of truth.' "); Law Professors' Open Letter Regarding Campus Free Speech and Sexual Assault, SAVE (May 16, 2016), http://www.saveservices.org/wp-content/uploads/Law-Professor-Open-Letter-May-16-2016.pdf (stating disciplinary policies "must afford due process protections that are appropriate to the particular circumstances, considering the harm it has caused to other students, the degree to which the conduct has interfered with other students' access to educational benefits, and the severity of potential sanctions.  These due process protections include informing students of the specific conduct at issue, providing them with access to all evidence, assuring students enjoy the assistance of an independent advocate, affording them the right to cross-examination, and utilizing the appropriate standard of proof"); Members of Harvard Law School Faculty, Rethink Harvard's Sexual Harassment Policy, *Boston Globe* (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (alleging Harvard's policies for adjudicating cases of sexual misconduct, which do not ensure counsel for the accused, an opportunity to discover facts, confront witnesses, and present a defense at a hearing, and restrict all components of the adjudication to a Title IX compliance office, "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation").

39      149 F.Supp. 3d 602, 613-14 (E.D. Va. 2016) (quotation omitted).
40      *Id.* at 617.
41      *Id.* at 619.
42      *Id.* at 621.
43      246 Cal. App. 4th 221 (2016).
44      *Id.* at 248.
45      720 F.2d 721, 725 (1st Cir. 1983).

AR_00001318

March 2016, the District of Massachusetts relied in part on *Cloud* to hold that a complaint plausibly alleged a violation of basic fairness where a private university failed to provide a student accused of sexual misconduct with "a variety of procedural protections . . . many of which, in the criminal context, are the most basic and fundamental components of due process of law," including no right to notice of charges, counsel, confrontation of the accuser, cross-examination of witnesses, examination of evidence or witness statements, or an effective appeal.[46]

In June 2016, a student who had been disciplined after being found responsible for sexual misconduct filed a lawsuit against both the university and the Department of Education alleging in part that requiring institutions to use a preponderance of the evidence standard violates the APA, insofar as it constituted rule-making without notice and an opportunity for public comment, an action taken in excess of statutory authority, and an arbitrary and capricious action.[47]  A decision on the Department's motion to dismiss is pending.

Concerns over the partiality of investigators and adjudicators have also been the subject of a number of lawsuits.  For example, in *Doe v. Brandeis University*, the District of Massachusetts critiqued Brandeis University's Special Examiner Process, in which a "single individual was essentially vested with the powers of an investigator, prosecutor, judge, and jury"; the court remarked that the dangers of combining these powers in a single individual, with few rights to appeal and review, are "obvious."[48]  Similarly, in *Doe v. Washington & Lee University*, the Western District of Virginia concluded that bias existed on the part of the University's Title IX officer that was material to the outcome of the student's disciplinary proceeding "due to the considerable influence she appears to have wielded in those proceedings," where the Title IX officer had presented an article positing that "sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations," a factual situation paralleling the circumstances under which the student was found responsible for sexual misconduct.[49]

Although there have been increasing numbers of suits filed by students found responsible for sexual misconduct, no clear judicial trends have yet emerged.   For example, in a November 22, 2016 decision, the Fourth Appellate District of the California Court of Appeal reversed a superior court's determination that a male student accused of sexual misconduct was not afforded a fair hearing, that substantial evidence did not support the university panel's decision to suspend him, and that the Dean and university regents "improperly increased his punishment in response to his

---

46      *Doe v. Brandeis Univ.,* 177 F.Supp. 3d 561, 603 (D. Mass. 2016).  Compare *Doe v. Trustees of Boston Coll.,* No. 15-cv-10790, 2016 WL 5799297 at *21 (D. Mass. Oct. 4, 2016) (finding institution provided "basic fairness" when disciplinary process was in accord with school policies, student was given prompt notice of charge and factual allegations against him, he had benefit of attorney-advisor in hearing and could present testimony, and he received two reviews of the board's decision).

47      *See* Amended Complaint, *Doe v. Lhamon*, No. 1:16-cv-01158-RC (D.D.C. Aug. 15, 2016).

48      *Doe*, 177 F. Supp. 3d at 606.

49      No. 6:14-cv-00052, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015); *see also Sahm v. Miami Univ.*, 110 F.Supp. 3d 774, 778 (S.D. Ohio 2015) ("The thrust of the allegations against [the Title IX coordinator"] appears to be that her multiple roles as a part-time police officer, a member of the Task Force on the Prevention of Sexual Assault, and a Title IX investigator made her biased against [the plaintiff] during her investigation of the alleged assault of [the complainant].  The factual assertion that she discouraged a witness from testifying at the disciplinary hearing is troubling.  However, these facts pleaded against [the Title IX coordinator] do not suggest a gender bias against males so much as against students accused of sexual assault"), *but see Doe v. Univ. of Cincinnati*, 173 F.Supp.3d 586, 601-602 (S.D. Ohio 2016) (concluding that because school disciplinary boards are entitled to a presumption of honesty and impartiality, a plaintiff must allege specific statements indicating bias or a pattern of decision-making indicating gender was an influence, beyond simply sexual assault training provided to staff members and pressure exerted on universities by OCR).

AR_00001319

appealing the Panel's decision and recommended sanctions."[50]  The appellate court found that, under the "extremely deferential substantial evidence standard of review," there was sufficient evidence to buttress the panel's decision, given the complainant's testimony at the hearing and the investigator's report.[51]  Further, the court did not find the process unfair, noting that the accused student "was provided with notice of his alleged violation, informed regarding the basis of that violation, and given the opportunity to put forth his defense."[52]  Finally, the court found that the dean was authorized to sanction the student—as the panel was empowered only to give recommendations—and did so "per the applicable sanctioning guidelines."[53]  Although the court acknowledged that the university's procedures "were not perfect" and noted it had "some concerns," it ultimately concluded that on the record, it could not find the process unfair.[54]

Some courts have held that even in public institutions, the Due Process Clause "does not compel a university to allow cross-examination at all"[55]; others have found that "[a]ccused students do not have the right to be actively represented by an attorney at a disciplinary hearing"[56] and that there is no prohibition against the use of hearsay evidence in school disciplinary hearings or refraining from assigning the burden of proof to either party.[57]

## ACTL'S RECOMMENDATIONS

ACTL has the following concerns relating to the present state of campus sexual misconduct investigations, many of which directly arise from OCR's policies and promulgations and which adversely impact the rights of students accused of sexual misconduct.

### Need For Procedural Due Process

ACTL recognizes that colleges and universities face a difficult task in accommodating the inherent tension between fairness to accused students and to complainants and achieving a proportionate balance. However, basic fairness requires that sexual misconduct investigations provide accused students with effective procedural protections.  As one federal judge has noted, in such investigations, the stakes are "very high," as students are charged with serious offenses "that carry the potential for substantial public condemnation and disgrace."[58]

Although disciplinary policies at public universities must comport with the Fourteenth Amendment, "those same protections are not available to students enrolled in private colleges and

---

50      *Doe v. Regents of the Univ. of Cal.*, D068901, __ Cal. Rptr. 3d __, 2016 WL 6879293 at * 1 (Cal. App. 4th Nov. 22, 2016).
51      *Id.* at *2.
52      *Id.*
53      *Id.*
54      *Id.*
55      *Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547 at *7 (S.D. Ohio Feb. 22, 2016), *report and recommendation adopted*, No. 2:15-cv-2830, 2016 WL 1578750 (S.D. Ohio Apr. 20, 2016).
56      *Johnson v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, No. 12-515, 2013 WL 5298484 at *10-11 (E.D.Pa. Sept. 19, 2013).
57      *Doe*, 173 F.Supp.3d at 603.
58      *Id.* at 604.

AR_00001320

universities."[59]  ACTL believes that all students, whether at public or private institutions, who are accused of sexual misconduct should be guaranteed due process protections.  To that end, ACTL submits that accused students should be:

- **Provided with an investigation or hearing conducted with due consideration for any appearance of partiality, including any that might arise from the factfinder's other responsibilities or affiliations;**

- **Promptly provided with the details of the allegations and advised of their right to consult legal counsel;**

- **Provided the right to be advised and accompanied by legal counsel at all stages of the investigation or hearing;**

- **Provided with access to all evidence at a meaningful time and in a meaningful manner, so that they can adequately respond to it;**

- **Permitted to conduct some form of cross-examination of witnesses, in a manner deemed appropriate by the institution, in order to test the veracity of witnesses and documents;**

- **Provided with a process where the standard of proof for responsibility should be clear and convincing evidence; and**

- **Provided with written findings of fact on completion of the investigation or hearing sufficiently detailed to permit meaningful appellate review.**

**Need For Impartial Investigations**

A critical piece of procedural justice is the belief that an individual has been investigated and sentenced by an impartial factfinder.[60]  The judicial system strives to avoid both actual impropriety and the appearance thereof; regardless of whether misconduct occurred, courts should guard against actions or appearances that may "reasonably cause an objective observer to question [a factfinder's] impartiality."[61]

OCR describes its 2011 DCL as a "guidance document" that "does not add requirements to existing law."[62]  But, in the words of one court, the power of the Dear Colleague Letters stems from the Department of Education's ability to  "hold[] the specter of loss of federal funds as a sword over . . .

---

59     *Beauchene v. Mississippi Coll.*, 986 F.Supp.2d 755, 765 (S.D. Miss. 2013) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982)); *see also* 2011 DCL at 12 ("Public and state-supported schools must provide due process to the alleged perpetrator.").

60     *See, e.g., Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The due process requirement that a litigant's claim be heard by a fair and impartial factfinder applies to administrative as well as judicial proceedings."); *In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man is permitted to try cases where he has an interest in the outcome.").

61     *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988); *cf Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").

62     2011 DCL at 1 n.1.  *See also* Lhamon Letter at 3 (Feb. 17, 2016) ("[I]t is Title IX and the regulation, which have the force and effect of law, that OCR enforces, not OCR's 2011 (or any other) DCL.  OCR's 2011 DCL simply serves to advise the public of the construction of the regulation it administers and enforces.").

universities' heads in the event it were to find that [a] university failed to comply with Title IX."[63]

As one professor observed, faced with the threat of a federal investigation, coupled with a possible loss of federal funding, "schools could even be said to have a financial stake in the outcomes of the cases they decide—a possible conflict of interest."[64] Title IX officials, some of whom, as the aforementioned cases discuss, have been accused of partiality in their handling of complaints, owe their position to the 2011 DCL, which required colleges and universities to designate a Title IX coordinator.[65]

Concerns of withdrawal of federal funding, combined with media attention surrounding campus sexual assault, may cause universities—consciously or not—to err on the side of protecting or validating the complainant at the expense of the accused. These not-so-subtle pressures may contribute to partial and discriminatory investigations and the absence of protection for the accused. One former federal judge has noted that the preponderance of the evidence standard, in combination with media pressure, "effectively creates a presumption in favor of the woman complainant. If you find against her, you will see yourself on *60 Minutes* or in an OCR investigation where your funding is at risk. If you find for her, no one is likely to complain."[66]

Recently, in the first case of its kind to reach a federal circuit court, the Second Circuit reversed the district court's dismissal of a complaint alleging Columbia University violated Title IX by demonstrating sex bias in its investigation and suspension of the accused student for alleged sexual assault.[67] In reviewing the complaint, the court found that the student pled sufficient facts—the investigator and panel did not seek out his identified witnesses, comply with Columbia's procedures protecting alleged perpetrators, or reach conclusions supported by the weight of the evidence—to support an inference Columbia was motivated in its actions by "pro-female, anti-male bias . . . adopted to refute criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to female students' charges of sexual assaults by male students."[68]

In order to enhance subjective and objective procedural fairness and reduce the incidence of conflicts of interest, educational institutions should: (1) screen for and assign only individuals without actual or perceived bias to participate in the disciplinary process; and (2) consider identifying individuals and organizations outside universities that can act as investigators and/or decision-makers in Title IX cases, such that universities are not forced to police their own compliance with federal law. OCR should also embody within its policy documents the need for investigations and hearings to be conducted with due consideration for even the appearance of partiality arising from the factfinder's other responsibilities or affiliations within the institution.

---

63    *Doe*, 166 F.Supp.3d at 181.

64    Gersen, *supra*; *see also* Hartocollis, *supra* (noting that "[m]ore than 200 colleges and universities are under federal investigation for the way they have handled complaints of sexual misconduct, up from 55 [in 2014].").

65    *See* Hartocollis, *supra* (observing that Title XI coordinators can earn $50,000-$150,000 a year, that the Association of Title IX Administrators has 5,000 members and has "doubled in size for each of the past two years", and that schools like Harvard and Yale have between thirty and fifty individuals working as Title IX supporters and coordinators).

66    Gertsen, *supra*, at 8.

67    *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

68    *Id.* at 56. *See also Doe*, 166 F.Supp.3d at 189 (finding complaint plausibly alleged gender bias motivating investigation and punishment levied against male student accused of sexual assault sufficient to sustain a Title IX claim); *Doe*, 2015 WL 4647996 at *10 (finding student plausibly pled a Title IX claim in alleging the university's disciplinary procedures "amount to a practice of railroading accused students" and that gender bias motivated his expulsion (quotation omitted)).

AR_00001322

ACTL understands that many schools use a so-called investigative model in college disciplinary proceedings. However, with that model, we believe there is a heightened need for investigators to be qualified, appropriately trained, and impartial, since there is no separate adjudicative body to hear and weigh evidence and make findings of fact. To that end, any model should ensure there is an opportunity for meaningful appellate review by requiring the issuance of written findings of fact that adequately set forth the basis for any recommendation or decision.[69]

**The Right to Counsel, Access Evidence, and Notice of Allegations**

ACTL strongly believes that there are considerable benefits to extending accused students these procedural protections, whether at a private or public institution, beyond the simple but undeniable value of making investigations as equitable as possible.

Students at private universities may invoke due process protections if "they meet the threshold requirement of showing that the State somehow involved itself in what would otherwise be deemed private activity."[70] In expanding Title IX's protections, creating a mandatory Title IX investigative process (mandating hiring of a Title IX coordinator), and outlining acceptable procedures (mandating use of preponderance of evidence standard), the federal government has arguably "involved itself" in the disciplinary protocols of individual universities.[71] In recognition of its untraditional, expansive role, as well as its ability to command compliance through fines and the withholding of federal funding, we believe that OCR should amend its guidance letters to provide due process protections for accused students at both private and public institutions.

There is also a growing body of evidence demonstrating that the presence of procedural justice is critical to an individual's acceptance of the outcome of dispute. Scholars have found that individuals who believe that a dispute resolution process was fair but the outcome unfair are almost as satisfied as those who believe both were fair, an explanation credited to, among other things, the "importance to one's self-esteem of being treated fairly by authoritative individuals and institutions . . . and the possibility that lay individuals used their assessment of process fairness to help them assess ambiguous outcomes."[72]

---

69    *Accord* Conor Friedersdorf, *What Should the Standard of Proof Be in Campus Rape Cases?*, *The Atlantic* (Jun. 17, 2016), http://www.theatlantic.com/politics/archive/2016/06/campuses-sexual-misconduct/487505/ ("...if the 'preponderance of the evidence' standard survives both litigation and debate, it ought to at least be paired with procedural reforms that guarantee that the accused on campuses are transparently told the charges against them, given access to evidence, allowed legal representation, and otherwise afforded *at least* the same rights and safeguards against injustice that they'd have in a civil case with comparable stakes." (emphasis in original)).

