1   Jennifer A. Reisch (CA Bar No. 223671)
    Equal Rights Advocates
2   1170 Market Street, Suite 700
    San Francisco, CA 94102
3   Ph: (415) 621-0672
    Fax: (415) 621-6744
4   Email: jreisch@equalrights.org

5   Javier M. Guzman*
    Robin Thurston*
6   Karianne Jones*
    Democracy Forward Foundation
7   1333 H St. NW
    Washington, DC 20005
8   Ph: (202) 448-9090
    Fax: (202) 701-1775
9   Emails: jguzman@democracyforward.org, rthurston@democracyforward.org,
    kjones@democracyforward.org
10
    Leecia Welch (CA Bar No. 208741)
11  Seth Galanter*
    Alice Y. Abrokwa*
12  National Center for Youth Law
    405 14th Street, 15th Floor
13  Oakland, CA 94612, and
    1313 L Street, NW, Suite 130
14  Washington, DC 20005
    Ph: (510) 835-8098
15  Fax: (510) 835-8099
    Emails: lwelch@youthlaw.org, sgalanter@youthlaw.com, aabrokwa@youthlaw.org
16
    Emily Martin*
17  Neena Chaudhry*
    Sunu Chandy*
18  Elizabeth Tang*
    National Women's Law Center
19  11 Dupont Circle, NW, Suite 800
    Washington, DC 20036
20  Ph: (202) 588-5180
    Fax: (202) 588-5185
21  Emails: emartin@nwlc.org, nchaudhry@nwlc.org, schandy@nwlc.org, etang@nwlc.org

22  *pro hac vice

23  Counsel for Plaintiffs

24

25

1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

2

3  SURVJUSTICE, INC., et al.,                    )
            Plaintiffs,                          )

4                                                )
   v.                                            )      Case Number: 3:18-cv-00535-JSC

5                                                )
   ELISABETH D. DEVOS, et al.,                   )      PLAINTIFFS' MOTION FOR SUMMARY

6          Defendants.                           )      JUDGMENT
                                                 )

7                                                )      HEARING NOTICED: October 17, 2019 at
                                                 )      9:00 a.m.

8                                                )
   _____ )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

Pages

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ...................................1

INTRODUCTION AND STATEMENT OF ISSUES ...................................................................1

STATEMENT OF RELEVANT FACTS ....................................................................................2

STANDARD OF REVIEW .........................................................................................................6

ARGUMENT ..............................................................................................................................7

    I.     Plaintiffs have standing to pursue their claims .....................................................7

    II.    Title IX Policy is final agency action ..................................................................10

           A.     The Department Assurance encompasses the 2017 Title IX Policy ..........11

           B.     The OMB Assurance encompasses the 2017 Title IX Policy....................13

    III.    The 2017 Title IX Policy is arbitrary and capricious............................................14

           A.     The Department reversed its prior policies sub silentio and enacted policies that conflict with rules still in effect....................................16

           B.     The Department failed to provide a reasoned explanation for changing its positions as to the standard of proof and appeals ...........................................19

           C.     The Department failed to consider the 2017 Title IX Policy's effect on survivors..................................................................................23

CONCLUSION............................................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Bennett v. Spear,*
    520 U.S. 154 (1997)...................................................................................................10, 11

5

*California v. Ross,*
    362 F. Supp. 3d 749 (N.D. Cal. 2018) .......................................................................6

6

*Ctr. for Envt'l Health v. McCarthy,*
    192 F. Supp. 3d 1036 (N.D. Cal. 2016) .....................................................................7

7

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629 (1999)................................................................................................2, 3

8

9

*East Bay Sanctuary Covenant v. Trump,*
    909 F.3d 1219 (9th Cir. 2018) ...................................................................................9

10

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC,*
    666 F.3d 1216 (9th Cir. 2012) ...................................................................................9

11

12

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)...............................................................................15, 16, 19, 22

13

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998)................................................................................................2, 3

14

*Gill v. DOJ,*
    913 F.3d 1179 (9th Cir. 2019) .............................................................................10, 13

15

16

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)...................................................................................................7

17

*In re Horry Cty. Sch. Dist.,*
    1969 WL 26192 .......................................................................................................12

18

19

*Hyundai Am., Inc. v. Meissner & Wurst GmbH & Co.,*
    26 F. Supp. 2d 1217 (N.D. Cal. 1998) ....................................................................13

20

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999) .................................................................................11

21

22

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)...................................................................................................6

23

24

Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC

25

*Modesto Irr. Dist. v. Gutierrez,*
  619 F.3d 1024 (9th Cir. 2010) .................................................................16

*Monge v. California,*
  524 U.S. 721 (1998)...................................................................................23

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).............................................................................15, 23

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) ...................................................15, 20, 21

*Pub. Citizen Inc. v. Mineta,*
  343 F.3d 1159 (9th Cir. 2003) .................................................................13

*In re Smith Cty. Bd. of Ed.,*
  1967 WL 21744 .........................................................................................12

*El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.,*
  959 F.2d 742 (9th Cir. 1991) .....................................................................7

*Spokeo, Inc. v. Robins,*
  1136 S. Ct. 1540 (2016) ..............................................................................7

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017)................................................................................7

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
  136 S. Ct. 1807 (2016) ..............................................................................11

*United States v. Phoenix Union High Sch. Dist.,*
  681 F.2d 1235 (9th Cir. 1982) .................................................................11

*United States v. Wealth & Tax Advisory Servs., Inc.,*
  526 F.3d 528 (9th Cir. 2008) ...................................................................12

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ..............................................................7, 9

**Statutes**

5 U.S.C. § 706................................................................................... *passim*

20 U.S.C. § 1681 .............................................................................. *passim*

44 U.S.C. § 3501 ........................................................................................13

1

**Other Authorities**

2

34 C.F.R. § 106.8 ................................................................................................................3

3

*Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/
    guideline ..............................................................................................................11

4

5

*Roget's 21st Century Thesaurus*, 3d ed. (2013),
    https://www.thesaurus.com/browse/guideline ......................................................12

6

Fed. R. Civ. P. 56 ..............................................................................................................1

7

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/guideline..............................11

8

*Webster's New World Coll. Dictionary*, 4th ed. (2010),
    https://www.collinsdictionary.com/us/dictionary/english/guideline .....................................11

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC

1   Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs SurvJustice, Inc., Equal Rights

2   Advocates, and Victim Rights Law Center hereby move this Court for summary judgment.

3   **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

4   PLEASE TAKE NOTICE that on October 17, 2019 at 9:00 a.m., before the Honorable

5   Jacqueline Scott Corley, Courtroom F, 15th Floor, 450 Golden Gate Avenue, San Francisco,

6   California, 94102, Plaintiffs SurvJustice, Inc. ("SurvJustice"), Equal Rights Advocates ("ERA"),

7   and Victim Rights Law Center ("VRLC") will and hereby do move the Court pursuant to Federal

8   Rule of Civil Procedure 56 for an order granting Plaintiffs' summary judgment as to all their

9   claims.

