## EXHIBIT INDEX

**Exhibit**

Declaration of Gilbert Orbea ........................................................................................A

Department Assurance ............................................................................................ A-1

OMB Assurance....................................................................................................... A-2

2001 Guidance ........................................................................................................ A-3

Rick Fitzgerald, *U-M Revises Student Sexual and Gender-Based Misconduct Policy*, The
University Record (Feb. 1, 2018)........................................................................ A-4

Jacob Eads, *UK Administration Overhauls Disciplinary Policies Regarding Sexual Assault
Claims,* Kentuckykernel (June 20, 2018) .......................................................... A-5

Kara Coleman, *Auburn University Re-evaluating Title IX Policies and Procedures,* Opelika-
Auburn News (Feb. 9, 2018)............................................................................... A-6

OMB Notice of Extension ....................................................................................... A-7

National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Have
Suffered Harassment and Sexual Violence* (2017)............................................. A-8

Press Release, U.S. Dep't of Educ., Department of Education Issues New Interim Guidance on
Campus Sexual Misconduct (Sept. 22, 2017) .................................................... A-9

U.S. Dep't of Educ., Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7,
2017) ................................................................................................................. A-10

Declaration of Katherine McGerald........................................................................... B

SurvJustice Comment ............................................................................................. B-1

Declaration of Noreen Farrell .................................................................................... C

Equal Rights Advocates Comment ..........................................................................C-1

Declaration of Stacy Malone ............................................................................................D

Victim Rights Law Center Comment ....................................................................... D-1

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SURVJUSTICE, INC., et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Number: 3:18-cv-00535-JSC |
| | ) | |
| ELISABETH D. DEVOS, et al., | ) | Declaration of Gilbert Orbea |
|     Defendants. | ) | |
| | ) | |
| | ) | |
|                                                             | ) | |

## <u>DECLARATION OF GILBERT ORBEA</u>

I, Gilbert Orbea, am competent to testify and I have personal knowledge of the matters herein:

1.      I am a Legal Assistant at Democracy Forward Foundation, which serves as counsel to the plaintiffs in the above captioned matter.

2.      Attached hereto as Exhibit A-1 is a true and correct copy of the Department of Education's Department Assurance of Compliance – Civil Rights Certificate ("Department Assurance"), available at https://www2.ed.gov/about/offices/list/ocr/letters/boy-scouts-assurance-form.pdf.

3.      Attached hereto as Exhibit A-2 is a true and correct copy of the Office of Management & Budget's Assurance form ("OMB Assurance"), available at https://www2.ed.gov/admins/lead/account/stateplan17/reviseded18100576.pdf.

4.      Attached hereto as Exhibit A-3 is a true and correct copy of the Department of Education's guidance, the *Revised Sexual Harassment Guidance: Harassment of Students by*

*School Employees, Other Students, or Third Parties*, 66 Fed Reg. 5512 (Jan. 19, 2001) ("2001

Guidance"), available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

5.     Attached hereto as Exhibit A-4 is a true and correct copy of an article written by

Rick Fitzgerald in The University Record, University of Michigan's student newspaper,

regarding changes to their sexual and gender-based misconduct policy.  Rick Fitzgerald, *U-M*

*Revises Student Sexual and Gender-Based Misconduct Policy*, The University Record (Feb. 1,

2018), https://record.umich.edu/articles/u-m-revises-student-sexual-gender-based-misconduct-

policy

6.     Attached hereto as Exhibit A-5 is a true and correct copy of an article written by

Jacob Eads in the Kentuckykernel, discussing changes to the University of Kentucky's

disciplinary policies regarding sexual assault accusations. Jacob Eads, *UK Administration*

*Overhauls Disciplinary Policies Regarding Sexual Assault Claims*, Kentuckykernel (June 20,

2018), http://www.kykernel.com/news/uk-administration-overhauls-disciplinary-policies-

regarding-sexual-assault-claims/article_d9808d74-74c2-11e8-8509-67e774e9238c.html.

7.     Attached hereto as Exhibit A-6 is a true and correct copy of an article written by

Kara Coleman in the Opelika-Auburn News, discussing changes to Auburn University's Title IX

policies and procedures. Kara Coleman, *Auburn University Re-evaluating Title IX Policies and*

*Procedures*, Opelika-Auburn News (Feb. 9, 2018), https://www.oanow.com/news/

auburnuniversity/auburn-university-re-evaluating-title-ix-policies-and-procedures/article

_16b90e14-ecf7-507c-a390-85c0ad88e538.html

8.     Attached hereto as Exhibit A-7 is a true and correct copy of the Office of

Management and Budget's "extension without change" of its OMB Assurance form until

September 30, 2020, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_
nbr=201707-1810-001#.

9.      Attached hereto as Exhibit A-8 is a true and correct copy of National Women's
Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment
and Sexual Violence* (2017), available at https://nwlc.org/resources/ stopping-school-pushout-
for-girls-who-have-sufferedharassment-and-sexual-violence.

10.     Attached hereto as Exhibit A-9 is a true and correct copy of a press release by the
Department of Education, titled Department of Education Issues New Interim Guidance on
Campus Sexual Misconduct (Sept. 22, 2017), available at https://www.ed.gov/news/press-
releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

11.     Attached hereto as Exhibit A-10 is a true and correct copy of a speech by
Secretary DeVos, titled Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7,
2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-
enforcement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 25, 2019 in Washington, D.C.

_____

Gilbert Orbea

# EXHIBIT INDEX

**Tab**

Department Assurance ...........................................................................................................1

OMB Assurance ....................................................................................................................2

2001 Guidance ......................................................................................................................3

Rick Fitzgerald, *U-M Revises Student Sexual and Gender-Based Misconduct Policy*, The
University Record (Feb. 1, 2018)...........................................................................................4

Jacob Eads, *UK Administration Overhauls Disciplinary Policies Regarding Sexual Assault
Claims,* Kentuckykernel (June 20, 2018) ...............................................................................5

Kara Coleman, *Auburn University Re-evaluating Title IX Policies and Procedures,* Opelika-
Auburn News (Feb. 9, 2018)...................................................................................................6

OMB Notice of Extension ......................................................................................................7

National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Have
Suffered Harassment and Sexual Violence* (2017) .................................................................8

Press Release, U.S. Dep't of Educ., Department of Education Issues New Interim Guidance on
Campus Sexual Misconduct (Sept. 22, 2017) ........................................................................9

U.S. Dep't of Educ., Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7,
2017) ....................................................................................................................................10

# EXHIBIT A-1

*United States Department of Education, Office for Civil Rights*

# ASSURANCE OF COMPLIANCE – CIVIL RIGHTS CERTIFICATE

**TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, SECTION 504 OF THE REHABILITATION ACT OF 1973, THE AGE DISCRIMINATION ACT OF 1975, AND THE BOY SCOUTS OF AMERICA EQUAL ACCESS ACT OF 2001**

The applicant provides this assurance for the purpose of obtaining Federal grants, loans, contracts (except contracts of insurance or guaranty), property, discounts, funds made available through the U.S. Department of Education, or other Federal financial assistance from the Department.  This assurance applies to all Federal financial assistance from or funds made available through the Department, including any that the applicant may seek in the future.

The applicant assures that it will comply with:

1. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d *et seq.*, which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance.
2. Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. 1681 *et seq.*, which prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.
3. Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance.
4. The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 *et seq.*, which prohibits discrimination on the basis of age in any program or activity receiving Federal financial assistance.
5. If applicable, the Boy Scouts of America Equal Access Act of 2001, 20 U.S.C. 7905, which requires equal access for the Boy Scouts of America and other designated youth groups to meet at public schools. This law applies to any public elementary school, public secondary school, local educational agency, or State educational agency that has a designated open forum or limited public forum and that receives funds made available through the Department.
6. All regulations, guidelines, and standards issued by the Department under any of these statutes.

The applicant understands that it must comply with items 1-6 in order to continue receiving Federal financial assistance from the Department.  The applicant also understands that this Assurance is binding on the applicant, its successors, transferees, and assignees at any time during which federal financial assistance is provided.  The applicant will ensure that all contractors, subcontractors, subgrantees, or others with whom it arranges to provide services or benefits are not discriminating in violation of items 1-6.  Otherwise, the financial assistance can be terminated and the applicant can be declared ineligible to receive further assistance.  The applicant also understands that the Department may seek a court order requiring compliance with items 1-6 or seek other appropriate judicial relief.

By signing this form, the applicant is agreeing to the above provisions.


| | |
|---|---|
| _____ | _____ |
| Signature of Authorized Official | Title |
| _____ | _____ |
| Print Name | Name of Institution or Agency |
| _____ | _____ |
| Date | Street |

PLEASE RETURN TO:

U.S. Department of Education
Office for Civil Rights
400 Maryland Avenue, SW
Washington, DC 20202-1100

_____
City, State, Zip Code

_____
Office Email Address

## Paperwork Burden Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. Public reporting burden for this collection of information is estimated to average 20 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (42 U.S.C. 2000d *et seq.*; 20 U.S.C. 1681 *et seq.*; 29 U.S.C. 794; 42 U.S.C. 6101 *et seq.*; 20 U.S.C. 7905). Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Education, 400 Maryland Ave., SW, Washington, DC 20202-4536 or email ICDocketMgr@ed.gov and reference the OMB Control Number 1870-0503. Note: Please do not return the completed Assurance of Compliance – Civil Rights Certificate to this address.

# EXHIBIT A-2

# Revised Assurances Template
## The Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act



**U.S. Department of Education**
**Issued: May 2017**

OMB Number: 1810-0576
Expiration Date: September 30, 2017

**Paperwork Burden Statement** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1810-0576. The time required to complete this complete information collection is estimated to average 2080 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this collection, please write to: U.S. Department of Education, Washington, DC 20202-4537. If you have comments or concerns regarding the status of your individual submission of this collection, write directly to: Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Washington, DC 20202-3118.

# COVER SHEET FOR STATE PLAN ASSURANCES

## Overview

Section 8304 of the Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every Student Succeeds Act (ESSA),[1] provides that each State educational agency (SEA) that submits a consolidated State plan or individual program plan under the ESEA must have on file with the Secretary a single set of assurances. Each SEA must submit to the Secretary a signed set of the enclosed assurances **no later than June 2, 2017**, in order to receive Federal allocations for the following programs for fiscal year 2017:

- Title I, Part A: Improving Basic Programs Operated by Local Educational Agencies
- Title I, Part C: Education of Migratory Children
- Title I, Part D: Prevention and Intervention Programs for Children and Youth Who Are Neglected, Delinquent, or At-Risk
- Title II, Part A: Supporting Effective Instruction
- Title III, Part A: English Language Acquisition, Language Enhancement, and Academic Achievement
- Title IV, Part A: Student Support and Academic Enrichment Grants
- Title IV, Part B: 21st Century Community Learning Centers
- Title V, Part B, Subpart 2: Rural and Low-Income School Program
- Title VII, Subpart B of the McKinney-Vento Homeless Assistance Act: Education for Homeless Children and Youths

## Instructions

An authorized representative of the SEA must sign the enclosed assurances and the standard forms attached in Appendix A, and demonstrate agreement by selecting the boxes provided, completing the fields below, and providing a signature in the space provided.

An SEA must submit the signed Assurance Template by emailing it to its contact in the Office of State Support at OSS.[State]@ed.gov (e.g., OSS.Nebraska@ed.gov) no later than June 2, 2017.

---

[1] Unless otherwise indicated, citations to the ESEA refer to the ESEA, as amended by the ESSA.

**Cover Page**

| Contact Information and Signatures | |
|---|---|
| **SEA Contact** (Name and Position) | Telephone |
| Mailing Address: | Email Address: |
| By signing this document, the SEA, through its authorized representative, agrees to the enclosed and attached assurances and certifications. | |
| **Authorized SEA Representative (Printed Name)** | Telephone: |
| **Signature of Authorized SEA Representative** | Date: |

Identify the Federal programs for which the SEA is applying for funds for fiscal year 2017

☐ Title I, Part A: Improving Basic Programs Operated by Local Educational Agencies
☐ Title I, Part C: Education of Migratory Children
☐ Title I, Part D: Prevention and Intervention Programs for Children and Youth Who Are Neglected, Delinquent, or At-Risk
☐ Title II, Part A: Supporting Effective Instruction
☐ Title III, Part A: English Language Acquisition, Language Enhancement, and Academic Achievement
☐ Title IV, Part A: Student Support and Academic Enrichment Grants
☐ Title IV, Part B: 21st Century Community Learning Centers
☐ Title V, Part B, Subpart 2: Rural and Low-Income School Program
☐ Title VII, Subpart B of the McKinney-Vento Homeless Assistance Act: Education for Homeless Children and Youths


ESEA section 8304 assurances

For each program that an SEA includes in a consolidated State plan[2] or for which the SEA submits an individual program plan, the SEA assures that—

☐ Each program will be administered in accordance with all applicable statutes, regulations, program plans, and applications;

☐ The control of funds provided under each program and title to property acquired with program funds will be in a public agency, an eligible private agency, institution, or organization, or an Indian Tribe, if the law authorizing the program provides for assistance to those entities; and

☐ The public agency, eligible private agency, institution, or organization, or Indian Tribe will administer those funds and property to the extent required by the authorizing law;

☐ The SEA will adopt and use proper methods of administering each such program, including—
   1) The enforcement of any obligations imposed by law on agencies, institutions, organizations, and other recipients responsible for carrying out each program;
   2) The correction of deficiencies in program operations that are identified through audits, monitoring, or evaluation; and
   3) The adoption of written procedures for the receipt and resolution of complaints alleging violations of law in the administration of the programs;

☐ The SEA will cooperate in carrying out any evaluation of each program conducted by or for the Secretary or other Federal officials;

☐ The SEA will use such fiscal control and fund accounting procedures as will ensure proper disbursement of, and accounting for, Federal funds paid to the State under each program;

---

[2] Under ESEA section 8302, an SEA may include the following ESEA programs in a consolidated State plan: Title I, Part A; Title I, Part C; Title I, Part D; Title II, Part A; Title III, Part A: Title IV, Part A; Title IV, Part B; Title V, Part B, Subpart 2: Rural and Low-Income School Program. Additionally, under the authority in ESEA section 8302(a)(1)(B), the Secretary has designated Title VII, Subpart B of the McKinney-Vento Homeless Assistance Act: Education for Homeless Children and Youths as a program that may be included in a consolidated State plan.

☐ The SEA will—
    1) Make reports to the Secretary as may be necessary to enable the Secretary to perform the Secretary's duties under each program; and
    2) Maintain such records, provide such information to the Secretary, and afford such access to the records as the Secretary may find necessary to carry out the Secretary's duties; and

☐ Before the consolidated State plan or an individual program plan was submitted to the Secretary (or will be submitted, should the State submit by September 18, 2017), the State afforded a reasonable opportunity for public comment on the plan and considered such comment.

<u>Other Assurances</u>

☐ The SEA assures that each such program will be administered in accordance with all applicable consultation requirements, including the State plan public posting requirements in ESEA section 1111(a)(8), and the State plan consultation requirements in ESEA sections 1111(a)(1)(A) for Title I, Part A; 1304(c)(3) for Title I, Part C; 2101(d)(3) for Title II, Part A; 3113(b)(2) and (b)(3)(G) for Title III, Part A; and 4203(a)(12)(A) for Title IV, Part B.

☐ Consistent with ESEA section 8532, the SEA certifies that it will establish and implement a statewide policy requiring that a student attending a persistently dangerous public elementary school or secondary school, including a public charter school, as determined by the State in consultation with a representative sample of local educational agencies, or who becomes a victim of a violent criminal offense, as determined by State law, while in or on the grounds of a public elementary school or secondary school that the student attends, be allowed to attend a safe public elementary school or secondary school within the local educational agency, including a public charter school.

☐ By submitting a State plan, consistent with 34 C.F.R. 76.104, the SEA certifies that:
    1) The SEA is eligible to submit the consolidated State plan or individual program plan.
    2) The SEA has authority under State law to perform the functions of the State under the program(s).
    3) The SEA legally may carry out each provision of the plan.
    4) All provisions of the plan are consistent with State law.
    5) A State officer, specified by title in the certification, has authority under State law to receive, hold, and disburse Federal funds made available under the plan.
    6) The State officer who submits the plan, specified by title in the certification, has authority to submit the plan.
    7) The SEA has adopted or otherwise formally approved the plan.
    8) The plan is the basis for State operation and administration of all the programs included in the plan.

☐ The SEA certifies and assures compliance with the following enclosed forms:
    1) Assurances for Non-Construction Programs (SF 424B Form).
    2) Disclosure of Lobbying Activities (SF LLL).
    3) Certification Regarding Lobbying (ED 80-0013 Form).

5

## ASSURANCES - NON-CONSTRUCTION PROGRAMS

OMB Approval No. 0348-0040

---

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0040), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET. SEND IT TO THE ADDRESS PROVIDED BY THE SPONSORING AGENCY.**

---

**NOTE:** Certain of these assurances may not be applicable to your project or program. If you have questions, please contact the awarding agency. Further, certain Federal awarding agencies may require applicants to certify to additional assurances. If such is the case, you will be notified.

As the duly authorized representative of the applicant, I certify that the applicant:

1.  Has the legal authority to apply for Federal assistance and the institutional, managerial and financial capability (including funds sufficient to pay the non-Federal share of project cost) to ensure proper planning, management and completion of the project described in this application.

2.  Will give the awarding agency, the Comptroller General of the United States and, if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award; and will establish a proper accounting system in accordance with generally accepted accounting standards or agency directives.

3.  Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain.

4.  Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency.

5.  Will comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§4728-4763) relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration (5 C.F.R. 900, Subpart F).

6.  Will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to: (a) Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin; (b) Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§1681-1683, and 1685-1686), which prohibits discrimination on the basis of sex; (c) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. §794), which prohibits discrimination on the basis of handicaps; (d) the Age Discrimination Act of 1975, as amended (42 U.S.C. §§6101-6107), which prohibits discrimination on the basis of age; (e) the Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255), as amended, relating to nondiscrimination on the basis of drug abuse; (f) the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (P.L. 91-616), as amended, relating to nondiscrimination on the basis of alcohol abuse or alcoholism; (g) §§523 and 527 of the Public Health Service Act of 1912 (42 U.S.C. §§290 dd-3 and 290 ee 3), as amended, relating to confidentiality of alcohol and drug abuse patient records; (h) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§3601 et seq.), as amended, relating to nondiscrimination in the sale, rental or financing of housing; (i) any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and, (j) the requirements of any other nondiscrimination statute(s) which may apply to the application.

7.  Will comply, or has already complied, with the requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (P.L. 91-646) which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal or federally-assisted programs. These requirements apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

8.  Will comply, as applicable, with provisions of the Hatch Act (5 U.S.C. §§1501-1508 and 7324-7328) which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

---

9. Will comply, as applicable, with the provisions of the Davis-Bacon Act (40 U.S.C. §§276a to 276a-7), the Copeland Act (40 U.S.C. §276c and 18 U.S.C. §874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§327-333), regarding labor standards for federally-assisted construction subagreements.

10. Will comply, if applicable, with flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973 (P.L. 93-234) which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

11. Will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 (P.L. 91-190) and Executive Order (EO) 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in floodplains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972 (16 U.S.C. §§1451 et seq.); (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176(c) of the Clean Air Act of 1955, as amended (42 U.S.C. §§7401 et seq.); (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended (P.L. 93-523); and, (h) protection of endangered species under the Endangered Species Act of 1973, as amended (P.L. 93-205).

12. Will comply with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

13. Will assist the awarding agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. §470), EO 11593 (identification and protection of historic properties), and the Archaeological and Historic Preservation Act of 1974 (16 U.S.C. §§469a-1 et seq.).

14. Will comply with P.L. 93-348 regarding the protection of human subjects involved in research, development, and related activities supported by this award of assistance.

15. Will comply with the Laboratory Animal Welfare Act of 1966 (P.L. 89-544, as amended, 7 U.S.C. §§2131 et seq.) pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this award of assistance.

16. Will comply with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. §§4801 et seq.) which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

17. Will cause to be performed the required financial and compliance audits in accordance with the Single Audit Act Amendments of 1996 and OMB Circular No. A-133, "Audits of States, Local Governments, and Non-Profit Organizations."

18. Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program.

| SIGNATURE OF AUTHORIZED CERTIFYING OFFICIAL | TITLE |
|---|---|
| APPLICANT ORGANIZATION | DATE SUBMITTED |

# DISCLOSURE OF LOBBYING ACTIVITIES

Complete this form to disclose lobbying activities pursuant to 31 U.S.C. 1352

(See reverse for public burden disclosure.)

Approved by OMB

0348-0046

| 1. Type of Federal Action: | 2. Status of Federal Action: | 3. Report Type: |
|---|---|---|
| ☐ a. contract<br>b. grant<br>c. cooperative agreement<br>d. loan<br>e. loan guarantee<br>f. loan insurance | ☐ a. bid/offer/application<br>b. initial award<br>c. post-award | ☐ a. initial filing<br>b. material change<br>**For Material Change Only:**<br>year _____ quarter _____<br>date of last report _____ |

| 4. Name and Address of Reporting Entity: | 5. If Reporting Entity in No. 4 is a Subawardee, Enter Name and Address of Prime: |
|---|---|
| ☐ Prime        ☐ Subawardee<br>Tier _____, *if known*:<br><br><br><br>**Congressional District**, *if known*: | <br><br><br><br>**Congressional District**, *if known*: |

| 6. Federal Department/Agency: | 7. Federal Program Name/Description:<br><br>CFDA Number, *if applicable*: _____ |
|---|---|

| 8. Federal Action Number, *if known*: | 9. Award Amount, *if known*:<br>$ |
|---|---|

| 10. a. Name and Address of Lobbying Registrant<br>(*if individual, last name, first name, MI*): | b. Individuals Performing Services (*including address if different from No. 10a*)<br>(*last name, first name, MI*): |
|---|---|

| 11. Information requested through this form is authorized by title 31 U.S.C. section 1352. This disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into. This disclosure is required pursuant to 31 U.S.C. 1352. This information   will be available for public inspection.  Any person  who fails to file the required  disclosure  shall be subject to a  civil penalty of not less  than  $10,000 and not more than $100,000 for each such failure. | Signature: _____<br>Print Name: _____<br>Title: _____<br>Telephone No.: _____   Date: _____ |
|---|---|

| Federal Use Only: | Authorized for Local Reproduction<br>Standard Form LLL (Rev. 7-97) |
|---|---|

## INSTRUCTIONS FOR COMPLETION OF SF-LLL, DISCLOSURE OF LOBBYING ACTIVITIES

This disclosure form shall be completed by the reporting entity, whether subawardee or prime Federal recipient, at the initiation or receipt of a covered Federal action, or a material change to a previous filing, pursuant to title 31 U.S.C. section 1352. The filing of a form is required for each payment or agreement to make payment to any lobbying entity for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with a covered Federal action. Complete all items that apply for both the initial filing and material change report. Refer to the implementing guidance published by the Office of Management and Budget for additional information.

1. Identify the type of covered Federal action for which lobbying activity is and/or has been secured to influence the outcome of a covered Federal action.

2. Identify the status of the covered Federal action.

3. Identify the appropriate classification of this report. If this is a followup report caused by a material change to the information previously reported, enter the year and quarter in which the change occurred. Enter the date of the last previously submitted report by this reporting entity for this covered Federal action.

4. Enter the full name, address, city, State and zip code of the reporting entity. Include Congressional District, if known. Check the appropriate classification of the reporting entity that designates if it is, or expects to be, a prime or subaward recipient. Identify the tier of the subawardee, e.g., the first subawardee of the prime is the 1st tier. Subawards include but are not limited to subcontracts, subgrants and contract awards under grants.

5. If the organization filing the report in item 4 checks "Subawardee," then enter the full name, address, city, State and zip code of the prime Federal recipient. Include Congressional District, if known.

6. Enter the name of the Federal agency making the award or loan commitment. Include at least one organizational level below agency name, if known. For example, Department of Transportation, United States Coast Guard.

7. Enter the Federal program name or description for the covered Federal action (item 1). If known, enter the full Catalog of Federal Domestic Assistance (CFDA) number for grants, cooperative agreements, loans, and loan commitments.

8. Enter the most appropriate Federal identifying number available for the Federal action identified in item 1 (e.g., Request for Proposal (RFP) number; Invitation for Bid (IFB) number; grant announcement number; the contract, grant, or loan award number; the application/proposal control number assigned by the Federal agency). Include prefixes, e.g., "RFP-DE-90-001."

9. For a covered Federal action where there has been an award or loan commitment by the Federal agency, enter the Federal amount of the award/loan commitment for the prime entity identified in item 4 or 5.

10. (a) Enter the full name, address, city, State and zip code of the lobbying registrant under the Lobbying Disclosure Act of 1995 engaged by the reporting entity identified in item 4 to influence the covered Federal action.

    (b) Enter the full names of the individual(s) performing services, and include full address if different from 10 (a). Enter Last Name, First Name, and Middle Initial (MI).

11. The certifying official shall sign and date the form, print his/her name, title, and telephone number.

According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB Control Number. The valid OMB control number for this information collection is OMB No. 0348-0046. Public reporting burden for this collection of information is estimated to average 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0046), Washington, DC 20503.

**CERTIFICATIONS REGARDING LOBBYING; DEBARMENT, SUSPENSION AND OTHER
RESPONSIBILITY MATTERS; AND DRUG-FREE WORKPLACE REQUIREMENTS**

Applicants should refer to the regulations cited below to determine the certification to which they are required to attest. Applicants should also review the instructions for certification included in the regulations before completing this form. Signature of this form provides for compliance with certification requirements under 34 CFR Part 82, "New Restrictions on Lobbying," and 34 CFR Part 85, "Government-wide Debarment and Suspension (Nonprocurement) and Government-wide Requirements for Drug-Free Workplace (Grants)." The certifications shall be treated as a material representation of fact upon which reliance will be placed when the Department of Education determines to award the covered transaction, grant, or cooperative agreement.

1. **LOBBYING**

As required by Section 1352, Title 31 of the U.S. Code, and implemented at 34 CFR Part 82, for persons entering into a grant or cooperative agreement over $100,000, as defined at 34 CFR Part 82, Sections 82.105 and 82.110, the applicant certifies that:

(a) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement;

(b) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal grant or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions;

(c) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

2. **DEBARMENT, SUSPENSION, AND OTHER
RESPONSIBILITY MATTERS**

As required by Executive Order 12549, Debarment and Suspension, and implemented at 34 CFR Part 85, for prospective participants in primary covered transactions, as defined at 34 CFR Part 85, Sections 85.105 and 85.110—

A. The applicant certifies that it and its principals:

(a) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

(b) Have not within a three-year period preceding this application been convicted of or had a civil judgement rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2)(b) of this certification; and

(d) Have not within a three-year period preceding this application had one or more public transaction (Federal, State, or local) terminated for cause or default; and

B. Where the applicant is unable to certify to any of the statements in this certification, he or she shall attach an explanation to this application.

3. **DRUG-FREE WORKPLACE
(GRANTEES OTHER THAN INDIVIDUALS)**

As required by the Drug-Free Workplace Act of 1988, and implemented at 34 CFR Part 85, Subpart F, for grantees, as defined at 34 CFR Part 85, Sections 85.605 and 85.610 -

A. The applicant certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about:

(1) The dangers of drug abuse in the workplace;

(2) The grantee's policy of maintaining a drug-free workplace;

(3) Any available drug counseling, rehabilitation, and employee assistance programs; and

(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will:

(1) Abide by the terms of the statement; and

(2) Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

(e) Notifying the agency, in writing, within 10 calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to: Director, Grants Policy and Oversight Staff, U.S. Department of Education, 400 Maryland Avenue, S.W. (Room 3652, GSA Regional Office Building No. 3), Washington, DC 20202-4248. Notice shall include the identification number(s) of each affected grant;

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted:

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

B. The grantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific grant:

Place of Performance (Street address. city, county, state, zip code)

_____

_____

_____

Check **[ ]** if there are workplaces on file that are not identified here.

**DRUG-FREE WORKPLACE
(GRANTEES WHO ARE INDIVIDUALS)**

As required by the Drug-Free Workplace Act of 1988, and implemented at 34 CFR Part 85, Subpart F, for grantees, as defined at 34 CFR Part 85, Sections 85.605 and 85.610-

A. As a condition of the grant, I certify that I will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity with the grant; and

B. If convicted of a criminal drug offense resulting from a violation occurring during the conduct of any grant activity, I will report the conviction, in writing, within 10 calendar days of the conviction, to: Director, Grants Policy and Oversight Staff, Department of Education, 400 Maryland Avenue, S.W. (Room 3652, GSA Regional Office Building No. 3), Washington, DC 20202-4248. Notice shall include the identification number(s) of each affected grant.

_____

As the duly authorized representative of the applicant, I hereby certify that the applicant will comply with the above certifications.

| NAME OF APPLICANT | PR/AWARD NUMBER AND / OR PROJECT NAME |
|---|---|
| PRINTED NAME AND TITLE OF AUTHORIZED REPRESENTATIVE | |
| SIGNATURE | DATE |

ED 80-0013                                                                                                                          12/98

# EXHIBIT A-3

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education**
**Office for Civil Rights**

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the Federal Register "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  Gebser v. Lago Vista Independent School District (Gebser), 524 U.S. 274 (1998), and Davis v. Monroe County Board of Education (Davis), 526 U.S. 629 (1999). The Court held in Gebser that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages.  See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639.  The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages.  See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding.  The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092).  A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance.  In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance.  In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being.  Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn.  As with the 1997 guidance, the revised guidance applies to students at every level of education.  School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well- publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

### Harassment by Teachers and Other School Personnel

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees.  These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students.  The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students.  In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing.  We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services."  However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment.  We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping.  Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways.  The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program.  Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists.  We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created.  We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages.  We disagree.  First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.  In determining whether harassment is actionable, both <u>Davis</u> and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing <u>Oncale</u>)), and the <u>Davis</u> Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action.  A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students.  Other commenters, by contrast, commended OCR for recognizing that <u>Gebser</u> and <u>Davis</u> did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point.  While <u>Gebser</u> and <u>Davis</u> made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the <u>Davis</u> Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

**Effective Response**

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools.  We disagree.  Effectiveness has always been the measure of an adequate response under Title IX.  This does not mean a school must overreact out of fear of being judged inadequate.  Effectiveness is measured based on a reasonableness standard.  Schools do not have to know beforehand that their response will be effective.  However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.


# The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX.  The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

# REVISED SEXUAL HARASSMENT GUIDANCE:
## HARASSMENT OF STUDENTS[1]
## BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

## I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

## II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

## III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

3

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]   A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]   The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

# V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered.  The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex.  If it does, the second issue is the nature of the school's responsibility to address that conduct.  As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

## A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34]  Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct.  Harassment of this type is generally referred to as hostile environment harassment.[36]  This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment.  Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex.  OCR considers the conduct from both a subjective[38] and objective[39] perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40]  Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- The degree to which the conduct affected one or more students' education.  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program. For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- The type, frequency, and duration of the conduct.  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46] Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- <u>The number of individuals involved.</u> Sexual harassment may be committed by an individual or a group. In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- <u>The age and sex of the alleged harasser and the subject or subjects of the harassment.</u> For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- <u>The size of the school, location of the incidents, and context in which they occurred.</u> Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50] Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

- <u>Other incidents at the school.</u> A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- <u>Incidents of gender-based, but nonsexual harassment.</u> Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists. Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

### 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome. Conduct is unwelcome if

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]  Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]  For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]  Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection.  Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]  The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so.  Similarly, certain types of disabilities could affect a student's ability to do so.

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

## B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

## 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed.  The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63]  Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth- grade student in a school hallway.  Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways.  Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class.  In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment.  An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus.  As a result, the student stops using the campus shuttle and walks the very long distances between her classes.  In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

of aid, benefits, or services to students.  However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program.  Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX.  If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program.  The school, therefore, has engaged in its own discrimination.  It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.  (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

## 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67]  As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations.  On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68]  In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program.  As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70]  For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes.  However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back.  (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79]  (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.")  These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations.  By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied.  If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84]  (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR.  This is true in cases

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence).  This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85]  Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

## VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.  These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86]  As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment.  The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works.  If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.  The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors.  However, in all cases the inquiry must be prompt, thorough, and impartial.  (Requests by the student who

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint.  For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation.  Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate.  In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified.  In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88]  Appropriate steps should be taken to end the harassment.  For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89]  A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90]  In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student.  Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed.  If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created.  For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment.  If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record.  Other measures may include, if appropriate, directing a harasser to apologize to the harassed student.  If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93]  For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances.  As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95]  At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation.  To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have.  In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

## B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment.  In all cases, a school should discuss confidentiality standards and concerns with the complainant initially.  The school should inform the student that a confidentiality request may limit the school's ability to respond.  The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs.  If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees.  Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students.  The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student.  Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.  The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment.  There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant.  Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual.  In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action.  In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school.  Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student.  If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response.  These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter.  If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome.  If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation.  If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place.  Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations.  However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it.  Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment.  Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98]  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100]  Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints.  However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment.  Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

20

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]  The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]  Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]  While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]  Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]  OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]  Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution.  The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions.  The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment.  Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions.  Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.  In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements.  Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112]  Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]).  In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech.  OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117]  In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights.  For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard.  The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119]  As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1:  In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women.  Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class.  What must the school do in response?

Answer:  Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals.  Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

Example 2:  A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus.  The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety.  What must a school do in response?

Answer:  Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment.  The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

_____

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

(professor's spanking of university student may constitute sexual conduct under Title IX); Doe v. Petaluma, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim); Denver School Dist. #2, OCR Case No. 08-92-1007 (same to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); Nashoba Regional High School, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also Shoreline School Dist., OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); Dartmouth Public Schools, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); San Francisco State University, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); Analy Union High School Dist., OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987).  See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance.  (See section on "Harassment by Teachers and Other Employees.")  See Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees.  (See section on "Harassment by Teachers and Other Employees.")  For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10] Cf. John Does 1 v. Covington County Sch. Bd., 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that sex discrimination consisting of same-sex sexual harassment can violate Title VII's prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997 guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds, 171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65, 1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other students, including both boys and girls, sufficient to raise a claim under Title IX);  John Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by a male teacher.)  It can also occur in certain situations if the harassment is directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334, 1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment, but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana, 211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex, court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee.)  In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g, pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both.  Thus, in Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband.  In both cases, according to the court, the remarks were based on sex in that they were made with an intent to demean each member of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct. 733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

may be actionable even if the harassment is not sexual in nature); Hicks, 833 F.2d at 1415; Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] Davis, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); Franklin, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See Sexual Harassment Guidance, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, id. at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated–– "... if the victim does not subjectively perceive the environment to be abusive, the

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  510 U.S. at 21-22.

[39] See Davis, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); Elgamil v. Syracuse University, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing Harris); Booher v. Board of Regents, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See Oncale, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing Harris, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., Ellison, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See Davis, 526 U.S. at 651, citing both Oncale, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., Davis, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); Doe v. Petaluma, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); Modesto City Schools, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); Weaverville Elementary School, OCR Case No. 09-91-1116 (students left school due to the harassment).  Compare with College of Alameda, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] Doe v. Petaluma, 830 F.Supp. at 1566.

[43] See Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing Waltman; see also Hall, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., Elgmil 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Andrews, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986).

[45]  34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf. Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf. Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf. Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding a racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment. Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

---

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b).  Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination.  Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader.  That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

34

---

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gebser, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gebser, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment –– to inform the school community that harassment will not be tolerated.  Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e).  The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent.  Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b).  This requirement has been part of the Title IX regulations since their inception in 1975.  Thus, schools have been required to have these procedures in place since that time.  At the elementary and secondary level, this responsibility generally lies

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated.  While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way.  However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors.  The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).

# EXHIBIT A-4



Published on *The University Record* (https://record.umich.edu)

Home > U-M revises student sexual and gender-based misconduct policy

February 1, 2018

# U-M revises student sexual and gender-based misconduct policy

**By Rick Fitzgerald**
Public Affairs

**Topic:** Campus News

Print

After completing a regular policy review last fall, the University of Michigan will make a handful of updates to its policy and procedures regarding student sexual and gender-based misconduct.

The revisions include numerous edits to make the policy easier to read and understand.

# + more information

- Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence
- Office for Institutional Equity
- Office for Student Conflict Resolution
- Sexual Assault Prevention and Awareness Center
- FY 2017 Annual Report Regarding Prohibited Conduct

Among the more significant changes include revising definitions of gender-based harassment and intimate partner violence; changing responsibility for determining sanctions from a volunteer board to staff at the Office for Student Conflict Resolution; and clarifying when mediation may be used as a voluntary alternative resolution option for non-penetrative cases of sexual assault.

The university's standard of evidence remains as a preponderance of evidence standard as it awaits further guidance from the U.S. Department of Education.

These revisions, which take effect Feb. 7, build on the 2016 U-M Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence, which replaced an earlier version of the Student Sexual Misconduct Policy, introduced in 2013.

The most recent annual report on the policy, covering fiscal year 2017, was made public last week.

"We are confident that these changes will make the policy and procedures clearer and easier to understand, while also addressing some important changes that are significant to the adjudication of

these cases," said Pamela Heatlie, the university's Title IX coordinator, senior director of the Office for Institutional Equity, and associate vice provost for academic and faculty affairs.

The review was carried out by a collaborative team that included representatives from OIE, the Office of the Vice President and General Counsel, and the Division of Student Life.

Among the updates to the policy and procedures are these:

**Definitions:** The definition of gender-based harassment was revised to reflect how to handle cases where there is harassment based upon gender and another protected class such as race, national origin, disability or veteran status.

The definition of intimate partner violence was revised to reflect that emotional abuse is a pattern of behavior, rather than an isolated incident.

**Sanctioning process:** Under the revised policy, sanctions are determined by professional staff in OSCR instead of volunteer sanctioning boards that consist of faculty, staff and student representatives trained by OIE and OSCR.

The revised approach is consistent with other phases of the university's process where a professional with significant training and expertise related to their role in the process is responsible for various decision-making, and allows for increased consistency in sanctioning. OSCR also handles sanctioning for violations of the Statement of Student Rights and Responsibilities.

Cases opened under the 2016 policy will adhere to the previous process with violations sanctioned by a sanction board. In addition, the policy continues to require that the university's Title IX coordinator approve all sanctions, and will now outline a process that can be used in situations in which the Title IX coordinator and sanctioning decision-maker cannot agree.

**Alternative resolution:** The 2016 Policy has allowed for claimants to request alternative resolution, and these processes have been available when the claimant and respondent agree and when the Title IX coordinator has approved.

The policy has been updated to clarify the language about mediation — one form of alternative resolution. In some cases — and only when agreed to by both claimant and respondent and approved by the Title IX coordinator — mediation may be available as a voluntary means to resolve concerns of non-penetrative sexual assault.

This change is based on feedback from students, and it reflects the university's commitment to offering survivors the broadest possible range of appropriate options to address their concerns.

The change also reflects the most recent guidance from the U.S. Department of Education's Office for Civil Rights. That office has indicated that if the parties voluntarily agree and the university's Title IX coordinator determines that the particular case is appropriate for such a process, the university may use alternative dispute resolution including mediation to assist the parties in reaching a voluntary resolution.

**Tags:** <u>sexual assault</u>, <u>sexual misconduct</u>, <u>gender-based misconduct</u>, <u>Office for Institutional Equity</u>, <u>Office for Student Conflict Resolution</u>

**Source URL:** https://record.umich.edu/articles/u-m-revises-student-sexual-gender-based-misconduct-policy

# EXHIBIT A-5

http://www.kykernel.com/news/uk-administration-overhauls-disciplinary-policies-regarding-sexual-assault-claims/article_d9808d74-74c2-11e8-8509-67e774e9238c.html

# UK administration overhauls disciplinary policies regarding sexual assault claims

Jacob Eads    Jun 20, 2018



President Eli Capilouto announced Monday, June 18, 2018 that the University of Kentucky had officially finalized changes to Administrative Regulation 6:2 (AR 6:2), formally known as the "Policy and Procedures for Addressing and Resolving Allegations of Sexual Assault, Stalking, Dating Violence, Domestic Violence, and Sexual Exploitation." Evaluating disciplinary responses to alleged sexual assaults on campus gained attention following U.S. Secretary of Education Betsy DeVos' reversal of the Obama administration's "Dear Colleague letter" on sexual violence in September of 2017. (Olivier Douliery/Abaca Press/TNS)

Olivier Douliery

The UK community will now adhere to a new set of regulations outlining the disciplinary proceedings in cases of alleged sexual assault and similar incidents.

President Eli Capilouto announced Monday in an all-campus email that the university had officially finalized its awaited changes to Administrative Regulation 6:2 (AR 6:2), formally known as the "Policy and Procedures for Addressing and Resolving Allegations of Sexual Assault, Stalking, Dating Violence, Domestic Violence, and Sexual Exploitation."

The president's announcement is one that has been over a year in the making, after the administration charged an ad hoc committee with the responsibility of addressing sexual assault on UK's campus.

The quandary of evaluating disciplinary responses to alleged sexual assaults on campus has gained attention, following U.S. Secretary of Education Betsy DeVos' reversal of the Obama administration's "Dear Colleague letter" on sexual violence in September of 2017.

The 2011 Obama-era letter penned a set of regulatory policies and specific processes for how universities across the country should handle issues of sexual violence administratively.

In its own "Dear Colleague letter" published in September, 2017, DeVos' department said its members were choosing to rescind the previous suggestions to "develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits."

Since DeVos' upheaval of the previous guidelines, it has been up to universities to modify their own regulations as they see fit.

The administration's ad hoc committee, led by new Chair to the University Senate Counsel Jennifer Bird-Pollan, first met in October 2016 to begin constructing a proposal of new regulations.

The committee, made up of faculty, students and members of relevant campus organizations, like the Center for Research on Violence Against Women, met weekly until it submitted a report of its year-long findings and a new draft regulation to the administration in June 2017.

In its research, the committee received presentations from the VIP Center, reviewed information about cases of sexual assault on campus and examined media coverage of instances of campus sexual assault.

After joint review of the proposal from members of the committee and administration and endorsement by the University Senate, these finalized changes to AR 6:2 went into effect June 18.

7/23/2019
UK administration overhauls disciplinary policies regarding sexual assault claims | News | kykernel.com
Case 3:18-cv-00535-JSC   Document 36-2   Filed 07/25/19   Page 77 of 255

A "preponderance of evidence" will continue to be the standard by which members of the Sexual Misconduct Hearing Panel determine whether policy was violated by members of the UK community, meaning that more than 50 percent of evidence must point to a certain verdict for it to be enacted.

The president will no longer make appointments to the Sexual Misconduct Hearing Panel Pool. Now, each college will be required to send a certain number of faculty members to the pool, according to the regulation.

Now, in cases of alleged sexual assault, the disciplinary panel must be unanimous in determining that a respondent is responsible of committing an infraction, according to the regulation. This means that all three members of the panel must agree, where the previous regulation specified only two of the three panel members must agree.

The newest changes to AR 6:2 also eliminated the possibility of a party in a sexual assault case of appealing a determination of "not responsible." Now only a finding of "responsible" may be appealed, according to the regulation.

"In this way, we are working to ensure due process for all parties involved, both the victim survivor and the person accused," said UK spokesperson Jay Blanton.

These changes were the "result of concerns and suggestions made by a variety of persons within the University Community," according to Capilouto.

Although the administration worked with the ad hoc committee on sexual violence to determine these new regulations, this most recent incarnation of AR 6:2 doesn't include all of the committee's recommendations.

Among its absent recommendations, the committee pushed to include a pool of funds available for both complainants and respondents in cases of sexual assault to hire attorneys.

"Of course I would have been thrilled if they had accepted all of our recommendations, but I believe the new regulation includes important elements that were proposed by the committee," said Bird-Pollan. "Overall, I think the creation of this regulation has been a model of collaborative effort by faculty, staff, students, and the administration around an issue that is extremely challenging and contentious."

The last change to AR 6:2 came in June 2016.

Case 3:18-cv-00535-JSC Document 136-2 Filed 07/25/19 Page 78 of 255

From August 1, 2016, to June 1, 2018, the Office of Institutional Equity and Equal Opportunity had received 417 reports that fall within the Title IX and sexual misconduct headings or review, according to Blanton.

Not all of those reports made it to a sexual misconduct hearing or were adjudicated.

"I am proud of the way our campus is talking about these things, and I think we are headed in the right direction," said Bird-Pollan.

# EXHIBIT A-6

https://www.oanow.com/news/auburnuniversity/auburn-university-re-evaluating-title-ix-policies-and-procedures/article_16b90e14-ecf7-507c-a390-85c0ad88e538.html

# Auburn University re-evaluating Title IX policies and procedures

**Kara Coleman | Reporter**
Opelika-Auburn News
kcoleman@oanow.com
Follow on Twitter                    Feb 9, 2018



Auburn University is re-evaluating its Title IX policies and procedures in the midst of a national movement combating sexual assault and misconduct.

Title IX of the Educational Amendments of 1972 prohibits sex discrimination, including sexual misconduct in educational institutions that receive federal financial aid. Title IX coordinators at Auburn and other schools have the responsibility to determine whether allegations may constitute prohibited sexual conduct, and appointing a team to investigate each Title IX claim.

"If you look into the failures at Michigan State, in the Larry Nassar case, there were a ton of problems. There were a lot of mistakes made," Miles Lackey, chief of staff at Auburn, told Auburn's board of trustees during a work session Thursday. "Employees should know what their responsibilities are. That's a fundamental thing we can probably all agree on.

"If you are an employee at a university and you receive Title IV funds, which we do, if you get a claim of sexual assault or sexual misconduct, you're a mandatory reporter, and you have got to report that to the Title IX coordinator."

Title IV funds refers to the federal financial aid programs authorized under the Higher Education Act of 1965 and includes programs such as Unsubsidized Stafford Loans, Subsidized Stafford Loans, Federal Perkins Loans, Federal Graduate PLUS Loans, Federal PLUS Loans, Federal Pell Grants, and Federal Supplemental Grants, according to financial aid information on Auburn's website.

## Changes made

Lackey is reviewing the school's policies at the same time trustees Elizabeth Huntley and James Pratt are working with new general counsel Jaime Hammer on ways to improve the Title IX policy. The university made some changes to its existing Title IX policies before Christmas, Huntley said.

"In our preexisting policy, we had a 60-day timeline to do the entire investigation, bring the person before the investigators, all that, in 60 days," she explained. "And now we have what we call 'reasonable time.' That reasonable time could be three or four months, if need be, in order for the investigators to properly investigate."



TOP ARTICLES    1/5



Natalie Portman as Thor and a 'Blade' reboot: Everything to know about Marvel's Phase 4

READ MORE »

Another issue is whether an accuser or the accused have the right to counsel, whether that person was a lawyer or some other type of advisor.

"This is where we are now: if you can't afford a lawyer, and you don't have a lawyer who's with you, there will be an advisor through student affairs to help you understand what you need to be doing, to help you walk through things, or maybe even say to the person, 'This looks serious. You might want to try to do something different,'" Huntley said. "We did not have that before. Before, basically, a kid would get a notice, and they would kind of fumble through the process. And now, they don't necessarily have to do that by themselves, if they choose not to."

Some members of the board had expressed concern about the lack of diversity in Auburn's Title IX office, citing that all its Title IX coordinators were female, she said. Since that time, David Mines has become a deputy Title IX coordinator, adding a male investigator to the office.

**Future changes**

Hammer, who marked her one-month anniversary at Auburn on Thursday, is replacing Lee Armstrong as Auburn's general counsel. She has Title IX experience at other schools and will be involved in the continuing evaluations of how universities conduct Title IX investigations and what changes Auburn should propose to the board.

"There are some systems out there that are completely outsourcing it, where you've got a whole group of folks who represent both sides and do everything," Huntley explained. "There are some systems that are going to these centers that are being set up across the country. There's the University of Virginia, who, I kind of like their model. They have a sort of hearing that's involved, where it's not just the Title IX person to investigate and adjudicate and sanction.

"The driving force behind what's best is going to be what's best for our students."

EXHIBIT A-7

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date       09/21/2017

Department of Education

Office of Elementary and Secondary Education

FOR CERTIFYING OFFICIAL:      Holly Ham

FOR CLEARANCE OFFICER:       Kathy Axt

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received

07/24/2017

ACTION REQUESTED:    Extension without change of a currently approved collection

TYPE OF REVIEW REQUESTED:     Regular

ICR REFERENCE NUMBER:       201707-1810-001

AGENCY ICR TRACKING NUMBER:     ED-2017-ICCD-0021

TITLE:       Consolidated State Plan

LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved without change

OMB CONTROL NUMBER:       1810-0576

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  09/30/2020                    DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 52 | 108,155 | 0 |
| New | 52 | 108,155 | 0 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 0 | 0 | 0 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:

OMB Authorizing Official:      Dominic J. Mancini

Deputy and Acting Administrator,

Office Of Information And Regulatory Affairs

| List of ICs | | | |
| --- | --- | --- | --- |
| IC Title | Form No. | Form Name | CFR Citation |
| Consolidated State Plan | NA | State Template-Consolidated State Plan | 34 CFR 200.2-200.6, 34 CFR 200.8-200.9, 34 CFR 299.13-200.19 |

# EXHIBIT A-8

LET HER LEARN

**STOPPING SCHOOL PUSHOUT**

*for Girls Who Have Suffered Harassment and Sexual Violence*

**ABOUT THE NATIONAL WOMEN'S LAW CENTER**

The National Women's Law Center is a non-profit organization that has worked for more than 40 years to expand opportunities for women and their families, with a major emphasis on education and employment opportunities, women's health and reproductive rights, and family economic security.

**ACKNOWLEDGEMENTS**

Authors:   Kayla Patrick
           Neena Chaudhry

Design and Production:  Beth Stover

Requests for hard copies of the report can be made through LetHerLearn.org.

We gratefully acknowledge the following Center colleagues who provided leadership as well as editorial, research and communications assistance: Fatima Goss Graves, Anna Chu, Jasmine Tucker, Alexandra Brodsky, Karen Schneider, Maria Patrick, Hilary Woodward, Melanie Ross Levin, Olympia Feil, Sabrina Stevens, Erin Longbottom, Nia Evans, Selina Tran, and Faith Powell.

We also are extremely grateful to the following colleagues who provided us with feedback on the report: Jeannette Pai-Espinosa and Shakira Washington, The National Crittenton Foundation; and Yasmin Vafa and Maheen Kaleem, Rights4Girls.

Special thanks to Heidi Gertner, William Ferreira and Lowell Zeta at Hogan Lovells US LLP for their help with the Institutional Review Board process.

Thanks also to Lake Research Partners for their work on the Let Her Learn Focus Groups and Survey.

This report would not have been possible without the generous support of the Bill & Melinda Gates Foundation. The findings and conclusions of this report, however, are those of the authors alone, and do not necessarily reflect the views or positions of the funder.

**DISCLAIMER**

While text, citations, and data are, to the best of the authors' knowledge, current as of the date the report was prepared, there may well be subsequent developments, including legislative actions and court decisions, that could alter the information provided herein. This report does not constitute legal advice; individuals and organizations considering legal action should consult with their own counsel.



NATIONAL
WOMEN'S
LAW CENTER
EXPANDING THE POSSIBILITIES

© 2017 National Women's Law Center

NATIONAL WOMEN'S LAW CENTER



# GIRLS WHO HAVE SUFFERED HARASSMENT AND SEXUAL VIOLENCE

Sexual assault in colleges has received much-needed attention in recent years, but the sobering reality is that girls suffer harassment and sexual violence beginning at much younger ages. In the National Women's Law Center's 2017 Let Her Learn Survey ("Let Her Learn Survey"),[1] 26 percent of Native American girls[2] and 27 percent of girls who identify as LGBTQ reported being harassed since the election. With respect to sexual assault, more than 1 in 5 girls (21 percent) ages 14 to 18 reported that they had been kissed or touched without their consent, with LGBTQ girls[3] even more likely to report that they had been assaulted in this way. And across the country, girls, and Black girls in particular, are being bought and sold as victims of domestic sex trafficking.[4]

Not surprisingly, girls who suffer these forms of trauma are more likely to have serious behavioral, emotional and health problems.[5] They also face barriers to succeeding in school. However, little attention has been paid to how such trauma affects their educational experiences and so their educational needs are often left unaddressed. Adding insult to injury, schools around the country are failing girls when it comes to preventing and appropriately responding to sexual violence and harassment, in violation of Title IX of the Education Amendments of 1972.

This report delves into the data on girls who are victims of harassment and sexual violence, examines the impact it has on their education, and offers solutions to better serve and support them in schools.

## *METHODOLOGY* for Let Her Learn Survey and Focus Groups:

To better understand what healthy and safe schools look like for all girls, the National Women's Law Center collaborated with Lake Research Partners to conduct a study of girls from January 5-19, 2017. The study included an online survey of 1,003 girls ages 14-18 nationwide. Black, Latina, Asian/Pacific Islander, Native American, and LGBTQ girls were oversampled. The data were weighted by age, race, and census region to reflect the actual proportions of the population. Oversamples were weighted down to reflect their proportions in the population. The margin of error is +/- 3.1%. The margin of error is higher among subgroups. The study also included six focus groups on barriers facing girls who are survivors of sexual assault and girls who are either currently pregnant or those who are parenting children. The focus groups were conducted in Washington, D.C., Chicago, IL, and Atlanta, GA. The focus group guide and nationwide survey were reviewed by Schulman Institutional Review Board to ensure they protected the well-being of all girls involved in the study.

NATIONAL WOMEN'S LAW CENTER

# Background on Girls Who Have Suffered Harassment and Sexual Violence

Girls and young women across the country face high rates of harassment, sexual violence and trafficking, and certain girls of color and LGBTQ girls are disproportionately affected. Yet very few girls actually report harassment and violence to an adult, their schools, or the police because they are scared,[6] feel uncomfortable talking about it, do not want to get the perpetrators in trouble, or feel they should be able to handle it on their own.[7]

## Harassment

Harassment is prevalent among students in elementary and secondary school. According to the Let Her Learn Survey:

- More than 1 in 6 (or 17 percent) reported being harassed for any reason since the 2016 Presidential Election.
- Nearly 1 in 7 girls (14 percent) reported being harassed because they identify as a girl.
- Nearly 1 in 7 girls (13 percent) reported being harassed because of their name or family's country of origin.

Despite the prevalence of harassment, few girls who have been harassed in school opt to report the incident to school officials, family members, or the police. Instead, girls were more likely to do nothing or ignore the problem (**Figure 1**).[8]

**Figure 1.** Girls' Responses to being Harassed or Assaulted[9]



WHAT DID YOU DO IN RESPONSE TO BEING HARASSED OR ASSAULTED?

Source: National Women's Law Center, Let Her Learn Survey, Conducted by Lake Research Partners (2017).

NATIONAL WOMEN'S LAW CENTER



According to another study, nearly half (48 percent) of students experience sexual harassment at school, either in person or online, and 87 percent of those students said that the harassment had a negative effect on them. Girls (56 percent) were more likely than boys (40 percent) to report that they had experienced harassment and were more likely to report that they had been harassed more than once.[10]

> Under Title IX of the Education Amendments of 1972, schools are required to take steps to prevent sexual harassment and violence and respond to incidents quickly and fairly. Yet many schools around the country are not living up to their obligations.[11] Between 2009 and 2016, the number of sexual violence complaints at the elementary and secondary school level filed with the Office for Civil Rights increased over 600%, from 11 to 83.[12]

## Sexual Violence

Girls are also subject to sexual violence at young ages. The Adverse Childhood Experiences (ACEs) study[13] found that one in four girls is sexually abused before her 18th birthday.[4] And the Centers for Disease Control's Youth Risk Behavior Surveillance System shows that most girls report first being raped between the ages of 16 and 17 years old (**Figure 2**).[15] However, the actual number of girls and young women who have experienced sexual violence is likely even higher given that sexual abuse of children is grossly underreported: Only an estimated 36 percent of rape victims report to the police.[16]

In NWLC's Let Her Learn Survey:

- More than 1 in 5 girls (21 percent) reported that they had been kissed or touched without their consent.[17]

  - 38 percent of LGBTQ girls reported being kissed or touched without their consent.

  - 24 percent of Latina Girls, 23 percent of Native American girls, and 22 percent of Black girls reported being kissed or touched without their consent.

  - 6 percent of girls overall reported being forced to have sex when they did not want to, and these rates were higher for LGBTQ girls (15 percent), girls who are 18 years old (13 percent), Native American girls (11 percent), Black girls (9 percent), and Latinas (7 percent).

> **31% of girls reported being a survivor of sexual assault or other violence.**
> (National Women's Law Center, Let Her Learn Survey.)

Some Black girls and young women in particular may feel pressure not to report sexual assault to avoid subjecting Black boys and men to the criminal justice system when they are the perpetrators.[18] Coupled with the cultural expectation to be a "strong Black woman,"[19] this means that Black girls may not get the help they need processing trauma from sexual violence. As a result, they can experience toxic stress—the frequent and prolonged activation of the body's stress system that can cause a child to be in a constant state of emergency[20]—which impedes learning and triggers behaviors in school that can lead to disciplinary action or even involvement with the juvenile justice system.[21]

**Figure 2.** Age of Girls at First Rape



Source: NWLC Calculations from 2015 Centers for Disease Control, Youth Risk Behavior Surveillance System.[22]

**WHAT GIRLS SAY:**

"*I feel they teach girls to cover their selves* [sic] *but they don't teach boys to respect women… They don't teach boys to keep your hands to yourself or to always ask for consent… They teach us how to avoid it and that to me is kind of like they blame us… and I don't like that at all. – NWLC Focus Group Participant*

NATIONAL WOMEN'S LAW CENTER



Teenage girls are especially at risk of suffering sexual and physical violence from a dating partner. NWLC's Let Her Learn Survey shows that about 1 in 11 girls (9 percent) ages 14-18 have been hurt or injured on purpose by someone they were dating, including 13 percent of Native American girls and 16 percent of LGBTQ girls. Similarly, according to the CDC's Youth Risk and Behavior Surveillance System, among high school girls who dated in the last year, 15.6 percent said they had been forced to do sexual things (being kissed, touched, or physically forced to have intercourse) by someone they were dating. The highest rate of sexual dating violence was among multiracial girls (**Figure 3**).[23] And while both boys and girls are victims of dating violence, boys are more likely to force sex or cause injury to their partners as compared to girls.[24]



**Figure 3.** Percentage of girls who experienced sexual dating violence by race.

Source: NWLC Calculations from 2015 Centers for Disease Control, Youth Risk Behavior Surveillance System.[25]

### Sex Trafficking

Girls all over the country are being bought and sold. An estimated 100,000 girls in the U.S. are involved in commercial sex trafficking every year,[26] although the actual number of child victims is likely higher because trafficking is a hidden crime. Young girls who run away or are forced out of their homes are at particular risk for becoming victims; additionally, school failure, familial violence, and physical and sexual abuse also make girls vulnerable to sex trafficking.[27] Girls who are victims of sexual exploitation are also likely to have been in foster care, to have been involved in the juvenile justice system, and/or to be living in impoverished communities.[28]

These conditions make young girls more vulnerable to adults who promise them love, food, shelter, and money. Sex traffickers work hard to understand their victims and use this knowledge to manipulate and abuse them, often targeting girls in schools, malls, and online.[29] Black girls are disproportionately at risk for domestic sex trafficking: Studies report that Black girls are more likely to be trafficked at younger ages and to not have access to school and community supports. Black girls also make up the majority of prostitution arrests for girls,[30] despite the fact that these girls are too young to consent to sexual activity and therefore should be considered victims of crime.[31]

**WHAT GIRLS SAY:**

"*People who go through [violence]… sometimes they are afraid to say it because we often make topics like that kind of taboo.*"
– *NWLC Focus Group Participant*

NATIONAL WOMEN'S LAW CENTER



# Barriers to Success in School for Girls Who Have Experienced Harassment and Sexual Violence

Harassment and sexual violence can be incredibly damaging to girls' lives, affecting their mental, emotional and physical well-being as well as their educational outcomes.

Girls who are victims of harassment or sexual violence often suffer from trauma, the long-term effects of which can be significant. High doses of childhood trauma "can dramatically increase people's risk for 7 out of 10 of the leading causes of death in the U.S."[32] Research has also shown that a traumatic experience can change the functioning of a child's brain, which has long- and short-term consequences on mental health.[33] In particular, in NWLC's Let Her Learn Survey, girls who reported that they had been hurt or injured on purpose by a family member were overwhelmingly likely to report symptoms associated with post-traumatic stress disorder (92 percent), depression (96 percent), or generalized anxiety disorder (98 percent).[34]

In addition, girls who are survivors of sexual violence often suffer from a wide range of physical issues that can follow them throughout their lives, including chronic pain, diabetes, and eating disorders.[35] Survivors of childhood sexual abuse are also more likely to engage in dangerous behaviors with long-lasting effects, such as alcohol abuse, smoking,[36] and drug abuse and sexual activity that put them at a high risk for contracting HIV.[37]

In addition to negatively impacting girls' mental and physical health, harassment and sexual violence also impacts girls' ability to succeed in school. For example, a child who experiences sexual abuse often feels powerless and as though she lacks the ability to control her life and its trajectory.[38] These feelings may develop into behavioral issues that are misunderstood and punished in school settings. In fact, children who experience trauma are 32.6 times more likely to have behavioral and learning problems than children who are not exposed to trauma.[39] And children harmed by adults who are supposed to protect them often become distrustful of all adults, including their teachers.

NWLC's Let Her Learn Survey reveals a number of negative educational outcomes suffered by survivors of sexual assault (**Figure 4**):[40]

- 68 percent of survivors reported having difficulty concentrating, which can negatively affect their school performance.

- 30 percent of survivors reported being absent from school because they felt they would be unsafe at school or on their way to school.

- 25 percent of survivors reported experiencing exclusionary discipline,[41] which can be the result of behavior associated with experiencing trauma at early ages.

- 25 percent of survivors, more than twice the rate of girls overall, reported that they had been in a physical fight in school, suggesting that girls who have suffered trauma need more support to help them recover and cope in non-violent ways.

Girls who are victims of sex trafficking are even more at risk of poor educational outcomes.  Because they are subjected to ongoing abuse by their traffickers—including isolation, sexual and emotional violence, economic dependence, and blackmail—they often drop out of school. In some cases, predators may not allow them to go to school at all.[43] Collective ignorance by policymakers, educators and communities about the warning signs and risk factors for child trafficking makes these girls invisible and harder to reach.[44]

In 2015, a 13 year-old Brooklyn girl, with the help of a friend, told a school staff member that she was raped and videotaped by a fellow student who put the video online. The school staff member asked her if it was consensual and when she said "no," the staff member failed to report the incident to authorities. Later, the girl reported the incident to the principal, who called the police and the girl's mother but asked the girl to leave school while they investigated the incident. The investigation lasted a few days and the principal told the girl's mother that she had arranged a "safety transfer" to another school. She spent a month out of school while the transfer was completed and was never contacted by the school's Title IX coordinator or offered any support services. Instead, she was essentially suspended for being a victim.[42]

| Figure 4. Experiences of Survivors of Sexual Violence[45] | | |
|---|---|---|
| | **Girls Overall** | **Survivors of sexual violence** |
| Have felt nervous, anxious, or on edge | 78% | 91% |
| Have felt down, depressed, or hopeless | 66% | 86% |
| Have had repeated memories, thoughts, or images of a stressful experience | 49% | 82% |
| Have trouble concentrating and staying focused in school | 46% | 68% |
| Have missed 15 days or more of school in a school year | 25% | 43% |
| Have been absent from school because felt unsafe at school or on their way to school | 14% | 30% |
| Have been in a physical fight at school | 12% | 25% |
| Have experienced exclusionary discipline | 11% | 25% |

Source: National Women's Law Center, Let Her Learn Survey, Conducted by Lake Research Partners (2017).

NATIONAL WOMEN'S LAW CENTER



# Recommendations for Helping Girls Who Have Suffered Harassment and Sexual Violence Succeed in School

With the proper attention and support, girls who have experienced harassment and sexual violence can overcome the barriers they face and thrive in school. The recommendations below describe ways that policymakers, schools, and communities can address the educational challenges faced by these girls.

## Policymakers

- Policymakers should engage girls in the process of crafting solutions to the educational barriers they face, making sure to include a diverse set of voices. (One way of doing this is by creating youth advisory committees like the Young Women's Initiatives, first launched in New York City, http://www.shewillbe.nyc/.)

- The U.S. Departments of Education and the U.S. Department of Justice should provide technical assistance to schools to help them comply with federal requirements to prevent and address harassment and violence, including on the growing issue of cyberbullying and harassment.

- The U.S. Department of Education's Office for Civil Rights should continue strong enforcement of Title IX to ensure that schools are appropriately investigating complaints of sexual and gender-based harassment and violence and providing student victims with the accommodations and services they need.

- Congress should change the legal standards for sexual harassment in schools to be the same as those that apply in the workplace to help prevent and address school-based harassment and violence.

- Congress should enact laws and policies that protect students from harassment and violence based on their actual or perceived sexual orientation and gender identity by providing more explicit legal protections from discrimination for students at both the K-12 and higher education levels.

- Federal and state policymakers should require schools to conduct annual climate surveys to understand the environment their students are facing and to help fill the gap between what occurs in school and what gets publicly reported. (The U.S. Department of Justice offers a variety of tools and models for conducting climate surveys at www.NotAlone.gov.)

NATIONAL WOMEN'S LAW CENTER



- Federal and state policymakers should regularly collect from schools and make public, in a way that protects student privacy and confidentiality, disaggregated and cross-tabulated data on incidents of harassment and assault based on sex, race, disability, sexual orientation, and actual or perceived gender identity.

- States should exercise their authority to enforce Title IX of the Education Amendments of 1972 (prohibiting sex discrimination in federally funded education programs) and provide regular training on applicable civil rights laws for all Title IX coordinators and educators.

- States should ensure that their prostitution laws treat children under 18 as minors and should pass safe harbor laws that do not allow prosecution of minors for sex crimes and that provide support services for trafficking victims (such as immediate shelter, protection and rehabilitative services).

- States should require schools to annually provide all members of their school communities with mandatory, culturally responsive, trauma-informed, age-appropriate, and gender identity-sensitive training on bullying, harassment and sexual violence (including the definition of consent, healthy relationship skills, and bystander intervention) and how to identify and support sexual violence and trafficking survivors.

## Schools

- Schools should make sure that they have adequate staff, including crisis counselors, to provide victims of harassment and sexual violence with culturally responsive, gender responsive, and trauma-informed support, such as mental health services. Schools should also be ready to refer students to community-based services.

- Schools should make sure that students with emotional disturbances (depression, anxiety, PTSD or similar diagnoses) after sexual assault and trauma are provided accommodations under the Individuals with Disabilities Education Act and as required by Title IX.

- Schools should work with students who are victims of sexual harassment and violence to come up with individualized graduation plans and should utilize technology and other resources to allow them to keep up with schoolwork remotely if necessary.

- Title IX coordinators and other school officials should proactively disseminate information and conduct trainings for all members of their community on schools' policies and procedures for addressing sexual and gender-based harassment and violence.

- Schools should annually provide all members of their community with mandatory, culturally responsive, trauma-informed, age-appropriate, and gender identity-sensitive training on bullying, harassment and sexual violence (including the definition of consent, healthy relationship skills, and bystander intervention) and how to identify and support sexual violence and trafficking survivors.

- Schools should conduct annual climate surveys to understand the environment their students are facing and to help fill the gap between what occurs in school and what gets publicly reported. (The U.S. Department of Justice offers a variety of tools and models for conducting climate surveys at www.NotAlone.gov.)

NATIONAL WOMEN'S LAW CENTER



- Schools should regularly collect and make public, in a way that protects student privacy and confidentiality, disaggregated and cross-tabulated data on incidents of harassment and assault based on sex, race, disability, sexual orientation, and actual or perceived gender identity.

- Schools should develop reenrollment and individualized graduation plans for students who have spent significant amounts of time out of school due to sexual violence.

### Parents/Guardians and Advocates

- Parents/guardians and advocates should request their schools' policies and procedures for reporting and investigating sexual and gender-based harassment and violence and check to see if they meet the requirements set forth under Title IX (see http://nwlc.org/resources/title-ix-requires-schools-to-address-sexual-violence/).

- Parents/guardians and advocates should look up the name and contact information for each school's (or the district's) Title IX coordinator, a position required by law, and should ask that coordinators be appointed immediately if not already in place.

- Parents/guardians and advocates can learn the signs of sex trafficking to help identify children who need help and connect them with services and supports. (There are many groups that provide information on the signs of trafficking – for example, see https://polarisproject.org/recognize-signs.)

- Parents/guardians and advocates should encourage schools to develop partnerships with appropriate and responsive community-based organizations to whom they can refer students who have suffered harassment and sexual violence for counseling and other social services as needed.

- Parents/guardians and advocates can examine their schools' data on harassment and sexual violence—available from the Civil Rights Data Collection (http://ocrdata.ed.gov/) and starting in 2018 as part of state, local and school-level annual report cards —to evaluate school climate and advocate for changes as needed.

1    National Women's Law Center's Let Her Learn Survey was conducted online from January 5-19, 2017 by Lake Research Partners. The questions reached a total of 1,003 girls ages 14 to 18 nationwide. Black girls, Latinas, Asian/Pacific Islander girls, Native American girls, and LGBTQ girls were oversampled. The samples were drawn from online panels. The data were weighted by age, race, and census region to reflect the actual proportions of the population. Oversamples were weighted down to reflect their proportions in the population. The margin of error is +/-3.1%. The margin of error is higher among subgroups.

2    The Let Her Learn survey asked respondents to indicate their race as white, Black/African American, Hispanic/Latino, Asian or Pacific Islander, Native American, Multiracial, or other. Respondents could select all options that applied to them. "Black" is used to refer to girls who self-identified as "Black/African American" and "Latina" is used to refer to girls who self-identified as "Hispanic/Latino."

3    The Let Her Learn survey asked respondents about their current gender identity, allowing them to select from male, female, transgender male, transgender female, gender queer or gender nonconforming, or other. The survey also asked respondents about their sexual orientation, allowing them to select from heterosexual or straight, gay, lesbian, bisexual, queer, pansexual/biromantic, asexual, not sure, or other. Any data describing the experiences of LGBTQ girls reflects responses from those who self-identified their gender to be female or transgender female and those who self-identified their sexual orientation to be anything except heterosexual or straight.

4    Rights 4 Girls, *Domestic Child Sex Trafficking and African American Girls* (2016), *available at* http://rights4girls.org/wp-content/uploads/r4g/2015/02/Af-Am-Girls-Trafficking-July-2016.pdf.

5    Yael Dvir, Julian Ford, Michael Hill and Jean Frazier, "Childhood Maltreatment, Emotional Dysregulation, and Psychiatric Commodities," *Harvard Review Psychiatry* 22 (2014), 149-161, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4091823/; Stephanie Dallam, "The long-term medical consequences of childhood trauma," in *The cost of child maltreatment: Who pays? We all do.*, eds. K. Franey, R. Geffner, & R. Falconer (San Diego, CA: Family Violence and Sexual Assault Institute, 2001), 1-14, *available at* https://www.leadershipcouncil.org/1/res/dallam/4.html.

6    National Child Traumatic Stress Network, *Child Sexual Abuse Fact Sheet* (2009), 2, *available at* http://nctsn.org/nctsn_assets/pdfs/caring/ChildSexualAbuseFactSheet.pdf.

7    National Women's Law Center, Let Her Learn Survey.

8    National Women's Law Center, Let Her Learn Survey.

9    National Women's Law Center, Let Her Learn Survey. Girls could identify as many responses as they wanted.

10   Catherine Hill & Holly Kearl, American Association of University Women, *Crossing the Line: Sexual Harassment at School* (2011), 11, *available at* http://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

11   *See, e.g.,* National Women's Law Center, Press Release, "Federal Appellate Court Rules in Favor of Girl Raped as Part of Sting Operation Orchestrated by School Officials," Aug. 12, 2015, *available at* http://nwlc.org/press-releases/federal-appellate-court-rules-favor-girl-raped-part-sting-operation-orchestrated-school-officials/; National Women's Law Center, Press Release, "NWLC Joins Title IX Lawsuit Against Michigan Public School for Failing to Address Student's Sexual Assault," Apr. 18, 2013, *available at* http://nwlc.org/press-releases/nwlc-joins-title-ix-lawsuit-against-michigan-public-school-failing-address-students-sexual-assault/.

12   U.S. Department of Education, Office for Civil Rights, *Achieving Simple Justice: Highlights of Activities, Office for Civil Rights 2009-16* (2016), 10, *available at* https://www2.ed.gov/about/reports/annual/ocr/achieving-simple-justice.pdf.

13   Study conducted among adults reporting on adversities experienced before they reached the age of 18.

14   Centers for Disease Control and Prevention, Kaiser Permanente (2016), The ACE Study Survey Data [Unpublished Data] (ACEs Prevalence Table).

15   National Women's Law Center Calculations, Centers for Disease Control and Prevention, 2015 Youth Risk Behavior Surveillance System (YRBSS), *available at* https://www.cdc.gov/healthyyouth/data/yrbs/.

16   Callie Marie Rennison, The Bureau of Justice Statistics *Rape and Sexual Assault: Reporting to Police and Medical Attention*, 1992-2000 (Aug. 2002), *available at* https://www.bjs.gov/content/pub/pdf/rsarp00.pdf.

17   National Women's Law Center, Let Her Learn Survey.  Because so few girls report sexual assault to the police, data are limited on who is committing sexual assault against these girls.

18   Sonja Tonnesen, "Commentary: Hit It and Quit it: Responses to Black Girls' Victimization in School," *Berkeley Journal of Gender, Law, & Justice* 28 (2013), 20, *available at* http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1312&context=bglj.

19   Scyatta A.Wallace & Riki Wilchins, True Child & Heinz Endowments, *Gender Norms: A Key to Improving Health & Wellness Among Black Women & Girls* (2013), 4, *available at* http://www.truechild.org/Images/Interior/findtools/heinz%20report.pdf (citing Ellen Harrington, Janis Crowther, and Jillian Shipherd, "Trauma, Binge Eating, and the "Strong Black Woman," *Journal of Consulting and Clinical Psychology* 78 (2010), 469.

20   Children's Bureau, Association on Children Youth, and Families, and Health and Human Services, Child Welfare Information Gateway, *Understanding the Effects of Maltreatment on Brain Development* (2014), *available at* https://www.childwelfare.gov/pubPDFs/brain_development.pdf.

21   See generally Francine Sherman, *Reframing the Response: Girls in the Juvenile Justice System and Domestic Violence, Juvenile and Family Justice Today* 18 no.1 (2009), 17-20, *available at* http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=1589&context=lsfp; Francine Sherman, *Justice for Girls: Are We Making Progress?* Criminal Justice 28 no. 2 (Summer 2013), 9, *available at* http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=1507&context=lsfp.

22   National Women's Law Center Calculations, Centers for Disease Control and Prevention, 2015 Youth Risk Behavior Surveillance Survey (YRBSS), *available at* https://www.cdc.gov/healthyyouth/data/yrbs// The data reflects the age of the girls at the time of the survey, not at the time of the reported sexual assault.

23   National Women's Law Center Calculations, Centers for Disease Control and Prevention, 2015 Youth Risk Behavior Surveillance Survey (YRBSS), *available at* https://www.cdc.gov/healthyyouth/data/yrbs/.

24   Sharron Close, "Dating Violence Prevention in Middle School and High School," *Journal of Child and Adolescent Psychiatric Nursing* 18 (2005), 5, *available at* https://www.researchgate.net/publication/227691402_Dating_Violence_Prevention_in_Middle_School_and_High_School_Youth.



25  The data reflects the age of the girls at the time of the survey, not at the time of the reported sexual assault.

26  Rebecca Epstein and Peter Edelman, Georgetown Law Center on Poverty and Inequality, *Blueprint A Multidisciplinary Approach to the Domestic Sex Trafficking of Girls* (2013) 2, *available at* http://rights4girls.org/wp-content/uploads/r4g/2015/03/Blueprint.pdf.

27  Neha Deshpande and Nawal Nour, "Sex Trafficking of Women and Girls," *Reviews in Obstetrics and Gynecology* 6 (2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3651545/; Kristin Finklea, Adrienne Fernandes-Alcantara, & Alison Siskin, Congressional Research Service, *Sex Trafficking of Children in the United States: Overview and Issues for Congress* (2015), *available at* https://fas.org/sgp/crs/misc/R41878.pdf.

28  Rights 4 Girls, *Child Welfare and Domestic Child Sex Trafficking* (2014), 1, *available at* http://rights4girls.org/wp-content/up-loads/r4g/2015/12/Child-Welfare-and-Trafficking-Fact-Sheet-4-Dec-2015.pdf.

29  Linda Smith, Samantha Healy Vardaman, and Melissa Snow, *The National Report on Domestic Minor Sex Trafficking*, (2009), 17, *available at* https://sharedhope.org/wpcontent/uploads/2012/09/SHI_National_Report_on_DMST_2009.pdf.

30  Rights4Girls, *Domestic Trafficking and African American Girls* (2015), 1, *available at* http://rights4girls.org/wp-content/up-loads/r4g/2015/12/DCST-and-African-American-Girls-Fact-Sheet-Dec-2015.pdf.

31  Rights4Girls, *There Is No Such Thing as a Child Prostitute*, *available at* http://rights4girls.org/wp-content/uploads/r4g/2015/03/No-Such-Thing-one-pager11.pdf.

32  Harvard T. H. Chan Public School of Health, *How Childhood Trauma Affects Health Across a Lifetime* (2015), *available at* https://www.hsph.harvard.edu/news/hsph-in-the-news/childhood-traumas-devastating-impact-on-health/.

33  Ibid. 5; National Scientific Council on The Developing Child, *Early Experiences Can Alter Gene Expression and Affect Long-Term Development: Working Paper No. 10* (2010), 5, *available at* http://46y5eh11fhgw3ve3ytpwxt9r.wpengine.netdna-cdn.com/wp-content/uploads/2010/05/Early-Experiences-Can-Alter-Gene-Expression-and-Affect-Long-Term-Development.pdf.

34  National Women's Law Center, Let Her Learn Survey.

35  The White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* (2014), 2, *available at* http://www.sapr.mil/public/docs/research/201401_WhiteHouse_CouncilonWomenandGirls_RapeandSexualAssault.pdf.

36  Dean Kilpatrick et al., "Risk Factors for Adolescent Substance Abuse and Dependence from a National Sample," *Journal of Consulting and Clinical Psychology* 68 (2000).

37  Sally Zierler et al., "Adult Survivors of Childhood Sexual Abuse and Subsequent Risk of HIV Infection," *American Journal of Public Health* 81 (1991), 574-75; Dean Kilpatrick et al., "Violence and Risk of PTSD, Major Depression, Substance Abuse/Dependence and Comorbidity: Results from the National Survey of Adolescents," *Journal of Consulting and Clinical Psychology* 71 (2003), 698, *available at* http://www.apa.org/pubs/journals/releases/ccp-714692.pdf.

38  David Finkelhor and Angela Browne, *The Traumatic Impact of Child Sexual Abuse: A Conceptualization, American Journal of Orthopsychiatry* 55 (1985), 1-7, *available at* http://www.csom.org/train/victim/resources/the%20traumatic%20impact%20of%20child%20sexual%20abuse.pdf.

39  Nadine Burke et al., "The Impact of Adverse Childhood Experiences on an Urban Pediatric Population," *Child Abuse and Neglect* 35 (2011), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3119733/.

40  National Women's Law Center, Let Her Learn Survey. Girls who are survivors of sexual assault are defined as those who responded yes to at least one of the following: 1) I have been kissed or touched when I did not want to; 2) I have been physically forced to have sexual intercourse when I did not want to; 3) I have been forced to have sex in exchange for money or gifts.

41  Exclusionary discipline includes suspensions and expulsions and prevents students from attending school.

42  Katie Baker, "Sent Home from Middle School After Reporting A Rape," *BuzzFeed*, March 14, 2016, *available at* https://www.buzzfeed.com/katiejmbaker/sent-home-from-middle-school-after-reporting-a-rape?utm_term=.tqnQQx9qed#.yt3MMwAag9.

43  Shared Hope International, *The National Report on Domestic Minor Sex Trafficking* (2009), 37.

44  Ibid. v.

45  National Women's Law Center, Let Her Learn Survey. This includes girls who said they have been forced physically to have sexual intercourse when they did not want to, girls who said they had sex in exchange for money and gifts, and girls who said they have been kissed or touched when they did not want to be.

46  U.S. Department of Education, *Every Student Succeeds Act State and Local Report Cards Non-Regulatory Guidance* (2017), 36, *available at* https://www2.ed.gov/policy/elsec/leg/essa/essastatereportcard.pdf.

LET HER
LEARN

W NATIONAL
WOMEN'S
LAW CENTER
EXPANDING THE POSSIBILITIES

11 Dupont Circle NW, Suite 800
Washington, DC 20036
Phone: (202) 588-5180
Fax: (202) 588-5185
Email: info@nwlc.org
Website: nwlc.org

# EXHIBIT A-9

7/25/2019    Department of Education Issues New Interim Guidance on Campus Sexual Misconduct | U.S. Department of Education

Case 3:18-cv-00535-JST   Document 136-2   Filed 07/25/19   Page 106 of 255

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | 🔤 Language Assistance ▾

Search...

**ARCHIVED INFORMATION**

# Department of Education Issues New Interim Guidance on Campus Sexual Misconduct

***New Q&A will serve as interim guide until the conclusion of notice and comment rulemaking***
***Widely criticized 2011, 2014 guidance also withdrawn***

SEPTEMBER 22, 2017

**Contact:**  Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

**Washington** — Building on her remarks from September 7, 2017, regarding the Department's commitment to protecting all students from discrimination, today U.S. Secretary of Education Betsy DeVos announced the release of a new interim Q&A (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) for schools on how to investigate and adjudicate allegations of campus sexual misconduct under federal law.

"This interim guidance will help schools as they work to combat sexual misconduct and will treat all students fairly," said DeVos. "Schools must continue to confront these horrific crimes and behaviors head-on. There will be no more sweeping them under the rug. But the process also must be fair and impartial, giving everyone more confidence in its outcomes."

In the coming months, the Department intends to engage in rulemaking on Title IX responsibilities arising from complaints of sexual misconduct. The Department will solicit comments from stakeholders and the public during the rulemaking process, a legal procedure the prior administration ignored.

In the interim, the newly-released Q&A (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) on Campus Sexual Misconduct explains the Department's current expectations of schools, and the Department will continue to rely on its Revised Sexual Harassment Guidance, which was informed by a public comment process and issued in 2001, as well as the Dear Colleague Letter on Sexual Harassment issued on January 25, 2006.

"In the coming months, hearing from survivors, campus administrators, parents, students and experts on sexual misconduct will be vital as we work to create a thoughtful rule that will benefit students for years to come. We also will continue to work with schools and community leaders to better address preventing sexual misconduct through education and early intervention," DeVos added.

The Department of Education is also withdrawing (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf) the Dear Colleague Letter on Sexual Violence dated April 4, 2011, and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014. The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness.

DeVos concluded, "As I said earlier this month, the era of rule by letter is over. The Department of Education will follow the proper legal procedures to craft a new Title IX regulation that better serves students and schools."

**Press Call Information:**

The Department will hold a background press call at 10:45 a.m. open to credentialed members of the media. Media interested in participating should RSVP to press@ed.gov (mailto:press@ed.gov) to receive additional information.

## FAQs on Updated Campus Sexual Misconduct Guidance

**What is the purpose of the Q&A on Campus Sexual Misconduct?**

- Describes a school's responsibility to address sexual misconduct complaints
- Discusses the relationship between Title IX and the Clery Act
- Provides examples of interim measures that may be appropriate under the circumstances
- Summarizes what procedures a school should follow to adjudicate a finding of responsibility for sexual misconduct
- Describes what constitutes an "equitable" investigation
- Explains a school's obligations concerning appeals
- Clarifies appropriate evidentiary standards
- Informs schools of their responsibilities concerning notifications to parties of the outcomes of disciplinary proceedings

**What are a school's obligations under Title IX regarding sexual misconduct?**

- Schools must address sexual misconduct that is severe, persistent or pervasive.
- Schools must conduct a fair and impartial investigation in a timely manner.
- Title IX investigations must be led by a person free of actual or reasonably perceived conflicts of interest and biases.
- Schools must designate a Title IX Coordinator.

**Do schools have flexibility to establish fair procedures?**

- Schools have the discretion to apply either the preponderance of the evidence standard or the clear and convincing evidence standard.
- Schools are not required to allow appeals; however, a school may choose to allow appeals solely by the responding party or by both parties.
- Schools may permit an informal resolution, such as mediation, if it is appropriate and if all parties voluntarily agree.
- Schools should provide written notice to the responding party of the allegations, including sufficient details and with adequate time to prepare a response before any initial interview.
- OCR recommends schools provide concurrent, written notice of the outcome of disciplinary proceedings to the reporting and responding parties.

**Does the rescission letter or the Q&A add legal requirements?**

The rescission letter and Q&A do not add requirements to applicable law.

**Does the rescission letter or the Q&A limit the right of a person to file a Title IX complaint?**

No. A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. Moreover, whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what

7/25/2019 Department of Education Issues New Interim Guidance on Campus Sexual Misconduct | U.S. Department of Education

Case 3:18-cv-00535-JSC Document 138-2 Filed 07/25/19 Page 108 of 255

occurred and to respond appropriately. In particular, when sexual misconduct is so severe, persistent and pervasive as to deny or limit a student's ability to participate in or benefit from the recipient's school's programs or activities, a hostile environment exists and the school must respond.

**How can I get help from OCR?**

OCR offers technical assistance to help schools achieve voluntary compliance with the civil rights laws it enforces and works with schools to develop approaches to preventing and addressing discrimination. A school should contact the OCR enforcement office serving its jurisdiction for technical assistance.

- **Telephone: 800-421-3481**
- **FAX: 202-453-6012; TDD: 800-877-8339**
- **Email: OCR@ed.gov (mailto:OCR@ed.gov)**

**Tags:** Title IX (/category/keyword/title-ix)    Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

# Search press releases

Search...

# Find By Month

- July 2019 (/news/press-releases/monthly/201907)
- June 2019 (/news/press-releases/monthly/201906)
- May 2019 (/news/press-releases/monthly/201905)
- April 2019 (/news/press-releases/monthly/201904)
- March 2019 (/news/press-releases/monthly/201903)
- February 2019 (/news/press-releases/monthly/201902)
- January 2019 (/news/press-releases/monthly/201901)
- December 2018 (/news/press-releases/monthly/201812)
- November 2018 (/news/press-releases/monthly/201811)
- October 2018 (/news/press-releases/monthly/201810)

7/25/2019  Department of Education Issues New Interim Guidance on Campus Sexual Misconduct | U.S. Department of Education

Case 3:18-cv-00535-JSC Document 136-2 Filed 07/25/19 Page 109 of 255

- September 2018 (/news/press-releases/monthly/201809)
- August 2018 (/news/press-releases/monthly/201808)
- All Press Releases (/news/press-releases)

---

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

## Student Loans (https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (https://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (https://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

## Grants & Programs (https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://www.fafsa.ed.gov/?src=ft)

Grants Forecast (https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (https://www2.ed.gov/programs/find/elig/index.html?src=ft)

## Laws & Guidance (https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=ft)

FERPA (https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)

## Data & Research (https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://ies.ed.gov/ncee/wwc/?src=ft)

## About Us (https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://www.ed.gov/jobs?src=ft)

Press Releases (https://www.ed.gov/news/?src=ft)

FAQs (https://www.ed.gov/answers?src=ft)

Recursos en español (https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://www2.ed.gov/privacy?src=ft)

Subscribe to E-Mail Updates (https://www.ed.gov/subscriptions)

 (http://www.facebook.com/ed.gov)　 (http://www.twitter.com/usedgov)　
(https://www.ed.gov/subscriptions)　 (https://www.ed.gov/feed)

---

Notices (https://www2.ed.gov/notices/index.html?src=ft)   FOIA (https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (https://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (https://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)   Whitehouse.gov (https://www.whitehouse.gov/)
USA.gov (https://www.usa.gov/)   Benefits.gov (https://www.benefits.gov/)   Regulations.gov (https://www.regulations.gov/)

# EXHIBIT A-10

Skip to main content | About Us (https://www2.ed.gov/about/landing.jhtml) | Contact Us (https://www2.ed.gov/about/contacts/gen) |
FAQs (https://www.ed.gov/answers/) | Language Assistance ▼

Search...

**ARCHIVED INFORMATION**

# Secretary DeVos Prepared Remarks on Title IX Enforcement

SEPTEMBER 7, 2017

**Contact:** Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Thank you Dean Henry Butler for the kind introduction and for the opportunity to be here. Thank you President Angel Cabrera for your leadership of George Mason University.

And to the students and faculty with us today, thank you for making time to be here during this busy day of classes.

It is a great honor for me to be here today to address a very important topic.

Earlier this year marked the 45th anniversary of Title IX, the landmark legislation passed by Congress that seeks to ensure: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

The amendment to the Higher Education Act was initially proposed by Democrat Senator Birch Bayh, signed into law by Republican President Richard Nixon, and was later renamed for Congresswoman Patsy Mink, herself a victim of both sex-based and race-based discrimination as a third-generation Japanese-American.

Mink's law has served an important role in shaping our Nation's educational environment.

Title IX has helped to make clear that educational institutions have a responsibility to protect every student's right to learn in a safe environment and to prevent unjust deprivations of that right.

It is a responsibility I take seriously, and it is a responsibility that the Department of Education's Office for Civil Rights takes seriously.

We will continue to enforce it and vigorously address all instances where people fall short.

Sadly, too many fall short when it comes to their responsibility under Title IX to protect students from sexual misconduct, acts of which are perpetrated on campuses across our nation.

The individual impacts of sexual misconduct are lasting, profound, and lamentable. And the emotions around this topic run high for good reason.

We need look no further than just outside these walls to see evidence of this. Yet I hope every person—even those who feel they disagree—will lend an ear to what I outline today.

I'm glad we live in a country where an open debate of ideas is welcomed and encouraged. Debate, of course, comes with responsibilities. Violence is never the answer when viewpoints diverge.

I appreciate that you have the opportunity to attend a university that promotes a higher level of discourse.

So let me be clear at the outset: acts of sexual misconduct are reprehensible, disgusting, and unacceptable. They are acts of cowardice and personal weakness, often thinly disguised as strength and power.

Such acts are atrocious, and I wish this subject didn't need to be discussed at all.

Every person on every campus across our nation should conduct themselves with self-respect and respect for others.

But the current reality is a different story.

Since becoming Secretary, I've heard from many students whose lives were impacted by sexual misconduct: students who came to campus to gain knowledge, and who instead lost something sacred.

We know this much to be true: one rape is one too many.

One assault is one too many.

One aggressive act of harassment is one too many.

One person denied due process is one too many.

This conversation may be uncomfortable, but we must have it. It is our moral obligation to get this right.

Campus sexual misconduct must continue to be confronted head-on. Never again will these acts only be whispered about in closed-off counseling rooms or swept under the rug.

Not one more survivor will be silenced.

We will not abandon anyone. We will amplify the voices of survivors who too often feel voiceless.

While I listened to the stories of many survivors and their families over these past several months, I couldn't help but think of my own family.

I thought about my two daughters.

And I thought about my two sons.

Every mother dreads getting that phone call: a despondent child calling with unthinkable news.

I cannot imagine receiving that call.

Too many mothers and fathers are left on the other end of the line completely helpless. I have looked parents in their tear-filled eyes as they recounted their own stories, and each time their pain was palpable.

I'm haunted by the story one brave young woman told me. She was targeted and victimized by her college boyfriend—someone she thought cared about her.

He looked on as his roommate attempted to rape her. She escaped her harrowing encounter, but too many do not.

For too many, an incident like this means something even worse.

There is no way to avoid the devastating reality of campus sexual misconduct: lives have been lost. Lives of victims. And lives of the accused.

Some of you hearing my voice know someone who took his or her own life because they thought their future was lost; because they saw no way out; because they lost hope.

One mother told me her son has attempted to take his life multiple times. Each time she opens the door to his bedroom, she doesn't know whether she will find him alive or dead.

No mother, no parent, no student should be living that reality.

We are here today for those families. We need to remember that we're not just talking about faceless "cases."

We are talking about people's lives. Everything we do must recognize this before anything else.

And we're here today because the previous administration helped elevate this issue in American public life. They listened to survivors, who have brought this issue out from the backrooms of student life offices and into the light of day.

I am grateful to those who endeavored to end sexual misconduct on campuses.

But good intentions alone are not enough. Justice demands humility, wisdom and prudence.

It requires a serious pursuit of truth. And so, this is why I recently hosted a summit to better understand all perspectives: survivors, falsely accused students and educational institutions, both K-12 and higher ed. I wanted to learn from as many as I could because a conversation that excludes some becomes a conversation for none. We are having this conversation with and for all students.

Here is what I've learned: the truth is that the system established by the prior administration has failed too many students.

Survivors, victims of a lack of due process, and campus administrators have all told me that the current approach does a disservice to everyone involved.

That's why we must do better, because the current approach isn't working.

Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate.

Where does that leave institutions, which are forced to be judge and jury?

Where does that leave parents?

Where does that leave students?

This failed system has generated hundreds upon hundreds of cases in the Department's Office for Civil Rights, mostly filed by students who reported sexual misconduct and believe their schools let them down.

It has also generated dozens upon dozens of lawsuits filed in courts across the land by students punished for sexual misconduct who also believe their schools let them down.

The current failed system left one student to fend for herself at a university disciplinary hearing.

She told her university that another student sexually assaulted her in her dorm room. In turn, her university told her she would have to prosecute the case herself.

Without any legal training whatsoever, she had to prepare an opening statement, fix exhibits and find witnesses.

"I don't think it's the rape that makes the person a victim," the student told a reporter. She said it is the failure of the system that turns a survivor into a victim.

This is the current reality.

You may have recently read about a disturbing case in California. It's the story of an athlete, his girlfriend and the failed system.

The couple was described as "playfully roughhousing," but a witness thought otherwise and the incident was reported to the university's Title IX coordinator.

The young woman repeatedly assured campus officials she had not been abused nor had any misconduct occurred. But because of the failed system, university administrators told her they knew better.

They dismissed the young man, her boyfriend, from the football team and expelled him from school.

"When I told the truth," the young woman said, "I was stereotyped and was told I must be a 'battered' woman, and that made me feel demeaned and absurdly profiled."

This is the current reality.

Another student at a different school saw her rapist go free. He was found responsible by the school, but in doing so, the failed system denied him due process. He sued the school, and after several appeals in civil court, he walked free.

This is the current reality.

A student on another campus is under a Title IX investigation for a wrong answer on a quiz.

The question asked the name of the class Lab instructor. The student didn't know the instructor's name, so he made one up—Sarah Jackson—which unbeknownst to him turned out to be the name of a model.

He was given a zero and told that his answer was "inappropriate" because it allegedly objectified the female instructor.

He was informed that his answer "meets the Title IX definition of sexual harassment." His university opened an investigation without any complainants.

This is the current reality.

I also think of a student I met who honorably served our country in the Navy and wanted to continue his education after his service. But he didn't know the first thing about higher education.

He Googled "how to apply to college" and applied to one nearby, an HBCU. He was accepted and became the first in his family to attend college.

The student told me that as graduation approached, his grandmother beamed with pride. She had already purchased a flight and picked out her Sunday best for the occasion.

But three weeks before graduation, he saw his future dashed.

This young man was suspended via a campus-wide email which declared him a "threat to the campus community." When he tried to learn the reason for his suspension, he was barred from campus.

He was not afforded counsel by the college and couldn't afford counsel himself. Eventually, he found a lawyer who submitted a Freedom of Information Act request pro bono—but would do no more.

Only through the FOIA was he able to discover he had been accused of sexual harassment, but he was still denied notice of the specific allegations, and he remained suspended.

This young man was denied due process. Despondent and without options or hope, after five years of sobriety, he relapsed and attempted to take his own life.

He felt he had let down everyone who mattered to him—including, most of all, his grandmother who was so much looking forward to seeing the first member of her family don a cap and gown.

"Whatever your accusers say you are," he told me, "is what people believe you are."

That is the current reality.

Here is what it looks like: a student says he or she was sexually assaulted by another student on campus. If he or she isn't urged to keep quiet or discouraged from reporting it to local law enforcement, the case goes to a school administrator who will act as the judge and jury.

The accused may or may not be told of the allegations before a decision is rendered. If there is a hearing, both the survivor and the accused may or may not be allowed legal representation.

Whatever evidence is presented may or may not be shown to all parties. Whatever witnesses—if allowed to be called—may or may not be cross-examined. And Washington dictated that schools must use the lowest standard of proof.

And now this campus official—who may or may not have any legal training in adjudicating sexual misconduct—is expected to render a judgement. A judgement that changes the direction of both students' lives.

The right to appeal may or may not be available to either party. And no one is permitted to talk about what went on behind closed doors.

It's no wonder so many call these proceedings "kangaroo courts."

Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.

The current system hasn't won widespread support, nor has it inspired confidence in its so-called judgments.

The results of the current approach? Everyone loses.

Some suggest that this current system, while imperfect, at least protects survivors and thus must remain untouched. But the reality is it doesn't even do that.

Survivors aren't well-served when they are re-traumatized with appeal after appeal because the failed system failed the accused. And no student should be forced to sue their way to due process.

A system is not fair when the only students who can navigate it are those whose families can afford to buy good lawyers—or any lawyer at all.

No school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington.

For too long, rather than engage the public on controversial issues, the Department's Office for Civil Rights has issued letters from the desks of un-elected and un-accountable political appointees.

In doing so, these appointees failed to comply with basic legal requirements that ensure our so-called "fourth branch of government" does not run amok.

Unfortunately, school administrators tell me it has run amok. The Office for Civil Rights has "terrified" schools, one said.

Another said that no school feels comfortable calling the Department for simple advice, for fear of putting themselves on the radar and inviting an investigation.

One university leader was rightly appalled when he was asked by an Office for Civil Rights official: "Why do you care about the rights of the accused?"

Instead of working with schools on behalf of students, the prior administration weaponized the Office for Civil Rights to work against schools and against students.

One administrator summed this up clearly when he told me his staff should be "forward looking advocates for how to stop sexual misconduct."

Instead, he said, "they've been forced to be backward looking data collectors" to meet the Department's demands.

Faculty from the University of Pennsylvania's law school also voiced grave concerns about the current approach. They wrote, and I quote, "it exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."

Too often, they wrote, "outrage at heinous crimes becomes a justification for shortcuts" in processes.

Ultimately, they concluded, "there is nothing inconsistent with a policy that both strongly condemns and punishes sexual misconduct and ensures a fair adjudicatory process."

These professors are right. The failed system imposed policy by political letter, without even the most basic safeguards to test new ideas with those who know this issue all too well.

Rather than inviting everyone to the table, the Department insisted it knew better than those who walk side-by-side with students every day. That will no longer be the case.

The era of "rule by letter" is over.

Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today.

This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.

There must be a better way forward.

Every survivor of sexual misconduct must be taken seriously. Every student accused of sexual misconduct must know that guilt is not predetermined.

These are non-negotiable principles.

Any failure to address sexual misconduct on campus fails all students.

Any school that refuses to take seriously a student who reports sexual misconduct is one that discriminates.

And any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination.

A better way begins with a re-framing.

This conversation has too often been framed as a contest between men and women or the rights of sexual misconduct survivors and the due process rights of accused students.

The reality is, however, a different picture.

There are men and women, boys and girls, who are survivors, and there are men and women, boys and girls who are wrongfully accused.

I've met them personally. I've heard their stories. And the rights of one person can never be paramount to the rights of another.

A better way means that due process is not an abstract legal principle only discussed in lecture halls.

Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one.

The notion that a school must diminish due process rights to better serve the "victim" only creates more victims.

A better way also means we shouldn't demand anyone become something they are not.

Students, families, and school administrators are generally not lawyers and they're not judges. We shouldn't force them to be so for justice to be served.

A better way is also being more precise in the definition of sexual misconduct.

Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes.

Any perceived offense can become a full-blown Title IX investigation.

But if everything is harassment, then nothing is.

Punishing speech protected by the First Amendment trivializes actual harassment. It teaches students the wrong lesson about the importance of free speech in our democracy.

Harassment codes which trample speech rights derail the primary mission of a school to pursue truth.

A better way is ultimately about recognizing that schools exist—first and foremost—to educate. Their core obligation under Title IX is to ensure all students can pursue their education free of discrimination.

Schools tend to do a good job, as they should, of making appropriate accommodations that don't infringe on the rights of others.

While a Title IX complaint is pending, schools usually make academic accommodations such as adjusting schedules, changing dorm assignments, and postponing papers or exams.

But there is a fundamental difference between making these sorts of accommodations for accusers—and schools which seek to punish the accused before a fair decision has been rendered.

There is a competency gap here.

Washington has insisted that schools step into roles that go beyond the mission of these institutions.

This doesn't mean schools don't have a role. They do. But we should also draw on medical professionals, counselors, clergy, and law enforcement for their expertise.

And so, a better way includes pursuing alternatives that assist schools in achieving justice for all students.

In order to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence, we will launch a transparent notice-and-comment process to incorporate the insights of all parties in developing a better way.

We will seek public feedback and combine institutional knowledge, professional expertise, and the experiences of students to replace the current approach with a workable, effective, and fair system.

To implement sustainable solutions, institutions must be mindful of the rights of every student. No one benefits from a system that does not have the public's trust—not survivors, not accused students, not institutions and not the public.

Other groups have already made progress on these difficult issues.

The American Bar Association established a task force comprised of lawyers and advocates from diverse backgrounds and varying perspectives.

They found consensus and offered substantive ideas on how we can do better. Schools should find their recommendations useful.

The American College of Trial Lawyers also gathered experts from across the country to produce reasonable responses to the current failed system.

An open letter from Harvard's law school faculty provides important perspectives and insights that will be helpful as we pursue a better way.

Another promising idea comes from two former prosecutors, Gina Smith and Leslie Gomez.

Both of them have spent their careers specializing in sexual misconduct cases. They propose a "Regional Center" model; and it is being explored by a number of states today.

The model sets up a voluntary, opt-in Center where professionally-trained experts handle Title IX investigations and adjudications.

It looks something like this: in partnership among states and their Attorneys General, participating schools refer to the Center any Title IX incident which rises to a criminal level.

The Center cooperates with local law enforcement and has access to resources to collect and preserve forensic evidence, facilitate—but never require—criminal prosecutions, and apply fair investigative techniques to gather and evaluate all relevant evidence to determine whether sexual misconduct occurred.

This insures that students are not charged by school-based tribunals on the basis of hearsay or incomplete evidence.

This model allows educators to focus on what they do best: educate.

These are only a few examples that allow for a more effective and equitable enforcement of Title IX.

Our interest is in exploring all alternatives that would help schools meet their Title IX obligations and protect all students. We welcome input and look forward to hearing more ideas.

Schools have an opportunity to help shape and improve the system for all their students. But they also have a responsibility to do better by their students.

This is not about letting institutions off the hook. They still have important work to do.

A survivor told me that she is tired of feeling like the burden of ensuring her school addresses Title IX falls on her shoulders.

She is right. The burden is not hers, nor is it any student's burden.

We need to act as if any of these students were one of our own loved ones.

One young woman made this clear to me when she told me her story of the failed system. Both as a falsely accused student, and as a survivor.

She had recently gone through a bad break-up with her boyfriend.

Another female student, one of her close friends, sought to console her—except in all the wrong ways. The friend showed up and made an unwanted sexual advance. Upset about being rejected by the heartbroken student, the young woman who was supposed to be there as a friend, instead turned a lighthearted gesture into

a full-scale Title IX incident.

Shockingly, the school punished the student who only needed a friend after a break-up. This student then revealed to me that she had been sexually assaulted earlier in life.

"I've been on both sides of this issue," she told me, "and on neither side did they get it right."

We can and must get it right for her, and for all students.

We must continue to condemn the scourge of sexual misconduct on our campuses.

We can do a better job of making sure the handling of complaints is fair and accurate.

We can do a better job of preventing misconduct through education rather than reacting after lives have already been ruined.

We can do a better job of helping institutions get it right.

And we can do a better job for each other.

The truth is: we must do better for each other and with each other.

May God bless all of you, and may He continue to bless our great Nation.

**Tags:**    Title IX (/category/keyword/title-ix)    Speeches (/news/speeches)

# How Do I Find...?

- Student loans, forgiveness (https://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (https://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=rn)
- FERPA (https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (https://fafsa.ed.gov/?src=edgov-rn)
- 1098, tax forms (https://www.ed.gov/1098-e?src=rn)
- More... (https://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About...

- Transforming Teaching (https://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (https://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

## Search speeches

Search...

## Find By Month

- July 2019 (/news/speeches/monthly/201907)
- June 2019 (/news/speeches/monthly/201906)
- May 2019 (/news/speeches/monthly/201905)
- April 2019 (/news/speeches/monthly/201904)

- March 2019 (/news/speeches/monthly/201903)
- February 2019 (/news/speeches/monthly/201902)
- January 2019 (/news/speeches/monthly/201901)
- December 2018 (/news/speeches/monthly/201812)
- November 2018 (/news/speeches/monthly/201811)
- October 2018 (/news/speeches/monthly/201810)
- September 2018 (/news/speeches/monthly/201809)
- July 2018 (/news/speeches/monthly/201807)
- All Speeches (/news/speeches)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

## Student Loans (https://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (https://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (https://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (https://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (https://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

## Grants & Programs (https://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (https://www.fafsa.ed.gov/?src=ft)

Grants Forecast (https://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (https://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (https://www2.ed.gov/programs/find/elig/index.html?src=ft)

## Laws & Guidance (https://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (https://www.ed.gov/essa?src=ft)

FERPA (https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (https://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)

## Data & Research (https://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (https://nces.ed.gov/?src=ft)

Postsecondary Education Data (https://nces.ed.gov/ipeds/?src=ft)

ED Data Express (https://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (https://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (https://ies.ed.gov/ncee/wwc/?src=ft)

About Us (https://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (https://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (https://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (https://www.ed.gov/jobs?src=ft)

Press Releases (https://www.ed.gov/news/?src=ft)

FAQs (https://www.ed.gov/answers?src=ft)

Recursos en español (https://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (https://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://www2.ed.gov/privacy?src=ft)

Subscribe to E-Mail Updates (https://www.ed.gov/subscriptions)

 (http://www.facebook.com/ed.gov)  (http://www.twitter.com/usedgov) 

(https://www.ed.gov/subscriptions)  (https://www.ed.gov/feed)

---

Notices (https://www2.ed.gov/notices/index.html?src=ft)   FOIA (https://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (https://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (https://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (https://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (https://www2.ed.gov/about/offices/list/oig/index.html?src=ft)   Whitehouse.gov (https://www.whitehouse.gov/)
USA.gov (https://www.usa.gov/)   Benefits.gov (https://www.benefits.gov/)   Regulations.gov (https://www.regulations.gov/)

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

SURVJUSTICE, INC., et al., )
     Plaintiffs, )
                        )     Case Number: 3:18-cv-00535-JSC
                        )
v.                          )     Declaration of Katherine McGerald
                        )
                        )
ELISABETH D. DEVOS, et al., )
     Defendants. )

---

I, Katherine McGerald, Executive Director, declare as follows:

1.     I submit this declaration in support of the Motion for Summary Judgment filed by SurvJustice, Inc. ("SurvJustice"), Equal Rights Advocates, and Victim Rights Law Center (Plaintiffs in the above-captioned case), which challenges as unlawful the 2017 Title IX Policy issued by the U.S. Department of Education.

2.     The facts set forth in this declaration are based on my personal knowledge. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

3.     I have been employed by SurvJustice since 2018. I currently serve as the Executive Director of the organization. In this position, I manage the strategic direction, operations, and development of SurvJustice's national programs and SurvJustice's office in Washington, D.C. I also oversee the organization's management team, finance, fundraising and development, media relations, human resources, and project development. Consequently, I am familiar with and have participated in the organization's Title IX work as an attorney, mentor and supervisor.

4.      Founded in 2014, SurvJustice is a national nonprofit dedicated to assisting survivors of sexual violence and related forms of sex discrimination in seeking justice. SurvJustice provides legal assistance, policy advocacy, and institutional trainings across the nation. Through its efforts, SurvJustice aims to decrease the prevalence of sexual violence throughout the country.

5.      SurvJustice provides legal assistance to survivors of sexual violence in campus proceedings as well as in the civil and criminal legal systems. Over 70% of our cases are  at the campus level. SurvJustice's staff members help sexual violence survivors navigate the campus grievance process, which can include reporting the violence, assisting throughout any investigation, advising in campus hearings, filing or responding to appeals, and helping survivors access accommodations and similar services from their educational institutions. SurvJustice's staff members frequently serve as "advisors of choice" for college students during institutional disciplinary actions in cases of alleged domestic violence, dating violence, sexual assault, or stalking, as provided for by the Clery Act as amended through the 2013 Violence Against Women Reauthorization Act, 20 U.S.C. § 1092(f)(8)(B)(iv)(II) ("Clery Act"). SurvJustice's staff members also represent survivors in civil litigation directly or refer survivors to other qualified lawyers for such representation. Furthermore, SurvJustice assists survivors in reporting crimes to law enforcement, advocating for criminal prosecution, and serving as representatives for victims and their families in high-profile criminal cases.

6.      Beyond providing direct services, SurvJustice also trains educational institutions and others on topics related to preventing and addressing sexual violence in compliance with federal law, enforcing victims' rights, and adopting best practices, such as the development of a

culture that supports survivors and encourages "sexual respect" (*i.e.*, respect in sexual interactions and relationships).

7.      Finally, SurvJustice engages in policy advocacy by providing technical assistance and recommendations to legislators and policymakers on various state and federal legislation and policy efforts regarding sexual violence and other types of sex discrimination. SurvJustice also collaborates with local changemakers on policy efforts within their communities, particularly on individual college and university campuses.

8.      The Department of Education's 2011 Dear Colleague Letter and 2014 Questions & Answers document provided much-needed clarity to schools and advocates, clarifying that institutions were required to respond to sexual harassment immediately when on constructive notice of incidents that violated their policy, and incorporating provisions to ensure that the institutions explained to complainants their rights and options upon disclosure of sexual harassment. When advising survivors about their rights under Title IX, we frequently directed students to those documents. Moreover, the policies enumerated in those documents provided much-needed procedural protections to survivors of sexual harassment, who risk retaliation and further traumatization when engaging in the campus grievance process under Title IX.

9.      The Department's decision to rescind those documents and replace them with the 2017 Title IX Policy reveals a fundamental disregard for the purpose and meaning of Title IX and the needs of sexual harassment survivors. Under the new Title IX Policy, schools can, and in certain cases must, implement Title IX procedures that tilt in favor of the accused and which communicate a distrust and skepticism of survivors. Under the 2017 Title IX Policy schools:

> a.      Can require a higher standard of proof for complaints of sexual assault compared with what had previously been required;

Declaration of Katherine McGerald Case No.: 3:18-cv-00535-JSC                Page: 3

1      b.    Can create one-sided appeals processes, whereby only accused students

2          have the right to appeal an adverse finding;

3      c.    Can allow students to elect to resolve complaints of sexual violence

4          through mediation, despite significant evidence showing that students who

5          experience sexual violence often feel unduly pressured into mediation—a

6          process that exposes students to the risk of being re-traumatized, coerced,

7          or bullied by their alleged assailant;

8      d.    Must disclose the identity of the student-complainant to the alleged

9          assailant;

10     e.    Do not have to provide interim measures in a way that minimizes the

11         burden on complainants of sexual violence, and are allowed to impose

12         mutual no-contact orders, which essentially punish a survivor for reporting

13         an incident of rape or sexual assault;

14     f.    Do not have to complete Title IX proceedings within an objectively

15         prompt timeframe, aiming to meet a 60-day benchmark;

16     g.    Can decline to investigate off-campus misconduct even when it results in a

17         hostile environment on-campus;

18     h.    Can allow information about a complainant's sexual history to be

19         considered during a Title IX hearing; and

20     i.    Can allow alleged assailants to cross-examine complainants.

21     10.    These new policies reflect sexist stereotypes about sexual assault survivors:

22 namely, that women and girls tend to lie about, exaggerate, or misunderstand sexual harassment,

23 including sexual assault and other incidents of sexual violence. The result is a framework that

24

25

provides incentives to schools to place a greater emphasis on the rights of respondents over protection for complainants. Since the 2017 Policy's release, fewer victims of rape and sexual assault have come forward to report and seek protection.

11.     SurvJustice has been harmed by the 2017 Title IX Policy.

12.     The Policy frustrates SurvJustice's mission and purpose by (among other things):

a.     Impairing its mission of providing legal assistance to survivors of sexual assault and/or violence;

b.     Limiting the efficacy of available avenues of redress for the population it seeks to serve; and

c.     Creating confusion amongst the student community about a survivor's rights under Title IX.

13.     As an organization that provides direct assistance and referral services to survivors of sexual violence, SurvJustice's core mission and daily operations have been and will continue to be impeded by the chilling effect that the 2017 Title IX Policy has had and continues to have on students' willingness to report sexual violence. Following and as a direct result of the 2017 Title IX Policy, SurvJustice experienced a decrease in the number of sexual violence survivors seeking its services. In the last quarters of 2016 and 2017, SurvJustice had approximately 52 and 51 requests for assistance, respectively. In the last quarter of 2018 that number dropped to only 27 requests for assistance. Based on SurvJustice's interactions with college and university students, it has observed that this chilling effect is at least in part due to student concerns about the barriers to justice imposed by the 2017 Title IX Policy, including the increased time for an investigation, the heightened standard of proof, the one-sided appeals process, and the allowance of mutual no-contact orders.

14.    SurvJustice is also harmed because the 2017 Policy makes it more difficult for SurvJustice to obtain justice for their clients by, for example, heightening the standard of proof and allowing for one-sided appeals processes. Additionally, the 2017 Policy makes it more difficult for SurvJustice to obtain interim measures that are appropriate for survivors of sexual violence and to ensure ongoing access to education for its clients in accordance with the organization's mission. For example, SurvJustice often requests unilateral no-contact orders on its clients' behalf. However, schools now understand the 2017 Title IX Policy to prohibit unilateral no-contact orders and instead require *mutual* no-contact orders, which are retaliatory and infringe on a survivor's ability to learn in a safe environment because they prohibit the survivor from being in certain campus spaces, such as particular dormitories, dining hall, or study spaces.

15.    In addition, the 2017 Title IX Policy makes it harder for SurvJustice to accomplish speedy resolutions for its clients, given that the Policy no longer provides an objective 60-day benchmark for a prompt investigation. Indeed, SurvJustice has observed a trend in educational institutions not responding at all, or not responding in a prompt manner, to its clients' complaints. SurvJustice currently has at least three cases where the client's Title IX complaint has been pending for 200-500 days—which is significantly longer than the average case under the prior guidance. And it harms students, who sometimes drop out, or consider dropping out of, school in order to avoid having to take classes with the alleged perpetrator, or who may actually graduate before the Title IX grievance process is completed. This trend has required SurvJustice to spend additional staff time and resources attempting to get school officials to respond to a survivor's complaint of sexual violence.

16.     Following and as a direct result of the 2017 Title IX Policy, SurvJustice has also spent resources to counteract the confusion caused by that Policy—such as the conflicting statements in the 2017 Policy on off-campus conduct or the conflicting positions on the appropriateness of mediation taken in the 2017 Policy's and still-effective 2001 Guidance. SurvJustice has spent significant staff resources reviewing and understanding the 2017 Title IX Policy in order to better advise its clients in ongoing campus investigations and advocate on their behalf. Staff have reviewed the policies at every school with which it interacts on behalf of clients to determine whether and how the school is changing procedures in light of the 2017 Title IX Policy. They have also spent more time working with schools' Title IX offices at educational institutions to help them understand the anti-survivor stances contained in the 2017 Policy. In addition, SurvJustice has provided an increased number of trainings on students' rights at college and university campuses in response to the confusion that the 2017 Title IX Policy created among students about their legal rights. SurvJustice has also significantly reduced its fees for providing these trainings or agreed to provide them *pro bono* in response to the increased need resulting from the widespread uncertainty among students regarding what their legal rights are under the 2017 Title IX Policy. In the last year alone, SurvJustice has delivered at least three trainings free-of-charge.

17.     The confusion created by the 2017 Title IX Policy also has a financial impact on SurvJustice. Intake processes for many clients are taking far longer than before, up to double the time, because SurvJustice staff have to spend more time counseling clients on their rights under Title IX and how the 2017 Policy effects a survivor's access to justice. Because SurvJustice does not charge an hourly rate during the intake process, this can make the intake much more expensive. One recent intake, for instance, produced $6,000 in uncharged fees. SurvJustice has

1   also increased the number of pro bono cases it takes on to respond to the confusion created by

2   the 2017 Policy.

3          18.     In addition, SurvJustice has also had to engage in regulatory advocacy as a result

4   of the 2017 Title IX Policy. The U.S. Department of Education published a Notice of Proposed

5   Rulemaking ("NPRM"), wherein it proposed (among other things) codifying the provisions

6   contained in the 2017 Title IX Policy. *See* NPRM, *Nondiscrimination on the Basis of Sex in*

7   *Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462

8   (Nov. 29, 2018). In response, SurvJustice submitted a lengthy comment explaining how the

9   policies in the 2017 Title IX Policy had negatively impacted survivors of sexual violence to date

10  and would continue to do so, as well as why these policies should not be codified in regulation.

11  *See* Ex. B-1.

12         19.     SurvJustice has already expended significant resources to conduct the additional

13  work outlined above to counteract the harm from the 2017 Title IX Policy. To date, and

14  collectively, SurvJustice has already expended approximately 460 hours in additional staff time

15  because of the 2017 Policy, at an estimated cost of $55,200 to the organization. In addition,

16  SurvJustice has had to spend approximately an additional 75 hours in staff time, at an estimated

17  cost of $9,000 to undertake new fundraising efforts to attempt to support the above activities.

18  SurvJustice anticipates that over the next year it will have to devote 300 hours of staff time, at an

19  estimated cost of $36,000 to perform this additional work. The time and resources spent by

20  SurvJustice as a direct result of the 2017 Title IX Policy have impaired our ability to engage in

21  multiple other mission-critical activities, including the amount of time that SurvJustice has

22  available to provide other legal services, including working on ongoing civil litigation.

23         20.     I declare under penalty of perjury that the foregoing is true and correct.

24

25

Declaration of Katherine McGerald Case No.: 3:18-cv-00535-JSC        Page: 8

1

Executed on July 24, 2019.

2

3

Katherine McGerald

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B-1

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

January 30, 2019

Submitted via www.regulations.gov
Kenneth L. Marcus
Assistant Secretary for Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

> **RE: ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Mr. Marcus:

We are writing on behalf of SurvJustice, Inc. in response to the U.S. Department of Education ("Department")'s Notice of Proposed Rulemaking ("NPRM" or "proposed regulations") to express our strong opposition to the Department's proposal to amend regulations implementing Title IX of the Education Amendment Act of 1972 ("Title IX"), as published in the Federal Register on November 29, 2018.

## INTRODUCTION

The Department's proposed Title IX regulations, along with its previous rescission of the 2011 and 2014 guidance documents issued under the Obama administration, make schools unsafe for students. The proposed regulations are dangerous for students and schools alike in that, if implemented, perpetrators of sexual harassment (which includes sexual violence and is how our comment will refer to the umbrella term that includes various types of sexual misconduct) would have the means to inflict widespread harm, avoid accountability, and impose liability for causing such harm onto their schools. The effects of changing applicable Title IX standards by narrowing the definition of sexual harassment, limiting the scope of school responsibility for investigating reports of sexual violence, and reducing the number of school officials who are capable of initiating a Title IX investigation (among other things) will be far-reaching. These proposed regulations will discourage students across the country who experience sexual violence from reporting it to their schools. Even in the case of those students who attempt to report despite the odds being stacked against them, many will find that there is no assistance or remedy available to them, thereby forcing them to choose between continuing their education in a hostile environment, attempting to transfer, or dropping out. Furthermore, the proposed regulations, if implemented, will reinforce the normalization of sexual violence on college campuses and secondary schools alike.

These proposed regulations would fundamentally alter Title IX and undermine its entire purpose. If this administration insists on making such significant changes, the process should at least include the input of survivors, advocates, legal professionals, mental health care providers, and many others who engage in this work on a regular basis. Any new Title IX regulations

1

SurvJustice Inc
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

should be centered on creating and maintaining pathways to justice and ensuring access to an equitable and safe education for all survivors—especially those who are most likely to experience sexual violence, which includes students of color, LGBTQIA students, and students with disabilities. However, in their current form, the proposed regulations lack such insight and thus should not be codified because it is clear that the purpose of the NPRM is to serve the interests of accused students and institutions only, as opposed to promoting and protecting civil rights in the education context.

### *SurvJustice's work as it relates to campus sexual assault*

Founded in 2014, SurvJustice is a national nonprofit dedicated to assisting survivors of sexual violence in seeking justice. SurvJustice provides legal assistance, policy advocacy, and institutional trainings across the United States. We prioritize the needs of survivors in all of our work. As a survivor-founded and led organization, we understand that the trauma which results from sexual violence often leaves survivors feeling alone and unsure of what to do next. SurvJustice exists to help survivors learn about their rights and options in order to pursue their own personal means of justice with an attorney by their side every step of the way. Our goal is always to ensure that survivors have all the information they need to make informed decisions about their own cases, thereby helping to restore the sense of control that sexual violence takes away. We are also committed to taking an intersectional and sensitive approach to working with survivors—we know that anyone can experience sexual violence and that it harms people in different ways. By providing high-quality legal services to survivors, we seek to hold perpetrators and enablers of sexual violence accountable.

SurvJustice is the only organization that provides legal assistance in campus proceedings across the nation. Upon accepting a case, we provide assistance remotely from our office in D.C. and travel as needed. We offer discounted services and various payment options to ensure affordability for students, which sets us apart from law firms. The majority of the requests for legal assistance that we receive come from students at institutions of higher education. SurvJustice staff members help sexual violence survivors navigate the campus grievance process, such as by assisting them with reporting the violence and going through any investigation, advising them in campus hearings, coordinating on any appeals or appeal responses, and ensuring access to accommodations and other services. Our staff members frequently serve as "advisors of choice" for college students in institutional disciplinary actions for cases involving allegations of sexual assault, domestic violence, dating violence, stalking, and/or retaliation, as provided for by the Clery Act through amendments from the 2013 Violence Against Women Reauthorization Act, 20 U.S.C. § 1092(f)(8)(B)(iv)(II) ("Clery Act"). Our organization also represents survivors in civil litigation or refers survivors to other qualified lawyers for such representation. Finally, SurvJustice often assists survivors in reporting crimes to law enforcement, advocates for police investigation and prosecution of perpetrators, and serves as media representatives for survivors and their families in high-profile criminal cases.

Our commitment to assisting survivors of sexual violence and protecting the right to an education free of discrimination makes SurvJustice well-poised to comment on the proposed regulations. We have a wealth of firsthand experience with this issue as we directly represent

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

survivors every single day. Based on this experience, we vehemently oppose the Department's proposed Title IX regulations.

SurvJustice's comment is offered by Executive Director Katherine W. McGerald[1] and Senior Staff Attorney Carly Mee,[2] both of whom are experienced attorneys in cases involving sexual and intimate partner violence, with invaluable assistance from SurvJustice's legal and policy interns, who are students themselves: Laura Alexander (George Washington University graduate student), Grace Quintana (University of Minnesota law student), Grace Perret (Georgetown University undergraduate student), Nikki Wolfrey (University of Virginia law student), Maria Baez de Hicks (University of Arkansas law student), and Sarah Jurinsky (George Washington University undergraduate student).

### *The Department's proposed regulations vitiates its stated mission and the purpose of Title IX.*

Department officials have repeatedly criticized the protections that Title IX affords to women and other survivors of sexual harassment, including sexual violence. These officials have based much of their criticism on discriminatory stereotypes and unfounded generalizations about female students in general and female victims of sexual violence in particular—despite the fact that Title IX protects *all* victims of discriminatory conduct on the basis of sex. In speaking about the issue of sexual harassment in the education context, and in developing these proposed regulations, Department officials have relied on the longstanding and inaccurate stereotype that women and girls tend to lie about or misunderstand their own experiences of sexual violence and harassment[3]. This practice of relying on such unfounded stereotypes is not limited to Department officials: many others who interact with victims do the same. For example, a recent study published in the Psychology of Violence determined that police routinely rely on rape myths, such as that the victim was lying or had given consent, in judging whether a case should be referred to a prosecutor.[4] However, Department officials have a responsibility to break this harmful pattern and avoid relying on unsupported myths in enforcing Title IX.

---

[1] Katherine McGerald has provided legal representation to hundreds of clients and survivors for with a focus on providing holistic legal services to survivors of sexual assault, domestic violence, intimate partner violence, harassment based on gender or gender identity, and stalking. Her areas of expertise include intimate partner violence litigation, sexual assault litigation, family court proceedings, and trial advocacy. She has served as a faculty member for basic lawyering skills training through the Sargent Shriver National Center on Poverty Law, as a presenter at the NYS Bar Association Legal Assistance Partnership Conference, and as a presenter in many Continuing Legal Education classes on trial strategy and technique, stalking and technology, how to admit evidence at trial, family offenses, domestic violence and proving your case, and trial preparation.

[2] Carly Mee is a Virginia-barred attorney who provides direct assistance to survivors in campus, civil, and criminal systems to college and high school students. She assisted with achieving federal court recognition of a new form of privilege that applies between victims and advocates, which was a historic win. She has conducted numerous trainings on Title IX, the Clery Act, and FERPA for attorneys, law enforcement, school officials, and students. Her writing has been featured in *The Washington Post* and she has provided legal commentary in CNN, the Independent, Buzzfeed, NPR, and various other media outlets. She also serves as a liaison to the American Bar Association Commission on Domestic & Sexual Violence.

[3] *See, e.g.*, Benjamin Wermund, *DeVos' Donations Spark Questions About Her Stance On Sexual Assault*, Politico (Jan. 9, 2017), https://www.politico.com/story/2017/01/betsy-devos-education-sexual-assault-233376; Erica L. Green & Sheryl Gay Stolberg, *Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times (July 13, 2017) (emphasis added), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html (citing Jackson's statement that "[i]n most investigations . . . there's 'not even an accusation that these accused students overrode the will of a young woman. Rather, the accusations — 90 percent of them — fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because *she* just decided that our last sleeping together was not quite right.'").

[4] Romeo Vitelli, *Rape Myths and the Search for True Justice*, Psychology Today (Oct. 26, 2017), https://www.psychologytoday.com/us/blog/media-spotlight/201710/rape-myths-and-the-search-true-justice. *See also* Academic

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

Officials within this administration have repeatedly criticized core civil rights achievements, such as legal protections against sexual harassment.[5]  In contrast to the Department's proactive solicitation of views from those representing the interests of students accused of sexual harassment or assault, Secretary DeVos agreed to meet with organizations representing the interests of sexual harassment and assault survivors only after repeated, collective requests from those organizations. Such meetings were rare and limited in time, as SurvJustice itself experienced. Moreover, it is clear from the proposed rules that the Department ignored the credible perspectives of SurvJustice and organizations like us. Instead, it relied on the views of individuals arguing that women tend to lie about sexual harassment and assault, even though such individuals spoke primarily about personal, unverified anecdotes without any reliable data to support their position.

Given that the Department has proposed regulations that contradict its stated mission and its responsibility to enforce Title IX, SurvJustice unequivocally opposes the Department's proposed regulations. For the reasons discussed at length in this comment, SurvJustice requests that the Department immediately revoke these misguided proposed regulations and engage in a process that involves meaningful consideration of all parties' perspectives and experiences, including survivors of sexual harassment/assault. If the proposed regulations are implemented, the Department will give colleges and universities free license to shirk their responsibility to provide safe and equitable access to education for all students. Finally, since the Department seeks to fundamentally alter campus disciplinary processes *only with regard to sexual harassment complaints* (but not any other potentially criminal and prosecutable offenses), it must explain and justify why it seeks to create a special standard for only this type of misconduct.

## THE NPRM SHOULD NOT BE CODIFIED

### I.  The proposed regulations fail to properly address the realities of sexual harassment in the education context.

The proposed regulations ignore the devastating impact of sexual violence in schools. Instead of effectuating Title IX's purpose by keeping students safe from sexual violence and other forms of sexual harassment—that is, from unlawful sex discrimination—the proposed regulations make it harder for students to report abuse. They also allow (and in some cases even *require*) schools to

---

PRESS, ENCYCLOPEDIA OF MENTAL Health 3 (Howard S. Friedman, ed., 2nd ed. 2015) ("Common rape myths may include: women often lie about rape, a victim's clothing can precipitate a sexual assault, rape is the fault of the victim if she was intoxicated, and when a male pays for a date, the woman is expected to reciprocate with sexual intercourse."); ROUTLEDGE, CRITICAL ISSUES ON VIOLENCE AGAINST WOMEN: INTERNATIONAL PERSPECTIVES AND PROMISING STRATEGIES 96 (Holly Johnson et al. eds., 1st ed. 2014) ("Allegations that women lie about sexual assault are not new. . . . Despite social advancements in the past several decades regarding rape awareness, negative attitudes and belief in 'rape myths' are still pervasive.").

[5] In a book published in 2005, Ms. Jackson stated that laws to combat sexual harassment gloss over "the reality that unwanted sexual advances are difficult to define." CANDICE JACKSON, THEIR LIVES: THE WOMEN TARGETED BY THE CLINTON MACHINE 138 (2005). Ms. Jackson regularly questions the veracity of sexual harassment and assault claims made by women, stating, for example: "[I]t wasn't enough that women are not legally forbidden anymore from getting an education and entering the workforce. Feminists and other leftists thought the problem of workplace sexual harassment needed a legal remedy. Since sexual harassment is such a nebulous experience, defined so subjectively and turning on the perceptions of the people involved, laws banning it are difficult to articulate. But they have tried anyway, with the side result that many men self-censor themselves to avoid being accused of sexual harassment, and institutions remove valid expressions of art and learning to avoid "even the appearance of sexual harassment." *Id.*

SurvJustice Inc

1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

ignore reports and unfairly tilt the investigation process in favor of accused students, to the direct detriment of survivors, under the false guise of "due process." SurvJustice fully supports the constitutional right to due process because it is a fundamental protection of liberty in our society. Furthermore, SurvJustice has every interest in ensuring that accused students receive due process in campus disciplinary proceedings because we do not want our clients to have to suffer through a second process if procedural violations occur and the outcome is subsequently overturned. However, the proposed regulations severely miss the mark on what actually constitutes due process, and instead the Department has gone far beyond what is due in order to give special rights to accused students.

    a. **Sexual harassment is far too common in our schools, and the proposed regulations would significantly worsen this problem.**

Far too many students experience sexual harassment. Consider the following statistics:

- In grades 7–12, 56% of girls and 40% of boys are sexually harassed in any given school year.[6] More than 1 in 5 girls ages 14–18 are kissed or touched without their consent.[7]
- During college, 62% of women and 61% of men experience sexual harassment.[8] More than 1 in 5 women and nearly 1 in 18 men are sexually assaulted in college.[9]
- Men and boys are far more likely to be victims of sexual assault themselves than to be falsely accused of committing such acts.[10]

Historically marginalized and underrepresented groups are more likely to experience sexual harassment than their peers:

- 56% of girls ages 14–18 who are pregnant or parenting are kissed or touched without their consent.[11]
- More than half of LGBTQIA students ages 13–21 are sexually harassed at school.[12]

---

[6] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW (2011) [hereinafter *Crossing the Line*], https://www.aauw.org/research/crossing-the-line.

[7] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017) [hereinafter *Let Her Learn: Sexual Harassment and Violence*], https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[8] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW 17, 19 (2005) [hereinafter *Drawing the Line*], https://history.aauw.org/aauw-research/2006-drawing-the-line (noting differences in the types of sexual harassment and reactions to it).

[9] *E.g.*, David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, ASSOCIATION OF AMERICAN UNIVERSITIES 13-14 (Sept. 2015) [hereinafter *AAU Campus Climate Survey*], https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[10] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[11] National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017) [hereinafter *Let Her Learn: Pregnant or Parenting Students*], https://nwlc.org/resources/ stopping-school-pushout-for-girls-who-are-pregnant-or-parenting.

[12] Joseph G. Kosciw et al., *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN 26 (2018) [hereinafter *2017 National School Climate Survey*], https://www.glsen.org/article/2017-national-school-climate-survey-1.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

- Nearly 1 in 4 transgender and gender-nonconforming students are sexually assaulted during college.[13]
- Students with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[14]

Sexual harassment occurs both on-campus and in off-campus spaces closely associated with school:
- Nearly 9 in 10 college students live off campus.[15]
- 41% of college sexual assaults involve off-campus parties.[16] Students are far more likely to experience sexual assault if they are in a sorority (nearly 1.5 times more likely) or fraternity (nearly 3 times more likely).[17]
- Only 8% of all sexual assaults occur on school property.[18]

**b. Incidents of sexual harassment and sexual violence are already underreported due to the poor treatment that survivors face in seeking justice.**

It is already extremely difficult for victims to report sexual harassment and violence as doing so takes a significant toll on them. Survivors who do report face disbelief, shaming, guilt, and many other inappropriate reactions from officials within the various justice systems and even from their own loved ones. They also fear retaliation by perpetrators and their associates. The proposed regulations would worsen this problem by further discouraging students from coming forward. Already, only 12% of college survivors[19] and 2% of girls ages 14-18[20] report sexual assault to their schools or the police. Survivors do not report for a number of reasons, including fear of reprisal. Often, they have also been made to believe that their abuse was not important enough or that no one would do anything to help—rightfully so, given the low prosecution rate of perpetrators who commit sexual violence and the even lower rate of meaningful consequences even for perpetrators who are charged and convicted.[21] Some students—especially students of color, undocumented students,[22] LGBTQIA students,[23] and students with disabilities—are even

---

[13] *AAU Campus Climate Survey*, *supra* note 9 at 13-14.

[14] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017) [hereinafter *Let Her Learn: Girls with Disabilities*], https://nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities.

[15] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, NEW YORK TIMES (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (87%).

[16] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, https://www.ue.org/sexual_assault_claims_study.

[17] Jennifer J. Freyd, *The UO Sexual Violence and Institutional Betrayal Surveys: 2014, 2015, and 2015-2016* (Oct. 16, 2014), https://www.uwire.com/2014/10/16/sexual-assault-more-prevalent-in-fraternities-and-sororities-study-finds (finding that 48.1% of females and 23.6% of males in Fraternity and Sorority Life have experienced non-consensual sexual contact, compared with 33.1% of females and 7.9% of males not in FSL).

[18] RAINN, *Scope of the Problem: Statistics*, https://www.rainn.org/statistics/scope-problem.

[19] *Poll: One in 5 women say they have been sexually assaulted in college*, WASHINGTON POST (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll.

[20] *Let Her Learn: Sexual Harassment and Violence*, *supra* note 7 at 1.

[21] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[22] *See, e.g.*, Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. TIMES (April 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[23] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], *available at* https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

less likely than their peers to report sexual violence to the police as they face an increased risk of being subjected to police violence and/or deportation. In addition, survivors of color are often silenced as they face pressure to not go to the police because doing so could be seen as contributing to the criminalization of men and boys of color. For all of these reasons, schools are often the only avenue for relief for survivors. Furthermore, even for those who may report to the police, the criminal justice system does not afford them protections that enable them to continue pursuing an education. Comparatively, schools have the ability to provide meaningful accommodations (such as excused absences and extensions on assignments, free counseling, dormitory reassignments, and No Contact Orders) that may be necessary to remain in school.

When schools fail to provide effective responses to reports of sexual harassment, the impact of these incidents can be that much more devastating.[24] Far too many survivors are effectively forced out of school because they do not feel safe on campus, with 34% of college survivors dropping out. Many schools have even expelled survivors when their grades suffer as a result of trauma.[25]

## II.     The proposed regulations would hinder Title IX enforcement, discourage reports of sexual harassment, and allow schools to avoid accountability instead of protecting students who experience sex discrimination.

For the better part of two decades, the Department has used one consistent standard to determine if a school violated Title IX by failing to adequately address sexual harassment. The Department's 2001 Guidance, which went through public notice-and-comment procedures and has been enforced by both Democratic and Republican administrations,[26] defines sexual harassment as "unwelcome conduct of a sexual nature."[27] The 2001 Guidance requires schools to address student-on-student harassment if *any employee* "knew, or in the exercise of reasonable care should have known" about the harassment. In the context of employee-on-student harassment, the 2001 Guidance requires schools to address harassment "whether or not the [school] has 'notice' of the harassment."[28] Schools that do not "take immediate and effective

---

[24] *See, e.g.*, Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[25] *See, e.g.*, Alexandra Brodsky, *How much does sexual assault cost college students every year?*, WASHINGTON POST (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-students-every-year. *See also* Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), *available at* https://doi.org/10.1177/1521025115584750.

[26] These standards have been reaffirmed time and time again: in 2006 by the Bush Administration, in 2010, 2011, and 2014 in guidance documents issued by the Obama Administration, and even in the 2017 guidance document issued by the current Administration. U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment* (Jan. 25, 2006) [hereinafter 2006 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; *see also* U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], *available at* https://ww2ed.gov/about/offices/ list/ocr/letters/colleague-201104.pdf; *see also* U.S. Dep't of Educ. Office of Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, &16 (Apr. 4, 2011) [hereinafter 2011 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; *see also* U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ; *see also* U.S. Dep't of Educ. *Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct* (Sept. 2017) [hereinafter 2017 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[27] U.S. Department of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

[28] *Id.*

SURVJUSTICE INC.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

corrective action" are in violation of Title IX. These standards have appropriately guided OCR's enforcement activities, effectuating Title IX's nondiscrimination mandate by requiring schools to promptly and effectively respond to instances of sexual harassment, and in turn fulfilling OCR's purpose of enforcing students' civil rights.

This standard appropriately differs from the higher bar erected by the U.S. Supreme Court in the very specific and narrow context of a civil Title IX lawsuit seeking monetary damages against a school due to its response (or lack thereof) upon receiving actual notice of sexual harassment. To recover monetary damages, a plaintiff must show that the defendant school was deliberately indifferent to known sexual harassment that was severe and pervasive and that deprived a student of access to educational opportunities and benefits.[29] However, in establishing that standard, the Court recognized that it was appropriately limited to civil lawsuits seeking monetary damages and would not apply in the context of administrative enforcement. The Court specifically noted that this standard did not affect agency action; rather, the Department was still permitted to administratively enforce rules addressing a broader range of conduct to fulfill Congress's direction to effectuate Title IX's nondiscrimination mandate.[30] The Court drew a distinction between "defin[ing] the scope of behavior that Title IX proscribes" and identifying the narrower circumstances in which a school's failure to respond to harassment supports a civil claim for monetary damages.[31] The 2001 Guidance also directly addressed this precedent, concluding that it was inappropriate for the Department to limit its enforcement activities by applying the more stringent standard and stating that the Department would continue to enforce the broader protections provided under Title IX. Indeed, in the current proposed regulations, the Department itself acknowledges that it is "not required to adopt the liability standards applied by the Supreme Court in private suits for money damages."[32] As set out in further detail below, the Supreme Court's notice requirement, harassment definition, and deliberate-indifference standard are all designed to account for the unique circumstances involved when determining monetary liability in a civil case proceeding under Title IX's private right of action. These holdings have no place in the vastly different context of administrative enforcement with its iterative process and focus on voluntary corrective action by schools. By choosing to import these civil liability standards, the Department confuses its enforcement mechanisms with court processes that have no place in administrative proceedings, which would certainly have devastating effects on students who remain without recourse.

### a. The Department's proposed regulations use inconsistent standards for students and employees regarding what constitutes notice, deliberate indifference, and sexual harassment.

Under Title VII, a federal law that addresses workplace harassment, a school is potentially liable for harassment of an employee if the harassment is "sufficiently severe *or* pervasive to *alter* the conditions of the victim's employment (emphasis added).[33] When an

---

[29] *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998) (detailing standard for employee-on-student harassment); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (detailing standard for student-on-student harassment).

[30] *Gebser*, 524 U.S. at 291-92 (citing 20 U.S.C. § 1682).

[31] *Davis*, 526 U.S. at 639.

[32] 83 Fed. Reg. 61468, 61469.

[33] https://www.eeoc.gov/laws/statutes/titlevii.cfm Did you mean to cite Title VII here as the statute instead of the link to the website with it? Not sure.

8

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

employee is harassed by a coworker or other third party, the school is liable if it: (1) "knew or should have known of the misconduct," and (2) failed to take immediate and appropriate corrective action.[34] If a supervisor harasses an employee, the school is automatically liable if such harassment resulted in a tangible employment action (such as firing or demotion) unless it can prove that the employee unreasonably failed to take advantage of opportunities offered by the school to address the harassment. [35] However, under the Department's proposed regulations, a school would only be liable for harassment against a student if (1) it is deliberately indifferent to sexual harassment that is so severe, pervasive, *and* objectively offensive that it *denied* the student access to the school's program or activity; (2) the harassment occurred within the school's program or activity; and (3) a school employee with "the authority to institute corrective measures" had "actual knowledge" of the harassment. In other words, schools would be held to a far more lenient standard when addressing the harassment of students under its care—including minors—than when addressing the harassment of its adult employees.

Moreover, in contrast to Title VII, which recognizes employer responsibility for harassment enabled by supervisory authority, and in contrast to the 2001 Guidance, the proposed regulations fail to recognize any meaningful obligation by schools to address harassment of students by school employees who are exercising authority over students. The 2001 Guidance imposed administrative responsibility when an employee "is acting (or . . . reasonably appears to be acting) in the context of carrying out these responsibilities over students" and engages in sexual harassment.[36] By jettisoning this standard, the Department would free schools from accountability in many instances, even when their employees use the authority they exercise as school employees to harass students. For example, under the proposed regulations, schools may not have to hold serial abusers such as Larry Nassar (who assaulted hundreds of students in his role as a school doctor at Michigan State University) responsible if survivors are too uncomfortable or afraid to report to the school official who meets this narrow definition.

This drastic difference between Title VII and the proposed Title IX regulations would mean that, in many instances, schools are actually *prohibited* from taking the same steps to protect students that they are *required* to take to protect employees in the workplace, as set out further below. Even in instances in which schools may not be prohibited from taking action, the proposed regulations would still apply a more demanding standard to students in schools (many of whom are children) than for adults in the workplace when they seek assistance regarding sexual harassment and violence.

---

[34] *Meritor Savings Bank v. Vinson*, 477 US 57, 476-477 (1986) (internal quotations and brackets omitted); Equal Employment Opportunity Commission, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999) [*hereinafter* EEOC Guidance], *available at* https://www.eeoc.gov/policy/docs/harassment.html ((an employer is automatically liable for harassment by "a supervisor with immediate (or successively higher) authority over the employee").

[35] *Meritor*, 477 U.S. at 477 (citing *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257, 2270 (1998); *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2293 (1998)).

[36] 2001 Guidance, *supra* note 25. ("[I]f an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct.").

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

**b. The Department's proposed notice requirement undermines Title IX's discrimination protections by making it harder for individuals to report sexual harassment and violence.**

Under the proposed regulations, schools would be responsible for addressing sexual harassment only when one of a small subset of school employees actually knew about the harassment. Specifically, schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator, (ii) a K-12 teacher (but only for student-on-student harassment, *not* employee-on-student harassment); or (iii) an official who has "the authority to institute corrective measures."[37] This is a drastic change: The Department has long required schools to address student-on-student sexual harassment if almost *any* school employee[38] either knew about it or should reasonably have known about it.[39] This well-established standard, which encompasses more employees, takes into account the reality that many students disclose incidents of sexual harassment to employees who do not have the authority to institute corrective measures but can speak to a higher-up official who does. Students seeking help first turn to adults whom they trust and feel comfortable around, which is typically not a higher-up official with whom they have never interacted; instead, it would be someone such as a teacher, a resident advisor, an athletic coach, or someone else with whom they interact on a regular basis. Moreover, most students do not know which employees have the authority to address the harassment and would not even know whom to seek out. The longstanding "should have known" standard ensured that employees would be held accountable for purposely turning their backs on students who seek to report sexual harassment, as several employees did at Michigan State University when they failed to take any action after students disclosed Larry Nassar's abuse to them

The 2001 Guidance also properly requires schools to address all employee-on-student sexual harassment "whether or not the [school] has 'notice' of the harassment."[40] This requirement was an explicit acknowledgment of the particular harm suffered by students when adult employees prey upon them and the pressure that adult employees can exert over students to ensure their silence. This heightened responsibility for instances of harassment by their own employees also served to recognize that schools have control over their own employees.

By contrast, under the proposed regulations, if a K-12 student were to report to a trusted non-teacher school employee—such as a guidance counselor or teacher's aide—that she or he had been sexually assaulted, the school would have no obligation to respond and assist.[41] If a K-12 student reported to a teacher that she or he had been sexually assaulted by a school employee, the school would have no obligation to respond and assist.[42] Perversely, then, the proposed regulations provide a more limited duty for K-12 schools to respond to a student's report of

---

[37] Proposed rule § 106.30.

[38] This duty applies to "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." 2001 Guidance, *supra* note 27 at 13.

[39] *Id.* at 14.

[40] *Id.* at 10.

[41] *See* proposed rule § 106.30 (83 Fed. Reg. 61496) (for K-12, limiting notice to "a teacher in the elementary and secondary context with regard to student-on-student harassment).

[42] *See id.*

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

sexual harassment when the perpetrator is a school employee than when the perpetrator is a student. Similarly, if a college student told their professor or RA that a fellow student, a faculty member, or a school employee had raped them, the school would have no obligation to respond and assist. As detailed above, a multitude of factors combine to make it notoriously difficult for survivors to report sexual violence. Sections 106.44(a) and 106.30 would further discourage reporting. Further, even if a student were to find the courage to report to a trusted school employee, the school would frequently have no obligation to respond and assist. If the proposed regulations had been in effect a few years ago, colleges such as Michigan State and Penn State would not have been required to stop Larry Nassar and Jerry Sandusky, enabling them to abuse even more students—just because the students who bravely came forward reported the sexual abuse to athletic trainers and coaches, who lack the "authority to institute corrective measures." These proposed provisions would absolve some of the worst Title IX offenders of responsibility. There should be no "wrong" employee to approach to report sexual violence, and students should not have to go from person to person just to get their school to intervene. All school employees should be committed to ensuring student safety. In fact, school officials themselves object to this new limitation, with the AASA stating that it is "opposed to any scenario in which the district could somehow disregard the information a child presents to those without the authority to institute corrective action simply because of their technical status within the regulation. It also underestimates the care we entrust all our employees to put towards students' safety."[43]

The following real-life examples demonstrate how these proposed regulations could harm students if implemented:

1. In April 2017, a high school student in Alachua, Florida was assaulted by another student off-campus, which **she reported to the high school guidance counselor (a non-teacher school employee) the next day**. The student's mother sued the school for failing to investigate the case and hold the perpetrator for his actions through disciplinary action. The perpetrator had allegedly assaulted two other students and school staff members allegedly knew about both incidents at the time of the survivor's report. If the proposed regulations are implemented, survivors such as the student in this case will have no method to hold K-12 schools accountable for failing to protect them and for effectively forcing them to continue attending classes with perpetrators of assault.[44]

2. In September 2018, a non-verbal high school student with autism was assaulted and sexually abused by a teacher's aide in Rutherford, Tennessee. **A custodian witnessed the abuse firsthand** and reported the assault to the school principal. The student's parents are suing the school for failing to protect the student, failing to hold the aide accountable, and for failing to conduct thorough background checks. The school would have not been liable under the proposed regulations had the custodian not reported what they had seen.[45] This example also demonstrates how the proposed regulations make students with

---

[43] AASA letter at 2.

[44] CBS4 Gainesville, "Mother of Santa Fe High student says police, school officials didn't report sexual assault," *CBS4 News Gainesville*, Aug. 31, 2018, https://mycbs4.com/news/local/mother-of-santa-fe-high-student-says-police-school-officials-didnt-report-sexual-assault.

[45] Brinley Hineman, "Family of special needs student sues Rutherford County school board over sexual assault," *Murfreesboro Daily News Journal*, Jan. 23, 2019, https://www.dnj.com/story/news/2019/01/23/rutherford-county-schools-lawsuit-autism-sexual-abuse/2643521002/.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

disabilities particularly vulnerable; not only are students with disabilities more vulnerable to sexual abuse than their peers, they are also less likely to have access to the "correct" responsible employees (as defined through the proposed regulations) and are less likely to report experiences of abuse.[46]

3. In 2017, a first-year student at the University of North Texas **told her resident assistant** that she had been raped by three members of the basketball team. Two of the alleged perpetrators later called the student and suggested she join their "escort service," a call to which the RA listened as well. The University of North Texas allegedly pressured the student not to report to local police, preferring to investigate the allegations through University processes. The student alleges that UNT officials refused to investigate any broader situation within the basketball team, though the perpetrators were not allowed on campus during the investigation and were eventually removed from the basketball team. None of the perpetrators faced charges of sexual assault in court. Under the proposed regulations, the school could not have been liable for reports made to an RA, even if the RA themselves had witnessed or heard direct evidence of the complainant's allegations (as in this example).

4. Seo-Young Chu alleges that she was raped and repeatedly sexually harassed by her Stanford professor and dissertation advisor, Jay Fiegelman, while she attended Stanford in the 1990s. **Chu reported the misconduct to another professor,** Herbert Lindenberger, who reported to the **Chair of the English Department**, while another graduate student reported to the **Dean's Office**. Chu alleges other professors enabled and protected Fiegelman's behavior. Stanford suspended the professor for two years, but he eventually resumed teaching. Under the proposed regulations, Stanford would not have been responsible for investigating Fiegelman, despite the fact that multiple professors knew of and attempted to report the assault.[47]

c. **The new proposed definition of harassment improperly prevents schools from providing students with a safe learning environment.**

The proposed regulations define sexual harassment as "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity"[48] and mandate dismissal of complaints that do not meet this burdensome standard. Under this definition, even if a student reports sexual harassment to the "right person," the school would still be *required* to ignore the student's complaint if the harassment has not yet advanced to a certain level of severity. A school would have to dismiss such a complaint even if it involved harassment of a minor student by a teacher or other school employee, despite having an interest in investigating and terminating that employee to prevent further abuse. In this way, the Department's proposed definition fails to

---

[46] David Cantor, Bonnie Fisher, et al., "Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct," *American Association of Universities*, Oct. 20, 2017, https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

[47] Vanessa Rancaño, "Former Grad Students: Our Professors Raped Us," *KQED*, Dec. 7, 2017, https://www.kqed.org/news/11633019/years-later-women-find-their-voice-to-speak-out-against-sexual-misconduct-by-professors.

[48] Proposed rule § 106.30.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

align with Title IX's purpose and precedent. It also discourages reporting and excludes many forms of sexual harassment that still interfere with access to educational opportunities.

Moreover, the Department fails to provide a persuasive justification for changing the definition of sexual harassment from the 2001 Guidance, which defines sexual harassment as "unwelcome conduct of a sexual nature."[49] This broader definition rightly requires schools to respond to harassment before it escalates to a point that students suffer even further or more severe harm. Instead of intervening early on, schools would have to wait until harassment escalates even further, thereby severely jeopardizing students' safety and even putting their lives at risk. For example, a student who reports verbal sexual harassment could be turned away without any institutional intervention, at which point the abuse could quickly escalate to sexual assault. Students would be forced to endure repeated and escalating levels of abuse, whether from a peer or a school employee, before their schools would be required to investigate and intervene. This poses a risk that more students will be raped or even killed by perpetrators who are not stopped earlier on but instead feel empowered to escalate their abuse as a result of the lack of school intervention. Furthermore, if a school turns away a student who reports sexual harassment, that student is extremely unlikely to then report a second time when the harassment escalates.

The Department repeatedly attempts to justify its proposed definition by citing "academic freedom and free speech."[50] However, harassment is not protected speech if it creates a "hostile environment,"[51] i.e., if the harassment limits a student's ability to participate in or benefit from a school program or activity.[52] Furthermore, schools have the authority to regulate harassing speech: the U.S. Supreme Court held in *Tinker v. Des Moines* that school officials can regulate student speech if they reasonably forecast "substantial disruption of or material interference with school activities" or if the speech involves "invasion of the rights of others."[53] There is thus no conflict between the First Amendment and Title IX's regulation of sexually harassing speech.

The following examples demonstrate how the proposed definition of sexual harassment could harm students if implemented:

1. If the proposed regulations were implemented, schools may be able to dismiss cases in which sexual harassment takes place online as "insufficiently severe." The proposed definition disregards the considerable psychological trauma inflicted through online harassment and could absolve schools from responsibility for not stepping in earlier, especially if online harassment transitions into physical harassment and/or violence. Courts have held that online harassment constitutes sufficient basis for schools to act against harassers, as in *Feminists Majority Foundation v. University of Mary Washington*,

---

[49] 2001 Guidance, *supra* note 25.

[50] 83 Fed. Reg. 61464, 61484. *See also* § 106.6(d)(1), which states that nothing in Title IX requires a school to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution."

[51] *See* Joanna L. Grossman & Deborah L. Brake, *A Sharp Backward Turn: Department of Education Proposes to Protect Schools, Not Students, in Cases of Sexual Violence*, VERDICT (Nov. 29, 2018) [hereinafter *A Sharp Backward Turn*], *available at* https://verdict.justia.com/2018/11/29/a-sharp-backward-turn-department-of-education-proposes-to-protect-schools-not-students-in-cases-of-sexual-violence. ("There is no legitimate First Amendment or academic freedom protection afforded to unwelcome sexual conduct that creates a hostile educational environment.").

[52] 2001 Guidance, *supra* note 25.

[53] 393 U.S. 503, 513-514 (1969).

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

in which the majority opinion stated that "the offenders could have been disciplined or prosecuted without infringing on the First Amendment." [54]However, these new rules create a grey area in which online harassment could be subject to discipline at significantly lower rates. This would discourage survivors from reporting additional instances of harassment or assault if their initial report was dismissed as "insufficiently severe," exposing survivors to repeated and increasingly intense abuse.

2.  The proposed definition of harassment also allows schools to ignore cases which they have determined are not so "severe, pervasive, and objectively offensive" as to "effectively [deny the student] equal access to the recipient's education program or activity." In 2014, a student referred to by the pseudonym "Deena" began to receive significantly lower grades after she was assaulted, including a "D" and an "F." Her GPA dropped to a 2.0 and her concerns were dismissed by her academic dean, who allegedly told her that "Lots of students graduate with a 2.0." [55]While Deena's academic prospects were significantly impaired by her assault (and could have eventually driven her to drop out), under the proposed definition of harassment, cases like hers would not be considered grounds to hold schools liable for protecting survivors' access to education.

**_Stalking, Intimate Partner Violence, and Dating Violence under the Proposed Regulations_**

The Department's proposed definition of sexual harassment is particularly problematic when considered in the context of stalking allegations. It is unclear from the proposed regulations whether stalking complaints would have to meet the stringent "so severe, pervasive, and objectively offensive" standard to avoid being dismissed. The current standard that schools rely upon from the 2001 guidance defines sexual harassment as unwelcome conduct of a sexual nature. This definition appropriately charges schools with responding to harassment before it escalates to the point that a student suffers severe harm. Stalking presents a particularly unique risk to the health and safety of college students because there is a significant connection between stalking and intimate partner homicide.[56]

Stalking is very common on college campuses and within the college population. Persons aged 18 to 24 (which is the average age of most college students) experience the highest rates of stalking victimization.[57] Research also shows that there are even higher rates of stalking victimization among college-aged women than among the general population. The _National College Women Sexual Victimization Study_ found that over 13 percent of college women had

---

[54] Lauren Camera, _Court rules schools must investigate threats – anonymous, online, or otherwise_, U.S. News and World Report (Dec. 20, 2018), https://www.usnews.com/news/education-news/articles/2018-12-20/court-rules-schools-must-investigate-threats-anonymous-online-or-otherwise.
[55] Cari Simon, _On top of everything else, sexual assault hurts the survivors' grades_, Washington Post (Aug. 6, 2014), https://www.washingtonpost.com/posteverything/wp/2014/08/06/after-a-sexual-assault-survivors-gpas-plummet-this-is-a-bigger-problem-than-you-think/?utm_term=.f6fd59aa8475.
[56] _Judith McFarlane et al., "Stalking and Intimate Partner Femicide," Homicide Studies 3, no. 4 (1999)._
[57] Katrina Baum, Shannan Catalano, Michael Rand, and Kristina Rose, "Stalking Victimization in the United States" (Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2009).

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

experienced stalking in the academic year prior to the study.[58] It is important to note that stalking often occurs in the context of both dating violence and sexual violence. In one study, researchers found that 43 percent of victims were stalked by a current or former boyfriend, and in 10 percent of incidents, the victim reported that the stalker committed or attempted forced sexual contact.[59] Other research about sexual assault on college campuses found that the perpetrators of these assaults were premeditating, repeat offenders who employed classic stalking strategies (such as surveillance and information-gathering) to select and ensure the vulnerability of their victims.[60]

 In any new regulations, the Department should adopt the standard that harassing conduct creates a hostile environment "if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program." This definition, which comes from the Department's 2001 "Dear Colleague Letter,"[61] appropriately recognizes that schools should never permit violence and harassment to interfere with a student's education. Yet the proposed regulations improperly depart from earlier Department guidance by stating that schools do not have to investigate complaints involving "unwelcome conduct of a sexual nature" that "limit[s]" but does not "deny" a students' ability to learn. However, the Department has erred in adopting this for its proposed regulations because, as stated above, the U.S. Supreme Court limited this narrow definition of sexual harassment solely to "private suit[s] for money damages" brought by students against schools.[62] At the campus level, schools should investigate *all* allegations of sexual harassment and it is crucial that the definition of sexual harassment encompass stalking in order to ensure student safety.

 SurvJustice therefore proposes that the Department incorporate the definition of sexual harassment contained within the 2001 Guidance in any forthcoming regulations instead of the improper language currently contained in the proposed regulations. In the alternative, we propose that the Department revise prong (3) to read "Sexual assault, Dating violence, Domestic violence, and stalking where based on sex, as defined in 34 CFR 668.46(a)." This would sufficiently protect victims of stalking, intimate partner violence, and dating violence by including those types of misconduct within the definition.

The definitions from 34 CFR 668.46(a) are as follows:

**Stalking**[63]
**(i)** Engaging in a course of conduct directed at a specific person that would cause a reasonable person to -
**(A)** Fear for the person's safety or the safety of others; or
**(B)** Suffer substantial emotional distress.
**(ii)** For the purposes of this definition -

---

[58] Bonnie S. Fisher, Francis T. Cullen, and Michael G. Turner, "Sexual Victimization of College Women" (Washington, DC: U.S. Department of Justice, National Institute of Justice, 2000).
[59] *Id.*
[60] David Lisak and Paul Miller, "Repeat Rape and Multiple Offending Among Undetected Rapists," *Violence and Victims* vol. 17, no.1 (February 2002).
[61] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf
[62] *See Davis v. Monroe County Board of Education*, 526 US 629 (1999).
[63] 34 CFR 668.46(a)

SurvJustice Inc
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

**(A)** *Course of conduct* means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

**(B)** *Reasonable person* means a reasonable person under similar circumstances[64] and with similar identities to the victim. [65]

**(C)** *Substantial emotional distress* means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

## Dating Violence[66]

Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

**(i)** The existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

**(ii)** For the purposes of this definition -

**(A)** Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

**(B)** Dating violence does not include acts covered under the definition of domestic violence.

## Domestic Violence[67]

**(i)** A felony or misdemeanor crime of violence committed -

**(A)** By a current or former spouse or intimate partner of the victim;

**(B)** By a person with whom the victim shares a child in common;

**(C)** By a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner;

**(D)** By a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred, or

**(E)** By any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred.

---

[64] New York case law highlights the importance of why past experiences of the complainant are relevant to the allegations of defendant's intention to place the complainant in reasonable fear of physical injury. People v. Payton, 161 Misc. 2d 170, 175, 612 N.Y.S.2d 815, 818 (Crim. Ct. 1994). *See also* People v. Goetz 68 N.Y.2d 96 at 114, 506 N.Y.S.2d 18, 497 N.E.2d 41. In order to constitute a 'true threat' which will support a conviction for aggravated harassment, it must be shown that under the circumstances, an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury, whether or not the defendant subjectively intended the communication to convey a true threat. Put this in the context of something that seems benign- the classic example of sending flowers to the victim. Most reasonable people would view this as a thoughtful or kind gesture. But what if the abuser told the victim that he would send her flowers on the day he was going to kill her?

[65] In its first decision interpreting the statute, the Court of Appeals emphasized that the statutory requirement of intent was appropriately limited to an intent to engage in a course of conduct targeted at a specific person and did not include an additional intent to cause a specific result, such as fear. The statute thus focuses on what the offenders do, not what they mean by it or what they intend as their ultimate goal. In this manner, the law could properly reach those "delusional stalkers who believe either that their victims are in love with them or that they can win their victims' love by pursuing them.". If the Legislature had required that the stalker intend to frighten or harm the victim, the statute would be debilitated and a great many victims endangered. People v. Stuart, 100 N.Y.2d 412, 427, 765 N.Y.S.2d 1, 797 N.E.2d 28 (2003).

[66] Id.

[67] Id.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

If the proposed Title IX regulations do not include stalking within the definition of sexual harassment, student safety will be greatly at risk.[68] In addition, Title IX regulations will not satisfy the civil rights law's stated purpose of promoting and protecting civil rights in education. The exclusion of stalking would exclude dangerous behaviors—many of which we have seen committed against our clients—from Title IX's coverage. Some examples of these types of behaviors include: (1) following a student to their classes, workplace, or home; (2) repeatedly contacting a student despite frequent requests to cease communication; (3) threats of self-harm if a student does not stay in a relationship with a perpetrator or otherwise comply with their requests; (4) isolation from friends and family; and (5) endangerment of safety through behavior such as reckless driving, to name just a few. Although this conduct would likely be covered under the Clery Act (and thereby entitle victims to pursue the school disciplinary process and trigger other victim rights), simultaneous exclusion from Title IX would cause unnecessary confusion for students and staff.

> **d. Proposed rules §§ 106.30 and 106.45(b)(3) would require schools to ignore sexual harassment that occurs outside of a school activity or program, even when it results in the creation of a hostile environment on campus.**

The proposed regulations would *require* schools to ignore all complaints involving off-campus or online sexual harassment (including sexual violence) that occur outside of a school-sponsored program—even if, for example, the student is forced to see the perpetrator on campus every day and therefore creates a hostile environment on campus. To understand why it is crucial to maintain Title IX protections for off-campus activities, one need only look at the Department's own recent decision to cut off partial funding to the Chicago Public Schools for failing to address two reports of off-campus sexual assault, which the Department described as "serious and pervasive violations under Title IX."[69] In one case, a tenth grade student was forced to perform oral sex in an abandoned building by a group of 13 boys, 8 of whom she recognized from school. In the other case, another tenth-grade student was given alcohol and sexually abused by a teacher in his car. If the proposed regulations are codified, school districts would be required to dismiss similarly egregious complaints simply because of the location.

This proposal directly conflicts with Title IX's statutory language, which does not depend on where the *underlying conduct* occurred but instead prohibits discrimination that "exclude[s a person] from participation in . . . denie[s a person] the benefits of, or . . . subject[s a person] to discrimination under any education program or activity[.]"[70] For almost two decades, the Department's guidance documents have held schools responsible for addressing sexual harassment if it is "sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program,"[71] regardless of where it occurs.[72]

---

[68] *See, e.g.*,  Model Campus Stalking Policy, https://www.futureswithoutviolence.org/model-campus-stalking-policy/ (last visited Jan. 30, 2019).

[69] *See* David Jackson et al., *Federal officials withhold grant money from Chicago Public Schools, citing failure to protect students from sexual abuse*, CHICAGO TRIBUNE (Sept. 28, 2018), https://www.chicagotribune.com/news/local/breaking/ct-met-cps-civil-rights-20180925-story.html.

[70] 20 U.S.C. § 1681(a).

[71] 2001 Guidance, *supra* note 27.

[72] 2017 Guidance, *supra* note 26 at 1 n.3 ( ("Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities."); 2014 Guidance, *supra* note 26 ("a school must process all complaints of sexual violence, regardless of where the conduct occurred"); 2011 Guidance, *supra* note 26 ("Schools may have an obligation to respond

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

The Department's proposed regulations ignore the reality that sexual harassment often occurs off campus and outside of a school program or activity, yet such incidents are no less traumatic than on-campus harassment as the effects transfer back to the campus.[73] For example, there is still a severely negative impact on a student's education if s/he is forced to see the harasser regularly at school. Furthermore, a great deal of school life occurs off-campus—and in turn, a great deal of sexual harassment. Notably, almost 9 in 10 college students live off campus[74] and much of student life takes place outside of school-sponsored activities. If a professor invites a student to his house under the guise of professional mentorship and then rapes the student, the college would be required to ignore the student's complaint—even if he has to continue taking the professor's class. If a student rapes another student at an off-campus party, the college would not need to investigate—even if she sees the rapist every day in class, the dining hall, or residential hallways. Furthermore, if schools interpret the proposed regulations to prevent them from addressing harassment that occurs off-campus at fraternity and sorority houses,[75] it would be particularly problematic as students of all genders are more likely to be sexually assaulted if they belong to a fraternity or sorority.[76] The reality is that this proposal would make it so that perpetrators receive a free pass as long as they commit abuse in the right location. Repeat offenders will be able to systematically target victims, knowing they can get away with it. The majority of students who seek legal assistance from SurvJustice have experienced sexual violence at an off-campus location, such as a party at someone's house. It is rare for sexual violence to occur on campus in a dorm room. Pursuant to the proposed regulations, then, the vast majority of survivors would be left without any recourse.

The proposed regulations would also pose unique risks to students at community colleges and vocational schools. Students at these institutions do not live on campus, meaning that any harassment committed against them by faculty or other students is especially likely to occur off campus. The proposed regulations would leave these students completely unprotected.

e. **The Department's proposed incorporation of the civil deliberate indifference standard would allow schools to take virtually no action in response to complaints of sexual harassment.**

---

to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity."); 2010 Guidance, *supra* note 26 at 2 (finding Title IX violation where "conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," regardless of the location of the harassment).

[73] The Department itself admitted in the previous leaked draft of the NPRM that 41% of college sexual assaults occur off campus. *See* Letter from Anne C. Agnew to Paula Stannard et al., *HHS Review: Department of Education Regulation – Noon September 10*, U.S. Dep't of Health & Human Services 79 n.21 (Sept. 5, 2018) [*hereinafter* Draft NPRM], *available at* https://atixa.org/wordpress/wp-content/uploads/2018/09/Draft-OCR-regulations-September-2018.pdf.

[74] Sharpe, *How Much Does Living Off-Campus Cost?*, *supra* note 15.

[75] Although the preamble mentions one case where a Kansas State college fraternity was considered an "education program or activity" for the purposes of Title IX, the Department emphasizes that there are many "factors" and that the determination would be specific to each incident. For example, it would depend on whether the school "owned the premises; exercised oversight, supervision, or discipline; or funded, sponsored, promoted, or endorsed the event or circumstance" (83 Fed. Reg. 61468). This multi-factor test is not only unnecessarily unclear and confusing but also is not included in the proposed regulatory language, making it difficult for students and schools to understand their rights and obligations under Title IX. Schools might certainly conclude that § 106.30 and § 106.45(b)(3) mandates dismissal of complaints from all students who are sexually assaulted at unrecognized fraternities, sororities, and other unrecognized social clubs; at unaffiliated local bars and clubs; in non-residential housing; and through online channels in many instances.

[76] Freyd, *supra* note 17.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

The deliberate indifference standard adopted by the Department in the proposed regulations is a much lower standard than what is required of schools under current guidance, which requires schools to act "reasonably" and "take immediate and effective corrective action" to resolve harassment complaints.[77] This change would mean that schools merely have to avoid acting in a manner that is clearly unreasonable. This is the civil standard that applies in civil lawsuits brought against institutions to obtain monetary damages, and therefore, the Department is again seeking to apply a standard that remains inappropriately burdensome for evaluating *campus* complaints. The practical effects of this proposed rule would shield schools from any administrative accountability under Title IX, even they mishandle complaints, fail to provide effective support for survivors, wrongly determine against the weight of the evidence that an accused harasser was not responsible for sexual assault, or commit other violations that may not rise quite to the level of deliberate indifference.

Examples of how the proposed "deliberate indifference" standard would harm survivors include, but are not limited to:

1. In Tuscaloosa, AL, a student killed herself after the University of Alabama allegedly failed to appropriately handle her sexual assault case. The student's parents sued the school, alleging that the University failed to support their daughter by connecting her to resources or helping her stay in school after the assault. Under the "deliberate indifference" standard in the proposed regulations, the University would not have been liable under Title IX for failing to actively support this student because they could claim their actions in the situation were "not clearly unreasonable," and that they could not have known that their lack of support would drive her to commit suicide.[78]

2. Under the proposed "deliberate indifference" standard, UC Berkeley would have been allowed to ignore allegedly mishandled sexual misconduct cases. A February 2018 report by the Office of Civil Rights found that UC Berkeley received 401 oral and written complaints of sexual harassment or violence, the majority of which were settled through informal processes, and that investigations of sexual assault could take up to three years, an unreasonable period of time given that most undergraduate programs last four years. Under the proposed regulations, UC Berkeley would have only needed to claim each individual response was "not clearly unreasonable" given the circumstances, despite a clear pattern of indifference towards survivors of assault.[79]

III. **The proposed regulations impermissibly limit the "supportive measures" available to those who report sexual harassment, § 106.30.**

Under the proposed regulations, even if a student suffered harassment that occurred on campus *and* it was "severe, pervasive, and objectively offensive," the school would still be able

---

[77] 2001 Guidance, *supra* note 27.

[78] CBS/AP, "Parents of alleged rape victim sue University of Alabama over her suicide," *CBS News,* 4 July 2017. https://www.cbsnews.com/news/megan-rondini-suicide-parents-sue-university-of-alabama-alleged-rape/

[79] Anjali Shrivastava, "UC Berkeley mishandled 8 Title IX cases, federal investigators say," *The Daily Californian,* 1 March 2018. http://www.dailycal.org/2018/03/01/uc-berkeley-mishandled-eight-title-ix-cases-federal-investigators-say/

19

SurvJustice, Inc.
1015 15th NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

to deny the "supportive measures" that student needed to continue pursuing an education. In particular, the proposed regulations allow schools to deny a student's request for effective "supportive measures" on the grounds that the requested measures are "disciplinary," "punitive," or that they "unreasonably burden[] the other party." For example, a school might feel constrained from transferring a reported harasser to another class or dorm because it would place an "unreasonabl[e] burden," thereby forcing the survivor to change all of her own class and housing assignments in order to avoid seeing the harasser. Groups such as the Association for Student Conduct Administration (ASCA) agrees that "[e]ffective interim measures, including … *actions restricting the accused*, should be offered and used while cases are being resolved, as well as without a formal complaint."[80] In addition, schools may interpret this propose regulation to prohibit issuing a unilateral no-contact order against an assailant and instead require a survivor to agree to a *mutual* no-contact order, which imposes burdens on the survivor solely for reporting sexual harassment and arguably constitutes retaliation by the school.[81] This is a departure from longstanding practice under the 2001 Guidance, which instructed schools to "direct[] *the harasser to have no further contact with the harassed student*" but not vice-versa.[82] Our concern is *not* that survivors should be able to contact perpetrators; in fact, our significant experience in this work has shown us that no survivor has any interest in contacting the person who harassed them and against whom they sought a no-contact order. The problem lies in that mutual no-contact orders unfairly limit survivors from freely moving about campus simply because they filed a report. Even more alarmingly, mutual no-contact orders serve as a mechanism for accused students to file retaliatory complaints against survivors by falsely alleging violations of the mutual no-contact order. SurvJustice has seen firsthand that accused students repeatedly use this tactic (such as by claiming that a survivor-complainant was in the dining hall at the wrong time, for example, or walked by them in a campus building hallway) in order to retaliate. The survivor is then forced to endure an investigation into the falsely alleged violation, which takes a severe toll.

Prior to the 2017 rescission of Title IX guidance, SurvJustice often advocated for schools to provide accommodations to our clients, including during the pendency of an investigation, so that they could continue to safely pursue their education. SurvJustice often requested unilateral no-contact orders on our clients' behalf but opposed mutual no-contact orders because of our aforementioned view that they are retaliatory. SurvJustice has observed schools issuing mutual no contact orders on a regular basis and that these mutual no-contact orders are forms of retaliation when there is no basis to place the order against our clients other than the fact that they made a Title IX complaint. In such instances, schools limit victims' access to educational opportunities and benefits as a direct result of the victims' assertion of their federal rights and utilization of the Title IX grievance process.

---

[80] Association for Student Conduct Administration, *ASCA 2014 White Paper: Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses* 2 (2014) [hereinafter *ASCA 2014 White Paper*], https://www.theasca.org/Files/Publications/ASCA%202014%20White%20Paper.pdf.

[81] *See, e.g.*, Joan Zorza, *What Is Wrong with Mutual Orders of Protection?* 4(5) DOMESTIC VIOLENCE REP. 67 (1999). Experts have recognized for decades that *mutual* no-contact orders are harmful to victims, because abusers often manipulate their victims into violating the mutual order.

[82] 2001 Guidance, *supra* note 25, at 16.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

As a former prosecutor in the sex crimes and domestic violence units, and a litigator in New York Family Court[83] on cases involving sexual and intimate partner violence, I know that domestic violence and stalking mutual orders of protection (akin to mutual no-contact orders)[84] are very difficult (if not impossible) to enforce.[85] Abusers consistently utilize them to retaliate against former intimate partners, intentionally placing them in fear of facing sanctions.[86]

Although the general sentiment on mutual protective orders indicates that proper issuance of mutual orders must take place within an actual court system[87]—which already has procedures in place to test evidence and determine standards of abuse by all parties—the Department instead argues that in a Title IX setting schools are issuing using mutual protective orders not because evidence has been found to prove complainants pose a risk to their perpetrators or to their perpetrators access to education but because of respondents' claiming "supportive measures" for survivors are "disciplinary" or overly "punitive" or that they "unreasonably burden the other party."

Again, the Department is elevating rights of the accused over the civil rights of the accuser. Title IX is a civil rights remedy to provide equal access to education, but placing sanctions on an accuser for simply reporting sexual harassment may violate the accuser's due process rights.[88]

The proposed regulation suggests that its definition of supportive measures is a neutral stance in the face of allegations prior to an adjudication, but this simply is not true. By prohibiting such measures from ever "unreasonably burdening the other party," the Department strips institutions of the ability to impose unilateral no-contact orders or other safety measures designed to protect the complainant *when it identifies the need to do so*. If implemented, this provision will lead to

---

[83] For more information regarding the background of SurvJustice Executive Director Katherine W. McGerald, please visit http://www.survjustice.org/staff.

[84] Elizabeth Topliffe, *Why Civil Protection Orders Are Effective Remedies for Domestic Violence but Mutual Protective Orders are Not*, 67 *Indiana Law Journal* 951, 1039-1065, (1992). "In general, mutual protective orders are not enforced as well as regular orders. Also, the mutual protection order often prejudices the victim in future proceedings" (1061). Police don't know how to respond, often don't arrest (1061-1062). Abusers use mutual protection orders as weapons against those they abuse in future legal proceedings, including "divorce proceedings, civil proceedings on domestic violence, and criminal proceedings against the abuser . . . husbands will often seek new forms of control when the old (violence) fails" (1062).

[85] *Id.*

[86] *Id.*

[87] *Id.* at 1060 ("Judicial behavior strongly influences the possibility of future violence and issuing a mutual protection order can send a message both to the batterer and to the victim regarding violence"). *Id* at 1061 ("[Batterers] could easily understand a mutual protection order to mean that the court blames the victim as much as the batterer. The implication is that there is no accountability by the batterer."). *Id* ("Furthermore, the victim herself can recognize this implicit message . . . when myths [that the woman either instigates or deserves the abuse] are bolstered by the judicial system's response, the woman feels that there is no place where she will be understood. The woman often finds the court's approach degrading, and the experience reinforces the woman's belief that she is to blame for her abuse").

[88] *See, E.g.* Jane F. Golden, "Mutual Orders of Protection in New York State Family Offense Proceedings: A Denial of 'Liberty' Without Due Process of Law," in *Columbia Human Rights Law Review* 18:2 (Spring 1987), 309. Mutual Orders of Protection in Practice…"create the appearance that both parties were found to be violent" at 319, "may work against the woman in a subsequent divorce action" at 318; "May encourage police not to take action when survivors call about an abusive partner, or may discourage reporting if they believe police may not enforce or may call child protective services to take their children" at 319; "A final problem with mutual orders of protection, identified by the Task Force, is that they perpetuate the myth that battered women are responsible for the violence directed against them" at 319.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

complainants alone bearing the burden of making any changes to their housing or academics in order to feel safe. Ironically, the Department repeatedly emphasizes that supportive measures are "designed to restore or preserve access to the recipient's education program or activity." Considering that complainants will be forced to limit participation in education programs or activities due to this definition, this emphasis is clearly not intended to treat parties equitably and will, in fact, harm the civil rights of survivors.

### IV.   The proposed regulations would allow schools to claim religious exemptions after violating Title IX, with no prior notification to students or the Department that they would seek to claim such an exemption.

The current rules allow schools to claim religious exemptions by notifying the Department in writing of the specific Title IX provisions that conflict with their religious beliefs. The proposed regulations modify this requirement of advance notice by permitting schools to retroactively opt out of the requirement that they adhere to administrative Title IX requirements or face withdrawal of federal funding. Such schools would not be required to notify students, parents, or the Department in advance that they would be seeking such an exemption; instead, schools would be able to seek an exemption after a federal complaint is filed against them. This would allow schools to conceal their intent to discriminate against populations of students that religious institutions often discriminate against on the basis of sex, including LGBTQIA students, pregnant or parenting students (including those who are unmarried and those who have become pregnant as a result of rape), and students who access or attempt to access birth control or abortion.[89]

In particular, this provision will further decrease the disproportionately low reporting rates for LGBTQIA survivors at religious institutions. It is well understood that LGBTQIA students who are not public about their sexuality are already less likely to report intimate partner violence because the decision to report often forces LBGQTIA students to reveal their sexuality, which could be traumatic and even dangerous, especially in the context of religious institutions that go so far as to punish students for not being heterosexual or seek to forcibly "reform" them. Uncertainty regarding whether or not their institution will take their experiences of sexual violence seriously could depress reporting rates even further and effectively prohibit queer survivors from accessing the resources that they may need in the aftermath of abuse.

Many marginalized populations already experience sexual violence at higher rates than other groups. The denial of Title IX protections for religious reasons will only serve to multiply their trauma. According to the National Sexual Violence Resource Center, lesbian, gay, and bisexual students experience sexual violence at significantly higher rates than their heterosexual peers.[90] For transgender students, the risk is even more pronounced: 47% of respondents to the 2015

---

[89] Transgender students are especially at risk because this proposed change threatens to compound the harms created by (i) the Department's decision in February 2017 to rescind Title IX guidance on the rights of transgender students;[89] (ii) the Department's decision in February 2018 to stop investigating civil rights complaints from transgender students regarding access to sex-segregated facilities; and (iii) HHS's leaked proposal in October 2018 for the Department and other federal agencies to define "sex" to exclude transgender, non-binary, and intersex students. Erica. L. Green et al., *'Transgender' Could Be Defined Out of Existence Under Trump Administration*, NEW YORK TIMES (Oct. 21, 2018),
https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html.
[90] National Sexual Violence Resource Center, *Sexual Violence and Individuals Who Identify as LGBTQ*,
https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Guides_Sexual-Harassment-Bullying-Youth.pdf.

SurvJustice, Inc
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

National Transgender Discrimination Survey had experienced sexual assault at some point during their lives, and 1 in 10 had been sexually assaulted in the past year.[91] Allowing religious schools to effectively deny LGBTQIA students protection under Title IX propagates the extremely damaging myth that LGBTQIA individuals cannot or do not experience sexual assault, which in turn can cause queer survivors to doubt their own experiences of sexual violence and harassment.[92] The Department's previous statements that Title IX does not protect transgender students from discrimination "on the basis of gender identity"[93] further supports the fact that it refuses to protect all students from gender-based discrimination and violence.

Further, the provision regarding religious exemptions directly conflicts with the current[94] and proposed[95] regulations requiring that each covered educational institution "notify" all applicants, students, employees, and unions "that it *does not* discriminate on the basis of sex." By requiring schools to tell students that they do not discriminate while simultaneously allowing them to opt out of anti-discrimination provisions, the Department is enabling schools to actively mislead students. This bait-and-switch practice sends a clear message to students that the Department has no intention of holding schools accountable for discriminating against students. In turn, this sends a message to students that they should not bother filing Title IX complaints with OCR, as there will be no consequences because the Department will likely *never* find that a school is out of compliance with Title IX.

### V.    The grievance procedures required by the proposed regulations would impermissibly tilt the process in favor of accused students, retraumatize complainants, and conflict with Title IX's nondiscrimination mandate.

Current Title IX regulations and guidance require schools to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of student and employee complaints" of sexual misconduct.[96] The proposed regulations also purport to require "equitable" processes.[97] However, they are simultaneously riddled with language that would require schools to conduct grievance procedures in a fundamentally *inequitable* way that favors accused students and goes far beyond the requirements of due process.

The Department repeatedly uses the purported need to protect accused students' due process rights in order to justify weakening Title IX protections for complainants. It also proposes a provision that specifies that nothing in the rules would require a school to deprive people of their due process rights.[98] However, this language is wholly unnecessary, as schools have *never* been required to deprive anyone of due process rights. In fact, the current Title IX regulations and the rescinded guidance provided more rigorous protections to accused students

---

[91] National Center for Transgender Equality, *A Report of the National Transgender Discrimination Survey*, https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.

[92] RAINN, *LGBTQ Survivors of Sexual Violence,* https://www.rainn.org/articles/lgbtq-survivors-sexual-violence

[93] Moriah Balingit, *The Washington Post*, "Education Department no longer investigating transgender bathroom complaints," https://www.washingtonpost.com/news/education/wp/2018/02/12/education-department-will-no-longer-investigate-transgender-bathroom-complaints/?utm_term=.d93a74c4d526.

[94] 34 C.F.R. § 106.9(a).

[95] Proposed rule §106.8(b)(1).

[96] 34 C.F.R. § 106.8(b).

[97] *See* proposed rule § 106.8(c).

[98] Proposed rule § 106.6(d)(2).

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

than those required under the Constitution. The U.S. Supreme Court has held that students facing short-term suspensions from public schools[99] require only "some kind of" "oral or written notice" and "some kind of hearing."[100] The Court has explicitly said that a 10-day suspension does not require "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."[101] The Court has also approved at least one circuit court decision holding that expulsion from a public school does not require "a full-dress judicial hearing."[102] Furthermore, the Department's 2001 Guidance explicitly instructs schools to protect the "due process rights of the accused."[103] The addition of § 106.6(d)(2) provides no new or necessary protections and inappropriately pits Title IX's civil rights mandate against the Constitution when no such conflict actually exists.

***The NPRM improperly mandates turning Title IX proceedings into quasi-trials and only for disciplinary matters involving sexual harassment.***

    The grievance procedures outlined in proposed §160.45 reflect an attempt by the Department to turn disciplinary and grievance processes *only for complaints involving sexual harassment*,[104] but not for any other potentially criminal and prosecutable offenses, into quasi-court like adversarial proceedings—complete with protections analogous to those provided in criminal court for accused students. This undermines the function of Title IX as a statute designed to address historic sex discrimination in the education context: "Title IX is about institutional accountability, a civil rights mechanism to hold institutions accountable for providing equitable education," not a criminal trial with the rights required of criminal court proceedings.[105]

    **a.   The proposed rule's requirement that an accused student be presumed not responsible for harassment is inequitable and inappropriate in school proceedings.**

    Under proposed rule § 106.45(b)(1)(iv), schools would be required to presume that a report of harassment is false, which is biased in favor of accused students and effectively shifts the burden of proof to the complainant. This proposed presumption also conflicts with proposed § 106.45(b)(1)(ii), which states that "credibility determinations may not be based on a person's status as a complainant" or "respondent." This presumption would also exacerbate rape myths upon which many of the proposed regulations are based—namely, the myth that women and girls often lie about sexual assault.[106] *The presumption of innocence is a criminal law principle,*

---

[100] *Goss v. Lopez*, 419 U.S. 565, 566, 579 (1975).
[101] *Id.* at 583. *See also Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 23 (D. Me. 2005); *B.S. v. Bd. of Sch. Trs.*, 255 F. Supp. 2d 891, 899 (N.D. Ind. 2003); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383 (C.D. Cal. 1995); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994).
[102] *E.g., Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961).
[103] 2001 Guidance, *supra* note 27 at 22.
[104] This is referred to as "rape exceptionalism." Naomi Mann, *Taming Title IX Tensions*, 20 J. CONST. L. 631, 666 (2018); Michelle Anderson, *Campus Sexual Assault Adjudication and Resistance to Reform,* 125 YALE L.J. 1940, 2000 (2016).
[105] *Id.*
[106] Indeed, the data shows that men and boys are far more likely to be victims of sexual assault than to be falsely accused of it. *See, e.g.,* Kingkade, *supra* note 10.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

*incorrectly imported into this context.*[107] Criminal defendants are presumed innocent until proven guilty because their very liberty is at stake in that they face imprisonment if they are found guilty. There is no such principle in civil proceedings or civil rights proceedings, and Title IX is a civil rights law that ensures that sexual harassment is never the end to anyone's education, making it most analogous to civil proceedings. It is entirely inappropriate to import criminal procedures and protections into the campus disciplinary process. Notably, this is not what the U.S. Constitution provides and to do so would fly in the face of such a sacred document.

Title IX has always required schools to treat parties equitably. A presumption that one party is lying (and again, a presumption that is *provided only to those accused of sexual harassment under Title IX* but not any other potentially criminally prosecutable offense) fundamentally alters this equitability framework. Instead, institutions would be forced to take a position before any evidence is examined or weighed. The Department's claim that this provision promotes impartiality is a blatant attempt to detract from how it advances only the interests of those accused of sexual harassment and creates a special standard that applies solely for proceedings involving allegations of sexual harassment.

Moreover, § 106.45(b)(1)(iv) would encourage schools to ignore or punish historically marginalized and underrepresented groups for allegedly lying when they report sexual harassment.[108] Schools also may be more likely to ignore or punish survivors who are women and girls of color,[109] pregnant and parenting students,[110] and LGBTQIA students[111] because of harmful race and sex stereotypes that label them as "promiscuous." If all perpetrators are presumed innocent, all survivors are confronted with the parallel assumption that if sexual contact did occur, they (the survivors) must have played some part in initiating or wanting the contact. The effects of the assumption that survivors are somehow to blame for their experiences are intensified for historically marginalized populations already burdened with harmful stereotypes of promiscuity. Please see below for examples:

**Women and girls of color**: Women and girls of color already face unfair discipline due to race and sex stereotypes.[112] Schools are also more likely to ignore, blame, and punish women and girls of color who report sexual harassment due to harmful race and sex stereotypes that

---

[107] *See also* the Department's reference to "inculpatory and exculpatory evidence" (§ 106.45(b)(1)(ii)), the Department's assertion that "guilt [should] not [be] predetermined" (83 Fed. Reg. 61464), and Secretary DeVos's discussion of the "presumption of innocence" (Betsy DeVos, *Betsey DeVos: It's time we balance the scales of justice in our schools*, Washington Post (Nov. 20, 2018), https://www.washingtonpost.com/opinions/betsey-devos-its-time-we-balance-the-scales-of-justice-in-our-schools/2018/11/20/8dc59348-ecd6-11e8-9236-bb94154151d2_story.html.

[108] *E.g.*, Tyler Kingkade, *When Colleges Threaten To Punish Students Who Report Sexual Violence*, HUFFINGTON POST (Sept. 9, 2015), https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c.

[109] *E.g.*, Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARVARD J.L. & GENDER 1, 16, 24-29 (forthcoming); https://ssrn.com/abstract=3168909; National Women's Law Center, *Let Her Learn: A Toolkit To Stop School Pushout for Girls of Color* 1 (2016) [hereinafter *Let Her Learn: Girls of Color*], https://nwlc.org/resources/let-her-learn-a-toolkit-to-stop-school-push-out-for-girls-of-color.

[110] Chambers & Erausquin, *The Promise of Intersectional Stigma to Understand the Complexities of Adolescent Pregnancy and Motherhood*, JOURNAL OF CHILD ADOLESCENT BEHAVIOR (2015), https://www.omicsonline.org/open-access/the-promise-of-intersectional-stigma-to-understand-the-complexities-ofadolescent-pregnancy-and-motherhood-2375-4494-1000249.pdf.

[111] *See, e.g.*, David Pinsof, et al., *The Effect of the Promiscuity Stereotype on Opposition to Gay Rights* (2017), https://doi.org/10.1371/journal.pone.0178534.

[112] *Let Her Learn: Girls of Color*, *supra* note 109 at 1.

SurvJustice Inc
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

label them as "promiscuous."[113] For example, Black women and girls are commonly stereotyped as "Jezebels," Latina women and girls as "hotblooded," Asian American and Pacific Islander women and girls as "submissive, and naturally erotic," Native women and girls as "sexually violable as a tool of war and colonization," and multiracial women and girls as "tragic and vulnerable, historically, products of sexual and racial domination" (internal quotations and brackets omitted).[114] Black women and girls are especially likely to be punished by schools. For example, the Department's 2013–14 Civil Rights Data Collection (CRDC) shows that Black girls are five times more likely than white girls to be suspended in K-12, and that while Black girls represented 20% of all preschool enrolled students, they were 54% of preschool students who were suspended.[115] The Department's 2015–16 CRDC again shows that Black girls are more likely to be suspended and expelled than other girls.[116] Schools are also more likely to punish Black women and girls by labeling them as the aggressor when they defend themselves against their harassers or when they respond to trauma because of stereotypes that they are "angry" and "aggressive."[117] The effects of many of these harmful trends were extremely evident in a recent incident in Binghamton, New York, in which four Black middle school girls were strip-searched after appearing "hyper and giddy" in the cafeteria. One of the students received an in-school suspension after refusing to remove her clothing.[118] This incident is not only a clear example not only of how Black girls are more likely to be punished in school but also of how they are considered less vulnerable to the trauma induced by violations of bodily autonomy, as is the case in strip-searches and incidents of sexual violence.

**Pregnant or parenting students:** Women and girls who are pregnant or parenting are more likely to experience sexual harassment than their peers, due in part to the stereotype that they are more "promiscuous" because they have engaged in sexual intercourse in the past. For example, 56% of girls ages 14–18 who are pregnant or parenting are kissed or touched without their consent.[119]

**LGBTQIA students**: LGBTQIA students are more likely to experience sexual harassment than their peers. For example, more than half of LGBTQIA students ages 13–21 are sexually harassed at school,[120] and nearly 1 in 4 transgender and gender-nonconforming students

---

[113] *E.g.*, Cantalupo, *supra* note 109 at 16, 24-29.

[114] *Id.* at 24-25.

[115] U.S. Dep't of Education, Office for Civil Rights, *A First Look: Key Data Highlights on Equity and Opportunity Gaps in Our Nation's Public Schools*, at 3 (June 7, 2016; last updated Oct. 28, 2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[116] U.S. Dep't of Education, Office for Civil Rights, *School Climate and Safety: Data Highlights on School Climate and Safety In Our Nation's Public Schools* (Apr. 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[117] NAACP Legal Defense and Educational Fund, Inc. & National Women's Law Center, *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* 5, 18, 20, 25 (2014), https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf. *See also* Sonja C. Tonnesen, *Commentary: "Hit It and Quit It": Responses to Black Girls' Victimization in School*, 28 BERKELEY J. GENDER, L. & JUST. 1 (2013), http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1312&context=bglj.

[118] Carla Herreria, "NY Middle School Faces Scrutiny After Parents Claim 4 Black Girls Were Strip-Searched," *Huffington Post,* 26 January 2019. https://www.huffingtonpost.com/entry/students-strip-searched-new-york_us_5c4d1f70e4b0e1872d4476df.

[119] *Let Her Learn: Pregnant or Parenting Students*, *supra* note 11 at 12.

[120] *2017 National School Climate Survey*, *supra* note 12 at 26.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

are sexually assaulted during college.[121] However, LGBTQIA students are also less likely to report sexual assault to school authorities or the police because they are rightfully concerned about further discrimination or retaliation due to their LGBTQIA status.[122] They are also less likely to be believed due to stereotypes that they are more "promiscuous" or bring the "attention" upon themselves.

**Students with disabilities:** As the Department notes in the preamble,[123] students with disabilities have different experiences, challenges, and needs." But the proposed regulations are especially harmful to students with disabilities, who already face additional barriers to equal access to education and are 2.9 times more likely than their peers to be sexually assaulted.[124] They are also less likely to be believed due to stereotypes about people with disabilities and often have greater difficulty describing the harassment they experience.[125]

In our work representing survivors of sexual violence, we already witness significant issues at the campus level wherein investigators, hearing panels, and Title IX officials rely on gender stereotypes and myths about false allegations as well as engage in victim-blaming techniques. This proposed rule would only further codify, and deem as relevant, such egregious falsehoods, misconceptions, and shoddy investigative techniques—in turn conveying that the Department approves and endorses them.

**b. The proposed regulations would improperly require survivors and witnesses in colleges and graduate programs to submit to live cross-examination by their named harasser's advisor of choice without any procedural protections, causing further trauma.**

Proposed rule § 106.45(b)(3)(vii) requires colleges and graduate schools to conduct a "live hearing," and states that parties and witnesses must submit to cross-examination by the other party's "advisor of choice." This advisor could be an attorney who verbally attacks the survivor's character instead of engaging in genuine questioning to aid the fact-finding process. It could even be an angry parent or a close friend of the accused student who would lack any training or experience in conducting cross-examination, while also holding a position of severe bias. Furthermore, the adversarial and contentious nature of cross-examination would further traumatize college and graduate-school survivors who seek help through Title IX. Being forced to endure detailed, personal, and humiliating questions (often rooted in gender stereotypes and rape myths that tend to blame victims for incidents of sexual violence)[126] would understandably discourage many students—including both parties and witnesses—from participating in a Title IX grievance process, thereby chilling those who have experienced or witnessed harassment

---

[121] *AAU Campus Climate Survey*, *supra* note 9 at 13-14 (Sept. 2015), https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[122] *2015 U.S. Transgender Survey*, *supra* note 23 at 12.

[123] 83 Fed. Reg. 61483.

[124] *Let Her Learn: Girls with Disabilities*, *supra* note 14 at 7.

[125] *E.g.*, Angela Browne et al., *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx.

[126] Zydervelt, S., Zajac, R., Kaladelfos, A. and Westera, N., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have we Moved Beyond the 1950s?*, BRITISH JOURNAL OF CRIMINOLOGY, 57(3), 551-69 (2016).

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

from coming forward. Confoundingly, the proposed regulations implement this requirement without guaranteeing any of the procedural protections that parties and witnesses have during cross-examination in the criminal court proceedings that apparently inspired this requirement. Schools would not be required to apply rules of evidence or make a prosecuting attorney available to object or a judge available to rule on objections. The live cross-examination requirement would also lead to sharp inequities if one party can afford an attorney and the other cannot.

Educational institutions are not courtrooms with the prescribed protections of court proceedings. The Department is fundamentally changing the nature of educational disciplinary proceedings into quasi-legal trials by requiring adversarial cross-examination. Showing its lack of expertise in trial work, the Department does not even account for any training that would be required for hearing panelists or others, the limits of these quasi-legal trials, or the protections necessary to prevent complete chaos with its proposals.[127]

The Department's failure to recognize the unique nature of disciplinary processes at educational institutions constitutes willful ignorance with dangerous consequences. Requiring students and their advisors to prepare and conduct cross-examination switches the burden of conducting an investigation from the institution to the students. This could require institutions to provide counsel to all parties. It could make institutions liable for ineffective assistance of counsel. It could force institutions to hire retired judges as hearing chairs. In sum, this would require resources that schools simply do not have. The utter lack of information contained within the NPRM shows the Department's lack of understanding about the ramifications of its proposals; alternatively, it suggests that the Department is *willfully ignorant* of these predictable collateral problems. Regardless of the reason for the deficiencies, the Department's proposal is simply not workable as it stands; in fact, it may not be workable even with additional details, as many institutions would not have the capacity and resources to accommodate this requirement that would involve significant allocations of time, money, resources, and policy revisions.

### *The proposed rule misstates the law*

Neither the Constitution nor any other federal law requires live cross-examination in school conduct proceedings. The U.S. Supreme Court does not require any form of cross-examination (live or indirect) in public school disciplinary proceedings under the Due Process Clause.[128] Instead, the Court has explicitly stated that a 10-day suspension does not require "the opportunity . . . to confront and cross-examine witnesses"[129] and has approved at least one circuit court decision holding that expulsion does not require "a full-dress judicial hearing, with the right to cross-examine witnesses."[130] The vast majority of courts that have reached this issue agree that live cross-examination is not required in public school disciplinary proceedings as

---

[127] Mann, *supra* note 86, at 657. "Adding [mandatory] counsel would complicate the proceedings by importing outside legal rules based on adversarial systems. Schools and educational institutions would need to learn to navigate and utilize these foreign systems. Critically for students, the use of counsel would shift the burden of investigating and proving allegations from the educational institution to the students. This is a high burden that would disproportionally fall on them."

[128] Of course, private schools are not impacted by Constitutional due process requirements.

[129] *Goss*, 419 U.S. at 583. *See also Coplin*, 903 F. Supp. at 1383; *Fellheimer*, 869 F. Supp. at 247.

[130] *E.g.*, *Dixon*, 294 F.2d at 158, *cert. denied*, 368 U.S. 930 (1961). *See also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (holding no due process violation in expulsion of college student without providing him to right to cross-examination).

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

long as there is a meaningful opportunity to have questions submitted to and posed by a hearing examiner.[131] The Department itself admits that written questions submitted by students or oral questions asked by a neutral school official are fair and effective ways to discern the truth in K-12 schools,[132] and it therefore proposes retaining that method for K-12 proceedings. The Department has failed to explain why the processes that it considers effective for adjudicating sexual harassment complaints in proceedings involving 17- or 18-year-old students in high school would somehow be ineffective for 17- or 18-year-old students in college.

In a radical shift from prior practice and guidance- and from the Department's stated mission- the Department's misguided and unrelenting advocacy for adversarial cross-examination shows the Department's blatant disregard for victims and support for those accused of sexual harassment or assault. The Department's reasoning for this shift is one-sided, focusing on carefully selected federal cases that have described the need for cross-examination in educational settings while ignoring the split in how courts understand institutional due process obligations to include or exclude adversarial cross-examination.[133] A close examination of federal case law regarding the due process protections required in student disciplinary cases reveals a substantially different landscape from what the Department described in the proposed rules[134] Many federal appellate courts have grappled with this concept and questioned whether there is a procedural due process right to any cross-examination at all or contemplated that any such right would be narrow.[135] Indeed, many courts have recognized that "[f]undamental fairness

---

[131] See A Sharp Backward Turn, supra note 51 (Baum "is anomalous.").

[132] 83 Fed. Reg. 61476.

[133] Sara O'Toole, "Campus Sexual Assault Adjudication, Student Due Process, and a Bar on Direct Cross Examination," in University of Pittsburgh Law Review 79, 511-542 (Spring 2018). (""An examination of the due process case law in educational settings and an application of the analysis from Mathews v. Eldridge supports the recommendation against personal cross-examination. A balancing of the Mathews factors demonstrates that the limited additional value of personal cross-examination and a university's interest in maintaining an affordable and effective adjudication system weigh against the interest of the student, who is offered a variety of procedural protections aside from personal cross-examination" "Morrissey v. Brewer: "It has been said so often by this Court and others as to not require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands")

[134] Id. ("An analysis of the requirement of direct cross examination under the Mathews balancing factors reveals that it is not mandated by due process in university disciplinary settings…" "The potential harm to a student dismissed from school should not be minimized, but his or her interest is not the same as a criminal defendant or even a civil defendant…"
"Next, a court would consider the risk of erroneous deprivation of the student's interest and the probable value of allowing direct cross-examination during the hearing… – Goss held that "requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action…" "In light of the disputed nature of the facts and the importance of witness credibility in [the] case, due process required that the panel permit the plaintiff to hear all evidence against him and to direct questions to his accuser through the panel.' Therefore, the court found that directing questions through a panel would have provided sufficient due process." Citing: Donohue v. Baker, 976 F. Supp. 136, 147 (N.D.N.Y. 1997). "Distinctive characteristics of sexual assault adjudication may decrease the effectiveness of personal cross-examination. Complaints of sexual assault involve instances of intimate attack that may traumatize survivors physically and emotionally. When survivors of sexual assault are personally cross-examined, it often adds to their trauma and may make it more difficult for them to share their stories…" "Considering the alternative of directing questions through a panel, the added value of allowing personal cross-examination is limited in the university setting. Moreover, the risk of erroneous deprivation is low because universities have established protective processes that provide notice and a hearing to handle disciplinary matters…"

[135] Mann, supra note 86, at 658; See also Newsome v. Batavia Local School Dist., 842 F.2d 920, 925–26 (6th Cir. 1988) (deciding that there is no right to cross-examine adverse witnesses in expulsion proceedings due to the burden it would place on school employees); Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses . . . ."); Brewer v. Austin Independent School Dist., 779 F.2d 26, 263 (5th Cir. 1985) (rejecting argument that accused had a procedural due process right to cross-examination in a suspension case and stating, "[W]e reject any suggestion that the technicalities of criminal procedure ought to be transported into school suspension cases."); Boykins v. Fairfield Bd. Of Education, 492 F.2d 697, 701 (5th Cir. 1974) (holding that the right to cross-examination is not required in expulsion proceedings); Flaim v. Med. College of Ohio, 418 F.3d 629, 636 (6th Cir. 2005) ("Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases.");

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

without adversarial cross-examination is satisfied where the accused is provided with the opportunity to know the substance of the evidence against him and has the opportunity to provide evidence and testimony on his behalf."[136] A review of the body of law regarding this issue—as opposed to the one federal appellate decision that the Department cites—makes it clear that there are limits that may be appropriately placed on cross-examination once fundamental fairness has been provided.[137]

Not surprisingly, experts on Title IX and student conduct procedures similarly oppose these proposed regulations. The Association of Title IX Administrators ("ATIXA") announced in October 2018 that it opposes live, adversarial cross-examination, stating that instead "investigators should solicit questions from the parties, and pose those questions the investigators deem appropriate in the investigation interviews."[138] The Association for Student Conduct Administration ("ASCA") agrees that schools should "limit[] advisors' participation in student conduct proceedings."[139] The American Bar Association ("ABA") recommends that schools provide "the opportunity for both parties to ask questions through the hearing chair."[140]

### The proposed rule mischaracterizes cross-examination

Cross-examination is an invaluable tool for attorneys—*when done well*.[141] But very few attorneys, let alone parents or friends, would be able to conduct a successful cross-examination. Still, some argue that adversarial questioning is necessary for campus sexual misconduct cases even though it is not used for other student misconduct matters such as drug use, vandalism, and nonsexual assault or harassment. The Department states in its proposed rules that cross-examination "takes aim at credibility like no other procedural device" because it enables the accused to "probe the witness's story to test her memory, intelligence, or possible ulterior

---

Gorman v. University of Rhode Island, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases."); Winnick v. Manning, 460 F.2d 545, 549 (2d Cir. 1972) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961).

[136] Mann, *supra* note 86, at 659. *See also* Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding."); Goss v. Lopez, 419 U.S. 565, 581 (1975); *Flaim*, 418 F.3d at 636, 641 (deciding whether the "accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence" when the accused had the "opportunity to present his version of events . . .

[and] point out inconsistencies or contradictions in the officer's testimony"); *Winnick*, 460 F.2d at 549 ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); *Dixon*, 294 F.2d at 158–59.

[137] *See* Mann, *supra* note 86, at 660-61 ("evidence does not need to be questioned in the traditional adversarial context, the content of cross-examination may be limited, the individuals that may be cross-examined may be limited, cross-examination may be denied where not material to the result, cross-examination does not have to be face-to-face, and cross-examination may be performed through a third party. Permissible cross-examination may be oral or written, with some courts holding that there is no right to change the submitted written questions in response to the victim's testimony at a hearing. The cross-examination may be in front of a hearing board or an investigator) (internal citations omitted).

[138] Association of Title IX Administrators, *ATIXA Position Statement on Cross-Examining: The Urge to Transform College Conduct Proceedings into Courtrooms* 1 (Oct. 5, 2018), https://atixa.org/wordpress/wp-content/uploads/2018/10/ATIXA-Position-Statement_Cross-Examination-final.pdf.

[139] *ASCA 2014 White Paper*, *supra* note **Error! Bookmark not defined.** at 2 (2014).

[140] American Bar Association, *ABA Criminal Justice Section Task Force On College Due Process Rights and Victim Protections: Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct* 8-10 (June 2017).

[141] Michael R. Black, Cross Examination: The Greatest Legal Engine for the Discovery of Truth: A Comparative Analysis of the American and English Rules of Cross-Examination, 15 S.U. L. Rev. 397 (1988)

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

motives,"[142] but the Department fails to make the case for why there must be adversarial cross-examination. Questions need not be adversarial to assess credibility or any potential bias or to test the facts the witness is alleging. Nearly all courts to consider the issue have found that fairness can be fully achieved through questioning by a neutral college administrator. And although the Department of Education says that its proposal will avoid "any unnecessary trauma" that might result from the parties questioning one another directly, there is nothing concrete in the proposed rules or the Department's history to show that it consulted survivors about this.

This brings us to an important question the Department and those who advocate for adversarial cross-examination must ask—what is the point of the cross-examination? Is it to assess credibility, test bias, or determine the facts of the case—or is to trap, harass, try to confuse, and get out only the facts that are best for your client's case?[143] If it is the former, then there is no reason the questions cannot be asked by a hearing examiner; if the latter, then truth is not really being sought, which decimates the Department's argument of adversarial cross-examination as the greatest engine for the truth.[144] As a litigator, I understand the importance of cross-examination before a fact-finder and how to best "sell" your case; however, in an educational setting where the truth is being sought, an advisor can challenge a complainant's or witnesses' credibility by submitting questions for an impartial hearing examiner to ask in an educational disciplinary hearing. As long as the parties have been able to present their facts and evidence, due process is satisfied. Those arguing that this is not the same as cross-examination have yet to demonstrate how, exactly, this procedure is insufficient.

Many attorneys have never participated in a hearing or trial; this means that many of those most adamantly pressing for cross-examination in campus proceedings lack significant firsthand knowledge about or experience with this topic. As litigators know, "cross-examination, when conducted in the proper manner, can be an invaluable tool to the trial lawyer." However, when conducted in court, there are safeguards fundamental in the process of cross-examination to ensure fairness that are simply not present in an educational disciplinary proceeding. At a minimum, these safeguards require that a neutral judge with experience serving as an arbiter in cross-examination processes (and therefore able to identify situations in which cross-examination is being abused) must be present to ensure that counsel is not misleading the fact-finder. There is nothing in the proposed provisions to safeguard against the abuse of cross-examination by either advisors of the complainant or the respondent, which fundamental fairness requires.

Shockingly, the proposed regulations offer *no guidance, framework, or even advice* for the realities parties and institutions will face if these misguided proposed rules are codified. Numerous questions are not answered by the Department, most notably:

- Who will object during the live, adversarial cross-examination (surely witnesses with no legal training cannot be expected to object while testifying)?
- Who will make any rulings on objections (and what is the legal training of that person making the rulings)?

---

[142] The Department cites *Doe v. Baum,* Case No. 17-2213, 2018 U.S. App. LEXIS 25404 (6th Cir. Sept. 7, 2018)

[143] *Id* at 403 ("Since a lawyer may make the truth or fact appear as if it were fiction and the untruth appear as if it were fact, the use of cross examination is quite vulnerable to abuse.)

[144] *See E.g.*, The Truth Engine: Cross-Examination Outside the Box, Francis P. Karam, (2017).

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

- Will schools be required to provide legal counsel to both parties so that the "advisors" conducting the cross-examination have, at a minimum, some legal training?
- Will schools then be open to ineffective assistance of counsel claims?
- When an attorney pushes the envelope and asks a question that he or she knows is not permissible, but does so to shake up the witness or plant an idea in the heads of the fact-finders, will the attorney or school be liable for that overreach?

We could go on. The number of questions and potential scenarios that remain unanswered by the Department are endless. Without these, and other, safeguards and processes in place, the Department is potentially subjecting itself and institutions to significant liability and monetary damages. More importantly, these quasi-legal proceedings could severely harm the very students (both accused and complainants) the Department is charged with protecting.

**The NPRM inappropriately places undue burdens and pressures upon survivors of sexual harassment**

    **c.  The proposed regulations would improperly allow schools to pressure survivors into participating in traumatizing mediation procedures, even with regard to complaints of sexual violence.**

Proposed rule § 106.45(b)(6) would allow schools to use "any informal resolution process, such as mediation" to resolve a complaint of sexual harassment, as long as the school obtains the students' "voluntary, written consent." Even worse, the Department states that, once consent is obtained and the informal process begins, schools may then "preclude[] the parties from resuming a formal complaint," thereby barring survivors from pursuing the formal complaint process. In doing so, the Department fails to recognize the significant potential for re-traumatization when schools rob survivors of the choice to seek justice on their own terms, thereby mimicking the control that was taken from them during an incident of sexual violence.

Even if schools were to permit survivors to re-enter the formal process, mediation is a strategy often used in schools to resolve peer conflicts and involves both sides' taking responsibility for their actions while reaching a compromise. In that light, mediation is *never* appropriate for resolving sexual violence or harassment complaints, even on a voluntary basis—the Department itself recognized this in its 2001 Guidance. Survivors should not be placed into a room with someone who abused them to "work things out" (thereby insinuating that they share responsibility for the assault), nor should they be exposed to the risk of being retraumatized, coerced, or bullied during the mediation process. Experts also agree that mediation is inappropriate for resolving sexual violence. For example, NASPA - Student Affairs Administrators in Higher Education stated in 2018 that it was concerned about students' being "pressured into informal resolution against their will."[145] SurvJustice has the same concerns that mediation will not be *truly* voluntary. It is entirely possible that schools will seek to pressure survivors into participating in mediation given that this is an effective way to resolve matters

---

[145] NASPA - Student Affairs Administrators in Higher Education, *NASPA Priorities for Title IX: Sexual Violence Prevention & Response* 1-2 [hereinafter *NASPA Title IX Priorities*], https://www.naspa.org/images/uploads/main/NASPA_Priorities_re_Title_IX_Sexual_Assault_FINAL.pdf.

SurvJustice, Inc.
1015 15ᵗʰ St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

quickly and quietly, in turn protecting institutions' reputations. Furthermore, minors would be particularly vulnerable to such pressure; it is hard to imagine that a child would feel able to advocate for a formal process if an adult employee is suggesting that they go through the mediation process. Then, once a student has "agreed" to meditation, schools could refuse to end the informal process and start a formal investigation—even if the student realizes that mediation is too traumatizing to continue or that it would not result in an outcome that ensures her or his safety. Survivors are very likely to be dissatisfied with the outcome, given that the nature of mediation means that it generally does not result in the imposition of sanctions like a favorable outcome in a formal process would.

It is also concerning that the Department has not stated any training requirements for mediators. It has not documented any requirement that students receive notice about their rights so that they are aware that they do not have to participate in mediation. Overall, this proposal has not been adequately considered or developed, and it will do significant and irreversible damage to those who come forward about sexual harassment.

### d. The proposed regulations would force many schools to use a more demanding standard of proof to investigate sexual harassment than used to investigate other types of student misconduct or other civil wrongs.

The Department's longstanding practice requires that schools use a "preponderance of the evidence" standard—meaning "more likely than not"—in Title IX cases to decide whether sexual harassment occurred.[146] Proposed rule § 106.45(b)(4)(i) departs from that practice and instead establishes a system in which schools may elect to use the more burdensome "clear and convincing evidence" standard for sexual harassment cases, while allowing all other student misconduct cases to be governed by the preponderance of the evidence standard, even if the proceedings carry the same potential sanctions.[147] The Department's decision to allow schools to impose a more burdensome standard on those who report sexual violence conveys its reliance on the stereotype and assumption that survivors (who are predominately girls and women) are more likely to lie about sexual violence than students who report physical assault, plagiarism, or other school policy violations. However, this sexist belief is unsupported; in fact, boys and men are far more likely to be *victims* of sexual assault than to be *falsely accused* of sexual assault.[148]

---

[146] The Department has required schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations. For example, its April 1995 letter to Evergreen State College concluded that its use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College* (Apr. 4, 1995), at 8, http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf. Similarly, the Department's October 2003 letter to Georgetown University reiterated that "in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University* (Oct. 16, 2003), at 1, http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf.

[147] Proposed rule § 106.45(b)(4)(i) permits schools to use the preponderance standard *only if* it uses that standard for all other student misconduct cases that carry the same maximum sanction *and* for all cases against employees. This is a one-way ratchet: a school would be permitted to use the higher clear and convincing evidence standard in sexual assault cases, while using a lower standard in all other cases.

[148] *E.g.*, Kingkade, *supra* note 10.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

The preponderance standard is used by courts in all civil rights cases.[149] It is the only standard of proof that treats both sides fairly, and it is consistent with Title IX's requirement that grievance procedures be "equitable." By allowing schools to use a "clear and convincing evidence" standard, the proposed rule would tilt investigations significantly in favor of respondents and against complainants. Increasing the burden that complainants face to prove that sexual harassment occurred is particularly problematic in light of the fact that it is already difficult to prove that such an incident occurred as a result of the inherent lack of physical evidence and the common yet mistaken belief that testimony does not constitute sufficient evidence to make a finding of responsibility. The Department argues that Title IX investigations may need a more demanding standard because of the "heightened stigma" and the "significant, permanent, and far-reaching" consequences for respondents found responsible for sexual harassment.[150] Yet this ignores the reality that Title IX complainants themselves face heightened stigma for reporting sexual harassment, as compared to other types of misconduct, and that complainants suffer "significant, permanent, and far-reaching" consequences to their education if their schools fail to meaningfully address the harassment. In fact, 34% of college survivors drop out of college after a sexual assault.[151] Both parties therefore have an equal interest in continuing to pursue their education. It is inequitable to cater only to the purportedly more serious impact on accused students in designing a grievance process to address harassment.

Many Title IX experts support the preponderance standard, which was used to address harassment complaints at more than 80% of colleges even prior to the 2011 Dear Colleague Letter's clarification about the correct standard.[152] The NCHERM Group, whose white paper *Due Process and the Sex Police* was cited by the Department,[153] has promulgated materials that require schools to use the preponderance standard because "[they] believe higher education can acquit fairness without higher standards of proof." [154] A white paper by four Harvard professors that is cited by the Department[155] also recognizes that schools should use the preponderance standard if "other requirements for equal fairness are met."[156] ATIXA's position is that "any standard higher than preponderance advantages those accused of sexual violence (mostly men) over those alleging sexual violence (mostly women). It makes it harder for women to prove they have been harmed by men. The whole point of Title IX is to create a level playing field for men and women in education, and the preponderance standard does exactly that. *No other evidentiary standard is equitable.*"[157] NASPA - Student Affairs Administrators in Higher Education

---

[149] Katharine Baker et al., *Title IX & the Preponderance of the Evidence: A White Paper* (July 18, 2017), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (signed by 90 law professors).

[150] 83 Fed. Reg. 61477.

[151] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. STUDENT RETENTION: RES., THEORY & PRAC. 234, 244 (2015), https://doi.org/10.1177/1521025115584750.

[152] Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* 120 (Oct. 2002), https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf.

[153] 83 Fed. Reg. 61464 n.2.

[154] The NCHERM Group, *Due Process and the Sex Police* 2, 17-18 (Apr. 2017), https://www.ncherm.org/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf.

[155] 83 Fed. Reg. 61464 n.2.

[156] Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX* 5 (Aug. 21, 2017), https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf.

[157] Association of Title IX Administrators, *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 4 (Feb. 17, 2017), https://atixa.org/wordpress/wp-content/uploads/2017/02/2017February-Final-ATIXA-Position-Statement-on-Colleges-Addressing-Sexual-Violence.pdf.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

recommends the preponderance standard: "Allowing campuses to single out sexual assault incidents as requiring a higher burden of proof than other campus adjudication processes make it—by definition—harder for one party in a complaint than the other to reach the standard of proof. Rather than leveling the field for survivors and respondents, setting a standard higher than preponderance of the evidence tilts proceedings to unfairly benefit respondents."[158] ASCA agrees that schools should use "[u]se the preponderance of evidence (more likely than not) standard to resolve all allegations of sexual misconduct"[159] because "it is the only standard that reflects the integrity of equitable student conduct processes which treat all students with respect and fundamental fairness."[160]

### e.   The proposed regulations fail to impose clear timeframes for investigations and allow impermissible delays.

The Department maintains the requirement that schools provide "reasonably prompt timeframes" for resolving complaints but also allows them to create a "temporary delay" or "limited extension" of timeframes for "good cause," which it says would include "concurrent law enforcement activity."[161] In contrast, previous Title IX guidance recommended that schools finish investigations within 60 days and prohibited schools from delaying a Title IX investigation simply because there was an ongoing criminal investigation.

Under the Department's proposal, if there is an ongoing criminal investigation, a school would be permitted to delay even beginning any Title IX investigation for an unspecified length of time. While criminal investigations seek to punish abusers for their conduct, Title IX investigations should seek to ensure that complainants are able to access educational opportunities that become inaccessible due to harassment. Students should not be forced to wait months or even years until after a criminal investigation is completed in order to seek resolution from their schools. ATIXA agrees that a school that "delay[s] or suspend[s] its investigation" at the request of a prosecutor creates a safety risk to the survivor and to other students as well, whom the perpetrator could go on to harm.[162]

One of the most significant ramifications of the September 2017 Interim Guidance issued by this Department of Education is the length of time investigations are taking. Since the interim guidance was released, SurvJustice has not had a single case that was completed in 60 days as the 2017 Q&A guidance recommended. Moreover, the majority of our cases have taken *a full year* to complete. During that timeframe, survivors do not receive any information from the school about the status of their complaint unless they ask, and even then they frequently do not get a response. In addition, we have observed that schools send repeated notices that the process is being delayed without providing any reason for an estimated new date. These open-ended,

---

[158] *NASPA Title IX Priorities, supra* note 145 at 1-2.

[159] *ASCA 2014 White Paper, supra* note **Error! Bookmark not defined.**.

[160] Chris Loschiavo & Jennifer L. Waller, *The Preponderance of Evidence Standard: Use In Higher Education Campus Conduct Processes*, ASSOCIATION FOR STUDENT CONDUCT ADMIN, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.

[161] Proposed rule § 106.45(b)(1)(v).

[162] Association of Title IX Administrators, *ATIXA Position Statement on the Proposed Legislation Entitled: Promoting Real Opportunity, Success, And Prosperity Through Education Reform (PROSPER) Act (Higher Education Act Reauthorization)* (Jan. 18, 2018), https://atixa.org/wordpress/wp-content/uploads/2015/03/ATIXA-POSITION-STATEMENT-ON-PROSPER-ACT-Final.pdf.

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

lengthy investigations convey to other students that there is no point in coming forward as they will simply be strung along while they suffer. Further, the prolonged investigations take a very real toll on survivors and interfere with their access to education. They suffer from severe stress, changes in sleep and appetite, inability to focus, isolation, and many other problems as they are forced to relive their worst nightmare for a year because their school will not conclude the investigation. They are also consistently retraumatized by the repeated interviews, phone calls, and emails from the school. Even for those who ultimately obtain an outcome that restores some measure of safety (such as if the perpetrator is suspended or expelled for sexual violence), the process has tainted their educational experience to the point that they decide to drop out or transfer.

Examples of how the proposed regulations' failure to impose clear timeframes could harm students include, but are not limited to:

1. A February 2018 report by the Office of Civil Rights found that UC–Berkeley received 401 oral and written complaints of sexual harassment or violence, the majority of which were settled through informal processes. The report found that when cases actually were investigated, these investigations could take up to three years, an unreasonable period of time given that most undergraduate programs last four years. The report also found that most cases were closed after complainants graduated or left the program. Under the proposed regulations, these delays would not constitute a violation of Title IX, despite Berkeley's clear failure to provide students with a "prompt and equitable" response to their case.[163]

2. Similarly, a male student at Southern Methodist University dropped out of school after the University "failed to provide a 'prompt and equitable response'" to the assault and "failed to protect the victim from further harassment and embarrassment following the assault." The Department of Education found that the school violated Title IX in prolonging its response, but under the proposed regulations, the school would not have been found responsible. In effect, these proposed rules encourage universities to prolong cases until the survivor drops out or graduates, as was the case in both of these examples. These proposed provisions could discourage survivors from pursuing their cases and effectively removes responsibility from schools to discipline perpetrators while they are still students.[164]

   **f.  The proposed regulations would require schools to grant unequal appeal rights.**

Although Secretary DeVos claims that the proposed regulations make "[a]ppeal rights equally available to both parties,"[165] they do not in fact provide equal *grounds for appeal* to both parties, because complainants are barred from appealing a school's resolution of a harassment complaint based on the sanctions' inadequacy. Allowing only the respondent the right to appeal a

---

[163] Anjali Shrivastava, "UC Berkeley mishandled 8 Title IX cases, federal investigators say," *The Daily Californian,* 1 March 2018. http://www.dailycal.org/2018/03/01/uc-berkeley-mishandled-eight-title-ix-cases-federal-investigators-say/
[164] Jake New, "When the Victim is Male," *Inside Higher Ed,* 12 December 2014, https://www.insidehighered.com/news/2014/12/12/smu-found-violation-title-ix-after-not-investigating-male-students-claim-sexual
[165] DeVos, *supra* note 107.

SurvJustice, Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

sanction decision is both unfair and a violation of the requirement that procedures be equitable. Survivors are just as affected by sanction decisions as accused students. For example, if their abusers are still allowed to live in the same dorm as them, or if they are still in the same classroom, survivors may experience further trauma or even have to drop out of school to ensure their safety.

Experts support equal appeal rights. The ABA recommends that the grounds for appeal include "a sanction disproportionate to the findings in the case (that is, too lenient or too severe)."[166] ATIXA announced in October 2018 that it supports equal appeal rights for both parties, "[d]espite indications that OCR will propose regulations that permit inequitable appeals."[167] Even the white paper by four Harvard professors that is cited by the Department (p.9–10 n.2) recognizes that schools should allow "[e]ach party (respondent and complainant) [to] request an impartial appeal."[168]

## VI.     The proposed regulations are inconsistent with the Clery Act.

A number of the Department's proposed regulations are inconsistent with the Clery Act, which the Department enforces and which also addresses the obligation of colleges and universities to respond to sexual assault, dating violence, domestic violence, and stalking, as noted in the earlier section of this comment on stalking. Further examples include, the proposed regulations prohibiting schools from investigating off-campus and online sexual harassment conflict with the Clery Act's reporting requirements for policy violations that would also constitute sexual harassment under Title IX (such as sexual assault). The Clery Act requires colleges and universities to notify in writing all students who report sexual assault, stalking, dating violence, and domestic violence of their rights regardless of "whether the offense occurred on or off campus."[169] The Clery Act also requires colleges and universities to report all incidents of sexual assault, stalking, dating violence, and domestic violence that occur on "Clery geography," which is defined to include all property controlled by a school-recognized student organization (such as an off-campus fraternity), nearby "public property," and "areas within the patrol jurisdiction of the campus police or the campus security department."[170] The proposed regulations would therefore undermine and conflict with the Clery Act's mandate while creating an upside-down system in which schools would have to publicly disclose instances of sexual assault that occur off-campus but would be required by the Department to dismiss any complaints filed about these same incidents and not investigate them.

The Clery Act also requires that investigations of sexual assault, dating violence, domestic violence, and stalking be "prompt, fair, and impartial."[171] However, as previously noted, the proposed regulations set forth an unclear timeframe for investigations that conflicts with Clery's mandate that investigations be prompt. In addition, the many proposed regulations discussed

---

[166] American Bar Association, *supra* note140, at 5.
[167] Association of Title IX Administrators, *ATIXA Position Statement on Equitable Appeals Best Practices* 1 (Oct. 5, 2018), https://atixa.org/wordpress/wp-content/uploads/2018/10/2018-ATIXA-Position-Statement-Appeals.pdf.
[168] Bartholet, et al., *supra* note 156.
[169] 20 U.S.C. § 1092(f)(8)(C).
[170] 20 U.S.C. § 1092(f)(6)(iii); 20 U.S.C § 1092(f)(6)(iv)); 34 C.F.R. § 668.46(a)).
[171] 20 U.S.C. § 1092(f)(8)(b)(iv)(I)(aa).

SurvJustice Inc
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699
SURVJUSTICE

above that tilt investigation procedures in favor of the respondent are anything but fair and impartial.

Although the Department acknowledges that Title IX and the Clery Act's "jurisdictional schemes . . . may overlap in certain situations,"[172] it fails to explain how institutions of higher education should resolve the conflicts between two different laws when addressing sexual assault, dating violence, domestic violence, and stalking. These conflicting rules would create widespread confusion for schools and students.

**VII.    The proposed regulations requiring schools to dismiss sexual harassment complaints go beyond the Department's authority to effectuate the nondiscrimination provisions of Title IX and are unworkable in practice.**

Section 106.45(b)(3) of the proposed regulations actively *requires* schools to dismiss complaints of sexual harassment if such complaints do not meet strict standards. If a school determines that a complaint of sexual harassment does not meet the improperly narrow definition (meaning that the harassment is severe, pervasive, and objectively offensive), the school *must* dismiss it under the proposed rule. Further, even if the harassment is severe, pervasive, and objectively offensive, a school *must* dismiss the complaint if it occurs outside of an educational program or activity, including most off-campus and online harassment. However, the Department lacks the authority to require schools to dismiss complaints of discrimination. Under Title IX, the Department is authorized to issue rules only "to effectuate the [anti-discrimination] provision of [Title IX]." Title IX does not delegate to the Department the authority to dictate when schools *cannot* address sex discrimination.[173] By requiring schools to dismiss certain types of complaints of sexual harassment, without regard to whether those forms of harassment deny students educational opportunities on the basis of sex, § 106.45(b)(3) fails to effectuate Title IX's anti-discrimination mandate. It would also force many schools that already investigate off-campus conduct, pursuant to their existing student conduct policies, to abandon these anti-discrimination efforts and launch a thorough revision of their policies. While the Department is well within its authority to require schools to adopt civil rights protections to effectuate Title IX's mandate against sex discrimination, it lacks the authority to force schools to violate students' and employees' civil rights under Title IX by forcing schools to ignore sexual harassment. Furthermore, in creating this mandate, the Department forces schools to choose between adhering to administrative regulations or facing repeated civil liability in lawsuits brought by students, as courts have often held that schools act with deliberate indifference when they fail to respond to a complaint of sexual harassment *even if it occurred off campus*.[174] Schools should not have to face the catch-22 of facing federal investigations and losing their

---

[172] 83 Fed. Reg. 61468.

[173] *See* Michael C. Dorf, *The Department of Education's Title IX Power Grab*, VERDICT (Nov. 28, 2018), https://verdict.justia.com/2018/11/28/the-department-of-educations-title-ix-power-grab.

[174] *See generally* Dana Bolger, *Betsy DeVos's New Harassment Rules Protect Schools, Not Students*, New York Times (Nov. 27, 2018) https://www.nytimes.com/2018/11/27/opinion/betsy-devos-title-ix-schools-students.html last viewed January 30, 2019.
DR. EDWARD F. DRAGAN, *Title IX: What Constitutes Actual Notice of Sexual Harassment or Sexual Violence in a School Setting? http://education-expert.com/2017/06/title-ix-constitutes-actual-notice-sexual-harassment-sexual-violence-school-setting/*

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

federal funding or repeatedly being found civilly responsible and having to pay significant monetary damages.

The Department further notes that, if conduct does not meet the proposed regulation's definition of harassment or if it occurs off-campus, schools may still process the complaint under a different conduct code. However, they may not process it under a conduct code relating to Title IX. This "solution" to the required dismissals for Title IX investigations is both confusing and impractical. The proposed regulations offer no guidance or safe harbor for schools to offer parallel sexual harassment proceedings that do not comply with the detailed and burdensome procedural requirements set out in the proposed rule. Schools that did so would no doubt be forced to contend with accused students' complaints that the school had failed to comply with the requirements set out in the NPRM and thus violated accused students' rights as described in the NPRM.

## CONCLUSION

The Department's proposed regulations import inappropriate criminal and civil legal standards into administrative agency enforcement, rely on sexist stereotypes about survivors of sexual harassment, and impose procedural requirements that force schools to provide Title IX procedures that favor accused students to the detriment of survivors and in violation of the equitable process requirement of Title IX. Instead of effectuating Title IX's prohibition on sex discrimination in schools, these proposed regulations serve only to protect schools from liability if they fail to respond to complaints of sexual harassment. SurvJustice calls on the U.S. Department of Education to immediately withdraw this NPRM and instead focus its energies on vigorously enforcing the Title IX requirements that the Department has relied on for decades in order to ensure that schools promptly and effectively respond to sexual harassment, remedy its effects, and prevent its recurrence.

Thank you for the opportunity to submit comments on the NPRM. Please do not hesitate to contact Katherine W. McGerald at Katherine.McGerald@SurvJustice.org to provide further information or facilitate discussion.

Katherine W. McGerald, Esq.
Executive Director
SurvJustice, Inc.
1015 15th Street NW
Suite 632
Washington, D.C. 20005
202-869-0699

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

SURVJUSTICE, INC., et al., )
     Plaintiffs, )
                )
                )     Case Number: 3:18-cv-00535-JSC
                )
v.               )     Declaration of Noreen Farrell
                )
                )
ELISABETH D. DEVOS, et al., )
     Defendants. )

I, Noreen Farrell, declare as follows:

1.     I submit this declaration in support of the Motion for Summary Judgment filed by Equal Rights Advocates ("ERA"), SurvJustice, Inc., and Victim Rights Law Center, plaintiffs in the above-captioned case, which challenges as unlawful the 2017 Title IX Policy released by the U.S. Department of Education.

2.     The facts set forth in this declaration are based on my personal knowledge. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

3.     Equal Rights Advocates has employed me since 2004. I joined the organization as a Staff Attorney and later became the Legal Director. Since April 2012, I have served as the Executive Director of the organization. As an attorney with ERA and later as its Legal Director, I was counsel for plaintiffs in a number of Title IX cases, including *Mansourian v. Regents of the Univ. of California*, No. 03-2591 (E.D. Cal. Apr. 23, 2008), which resulted in a published Ninth Circuit opinion interpreting Title IX, 602 F.3d 957 (9th Cir. 2010), and *Brust v. Regents of Univ. of California*, No. 2:07-1488 (E.D. Cal. Dec. 12, 2007), which resulted in a stipulated judgment

designed to ensure equitable opportunities for female student athletes at University of California Davis, *Brust v. Regents of Univ. of California*, No. 2:07-1488 (E.D. Cal. Oct. 20, 2009). I also represented numerous students facing discrimination in school and university settings as a result of sexual harassment and/or sexual violence and helped to form a national network of Title IX advocates when I was actively litigating these cases. In my current position, I remain active in Title IX advocacy efforts and related policy initiatives as both a legal expert and thought leader on education equity matters. I have directly contributed to the conceptualization, development, project design, strategic planning, and oversight of the Initiative to End Sexual Violence in Education ("ESVE") described below. I oversee the organization's budget and fundraising efforts and am responsible for raising money to support all the Title IX sexual violence-related work described herein.

4.      Equal Rights Advocates is a national nonprofit civil rights organization based in San Francisco, California. Founded in 1974, ERA is dedicated to protecting and expanding economic and educational access and opportunities for women and girls. ERA takes an intersectional approach to tackling gender-based harassment, sexual violence, and other forms of gender discrimination, with a focus on centering the experiences of women of color and those from disadvantaged communities.

5.      In furtherance of ERA's mission, the organization engages in public education efforts; advocates for policy and legislative reform; provides free legal information and counseling; and litigates cases involving issues of gender discrimination in employment and education at all stages. Examples of ERA's projects and initiatives include: (1) the Women at Work Initiative, which seeks to remove systemic barriers to women's economic security,

including sexual harassment, pregnancy discrimination, and unequal pay;[1] (2) the Access to Justice Initiative, which provides legal assistance and information to workers and students facing discrimination or other unfair treatment because of gender;[2] and (3) the Strong Girls Initiative, which seeks to enforce existing laws and advocate for policies that ensure all students can access education free from sexual harassment and unburdened by gender stereotypes.[3]

6.      For the past 45 years, ERA has advocated for gender equity in education across the country through a unique combination of strategies. We provide free legal information and assistance to individuals facing discrimination at school through our Advice and Counseling program. We represent victims of sexual harassment and assault in cases brought pursuant to Title IX and analogous state laws at all stages, from the school grievance process, through the administrative agency process, and up to and  including the United States Supreme Court. ERA has represented plaintiffs in important precedent-setting cases under Title IX, including *Doe By and Through Doe v. Petaluma City School Dist.*, 54 F.3d 1447 (9th Cir. 1995), where the Ninth Circuit held for the first time that a school can be held liable under Title IX when it fails to address a student's claim of serious harassment by another student. ERA also collaborates with students, schools, and community organizations to provide Know-Your-Rights workshops on issues related to gender discrimination and Title IX. We publish reports, fact sheets, and other materials about sexual harassment and gender-based violence in education.[4] Because of this

---

[1] *Women at Work Initiative*, Equal Rights Advocates, https://www.equalrights.org/our-work/women_at_work/.
[2] *Access to Justice Initiative*, Equal Rights Advocates, https://www.equalrights.org/our-work/access-to-justice/.
[3] *Strong Girls Initiative*, Equal Rights Advocates, https://www.equalrights.org/our-work/strong_girls/.
[4] *See, e.g.*, *Sexual Harassment at School*, Equal Rights Advocates, https://www.equalrights.org/legal-help/know-your-rights/sexual-harassment-at-school/.

Declaration of Noreen Farrell; Case No.: 3:18-cv-00535-JSC                    Page: 3

work, ERA knows firsthand the protections needed in the Title IX process to ensure that students who experience sexual harassment and assault feel safe coming forward with their claims, and that they will be protected through a fair and equitable process designed to limit any infringement upon their educational opportunities.

7.      Students who experience sexual harassment, including in its most extreme form, sexual violence, suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities, on the basis of sex.

8.      Twenty years ago, acting on the basis of Supreme Court decisions that confirmed that Title IX's promise of equality is hollow if a student can be subjected to sexual harassment with impunity, the U.S. Department of Education issued its first guidance to educational institutions (both K-12 schools and institutions of higher education) on the standards that govern their response to sexual harassment, a form of sex discrimination. Since then, through several successive policy materials issued under Administrations led by both political parties, the Department has reaffirmed that Title IX's prohibition on sex discrimination requires schools and universities to prevent and redress sex and gender-based harassment.

9.      But in September 2017, the Department of Education rescinded prior guidance documents and replaced those with a new Title IX Policy which rolls back many protections previously afforded to students who experience, and report, incidents of sexual assault and violence. Under the new Title IX Policy, schools can, and in certain cases must, implement Title IX procedures that tilt in favor of the accused at the expense of the survivors. Under the 2017 Title IX Policy schools:

      a.      Can require a higher standard of proof for complaints of sexual assault compared with what had previously been required;

b.   Can create one-sided appeals processes, whereby only accused students have the right to appeal an adverse finding;

c.   Can allow students to elect to resolve complaints of sexual violence through mediation, despite significant evidence showing that students who experience sexual violence often feel unduly pressured into mediation—a process that exposes students to the risk of being re-traumatized, coerced, or bullied by their alleged assailant;

d.   Must disclose the identity of the student-complainant to the alleged assailant;

e.   Do not have to provide interim measures in a way that minimizes the burden on complainants of sexual violence, and are allowed to impose mutual no-contact orders, which essentially punish a survivor for reporting an incident of rape or sexual assault;

f.   Do not have to complete Title IX proceedings within an objectively prompt timeframe, aiming to meet a 60-day benchmark;

g.   Can decline to investigate off-campus misconduct even when it results in a hostile environment on-campus;

h.   Can allow information about a complainant's sexual history to be considered during a Title IX hearing; and

i.   Can allow alleged assailants to cross-examine complainants.

10.   These new policies reflect sexist stereotypes about sexual harassment survivors: namely, that women and girls tend to lie about, exaggerate, or misunderstand sexual harassment, including sexual assault and other forms of sexual violence. The result is a framework that

provides incentives to schools to place a greater emphasis on the rights of respondents over protection for complainants. The new Policy serves only to shield schools from liability when they refuse to address complaints of sexual assault and to encumber schools that mean to protect complainants by tying their hands in the face of obvious safety threats and gross conduct violations.

11.     ERA has been harmed by the 2017 Title IX Policy.

12.     The Policy frustrates ERA's mission and purpose by (among other things):

    a.     Limiting the efficacy of available avenues of redress for the population it seeks to serve; and

    b.     Creating confusion amongst the student community about a survivor's rights under Title IX.

13.     Work on behalf of sexual harassment and assault survivors in the academic context is central to ERA's mission. The 2017 Title IX Policy frustrates this mission by making it more difficult for ERA to obtain timely and fair outcomes for survivors and to protect survivors' access to education. For example, ERA hears and sees firsthand how prevalent off-campus sexual harassment is and how much it impacts students' access to educational programs and activities. We receive daily requests for assistance from victims of off-campus harassment who must face their alleged harassers or assailants in class, on athletic teams, and in on-campus housing. Because many of ERA's past and current clients experienced sexual assault or other sexual harassment that took place off-campus, we know that such harassment is equally as likely to create an unsafe and hostile educational environment as harassment that takes place during an on-campus school activity. Yet, under the 2017 Title Policy (and the proposed Title IX regulations), if a student were harassed or assaulted off-campus by a professor, her college could

claim zero obligation to investigate that assault as a Title IX matter—even if the student has to continue taking the professor's class. Similarly, if a college student were raped at an off-campus party by a fellow student, their school may not be required to investigate or take other remedial action—even if that student is forced to confront their rapist every day in class, the dining hall, or residential hallways. The provision of the 2017 Policy distinguishing between schools' obligations to respond to "off-campus" harassment versus harassment that takes place on school property within the context of a school activity poses particular risks to students of community colleges and vocational schools, none of whom live on-campus. In one case ERA worked on after release of the 2017 Policy, a community college professor demanded that certain female students answer his calls after hours, meet him off-campus to go over their coursework, and allow him to drive them home after class. The 2017 Title Policy makes it more difficult to advocate for and obtain a timely, fair outcome for such students because it tells their college it may not have any obligation to investigate the harassment as a Title IX matter simply because it happened off-campus.

14.     Additionally, ERA knows that requiring schools to make interim measures "equally" available to both complainants and respondents will hamper our ability to get timely, fair outcomes for student survivors of sexual violence. ERA has observed that schools are interpreting the 2017 Title IX Policy as prohibiting one-way no-contact orders to protect complainants and requiring *mutual* no-contact orders, even without any evidence that a complainant has engaged in threatening behavior or other misconduct. ERA has seen how such policies enable interim measures to be used *against* complainants, sometimes leading to full investigations of facially spurious, retaliatory counter-claims while delaying the the completion and resolution of investigations of the underlying harassment or assault allegations—all of which

sends a message to victims of sexual assault that they proceed with a formal complaint at their peril.

15.     ERA's mission is also frustrated by the confusion bred by the 2017 Title IX Policy. The withdrawal of the prior guidance and the adoption and implementation of the new Policy has caused significant confusion for schools, advocates, and students. ERA has seen an increase in the demand for its consultation services from students who need help navigating a more complex and confusing Title IX grievance process. Schools and advocates, too, have suffered from the vague and sometimes conflicting instructions the Policy entails, including for example, internally conflicting instructions as to whether a school must address complaints of off-campus conduct and instructions on mediation that conflict with the still-effective 2001 Guidance.

16.     As a result of the 2017 Title IX Policy, ERA has been compelled to expend significant resources.

17.     First and foremost, in response to the 2017 Title IX Policy, ERA launched a new National Initiative to End Sexual Violence in Education ("ESVE"), to narrow the justice gap for survivors of sexual assault and violence. At the core of this initiative is ERA's work to create a supported network of trained legal advocates to defend students' civil rights and provide free legal assistance to student survivors. To this end, ERA has, or is in the process of:

a. Expanding ERA's Advice & Counseling service to offer holistic legal assistance in response to an increasing demand for consultation services from student survivors of sexual violence;[5]

b. Recruiting and training pro bono attorneys to provide high-quality, trauma-informed legal counseling and representation to student survivors at all stages of the Title IX complaint process;

c. Establishing a network of experienced mentor attorneys to support the pro bono network and work with ERA on potential impact litigation or other strategic enforcement arising from ESVE cases;

d. Developing a nationally-unique, continuing education (CLE) accredited training series on representing student victims of sexual violence;

e. Convening and participating in coalitions and working groups of lawyers and student advocates to share insights, spot trends, and strategize about enforcement gaps and advocacy opportunities; and

f. Partnering with market experts and student researchers to help us develop outreach materials and strategic communications that will reach students who need us most.

18. To meet the growing needs of students and develop the ESVE Initiative, ERA has made several staff hires. In December 2017, ERA hired Becca Holt as Program Coordinator.

---

[5] From March 2018 to July 2019, ERA processed over 130 requests for assistance about gender discrimination matters in education through our Advice & Counseling program, 96 of which relate to sexual harassment or violence. This represents a significant increase in the number and portion of education-related inquiries involving sexual harassment or violence as compared to the previous year.

Through April 2019, Ms. Holt dedicated half of her time to coordination and project management for the ESVE Initiative. In April 2019, recognizing the growing demand for our services and wanting to ensure the ESVE initiative and ERA's Advice & Counseling program were fully staffed and supported, we promoted Ms. Holt to a Senior Program Coordinator position and she became a full-time member of ERA's Legal team. In this position, she continues to oversee project management for the ESVE initiative and is responsible for integrating and coordinating the student outreach and direct services provided through the ESVE initiative into ERA's Advice & Counseling program and related activities.

19.     In October 2018, ERA hired Harjit Kaur as the Pro Bono Coordinating Attorney for the ESVE Initiative, the first time ERA has employed any attorney in such a capacity. Although initially structured as a half-time position with a one-year term, ERA recently expanded Ms. Kaur's position to a full-time role and extended her contract in response to the increased demand for services from students and in recognition of the hours it takes to adequately train and support a pro bono program. In her full-time position, Ms. Kaur will devote the majority of her time (at least 70 percent) to work directly related to the ESVE Initiative, and the remainder of her time to providing legal services and assisting with supervision and management of ERA's Advice & Counseling program, at least half of which relates directly to her work on ESVE and/or involves sexual harassment/assault in education matters.

20.     This month, ERA will finish training the first group of ESVE pro bono attorneys who will provide legal assistance to students facing sexual harassment and violence starting this fall, using ERA's recently-updated and expanded intake and case management system. Beginning in late 2017, and into the spring of 2018, ERA worked to design this system on a cloud-based program called LegalServer®. ERA staff helped to migrate data from the former

Advice & Counseling database onto this new system, develop protocols, write instructions and guidelines for intake counselors, and design the intake process (including an online intake module specifically for students with questions about sexual harassment and assault). Using the program's pro bono module, ERA staff also have developed assignment, tracking, and supervision protocols specifically for ESVE pro bono volunteers.

21.     In addition to spending resources on developing, implementing, and running the ESVE Initiative, ERA has also engaged in regulatory and legislative advocacy in response to the Department's Title IX policy changes.  In January 2019, ERA submitted a comment, Ex. C-1, to the Department of Education on the Notice of Proposed Rulemaking ("NPRM") released in November 2018 proposing, in large part, to codify in regulation the policies set forth in the September 2017 Title IX Policy. *See* NPRM, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462 (Nov. 29, 2018). ERA also coordinated a comment-submission campaign: in collaboration with the student-led organization End Rape on Campus, we developed and posted on our website a Comment Guide, which included instructions on how to submit a comment, tips on how to write an effective comment, citations to specific sections of the proposed regulations to refer to in a comment, a glossary of relevant terms, and sample draft comments.[6] Our Comment Guide was used by 2,352 people and organizations who submitted comments to the Department of Education. In addition, we have spent significant resources engaging in public education and outreach, coalition building, and lobbying the California state legislature to pass a bill, SB 493, which would codify

_____

[6] *Comment Guide: Speak Out Against Title IX Regulations*, Equal Rights Advocates, https://www.equalrights.org/comment-guide-proposed-title-ix-regulations/ (Dec. 6, 2018).

Declaration of Noreen Farrell; Case No.: 3:18-cv-00535-JSC                    Page: 11

into state law (specifically, the Education Code) many of the procedural protections and guidelines that were eviscerated by the 2017 Title IX Policy.

22.     Finally, as result of the 2017 Title IX Policy, throughout 2018 and this year, ERA engaged in additional community education and outreach with student groups, public interest/civil rights legal organizations, and Title IX coordinators. During this period, ERA also convened a Bay Area Title IX Roundtable and increased our participation in a number of national and regional coalitions, alliances, and working groups focused on helping student survivors of sexual violence and defending education-related civil rights. ERA staff has provided training on the new Policy and the proposed Title IX regulations and has shared resource materials designed to help students and advocates for survivors understand students' legal rights and avenues for relief as well as what to expect from schools in the wake of changes to Title IX policy that have been made by the Department of Education.

23.     ERA has already expended significant resources to conduct the additional work outlined above to counteract the harm from the 2017 Title IX Policy. To date, and collectively, ERA has already expended in excess of 4,238 hours of staff and consultant time, at an estimated cost to the organization of over $255,000, plus approximately $23,000 in program and meeting supplies and travel expenses to undertake this work and to engage in the additional fundraising efforts required to fund the above activities. ERA anticipates that over the next 18 months, it will have to devote an equal or greater amount of staff and consultant time and will have to incur an equal or increased amount of other expenses in order to: (1) meet increasing demand for direct legal assistance and representation of students facing more complex and unfavorable Title IX complaint systems and shifting practices at their schools; (2) recruit, train, and provide ongoing support to a growing network of pro bono attorneys; (3) continue to educate the public and

engage community members (including parents, students, and other advocates) about the ever-changing Title IX legal and policy landscape; (4) carry out an outreach campaign targeting students most vulnerable to sexual harassment and violence to let them know about their rights and where they can get help; (5) conduct policy advocacy at the state and federal level to restore, defend, and expand the civil rights of student survivors of sexual harassment and violence; and (6) fundraise to support this additional work.  The time and resources spent by ERA as a direct result of the 2017 Title IX Policy have impaired our ability to engage in multiple other mission-critical activities, including: worker and student organizing and training; workplace justice-related litigation and advocacy; and strategic communications around legislative advocacy and policy reform efforts *not* related to Title IX rights and procedural protections.

24.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2019.

Noreen Farrell

Declaration of Noreen Farrell; Case No.: 3:18-cv-00535-JSC                    Page: 13

# EXHIBIT C-1



February 15, 2019

Submitted via www.regulations.gov

Kenneth L. Marcus
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

***Re: ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14, Nondiscrimination on the Basis of Sex
in Education Programs or Activities Receiving Federal Financial Assistance.***

Dear Mr. Marcus:

Equal Rights Advocates ("ERA") strongly opposes the Department of Education's ("the Department")
proposal to reverse and undermine existing rules implementing Title IX of the Education Amendments of
1972 ("Title IX") as published in the Federal Register on November 29, 2018.  The Department's
proposed rules on Title IX set forth in the Notice of Proposed Rulemaking ("NPRM" or "proposed rules")
are antithetical to the spirit and purpose of Title IX, which is to eradicate discrimination on the basis of
sex in educational  programs and activities receiving federal financial assistance (hereinafter, "schools
and universities" or "educational programs").  This landmark civil rights law has helped fight sex
discrimination and promote equal educational access and opportunities for girls and women.

Founded in 1974, ERA is a national non-profit civil rights organization dedicated to protecting and
expanding educational access and opportunities for women and girls.  For the past 45 years, ERA has
advocated for gender equity in education across the country through a unique combination of strategies
including litigation, policy reform, and community engagement.  We provide free legal information and
assistance to individuals facing discrimination at school and at work through our Advice and Counseling
program. ERA represents victims of sexual harassment and assault in cases brought pursuant to Title IX
at all stages, from the administrative agency process through and including the United States Supreme
Court.  We also collaborate with students, schools, and worker and community organizations to provide
Know-Your-Rights workshops on issues related to gender discrimination and Title IX. We publish reports,
fact sheets, and other materials about sexual harassment and gender-based violence in education. ERA
recently launched an initiative to End Sexual Violence in Education ("ESVE") in order to narrow a rapidly
expanding justice gap for survivors of sexual violence in schools. Students are ERA's clients and our
partners in this work; their experiences, input, and needs drive ERA's commitment of resources, our
search for solutions, and our fight for justice.

Twenty years ago, acting on the basis of Supreme Court decisions and the recognition that Title IX's
promise of equality is hollow if a student can be subjected to sexual harassment with impunity, the
Department issued its first guidance to educational institutions (both K-12 schools and institutions of
higher education) on the standards that govern their response to sexual harassment, a form of sex
discrimination. Since then, through several successive guidance materials issued under Administrations
led by both political parties (as discussed below), the Department has reaffirmed that Title IX's

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

_____

prohibition on sex discrimination requires schools and universities to prevent and redress sex and gender-based harassment. These policies recognize that students who experience sexual harassment, including in its most extreme form, sexual violence, suffer not only physically and emotionally, but also in their ability to participate in and benefit from educational opportunities, on the basis of their sex.

The proposed rules contravene Title IX and represent a betrayal of the Department's duty to promote and enforce the educational civil rights of all students. They turn the fundamental anti-discrimination purpose of Title IX on its head by curtailing the rights and protections afforded to victims and survivors of sex-based violence, running directly counter to the gender equity aim of the law these regulations should be advancing. The proposed rules will make campuses less safe and make equitable access to education more fragile and uncertain. They create dangerous mandates that will dissuade, if not prevent, many victims of sexual harassment from seeking support and obtaining the redress they need in order to maintain their access to an education. They push schools to adopt policies and processes that place a uniquely high burden on students who report sexual harassment or assault – the vast majority of whom are women and girls – and all but require students to retain an attorney in order to participate in grievance processes relating to sexual misconduct, whether as complainants or respondents. These rules will have a devastating impact on all students, but will be especially harmful to women and girls, particularly those who identify as people of color, members the LGBTQI community, and/or persons with disabilities, who are more vulnerable to sexual harassment and gender-based violence in the first place.

For the reasons discussed below, Equal Rights Advocates unequivocally opposes the Department's proposed rules.

**I.    <u>The Proposed Rules Ignore the Realities of Sexual Harassment and Violence in Schools</u>**

The proposed rules ignore the pervasiveness and devastating impact of sexual violence in schools and universities.  Instead of effectuating Title IX's purpose of eliminating sexual harassment, assault, and other forms of unlawful sex discrimination, they make it harder for students to report sexual and gender-based misconduct, allow (if not require) schools to ignore certain reports when they are made, and unfairly tilt the investigation process in favor of respondents to the direct detriment of survivors.

**a.  Sexual harassment occurs at epidemic levels in schools and universities.**

Sexual harassment – which is conduct including, but not limited to, unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal, nonverbal, or physical conduct of a sexual nature that targets someone because of their sex, including sexual assault or other sexual violence (hereinafter "sexual harassment" or "sexual harassment, including sexual violence") – is widespread in schools across the country, particularly in institutions of higher education. Sexual harassment disproportionately impacts women and girls.

- In grades 7-12, 56% of girls and 40% of boys are sexually harassed in any given school year.[1]  More than 1 in 5 girls ages 14-18 are kissed or touched without their consent.[2]

_____

[1] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW (2011) [hereinafter *Crossing the Line*], *available at* https://www.aauw.org/research/crossing-the-line.
[2] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* at 1 (Apr. 2017) [hereinafter *Let Her Learn: Sexual Harassment and Violence*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

- During college, 62% of women and 61% of men experience sexual harassment.[3]  More than 1 in 5 women and nearly 1 in 18 men are sexually assaulted in college.[4]
- Men and boys are far more likely to be victims of sexual assault than to be falsely accused of it.[5]

Students from historically marginalized and underrepresented groups are more likely to experience sexual harassment than their peers:

- 56% of girls ages 14-18 who are pregnant or parenting are kissed or touched without their consent.[6]
- More than half of LGBTQ students ages 13-21 are sexually harassed at school.[7]
- Nearly 1 in 4 transgender and gender non-conforming students are sexually assaulted during college.[8]
- Students with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[9]

Sexual harassment occurs both on campus and in off-campus spaces closely associated with school. In fact, only 8% of all student sexual assaults occur on school property.[10]  With nearly 9 in 10 college students living off campus,[11] it is not surprising that an estimated 41% of college sexual assaults involve

---

[3] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW at 17, 19 (2005) [hereinafter *Drawing the Line*], *available at* https://history.aauw.org/aauw-research/2006-drawing-the-line (noting difference in the types of sexual harassment and reactions to it).

[4] E.g., David Cantor et. al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, ASSOCIATION OF AMERICAN UNIVERSITIES at 13-14 (Sept. 2015) [hereinafter *AAU Campus Climate Survey*], *available at* https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[5] *See* Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], *available at* https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html (citing Centers for Disease Control and Prevention, THE NATIONAL INTIMATE PARTNER AND SEXUAL VIOLENCE SURVEY: 2010 FINDINGS ON VICTIMIZATION BY SEXUAL ORIENTATION, *available at* https://www.cdc.gov/ViolencePrevention/pdf/NISVS_SOfindings.pdf).

[6] National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* at 12 (2017) [hereinafter *Let Her Learn: Pregnant or Parenting Students*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting.

[7] Joseph G. Kosciw et al., *The 2018 National School Climate Survey: The Experience of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools,* GLSEN at 26 (2018) [hereinafter *2017 National School Climate Survey*], *available at* https://www.glsen.org/article/2017-national-school-climate-survey-1; *see also* Centers for Disease Control and Prevention, Youth Risk Behavior Survey, MMWR Vol. 65, No. 9 (Aug. 12, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf (national survey finding that lesbian and bisexual girls and gay and bisexual boys in grades 9-12 experienced higher rates of sexual assault than their straight counterparts).

[8] *AAU Campus Climate Survey, supra* note 4 at 13-14.

[9] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* at 7 (2017) [hereinafter *Let Her Learn: Girls with Disabilities*], *available at* https://www.nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities.

[10] RAINN, *Scope of the Problem: Statistics,* https://www.rainn.org/statistics/scope-problem.

[11] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, NEW YORK TIMES (Aug. 5, 2016), *available at* https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html.

off-campus parties.[12]  Additionally, studies show that college students are far more likely to experience sexual assault if they are in a sorority (nearly 1.5x more likely) or fraternity (nearly 3x more likely).[13]

      **b. Sexual harassment and assault are vastly underreported.**

Reporting sexual harassment or assault is never easy, and the proposed rules would make it even more difficult for students to come forward and ask their schools to support them and take appropriate corrective action.  Nationally, studies estimate that only 7 to 12% of college student survivors[14] and 2% of girls aged 14-18 report sexual assault to their schools or the police.[15]  Students do not report sexual assault and harassment for many reasons, including fear of reprisal, lack of knowledge about where or how to complain, stigma, fear of not being believed or taken seriously, and because they think that no one will do anything to help.[16]  Students of color, undocumented students,[17] LGBTQI students,[18] and students with disabilities are even less likely than their peers to report sexual assault to law enforcement due to reasonable fears about being subjected to police violence and/or reported to immigration authorities.  Survivors of color who are harassed or assaulted by another person of color may not want to report to law enforcement and thereby add to the criminalization of men and boys of color.[19]  For students already facing significant social and cultural barriers to reporting sexual harassment and assault, it is especially important that schools and universities provide an accessible and equitable process for reporting harassment and for remedying the hostile educational environment created by such misconduct.

Contrary to the narrative espoused by the Department, most student victims of sexual assault and other gender-based violence do not wish to pursue criminal charges against their perpetrators. In ERA's experience, most students seeking our advice and assistance are concerned primarily with maintaining or recovering their access to education. They want to be heard and feel safe at school. More than

---

[12] United Educators, *Facts From United Educators' Report – Confronting Campus Sexual Assault: An Examination of Higher Education Claims, available at*  https://www.ue.org/sexual_assault_claims_study (last visited on January 27, 2019).

[13] Jennifer J. Freyd, *The UO Sexual Victimization and Institutional Betrayal Surveys: 2014, 2015, and 2015-2016* (Oct. 16, 2014), *available at* https://www.uwire.com/2014/10/16/sexual-assault-more-prevalent-in-fraternities-and-sororities-study-finds (finding that 48.1% of females and 23.6% of males in fraternity and sorority life [FSL] have experienced non-consensual sexual contact, compared with 33.1% of females and 7.9% of males not in FSL).

[14] *Poll: One in 5 women say they have been sexually assaulted in college,* Washington Post (June 12, 2015), *available at* https://www.washingtonpost.com/graphics/local/sexual-assault-poll; *See also* The White House, The Second Report of the White House Task Force to Protect Students from Sexual Assault at 10 (Jan. 5, 2017), *available at* https://obamawhitehouse.archives.gov/sites/obamawhitehouse.archives.gov/files/images/Documents/1.4.17.VAW%20Event.TF%20Report.PDF (finding that only 7 percent of students who indicated that they had been raped reported the rape to school authorities).

[15] *Let Her Learn: Sexual Harassment and Violence, supra* FN 2 at 1.

[16] RAINN, *Campus Sexual Violence: Statistics, available at* https://www.rainn.org/statistics/campus-sexual-violence.

[17] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation,* New York Times (April 30, 2017), *available at* https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[18] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], *available at* https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[19] *See, e.g.,* Lauren Rosenblatt, Q&A with Chardonnay Madkins, *Why it's Harder for African American Women to Report Campus Sexual Assaults, Even at Mostly Black Schools*, L.A. Times, Aug. 28, 2017, *available at* https://www.latimes.com/politics/la-na-pol-black-women-sexual-assault-20170828-story.html.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

getting the individuals who harassed or assaulted them "punished," most students with whom ERA works identify as their primary goals: (1) getting help to mitigate the harm they or their academic careers have suffered due to the harassment and (2) making sure that other students are not harmed by the respondent's actions and choices in the future.

When schools fail to respond effectively to sexual violence against students, the impact can be devastating.[20]  Too many survivors end up dropping out of school because they do not feel safe on campus;[21] some even face expulsion when their grades go down because they experienced trauma.[22] Of the victims we have worked with and heard from over the last three years who have been pushed out of their schools in the wake of severe harassment or sexual violence, 100% have cited their school's response (or lack thereof) as the driving factor of their pushout.

## II.     The Proposed Rules Would Hobble Title IX Enforcement and Discourage Reporting of Sexual Harassment, to the Detriment of Schools and Students.

For the better part of two decades, the Department has used one consistent standard to determine if a school violated Title IX by failing to adequately address sexual harassment and assault.  The Department's 2001 Guidance, which went through public notice-and-comment and has been enforced under both Democratic and Republican administrations,[23] defines sexual harassment as "unwelcome conduct of a sexual nature."[24]  The 2001 Guidance requires schools to address student-on-student harassment if *any employee* "knew, or in the exercise of reasonable care should have known" about the harassment.  In the context of employee-on-student harassment, the Guidance requires schools to address harassment "whether or not the [school] has 'notice' of the harassment."[25]  Under the 2001 Guidance, schools that fail to "take immediate and effective corrective action" would be in violation of

---

[20] *E.g.,* Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus,* Vice (Sept. 26, 2017), *available at* https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[21] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout,* 18 (2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), *available at* https://doi.org/10.1177/1521025115584750 (reporting that 34% of college student survivors drop out).

[22] *E.g.,* Alexandra Brodsky, *How much does sexual assault cost college students every year?,* Washington Post (Nov. 18, 2014), *available at* https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-students-every-year.

[23] The Department has reaffirmed these standards on numerous occasions in policy guidance issued after 2001. *E.g.,* U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment* (Jan. 25, 2006) [hereinafter 2006 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html (Bush Administration); U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague/201104.pdf (Obama Administration); U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, & 16 (Apr. 4, 2011) [hereinafter 2011 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (same); U.S. Dep't of Educ. Office for Civil Rights, *Question and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (same); and U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Campus Sexual Misconduct* (Sept. 2017) [hereinafter 2017 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (Trump administration).

[24] U.S. Department of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

[25] *Id.* at 10.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

Title IX.[26]  These standards help effectuate Title IX's nondiscrimination mandate by requiring schools to quickly and effectively respond to serious instances of harassment and enabling the Office for Civil Rights ("OCR") to fulfill its duties of ensuring equal access to education and enforcing students' civil rights.

In the very specific and narrow context of a Title IX lawsuit *seeking monetary damages* against a school because of sexual harassment, the Supreme Court has held that, in order to recover monetary damages, a plaintiff must show that their school was *deliberately indifferent* to *known* sexual harassment that was severe *and* pervasive and which deprived the plaintiff of access to educational opportunities and benefits.[27]  In establishing this standard, the Court acknowledged that it was different from that which applied to administrative enforcement or other agency actions.  The Court drew a distinction between "defining[ing] the scope of behavior that Title IX proscribes" and identifying the narrower circumstances in which a school's failure to respond to harassment supports a claim for monetary damages.[28]  It specifically noted that the Department could still enforce rules addressing a broader range of conduct in order to fulfill Title IX's nondiscrimination mandate.[29]  The 2001 Guidance directly addressed this, concluding that it was inappropriate for the Department to limit its enforcement activities to the narrower damages standard and that the Department would continue to enforce the broad protections provided under Title IX.  Indeed, in the current proposed regulations, the Department acknowledges that it is "not required to adopt the liability standards applied by the Supreme Court in private suits for money damages."[30]

As set out in further detail below, the actual notice requirement, "severe and pervasive" definition of harassment, and the deliberate indifference standard are meant to be applied in the unique circumstance of determining schools' liability for monetary damages in private suits. They have no place in the far different context of administrative enforcement of Title IX, with its iterative process and focus on voluntary corrective action by schools.  By choosing to import those liability standards into the proposed rules, the Department will hobble Title IX enforcement and discourage reporting of sexual harassment, to the detriment of schools and students.

   a.  **The proposed changes to the notice requirements, deliberate indifference standard, and definition of sexual harassment leave students far less protected than employees.**

The proposed rules change the definition of sexual harassment and dramatically shrink schools' responsibility to intervene. In many instances, the rules will *prohibit* schools from taking the same steps to protect children that they are *required* to take to protect adults in the workplace.  Even where the rules do not affirmatively prohibit schools from taking action, they create a more demanding standard for seeking help and ending sexual harassment for children in schools than for adults in the workplace.

Under Title VII, the federal law that prohibits sex discrimination in employment, employers – including schools – are potentially liable for harassment of an employee if the harassment is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment" and thereby creates a discriminatorily hostile or abusive working environment.[31] If an employee is harassed by a co-worker or other third

---

[26] *Id.* at 12 (citing 34 CFR §106.31(b)).

[27] *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 290 (1998) (detailing standard for employee-on-student harassment); *Davis v. Monroe Cty. Bd. Of Educ.,* 526 U.S. 629, 650 (1999) (detailing standard for student-on-student harassment).

[28] *Davis,* 526 U.S. at 639.

[29] *Gebser,* 524 U.S. at 291-92 (citing 20 U.S.C. § 1682).

[30] 83 Fed. Reg. 61468, 61469.

[31] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)).

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

party, the employer is liable if: (1) it "knew or should have known of the misconduct" and (2) failed to take immediate and appropriate corrective action.[32]  If the employee is harassed by a supervisor, the school is automatically liable if the harassment resulted in a tangible employment action such as firing or demotion, and otherwise unless the school can prove that the employee unreasonably failed to take advantage of opportunities offered by the school to address harassment.[33]  However, under the Department's proposed rules on prohibited sexual harassment under Title IX, a school or program would only be liable for harassment against a student if it is (1) deliberately indifferent to (2) sexual harassment that is so severe, pervasive, *and* objectively offensive that it *denied* the student access to the school's program or activity; (3) the harassment occurred within the school's program or activity; and (4) a school employee with "the authority to institute corrective measures" had "actual knowledge" of the harassment.  In other words, under the proposed rules, schools would be held to a far lesser standard in addressing harassment perpetrated against students – including minors under their care – than addressing harassment of adult employees.

Moreover, in contrast to Title VII case law and regulations, which recognize employer responsibility for harassment enabled by supervisory authority, and in contrast to the 2001 Guidance, the proposed rules do not recognize any higher obligation by schools to address harassment of students by school employees who are exercising authority over students.  The 2001 Guidance imposed liability when an employee "is acting (or . . . reasonably appears to be acting) in the context of carrying out these responsibilities over students" and engages in sexual harassment.[34]  By abandoning this standard, the Department would free schools from liability in many instances even when their employees use the authority they exercise as school employees to harass students.  Under the proposed rules, for example, schools would not be held responsible for serious, serial harassment like that committed by Larry Nassar, who assaulted hundreds of student athletes in his role as a school doctor, unless each survivor could show that she gave actual notice of the harassment to a person with the authority to take corrective action and that her access to an educational program was completely denied. Setting the bar this low serves no one.

      **b.  The proposed notice requirement undermines Title IX's discrimination protections by making it harder to report sexual harassment and assault (§§ 106.44(a) & 106.30).**

Sexual assault is very difficult to discuss.  Proposed sections 106.44(a) and 106.30 would mean that, even when students find the courage to talk to the adult school employees they trust, schools would frequently have no obligation to respond.  Under the proposed rules, schools would only be responsible for addressing sexual harassment when one of a small subset of school employees actually knew about the harassment.  Schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator, (ii) a K-12 teacher (but only for student-on-

---

[32] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998); *See also* Equal Employment Opportunities Commission, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999) [hereinafter EEOC Guidance] (An employer is automatically liable for harassment by "a supervisor with immediate (or successively higher) authority over the employee."), *available at* https://www.eeoc.gov/policy/docs/harassment.html.

[33] *Id.* at 765.

[34] 2001 Guidance, *supra* note 24, at 10. ("if an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct").

student harassment, *not* employee-on-student harassment); or (iii) an official who has "the authority to institute corrective measures."[35]  This is a dramatic change, as the Department has long required schools to address *student-on-student* sexual harassment if almost any school employee either knows about it or should reasonably have known about it.[36]  The prior standard takes into account the reality that many students disclose sexual abuse to employees who may not have the authority to institute corrective measures, both because students seeking help turn to the adults they trust the most and because students do not know which employees have authority to address the harassment.[37]

The 2001 Guidance also requires schools to address all employee-on-student sexual harassment "whether or not the [school] has 'notice' of the harassment."  The 2001 Guidance recognized the particular harms of students being preyed upon by adults, especially those in positions of authority or high status, and students' vulnerability to pressure to remain silent in those circumstances, and accordingly acknowledged schools' heightened responsibilities to address harassment by their employees.

In stark contrast to the 2001 Guidance, under the proposed regulations, if a K-12 student tells a trusted non-teacher school employee – such as a guidance counselor, teacher aide, or athletic coach – that they had been sexually assaulted by another student, the school would have no obligation to help the student.[38]  Moreover, if a K-12 student tells any teacher that she has been sexually assaulted by another teacher or other school employee, the school would have no obligation to help her.[39]  Perversely, the proposed rules thus provide a more limited duty for K-12 schools to respond to a student's allegations of sexual harassment by a school employee than by a student.  And, if a college student told their professor or Residential Advisor ("RA") that they had been raped by another student, by a professor, or by another employee at the university, the university would have no obligation to help that student.

For example, at ERA, we received a call through our advice and counseling program from the mother of an autistic student who had been sexually assaulted (repeatedly) by another student who was the victim's "best and only" friend at school.  The student had a full-time aide who was employed by the school, but was not a teacher.  When the victim finally confided in the aide and told her about the groping, forced oral sex, and finally rape that occurred almost daily in the restroom, the trusted aide's only response was to advise that the student not to go to the bathroom with their friend anymore, and to tell the victim's mother that "maybe [the two students] shouldn't be friends anymore."  Nobody at the school took action to investigate or stop the harassment; in fact, the victim's mother only learned what happened many months later, when her child began engaging in a pattern of self-harm and run-away attempts that ultimately led to confiding in their parents about what had been happening to them at school.  Under the proposed rules, this student would have no recourse under Title IX through the school or OCR.

The Department's proposal to absolve universities of any responsibility to act on a college student's report to an RA, professor, or other employee also defies logic and common sense.  Many American

---

[35] Proposed rule § 106.30.

[36] See 2001 Guidance, *supra* note 24, at 13-14 (explaining that the duty to respond to a report of sexual harassment applies to "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.")

[37] *Id.* at 10.

[38] *See* proposed rule § 106.30 (83 Fed. Reg. 61496) (for K-12, limiting notice to "a teacher in the elementary and secondary context with regard to student-on-student harassment).

[39] *Id.*

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

---

universities are huge.[40]  The vast majority of college students are in their late teens and early twenties, living on their own for the first time.  Most schools assign professor-mentors, department guides, and especially housing aides, such as RAs, to help students navigate these huge campuses and this new stage of life.  Students are placed in proximity to these employees precisely to develop bonds and confidences with people who represent the institution and can serve as channels of information between various departments, campus leadership, and student services.  Of the college-aged clients ERA serves, over 95% of students report that they confided in or sought the assistance of a program director, professor, coach, or RA to navigate a sexual trauma that happened to them that is negatively affecting their access to an education. By telling schools that they only have to investigate or respond to reports of harassment and assault that are made to employees with the authority to take corrective action, the proposed rules ignore the realities of student life and undermine school safety.

If the proposed rules had been in place, colleges like Michigan State and Penn State would have had no responsibility to stop Larry Nassar and Jerry Sandusky because their victims reported their experiences of harassment and abuse to school employees like athletic trainers and coaches, who are not school officials with the "authority to institute corrective measures."  These proposed provisions would absolve some of the worst Title IX violators of legal liability and leave students in the lurch.

> c.  **The proposed definition of harassment interferes with schools' ability to provide a safe learning environment.**

The proposed rule defines sexual harassment as "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity,"[41] and mandates dismissal of complaints of harassment that do not meet this standard.  Under this definition, even if a student reports sexual harassment to the "right person," their school would still be *required* to ignore the student's Title IX complaint if the harassment hasn't yet advanced to a point that it is actually denying a student access to education.  Even if it involved harassment of a minor student by a teacher or other school employee, the school would have no obligation to investigate it as a Title IX matter.  The Department's proposed definition is out of line with Title IX's purpose and precedent, discourages reporting, and excludes many forms of sexual harassment that interfere with access to educational opportunities.

If schools are mandated to wait until a student has been effectively pushed out of school before acting, it will already be too late to get that student back and on track to complete their education. Some estimates show that upwards of 60 percent of K-12 girls who have been pushed out of school are the victims of rape or threat of rape.[42] Preventing and interrupting pushout is already a herculean task for communities all over the country, especially communities of color whose girls face the highest and most disproportionate pushout rates.[43]  The NPRM effectively mandates pushout, destroying the prospects of generations of girls in search of equal access to their education.[44]

---

[40] The largest 31 public universities in the United States each have upwards of approximately 30,000 enrolled on-campus undergraduates in their programs.  The top three public universities by on-campus undergraduate enrollment have over 50,000 such students each.  *See*, *e.g.*, https://blog.prepscholar.com/the-biggest-colleges-in-the-united-states.

[41] Proposed rule § 106.30.

[42] MONIQUE W. MORRIS, PUSHOUT: THE CRIMINALIZATION OF BLACK GIRLS IN SCHOOLS 136 (2016).

[43] *Id.* at 68-69.

[44] *Id.* at 144-145.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

___

The Department provides no persuasive justification for changing the definition of sexual harassment from that in the 2001 Guidance, which defines sexual harassment as "unwelcome conduct of a sexual nature."[45]  The 2001 Guidance definition rightly charges schools with responding to harassment before it escalates to a point that students suffer severe harm.  But, under the Department's proposed, narrower definition of harassment, students would be forced to endure repeated and escalating levels of abuse from another student or a teacher before their schools would be required to investigate and stop the harassment.  What's more, if a student is turned away by their school after reporting sexual harassment, the student is extremely unlikely to report a second time when the harassment escalates. The proposed rules will have especially devastating consequences for young children: by prohibiting schools from taking appropriate action when young children who are still learning how to behave towards each other engage in harmful conduct, the rules will not only allow the harms to go unaddressed; they will cause schools to lose the opportunity to redirect harmful behavior and prevent children from engaging in more severe harassment or other violent behavior in the future.

The Department repeatedly attempts to justify its proposed definition by citing "academic freedom and free speech."[46]  But harassment is not protected speech if it creates a "hostile [or abusive] environment,"[47] i.e., if the harassment limits a student's ability to participate in or benefit from a school program or activity.[48]  Moreover, schools have the authority to regulate harassing speech; the Supreme Court held in *Tinker v. Des Moines* that school officials can regulate student speech if they reasonably forecast "substantial disruption of or material interference with school activities" or if the speech involves "invasion of the rights of others."[49]  There is no conflict between Title IX's regulation of sexually harassing speech in schools and the First Amendment.

> **d.  Proposed rules §§ 106.30 and 106.45(b)(3) would *require* schools to ignore harassment that occurs outside of a school activity, even when it creates a hostile educational environment.**

The proposed rules would require schools to ignore all complaints of off-campus or online sexual harassment that happen outside of the school-sponsored program – even if the student is forced to see their harasser on campus every day and the harassment directly impacts their education as a result.  To understand why it is crucial to maintain Title IX protections for off-campus activity, one need only look at the Department's own recent decision to cut off partial funding to the Chicago Public Schools for failing to address two reports of off-campus assault, which the Department described as "serious and pervasive violations under Title IX."[50]  In one case, a 10th grade student was forced to perform oral sex in

___

[45] 2001 Guidance, *supra* note 24, at 2.

[46] 83 Fed. Reg. 61464, 61484. *See also* § 106.6(d)(1), which states that nothing in Title IX requires a school to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution."

[47] *See* Joanna L. Grossman & Deborah L. Brake, *A Sharp Backward Turn: Department of Education Proposes to Protect Schools, Not Students, in Cases of Sexual Violence,* VERDICT (Nov. 29, 2018) [hereinafter *A Sharp Backward Turn*], *available at* https://verdict.justia.com/2018/11/29/a-sharp-backward-turn-department-of-education-proposes-to-protect-schools-not-students-in-cases-of-sexual-violence. ("There is no legitimate First Amendment or academic freedom protection afforded to unwelcome sexual conduct that creates a hostile educational environment.").

[48] 2001 Guidance, *supra* note 24, at 2.

[49] 393 U.S. 503, 513 - 514 (1969).

[50] *See* David Jackson et al., *Federal Officials Withhold Grant Money from Chicago Public Schools, Citing Failure to Protect Students from Sexual Abuse,* CHICAGO TRIBUNE (Sept. 28, 2018), https://www.chicagotribune.com/news/local/breaking/ct-met-cps-civil-rights-20180925-story.html.

an abandoned building by a group of 13 boys, 8 of whom she recognized from school.  In the other case, another 10th grade student was given alcohol and sexually abused by a teacher in his car.  If the proposed rules are implemented, school districts would be required to dismiss similarly egregious complaints simply because they occurred off campus, even if they result in a hostile educational environment.

The proposed rule also conflicts with Title IX's statutory language, which does not prohibit discrimination based on *where* the underlying conduct occurred but on whether it "exclude[s a person] from participation in, [. . .] denie[s a person] the benefits of, or [. . .] subject[s a person] to discrimination under any education program or activity [. . .]."[51]  For almost two decades, the Department's guidance documents have agreed that schools are responsible for addressing sexual harassment if it is "sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program,"[52] regardless of where it occurs.[53]  This guidance is consistent with Title IX's express language as well as case law establishing that sexual assault itself (no matter where it happened) and the risk of encountering your assailant, alone, can create a hostile environment.[54]

The Department's proposed rules ignore the reality that sexual harassment that happens off campus and/or outside of a school activity is no less traumatic than on-campus harassment.[55]  The negative impact on the student victim's education is typically the same if they are forced to see their harasser regularly at school.  For example, if a middle school student is being sexually harassed by her classmates on Instagram or Snapchat, or on the way to or from school in a private carpool, her school would be forbidden from doing anything under Title IX, according to the proposed rules – even if she starts missing class or not attending school to avoid facing her harassers.

At ERA, we know that "off-campus" harassment is equally as likely to create an unsafe and hostile educational environment as harassment that takes place during a school activity. One of our clients was

---

[51] 20 U.S.C. § 1681(a).

[52] 2001 Guidance, *supra* note 24, at v.

[53] 2017 Guidance, *supra* note 23, at 1 n.3 ("Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off campus activities"); 2014 Guidance, *supra* note 23 ("a school must process all complaints of sexual violence, regardless of where the conduct occurred"); 2011 Guidance, *supra* note 23 ("Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity"); 2010 Guidance, *supra* note 23 at 2 (finding Title IX violation where "conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," regardless of location of harassment).

[54] *See, e.g.*, *Roe v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1027 (E.D. Cal. 2009) ; *T.Z. v. City of N.Y.* 364 F.Supp.2d 263, 270 (E.D.N.Y. 2009); *Brzonkala v. Virginia Polytechnic Inst. State Univ.*, 132 F.3d 949, 959(4th Cir. 1997)  (reversed in part on other grounds in *Brzonkala v. Va Polytechnic Inst. & State Univ.*, 169 F.3d 820 (4th Cir. 1999)) (noting that "the rapes themselves created a hostile environment" that defendant institute had a duty to remedy); *Doe v. Coventry Board of Edu.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (holding that "a reasonable jury could determine a risk of encountering the perpetrator was enough to create a hostile environment"); *Kelly v. Yale Univ.*, 2003 U.S. Dist. LEXIS 4543, at *3 (D.Conn. March 26, 2003) (finding that a reasonable jury could conclude that "further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.")

[55] The Department admitted in the previous leaked draft of the NPRM that 41% of college sexual assaults occur off campus. *See* Letter from Anne C. Agnew to Paula Stannard et al., *HHS Review: Department of Education Regulation - Noon September 10*, U.S. Dep't of Health & Human Services at 78 n.21 (Sept. 5, 2018) [*hereinafter* Draft NPRM], *available at* https://atixa.org/wordpress/wp-content/uploads/2018/09/Draft-OCR-regulations-September-2018.pdf.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

gang-raped at an off-campus party by high school classmates, who took pictures of her body immediately after the rape and posted them on social media.  When the School Resource Officer learned about the rape, he called the victim out of class to ask her irrelevant and traumatizing questions (such as, "Were you a virgin?"). After this interview, he escorted her off campus, advising her not to return for the rest of that academic year because her presence was distracting to other students and "everyone was talking about what happened."   When the Assistant Vice Principal learned about the rape, he reportedly asked another employee to "make sure we don't have to do anything for [the student]." The Department's proposed rules tell administrators like this Assistant Vice Principal that the answer is simple: they don't.

Almost 9 in 10 college students live off campus[56] and much of student life takes place outside of school-sponsored activities.  Under the proposed rules, if a student were assaulted off campus by a professor, his college would have zero obligation to investigate that assault as a Title IX matter – even if the student has to continue taking the professor's class. If a college student were raped at an off-campus party, their school wouldn't need to investigate – even if they are forced to confront their rapist every day in class, the dining hall, or residential hallways.  At ERA, we have received calls from students harassed by professors who insisted on going over required final papers and answering questions about upcoming finals at coffee shops off campus. We assisted a graduate student whose professor-mentor knew where she lived (off campus) and showed up unannounced at their apartment one night, then proceeded to drug and molest her. The proposed rule may even prevent schools from addressing assault or harassment that occurs in fraternity and sorority houses, which are usually off campus.[57]  This is particularly troubling in light of the high rates of sexual assault associated with membership in a fraternity or sorority.[58]  Moreover, living on campus is an expensive luxury. Many independent students, returning (older) students, low-income students, students of color, LGBTQI students, and former foster youth are struggling to make ends meet while making it through college. They need the civil rights protections promised to them by Title IX to follow them as they eat, work, and live in the surrounding community.

The proposed rule would pose particular risks to students at community colleges and vocational schools. Because none of these students live on campus, when they are harassed by other students or by faculty members, it is especially likely to occur off campus. Stripping protections from community college students will have an especially negative impact in California, home to the most diverse college student population in the nation, whose community college system educates over 2.1 million students and consists of 114 non-residential colleges.  For example, in one case ERA worked on, a community college professor demanded that certain female students answer his calls after hours, meet him off campus to go over their coursework, and allow him to drive them home after class.  Under the proposed rules,

---

[56] Sharpe, *How Much Does Living Off-Campus Cost?, supra* note 11.

[57] Although the preamble mentions one case where a Kansas State college fraternity was considered an "education program or activity" for the purposes of Title IX, the Department emphasizes that there are many "factors" and that the determination would be specific to each incident. For example, it would depend on whether the school "owned the premises; exercised oversight, supervision, or discipline; or funded, sponsored, promoted, or endorsed the event or circumstance" (83 Fed. Reg. 61468). This multi-factor test is not only unnecessarily unclear and confusing but also is not included in the proposed regulatory language, making it difficult for students and schools to understand their rights and obligations under Title IX. Schools might certainly conclude that § 106.30 and § 106.45(b)(3) mandates dismissal of complaints from all students who are sexually assaulted at unrecognized fraternities, sororities, and other unrecognized social clubs; at unaffiliated local bars and clubs; in non-residential housing; and through online channels in many instances.

[58] Freyd, *supra* note 13.

these students would have no recourse to hold their schools accountable because the harassment happened off campus.

Our organization hears and sees firsthand how prevalent off-campus sexual harassment is and how much it impacts students' access to educational programs and activities. We receive daily requests for assistance from victims of harassment who must face their harassers or assailants in class, on athletic teams, and in on-campus housing. It is simply unfathomable that the Department seeks to bar schools from investigating these matters and abandon their students in this way.

> **e.  The Department's proposed "deliberate indifference" standard would allow schools to do virtually nothing in response to complaints of sexual harassment and assault.**

The "deliberate indifference" standard adopted in the proposed rules is a significant change from the Department's current policy guidance, which requires schools to act "reasonably" and "take immediate and effective corrective action" to resolve harassment complaints.[59] Under the proposed rules, schools would merely have to refrain from being "deliberately indifferent" to harassment. In other words, any response to harassment would comply with Title IX as long as it was not *clearly* unreasonable. This will effectively preclude any challenge to a school's response to harassment if that response comports with the various procedural requirements set out in the proposed rules. The practical effect – and apparent purpose – of adopting a "deliberate indifference" standard for determining whether a school violated Title IX will be to shield schools from any accountability under Title IX, even when they mishandle complaints, fail to provide effective supports or safety measures for survivors, and wrongly determine against the weight of the evidence that an accused harasser was not responsible for sexual assault. In fact, as explained above and below, many of the requirements of the NPRM are themselves acts of deliberate indifference – ignoring off-campus harm even if it affects on-campus educational equity; allowing respondents and their attorneys to directly cross-examine survivors of sexual assault in on-campus proceedings; prohibiting accommodations for a survivor to be able to continue their education if those accommodations "unreasonably burden" the respondent; and allowing schools to pursue mediation in cases of sexual assault. Although these actions and failures to act clearly demonstrate deliberate indifference to the civil rights of sexual harassment victims, a school engaging in such conduct in response to a report of sexual harassment in order to comply with the proposed rule will be able to cite that effort at compliance to insulate itself from liability in a civil action. In this way, the proposed rules create a Catch-22 in which a complainant can never prevail – neither can s/he safely receive equal access to an education, nor can s/he hold the school legally responsible for failing to do so.

> **III.  The Proposed Rules Impermissibly Limit the "Supportive Measures" Available to Complainants (§ 106.30).**

Under the proposed rules, even if a student suffered on-campus harassment *and* it was "severe, pervasive, and objectively offensive," the school would still be able to deny the student the "supportive measures" needed to stay in school. The proposed rules allow schools to deny these requests on the grounds that the requested measures are "disciplinary," "punitive," or "unreasonably burden [] the other party." For example, if a school believed that transferring a named harasser to another class or dorm would "unreasonably burden" the harasser, it could force a survivor to change all of their own classes and housing assignments in order to avoid their harasser.

At ERA, we worked with a student whose high school acknowledged that another student likely trapped and violently groped her at an athletic event. The school had surveillance footage of the assailant

---

[59] 2001 Guidance, *supra* note 24, at 12.

stalking the victim at school and lying in wait behind lockers, around corners, outside of her classroom, for up to a year after the original assault.  There was also reason to believe he had broken into her family's home when they were away.  The school initially insisted that the only accommodations it could provide the victim were to suggest that she exit the school and walk around the outside perimeter to get from one classroom to the next rather than through the hallways in order to avoid her assailant-stalker and his friends, who would verbally harass and shove and trip her as she passed them.  This is a public high school in an urban area that spans two full city blocks.  The school later offered the victim alternative classes that were held off campus, some nearly a half-hour drive away from campus, with an accompanying on-campus class schedule that did not allow for transportation time between the distant class locations.  Finally, the school acknowledged to the student that they owed her a duty to protect her, and that they feared for her safety, but because they had a policy of not altering the schedule or negatively impacting the convenience of a respondent, they suggested she leave the school and enroll in independent study from home.  When the complainant tried to transfer to a neighboring district, her school refused to sign off on the transfer.

Under the new proposed rules, this school's response to recognized sexual harassment would not only be permissible, it might be required.  By conflating "equitable" (meaning, fundamentally fair) with "equal" (meaning, the same), the proposed rules undermine the protections that Title IX is supposed to provide to sexual harassment complainants in direct contravention of the 2001 Guidance, which reiterates the importance of ensuring that interim measures are "designed to minimize, as much as possible, the burden on *the student who was harassed*," and that "steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX *to the complainant*."[60] As demonstrated by the example above and discussed in further detail below (*see* Section V), it is clearly "inequitable" (i.e., fundamentally unfair) to place the burden of adjustment and accommodation on the victim of harassment or assault, even where doing so is the consequence of providing "equal" remedies to both the complainant and respondent.

In addition, schools may interpret this proposed rule as prohibiting *one-way* no-contact orders against an assailant and requiring survivors to agree to a *mutual* no-contact order, which effectively punishes them for reporting their rape.[61]  This is a departure from longstanding practice under the 2001 Guidance, which instructed schools to "*direct[] the harasser to have no further contact with the harassed student*" but not vice-versa.[62]  And groups such as the Association of Student Conduct Administration ("ASCA") agree that "[e]ffective interim measures, including . . . *actions restricting the accused*, should be offered and used while cases are being resolved, as well as without a formal complaint."[63]

---

[60] *Id.* at 16-17 (emphasis added).

[61] Experts have recognized for decades that *mutual* no-contact orders are harmful to victims, for a multitude of reasons, including because abusers often manipulate their victims into violating the mutual order. *E.g.*, Joan Zorza, *What is Wrong with Mutual Orders of Protection?* 4(5) Domestic Violence Rep. 67 (1999), *available at* https://www.civicresearchinstitute.com/online/article.php?pid=18&iid=1005.  Mutual no-contact orders also invite retaliatory and further harassing behavior. In particular, ERA has observed them being used to turn the tables against complainants and delay investigations of actual harassment or assault while claim after claim is leveled against the complainant for allegedly violating the no-contact order supposedly put in place to protect her, often leading to full investigations into facially spurious, retaliatory counter-claims.  This creates an effective and vicious mechanism to push a complainant to drop her original complaint.

[62] 2001 Guidance, *supra* note 24, at 16.

[63] Association for Student Conduct Administration, *ASCA 2014 White Paper: Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses* 2 (2014)

IV.   **The Proposed Rules Would Allow Schools to Claim "Religious" Exemptions for Violating Title IX with No Warning to Students or Prior Notification to the Department.**

The current rules allow religious schools to claim religious exemptions by notifying the Department in writing and identifying which Title IX provisions conflict with their religious beliefs.  The proposed rules remove that requirement and permit schools to opt out of Title IX without notice or warning to the Department or students.  This would allow schools to conceal their intent to discriminate, exposing students to harm, especially women and girls, LGBTQI students, pregnant or parenting students (including those who are unmarried), and students who access or attempt to access birth control or abortion services.[64]  It also allows schools to play a run-around game of proxy discrimination, in which they can discriminate first and claim a religious tenet later.  This is especially problematic as ERA has seen that, upon receiving notice of an on-campus rape, religious schools swiftly punish the victim, often including suspension or expulsion, for "violating the institution's belief in abstinence before marriage," or violating the policies of a dry campus if alcohol or drugs were involved, while absolving the assailant. The NPRM would sanction and enable this behavior.

Further, the Department's proposed assurances directly conflict with the current[65] and proposed[66] rules requiring that each covered educational institution "notify" all applicants, students, employees, and unions "that it *does not* discriminate on the basis of sex."  By requiring a school to tell students that it does not discriminate while simultaneously allowing it to opt out of anti-discrimination provisions whenever it chooses, the Department is creating a system that enables "religious" schools to actively mislead students.  This bait-and-switch practice demonstrates that the Department is more interested in protecting "religious" schools from liability when they discriminate than protecting students from discrimination at these schools.

V.   **The Grievance Procedures Required by the Proposed Rules Would Impermissibly Tilt the Process in Favor of Named Harassers, Re-Traumatize Complainants, and Conflict with Title IX's Nondiscrimination Mandate.**

Current Title IX regulations require schools to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of student and employee complaints" of sexual misconduct.[67]  The proposed rules purport to require "equitable" processes as well.[68]  However, the proposed rules are riddled with language that would require schools to conduct their grievance procedures in a fundamentally *inequitable* way that favors respondents.

---

[hereinafter *ASCA 2014 White Paper*], *available at* https://www.theasca.org/Files/Publications/ASCA%202014%20White%20Paper.pdf.

[64] Transgender students are especially at risk because this proposed change threatens to compound the harms created by (i) the Department's decision in February 2017 to rescind Title IX guidance on the rights of transgender students; (ii) the Department's decision in February 2018 to stop investigating civil rights complaints from transgender students regarding access to sex-segregated facilities; and (iii) HHS's leaked proposal in October 2018 for the Department and other federal agencies to define "sex" to exclude transgender, non-binary, and intersex students. Erica L. Green et al., *'Transgender' Could Be Defined Out of Existence Under Trump Administration,* New York Times (Oct. 21, 2018), available at https://nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html.

[65] 34 C.F.R. § 106.9(a).

[66] Proposed rule § 106.8(b)(1).

[67] 34 C.F.R. §106.8(b).

[68] *See* proposed rule § 106.8(c).

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

The Department repeatedly uses the purported need to increase protections of respondents' "due process rights" to justify weakening Title IX protections for complainants and proposes a provision specifying that nothing in the rules would require a school to deprive a person of their due process rights.[69] ***But the current Title IX regulations already provide more rigorous due process protections than are required under the Constitution.*** The Supreme Court has held that students facing short-term suspensions from public schools require only "some kind of" "oral or written notice" and "some kind of hearing."[70] The Court has explicitly said that a 10-day suspension does not require "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."[71] Furthermore, the Department's 2001 Guidance already instructs schools to protect the "due process rights of the accused,"[72] and notes that while the rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding, schools and programs should ensure that "steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."[73] Adding section 106.6(d)(2) provides no new or necessary protections and inappropriately pits Title IX's civil rights mandate against the Constitution when no such conflict exists.

### a. The proposed rule's requirement that a respondent be presumed not responsible for harassment is inequitable and inappropriate in school proceedings.

Under section 106.45(b)(1)(iv) of the proposed rules, schools would be required to presume that the reported harassment did not occur, which would ensure partiality to the respondent and conflict with the standard of evidence. This presumption would also exacerbate rape myths upon which many of the proposed rules are based – namely, the myth that women and girls often lie about sexual assault. The presumption of innocence is a criminal law principle, incorrectly imported into this context;[74] under which criminal defendants are presumed innocent until proven guilty because their very liberty is at stake. There is no such principle in civil proceedings or civil rights proceedings.

Section 106.45(b)(1)(iv) would only encourage schools to ignore or punish historically marginalized and underrepresented groups that report sexual harassment for "lying" about it.[75] Schools may be more likely to ignore or punish survivors who are women and girls of color,[76] pregnant and parenting

---

[69] Proposed rule § 106.6(d)(2).

[70] *Goss v. Lopez*, 419 U.S. 565, 566, 579 (1975).

[71] *Goss* at 583. *See also Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 23 (D. Me. 2005); *B.S. v. Bd. Of Sch. Trs.*, 255 F. Supp. 2d 891, 899 (N.D. Ind. 2003); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383 (C.D. Cal. 1995); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994).

[72] 2001 Guidance, *supra* note 24, at 22.

[73] *Id.* at 22.

[74] *See also* the Department's reference to "inculpatory and exculpatory evidence" (§ 106.45(b)(1)(ii)), the Department's assertion that "guilt [should] not [be] predetermined" (83 Fed. Reg. 61464), and Secretary DeVos's discussion of the "presumption of innocence" (Betsy DeVos, *Betsy DeVos: It's time we balance the scales of justice in our schools*, WASHINGTON POST (Nov. 20, 2018), *available at* https://www.washingtonpost.com/opinions/betsey-devos-its-time-we-balance-the-scales-of-justice-in-our-schools/2018/11/20/8dc59348-ecd6-11e8-9236-bb94154151d2_story.html

[75] *E.g.*, Tyler Kingkade, *When Colleges Threaten To Punish Students Who Report Sexual Violence*, HUFFINGTON POST (Sept. 9, 2015), *available at* https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c.

[76] *E.g.*, Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARVARD J.L. & GENDER 1, 16, 24-29 (forthcoming), *available at* https://ssrn.com/abstract=3168909; *See also* National Women's Law Center, *Let Her Learn: A Toolkit To Stop*

students,[77] and LGBTQI students[78] because of harmful race and sex stereotypes that label them as "promiscuous."

**Women and girls of color:**  Women and girls of color already face unfair discipline due to race and sex stereotypes.[79]  Schools are also more likely to ignore, blame, and punish women and girls of color who report sexual harassment due to harmful race and sex stereotypes that label them as "promiscuous."[80]  For example, Black women and girls are commonly stereotyped by schools as "Jezebels," Latina women and girls as "hotblooded," Asian American and Pacific Islander women and girls as "submissive, and naturally erotic," Native women and girls as "sexually violable," and multiracial women and girls as "vulnerable [and] historically products of sexual and racial domination."[81]  Black women and girls are especially likely to be punished by schools.  For example, the Department's 2013-14 Civil Rights Data Collection ("CRDC") shows that Black girls are five times more likely than white girls to be suspended in K-12 schools, and that while Black girls represented 20% of all preschool enrolled students, they were 54% of preschool students who were suspended.[82]  The Department's 2015-16 CRDC again shows that Black girls are more likely to be suspended and expelled than other girls.[83]  Schools are also more likely to punish Black women and girls by labeling them as the aggressor when they defend themselves against their harassers or when they respond to trauma because of stereotypes that they are "angry" and "aggressive."[84]

**Pregnant or parenting students:**  Women and girls who are pregnant or parenting are more likely to experience sexual harassment than their peers, due in part to the stereotype that they are more "promiscuous" because they have engaged in sexual intercourse in the past.  For example, 56% of girls ages 14-18 who are pregnant or parenting are kissed or touched without their consent.[85]

---

*School Pushout for Girls of Color*  1 (2016) [hereinafter *Let Her Learn: Girls of Color*], *available at* https://nwlc.org/resources/let-her-learn-a-toolkit-to-stop-school-push-out-for-girls-of-color.

[77] Chambers & Erausquin, *The Promise of Intersectional Stigma to Understand the Complexities of Adolescent Pregnancy and Motherhood,* JOURNAL OF CHILD ADOLESCENT BEHAVIOR (2015), *available at* https://www.omicsonline.org/open-access/the-promise-of-intersectional-stigma-to-understand-the-complexities-ofadolescent-pregnancy-and-motherhood-2375-4494-1000249.pdf

[78] *See, e.g.,* David Pinsof, et al., *The Effect of the Promiscuity Stereotype on Opposition to Gay Rights* (2017), *available at* https://doi.org/10.1371/journal.pone.0178534.

[79] *Let Her Learn: Girls of Color, supra* note 77 at 1.

[80] *See, e.g.* Cantalupo, *supra* note 77 at 16, 24-29.

[81] Cantalupo at 24-25 (internal quotations and brackets omitted).

[82] U.S. Dep't of Education, Office for Civil Rights, *A First Look: Key Data Highlights on Equity and Opportunity Gaps in Our Nation's Public Schools,* at 3 (June 7, 2016; last updated Oct. 28, 2016), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[83] U.S. Dep't of Education, Office for Civil Rights, *School Climate and Safety: Data Highlights on School Climate and Safety In Our Nation's Public Schools* (Apr. 2018), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[84] NAACP Legal Defense and Educational Fund, Inc. & National Women's Law Center, *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity*  5, 18, 20, 25 (2014), *available at* https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf. *See also* Sonja C. Tonnesen, *Commentary: "Hit It and Quit It": Responses to Black Girls' Victimization in School,* 28 BERKELEY J. GENDER, L. & JUST. 1 (2013), *available at* https://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1312&context=bglj.

[85] *Let Her Learn: Pregnant or Parenting Students, supra* note 6 at 12.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

**LGBTQ students**:  LGBTQ students are more likely to experience sexual harassment than their peers.  For example, more than half of LGBTQ students ages 13-21 are sexually harassed at school,[86] and nearly 1 in 4 transgender and gender non-conforming students are sexually assaulted during college.[87]  However, LGBTQ students are also less likely to report sexual assault to school authorities or the police because they are rightfully concerned about further discrimination or retaliation due to their LGBTQ status.[88]  They are also less likely to be believed due to stereotypes that they are more "promiscuous" or bring the "attention" upon themselves.

**Students with disabilities:**  As the Department notes in the preamble to the proposed rules,[89] students with disabilities have different experiences, challenges, and needs.  But the proposed rules are especially harmful to students with disabilities, who already face additional barriers to equal access to education and are 2.9 times more likely than their peers to be sexually assaulted.[90]  They are also less likely to be believed due to stereotypes about people with disabilities and often have greater difficulty describing the harassment they experience.[91]

The proposed rule's presumption in favor of respondents conflicts with the current Title IX rules[92] and other proposed rules,[93] which require that schools provide "equitable" resolution of complaints. A presumption in favor of one party against the other is not equitable. This proposed presumption is also in significant tension with proposed section 106.45(b)(1)(ii), which states that "credibility determinations may not be based on a person's status as a complainant" or "respondent."

> **b.   The proposed rules would improperly require survivors and witnesses in college and graduate school to submit to live cross-examination by their named harasser's advisor of choice, causing further trauma.**

Section 106.45(b)(3)(vii) of the proposed rules requires colleges and graduate schools to conduct a "live hearing," and requires parties and witnesses to submit to cross-examination by the other party's "advisor of choice" – often an attorney who is prepared to grill the survivor about the traumatic details of the assault, or possibly an angry parent or a close friend of the named harasser. The adversarial and contentious nature of cross-examination would further traumatize college and graduate school survivors who seek help through Title IX. Being asked detailed, personal, and humiliating questions by a person of the respondent's choosing – questions often rooted in gender stereotypes and rape myths that tend to blame victims for the assault they experienced[94] – would understandably discourage many students, both parties and witnesses, from participating in a Title IX grievance process, chilling those who have experienced or witnessed harassment from coming forward. Nor would the proposed rules entitle the survivor to the procedural protections that witnesses have during cross-examination in the criminal

---

[86] 2017 National School Climate Survey*, supra* note 7 at 26.

[87] *AAU Campus Climate Survey, supra* note 4 at 13-14 (Sept. 2015), *available at* https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[88] *2015 U.S. Transgender Survey, supra* note 18 at 12.

[89] 83 Fed. Reg. 61483.

[90] *Let Her Learn: Girls with Disabilities, supra* note 9 at 7.

[91] *E.g.* Angela Browne, et al., *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), *available at* https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx.

[92] 34 C.F.R. § 106.8(b).

[93] Proposed rules §§ 106.8(c) and 106.45(b).

[94] Zydervelt, S., Zajac, R., Kaladelfos, A. and Westera, N., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have we Moved Beyond the 1950s?*, BRITISH JOURNAL OF CRIMINOLOGY, 57(3), 551-569 (2016).

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

court proceedings that apparently inspired this requirement; schools would not be required to apply rules of evidence or make a prosecuting attorney available to object or a judge available to rule on objections. The live cross-examination requirement would also lead to sharp inequities if one party can afford an attorney and the other cannot.

Neither the Constitution nor any other federal law requires live cross-examination in school conduct proceedings. The Supreme Court does not require any form of cross-examination (live or indirect) in disciplinary proceedings in public schools under the Due Process clause.  Instead, the Court has explicitly said that a 10-day suspension does not require "the opportunity … to confront and cross-examine witnesses"[95] and has approved at least one circuit court decision holding that expulsion does not require "a full-dress judicial hearing, with the right to cross-examine witnesses."[96]  The vast majority of courts that have reached the issue have agreed that live cross-examination is not required in public school disciplinary proceedings, as long as there is a meaningful opportunity to have questions posed by a hearing examiner.[97] The Department itself admits that written questions submitted by students or oral questions asked by a neutral school official are fair and effective ways to discern the truth in K-12 schools,[98] and proposes retaining that method for K-12 proceedings. The Department has not explained why the processes that it considers effective for addressing harassment in proceedings involving 17- or 18-year-old students in high school would be ineffective for 17- or 18-year-old students in college.

Not surprisingly, Title IX and student conduct experts oppose these proposed rules. The Association of Title IX Administrators ("ATIXA") announced in October, 2018 that it opposes live, adversarial cross-examination, instead stating, "investigators should solicit questions from the parties, and pose those questions the investigators deem appropriate in the investigation interviews."[99] The Association for Student Conduct Administration ("ASCA") agrees that schools should "limit[] advisors' participation in student conduct proceedings."[100] The American Bar Association recommends that schools provide "the opportunity for both parties to ask questions through the hearing chair."[101]

    **c.** **The proposed rules would allow schools to pressure survivors into traumatizing mediation procedures with their assailants.**

Section 106.45(b)(6) of the proposed rules would allow schools to use "any informal resolution process, such as mediation" to resolve a complaint of sexual harassment, as long as the school obtains the students' "voluntary, written consent." Once consent is obtained and the informal process begins, schools may "preclude[] the parties from resuming a formal complaint."

Mediation is a strategy often used in schools to resolve peer conflict, where both sides must take responsibility for their actions and come to a compromise. Mediation is never appropriate for resolving

---

[95] *Goss*, 419 U.S. at 583. *See also Coplin*, 903 F. Supp. 1377 at 1383; *Fellheimer*, 869 F. Supp. 238 at 247.

[96] *See e.g.*, *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (holding no due process violation in expulsion of college student without providing him to right to cross-examination).

[97] *See A Sharp Backward Turn*, *supra* note 47 (*Baum* "is anomalous.").

[98] 83 Fed. Reg. 61476.

[99] Association of Title IX Administrators, *ATIXA Position Statement on Cross-Examining: The Urge to Transform College Conduct Proceedings into Courtrooms* 1 (Oct. 5, 2018), *available at* https://atixa.org/wordpress/wp-content/uploads/2018/10/ATIXA-Position-Statement_Cross-Examination-final.pdf.

[100] *ASCA 2014 White Paper*, *supra* note 63 at 2 (2014).

[101] American Bar Association, *ABA Criminal Justice Section Task Force On College Due Process Rights and Victim Protections: Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct* 8-10 (June 2017).

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

---

sexual assault or harassment, even on a voluntary basis. Survivors should not be pressured to "work things out" with their assailant (as though they share responsibility for the assault) or be exposed to the risk of being re-traumatized, coerced, or bullied during the mediation process. As the Department recognized in the 2001 Guidance, students in both K-12 and higher education can be pressured into mediation without informed consent, and even "voluntary" consent to mediation is inappropriate to resolve cases of sexual assault. Experts also agree that mediation is inappropriate for resolving sexual violence. For example, NASPA - Student Affairs Administrators in Higher Education stated in 2018 that it was concerned about students being "pressured into informal resolution against their will."[102] The proposed rule increases pressure on survivors, including minors, to give their "consent" to engaging in mediation or other informal "dispute resolution" processes with their assailants and prevents them from ending an informal process and requesting a formal investigation – even if they change their mind and realize that mediation is too traumatizing to continue.

> **d. The proposed rules would force many schools to use a more demanding standard of proof to investigate sexual harassment than they would use to investigate other types of student misconduct.**

The Department's longstanding practice requires that schools use a "preponderance of the evidence" standard – which means "more likely true than not true" – in Title IX cases to decide whether sexual harassment occurred.[103] Section 106.45(b)(4)(i) of the proposed rule departs from that practice, and establishes a system where schools could elect to use the more demanding "clear and convincing evidence" standard in sexual harassment cases, while allowing all other student misconduct cases to be governed by the preponderance of the evidence standard, even if they carry the same maximum penalties.[104] The Department's decision to allow schools to impose a more burdensome standard in sexual assault cases than in any other student misconduct case appears to rely on the unspoken stereotype and assumption that survivors (who are mostly women) are more likely to lie about sexual assault than students who report physical assault, plagiarism, or other school disciplinary violations.

---

[102] NASPA - Student Affairs Administrators in Higher Education, *NASPA Priorities for Title IX: Sexual Violence Prevention & Response* 1-2 [hereinafter *NASPA Title IX Priorities*], *available at* https://www.naspa.org/images/uploads/main/NASPA_Priorities_re_Title_IX_Sexual_Assault_FINAL.pdf.

[103] The Department has required schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations. For example, its April 1995 letter to Evergreen State College concluded that its use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College* (Apr. 4, 1995), at 8, *available at* http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf. Similarly, the Department's October 2003 letter to Georgetown University reiterated that "in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University* (Oct. 16, 2003), at 1, *available at* http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf.

[104] Proposed rule § 106.45(b)(4)(i) permits schools to use the preponderance standard *only if* it uses that standard for all other student misconduct cases that carry the same maximum sanction *and* for all cases against employees. This is a one-way ratchet: a school would be permitted to use the higher clear and convincing evidence standard in sexual assault cases, while using a lower standard in all other cases.

There is no basis for that sexist belief and in fact men and boys are far more likely to be *victims* of sexual assault than to be *falsely accused* of sexual assault.[105]

The preponderance standard is used by courts in all civil rights cases.[106] It is the only standard of proof that treats both sides equally and is consistent with Title IX's requirement that grievance procedures be "equitable." By allowing schools to use a "clear and convincing evidence" standard, the proposed rule would tilt investigations in favor of respondents and against complainants. The Department argues that Title IX investigations may need a more demanding standard because of the "heightened stigma" and the "significant, permanent, and far-reaching" consequences for respondents if they are found responsible for sexual harassment.[107] But the Department ignores the reality that Title IX complainants face "heightened stigma" for reporting sexual harassment as compared to other types of misconduct, and that complainants suffer "significant, permanent, and far-reaching" consequences to their education (not to mention their lives) if their school fails to meaningfully address the harassment, particularly as 34% of college survivors drop out of college.[108] Both students have an equal interest in obtaining an education. Catering only to the impacts on respondents in designing a grievance process to address harassment is inequitable.

Moreover, Title IX experts support the preponderance standard, which is used to address harassment complaints at over 80% of colleges.[109] The NCHERM Group, whose white paper *Due Process and the Sex Police* was cited by the Department,[110] has promulgated materials that require schools to use the preponderance standard, because "[w]e believe higher education can acquit fairness without higher standards of proof."[111] The white paper by four Harvard professors that is cited by the Department[112] recognizes that schools should use the preponderance standard if "other requirements for equal fairness are met."[113] ATIXA's position is that "any standard higher than preponderance advantages those accused of sexual violence (mostly men) over those alleging sexual violence (mostly women). It makes it harder for women to prove they have been harmed by men. The whole point of Title IX is to create a level playing field for men and women in education, and the preponderance standard does exactly that. *No other evidentiary standard is equitable.*"[114] NASPA - Student Affairs Administrators in Higher

---

[105] *E.g.*, Kingkade, *supra* note **Error! Bookmark not defined.**.

[106] Katharine Baker et al., *Title IX & the Preponderance of the Evidence: A White Paper* (July 18, 2017), *available at* http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (signed by 90 law professors).

[107] 83 Fed. Reg. 61477.

[108] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. STUDENT RETENTION: RES., THEORY & PRAC. 234, 244 (2015), *available at* https://doi.org/10.1177/1521025115584750.

[109] Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* 120 (Oct. 2002), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf.

[110] 83 Fed. Reg. 61464 n.2.

[111] The NCHERM Group, *Due Process and the Sex Police* 2, 17-18 (Apr. 2017), *available at* https://www.ncherm.org/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf.

[112] 83 Fed. Reg. 61464 n.2.

[113] Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX* 5 (Aug. 21, 2017), *available at* https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf.

[114] Association of Title IX Administrators, *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 4 (Feb. 17, 2017), *available at* https://atixa.org/wordpress/wp-content/uploads/2017/02/2017February-Final-ATIXA-Position-Statement-on-Colleges-Addressing-Sexual-Violence.pdf.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

___

Education recommends the preponderance standard: "Allowing campuses to single out sexual assault incidents as requiring a higher burden of proof than other campus adjudication processes make it – by definition – harder for one party in a complaint than the other to reach the standard of proof. Rather than leveling the field for survivors and respondents, setting a standard higher than preponderance of the evidence tilts proceedings to unfairly benefit respondents."[115] ASCA agrees that schools should "[u]se the preponderance of evidence (more likely than not) standard to resolve all allegations of sexual misconduct"[116] because "it is the only standard that reflects the integrity of equitable student conduct processes which treat all students with respect and fundamental fairness."[117]

> **e.   The proposed rules fail to impose clear timeframes for investigations and allow impermissible delays.**

The proposed rules require schools to have "reasonably prompt timeframes," but allows them to create a "temporary delay" or "limited extension" of timeframes for "good cause," which includes "concurrent law enforcement activity."[118] In contrast, Title IX guidance issued by the Obama administration recommended that schools finish investigations within 60 days, and prohibited schools from delaying a Title IX investigation just because there was an ongoing criminal investigation.

Under the proposed rules, if there is an ongoing criminal investigation, the school would be allowed to delay its Title IX investigation for an unspecified length of time. However, there is no logic to this policy. While criminal investigations seek to punish an abuser for their conduct, Title IX investigations should seek to ensure that complainants are able to access educational opportunities that become inaccessible due to harassment. Students should not be forced to wait months or years until after a criminal investigation is completed in order to seek resolution from their schools. ATIXA agrees that a school that "delay[s] or suspend[s] its investigation" at the request of a prosecutor creates a safety risk to the survivor and to "other students, as well."[119]

Almost all of the education cases that come to ERA involve students whose schools have granted themselves indefinite extensions, if the school has undertaken a Title IX investigation at all.  It is not uncommon for colleges to take upwards of a year to investigate harassment and assault complaints. Schools frequently "lose" investigation files, change Title IX investigators multiple times in the course of a single complaint, or simply fail to devote adequate resources to the Title IX office and claim the investigator is overwhelmed.  Drawn out processes do not serve either respondents or complainants, many of whom are yearning to move on with their lives.  Complainants are forced to relive the worst moments of their lives, over and over again, while trying to stay focused in school, without a clear end in sight.  Instead of pushing schools to recognize when their Title IX investigators need more resources or training so that their proceedings are in fact "prompt and equitable," the proposed rules make the

___

[115] *NASPA Title IX Priorities*, *supra* note 104 at 1-2.

[116] *ASCA 2014 White Paper*, *supra* note 63.

[117] Chris Loschiavo & Jennifer L. Waller, *The Preponderance of Evidence Standard: Use In Higher Education Campus Conduct Processes*, Association for Student Conduct Admin, *available at* https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.

[118] Proposed rule § 106.45(b)(1)(v).

[119] Association of Title IX Administrators, *ATIXA Position Statement on the Proposed Legislation Entitled: Promoting Real Opportunity, Success, And Prosperity Through Education Reform (PROSPER) Act (Higher Education Act Reauthorization)* (Jan. 18, 2018), *available at* https://atixa.org/wordpress/wp-content/uploads/2015/03/ATIXA-POSITION-STATEMENT-ON-PROSPER-ACT-Final.pdf.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

---

purgatory of an unending investigation the new normal.  This sends the wrong message to schools and will have a further chilling effect on reports of sexual assault and harassment.

### f.   The proposed rules would require schools to give unequal appeal rights.

Although Secretary DeVos claims that the proposed rules make "[a]ppeal rights equally available to both parties,"[120] they do not in fact provide equal *grounds for appeal* to both parties, as complainants are barred from appealing a school's resolution of a harassment complaint based on inadequate sanctions imposed on a respondent. Allowing only the respondent the right to appeal a sanction decision is both unfair and a violation of the requirement of "equitable" procedures, because survivors are also impacted by sanction decisions. For example, if their abuser is still allowed to live in the same dorm as the survivor, or if they are still in the same classroom, the survivor may experience further trauma.

Experts support equal appeal rights. The American Bar Association recommends that the grounds for appeal include "a sanction disproportionate to the findings in the case (that is, too lenient or too severe)."[121] ATIXA announced in October, 2018 that it supports equal rights to appeal for both parties, "[d]espite indications that OCR will propose regulations that permit inequitable appeals."[122] Even the white paper by four Harvard professors that is cited by the Department (pp. 9-10, n.2) recognizes that schools should allow "[e]ach party (respondent and complainant) [to] request an impartial appeal."[123]

### VI.   <u>The Proposed Rules are Inconsistent with the Clery Act.</u>

A number of the Department's proposed rules are inconsistent with the Clery Act, as amended by the 2013 Violence Against Women Authorization Act, 20 U.S.C. § 1092, which the Department also enforces, and which also addresses the obligation of colleges and universities to respond to sexual assault and other behaviors that may constitute sexual harassment, including dating violence, domestic violence, and stalking. For example, the proposed rules prohibiting schools from investigating off-campus and online sexual harassment conflict with Clery's reporting requirements. The Clery Act requires colleges and universities to notify all students who report sexual assault, stalking, dating violence, and domestic violence of their rights, regardless of "whether the offense occurred on or off campus."[124] The Clery Act also requires colleges and universities to report all sexual assault, stalking, dating violence, and domestic violence that occur on "Clery geography," which includes all property controlled by a school-recognized student organization (such as an off-campus fraternity); nearby "public property"; and "areas within the patrol jurisdiction of the campus police or the campus security department."[125] The proposed rules would undermine Clery's mandate and create a perverse system in which schools would be required to report instances of sexual assault between school parties that occur off campus to the Department, but would have to dismiss these complaints and not investigate them as Title IX matters.  An incident between school parties deemed to fall into a category of danger worthy of Clery reporting and campus notification will not be deemed dangerous enough to the victim and their access to education to

---

[120] DeVos, *supra* note 75.

[121] American Bar Association, *supra* note 103, at 5.

[122] Association of Title IX Administrators, *ATIXA Position Statement on Equitable Appeals Best Practices* 1 (Oct. 5, 2018), *available at* https://atixa.org/wordpress/wp-content/uploads/2018/10/2018-ATIXA-Position-Statement-Appeals.pdf.

[123] Bartholet, et al., *supra* note 115.

[124] 20 U.S.C. § 1092(f)(8)(C).

[125] 20 U.S.C. § 1092(f)(6)(iii); 20 U.S.C § 1092(f)(6)(iv)); 34 C.F.R. § 668.46(a)).

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

---

warrant investigation by the school, even though the institution has disciplinary authority over both parties by virtue of their membership in the campus community.

Clery also requires that investigations of sexual harassment and assault be "prompt, fair, and impartial."[126] But the proposed rules' unclear timeframe for investigations conflicts with Clery's mandate that investigations be prompt. And the many proposed rules discussed above that tilt investigation procedures in favor of the respondent are anything but fair and impartial.

Although the Department acknowledges that Title IX and the Clery Act's "jurisdictional schemes [. . .] may overlap in certain situations,"[127] it fails to explain how institutions of higher education should resolve the conflicts between two different sets of rules when addressing sexual harassment. These different sets of rules would likely create widespread confusion for schools.

### VII. The Proposed Rules *Requiring* Schools to Dismiss Harassment Complaints Go Beyond the Department's Authority to Effectuate the Nondiscrimination Provisions of Title IX and Are Practically Unworkable.

Section 106.45(b)(3) of the proposed rules *requires* schools to dismiss complaints of sexual harassment if they don't meet specific narrow standards. If it's determined that harassment doesn't meet the improperly narrow definition of severe, pervasive, *and* objectively offensive harassment, it *must* be dismissed, per the command of the rule. If severe, pervasive, *and* objectively offensive conduct occurs outside of an educational program or activity, including most off-campus or online harassment, it *must* be dismissed. However, the Department lacks the authority to require schools to dismiss complaints of discrimination. Under Title IX, the Department is only authorized to issue rules "to effectuate the [anti-discrimination] provision of [Title IX]." Title IX does not delegate to the Department the authority to tell schools *when they cannot* protect students against sex discrimination.[128] By requiring schools to dismiss certain types of complaints of sexual harassment, without regard to whether those forms of harassment deny students educational opportunities on the basis of sex, section 106.45(b)(3) fails to effectuate Title IX's anti-discrimination mandate and would force many schools that already investigate off-campus conduct under their student conduct policies to abandon these anti-discrimination efforts. While the Department is well within its authority to require schools to adopt civil rights protections to effectuate Title IX's mandate against sex discrimination, it does not have authority to force schools to violate students' and employees' civil rights under Title IX by forcing schools to ignore sexual harassment.

The Department notes that if conduct does not meet the proposed rule's definition of harassment or occurs off campus, schools may still process the complaint under a different conduct code, but not Title IX. This "solution" to its required dismissals of Title IX complaints is confusing and impractical. The proposed regulations offer no guidance or safe harbor for schools to offer parallel sexual harassment proceedings that do not comply with the detailed and burdensome procedural requirements set out in the proposed rule. Schools that did so would no doubt be forced to contend with respondents' complaints that the school had failed to comply with the requirements set out in the NPRM and thus violated respondents' rights as described in the NPRM.

---

[126] 20 U.S.C. § 1092(f)(8)(b)(iv)(I)(aa).

[127] 83 Fed. Reg. 61468.

[128] *See* Michael C. Dorf, *The Department of Education's Title IX Power Grab*, VERDICT (Nov. 28, 2018), *available at* https://verdict.justia.com/2018/11/28/the-department-of-educations-title-ix-power-grab.

Equal Rights Advocates
Comment on ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14

---------------

The Department's proposed rules import inappropriate legal standards into agency enforcement, rely on sexist stereotypes about survivors of sexual harassment and assault, and impose procedural requirements that force schools to tilt their Title IX investigation processes in favor of named harassers to the detriment of survivors. Instead of effectuating Title IX's prohibition on sex discrimination in schools, these rules serve only to shield schools from liability when they refuse to address complaints of sexual harassment and assault, and encumber schools that mean to protect their students by tying their hands in the face of obvious safety threats and gross conduct violations. These NPRM increase the liability of caring and conscientious schools to students who violently harm other students, and force all schools, except for those that preemptively exempt themselves from Title IX entirely on the grounds of a religious tenet, to become mini-courts instead of academic institutions enforcing student conduct policies in accordance with education civil rights laws to ensure equitable access to their programs and facilities. Equal Rights Advocates calls on the Department of Education to immediately withdraw this NPRM and instead focus its energies on vigorously enforcing the Title IX requirements that the Department has relied on for decades, to ensure that schools promptly and effectively respond to sexual harassment.

**We oppose any changes that would diminish the purpose and spirit of Title IX.  Women and girls have faced barriers to achieving equity in education throughout the history of our country.  Now is not the time to weaken legal protections and create regulations that in fact further marginalize and silence the very populations Title IX exists to protect.**

Thank you for the opportunity to submit comments on the NPRM. Please do not hesitate to contact Jennifer Reisch, Legal Director, at jreisch@equalrights.org or 415-621-2384, or Jessica Stender, Senior Counsel, Workplace Justice and Public Policy, at jstender@equalrights.org or 415-575-2394**,** to provide further information to you as to our comment or the work that we perform in this area of civil rights law.

Sincerely,

Jennifer A. Reisch
Legal Director

# EXHIBIT D

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

3

SURVJUSTICE, INC., et al.,  )
          Plaintiffs,  )

4

)          Case Number: 3:18-cv-00535-JSC
)

5

v.  )          Declaration of Stacy Malone
)

6

)
)

7

ELISABETH D. DEVOS, et al.,  )
          Defendants.  )

8

9

10          I, Stacy Malone, Executive Director, declare as follows:

11          1.          I submit this declaration in support of the Motion for Summary Judgment filed by

12  Victim Rights Law Center ("VRLC"), Equal Rights Advocates, and SurvJustice, Inc., plaintiffs

13  in the above-captioned case, which challenges as unlawful the 2017 Title IX Policy issued by the

14  U.S. Department of Education.

15          2.          The facts set forth in this declaration are based on my personal knowledge.  If I

16  am called as a witness in these proceedings, I could and would testify competently to these facts.

17          3.          I have been employed by VRLC since October 2010. I currently serve as the

18  Executive Director of the organization. In that position, I manage the strategic direction,

19  operations, and development for VRLC's national programs, as well as VRLC's five offices

20  located in Massachusetts and Oregon. I also oversee the organization's management team,

21  finance, fundraising and development, media relations, human resources, and project

22  development. Consequently, I am familiar with and have participated in the organization's Title

23  IX work as an attorney, mentor and supervisor.

24

25

4.      Founded in 2000, VRLC is a non-profit organization dedicated to serving the legal needs of rape and sexual assault victims. VRLC's mission is to provide legal representation to victims of rape and sexual assault to help rebuild their lives and to promote a national movement committed to seeking justice for every rape and sexual assault victim.

5.      VRLC provides free and comprehensive legal services to help restore victims' lives after experiencing sexual violence, by ensuring that survivors are able to stay in school; protecting their privileged and confidential mental health, medical, and education records; preserving their employment; maintaining their access to safe housing; securing their immigration status; and swiftly helping them access victim compensation and other benefits.

6.      As part of its work, VRLC provides legal services and/or facilitates the provision of legal services to individuals who have experienced sexual violence and/or assault on elementary, secondary, and higher education campuses. With almost 50 percent of VRLC's clients under the age of 24, a substantial portion of its practice is providing education-related legal consultation and representation. VRLC attorneys represent campus victims in communications with campus administrators, acquire interim measures and accommodations to secure their education, prepare and attend disciplinary hearings, file appeals, and, if necessary, file complaints with the U.S. Department of Education's Office for Civil Rights.

7.      The Department of Education's 2011 Dear Colleague Letter and 2014 Questions & Answers document provided much-needed clarity to schools and advocates, clarifying that institutions were required to respond to sexual harassment immediately when on constructive notice of incidents that violated their policy, and incorporating provisions to ensure that the institutions explained to individuals their rights and options upon disclosure of sexual harassment. When advising survivors about their rights under Title IX, we frequently directed

1  students to those documents. Moreover, the policies enumerated in those documents provided

2  much-needed procedural protections to survivors of sexual harassment, who risk retaliation and

3  further traumatization when engaging in the campus grievance process under Title IX.

4        8.      The Department's decision to rescind those documents and replace them with the

5  2017 Title IX Policy reveals a fundamental disregard for the purpose and meaning of Title IX

6  and the needs of rape and sexual assault survivors. Under the new Title IX Policy, schools can,

7  and in certain cases must, implement Title IX procedures that tilt in favor of the accused and

8  which communicate a distrust and skepticism of survivors. Under the 2017 Title IX Policy

9  schools:

10        a.      Can require a higher standard of proof for complaints of sexual assault

11               compared with what had previously been required;

12        b.      Can create one-sided appeals processes, whereby only accused students

13               have the right to appeal an adverse finding

14        c.      Can allow students to elect to resolve complaints of sexual violence

15               through mediation, despite significant evidence showing that students who

16               experience sexual violence often feel unduly pressured into mediation—a

17               process that exposes students to the risk of being re-traumatized, coerced,

18               or bullied by their alleged assailant;

19        d.      Must disclose the identity of the student-complainant to the alleged

20               assailant;

21        e.      Do not have to provide interim measures in a way that minimizes the

22               burden on complainants of sexual violence, and are allowed to impose

23

24

25

mutual no-contact orders, which essentially punish a survivor for reporting an incident of rape or sexual assault;

    f.    Do not have to complete Title IX proceedings within an objectively prompt timeframe, aiming to meet a 60-day benchmark;

    g.    Can decline to investigate off-campus misconduct even when it results in a hostile environment on-campus;

    h.    Can allow information about a complainant's sexual history to be considered during a Title IX hearing; and

    i.    Can allow alleged assailants to cross-examine complainants.

9.    These new policies reflect sexist stereotypes about sexual assault survivors: namely, that women and girls tend to lie about, exaggerate, or misunderstand sexual harassment, including sexual assault and other incidents of sexual violence. The result is a framework that incentivizes schools to place a greater emphasis on the rights of respondents over protection for complainants. Since the 2017 Policy's release, fewer victims of rape and sexual assault have come forward to report and seek protection.

10.    VRLC has been harmed by the 2017 Title IX Policy.

11.    The Policy frustrates VRLC's mission and purpose by (among other things):

    a.    Impairing its mission of providing legal assistance to survivors of rape and sexual assault;

    b.    Limiting the efficacy of available avenues of redress for survivors of rape and sexual assault; and

    c.    Creating confusion for schools and the student community about a survivor's rights under Title IX.

12.     Following, and as a result of, the 2017 Title IX Policy, VRLC experienced a decrease in the number of student-survivors seeking its services. Between the periods of October 1, 2016 – September 30, 2017 and October 1, 2017 – September 30, 2018, VRLC saw a 30 percent decline in the number of educational clients seeking its services. The Boston office, in particular, had only 31 clients seeking VRLC's services during the 2017-2018 academic year, as compared to 39, clients during the 2016-2017 academic year. Of those 31 clients, VRLC represented only 6 clients in Title IX campus hearings, as compared with 16 hearings the year prior. The Portland office has suffered a similar effect: In the period of October 2016 – September 2017, the Portland office had 19 total education clients as compared to 9 education clients in the period of October 2017 – September 2018. Of those 9 clients, VRLC represented only 2 clients in Title IX campus hearings, as compared with 6 the year prior. Additionally, VRLC has filed only one OCR complaint since the 2017 Policy was issued, as compared with 7 in previous years. These same downward trends have continued to the present.

13.     Based on staff consultations with clients, VRLC has observed that the chilling effect described above is in large part due to survivors' concerns that the 2017 Title IX Policy increases their barriers to justice by, for example, endorsing one-sided appeals, allowing for a heightened standard of proof, and deemphasizing the need for prompt investigations. Indeed, VRLC staff reported spending more time on consultations with clients who expressed concern and confusion over the new Policy.

14.     Even when a survivor decides to file a Title IX complaint, VRLC's mission is frustrated by the 2017 Title IX Policy, given the procedures it allows, or requires, schools to implement—procedures that make it more difficult for VRLC to obtain justice for survivors of rape and sexual assault. For example, because the 2017 Policy eliminated the requirement that

schools resolve reports of sexual assault in an objectively prompt manner, aiming to meet a 60-day benchmark, VRLC has observed a trend in schools either not responding at all, or not responding promptly, to complaints. For example, VRLC is aware of one institution that had previously adhered to the 60-day investigation timeline but is now, under the 2017 Policy, taking 180+ days to complete their process. Similarly, VRLC has observed other schools citing the 2017 Title IX Policy as a reason to grant a request from the respondent to delay meetings with investigators or delay the hearing.

15.     VRLC has also devoted extensive staff time to reviewing and understanding the 2017 Title IX Policy—for example, the vague policy on what constitutes a prompt investigation and the contradictory language on whether a school must investigate off-campus conduct—in order to advise its clients in ongoing campus investigations and advocate on their behalf.

16.     In addition to the above, VRLC has also engaged in regulatory advocacy. The Department of Education published a Notice of Proposed Rulemaking ("NPRM"), wherein it proposed, among other things, to codify in regulation the policies set forth in the 2017 Title IX Policy. *See* NPRM, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462 (Nov. 29, 2018). VRLC submitted a comment explaining how the policies in the 2017 Title IX Policy had to date, and continue to, hurt survivors of sexual assault and violence, and why such policies should not be codified in regulation. *See* Ex. D-1.

17.     VRLC staff report their time by grant, as opposed to by activity. This makes it difficult to quantify precisely how many resources have been expended on the efforts described above. However, VRLC attests that it has diverted money and staff time to those activities at the

expense of others, including pursuing new outreach avenues or exploring other civil justice options for campus survivors.

17. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2019.

_____
Stacy Malone, Esq.

# EXHIBIT D-1



Office for Civil Rights
U.S. Department of Education
**RE: ED-2018-OCR-0064**

PUBLIC COMMENT BY THE VICTIM RIGHTS LAW CENTER ON THE
DEPARTMENT OF EDUCATION'S PROPOSED REGULATIONS REGARDING TITLE IX OF THE
EDUCATION AMENDMENTS OF 1972

INTRODUCTION

The proposed regulations concerning Title IX of the Education Amendments of 1972 ("Title IX") released by the Department of Education ("the Department") on November 29, 2018 are legally unsound. The suggested changes to the regulatory framework, beginning with the rescission of the 2011 and 2014 guidance documents and simultaneous implementation of interim guidance in September 2017, reveal a fundamental disregard for the purpose and meaning of Title IX and victims of sexual harassment.[1] The result is a new framework that will incentivize institutions of higher education to place a greater emphasis on the rights of respondents than protection for complainants, cause fewer victims of rape and sexual assault to come forward, and foreclose victims' ability to seek redress from the Department. These changes reflect an unfounded reaction to current adjudicatory practices among institutions of higher education that fails to consider the history and purpose of Title IX, the reality of sexual harassment and gender-based violence on campuses, and the critical differences in function

---

[1] While the Department's language would suggest that it took a fair and balanced approach to understanding campus adjudication processes, a close reading reveals a strong prejudice towards respondent-focused information. For instance, the Preamble repeatedly cites the same respondent-friendly perspectives, but only includes one citation to a victim-centered perspective.

The Department also notes that the proposed changes came after "personally engaging numerous stakeholders." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462, 61464 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) [hereinafter "NPRM"]. While the meeting participants were largely balanced between organizations and individuals representing respondents' interests and victims' interest, the sources cited in the proposed rule as well as the perspectives cited were overwhelmingly in support of respondents. This illuminates the bias that undergirds these proposed changes across the board. Proposed provisions repeatedly restrict the ability of institutions to adequately address civil rights violations on their campus and will prevent victims from accessing their education.

The Department would also have the public believe that there was overwhelming and widespread criticism of the Obama-era guidance documents. However, the statements carelessly cite to dissenting opinions of cases and ignore information that indicate the opposite: the changes brought about by the Dear Colleague Letter and the Frequently Asked Questions document were welcomed in a system that largely had no parameters which frequently resulted in quasi-judicial proceedings going awry. See Tiffany Buffkin, et al., *Widely Welcomed and Supported by the Public: A Report on the Title IX-Related Comments in the U.S. Department of Education's Executive Order 13777 Comment Call*, CAL. L. REV. ONLINE (forthcoming), *available at* SSRN: https://ssrn.com/abstract=3255205 or http://dx.doi.org/10.2139/ssrn.3255205; TITLE IX AND THE PREPONDERANCE OF THE EVIDENCE: A WHITE PAPER (November 29, 2016), *available at* http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (signed by dozens of law professors and scholars).

between educational institutions, the judicial system, and the Department as the agency overseeing Title IX compliance. The Victim Rights Law Center ("VRLC") has provided free legal services to rape and sexual assault victims for fifteen years and opposes the vast majority of proposed changes by the Department for all of the reasons outlined in this Comment. Furthermore, the VRLC wishes to reiterate its concern that the Department has lost sight of its duty and mandate to ensure that institutions are protecting the civil rights of its students who experience sex discrimination. The abdication of this responsibility and concurrent erasure of protections for victims of sexual violence make pursuing any educational recourse more dangerous for victims. This is not only misaligned with Title IX; it stands in complete contradiction to it.

<div align="center">

### BACKGROUND/CONTEXT

</div>

The VRLC has been practicing law in the education realm since its inception in 2003, eight years prior to the 2011 Dear Colleague Letter ("DCL"). In those eight years, VRLC attorneys practiced in an arena characterized by untrained adjudicators, unreliable and variable standards, and unaddressed complaints of sexual assault and rape.[2] Notably, adjudications

---

[2] For cases demonstrating instances of school officials ignoring or brushing aside victim's complaints, *see* S.G. v. Rockford Bd. of Educ., 2008 U.S. Dist. LEXIS 95522, at *15-16 (N.D. Ill. Nov. 24, 2008); James v. Indep. Sch. Dist. No. 1-007, 2008 U.S. Dist. LEXIS 82199, at *6 (W.D. Okla. Oct. 16, 2008); Bruning v. Carroll Cnty. Sch. Dist., 486 F. Supp. 2d 892, 915-16 (N.D. Iowa 2007); Bashus v. Plattsmouth Cnty. Sch. Dist., 2006 U.S. Dist. LEXIS 56565, at *10 (D. Neb. Aug. 3, 2006); Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438, 447-48 (D. Conn. 2006); Doe v. E. Haven Bd. of Educ., 430 F. Supp. 2d 54, 63-65 (D. Conn. 2006), aff'd, 200 F. App'x 46, 49 (2d Cir. 2006); Martin v. Swartz Creek Cmty. Schools, 419 F. Supp. 2d 967, 974 (E.D. Mich. 2006); Jones v. Ind. Area Sch. Dist., 397 F. Supp. 2d 628, 645-46 (W.D. Pa. 2005); Theno v. Tonganoxie Unified Sch. Dist. No. 464, 394 F. Supp. 2d 1299, 1301 (D. Kan. 2005); Ray v. Antioch Unified Sch. Dist., 107 F. Supp. 2d 1165, 1170 (N.D. Cal. 2000).

For cases where the victim reported the rape to a school official or some other authority figure, but the school did nothing to prevent the offender or his friends from continually coming in contact with the victim, *see* Patterson v. Hudson Area Sch., 551 F.3d 438, 450 (6th Cir. 2009); Doe v. Brimfield Grade Sch., 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008); Doe v. Hamden Bd. of Educ., 2008 U.S. Dist. LEXIS 40269, at *17 (D. Conn. May 19, 2008); M. v. Stamford Bd. of Educ., 2008 U.S. Dist. LEXIS 51933, at *28 (D.Conn. 2008); James, 2008 U.S. Dist. LEXIS 82199, at *6; *Rockford Bd. of Educ.*, 2008 U.S. Dist. LEXIS 95522 at *10, *14-15; *Bashus*, 2006 U.S. Dist. LEXIS 56565, at *10-11; *Derby Bd of Educ.*, 451 F. Supp. 2d at 444- 45; Doe v. Erskine Coll., 2006 U.S. Dist. LEXIS 35780, at *39 (D.S.C. May 25, 2006); *E. Haven Bd of Educ.*, 430 F. Supp. 2d at 59-60; *Martin*, 419 F. Supp. 2d at 974; *Jones*, 397 F. Supp. 2d at 645-46; *Theno*, 394 F. Supp. 2d at 1310-11; Letter from Charlene F. Furr, Operations Officer, Dall., Office for Civil Rights, U.S. Dep't of Educ., to Jimmy D. Hattabaugh, Superintendent, Mansfield Sch. Dist. (Apr. 16, 2007) (on file with author); Letter from Cathy H. Lewis, Acting Dir., Policy & Enforcement Serv., Office for Civil Rights, U.S. Dep't of Educ., to Thomas Crawford, Superintendent, Acad. Sch. Dist. (Apr. 16, 1993) (on file with author).

For cases in which the school conducted a biased investigation, *see Patterson*, 551 F.3d at 439; *Brimfield Grade Sch.*, 552 F. Supp. 2d at 823; S.S. v. Alexander, 177 P.3d 724, 740 (Wash. Ct. of App. Div. 1, 2008); Siewert v. Spencer-Owen Cmty. Sch. Corp., 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007); Erskine, 2006 U.S. Dist. LEXIS 35780, at *33-34; *Theno*, 394 F. Supp. 2d at 1310-11; Kelly v. Yale Univ., 2003 U.S. Dist. LEXIS 4543, at *3 (D. Conn. Mar. 26, 2003); Letter from John E. Palomino, Reg'l Civil Rights Dir., S.F., Office for Civil Rights, U.S. Dep't of Educ., to Ruben Armifiana, President, Sonoma State Univ. (Apr. 29, 1994) (on file with author.

For cases demonstrating instances when school officials investigated and determined that the sexual violence did occur, but did not discipline or minimally disciplined the assailant, and did not protect the survivor from any

during this time were often quasi legal trials with actively participating attorneys and cross-examination, but without trained professionals ensuring that the proceedings were structured, balanced, and equitable, and without guidance about what process was to be expected and implemented in such cases. The VRLC's education practice throughout these years was characterized by navigating bizarre and inappropriate adjudication processes.

The DCL prompted a sea-change among institutions of higher education with respect to Title IX: it clarified that institutions were required to respond to sexual harassment immediately when on constructive notice of incidents that violated their policy, incorporated provisions to ensure individuals were explained their rights and options upon disclosure of sexual harassment and led to an increase in reporting across the country. This letter responded to systemic problems in campus disciplinary processes while recognizing and balancing the reality of sexual harassment and gender-based violence on campus.[3] The DCL and the subsequent 2014 Frequently Asked Questions document ("FAQ") were, in fact, not vilified across the board, as the Department suggests. Rather, they were largely welcomed by all parties involved, including respondent advocates, for providing structure in the midst of unregulated disorder.[4]

---

retaliation, *see* Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 262 (6th Cir. 2000); *Hamden*, 2008 U.S. Dist. LEXIS 40269, at *5; *Stamford*, 2008 U.S. Dist. LEXIS 51933, at *28; *Siewert*, 497 F. Supp. 2d at 954; *Derby Bd. of Educ*., 451 F. Supp. 2d at 447; Doe v. Oyster River Coop. Sch. Dist., 992 F. Supp. 467, 481 (D.N.H. 1997); *see also* Sonoma State Univ. Letter (stating that after the victim reported the sexual violence she experienced, the university declared it was only a "miscommunication" and failed to take any further action); Letter from Patricia Shelton, Branch Chief, and C. Mack Hall, Div. Dir., Office for Civil Rights, U.S. Dep't of Educ., to James C. Enochs, Superintendent, Modesto City Schools (Dec. 10, 1993) (on file with author) (finding that once the victims told the principal, school officials did nothing more than lecture the assailants about their actions); Kristen Lombardi, *A Lack of Consequences for Sexual Assault: Students Found "Responsible" Face Modest Penalties, While Victims are Traumatized*, CTR. FOR PUB. INTEGRITY (Feb. 24, 2010), http://www.publicintegrity.org/investigations/campus-assault/ articles/entry/1945/ (explaining that at many campuses, abusive students are rarely disciplined, and when they are, it is rarely more than a slap on the wrist).

[3] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf (finding that campuses reported approximately 3,300 forcible sex offenses as defined by the Clery Act); CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf (study found that about 1 in 5 women were victims of completed or attempted sexual assault while in college).

[4] "In June 2017, the U.S. Department of Education opened a public comment forum requesting input on the Trump Administration's Executive Order 13777, which established a federal policy to 'alleviate unnecessary regulatory burdens.' By the end of that August, 10,856 comments had been entered into the system and a few hours clicking through the comments gave the impression that commenters overwhelmingly both commented on Title IX and wrote in support of continuing OCR's robust regulatory enforcement of civil rights in education." Indeed, of the 12,035 total public comments addressing Title IX, 11,528 – 97% -- supported upholding the 2011 DCL compared to 123 (less than 1%) specifically advocated for rescinding the 2011 DCL. Buffkin et al., *supra* note 1, at 12.

This isn't to say there aren't critics of these guidance documents. There have been notable outspoken critics of this guidance, most of whom are repeatedly cited in the proposed regulation. The point here is the misleading nature of the Department's language around the 2011 and 2014 guidance particularly in light of widespread public support of the 2011 and 2014 guidance documents.

In light of these changes, reports of sexual harassment increased, as did the petitions to the Office for Civil Rights (OCR).[5] That is, at least in part, what this subregulatory guidance was designed to do.[6] This is willfully ignored in the proposed regulation ("NPRM"); the Department would have the public believe that the "hundreds of students" that filed complaints with OCR and the lawsuits that were filed by respondents in this timeframe reflect a problem with the guidance itself rather than indicate the need for it in the first place.[7] In fact, a direct comparison between cases pre-2011 DCL and post-2011 DCL reveals a marked positive shift in the way campus disciplinary processes were implemented and a new willingness for victims of sexual assault to come forward. The NPRM will dismantle these changes and fundamentally shift the Title IX paradigm.

This Comment will address the problematic ideological and legal underpinnings of the NPRM, as well as its practical implications for victims trying to access their education. It is important to note, however, that the **Department's lack of clarity on the status of the 2001 Guidance makes it impossible to comment effectively on the NPRM.** While the NPRM states that it is "reconsidering" at least portions of the 2001 Guidance, it never explicitly addresses whether the entirety of the Guidance will be rescinded. This is problematic because the 2001 Guidance addresses a broad range of issues, such as retaliation, that are entirely ignored in the NPRM. This glaring omission limits the public's ability to effectively comment on the NPRM, since it prevents an understanding of the full extent of the changes to the Title IX system. If the 2001 Guidance is rescinded, there are significant gaps in the NPRM that deserve to be addressed; if the 2001 Guidance is not rescinded, there are direct contradictions between the documents that will cause confusion and chaos for institutions and parties.

---

[5] Indeed, an increase in victim reporting should be understood in the larger context of Title IX – as "critical to adequately meeting Title IX obligations" since "equal opportunity in education includes creating and maintaining systems in which victims of sexual assault report sexual assaults and receive the education-related remedies that they need in order to continue their education. Unless victims report, educational institutions may remain unaware of the contours of the problem and victims will not be provided equal access to education." Naomi Mann, *Taming Title IX Tensions*, 20 J. CONST. L. 631, 669 (2018).

[6] Office for Civil Rights, Dear Colleague Letter from Assistant Secretary for Civil Rights Russlynn Ali, U.S. Dep't Educ. 1 (Apr. 4, 2011) [hereinafter "2011 DCL"]; CATHERINE E. LHAMON, ASSISTANT SEC'Y, OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE (2014) [hereinafter "2014 FAQ"]; Office for Civil Rights, Dear Colleague Letter from Acting Assistant Secretary for Civil Rights Seth M. Galanter, U.S. Dep't of Educ., 2 n.4 (Jan. 25, 2013); *see also* Erin Buzuvis, *Title IX & Procedural Fairness: Why Disciplined-Student Litigation Does Not Undermine the Role of Title IX in Campus Sexual Assault*, 78 MONT. L. REV. 1, 72 (2017) ("It is possible, therefore, that students disciplined for sexual assault are just as litigious as they were prior to the Dear Colleague Letter – there are simply more of them today. This is not because of problems that the Letter caused; rather, it is because of the problems it corrected.").

[7] NPRM, *supra* note 1, at 61465. It is also notable that the ability to cite how many complaints were filed with OCR is a product of 2011 Dear Colleague Letter. Data from prior to its issuance was not publicly available. Inserting such information without context is uninterpretable since the Department provides no point of comparison.

## I.      THE DEPARTMENT HAS LOST SIGHT OF ITS STATED PURPOSE.

The Preamble of the NPRM argues that the context is ripe for the proposed regulations, such that the actual changes seem reasonable in light of the "lack of clear regulatory standards" that have "undermined confidence" in reliability of outcomes solely precipitated by the Obama-era guidance.[8] The problem is that the entire premise relied on by the Department is fundamentally flawed; it is built on a series of assumptions and biases that, when untangled, reveal what can only be understood as an effort to eliminate educational processes as avenues of redress for victims of sexual harassment.

In making the case for these changes and the adoption of purloined authority, the Department repeatedly emphasizes criticism from a few select groups of individuals and organizations that do not represent the majority of stakeholders.[9] The Preamble then suggests that the proper way forward is an alignment of agency review of Title IX compliance with select aspects of legal jurisprudence and, in particular, misapplied Supreme Court precedent. In so doing, the Department completely fails to understand the important distinctions in both object and purpose between these different avenues and essentially forecloses the path for redress at the institution writ large.[10]

In addition to the Preamble's duplicitous narrative, the general text of the NRPM is reflective of an agency that has veered off course and lost sight of its obligation to enforce Title IX. The

---

[8] *Id.*

[9] The Department would have the public believe that it is responding to rampant problems arising from students being accused of, and adjudicated responsible for, sexual assault without proper process or protections. This is not the reality of campus sexual assault. According to one study, only 45% of disciplinary proceedings result in the accused student being found responsible for sexual assault. Confronting Campus Sexual Assault: An Examination of Higher Education Claims, United Educators, 10–12, *available at* https://perma.cc/ 6NWY-ARX6. This report further notes that among students who are found responsible, most are sanctioned by something other than expulsion. In cases where the accused is found responsible, the student is expelled 43% of the time. *Id.* at 12; *see also* Tyler Kinkade, *Fewer than One-Third of Campus Sexual Assault Cases Result in Expulsion*, HUFFINGTON POST (Sept. 29, 2014, 8:59 AM EST), *available at* https://perma.cc/2N4Z-5N8H (reporting that among students found responsible for sexual assault, only 30% are expelled).

[10] The NPRM is rife with inconsistencies and irony. It suggests an alignment of agency standards with legal precedent while failing to take into account the distinct differences in remedies between civil courts and campus disciplinary processes. Then the NPRM explicitly departs from civil litigation standards on the grounds of these previously ignored distinctions. The NPRM incorporates elements of the criminal justice system while, in the same breath, taking issue with the overreach of institutions adjudicating sexual assault. In short, the logic presented in this NPRM does not hold water and suggests that the Department has failed to understand not only basic tenets of the law, but also of its own purpose. These finer points will be addressed in detail later in this Comment.

Additionally, the NPRM's creation of a safe harbor suggests that OCR's interest and ability to meaningfully investigate allegations of Title IX violations by victims are null and void. When coupled with the proposed "deliberate indifference" standard for investigated cases, the changes will effectively prevent victims from obtaining equal access to their education that Title IX was designed to provide for in the first place and leave them with no recourse.

proposed regulation is rife with overly prescriptive requirements while, at the same time, purporting to promote flexibility in addressing sexual harassment. In an effort to incorporate respondent-friendly measures under the guise of due process protections, the Department steps outside their purview, culling portions of criminal procedure – including a presumption of innocence, a right to cross examine the reporting party, and a mandated hearing – and haphazardly applying them to a disciplinary proceeding. Ignoring basic legal distinctions, they conflate the criminal justice system with regulatory law, resulting in an overly prescriptive system that alienates victims and is impossible to navigate for all parties. The NPRM reflects the Department's abdication of responsibility for protecting the civil rights of students who are victims of sexual harassment – ostensibly the primary role of the agency.[11] This new system will make it harder and more dangerous for victims of sexual harassment to come forward and seek redress, lead to careless adjudication processes, and engender a deep-seated lack of faith in the agency's willingness to protect the civil rights of students.

Finally, throughout the NPRM, the Department perpetuates the falsity that sexual assault and rape allegations stand apart from all other potentially criminally prosecutable offenses that occur in educational programs and activities. The overemphasis on procedural due process in campus sexual assault cases stands in stark contrast to other cases where a student is accused of a violation that may lead to expulsion, such as plagiarism or even misconduct that may also be a felony under state law (i.e. distribution of drugs).  In those contexts, however, the recognition that an institution of higher education has the discretion to implement its own community standards and discipline its students goes unchallenged; there is little discussed about the rights of the accused to heightened procedural protections, such as counsel and cross-examination. This discrepancy underscores that the focus of the Department's ire is on the nature of the allegation, not the nature of the deprivation at issue. Thus, while allegations of sexual harassment will *require* a higher burden of proof in many cases and must overcome the application of pseudo legal procedures, these requirements are not reflected in any other campus disciplinary cases. This is fundamentally misaligned with procedural due process analyses and, once again, illuminates the Department's failure to understand the legal principles it is seeking to promote.[12]

The effect of this ill-conceived framework by the Department is that victims of sexual assault and rape will be left with little possibility of obtaining a remedy affording them equal access to their education. For the reasons laid out in this Comment, it would seem as if that is the Department's ultimate design.

---

[11] "How to File a Discrimination Complaint with the Office for Civil Rights," *available at* www2.ed.gov/about/offices/list/ocr/docs/howto.html ("It is the mission of the Office for Civil Rights to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights.").

[12] Deprivation of access in an educational context is distinct from other deprivations (such as those occurring in a criminal justice context) and therefore do not demand a greater level of process. Mann, *supra* note 5, at 668.

## II.      THE APPLICATION OF A DELIBERATE INDIFFERENCE STANDARD TO AGENCY REVIEW IS AN INTENTIONAL ABDICATION OF RESPONSIBILITY BY THE DEPARTMENT TO ENFORCE TITLE IX.

Proposed § 106.44(a) is problematic on its face and in practice. Broken down into its component parts, this provision adopts a deliberate indifference standard, includes an actual knowledge requirement, and narrows the definition of sexual harassment. The effect of these, if implemented, will be the exclusion of victims of sexual harassment from the purview of Title IX, significant reporting hurdles for those who experience conduct prohibited by Title IX, and the elimination of the Department as a viable mechanism to hold institutions accountable when they fail to respond adequately. This provision in and of itself exemplifies the Department's unraveling of Title IX protections for victims and should not be implemented.

The following sections will outline the insidious nature of this provision, starting with deliberate indifference and moving to the skeletal definition of sexual harassment.

A.  Deliberate Indifference is a Grossly Inappropriate and Unwarranted Standard for the Department to Adopt when Investigating Institutional Failure to Respond to Sex Discrimination.

The Department intentionally conflates the deliberate indifference standard with administrative agency review, misaligning the Department's public duty to enforce Title IX with Supreme Court precedent pertaining to private rights of action for money damages. The decision to do this, regardless of any justification provided in the NPRM itself, is emblematic of the Department's intention to wash its hands of any oversight when it comes to sex discrimination in educational settings and leave victims to fend for themselves amidst pervasive sexual harassment. This decision was entirely voluntary, and for the reasons set forth below, will have dire consequences for victims.

The deliberate indifference standard is derived from *Davis* – a decision coming out of a private lawsuit for money damages based on institutional failure to respond to sexual harassment. This standard of liability was developed over time in response to third-party claims for money damages under Title IX in the absence of an explicit private right of action under Title IX.[13] The Courts' decision to limit liability of institutions in these settings reflects a recognition of Title IX's legislative history and the difference between public and private remedies associated with Title IX. Previously, the Department itself acknowledged this distinction and the Court's intent, stating, "the Court was explicit in *Gebser* and *Davis* that the liability standards established in these cases are limited to private actions for monetary damages."[14] Indeed, in *Gebser*, the Court "was concerned with the possibility of a money damages award against a

---

[13] *See* Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998); Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 642 (1999).

[14] Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Preamble at ii. [hereinafter 2001 Guidance] (citing *Gebser*, 524 U.S. at 283, and *Davis*, 526 U.S. at 639).

school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms."[15] Further, Commenters on the 2001 Guidance "uniformly agreed with [the Department] that the Court limited the liability standards established in *Gebser* and *Davis* to private actions for monetary damages."[16] Thus, the Department has previously acknowledged that its enforcement is largely equitable in nature, directing institutions to "change policies, procedures, and other responses that do not comply with Title IX"[17] in contrast to judicial enforcement of an action by private party for money damages.

This distinction is critical. The application of the deliberate indifference standard to agency review is an effort to effectively nullify agency review. This is in conflict with the Department's mandate, its purpose, and the Court's intent when creating this standard. The Court in *Davis* essentially equated deliberate indifference to intentional discrimination, purposely setting the bar for relief almost impossibly high due to the lack of notice provided to institutions in third-party claims for money damages.[18] Indeed, the consequences have borne out in *Davis* progeny, where courts have across the board determined that only the most severe cases can meet the deliberate indifference standard.[19] This means that private litigation, at least by complainants, is not an avenue that encourages or incentivizes institutions to adequately address sexual harassment, in direct conflict with the mandate of Title IX to prohibit discrimination on the basis of sex. Moreover, court cases applying deliberate indifference have communicated that an institution can essentially do nothing in response to allegations of sexual harassment and are still not found deliberately indifferent.[20] One case decision actually noted

---

[15] *Id.* at iii – iv.

[16] *Id.* at iv.

[17] Nancy Chi Cantalupo, *How Should Colleges and Universities Respond to Peer Sexual Violence on Campus? What the Current Legal Environment Tells Us*, 3 NASPA J. ABOUT WOMEN HIGHER EDUC. 49, 63 (2010) [hereinafter *"How Should Colleges?"*]; 2001 Guidance, *supra* note 14.

[18] *Davis*, 526 U.S. at 642 (emphasis added).

[19] *See* Catherine MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 YALE L.J. 7 (2016) ("Schools are routinely found sufficiently responsive to reported sexual harassment as not to be deliberately indifferent when they do almost nothing about it. The most stringent standards to which schools have been held in this highly fact-intensive inquiry, resulting in the most positive outcomes for sexually harassed students, have occurred in cases in which a teacher had sex with or sexually molested an underage, disabled, or boy student—or all three at once.") (internal citations omitted).

[20] *See, e.g..*, Wyler v. Connecticut State University System, 100 F. Supp. 3d 182, 195 (D. Conn. 2015) (holding that "[t]he deliberate indifference standard … is not an invitation for courts to second-guess disciplinary decisions" and therefore a university's one-week paid suspension was deemed an adequate punishment for sexually propositioning a student in a closet and blocking her exit.); Doe v. Bd. of Educ. of Prince George's Cty., 605 Fed. App. 159, 170 (4th Cir. 2015) (where a boy was assaulted and harassed for a year, then forced to engage in sex with another male student on school grounds, but the institution was not found deliberately indifferent because it separated the two students, imposed a suspension on the offender, and gave the victim an escort to the bathroom, but later placed the two students in the same classroom after the suspension was over.); Roe v. St. Louis Univ., 746 F.3d 874, 883 (8th Cir. 2014) (where the university's lack of response to a known

that, when it comes to peer-on-peer harassment, "[t]his 'high standard' precludes a finding of deliberate indifference in all but 'limited circumstances.'"[21] The Department's decision to adopt this standard essentially negates the Departments ability to perform regulatory oversight, one of its primary functions.

Further, the Department fails to acknowledge – or perhaps care – that administrative review is often not pursued for individual remedies, but for victims to seek accountability for systemic failures in response to sex discrimination. VRLC's sexual assault clients have filed complaints with the Department knowing that they would never get any personal remedy, and that any resolution could be rendered years after they had moved on from their institution. Still, the role of the Department was important in that it gave victims an ability to raise awareness of unfair and inadequate processes that often failed to take their complaints seriously or retraumatized them, thus improving the process for future victims. Foreclosing this avenue is an abdication of the Department's central responsibility in enforcing Title IX. By proposing this action, the Department is closing ranks on victims, ensuring they do not have meaningful access to a mechanism to hold their institutions accountable for the ways they fail in responding to sex discrimination.

In the VRLC's practice, very few clients have been in a position to bring a private civil lawsuit due to the high burden threshold, cost, or a combination thereof, despite their experiences of sexual harassment. Historically, these victims have depended on Title IX and the Department to obtain justice. The adoption of the deliberate indifference standard will cut off all avenues of redress and truncate educational institutions' motivation to remedy ongoing sexual harassment. All but a very few will be without remedy, forcing many to endure sexual harassment in their education. The appropriateness of the court's reliance on this standard in private actions is a different discussion, but one crucial aspect of this jurisprudence is that, in addition to the requirements being impossible to meet, it has "not promoted, and does not promote, sex equality in the educational setting."[22] Yet, the Department has deemed it "the best policy approach," [23] finding that foreclosing avenues that protect civil rights is the best policy for advancing and interpreting Title IX.

---

report of rape was justified by the plaintiff's failure to file a formal complaint.); Moore v. Regents of the Univ. of Cal., No. 15-CV-05779-RS, 2016 WL 2961984 at *7–8 (N.D. Cal. May 23, 2016) (concluding that failure to provide housing or academic accommodations did not constitute deliberate indifference – suggesting that even violations of policies promulgated by the Department itself do not automatically qualify as deliberate indifference).

[21] Doe v. Bd. of Educ. of Prince George's Cty., 982 F. Supp. 2d 641, 654 (D. Md. 2013).

[22] Mackinnon, *supra* note 19.

[23] NPRM, *supra* note 1, at 61468.

i.   *Requiring actual knowledge to trigger an institution's obligations under Title IX will make reporting more difficult and campuses more dangerous for victims.*

Part and parcel of the problem with the deliberate indifference standard is the requirement of actual knowledge to trigger an institution's obligation to respond to sex discrimination. The actual knowledge standard was initially established in *Gebser,* where the Court held that an educational entity cannot be held liable for money damages unless an official of the school district with the authority to institute corrective measures has actual notice of, and is deliberately indifferent to, the harassment.[24] Appropriating the actual notice requirement in the context of administrative agency review will limit access to administrative remedies for many victims and thus, continue to limit victims' access to justice and support.

Considered against this backdrop, the NPRM's shift to actual knowledge to trigger an institution's obligation to respond to sexual harassment will further quell reporting and cultivate a more dangerous context for victims to come forward. Previously, institutions were encouraged to designate many responsible employees such that reporting was not in and of itself as difficult for victims. In practical terms, the NPRM will now require victims to make a report in person to one specific, designated individual on campus in order to receive supportive measures, file a complaint, or obtain interim measures. For victims who attend large institutions, i.e. one comprised of over 50,000 students, this is impracticable and will deter reporting. What if, for instance, the victim does not know who exactly they should report to when they are assaulted? What if this designated individual is located at another campus? Reducing the number of designated individuals to report to places a greater burden on victims already dealing with the aftermath of trauma. In many cases, it will be too daunting to take on. In other cases, the process of getting to the right person may entail disclosing and reliving the assault several times before landing in the right office. Essentially, by requiring actual notice before an institution must respond, the Department is asking all women and members of vulnerable populations, such as those with disabilities and those who are gender non-conforming, to prepare themselves in advance to be retraumatized in order to find the one designated person on campus they should reach out to in case they are assaulted. Even if they manage to get to this one person, there are a number of factors that may prevent them from reporting altogether, including the person being unavailable or generally unapproachable.

---

[24] *Gebser*, 524 U.S. at 283.

Despite the well-documented, alarmingly high rate of rape and sexual assault in higher education contexts,[25] there is a correspondingly high percentage of victims who do not report.[26] Factors that contribute to the lack of reporting include, *inter alia*, shame, trauma, fear of the perpetrator, fear that they will not be believed, hesitance to share with administrators that they may see on a regular basis, fear of being attacked or blamed for the assault, and fear of retaliation.[27] Victims experience a range of emotions and responses in the aftermath of an

---

[25] According to an American Association of Universities survey from 2015, the incidence of sexual assault and other sexual misconduct due to physical force, threats of physical force, or incapacitation among undergraduate female respondents was 23.1%. By the time the students were seniors, 26.1% of women and 29.5% of students who identify as genderqueer, trans, or other identification reported nonconsensual sexual contact through completed penetration or sexual touching by physical force or incapacitation. In addition, 61.9% of undergraduate females reported sexual harassment. DAVID CANTOR ET AL., *Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct*, WESTAT (2015), *available at:* http://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/Report%20on%20the%20AAU%20Campus%20Climate%20Survey%20on%20Sexual%20Assault%20and%20Sexual%20Misconduct.pdf.

According to another study, an estimated 20–25% of undergraduate women are victims/ survivors of peer sexual violence. *See* Brenda J. Benson et al., *College Women and Sexual Assault: The Role of Sex-Related Alcohol Expectancies*, 22 J. FAM. VIOLENCE 341, 348 (2007). "Most victims are between the ages of 15 and 24, and 'experience rape at rates four times higher than the assault rate of all women ... College women are more at risk ... than women the same age but not in college.' Sexual assaults most often happen during a victim's first year in college, often during the first week they are on campus. In one study, 12.8% of completed rapes, 35% of attempted rapes, and 22.9% of threatened rapes took place on a date. Most perpetrators are known to the victim, including classmates and friends (70% of completed or attempted rapes) and boyfriends or ex-boyfriends (24.7% of completed rapes and 14.5% of attempted rapes). Often the victim has been drinking or has been given alcohol." Cantalupo, *How Should Colleges?, supra* note 17, at 52.

For further information related to the pervasiveness of sexual harassment and sexual assault, *see* MacKinnon, *supra* note 19.

[26] Some studies estimate the percentage of victims that do not report to be 90%. Cantalupo, *How Should Colleges*?, *supra* note 17, at 49. Other data indicates a rate of 63% nonreporting by victims. Beverly Engel, *Stop Shaming Victims of Sexual Assault for Not Reporting*, PSYCHOLOGY TODAY (Sep. 23, 2018), *available at*: https://www.psychologytoday.com/us/blog/the-compassion-chronicles/201809/stop-shaming-victims-sexual-assault-not-reporting.

It is important to note here that while reporting among sexual assault victims tends to be low across the board, there was a marked shift in victims coming forward and seeking assistance after the 2011 DCL and 2014 FAQ.

[27] *See* Nancy Chi Cantalupo, *Burying Our Heads in the Sand: Lack of Knowledge, Knowledge Avoidance, and the Persistent Problem of Campus Peer Sexual Violence*, 43 LOY. U. CHI. L.J. 205, 213 (2011) [hereinafter "*Burying Our Heads"*] ("The vast majority of the reasons that victims provide involve victims' fears that they will not be believed or will face hostile treatment, especially from authority figures. Fear of hostile treatment or disbelief by legal and medical authorities prevents 24.7% of college rape survivors from reporting. Other factors include not seeing the incidents as harmful, not thinking a crime had been committed, not thinking what happened was serious enough to involve law enforcement, not wanting family or others to know, lack of proof, and the belief that no one will believe them and nothing will happen to the perpetrator. Moreover, the stakes of a victim's report not being credited are quite high for the victim. Not being believed and official mishandling can increase survivor trauma.") (internal citations omitted).

assault and are faced with overwhelming pressure to move forward with their lives, often in the same spaces as their perpetrators.[28] Students at this critical juncture may be debilitated from the sexual assault, such that getting through each day is the most they can muster. VRLC attorneys witness this on a regular basis. The notion that victims who have just been through one of the most, if not the most, traumatic experiences of their lives are expected to think clearly and strategically about reporting to the right person at their institution is unrealistic and, plainly, uninformed.

This indicates that the Department is not actually concerned about addressing the pervasiveness of sexual harassment on campuses. A shift to actual notice and the elimination of responsible employees within higher education institutions will undoubtedly make campuses more dangerous for the following reasons:

- **This proposal makes campuses more dangerous by delaying victims' ability to obtain safety measures.** Under the current framework, responsible employees serve as the institution's eyes and ears on the ground. This has enabled victims to obtain information and assistance, including getting safety measures implemented in unsafe situations. Numerous student victims who seek assistance from the VRLC do not know what Title IX is or what it guarantees. Many of them have disclosed to trusted employees, such as Resident Advisors, coaches, teaching assistants, or professors. Because of their duty to relay information to the Title IX Office, responsible employees often facilitate a prompt response that includes basic protective measures for the victim. Eliminating responsible employees will delay, if not totally hinder, the ability of victims to get prompt assistance in the wake of trauma.

- **This proposal makes campuses more dangerous by allowing untrained employees to determine whether behavior is sufficiently serious to warrant a response.** Under the previous guidance, institutions were required to designate and train responsible employees about gender-based violence on campus. By removing responsible employees, the Department conveys how little it understands or cares about the realities of sexual harassment. For instance, a student may report to their professor about being uncomfortable with a classmate that touched them inappropriately after making overtly

---

Notably, the NPRM is *completely silent* on retaliation, leaving victims with no assurance that they will be protected if they experience retaliation for report or otherwise participating in a complaint process on campus.

[28] *See* Lynn Langton & Jennifer Truman, U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Socio-emotional Impact of Violent Crime* 3 (2014), *available at* https://www.bjs.gov/content/pub/pdf/sivc.pdf (reporting that 70% of sexual assault survivors experience moderate to severe distress, which is a larger percentage than for any other violent crime); Starre Vartan, *The Lifelong Consequences of Rape,* PAC. STANDARD (Dec. 15, 2014), *available at* https://psmag.com/social-justice/lifelong-consequences-rape-96056 ("For reasons that aren't entirely clear to researchers, rape is different from other forms of physical violence and trauma. Even though people may suffer from PTSD following a variety of terrible events, … rape victims are more likely to experience long-lasting mental and physical problems – and here, long-term can mean a lifetime of torment."); Barbara Rothbaum et al., *A Prospective Examination of Post-Traumatic Stress Disorder in Rape Victims,* 5 J. TRAUMATIC STRESS 455 (1992) (finding that 94% of women who are raped experience symptoms of post-traumatic stress disorder during the two weeks following the rape).

sexual remarks. Considered in isolation, the professor may not believe the behavior serious enough to either recommend the student reach out to the Title IX Coordinator or figure out a way to address the situation. Furthermore, the professor likely will not recognize if the behavior occurs more frequently or escalates that the student's safety may be at risk. Many employees are not experts in sexual harassment or understand the dynamics of how victims respond to being harassed. Additionally, professors, coaches, RAs, or teaching assistants that know accused students well may not believe the victim when they disclose, given their exposure to the accused student.  As such, they may respond to victims out of personal preferences or biases that will impact the victim's understanding of what happened, its seriousness, and their ability to obtain assistance from trained professionals.  In contrast, the designation of responsible employees has led to increased and ongoing training to help employees identify sexual harassment and establish protocols to refer all questionable cases to the Title IX coordinator. Once again, this change indicates that the Department is not concerned with addressing the pervasiveness of sexual harassment on campuses but protecting institutions and limiting victims' access to remedies.

- **This proposal makes campuses more dangerous by eliminating avenues by which the institution identifies a threat on campus.** One of most important roles of a Title IX Coordinator is to identify patterns of discrimination at the institution.[29] Eliminating responsible employees exposes the insidious nature of the Department's changes. Currently, Title IX Coordinators receive reports from responsible employees that assist them in identifying discrimination by individuals as well as pockets of harassment by groups. Without the requirement that responsible employees report behaviors, the Title IX Coordinator is reliant solely on victim reports to ensure their campus community is safe from serial perpetrators or other threats. The NPRM's suggestion that the impact of serial predation will be corrected by requiring the Title IX Coordinator to act upon learning of a second report of the same respondent is inherently flawed. This logic hinges on the premise that victims will ever come forward, despite the 5% reporting rates of sexual violence on campuses. The reality is that a shift to actual knowledge means that the Title IX Coordinator will be less informed than they have been since 2011, thereby decreasing their ability to promptly identify and take action to ensure the campus community is alerted and procedures are implemented to address the risk and incidents. This *by definition* makes campuses more dangerous.

The concerns listed above are not only the concerns of victims; they are practical safety concerns for students and other individuals that make up the entire campus community. Yet, these concerns are not discussed, cited, or otherwise given voice in the NPRM. Instead, the Department justifies its position by suggesting that it is necessary to achieve "an essentially uniform standard" with private litigation for money damages. In so doing, the Department fails to recognize the unique analysis of Supreme Court precedent on which it is relying. While the Supreme Court required proof of actual notice and deliberate indifference in order for a

---

[29] *See* Letter from Catherine Lhamon Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter on Title IX Coordinators at 3 (Apr. 24, 2015) ("This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate.").

plaintiff to prevail in a private lawsuit for damages based on the sexual harassment, the Court expressly reserved the ability of the enforcing agency, the Department, to impose a different standard of compliance on institutions through its administrative enforcement of Title IX.[30] Administrative enforcement is distinct from a lawsuit in that it provides an opportunity for an institution to come into compliance before any loss of federal funds (whereas no such compliance agreement would avoid a damages award imposed through litigation).   The NPRM's justification for conflating these processes overlooks the ways in which the Supreme Court itself has upheld the distinctions between administrative review and private litigation. Such a duplicitous justification on the Department's part indicates a willful attempt to make reporting incidents of sexual harassment, including sexual assault, more difficult for victims.

B.  Narrowing the Definition of Sexual Harassment Will Deny Redress to Victims of Sexual Harassment and Make Institutions More Dangerous.

The NPRM's proposed definition of sexual harassment in § 106.44(e)(1) narrows the scope of behavior covered by Title IX and eliminates the concept of hostile environment entirely, deviating from long-standing federal guidance as well as statutory language. If implemented, it will effectively deny redress to a significant percentage of victims of sexual harassment. Coupled with the lack of guidance related to how sexual harassment will be assessed and understood by institutions, this change will make institutions more dangerous for victims and reflects the Department's ultimate goal of limiting the scope and applicability of Title IX.

Federal guidance related to Title IX has long contemplated and promulgated standards related to the seriousness of conduct covered by the statute.[31] In 1997, the Department indicated that hostile environment sexual harassment, as distinct from quid pro quo harassment, was indicated by "severe, persistent, or pervasive" conduct.[32]  It went on to note that the benchmark for determining applicability of Title IX was whether that conduct had the effect of "limit[ing] a student's ability to participate in or benefit from an education program or activity."[33] Then, in 2001, the Revised Sexual Harassment Guidance contemplated sexual harassment in the context of *Davis* and the relationship between regulation and Supreme Court precedent. In so doing, it acknowledged the benefit of having a consistent standard, but proceeded by providing a detailed roadmap for institutions to determine whether conduct was "sufficiently serious" to trigger an institution's response. This included instructing institutions to "look at the 'constellation of surrounding circumstances, expectations, and relationships'" and noted the *Davis* Court "cited approvingly to the underlying core factors described in the 1997 guidance

---

[30]*Gebser*, 524 U.S. at 292; *Davis*, 526 U.S. at 638-639.

[31]Office for Civil Rights, U.S. Dep't of Educ., Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (1997) [hereinafter "1997 Guidance"]; 2001 Guidance, *supra* note 14.

[32] 1997 Guidance, *supra* note 31.

[33] *Id.*

for evaluating the context of sexual harassment."[34] The 2001 Guidance also provided additional clarification of the factors to consider when assessing conduct, recognizing that the *Davis* opinion addressed a specific set of facts that was not emblematic of all cases, particularly in higher education contexts. Such factors included: the degree to which the conduct affected one or more students' education, the type, frequency and duration of the conduct, the identity of and relationship between the alleged harasser and the subject/subjects of the harassment, the number of individuals involved, the age and sex of the alleged harasser and the subject/subjects of harassment, the size of the institution, location of the incidents, and context in which they occurred, and other incidents at the institution.[35] It also provided an in-depth discussion of welcomeness, recognizing the degree to which such concepts, when left unaddressed, can present confusion and be manipulated.[36]

**None of this is present in the NPRM**. Instead, the Department spends approximately one page on its decision to narrow the definition to requiring severity, pervasiveness, **AND** objective offense without any guidance as to how institutions make determinations related to these terms and their meaning.[37] There is no discussion of how to assess unwelcomeness, nor is there any provision of examples to guide institutions in ambiguous or gray areas. The Department has eliminated a useful and well-developed framework and has left in its place a vacuum. This scheme is dangerous for victims in educational settings. Consider the following scenarios:

1. A young woman is taunted by a classmate about her breasts or genital area and the conduct has gone on for some time. Under the proposed definition, it is unlikely that this conduct would be considered severe or pervasive enough to fall under Title IX. If

---

[34] 2001 Guidance, *supra* note 14 at vi (citing *Davis,* 526 U.S. at 651) ("Whether gender-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved.").

[35] *Id.* at 6-7.

[36] *Id.* at 7-9. For instance, the Guidance notes: "If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances." *Id.* at 8-9. The Guidance then provides a list of factors to consider in making this determination. *Id.* at 9.

[37] NPRM, *supra* note 1, at 61463, 61496. The "and" in this phrase is emphasized to demarcate how significantly the Department has narrowed the definition of sexual harassment. In the past, the Department took the position that sexual harassment had to be severe, persistent, **OR** pervasive, which did not so rigidly define conduct that would trigger an institution's obligation to respond. *See* 1997 Guidance; Office for Civil Rights, Dep't of Educ., Q & A on Campus Sexual Misconduct (2017). A shift to "severe, pervasive, and objectively offensive" is therefore not only breaking with decades of precedent, but also drastically weakens protections for students who experience sexual harassment in their education. To put this into perspective, hostile environment is defined more broadly under Title VII than here in the NPRM: the Supreme Court has ruled that to violate Title VII harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Savings Bank v. Vinson, 106 S. Ct. 2399, 2406 (1986). In essence, adults in employment settings will be afforded *more* protection than minors and students in higher education settings under the framework proposed by the Department.

the taunts are made by a few of her classmates, would that constitute severe and pervasive conduct? What if the young woman was actually in middle school and being taunted by students in high school? What if she was a freshman in college? The ambiguity will create scenarios in which victims are asked to endure sexual harassment that institutions may arbitrarily deem not sufficiently serious under this framework, even if the students end up withdrawing from academic and extracurricular opportunities because of the behavior.[38]

2.  A professor regularly directs sexually explicit and inappropriate comments to a specific student during class. Does this constitute sexual harassment of the student under the Department's proposed definition? What about those who witness the behavior on a regular basis, some of whom are victims of sexual assault? Can an individual pursue a sexual harassment complaint if they are not the individual to whom the harassment is targeted? The NPRM suggests that Title IX does not extend to these situations, such that the students affected would have to choose between subjecting themselves to the harassment and removing themselves from the class or otherwise limiting their involvement.[39] The proposed definition would provide little protection in student/employee situations, where the power dynamic clearly favors a campus or secondary school employee.

3.  A student is raped off campus by another student or employee with whom they share a class/classes or otherwise interact with at the institution. The proposed definition forecloses a remedy for this student under Title IX. Given that 87% of campus students live off-campus[40], the Department's prohibition on providing a Title IX complaint remedy for those students unfortunate enough to be sexually assaulted off-campus, shows not only a total lack of understanding of how sexual violence is committed, but an utter disregard for the safety of all elementary, secondary and campus communities. According to the NPRM, a victim who has been raped by another student/employee at an off-campus party and must see their perpetrator in class the next day, would only be allowed to ask for supportive measures, but would not be afforded the right of a Title IX complaint. In other words, off-campus sexual violence is not considered sufficiently severe and pervasive to require institutional response. In light of the Department's additional changes to actual notice, which limit a campuses' ability to learn of serial predators or other serious threats to campus safety, prohibiting victim reports of off-

---

[38] This example is lifted from the 2001 Guidance (see page 6) as one that would fall under the scope of Title IX.

Notably, in the K-12 context, many states have developed robust anti-bullying laws. These laws and their corresponding policies will ultimately offer more protection than Title IX, a **federal anti-discrimination** statute, if the limitations proposed by the Department are enacted.

[39] This example is also lifted from the 2001 Guidance (see page 6) as one that would fall under the scope of Title IX.

[40] Rochelle Sharp, *How Much Does Living Off-Campus Cost? Nobody Knows,* N.Y. TIMES (Aug. 15, 2016), *available at* https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html

campus assault is yet another way campuses will never know of the threats that exist within their communities due to a logistical technicality.

In such situations, the Department requires the institution's analytical focus to be on the interaction or conduct that takes place after the fact without considering the rape itself – a marked departure from decades of widespread recognition of hostile environment sexual harassment. Eliminating hostile environment in its entirety from analyses of sexual harassment leaves victims like the one in this scenario without educational recourse. It also reflects the Department's ignorance of the realities of sexual violence – how conduct considered benign when examined in isolation can be oppressive and limiting when considered in the context of sexual trauma. The decision to eliminate hostile environment without anything in its place is a callous decision that fundamentally contradicts the object and purpose of Title IX.

C. <u>Adopting a Drastically Restrictive Interpretation of the Geographical Reach of Title IX and the Scope of its Application to Educational Programs and Activities is an Effort to Foreclose Educational Remedies and Undermine Title IX Protections.</u>

In addition to adopting deliberate indifference, requiring actual knowledge, narrowing the definition of sexual harassment and eliminating hostile environment altogether, the Department goes *even further* by stating that study abroad programs and other extensions of institutions' academic programs and activities outside of the geographical United States could be excluded from Title IX's reach.  By taking this approach, the Department again chooses to adopt the most restrictive interpretation of the statute. In so doing, it ignores the object and purpose of Title IX as well as the shifting nature of higher education over four decades. While the concept of studying abroad or having satellite campuses across the globe may not have been contemplated in the 1970s when this statute was written, international exposure and integration are central aspects to higher education today. Current estimations indicate that over 300,000 students study abroad in any given year and that 10% of all U.S. graduates have studied abroad.[41] It is rare to find an institution of higher education that does not have an international presence or focus.[42] Indeed, even the federal government recognizes the need for

---

[41] NAFSA: Association of International Educators, Trends in U.S. Study Abroad, at https://www.nafsa.org/Policy_and_Advocacy/Policy_Resources/Policy_Trends_and_Data/Trends_in_U_S__St udy_Abroad/ ("Nationally, the number of U.S. students studying abroad for credit during the 2016-2017 academic year grew 2.3 percent from 325,339 students to 332,727 students. This represents about 1.6 percent of all U.S. students enrolled at institutions of higher education in the United States and about 10 percent of U.S. graduates."); U.S. Dep't of State, U.S.A. Study Abroad, Study Abroad Data, at https://studyabroad.state.gov/value-study-abroad/study-abroad-data ("In academic year 2015/16 a total of 325,339 U.S. students studied abroad for academic credit, an increase of 4 percent over the previous year."); Elizabeth Redden, *Study Abroad Numbers Grow,* INSIDE HIGHER EDUC. (Nov. 13, 2018), *at* https://www.insidehighered.com/news/2018/11/13/study-abroad-numbers-continue-grow-driven-continued-growth-short-term-programs (Women have historically studied abroad at higher rates than men, and the gap has only widened over the last decade. Women made up more than two-thirds (67.3 percent) of students studying abroad in 2016-17, compared to 65.1 percent a decade earlier.).

[42] Over 85 percent of U.S. colleges and universities report that they offer multiple types of education-abroad programs. Brian Whalen, *The Management and Funding of US Study Abroad*, 50 INT'L HIGHER EDUC. 15 (2008). The national source for college and university rankings, U.S. News, publishes a list of colleges that have

students to have international experience in order to compete in an increasingly globalized society. The U.S. Department of State has a website dedicated to study abroad, noting that "[a]n international experience should be part of your education, whatever your goals, socioeconomic status, or field of study."[43] In addition to study abroad programs, certain degrees require fieldwork in order for students to graduate (i.e. Anthropology). For many of these students, fieldwork is not only necessary for an academic degree, but central to their research and essential to their careers.

In light of this reality of higher education, the Department's suggestion that these programs could be properly excluded from Title IX's reach is beyond the pale. Not only is it absurd to tell students that if they participate in an academic program in a different country that is controlled by their home institution, they will not have any Title IX rights if they are assaulted in the course of that program, it is also absurd for institutions and the federal government to encourage international exposure while hedging on whether victims of sexual harassment will be protected by a federal law designed to protect them. The Department's decision to adopt such a restrictive approach to Title IX further underscores the extent to which it is intent upon stripping protections for victims and making Title IX an elusive remedy.

### III.   BY INCORPORATING A SAFE HARBOR FOR INSTITUTIONS, THE DEPARTMENT FURTHER STIFLES THE ABILITY OF VICTIMS TO SEEK REDRESS FOR VIOLATIONS OF TITLE IX.

If the adoption of deliberate indifference is a barrier for victims, then offering a safe harbor to institutions is a complete barricade. The NPRM essentially sets up a two-pronged analysis that makes a finding of noncompliance virtually impossible. First, if an institution checks procedural boxes laid out in §106.45 in response to a formal complaint or multiple complaints, it will be afforded safe harbor by the Department. If, however, the institution fails to comply with §106.45 in some way, the institution's response will be subjected to a deliberate indifference standard, which, as discussed above, is an extremely heightened standard that is rarely met. The incorporation of a safe harbor further illustrates the Department's perspective of Title IX as detached, general instruction for educational institutions as opposed to a civil rights law. In civil rights and anti-discrimination contexts, process matters, but must be designed to meet the stated purposes of the statute. In the Title IX context, the proper end must be the statute's object and purpose as an anti-discrimination mandate (to prohibit discrimination on the basis of sex in education programs and activities receiving Federal financial assistance), not saving institutions money by limiting liability. Safe harbor attached solely to process without any substantive inquiry into the nature and experience of that process does not advance Title IX's objectives.

---

the highest percentage of students who participated in study abroad during their undergraduate years. The website notes, "Some of the schools listed below believe studying abroad to be such a valuable learning experience that they require every undergraduate student to do so." U.S. News, Higher Education, Colleges, Most Students Studying Abroad, *at* https://www.usnews.com/best-colleges/rankings/most-study-abroad.

[43] Study Abroad Data, *supra* note 41.

The following elements of the safe harbor section of the NPRM further demonstrate how significantly the Department has erred in its proposal:

**§ 106.44(e)(5): Formal Complaint.** The NPRM requires a formal complaint to trigger an institution's obligation to respond and implement its grievance procedures. Its definition of a formal complaint is narrow, requiring a signature by the complainant or the Title IX Coordinator and specifically requesting initiation of grievance procedures. This is problematic on multiple fronts. First, it deviates from the Department's stated goals of promoting flexibility in how institutions create and implement disciplinary measures by providing a specific and narrow definition that is required by all institutions, no matter the age or ability of complainants. Secondly, read in conjunction with the actual notice requirement, this will present accessibility issues that will hinder reporting. Consider, for instance, institutions with satellite campuses with just one Title IX Coordinator. An individual is tasked with going in-person to the Title IX Coordinator to report sexual harassment or sexual assault to learn about their options. If they are not ready to move forward with a formal complaint, they face having to come back in-person to file a formal complaint with a signature. This is further complicated by those students who do not have reliable transportation or extra funds to spend on transportation. The restrictive definition imposes unnecessary barriers to filing a complaint that will detrimentally impact victims' willingness to do so. Considered in the larger context of the NPRM, this seems to be the end goal of the Department.

**§ 106.44(b)(2): Actual Knowledge of Reports by Multiple Complainants.** This proposal reveals the extent to which the Department, again, fails to consider its implications for victims and reporting. This particular proposal, requiring the Title IX Coordinator to file a formal complaint in response to actual knowledge of reports by multiple complainants of conduct by the same respondent, contradicts the NPRM's assertion of concern for complainant autonomy when it comes to reporting, and turns a blind eye to the safety implications for victims. If, for instance, a victim reports to the Title IX Coordinator and does not wish to move forward with a formal complaint, yet does not know that there have been other reports by victims in similar circumstances, there is a complete loss of autonomy over whether a process will move forward. Those victims that came forward previously and did not wish to pursue a formal complaint will be forced into potentially dangerous situations unknowingly, since nothing in the NPRM imposes a duty on the institution to go back and offer safety measures or accommodations. This will put victims in harm's way without their knowledge or input.

This proposal also alters a vital role of the Title IX Coordinator, removing their discretion in conducting a safety risk analysis for the complainant and the community. Previously, Title IX Coordinators were called upon to conduct such an analysis in the wake of a report of sexual harassment and the complainant's request for confidentiality. They were explicitly allowed to balance factors, such as whether there was an increased risk of future similar acts of violence, whether the act was carried out with a weapon, the age of the complainant, whether there were multiple perpetrators, whether the institution was on notice of other prior actions by the same perpetrator, etc., in order to determine whether to pursue an investigation.[44] This analysis also

---

[44] 2014 FAQ, *supra* note 6, at 21.

took into consideration the implications for the victim if an investigation was pursued. Under the new proposed framework, the Title IX Coordinator will have no discretion when a second victim comes forward, irrespective of the danger or harm that an investigation may cause the first or second victim. It also complicates the Title IX Coordinator's role of responding to reports. For instance, if the Title IX Coordinator receives a report from a Resident Advisor or faculty member, not from the victim themselves, and then subsequently receives a report from a victim alleging a similar incident with the same perpetrator, is the Title IX Coordinator required to pursue an investigation at that point? Would the first report, albeit not from a victim, constitute actual notice for the purposes of this provision? If not, it puts the Title IX Coordinator in a perilous situation with respect to protecting the campus community. This will put Title IX Coordinators in challenging and sometimes impossible situations.

Moreover, such a process seems designed to fail: if the Title IX Coordinator files a formal complaint, but no complainant is willing to participate or provide further information, the procedural elements required by the NPRM, including the notice requirement and cross-examination, cannot be met. Such a requirement will reliably result in a non-responsibility finding for the respondent, while falling short of meeting due process requirements along the way. This designed-to-fail framework protects an institution from a claim by another victim that is attacked by the same perpetrator, since all the institution has to do is show that it made a pro forma attempt to comply with its obligations and therefore qualifies for safe harbor.[45]

**§ 106.44(b)(3) & §106.44(e)(4): Supportive Measures.** The NPRM suggests that its definition of supportive measures is a neutral stance in the face of allegations prior to an adjudication. This is far from true. By prohibiting such measures from ever "unreasonably burdening the other party," the Department strips institutions of the ability to impose unilateral no contact orders or other safety measures designed to protect the complainant when it identifies the need to do so. If implemented, this provision will lead to complainants solely bearing the burden of making any changes to their housing or academics in order to feel safe. Consider, for instance, a student who has been repeatedly sexually harassed on campus. There are witnesses and other substantial evidence suggesting the ongoing nature and severity of the harassment. The victim and perpetrator have two courses together and live in the same building. If the victim is able to get to the Title IX Coordinator in order to report, they will be informed that they can pursue a formal complaint, but during the pendency of that process the onus will be on the victim to remove themselves from any situation in which they feel unsafe. This means that, on top of the upheaval imposed by the harassment itself, the victim will experience even more upheaval by having to change significant aspects of their life on campus. Ironically, the Department repeatedly emphasizes that supportive measures are "designed to restore or preserve access to the recipient's education program or activity." Considering that complainants will be forced to limit participation in education programs or activities due to this definition, this emphasis is clearly not intended to support victims.

Additionally, the NPRM clearly states that the Title IX Coordinator is the only individual who can coordinate supportive measures. Restricting institutions' ability to identify other

---

[45] Notably, this framework also protects serial perpetrators who will benefit from a system designed to fail on this front.

individuals on campus who may be able to fulfill that role again contradicts the Department's insistence on victim autonomy or the importance of allowing institutions flexibility in responding to sex discrimination. More broadly, this proposal fails to consider the practical needs and abilities of victims who are trying to feel safe as they continue to pursue their education. For a variety of personal identity reasons – not to mention the inherent danger of the "multiple victim complaint requirement" above – victims may be better supported by advocates and other campus administrators without the Title IX Coordinator's involvement. In line with requiring actual knowledge and the definition of a formal complaint, the restrictive approaches promoted in the NPRM underscore how little the Department is concerned about promoting or advancing Title IX's object and purpose.

## IV. THE PROPOSED GRIEVANCE PROCEDURES CREATE A FRAMEWORK THAT ROLLS BACK PROTECTIONS FOR VICTIMS, PRIORITIZES RESPONDENTS, AND WILL LEAD TO FRAUGHT AND HARMFUL ADJUDICATION PROCESSES.

The grievance procedures outlined in proposed § 106.45 reflect an attempt by the Department to over-prescribe adjudication processes, eliminate critical protections for victims, and undermine the function of Title IX as a statute designed to address historic sex inequality in education. These procedures reveal the crux of the Department's proposal: to reconfigure Title IX as a tool to protect respondents and discredit and intimidate victims. The following sections address key provisions of § 106.45 that exemplify this effort.

### A. The Department's Extension of Title IX to Reverse Discrimination Has No Basis in Law and Equates Respondents' Treatment in a Disciplinary Process with Victims' Experiences of Severe, Pervasive, and Objectively Offensive Sexual Harassment.

Though the *opening line* of the NPRM's first substantive proposal states that the statute itself does not specifically discuss sexual harassment,[46] long-standing legal precedent places sexual harassment squarely within the ambit of Title IX.[47] There is no legal corollary justifying the Department's position that a respondent's treatment in an educational program's adjudication process qualifies as sex discrimination under Title IX. The Department declares this proposition sua sponte, asserting its intent to treat it the same as a victim's experience of sexual harassment. In other words, in a framework which requires a Complainant's sexual harassment to be severe, pervasive and objectively offensive in order to qualify for Title IX protections, the Department now equates a respondent's experience during an adjudication process to the same level of systemic sexual discrimination that victims experience. This flawed premise cuts against the fabric of Title IX and exposes how far the Department will go in order to protect and promote the interests of respondents.

---

[46] NPRM, *supra* note 1, at 61466. The fact that this is placed in the opening line of the first proposed change of the NPRM is no accident. It illuminates the Department's skewed perspective with respect to Title IX and its attempt via the NPRM to undermine the current regime and its legal foundation. Notably, the statute also fails to specifically mention college athletics, but that has not been widely criticized as outside of the purview of Title IX.

[47] *Gebser*, 524 U.S. at 283.

Additionally, this proposal ignores the statute's legislative history and the long-term impact of sexual assault on a victim's ability to access education and opens agency review to respondent complaints.[48] The legislative history indicates an expressed intention by legislators to address pervasive gender inequality in education. Senator Birch Bayh, one of the amendment's sponsors, stated in support of passage that Title IX was a direct reaction to the Civil Rights Act and "an important first step in the effort to provide for the women of America something that is rightfully theirs - an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work."[49] The statute was clearly designed to address and confront the systemic gender inequality in education. It was not, as the Department suggests, enacted from a place of neutrality or with the end goal of transforming disciplinary proceedings into quasi legal proceedings.

The breadth of the statutory language brought much-needed attention to the structural and systemic barriers that led to gender inequality in education. Sexual harassment is widely accepted and acknowledged as one of these barriers, even by the Supreme Court. Rates of sexual assault in higher education are estimated at around 20% and a majority of the victims are women.[50] The effects of sexual assault on education have been well-documented: victims of sexual assault generally experience adverse educational outcomes, ranging anywhere from a drop in grades to withdrawal and even expulsion from the educational institution. Additional effects include the "ability to stay at the institution of one's choice, ability to graduate on time, ability to maintain scholarships, and even the ability to continue education itself."[51] Victims are also at an increased risk for post-traumatic stress disorder, depression, suicidality, lower earnings, homelessness, and poverty.[52] It is undeniable that there remains a pressing need for Title IX protections as a result of pervasive sexual assault and harassment. Downplaying the context of sexual harassment and its impact on victims' education, the NPRM casts Title IX as merely a mechanism meant to provide procedures to safeguard the accused without any acknowledgement of the statute's original purpose or continuing need.[53] This depiction of Title IX is grossly inaccurate and ignores its fundamental purpose as borne out in history, jurisprudence, and basic facts.

---

[48] Ironically, the NPRM forecloses an avenue of redress for victims (via safe harbor and other restrictive provisions) but *creates* an avenue for respondents to obtain redress.

[49] 118 Cong. Rec. 5807 (1972) (statement of Sen. Birch Bayh).

[50] Mann, *supra* note 5, at 50 (internal citations omitted).

[51] *Id.* at 638.

[52] *Id.* at 638.

[53] NPRM, *supra* note 1, at 61472.

22

B. In Addition to Endorsing Reverse Discrimination as Under Title IX's Purview, the Department Proposes Extra Safeguards for Respondents While Simultaneously Negating Victims' Experiences.

Building on its flawed position that respondents' experiences through an adjudication process equate to a victim's experience of severe, pervasive and objectively offensive conduct, the Department proposes additional safeguards for respondents in § 106.45(b)(1)(i). It requires institutions to "[t]reat complainants and respondents equitably. An equitable resolution for a complainant must include remedies where a finding of responsibility for sexual harassment has been made against the respondent; such remedies must be designed to restore or preserve access to the recipient's education program or activity. An equitable resolution for a respondent must include due process protections before any disciplinary sanctions are imposed."[54]

A close reading of this provision reveals the Department's underlying objective of convincing the public that a respondent's experience in a disciplinary process is more serious than a complainant's. The selective wording of this provision entirely downplays the experiences of victims, sidestepping (or rejecting) entirely the reality of sexual harassment and the need to ensure fair treatment in an adjudication process. In describing the "distinct interests" of the parties in grievance processes, the Department suggests that complainants have an interest in receiving remedies (that are solely designed to facilitate access to educational programs and activities as long as they do not burden the respondent), while the respondent's interests demand additional due process protections. This juxtaposition suggests that victims would not prioritize fair treatment in an adjudication process for themselves as well. It also describes the ramifications of a process for a respondent in a particularly dire way ("the resulting sanctions against the respondent could include a complete loss of access to the education program or activity of the recipient"), while again downplaying the impact to the complainant ("complainant's access to the recipient's education program or activity can be *limited* by sexual harassment"). The wording of this provision should not go unnoticed – whereas here, the Department chooses to frame the impact of sexual harassment on a victim as potentially "limiting," the rest of the NPRM repeatedly insists on a higher threshold for conduct to fall under Title IX ("effectively denies"). The choice of words here underscores the brazen attempt to persuade the public that when it comes to process, the interests of the respondents overshadows and ultimately trumps the interests of the complainant. From that vantage point, due process protections are crucial only when applied to respondents. This fundamentally flawed perspective is ultimately emblematic of the NPRM's bottom line: to serve the interests of respondents and institutions as opposed to promoting and protecting civil rights in education.

---

[54] The NPRM states that the concerns about the respondent requires a process that "seriously considers contrary arguments or evidence the respondent might have" as well as the specific due process protections outlined in the rest of the NPRM. The complainant is not guaranteed these opportunities. Instead, the NPRM indicates that the outcome of the process that could provide remedies and restore access to education sufficiently satisfies the complainant's stake in and experience with the process. *Id*. This flies in the face of equity.

C.  Requiring a Presumption of No Harassment Will Effectively Shift the Burden of Proof
    to the Complainant and Perpetuates the Myth that False Allegations are Common.

In the same vein as providing additional safeguards for respondents, the very next provision
requires institutions to adopt a presumption of no harassment under the auspices of shoring up
impartiality. To be clear, requiring a presumption does not guarantee, nor is it necessary for,
impartiality on the part of the recipient/adjudicator. Educational proceedings have operated
under the mandate to treat the parties equitably for decades, where presumptions about either
party are prohibited. A presumption of no harassment fundamentally alters this equitability
framework and forces the institution to take a position before any evidence is examined or
weighed. To suggest that this provision promotes impartiality is an attempt to detract from how
it actually advances the interests of respondents.

Imposing a presumption of no harassment also shifts the burden of proof onto the complainant,
despite the Department's effort to convince the public that the burden remains with the
recipient. It is well-established that imposing a presumption shifts the burden of proof onto the
party without the presumption protection.[55] If the decision to require a presumption is in line
with fair proceedings in legal systems, as explicitly stated by the NRPM, then the logical
extension is that it be applied in the same fashion. Merely stating that the recipient will bear
the burden of proof does not in practical terms make it so. Rather, it makes the Department
seem naïve to the actual legal underpinnings of their assertions.

The Department's justification for requiring a presumption is entirely respondent-focused and
perpetuates the insidious myth that women lie about being sexually harassed. According to the
NPRM itself, this provision is a reaction to the "stigma and reputational harm that accompany
an allegation of sexual misconduct." The NPRM is noticeably silent on the reputational harm
and stigma that accompanies coming forward about being sexually harassed. In fact, fear of
stigma and retaliation are commonly identified as barriers to coming forward, not to mention
navigating overly intrusive questions about prior sexual history, behavior, the clothes the
victim was wearing, or whether their conduct post-incident met the expectations of the
interviewer.[56] Victims are often in a lose-lose position. If they had a forensic medical
examination completed, they endured hours of invasive and painful evidence collection. If they
did not seek medical attention, their credibility is questioned. Either way, the intrusion, both
physically and mentally, into a victim's life when they come forward about an assault is
literally given no space –not even one word – by the Department.[57]

---

[55] Stephen Dwyer, *Presumptions and Burden of Proof*, 21 LOY. L. REV. 377, 377 (1975).

[56] *See, e.g.*, Sable, et al., *Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College
Students*, J. AM. COLLEGE HEALTH, 55, 157-162 (2006). ("The . . . barriers prevalent 30 years ago, prior to
efforts by the rape reform movement, continue to be considered important among college men and women. The
barriers rated as the most important were (a) shame, guilt, embarrassment, not wanting friends and family to
know; (b) concerns about confidentiality; and (c) fear of not being believed. Both genders perceived a fear of
being judged as gay as an important barrier for male victims of sexual assault or rape and fear of retaliation by
the perpetrator to be an important barrier for female victims.").

[57] This does not even account for the race and power dynamics that victims grapple with in deciding whether to
report. It is well-documented that women of color, along with gender nonconforming individuals, are more

At bottom, the framing of a presumption requirement by the Department reflects the deep-seated, yet thoroughly debunked, belief that women lie about being raped and sexually harassed. In reality, the rate of false sexual assault allegations lies somewhere between 2% and 10%.[58] These estimations may even be on the higher side, considering the inherent difficulties with defining "false allegations." These definitions can vary by jurisdiction, but in general there is a material difference between an unfounded report and a false report, and what underlies a victim's decision to recant or withdraw their complaint. In this context, the Department's insistence on a presumption is contraindicated. Inserting this into an educational adjudication stamps the process with the question of whether the victim is telling the truth and whether "real" sexual harassment occurred. This perpetuates victim-blaming, excusing behavior of accused students, and the idea that false claims are common.[59]

D. Requiring a Live Hearing with Adversarial Cross-Examination is a Barely Disguised Design to Minimize Reporting, Bolster the Accused, and Will Have a Devastating Impact on Victims Most Traumatized by Their Experience of Sexual Harassment.

Adversarial cross-examination is not an appropriate evidentiary tool to impute into campus disciplinary proceedings. First and foremost, educational institutions are not courtrooms. They are communities focused on learning, with codes of conduct designed to articulate their unique value system, protect the community and promote this core responsibility. Mandatory adversarial processes "cut against the learning goal of discipline, and superimpose a high conflict procedure into a non-adversarial community and system."[60] By requiring adversarial cross-examination, the Department is fundamentally changing the nature of educational disciplinary proceedings into quasi legal trials without accounting for the training, limits, and protections that are necessary to prevent complete chaos. The imposition of cross-examination reflects the Department's anti-victim perspective on Title IX, is overly prescriptive and practically flawed, and will have a long-lasting devastating impact on victims and campus adjudications writ large.

---

disproportionately targeted. The risks of coming forward for victims cannot be separated from the racism, homophobia, transphobia, and misogyny present in communal campus life.

[58] A multi-site study of eight U.S. communities (a combined 2,059 cases of sexual assault) found a 7.1 percent rate of false reports. Kimberly Lonsway et al., *False Reports: Moving Beyond the Issue to Successfully Investigate and Prosecute Non-Stranger Sexual Assault,* Nat'l Ctr. for the Prosecution of Violence Against Women (2009). A study of 136 sexual assault cases in Boston from 1998-2007 found a 5.9 percent rate of false reports. Lisak et al., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases,* 16 Violence Against Women 1318 (2010).

[59] Joanne Belknap, *Rape: Too Hard to Report and Too Easy to Discredit Victims*, 12 Violence Against Women 1335, 1335-1336 (2010).

[60] Mann, *supra* note 5, at 665.

i.    *Requiring cross-examination is representative of the Department's skewed ideological perspective on adjudications in higher education and Title IX.*

In a seismic departure from past practice and guidance, the Department's insistence on adversarial cross-examination reveals the deeply misplaced ideological commitments of an agency intent on dismantling protections for victims and bolstering the accused. The rationale underlying the shift is one-sided, focusing on select federal cases that have described the need for cross-examination in education settings while ignoring the split across the board in how courts understand the institution's due process obligations to include or exclude adversarial cross-examination. A close examination of federal case law regarding the proper due process protections required in student disciplinary cases reveals a substantially different landscape than the Department has described in the NPRM. Many federal appellate courts that have grappled with this concept have either questioned whether there is a procedural due process right to any cross-examination at all or contemplated that any such right would be narrow.[61] Indeed, many courts have recognized that "[f]undamental fairness without adversarial cross-examination is satisfied where the accused is provided with the opportunity to know the substance of the evidence against him and has the opportunity to provide evidence and testimony on his behalf."[62] Considering the body of law around this issue – as opposed to just one federal appellate decision cited by the Department – there are limits that may be appropriately placed on cross-examination once fundamental fairness has been provided.[63]

---

[61] *Id.* at 658; *See also* Newsome v. Batavia Local School Dist., 842 F.2d 920, 925–26 (6th Cir. 1988) (deciding that there is no right to cross-examine adverse witnesses in expulsion proceedings due to the burden it would place on school employees); Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses . . . ."); Brewer v. Austin Independent School Dist., 779 F.2d 26, 263 (5th Cir. 1985) (rejecting argument that accused had a procedural due process right to cross-examination in a suspension case and stating, "[W]e reject any suggestion that the technicalities of criminal procedure ought to be transported into school suspension cases."); Boykins v. Fairfield Bd. of Education, 492 F.2d 697, 701 (5th Cir. 1974) (holding that the right to cross-examination is not required in expulsion proceedings); Flaim v. Med. College of Ohio, 418 F.3d 629, 636 (6th Cir. 2005) ("Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases."); Gorman v. University of Rhode Island, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases."); Winnick v. Manning, 460 F.2d 545, 549 (2d Cir. 1972) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961).

[62] Mann, *supra* note 5, at 659. *See also* Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding."); Goss v. Lopez, 419 U.S. 565, 581 (1975); *Flaim*, 418 F.3d at 636, 641 (deciding whether the "accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence" when the accused had the "opportunity to present his version of events . . . [and] point out inconsistencies or contradictions in the officer's testimony"); *Winnick*, 460 F.2d at 549 ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); *Dixon*, 294 F.2d at 158–59.

[63] *See* Mann, *supra* note 5, at 660-61 ("evidence does not need to be questioned in the traditional adversarial context, the content of cross-examination may be limited, the individuals that may be cross-examined may be limited, cross-examination may be denied where not material to the result, cross-examination does not have to be face-to-face, and cross-examination may be performed through a third party. Permissible cross-examination may be oral or written, with some courts holding that there is no right to change the submitted written questions

This legal landscape reflects courts' recognition of the material difference between educational institutions and courts of law.[64] Educational institutions and their disciplinary processes are geared toward protecting the learning environment and, as such, the remedies associated are qualitatively different than criminal or civil litigation. The sanctioning power of an institution is limited to reviewing and modifying the relationship it has with each student. For instance, educational institutions may impose sanctions such as moving a respondent's residence, requiring the respondent to stay away from the victim, or requiring the respondent to undergo specific training. Institutions have discretion to impose suspensions and expulsions, but often employ them only in egregious cases. In all cases, educational institutions have the obligation of striking the appropriate balance between preserving the integrity of the learning community and ensuring the safety of their community's members. Imposing an adversarial model in these settings "negatively affects the fabric of the educational community and detracts from the educational institution's ability to carry out its core functions."[65]

The Department's failure to recognize the unique nature of disciplinary processes at educational institutions in the context of imposing adversarial cross-examination is willful ignorance with inappropriate and dangerous consequences. For instance, the Department theoretically agrees that the burdens of investigation and proof should rest with the institution and not with the parties, but imposes requirements that are practically inconsistent with this. Imposing adversarial features such as cross-examination in these settings shifts that burden to the parties and their advisors. That means that students/their advisors will be called on to prepare and conduct a cross-examination, which is a difficult and nuanced task. This position, and the Department's framing of it, presumes that students will have access to a skilled attorney, but that is generally not the case. Moreover, institutions will be called upon to coordinate advisors (i.e. provide counsel) for the parties, requiring significant resources that most institutions do not have. The risks and problems associated with this proposed structure is several-fold: it is practically flawed and will lead to potentially dangerous and uncontrolled kangaroo proceedings; it will prevent victims of sexual harassment from coming forward and will impact the most vulnerable populations; it will retraumatize victims who are brave enough

---

in response to the victim's testimony at a hearing. The cross-examination may be in front of a hearing board or an investigator) (internal citations omitted).

[64] *Goss*, 419 U.S. at 583 (imposing "truncated trial-type procedures" and noting that "further formalizing the . . . adversary nature" of the suspension process in all disciplinary cases might "destroy its effectiveness as part of the teaching process"); *Gorman*, 837 F.2d at 14 ("[T]he courts have not and should not require that a fair hearing is one that necessarily must follow the traditional common law adversarial method."); *Nash*, 812 F.2d at 664 ("[Defendants'] rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial.");
Linwood v. Board of Education, 463 F.2d 763, 770 (7th Cir. 1972) (stating that an expulsion hearing "need not take the form of a judicial or quasi-judicial trial. . . . [It] is not to be equated . . . with that essential to a criminal trial"); Gomes v. Univ. of Me. Sys., 365 F. Supp. 2d 6, 16 (D. Me. 2005) ("[A] major purpose of the administrative process and hearing is to avoid formalistic and adversarial procedures.").

[65] Mann, *supra* note 5, at 653 (citing Goss, 419 U.S. at 583 ("[F]urther formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.")).

to come forward; it will put institutions in a perilous situation with respect to the mandated provision of counsel.

> ii. *The Department's adversarial cross-examination mandate is simultaneously overly prescriptive and practically careless.*

The Department's overly prescriptive approach to regulating the ins and outs of disciplinary processes is a marked departure from its self-proclaimed commitment to providing institutions flexibility. Adversarial cross-examination and a mandatory live hearing are not only prescriptive, but carelessly imposed, suggesting there was little forethought about the practicalities involved in complying with such a narrow regimen. For instance, the Department insists that the rules of evidence do not apply ("there are no rules of evidence in Title IX grievance processes"[66]) in the context of adversarial cross-examination, which is in and of itself an evidentiary issue. Cross-examination is designed to elicit testimony and evidence, but is subject to appropriate limitations to both protect the witness and safeguard the integrity of the proceeding. A substantial body of law around cross-examination exists such that even those trained as lawyers and judges grapple with its nuance, application, and scope in legal proceedings. The NPRM is largely silent on the practical issues that inherently accompany cross-examination. There is no instruction related to who plays the role of gatekeeper/judge in determining the scope and limitations of cross-examination, whether there is a relevancy threshold that must be met for the information elicited, whether objections are allowed and whether such objections can be the basis of appeal, and what training adjudicators will be required to undergo in order to competently preside over a cross-examination. In fact, so little is said about how adversarial cross-examination is to be carried out that it suggests the traditional limits are inapplicable. As discussed below, this carelessness has dangerous consequences for the proceedings themselves and for victims.

> iii. *Cross-examination will turn campus disciplinary processes into kangaroo legal proceedings.*

The NPRM requires that cross-examination be carried out by advisors to the parties, narrowing the discretion of institutions with respect to limiting advisors' roles and essentially forcing institutions to provide counsel. The NPRM is silent as to the weight that this puts on advisors and ignores the reality that cross-examination is an uncommon professional skill. If advisors are not competent in cross-examination, there is a significant chance that the proceeding will go awry. Moreover, there is the question of whether an institution-appointed advisor has to have equivalent skills to an advisor who is trained in cross-examination, and whether the guarantee of an advisor insinuates the guarantee of an effective advisor. The lack of information regarding the practicalities of mandatory cross-examination suggests that the Department either does not care about its ramifications or is actually ignorant of these predictable collateral problems. Either way, its insistence on cross-examination will lead to absurd and inappropriate proceedings.

---

[66] NPRM, *supra* note 1, at 61477.

Consider an institution that does not typically have attorneys participate in their disciplinary process, either due to a lack of resources or because attorneys are not readily available for this kind of representation. Without limits on cross-examination, individuals wholly untrained in cross-examination, such as fraternity brothers, parents, peers, or even faculty members, will be thrown into a quasi-legal arena and tasked with carrying it out. This will lead to chaotic, uncontrolled, and largely ill-conceived proceedings that can have dire consequences for both parties involved. Questioning will likely far exceed the scope of relevant information, the few limits placed on cross-examination will not be respected, and administrators will be called upon to make nuanced legal determinations about the scope of information solicited. The precariousness of this proposal suggests that the Department is listening to a select group of respondent-friendly organization and individuals and naively regulates from the perspective that parties have attorney advisors across the board. This is not the case; in fact, those parties who have attorney advisors are in the vast minority of those who participate in a disciplinary process. The carelessness of the Department's perspective has serious implications for all of those involved in the campus disciplinary process.

> iv.   *Cross-examination will have a devastating impact on victims.*

A central concern about cross-examination is the impact it will have on victims. In what can only be described as lip service, the Department suggests that it has seriously considered the concern about "any unnecessary trauma that could arise from personal confrontation between the complainant and respondent"[67] by allowing an institution to facilitate questioning with the parties in different places. It also states that general rape shield provisions will apply, but in a context in which the rules of evidence do not. This ignores how attorneys routinely attempt to circumvent rape shield limitations.[68] In such contexts, the need for trained and skilled adjudicators cannot be overstated. Without appropriate and reliable limits, victims will be faced with intrusive and retraumatizing questions that are designed to humiliate and victim-blame them – with little to no recourse. This is likely to have a chilling effect on victims, preventing them from coming forward but doing nothing to address the pervasive sexual harassment that occurs in educational contexts. Taking that to its logical end, more victims will be prevented from equal access to their education, which contradicts and undermines Title IX.

Underlying the Department's insistence on adversarial cross-examination, among other required elements aimed at molding campus adjudications into courtroom legal proceedings, is the unfounded notion that sexual assault and rape are different kinds of cases than others that could result in equal sanctions, referred to as "rape exceptionalism."[69] The tendency to treat

---

[67] NPRM, *supra* note 1, at 61476. The wording here is particularly illuminating. *Any* trauma should be considered inexcusable in this context, not just "unnecessary" trauma.

[68] A comprehensive study in 2006 found that "applications to admit sexual history evidence were made in just under one-third of trials sampled, though in practice this evidence was raised in two-thirds of trials as it was often introduced without following the proper procedures. Hardly any applications were made in advance of the trial, contrary to procedural rules, and two-thirds of those made at trial were successful." Claire McGlynn, *Rape Trials and Sexual History Evidence*, 81 J. Crim. L. 5 (2017).

[69] Mann, *supra* note 5, at 666; Michelle Anderson, *Campus Sexual Assault Adjudication and Resistance to Reform*, 125 Yale L.J. 1940, 2000 (2016) ("Title IX Is about institutional accountability, a civil rights

sexual assault and rape victims as distinct from other crime victims has roots in criminal justice and civil litigation contexts, where victim testimony has been required to be corroborated and victims have carried extra burdens to establish that they resisted.[70] Contrasted to the lack of such requirements placed on other victims of physical crimes, it is clear that there has been unequal treatment. The Department is perpetuating this rape exceptionalism, suggesting that sexual harassment, sexual assault, and rape are so distinct from other disciplinary infractions that they require additional hurdles to establish credibility. This is ultimately attributable to the Department's belief that victims lie and must be subjected to additional scrutiny.

In addition to this deeply flawed ideology, the overemphasis on due process in sexual harassment is at odds with the rights the Department is ostensibly seeking to promote. If the Department was actually concerned with the nature of the deprivation, as procedural due process analysis requires, then it would not be overly concerned with distinguishing sexual harassment cases from other disciplinary actions that carry similar risk of deprivation, i.e. plagiarism. Indeed, nothing coming out of the Department implies that every time a student is accused of violating a code of conduct that could risk suspension or expulsion, that they should have the right to counsel and adversarial cross-examination rights. Requiring only sexual harassment cases to take on the form of a courtroom legal proceeding reinforces the myth that victims lie and should be subjected to heightened scrutiny. These anti-victim ideological underpinnings of the NPRM reflect a shift in systemic values at the Department that will have long-term consequences for victims of sexual harassment in educational contexts.

### E. Shifting the Standard of Evidence Prioritizes Respondents Over Victims in an Attempt to Undermine Victims' Credibility and Make Educational Remedies Even Harder to Obtain.

The NPRM's departure from the preponderance of the evidence standard is a predictable outgrowth of anti-DCL sentiment among those who decried its "overly prescriptive" regime. However, the Department's proposal overlooks several crucial facts and consequences in service to this perspective that does not actually carry water.

First, a preponderance standard was used by a majority of institutions prior to the release of the DCL. One study relying on data from public and private institutions indicated that over sixty percent of institutions utilized a preponderance standard, while other studies have estimated that it was actually around seventy percent.[71] Russlyn Ali, Assistant Secretary for Civil Rights at the Department of Education in 2011, estimated that 80% of higher education

---

mechanism to hold institutions accountable for providing equal education."); *see also* Donald Dripps, *After Rape Law: Will the Turn to Consent Normalize the Prosecution of Sexual Assault?*, 41 AKRON L. REV. 957, 957 (2008) ("Rape is an exceptional area of law.").

[70] Anderson, *supra* note 68 at 1943, 1946-50.

[71] Angela Amar et al., *Administrators' Perceptions of College Campus Protocols, Response, and Student Prevention Efforts for Campus Sexual Assault*, 29 VIOLENCE & VICTIMS 579, 584-85 (2014); Jake New, *Burden of Proof in the Balance*, INSIDE HIGHER EDUC. (Dec. 16, 2016), *available at* https:// perma.cc/YD8T-8U56.

institutions were using the preponderance standard prior to the DCL.[72] This demonstrates that the DCL did not mark a radical shift in practice related to the standard of evidence, and that student conduct professionals generally agreed that the preponderance standard was the most appropriate standard in facilitating a resolution with the distinct interests at stake. In further support of this, a 2004 Model Student Conduct Code noted that the preponderance standard "correctly treats each [party] as equally important when a fact finder tries to decide what happened when facts are disputed."[73] It specifically distinguished this standard from clear and convincing and beyond a reasonable doubt, noting: "The 'clear and convincing' and 'beyond a reasonable doubt' standards inaccurately treat the Accused Student as more important than the student who believes s/he was a victim of misconduct and/or as having more important interests than all other members of the academic community have in the maintenance of a calm, peaceful and productive living/learning environment."[74] The Department expressed similar sentiment about the preponderance standard dating back to 1995, noting that applying clear and convincing in sexual harassment cases was inconsistent with equitable grievance procedures required by Title IX.[75] The same analysis is applicable today; the Department's attempt to shift the standard represents a sea-change in Title IX and will have drastic consequences for victims as well as adjudications.

In addition to causing a baseline imbalance between the parties and shifting the burden of proof to the complainant, a move to clear and convincing will disproportionately affect marginalized communities. Underlying the effort to shift the standard are the rape myths that pervade the NPRM writ large. While they have already been discussed at length in other sections, it is worth noting that creating an unequal baseline at the outset perpetuates the myth that victims lie about being harassed or assaulted and sets a higher bar for credibility, particularly when it comes to incidents that do not involve force. It is widely known that victims who come forward without any corroborating evidence are met with a level of skepticism that often prevents cases from moving forward in the criminal justice system. Under a higher standard of evidence that endorses the baseline skepticism of victims, reporting will be further quelled. Of those who will feel this acutely are women victims of color who are already less likely to report than white women.[76] Elevating the standard of proof in disciplinary proceedings will increase the

---

[72] Letter from Ass'n of Title IX Adm'rs et al. to Russlyn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ., 2 (Feb. 7, 2012), *available at* https://www.prnewswire.com/news-releases/atixa-co-authors-letter-supporting-the-ocr-title-ix-dear-colleague-letter-on-campus-sexual-assault-139206759.html.

[73] Edward Stoner II & John Wesley Lowery, *Navigating Past the "Spirit of Subordination": A Twenty-First Century Model Student Conduct Code with a Model Hearing Script*, 31 J. C. & U. L. 1, 49 (2004).

[74] *Id.*

[75] See Letter from Gary Jackson, Reg'l Civil Rights Director., Office for Civil Rights., U.S. Dep't of Educ., to Jane Jervis, President, The Evergreen St. Coll. (Apr. 4, 1995).

[76] Sarah Ullman et al., *Exploring the Relationships of Women's Sexual Assault Disclosure, Social Reactions, and Problem Drinking*, 23 J. INTERPERSONAL VIOLENCE 1235, 1237 (2008); Martie Thompson et al., *Reasons for Not Reporting Victimizations to the Police: Do They Vary for Physical and Sexual Incidents?*, 55 J. AM. COLL. HEALTH 277, 279 (2010) (finding that women of color are less likely to report sexual violence to the police than white women).

likelihood that women of color do not come forward, since it will amplify the skepticism of victims who do not conform to cultural stereotypes of who "real" victims are.[77]

Compounding these concerns about the barriers to reporting is the predictable dilemma it sets up for educational institutions adjudicating cases with overlapping layers of discrimination. Nothing in the NPRM suggests or hints at a shifting standard with respect to allegations of racial discrimination, so preponderance will remain the standard in those contexts. Thus, when an institution is faced with allegations of sexual and racial harassment, the regulatory framework would "single[] out sexual harassment victims for differentially less protection than victims of racial or other kinds of discriminatory harassment."[78] Addressing the intersectional dimensions of discrimination is a difficult task, but even more challenging in light of this inconsistent and incoherent scheme presented by the Department. Notably, the NPRM acknowledges that it is setting up this inconsistency, then proceeds to communicate how little it cares about addressing questions of intersectionality. What will transpire, therefore, is that victims of color will be disproportionately affected and have to navigate a confusing network of competing evidentiary standards and requirements in a context in which the odds are already stacked against them.

The impact of this proposal on victims will be significant and harmful, yet nothing in the Department's rationale even mentions victims. It focuses solely on the possible ramifications for respondents. In fact, it essentially urges institutions to adopt a higher standard of evidence by acknowledging that faculty have more bargaining power than students and requiring that protections for faculty respondents be extended to students (the NPRM actually uses the language of "specially disfavored treatment of student respondents").[79] While such sentiment is par for the course for the NPRM as a whole, the language here again underscores the extent to which the Department is regulating from the perspective of dismantling protections for victims as opposed to ensuring that the mandate of Title IX is appropriately upheld. The entire premise of the Department's proposal willfully ignores that a victim's educational access and opportunities will likely be greatly curtailed following harassment or assault – regardless of whether the respondent is ultimately held responsible. In such contexts, an endorsement of a higher standard is an inherently biased decision that favors the rights of the accused over rights of alleged victims. Such a decision does not just undermine the equitability doctrine that has appropriately presided over Title IX processes for decades, it flies in the face of it.

While the Department attempts to provide a legal justification for its proposal, suggesting that select administrative law cases that apply a higher standard of evidence are more appropriate for campus disciplinary processes than the overwhelming body of civil rights law, it is

---

[77] Deborah Brake, *Fighting the Rape Culture Wars Through the Preponderance of the Evidence Standard,* 78 MONT. L. REV. 109, 139 (2017). This maps how such rape myths are not just gendered, but also racialized. Sexual and racial stereotypes have roots back to slavery, where women of color were described as "lascivious and animalistic, and rendered legally unrapable." *Id.* at 138.

[78] Nancy Chi Cantalupo, *And Even More of Us are Brave: Intersectionality & Sexual Harassment of Women Students of Color,* 42 HARV. J. L. & GENDER 7 (forthcoming 2019).

[79] NPRM, *supra* note 1, at 61477.

uninformed and unpersuasive. Civil rights cases have been adjudicated under the preponderance standard for years.[80] These include cases falling under Title VII and Title VI, the statute on which Title IX was closely modeled.[81] Lawmakers have also expressed their intent for civil rights violations to be evaluated under the preponderance standard, such that the defendant's word is not privileged over that of the complainant.[82] The Department's undue focus on the risk of reputational harm for the respondent ignores the educational context in which these civil rights violations are adjudicated, where the institution is called on to provide remedies and sanctions that fundamentally differ from civil or criminal litigation. In these settings, the stakes for both parties must be balanced and considered, and institutions must be able to take the steps it determines necessary to preserve the educational community. The Department does not even make a superficial attempt to balance the stakes for both parties; it only expresses concern over the outcomes for respondents. It is clear that a heightened standard is yet another attempt by the Department to close ranks on victims and foreclose access to a critical remedy.

## CONCLUSION

The NPRM is a carefully crafted and strategic effort to dismantle the historic and current framework of Title IX. Each provision addressed by this Comment presents its own unique set of problems, both ideological and practical. Yet, when read together, the narrative that the Department has developed reveals an insidious and full-on offense against victims, designed to cast doubt on their reports of sexual harassment while advancing and protecting the interests of respondents. In the NPRM's hierarchy of priorities, victims come last. This is largely due to the flawed ideological underpinnings of the proposal which reflect outdated, archaic, and unfounded assumptions about sexual harassment and sexual violence and perpetuate the vicious cycle of harm against women and vulnerable populations. If this is formalized and codified in regulation, it will increase the pervasiveness of sexual harassment in educational contexts.

---

[80] See, e.g., Bazemore v. Friday, 478 U.S. 385, 400 (1986).

[81] Price Waterhouse v. Hopkins, 490 U.S. 228, 253 (1989) (all concurring justices in a plurality opinion agreeing that the preponderance standard applies) (citations omitted), superseded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074 5 107, as recognized in Landgraf v. USI Film Prods., 511 U.S. 244,251 (1994); Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1407 (11th Cir. 1993); 42 U.S.C S 2000D (2006). As the Supreme Court has pointed out, Title VI served as a model for Title IX; the language of the two statutes is identical except for the protected classes named and the addition of the word "education" in Title IX. Cannon v. Univ. of Chi., 441 U.S. 677, 694-98, 694- 95 n.16 (1979) (citing and comparing 110 Cong. Rec. 1540, 7062 (1964) (pertaining to Title VII of the Civil Rights Act of 1964), with 118 Cong. Rec. 5806-07 (1972) (pertaining to Title IX)). Other civil rights statutes, including Sections 1981, 1983, and 1985, also use the preponderance standard. See, e.g., Lynch v. Belden & Co., 882 F.2d 262, 267, 269 (7th Cir. 1989) (Section 1981 claim).

[82] See H.R. Rep. No. 88-914 (1963) (requiring the Equal Employment Opportunity Commission to prove "discrimination by a preponderance of the evidence"); S. Rep. No. 102- 197, at 51 (1991) ("It is a basic legal rule that civil cases ... do not require the kind of proof "beyond a reasonable doubt" demanded in criminal cases. Literally thousands of civil rights cases have proceeded under the traditional civil "preponderance" standard; [VAWA's civil rights remedy] simply follows suit.").

The VRLC has been serving the legal needs of sexual assault victims for fifteen years. The effects of sexual violence on clients' lives cannot be overstated or emphasized enough – they are simply devastating. Yet when given options for obtaining a remedy or the assurance that they will be treated with respect, dignity and equity in a process, the devastating effects start to have less power. Clients who have been able to walk their campuses without fear have exhibited monumental shifts in their ability to cope and to pursue the educational opportunities that bring them to life, an opportunity that all students should have. This is the fundamental purpose of Title IX: to restore that which is imbalanced and to safeguard those who pursue learning when they have been systemically barred from doing so. Indeed, that is the essence of civil rights protections. Let this not be dismantled by political ire and regressive ideology.