1  JOSEPH H. HUNT
   Assistant Attorney General
2
   CARLOTTA P. WELLS
3  Assistant Branch Director
   Civil Division
4
   STEVEN A. MYERS (NY Bar # 4823043)
5  BENJAMIN T. TAKEMOTO (CA Bar # 308075)
   Trial Attorneys
6  United States Department of Justice
   Civil Division, Federal Programs Branch
7  P.O. Box No. 883, Ben Franklin Station
   Washington, DC 20044
8  Tel: (202) 305-8648
   Fax: (202) 616-8470
9  E-mail: steven.a.myers@usdoj.gov

10 *Attorneys for Defendants*

11            **UNITED STATES DISTRICT COURT FOR THE**
                 **NORTHERN DISTRICT OF CALIFORNIA**
12                  **SAN FRANCISCO DIVISION**

13

14 SURVJUSTICE, INC.,
   EQUAL RIGHTS ADVOCATES, and
15 VICTIM RIGHTS LAW CENTER,                    Case No. 18-cv-0535-JSC

16                  Plaintiffs,                 **DEFENDANTS' OPPOSITION TO**
                                                **PLAINTIFFS' MOTION FOR**
17         v.                                   **SUMMARY JUDGMENT AND**
                                                **CROSS-MOTION FOR SUMMARY**
18                                              **JUDGMENT**

19 ELISABETH D. DEVOS,                          Hon. Jacqueline Scott Corley
   *in her official capacity as Secretary of*   Hearing: October 17, 2019
20 *Education*,
   KENNETH L. MARCUS,                           Phillip Burton Federal Building & United
21 *in his official capacity as Assistant Secretary*  States Courthouse, Courtroom F, 15th Fl.,
   *for Civil Rights*, and                       450 Golden Gate Ave., San Francisco, CA
22 U.S. DEPARTMENT OF EDUCATION,                94102

23                  Defendants.

24

25

26

27

28

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ............................................. VI

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I.     Introduction and Statement of Issues ......................................................1

II.    Background ....................................................................................2

       A.    Statutory Background and the 2011/2014 Guidance. ........................2

       B.    Criticism of the 2011 and 2014 Guidance. ...................................4

             1.    Legal Reform Groups ...............................................4

             2.    Professors and Other Higher Education Officials.................4

             3.    Civil Liberties Groups and Advocates for the Accused...........5

             4.    Advocates for Survivors ...........................................6

       C.    The 2017 Guidance ................................................................7

       D.    Procedural History ...............................................................9

III.   Legal Standard ...............................................................................9

IV.    Argument ......................................................................................9

       A.    The 2017 Guidance Is Not Final Agency Action.............................10

       B.    The 2017 Guidance Is Not Arbitrary or Capricious: OCR Adequately
             Explained the Basis for Its Actions, Including in Those Cases Where It
             Departed from Earlier Guidance Documents.................................12

             1.    Standard of Proof: OCR Provided a Reasoned Explanation for
                   Advising that Schools May Use a Clear and Convincing Standard if
                   They So Choose. ....................................................13

             2.    Appeal: OCR Reasonably Explained That It Was Returning to Its Pre-
                   2011 Interpretation Pending Issuance of a Final Rule. ...........17

             3.    Mediation: Plaintiffs Lack Standing and OCR Explained Its Action. ..18

             4.    Interim Measures: OCR Continues to Encourage Schools to Provide
                   Them Where Appropriate. ...........................................19

             5.    Promptness: OCR Continues to Advise Schools to Conduct Prompt
                   Investigations without Fixed Timelines.............................20

             6.    Off-Campus Conduct: OCR Continues to Advise Schools to Address
                   the On-Campus Effects of Off-Campus Conduct. ...................21

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

i

7.     Confidentiality: OCR Continues to Recognize That Respondents Are Entitled to Know the Identity of Their Accusers in Formal Disciplinary Hearings. ................................................................................................22

8.     Evidence of Complainant's Sexual History: It Is Reasonable to Recommend "Adequate, Reliable, and Impartial Investigations of Complaints." ...........................................................................................23

C.     Remand without Vacatur Would Be the Only Appropriate Remedy ...............................23

V.   Conclusion ...................................................................................................................................25

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, **No. 18-cv-0535-JSC**

ii

# TABLE OF AUTHORITIES

## STATUTES

20 U.S.C. § 1681 ............................................................................................................ 2

5 U.S.C. § 553 ............................................................................................................... 7

5 U.S.C. § 704 .......................................................................................................... 9, 10

## CASES

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................. 10

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) .................................................................................... 24

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .................................................................................................. 24

*Carhart v. Ashcroft*,
  331 F. Supp. 2d 805 (D. Neb. 2004) ........................................................................ 25

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) .............................................................................................. 2, 21

*Doe v. Brandeis*,
  177 F. Supp. 3d 561 (D. Mass. 2016) .................................................................... 6, 15

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ................................................................................................ 2

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................................................. 13

*FERC v. Electric Power Supply Ass'n*,
  136 S. Ct. 760 (2016) ................................................................................................ 12

*Gill v. U.S. Dep't of Justice*,
  913 F.3d 1179 (9th Cir. 2019) ............................................................................... 9, 10

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) .................................................................................................. 25

*John Doe #1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) .................................................................................... 25

*Kentuckians for Commonwealth v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) .................................................................................... 25

*Klamath Siskiyou Wildlands Ctr.*,
  962 F. Supp. 2d 1230 (D. Or. 2013) ........................................................................... 9

*L.A. Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) .................................................................................... 25

*Lion Health Servs., Inc. v. Sebelius,*
   635 F.3d 693 (5th Cir. 2011) ................................................................................. 25

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................................ 18

*Managed Pharm. Care v. Sebelius,*
   716 F.3d 1235 (9th Cir. 2013) ......................................................................... 12, 15

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ........................................................................................... 12, 14

*Neb. Dep't of Health & Human Servs. v. HHS,*
   435 F.3d 326 (D.C. Cir. 2006) .............................................................................. 25

*Occidental Eng'g Co. v. INS,*
   753 F.2d 766, 769 (9th Cir. 1985) ........................................................................... 9

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
   795 F.3d 956 (9th Cir. 2015) (en banc) ................................................................ 13

*Pollinator Stewardship Council v. EPA,*
   806 F.3d 520 (9th Cir. 2015) ................................................................................ 24

*Rogers v. Scurr,*
   676 F.2d 1211 (8th Cir. 1982) .............................................................................. 25

*Rolph v. Hobart & William Smith Colls.,*
   271 F. Supp. 3d 386 (W.D.N.Y. 2017) ................................................................... 6

*Stuttering Found. of Am. v. Springer,*
   498 F. Supp. 2d 203 (D.D.C. 2007) ........................................................................ 9

*Today's IV, Inc. v. Fed. Trans. Admin,*
   No. 13-378, 2014 WL 5313943 (C.D. Cal. Sept. 12, 2014) ................................. 24

*Va. Soc'y for Human Life, Inc. v. FEC,*
   263 F.3d 379 (4th Cir. 2001) ................................................................................ 25

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................ 9

**ADMINISTRATIVE MATERIALS**

34 C.F.R. § 106.8 ............................................................................................................ 2

Department of Education, NPRM,
   Title IX of the Education Amendments of 1972, 83 Fed. Reg. 61,462
   (2018) ................................................................................................................ 7, 17

Office of the Associate Attorney General,
   "Limiting Use of Agency Guidance Documents in Affirmative Civil
   Enforcement Cases" (Jan. 25, 2018) .................................................................... 12

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos***, No. 18-cv-0535-JSC**

iv

Office of the Attorney General,
    "Prohibition on Improper Guidance Documents" (Nov. 16, 2017) ..................................................... 12

OMB, "Final Bulletin on Agency Good Guidance,"
    72 Fed. Reg. 3,432 (Jan. 25, 2007) ............................................................................................. 11

*Revised Sexual Harassment Guidance: Harassment of Students by School
    Employees, Other Students, or Third Parties*,
    66 Fed. Reg. 5,512 (Jan. 19, 2001) ............................................................................................... 2

