**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| SURVJUSTICE, INC., et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Number: 3:18-cv-00535-JSC |
| | ) | |
| ELISABETH D. DEVOS, et al., | ) | Declaration of Seth M. Galanter |
|     Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

DECLARATION OF SETH M. GALANTER

I, Seth M. Galanter, am competent to testify and I have personal knowledge of the matters herein:

1. I am a Senior Director at the National Center for Youth Law, which serves as counsel to the plaintiffs in the above captioned matter.

2. The U.S. Department of Justice (DOJ) filed a brief in *Grove City College v. Bell*, Nos. 80-2383 and 80-2384 (3d Cir.) on March 12, 1982. That brief was reprinted on pages 96-140 of a published congressional hearing entitled *Guaranteed Student Loan and Civil Rights Enforcement*, Hearings before the House Subcommittee on Postsecondary Education of the Committee of Education and Labor, 97th Cong., 2d Sess. (May 1982). That hearing is available online at https://babel.hathitrust.org/cgi/pt?id=mdp.39015031757860.

3. In footnote 7 of the DOJ brief (which appears on page 102 of the hearing), the DOJ explained that an old Assurance form was reproduced in the Joint Appendix. It further

stated: "A new form, which was adopted by the Department of Education in 1980, is attached to this brief as an appendix."

4. That brief's appendix with the 1980 Department of Education assurance form (which appears on page 139 of the hearing) required an applicant to "assure[] that it will comply with" various civil rights statutes, including Title IX, and "[a]ll regulations, guidelines, and standards lawfully adopted under the above statutes by the United States Department of Education." The 1980 assurance form also stated: "The applicant also understands that the Department of Education may at its discretion seek a court order requiring compliance with the terms of the Assurance or seek other appropriate judicial relief."

5. That brief's appendix with the 1980 Department of Education assurance form as reprinted in the congressional hearing is attached as Exhibit A-1 to this declaration.

6. The U.S. Commission on Civil Rights issued a report in 1996 entitled *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs*. That report is available online at

https://babel.hathitrust.org/cgi/pt?id=uc1.31210012722623&view=1up&seq=1.

7. On page 73 of that report, the Commission stated (footnotes omitted):

DOJ also provides Federal agencies with guidance on Title VI policies and procedures through another publication, "Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance." This document does not contain DOJ's guidelines on Title VI policies and procedures, but provides suggestions for Federal agencies in developing their own Title VI guidelines, as DOJ regulations require of them. *** DOJ's procedures offer examples of agencies' guidelines and sample format.

8. In response to a Freedom of Information Act (FOIA) request docketed as 19-00198-F, DOJ released a partial copy of "Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance" on July 25, 2019, and a complete copy on August 12, 2019.

9.     The July 25, 2019 FOIA response letter from DOJ accompanying the partial copy, the August 12, 2019 email accompanying the complete copy, and the complete copy of "Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance" are attached as Exhibits A-2, A-3, and A-4 to this declaration.

10.     On page 2 of Exhibit A-4, the DOJ publication says:  "Examples of guidelines are found in several agencies. The Food and Nutrition Service of the Department of Agriculture developed guidelines for all its programs by means of FNS Instruction 113-1."

11.     On page 2 of Exhibit A-4, the DOJ publication says:  "The Veterans Administration has issued guidelines for its Educational and Training Programs. One document is directed primarily to recipients *** .  The other document, an insertion to the agency's Title VI Manual, is intended primarily to: [p]rovide procedures to enable Veterans Services personnel to carry out the Veterans Administration's responsibilities under Title VI of the Civil Rights Act of 1964 . . . . as they relate to proprietary educational institutions, apprenticeship programs and on-the-job training programs." (brackets and traditional ellipses in original).

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 19, 2019 in Washington, D.C.

Seth M. Galanter

## EXHIBIT INDEX

U.S. Department of Education, Assurance Form (1980)..................................................A-1

U.S. Department of Justice, FOIA letter (July 25, 2019) ................................................A-2

U.S. Department of Justice, FOIA email (August 12, 2019) ......................................... A-3

Department of Justice, "Procedures for the Development of Guidelines by
  Federal Agencies for Recipients of Federal Financial Assistance".............................A-4

# EXHBIT A-1

## CIVIL RIGHTS CERTIFICATE

**ASSURANCE OF COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, SECTION 504 OF THE REHABILITATION ACT OF 1973, TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AND THE AGE DISCRIMINATION ACT OF 1975**

The applicant provides this assurance in consideration of and for the purpose of obtaining Federal grants, loans, contracts (except contracts of insurance or guaranty), property, discounts, or other Federal financial assistance to education programs or activities from the Department of Education.

