1

2                   UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    SURVJUSTICE INC, et al.,                 Case No.18-cv-00535-JSC

6                    Plaintiffs,

7           v.                                **ORDER RE: CROSS MOTIONS FOR
                                              SUMMARY JUDGMENT**
8    ELISABETH DEVOS, et al.,
                                              Re: Dkt. Nos. 136, 140
9                    Defendants.

10          SurvJustice, Inc., Equal Rights Advocates, and Victim Rights Law Center ("Plaintiffs") are

11   non-profit advocacy organizations who sue for injunctive relief against the U.S. Department of

12   Education (the "Department"), Secretary Elisabeth D. DeVos, and Acting Assistant Secretary for

13   Civil Rights Kenneth L. Marcus (collectively, "Defendants").[1]  Plaintiffs seek to vacate the

14   Department's policy regarding enforcement of Title IX of the Education Amendments of 1972 set

15   forth in guidance documents the Department issued on September 22, 2017.  (Dkt. No. 123 at ¶

16   1.)[2]  Now before the Court are the parties' cross motions for summary judgment.  (Dkt. Nos. 136

17   & 140.)  After careful consideration of the parties' briefing and having had the benefit of oral

18   argument on October 17, 2019, the Court DENIES Plaintiffs' motion and GRANTS Defendants'

19   motion because the challenged agency action is not "final" for purposes of judicial review under

20   the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

21                              **BACKGROUND**

22   **I.     Factual Background**

23           **A.     Title IX Generally**

24           Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, prohibits any

25   educational program or activity that receives federal funding from discriminating on the basis of

26

27   [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
     636(c).  (Dkt. Nos. 18 & 36.)
28   [2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

sex.  20 U.S.C. § 1681(a).  Sexual harassment is a form of sex discrimination that educational institutions must address and remedy under Title IX.  *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).  The Department, acting through its Office of Civil Rights ("OCR"), is "the administrative agency charged with administering Title IX."  *Neal v. Bd. of Trs. of California State Univ.*, 198 F.3d 763, 770 (9th Cir. 1999) (internal quotation marks and citation omitted).  Applicants for federal funding from the Department must sign an "assurance of compliance" indicating that "the education program or activity operated by the applicant" will comply with Title IX and its implementing regulations.  34 C.F.R. § 106.4(a).  Further, recipients of federal funding must "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action" prohibited under Title IX.  34 C.F.R. § 106.8(b).

### B.   The 2001 Guidance

In January 2001, OCR issued a revised guidance document titled *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, which "reaffirm[ed] the compliance standards that OCR applies in investigations and administrative enforcement of Title IX . . . regarding sexual harassment."  (Dkt. No. 136-2, Ex. A-3 at 24 ("2001 Guidance").)  The 2001 Guidance largely reaffirmed the requirements and guidelines established under previous guidance issued by OCR in 1997, but also "re-ground[ed]" OCR's standards "in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law."  (*See id.*)  The stated purpose of the 2001 Guidance is to "provide the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."  (*Id.*)  OCR issued the 2001 Guidance after publishing notice in the Federal Register "requesting public comments on the proposed revised guidance."  (*Id.* at 25.)

### C.   The 2011 Letter and the 2014 Q&A

In April 2011, OCR issued a "Dear Colleague Letter on Sexual Violence," (Dkt. No. 134-3 at 89-107 ("2011 Letter")), followed by a set of questions and answers in 2014 in response to

"additional concerns raised by schools and students," (*id.* at 192-244 ("2014 Q&A")) (together, "2011 & 2014 Guidance").  The 2011 Letter reaffirmed the Title IX requirements detailed in the 2001 Guidance "related to student-on-student sexual harassment, including sexual violence, and . . . schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence."  (*Id.* at 90.)  The 2011 Letter also "supplement[ed] the 2001 Guidance by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence."  (*Id.*)

The 2011 & 2014 Guidance set forth or reiterated several substantive provisions; specifically: (1) requiring schools to "use a preponderance of the evidence standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)"; (2) requiring schools to provide an appeals process for both parties; (3) noting that voluntary mediation is not appropriate "[i]n cases involving allegations of sexual assault"; (4) requiring schools "to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation"; (5) recognizing that "a typical [sexual misconduct] investigation takes approximately 60 calendar days following receipt of the complaint," but specifying that "[w]hether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct"; (6) requiring schools to "process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity"; (7) requiring that "[i]f a school determines that it can respect [a] student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to respond to the complaint consistent with the request"; and (8) noting that "[q]uestioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted."  (*See* Dkt. No. 134-3 at 31, 96, 98-99, 100, 211, 218, 227, 229, 230.)

**D.     The 2017 Guidance**

On September 22, 2017, the Department issued a "Dear Colleague Letter" rescinding the 2011 & 2014 Guidance.  (Dkt. No. 134-2 at 2 ("2017 Letter").)  That same day, the Department

United States District Court
Northern District of California

issued questions and answers on "Campus Sexual Misconduct." (*Id.* at 4 ("2017 Q&A").)  The stated purpose of the 2017 guidance documents (collectively, "2017 Guidance") was to withdraw the "new mandates" imposed by the 2011 letter and 2014 Q&A "related to the procedures by which educational institutions investigate, adjudicate, and resolve allegations of student-on-student sexual misconduct." (*Id.* at 2.)

The 2017 Letter singles-out as flawed the following procedures set forth in the 2011 Letter: (i) requiring "schools to adopt a minimal standard of proof—the preponderance-of-the-evidence standard—in administering student discipline, even though many schools had traditionally employed a higher clear-and-convincing-evidence standard"; (ii) "insist[ing] that schools with an appeals process allow complainants to appeal not-guilty findings, even though many schools had previously followed procedures reserving appeal for accused students"; (iii) "discourag[ing] cross-examination by the parties, suggesting that to recognize a right to such cross-examination might violate Title IX"; (iv) "forb[idding] schools from relying on investigations of criminal conduct by law-enforcement authorities to resolve Title IX complaints, forcing schools to establish policing and judicial systems while at the same time directing schools to resolve complaints on an expedited basis;" and (v) "provid[ing] that any due-process protections afforded to accused students should not 'unnecessarily delay' resolving the charges against them." (*Id.*)  The 2017 Letter notes that "[t]he Department imposed these regulatory burdens without affording notice and the opportunity for public comment." (*Id.* at 3.)  The 2017 Letter continues:

> Under these circumstances, the Department has decided to withdraw the above-referenced guidance documents in order to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits. The Department intends to implement such a policy through a rulemaking process that responds to public comment. The Department will not rely on the withdrawn documents in its enforcement of Title IX.