70    *Beilis v. Albany Med. College of Union Univ.*, 525 N.Y.S. 2d 932, 934 (N.Y. App. Div. 1988).

71    See *Remy v. Howard Univ.*, 55 F.Supp. 2d 27, 29 (D. D.C. 1999) ("[T]he government must exert control over an institution before a body becomes subject to governmental . . . restrictions.").

72    Deborah A. Hensler, *Our Courts, Ourselves: How the Alternative Dispute Resolution Movement is Re-Shaping Our Legal System*, 108 Penn. St. L. Rev. 165, 179 n. 63 (2003); *see also* Rebecca Hollander-Blumoff & Tom R. Tyler, *Procedural Justice in Negotiation: Procedural Fairness, Outcome Acceptance, and Integrative Potential*, 33 Law & Soc. Inquiry 473, 491 (2008) (reporting result of studies suggesting "people were more willing to accept a decision that was reached via a procedure in which they felt treated fairly"); Tamar R. Birckhead, *Toward a Theory of Procedural Justice for Juveniles*, 57 Buff. L. Rev. 1447, 1454 (2008) (noting that "when juveniles perceive that they have been treated fairly by law enforcement and the courts—a judgment shown not to be dependent upon the outcome of the case—they are less likely to recidivate."); Deborah Epstein, *Procedural Justice: Tempering the State's Response to Domestic Violence*, 43 Wm. & Mary L. Rev. 1843, 1875 (2002) (arguing research suggests safety of domestic violence victims can be aided by attending to batterers' perception of fairness, as "fair treatment affects compliance regardless of whether the ultimate result is viewed as right or wrong").

AR_00001323

Ensuring procedural justice in campus sexual assault investigations thus serves a dual purpose.  First, it affirms the critically important sexual assault prevention goals of Title IX and the Department of Education.  The problem of campus sexual assault is widely recognized to have reached "epidemic levels." [73]  An Association of American Universities (AAU) study of 150,000 students at 27 colleges and universities showed that 27.2% of female college seniors reported they had "experienced some kind of unwanted sexual contact . . . carried out by incapacitation, usually due to alcohol or drugs, or by force."[74]

Procedural justice can reduce recidivism and ensure sexual assault investigations are regarded with seriousness and respect, ending the backlash incurred by any public perception that these investigations serve only to railroad and scapegoat individual men.  As one retired federal district judge, now a lecturer at Harvard Law School, writes:

> You don't have to believe that there are large numbers of false accusation[s] of sexual assault—I do not—to insist that the process of investigating and adjudicating these claims be fair.  In fact, feminists should be especially concerned, not just about creating enforcement proceedings, but about their fairness.  If there is a widespread perception that the balance has tilted from no rights for victims to no due process for the accused, we risk a backlash. Benighted attitudes about rape and skepticism about women victims die hard.  It takes only a few celebrated false accusations of rape to turn the clock back.[75]

Second, if alleged perpetrators are treated fairly, they are more likely to accept a decision of culpability, perhaps leading to less litigation against colleges and universities, which would in turn free up institutional resources better used for sexual assault education and prevention.[76]

In sum, ACTL believes that by ensuring accused students are afforded due process protections—including a fair and impartial investigator/decision maker, the right to notice of the allegations, access to evidence, some form of cross-examination, assistance by counsel, with the standard of proof by clear and convincing evidence, and written factual findings and conclusions— educational institutions can simultaneously ensure investigations are fair and equitable, promote procedural justice, comply with the U.S. Constitution, and enhance public confidence in their adjudicative procedures and the broader goal of prevention.

---

[73]    Abby Ohlheiser, *Study Finds 'Epidemic' of Sexual Assault Among First-Year Women At One U.S. College*, *The Wash. Post* (May 20, 2015), http://www.washingtonpost.com/news/grade-point/wp/2015/05/20/study-finds-epidemic-of-sexual-assault-among-first-year-women-at-one-u-s-college/.

[74]    Richard Pérez-Peña, *1 in 4 Women Experience Sex Assault on Campus*, *NY Times* (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/us/a-third-of-college-women-experience-unwanted-sexual-contact-study-finds.html.

[75]    Nancy Gertner, *Sex, Lies, and Justice: Can We Reconcile the Belated Attention to Rape on Campus with Due Process?*, *The American Prospect* at 3 (Winter 2011).

[76]    *See, e.g.*, Anemona Hartocollis, *Colleges Spending Millions to Deal With Sexual Misconduct Complaints*, *NY Times* (Mar. 29, 2016), http://www.nytimes.com/2016/03/30/us/colleges-beef-up-bureaucracies-to-deal-with-sexual-misconduct.html (observing that responding to a lawsuit "can run into the high six or even seven figures, not counting a settlement or verdict"); *Doe v. Brown Univ.*, 166 F.Supp. 3d 177, 180 (D. R. I. 2016) ("This case is one of a number of recent actions in the federal district courts in which a male student has sued a university that found him responsible for committing sexual assault after an allegedly flawed and deficient disciplinary proceeding.").

AR_00001324

**Some Form of Cross-Examination**

ACTL believes OCR's goal of protecting victims from re-victimization can be balanced with due process. For example, the *Doe v. University of Southern California* court rejected the argument that confrontation and cross-examination of witnesses was necessary in an investigation involving student sexual assault, echoing the concerns of the 2011 DCL that allowing an alleged perpetrator to directly question an alleged victim "may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment."[77] However, the court noted that there are "alternate ways" to enable accused students to hear the evidence against them and it cited cases where, for example, a complainant's testimony was tape-recorded and played for the accuser, a screen was placed between the parties, or testimony was given through closed-circuit television.[78]

Similarly, concern about students questioning one another in such cases has been addressed by some colleges and universities by permitting the accused to submit questions to a third-party, such as the investigator, to be asked of the complainant. At the University of Delaware, investigators provide both the complainant and the respondent a chance to "present questions they believe should be asked of the other party and witnesses and the opportunity to respond to statements made by others," though only in instances where it has been "deemed appropriate by the investigator."[79] The University of Dayton provides accused students with the right to request a hearing board to "consider their submitted questions for other parties (investigators, complainant, witnesses) at the hearing in those cases that go before the University Hearing Board."[80] Similarly, although Indiana University prevents complainants and respondents from directly questioning each other at sexual misconduct hearings, it permits the parties to submit questions to the chair of the hearing panel to be asked of other parties, although the chair or other panel members "will review questions prior to posing to the other party to prevent questioning that is not permitted under these proceedings."[81]

**The Inadequacy of Preponderance of the Evidence Standard**

It is well accepted that the standard of proof in most noncriminal adjudications is preponderance of the evidence. In *Addington v. Texas*, the Supreme Court noted that such a standard is appropriate in a "typical civil case involving a monetary dispute between private parties" where society at large has a "minimal concern with the outcome."[82] However, the Court observed that an intermediate standard is "no stranger to the civil law" and can be used in civil cases "involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant."[83] Where the interests at stake "are deemed to be more substantial than mere loss of money,"—for example, where a defendant risks "having his reputation tarnished erroneously"—a plaintiff's burden of proof is often

---

77      246 Cal. App. 4th at 245 (quoting 2011 DCL at 12).
78      *Id.* at 245 n.12.
79      Office of the President, *Sexual Misconduct Policy*, University of Delaware at 23 (Aug. 5, 2016), available at http://sites.udel.edu/sexualmisconduct/files/2016/08/20160809-Sexual-Misconduct-Policy-1muljdr.pdf.
80      University of Dayton, *Sexual Harassment/Misconduct Policy* (n.d.), available at https://udayton.edu/studev/dean/civility/sexual_harassment_misconduct.php.
81      IU Office of Student Welfare and Title IX, *Sexual Misconduct*, Indiana University at 12 (revised Aug. 25, 2016), available at http://policies.iu.edu/policies/categories/administration-operations/equal-opportunity/sexual-misconduct.pdf.
82      441 U.S. 418, 423 (1979).
83      *Id.* at 424.

AR_00001325

increased to clear and convincing evidence.[84]

The suitability of the clear and convincing evidentiary standard for sexual assault investigations is striking. Such cases are not "typical civil" matters based exclusively on "monetary dispute[s]"; moreover, as expressed through position statements from the White House, both national political parties, and state governments across the country, society has a significant interest in preventing and investigating sexual violence.[85] Further, alleged perpetrators risk a substantial tarnishing of their reputation. As the Supreme Court recognized in *Goss v. Lopez*, charges of misconduct leading to a suspension can "seriously damage...students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."[86] In such cases:

> [T]he private interest is compelling. The Plaintiffs faced charges of sexual assault against a fellow student, charges that could have led to their expulsions and did lead to their suspensions. The potential consequences reach beyond their immediate standing at the University. The Supreme Court has noted that where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied . . . The Plaintiffs argue, and this Court accepts, that these charges could have a major immediate and life-long impact on their personal life, education, employment, and public engagement.[87]

The "majority" of courts addressing the constitutionally required evidentiary standard for school disciplinary proceedings "have held that due process requires disciplinary decisions to be based on 'substantial evidence.' "[88]

Judge Gertsen described the current regime as "the worst of both worlds, the lowest standard of proof, coupled with the least protective procedures."[89] Recognition of the significant adverse consequences to students found responsible in sexual misconduct disciplinary proceeding, combined with the absence of virtually all of the procedural rights provided in civil lawsuits, such as voir dire, trial by judge or jury, or full cross-examination, compels an accompanying call for a higher standard of proof.[90]

---

84      *Id.*; *see, e.g., Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (applying clear and convincing evidence standard to terminations of parental rights); *Woodby v. INS*, 385 U.S. 37, 48-49 (1966) (applying standard to deportation proceeding); *see also Tijani v. Willis*, 430 F.3d 1241, 1245 (9th Cir. 2005) (recognizing Supreme Court has affirmed principle that "a heightened burden of proof" is on the State in civil proceedings where "the individual interests at stake...are both particularly important and more substantial than mere loss of money." (quotations omitted)).

85      *Addington*, 441 U.S. at 423.

86      419 U.S. 565, 575 (1975).

87      *Gomes v. Univ. of Maine Sys.*, 365 F.Supp.2d 6, 16 (D. Me. 2005) (citations and quotations omitted).

88      Lavinia M. Weizel, Note, *The Process That Is Due: Preponderance of the Evidence As the Standard of Proof for University Adjudications of Student-on-Student Sexual Assault Complaints*, 53 B.C.L. Rev. 1613, 1633 (2012).

89      Gertsen, *supra*, at 8.

90      *Compare* Chris Loschiavo & Jennifer L. Wallace, *The Preponderance of Evidence Standard: Use in Higher Education Campus Conduct Processes*, Association for Student Conduct Administration (n.d.) ("When both students have so much to lose, depending on the outcome of the hearing, preponderance is the appropriate standard . . . the expelled student can make a new beginning at another institution.") with *Doe*, 177 F.Supp. 3d at 607 ("[T]his was not a criminal proceeding, and Brandeis is not a governmental entity. Nonetheless [the student] was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense. He was ultimately found 'responsible,' and received a penalty that may permanently scar his life and career.").

AR_00001326

## **CONCLUSION**

ACTL strongly supports efforts to remedy the longstanding failure to adequately address the problem of sexual misconduct, particularly on college campuses.  But we believe that OCR has imposed on colleges and universities an investigative and adjudicative system that does not ensure basic fairness for accused students.  Under the current system everyone loses: accused students are deprived of fundamental fairness, complainants' experiences are unintentionally eroded and undermined, and colleges and universities are trapped between the two, while facing a potential loss of federal funding.

ACTL advocates for a system that encompasses essential elements of due process:  a fair and impartial investigation and hearing by qualified factfinders, and granting students the right to be advised and accompanied by counsel, to be permitted some form of cross-examination, to examine the evidence, to receive adequate written factual findings, and to be found responsible only if the evidence satisfies the clear and convincing standard.  These steps would enhance procedural justice and ensure the confidence of participants and the public in the fairness of Title IX investigations on campus.

AR_00001327

American College of Trial Lawyers
(Phone) 949-752-1801   (Fax) 949-752-1674
Website:  www.actl.com
Email: nationaloffice@actl.com

AR_00001328

**FACE.**
Families Advocating for Campus Equality

3905 State Street # 7- 408
Santa Barbara, CA  93105

## DUE PROCESS PROCEDURES NECESSARY IN
## CAMPUS SEXUAL MISCONDUCT DISCIPLINARY PROCEEDINGS

Following are the due process procedure Families Advocating for Campus Equality (FACE) believes are essential to ensure fair and balanced campus sexual misconduct disciplinary processes which result in unbiased assessments of the facts and evidence.

These recommendations were developed as the result of reports from the hundreds of students who have contacted FACE for support and advocacy over the past three years after having been accused of sexual misconduct, enduring misguided and result-driven campus disciplinary procedures, unfairly found responsible and suspended or expelled from their campuses. The procedures suggested here were also informed by a detailed review of existing campus policies including Stanford University,[1] recommendations from the American College of Trial Lawyers[2] and The NCHERM Group,[3] and the author's membership in an American Bar Association Task Force on the issue.[4]

1.  *EQUITABLE & UNBIASED PROCESSES:*[5] *Disciplinary proceedings should seek to ascertain the truth, not prove guilt or innocence.* Though SB169[6] and the 2011 Dear Colleague Letter (DCL)[7] both require "adequate, reliable and impartial investigations," many schools do not believe it necessary to provide or even understand the mechanics of providing adequate, reliable and impartial processes, making it imperative that SB169 provide basic guidelines, such as those discussed here and in the accompanying FACE Comparison of CA SB169 Procedures With Recommended Due Process Procedures Table.[8]

    The NCHERM Group, the leading provider of Title IX training throughout the country recently has warned schools that "[s]ome pockets in higher education have twisted the [DCL] and Title IX into a license to subvert due process and to become the sex police."[9] Nevertheless, SB169 Section 4(k) as proposed intends to create future regulations which mimic all provisions enumerated by the 19-page DCL that are "not covered" by the bill itself. It is inappropriate for a California statute to impose unarticulated responsibilities on schools, especially when those responsibilities have been uniformly criticized and results of their application so obviously ineffective at resolving the intended problems.