10   Plaintiffs' motion is based on this Notice of Motion and Motion, the accompanying

11   Memorandum of Points and Authorities, the accompanying declarations and exhibits, the

12   pleadings filed in this action, any matter that may be judicially noticed, and any other matter

13   raised in oral arguments in support of this motion. Defendants' response to this motion must be

14   filed with the Court and served on counsel for Plaintiffs by August 22, 2019. *See* Dkt. No. 128.

15   **INTRODUCTION AND STATEMENT OF ISSUES**

16   Sexual harassment, including sexual assault and other forms of sex-based violence,

17   occurs at schools across the United States at alarming rates—with a particularly harmful impact

18   on women and girls—and it impedes a survivor's equal access to educational opportunities. Title

19   IX of the Education Amendments of 1972 ("Title IX") prohibits sex discrimination in federally-

20   funded education programs and therefore requires schools to promptly and thoroughly address

21   sexual harassment of students and employees. To protect students' equal access to educational

22   opportunities, the Office for Civil Rights ("OCR") at the U.S. Department of Education (the

23   "Department") has historically enforced Title IX policies that required schools to investigate and

24

25

1  adjudicate sexual harassment complaints in ways that afforded appropriate substantive and

2  procedural protections to all parties and allowed survivors to feel safe reporting harassment and

3  seeking remedial services.

4  　　　　　That has all changed. In September 2017, the Department adopted a new Title IX Policy,

5  requiring schools to implement harmful mandates that dissuade survivors from reporting

6  incidents of sexual harassment. That Policy undermines the fundamental antidiscrimination aim

7  of Title IX, makes schools less safe, and impedes women's and girls' access to educational

8  opportunities. Yet, in adopting the new Policy, the Department was notably silent about its

9  reasoning, failing to explain or acknowledge the way in which it upends its historic approach to

10 Title IX. For these reasons, the Policy is arbitrary and capricious under the Administrative

11 Procedure Act ("APA"), 5 U.S.C. § 706, and must be vacated.

12 **STATEMENT OF RELEVANT FACTS**

13 　　　　　Title IX, 20 U.S.C. § 1681, prohibits discrimination on the basis of sex in any federally-

14 funded education program or activity. The Supreme Court has held that sexual harassment is a

15 form of sex discrimination under Title IX. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of*

16 *Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

17 　　　　　To receive federal funding from the Department, an educational institution must sign

18 "assurance" documents, which formally obligate it to comply with Title IX. 34 C.F.R.

19 § 106.4(a). All applicants for federal funding must sign the Department Assurance of

20 Compliance – Civil Rights Certificate ("Department Assurance"), which commits the applicant

21 to complying with Title IX and "[a]ll regulations, guidelines, and standards issued by the

22 Department" under Title IX "in order to continue receiving Federal financial assistance from the

23 Department." *See* Ex. A-1. The Assurance specifies that if the applicant fails to comply,

24

25

1    "financial assistance can be terminated and the applicant can be declared ineligible to receive

2    further assistance." *Id.* Some federal funding recipients must also sign the Office of Management

3    & Budget Assurance form ("OMB Assurance"), *see* Ex. A-2. As a condition of funding, the

4    OMB Assurance requires the recipient to agree to comply with Title IX and "all applicable

5    requirements of all other Federal laws, executive orders, regulations, and policies governing this

6    program." *Id.*

7           **Title IX Guidance from 1975 - 2017.** The Department of Education is the lead agency

8    charged with enforcing Title IX. In 1975, the Department published regulations governing how

9    schools are required to investigate and adjudicate complaints under Title IX. These regulations

10   require schools to "adopt and publish grievance procedures providing for prompt and equitable

11   resolution" of student and employee complaints of sex discrimination. 34 C.F.R. § 106.8(b).

12   Since 1975, the Department has issued a series of policy documents to further articulate the

13   standards that it will use to determine whether a campus grievance procedure complies with Title

14   IX. In 2001, following the Supreme Court's decisions in *Gebser* and *Davis* holding that sexual

15   harassment of students constitutes sex discrimination under Title IX, the Department, after

16   providing notice in the Federal Register and an opportunity to comment, published a revised

17   guidance document. This guidance, the *Revised Sexual Harassment Guidance: Harassment of*

18   *Students by School Employees, Other Students, or Third Parties* ("2001 Guidance"), Ex. A-3,

19   explains "how the requirements of the Title IX regulations apply to situations involving sexual

20   harassment of a student and outlines measures that schools should take to ensure compliance

21   [with Title IX and its implementing regulations]." *Id.* at 4.

22          In 2011, the Department issued a Dear Colleague Letter further clarifying how schools

23   must treat sexual violence complaints under Title IX. U.S. Dep't of Educ., Ltr. From Ass't Sec'y

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                              Page: 3

1   Russlynn Ali (Apr. 4, 2011), AR_2764-82 ("2011 DCL"). Citing "deeply troubling" statistics

2   that roughly 1 in 5 women are victims of completed or attempted sexual assault while in college,

3   the 2011 DCL "supplement[ed] the *2001 Guidance* by providing additional guidance and

4   practical examples regarding Title IX requirements as they relate to sexual violence." *Id.* at 2. In

5   2014, the Department issued a Questions & Answers document to "further clarify the legal

6   requirements and guidance articulated in the DCL and the 2001 Guidance and include examples

7   of proactive efforts schools can take to prevent sexual violence and remedies schools may use to

8   end such conduct, prevent its recurrence, and address its effects." *See* U.S. Dep't of Educ., Q&A

9   on Title IX and Sexual Violence (Apr. 29, 2014), AR_325-377 ("2014 Q&A").

10         **The 2017 Title IX Policy.** In 2017, the Department began actively soliciting the views of

11   individuals and groups that oppose robust Title IX protections and question the veracity of

12   survivors' experiences of sexual assault.[1] This effort culminated in September 2017, when the

13   Department issued a Dear Colleague Letter and a Questions & Answers document (collectively

14   the "2017 Title IX Policy" or "Policy") that rescinded the 2011 DCL and 2014 Q&A, and

15   imposed new, weaker standards governing campus grievance procedures under Title IX. U.S.