### OTHER AUTHORITIES

James M. Picozzi, Note,
    *University Disciplinary Process: What's Fair, What's Due, and What
    You Don't Get*, 96 Yale L.J. 2132 (1987) ...................................................................................... 15

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

v

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE THAT on October 17, 2019, at 9:00 a.m., before the Honorable Jacqueline Scott Corley, Courtroom F, 15th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants U.S. Department of Education (ED), Secretary of Education Elisabeth D. DeVos, and Assistant Secretary for Civil Rights Kenneth L. Marcus (in their official capacities) will and hereby do move the Court for an order entering summary judgment in favor of Defendants in this Administrative Procedure Act (APA) case. Defendants' motion is based on this Notice, the accompanying Memorandum of Points and Authorities; the Court's files and records in this action, any matter that may be judicially noticed, and any other matter that the Court may consider at any oral argument that may be presented in support of this motion. Pursuant to the Court's Order of August 8, 2019, *see* ECF No. 139, Plaintiffs' opposition or other response to this motion must be filed with the Court and served on counsel for Defendants by September 19, 2019, and Defendants' reply must be filed with the Court and served on counsel for Plaintiffs by October 3, 2019.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      Introduction and Statement of Issues

In 2017, the Department of Education's Office for Civil Rights (OCR) issued guidance that described its understanding of educational institutions' obligations to respond to complaints of sexual misconduct under Title IX of the Education Amendments Act of 1972 (Title IX) and withdrew "the statements of policy and guidance reflected in" earlier guidance that it had issued in 2011 and 2014. *See* A.R. 1–10 (2017 Guidance).[1] The 2017 Guidance, like all other guidance that OCR has issued concerning this topic, recognizes that schools must respond under Title IX to complaints of sex discrimination, including sexual violence. *See* A.R. 4.

As a threshold matter, the Court should not reach the merits of Plaintiffs' sole remaining APA claim because the 2017 Guidance is not final agency action. Upon granting Plaintiffs' motion for reconsideration of the Court's first order dismissing those claims, the Court observed that "a more fulsome record may establish that the 2017 Guidance is not encompassed by the Assurance" of Compliance that ED issues. ECF No. 121 at 8. Defendants have now provided that evidence: as confirmed by the attached declaration of OCR Senior Counsel William E. Trachman, OCR does not treat the 2017 Guidance as a document with which applicants must comply when they sign the OCR Assurance or a separate Office of Management and Budget (OMB) Assurance, and therefore does not enforce either assurance on the basis of such an understanding. Accordingly, and as the Court previously held, no legal consequences flow from the 2017 Guidance.

Even if the 2017 Guidance were final agency action, Plaintiffs' APA claim fails on the merits. From Plaintiffs' rhetoric in this case, one might have imagined that they disagree with the 2017 Guidance in its entirety. *See, e.g.*, Third Am. Compl. ¶ 127, ECF No. 123 (alleging that the 2017 Guidance has caused "devastating effects on students' equal access to educational opportunity"). Yet Plaintiffs' motion for summary judgment, *see* ECF No. 136 (Pls.' Mot.), reveals a different reality: Plaintiffs assert only a handful of procedural claims under the APA, contending that in a few areas where the 2017 Guidance departs from the guidance that OCR issued in 2011 and 2014, OCR failed to adequately acknowledge and

---

[1] The 2017 Guidance comprises two documents: a dear colleague letter, A.R. 1–3, and a Q&A on Campus Sexual Misconduct (2017 Q&A), A.R. 4–10.

explain its change of position.

Those claims fail. In many cases, OCR did not meaningfully change its position: for example, the 2017 Guidance continues to state that no one may be required to participate in mediation, *contra* Pls.' Mot. 16; that schools should offer interim measures where appropriate, *contra id.* at 16–17; and that schools must conduct prompt investigations of sexual harassment, *contra id.* at 17. In those cases where OCR did in fact change its interpretation—such as the 2017 Guidance's view that school may select either a clear and convincing standard of proof or a preponderance standard—OCR acknowledged that it was doing so and explained why. The APA requires no more. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

## II.     Background

### A.     Statutory Background and the 2011/2014 Guidance.

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment, including sexual violence, may constitute a form of sex discrimination that schools are obligated to address. *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). ED's Title IX regulations accordingly require recipients of federal funding to "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part." 34 C.F.R. § 106.8(b).

In 2001, OCR issued a guidance document titled *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5,512–01 (Jan. 19, 2001) [hereinafter 2001 Guidance] (A.R. 277–324), which "provide[s] the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance." In 2011, OCR issued a dear colleague letter (2011 DCL) on this topic, A.R. 222–40, and in 2014 it issued a document titled *Questions and Answers on Title IX and Sexual Violence* (2014 Q&A), A.R. 325–77. Among other things, the 2011 and 2014 guidance documents advised schools as follows:

1    **Standard of Proof:** Schools must apply the preponderance of the evidence standard in

2 investigations concerning alleged sexual harassment. *See* 2011 DCL at 10 (A.R. 231); 2014 Q&A at 13

3 (A.R. 344).

4    **Appeals**: If a school provides for an appeal of the findings, remedy, or both, it must do so equally

5 for both parties. 2011 DCL at 12 (A.R. 233); 2014 Q&A at 37 (A.R. 368).

6    **Mediation**: "[I]n cases involving allegations of sexual assault, mediation is not appropriate even

7 on a voluntary basis." 2011 DCL at 8 (A.R. 229).

8    **Interim Measures**: "Title IX requires a school to take steps to protect the complainant as

9 necessary, including taking interim steps before the final outcome of the investigation." 2011 DCL at 15

10 (A.R. 236). "When taking steps to separate the complainant and alleged perpetrator, a school should

11 minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants

12 from classes or housing while allowing alleged perpetrators to remain." *Id.* at 15–16 (A.R. 236–37); *see*

13 *also* 2014 Q&A at 32–33 (A.R. 363–64).

14    **Timing:** "Based on OCR experience, a typical investigation takes approximately 60 calendar days

15 following receipt of the complaint," but "[w]hether OCR considers complaint resolutions to be timely, . . .

16 will vary depending on the complexity of the investigation and the severity and extent of the harassment."

17 2011 DCL at 12 (A.R. 233); *see also* 2014 Q&A at 32 (A.R. 363) ("OCR does not require a school to

18 complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the

19 resolution of sexual violence complaints is prompt and equitable.").

20    **Off-Campus Conduct:** "Because students often experience the continuing effects of off-campus

21 sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct

22 when evaluating whether there is a hostile environment on campus." 2011 DCL at 4 (A.R. 225). "Under

23 Title IX, a school must process all complaints of sexual violence, regardless of where the conduct

24 occurred, to determine whether the conduct occurred in the context of an education program or activity or

25 had continuing effects on campus or in an off-campus education program or activity." 2014 Q&A at 29

26 (A.R. 360).

27    **Confidentiality:** "If the complainant requests confidentiality or asks that the complaint not be

28 pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent

with the request for confidentiality or request not to pursue an investigation." 2011 DCL at 5 (A.R. 226); *accord* 2014 Q&A at 19 (A.R. 350) ("For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator.").

**Evidence of Complainant's Sexual History:** "[T]he alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history." 2011 DCL at 11 n.29 (A.R. 232); *accord* 2014 Q&A at 31 (A.R. 362) ("Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted.").

### B. Criticism of the 2011 and 2014 Guidance.

The 2011 and 2014 guidance documents were extraordinarily controversial. As the administrative record reveals, they received deafening criticism from all corners:

#### 1. Legal Reform Groups

• The American College of Trial Lawyers (ACTL) stated that "OCR has imposed on colleges and universities an investigative and adjudicative system that does not ensure basic fairness for accused students," and "[u]nder the current system, everyone loses." A.R. 275. Among its recommendations was that "[t]he standard of proof for 'responsibility' should be clear and convincing evidence." A.R. 259.

• An American Bar Association (ABA) task force recommended that, contrary to OCR's 2011 and 2014 guidance, schools use a standard of proof in which a respondent would only be found responsible "if the evidence unanimously convinces [a hearing panel] to reasonably conclude that a finding of responsibility is justified." A.R. 248.