The applicant assures that it will comply with:

1. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d et seq., which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving Federal financial assistance.

2. Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of handicap in programs and activities receiving Federal financial assistance.

3. Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. 1681 et seq., which prohibits discrimination on the basis of sex in education programs and activities receiving Federal financial assistance.

4. The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance.

5. All regulations, guidelines, and standards lawfully adopted under the above statutes by the United States Department of Education.

The applicant agrees that compliance with this Assurance constitutes a condition of continued receipt of Federal financial assistance, and that it is binding upon the applicant, its successors, transferees, and assignees for the period during which such assistance is provided. The applicant further assures that all contractors, subcontractors, subgrantees or others with whom it arranges to provide services or benefits to its students or employees in connection with its education programs or activities are not discriminating in violation of the above statutes, regulations, guidelines, and standards against those students or employees. In the event of failure to comply the applicant understands that assistance can be terminated and the applicant denied the right to receive further assistance. The applicant also understands that the Department of Education may at its discretion seek a court order requiring compliance with the terms of the Assurance or seek other appropriate judicial relief.

The person or persons whose signature(s) appear(s) below is/are authorized to sign this application, and to commit the applicant to the above provisions.

_____
Date

_____
Authorized Official(s)

_____
Name of Applicant or Recipient

_____
Street

_____
City, State, Zip Code

Appendix

Generated on 2019-09-18 18:07 GMT / http://hdl.handle.net/2027/mdp.39015031757860
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF MICHIGAN

# EXHBIT A-2



U.S. Department of Justice
Civil Rights Division

*Freedom of Information/Privacy Acts Branch - PHB*

*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

<u>*Via Electronic Mail Only*</u>
Mr. Seth Galanter
National Center for Youth Law
1313 L Street NW
Washington, DC 20005
sgalanter@youthlaw.org

7/25/2019

Dear Mr. Galanter:

This is in further response to your June 7, 2019 Freedom of Information Act request seeking access to "Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance" and the "Checklist of Analysis of a Federal Agency's Title VI Enforcement Effort."

After review of the responsive Civil Rights Division documents, I have determined that the enclosed records may be released to you in their entirety.

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

*Tink Cooper/af*

Tink Cooper, Acting Chief
Freedom of Information/Privacy Acts Branch
Civil Rights Division

# EXHBIT A-3



## RE: FOIA Request 19-00198-F
1 message

**Green, Robert (CRT)** <Robert.Green2@usdoj.gov>           Mon, Aug 12, 2019 at 11:31 AM
To: Seth Galanter <sgalanter@youthlaw.org>

Good morning Mr. Galanter,

Great news, you were absolutely right! The pages were double sided. I've attached a copy of the complete document, both sides scanned. Please let me know if you have any questions.

Have a great day!

Robert Green

Government Information Specialist

FOI/PA Branch

Civil Rights Division

U.S. Department of Justice

202.616.2503

**robert.green2@usdoj.gov**

**From:** Seth Galanter <sgalanter@youthlaw.org>
**Sent:** Monday, August 12, 2019 10:43 AM
**To:** Green, Robert (CRT) <Robert.Green@crt.usdoj.gov>
**Subject:** Re: FOIA Request 19-00198-F

Hi Robert.  I hope the move went (is going) well.  I just wanted to see if you'd heard anything about getting the full doc.  Thanks.

-Seth

------------------------------------------

**Seth Galanter** (*Pronouns:* he / him / his)

**Senior Director**

National Center for Youth Law

1313 L Street, NW Washington DC 20005

(202) 288-8188 (cell)

┌─────────┐ ┌─────────┐ ┌─────────┐
└─────────┘ └─────────┘ └─────────┘

On Thu, Jul 25, 2019 at 4:09 PM Green, Robert (CRT) <Robert.Green2@usdoj.gov> wrote:

Good afternoon Mr. Galanter. I'll check with the section asap to find out what happened with the missing pages. Just an FYI, it may delayed a bit as the Division is relocating to a new building.

Thank you for the heads up!