(*Id.*)  In the interim, the 2017 Letter directs readers to the 2017 Q&A, and states that the Department "will continue to rely on [the 2001 Guidance], which was informed by a notice-and-comment process," and a 2006 Dear Colleague Letter on Sexual Harassment that reaffirmed the

1    2001 Guidance.  (*Id.*)  The 2017 Q&A reiterates the Department's intention to engage in formal

2    "rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual

3    misconduct," stating, in pertinent part:

4            Under Title IX of the Education Amendments of 1972 and its
         implementing regulations, an institution that receives federal funds
5        must ensure that no student suffers a deprivation of her or his access
         to educational opportunities on the basis of sex.  The Department of
6        Education intends to engage in rulemaking on the topic of schools'
         Title IX responsibilities concerning complaints of sexual misconduct,
7        including peer-on-peer sexual harassment and sexual violence.  The
         Department will solicit input from stakeholders and the public during
8        that rulemaking process.   In the interim, these questions and
         answers—along with the [2001 Guidance] previously issued by the
9        Office of Civil Rights—provide information about how OCR will
         assess a school's compliance with Title IX.

10

11   (*Id.* at 4 (footnote omitted).)[3]

12                          **1.       Substantive changes under the 2017 Guidance**

13           In rescinding the 2011 & 2014 Guidance, the 2017 Guidance enacts eight changes.  (*See*

14   Dkt. Nos. 136 at 11-12 & 140 at 14-15.)  First, the 2017 Guidance returns to the pre-2011 policy

15   of giving schools discretion over the standard of proof it employs in evaluating evidence,

16   permitting schools to use either the "preponderance" or a "clear and convincing" standard.[4]  (*See*

17   Dkt. No. 134-2 at 8.)  Second, regarding the appeals process, the 2017 Guidance allows schools to

18   "choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case

19   any appeal procedures must be equally available to both parties."  (*Id.* at 10.)  Third, the 2017

20   Guidance allows for voluntary informal mediation if the parties have "receiv[ed] a full disclosure

21   of the allegations and their options for formal resolution and if a school determines that the

22   particular Title IX complaint is appropriate for such a process."  (*Id.* at 7.)

23           Fourth, the 2017 Guidance rescinds the 2014 Q&A's mandate that schools must take

24   _____

25   [3] The Department published in the Federal Register a notice of proposed rulemaking on November
     29, 2018, indicating that it proposes to amend Title IX's implementing regulations to clarify
26   schools' obligations under Title IX, including how schools "must respond to incidents of sexual
     harassment."  *See* Nondiscrimination on the Basis of Sex Education Programs or Activities
27   Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018).
     [4] The 2017 Q&A explains that "the standard of evidence for evaluating a claim of sexual
28   misconduct should be consistent with the standard the school applies in other student misconduct
     cases."  (Dkt. No. 134-2 at 8 n.19.)

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   interim measures during the investigation of a complaint, and instead returns to the 2001

2   Guidance, which provided that schools may take such measures.  (*See id.* at 5-6; *see also* Dkt. No.

3   136-2, Ex. A-3 at 47 (providing that "[i]t may be appropriate for a school to take interim measures

4   during the investigation of a complaint.").)  Fifth, the 2017 Guidance does not recognize the 2014

5   Q&A's 60-day benchmark for "prompt" investigations in typical cases, (*see* Dkt. No. 134-3 at

6   229), and states instead that "[t]here is no fixed time frame under which a school must complete a

7   Title IX investigation," (Dkt. No. 134-2 at 6).  In determining whether an investigation is

8   "prompt," the 2017 Guidance provides that "OCR will evaluate a school's good faith effort to

9   conduct a fair, impartial investigation in a timely manner designed to provide all parties with

10  resolution."  (*Id.*)

11      Sixth, the 2017 Guidance addresses off-campus conduct and provides that "[s]chools are

12  responsible for redressing a hostile environment that occurs on campus even if it relates to off-

13  campus activities," but notes that "OCR has informed institutions that a university does not have a

14  duty under Title IX to address an incident of alleged harassment where the incident occurs off-

15  campus and does not involve a program or activity of the [school]."  (Dkt. No. 134-2 at 4 n.3

16  (internal quotation marks omitted) (citing OCR complaints issued prior to the 2011 & 2014

17  Guidance.)  Conversely, the 2014 Q&A provided that "school[s] must process all complaints of

18  sexual violence, regardless of where the conduct occurred, to determine whether the conduct

19  occurred in the context of an education program or activity or had continuing effects on campus or

20  in an off-campus education program or activity."  (Dkt. No. 134-3 at 227.)  The 2014 Q&A further

21  provided that "[e]ven if the misconduct did not occur in the context of an education program or

22  activity, a school must consider the effects of off-campus misconduct when evaluating whether is

23  hostile environment on campus or in an off-campus education program or activity."  (*Id.*)

24      Seventh, the 2017 Guidance provides that schools should provide notice to the accused

25  party of the "identities of the parties involved" in the complaint "[o]nce it decides to open an

26  investigation that may lead to disciplinary action."  (Dkt. No. 134-2 at 7.)  This differs from the

27  2014 Q&A, which provided that "[i]f a school determines that it can respect [a] student's request

28  not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to

6

United States District Court
Northern District of California

respond to the complaint consistent with the request."[5]  (Dkt. No. 134-3 at 218.)  Finally, the 2017

Guidance appears to differ from the rescinded guidance in that it does not expressly prohibit

"[q]uestioning about the complainant's sexual history with anyone other than the alleged

perpetrator," which the 2014 Q&A noted "should not be permitted."  (*Compare id.* at 229 *with*

Dkt. No. 134-2 at 7 (noting that investigating "a Title IX complaint requires a trained investigator

to analyze and document the available evidence to support reliable decisions, objectively evaluate

the credibility of parties and witnesses, synthesize all available evidence—including both

inculpatory and exculpatory evidence—and take into account the unique and complex

circumstances of each case").)

## II.     Procedural History

In January 2018, Plaintiffs filed their original complaint for injunctive relief against

Defendants Elisabeth D. DeVos and Candice Jackson in their official capacities,[6] and the

Department.  (Dkt. No. 1.)  Plaintiffs filed the first amended complaint ("FAC") the following

month, seeking injunctive relief and alleging causes of action for: (i) violation of the APA, 5

U.S.C. § 706; (ii) *ultra vires* action; and (iii) violation of the equal protection guarantee under the

Fifth Amendment.  (Dkt. No. 23.)  Defendants moved to dismiss the FAC pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. No. 40.)  The Court granted dismissal of

Plaintiffs' *ultra vires* action and equal protection claims without prejudice and with leave to

amend.  (Dkt. No. 81 at 21.)  The Court dismissed Plaintiffs' APA claim with prejudice, however,

concluding that the 2017 Guidance did not constitute final agency action for purposes of judicial

review under the APA.  (*Id.*)

Plaintiffs filed the second amended complaint ("SAC") on October 31, 2018, alleging

---

[5] The language quoted from the 2014 Q&A tracks the confidentiality provisions in the 2001
Guidance, which provides that if a student requests "that his or her name not . . . be revealed [to
the accused party], the school should take all reasonable steps to investigate and respond to the
complaint consistent with the student's request as long as doing so does not prevent the school
from responding effectively to the harassment and preventing the harassment of other students."
(*See* Dkt. No. 136-2, Ex. A-3 at 48.)
[6] On June 25, 2018, Kenneth L. Marcus succeeded Candice Jackson as Assistant Secretary for
Civil Rights; he is automatically substituted as a party pursuant to Federal Rule of Civil Procedure
25(d).