2.  *IMPORTANCE OF DUE PROCESS:* SB169's only mention of "due process," cautions that a respondent's right to due process should not be allowed to interfere with protections for the complainant.[10] However, many of the due process-like procedures addressed below do not interfere with protecting and would in fact benefit complainants. Even victims' rights advocates have supported additional due process in campus sexual misconduct proceedings.[11] Due process is essential in

---

[1] Stanford Student Title IX Investigation & Hearing Process, February 2016, at pp. 9-10, (various provisions of Stanford's Policy are paraphrased or summarized unless otherwise indicated) https://stanford.app.box.com/v/student-title-ix-process .
[2] American College of Trial Lawyers (ACTL), White Paper on Campus Sexual Assault Investigations, March 2017, at p. 11, (various provisions of ACTL's paper are paraphrased or summarized unless otherwise indicated) http://files.constantcontact.com/dbc236ec501/9b906384-177d-42df-9e1a-bcb6f62d9340.pdf .
[3] The 2017 NCHERM Group White Paper (NCHERM); Due Process and the Sex Police. p. 2, (provisions of the NCHERM White Paper are paraphrased or summarized unless otherwise indicated) https://www.ncherm.org/wordpress/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf.
[4] Cynthia P. Garrett, FACE Co President, is a member of an American Bar Association Task Force on the issue of campus sexual misconduct disciplinary procedures, which was able to reach a consensus among administrators, victims and women's rights advocates and defense attorneys. Release of that report is anticipated to be sometime in May 2017.
[5] These numbered categories correspond to those in the FACE Comparison of CA SB169 Procedures With Recommended Due Process Procedures Table, https://drive.google.com/file/d/0B0CTUnodV2_iZmRpTTVXWW51Rk0/view?usp=sharing .
[6] SB169 provisions are based on the version as of May 4, 2017. SB169 sections are paraphrased or summarized unless otherwise indicated.
[7] *Dear Colleague Letter*, U.S. Department of Education, Office for Civil Rights, *Ed.gov*, April 2011 (2011 DCL), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html
[8] FACE Comparison Table, note 5, *supra*.
[9] NCHERM, note 3, *supra*, at p. 2.
[10] SB169 Sections 4 & 6 (f), and Office for Civil Rights' "Questions and Answers about Title IX and Sexual Violence," U.S. Dep't of Education (Apr. 29, 2014), p. 13, http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf
[11] Know Your IX, Fair Process in Campus Discipline, https://www.knowyourix.org/issues/fair-process-campus-discipline/ .

1

campus processes because, although DCL proponents claim the process is merely "educational,"[12] as one court recently concluded such an argument "is not credible," because the "stakes are very high, and students are 'charged with serious offenses' "that carry the potential for substantial public condemnation and disgrace."[13]

3. *PROMPT & DETAILED NOTICES: Students must receive prompt and adequate notice of all actions and decisions relevant to the allegations.* Notices should be provided sufficiently in advance to allow parties a reasonable time to respond.

- Notice of the complaint must detail the facts on which the allegations are based, beyond merely listing "sexual misconduct," or a similarly vague category.[14] Respondents must be informed of:
  1) the specific conduct at issue,
  2) the complainant's identity and
  3) the date of the alleged incident prior to any interview by school personnel.
- Too often a student is not informed of the factual basis for the complaint until shortly before a hearing. This impedes respondents' ability to defend themselves by obtaining evidence and locating witnesses, particularly when a complaint is brought long after the alleged incident, as many are, and memories have faded or witnesses graduated.
- Respondents also must be notified that their statements and other information they may provide to the school can be used in criminal proceedings.
- Parties should be provided timely notice of all meetings, including those with other parties, either before or soon thereafter, including updates on the status of investigations and resolutions and notice of the hearing and a copy of the investigation report sufficiently in advance to allow time to prepare for the hearing.[15]

4. *PARTY IDENTITY: The identities of parties and witnesses should be disclosed to the parties, unless there are legitimate, verifiable safety concerns.*

5. *LAW ENFORCEMENT: Complainants should be encouraged but not required to report <u>criminal</u> sexual violence to law enforcement, and should they choose to report, they must be supported by the school in that effort.*

- Filing a police report creates a record of repeat offenders even if the matter is not pursued.
- Title IX investigations should be stayed during criminal investigations, to allow for the expert collection and preservation of evidence, and non-punitive interim measures available to ensure student safety.
- Students are not able to defend themselves adequately when they are involved in a criminal investigation.

6. *NON-PUNITIVE INTERIM MEASURES: Interim measures should be non-punitive.* Similarly, a respondent's interests should be taken into account in implementing interim measures, if they are not inconsistent with protecting the complainant. We have seen complainants go out of their way to attend respondent-related events seemingly for the primary purpose of retaliation.

7. *ADVOCATES & ATTORNEYS: Students must be permitted to be accompanied by an independent advocate or attorney throughout the disciplinary process, including during interviews.*

- Because colleges seek to protect complainants and their focus is frequently to establish guilt, respondents can often find themselves in a position similar to David facing Goliath, defending themselves against experienced lawyers or administrators.[16]
- Though schools sometimes require an independent employee be assigned as support for the respondent, such an employee owes allegiance to the school, is not normally bound by confidentiality laws and their participation is restricted during hearings and investigations. This disproportionately affects the respondent in the collection and presentation of evidence.

---

[12] This point was addressed in *Doe v University of Notre Dame*, when, in response to the court's query as to "why an attorney is not allowed to participate in the hearing especially given what is at stake—potential dismissal from school and the forfeiture of large sums of tuition money," the campus official provided the commonly used rationalization that 'it's because he views this as an "educational" process for the student, not a punitive one.' The court replied: 'This testimony is not credible. Being thrown out of school, not being permitted to graduate and forfeiting a semester's worth of tuition is "punishment" in any reasonable sense of that term.' *Doe v University of Notre Dame*, Case No. 3:17CV298, at pp. 25-26, (Dist. Court IN, South Bend, May 8, 2017, https://drive.google.com/file/d/0B0CTUnodV2_iZ19NMkdwSVczSzA/view?usp=sharing.

[13] ACTL, note 2, *supra*, at p. 11.

[14] For example, in *Doe v University of Notre Dame* granted the accused student's request for a TRO against the school, noting that "the lack of meaningful notice to John of the allegations against him, so as to be able to adequately prepare his defense, has a more than negligible chance of being found to render the disciplinary process capricious … John reasonably needed to know what contacts and conduct was being scrutinized for possible violation of which policies." The court found that merely advising the student of policies violated, such as "sexual misconduct," 'amounts to no notice at all. … This so-called "notice of charges" could not be further from revealing particular policy violations implicated, much less specific allegations of John's objectionable conduct.' Note 12, *supra*, at p. 21.

[15] NCHERM, note 3, *supra*, at pp. 17-18.

[16] See *Doe v University of Notre Dame*, note 12, *supra*, at pp. 25-26.

2

AR_00001330

- Advocates should have the same access to evidence as the party they represent, and the right to communicate with that party and to be present during all meetings and proceedings.[17]

8. *CONFIDENTIAL ADVISORS: Both parties must have confidential advisors;* respondents can be unaware of how to defend their rights, unable to afford an attorney and traumatized by the isolation they experience after an accusation, particularly one that is false.

9. *STUDENT SUPPORT: Support services are must be provided to both parties.* Many schools provide support services for complainants although wrongfully accused respondents experience equivalent emotional trauma, such as PTSD, depression and suicidal ideation (a few wrongfully accused respondents have committed suicide.) These students also may experience repulsion and rejection by other students, friends and family who, not understanding campus culture,  may presume their guilt. All students affected by disciplinary proceedings must be provided counseling, medical, and educational support services such as tutoring and grade forgiveness.

10. *UNAMBIGUOUS & PRECISE MISCONDUCT DEFINITIONS: Definitions should be specific and not employ criminal terminology.*
    - Unfortunately, SB169's definitions are confusing and ill-defined. Currently, "sexual harassment" is a broad category which includes sexual assault, sexual misconduct, dating violence, domestic violence and stalking in addition to the traditional sexual harassment. In fact, many FACE student cases have been suspended or expelled for alleged conduct which did not even involve involve sexual intercourse.
        1) On campuses, the conduct included under the term "sexual misconduct" ranges from unwanted touching of a fully clothed body part to repeated verbal requests for sex.
        2) SB169 Section 2(a) defines it as unwelcome sexual advances, requests for sexual favors, and other verbal, visual, physical conduct of sexual nature if submitting was a condition of employment, grades, etc.
    - SB-169 Section 2(b) inexplicably states that sexual harassment also means 'sexual violence, without clarifying that under the DCL and more recent Title IX interpretation sexual violence may be a *form* of sexual harassment, but the latter term may not always signify violence.
    - SB-169 Section 3(a) defines "sexual violence" as sexual acts against one's will or where there is an incapacity to consent due to victim's use of drugs or alcohol.
        1) However, the bill fails to define "incapable of giving consent." It would be far more effective to use the term "incapacitated," thereby providing a more definitive threshold which is also more likely to be within the capabilities of campus administrators to assess.
        2) The bill defines "sexual violence" to include:
            a) Rape as defined as in the California Penal code (SB169 Section 3(b)).
            b) Sexual assault or sexual battery as defined as in the California Penal code (SB169 Section 3 (c)).
            c) Sexual coercion, with no definition or Penal code section cited. This is unacceptably vague: what is "sexual coercion?"  Is it considered "coercion" when one party asks a partner for sex twice within an hour?  Six times over the course of an evening?
        3) Unfortunately including both criminal and noncriminal conduct under the category "sexual violence" and conflating criminal terminology with non-criminal conduct code violations has serious repercussions:
            a) Sexual misconduct or sexual harassment can remain on an respondent transcript, causing future schools and employers to grievously misinterpret the heinousness of the offense, impacting a student's future employability because these terms imply a more serious violation to those outside the campus community.
            b) If a violation is not criminal, it should be called a 'student conduct code violation,' or another term not used for describing or implying criminal sexual conduct.

11. *UNBIASED INVESTIGATION: Party interviews should be conducted with the same procedural protections as hearings.*[18]
    - Campus investigators often gather evidence to demonstrate guilt, while neglecting to interview witnesses or collect evidence that may undermine the allegations.
    - An investigator may also act as a prosecutor at hearings, and present evidence only on behalf of a complainant.
    - In case after case discovery in connection with a civil lawsuit has revealed significant evidence such as text messages, emails and other social media sources which exonerates a respondent, but was not produced at the campus proceeding because the investigator did not request or have access to such information.[19]

---

[17] In *Doe v University of Notre Dame*, during the hearing the advisor was 'not allowed to "make comments, pass notes"' and "could confer with their respective advisors during the hearing only on breaks, taken entirely at the discretion of the Hearing Panel." Note 12, *supra*, at p. 14.
[18] NCHERM, note 3, *supra*, at p. 18.
[19] *Doe v University of Notre Dame*, the respondent requested access to the complainant's text messages to rebut her hearing testimony, but the school refused. According to the court, the respondent "didn't have access to these texts messages because it was Jane who selectively chose which texts would be produced during the investigation." Note 12, *supra*, at pp. 15-16.

3

AR_00001331

- Respondents who were loyal to their school and believed the system was fair and truth would prevail have been blindsided by decisions based on incomplete or skewed facts, often because they were unaware of the need to produce evidence on their own behalf.

12. *IMPARTIAL INVESTIGATOR: Respondents must be presumed innocent.*
   - A presumption of innocence is critical in the campus process where wrongful allegations and findings are more prevalent due to expanded definitions of sexual harassment, narrow definitions of consent, the absence of sworn testimony, restrictions on hearsay and cross-examination and the lower standard of evidence.[20]
   - Wrongful allegations and findings also are more likely on campus because historical disincentives for false *criminal* reporting (such as trauma, shame and fear of repercussions) have been mitigated by a protected and even respected status on many campuses. Furthermore, the vast majority of cases involve scenarios in which wrongful or exaggerated accusations occur most frequently, such as "attempts to conceal or deny discovered infidelity … consensual sexual activity that is subsequently regretted … [and] … complaints following the breakdown of a relationship."[21] Students have reported that if they wish to "Title IX" someone, they need only "fill out a form."

13. *COMPREHENSIVE INVESTIGATION REPORT: A comprehensive report should identify all evidence collected.*
   - Both parties should receive a copy of the investigation report and be permitted to submit suggestions for additions and exclusions, as well as to submit responses to the final report.[22]
   - Due to confirmation bias, an investigator must be precluded from making responsibility conclusions and findings of fact.[23]

14. *COMPLETE ACCESS TO EVIDENCE: Students must have access to all evidence.*
   - If the school process seeks the truth, there is no reason to deny access to all evidence collected or discovered.
   - Currently, often under the pretext of confidentiality, discovery of the truth is hampered because respondents is:
       1) barred from contacting potential student witnesses,
       2) denied access to evidence or sufficient time[24] to review records, and
       3) forbidden to photocopy or take detailed notes on investigation records and witness statements.[25]
   - NCHERM warns all parties should be given copies of reports and access to evidence used in responsibility decisions.[26]

15. *WITNESS TESTIMONY: Parties should be able to suggest witnesses and present written questions to them, as well as follow up questions generated by their statements or testimony.*
   - SB 169 Sections 4 and 6(c)(3)(C) provide that both parties should have "the opportunity … to present witnesses and other evidence." However, schools limit questions and may not allow follow up questions generated by testimony.
   - If a witness account is pivotal for finding responsibility, fact-finders should be able to hear their testimony in person or by electronic means.

16. *RIGHT TO BE HEARD: Parties should be given an opportunity to be heard by fact-finders.* Parties must be informed of and the chance to fully and fairly defend against all allegations and respond to all evidence on the record.

17. *ADMISSIBILITY & OF RELEVANCY OF EVIDENCE: All relevant evidence must be considered in a process seeking to ascertain the truth.*
   - SB-169 Sections 4 and 6(c)(3)(C) require grievance procedures to provide both parties the opportunity to present witnesses and evidence. Unfortunately, SB169 provides no clarification with respect to the types of evidence admissible, how the evidence is to be accessed or presented, the parties' rights to question evidence, rules for disclosure or sequestration, rape shield rules, etc.

---

[20] Research has undermined David Lisak's much relied upon study which estimated only 2-9% of accusations are false. See Soave, Robby, "How an Influential Campus Rape Study Skewed the Debate; Widely cited study relies on surveys that don't actually have anything to do with on-campus rape assaults," *Reason.com*, July 28, 2015, http://reason.com/blog/2015/07/28/campus-rape-stats-lisak-study-wrong.

[21] Saunders, Candida L., "The Truth, The Half-Truth, and Nothing Like the Truth, Reconceptualizing False Allegations of Rape," *The British Journal of Criminology*, Vol. 52(6), pp. 1152-1171, http://bjc.oxfordjournals.org/content/52/6/1152.full.pdf; *see also* Erwin, John, "Missing the Mark; False Allegations in the U.S. Government," *American Analyst*, August 8, 2014, p. 8 (in his article Erwin refers to Saunders' article as the "best overview of the issue," and references several others studies examining the likelihood of false allegations), https://drive.google.com/file/d/0B0CTUncdV2_iSTBQNDNScDlVV2s/view?usp=sharing.

[22] Stanford, note 1, *supra*, at pp. 9-10; NCHERM, note 3, *supra*, at p.18.