16   Dep't of Educ., Ltr. from Ass'n Sec'y Candice Jackson (Sept. 22, 2017), AR_2-3 ("2017 DCL");

17   U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct (Sept. 22, 2017), AR_4-10 ("2017

18   Q&A"). The Department also stated that it "will continue to rely on" the 2001 Guidance for

---

20   [1] *See, e.g.*, AR_1674 (email from then- Acting Assistant Secretary Candice Jackson forwarding

21   email from FIRE); AR_1862 (email from FACE Co-President to Jackson discussing "comparing
the fairness and due process recommendations" presented to her); AR_1959-63 (email from

22   Jackson stating, "Everyone needs to read for tomorrow AM meeting[,]" attaching a letter from
SAVE advocating for "the Department of Education to endorse … a justice-centered approach

23   over a victim-centered approach"); AR_3030 (email from Jackson calling a National Review
article a "good piece" in which the Obama Administration OCR is said to have "seemed to take
the side of the loudest and most hysterical campus activists").

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                                    Page: 4

"how [it] will assess a school's compliance with Title IX." 2017 DCL at 2; 2017 Q&A at 1 & n.1.

The 2017 standards depart from those in place under the prior guidance documents in eight critical ways, each of which disfavors complainants:

1. **Standard of proof:** Schools had been required to use a "preponderance of the evidence" standard in Title IX proceedings for sexual harassment complaints. *See* 2014 Q&A at 13; 2011 DCL at 10. Now schools may impose the more burdensome clear-and-convincing evidence standard. 2017 DCL at 1; 2017 Q&A at 5.

2. **Appeals:** Schools that had offered an appeals process were required to offer equal appellate rights to both the complainant and respondent. 2014 Q&A at 26; 2011 DCL at 12. Now a school may offer the right to appeal only to the respondent. 2017 DCL at 1; 2017 Q&A at 5.

3. **Mediation:** Schools had been prohibited from allowing students to resolve sexual violence complaints through an informal mediation process. 2011 DCL at 8; Ex. A-3 at 21. Now mediation is seemingly permissible under the 2017 Policy, 2017 Q&A at 4, despite the conflicting prohibition that remains in effect under the 2001 Guidance.

4. **Interim measures:** Schools had been required to provide interim measures to accommodate the educational and safety needs of the complainant during the pendency of an investigation and to "minimize the burden on the complainant" when adopting such measures. 2014 Q&A at 33; 2011 DCL at 15. Now schools are not required to provide interim measures at all, and if they do so, they must provide the interim measures to "both the reporting and responding parties involved in an alleged incident" and "may not rely on fixed rules or operating assumptions that favor one party over another." 2017 Q&A at 2-3.

5. **Promptness:** The Department had employed an objective test to determine whether a school handled a complaint in a "prompt" manner, as required by regulations. The Department set a 60-day benchmark and explained that the promptness determination would be made on a case-by-case consideration of circumstances such as "the complexity of the investigation and the severity and extent of the alleged conduct." 2014 Q&A at 31-32. Now the test for promptness is subjective: the Department will consider whether a school engaged in a "good faith effort to conduct a fair, impartial investigation in a timely manner." 2017 Q&A at 3.

6. **Off-campus conduct:** Schools had been obligated to investigate all allegations of sexual harassment "regardless of where the conduct occurred" and "[e]ven if the misconduct did not occur in the context of an education program or activity" in order to determine whether the misconduct resulted in a hostile educational environment. 2014 Q&A at 29. Now the Department appears to point in the opposite direction:

1

2

3

stating that schools "do[] not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient," despite, in the very same footnote, also stating that schools "are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." 2017 Q&A at 1 n.3.

4

5

6

7

7. **Confidentiality:** Schools had been required to "take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality" if the complainant so requested. 2011 DCL at 5; 2014 Q&A at 18-20; Ex. A-3 at 17. Now schools are required to disclose to a respondent "the identities of the parties involved," once "it decides to open an investigation that may lead to disciplinary action," 2017 Q&A at 4, despite the conflicting provision that remains in effect under the 2001 Guidance.

8

9

8. **Sexual history of complainant:** The Department had prohibited "[q]uestioning about the complainant's sexual history with anyone other than the alleged perpetrator." 2014 Q&A at 31. Now such questioning is permitted.

10

11

12

13

14

**Procedural History.** Plaintiffs brought the present lawsuit challenging the 2017 Title IX Policy as arbitrary and capricious under the APA, 5 U.S.C. § 706. After briefing on several preliminary motions, this Court held that (1) Plaintiffs had alleged facts sufficient to establish standing to pursue their APA claims, Dkt. 81 at 14, and (2) Plaintiffs could plausibly allege that the 2017 Title IX Policy was final agency action, as required by the APA, Dkt. 121 at 10.

15

**STANDARD OF REVIEW**

16

17

18

19

At summary judgment, plaintiffs must "set forth by affidavit or other evidence specific facts" that support a finding of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 555 (1992). "These facts are presumed to be true at the summary judgment stage." *California v. Ross*, 362 F. Supp. 3d 749, 753 (N.D. Cal. 2018).

20

21

22

Under the APA, a court must "hold unlawful and set aside agency action, findings, [or] conclusions[,]" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2). "[S]ummary judgment is an appropriate mechanism"

23

24

25

for determining whether an agency action violated that standard. *Ctr. for Envt'l Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016).

## ARGUMENT

### I.   Plaintiffs have standing to pursue their claims.

To demonstrate Article III standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 1136 S. Ct. 1540, 1547 (2016). An organization has standing to sue in its own right when "it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (internal citations omitted); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Although only one plaintiff need have standing, *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017), each Plaintiff here has standing.

Work on behalf of sexual harassment survivors is central to each Plaintiff's mission. SurvJustice's mission is to increase the prospect of justice for survivors of sexual violence. SurvJustice Decl. ¶¶ 4-7. ERA's mission is to protect and expand access to economic and educational opportunities for women and girls. ERA Decl. ¶ 4. And VRLC's mission is to provide legal representation to victims of rape and sexual assault. VRLC Decl. ¶¶ 4-6. Each organization works to help student-survivors navigate the Title IX process, for example, through providing counseling, consultation, referral, and legal services. VRLC Decl. ¶¶ 4-6. In addition, SurvJustice and ERA each provide training to educational institutions, lawmakers, and fellow advocates. SurvJustice Decl. ¶¶ 6-7; ERA Decl. ¶ 6. The 2017 Title IX Policy impedes Plaintiffs' missions and activities in at least three ways.