#### 2. Professors and Other Higher Education Officials

• Sixteen members of the University of Pennsylvania Law School faculty wrote that "OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness." A.R. 378; *see also id.* ("We do not believe that providing justice for victims of sexual assault requires subordinating so many protections long deemed necessary to protect from injustice those accused of serious offenses.").

- After Harvard announced a new policy designed to comply with the 2014 Q&A, twenty-eight members of the Harvard Law School faculty complained that Harvard had "adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." A.R. 721.[2]

- The American Association of University Professors called for universities to be permitted to use the "clear and convincing" standard of proof in sexual assault cases. *See* A.R. 3444.

- The General Counsel of Duke University described the 2011 DCL as "a failure" that produced an "insensible result." A.R. 1763.

- The General Counsel of Dickinson College said that "[g]iven the significance of ending someone's relationship with his or her college, many institutions prefer to use a higher burden of proof, such as by clear and convincing evidence, before they are confident that separation is the appropriate remedy." A.R. 2040.

- Laura Kipnis, a professor at Northwestern University, observed that OCR's guidance consisted of "incomprehensible directives," A.R. 1969, that had "toss[ed] constitutional rights out the window," A.R. 1970.

- R. Shep Melnick, a professor at Boston College, said that OCR should commence "an explicit re-examination of its 2011 and 2014 guidance on sexual harassment," which had "thumbed its nose at the Supreme Court's reading of the statute it claimed to implement." A.R. 3359.

### 3. Civil Liberties Groups and Advocates for the Accused

- The Foundation for Individual Rights in Education (FIRE) told Congress that OCR had "emphasiz[ed] the rights of the complainant while paying insufficient attention to the rights of the accused." A.R. 1218; *accord id.* ("Without the basic procedural protections that courts use (like rules of

---

[2] Four of these professors later indicated that "most" of the problems caused by OCR's guidance "involve unfairness to the accused; some involve unfairness to both accuser and accused; and some are unfair to victims." A.R. 712; *accord* A.R. 713 ("so unfair as to be truly shocking."). One of the professors, former federal Judge Nancy Gertner, described the approach as "the worst of both worlds, the lowest standard of proof, coupled with the least protective procedures." A.R. 731–32. Another, Elizabeth Bartholet, said that "[h]istory will demonstrate the federal government's position to be wrong and our society will look back on this time as a moment of madness." A.R. 1891.

1    evidence, discovery, trained legal advocates, the right to cross-examine witnesses, and so forth), campus

2    tribunals are making life-altering findings using a low evidentiary threshold that amounts to little more

3    than a hunch that one side is right.").

4    •   Families Advocating for Campus Equality (FACE) (A.R. 1438–44) wrote that OCR's

5    policies were "shortchanging victims as well as accused students, and leaving potential rapists to roam

6    our streets," A.R. 1439, insofar as they produced hearings that were "stunning in their irrationality and

7    blatant disregard for basic rules of fairness, equality and justice," A.R. 2262.

8                              **4.    Advocates for Survivors**

9    •   The Rape, Abuse, and Incest National Network said that the college disciplinary boards

10   operating under the 2011 DCL "offer the worst of both worlds: they lack protections for the accused while

11   often tormenting victims." A.R. 1219.

12                                          ✱✱

13        Unsurprisingly, the federal courts have been hostile to campus adjudications influenced by the

14   2011 and 2014 guidance documents. As the National Center for Higher Education Risk Management put

15   it, "[n]ever before have colleges been losing more cases than they are winning but that is the trend as we

16   write this." A.R. 1338–39; *accord* A.R. 894 (ABA) ("[C]ourts across the country have started finding that

17   aspects of the procedures and practices used at a number of schools to investigate and adjudicate reports

18   of sexual misconduct violate principles of fundamental fairness, and in the case of public institutions,

19   procedural due process."); A.R. 1106 (collecting a "few of the more egregious examples"). Several courts

20   have recognized that the university decisions criticized in these cases were the result of OCR's advice in

21   the 2011 and 2014 guidance documents. *See, e.g.*, *Doe v. Brandeis*, 177 F. Supp. 3d 561, 572 (D. Mass.

22   2016) ("In recent years, universities across the United States have adopted procedural and substantive

23   policies intended to make it easier for victims of sexual assault to make and prove their claims and for the

24   schools to adopt punitive measures in response. That process has been substantially spurred by the Office

25   for Civil Rights of the Department of Education, which issued a 'Dear Colleague' letter in 2011

26   demanding that universities do so or face a loss of federal funding."); *Rolph v. Hobart & William Smith*

27   *Colls.*, 271 F. Supp. 3d 386, 390 (W.D.N.Y. 2017) ("Many colleges changed their sexual misconduct

28   policies and procedures after the Dear Colleague Letter was issued. In addition to the Dear Colleague

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

6

Letter, the federal government pressured colleges to aggressively investigate sexual assaults through its own investigations of universities and potential lawsuits." (citation omitted)).

### C. The 2017 Guidance

On September 22, 2017, after consulting with a wide variety of stakeholders,[3] OCR issued a dear colleague letter that withdrew "the statements of policy and guidance reflected in" the 2011 DCL and the 2014 Q&A. A.R. 1. OCR announced that it would engage in future rulemaking "to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits." A.R. 3.[4] In the interim, OCR advised schools that the 2001 Guidance and 2017 Q&A, A.R. 4–10, would "provide information about how OCR will assess a school's compliance with Title IX." A.R. 4. The 2017 Guidance also states that it "does not add requirements to applicable law" and that "the Department's enforcement efforts proceed from Title IX itself and its implementing regulations." A.R. 3. The 2017 Guidance advises as follows:

**Standard of Proof:** Schools may use either a preponderance of the evidence standard or a clear and convincing evidence standard for resolving Title IX complaints. 2017 Q&A at 5 (A.R. 8).

**Appeals:** If a school provides an appeals process, it may make it available either to both parties, or only to the responding party. 2017 Q&A at 7 (A.R. 10).

**Mediation:** "If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate

---

[3] Plaintiffs complain that ED was in closer consultation with those opposed to the 2011 and 2014 guidance than those who supported it. *See, e.g.*, Pls.' Mot. 4. At the outset, Defendants consulted groups with a variety of perspectives on this issue, including SurvJustice, *see* A.R. 387, 2109, 2258. Indeed, Safety Advisors for Educational Campuses, LLC—which later sought to intervene as a Plaintiff in this matter, *see* ECF Nos. 71, 89—noted "how diligently you are gathering information from a multitude of stakeholders and perspectives." A.R. 1073. In any event, any obligation to consult with outside groups is not at issue in this litigation, as Plaintiffs have disclaimed any contention that the 2017 Guidance is a legislative rule that required public comment under 5 U.S.C. § 553, *see* ECF No. 45 at 15.

[4] On November 29, 2018, ED published in the Federal Register a Notice of Proposed Rulemaking (NPRM) that clarifies recipients' obligations under Title IX in redressing sex discrimination, including complaints of sexual harassment, and the procedures by which they must do so. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (proposed Nov. 29, 2018).

1  for such a process, the school may facilitate an informal resolution, including mediation, to assist the

2  parties in reaching a voluntary resolution." 2017 Q&A at 4 (A.R. 7).

3      **Interim Measures:** "It may be appropriate for a school to take interim measures during the

4  investigation of a complaint. In fairly assessing the need for a party to receive interim measures, a school

5  may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school

6  make such measures available only to one party. Interim measures should be individualized and

7  appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid

8  depriving any student of her or his education." 2017 Q&A at 3 (A.R. 6) (footnote omitted).

9      **Timing:** "There is no fixed time frame under which a school must complete a Title IX

10  investigation." 2017 Q&A at 3 (A.R. 6). Whether an investigation is "prompt" is based on "a school's

11  good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties

12  with a resolution." *Id.*

13      **Off-Campus Conduct**: "Schools are responsible for redressing a hostile environment that occurs

14  on campus even if it relates to off-campus activities." 2017 Q&A at 1 (A.R. 4) n.3.