Robert Green

Government Information Specialist

FOI/PA Branch

Civil Rights Division

U.S. Department of Justice

202.616.2503

*robert.green2@usdoj.gov*

---

**From:** FOIArequests, CRT (CRT) <CRT.FOIArequests@crt.usdoj.gov>
**Sent:** Thursday, July 25, 2019 2:40 PM
**To:** Green, Robert (CRT) <Robert.Green@crt.usdoj.gov>
**Subject:** FW: FOIA Request 19-00198-F

**From:** Seth Galanter <sgalanter@youthlaw.org>
**Sent:** Thursday, July 25, 2019 12:26 PM
**To:** FOIArequests, CRT (CRT) <CRT.FOIArequests@crt.usdoj.gov>
**Cc:** Tamara Lewis <tlewis@youthlaw.org>; Alice Abrokwa <aabrokwa@youthlaw.org>
**Subject:** Re: FOIA Request 19-00198-F

Hello CRT/FOI:  Thank you for the materials you released to me today.

The copy of the first record (pdf pages 1-8) seems to be missing some pages. Is it possible some of the pages got stuck together in the scanner, or that the document was double sided?

I recognize that the original document did not have page numbers, but it appears that, starting on pdf page 3, the document is divided into 13 roman-numeral numbered headings, but the document only contains I-IV (pdf page 3), VIII (page 5), IX (page 6), XI (page 7), and XIII (page 8).  That leaves 5 headings missing: V, VI, VII, X, and XII.

Page 2 starts with "These examples," but there are no examples preceding it.  Likewise page 3, in heading I (one), urges the reader "for example, see purpose for FNS Instruction 113-1, above," but there is no such instruction mentioned previously.

Page 4 contains headings A-I (eye), but page 5 starts with C.  Similarly, page 6 has a list that goes from IX.A to D, but then page 7 starts with a list going 2-5.

Could you please check back to the original record and see whether there are more pages that did not get released?

Thank you for your consideration.  I look forward to your response.


-Seth

-------------------------------------------

**Seth Galanter** (*Pronouns*: *he / him / his*)

**Senior Director**

National Center for Youth Law


1313 L Street, NW Washington DC 20005

(202) 288-8188 (cell)

www.youthlaw.org

On Thu, Jul 25, 2019 at 11:45 AM FOIArequests, CRT (CRT) <CRT.FOIArequests@usdoj.gov> wrote:

> Dear Mr. Galanter,

Attached is a letter with information about your recent FOIA request to the Civil Rights Division of the US Department of Justice.


Regards,


*Civil Rights Division/FOI*

*(202) 514-4210 - Main FOI*

---

**Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance.pdf**
10953K

# EXHBIT A-4

Procedures for the Development of Guidelines by Federal
Agencies for Recipients of Federal Financial Assistance

## Legal Basis

The Department of Justice Regulations, Coordination
of Enforcement of Nondiscrimination in Federally Assisted
Programs at 28 C.F.R. Section 42.404, require federal
agencies to develop and publish "Title VI guidelines for
each type of program to which they extend financial
assistance, where such guidelines would be appropriate to
provide detailed information on the requirements of Title
VI." Such guidelines shall include the following:

o    the nature of the Title VI coverage;

o    methods of enforcement;

o    examples of prohibited discriminatory practices;

o    required or suggested remedial actions;

o    requirements pertaining to covered employment,
     data collection, complaints, and public
     information.

## Purpose

Each federal agency's regulations implementing Title
VI generally proscribe discrimination, describe some basic
kinds of discriminatory practices which are prohibited, and
often contain some examples to illustrate discrimination in
individual federally assisted programs. More specific
material is needed to explain the application of Title VI
to particular types of federally assisted programs or
recipients. This more detailed explanation is to guide
agency compliance officers and program recipients in their
day-to-day activities. In general, guidelines describe the
methods the federal agency will follow in carrying out its
Title VI compliance program, outline the steps in handling
complaints alleging violations of Title VI, detail the
sanctions that apply in instances of noncompliance, narrate
with specificity those practices which are violations of
Title VI and spell out the procedures recipients are
required to follow to achieve compliance with Title VI.

Guidance to recipients is essential, and particularly when recipients have been directed by the federal agency to actively carry out compliance functions, such as compliance reviews.