equal protection and *ultra vires* action claims.  (Dkt. No. 86.)  Defendants moved to dismiss the SAC pursuant to Rules 12(b)(1) and 12(b)(6).  (Dkt. No. 95.)  Plaintiff then filed a motion for reconsideration of the Court's dismissal with prejudice of Plaintiffs' APA claim.[7]  (Dkt. No. 107.)  On March 29, 2019, the Court denied Defendants' motion to dismiss the SAC under Rule 12(b)(1) for lack of Article III standing but granted dismissal with prejudice as to the equal protection claim pursuant to Rule 12(b)(6) for lack of prudential standing.  (Dkt. No. 120 at 17.)  The Court also granted dismissal with prejudice as to Plaintiffs' *ultra vires* action claim because Plaintiffs "did not amend their complaint after being granted leave to amend, but instead re-pled the same facts and legal theories."  (*Id.* (internal quotation marks and citation omitted).)  The Court granted Plaintiffs' motion for reconsideration the same day, concluding that the Ninth Circuit's decision in *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179 (9th Cir. 2019) warranted reconsideration of the Court's October 2018 Order "to the extent it dismissed Plaintiffs' APA claim with prejudice."  (Dkt. No. 121 at 1.)  The Court directed Plaintiffs to file an amended complaint within 30 days of the Order.  (*Id.* at 12.)

Plaintiffs filed the third amended complaint ("TAC") on April 18, 2019, alleging arbitrary and capricious agency action in violation of the APA.  (Dkt. No. 123.)  The parties filed a joint case management statement on April 25, 2019, in which both parties requested to proceed with summary judgment briefing.  (Dkt. No. 124 at ¶¶ 4, 17.)  Following the case management conference on May 2, 2019, the Court issued a scheduling order that set deadlines for Defendants' production of the administrative record and the parties' respective motions for summary judgment.  (Dkt. No. 128.)  Defendants filed the administrative record on June 3, 2019.  (Dkt. No. 134.)  The parties' cross motions for summary judgment are fully briefed, (*see* Dkt. Nos.  136, 140, 141, 144), and the Court heard oral argument on October 17, 2019.

## DISCUSSION

Plaintiffs assert that the Court should enter judgment in their favor because they have satisfied the elements of their APA claim: (1) they have standing, (2) the 2017 Guidance

---

[7] Plaintiffs first sought leave to file the motion for reconsideration, (Dkt. No. 103), which the Court granted, (Dkt. No. 104).

constitutes final agency action, and (3) the 2017 Guidance is arbitrary and capricious.  (Dkt. No.

136 at 13-30.)  Defendants oppose Plaintiffs' motion and move for judgment in their favor on two

grounds: (1) the 2017 Guidance does not constitute final agency action and is therefore non-

reviewable under the APA; and (2) "the 2017 Guidance is not arbitrary or capricious."  (Dkt. No.

140 at 16.)

###### A.        Standing

The Court previously determined that Plaintiffs adequately alleged Article III standing to

pursue their APA claim, (*see* Dkt. Nos. 81 at 10-14 & 121 at 10-11), and Plaintiffs' declarations in

support of their motion for summary judgment continue to demonstrate standing, (*see* Dkt. No.

136-2, Exs. B-D).  Further, Defendants' cross motion for summary judgment does not challenge

the Court's prior rulings or set forth substantive arguments that Plaintiffs lack standing overall,

(*see* Dkt. No. 140 at n.5 ("While Defendants continue to dispute Plaintiffs' standing generally, in

light of the Court's prior rulings, this brief addresses only Plaintiffs' standing to challenge the

2017 Guidance's determination that mediation may be permissible in certain cases of alleged

sexual assault.")).  Thus, there is nothing in the record that changes the Court's previous rulings

regarding Plaintiffs' standing.  Accordingly, the Court incorporates by reference its prior analysis

and concludes that Plaintiffs have established Article III standing to pursue their APA claim.

###### B.        Final Agency Action

Under the APA, a plaintiff may seek judicial review of "final agency action for which there

is no other adequate remedy in a court."  5 U.S.C. § 704.  Determining whether an agency action is

"final" is a two-step process.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The action must

first "mark the consummation of the agency's decisionmaking process."  *Id.* (internal quotation

marks and citation omitted).  Next, "the action must be one by which rights or obligations have

been determined, or from which legal consequences will flow."  *Id.* at 178 (internal quotation

marks and citation omitted).

###### 1.        Consummation of Decision-Making

In determining whether a challenged agency action is "final" under the first prong of the

*Bennett* test, the Court must "look to see whether the agency has rendered its last word on the

United States District Court
Northern District of California

1    matter." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006)

2    (internal quotation marks and citation omitted).  In doing so, the Court must consider "the effect of

3    the action and not its label."  *Id.* at 985 (internal quotation marks and citation omitted). Thus, the

4    Court must "'focus on the practical and legal effects of the agency action' and interpret finality in

5    a 'pragmatic and flexible manner.'"  *Gill*, 913 F.3d at 1184 (quoting *Oregon Nat. Desert*, 465 F.3d

6    at 982).

7          The 2017 Guidance satisfies the first *Bennett* prong because it "mark[s] the consummation

8    of the agency's decisionmaking process."  *See Bennett*, 520 U.S. at 177-78.  As the Court

9    previously concluded:

10               [B]ecause the 2017 Guidance consummates the Department's
                 decision to rescind the previous guidance and thereby effect several
11               substantive changes, it reflects a definitive statement regarding the
                 Department's current Title IX enforcement policy. Whether the
12               Department intends to engage in future rulemaking does not affect the
                 finality of that particular decision. *See Fairbanks N. Star Borough v.*
13               *U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008)
                 (rejecting defendant's argument against finality that "conflate[d] one
14               . . . decision with a future yet distinct administrative process.").

15    (Dkt. No. 81 at 17.)  There is nothing in the record that changes the Court's previous

16    determination; indeed, the parties do not dispute that the 2017 Guidance satisfies the first *Bennett*

17    prong.  (*See* Dkt. Nos. 136 at 17 ("As to the first element of *Bennett*, the Court correctly held as a

18    matter of law that the [2017 Guidance] marks the consummation of the agency's decision-making

19    process.") & 140 at 17 (noting that "[a]t this juncture, it is necessary to address only the second

20    [*Bennett*] prong").)

21                              **2.     Legal Consequences**

22          The parties dispute whether Plaintiffs have established that the 2017 Guidance satisfies the

23    second *Bennett* prong—whether the action is "one by which rights or obligations have been

24    determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178.  In

25    addressing this prong in the October 2018 Order on Defendants' motion to dismiss, the Court

26    determined that the 2017 Guidance did not constitute final agency action because it did not

27    produce legal consequences.  (*See* Dkt. No. 81 at 16-20).  The Court concluded that the 2017

28    Guidance is not binding on schools and does not otherwise produce legal consequences, but

1    instead provides only "information" for schools regarding how OCR will assess a school's

2    compliance with Title IX and its implementing regulations.  (*Id.* at 18 (noting that "if a school is in

3    compliance with Title IX and its regulations, it need not change its policies in response to the 2017

4    Guidance").)  The Court dismissed Plaintiffs' APA claim with prejudice, concluding that "the

5    2017 Guidance does not satisfy the second *Bennett* prong as a matter of law."  (*Id.* at 21.)