[23] Stanford, note 1, *supra*, at p.12.

[24] For example, in *Doe v University of Notre Dame*, the district court, calling it a "data dump," noted that before the hearing the respondent was given "two-and-a-half days to review" "a substantial volume of new material." The court found "[s]uch a process is not designed to facilitate a fair hearing for which John is fully prepared to respond against Jane's allegations and evidence." Note 12, *supra*, at pp. 25, 15.

[25] In *Doe v University of Notre Dame*, the district court noted that the respondent was permitted to "review, but not photocopy or otherwise duplicate, the Administrative Investigation documents (over 350 pages) prior to the hearing." Note 12, *supra*, at p. 14.

[26] NCHERM, note 3, *supra*, at p. 18.

4

- Further clarification is needed because:

  1) Decision-makers consistently ignore the context of the parties' relationship, finding texts, photographs and witness statements "irrelevant," on the basis that only evidence during the alleged event is relevant. Decision-makers must consider the circumstances concerning the parties' relationship; as NCHERM recently explained, context is relevant: consent is contextual and transactional and interactions should be viewed within the context of the larger relationship, avoiding the tendency "to hyper-focus on each touch within an interaction."[27]

  2) Decision-makers frequently reject phone records, blood tests, polygraph results and other forensic data unless produced by the campus investigator, thereby preventing consideration of exculpatory evidence an investigator may have overlooked or intentionally ignored.

18. *ONE INVESTIGATOR-ADJUDICATOR: an investigator serving as decision-maker should be discouraged.*
   - A separate decision-maker offsets the potential for investigator bias. and to hear the parties.
   - A clear and convincing standard of proof should be required to offset potential bias when the investigator and decision-maker roles are combined.

19. *HEARING ALTERNATIVES: Schools should be permitted to allow non-mediation alternatives if appropriate.* Both parties must voluntarily agree to participate in any such process and may withdraw their consent at any time.

20. *PARTY SILENCE & PRESENCE: Neither party should be required to participate in a disciplinary process.*
   - Silence must not support guilt findings especially with a criminal action pending.
   - A party who chooses to remain silent should still be able to present evidence or question evidence that is presented.

21. *IMPARTIAL & UNBIASED DECISION-MAKERS: A panel should be comprised of three unbiased members who are diverse in gender, race, age, sexual orientation and position and receive explicit training on objective adjudication.*
   - 'Believe the victim' is appropriate for support, but has no place in a hearing.
   - Use of administrators/professors could affect their objectivity due to their immersion in campus culture.
   - Parties should be advised of decision-makers' identity in advance.

22. *LIMITED CROSS-EXAMINATION: Questioning of witnesses is crucial to evaluating credibility.*
   - Credibility, is often the *only* issue in campus "he said–she said" cases.
   - Though policies allow questions submitted in writing, decision-makers sometimes unreasonably refuse to ask questions and often follow up questions in response to testimony are denied.[28]
   - Respondents also are not permitted to question the investigator whose report is relied upon in determining guilt.

23. *TIME LIMITS: Completion of a disciplinary process in 60 days should be the goal, but a thorough and fair process should not be compromised to meet that deadline.*

24. *DETAILED RECORDS: Disciplinary proceedings must be documented.* Colleges should maintain written, video or audio records of all proceedings including investigations, to facilitate a decision's review and/or appeal.

25. *REASONABLE STANDARD OF EVIDENCE & ADEQUATELY TRAINED DECISION-MAKERS: The standard of evidence must protect against life-altering consequences.*
   - The preponderance standard of evidence "is a fairly minimal standard," and "it must be applied with steadfast rigor."[29]
   - Due to the low standard of evidence, FACE supports Stanford's requirement that a panel of three decision-makers be unanimous.[30]
   - Unfortunately, decision-makers believe they must choose one party over the other -- that there is no neutral position. However, "if the parties are equally persuasive" in their assertions, the school "has not met its burden and the responding party cannot be found in violation of the sexual misconduct policy."[31]
   - It must be clarified that it is not the job of decision-makers to decide whether one party or the other is more credible or has more evidence (they may be both credible, but the evidence still does not pass the threshold), the decision should be *whether there is sufficient evidence to make the occurrence of the violation more probable.*[32]

---

[27] NCHERM, note 3, *supra*, at p. 6. Similarly, the district court in *Doe v University of Notre Dame*, noted that "[i]n a disciplinary matter concerning behavior in a long-term existing relationship, context matters, and the motive of the complainant (as it relates to credibility) bears more scrutiny than in some other cases." Note 12, *supra*, at p. 23.

[28] In *Doe v University of Notre Dame*, the court observed "[t]hat all questions must be proposed in writing and are asked of witnesses only at the discretion of the Hearing Panel does not permit a robust inquiry in support of a party's position. The stilted method does not allow for immediate follow-up questions based on a witness's answers, and stifles John's presentation of his defense to the allegations." Note 12, *supra*, at p. 25.

[29] NCHERM, note 3, *supra*, at pp. 5, 18.

[30] Stanford, note 1, *supra*, at p. 18.

[31] NCHERM, note 3, *supra*, at p.16.

[32] NCHERM, note 3, *supra*, at p.16.

5

- Decision-makers must also be given instructions on how to properly apply the preponderance of evidence standard, such as:
  1) to evaluate the quality of evidence;
  2) give more weight to higher quality or reliable evidence than that of low quality;
  3) that quantity of evidence alone does not support a responsibility finding; and
  4) that respondent should be found to have engaged in misconduct only if the decision-makers believe there is sufficient, relevant, probable and persuasive evidence and that evidence outweighs any evidence that the alleged conduct did not occur.
- There must be no gender-based presumptions or shifting of the burden of proof: OCR policies and California laws reinforce gender-biased decision-making caused by affirmative consent policies under which campus fact-finders:
  1) presume males initiate sexual encounters, even when evidence shows otherwise;
  2) penalize only an initiator for alcohol violations, even when an complainant's intoxication was self-induced;
  3) demand the initiator gauge the intoxication level of an complainant who may appear lucid and be in a blackout;
  4) negate otherwise valid consent when it is later decided the respondent "*should have*" accurately gauged the complainant's intoxication;
  5) absolve an complainant from conveying objection to the sexual activity; and,
  6) transfer the burden of proof to the respondent to prove consent was obtained.[33]
- Together the above factors undoubtedly tilt decisions in favor of complainants, and demand "a finding that conduct was unwelcome *solely* because of the [complainant's] drug or alcohol consumption … [while] denying the respondent any mitigation because of his."[34]

26. *DETAILED FINDINGS: Findings must be specific and provide a rational basis for the decision and which allows parties to file meaningful appeals.*

27. *PROPORTIONATE SANCTIONS: Adjudications and sanctions should consider the motivation for and reasonableness of the conduct.*

- In attempting to demonstrate responsiveness to sexual assault, decision-makers indiscriminately suspend or expel students found responsible, despite lack of an intent to harm or an honest belief in consent, no matter how egregious the violation, and even when the he-said/she-said controversy was indecipherable or both parties were equally intoxicated.
- Decision-makers must consider all circumstances in adjudication and imposition of penalties, and sanctions should account for mitigating[35] and aggravating factors, prior conduct history, the nature and seriousness of offense and the impact on the complainant and community.
- Sanctions should include an allowance of educational and training remedies when justified by the facts.[36]

28. *RIGHT TO APPEAL: Grounds for appeal should be limited to:*
  1) new information not known or available at hearing;
  2) procedural error materially affecting the findings (includes improperly excluding or including evidence);
  3) the imposition of disproportionate sanctions; or
  4) that the conduct does not violate school policy.

29. *UNDERSERVED POPULATIONS: Though SB169 recites that education is a 'great equalizer,' the policies it seeks to codify have been shown to undermine that effect by disproportionately impacting minorities, first generation, financial aid students, and other similarly-situated student populations.*

30. *ALCOHOL ABUSE: Schools must develop education and other policies designed to reduce the incidence of sexual conduct violations associated with alcohol and drug abuse, especially in a culture where it is common to "pre-game" before an event by ingesting shots of alcohol.*

---

[33] In one case the judge ruled that to require the respondent to prove consent violated due process. Greenfield, Scott H., "Affirmative Consent is Unconstitutional," *Simple Justice, A Criminal Defense Blog*, August 11, 2015, http://blog.simplejustice.us/2015/08/11/affirmative-consent-is-unconstitutional/.

[34] Halley, Janet, Commentary, "Trading the Megaphone for the Gavel in Title IX Enforcement; Backing off the hype in Title IX enforcement," *Harvard Law Review Forum*, 128 Harv. L. Rev. F. 103, February 18, 2015 (a "witch hunt" due to "pressure on schools to hold students responsible for serious harm even when — precisely when — there can be no certainty about who is to blame for it."), http://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/.

[35] "John's depression … was not taken into account in the disciplinary process." *Doe v University of Notre Dame*, note 12, *supra*, at p. 24.

[36] Stanford, note 1, *supra*, at p. 26; NCHERM, note 3, *supra*, at p. 18.

AR_00001334

31. *INSTITUTIONS   SUBJECT   TO SB169:* *SB169 does not distinguish between public and private schools, ignoring a significant discrepancy in the rights of students attending public schools, which are held to higher fairness and due process standards, and private which are not.*

- There is no consensus as to how much process is constitutionally or contractually required to be provided to respondents, and the outcome often depends on whether the institution is public or private.[37]
- Equality and fairness require SB169 to provide due process for private as well as public school students.[38]
- NCHERM has warned that 'more and more courts seem to be affording due process rights (or the equivalent) to students enrolled in private colleges, including recent decisions at the University of Southern California and Brandeis University.'[39]
- OCR's Wesley Resolution 'makes the case for Title IX-derived due process rights at a private college' for a respondent; reflects the idea that Title IX focuses on equity for both parties, not just the reporting party.[40]
- SB169 should not impose 'grievance procedures' on elementary or secondary schools; educational and training remedies to address children's sexual misconduct would be more appropriate in these schools.

32. *SCHOOLS NEED DUE PROCESS GUIDANCE:* *Although SB169 Section 6(c)(3) instructs schools to develop grievance procedures, neither SB169 nor OCR has provided guidance on specific due process procedures necessary to protect respondents.*

- Adding due process provisions will improve both parties' experiences because decisions will have more credibility and be more trustworthy.
- Our experience with the DCL along with the concerns expressed by NCHERM and ACTL confirm that our schools need specific instruction on creating and applying equitable grievance procedures for sexual offenses on campuses in order to correct current practices. Even if the DCL were withdrawn, many campus leaders have expressed their commitment to keeping the same processes, and schools will continue to be under political pressure to do so.
- Furthermore, such procedures can only be created in consultation with those who posses expertise in the fields of sexual violence, law and education.

## CONCLUSION

FACE appreciates your consideration of our comments and suggestions to help ensure campus disciplinary proceedings are transparent and unbiased, and individual disciplinary decisions are not motivated by threats of penalties or political pressure to report a threshold number of sexual assaults. We believe the integrity of campus disciplinary decisions will be preserved and prevention efforts more successful when decisions are based on fair procedures, reasonable and objective behavioral standards and the decision-makers' independent evaluation of all available relevant and reliable evidence.

FACE students and representatives are available to provide testimony regarding the effects of the current college disciplinary process on falsely respondents and their families.

Respectfully submitted,

May 12, 2017

*Cynthia P Garrett, Co President*
**Families Advocating for Campus Equality**
(b)(6)
cgarrett101@gmail.com
facecampusequality@gmail.com

*Andrea Pitts, Advocacy*
**Families Advocating for Campus Equality**
(b)(6)
micrigal1@hotmail.com
facecampusequality@gmail.com

*Families Advocating for Campus Equality (FACE) is a 501(C)(3) organization whose mission is to provide support and advocacy for students adversely impacted by campus sexual misconduct disciplinary policies.*
*www.facecampusequality.org*

---

[37] ACTL, note 2, *supra*, at p. 2.
[38] ACTL, note 2, *supra*.
[39] NCHERM, note 3, *supra*, at p. 19.
[40] NCHERM, note 3, *supra*, at p. 19.

8

# THE
## 2017
# NCHERM GROUP
# WHITEPAPER

## DUE PROCESS
## AND
## THE SEX POLICE

Nedda Black, J.D., LMSW
Michael Henry, J.D.
W. Scott Lewis, J.D.
Leslee Morris, J.D.
Anna Oppenheim, J.D.
Saundra K. Schuster, J.D.
Brett A. Sokolow, J.D.
Daniel C. Swinton, J.D., Ed.D.

The NCHERM Group, LLC

www.ncherm.org

# CONTENTS

Introduction ....................................................................................................... 2
Are You the Sex Police? ...................................................................................... 3
CASE STUDY #1 – LIZ AND NEVEAH ................................................................ 7
CASE STUDY #2 – WES AND TAMEKA ............................................................ 10
A Note about Tone ............................................................................................. 14

The Intersection of Consent Theory and Due Process ................................... 15
Due Process Commitment ................................................................................. 17
       The NCHERM Group Statement of Commitment to Due Process Protections ...... 17
Due Process Checklist ...................................................................................... 17
The Wesley College OCR Determination ........................................................... 19

Conclusion ........................................................................................................ 19

About the Authors ............................................................................................. 21

## Introduction

The authors started out writing the annual Whitepaper, and it turned into a book: *The ATIXA Playbook*. We expect that *The Playbook* will become your essential "how to" guide for ensuring that the resolution of sexual misconduct allegations at your college is done right. The NCHERM Group has typically focused our annual Whitepaper on topics where gaps exist in the field so that we can accurately identify a weakness, and provide the practical advice that begins to move the field toward filling the gap with stronger practices. We have focused in the past on topics such as incident response and investigation, as well as the unique sociology of addressing intimate partner violence in a college environment. This year, the Whitepaper excerpts two sections of *The ATIXA Playbook*. The first is focused on advanced application of consent concepts to ensure that colleges don't turn into the sex police. The second focuses on ensuring due process specific to sexual misconduct procedures, but has universal applicability to all forms of college conduct proceedings.

Some pockets in higher education have twisted the 2011 Office for Civil Rights (OCR) Dear Colleague Letter (DCL)[1] and Title IX into a license to subvert due process and to become the sex police. *The ATIXA Playbook* and this Whitepaper push back strongly against both of those trends in terms of best practices. By design, the models of proof provided in *The ATIXA Playbook* address the substantive due process of making a reliable determination, and we include in this Whitepaper a critical checklist tool for you on substantive and procedural due process. Our concerns around procedural due process are so significant that they continue to be a top priority in our trainings. In 2017, we'll be offering a series of due process-specific trainings and tracks, to bolster the due process elements of our training curricula that have always been part of our emphasis.[2]

If you need an extensive written guide, the Foundation for Individual Rights in Education's (FIRE) *Guide to Due Process and Campus Justice* says what needs to be said about this topic.[3] It is free and available online. Why re-invent the wheel? Where we depart from FIRE is that FIRE seeks to expand college due process and push it well beyond what the courts have required. We like college due process just the way it is, because we believe the protections that courts currently afford within college processes are well-balanced against the educational and developmental aims of the college conduct process. We believe higher education can acquit fairness without higher standards of proof, actual cross-examination, and full-on, adversarial hearings presented by attorneys.[4]

Ultimately, you will determine whether FIRE's vision of expanded due process becomes the law of our land. The field is losing case after case in federal court on what should be very basic due process protections. Never before have colleges been losing more cases than they are

---

[1] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

[2] https://atixa.org/events/training-and-certification/

[3] https://www.thefire.org/fire-guides/fires-guide-to-due-process-and-campus-justice/fires-guide-to-due-process-and-fair-procedure-on-campus-full-text/

[4] We do agree with FIRE that definitions of hostile environment sexual harassment should be more rigorous, and ATIXA's model policy has long-used the rigorous definition from the Supreme Court's decision in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).