*First*, the Policy makes it more difficult for Plaintiffs to achieve successful results for their clients in Title IX proceedings because it allows—and in some cases, requires—schools to impose policies and procedures that make it more difficult for students to prove their complaints and obtain prompt relief through the campus grievance process. *See* SurvJustice Decl. ¶¶ 11, 13-14; ERA Decl. ¶¶ 13-14; VRLC Decl. ¶¶ 10, 12. For example, the Policy allows schools to impose on complainants the more burdensome clear-and-convincing standard of proof, allows schools to provide appeal rights only to the respondent, and frees schools of the prior objective 60-day benchmark for a prompt investigation. The 2017 Policy thus increases barriers to redress, and thereby injures plaintiff, whose organizational missions include the provision of direct assistance and referral services to survivors of sexual violence. *See El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 748 (9th Cir. 1991) (legal services groups had standing to challenge policy limiting language interpretation in immigration proceedings because policy frustrated groups' efforts to obtain asylum and withholding of deportation for their clients).

*Second*, the Policy makes it more difficult for SurvJustice and VRLC to achieve their mission because, since the Policy's release, fewer students have sought their legal and counseling services. *See* SurvJustice Decl. ¶¶ 11-12; VRLC Decl. ¶¶ 10-11. The chilling effect SurvJustice and VRLC have observed is a result, in large part, of students' increasing concerns that they will be less likely to obtain a successful outcome under the Policy. *See* SurvJustice Decl. ¶ 12; VRLC Decl. ¶¶ 12-13. Additionally, Plaintiffs have observed that students are deterred from pursuing complaints because the Policy allows schools to impose practices and procedures that put survivors at risk of re-traumatization and retaliation. *Id.* For example, schools may now allow a respondent to ask about the complainant's sexual history and are no longer

1    required to give weight to a complainant's request for confidentiality. Furthermore, the Policy

2    generally communicates a distrust and skepticism of survivors. SurvJustice ¶¶ 8-9; VRLC Decl.

3    ¶¶ 8-9. As a result, SurvJustice and VRLC have represented fewer students since the Policy was

4    issued—an injury sufficient to establish organizational standing. *See East Bay Sanctuary*

5    *Covenant v. Trump*, 909 F.3d 1219, 1242 (9th Cir. 2018) (organizations had standing because the

6    challenged rule "frustrated their mission of providing legal aid … because the Rule significantly

7    discourages a large number of those individuals" from seeking the organizations' services);

8    *Whiting*, 732 F.3d at 1018 (organizations had standing because they "reasonably fear[ed] that

9    [their] volunteers w[ould] be deterred from participating in light of" the contested law).

10           *Third*, the Policy sows confusion among students, schools, and advocates. *See*

11   SurvJustice Decl. ¶¶ 15-16; ERA Decl. ¶¶ 12, 15; VRLC Decl. ¶ 15. For example, the Policy no

12   longer provides an objective benchmark for what qualifies as a prompt investigation, yet still

13   purports to require promptness—thus causing uncertainty as to whether a grievance process is

14   proceeding promptly under the new subjective standard. *Id.* Similarly, under the Policy, a

15   school's obligation with regards to off-campus conduct is governed by two contradictory

16   standards, *see supra* 5-6—thus causing uncertainty as to whether a survivor can raise a complaint

17   under Title IX involving off-campus conduct. *Id.* And for mediation: the 2017 Policy's

18   instruction conflicts with the still-effective 2001 Guidance. *See supra* 5; ERA Decl. ¶ 15. The

19   result is confusion about students' rights under Title IX that impedes Plaintiffs' mission of

20   helping student survivors access those rights. *See Fair Hous. Council of San Fernando Valley v.*

21   *Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (holding that nonprofit organizations

22   have standing because defendant's violation of Fair Housing Act necessitated "new education

23

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                              Page: 9

1   and outreach campaigns targeted at discriminatory roommate advertising[,]" which caused them

2   "to divert resources independent of litigation costs and frustrated their central mission").

3        Because the Policy has caused the injuries outlined above, Plaintiffs have been forced to

4   divert resources from other activities. For example, SurvJustice and VRLC have diverted

5   significant staff resources to analyzing, understanding, and providing lengthier consultations on

6   the confusing, and at times conflicting, Policy. SurvJustice Decl. ¶¶ 15-17, 19; VRLC Decl.

7   ¶¶ 13-15, 17. SurvJustice has also expended resources to provide more campus trainings at free

8   or reduced cost. SurvJustice Decl. ¶ 16. And ERA has worked to streamline its own processes, as

9   well as developed a new initiative designed to broaden the community of advocates available to

10  assist student-survivors in a pro bono capacity; it has also offered more trainings on the Policy to

11  student communities and advocates. ERA Decl. ¶¶ 17-20, 22-23.

12       In sum, the 2017 Policy has impeded Plaintiffs' missions and caused them to divert

13  resources, establishing Article III injuries; Defendants caused these harms because schools have

14  modified their policies and practices in response to the Policy, *see infra* 13 n.3; SurvJustice Decl.

15  ¶¶ 14-15; ERA Decl. ¶¶ 13-14; VRLC Decl. ¶ 14; and the Court could redress the harms by

16  vacating the Policy and declaring it unlawful because such "schools would have no reason to

17  continue implementing the injurious and unlawful policies." Dkt. 120 at 11.

18  **II.    The 2017 Title IX Policy is final agency action.**

19       The 2017 Title IX Policy is reviewable final agency action. An agency action is "final"

20  when it marks the "consummation of the agency's decisionmaking process" and is one "by

21  which 'rights or obligations have been determined,' or from which 'legal consequences will

22  flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The inquiry is a "pragmatic" and

23  "flexible" one, not beholden to an agency's labels or boilerplate disclaimers. *Gill v. DOJ*, 913

24

25  Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                              Page: 10

F.3d 1179, 1184 (9th Cir. 2019); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016).