15      **Confidentiality**: "Once it decides to open an investigation that may lead to disciplinary action

16  against the responding party, a school should provide written notice to the responding party of the

17  allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient

18  details and with sufficient time to prepare a response before any initial interview. Sufficient details include

19  the identities of the parties involved, the specific section of the code of conduct allegedly violated, the

20  precise conduct allegedly constituting the potential violation, and the date and location of the alleged

21  incident." 2017 Q&A at 4 (A.R. 7).

22      **Evidence of Complainant's Sexual History**: Although the 2017 Guidance does not directly

23  address evidence of a complainant's sexual history, it states, "[a]n equitable investigation of a Title IX

24  complaint requires a trained investigator to analyze and document the available evidence to support

25  reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available

26  evidence—including both inculpatory and exculpatory evidence—and take into account the unique and

27  complex circumstances of each case." 2017 Q&A at 4 (A.R. 7).

28

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

8

### D.      Procedural History

Plaintiffs commenced this action by filing a complaint on January 25, 2018, *see* ECF No. 1, which they have since amended three times, *see* ECF Nos. 23, 86, 123. This Court has previously held that Plaintiffs adequately alleged Article III standing; dismissed Plaintiffs' Fifth Amendment equal protection claim for lack of prudential standing; and dismissed Plaintiffs' claim that the 2017 Guidance is ultra vires. *See generally* ECF Nos. 81, 120.

Only Plaintiffs' arbitrary-and-capricious claim under the APA remains for resolution. The Court initially dismissed that claim, holding that the 2017 Guidance is not final agency action within the meaning of 5 U.S.C. § 704. *See* ECF No. 81 at 16–20. On March 29, 2019, however, the Court granted Plaintiffs' motion for reconsideration of that order, holding that "the Ninth Circuit's recent decision in *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179 (9th Cir. 2019) warrants reconsideration of the October 2018 order to the extent it dismissed Plaintiffs' APA claim with prejudice." ECF No. 121 at 1. The Court therefore "amend[ed] its dismissal of the APA claim with prejudice to a dismissal with leave to amend," *id.* at 12, but it did not affirmatively hold that the 2017 Guidance constitutes final agency action under the APA.

## III.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving review of agency action under the APA, however, the district court's role is not to identify genuine disputes of material fact for trial because no trial is anticipated or would be appropriate. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985); *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013). Summary judgment instead "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).

## IV.    Argument

Defendants are entitled to summary judgment for two reasons. First, the 2017 Guidance is not final agency action. And second, the 2017 Guidance is not arbitrary or capricious.[5]

---

[5] The Court has previously held that Plaintiffs' complaint adequately alleges Article III standing, *see* **Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos***, No. 18-cv-0535-JSC**

### A.      The 2017 Guidance Is Not Final Agency Action.

As a threshold matter, the Court should award summary judgment in Defendants' favor because the 2017 Guidance is not final agency action. Under the APA, courts may review only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "For agency action to be final, it must 'mark the consummation of the agency's decisionmaking process' and 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Gill*, 913 F.3d at 1184 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). At this juncture, it is necessary to address only the second prong: whether legal consequences flow from the 2017 Guidance.

The Court initially held that legal consequences do not flow from the 2017 Guidance. The Court explained that "legal consequences continue to flow only from a school's noncompliance with Title IX and its implementing regulations, and the guidance merely provides 'information' for schools regarding how the Department's Office [for] Civil Rights will assess compliance with *those* existing laws." ECF No. 81 at 18. The Court further reasoned that the 2017 Guidance does not create new obligations for schools: "The language is instead discretionary, and largely *relieves* schools of previous obligations under the Rescinded Guidance." *Id.* Nothing in the record detracts from the Court's determination that the 2017 Guidance does not have legal effect of its own force.

The Court granted reconsideration of its order dismissing Plaintiffs' APA claims after Plaintiffs pointed to a document titled Assurance of Compliance—Civil Rights Certificate (OCR Assurance) that, according to Plaintiffs, indicated that schools could face an OCR enforcement action if they failed to comply with the 2017 Guidance. Plaintiffs asserted that the Assurance form requires recipients to promise to comply with "guidelines," and the 2017 Guidance is a form of "guidelines" with which recipients promise to comply. *See* Pls.' Mot. Recons. 5–6, ECF No. 107. Notwithstanding Defendants' representation to this Court that OCR does not treat the 2017 Guidance as a form of guidelines under the

---

ECF No. 81 at 10–14. While Defendants continue to dispute Plaintiffs' standing generally, in light of the Court's prior rulings, this brief addresses only Plaintiffs' standing to challenge the 2017 Guidance's determination that mediation may be permissible in certain cases of alleged sexual assault. *See infra* Part IV.B.3. As described more fully below, Plaintiffs lack standing to challenge the 2017 Guidance's position on mediation because it is undisputed that complainants may decline mediation at their absolute discretion.

OCR Assurance, *see* ECF No. 115 at 5, the Court held that "[a]ttorney argument" to that effect was insufficient to satisfy Defendants' burden, *see* ECF No. 121 at 8. Nevertheless, the Court observed that "a more fulsome record may establish that the 2017 Guidance is not encompassed by the [OCR] Assurance." *Id.* Defendants have now provided that record.

The OCR Assurance, which the agency collects from federal financial assistance applicants and recipients (together, applicants), includes a promise that the applicants comply with "[a]ll regulations, guidelines, and standards issued by the Department under" certain statutes, including Title IX. ECF No. 136-2 at 9. Failure to comply with the OCR Assurance can result in an enforcement proceeding or a referral to the Department of Justice (i.e., enforcement action). *See* Trachman Decl. ¶ 19. However, as established by the declaration of OCR Senior Counsel William Trachman, OCR does not treat the 2017 Guidance as "guidelines" under the OCR Assurance. *See id.* ¶ 21. Rather, "[t]he terms 'guidelines' and 'standards' addressed in the Assurance of Compliance refer to certain notices or appendices that the Department published in the Federal Register or Code of Federal Regulations, or to specific standards referenced in the regulations." *Id.* ¶ 20. "Therefore, if OCR initiates an enforcement action under the OCR Assurance, it would proceed from Title IX and its implementing regulations, not the 2017 Guidance." *Id.* ¶ 21. The same is true of the OMB Assurance, in which applicants agree to "comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program." ECF No. 136-2 at 17. ED does not consider the 2017 Guidance to be "policies" under the OMB assurance. Trachman Decl. ¶ 23. "Therefore, if OCR were to initiate an enforcement action under the OMB Assurance, it would proceed from Title IX and its implementing regulations, not the 2017 Guidance." *Id.*

Plaintiffs' counterarguments regarding the various ways in which the terms "guidelines" and "policies" *could* be interpreted are irrelevant. Plaintiffs' theory of final agency action is that ED will enforce the OCR Assurance or OMB Assurance based on noncompliance with the 2017 Guidance. ED has now unambiguously stated that it will not do so because it does not agree with Plaintiff's reading of the assurance forms and the 2017 Guidance. Accordingly, Plaintiffs have not pointed to any legal consequences and there is no final agency action.

The 2017 Guidance cannot be final agency action because it does not create binding legal

Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot., *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

11

1   obligations or serve as a basis for a noncompliance finding and federal funding termination. *See* OMB,

2   "Final Bulletin on Agency Good Guidance," 72 Fed. Reg. 3,432, 3,436–37 (Jan. 25, 2007); *see also* Mem.