Examples of guidelines are found in several agencies. The Food and Nutrition Service of the Department of Agriculture developed guidelines for all its programs by means of FNS Instruction 113-1. The purposes of that Instruction could be applied to all agency guidelines:

A.  Establishes the policy for FNS on nondiscrimination in the administration of its federally-assisted programs.

B.  Delegates authorities and specifies responsibilities.

C.  Specifies minimum requirements and procedures to ensure compliance with the provisions of Title VI of the Civil Rights Act of 1964 and Departmental policy and regulations.

The Veterans Administration has issued guidelines for its Educational and Training Programs. One document is directed primarily to recipients and describes as its purpose:

to ensure that Federal employees, applicants for, recipients and beneficiaries of, and other persons affected by or interested in Federal financial assistance extended by the Veterans Administration in furtherance of its education and training programs are aware of their rights and responsibilities under Title VI of the Civil Rights Act of 1964.

The other document, an insertion to the agency's Title VI Manual, is intended primarily to:

[p]rovide procedures to enable Veterans Services personnel to carry out the Veterans Administration's responsibilities under Title VI of the Civil Rights Act of 1964 . . . . as they relate to proprietary educational institutions, apprenticeship programs and on-the-job training programs.

These examples show the often complementary reasons for promulgating guidelines:

1. to provide detailed guidance to compliance officers so that they effectively discharge their responsibilities under Title VI;

2. to make recipients, beneficiaries, and possibly the general public aware of their rights and responsibilities under Title VI.

It is, of course, possible to combine these two purposes in one instruction. This memorandum is intended to discuss procedures for the development of guidelines by federal agencies for recipients of federal financial assistance. Such a guideline may be the same guideline developed by federal compliance officers or it may be a separate document, whichever is more suitable for the particular federal program.

## Appropriatness

Where the need for adequate guidance beyond agency regulations is present, agencies shall develop guidelines. Guidelines should set forth the appropriate procedures to follow to implement agency regulations. Without explicit standards to interpret these regulations, differing compliance standards in a program may result. The complexity of many federal programs, combined with the differing political and geographic levels often charged with responsibility (i.e., national, regional, state, local), generally make guidelines essential for most agencies in order to provide meaningful direction.

For some programs, guidelines may not be necessary. Federal agencies may deem guidelines inappropriate where regulations are comprehensive and detailed and are able to be used in lieu of guidelines, where the size of the program possibly does not justify guidelines, or where the program is subject to a delegation agreement.

However, these reasons do not necessarily preclude guidelines. As an example, one agency designated its regulations, as well as its internal administrative regulations, as guidelines. Upon review, the Department of Justice found that a specific-benefit program required more explicit detail than existing documents could provide.

With delegation agreements, guidelines may still be advisable for the delegating agency in order to provide guidance for those instances in which the agency conducts independent reviews, for the referral of complaints, for the collection of Title VI assurances and pre-award data, and for the procedures to follow when voluntary compliance efforts have failed.

If an agency has determined that guidelines are not appropriate for specific programs, justification for that position must be stated in writing and be available to any interested party upon request. In addition, such determinations must be included in the agency's Title VI Enforcement Plan.1/ See 28 C.F.R. Section 42.415.

The Department of Justice Coordination Regulations became effective on January 3, 1977. Federal agencies thus should have issued guidelines for existing programs by April 3, 1977. Programs authorized subsequent to January 1977 should issue guidelines three months after the enabling legislation becomes effective.

## Sample Format

Guidelines must be very specific, providing step-by-step instructions to compliance officers so that they may effectively enforce Title VI. As guidelines must be keyed to the particular programs, a sample format can only outline the basic requisites of any guideline. A detailed format must be devised by each agency upon evaluation of the particular program. In this regard, the HUD Title VI Handbook at chapter 4, Section 14a states that "[t]he investigator must be . . . particularly knowledgeable of the present and past operation of the program or activity which is to be reviewed, including the regulations and requirements governing the operation of that program." Consequently, any compliance analysis must be rooted in the particular program under consideration.

---

1/ The Office of Coordination and Review has developed a procedure entitled, "Guidelines for Development of Civil Rights Enforcement Plans," which details a model Plan.

The Department of Justice Coordination Regulations state that "[f]ederal agencies shall publish Title VI guidelines for each type of program to which they extend financial assistance . . . ." "Type of program" means programs of a similar nature, purpose or structure; such programs will often provide assistance to the same recipient and may be administered similarly, e.g., by state welfare agencies, local governments or private institutions.