6         As previously discussed, however, the Court subsequently granted Plaintiffs' motion for

7    reconsideration of that decision to the extent the Court dismissed the APA claim with prejudice.

8    (*See* Dkt. No. 121 at 12.)  The Court determined that reconsideration was warranted based on an

9    *Assurance of Compliance* issued by OCR in which signatory schools agree to comply with Title

10   IX and "[a]ll regulations, guidelines, and standards issued by the Department" in order to receive

11   federal funding.  (*See id.* at 6-9 (relying on *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1185 (9th

12   Cir. 2019) (holding that nonbinding policy guidelines related to a voluntary government program

13   can result in legal consequences under the second *Bennett* prong)); *see also* Dkt. No. 136-2, Ex. A-

14   1 at 9 ("OCR Assurance").)  The Court concluded that "[i]f the 2017 Guidance constitutes the type

15   of 'guidelines' referenced in the Assurance, then *Gill* supports Plaintiffs' contention that the

16   Guidance produces legal consequences; specifically, the potential termination of financial

17   assistance for failure to comply."  (Dkt. No. 121 at 7.)

18        In support of their motion for summary judgment, Plaintiffs reiterate the argument set forth

19   in their motion for reconsideration regarding the finality of the 2017 Guidance—both the OCR

20   Assurance and the Office of Management and Budget's *Assurance – Non-Construction Programs*

21   ("OMB Assurance")[8] encompass the 2017 Guidance and failure to comply with the Guidance

22   could thus result in termination of financial assistance.  (Dkt. No. 136 at 17-20.)  Defendants

23   counter that the 2017 Guidance does not produce legal consequences because neither the OCR nor

24

25   _____

     [8] The Court's March 2019 Order on Plaintiffs' motion for reconsideration did not address the
26   OMB Assurance because it "was issued in May 2017 and by its terms expired on September 30,
     2017."  (Dkt. No. 121 at 7 n.6 (citing
27   https://www2.ed.gov/admins/lead/account/stateplan17/revisededs18100576.pdf).)  In support of
     their motion for summary judgment, Plaintiffs submit a notice issued by OMB indicating an
28   "[e]xtension without change" of the OMB Assurance extending the expiration date to September
     30, 2020.  (*See* Dkt. No. 136-2, Ex. A-7 at 86.)  Thus, the OMB Assurance is still in effect.

OMB Assurance requires schools to comply with the 2017 Guidance.  The Court agrees.

### a.    OCR Assurance

The OCR Assurance states, in pertinent part:

> The applicant provides this assurance for the purpose of obtaining Federal grants, loans, contracts (except contracts of insurance of guaranty), property, discounts, funds made available through the U.S. Department of Education, or other Federal financial assistance from the Department. This assurance applies to all Federal financial assistance from or funds made available through the Department, including any that the applicant may seek in the future.

(Dkt. No. 136-2, Ex. A-1 at 9.)

By signing the OCR Assurance, applicants are required to comply with Title IX, among other statutes, as well as "[a]ll regulations, guidelines, and standards issued by the Department under any of these statutes." *Id.*  The OCR Assurance specifies that it "is binding on the applicant," and applicants "must comply" with it "to continue receiving Federal financial assistance from the Department." *Id.*  Thus, the OCR Assurance provides that if the applicant fails to comply, "the financial assistance can be terminated and the applicant can be declared ineligible to receive further assistance." *Id.*

### b.    OMB Assurance

Applicants for Department funding must also sign the OMB Assurance pursuant to section 8304 of the Elementary and Secondary Education Act of 1965 ("ESEA"), as amended by the Every Student Succeeds Act.  (*See* Dkt. No. 136-2, Ex. A-2 at 12, 16 (providing that "each State educational agency . . . that submits a consolidated State plan or individual program plan under the ESEA must have on file with the Secretary a single set of assurances" in order to receive Department funding); *see also* Dkt. No. 140-1 at ¶ 22 (declaration of William E. Trachman, former Deputy Assistant Secretary for Policy and Development and current Senior Counsel to the OCR, attesting that "[i]n addition to the OCR Assurance of Compliance, grant applicants must also complete the OMB Assurance").)  The OMB Assurance requires signatories to "comply with all Federal statutes relating to nondiscrimination," including Title IX, as well as "all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program."  (Dkt. No. 136-2, Ex. A-2 at 16-17.)

### c.     The Assurances do not require compliance with the 2017 Guidance

There is no dispute that schools must sign the Assurances to receive federal funding from the Department.  The parties instead dispute whether the Assurances require compliance with the 2017 Guidance at the risk of termination of federal funding.  The Court's March 2019 Order on Plaintiffs' motion for reconsideration addressed the legal effect of the OCR Assurance and Defendants' argument in opposition that the OCR Assurance did not require compliance with the 2017 Guidance.  The Order states, in pertinent part:

> Defendants' argument . . . can succeed at the motion to dismiss stage only if they have established as a matter of law that the 2017 Guidance is not the type of "guidelines" referred to in the Assurance. They have not. Attorney argument that the guidelines referred to in the Assurance do not encompass the 2017 Guidance does not meet Defendants' burden, especially on a motion to dismiss where all plausible inferences must be drawn in Plaintiffs' favor. Further, Defendants' identification of other guidelines that they contend are the type of guidelines contemplated by the Assurance, (*see* Dkt. No. 48 at 15), does not mean that as a matter of law the 2017 Guidance does not also constitute such "guidelines." Defendants' citation to the statute describing the administrative and judicial process for terminating federal funding, (*see* Dkt. No. 115 at 10), likewise does not satisfy their burden because it does not address the Assurance's affirmative statement that "financial assistance can be terminated and the applicant can be declared ineligible to receive further assistance" for failure to comply, *see* U.S. Dep't of Educ., *Assurance of Compliance*. **While a more fulsome record may establish that the 2017 Guidance is not encompassed by the Assurance,** the Court cannot conclude based on the current record that as a matter of law the Assurance does *not* encompass the 2017 Guidance and that the failure to follow the Guidance therefore *cannot* produce a legal consequence—withholding of federal funds for violating the Assurance.

(Dkt. No. 121 at 8-9 (emphasis added).)  The "more fulsome record" referenced in the Order is now before the Court.  And the record demonstrates that the 2017 Guidance does not produce legal consequences because as a matter of undisputed fact neither the OCR nor OMB Assurance requires compliance with the 2017 Guidance.