AR_00001338

winning, but that is the trend as we write this. The courts are not expanding due process yet, but are insisting that colleges provide the full measure of college-based due process that has been required over almost 60 years of litigation by students. Now, OCR is adding pressure by holding colleges accountable for due process failures under Title IX. And, some courts are willing to hold private colleges to elevated procedural fairness, as if they were public universities. That backdrop means we all need to sharpen our games, or the courts and Congress may sharpen them for us.

Why are we systemically failing to protect the rights of all students? FIRE took a shot at higher education on January 19th, 2017, calling administrators amateurs in addressing sexual violence.[5] If you resent that characterization, we need to stop resembling it. Sharpen the qualifications of those at your colleges who are the custodians of due process and advance the level of training that is afforded to them. Read recent decisions involving George Mason University, James Madison University, and Brandeis University[6] to realize how far we still need to come in this field. Don't be fooled by the fact that higher education wins some of these lawsuits, as the law favors institutions. The bar on due process lawsuits is high, and courts have been deferential to college disciplinary decisions, though that historical deference is eroding as judges lose patience with skewed college proceedings.

*Sharpen the qualifications of those at your colleges who are the custodians of due process and advance the level of training that is afforded to them.*

Now, higher education needs to start winning because of its excellence and because it is highly respectful of student rights. If being a custodian of due process is a mid-level management role on college campuses, that does not mean it has to be a mid-level institutional priority. The courts can't expand due process if case after case shows judges that higher education is exceeding the due process floor set by federal law. We critique FIRE for its failure to advocate for the civil rights of victims, but FIRE is right about this. Our goal is to help the field fulfill the current mandates of law, and move out of the current cycle of tempting courts to turn college resolutions into exact replicas of the criminal justice process.

Are You the Sex Police?

One of the reasons we prioritized re-issuing and updating The NCHERM Group's 2005 Whitepaper in the form of the ATIXA Whitepaper this year is to provide further corrective direction as higher education continues to veer off-course in its resolutions of college sexual violence allegations. The NCHERM Group is widely credited with helping to popularize and institutionalize consent-based policies in higher education. As such, we have a responsibility to the field to make sure that this body of knowledge is used correctly, and to continue our thought-leadership on the ways that consent is applied in theory and practice. As usual, we'll be blunt.

---

[5]  https://.thefire.org/law-enforcement-involvement-key-to-protecting-students-from-sexual-assault/
[6]  http://ia801309.us.archive.org/2/items/gov.uscourts.vaed.314481/gov.uscourts.vaed.314481.92.0.pdf; http://www.vawd.uscourts.gov/OPINIONS/DILLON/5.15cv35doevalger.3.31.16.pdf; https://www.documentcloud.org/documents/2799157-John-Doe-v-Brandeis-University-3-31-2016-Ruling.html

AR_00001339

**Some of you have become the sex police.**

Maybe you wound up in this role as the result of political pressures – real or imagined – that make you feel like you need to be policing student sexual mores. Or, for some of you, you took the 2011 DCL as a license to become the sex police that you always wanted to be. Or, maybe it has been a gradual and inadvertent shift for you. For whatever reason, if you have become the sex police, we want you to know that The NCHERM Group condemns what you are doing in the strongest possible terms and entreats you to change your thinking and your practices. Our tone in this section reflects the gravity and import of the situation.

Sex policing isn't working for you. The field is being hammered by an unprecedented wave of litigation, and higher education is losing! Do you remember the days when judges were deferential to the internal disciplinary decisions of college administrators? If those days are rapidly receding or are gone, you have to ask yourselves what role you have played in that. If you are the sex police, your overzealousness to impose sexual correctness is causing a backlash that is going to set back the entire consent movement. It is imperative that you self-correct and find a golden mean or middle path on this issue. You are sowing the seeds of your own destruction. We've been beating this drum since 2012, and we will get progressively louder and louder until you get it. If you persist, you will touch off a new wave of due process protections in the courts and in Congress, which will once again skew the playing field for victims and those who are accused – a playing field some of us have worked our entire careers to level. You don't want that because it will deeply inhibit your ability to spread the sexual correctness to which you are so very wedded. So, stop it. Now.

If you don't know what we mean by sex policing, it's happening on two levels: the substantive and the procedural. Procedurally, responding parties need to be accorded the full measure of their rights. The courts are starting to smack colleges down left and right when due process corners are cut, bias is in play, and politics motivate the imposition of corrupt outcomes. You need to get your procedural houses in order, because no one is served when the court overturns your decision, especially you, so why drive toward an outcome that won't be sustained by the scrutiny of the courts?[7] We want you to suspend and expel those who commit sexual violence at colleges. This has been a central theme of our work for almost 20 years. But, we need you to do it by the book.

If the preponderance of the evidence standard of proof is a fairly minimal standard on the continuum of proof, we need you to apply it with steadfast rigor. Preponderance is an on/off switch. You're either over 50% with the evidence you have found, or you're at 50% or under. Play it straight and keep your thumb off the scale. The NCHERM Group's Managing Partner, Daniel Swinton, says it best when he trains on Title IX: "If you picture the scales of justice, with evidence on either side, the Title IX Coordinator is the post in the middle, holding up the scales. The upright neutrality of the post allows the scale to tip, but does not cause it to do so. The evidence does, and nothing else should."

---

[7] And we'll note, as we have since day one, that the offending colleges being slapped the hardest by the courts are not those who have shifted to the civil rights model, but those who still cling to using the traditional student conduct process to resolve allegations of civil rights discrimination.

For those of you who relish being the sex police, we don't respect what you are doing. Your thumb is on the scale, and if you intend to keep it there, we beseech you to at least be intellectually honest about it. Your students should know that you intend to examine their sexual decisions under a microscope. Your applicants should know that when choosing a college, you err on the side of caution and kick accused students out even if the evidence is uncertain. They should know you aren't just victim-centered, you are victim-favoring. Perhaps many students will like that. They will seek your college out because of your bias. But, for those that don't, the truth in advertising will help them to choose a college that values fairness and equity, if that is their preference. It's ours.

*Human interactions are messy, confusing, and illogical. That includes sexual interactions. You should be struggling to apply the consent rules at your college. You should be wrestling with them, challenging your understandings, and trying to find the right balance.*

The rest of you have your thumbs on the scale inadvertently. Some of you stumbled into sex policing and simply need some perspective to realize you've gone too far. You are willing to self-correct, and we are eager to help you. We want you to be victim-centered. Every college should be. But, being victim-centered is different than being victim-favoring, and we recognize and honor that you are intent upon learning how to find the correct balance and upon affording equal dignity to every student, regardless of their role in your resolution process. You're our kind of administrator, so keep reading – this section is for you!

That brings us to the second form of sex policing, which is substantive. Put simply, you are misunderstanding or misapplying the rules. "Affirmative consent" policies are the norm now on college campuses, and they are a boon to the cause of equity, but they need to be used correctly or the entire concept will get a bad name. Consent is clear permission for sex by word or action. It's an elegant concept that is simple to capture in policy, but difficult to apply in practice. We can't change that for you. Human interactions are messy, confusing, and illogical. That includes sexual interactions. You should be struggling to apply the consent rules at your college. You should be wrestling with them, challenging your understandings, and trying to find the right balance between being the sex police and allowing free reign for abusive sexual practices. Some of you are off track because you are applying a utopian lens to consent. You consciously or unconsciously want sex to be ideal, every time. Get over that. Sex is rarely ideal, especially for those 18-24 in age. Having less-than-ideal sex is unfortunate, but probably universal at some point for all people who are sexually active. We have to be able to separate less-than-ideal sexual experiences from those that are sexually transgressive of our rules. How?

To do so, we must understand that consent is imperfect in both theory and practice. It wasn't meant as a perfect construct, but as a better construct than the force and resistance-based policies that defined sex offenses a generation ago. Because consent is an imperfect construct, applying it with rote literality will not produce good results. Consent is meant to be applied in context, not in a vacuum that assumes all students are equal and all sexual events have parity

to all other sexual events. Our consent rules need to be malleable to account for the vagaries of the human experience, and we need to be flexible enough to allow for the fact that human communication and interaction are imperfect. Late adolescence can teach people how to become sexual beings, but we can't expect that students arrive at college fully equipped to think and act as mature, respectful sexual partners. They will fumble a bit. They will fail to make each sexual interaction ideal. They will not live up to our standards or theirs. So, should we discipline them for that developmental failure? We should impose our discipline for abusive transgressions, those actions according to OCR that have a discriminatory effect on the basis of sex or gender. Rudeness, insensitivity to one's partner, having underdeveloped communication skills – these are behaviors that need to be corrected by appropriate intervention – but only the sex police believe they need to be disciplined.[8]

In being sensitive to our own tendencies to want to be the sex police, we also need to consider that issue of intent. Should we give someone a break if they transgress against another student, but didn't intend to do so? No, of course not. But, intent is much more complex than just the simple question of whether someone meant to transgress against another person's sexual boundary. At this point in our understanding of consent theory, we'd say that intent is an aggravating factor, for sure. If you have the intent to violate someone, that heightens the abusiveness of the act. But, lacking the intent can mean a lot of different things, depending on context. It can mean carelessness, recklessness, naïveté, drunkenness, and many other things which may equate to a violation of policy, or might not. It's not fair to say that the lack of intent means someone didn't violate the rules, but we need to become better at reading the context to know more precisely what the lack of intent means to our ultimate determination of an allegation.

To help us get there, we posit that you should look at consent more as transactional and contextual, meaning that we view the entire sexual interaction and the context of the larger relationship. We contrast that to an approach that is more particularized and occurrence-based, where finders-of-fact tend to hyper-focus on each touch within a sexual interaction and ignore the larger context of the relationship. There are always exceptions, but you will be best served by evaluating consent based on the perspective of a reasonable person who is viewing the totality of the circumstances. That means we look at the whole relationship or interaction (the transaction), not just one time that someone might have touched someone else problematically (the occurrence). And, we ask how a reasonable person would view the situation, and whether through that lens the behavior does or does not cross the line. Two case studies will demonstrate the reasonable person concept and the transaction concept. Approach them as if they are a Facebook™ quiz that lets you figure out your sex policing tendencies on a scale of 1 to 100.

Taking a different approach than we have in past Whitepapers, we've chosen to illustrate our points about consent with two case studies, offered below. The content of the case studies and discussion is graphic, as is this subject matter.

---

[8] It is important to note that some may self-define as survivors based on such experiences and are entitled to access support services, if not resolution processes.

## CASE STUDY #1 – LIZ AND NEVEAH

Liz and Neveah are roommates on your campus. Liz is a virgin and identifies as straight. Neveah identifies as sexually fluid, and is very sexually experienced compared to Liz. One night after they have gone to bed, Liz heard Neveah masturbating along with the sound of a vibrator. The next day, Liz asked Neveah about it, and Neveah was very open with her, explaining that she has a "Bunny" which she described as a vibrator designed to allow her to penetrate herself while simultaneously stimulating her clitoris to climax. She was not apologetic or embarrassed that Liz overheard her masturbating, and asked Liz if she masturbates. Liz shyly said no and Neveah offered to teach her how if she is interested. She asked if Liz wants to see the Bunny. Liz seemed curious, so Neveah took it out and showed it to Liz. Liz immediately said she could never use it because she was diagnosed with vaginal hypoplasia, meaning a very narrow vaginal canal, and that the Bunny would never fit.

Neveah, sensing Liz's growing interest, told her that she can use the Bunny on Liz if Liz would like, and go very gently with it to ensure that it doesn't hurt. Alternately, she told Liz she can just use the Bunny's "ears" on Liz, without penetrating her, if it's too tight. Liz said she'll think about it, and Neveah could see the flush on Liz's face and how excited she was. Later that night, Neveah was more open about her masturbation and started to use the Bunny on herself while Liz was watching from across the room. She then asked Liz if Liz wants to try it. Liz agreed, but asked Neveah to show her how to do it, the first time. Neveah cleaned the Bunny, lubricated it, and slowly penetrated Liz with it. She asked Liz to tell her if it is painful at any point. Neveah began to use the Bunny on Liz, and Liz flinched in pain, telling Neveah to go slower. Neveah slowed down, and soon Liz was uncomfortable again. Neveah shifted the position of the Bunny and Liz became more comfortable. Neveah used the Bunny on Liz until she climaxed. Neveah tells Liz, "if you liked that, you should feel my tongue on you next time." Liz smiled, and they go to bed.

The next night, Neveah again offers to use the Bunny on Liz. Liz agrees, but is immediately uncomfortable with the sensation of penetration by the vibrator. Neveah repositions it several times, but can't find a comfortable position for Liz. Liz tells Neveah to stop because she is sore from the night before. Neveah stops penetrating Liz, and uses the "ears" of the Bunny to stimulate Liz without penetrating her. While doing so, Neveah also uses her tongue to bring Liz to climax, and Liz presses her hands against Neveah's head as she does this. Afterward, Neveah asked Liz to use the Bunny on her, which Liz did. The women kissed and spent the night in the same bed.

The next night, Neveah climbed into bed with Liz, and began to perform oral sex on her. She told Liz she had lubed the Bunny and it was ready for her. Liz agreed and then allowed herself to be penetrated by the Bunny, and while it was still uncomfortable, it was less so than the night before. At one point, Liz cried out in pain, and Neveah repositioned the Bunny for greater comfort. Liz then seemed to get more into it, was arching her back and moaning with pleasure, and Neveah continued. Neveah also slapped Liz on the buttocks several times as they engaged in sexual contact. As Neveah continued with the Bunny, Liz called out in pain again, saying, "No. Stop." Neveah withdrew the Bunny slightly and eased up on the speed settings of the vibrator. She repositioned the Bunny again to ensure Liz's comfort, and penetrated her gently once again,

but Liz pushed her hand away, making her stop, crying that she was just too tight for it. They went to bed.