As to the first element of *Bennett*, the Court correctly held as a matter of law that the Policy marks the consummation of the agency's decision-making process. Dkt. 81 at 17. As to the second element, the Court held that if, by signing an assurance form, schools agree to comply with the 2017 Guidance, then "the Guidance produces legal consequences; specifically, the potential termination of financial assistance for failure to comply." Dkt. 121 at 7 (citing *Gill*). Both assurance forms contain an agreement to comply with the Policy.[2]

A. **The Department Assurance encompasses the 2017 Title IX Policy.**

The Department Assurance requires schools to agree to comply with Title IX and "[a]ll regulations, guidelines and standards issued by the Department." Ex. A-1 at 1. A "guideline" is "a standard or principle by which to make a judgment or determine a policy or course of action." *Webster's New World Coll. Dictionary*, 4th ed. (2010), https://www.collinsdictionary .com/us/dictionary/english/guideline; *see also Merriam-Webster*, https://www.merriam-webster.com/dictionary/guideline (defining "guidelines" as "an indication or outline of policy or conduct"); *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/ guideline (defining "guidelines" as "a piece of information that suggests how something should

---

[2] Signing the assurance form "contractually obligate[s]" a recipient to abide by its terms in exchange for federal funding. *United States v. Phoenix Union High Sch. Dist.,* 681 F.2d 1235, 1237 (9th Cir. 1982). The meaning of these forms is therefore determined pursuant to federal common law, with guidance from "general principles for interpreting contracts[,]" including the Restatement (Second) of Contracts. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).

be done"). That definition surely encompasses the 2017 Policy, which "provide[s] information about how OCR will assess a school's compliance with Title IX." 2017 Q&A at 1.

Moreover, the Department describes the document as "guidance," which is, of course, synonymous with "guidelines." *See Roget's 21st Century Thesaurus*, 3d ed. (2013), https://www .thesaurus.com/browse/guideline; Press Release, U.S. Dep't of Educ., Department of Education Issues New Interim Guidance on Campus Sexual Misconduct (Sept. 22, 2017), Ex. A-9; *see also In re Horry Cty. Sch. Dist.*, 1969 WL 26192, at *13 (U.S. Dep't of Health, Educ. & Welfare Civil Rights Reviewing Authority, June 25, 1969) (predecessor agency defining "[g]uidelines" as "statements of policy to provide assistance and *guidance* to recipients to help them comply voluntarily with the legal requirements of Title VI of the Civil Rights Act" (emphasis added)); *In re Smith Cty. Bd. of Ed.*, 1967 WL 21744, at *1, *6 & n.10 (HEW Commissioner of Education, May 2, 1967) (same). Even Secretary DeVos described the prior guidance documents as "guidelines" in announcing her intention to rescind them. *See* U.S. Dep't of Educ. Betsy DeVos, Sec'y of Educ., Prepared Remarks on Title IX Enforcement, Sept. 7, 2017, Ex. A-10; *see also* AR_2272 (Department Press Secretary describes 2017 Policy as "interim guidelines").

The Department thus far has insisted that the term "guidelines" in the Department Assurance only means documents published in the Federal Register. *See* Dkt. 115 at 6-7. But nothing in the plain language of the Assurance suggests that qualification. To the contrary, the Assurance by its own terms extends to "all" guidelines "issued by the Department." Use of the prefatory "all" indicates that "guidelines" should be read broadly. *See United States v. Wealth & Tax Advisory Servs., Inc.*, 526 F.3d 528, 531 (9th Cir. 2008) (holding that use of the term "all" in the phrase "all opinions or memorandum" meant the phrase referred to "any type of opinion or memorandum"). And the qualifier "issued by the Department" means any guideline made public.

1    *See Pub. Citizen Inc. v. Mineta*, 343 F.3d 1159, 1167 (9th Cir. 2003) (holding that the verb

2    "issue" contemplates "some form of public notice"). The Department has many ways to "issue"

3    or provide public notice of, documents including sending letters to every educational institution

4    in the country. *Cf.* 2014 Q&A at i ("On April 4, 2011, … the U.S. Department of Education

5    issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence").

6    Had the Department intended to exclude documents issued in this fashion from the Department

7    Assurance, it could have done so by explicitly stating that schools are required to comply *only*

8    with "regulations, guidelines and standards *published in the Federal Register*." It did not do so,

9    and this Court must reject the government's attempt to rewrite the Assurance post-hoc. *See*

10   *Hyundai Am., Inc. v. Meissner & Wurst GmbH & Co.*, 26 F. Supp. 2d 1217, 1219 (N.D. Cal.

11   1998) ("Courts interpret contracts as made by the parties and do not make new ones for them.").

12   Because the Policy is encompassed by the Department Assurance, it has the legal effect of

13   forcing compliance with its terms. *See* Dkt. 121 at 7.[3]

14            **B.      The OMB Assurance encompasses the 2017 Title IX Policy.**

15            This Court previously did not consider the OMB Assurance because, by its terms, it

16   expired on September 30, 2017 under the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*.

17   However, the Department received an "extension without change" until September 30, 2020.

18   OMB Office of Information and Regulatory Affairs, Conclusion, Ex. A-7. The form is therefore

19   _____

20            [3] The Policy also has practical effects that support a finding of finality. *See Gill*, 913 F.3d
     at 1185. As the Plaintiffs have experienced while working with students, *see* SurvJustice Decl.
21   ¶¶ 14-15; ERA Decl. ¶¶ 13-14; VRLC Decl. ¶ 14, schools across the U.S. have changed their
     own policies and practices to comply with the Policy, *see, e.g.,* Exs. A-4 to A-6. The Department
22   has confirmed this practical effect of the Policy, explaining that it "takes into account the views
     that it expressed in the 2017 Guidance when making enforcement decisions[,]" as it did with the
23   University of North Carolina. Dkt. 115 at 7.

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                                      Page: 13

1    still legally effective, as it was when the Department issued the Policy on September 22, 2017.

2    Because it encompasses the Policy, the OMB Assurance also has the legal and practical effect of

3    requiring schools to comply with its terms or risk losing federal funding.

4          The OMB Assurance requires certain educational institutions to agree to comply with

5    Title IX and "all applicable requirements of all other Federal laws, executive orders, regulations,

6    and policies governing this program." Ex. A-2 at 6-7 ¶¶ 6, 18. The Department does not dispute

7    that the 2017 Policy is in fact a "policy," but argues that it "does not impose requirements," and

8    thus is not encompassed by the OMB Assurance.  Dkt. 70 at 10. That is incorrect.