3   of the Attorney General, Prohibition on Improper Guidance Documents, at 2 (Nov. 16, 2017) (public's

4   "obligations [do not] go beyond those set forth in the applicable statutes or legislative rules"), https://

5   www.justice.gov/opa/press-release/file/1012271/download; Mem. of the Associate Attorney General,

6   Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases, at 1–2 (Jan. 25,

7   2018) ("Guidance documents cannot create binding requirements that do not already exist by statute or

8   regulation"), https://www.justice.gov/file/1028756/download. As noted in the 2017 Guidance, ED's

9   enforcement efforts stem from Title IX and its regulations, not from policy guidance. Consequently,

10  Plaintiffs' APA claim should be dismissed.

11       **B.     The 2017 Guidance Is Not Arbitrary or Capricious: OCR Adequately Explained the**

12              **Basis for Its Actions, Including in Those Cases Where It Departed from Earlier Guidance Documents.**

13        Plaintiffs fail to demonstrate that the 2017 Guidance is arbitrary or capricious. Under the APA, the

14  Court's role is "not to ask whether a regulatory decision is the best one possible or even whether it is better

15  than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Rather, agency

16  action is arbitrary and capricious only when the agency "has relied on factors which Congress has not

17  intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an

18  explanation for its decision that runs counter to the evidence before the agency," or the decision "is so

19  implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor*

20  *Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Court may not

21  "substitute its judgment for that of the agency." *Id*. Rather, the Court "must uphold an agency action—

22  even if it is made with 'less than ideal clarity'—as long as 'the agency's path may reasonably be discerned'

23  from the record." *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1250 (9th Cir. 2013) (quoting

24  *State Farm*, 463 U.S. at 43).

25        Plaintiffs' motion does not contend that any aspect of the 2017 Guidance is inconsistent with Title

26  IX—nor could it, given that the Court has already dismissed Plaintiffs' ultra vires claim. *See* ECF No. 81

27  at 20 (no plausible allegation that Defendants "violated an unambiguous and mandatory legal

28  requirement"). Instead, Plaintiffs' principal claim is that the 2017 Guidance departs from earlier guidance

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, **No. 18-cv-0535-JSC**

12

1   in eight areas without either (1) acknowledging that it is doing so, or (2) providing a reasoned explanation.

2   Plaintiffs are wrong.

       **1.**     **Standard of Proof: OCR Provided a Reasoned Explanation for Advising that**
                   **Schools May Use a Clear and Convincing Standard if They So Choose.**

5          Plaintiffs contend that OCR failed to adequately explain its reasons for advising that schools could

6   use either a clear and convincing or a preponderance of the evidence standard of proof in Title IX

7   investigations. That argument is belied by the administrative record, which shows that OCR expressly

8   indicated that it was changing positions and provided its justification for doing so. The APA requires no

9   more. *See generally Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en

10  banc); *see also, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an

11  agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than

12  the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are

13  good reasons for it, and that the agency *believes* it to be better, which the conscious change of course

14  adequately indicates").

15         As OCR explained, the preponderance standard is a "minimal standard of proof," but "many

16  schools had traditionally employed a higher clear and convincing-evidence standard." A.R. 2. OCR

17  explained that by requiring schools to use the preponderance standard, the 2011 and 2014 guidance

18  documents had (1) "place[d] 'improper pressure upon universities to adopt procedures that do not afford

19  fundamental fairness,'" A.R. 2 (quoting Penn Law faculty); (2) "led to the deprivation of rights for many

20  students," A.R. 3; and (3) "not succeeded in providing clarity for educational institutions or in leading

21  institutions to guarantee educational opportunities on the equal basis that Title IX requires." *Id.* OCR

22  further noted that (4) the 2011 and 2014 guidance documents had "imposed these regulatory burdens

23  without affording notice and the opportunity for public comment." *Id.* Plaintiffs' straw-man

24  characterization of Defendants' position as resting solely on the fact that many schools previously used a

25  clear and convincing standard, and on the belief that the standard should be the same for sexual misconduct

26  and other misconduct, does not reflect the reasons that OCR actually relied on.

27         The administrative record reveals that OCR relied on overwhelming criticism of the requirement

28  that schools use a preponderance standard. For example, OCR relied on the American College of Trial

Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot., *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

13

Lawyers, which suggested that the clear and convincing standard was appropriate in light of the seriousness of an accusation of sexual assault and the abbreviated procedures available in a campus hearing. *See* A.R. 274. It also relied on the University of Pennsylvania Law School faculty's observation that "[a]n evidentiary standard of clear and convincing evidence to convict provides a more durable safeguard against wrongful 'convictions.'" A.R. 382.

OCR also relied upon a report prepared by an ABA task force, which recommended a standard of proof in which accused students would be found responsible only "if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified." A.R. 248; *accord id.* ("convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct").[6] While the ABA task force chose to "avoid labels," A.R. 247, the standard that it recommended is far more demanding than preponderance of the evidence. *Compare* A.R. 248 ("*convince* [the decision maker] that the respondent engaged in the alleged misconduct" (emphasis added)) *with, e.g.*, 3 Kevin O'Malley et al., Federal Jury Practice & Instructions § 104:01 (6th ed. 2019) (defining preponderance: "more probable than not . . . more likely true than not true"). Notably, this ABA task force included Laura Dunn, founder and then-executive director of SurvJustice. *See* A.R. 250. Dunn later explained that the task force recommended this standard of proof so that schools "would be really sure when they made this decision." A.R. 3364. Although SurvJustice does not acknowledge its founder's previous position, its change of heart plainly underscores that the dispute regarding the appropriate standard of proof can be "ascribed to a difference in view" rather than an arbitrary and capricious change in position. *See State Farm*, 463 U.S. at 43.

The administrative record contains numerous other criticisms of the requirement that schools exclusively use the preponderance standard. *See, e.g.*, A.R. 715 (four Harvard law professors, arguing preponderance standard "risks holding innocent students responsible"); A.R. 731 (law professor and former federal judge Nancy Gertner: "worst of both worlds, the lowest standard of proof, coupled with

---

[6] The ABA recommended an even higher standard of proof in cases where there is only one decisionmaker. *See* A.R. 248 ("firmly convince him or her that the respondent engaged in the alleged misconduct").

Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot., *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

14

the least protective procedures"); A.R. 1224 (FIRE: "The government should drop its insistence that institutions use the preponderance of the evidence standard"); A.R. 2040 (Dickinson College general counsel: "colleges and universities need the flexibility to decide which standard best serves the needs of their distinct communities"); A.R. 3396 (referencing study finding that lowest standard of proof greatly increased risk of false findings of responsibility). Given this record, the suggestion that Plaintiffs cannot "reasonably discern" the "path" that OCR took, *Managed Pharmacy Care*, 716 F.3d at 1250, cannot be taken seriously.

Plaintiffs are also wrong to contend that there is no record evidence for the proposition that many schools used the clear and convincing evidence standard prior to 2011. Indeed, one study referenced in the administrative record reported that prior to 2011, thirty percent of schools used the clear and convincing standard. *See* A.R. 2050; *see also* A.R. 945 ("A generation ago, most colleges used a 'clear and convincing' evidence standard in student and faculty discipline cases." (citing James M. Picozzi, Note, *University Disciplinary Process: What's Fair, What's Due, and What You Don't Get*, 96 Yale L.J. 2132, 2159 n.117 (1987))); A.R. 1223 (noting that "many" schools "previously used higher, more appropriate standards such as that of 'clear and convincing evidence'"); A.R. 1412 (noting that Harvard Law School previously used a clear and convincing standard of proof); A.R. 1892 ("Many schools had previously required 'clear and convincing' evidence . . . ."); A.R. 1898 n.15 (citing article noting that Princeton University agreed to adopt preponderance standard as part of OCR settlement); A.R. 2040 (noting that "many institutions prefer to use a higher burden of proof, such as by clear and convincing evidence, before they are confident that separation is the appropriate remedy."); A.R. 2062 (noting eleven schools that switched from clear and convincing to preponderance as a result of 2011 letter).