For certain federal agencies a single guideline will suffice to cover the Title VI-affected programs; for others, composed of several constituent agencies, guidelines will be needed for each differing program. This might require a guideline for every Title VI program within an agency; alternatively, like components within the agency could group together. Existing instructions, handbooks, or manuals may be designated as guidelines after proper evaluation.

The broad categories to be included in a guideline are at least:

I.  Purpose of Guidelines (for example, see purpose for FNS Instruction 113-1, above)

II.  Basic Authorities (i.e., authorizing legislation; departmental regulations; Department of Justice regulations; Executive Orders).

III. Definition of Terms

IV. Responsibilities and Delegations of Authority

This refers to the civil rights obligations of the following entities: agency civil rights offices, program offices, regional and field offices, offices of general counsel, and primary and secondary recipients.

Frequently, state agencies are primary recipients of federal assistance. Each State Agency administering a continuing program which receives federal financial assistance is required to establish a Title VI compliance program for itself and other recipients which obtain federal assistance through it. The State Agencies must maintain the records necessary to permit federal officials to determine the Title VI compliance of the State agencies and the secondary recipients. Specific responsibilities of primary recipients may include:

A.    Complying with those assurances it has signed with the federal agency and for executing and monitoring assurances with secondary recipients.

B.    Assuring that records are maintained that show racial and national origin data as requested by the federal agency, including: statistics on participants, potential eligibles, and applicants in the particular program.

C.    Requiring secondary recipients to maintain records and submit reports necessary to ascertain whether such secondary recipients have complied or are complying with Title VI.

D.    Submitting data and reports that the federal agency determines are necessary to ascertain whether the recipient has complied or is complying with Title VI and any other federal requirements.

E.    Accepting all complaints, written or verbal, and forwarding immediately to the office responsible for complaint handling.

F.    Conducting compliance reviews of agency programs to assure that all benefits and services are provided on an equal opportunity basis.

G.    Initiating the voluntary compliance process with secondary recipients.

H.    Advising secondary recipients of findings of noncompliance and taking corrective action within the federal agency's specified time period.

V. Examples of Prohibited Discrimination (specific examples for the particular program should be listed under each of the following categories):

A. Denying an individual any service or benefit provided under the program.

B. Providing a service or benefit to an individual which is inferior either in quantity or quality to that provided to others in the program.

C. Providing any service or benefit to an individual in a manner different from that provided to others under the program.

D. Subjecting an individual to segregation or separate treatment in any manner related to receipt of any service or other benefit under the program.

E. Restricting an individual in any way in the receipt of any advantage or privilege enjoyed by others receiving such service and other benefits under the program.

F. Treating an individual differently from others in determining whether the person satisfies any admission, enrollment, quota, eligibility, membership, or other requirement or condition which individuals meet to be provided the service or benefit.

G. Denying any person the opportunity to participate as a member of a planning or advisory body which is an integral part of the program.

H. Selecting sites or locating facilities for dispensing benefits or services in any way which would have the purpose or effect of denying benefits or limiting or impeding access to a federally funded service or benefit.

I. Utilizing criteria or methods of administration which (1) have the effect of subjecting individuals to discrimination or (2) operate to defeat or substantially impair the accomplishment of the objectives of the program.

J.   Permitting   discriminatory   activity   in   a
     facility built in whole or in part with federal
     funds.

K.   Failing to provide service or information for
     the program in a language other than English
     when significant numbers of potential or actual
     beneficiaries are of limited English speaking
     ability.

L.   Failing to advise the population eligible to be
     served  or  benefited  by  the  program  of  the
     existence of the program.

M.   Subjecting   an   individual   to   discriminatory
     employment and/or training practices under any
     federally funded program whose object is to
     provide employment and training.

N.   Designing any funded program of employment or
     training or supportive services which has the
     effect of defeating or substantially impairing
     the accomplishment of the program with respect
     to individuals of a protected group.

## VI. Advisory Bodies

The  composition  of  any  recipient  planning  or
advisory body which is an integral part of a program should
be representative of the population eligible to be served.

[program-specific  responsibilities  or  requirements  should
be added by the federal agency]

## VII. Public Notification Program

A. Recipients are expected to make available to the
public  the  nondiscriminatory  policy  and  to  display  in
recipient offices the agency nondiscrimination poster.