Defendants submit the declaration of William E. Trachman, former Deputy Assistant Secretary for Policy and Development and current Senior Counsel to the OCR.  (Dkt. No. 140-1 at ¶ 1.)  Mr. Trachman has been employed at the OCR since December 18, 2017, and his declaration is "based on [his] personal knowledge and information made available to [him] in the course of

[his] official duties." (*Id.* at ¶¶ 1, 3.)  Mr. Trachman's declaration attests to the Department's

administrative enforcement procedures and the statutory and regulatory authority underlying same.

(*Id.* at ¶¶ 7-13.)  In pertinent part, OCR first investigates Title IX complaints and attempts to

"achieve voluntary compliance." (*Id.* at ¶ 9.)  If the school does not comply voluntarily:

> OCR can effectuate compliance with Title IX in one of two ways: (1)
> It can initiate administrative proceedings to withhold further funds; or
> (2) it can refer the matter to [the Department of Justice ("DOJ")] with
> a recommendation to file a civil action to enjoin further violations (1
> and 2 collectively referred to as "enforcement action"). *See* 20 U.S.C.
> § 1682; 34 C.F.R. § 100.8(a)

(*Id.* at ¶ 10.)  "If OCR initiates an enforcement action, it would be based on Title IX and its

implementing regulations." (*Id.* at ¶ 14.)  This testimony is consistent with the 2017 Guidance,

which "states that the [G]uidance 'does not add requirements to applicable law,' and that

'enforcement efforts proceed from Title IX itself and its implementing regulations.'" (*Id.* (quoting

Dkt. No. 134-2, at 3 (2017 Letter), 10 (2017 Q&A)).)

Mr. Trachman attests that he "participated in the most recent development, review, and

issuance" of the OCR Assurance "[a]s part of [his] duties in OCR." (*Id.* at ¶ 17.)  He notes that

"OCR may use the signed assurances of compliance in an enforcement action" if OCR determines

that an applicant violated "Title IX, and all regulations, guidelines, and standards under the

statute." (*Id.* at ¶ 19.)  Regarding the scope of the OCR Assurance, Mr. Trachman attests:

> The terms "guidelines" and "standards" addressed in the Assurance
> of Compliance refer to certain notices or appendices that the
> Department published in the Federal Register or Code of Federal
> Regulations, or to specific standards in the regulations.  Examples
> include: *Guidelines for Eliminating Discrimination and Denial of
> Services on the Basis of Race, Color, National Origin, Sex, and
> Handicap, 34 C.F.R. pt. 100, Appendix B; Guidelines on current title
> IX requirements related to single-sex classes and schools*, 67 Fed.
> Reg. 31102-03, 31098-99 (2002) (issued pursuant to Section 5131(c)
> of the [ESEA], which required that the Secretary "issue guidelines for
> local education agencies" seeking funding for "programs to provide
> same-gender schools and classrooms").

(*Id.* at ¶ 20.)  Further:

> The Department's interpretation of the Assurance of Compliance is
> that the "regulations, guidelines, and standards issued by the
> Department under any of [the listed] statutes" to which the Assurance

United States District Court
Northern District of California

of Compliance refers do not include the 2017 Guidance. **Therefore, if OCR initiates an enforcement action under the Assurance of Compliance, it would proceed under Title IX and its implementing regulations, not the 2017 Guidance.**

(*Id.* at ¶ 21 (alteration in original) (emphasis added).)  As for the OMB Assurance, Mr. Trachman similarly attests:

> The Department's interpretation of the OMB assurance is that the "Federal laws, executive orders, regulations, and policies governing this program" to which the OMB assurance refers do not include the 2017 Guidance. **Therefore, if OCR initiates an enforcement action under the OMB assurance it would proceed under Title IX and its implementing regulations, not the 2017 Guidance.**

(*Id.* at ¶ 23 (emphasis added).)  In sum, Mr. Trachman's declaration establishes that the agency tasked with administratively enforcing compliance with Title IX does not consider the 2017 Guidance binding on signatories of either the OCR or OMB Assurances and OCR will *not* initiate an enforcement action based on violation of the 2017 Guidance.  On this record, failure to comply with the 2017 Guidance will not result in potential termination of federal funding.  In the absence of any legal consequences that flow from the 2017 Guidance, the Court must conclude that the Guidance does not constitute final agency action.

Plaintiffs argue that Mr. Trachman "provides *no* foundation for his conclusory assertions." (Dkt. No. 141 at 9.)  Plaintiffs also assert that whether the Assurances require compliance with the 2017 Guidelines "is determined pursuant to the federal common law of contracts, not one contracting party's post hoc assertions."  (*Id.* at 8.)  The Court disagrees on both scores.[9]

First, Mr. Trachman's declaration is based on his personal knowledge and official duties as Senior Counsel to the OCR, and his role in the "development, review, and issuance" of the OCR Assurance.  (*See* Dkt. No. 140-1 at ¶¶ 1, 3, 17.)  As such, he is qualified to state OCR's position

---

[9] Plaintiffs' reply requests, in a footnote, "the opportunity to submit a request for limited discovery" under Federal Rule of Civil Procedure 56(d) "[i]f the Court is inclined to rely on the Trachman Declaration to determine that the 2017 Policy is not final agency action."  (*See* Dkt. No. 141 at 9 n.2.)  The request is procedurally improper, however, because Rule 56(d) applies "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to summary judgment, Fed. R. Civ. P. 56(d), and Plaintiffs have not filed a declaration as required under the Rule.  Further, even apart from the lack of a declaration, Plaintiffs do not identify what facts they would discover or explain why such facts would preclude summary judgment in Defendants' favor.  *See Tatum v. City and Cty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

United States District Court
Northern District of California

regarding the legal effect of the 2017 Guidance.  *See* OMB, Final Bulletin for Agency Good

Guidance Practices, 72 Fed. Reg. 3,432, 3,436 (Jan. 25, 2007) (noting "the authority of agency

General Counsels . . . to provide legal interpretations of statutory and regulatory requirements").

Because the Department administratively enforces Title IX and its implementing regulations

through OCR, Mr. Trachman is similarly qualified to state whether OCR views the 2017 Guidance

as enforceable under the OMB Assurance.  *See id.*  Further, Mr. Trachman's declaration that OCR

enforcement actions "proceed under Title IX and its implementing regulations, not the 2017

Guidance," (Dkt. No. 140-1 at ¶¶ 21, 23), is supported by the plain language of the 2017

Guidance, which "states that the [G]uidance 'does not add requirements to applicable law,' and

that 'enforcement efforts proceed from Title IX itself and its implementing regulations[,]'" (*see*

Dkt. No. 134-2, at 3 (2017 Letter), 10 (2017 Q&A))).