The next day, Liz was talking with Burke, a woman on the hall who identifies as lesbian. Burke asked Liz if Neveah had turned her into a "lez" yet. Liz pretended not to understand, and Burke said, "She'll groom you and the next thing you know, she'll turn you into one of us." Liz suddenly realized that it was Neveah's plan to seduce her all along. She became very uncomfortable with Neveah as a roommate, someone she thought was trying to help her become more sexually comfortable as a friend, but who was really coming on to her as a girlfriend. Liz went back to her room and told Neveah how uncomfortable she was, and that all sexual contact needed to end. Neveah, who had perceived her encounters with Liz as a budding romance, was shocked, but agreed to keep things platonic.

The more Liz thought about it, the more upset she became. She felt betrayed by her roommate. Three days later, she went to the Title IX office and reported what happened. Neveah was notified of three alleged offenses: Non-Consensual Sexual Contact for performing cunnilingus on Liz without consent during the second encounter; Non-Consensual Sexual Intercourse for continuing to penetrate Liz with the Bunny during the third encounter after Liz said, "No. Stop"; and intimate partner violence, for slapping Liz on the buttocks during sex without consent.

### Discussion

STOP HERE. It's time to analyze this fact-pattern and develop a gut check on what you think. Does your gut tell you that each of these behaviors does, technically, violate your consent policy? Many people would say so. But, take a step back and look at the totality of their interactions. Answer these questions:

- Does the totality of the evidence suggest an abusive series of encounters?
- Do you have evidence that Neveah was trying to groom Liz or sway her sexual orientation?
- Do you have evidence that Neveah intended to discriminate against Liz or cause her a hostile environment on the basis of sex?
- What assumptions did you make about Liz's allegations?
- Do you have evidence that Neveah meant to transgress Liz's sexual boundaries?
- What do you think Neveah's responses to these allegations would be?

Neveah was shocked by the allegations. She realized that Burke might be interested in Liz, and was poisoning their budding relationship. She insisted that she had been incredibly respectful of Liz, not abusive. Neveah said that she constantly checked in with Liz during sex, repositioned the Bunny to ensure Liz's comfort, and stopped when asked. She said she did not realize that Liz wanted her to stop that last time, thinking that like previous times, Liz meant she just needed to adjust the Bunny. Once she realized that Liz really meant stop, she stopped right away, and had only penetrated her once after she said to stop, to adjust the vibrator. So, is this a misunderstanding or a sex offense?

If you determined that this is sexual misconduct, you're confusing Liz's discomfort about her own sexual experimentation with a non-consensual sexual experience. Please understand that it is the unanimous consensus of all eight authors of this Whitepaper that Neveah should be found *not* in violation of the sexual misconduct policy. Maybe Neveah did seduce Liz. That's not against policy. Maybe Neveah did want Liz to explore her sexuality or sexual orientation. That's not uncommon in college, and as long as it isn't coercive, that isn't sexual misconduct. But, you might be thinking, don't Neveah's behaviors meet the definitions of sexual misconduct and intimate partner violence? Don't you have to stop when someone tells you to stop in the middle of sexual intercourse? Don't we teach our students that? Don't we tell them you can't touch someone sexually without getting permission first? We don't want our students slapping each other during sex, do we?

Becoming the sex police can be a little insidious, creeping up on us without our even realizing we are propagating an orthodoxy of sexual correctness. It's true that Liz told Neveah to stop during the third interaction, and that Neveah did not stop. If a male student kept thrusting when his female partner told him to stop, would we look at this differently? The ATIXA model policy says that if your partner withdraws consent, you must stop in a reasonably immediate time.[9] That is what Neveah did. One additional thrust of the vibrator was not meant to be abusive, but to try to make Liz more comfortable, and she stopped within several seconds of understanding what Liz really wanted. Thus, the context is what matters here. At first, Neveah was not clear whether Liz was telling Neveah to stop, or communicating that she was uncomfortable with the position of the Bunny. Liz is saying now that she wanted Neveah to stop, and maybe that is true, but Neveah was thinking about the second sexual interaction, and how she had to position the Bunny carefully so that it did not hurt Liz, just as she had done earlier in the third sexual interaction as well. She thought she could reposition it similarly during the third interaction when Liz said stop, to increase Liz's comfort and make sure it hurt less. Was this a reasonable interpretation by Neveah? Yes, Neveah's interpretation was reasonable when considered in the context of the totality of the circumstances surrounding their interactions.

Did she have reason to believe that Liz really wanted her to stop penetrating her entirely, or that she just wanted Neveah to be more gentle or to reposition the vibrator? If Neveah moved the Bunny and was then more gentle with it as the result of Liz's objection, wasn't she trying to make her partner more comfortable? How is that discriminatory? Doesn't no mean no, though? Well, during the second encounter, when Liz said stop, it meant a need to reposition. Isn't it reasonable to think the same context applied to the third encounter? After all, Neveah was clear that, after she tried to reposition the Bunny during the third encounter and Liz was still in pain, she needed to stop and she did. We can't chalk this up to a miscommunication about what Liz wanted, but Neveah's interpretation of the situation is reasonable given the totality of the circumstances.

Yes, but what about the oral sex during the second encounter? Taken together with what happened in the third encounter, doesn't the totality of the evidence show that Neveah was pushing Liz past her boundaries? I hope we can agree that when Neveah was using the Bunny's ears on Liz, and then began to use her tongue, Neveah did not have Liz's clear permission to do so. That was not consent, and most people can respect the distinction between agreeing to stimulation

---

[9]  https://atixa.org/resources/model-policies/

by an object and the use of someone's tongue. Permission for one does not imply permission for the other. To understand why this isn't sexual misconduct, you need to understand the concept of ratification, which means retroactive consent demonstrated after the fact. This happens in sex ALL THE TIME, though we don't account for it in our policies. Liz continued to have sexual interactions and want sexual interactions with Neveah after the oral sex. They had oral sex a second time. Liz pressed Neveah's head toward her as Neveah performed cunnilingus. That ratifies it after the fact, even if Neveah didn't strictly ask for consent when she first did it.

Not objecting to something is not the same thing as ratification, so be careful not to confuse those two things. While it's entirely possible that Liz was comfortable with a friend teaching her how to use a sex toy, but wholly uncomfortable with engaging in sexual activity directly with another female without the sex toy as a buffer, that's not the evidence we have here. Should Neveah have asked first? Sure. But, is it a sex offense that she didn't? Not in this context. Failing to object is passive. Ratification is an active participation subsequent to an encounter that began without clear consent.

> *To understand why this isn't sexual misconduct, you need to understand the concept of ratification, which means retroactive consent demonstrated after the fact.*

Well, what about the butt slapping, then? *Fifty Shades of Grey* was a movie that made more than half a billion dollars at the box office in 2015. Light bondage and practices drawn from the Bondage and Discipline, Dominance and Submission, or Sadism and Masochism (BDSM) world have gone mainstream. Again, context is everything. Was Neveah trying to abuse her partner? No. Should she have asked first? Sure, but to call a few slaps on the butt during sex a form of intimate partner violence is to water down what intimate partner violence is to the point of meaninglessness. **If everything is discrimination, then discrimination means nothing.** Many of our students are influenced by mainstream erotic and even hardcore pornography. You can't assume you can treat your partner the way it is depicted on screen, but we need to take into account that for many of our students, if they have learned their sexual mores from pornography, this is an opportunity to re-socialize them, educationally, in respectful sexual patterns. What they think is normative is potentially going to be different than our sexual norms.

A second case study will challenge us to apply the reasonable person lens.[10]

## CASE STUDY #2 – WES AND TAMEKA

Tameka was flirting with Harris at the party. She told him if he agreed to date her, she would hook up with him that night. He told her he wasn't the dating type. Later, friends saw Tameka flirting with another student, Wes. The friends also testified that they saw Tameka and Wes walking hand-in-hand away from the party toward her residence hall. Surveillance video from the hall

---

[10]  Some people think it's important to debate the reasonable person standard. We do not. OCR says it's the reasonable member of a college community. For our purposes, we always interpret the standard to be a reasonable person in the same or similar circumstances, so it is contextual.

cameras shows that the two entered her residence hall at 11:14pm and proceeded to the common lounge, which was empty. While there is no audio, the video showed the two kissing, and then showed Tameka on top of Wes while he was lying on the couch. The video showed that she was grinding on him as he fondled her breasts, first over and then under her shirt. At one point, her breasts were clearly exposed on camera. They were on the couch for 23 minutes. The video then shows them getting up, and Tameka leading Wes down the hall by the hand. Their stories diverge at this point.

Tameka stated that she was going to see Wes out, but had to go to the bathroom. She stopped at her room on the way out. She let him into her room to wait and asked him to be quiet because her roommate was sleeping. She went into the bathroom and said that after she used the bathroom, he pushed his way inside the door and closed it behind him, before she had a chance to put her pants back on. She said that he then told her she couldn't leave him hanging, referring to their activity in the common lounge. He asked her for a handjob, and she agreed. He took off his shorts. She proceeded to rub his penis with her hand. He then asked her for a blowjob, but she said no, and continued with the handjob. As she gave him the handjob, he fondled her breasts and they kissed. He then began to rub between her legs and she allowed this and continued the handjob. He then penetrated her with his finger. She moved his hand away, stopped rubbing his penis, and told him he needed to leave. His account differed considerably.

Wes said that while on the couch in the common room, he suggested they go to her room and continue things more privately. She told him that her roommate was there and would be asleep at that hour. She then suggested they could go in her bathroom. They agreed, got up from the couch and she led him by the hand to her room, reminding him they needed to be quiet because her roommate would be asleep. They entered the room, and then went into the adjoining bathroom. There, she took off his shorts and hers and began to give him a handjob. He asked for a blowjob, but she said no and continued to rub his penis. During the handjob, they kissed and he fondled her breasts. He then began to rub her between her legs and she continued the handjob and was making moaning sounds. He teased her that she needed to be quiet or she'd wake her roommate. He then penetrated her vagina with his finger, and she immediately moved his hand away from her. She continued the handjob until he climaxed. Video shows that she escorted him from the residence hall at 12:24am, shows that she held the door open for him as he exited, and that they kissed as he left.

At 10:04am the next day, Tameka texted Wes, asking him how she should refer to their "couple status" when she told her roommate about the night before. At 10:18am, Wes texted her that he felt really guilty about what they did the night before because he had a girlfriend. He told Tameka that she was really nice, but that she needed to stay in the friend zone and that he hoped he hadn't led her on. When she got the text, she immediately removed him from her contacts and blocked him on social media. She told her roommate that she needed to find someone who was ready for a serious relationship, and that the night before with Wes had been a mistake. Wes told his roommate that he felt bad that he had led her on.

By that evening, rumors were circulating that Wes had assaulted Tameka. He heard the rumors from a friend and decided he needed to address them. He texted Tameka at 8:40pm, "Please

tell people I didn't rape you. Some people are spreading a rumor." She texted back at 8:42pm, "but u did rape me. Don't contact me again." The next morning, Wes went to the dean to address these rumors because he wanted to be clear that he had not raped Tameka. When he recounted to the dean what had happened, and concluded that they hadn't even had sex, so he couldn't have raped her, the dean informed him that it sounded from the story like he might have raped her. Wes was placed on interim suspension and an investigation was initiated. Wes tried to file a counter-claim that the handjob was not consensual, but the Title IX Coordinator decided it was retaliatory and did not take it forward.

Discussion

STOP HERE. Do you agree with this dean? Is she a steadfast protector of student welfare, or a card-carrying member of the sex police? If you consider the totality of the circumstances, there is a clear subtext to the allegations, right? Tameka was looking for a relationship. She rejected Harris when all he wanted was a hookup. She then attempted a relationship with Wes, but wound up being used by him and feeling rejected. That rejection could have been motivation to tell people that Wes assaulted her (she later filed a formal allegation and participated in the investigation), but that only addresses her motivation to report, and not the underlying question of whether what she was reporting was a violation policy. Are we troubled by the fact that she did not consider it sexual misconduct that morning, and came out of the interaction thinking that they were dating? Sure. It goes to her credibility. For some people, though, the reality of victimization takes a while to dawn on them, whether out of shock, denial, or a failure to self-identify. When that is the reason for delay, it is not a credibility concern.

You might think that Wes described a situation to the dean that is arguably sexual misconduct, regardless of Tameka's motivation to report it, right? Let's break it down. Wes and Tameka agreed that the sexual activity on the couch was consensual. But, what about the sexual activity in the bathroom? She performed the handjob voluntarily. It wasn't coerced or forced. Thus, she consented to it. Whether he consented to being touched is a question we will address shortly. Their kissing was mutual, according to both of them, and she did not raise the fondling of her breasts as an issue. However, if you are a literalist about consent, he did fondle her breasts without consent. You can make a ratification argument here, though, because he didn't ask to fondle her breasts in the common room, either, but she participated when he did. There is an interesting question, too, about whether her consent to fondling her breasts earlier in the common room remained valid ten minutes later in the bathroom. We would say it did. And, we would argue that he had consent to touching her vulva and fondling her genital area by ratification. In the course of a sexual transaction, she permitted him to touch her, and continued to touch him as she did so, without objection. That's ratification. So, the only remaining question is whether his act to penetrate her with his finger was without consent. We believe a reasonable person would believe that act was consensual. How can this be? He penetrated her without asking, and her response clearly shows she did not welcome his penetration.

The construct of consent in sexual interactions is governed by policies, but as we noted above, it is not a perfect construct, in the sense that theory and practice do not fully align. Policies require clear actions or words indicating permission. So, if you think about it, there is no way to

AR_00001348

kiss someone without asking first, if you take the concept of consent literally. If I move in to kiss someone, I cannot know the conduct is agreed to unless I ask, because even if they move in to kiss me, they cannot know I am consenting unless they ask. So, rather than strictly adhering to such rigidity, we allow some non-verbal, unspoken rules to govern our sexual interactions. Many of us move in for a kiss, mutually, on the basis of context, without asking. And, in certain circumstances, consent can be assumed; for example, if you kiss me, I can kiss you back. I don't have to ask or clarify that. I am not expected to simply passively receive the kiss. The "clear words or action" part of the policy takes over from there. We can kiss, but what happens next has to be the result of agreement by word or conduct, if the interaction is to escalate sexually. Think of it as being akin to levelling up in a video game. Once you unlock a level, you are free to explore that level, but you can't move on to the next level until you unlock the achievement for that level (in this case, by having clear consent).

If a female student is voluntarily stroking a male student's penis, he is within the bounds of consent to reciprocate by touching her vulva and using his fingers to penetrate her vagina. This is really no different – in terms of reciprocity – than if a woman begins to stroke a man's chest, and he responds by fondling her breasts. It is artificial in the extreme to expect verbal requests in such a context, "I see that you are touching my pecs…does that mean I can caress your breast? If so, left, right, or both? And, is that your left or my left?" That's not how sexual communication works, as noted in describing the kiss, above. Consent is designed to allow such reciprocation without resorting to asking, **but** clarifying communication **is** required if one or both of the partners wish to elevate or progress the level of sexual interaction. If the partners are now caressing each others' chests, and one wants to touch the genitals of the other, that cannot be assumed to be okay, based on the sexual activity already taking place. To move to genital contact, there again must be communication that establishes consent. Consent theory supports this. Some acts are mutual, others require additional communication and clarification.