9          The 2017 Policy changes how schools must conduct campus grievance processes for

10   complaints of sexual harassment. *See supra* 5-6. For example, the Policy requires schools to

11   provide the respondent with the complainant's name. 2017 Q&A at 4. It further requires that,

12   before disciplining a student found responsible for sexual harassment, schools must consider "the

13   impact of separating [that] student from her or his education." *Id.* at 6. And it requires that any

14   interim measures be made available equally to "both the reporting and responding parties

15   involved in an alleged incident[.]" *Id.* at 2-3 ("[A] school may not rely on fixed rules or

16   operating assumptions that favor one party over another, nor may a school make such measures

17   available only to one party."). If a school violates these or other requirements in the Policy, it has

18   likewise violated the OMB Assurance, potentially leading to the termination of financial

19   assistance. Such legal consequence renders the 2017 Title IX Policy final agency action. *See* Dkt.

20   121 at 7.

21          **III.    The 2017 Title IX Policy is arbitrary and capricious.**

22          An agency's action is arbitrary and capricious when it "relie[s] on facts which Congress

23   has not intended it to consider, entirely fail[s] to consider an important aspect of the problem,

24

25

1    offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is

2    so implausible that it could not be ascribed to a difference in view or the product of agency

3    expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

4    29, 43 (1983). Under the APA, an agency must examine "relevant data and articulate a

5    satisfactory explanation for its action including a rational connection between the facts found and

6    the choice made." *Id.* (internal quotation marks omitted).

7              Although an agency may change a policy or statutory interpretation in appropriate

8    circumstances, it must provide a "reasoned explanation" for the change. *FCC v. Fox Television*

9    *Stations, Inc.*, 556 U.S. 502, 515 (2009). Specifically, an agency must (1) "display[] awareness

10   that it is changing position," (2) "show[] that the new policy is permissible under the statute,"

11   (3) "believe[] the new policy is better," and (4) "provide[] good reasons for the new policy[.]"

12   *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc)

13   (internal quotation marks omitted) (quoting *Fox*). An agency must also supply a "more detailed

14   justification" for a policy change that "disregard[s] facts and circumstances that underlay or were

15   engendered by the prior policy." *Fox*, 556 U.S. at 515-16.

16             The 2017 Title IX Policy fails in all respects. In six areas addressed in the 2017 Title IX

17   Policy—mediation, interim measures, promptness, off-campus conduct, confidentiality, and

18   sexual history evidence—the Department changed positions without displaying awareness that it

19   was doing so, and without showing that there are good reasons for the changes.  In addition, the

20   Department imposed standards on some of those subjects—mediation, promptness, and

21   confidentiality—that conflict with the still-operative 2001 Guidance. And even for the two areas

22   where the Department did acknowledge that it was changing policy—standard of proof and

23   appeals—the decision to do so is not supported by a reasoned explanation, let alone an

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                                 Page: 15

explanation sufficient to meet *Fox*'s "heightened standard" required when an agency disregards prior factual findings. Finally, the Policy wholly disregards the reliance interests of, and effect on, survivors. For all these reasons, the Policy is unlawful.

### A. The Department reversed its prior policies *sub silentio* and enacted policies that conflict with rules still in effect.

"An agency may not … depart from a prior policy *sub silentio*[.]" *Fox*, 556 U.S. at 515; *Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010) ("Courts will not assume [an agency] has engaged in reasoned decision making when it implicitly departs from prior precedent and provides no explanation for doing so." (internal quotation marks omitted)). Nor may it "simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515. But that is precisely what the Department did here—violating the APA.

**Mediation.** Until 2017, the Department had consistently prohibited mediation as a means of resolving complaints of sexual assault. *See* 2011 DCL at 8 ("[I]n cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis."); Ex. A-3 at 21 ("In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis."). The Department now states—reversing course *sub silentio* and in conflict with the still-operative 2001 Guidance—that "[i]f all parties voluntarily agree … , [a] school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution." 2017 Q&A at 4.

**Interim measures.** The Department previously required schools to take interim measures to protect a complainant: "Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation." 2014 Q&A at 32. To effectuate Title IX's mandate, the Department further required schools to impose interim measures in a way

1    that "minimize[s] the burden on the *complainant*." *Id.* at 33 (emphasis added). The 2017 Policy

2    reverses both positions without acknowledgment, now stating that interim measures "*may* be

3    appropriate," rather than requiring them, and prohibiting schools from making decisions based

4    on "fixed rules or operating assumptions that favor one party over another," or from "mak[ing]

5    such measures available only to one party." 2017 Q&A at 3 (emphasis added).

6          **Promptness.** The Department previously used an *objective* test to determine whether a

7    school had conducted a "prompt" investigation of sexual harassment complaints, as required by

8    Title IX regulations. Prior guidance noted that the "typical" investigation would take

9    approximately 60 days, 2014 Q&A, at 31; 2011 DCL at 12, and explained that the Department's

10   promptness determination would be based on reasonableness, taking into account "the

11   complexity of the investigation and the severity and extent of the alleged conduct." 2014 Q&A at

12   32; Ex. A-3 at 20. Without explanation or acknowledgment, the new Policy shifts to a far less

13   rigorous *subjective* test: "OCR will evaluate a school's *good faith effort* to conduct a fair,

14   impartial investigation in a timely manner[.]" 2017 Q&A at 3 (emphasis added).

15         **Off-campus conduct.** The Department's prior policy required schools to "process all

16   complaints of sexual violence, regardless of where the conduct occurred." 2014 Q&A at 29.

17   Under the prior guidance, "[e]ven if the misconduct did not occur in the context of an education

18   program or activity, a school must consider the effects of the off-campus misconduct when

19   evaluating whether there is a hostile environment on campus or in an off-campus education

20   program or activity[.]" *Id.* But the 2017 Policy confuses the matter: in the same footnote, the

21   Policy states both that "[a] university *does not have a duty* under Title IX to address an incident

22   of alleged harassment where the incident occurs off campus and does not involve a program or

23   activity of the recipient" and that schools "*are responsible* for redressing a hostile environment

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                   Page: 17

1   that occurs on campus even if it relates to off-campus activities." 2017 Q&A at 1 n.3 (internal

2   citation omitted) (emphasis added). The Policy thus either eliminates the requirement to

3   investigate off-campus conduct that causes a hostile environment on campus, or, at the very

4   least, provides conflicting instructions on a school's duties with regards to off-campus conduct.