Plaintiffs also challenge the 2017 Guidance's statement that schools should apply the same standard in sexual misconduct and other misconduct cases. But while Plaintiffs indicate that "[t]his rationale cannot explain the rule the Department adopted," it is not a "rationale" at all—it is a condition on the advice that OCR offered. As OCR explained, no matter what standard schools use, they should use the same standard in all misconduct cases. *See* A.R. 8 n.19. That advice was informed by a court decision holding that it was inappropriate to apply a lower standard of proof exclusively in cases of alleged sexual assault. *See Brandeis Univ.*, 177 F. Supp. 3d at 607 ("The lower standard may thus be seen, in context, as

part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). Plaintiffs contend that it is arbitrary and capricious to permit schools to use a lower standard of proof for sexual harassment than racial harassment, *see* Pls.' Mot. 21–22, but the 2017 Guidance simply does no such thing.[7]

Finally, the Court should not lose sight of the fact that the stakes in campus sexual assault hearings are extraordinarily high: these proceedings may not send anyone to prison, but the repercussions for those found responsible for sexually assaulting someone are (appropriately) serious and lifelong. *See* A.R. 1755 ("A finding of responsibility on sexual misconduct charges carries serious, lifelong consequences—as it should if someone has actually committed sexual misconduct."). Students found responsible for sexual assault are expelled, and "all college applications now ask if a student has been found responsible for behavioral misconduct at a previous institution, and demand the details," A.R. 1972. A finding of responsibility is therefore a "scarlet letter that will follow [a student] for the rest of his life," A.R. 937. The administrative record is replete with examples of students contemplating or attempting suicide after being found responsible for sexual assault. *See* A.R. 935, 1556, 1557, 1610, 1613, 1728, 2199. As the Court has recognized, "[f]or a student to be expelled from school could have consequences similar to what criminal consequences have." July 19, 2018 Hr'g Tr. at 78:5–7, ECF No. 67. With the stakes this high, there are compelling reasons why schools might appropriately choose to use a clear and convincing standard of proof.

Of course, the 2017 Guidance also fully takes into account that complainants likewise have high stakes in these proceedings, and that survivors of sexual assault also suffer serious, lasting consequences. Indeed, OCR is committed to vigorously enforcing Title IX. But OCR strives to enforce Title IX in a way that is fair. As Laura Dunn, former executive director of SurvJustice, has recognized, "both parties, accuser

---

[7] Plaintiffs' contention that OCR has "long required schools to apply the *preponderance* standard when investigating complaints of racial harassment," Pls.' Mot. 21, is both irrelevant and wrong. It is irrelevant because if schools are in fact required to use the preponderance standard for alleged racial harassment, then the 2017 Guidance requires them to use the same standard for alleged sexual harassment. And it is wrong because OCR has never issued generally applicable guidance stating a standard of proof that schools should apply when investigating allegations of racial harassment. The paper upon which Plaintiffs rely for the contrary proposition, *see* A.R. 2048 & n.47, cites only a single voluntary resolution agreement, not a general statement of OCR policy.

1  and accused, have similar interests in a fair process on campus and should not be set up to oppose each

2  other." A.R. 387. That perspective makes sense: fair processes are fair for everyone, but processes that are

3  perceived as providing insufficient due process ultimately undermine efforts to combat sexual assault. *See*

4  A.R. 726 ("If there is a widespread perception that the balance has tilted from no rights for victims to no

5  due process for the accused, we risk a backlash.").

### 2. Appeal: OCR Reasonably Explained That It Was Returning to Its Pre-2011 Interpretation Pending Issuance of a Final Rule.

8      Plaintiffs also contend that OCR failed to provide a reasoned explanation for its advice that schools

9  providing appellate rights may do so either (1) to both parties, or (2) to only the respondent. That is again

10 wrong: OCR's clearly stated rationale was that the 2011 DCL had imposed new obligations and deviated

11 from past OCR practice without engaging in notice and comment rulemaking. *See* A.R. 10 n.30 (noting

12 that prior to 2011, OCR had repeatedly informed schools that it was permissible to offer appeals

13 exclusively to respondents); A.R. 3 (explaining that the Department deviated from past practice and

14 "imposed these regulatory burdens without affording notice and the opportunity for public comment").[8]

15     Because OCR's rationale was that the 2011 and 2014 guidance documents should not have

16 purported to impose new requirements without engaging in rulemaking, the record demonstrates that OCR

17 simply sought to return to the pre-2011 status quo. *See* A.R. 3 ("Under these circumstances, the

18 Department has decided to withdraw the above-referenced guidance documents in order to develop an

19 approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with

20 the purpose of Title IX to achieve fair access to educational benefits. The Department intends to implement

21 such a policy through a rulemaking process that responds to public comment."). And for that reason,

22 Plaintiffs' policy arguments about why OCR *should* require equal access to appeals are beside the point:

23 OCR determined that it was not appropriate to impose new obligations without engaging in rulemaking.

24     Nonetheless, while the parties disagree about how OCR characterized the law in 2017, they agree

---

26 [8] Plaintiffs claim that there is "no indication that the Department itself did a thorough canvass of its pre-2011 letters" before concluding that it had previously permitted schools to offer appellate rights exclusively to respondents. *See* Pls.' Mot. 22–23. Yet even assuming that the "thorough canvass" Plaintiffs think was missing would reveal that OCR had offered inconsistent advice on this point prior to 2011, that would not change the fact that OCR did not purport to consistently and categorically preclude respondent-only appeals prior to the 2011 guidance, which was issued without notice and comment.

1    about what the law should be, as set forth in OCR's NPRM. That proposed rule would require equal access

2    to appeals as a matter of ED's legislative rulemaking authority. *See* 2018 NPRM, 83 Fed. Reg. at 61499

3    (proposed regulation: "If a recipient offers an appeal, it must allow both parties to appeal."). OCR agrees

4    with Plaintiffs as a matter of policy about what the law should be, but it was not arbitrary and capricious

5    for OCR in 2017 to provide schools with an accurate description of existing law.

### 3.    Mediation: Plaintiffs Lack Standing and OCR Explained Its Action.

7    Plaintiffs contend that by permitting voluntary mediation in cases of alleged sexual assault, the

8    2017 Guidance "revers[es] course *sub silientio* and in conflict with the still-operative 2001 Guidance."

9    Pls.' Mot. 16. That contention fails both because Plaintiffs lack standing to assert it and because OCR

10   explained the reasons for its current view that mediation is permissible.

11   At the outset, Plaintiffs lack standing to challenge this aspect of the 2017 Guidance, which provides

12   additional options for complainants that they are free to reject at their absolute discretion. *See* A.R. 7

13   (mediation permissible only if "all parties *voluntarily agree*" (emphasis added)). Plaintiffs' only theory of

14   how they are injured by the availability of an additional option that they are free to reject is that it has

15   caused confusion about how the 2017 Guidance interacts with the 2001 Guidance, *see* Pls.' Mot. 9; ERA

16   Decl. ¶ 15, but Plaintiffs do not contend that there is any confusion about whether mediation is *required*;

17   it is undisputed that no one has to accept mediation who does not want to. Any confusion about whether

18   mediation might be available to those who *do* want it is irrelevant to Plaintiffs, who are asking the Court

19   to set aside the 2017 Guidance because they think mediation should not be available in handling

20   complaints of sexual assault. Because they have not established an injury due to the voluntary availability

21   of mediation, Plaintiffs have failed to satisfy their burden of demonstrating their standing to challenge this

22   aspect of the 2017 Guidance. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (standing "must be

23   supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with

24   the manner and degree of evidence required at the successive stages of the litigation").

25   Even if Plaintiffs had standing to assert this claim, it fails on the merits, as OCR recognized that it

26   was departing from its prior position that mediation was never permissible in sexual assault cases and

27   explained why it was doing so: OCR explained that it was rescinding the 2011 Guidance because it had

28   "imposed . . . regulatory burdens without affording notice and the opportunity for public comment," and

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

18

that "regulatory compliance has displaced Title IX's goal of educational equity." A.R. 3. While Plaintiffs claim that OCR should also have referenced the 2001 Guidance, it was only the 2011 DCL that had unambiguously stated that mediation was never permissible in any cases of alleged sexual assault. *Compare* 2011 DCL at 8 (A.R. 229) ("[I]n cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis.") *with* 2001 Guidance at 21 (A.R. 306) ("In *some* cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis." (emphasis added)). The 2001 Guidance does not contain a categorical statement that mediation is never available in any cases of alleged sexual assault, which is presumably why OCR used a different formulation in 2011.[9] Because OCR recognized that it was departing from its prior policy and explained why it was doing so, it satisfied its obligations under the APA.