B. This policy should be included in any publication
or staff regulations, on public information brochures, kept
current,  on  applications  and  other  appropriate  forms,  and
periodically reviewed with staff and employees.

Beneficiaries, potential beneficiaries, and applicants shall have access to Title VI information. Examples of the material to be provided include procedures for filing complaints, program information, and rights of beneficiaries and applicants as reflected in legislation, program regulations, directives, materials, and pamphlets.

C. Where a significant number or proportion of the population eligible to be served, or likely to be directly affected by a program, need service or information in a language other than English in order effectively to be informed of or to participate in the program (as determined by program-specific guidelines), recipients are expected to take reasonable steps to provide such information in appropriate languages other than English.

VIII. Racial and Ethnic Data Collection and Reporting

Recipients are expected to collect data and maintain adequate records to enable the federal agency or any other duly authorized agency to determine if they are in compliance with all applicable civil rights legislation, regulations, orders, and other pertinent issuances. Guidelines should specify the precise data requirements for the particular program. The data and information to be collected and maintained could include:

A.   A description of the services and the manner in which they will be provided by the recipient.

B.   The population eligible to be served, by race, color, or national origin.

C.   The population participating in the program, by race, color, or national origin.

D.   Data regarding covered employment (of the recipient staff) including use or planned use of bilingual public contact employees.

E.   The location of existing or proposed facilities connected with each program.

F.   The present or proposed membership by race, color, or national origin in any planning or advisory body which is an integral part of a program.

G.   Additional data, including demographic maps of racial and ethnic composition of affected neighborhoods or census data where necessary.

H.   Any program specific data requirements.

All recipients normally will be required to provide the following information to the federal agency:

A.   Timely notice of any lawsuit filed against the recipient alleging discrimination on the basis of race, color, or national origin, and of any complaints filed against the recipient alleging such discrimination.

B.   A brief description of any federal financial assistance to the same area or project by another federal agency, as well as any pending applications to another federal agency for assistance.

C.   A statement by the recipient in its application for assistance describing any civil rights compliance review during the two-year period before the applcation, and information concerning the agency or organization performing the review and its findings.

D.   Written assurance that the recipient has not been found in noncompliance with any relevant civil rights requirements by any agency listed pursuant to number 3 above.

E.   assurance by a recipient that it will compile and maintain the records required by the federal agency.

F.   A log of all complaints of discrimination as prescribed by federal agency reporting requirements.

Records should be maintained uniformly without discrimination for all applicants, participants, and employees. Identification on appropriate records of a beneficiary's race, color, or national origin, is not considered to be discriminatory, and may be used to accumulate data demonstrating compliance with applicable civil rights legislation, regulations or orders, and other pertinent civil rights mandates.

Recipients are expected to permit officials access during normal business hours to such of its books, records, accounts, other sources of information, and facilities as may be pertinent to ascertain compliance with Title VI.

## IX. Complaint Procedures

Complaint responsibilities of recipients depend upon the complaint procedures established by the individual federal agencies. Thus, federal agencies may require that recipients refer all complaints to the appropriate agency office for handling, that recipients be responsible for the processing and disposition of complaints, or that recipients conduct inquiries or investigations after initial processing by the federal agency. The following actions should be taken wherever they fit the responsibilities vested in the recipient:

A. Establishing procedures for the prompt processing and disposition of complaints, which are subject to review and approval by the federal agency. Where procedures have been approved, recipients should investigate complaints having apparent merit. Where such complaints are not investigated, good cause should exist, and the reasons stated in the notification of disposition.

B. Designating trained individual(s) to assure prompt and equitable resolution of complaints alleging prohibited discriminatory activity.

C. Notifying the complainant and/or secondary recipient in writing as to the receipt and disposition of the complaint.

D. Maintaining a complaint log which identifies the grounds and nature of each complaint, the date the complaint was filed, the date the investigation was initiated and completed, the final disposition and the date of disposition, and other pertinent information, as prescribed by the federal agency, including any corrective action taken.

E. Processing the complaint and submitting to the federal agency a summary report, within a specified time period, the following information:

1. name and address of complainant;

2. brief summary of findings including a statement as to the recipient's conclusion as to whether or not the allegations of the complaint have been substantiated;

3. a statement of the disposition of the case, including any corrective action taken.