Mr. Trachman's declaration is also supported by OMB and DOJ documents indicating that

guidance documents like the 2017 Guidance "do[ ] not create binding legal obligations or serve as

a basis for a noncompliance finding and federal funding termination."  (*See* Dkt. No. 140 at 18-19

(citing Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. at 3,436-37 (noting that

"a guidance document cannot legally bind [the public]" and "given their legally nonbinding

nature, significant guidance documents should not include mandatory language such as "shall,"

"must," "required" or requirement," unless the agency is using these words to describe a statutory

or regulatory requirement"); Mem. of the Attorney General, *Prohibition on Improper Guidance*

*Documents*, at 2 (Nov. 16, 2017) (noting that "the public has [no] obligations that go beyond those

set forth in the applicable statutes or legislative rules"), https://www.justice.gov/opa/press-

release/file/1012271/download; Mem. of the Associate Attorney General, *Limiting Use of Agency*

*Guidance Documents in Affirmative Civil Enforcement Cases*, at 1-2 (Jan. 25, 2018) (noting that

"[g]uidance documents cannot create binding requirements that do not already exist by statute or

regulation," and DOJ "may not use its enforcement authority to effectively convert agency

guidance documents into binding rules"); https://www.justice.gov/file/1028756/download).)

Plaintiffs challenge Mr. Trachman's statement that "[t]he terms 'guidelines' and

'standards' addressed in the Assurance of Compliance refer to certain notices or appendices that

the Department published in the Federal Register or Code of Federal Regulations, or to specific standards in the regulations," (*see* Dkt. No. 140-1 at ¶ 20), and argue that "extrinsic evidence confirms that the term 'guidelines and standards'" is not so limited, (*see* Dkt. No. 141 at 9-10).  In support, Plaintiffs note that "since 1976, DOJ has required every federal agency to publish 'guidelines for each type of program to which they extend financial assistance.'"  (*Id.* at 10 (quoting 41 Fed. Reg. 52,669, 52670 (Dec. 1, 1976) (codified at 28 C.F.R. § 42.404(a))).)  Plaintiffs assert that DOJ has provided "examples of guidelines in agency instructions, handbooks, and manuals, but nowhere suggested that guidelines must be published in the Federal Register." (*Id.* (citing Dkt. No. 141-1 at ¶¶ 7-11 (declaration of Seth M. Galanter, Senior Director at the National Center for Youth Law)).)

   In particular, Plaintiffs identify a DOJ publication titled "Procedures for the Development of Guidelines by Federal Agencies for Recipients of Federal Financial Assistance" (the "Procedures") that was referenced in a U.S. Commission on Civil Rights report issued in 1996. (*See* Dkt. No. 141-1, Ex. A-4 at 15-29.)  The Procedures note that federal agencies are required "to develop and publish Title VI guidelines for each type of program to which they extend financial assistance" pursuant to 28 C.F.R. § 42.404.  (*Id.* at 15.)  The Procedures also use the terms "guidance" and "guidelines" interchangeably, explaining that "[w]here the need for adequate guidance beyond agency regulations is present, agencies shall develop guidelines."  (*Id.* at 17.)

   That the Department (along with other agencies) is required to develop guidelines does not mean that such guidelines are legally binding.  Further, that the DOJ or even the Department itself has used the terms "guidelines" and "guidance" interchangeably does not create a genuine dispute as to Mr. Trachman's declaration or the OMB and DOJ documents stating that guidance documents themselves are not legally binding.  Indeed, the Procedures recognize that guidelines are "generally . . . essential for most agencies in order to provide meaningful direction" and "[t]he head of each department and agency administering programs of federal financial assistance is ultimately responsible for ensuring that all recipients are in compliance with all applicable laws and regulations."  (*See id.* at 17, 29.)  Thus, the Procedures demonstrate that "guidance" or "guidelines" provide *direction* regarding agency enforcement procedures, but recipients of federal

1    funds must ultimately comply with the underlying laws and regulations.

2         Plaintiffs also assert that "between 1977 and 1981" the Government Accountability Office

3    ("GAO") "equated the Department's 'policy guidelines and compliance standards' with

4    'guidance,' and made clear that documents could be guidelines and standards without being

5    published in the Federal Register." (Dkt. No. 141 at 10 (citing GAO, *The Office for Civil Rights*

6    *in the Departments of Education and HHS Have Improved the Management of Their Civil Rights*

7    *Enforcement Responsibilities*, HRD-82-21, at 4 (Nov. 27, 1981),

8    https://www.gao.gov/products/HRD-82-21; GAO, Review of the Department of Health,

9    Education, and Welfare's Office for Civil Rights, HRD-77-78, at 7 (Mar. 30, 1977),

10   https://www.gao.gov/products/HRD-77-78).)  However, evidence that another agency has long in

11   the past not limited the Department's "guidelines and standards" to information published in the

12   Federal Register does not bear on how the Department itself views the 2017 Guidance.  Nor does

13   it demonstrate that the Department treats the 2017 Guidance as legally binding under the

14   Assurances such that violation of the Guidance alone can serve as the basis for OCR enforcement

15   actions.  Plaintiffs' argument that "both before and after 1980, the Department described another

16   document promulgated by OCR as 'guidelines' even though it was not published in the Federal

17   Register," is similarly unavailing because it does not concern the 2017 Guidance.  (*See* Dkt. No.

18   141 at 10.)

19        Plaintiffs also fail to cite any evidence that OCR has initiated an administrative

20   enforcement action based on an alleged violation of the 2017 Guidance, or that OCR has authority

21   to do so under the Assurances.  Mr. Trachman's declaration, the OMB and DOJ documents

22   Defendants cite, and the 2017 Guidance itself, demonstrate instead that OCR does not have such

23   enforcement authority and agency enforcement actions must be predicated on violations of the

24   underlying statute and its implementing regulations.  Plaintiffs asserted at oral argument that they

25   have previously cited "numerous" instances in which OCR initiated enforcement actions against

26   schools for failure to comply with the 2011 and 2014 Guidance and directed the Court's attention

27   to "footnote 12" in their supplemental opposition to Defendants' motion to dismiss the FAC, (Dkt.

28   No. 68 at 10 n.12).  The footnote cites several pre-2017 Guidance "Resolution Agreements"

United States District Court
Northern District of California

United States District Court
Northern District of California

1   between schools and OCR stemming from OCR's informal resolution process in response to Title

2   IX complaints and following OCR's initial investigation.  (*See id.*)  Plaintiff is mistaken, however,

3   because the Resolution Agreements do not reflect administrative enforcement actions premised on

4   violations of the 2011 or 2014 Guidance.

5        The first cited Agreement, concerning the University of Notre Dame's Title IX grievance

6   policy's in effect in 2011, states, in pertinent part:

7           **The U.S. Department of Education, Office for Civil Rights**
    **(OCR), initiated this investigation with the University of Notre**
8           **Dame (the University), pursuant to Title IX of the Education**
    **Amendments of 1972 (Title IX), 20 U.S.C. §1681 et seq. and its**
9           **implementing regulation, 34 C.F.R. Part 106 (which prohibit**
    **discrimination based upon sex in any education program or**
10          **activity receiving Federal financial assistance).** The review
    examined the University's policies and procedures relating to peer
11          sexual harassment of students and the University's implementation of
    those policies and procedures. **This resolution has been entered into**
12          **voluntarily by the University and does not constitute a finding or**
    **admission that the University is not in compliance with Title IX**
13          **and/or its implementing regulations**.

14  Resolution Agreement, Univ. of Notre Dame & OCR, at 1,

15  https://www2.ed.gov/about/offices/list/ocr/docs/investigations/05072011-b.pdf (emphasis added).