When a female student is voluntarily giving a male student a handjob, and he reciprocates by touching and fingering her vulva and vagina, if she denies having consented to being touched/penetrated solely because he didn't ask, we would say that a preponderance of evidence shows that they engaged in mutually consensual fondling of each other's genitals. To conclude otherwise would require that the male partner to say something like, "I see your hand is on my penis, may I now place my hand between your legs?"

That is not how sexual communication occurs, and it is not how consent policies were intended to function. To see the logic of this, take it to its extreme. Imagine that sexual intercourse is taking place. The female partner raises her hips on her male partner's penis. When she does, he hesitates, and says, "May I thrust my penis in response?" If the female partner says "yes," he may thrust back. How many times? Once? Many times? Does he need to clarify that, or is it assumed once they are having intercourse that thrusting is going to occur, positions may be changed, and there will likely be an ejaculation as a result? It is assumed, but according to policy, it's really not explicitly agreed to, is it?

Some of you will make a distinction with Wes and Tameka out of the fact that the sex acts weren't really mutual. They fondled each other's genitals, but she was penetrated and he was not. To

that, we say that is a distinction that arises solely from anatomy, but it is no more invasive to a man to have a non-consensual handjob than it is to a woman to be fingered without consent. A man can be subject to sexual misconduct without being penetrated, so we need to stay focused on the video game metaphor. What Tameka did to Wes and what Wes did to Tameka each occurred on the same level of the game. No one upped the level without asking, and Wes respected her instruction to stop when he did something that went beyond her boundaries. This does not make him in violation of policy. That's what a reasonable person would say. I can fondle you if you are fondling me; I don't have to ask you. For anyone who wishes to insist that he is in violation of policy, we require you to be consistent. If your purist approach to consent demands that you find him in violation of policy for penetrating her, then you must also be willing to find her in violation for giving him a handjob without his consent. If that is your preferred approach, we think you are being absurd, but at least you will keep the legal profession gainfully employed for many years to come.

> *As you can now see, a consent policy is viable in theory, but can become absurd in practice if taken to an extreme. You are the guardians of applying the reasonable person standard to these interactions.*

As you can now see, a consent policy is viable in theory, but can become absurd in practice if taken to an extreme. You are the guardians of applying the reasonable person standard to these interactions. We know this challenges an orthodoxy that may be widely accepted in the field, but the question is whether we are trying to govern every nuance of sex as if we are the sex police, or whether we are trying to establish reasonable rules to regulate inherently ambiguous human behavior in a way that minimizes the risk of harm to those involved? If you need a litmus test for whether you have become the sex police, ask yourself whether the college-age version of you would hate what you have become. If so, let's recalibrate. One way to do so is to refocus and rededicate ourselves to due process and protecting the rights of ALL students.

A Note about Tone

There are some readers who might perceive this publication to be less victim-centered than our previous body of work. We'd suggest that perception is only accurate in comparison to the tone of our past work, which was needed at the time we wrote it, to catalyze an important shift needed in the field at that time. Now, the tone of this publication is appropriate to the environment in which we are writing today. As times change, our guidance has to as well. We intend this publication to build on the strong foundation of victim-centered (not victim-favoring) work we have done, rather than to weaken it. With a solid history of writing about and advancing those procedural protections for victims/survivors, we can now also see the need to ensure those protections are just as strong for responding parties.

Additionally, the overall tone of this Whitepaper and *The ATIXA Playbook* is about striking the right balance between student rights, with the understanding that being off-balance in the long run isn't good for victims/survivors or for those accused. There are always unintended conse-

quences to showing favoritism. If a college is known to be biased toward responding parties, this can chill the willingness of victims/survivors to report. If a college is known to be biased toward reporting parties, a victim/survivor's sense of safety or justice based on the campus outcome in the short run may be quickly compromised by a court order or lawsuit reinstating the responding party, giving her a Pyrrhic victory, at best.[11] What is needed for all of our students is a balanced process that centers on their respective rights while showing favoritism to neither. Not only is that best, it is required by law.

Title IX Coordinators write to us, worried that their annual summaries show that they are finding no violation of policy 60% of the time in their total case decisions. They feel like somehow that is wrong, or not as it should be, as if there is some proper ratio of findings that we are supposed to be reaching. We wrote in 2014 of our concerns with the types of allegations being made on college campuses,[12] but that is inevitable. With all the training and education being directed at students, more are coming forward, and that education brings allegations of all kinds out of the woodwork, some based strongly in fact, others that are baseless, and most that are somewhere in between.

That 2014 Open Letter took issue with growing imbalance in the field, and we fear three years later that it is taking far too long for higher education to self-correct. This Whitepaper roadmaps what that self-correction should look like. We hope that our readers do not see the rights of the parties as a zero sum game, where protecting one requires compromising the other. Responding parties should want their colleges to provide strong victim services, and reporting parties should insist that the full measure of due process be accorded to those who are being accused. We believe – strongly – that colleges can and should provide the full measure of student rights and accord equal dignity to all parties to an allegation of sexual misconduct.

## The Intersection of Consent Theory and Due Process

Consent as a concept is one whose time has come because of the resonant way in which the idea of consent ratifies the right we all have to bodily autonomy. We all have the right not to be acted upon by someone else unless and until we give permission for it. Consent is a requirement for mutual respect, and the need to communicate that respect by word or action. Ideally, consent is neither given nor received, but exchanged. Bodily autonomy is key here, because other than defining sex offenses by consent, the only other two choices are to define it by force or by resistance. But, it is not true that someone's autonomy is only violated if they are forced, or if they resist the act. Autonomy is not respected any time something is taken from someone without their consent.

There are those, however, who believe that consent-based policies are unfair. They've conveniently linked affirmative consent to a due process failure, but that is just sleight-of-hand because they don't want to be seen as simply opposing the concept of consent outright, which is what they are actually doing. Still, part of the goal of this Whitepaper is to ensure that you are using the consent construct correctly, so this must be briefly addressed for any of you who might misunderstand or misapply it.

---

[11] We in no way intend to minimize or negate the experiences of men who are victims.

[12] https://www.ncherm.org/wordpress/wp-content/uploads/2012/01/An-Open-Letter-from-The-NCHERM-Group.pdf

The assessment of consent is a determination by the institution, not something proved by the reporting party or the responding party. The college determines whether its policy was violated, and has the burden to do so. The college does not place the burden on the reporting party to prove non-consent, and it does not place the burden on the responding party to prove consent. The concept of the presumption of innocence is based in criminal law, and really doesn't apply to college processes in a linear legal fashion.[13] However, it is important to state that while colleges don't really presume anything, because presumptions are a criminal construct, we certainly cannot presume that a responding party is in violation of our policies unless and until he[14] can prove he obtained consent. It is not the burden of the responding party to show consent, but the burden of the college to prove non-consent.

Put another way for simplicity, if the parties are equally persuasive as to their assertions of consent and non-consent, the college has not met its burden and the responding party cannot be found in violation of the sexual misconduct policy. The opponents of consent insist that "affirmative" consent is burden-shifting by design, and that the shift in burden is a violation of due process and unconstitutional. Precision is important here. By design, consent shifts the burden to a sexual initiator or actor to obtain consent, from a policy perspective, but it does not shift the burden to them to prove that consent if sexual misconduct is alleged. Put succinctly, it shifts the burden in the bedroom, but not in the college "courtroom."

> *The assessment of consent is a determination by the institution, not something proved by the reporting party or the responding party. The college determines whether its policy was violated, and has the burden to do so.*

Due process hawks won't agree, and will continue to insist that the consent construct offends the U.S. Constitution, but we consider ourselves due process hawks, and we have a question: If "affirmative" consent is unconstitutional, why then isn't the burden-shifting in robbery unconstitutional, too? You see, if someone takes something from you without your permission, it's a robbery. But, if they take it from you with your permission, it is borrowing, or a gift. Thus, property crimes like robbery, theft, and larceny are consent crimes. Take the property without consent and you have committed a crime. Take the property with consent and you have a brand new bicycle. If it isn't unconstitutional burden-shifting to undergird property crimes with consent, it isn't a due process issue to do it with sexual misconduct, either, as long as you don't misapply it by placing a burden of proof on the responding party that a consent-based policy does not require. Another analogy might be to fighting. Do it on the street, without the other person's okay, and you could be arrested for assault or battery. Do it in a ring, with the other person on board, we'll call it boxing, and you could be paid for it. Or at least get a good workout. Consent. It turns a crime into a sport, and it's a perfectly viable and constitutional legal concept.

---

[13] Mostly because the Fifth Amendment does not strictly apply to college processes in the way it does to criminal proceedings.
[14] He or she or they or other terms that recognize fluid or non-binary identities.

AR_00001352

## Due Process Commitment

We've been thinking about ways to advance the commitment of the field to due process, and since administrators are always asking students to sign pledges as a symbol of prevention, we came up the idea for this oath or commitment statement as a pledge you can make to prevent due process violations in your conduct or resolution process. Maybe you'll frame it and hang it on your wall?

<u>The NCHERM Group Statement of Commitment to Due Process Protections</u>

As a college administrator, you have my commitment to your due process rights. Specifically, I commit to the following ten assurances…

1. I promise to provide you with a neutral, unbiased, impartial, and objective decision on whether your behavior(s) violates college policy.
2. I commit to understanding and owning my own biases and to check them at the door.
3. I promise to recuse myself from the process should I identify a conflict-of-interest, or should a conflict be brought to my attention.
4. I promise to follow college procedures without material deviation.
5. I promise to honor your humanity and the equal dignity of all participants in the conduct process, and to conduct the process with as much transparency as I can.
6. I commit that I will not find you in violation of college policy unless a preponderance of the evidence establishes that a violation occurred.
7. I promise that the college has the burden of proving whether you violated policy or not; that burden is not on either party.
8. I commit to afford equitable procedural protections to all parties to an allegation of misconduct.
9. I promise not to prejudge the allegations that have been made, and to reserve judgment until all evidence has been gathered.
10. I commit to sufficient annual training and professional development to assure the competence of my role.

## Due Process Checklist

Below, we've crafted a practical checklist of due process protections that should be afforded by every college. If you are intrigued by this content, please attend one of our upcoming <u>due process trainings</u>[15] to learn more about how to operationalize these ideas.

- ☐ Right to notice of investigation that includes a reasonable description of the allegations
- ☐ Right to access to an advisor of your choice throughout the process
- ☐ Right to the least restrictive terms necessary if interim suspension is implemented, and a right to challenge the imposition of the interim suspension

---

[15] https://atixa.org/events/training-and-certification/

- Right to uninfringed due process rights, as detailed in the college's procedures, if subject to interim actions
- Right to clear notice of the policies allegedly violated if and when the formal allegation is to be made
- Right to clear notice of any hearing in advance, if there is to be a hearing
- Right to receive COPIES of all reports and access to other documents/evidence that will be used in the determination, reasonably prior to the determination (these may be provided in redacted form)
- Right to suggest witnesses to be questioned, and to suggest questions to be asked of them (excluding solely character witnesses)
- Right to decision-makers and a decision free of demonstrated bias/conflict of interest (and advance notice of who those decision-makers will be)
- Right to clear policies and well-defined procedures that comply with state and federal mandates
- Right to a process free of (sex/gender/protected class etc.) discrimination
- Right to an investigation interview conducted with the same procedural protections as a hearing would be (because the interview is an administrative hearing)
- Right to a fundamentally fair process (essential fairness)
- Right to know, fully and fairly defend all of the allegations, and respond to all evidence, on the record
- Right to a copy of the investigation report prior to its finalization or prior to the hearing (if there is one)
- Right to know the identity of the reporting party and all witnesses (unless there is a significant safety concern or the identity of witnesses is irrelevant)
- Right to regular updates on the status of the investigation/resolution process
- Right to clear timelines for resolution
- Right to have procedures followed without material deviation
- Right to a process that conforms to all pertinent legal mandates and applicable industry standards
- Right to have only relevant past history/record considered as evidence
- The right to have the burden of proving a violation of policy borne by the college
- Right to the privacy of the resolution/conduct process to the extent of and in line with the protections and exceptions provided under state and federal law
- Right to a finding that is based on the preponderance of the evidence
- Right to a finding that is neither arbitrary nor capricious
- Right to be timely informed of meetings with each party, either before or reasonably soon thereafter (unless doing so would fundamentally alter or hamper the investigation strategy)
- Right to sanctions that are proportionate with the severity of the violation and the cumulative conduct record of the responding party
- Right to the outcome/final determination of the process in writing as per VAWA §304
- Right to a detailed rationale for the finding/sanctions
- Right to an appeal on limited, clearly identified grounds
- Right to competent and trained investigators and decision-makers
- Right to a written enumeration of these rights

## The Wesley College OCR Determination

OCR's Wesley College resolution is an important harbinger of the increased focus on due process that we can expect from Washington, D.C. going forward. For those of you who need deeper insight into the transformative OCR ruling on the Wesley College investigation, here is a brief overview. First, this is only one of three OCR letters to address the issue of due process (Minot State[16] and Christian Brothers[17] being the other two) but the most direct letter we have that makes the case for Title IX-derived due process rights at a private college.

Whether OCR sees Title IX as an independent source of these rights, or is simply reflecting on rights OCR believes are otherwise legally protected which OCR should be enforcing, this decision is notable as more and more courts seem to be affording due process rights (or the equivalent) to students enrolled in private colleges, including recent decisions at the University of Southern California[18] and Brandeis University.[19]

Second, and perhaps more important, OCR defied expectations in issuing a letter than seems broader in protective scope than many anticipated. OCR signaled in 2016 that it intended to issue resolutions protecting the rights of accused students, but the big question was how far would OCR go? Would OCR protect men from discrimination on the basis of sex, as it must under Title IX, or would OCR take the further step of determining that responding parties have rights under Title IX, whether they are men or not. OCR chose the latter, bolder, and broader approach.

The question of whether responding parties have independent rights under Title IX, or rights only as men who may experience discrimination, is important, as OCR has couched this as an equity issue, not an explicit issue of sex-based discrimination. Maybe OCR sees those as the same thing, but if OCR meant to issue a narrowly tailored resolution, they could have done so. OCR did not, but it also didn't give us significant explanation for the source or basis of these rights. If this body of knowledge evolves as OCR issues more resolution letters, we'll be sure to keep you abreast as they do. This is a revolutionary approach for OCR that changes the entire fabric of Title IX enforcement and fully reflects the idea that Title IX focuses on equity for both parties, not just the reporting party.