5   Either way, the change is unacknowledged and unreasoned.

6        **Confidentiality.** The 2001 Guidance says that if complainants insist their identity not be

7   disclosed to a respondent, schools must "take all reasonable steps to investigate and respond to

8   the complaint consistent with the student's request." Ex. A-3 at 17. The 2001 Guidance gives a

9   specific example of how an investigation can proceed against an individual respondent even

10  without revealing the identity of any complainant: "In instances affecting a number of students

11  … , an individual can be put on notice of allegations of harassing behavior and counseled

12  appropriately without revealing, even indirectly, the identity of the student who notified the

13  school." *Id.* at 18. By contrast, the 2017 Policy mandates that schools provide a respondent with

14  "the identities of the parties involved" "[o]nce it decides to open an investigation that may lead

15  to disciplinary action[s]." 2017 Q&A at 4. The Department cannot simply disregard the 2001

16  Guidance, which was reaffirmed on this matter in both of the rescinded policies. *See* 2011 DCL

17  at 5; 2014 Q&A at 20, 22.

18       **Evidence of complainant's sexual history.** Prior policy stated that "[q]uestioning about

19  the complainant's sexual history with anyone other than the alleged perpetrator should not be

20  permitted" and "the mere fact of a current or previous consensual dating or sexual relationship

21  between the two parties does not itself imply consent[.]" 2014 Q&A at 31. The new Policy

22  eliminated these restrictions. Yet, the Department neither acknowledged nor explained this

23  change.

24

25  Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                              Page: 18

1    In sum, the Department's many policy reversals, without acknowledgment or

2    explanation, and at times in blatant conflict with rules still in effect, renders the new Policy

3    arbitrary and capricious. *See Fox*, 556 U.S. at 515.

4    **B.    The Department failed to provide a reasoned explanation for**
     **changing its positions as to the standard of proof and appeals.**

5    Even where the Department did acknowledge changes in position, it did not give "good

6    reasons" to justify them. *Fox*, 556 U.S. at 515. The Department stated that it was withdrawing

7    requirements in the prior guidance that schools "adopt a minimal standard of proof," *i.e.*, a

8    preponderance of the evidence, and "allow complainants to appeal not-guilty findings[.]" 2017

9    DCL at 1. But its reasons were insufficient, particularly as the Department was required to

10   supply "a more detailed justification" in "disregard[ing] facts and circumstances that underlay or

11   were engendered by the prior policy." *Id*. The changes are therefore arbitrary and capricious.

12   **Standard of proof.** Under the prior guidance, the Department required schools to apply a

13   preponderance of the evidence standard in adjudicating sexual harassment complaints. *See* 2014

14   Q&A at 26 ("The school must use a preponderance-of-the-evidence (*i.e.,* more likely than not)

15   standard in any Title IX proceedings, including any fact-finding and hearings."); 2011 DCL at

16   10-11 ("[P]reponderance of the evidence is the appropriate standard for investigating allegations

17   of sexual harassment or violence."). The Department adopted this policy to align the standard of

18   proof used in campus grievance proceedings involving sexual harassment with the standard used

19   in civil cases to enforce other civil rights statutes, and the standard used by OCR to enforce Title

20   IX against funding recipients. *Id.* at 10-11. The Department found that because "grievance

21   procedures that use" the more burdensome clear and convincing standard are "inconsistent with

22   the standard of proof established for violations of the civil rights laws," they "are thus not

23   equitable under Title IX." *Id.* at 11.

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
     Page: 19

1    The Department has now reversed course, permitting schools to use "either a

2    preponderance of the evidence standard or a clear and convincing standard." 2017 Q&A at 5. Its

3    only explanations for this change were (1) "many schools had traditionally employed a higher

4    clear-and-convincing-evidence standard" prior to the guidance in 2011, 2017 DCL at 1, and

5    (2) "[t]he standard of evidence for evaluating a claim of sexual misconduct should be consistent

6    with the standard the school applies in other student misconduct cases," 2017 Q&A at 5 n.19.

7         Neither is sufficient.

8         As to the first reason, the Department cited no evidence, nor does any appear to exist in

9    the administrative record, to support the factual claim that "many schools" used the clear-and-

10   convincing standard before 2011. To the contrary, evidence before the agency explained that a

11   "substantial majority of colleges and universities were already using the preponderance standard

12   before OCR issued the 2011 DCL." AR_2051; *see also* AR_2080 ("A number of studies

13   demonstrate that the vast majority of schools used the preponderance standard for all disciplinary

14   proceedings, gender-based or not, *before the Dear Colleague Letter*."); AR_1886 (80 percent of

15   surveyed schools used preponderance standard prior to 2011). And there is no evidence in the

16   record that addresses what elementary and secondary school districts (which vastly outnumber

17   colleges and universities) were doing prior to 2011. But even if the observation were true, the

18   Department does not explain why the number of schools using a certain standard of proof

19   governs whether the use of that standard to resolve complaints of sexual harassment is consistent

20   with Title IX, particularly given its prior finding that use of the clear and convincing standard

21   was "not equitable under Title IX." 2011 DCL at 11. *See Organized Vill. of Kake*, 795 F.3d at

22   969 (agency's change in position concluding that a risk it previously found "prohibitive" is now

23   "merely a 'minor' one" required a more detailed justification).

24

25   Plaintiffs' Notice of Motion and Motion for Summary Judgment; Case No.: 3:18-cv-00535-JSC
                                                                              Page: 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

As to the second reason, the Department stated that the standard for evaluating sexual misconduct complaints should be consistent with the standard used in other student misconduct cases. 2017 Q&A at 5 n.19. This rationale cannot explain the rule the Department adopted. Followed to its logical conclusion, it would permit a school to use *any* standard of proof—be it substantial evidence or beyond-a-reasonable-doubt—so long as the school used that same standard in other student misconduct cases. But under the 2017 Policy, a school is limited to only two choices—preponderance or clear and convincing. So the Department cannot be relying on the rationale that sexual misconduct cases be judged by the same standard as other misconduct cases. And even if it were, the Department's assertion that use of the preponderance standard in Title IX cases is a "special procedure[]" suggestive of "a discriminatory purpose" contradicts its prior finding that it would be "inequitable" to allow schools to use a more burdensome standard of proof for sexual harassment complaints than what the Department itself uses to enforce Title IX—the preponderance standard. 2017 Q&A at 5 n.19. The Department cannot "simply discard [this] prior factual finding[] without a reasoned explanation." *Organized Vill. of Kake*, 795 F.3d at 968.