### 4.    Interim Measures: OCR Continues to Encourage Schools to Provide Them Where Appropriate.

Plaintiffs further contend that the 2017 Guidance's advice concerning interim measures is arbitrary and capricious. Plaintiffs allege that the 2017 Guidance, in contrast to earlier guidance, (1) no longer requires interim measures and (2) discourages schools from "making decisions based on 'fixed rules or operating assumptions that favor one party over another.'" Pls.' Mot. 16–17. Neither point has merit. OCR still encourages schools to provide interim measures where appropriate, and there is nothing arbitrary or capricious in considering both students' access to education at a point in the proceeding before anyone has been found responsible for sexual assault.

First, OCR continues to recommend that schools provide interim measures where appropriate, just

---

[9] The administrative record reveals reasons why it may be appropriate to permit voluntary mediation in many cases of sexual misconduct. Four Harvard Law professors wrote that "OCR should abandon its senseless blanket disapproval of mediation or restorative approaches to accusations of sexual misconduct," explaining that an "exclusively disciplinary or punitive approach needlessly deprives victims of options that may benefit them in the pursuit of equal educational opportunity." A.R. 717. And more broadly, there is ample support for the proposition that complainants should not be forced into formal proceedings if they do not want to be. *See* A.R. 715 ("requiring schools to report all reported sexual misconduct to the police without the alleged victim's permission interferes with that person's autonomy, given the important privacy and relationship issues at stake."); A.R. 2085 (criticizing mandatory referral laws; *see also* Third. Am. Compl. (ECF No. 123) ¶ 93 (criticizing "a state bill that would require colleges to refer all sexual assault reports to the police, even against a victim's expressed wishes, a dangerous policy that would discourage reporting by victims").

as it has previously. *Compare* 2017 Q&A at 3 (A.R. 6) ("It may be appropriate for a school to take interim measures during the investigation of a complaint") *with* 2014 Q&A at 32 (A.R. 363) ("Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant *as necessary*, including taking interim measures before the final outcome of an investigation." (emphasis added)). The 2014 Q&A did not require interim measures in all circumstances, but rather only where such measures were "necessary." Similarly, the 2017 Q&A provides that such measures "may be appropriate." Neither guidance document suggests that interim measures are always required as part of every Title IX complaint process, nor would such a blanket suggestion make sense.

Second, there is nothing arbitrary or capricious in ED's advice that schools avoid "making decisions based on 'fixed rules or operating assumptions that favor one party over another.'" Title IX is concerned with equal access to education, and it is entirely reasonable for schools to consider accused students' access to education (among other factors) before there has been a finding of responsibility. *See, e.g.*, A.R. 753-754 (criticizing trend in which "OCR increasingly implies that the only adequate 'interim measure' that can protect a complainant in the Title IX process is the exclusion of the accused person from campus . . . . [E]nding . . . someone's access to education should be much harder than that."); A.R. 1330 (recommending that "a respondent's interests should be taken into account in implementing interim measures, if they are not inconsistent with protecting the complainant"); A.R. 1663 (suggesting that "interim measures should be reserved for situations where it looks like there may be a reasonable probability of guilt"); A.R. 3437 (example of interim measures interfering with access to education); *cf., e.g.*, July 19, 2019 Hr'g Tr. 47:2–5 ("Really, that—is that going to be the basis of your action, that that's arbitrary and capricious to say that you have to take both students' . . . rights to education into account?").

### 5. Promptness: OCR Continues to Advise Schools to Conduct Prompt Investigations without Fixed Timelines.

Plaintiffs' arguments regarding promptness are similarly without merit because OCR has not changed its position. In the 2011 DCL, OCR observed that the timeliness of a complaint resolution "will vary depending on the complexity of the investigation and the severity and extent of the harassment." 2011 DCL at 12. It observed that an investigation into a complaint of sexual misconduct "typically" takes sixty days but underscored that a school need not complete an investigation in sixty days. *See* 2011 DCL

Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot., *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

20

1   at 12–13; 2014 Q&A at 31–32. OCR reiterated this point in the 2017 Q&A: "There is no fixed time frame

2   under which a school must complete a Title IX investigation." 2017 Q&A at 3. There was no sixty-day

3   deadline in 2011 and 2014, and there is no sixty-day deadline now. OCR's advice to schools, which is to

4   conduct a prompt investigation in light of the relevant circumstances, is unchanged.[10]

5          **6.      Off-Campus Conduct: OCR Continues to Advise Schools to Address the On-
                    Campus Effects of Off-Campus Conduct.**

6

7          Plaintiffs' arguments regarding off-campus conduct fail for the same reason: OCR has not changed

8   its position. As Plaintiffs point out, OCR in 2014 stated that "a school must process all complaints of

9   sexual violence, regardless of where the conduct occurred." 2014 Q&A at 29. But to finish the sentence,

10  OCR does so "to determine whether the conduct *occurred in the context of an education program or*

11  *activity or had continuing effects on campus or in an off-campus education program or activity.*" *Id.*

12  (emphasis added).

13         OCR takes a consistent view now: "Schools are responsible for redressing a hostile environment

14  that occurs on campus even if it relates to off-campus activities." 2017 Q&A at 1 n.3. It further observes

15  that "OCR has informed institutions that '[a] university does not have a duty under Title IX to address an

16  incident of alleged harassment where the incident occurs off-campus and does not involve a program or

17  activity of the recipient.'" *Id.* (quoting Oklahoma State University Determination Letter at 2, OCR

18  Complaint No. 06-03-2054 (June 10, 2004)). But this is not a contradiction, as Plaintiffs suggest. OCR

19  has never opined that off-campus incidents that "do[] not involve a program or activity of the recipient"

20  implicate Title IX. *Id.*

21         In fact, the Supreme Court has clearly held that Title IX's "plain language confines the scope of

22  prohibited conduct based on the recipient's degree of control over the harasser and the environment in

23  which the harassment occurs." *Davis*, 526 U.S. at 644. To the extent Plaintiffs believe that off-campus

24

25         [10] Plaintiffs argue that the difference lies between a previous "*objective* test" and a current "*subjective*
    test." *See* Pls.' Mot. 17. Plaintiffs' strained reading of the guidance documents has no support, however,
26  as OCR has never characterized its assessment of promptness in these terms. And indeed, the 2014 Q&A
    observes that "a school should make every effort to try to conduct an investigation during [school] breaks
27  unless doing so would sacrifice witness availability or otherwise compromise the process," 2014 Q&A at
    32, suggesting that subjective "effort" plays a role in determining promptness.

28

Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot., *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

21

1    incidents entirely unconnected to a school program or activity can nevertheless implicate Title IX, their

2    quarrel is with the Supreme Court, not OCR.

3            **7.    Confidentiality: OCR Continues to Recognize That Respondents Are
                     Entitled to Know the Identity of Their Accusers in Formal Disciplinary
4                    Hearings.**

5            Plaintiffs further contend that the 2017 Guidance conflicts with the 2001 Guidance because the

6    2001 Guidance permitted complainants to proceed confidentially, whereas the 2017 Guidance requires

7    that schools provide a respondent with "the identities of the parties involved" "[o]nce it decides to open

8    an investigation that may lead to disciplinary action[s]." 2017 Q&A at 4. Plaintiffs' argument rests upon

9    a misreading of the 2001 Guidance.

10           The 2001 Guidance advises schools to tell students that "a confidentiality request may limit the

11   school's ability to respond," 2001 Guidance at 17 (A.R. 302), and specifically states that "if a student,

12   who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser

13   could not respond to the charges of sexual harassment without that information, in evaluating the school's

14   response, OCR would not expect disciplinary action against an alleged harasser." *Id.* In other words, the

15   2001 Guidance clearly advises that schools are not expected to conduct formal disciplinary hearings

16   against respondents on the basis of confidential allegations. While Plaintiffs accurately observe that the

17   2001 Guidance contemplated that reported harassers could be "counseled" on the basis of numerous

18   confidential complaints, *see* Pls.' Mot. 18, it did not indicate that schools could or should conduct formal

19   disciplinary hearings without telling respondents who they are accused of assaulting.