(Complaints, and all actions taken in connection with processing them, should be kept confidential by the recipient, except that the federal agency will be provided access to all complaint files. Where no resolution of a complaint, satisfactory to the complainant, can be reached within a specified time period, the complainant or representative should be advised of his or her right to file a complaint with the federal agency).

F. Any other program-specific requirements deemed necessary by the federal agency.

X. Compliance Reviews

A. Each primary recipient of funds has a responsibility to ensure that all funds it distributes are used in a nondiscriminatory manner.

B. Local office components of recipients should be monitored by recipient staff, as appropriate, to ensure that they do not discriminate in the provision of services or benefits.

C. Specific procedures for the conduct of reviews should be set forth in the guideline for recipients. These include:

1. Purpose of reviews and minimum number to be conducted annually

2. Types of reviews (e.g., Pre-Award Reviews, Routine Reviews, Special Reviews, Single-Agency Reviews, Community-Wide Reviews, Follow-up Reviews)

3. General procedures of reviews, including selection criteria and preparation

4. Organization and conduct of reviews

5. Compliance review reports

## XI. Sanctions

All primary recipients and their secondary recipients, subagents, subcontractors, and local office components, are expected to comply with the equal opportunity requirements established by Title VI and the agency regulations. Any recipient found in noncompliance may be subject to any or all of the following sanctions:

A. Voluntary compliance may be induced, until compliance is achieved, by:

1. regular reporting of compliance efforts

2. obligated authority issued on a regular, periodic (i.e., less than annual) basis

3. suspended funding

4. intensive onsite monitoring

B. Lawsuits may be filed to force adherence to all statutory and regulatory nondiscrimination mandates.

C. Administrative action may be initiated to involve any local or state organization, agency, body or federal agency having authority to enforce nondiscrimination requirements.

1. Funds may be terminated or suspended by the federal agency.

2. Obligational authority can be issued on a regular, periodic (i.e., less than annual) basis.

D. In emergency situations, as determined by the federal agency, funds obligated to the recipient can be terminated immediately without due process provided that prompt notice and an opportunity for a subsequent hearing are made available within a specified time period.

E. Any additional program-specific methods the federal agency deems appropriate.

## XII. Affirmative Action

A. Affirmative action is more than passive nondiscrimination and obligates recipients to take positive steps to ensure full participation and utilization of protected group individuals in all programs.

B. An affirmative action program documents the methodology a recipient will utilize in fulfilling the obligation specified above.

C. There are three instances wherein a recipient is mandated to develop and implement an affirmative action plan:

1. A program resulting from a Judicial Decree

The strongest situation in which a remedial affirmative action program will arise is where it is adopted as a result of a Judicial Decree designed to remedy a legal finding of noncompliance. In such a context, race-conscious and ethnic-conscious service goals or preferences may be imposed.

2. A program which is part of a compliance agreement with the agency

A remedial affirmative action program can be part of a compliance agreement based on a finding, by the federal agency, of noncompliance by the recipient. In such a context, use of race-conscious or ethnic-conscious preferences may also be appropriate.

3. A program resulting from the federal agency's findings of industry or other generalized discrimination.

A remedial affirmative action program resulting from federal agency initiatives and based on agency findings of discrimination in industry, education, services, or other areas affecting participation in federally funded programs can result in the establishment of race-conscious or ethnic-conscious programs or service goals.

D. An affirmative action program can also be implemented on the advice of the federal agency, but without a specific finding of a statutory violation by a judicial or administrative body, or adopted by a recipient on its own initiative without a basis for believing there has been discrimination. In this context, recipients should not adopt race-conscious or ethnic-conscious service goals which may act to exclude or impact on the services it provides to beneficiaries of different races or ethnicities. However, this is not intended to absolve recipients from their responsibility to service protected groups in proportion to their incidence in the eligible population.

E. Steps to be taken by an affirmative action plan will vary with the nature of the recipient's programs. Enumeration of appropriate program-specific affirmative action may be provided by the federal agency.

## XIII. Method of Enforcement

The head of each department and agency administering programs of federal financial assistance is ultimately responsible for ensuring that all recipients are in compliance with all applicable laws and regulations. In carrying out this responsibility, recipients can expect that federal staff will periodically:

A. Conduct preaward reviews of recipient;

B. Conduct desk audits or onsite compliance reviews;

C. Conduct reviews of recipient's complaint investigations;

D. Provide training or technical assistance upon request or as determined needed by the federal staff.