16       The Agreement notes that "[i]n accord with the *recommendations* in the [2011 Letter] . . .

17  the University will conclude its Title IX investigations within" 60 days "of receipt of a complaint,

18  except in extraordinary circumstances." *Id.* at 8.  Further, the Agreement specifies that OCR may

19  monitor the school to ensure it "has fulfilled the terms of th[e] Agreement and is in compliance

20  with the regulations implementing Title IX, at 34 C.F.R. §§ 106.8, 106.9, and 106.31, which were

21  at issue in th[e] review." *See id.* at 9.  The Agreement does not state that OCR will monitor the

22  University to ensure compliance with the 2011 Letter.  Thus, the Agreement is not evidence that

23  OCR initiated an enforcement action based on a violation of the 2011 Letter as opposed to Title IX

24  and its implementing regulations.  At most, the Agreement indicates that OCR considers and

25  applies its Title IX enforcement guidance (i.e., recommendations) in initially investigating Title IX

26  complaints through its informal resolution process.

27       Similarly, the second Resolution Agreement cited by Plaintiffs states, in pertinent part:

28          Michigan State University . . . has entered into the following

1

2

> agreement with the U.S. Department of Education, Office for Civil
> Rights (OCR), to resolve the above-referenced complaints and **to
> ensure the University's compliance with Title IX of the Education
> Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and its
> implementing regulation, at 34 C.F.R. Part 106**.

3

4

5

> **This resolution has been entered into voluntarily by the
> University and does not constitute an admission by the University
> that it has failed to comply with Title IX or its implementing
> regulations.**

6    Resolution Agreement, MSU & OCR (Aug. 28, 2015), https://www2.ed.gov/documents/press-

7    releases/michigan-state-agreement.pdf (emphasis added).  The Agreement cites the 2014 Q&A in

8    discussing only one of the 30 "revised policies" the school planned to implement, (*see id.* at 4 n.2

9    ("As described in the April 29, 2014, OCR Questions and Answers on Title IX and Sexual

10   Violence")), and does not otherwise reference the 2011 Letter or 2014 Q&A.  Like the Notre

11   Dame Agreement, this Agreement notes that OCR will monitor the Agreement until it determines

12   that the school has fulfilled the Agreement's terms "and is in compliance with the regulation[s]

13   implementing Title IX, at 34 C.F.R. §§ 106.8, 106.9, and 106.31, which were at issue in th[e]

14   case." *Id.* at 21.

15          Plaintiffs next cite an October 2013 letter from OCR to State University of New York

16   ("SUNY") regarding a Title IX compliance review conducted by OCR and subsequent Resolution

17   Agreement.  (See Dkt. No. 68 at 10 n.12.)  The letter states, in pertinent part:

18

19

20

21

22

> OCR initiated this compliance review under Title IX of the Education
> Amendments of 1972 (Title IX), as amended, 20 U.S.C. §1681 et seq.,
> and its implementing regulation at 34 C.F.R. Part 106, which prohibit
> discrimination on the basis of sex in programs and activities receiving
> financial assistance from the Department.  SUNY is a recipient of
> financial assistance from the Department.   Therefore, OCR had
> jurisdictional authority to conduct this compliance review under Title
> IX.

23   Ltr. from Timothy Blanchard, OCR, to Nancy Zimpher, Chancellor, SUNY, at 1 (Oct. 31, 2013),

24   http://www.ed.gov/documents/press-releases/suny-new-york-letter.doc.  The letter notes that the

25   "the applicable legal standards described [t]herein are more fully discussed in [the 2011 Letter],"

26   and it also cites the 2001 Guidance. *Id.* at 2 n.2.  The letter goes on to discuss Title IX's

27   implementing regulations and what they "require," while also noting that the 2011 Letter states

28   that schools "*should* notify all students and employees of the [email] address of the Title IX

United States District Court
Northern District of California

Coordinator." *Id.* at 3 (emphasis added).  The letter further references the 2011 Letter by noting that SUNY's procedures for investigating complaints of sex discrimination did not "state that mediation of sexual assault complaints is prohibited, as recommended by OCR's [2011 Letter]." *Id.* at 18.  The letter states that it "is not a formal statement of OCR policy," but provides that "OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement." *Id.* at 22.

The last cited document is a November 2014 letter from OCR to Princeton, which references a Resolution Agreement following an OCR compliance review.  *See* Ltr. from Timothy Blanchard, OCR, to Christopher L. Eisgruber, President, Princeton Univ. (Nov. 5, 2014), https://www2.ed.gov/documents/press-releases/princeton-letter.pdf.  Like the SUNY letter, the Princeton letter states, in pertinent part:

> OCR is responsible for enforcing Title IX, as amended, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in education programs and activities receiving financial assistance from the Department. The University is a recipient of financial assistance from the Department. Therefore, OCR has jurisdictional authority to investigate this complaint under Title IX.

*Id.* at 2.  Also like the SUNY letter, the Princeton letter states that "the applicable legal standards described [t]herein are more fully discussed in [the 2011 Letter and 2014 Q&A]," and it also cites the 2001 Guidance.  *Id.* at 3 n.2.  Again, like the SUNY letter the Princeton letter discusses Title IX's implementing regulations and what they "require," while also noting that the 2011 Letter states that schools "*should* notify all students and employees of the [email] address of the Title IX Coordinator." *See id.* at 7 (emphasis added).  The letter further references "requirements articulated" in the 2011 Letter, "including recipients' use of the preponderance of the evidence legal standard." *See id.* at 19 n.15.  Like the SUNY letter, the Princeton letter states "[i]f the University fails to implement the Agreement, OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement." *Id.* at 22.

Although the SUNY and Princeton letters state that OCR "may initiate enforcement or judicial proceedings to enforce" the Resolution Agreements, they do not support an inference that OCR can or has initiated an enforcement proceeding to terminate funding based on violation of the

United States District Court
Northern District of California

2017 Guidance for two reasons.  First, the Resolution Agreements and SUNY and Princeton letters predate both the 2017 Guidance and the previously discussed OMB and DOJ documents stating that guidance documents cannot serve as a basis for Title IX noncompliance and termination of federal funding.  *See Final Bulletin for Agency Good Guidance Practices*, 72 Fed. Reg. at 3,436-37 (noting that "a guidance document cannot legally bind [the public]" and "given their legally nonbinding nature, significant guidance documents should not include mandatory language such as 'shall,' 'must,' 'required or requirement,' unless the agency is using these words to describe a statutory or regulatory requirement"); Mem. of the Attorney General, *Prohibition on Improper Guidance Documents*, at 2 (Nov. 16, 2017) (noting that "the public has [no] obligations that go beyond those set forth in the applicable statutes or legislative rules"), https://www.justice.gov/opa/press-release/file/1012271/download; Mem. of the Associate Attorney General, *Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases*, at 1-2 (Jan. 25, 2018) (noting that "[g]uidance documents cannot create binding requirements that do not already exist by statute or regulation," and DOJ "may not use its enforcement authority to effectively convert agency guidance documents into binding rules"); https://www.justice.gov/file/1028756/download).  Because the Resolution Agreements concern the rescinded guidance and reflect an approach to guidance documents that appears outdated based on Mr. Trachman's declaration and the OMB and DOJ documents cited above, they do not raise a genuine dispute of material fact as to the legal effect of the 2017 Guidance.