## Conclusion

Many of you have been on a journey with us for almost 20 years. What a ride! Together, we are reshaping sexual conduct at colleges toward healthier and more respectful norms. Many in our field act out of a sense of obligation or to satisfy a compliance mandate, but we all can operate from our higher selves, better versions, or whatever you wish to call it. To do so, you have to be willing to accept constructive criticism and decide how you want to let it impact you. In this Whitepaper, we've been tough critics of some of you in the field. We hope you see it as constructive criticism. We're not inherently critical of higher education. We'd say nothing but glowing things

---

[16] https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05142061-a.pdf
[17] https://www.ncherm.org/documents/80-ChristianBrothersUniversity-04032043.pdf
[18] http://cases.justia.com/california/court-of-appeal/2016-b262917.pdf?ts=1459881022
[19] https://www.documentcloud.org/documents/2799157-John-Doe-v-Brandeis-University-3-31-2016-Ruling.html

if you deserved nothing but glowing things. Instead, we are agents of change and we know you are on an evolutionary path as professionals. Our role is to provoke you, to challenge you, and to call you to do better when we know you can. If we're successful, we speed and smooth your evolutionary path, helping you to grow as professionals, and become more successful practitioners. If this Whitepaper helps you to do so in any way, we will count it a success.

*Together, we are reshaping sexual conduct at colleges toward healthier and more respectful norms.*

This Whitepaper is adapted from the 120-page publication, *The ATIXA Playbook: Best Practices for the Post-Regulatory Era*, a comprehensive guide to addressing the resolution of sexual misconduct allegations on college campuses. Visit https://atixa.org/resources/playbook for more information and to learn how you can access the *Playbook* today. Additionally, information on and electronic access to the Association of Title IX Administrators (ATIXA) companion Whitepaper, *The ATIXA Rubric for Addressing Campus Sexual Misconduct*, can be found at https://atixa.org/resources/whitepapers/.

*Founded in 2000, The NCHERM Group, LLC is one of the country's foremost higher education law and consulting firms. The NCHERM Group manages the membership associations, ATIXA and NaBITA. In the last seventeen years, The NCHERM Group has served over 3,000 school and college clients, and has represented more than 250 colleges and universities as legal counsel. The NCHERM Group proffers 30 consultants and employs 15 executive staff members, with offices in Berwyn, PA, Columbus, OH, and Denver, CO. For more information, visit www.ncherm.org*

©2017 THE NCHERM GROUP. ALL RIGHTS RESERVED.

## About the Authors

**Nedda Black, J.D., LMSW** has been working in a variety of capacities within higher education since 2012, having assumed significant responsibility for Title IX policies, education, and implementation at the University of California, Hastings College of the Law, not long after the Office for Civil Rights released its 2011 Dear Colleague Letter. Over the last several years, Black has played a central role in Title IX implementation, including: ensuring Title IX compliance on a number of fronts; conducting Title IX training and serving as the institution's Title IX investigator; and drafting Annual Security Reports, Memoranda of Understanding, Codes of Conduct, and the College's new Title IX policy. Prior to law school, Black worked as a licensed master social worker in New York City, with special focus on trauma, including survivors and perpetrators of domestic violence, gang violence, prison violence, sexual violence, sexual assault, and child abuse, neglect, and molestation. She has continued to fulfill her passion for direct services through extensive volunteer work with the homeless and for a variety of social justice causes. Black is a graduate of the University of California Hastings College of the Law, New York University, and California State University. She is licensed to practice law in the state of California and the District of Columbia.

**Michael Henry, J.D.** serves as The NCHERM Group's Lead Investigator, performing external investigations for K-12 and higher education clients across the country. Prior to joining The NCHERM Group, Henry served as the Deputy Title IX Coordinator, Lead Title IX Investigator, and Director of the Office for Student Rights & Resolution at Texas Tech University. While at Texas Tech, Henry investigated and adjudicated employee and student cases of discrimination, harassment, and gender-based violence, as well as incidents of hazing and other forms of organizational misconduct within the university's Greek community. Henry authored and revised extensive portions of the university's conduct policy and procedure, trained University Discipline Committees, and developed institutional and system-wide operating policies related to discrimination, harassment, and Title IX. Henry has worked extensively with both university and municipal police departments, developing MOUs and joint interview protocols for Title IX investigations, and has provided education and prevention programming for faculty, staff, and students. Henry is a graduate of the Texas Tech University School of Law and has experience in civil litigation, as well as having worked in the Appellate Division of the Lubbock District Attorney's Office. Henry has presented at the Association for Student Conduct Administration (ASCA) National Conference, served as a Faculty Fellow at the Gehring Academy, and has trained Title IX Coordinators and Investigators as a faculty member for ATIXA.

**W. Scott Lewis, J.D.** is a Partner with The NCHERM Group, LLC. He served as the 2013-2014 President of the National Behavioral Intervention Team Association (NaBITA) and is a founder and Advisory Board member of ATIXA. Previously, he served as Special Advisor to Saint Mary's College in South Bend, IN and as Assistant Vice Provost at the University of South Carolina, where he was also on the faculty, teaching courses in Education, Law, Political Science, and Business. He has worked with the Department of Justice's Office of Violence Against Women as a trainer and consultant, as well as a consultant to the Office of the Vice President and the White House Task Force on issues of sexual misconduct and Title IX. Additionally, he serves as a consultant to the U.S. Olympic Committee in areas around sexual misconduct and equity. Lewis brings over 20 years of experience as a student affairs administrator, faculty member,

and consultant in higher education. He completed his undergraduate work in Psychology and his graduate work in Higher Education Administration at Texas A&M University and received his law degree and mediation training from the University of Houston. He lives in Denver, Colorado.

**Leslee Morris, J.D.** is a Title IX Investigator for the San Diego Community College District. She was previously an Associate Attorney with The NCHERM Group, LLC and a member of the Advisory Board of ATIXA. She received her law degree and mediation training from the University of Colorado (CU) School of Law. She was admitted to the Colorado bar in 2000 and served as an associate in the Office of University Counsel at CU, specializing in employment discrimination cases. She also served for nine years as an investigator in the Student Conduct Office at CU, specializing in civil rights-based grievances, and as the Title IX Compliance and Grievances Coordinator for National University in La Jolla, California. Prior to law school, Morris was a Policy Analyst for a nonprofit organization in New York City where she specialized in child welfare and juvenile justice issues.

**Anna Oppenheim, J.D.** is an Associate Attorney with The NCHERM Group, LLC. She advises colleges and universities on ongoing misconduct investigations and often serves as an external investigator for issues of complex sexual misconduct as well as employment matters, retaliation, and harassment. Oppenheim also is responsible for drafting policies and best practices for educational institutions on a wide range of matters, in addition to assisting with policy implementation. Prior to joining The NCHERM Group, LLC, she worked as a civil rights attorney at a boutique plaintiff's employment discrimination firm in Center City, Philadelphia, where she focused on advising current employees on issues involving sexual harassment. Oppenheim also served as an investigator for the Office of the Inspector General in Philadelphia, where she specialized in cases involving sexual misconduct by government employees. She has experience conducting mediations and other forms of alternate dispute resolution, and has developed and presented seminars and trainings related to complex employment matters, ethical obstacles in the workplace, and gender and diversity issues, both in the United States and internationally. A Philadelphia native, Oppenheim received her law degree from Temple University and her Bachelor of Arts from Dartmouth College.

**Saundra K. Schuster, J.D.** is a Partner with The NCHERM Group, LLC. She is a founder of ATIXA and a member of its Advisory Board. She was formerly General Counsel for Sinclair Community College in Dayton, Ohio and Senior Assistant Attorney General for the State of Ohio in the Higher Education Section. Schuster is a recognized expert in preventive law for education, notably in the fields of sexual misconduct, First Amendment, risk management, student discipline, campus conduct, intellectual property, and employment Issues. Prior to practicing law, Schuster served as the Associate Dean of Students at The Ohio State University. Schuster has more than 25 years of experience in college administration and teaching. She frequently presents nationally on legal issues in higher education. Schuster holds Masters degrees in Counseling and Higher Education Administration from Miami University, completed her coursework for her Ph.D. at The Ohio State University, and was awarded her law degree from the Moritz College of Law, The Ohio State University. She is a past President of the National Behavioral Intervention Team Association (NaBITA).

**Brett A. Sokolow, J.D.** is a higher education attorney who specializes in high-risk campus health and safety issues. He is recognized as a national leader on campus sexual violence prevention, response, and remediation. He is the founder, President, and CEO of The NCHERM Group, LLC, which serves as legal counsel to over 70 colleges and universities. The NCHERM Group has consulted with more than 3,000 college campuses. Sokolow is the Executive Director of ATIXA. He frequently serves as an expert witness on sexual assault and harassment cases, and he has authored twelve books and more than 50 articles on campus safety and sexual assault. He has provided strategic prevention programs to students at more than 2,000 college and university campuses on sexual misconduct and alcohol. He has authored the conduct codes of more than 75 colleges and universities. The ATIXA Model Sexual Misconduct policy serves as the basis for policies at hundreds of colleges and universities across the country. The NCHERM Group has trained the members of more than 700 conduct hearing boards at colleges and universities in North America. ATIXA has certified more than 8,400 school and campus Title IX Coordinators and civil rights investigators. Additionally, Sokolow is the Founder and Past President of the National Behavioral Intervention Team Association (NaBITA), and is a Directorate Body member of the American College Personnel Association – College Student Educators International (ACPA) Commission on Student Conduct and Legal Issues. Sokolow is a 1993 graduate of the College of William and Mary and a 1997 graduate of the Villanova University School of Law.

**Daniel Swinton, J.D., Ed.D.** is Managing Partner of The NCHERM Group, LLC and Senior Associate Executive Director of ATIXA. Prior to that, he served as Assistant Dean and Director of Student Conduct and Academic Integrity at Vanderbilt University. Swinton received his Bachelor's degree from Brigham Young University, his law degree from the J. Reuben Clark Law School at BYU, and a doctorate in higher education leadership and policy from Vanderbilt University's Peabody College. He is a member of the Tennessee State Bar. Swinton has presented nationally on issues such as sexual misconduct on college campuses, legal issues in student affairs and higher education, student conduct policies and procedures, mediation, and behavioral intervention teams. Swinton also served as President of the Association for Student Conduct Administration (ASCA) in 2011-2012.

# The Sex Bureaucracy

Jacob Gersen & Jeannie Suk*

*We are living in a new sex bureaucracy. Saliently decriminalized in the past decades, sex has at the same time become accountable to bureaucracy. In this Article, we focus on higher education to tell the story of the sex bureaucracy. The story is about the steady expansion of regulatory concepts of sex discrimination and sexual violence to the point that the regulated domain comes to encompass ordinary sex. The mark of bureaucracy is procedure and organizational form. Over time, federal prohibitions against sex discrimination and sexual violence have been interpreted to require educational institutions to adopt particular procedures to respond, prevent, research, survey, inform, investigate, adjudicate, and train. The federal bureaucracy required nongovernmental institutions to create mini-bureaucracies, and to develop policies and procedures that are subject to federal oversight. That oversight is not merely, as currently assumed, of sexual harassment and sexual violence, but also of sex itself. We call this bureaucratic sex creep—the*

DOI: http://dx.doi.org/10.15779/Z38HV80

Copyright © 2016 California Law Review, Inc. California Law Review, Inc. (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.

\* Professors of Law, Harvard Law School. We thank the following students for excellent research assistance over several years: Elizabeth Bewley, Kelsey Bleiweiss, Peter Bruland, Alison Burton, Thomas Chapman, Ryan Cohen, Elena Davis, Sean Driscoll, Nicholas Dube, Sophie Elsner, Timothy Goh, Joseph Goldstein, Shane Hunt, Rauvin Johl, Carys Johnson, Maria Lacayo, Blake Lanning, J. Harold Lee, Andrew Lewis, Ezra Marcus, Courtney Millian, Michael Mullan, Justin Patrick, Sheri Pan, Lauren Ross, Nicholas Ruge, Lauren Schloss, Clara Spera, Mary Schnoor, Ben Schwartz, Elizabeth Stork, Anna Vinogradov, Virginia Williamson, and Amy Zhang. We are grateful for very useful comments from Paul Abramson, Ian Ayres, Elizabeth Bartholet, Gabriella Blum, Jessica Bulman-Pozen, Kristen Carpenter, Jennifer Chacon, Adam Cox, Justin Dillon, Rosalind Dixon, Elizabeth Emens, Charles Fried, Nancy Gertner, Abbe Gluck, John Goldberg, Jamal Greene, Aya Gruber, Janet Halley, Stephen Henrick, Dan Ho, Bert Huang, Vicki Jackson, Duncan Kennedy, Issa Kohler-Hausmann, Anna Lvovsky, Michael McConnell, Melissa Murray, Robert Nagel, Anne Joseph O'Connell, Ruth Okediji, David Pozen, Jed Rubenfeld, David Schraub, David Sklansky, Holger Spamann, Matthew Stephenson, David Strauss, Julie Suk, Cass Sunstein, Nirvana Tanoukhi, Amanda Tyler, John Witt, and Emily Yoffe. We benefited from critiques raised in presentations at Columbia Law School, Colorado Law School, Harvard Law School, Sciences Po Law School, Stanford Law School, Thursday Morning Talks for Mt. Auburn Hospital, University of California, Berkeley, School of Law, University of New South Wales Faculty of Law, University of Wisconsin-Madison Center for the Humanities, and Yale Law School.

881

*enlargement of bureaucratic regulation of sexual conduct that is voluntary, non-harassing, nonviolent, and does not harm others. At a moment when it is politically difficult to criticize any undertaking against sexual assault, we are writing about the bureaucratic leveraging of sexual violence and harassment policy to regulate ordinary sex. An object of our critique is the bureaucratic tendency to merge sexual violence and sexual harassment with ordinary sex, and thus to trivialize a very serious problem. We worry that the sex bureaucracy is counterproductive to the goal of actually addressing the harms of rape, sexual assault, and sexual harassment. Our purpose is to guide the reader through the landscape of the sex bureaucracy so that its development and workings can be known and debated.*

Introduction ................................................................................................ 882
I. Sexual Deregulation? ............................................................................... 887
II. Administering Sex ................................................................................. 891
    A.   Regulation of Quasi-Crime ...................................................... 892
    B.   Discipline and Procedure ......................................................... 897
          1.  Sex Discrimination .......................................................... 897
          2.  Reporting Policy and Procedure ..................................... 905
          3.  Shadow Administration .................................................. 908
    C.   Prevention and Risk Reduction ................................................ 912
          1.  Beware Poor Minorities and Sexual Fantasies ................ 913
          2.  My Brother's Keeper ...................................................... 916
    D.   Making by Measuring .............................................................. 918
III. Bureaucrats of Desire ......................................................................... 924
    A.   The Foreplay Bureaucracy ....................................................... 924
    B.   DOE Process ............................................................................ 931
Conclusion: Desire for Bureaucracy ......................................................... 946

*The behavior of a human being in sexual matters is often a prototype for the whole of his other modes of reaction to life.*

*−Sigmund Freud[1]*

*When fully developed, bureaucracy['s] . . . specific nature . . . develops the more perfectly the more bureaucracy is "dehumanized," the more completely it succeeds in eliminating from official business love, hatred, and all purely personal, irrational and emotional*

---

1.   SIGMUND FREUD, SEXUALITY AND THE PSYCHOLOGY OF LOVE 25 (1963).