In any event, the more relevant comparison is not between the standards a school employs to adjudicate different types of student misconduct cases, but rather between the standard by which the Department measures schools' compliance with Title IX, a statute which applies only to sex discrimination, and the standard the Department requires for other kinds of discrimination cases. The record indicates that OCR has long required schools to apply the *preponderance* standard when investigating complaints of racial harassment. *See* AR_2048. Establishing a higher standard for sex discrimination "would not only have made sexual violence the only *civil rights* violation not proven by preponderance of the evidence, but would have

1    required sexual violence victims to reach a standard of proof that the vast majority of other

2    complainants in other administrative and civil justice systems do not have to reach." AR_2047.

3    These unexplained inconsistencies render the change arbitrary and capricious.

4         **Appeal.** The Department also failed to provide a reasoned explanation for changing its

5    policy about whether a school must provide a right to appeal to both parties. Previously, the

6    Department required that if a school provides an appeals process, "it must do so equally for both

7    parties." *See* 2014 Q&A at 26, 37, 38; 2011 DCL at 12. But under the 2017 Title IX Policy, a

8    school is now permitted to provide an appeal to *only* the respondent upon a finding of

9    responsibility or the imposition of disciplinary sanctions. 2017 Q&A at 7 & n.30. The

10   Department's reasons were: (1) "many schools had previously followed procedures reserving

11   appeal for accused students," 2017 DCL at 1; (2) there were three letters from OCR regional

12   offices that, prior to 2011, had indicated that one-sided appeals were permissible, 2017 Q&A at 7

13   n.30; and (3) a respondent "should not be made to be tried twice for the same allegation," *id*.

14        Again, none of these reasons suffices under *Fox*. The everybody-was-doing-it rationale

15   fails for the same reason as discussed above: the Department did not provide any evidence, nor

16   could Plaintiffs find any in the record, to support this factual assertion. Nor did the Department

17   explain, in any event, why this reason would warrant the policy change.

18        Likewise, for the second stated reason: the Department did not explain why letters in

19   three individual cases issued by regional offices prior to 2011 were relevant to whether the

20   Department should change the policy that it had adopted in 2011. Nor is there anything in the

21   administrative record that says that every decision issued by regional offices prior to 2011 had

22   reached that same result or that these three cases were representative of the Department's

23   enforcement actions. Indeed, there is no indication whatsoever that the Department itself did a

24

25

thorough canvass of its pre-2011 letters to determine what its regional offices had previously said about appeals. To the contrary, the record shows that a private individual repeatedly brought those three letters to the Department's attention, *see* AR_931, 933, 942, 947, 958, 1643, 2048, 2215, 2612, and received the personal thanks of the then-Acting Assistant Secretary, AR_942.

As to the third rationale—that a respondent "should not be made to be tried twice for the same allegation"—the Department ignores the distinction that it previously recognized between *civil* Title IX proceedings and *criminal* investigations—namely that, "[b]y contrast [to a criminal investigation], a Title IX investigation will never result in incarceration of an individual"—and it ignores its own prior conclusion that, "therefore, the same procedural protections and legal standards are not required." 2014 Q&A at 27. Nor does the Department acknowledge or provide any reasoning with respect to an important aspect of the problem: complainants stand to suffer from an institution's failure to appropriately address misconduct. *State Farm*, 463 U.S. at 43. Even if campus grievance proceedings were to be analogized to criminal proceedings, the 2017 DCL permits a school to establish a system where a respondent may challenge the sanction received but a complainant may not, even though in criminal cases the government is permitted to challenge a sentence as too short. *See, e.g.*, *Monge v. California,* 524 U.S. 721, 730 (1998).

In sum, for the Department's change in position with respect to standard of evidence and appeals, the stated rationales simply do not hold water, rendering them arbitrary and capricious.

### C.     The Department failed to consider the 2017 Title IX Policy's effect on survivors.

The 2017 Title IX Policy is arbitrary and capricious for all the reasons discussed above. And one more: the Department's new policy lacks any reference to, consideration of, or care for, the rights and needs of survivors of sexual assault. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if the agency failed to consider an important aspect of the problem).

About one in five women are victims of completed or attempted sexual assault while in college, and surveys indicate that the number is similar for girls in elementary and secondary schools.[4] These statistics are "both deeply troubling and a call to action for the nation." 2011 DCL at 2. Yet, the Department has now erased them and the reality they represent from Title IX policy. Instead, the Department chooses to focus its attention and regulatory efforts to protect those accused of sexual assault (predominantly men), at the expense of those who survive sexual assault (predominantly women). In so doing, the Department ignores Title IX's fundamental purpose to eradicate discrimination on the basis of sex and has made schools less safe by imposing mandates that will dissuade many student-survivors from reporting incidents of sexual assault. For this independent, and all too important reason, the Policy is arbitrary and capricious.

## CONCLUSION

Plaintiffs respectfully request that the Court grant summary judgment as to all claims raised in Plaintiffs' Third Amended Complaint, Dkt. No. 123, declare the Dear Colleague Letter and Q&A issued in September 2017 to be unlawful, set aside and vacate those documents, and reinstate the Dear Colleague Letter issued in 2011 and the Q&A issued in 2014.

Respectfully submitted,                                    Date: July 25, 2019

/s/ Karianne M. Jones

Leecia Welch (CA Bar No. 208741)              Washington, DC 20005
Alice Y. Abrokwa*                                          Ph: (510) 835-8098
Seth Galanter*                                               Fax: (510) 835-8099
National Center for Youth Law                     Emails: lwelch@youthlaw.org,
405 14th Street, 15th Floor                           sgalanter@youthlaw.com,
Oakland, CA 94612, and                               aabrokwa@youthlaw.org
1313 L Street, NW, Suite 130

---

[4] National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 3 (2017), Ex. A-8.

Jennifer A. Reisch (CA Bar No. 223671)
Equal Rights Advocates
1170 Market Street, Suite 700
San Francisco, CA 94102
Ph: (415) 896-0672
Fax: (415) 231-0011
Email: jreish@equalrightsadvocates.org

*Admitted *pro hac vice*

Counsel for Plaintiffs
Javier M. Guzman*
Robin Thurston*
Karianne Jones*
Democracy Forward Foundation
1333 H St NW
Washington, DC 20005
Ph: (202) 448-9090

Fax: (202) 701-1775
Emails: jguzman@democracyforward.org,
rthurston@democracyforward.org,
kjones@democracyforward.org

Emily Martin*
Neena Chaudhry*
Sunu Chandy*
Elizabeth Tang*
National Women's Law Center
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Ph: (202) 588-5180
Fax: (202) 588-5185
Emails: emartin@nwlc.org,
nchaudhry@nwlc.org, schandy@nwlc.org,
etang@nwlc.org