20           The 2017 Guidance's advice that schools must inform respondents in formal disciplinary

21   investigations of the identity of their accusers is thus entirely consistent with the 2001 Guidance. It also

22   makes sense: respondents cannot meaningfully dispute allegations of sexual assault if they are not even

23   told who they are accused of harassing. *See* A.R. 1330, 1354, 3422; *see also, e.g.*, A.R. 244 (ABA,

24   recommending that notice include "a summary of the alleged facts"); A.R. 259 (ACTL, recommending

25   that the "subject of a sexual misconduct investigation should promptly be provided with the details of the

26   allegations"). In light of these equities, it is far from arbitrary and capricious for OCR to conclude that

27   respondents must know the identity of their accuser after the school opens an investigation that may lead

28   to disciplinary action.

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, **No. 18-cv-0535-JSC**

1

2

**8.     Evidence of Complainant's Sexual History: It Is Reasonable to Recommend "Adequate, Reliable, and Impartial Investigations of Complaints."**

3

4

5

Last, Plaintiffs argue that OCR arbitrarily and capriciously overlooked a change in position regarding the admissibility of evidence of a complainant's sexual history. Plaintiffs are wrong for two reasons. First, OCR did not overlook any change. Second, OCR's current view is reasonable.

6

7

8

9

10

11

12

13

14

It bears emphasizing that, prior to 2014, OCR had not articulated a blanket prohibition on evidence concerning a complainant's prior sexual history. To the contrary, the 2001 Guidance merely advised that prompt and equitable procedures must consist of an "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," 2001 Guidance at 20. Contrary to Plaintiffs' arguments, OCR explained precisely why it was withdrawing the new mandates contained in the 2014 guidance: the 2014 Q&A "interpreted Title IX to impose new mandates related to the procedures by which educational institutions investigate, adjudicate, and resolve allegations of student-on-student sexual misconduct," and it did so without undergoing notice and comment. A.R. 2–3. The APA requires no further explanation.

15

16

17

18

19

20

21

22

In any event, OCR's view that a trained investigator should "analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case," 2017 Q&A at 4, is reasonable. As noted above, OCR relied on extensive criticism that the 2011 DCL and 2014 Q&A's recommended evidentiary procedures inappropriately restricted the rights of the accused. *See, e.g.*, A.R. 1218. Under these circumstances, OCR's modest recommendation for adequate, reliable, and impartial procedures that offer the opportunity to present evidence is reasonable.[11]

23

**C.     Remand without Vacatur Would Be the Only Appropriate Remedy**

24

Should the Court reject the foregoing arguments and enter some form of relief in favor of Plaintiffs,

25

26

27

28

---

[11] Finally, Plaintiffs accuse ED of failing to consider the 2017 Guidance's effect on sexual assault survivors, suggesting that ED has "erased them and the reality they represent from Title IX policy." Pls.' Mot. 24. Whatever that accusation is intended to mean, as set out above it is entirely consistent with Title IX—not to mention basic fairness—to "both strongly condemn[] and punish[] sexual misconduct and ensure[] a fair adjudicatory process" for students who have been accused of extraordinarily serious misconduct. A.R. 382–83.

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

23

1    any relief should be limited to a remand to the agency for further consideration with respect to the specific

2    areas where the Court found that OCR did not satisfy the APA. The Court should not enter vacatur or

3    other injunctive relief; should not enter relief running to the 2017 Guidance in its entirety; and should not

4    enter relief that extends beyond the parties to the case.

5            **No vacatur or injunctive relief.** There are two available remedies when a court determines that

6    an agency did not satisfy the procedural requirements of the APA: remand with vacatur or remand without

7    vacatur. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992–94 (9th Cir. 2012). Whether an agency

8    action should be vacated depends on the seriousness of the agency's errors and the disruptive consequence

9    of an interim change. *See id.*; *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

10    Courts may also look to whether the agency is likely to adopt the same rule, or a similar rule, on remand.

11    *Pollinator Stewardship Council*, 806 F.3d at 532. Here, Plaintiffs assert only minor procedural errors that

12    can be cured on remand. And vacating the 2017 Guidance without any new guidance in place would be

13    disruptive: as Laura Dunn, formerly of SurvJustice, indicated when the 2017 Guidance was issued,

14    "removal of all guidance without any vetted replacement plan from the department leaves schools without

15    standards." A.R. 952. Given that the alleged errors could be addressed on remand if necessary, there is no

16    reason to vacate any portion of the 2017 Guidance in the interim.

17            **Any vacatur should be limited to the challenged aspects of the guidance.** Should the Court

18    determine that vacatur is appropriate, any vacatur should be limited to the aspects of the 2017 Guidance

19    as to which Plaintiffs prevail. Plaintiffs do not challenge the 2017 Guidance in its entirety, and it would

20    be inappropriate to vacate portions of the 2017 Guidance that Plaintiffs do not challenge or as to which

21    Plaintiffs do not prevail. *See, e.g. Today's IV, Inc. v. Fed. Trans. Admin*, No. 13-378, 2014 WL 5313943,

22    at *18 (C.D. Cal. Sept. 12, 2014) ("Because the NEPA violation was so narrow, a complete vacatur of the

23    ROD is inappropriate."), *aff'd sub nom.*, *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th

24    Cir. 2016). To the contrary, any relief ordered by the Court should go no further than necessary to remedy

25    any injury that Plaintiffs have suffered as a result of any legal violation by Defendants.

26            **Relief limited to the parties.** Should the Court enter any form of vacatur or injunctive relief, such

27    relief should be limited to Plaintiffs. Absent a recognized exception, "litigation is conducted by and on

28    behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

24

Injunctive relief entered in an individual case "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* at 702; *see also, e.g.*, *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982); *Neb. Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006); *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *John Doe #1 v. Veneman*, 380 F.3d 807, 819 (5th Cir. 2004); *Kentuckians for Commonwealth v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012). "This is particularly true in cases of nationwide importance because a broad injunction may interfere with or preclude other courts from ruling on . . . such matters" and may "'deprive the Supreme Court of the benefit of decisions from several courts of appeals.'" *Carhart v. Ashcroft*, 331 F. Supp. 2d 805, 1047 (D. Neb. 2004) (quoting *Va. Soc'y for Human Life*, 263 F.3d at 393), *overruled on other grounds by Gonzales v. Carhart*, 550 U.S. 124 (2007). Indeed, the 2017 Guidance is also being challenged in the District of Massachusetts, *see Equals Means Equal v. ED*, No. 17-12043 (D. Mass. filed Oct. 19, 2017), and so it would be particularly inappropriate for this Court to enter a nationwide ruling that could interfere with that other pending litigation.

## V.    Conclusion

The Court should grant Defendants' summary judgment motion and deny Plaintiffs' summary judgment motion.

Dated: August 29, 2019                              Respectfully Submitted,

                                                     JOSEPH H. HUNT
                                                     Assistant Attorney General

                                                     CARLOTTA P. WELLS
                                                     Assistant Branch Director
                                                     Civil Division

                                                     /s/ *Steven A. Myers*
                                                     STEVEN A. MYERS
                                                     (NY Bar # 4823043)
                                                     BENJAMIN T. TAKEMOTO
                                                     (CA Bar #308075)
                                                     Trial Attorneys
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch

**Defs.' Opp'n Pls.' Mot. Summ. J. & Cross Mot.,** *SurvJustice v. DeVos*, No. 18-cv-0535-JSC

1            P.O. Box No. 883, Ben Franklin Station
              Washington, DC 20044

2            Tel: (202) 305-8648
              Fax: (202) 616-8470

3            E-mail: steven.a.myers@usdoj.gov

4

5            *Attorneys for Defendants*

1

**[PROPOSED] ORDER**

2        Having considered Defendants' Motion for Summary Judgment, and any opposition, reply, and

3  oral argument presented, it is HEREBY ORDERED that the Motion is GRANTED.

4        IT IS SO ORDERED.

5  Dated: _____        _____

6                                                                          JACQUELINE SCOTT CORLEY
                                                                            UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28