Second, as Plaintiffs recognized in their August 2018 supplemental briefing, Title IX's implementing regulations "require OCR to try to resolve any violation through informal means, i.e., a resolution agreement between the school and OCR; *only if that is unsuccessful may OCR initiate formal administrative proceedings to withhold funds*."  (Dkt. No. 68 at 8 (emphasis added) (citing 34 C.F.R. § 106.71).)[10]  Thus, Plaintiffs' reliance on the Resolution Agreements is

---

[10] Plaintiffs' characterization of the OCR administrative enforcement process is consistent with Mr. Trachman's declaration.  (*See* Dkt. No. 140-1 at ¶¶ 7-13 (noting that OCR first attempts to achieve voluntary compliance with Title IX through its informal resolution process and initiates an "enforcement action" (i.e., formal administrative proceedings to withhold funding or referral to DOJ) only if the informal process is unsuccessful).)

unavailing because those documents concern OCR's compliance review and informal resolution process, not an administrative enforcement action. The documents indicate that OCR considers its Title IX enforcement guidance in initially investigating Title IX complaints through its informal resolution process, but that evidence is not the same as evidence demonstrating that OCR has the authority to initiate formal administrative proceedings (i.e., an *enforcement action*) to withhold funds based on violation of OCR guidance. Indeed, Mr. Trachman attests that if a school does not voluntarily comply during the informal resolution process, OCR "can initiate administrative proceedings to withhold further funds," or it "can refer the matter to DOJ." (*See id.* at ¶ 10.) Such actions are "collectively referred to as "enforcement action." (*Id.* (citing 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a)).) Further, "if OCR initiates an enforcement action under [either the OCR or OMB Assurance] it would proceed under Title IX and its implementing regulations, not the 2017 Guidance." (*See id.* at ¶¶ 21, 23.) Defendants have submitted evidence that OCR does not have the authority to initiate an enforcement action based on noncompliance with guidance documents, and Plaintiffs point to no evidence that OCR has done so.

Plaintiffs assert in a footnote that the practical effects of the 2017 Guidance "support a finding of finality." (*See* Dkt. No. 136 at 19 n.3 (noting that "schools across the U.S. have changed their own policies and practices to comply with the [2017 Guidance]") (citing *Gill*, 913 F.3d at 1185).) However, in the absence of any legal consequences, the practical effects of the 2017 Guidance are insufficient to establish finality. As the Court explained in its March 2019 Order on Plaintiffs' motion for reconsideration, the practical effects noted in *Gill* "were not entirely independent of the legal consequences" that the *Gill* court also determined existed in that case. (*See* Dkt. No. 121 at 6, 9-10 ("The [*Gill*] court's holding regarding finality based on the practical effects of the Functional Standard relied on the same grounds as the court's holding regarding finality based on the Functional Standard's legal consequences—the existence and effect of the eGuardian User Agreement.").) Here, there are no legal consequences. As for the practical effects evinced by several schools changing their policies in response to the 2017 Guidance, (*see* Dkt. No. 136-2, Exs. A-4 – A-6 at 71-84), the Court has previously noted that "voluntarily changing a policy in response to an agency's nonbinding enforcement guidance is not

23

the same as being required to do so by the guidance itself," (*see* Dkt. No. 81 at 18).

Plaintiffs' reliance on *Gill* with regard to the legal effect of the 2017 Guidance is also unavailing.  (*See* Dkt. No. 141 at 11 (arguing that "the relevant question is not whether the government *will* enforce the assurances, but whether it *can*").)  As the Court previously noted, in *Gill* "the government conceded at the summary judgment stage that 'once an agency decides to participate, the eGuardian User Agreement permits the Department to revoke agency membership for violating various policies, including the [challenged agency action].'" (Dkt. No. 121 at 8 (quoting *Gill*, 913 F.3d at 1185 (finding that the eGuardian membership revocation is a legal consequence for purposes of establishing finality under the second *Bennett* prong)).)  Here, Defendants expressly represent that violation of the 2017 Guidance *cannot* result in an OCR enforcement action and potential termination of federal funding because OCR has no legal authority to enforce the Guidance through the Assurances; Defendants support that argument with Mr. Trachman's declaration and citation to OMB and DOJ documents stating that guidance documents like the 2017 Guidance cannot serve as the basis for enforcement actions.  And the 2017 Guidance itself states that it does not create any new requirements.  Thus, unlike the challenged agency action in *Gill*, the 2017 Guidance does not "impose[ ] direct and appreciable legal consequences" because the government *cannot* "take enforcement actions against a non-complying" school under the Assurances based on a violation of the Guidance.[11]  *See Gill*, 913

---

[11] Plaintiffs argue in a footnote that the 2017 Guidance is final agency action because it "'imposes obligations on the agency,' regardless of 'whether it imposes obligations on Plaintiffs' or other third parties." (Dkt. No. 141 at 12 n.6 (quoting *Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019)).)  Plaintiffs assert that the 2017 Guidance "meets this standard because agency staff are obliged to follow the [Guidance] in enforcing Title IX and its regulations." (*Id.*)  However, as the court noted in *Sierra Club*, challenged agency actions are final under *Bennett* if "they 'alter[ed] the legal regime to which the agency [wa]s subject." 929 F.3d at 698 n.23 (alterations in original) (quoting *Bennett*, 520 U.S. at 177).  Here, the 2017 Guidance does not alter the relevant *legal* regime because the record demonstrates that OCR does not have the legal authority to proceed with an enforcement action against a non-complying school under the Assurances based on a violation of the 2017 Guidance.  Nor does the Guidance otherwise affect OCR's legal obligations in ensuring that schools comply with Title IX and its implementing regulations.  *See, e.g.*, Mem. of the Associate Attorney General, *supra*, at 2 (noting that "agency guidance documents cannot create any additional *legal* obligations") (emphasis added).  Plaintiffs' reading of *Sierra Club* would render virtually any agency action as "final" so long as it directed agency staff to follow procedures in the course of their duties.  The Court rejects such an expansive reading of the footnote in *Sierra Club*.

F.3d at 1185.

*** 

Because Plaintiffs fail to establish a necessary element of their APA claim, specifically, that the 2017 Guidance constitutes final agency action, their motion for summary judgment fails. Conversely, Defendants provide evidence that the 2017 Guidance is not final agency action because it does not produce legal consequences, and Plaintiffs fail to rebut Defendants' evidence with evidence of their own that gives rise to a genuine dispute of material fact on that score. Accordingly, summary judgment on Plaintiffs' APA claim is warranted in Defendants' favor.

## CONCLUSION

For the reasons stated above, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion.

**IT IS SO ORDERED.**

Dated: November 1, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge